Agreement.[148]  The evidence demonstrates that all of the episodes that were part of this June 2008 Polvision agreement were broadcast prior to entry into the SEI/TVP Settlement Agreement.[149]

> **C.    SEI Has No Claim For The August 31, 2009 Licensing Agreement Because TVP Received From Polvision The Countersigned TVP/Polvision Licensing Agreement After The SEI/TVP Settlement Agreement Was Signed And Immediately Sought In Good Faith To Address Any Potential Conflicts With The Settlement Agreement**

19.    SEI's second Polvision-related claim relates to the August 31, 2009 Licensing Agreement TVP entered with Polvision under which TVP licensed the subsequent episodes of the programs TVP had previously licensed to Polvision in the March and June 2008 agreements. Nadolna's declaration relates the history of the negotiations and signature of the August 31, 2009 TVP/Polvision Licensing Agreement.[150]

20.    As Nadolna explains, TVP signed and sent what would become the August 31, 2009 TVP/Polvision Licensing Agreement to Polvision on July 2, 2009, nearly two months before the Settlement Agreement was eventually signed.  Under the terms of the TVP/SEI 1994 Agreement then in effect, as with the June 2008 agreement, nothing prevented TVP from licensing reruns of *TVP Polonia* programming content to Polvision because SEI only had "one-off use" rights.  Since all of the episodes included in the new licensing agreement with Polvision had already appeared on *TVP Polonia*, TVP did not breach the 1994 Agreement by entering into the new agreement with Polvision TVP sent to Polvision on July 2, 2009.

21.    Though TVP sent the agreement to Polvision for signature on July 2, 2009, Polvision's Kotaba was on vacation and did not countersign the agreement until his return. TVP viewed the agreement, governed by Polish law, as already binding upon TVP and began to perform by recording the licensed episodes and sending them to Polvision.  In Polvision's view too, the agreement was binding upon TVP when TVP sent it to Polvision on July 2, before Kotaba countersigned the agreement.[151]  Polvision understood that the reason TVP began sending Polvision episodes of series licensed in the agreement before Polvision countersigned the licensing agreement was because TVP was already bound by the agreement and thus obligated to perform.[152]

22.    On August 31, 2009 Polvision returned the countersigned agreement.[153]  In the meantime, TVP had entered into the August 11, 2009 Settlement Agreement with SEI.  Although

---

[148]  *Spanski Enterprises v. Telewizja Polska*, 2013 WL 81263, at * 4-5.

[149]  *See* TVP Trial Ex. 63 – Supplemental Expert Report of Tim Hart, dated May 16, 2012 ("Hart Supp. Report"), ¶ 25.

[150]  *See* Findings of Fact, ¶¶ 28-45.

[151]  November 14, 2011 Deposition of Walter Kotaba ("Kotaba Dep. Tr.") 116:22-118:3.

[152]  Kotaba Dep. Tr. 139:2-141:7.

[153]  Findings of Fact, ¶ 43.

the Settlement Agreement expanded SEI's rights to repeats of the *TVP Polonia* programming content and prevented TVP from distributing *TVP Polonia* as another renamed channel, TVP did not believe that the Settlement Agreement precluded TVP from licensing individual programming to Polvision.

23.     Nevertheless, after having sent many episodes to Polvision, TVP acted in good faith to deal with SEI's concerns (although they were not justified).  TVP sought terminate the Polvision agreement, tried to reach a financial resolution with Polvision, and spent extensive time and effort to try to find replacement programming to license to Polvision that had never been shown on *TVP Polonia*.[154]  Kotaba  testified that throughout TVP's efforts to terminate and modify the new Polvision agreement, Polvision would not agree because it viewed the agreement with TVP to be binding and Polvision had the right to broadcast the licensed episodes.[155]  Eventually, however, Polvision agreed to accept TVP's offer of replacement programming.

24.     The efforts TVP undertook in good faith to attempt to comply with SEI's interpretation of the Settlement Agreements are all that TVP was required to do in the circumstances.  The timing of Polvision's return of the countersigned agreement was beyond TVP's control, and once TVP had sent the episodes to Polvision TVP could not prevent Polvision from broadcasting them.  Thus, even if SEI is correct that the Settlement Agreement— signed between when TVP signed and Polvision signed the August 31, 2009 TVP/Polvision Licensing Agreement— prevented TVP from licensing the individual episodes to Polvision, TVP is not liable to SEI for the episodes that Polvision broadcast under that agreement.

**D.     SEI Has No Claim Relating To The July 2010 Annex Because None Of The Episodes Included In The Annex Were Broadcasted On *TVP Polonia***

25.     SEI's last claim relating to TVP's agreements with Polvision concerns the episodes that TVP licensed to Polvision in the July 2010 Annex to replace the episodes TVP had licensed to Polvision in the August 31, 2009 TVP/Polvision Licensing Agreement.

26.     SEI does not dispute that these episodes had never appeared on *TVP Polonia*.  The only basis for SEI's claim relating to these episodes is that some of the episodes (of *Klan* and *Plebania*) that TVP licensed to Polvision were episodes of a series of which other episodes had previously appeared on *TVP Polonia*.  Nothing in the parties' agreements gives SEI rights to all episodes of a series that had appeared on *TVP Polonia* when the individual episodes at issue have never appeared on *TVP Polonia*.

**E.     SEI Has No Claim Relating To The Canadian Litigation Because TVP Never Agreed To Join A Litigation Against A Third Party, Especially Where SEI Is Claiming Distribution Rights That TVP Disputes**

27.     SEI's second breach of contract claim is that TVP breached by failing to join a litigation SEI has been pursuing in Canada against an alleged unauthorized distributor of other

---

[154]  Findings of Fact, ¶¶ 46-61.

[155]  Kotaba Dep. Tr. 84:6-16; 96:3-8.

A-173

TVP channels (*TVP 1*, *TVP 2*, etc.).  SEI claims its legal fees could have been avoided if TVP had joined the litigation, and it seeks reimbursement from TVP for all of its legal fees.

28.     This claim suffers from the same fundamental problem as SEI's Polvision claim.  SEI is claiming a contractual right that SEI does not have. A party bringing a breach of contract claim must prove the contractual right it has that the other party has breached.  *Diesel Props*, 631 F.3d  at 52 (listing elements of breach of contract claim). TVP has never agreed to join SEI in litigation against third parties; nor did TVP ever agree to fund SEI's legal fees for such a litigation.

29.     Nowhere in TVP's agreements with SEI is there any obligation for TVP to join a litigation by SEI against a third party.  The parties could have specified such an obligation but did not do so.  Spanski acknowledged the absence of any contractual obligation for TVP to join such a litigation.[156]  To the contrary, in the 1999 Addendum to the 1994 Agreement, TVP specifically designated SEI as its representative in the Territory to protect against unauthorized distribution of TVP programming.[157]  While TVP agreed to provide "appropriate support" to SEI, TVP never agreed to join SEI in a litigation, much less to fund SEI's legal fees.

30.     As Nadolna explains, not only did TVP never agree to join SEI in a litigation against a third party or to pay SEI's attorney's fees for such an action, TVP had good reason not to join the Canadian litigation against IMB.[158] As described above, at the center of the Canadian litigation is the very issue in dispute between TVP and SEI – whether SEI's exclusive distribution rights are limited to the *TVP Polonia* channel as a unit of programming, and whether SEI has rights to all individual programming on *TVP Polonia* such that another distributor may not distribute other *TVP Polonia* channels that contain programming that also appears on *TVP Polonia*.[159]  TVP would not join SEI's litigation against IMB when TVP disagrees with the distribution rights SEI is claiming in that lawsuit.

31.     SEI has the exclusive right to distribute the *TVP Polonia* channel in the Territory.  To the extent that the Canadian litigation concerns SEI's rights to distribute the *TVP Polonia* channel, SEI can protect its rights against IMB without TVP's participation in the lawsuit.  Short of  participating in the lawsuit, TVP has offered to support SEI in any reasonable way;[160] Spanski could not identify any information or evidence that SEI asked TVP for that TVP did not provide.[161]

32.     SEI's experts have not offered an opinion that TVP was obligated to join the litigation.  Shulman simply added up SEI's invoices from SEI's Canadian lawyer Casey Chisick

---

[156]  Spanski Dep. Tr. 218:2-7.

[157]  TVP Trial Ex. 2, amendment No. 5 adding a new Section 7.

[158]  Nadolna Decl. ¶¶ 71-86.

[159]  Findings of Fact, ¶¶ 69-71.

[160]  Nadolna Decl. ¶ 74.

[161]  Spanski Dep. Tr. 224:10-14.

to calculate SEI's damages claim; he offered no opinion as to whether SEI is actually entitled to receive payment for its Canadian legal fees.[162]

33.    SEI's claim fails because again SEI seeks to impose upon TVP an obligation to which TVP has never agreed.  TVP has provided the "appropriate support" called for under the TVP/SEI agreement, but this term does not reasonably include assuming the substantial expense of SEI's lawsuit, nor adopting SEI's incorrect view of the rights it holds under the TVP/SEI agreement.  TVP has no contractual obligation to pay any of SEI's legal fees.

**F.     SEI Has No Claim Relating To *Klan* Because TVP Has Exclusive Control Over Its Programming Decisions**

34.    SEI third claim is that TVP breached its agreements with SEI by removing the long-running *Klan* program from the *TVP Polonia* channel.  SEI claims that TVP did so in response to SEI's June 24, 2010 filing of its original Complaint in this action in order to include subsequent *Klan* episodes in the replacement programming TVP licensed to Polvision as part of the July 2010 Annex.

35.    This claim suffers from the same problem as SEI's first two claims. SEI cannot point to any contractual right it has that TVP has breached.  As explained above, SEI has no right to control TVP's editorial decisions.  The 1994 Agreement specifies that TVP has unequivocal control over its programming decisions, and SEI acknowledges TVP's exclusive editorial control on its website.[163]  Absent a clear contractual right, SEI has no claim for breach.

36.    As explained above, the reasons for TVP's removal of the *Klan* program, though not relevant to TVP's liability for removing *Klan* because TVP has exclusive control over its editorial decisions, disprove SEI's claim that TVP did so in response to SEI's original filing in this case.  As Nadolna recounts, TVP decided to remove *Klan* from its programming lineup due to increasingly declining ratings (typical for soap operas) and to free up time for other programming required by Poland's Ministry of Foreign Affairs.[164]  TVP made that decision as part of its regular quarterly programming review process due to declining viewer interest in *Klan* and to make time available for other programming required by the Polish government.  This occurred two months before SEI sued TVP.[165]

37.    TVP did not breach its agreements with SEI by exercising its sole prerogative to edit the content of a television channel it produces.  SEI's claim for breach of contract should be dismissed because SEI has failed to show any contractual right that TVP has breached.

---

[162]   Shulman Dep. Tr. 192:17-193:13.

[163]   *See* Findings of Fact, ¶¶ 77-78.

[164]   *Id.* ¶¶ 79-82.

[165]   *Id.*

## II.    Even If TVP Did Breach Its Agreements With SEI, As To Each Of Its Claims For Breach of Contract SEI Has Failed To Prove Damages

38.    Even if the Court were to conclude that TVP violated its agreements with SEI through the June 2008 TVP/Polvision Barter Agreement, the August 11, 2009 TVP/Polvision Licensing Agreement, or the July 2010 Annex, SEI has not sustained any damages and should not prevail on its Polvision claim.

### A.    SEI's Damages Theory For Its Polvision Claim Is Incorrect Because SEI Has No Right To Distribute TVP Programming On An Individual Basis And Had Never Done So In The 18 Years It Has Been Distributing *TVP Polonia*

39.    As explained above, SEI's initial theory of damages for its Polvision claim was a lost profits theory based upon television and Internet subscribers SEI had allegedly lost as a result of TVP's agreements with Polvision.[166]  SEI attempted to show a causal link between alleged subscriber losses to SEI's distribution and the Polvision agreements.

40.    SEI apparently realized that it could not make a connection between any subscriber losses and TVP's licensing of programming to Polvision.  Its damages theory then changed.[167]  Instead of damages based on alleged lost subscribers, SEI now seeks lost profits damages based upon the purported value of the programming TVP licensed to Polvision, under a theory that SEI could have realized that value as profits.

41.    The premise for SEI's revised Polvision damages theory is incorrect.  As with its claims for breach of contract, SEI's new theory relies upon SEI having rights it has never received under the parties' agreements.  SEI's theory is based upon the notion that not only does SEI have distribution exclusivity to individual *TVP Polonia* programming but also the exclusive right to syndicate such individual programming to other networks for broadcast.  SEI claims it lost profits from such missed opportunities because TVP licensed content to Polvision.

42.    SEI has no right to syndicate individual programming to other networks or channels.  Nothing in the 1994 Agreement gives SEI that right.  SEI has the right only to distribute the *TVP Polonia* channel as a unit of broadcasting as that channel is broadcasted by TVP.  SEI attempts to read syndication rights into a contract that does not provide for them.  Where, the language of an agreement is clear, it should "be given effect in spite of one party's claim that something else was intended."  *Spanski Enterprises. v. Telewizja Polska*,  2013 WL 81263, at *5.

43.    TVP's industry expert Arlen describes in detail the various clauses in the parties' agreements he relies upon for his conclusion that "TVP has granted SEI the exclusive right to distribute for broadcasting the entire content of the TV Polonia and TVP Info channels," and that

---

[166]    *See id.* ¶¶ 62-65.

[167]    *Id.*

"SEI has no right to facilitate the secondary transmission of any individual programming on TV Polonia or TVP Info via syndication."[168]

- The *TVP Polonia* and *TVP Info* "Signal" - For the purposes of implementing SEI's right to the one-off use of *TVP Polonia* shows, TVP granted SEI the exclusive right to "receive and use the Signal (defined as the signal of *TVP Polonia* and *TVP Info* programming service broadcast by TVP via Satellite) in the Territory."[169]  This contract wording demonstrates that SEI is granted rights to the full *TVP Polonia* and *TVP Info* signals, not syndication of individual programming available as part of those signals.

- "Broadcasting" – The Agreements refer throughout to SEI's "broadcasting" of the *TVP Polonia* and *TVP Info* programming services in the Territory, not syndication of individual programming that constitutes the programming services.[170]

- Royalty Payments to TVP – The Agreements specify that SEI is to pay TVP 8 percent of royalties SEI earns from subscriber revenue and advertisements.  There is no mention of royalties to be paid by SEI from revenues SEI would earn from syndicating TVP programming.[171]

- SEI's Distribution Rights: Satellite and Cable Distributors –  The Settlement Agreement refers to SEI's rights to distribute *TVP Polonia* and *TVP Info* through SEI affiliates or third-party satellite or cable distributors.[172]  There is no mention of SEI syndicating content (i.e., individual programs) from *TVP Polonia* or *TVP Info* to television networks or channels such as Polvision.

- SEI's Distribution Rights: *TVP Polonia* and *TVP Info* as Whole Channels – The Settlement Agreement refers throughout to SEI's right to distribute *TVP Polonia* and *TVP Info* as whole channels, not to the syndication of individual programming.[173]

44.     As TVP's expert Arlen explains, his evaluation of business practices for programming distribution in North America led him to conclude that companies contract for distribution rights on a number of levels including whether they can syndicate individual programs or only have the right to distribute channels as a unit.[174]  The arrangement between SEI

---

[168]  TVP Trial Ex. 64 – Supplemental Expert Report of Gary Arlen, dated May 16, 2012 ("Arlen Supp. Report"), pgs. 1-4.

[169]  TVP Trial Ex. 1, Section 2.

[170]  *Id*., as amended by TVP Trial Exs. 2-3, Sections 4, 5, and 8; TVP Trial Ex. 16,  Clause II.D.

[171]  *Id*., Section 6; TVP Trial Ex. 16, Clause II.G.

[172]  TVP Trial Ex. 16, Clause II.C.

[173]  *Id*. Clauses II.A, B, C, D, F, and I.

[174]  TVP Trial Ex. 64, pg. 3; Arlen Dep. Tr. 233:12-234:3.)

and TVP, he says, is a "channel agreement," not an arrangement whereby SEI can distribute individual programming.[175] Notably, SEI's industry expert Larry Gerbrandt has not offered any opinion on whether SEI had the right to syndicate individual programming.[176]

45.     As SEI did not have the right under the parties' agreements to syndicate individual *TVP Polonia* programming, it cannot claim 'lost profits' resulting from TVP licensing individual programming to Polvision. Such profits were necessarily not within the contemplation of SEI and TVP when they made their contracts. A plaintiff seeking lost profits damages must prove that such damages "were within the contemplation of the parties when the contract was made." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2002). SEI did not lose an opportunity for profits to TVP, because SEI had no such opportunity. SEI's damages expert Shulman acknowledged at his deposition that if SEI did not have the right to syndicate individual content to other networks, his damages theory would not work.[177]

46.     Consistent with the understanding that it has only channel (not individual program) distribution rights under the parties' agreements, SEI has <u>never</u> syndicated individual programming content to another channel during the more than eighteen years that SEI has been distributing TVP programming. SEI cannot claim lost profits from syndication where it has never syndicated a single TVP program. It cannot claim lost profits it could have not and would have not ever earned. SEI's expert Shulman agreed at his deposition that if he was performing a financial projection for SEI, he would not include syndication as a source of potential revenue if it was clear that SEI was not syndicating programming.[178]

47.     This is the first case in which Shulman has offered this kind of lost profits theory.[179] And although Shulman has never offered an expert report in a case involving media-related litigation, it is not surprising that in his practical experience he has never heard of this kind of lost profits theory being offered.[180] As TVP's damages expert Tim Hart explains: "Shulman cannot properly claim that but-for TVP's licensing to Polvision, SEI would have made these licensing 'profits,' because SEI had no ability to make such profits."[181]

48.     SEI's new damages theory for Polvision grounded in lost profits based upon the syndication value of the programming TVP licensed to Polvision is without merit. SEI already recognized that its original damages theory grounded in lost subscribers was baseless. The new theory SEI advances is no better.

---

[175]   TVP Trial Ex. 64, pg. 3.

[176]   June 19, 2012 Deposition of Larry Gerbrandt ("Gerbrandt Dep. Tr.") 116:6-117-3.

[177]   Shulman Dep. Tr. 50:13-51:16.

[178]   *Id*.. 73:15-76:10.

[179]   *Id*. 65:24-66:4.

[180]   *Id*. 67:7-13.

[181]   TVP Trial Ex. 63 – Hart Supp. Report, ¶¶ 18-21.

49.     However, even if the Court concludes that, despite SEI's legal inability under the parties' agreement to syndicate individual content and the fact that SEI has never done so since the parties reached their agreement in 1994, SEI can seek damages based upon lost syndication profits, the Court should reject SEI's damages calculations as exaggerated and improper.

**B.     For SEI's Polvision Claim, SEI's Expert Uses An Incorrect Number of Episodes For Each Of His Three Alternative Damages Schemes**

50.     SEI's damages theory for its Polvision claim, offered by Shulman, is grounded in assigning a value (based upon either an industry standard market value, the market value stated in the agreement, or the amount actually paid under the agreement) to each of the episodes that TVP licensed to Polvision.  SEI claims it is entitled to the value of those episodes as lost profits.

51.     For each of these three damages schemes, Shulman applies a per-episode value to 860 episodes which he says should form the basis for SEI's damages claim.  These 860 episodes consist of episodes from the three TVP/Polvision agreements:  (1) June 27, 2008 TVP/Polvision Licensing Agreement; (2) August 31, 2009 TVP/Polvision Licensing Agreement; and (3) July 16, 2010 Annex to the August 31, 2009 Licensing Agreement.[182]

52.     TVP's damages expert Hart explains why the 860 episodes used by Shulman is an incorrect number of episodes to be used as the basis for Shulman's three alternative schemes.[183]

53.     First, Shulman uses 100 of the 200 episodes included in the June 27, 2008 TVP/Polvision agreement, using the groundless assumption that as of August 2009 (for prior periods the Court has restricted damages claims per the Settlement Agreement), Polvision had broadcast half of the 200 episodes.[184]  There is no basis for Shulman's assumption.  The June 27, 2008 agreement limited Polvision's broadcast to one showing and one re-run within a twenty-four hour period for the 200 licensed episodes of *Na Dobre* and *Plebania* (Nos. 1-100).  In the August 31, 2009 TVP/Polvision Licensing Agreement, TVP licensed the subsequent episodes of those two series in response to Polvision's request for the next episodes of those series because Polvision had run out of episodes and did not want to interrupt its programming.[185]  TVP cannot, under any theory, be liable for damages for 100 of the episodes that were part of the June 2008 TVP/Polvision agreement.[186]  SEI has not put forward any evidence that even one of the 200 licensed episodes, much less 100 episodes, had been broadcast by Polvision after August 2009.

54.     Schulman also improperly includes in his 860 episodes the 545 episodes from the July 2010 Annex to the August 31, 2009 TVP/Polvision Agreement.  As explained, the whole purpose of the July 2010 Annex was to substitute content TVP had licensed to Polvision with content that had never appeared on *TVP Polonia*.  None of these 545 episodes had ever been

---

[182]   Expert Report of Stephen Shulman, dated April 16, 2012 ("Shulman Report"), ¶¶ 52, 54, 58.

[183]   TVP Trial Ex. 63, ¶¶ 23-27.

[184]   *See*, *e.g.*, Shulman Report, ¶ 54.

[185]   TVP Trial Ex. 14.

[186]   TVP Trial Ex. 63, ¶ 25.

shown on *TVP Polonia*.[187]  SEI had no arguable rights to these episodes.  Shulman acknowledged at his deposition that if SEI had no rights to the 545 episodes that are part of the July 2010 Annex, then those episodes should not be included in the damages claim.[188]

55.     Spanski said he believes SEI had the right to all episodes of a particular series so long as any episode of that series had been included on *TVP Polonia*.[189]  Spanski made this claim even though the series at issue consist of thousands of episodes (in the case of *Plebania*, *Klan*, and *Zlotopolsky*) or hundreds (in the case of *Na Dobre*).  Notably, SEI's expert Gerbrandt had no opinion on whether the 545 episodes included in the July 2010 Annex should be included in SEI's damages scenarios.[190]  However, even under Spanski's view, only 408 of the 545 episodes of the July 2010 Annex could be included because the other episodes were part of series of which no episode had been broadcast on *TVP Polonia*.[191]

56.     As detailed in Supplemental Appendix B.1 to Hart's Supplemental Expert Report, the only number of episodes that could be used for SEI expert Shulman's damages calculations for each of his damages schemes (assuming that SEI is correct on liability and its lost profits theory is viable) is the 215 out of the 400 episodes that were included in the August 31, 2009 TVP/Polvision Licensing Agreement which Polvision had broadcast before agreeing with TVP on the replacement content included in the July 2010 Annex.  Alternatively, if Spanski's unsupported claim of having rights to the entire series of any episode ever broadcast on *TVP Polonia* is correct, 623 episodes should be used (215 episodes from the August 31, 2009 Agreement and 408 episodes from the July 2010 Annex).[192]

57.     However, under no scenario could 100 episodes from the June 2008 Agreement broadcast before August 2009, or 137 episodes of series from the July 2010 Annex never broadcast on *TVP Polonia*, be used as a basis for calculating damages.  Shulman's inclusion of these 237 episodes in his total of 860 episodes is incorrect even under SEI's view of its rights.

**C.     For His First Polvision Damages Scheme, SEI's Expert Relies Upon Incorrect, High-End-Only Values For His Inputs**

58.     In addition to improperly using 860 episodes as the basis for SEI's damages claim, Shulman also relies on improper inputs to arrive at his purported per-episode value under his three damages schemes.  Shulman's inputs are based on unsupported assumptions of facts.  An expert's opinions must be based on assumptions grounded in real-world facts.  *See Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc.*, 2010 WL 4892646, *5, 7-8 (S.D.N.Y. 2010)

---

[187]  Nadolna Decl. ¶ 67.

[188]  Shulman Dep. Tr. 110:17-22.

[189]  Spanski Dep. Tr. 83:84.

[190]  Gerbrandt Dep. Tr. 174:5-175:7.

[191]  *See* TVP Trial Ex. 40, Schedule No. 1 – the 408 episodes of series of which other episodes had been broadcast on *TVP Polonia* consist of 222 episodes of *Klan* and 186 episodes of *Plebania*.

[192]  *See* TVP Trial Ex. 63, ¶ 27.

(the "trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted").  Shulman's opinion fails this test.

59.    Shulman does not have an opinion on whether any of the three Polvision damages schemes is more appropriate than the others,[193] but each of his damages schemes rely on these improper inputs.

60.    Shulman's first damages scheme relies upon assigning a per-episode value to the episodes TVP licensed to Polvision using a purported industry standard market value.  Shulman acknowledges that he has not offered an opinion on the *appropriate* industry standard market value for each episode.  Rather, he says, he has offered only the highest theoretical value for each of the episodes based on the highest possible values of the inputs he uses so the Court could consider the upper limit of the potential value for the episodes.[194]  He has not provided low-end ranges for any of the inputs he uses to arrive at his maximum industry standard per-episode values.[195]

61.    Shulman uses several inputs to arrive at his highest-level, industry-standard market value for the episodes.  In essence, he calculates the value of advertising revenue during Polvision's broadcast of the episodes, then marks down the value of that revenue to account for what a company like Polvision would pay to acquire such episodes during which it could charge the calculated advertising revenue.

62.    For his inputs, Shulman assumes: (1) a 100-percent sellout rate for all available advertising during broadcasting of these episodes; (2) a $159-per-thirty-second-spot rate for advertising during broadcasting of the episodes; and (3) an assumption of a ratio of a 40-percent ratio of spending by a network to acquire a program compared to gross advertising billings for that program.  Each of these three inputs are inappropriate.

63.    As to Shulman's assumption of a 100-percent sellout rate for all available advertising during the broadcasting of the licensed episodes, TVP expert Arlen's view is that "television stations do not sell out their complete commercial inventory except in very rare circumstances" such as the Super Bowl, and "the assumption that Polvision sold 100 percent of its complete [advertising] inventory is not credible."[196]  SEI's expert Gerbrandt acknowledged that while a 100-percent sellout rate is a maximum possible sellout rate, to determine what rate should actually be used, he would need a lot more information.[197]

64.    Shulman's second assumption is that SEI would have received $159-per-thirty-second advertising spot.  He bases this upon a purported unpublished Polvision advertising rate card.  However, Shulman acknowledges that he does not know if Polvision ever actually realized

---

[193]   Shulman Dep. Tr. 106:15-23.

[194]   *Id*. 109:3-22; 122:22-124-16.

[195]   *Id*. 151:25-152:8.

[196]   TVP Trial Ex. 64, pg. 4.

[197]   Gerbrandt Dep. Tr. 142:8-143:15.

those rates for advertising.[198]  Walter Kotaba, the owner of Polvision, testified that: (a) between 2009 and 2011 Polvision charged between $40 and $90 per advertising spot; (b) an advertising spot could be one minute long (rather than the 30 seconds used by Shulman); and (c) some customers may have been charged less than $40 to $90 per advertising spot.[199]  Polvision may have even broadcast some commercials for free.[200]  Moreover, Kotaba said only 20 to 30 percent of Polvision viewers tune in to watch series, such as the episodes licensed by TVP to Polvision; most Polvision viewers are interested in news.[201]  Thus, advertisers are most interested in paying for advertisements during Polvision's news broadcasting, rather than during series-type programming such as the episodes TVP licensed to Polvision.[202]

65.    Shulman also fails to account for volume discounts that advertisers routinely receive for repeat advertising.  Arlen explains that advertisers always negotiate rates, are given volume discounts, pay different amounts based upon broadcast times, and will pay less for end-of-episode advertising as is the case with Polvision's broadcast (where advertisements are inserted after programming) rather than advertising during an episode.[203]  SEI expert Gerbrandt did not agree that failing to apply a volume discount rate could form the basis of an appropriate damages calculation.[204]  In his view, there are a lot of different factors that would affect volume discounts and he would want to consider all of them to arrive at appropriate volume discount rate.  However he did not identify those factors, nor did Shulman include them in his calculations.[205]

66.    Shulman's third assumption is that a network such as Polvision would spend 40 percent of its gross advertising billings during particular programming to acquire that programming.  Using his supposed $159-per-thirty-second-spot advertising rate, a 100-percent sellout rate, and assuming 12 minutes per hour of advertising, Shulman estimates that gross advertising revenues during a one-hour broadcast of the episodes TVP licensed to Polvision would be $3,816.[206]  Shulman applies a 40-percent ratio of program acquisition costs to gross advertising billings, leading to his conclusion that the per-hour value of the programming is $1,526.40, or $763.20 per half-hour episode licensed by TVP to Polvision.  Shulman then multiples $763.20 by the 860 episodes (from the June 2008 and August 2009 agreements, and from the July 2010 Annex), to arrive at a damages claim under his first damages scheme of $603,685.60.

---

[198]   Shulman Dep. Tr. 145:19-25.

[199]   Kotaba Dep. Tr. 39:12-41:6.

[200]   *Id*. 28:2-4.

[201]   *Id*. 132:4-13.

[202]   *Id*. 136:3-9.

[203]   *See* TVP Trial Ex. 64 - Arlen Supp. Report, pgs. 5-6.

[204]   Gerbrandt Dep. Tr. 150:14-151:5.

[205]   *Id*. 154:13-16.

[206]   Shulman Report, ¶ 47.

67.     Like the spot advertising rate and the 100-percent sellout rate Shulman uses, there is no basis for his 40-percent ratio of program acquisition costs to gross advertising revenues. Shulman relied upon data from SNL Kagan indicating a range of a 30-to-38 percent ratio between 2008 and 2011.  He used the 38-percent ratio, then marked up that ratio to 40 percent to account for a premium he says SEI would have charged Polvision to syndicate this content as a competing network.[207]  Shulman acknowledged that he applied the high-end 38 percent ratio in the Kagan data (for 2009) to all of the episodes, even though that ratio in 2009 is significantly higher than the ratio for the other years (2008 – 30 percent; 2010 and 2011 - 32 percent; for an average ratio of 33 percent).[208]  In TVP expert Arlen's view, Shulman's 40-percent ratio is "an arbitrary figure that cannot be applied to this situation with any degree of certainty."[209]

68.     Arlen explains that the ratio of program acquisition costs to advertising revenues fluctuates widely depending on individual circumstances.  For example, networks may value certain programs purely as a lead-in to other programming such as a local newscast during which networks will earn maximum advertising revenues.[210]  Further, as Arlen explains, the majority of the episodes TVP licensed to Polvision were many years old (*Klan* and *Zlotopolsky* – more than ten years old; *Na Dobre* and *Plebania* – more than six and four years old, respectively), and would be of limited value to Polvision to attract advertisers.  As further evidence that the 40-percent ratio is inappropriate, Polvision's Kotaba confirmed that Polvision viewership did not materially increase after the August 2009 agreement, and it is possible that viewership actually decreased.[211]  Further, Shulman did not consider whether Polvision's restricted territory (Chicago-area only) and restricted use (first run and one rerun) rights should also be applied to further reduce the 40-percent ratio.[212]  Gerbrandt agreed that Shulman's ratio was a maximum-possible high-end number but he would not an offer an appropriate program-acquisition-cost-to-advertising revenue ratio for these circumstances.[213]

69.     In TVP expert Hart's view, each of Shulman's damages schemes is incorrect because the appropriate form of damages for SEI's breach of contract claim is lost profits, and as mentioned above, SEI cannot claim lost profits for the syndication value of the episodes TVP licensed to Polvision where SEI had no rights to make profits from syndicating individual programming and had never in the history of the TVP/SEI relationship syndicated individual programming.[214]

---

[207]  *Id.* ¶ 47 and Ex. VII.

[208]  Shulman Dep. Tr. 159:7-15.

[209]  TVP Trial Ex. 64, pg. 6.

[210]  *Id.*

[211]  Kotaba Dep. Tr. 128:11-21.

[212]  Shulman Dep. Tr. 161:18-162:6.

[213]  Gerbrandt Dep. Tr. 165:16-167:12.

[214]  TVP Trial Ex. 63, ¶¶ 17-21.

70.     Nevertheless, assuming Shulman's theory of damages is not incorrect, Hart has corrected for each of Shulman's inputs to arrive at appropriate damages for Shulman's first damages scenario based upon an industry standard per-episode value.

71.     Hart has made conservative corrections.  First, instead of the 100-percent advertising sellout rate used by Shulman, Hart applies a 90-percent sellout rate based on Arlen's opinion of an appropriate maximum sellout rate.  Second, instead of the $159-per-thirty-second spot rate used by Shulman, Hart applies a $90-per-thirty-second spot rate (even though Kotaba said Polvision would sometimes charge less than $40 for a 1-minute spot rate, and might have broadcast some commercials for free).  Third, instead of the 40-percent ratio of program acquisition costs to gross advertising billings used by Shulman, Hart applies the average 33-percent ratio from the Kagan data (even though Arlen says a significant discount should be applied given the age of the programming).

72.     Using these corrected high-end inputs, Hart calculates SEI's damages under Shulman's theory using the high and low numbers of episodes to be included (either the 215 episodes broadcast by Polvision under the August 2009 Agreement, or 623 episodes which also includes the 408 episodes in the July 2010 Annex of series of which other episodes were broadcasted on *TVP Polonia*).[215]  Using 215 episodes, SEI's damages would be $64,681; using 623 episodes, SEI's damages would be $187,423.[216]  Hart's opinion does not however correct for Shulman's failure to provide appropriate low-end inputs for his damages calculation.

**D.     For His Second and Third Polvision-Related Damages Schemes, SEI's Expert Also Uses Improper Inputs**

73.     Shulman's second damages scenario is based on a per-episode value purportedly assigned by TVP and Polvision in their agreements rather than an industry standard per-episode value.  Shulman relies upon the March 17, 2008 Barter Agreement between TVP and Polvision as amended by a December 2, 2008 Annex (not the subject of SEI's damages claims) which states a "market value" of $600 for the episodes bartered as part of that agreement, including for episodes of *Klan* and *Zlotopolsky*, the same series as some of the episodes TVP licensed Polvision in the June 2008 and August 2009 licensing agreements, and the July 2010 Annex.[217]  Shulman applies the $600-per-episode market value across the board to all of the episodes licensed by TVP to Polvision, to arrive at his damages amount of $474,720 under his second damages scheme.[218]

74.     Again, Shulman's damages theory relies upon assumptions which are not based on real-world facts.  That is fatal to an expert's opinion.  *See Ho Myung Moolsan*, 2010 WL 4892646, at *5, 7-8.  This damages scheme is incorrect because: (a) Shulman uses the stated $600 "market value" in the March 2008 Barter Agreement but fails to account for the $300-per-episode market value actually assigned by the parties in determining the value of the bartered

---

[215]  *See id*. ¶¶ 23-27 and Supp. Appendix B.1.

[216]  *See id*. ¶ 32 and Table 3, and Supp. Appendix B.2.

[217]  Shulman Report, ¶ 53.

[218]  *Id*. ¶¶ 54-56.

episodes;[219] and (b) in the June 2008 Licensing Agreement, TVP actually charged Polvision different rates for other two licensed episode series - $270 for each of the 100 *Na Dobre* episodes and $130 for each of the 100 *Plebania* episodes.[220]

75.     As to the *Klan* and *Zlotopolsky* episodes, not only has Shulman disregarded the actual $300-per-episode market value assigned by the parties to episodes of those series in the March 2008 Barter Agreement, as Hart explains even though the parties assigned a $300 value, since "this agreement was on a barter basis, it is unlikely that the stated barter value equals the actual cash value."[221]  When Polvision was to actually pay for later episodes of the same series which TVP licensed as part of the August 2009 TVP/Polvision Licensing Agreement, the "value" paid by Polvision was $110 per episode, little more than a third of the assigned $300 value in the March 2008 Barter Agreement.[222]

76.     In addition, while Shulman states that he has "not been asked to opine as to the quality of the licensed programming as compared to the programming purportedly licensed by way of the Barter Agreement and its amendment," he assigns his $600 market value to all episodes licensed in the June 2008, August 2009, and July 2010 Agreements.  Shulman acknowledged that he used a $600 per episode value even though in all the agreements there is no other number that equates to $600 per episode other than in the March 2008 Barter Agreement for episodes of two of the series.[223]

77.     Polvision, which Kotaba said was struggling financially at the time of the August 2009 Agreement,[224] would not have paid $300 per episode, let alone $600 per episode.[225]  Gerbrandt had no opinion on the correctness of this damages scheme.[226]

78.     As Hart explains, "there is nothing suggesting that the so-called 'market value' rate of $600 per episode included in the March 17, 2008 Barter Agreement was anything more than an arbitrary number perhaps inserted to suggest that Polvision was getting a good deal."[227]

79.     As with Shulman's first damages scheme under his theory of damages for SEI's Polvision claim, assuming the theory is not fatally flawed because SEI has not lost any realizable profits, Hart has conservatively corrected for the flaws in Shulman's second damages to account for the per-episode market values actually assigned by the parties.  Hart uses the $300 per-

---

[219]   *See* TVP Trial Ex. 5, § 2.5(b).

[220]   *See* TVP Trial Ex. 6, Schedule, No. 15.

[221]   TVP Trial Ex. 63, ¶ 36.

[222]   TVP Trial Ex. 18, Schedule No. 1, *Klan* and *Zlotopolsky*.

[223]   Shulman Dep. Tr. 176:25-177:10.

[224]   Kotaba Dep. Tr. 109:12-110:4.

[225]   *See* TVP Trial Ex. 63, ¶ 36.

[226]   Gerbrandt Dep. Tr. 172:20-174:4.

[227]   *Id.* ¶ 37.

episode market value assigned by the parties in the December 2, 2008 Annex to the March 2008 Barter Agreement for the *Klan* and *Zlotopolsky* episodes, and the $270 per *Na Dobre* episode and the $130 per *Plebania* episode used by the parties in the June 2008 Agreement (conservatively, rather than the $180 per *Na Dobre* episode and the $110 per *Plebania* episode that Polvision actually paid under the August 2009 Agreement).[228]

80.     Hart calculates an adjusted damages amount for Shulman's second damages scheme of $43,948 using the low-end number of 215 episodes (broadcast under the August 2009 TVP/Polvision Licensing Agreement), and $127,466 using the high number of 623 episodes (to also include 408 episodes of series of which other episodes had been broadcast on *TVP Polonia* included in the July 2010 Annex).[229]

81.     Shulman's third damages scenario uses, as the quantum of SEI's lost profits claim, the amounts Polvision actually paid TVP under the June 2008 and August 2009 agreements and the July 2010 Annex.  Shulman calculates the value of all the episodes at $100,078.[230]  Hart adjusts this damages scenario to correct for the proper number of episodes to be included.  Using the 215 episodes Polvision broadcasted under the August 2009 TVP/Polvision Licensing Agreement, the proper damages amount should be $24,463; using the 623 episodes which also includes episodes of series of which other episodes have been broadcast on *TVP Polonia* from the July 2010 Annex, the proper damages amount should be $65,752.[231]

82.     In Hart's summary conclusion of his opinion on SEI's Polvision claim, he restates his opinion that SEI has suffered no damages for its Polvision claim.  As he explains, it is incorrect for SEI to put forth a damages claim based on lost profits grounded in SEI's alleged lost syndication opportunities because SEI has no right to syndicate individual TVP content and had never done so in more than eighteen years it has been distributing TVP's *TVP Polonia* channel.[232]

83.     While Hart has corrected each of Shulman's damages schemes to account for improper inputs, his expert opinion is that even if the Court were to conclude that Shulman's damages calculation theory is legally sound, then the only appropriate basis for damages would be the money actually paid to TVP by Polvision after the appropriate adjustments.  Only this basis takes into account the limited value of the content TVP licensed to Polvision and Polvision's limited ability to pay for such content.[233]

---

[228]   TVP Trial Ex. 63, ¶¶ 36-38.

[229]   *Id*. ¶ 39 and Table 4, and Supp. Appendix B.3.

[230]   Shulman Report, ¶¶ 57-63.

[231]   TVP Trial Ex. 63, ¶ 40 and Table 5, and Supp. Appendix B.4.

[232]   *Id*. ¶ 41.

[233]   *Id*. ¶ 42; either $24,463, using 215 episodes, or $65,752 using 623 episodes.

**E.      SEI Has Failed To Show A Causal Link Between TVP's Refusal To Join The Canadian Litigation and SEI's Legal Fees**

84.      SEI seeks $206,994.30 in damages for its second claim, purportedly representing all of its legal fees for its Canadian litigation.

85.      There is no basis in the parties' agreement requiring TVP to join the Canadian litigation.  But ever assuming the contrary, SEI has completely failed to show any causal link between TVP's refusal to join the litigation and SEI's legal fees.  "Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages." *Diesel Props*, 631 F.3d at 52-3; *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 731 (2d Cir. 1992) ("A plaintiff seeking damages for breach of contract ... must demonstrate that the damages were caused by and are directly traceable to the ... breach."); *Petitt v. Celebrity Cruises, Inc.*, 153 F.Supp.2d 240, 264 (S.D.N.Y. 2001) (plaintiffs' inability to establish that damages resulted from defendant's breach of contract "dooms plaintiffs' contract claim").

86.      SEI has never explained why TVP should be responsible for any of SEI's legal fees.  SEI has not shown that but for TVP's failure to join the Canadian litigation, SEI would not have incurred legal fees.  There is no evidence of what, if anything, IMB, the alleged unauthorized distributor, would have done differently had TVP joined the litigation.

87.      In SEI expert Shulman's March 18, 2013 supplement to his expert report, Shulman modifies the total amount of legal fees SEI is claiming (removing fees incurred prior to the filing of the Canadian complaint and adding fees incurred subsequent to his original report).[234]  But all Shulman states is that he has reviewed SEI's legal invoices to determine they pertain to the Canadian matter.  He has offered no opinion on whether there is a causal link between TVP's failure to join SEI's litigation and SEI's legal fees.[235]

88.      SEI's Canadian lawyer Casey Chisick's trial declaration also fails to make any causation link.  He baldly asserts his belief that the lack of support and assistance by TVP has resulted in SEI incurring significant costs of litigating against IMB.[236]  Like Shulman, Chisick does not explain by what amount if any SEI's legal fees would have been reduced has TVP joined the litigation, or even why SEI's legal fees would have been reduced.  SEI has completely failed to demonstrate why TVP should be responsible for any, much less, all of SEI's legal fees.

89.      In addition, SEI's claim against IMB also concerns non-TVP (Polsat) programming distributed by SEI.[237]  There is no evidence that SEI would not have incurred the same fees even if the TVP content were not at issue in the Canadian litigation. SEI has not shown that but-for TVP's failure to join the litigation, SEI would have incurred no legal fees.

---

[234]  March 18, 2013 Supplement to the Shulman Report, "Schulman Supp. Report."

[235]  *Id*. ¶¶ 13-15.

[236]  March 18, 2013 Declaration of Casey Chisick, ¶ 12.

[237]  TVP Trial Ex. 44, ¶ 1(d), 1(e)(ii), 1(g)(i), 1(g)(iv), (1)(g)(v), etc.

SEI thus failed to meet its burden to demonstrate the critical causation element of a breach of contract claim: that its damages were caused by an alleged breach of contract by TVP.

90.     As SEI has failed to show any causally connected damages from TVP's non-participation in the Canadian litigation, TVP is not liable on this claim.

**F.     For Its _Klan_ Claim, SEI Failed to Show A Causal Link Between TVP's Removal of _Klan_ And Any Damages**

91.     SEI's damages theory for its _Klan_ claim is that it has lost existing and potential subscribers to its television and Internet distribution of _TVP Polonia_ because TVP stopped including _Klan_ episodes in the programming lineup on _TVP Polonia_.  This theory suffers from the same fatal causation problem as SEI's second claim relating to the Canadian litigation.

92.     SEI's damages theory for its _Klan_ claim is based on an alleged diminished subscriber growth rate to SEI's distribution of _TVP Polonia_ after TVP removed the _Klan_ program.  In Shulman's view, based upon SEI's historical subscriber levels, SEI achieved a growth rate of 1.7 percent per quarter from the end of 2003 through the end of the second quarter of 2010 when TVP removed the _Klan_ program.[238]  Shulman compares the estimated number of subscribers SEI should have purportedly achieved based upon this 1.7 percent quarterly growth rate against the number of subscribers SEI actually achieved as of December 31, 2011, a year-and-a-half after _Klan_ was removed from _TVP Polonia_.  Shulman uses a purported shortfall of 2,071 subscribers to calculate SEI's lost revenues for his historical-period damages claim, which he calculates at $255,353.[239]  He then applies that estimated shortfall in subscribers as of December 31, 2011 for the duration of the 1994 Agreement's term until 2019 for his forward-looking damages claim of $1,007,525, for a total damages claim of $1,262,878.[240]

93.     SEI's damages theory as advanced by Shulman is incorrect because SEI cannot demonstrate any causal link between the removal of _Klan_ from _TVP Polonia_ and SEI's purported diminished subscriber growth rate.  As Hart explains, proximate cause is a fundamental principle that governs all compensatory damages.  In other words, "Recovery of damages for lost profits is subject to the general principle that damages must be proximately caused by the wrongful conduct of the defendant."[241]  Hart explains that Shulman has skipped one of the first questions that must be asked related to causation and damages, and that is fatal to his damages theory.  A factfinder must determine: "Has the plaintiff excluded or explained other possible causes of the claimed loss? The cases generally hold that failure to do so is <u>fatal to the claim</u>."[242]  _See Nat'l Market Share, Inc. v. Sterling Nat. Bank_, 392 F.3d 520, 526, 528 (2d Cir. 2004) (affirming denial

---

[238]   Shulman Report, ¶¶ 72-77.

[239]   _Id_. ¶¶ 78-81 and Exhibit V.

[240]   _Id_. ¶¶ 84-89 and Exhibit VI.

[241]   _See_ TVP Trial Ex. 63, ¶ 43,  quoting Dunn, Robert L., Recovery of Damages for Lost Profits, Vol. 1, 6th ed., Supplement, Lawpress Corporation 2011, pg. 2.

[242]   _See id_., quoting Dunn, Robert L., Recovery of Damages for Lost Profits, pg. 4 (emphasis added in Hart's report).

of damages for failure to show proximate cause, and holding that damages are unavailable where they are the result of intervening causes other than contract breach).

94.    As explained above, SEI has abandoned its lost subscribers damages theory for its Polvision claim because SEI realized it could not show any causal link between TVP's contracts with Polvision and *TVP Polonia* subscriber behavior. Shulman said he moved away from the cancelled subscriptions theory for Polvision because he was not comfortable that subscriber cancellations could actually be attributable to Polvision. ("I think in the end, that's the bottom line, we didn't feel comfortable that we could attribute the cancellations to Polvision.")[243]  The same causation problem is fatal to SEI's damages theory for its *Klan* claim, for four reasons, as explained below.

95.    First, SEI ignores all of the other reasons subscribers cancel or do not subscribe, such as normal customer attrition. As Arlen explains, the U.S. cable television industry has a "churn rate" (service cancellation rate) of 2.6 percent per month, or 31 percent on an annualized basis, mostly due to customers moving, inability to pay monthly fees, and service adoption issues.[244]  In SEI's case particularly, according to Arlen, cannibalization between SEI's television and Internet offerings may have also accounted for some cancellations.[245]  While Shulman acknowledged that it is difficult to attribute subscriber cancellations to any one reason, and there are many reasons why subscribers cancel,[246] in arriving at his purported diminished growth rate for SEI's subscribers, Shulman has completely ignored these other reasons, including normal customer attrition. Shulman admitted he failed to take into account many other potential reasons for cancellations such as economic conditions, price changes, changes in the distribution network, or competition in the marketplace.[247]  While Spanski said that he believes SEI received emails where former subscribers specifically mentioned the removal of *Klan* as the reason for cancelling a subscription,[248] SEI has produced no such emails. Spanski acknowledged that he cannot know all the reasons why subscribers cancelled after *Klan* was removed, he just assumes that removal of the program was the primary reason for cancellation.[249]

96.    Second, subscribers do not cancel subscriptions or choose not to subscribe to a cable channel because one show is discontinued, particularly on a specialty channel such as a foreign language programming channel like *TVP Polonia*. Arlen cites the example of HBO, where, after the cancellation of Sex and the City and The Sopranos, there were no significant subscriber cancellations. In fact, HBO saw increased viewership when new episodes of The Sopranos were no longer being broadcast.[250]  In Arlen's view, "[t]here is no historical evidence

---

[243]  Shulman Dep. Tr. 26:19-27:12

[244]  TVP Trial Ex. 59, pg. 18.

[245]  *Id.*

[246]  Shulman Dep. Tr. 33:13-23.

[247]  *Id.* 228:17-229:8.

[248]  Spanski Dep. Tr. 132:23-133:5;136:2-6; 266:22-267:5.

[249]  *Id.* 274:14-275:12.

[250]  TVP Trial Ex. 59, pg. 17.

that any significant number of viewers abandon a subscription – especially to a unique and favored service, such as a native-language channel – because of the loss of a single program, or even several favorite shows."[251]  He says "it is inconceivable that a substantial number of viewers would have cancelled a subscription because TVP removed a single show from TV Polonia."[252]

97.     Third, Shulman attempts to attribute all customer cancellations through December 31, 2011, nearly a year-and-a-half after the removal of *Klan*, to the removal of the program from *TVP Polonia*.  As mentioned, Arlen's view is that subscribers, especially to a native-language channel such as *TVP Polonia*, would not cancel subscriptions because of the removal of one program.  However, even if some customers did cancel because of the removal of *Klan*, in Arlen's view, they would have cancelled within 60 days of the program's removal from *TVP Polonia*, and likely earlier, but not for the extended, year-and-a-half cancellation period used by SEI expert.[253]

98.     Fourth, the "Terms and Conditions" page of SEI's website states that the website installs cookies on subscribers' computers which allows SEI to track subscriber viewing habits.[254]  Spanski acknowledged at his deposition that SEI's website installs these tracing cookies.[255]  Yet, not surprisingly, SEI has not even attempted to demonstrate based upon these cookies that the *Klan* program was so popular amongst its now cancelled subscribers so as to cause them to cancel their subscriptions.

99.     In all of Hart's 23 years of experience as an expert witness on damages issues, he has never seen a damages expert such as Shulman completely fail to consider causation issues, much less create a provable causal link between the alleged wrongful action and alleged damages.[256]  Tellingly, SEI's industry expert Gerbrandt offers no opinion in connection with Shulman's damages theory for *Klan*; he claims to have not even discussed Shulman's opinion with him.[257]

**G.     SEI's *Klan*-Related Damages Theory Also Suffers From Methodological Flaws And Sourcing Errors, And Is Partially Duplicative Of SEI's Polvision-Related Damages Claim.**

100.     In addition to SEI's failure to show any causal link between TVP's removal of the *Klan* program from *TVP Polonia* and any purported diminished subscriber growth rate,

---

[251]  *Id.*

[252]  *Id.* at 18.

[253]  *Id.*

[254]  TVP Trial Ex. 66.

[255]  Spanski Dep. Tr.  331:4-323:2.

[256]  June 21, 2012 Deposition of Timothy Hart, pgs. 102:8-12.

[257]  Gerbandt Dep. Tr. 175:20-176:9.

Shulman's theory also contains methodological flaws and sourcing errors which incorrectly inflate SEI's damages claim.

101.    First, Shulman has relied upon an incorrect, simplistic calculation of net additional subscribers to SEI's television and Internet distribution during the period for which he calculated SEI's baseline subscriber growth rate.  For each quarter Shulman used as a baseline reference point, he used new subscribers less cancelled subscriptions.  As Hart explains, because this number is a combination of new subscribers and cancellations, it does not accurately reflect the number of cancellations.[258]  For example, a quarter with few cancellations but also few new subscriptions would result in a low "net additional subscribers" rate when in reality during that given quarter SEI would have sustained only few cancellations.

102.    Shulman acknowledged that he did not consider how many subscribers cancelled or subscribed during any given time period; he just focused on net subscribers.[259]  In fact, during Shulman's overall historical damages period (July 2010 to December 2011), SEI actually gained 2,647 net additional subscribers, rather than losing subscribers.[260]  Thus, Shulman's theory is essentially that SEI would have gained more subscribers during this period but for TVP's removal of *Klan* from *TVP Polonia*.  But, as mentioned above, Shulman has utterly failed to provide any causal link between the removal of *Klan* and cancelled subscriptions, much less any causal link between the removal of *Klan* and lost potential new subscriptions.

103.    In addition, Shulman improperly pooled all of SEI's U.S. and Canada cable television subscribers and Internet subscribers to arrive at SEI's purported historical growth rate.[261]  Shulman's pooling of television and Internet subscribers fails to account for materially different typical churn rates between the two groups of subscribers (17.0 percent between January 2008 and July 2009 for a sample group of SEI's television subscribers, compared to 7 percent during that same period for SEI's Internet subscribers).[262]  According to Hart, this failure to account for different typical churn rates renders Shulman's analysis based on SEI's purported diminished growth rate for all subscribers effectively unusable and unrealistic.[263]

104.    Further, significant changes to SEI's distribution network accounted for large changes to television and Internet subscriber numbers.  For example, during the third quarter of 2010, DirectTV stopped distributing programming for SEI, resulting in a large reduction in SEI subscribers (a net loss of 624 subscribers during that quarter).[264]  Shulman acknowledged that if major distributors had stopped distributing TVP programming for SEI during Shulman's calculated growth period, or if new distributors joined SEI's distribution network, that would

---

[258]  TVP Trial Ex. 63, ¶ 48.

[259]  Shulman Dep. Tr. 236:11-17.

[260]  TVP Trial Ex. 63, ¶ 49.

[261]   *Id*. ¶ 50 and Table 6 on pg. 25.

[262]  *See id*. ¶ 51 and Table 7 on pg. 26.

[263]  *Id*. ¶ 52.

[264]  *Id*. ¶ 50.

skew his calculation of SEI's diminished subscriber growth rate.[265]  Yet, even with access to SEI's detailed records reflecting such material changes to SEI's distribution network, Shulman failed to account for such changes in arriving at SEI's purported diminished subscriber growth rate.

105.    Shulman's report claims that he removed unusual quarterly spikes in subscriber numbers as anomalies so as not to provide an incorrect subscriber growth rate,[266] but at his deposition he acknowledged that his quarterly subscriber change rate is compared to each previous quarter, so he in fact did use the unusual spike quarters as reference points for subsequent quarters.[267]

106.    Additionally, as Hart explains, Shulman's calculation of SEI's purported diminished subscriber growth rate has basic sourcing and calculation errors, including: (a) incorrectly-sourced U.S. cable revenues, resulting in overstating SEI' per-subscriber revenues;[268] (b) failing to pro-rate SEI's alleged damages in July 2010 when Shulman's damages period begins;[269] and (c) improperly averaging several models of the projected growth rate of the Polish-speaking population in the U.S. to artificially lower estimated annual attritions rates.[270] Hart has corrected for these sourcing and calculation errors.[271]  However, Hart could not correct for the basic causation problem in Shulman's analysis – his failure to attribute any supposed diminished subscriber growth rate to TVP's removal of *Klan*.  Hart's  view is that, as with SEI's Polvision claim, SEI has sustained no damages as a result of TVP's removal of the *Klan* program from *TVP Polonia*.[272]

107.    Finally, even assuming that Shulman is correct despite the lack of any causal link between TVP's removal of the *Klan* program and SEI's claimed damages, any damages from removal of *Klan* claim is to a large extent duplicative of SEI's Polvision claim.  When calculating SEI's alleged damages from TVP's contracts with Polvision, Shulman used 860 episodes TVP licensed to Polvision as a basis for calculating the Polvision-related damages. However, of the 860 episodes that form the basis for the Polvision claim, 223 episodes are *Klan* episodes.  SEI cannot claim damages for TVP's licensing to Polvision based upon the alleged value of these episodes (under its three alternative schemes), and again seek damages from TVP for allegedly removing the same 223 *Klan* episodes from *TVP Polonia* in order to license them to Polvision.

---

[265]  Shulman Dep. Tr. 249:6-250:7.

[266]  SEI Trial Ex. 142, Shulman Report ¶ 73.

[267]  Shulman Dep. Tr. 244:6-245:2.

[268]  TVP Trial Ex. 63, ¶ 54 and Supp.  Appendix C.1.

[269]  *Id*. ¶ 55 and Supp. Appendix C.2.

[270]  *Id*. ¶ 56 and Supp. Appendix C.3.

[271]  *Id*. Table 8 on pg. 28.

[272]  *Id.* ¶ 58.

108.   Shulman admits there is double-counting of damages between the Polvision and *Klan* claims, but he provides no alternative damages amount for either claim assuming either of them succeed.[273]   Under any view of the facts, SEI is not entitled to a double recovery.

### III.   SEI Breached The 1994 Agreement By Failing To Comply With Its Obligation To Maximize Subscribers, And Is Liable For The Lost Profits TVP Has Suffered As A Result

109.   The 1994 Agreement imposes upon SEI an obligation to use reasonable efforts to maximize subscribers to its distribution of *TVP Polonia*.[274]   TVP's statutory requirements under Polish law, and its mission to reach as much of the Polish Diaspora as possible, was incorporated as part of the parties' contract obligations.

110.   In order to prove a prima facie case for breach of contract under New York law, the claimant must establish: (1) a contract existed; (2) performance by one party; (3) breach by the other party; and (4) damages resulting from the breach. *Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, 2013 WL 81263, at * 6.   TVP has performed its contractual obligations, but SEI has fallen far short of complying with its obligation to maximize *TVP Polonia* subscribership, resulting in damages to TVP.

111.   Out of an estimated 2.5 to 3 million people in the Territory who speak Polish, SEI has reached only approximately 30,000 television subscribers and 15,000 Internet subscribers. As described in detail above, Arlen has concluded that as of 2006, 10 years after SEI began distributing *TVP Polonia*, SEI should have achieved a minimum of 150,000 total subscribers.[275] SEI has failed to reach and maintain agreements with major satellite and cable distributors to include *TVP Polonia* in their channel lineup.

112.   In addition, as described in detail above, Reyes identified major deficiencies in SEI's website, including its incompatibility with major web browsers constituting  a large percent of the web browser market, its incompatibility with non-Windows based and mobile devices, video quality issues, lack of search engine optimization, a poor user interface and no Spanish/Portuguese versions.[276]   The deficiencies have resulted in significant lost website subscribers.[277]   SEI has not even attempted to address most of these deficiencies.

113.   Hart has calculated that TVP has lost $6,603,285 in profits as a result of SEI's failure to maximize subscribers.[278]

---

[273]   *See* Shulman Dep. Tr. 217:24-219:7.

[274]   *Spanski Enterprises v. Telewizja Polska*, 2013 WL 81263, at *8.

[275]   Findings of Fact, ¶¶ 91-93.

[276]   *Id.* ¶ 94.

[277]   *Id.* ¶¶ 95-97.

[278]   *Id.* ¶¶ 101-103.

Dated: New York, New York
      July 1, 2013

                             DLA PIPER LLP (US)

                             By:    /s/David S. Wenger
                                  Andrew L. Deutsch
                                  David S. Wenger
                        1251 Avenue of the Americas
                        New York, New York  10020-1104
                        (212) 335-4500
                        andrew.deutsch@dlapiper.com
                        david.wenger@dlapiper.com

                        *Counsel for TVP*

Page 1

BOGUSLAW SPANSKI – VOLUME I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
SPANSKI ENTERPRISES, INC.,

              Plaintiff,

              vs.       Index No. 10 CV 4933 (RMB)

TELEWIZJA POLSKA S.A.,

              Defendant.
----------------------------------------X
VOLUME I


VIDEOTAPED DEPOSITION OF BOGUSLAW SPANSKI

New York, New York

November 8, 2011




REPORTED BY:  BARBARA R. ZELTMAN
               Professional Stenographic Reporter

Page 2

1             BOGUSLAW SPANSKI - VOLUME I
2
3             November 8, 2011
4               2:08 p.m.
5
6     Videotaped deposition of BOGUSLAW SPANSKI,
7  taken by Defendant, pursuant to Notice, at the
8  offices of DLA Piper, 1251 Avenue of the Americas,
9  New York, New York, before BARBARA R. ZELTMAN, a
10  Professional Stenographic Reporter and Notary Public
11  within and for the State of New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            BOGUSLAW SPANSKI - VOLUME I
2  A P P E A R A N C E S :
3
4  LOEB & LOEB LLP
5  Attorneys for Plaintiff
6     345 Park Avenue
7     New York, New York 10154
8     BY: JONATHAN ZAVIN, ESQ.
9
10
11  DLA PIPER LLP (US)
12  Attorneys for Defendant
13     1251 Avenue of the Americas
14     New York, New York 10020
15     BY: DAVID S. WENGER, ESQ. and
16       ROBERT F. FINK, ESQ.
17
18
19
20  Also Present:  Maria Nadolna, Telewizja Polska
21           Robert Kroplewski, Telewizja Polska
22           Ilitch Peters, Videographer
23
24
25

Page 4

1            BOGUSLAW SPANSKI - VOLUME I
2
3     IT IS HEREBY STIPULATED AND AGREED
4  by and between the attorneys for the respective
5  parties herein that filing and sealing be and
6  the same are hereby waived.
7     IT IS FURTHER STIPULATED AND AGREED
8  that all objections, except as to the form of
9  the question, shall be reserved to the time
10  of trial.
11     IT IS FURTHER STIPULATED AND AGREED
12  that the within deposition may be signed and
13  sworn to before any officer authorized to
14  administer an oath with the same force and
15  effect as if signed and sworn to before
16  the Court.
17
18
19
20
21
22
23
24
25

Page 5

1          BOGUSLAW SPANSKI - VOLUME I
2     THE VIDEOGRAPHER:  This is Tape
3  Number 1 of the videotaped deposition
4  of Mr. Boguslaw Spanski In the
5  Matter:  Spanski Enterprises,
6  Plaintiff, versus Telewizja Polska
7  S.A., Defendant in United States
8  District Court, Southern District of
9  New York.
10     Case Number 10 CV 4933 (RMB).
11     This deposition is being held at
12  DLA Piper, 1251 Avenue of the Americas,
13  on November 8, 2011 at approximately
14  2:08 p.m.
15     My name is Ilitch Peters from the
16  firm of Elisa Dreier Reporting
17  Corporation and I am the legal video
18  specialist.
19     The court reporter is Bobbie
20  Zeltman in association with Elisa Dreier
21  Reporting Corporation, located at 950
22  Third Avenue, New York, New York.
23     For the record, will counsel please
24  introduce themselves.
25     MR. WENGER:  David Wenger, DLA

2 (Pages 2 to 5)

**A-196**

---

Page 6

BOGUSLAW SPANSKI - VOLUME I
1
2  Piper, for Defendant Telewizja Polska
3  S.A.
4      MR. FINK: Robert Fink, DLA Piper,
5  the same.
6      MR. ZAVIN: Jonathan Zavin,
7  Loeb & Loeb, for the plaintiff
8  Boguslaw Spanski, who is an officer
9  of the plaintiff.
10     THE VIDEOGRAPHER: Will the
11  court reporter please swear in the
12  witness.
13     BOGUSLAW SPANSKI,
14     having been first duly sworn by
15  Barbara R. Zeltman, Notary Public, was
16  examined and testified as follows:
17     MR. ZAVIN: Can we just ask the
18  other people in the room to be
19  identified?
20     MR. WENGER: Sure.
21     With myself and Bob Fink is Maria
22  Nadolna and Robert Kroplewski from TVP.
23     EXAMINATION BY MR. WENGER:
24  Q   Mr. Spanski, have you ever been
25  deposed before?

---

Page 7

BOGUSLAW SPANSKI - VOLUME I
1
2  A   Yes.
3  Q   How many times?
4  A   Two.
5  Q   Do you know the general procedure
6  that we're going to be following?
7  A   Yes.
8  Q   I'll be asking questions and you'll
9  be answering the questions.
10     If you don't understand any of my
11  questions, you can let me know and I'll try
12  to rephrase them. Otherwise, if I ask a
13  question you are to answer the question
14  unless your attorney instructs you
15  otherwise.
16     Is that clear?
17  A   Yes.
18  Q   What is your role in the Spanski
19  Enterprises, Inc.?
20  A   I'm the president and chief
21  executive officer.
22  Q   Are you an owner, as well?
23  A   I am also an owner.
24  Q   Are there any other owners?
25  A   Yes.

---

Page 8

BOGUSLAW SPANSKI - VOLUME I
1
2  Q   Who?
3  A   My wife.
4  Q   What percentages do each of you
5  own?
6  A   She owns 11 percent.
7  Q   Has that always been the case with
8  you owning 89 percent and your wife owning
9  11 percent?
10  A   That's correct.
11  Q   As president, what is your role?
12     What duties do you -- are you in
13  charge of?
14  A   Running the business.
15     I mean, setting up the strategies,
16  identifying opportunities in which the
17  company wants to engage, and overseeing
18  day-to-day operations.
19  Q   Are you involved in any other
20  businesses?
21  A   Spanski Enterprises, the holding
22  company which owns other businesses, and I'm
23  involved in those other businesses.
24  Q   Other than the subsidiaries of
25  Spanski Enterprises, are you involved in

---

Page 9

BOGUSLAW SPANSKI - VOLUME I
1
2  other businesses other than Spanski and
3  their subsidiaries?
4  A   No.
5  Q   What is Bob Kaserik's role at
6  Spanski Enterprises?
7  A   His role, he's the president of one
8  of the subsidiaries of Spanski Enterprises,
9  as well he's a director of Spanski
10  Enterprises.
11  Q   Who are the other executives or
12  officials at Spanski Enterprises?
13  A   As I mentioned earlier, there is
14  Bob Kaserik and there is also my son Martin
15  Spanski. And those are officers including
16  myself.
17  Q   What other employees are there in
18  Spanski Enterprises?
19  A   Spanski Enterprises Holding Company
20  doesn't have many employees besides the ones
21  I've mentioned.
22     And there are other directors but
23  they are not in day-to-day operations.
24  Q   Are you in charge of all
25  contracting that Spanski Enterprises or its

---

3 (Pages 6 to 9)

Page 10

1           BOGUSLAW SPANSKI - VOLUME I
2    subsidiaries is involved in?
3        A    I'm involved.
4        Q    You are in charge of all that
5    contracting?
6        A    Yes.
7        Q    Do you consult with any of your
8    other co-executives about the contracts that
9    are to be entered?
10       A    I discuss the possibilities, but
11   with respect to consulting --
12           THE REPORTER:  I need you to keep
13   your voice up.
14           THE WITNESS:  Sorry about that.
15           "I discuss the possibilities, but
16   with respect to consulting ..."?
17       A    In what aspects are you asking?
18   What consulting?
19       Q    When Spanski Enterprises makes a
20   decision to enter a contract, is there
21   internal discussion about that or do you
22   decide to do that on your own?
23       A    Entering into a contract is a
24   decision if you want to pursue one or other
25   opportunity.

Page 11

1           BOGUSLAW SPANSKI - VOLUME I
2           Entering in the contract is the
3    procedure which is involved -- I mean,
4    attorneys are involved in preparing the
5    documents and so on, so it's not that other
6    executives that are involved.  More
7    attorneys are involved than executives.
8        Q    Who is the decision-maker or
9    decision-makers?
10       A    I'm the decision-maker.
11       Q    Please allow me to finish my
12   question before you answer.  But I've got
13   the answer.
14           Who does Spanski Enterprises,
15   Inc.'s accounting?
16       A    It's a Toronto-based firm,
17   accounting firm, Shaw & Associates.
18       Q    Does that firm Shaw & Associates do
19   accounting for SEI and its subsidiaries?
20       A    Not all of them, but it does for
21   Spanski Enterprises and Telewizja Polska
22   Canada.
23       Q    So let's discuss the subsidiaries.
24           You mentioned Telewizja Polska
25   Canada.

Page 12

1           BOGUSLAW SPANSKI - VOLUME I
2           Where is that entity located?
3        A    In Mississauga, Ontario.
4        Q    What other subsidiaries are there
5    of SEI?
6        A    There is Telewizja Polska USA and
7    there is Euro View.
8           Those are two subsidiaries.
9           And there is -- excuse me, I stand
10   corrected.  Telewizja Polska Panama.
11       Q    Telewizja Polska Canada, Telewizja
12   Polska USA, Euro View and Telewizja Polska
13   Panama?
14       A    That's correct.
15       Q    Are there any others?
16       A    Not at the present.
17       Q    Were there others recently?
18       A    How recently?
19       Q    Within the last five years.
20       A    I do not recall specifically when
21   we had disposed of other subsidiaries of
22   Spanski Enterprises, but it might have been
23   more than five years.
24       Q    Do you manage all these four
25   entities, all the four subsidiaries you just

Page 13

1           BOGUSLAW SPANSKI - VOLUME I
2    mentioned?
3        A    I'm involved in all of them, yes.
4        Q    Do you manage them?
5        A    Yes.
6        Q    How many employees does -- I'll
7    call it for short TVP Canada -- have?
8        A    Three.
9        Q    Who are they?
10       A    There is myself, there would be Bob
11   Kaserik, and there would be a person who
12   works under contract basis from Mr. Shaw's
13   office.
14           Those are the three.
15       Q    The person who works on a contract
16   basis from Mr. Shaw's office is a permanent
17   employee in TVP Canada?
18       A    Is a person assigned permanently to
19   do the accounting, day-to-day accounting.
20       Q    Do you work out of the office of
21   TVP Canada?
22       A    No.
23       Q    Where is your office located?
24       A    I mean, I do work from home and
25   literally I take a little bit of using

4 (Pages 10 to 13)

Page 14

BOGUSLAW SPANSKI - VOLUME I
1
2  Internet as my tool, as my working tool to
3  be where I need to be in any given time.
4      Q    TVP USA, where is that based?
5      A    In Schaumburg, Illinois.
6      Q    And how many employees does it
7  have?
8      A    Including myself, I would say also
9  three people.
10     Q    Who are they?
11     A    There's Ann Uvenstriska.
12          There is Couva Lipsgerik and
13  myself.
14     Q    What are Ann and Couva's role
15  respectively?
16     A    Ann is involved in administrative
17  duties.
18          Couva is involved in -- he was
19  involved more in the past overlooking the
20  distribution arrangements with Ann through
21  Telewizja Polska USA which are no longer.
22  And I'm simply overlooking them.
23     Q    You say the distribution
24  arrangements of Telewizja Polska USA are no
25  longer.

Page 15

BOGUSLAW SPANSKI - VOLUME I
1
2      What do you mean by that?
3      A    Telewizja Polska is no longer
4  involved in distribution of television
5  programming.
6      Q    Does TVP USA, for short, earn any
7  revenues from distributing
8  television or distributing television
9  programming in the United States?
10     A    Telewizja Polska USA facilitates in
11  the very minimal amount subscription of
12  Internet, which are basically derived mostly
13  from Canadian subscribers.
14     Q    We'll talk about that little more.
15          Euro View, how many employees does
16  it have?
17     A    There's three people also.
18     Q    Where is Euro View based?
19     A    Einsiedeln, Switzerland.
20     Q    Who are the three employees?
21     A    Jan Mark Thelar who is in the
22  day-to-day -- overlooks day-to-day
23  operation, and there's also Jacque
24  Couvell, and there is myself.
25     Q    Does the Shaw firm do accounting

Page 16

BOGUSLAW SPANSKI - VOLUME I
1
2  for Euro View as well?
3      A    No.
4      Q    Who does Euro View's accounting?
5      A    There's an accounting firm which
6  prepares the accounting statements for Euro
7  View.
8      Q    And TVP Panama.
9          Where is that located?
10     A    Located in Panama City.
11     Q    Are there employees of TVP Panama?
12     A    There is a person who is in charge
13  of it.
14     Q    Who is that?
15     A    Bob Kaserik.
16     Q    But TVP Panama doesn't have any
17  dedicated employees?
18     A    I mean, the person who is
19  overlooking how it operates is Bob Kaserik.
20     Q    Does TVP Panama have an office?
21     A    No one has dedicated an office, no.
22     Q    Does it have any operations in
23  Panama actually or is it just registered in
24  Panama?
25     A    It is registered in Panama.  It has

Page 17

BOGUSLAW SPANSKI - VOLUME I
1
2  basically a bank account and basically
3  that's it.
4      Q    Is there any other connection
5  between TVP Panama and the country of Panama
6  other than a bank account that TVP Panama
7  has in Panama?
8      A    Not to my knowledge.
9      Q    Do each of these entities, TVP
10  Canada, TVP USA, Euro View and TVP Panama,
11  all pay taxes?
12     A    To my knowledge, TVP, all of them
13  do except TVP Panama, which is not under the
14  law obligated.
15     Q    Why not?
16     A    Because that's how the law in
17  Panama is set.
18     Q    When you say it's not under the law
19  obligated to pay taxes, do you mean in
20  Panama or anywhere?
21     A    I mean, I'm not an accountant.
22          My knowledge is very limited but I
23  can tell you that to my limited knowledge
24  for revenues derived from outside of Panama,
25  the company is not obligated to pay taxes

5 (Pages 14 to 17)

Page 18

1       BOGUSLAW SPANSKI - VOLUME I
2 nor submit financial statements.
3     Q   Does TVP Panama pay taxes in the
4 US?
5     A   No, it does not.
6     Q   Does it pay any taxes anywhere?
7     A   Not to my knowledge.
8     Q   Which company or companies collect
9 revenues from television subscriptions or
10 television subscribers in the United States?
11     A   Euro View does.
12     And to some degree TVP Panama may,
13 yes.
14     Q   TVP Panama collects revenue from
15 television subscribers in the US?
16     A   No. Solely from Internet
17 subscribers.
18     Q   So my question was limited to
19 television subscribers.
20     Is it your response that Euro View
21 is the only entity that collects revenue
22 from US television subscribers?
23     A   Yes.
24     Q   You said before that TVP USA does
25 not collect any revenue from television

Page 19

1       BOGUSLAW SPANSKI - VOLUME I
2 subscribers in the US, is that right?
3     A   To my knowledge, yes, that's
4 correct.
5     Q   When you say to your knowledge, is
6 there someone else who knows better?
7     A   You are asking me about a question
8 which relates to, first of all, a very
9 minuscule amount of money. That's the first
10 thing.
11     And secondary is to my best
12 recollection on the revenues which are
13 collected by TVP USA are from subscribers
14 who pay for a subscription and those
15 subscribers are located in Canada.
16     MR. FINK: Can you read his
17 answer back?
18     THE REPORTER: Sure.
19     MR. FINK: I'm concerned you
20 may have used the wrong name.
21     Read it back?
22     (Requested portion of record read:
23     "A. You are asking me about a
24 question which relates to, first of all,
25 a very minuscule amount of money. That's

Page 20

1       BOGUSLAW SPANSKI - VOLUME I
2 the first thing.
3     "And secondary is to my best
4 recollection on the revenues which are
5 collected by TVP USA are from subscribers
6 who pay for a subscription, and those
7 subscribers are located in Canada.")
8     (End of read-back.)
9 BY MR. WENGER:
10     Q   Let me ask you this different so
11 that we're clear.
12     US subscriber revenues, those are
13 collected by Euro View mostly and some of
14 part of that is collected by TVP USA; is
15 that right?
16     MR. ZAVIN: Objection.
17 Misstates his testimony.
18     THE WITNESS: Should I answer?
19     Q   Yes.
20     A   TVP USA solely collects an amount
21 of couple -- I think it's less than a
22 hundred subscribers who are located in
23 Canada due to the fact that GlobeCast, being
24 the satellite provider who is allowed only
25 to distribute program in United States, is

Page 21

1       BOGUSLAW SPANSKI - VOLUME I
2 not entitled to collect funds from Canadian
3 subscribers.
4     As it happened in the very early
5 relation, there was sometimes -- if I
6 remember -- year 2002, there was interest by
7 some Canadian subscribers to subscribe to
8 services which were offered by GlobeCast.
9     Therefore, TVP USA has undertook to
10 play a role of intermediary of getting the
11 payment from those Canadian subscribers,
12 submitting them, those payments to
13 GlobeCast.
14     That's all. And like I said,
15 there's probably 60 or 70 of those
16 subscribers.
17     Q   So those payments are included --
18 or those subscribers are included in
19 GlobeCast payments to Euro View?
20     A   Correct.
21     Q   Which entity collects revenues from
22 television subscribers in Canada?
23     A   Telewizja Polska Canada.
24     Q   Is that the only entity that
25 collects revenue from subscribers in Canada?

6 (Pages 18 to 21)

| Page 22 | Page 24 |
|---|---|

**Page 22**

1      BOGUSLAW SPANSKI - VOLUME I
2    A    Correct.
3      MR. ZAVIN: Objection. Other
4 than what he just testified to?
5      MR. WENGER: Yeah.
6      MR. FINK: That's an objection?
7      MR. ZAVIN: Yes. Misstating
8 prior testimony. Avoiding confusion.
9      MR. FINK: Thank you.
10    Q    Just to be clear, TVP Panama is the
11 only entity that collects any Internet
12 revenues?
13    A    Correct.
14    Q    What other revenue streams do any
15 of these entities, the four entities we were
16 discussing, have besides for television or
17 Internet subscription revenues?
18    A    When you are asking television
19 revenues, how do you specify that?
20 Television revenues.
21    Q    Subscriber revenues.
22    A    There's no other subscriber
23 revenues.
24    Q    Besides for subscriber revenues,
25 are there any other revenues collected by

**Page 24**

1      BOGUSLAW SPANSKI - VOLUME I
2    Q    What entities are those that are
3 paid these commissions?
4    A    I mean, there are two entities
5 which pay commission, to my recollection:
6 One which is on advertising side and there
7 is standard media has a commission of
8 15 percent, which is paid to when we get
9 some advertising placed in the programming.
10      And secondary, there's one entity
11 called -- right now it's called NBC News,
12 but it used to be called International Media
13 Distribution, in which we had agreement by
14 which they represented us in soliciting
15 cable companies to gain distribution.
16    Q    For the second company you
17 mentioned, IMD or now NBC, what is the
18 percentage that is paid for new subscribers?
19    A    It's not for new subscribers. It
20 is they receive commission on revenues
21 derived from cable companies' contracts.
22    Q    That's not exactly what I was
23 talking about because I understand that
24 there's other entities that also get some
25 percentage of revenues for subscribers.

| Page 23 | Page 25 |
|---|---|

**Page 23**

1      BOGUSLAW SPANSKI - VOLUME I
2 any of these companies?
3    A    Advertising revenues.
4    Q    Anything else?
5    A    No.
6    Q    Do any of these entities have any
7 relationship with any company whereby if
8 those companies help get subscribers or sign
9 up subscribers, any other company would pay
10 one of these -- one of these companies would
11 pay any of those other companies money?
12      MR. ZAVIN: Objection. I
13 didn't understand the question.
14    A    Neither have I. Can you be more
15 specific?
16    Q    The question is: If any entity
17 assists with getting subscribers, does -- do
18 any of these entities pay such entity for
19 helping to get subscribers?
20    A    I mean, you are asking -- excuse me
21 if I'll paraphrase your question.
22      But are you asking if any of these
23 entities paid commission for revenues?
24    Q    That's right.
25    A    Yes.

**Page 25**

1      BOGUSLAW SPANSKI - VOLUME I
2 I'm specifically talking about for
3 signing up new subscribers.
4      Do any of your entities pay any
5 entity to help sign up new subscribers?
6    A    I mean, to precisely answer your
7 question, it is none, because it is not a
8 commission.
9      We have an agency arrangement with,
10 as used to be known AIMD, before it was
11 known as International Channels Network,
12 which represented us in negotiations with
13 cable companies and they are involved in
14 collecting revenues from subscribers from
15 those cable companies.
16      They consolidate those payments,
17 and based on those revenues, they receive
18 commission of 10 percent.
19    Q    Okay.
20      Other than IMD, is there any other
21 entity like IMD that helps -- well,
22 shouldn't say like IMD.
23      Is there any other entity that one
24 of your entities pays to get new
25 subscribers?

7 (Pages 22 to 25)

Page 26

```
 1        BOGUSLAW SPANSKI - VOLUME I
 2      A    No.
 3      Q    How does -- back up.
 4           What channels does SEI broadcast --
 5   or I shouldn't say SEI, or one of its -- SEI
 6   or one of its subsidiaries.
 7           Which channels are you involved in
 8   distributing?
 9      A    We are licensed to two channels by
10   TVP.
11           We have a license for channel
12   called Tele 5.  And we are also licensed for
13   Telewizja International as well as two radio
14   channels of Polskie Radio.
15      Q    What is Tele 5?
16      A    Tele 5 is a commercial broadcaster
17   or television station in Poland.
18      Q    What is Polsat 2 International?
19      A    Polsat 2 International is
20   equivalent of what TV Polonia is to
21   Telewizja Polska, is that program produced
22   by probably the largest one of two largest
23   commercial broadcasters in Poland called
24   Polsat.
25           So Polsat 2 International is the
```

Page 27

```
 1        BOGUSLAW SPANSKI - VOLUME I
 2   channel that is done by Polsat for audience
 3   abroad.
 4      Q    And for the two radio channels,
 5   what are those?
 6      A    Those are radio channels produced
 7   by and broadcast by Polish Public
 8   Broadcaster.
 9      Q    So there's TV Polonia, TVP Info,
10   Tele 5, Polsat 2 International and two radio
11   channels.
12           Are there anything else distributed
13   by SEI are or its subsidiaries?
14      A    No.
15      Q    Tele 5 and Polsat 2 and the two
16   radio channels, are those distributed via
17   television distribution?
18      A    Yes.
19      Q    The radio channels, how are those
20   distributed?
21      A    They're all put in the package
22   together with TVP, Polonia, all together.
23      Q    And are those channels including
24   the radio stations available on the Website?
25      A    Correct.
```

Page 28

```
 1        BOGUSLAW SPANSKI - VOLUME I
 2           There's not Polsat and not Tele 5.
 3           On our Website there is only TV
 4   Polonia and TV radio channels.
 5      Q    And when did those two radio
 6   channels go onto your Website?
 7      A    To my knowledge, from 2002 or even
 8   earlier.
 9      Q    And Tele 5, when did you start
10   including that with your television
11   broadcast package?
12      A    As soon as we have obtained a
13   license, which I'm trying to recollect the
14   time but I believe it was probably 2004.
15      Q    And when did you start including
16   Polsat 2 International in your television
17   package?
18      A    I have to advise you that Polsat 2
19   International is licensed in Canada.
20      Q    And when did you get that license?
21      A    2003, if I recall correctly.
22      Q    And is that about the time that you
23   started including that in your -- Polsat 2
24   in your television package in Canada?
25      A    We had basically Polsat 2.  We have
```

Page 29

```
 1        BOGUSLAW SPANSKI - VOLUME I
 2   not been successful in placing it on cable
 3   or satellite.
 4           We have placed it on the Internet
 5   as well an IPTV.
 6      Q    What entity licensed Tele 5 to you?
 7           Just to be clear, when I say "you"
 8   I mean you or your companies.
 9      A    The entity with whom we licensed
10   Tele 5 was the owner and broadcaster of this
11   channel in Poland.
12           And originally it was called
13   TinCast Broadcasting.  It later changed
14   name to PolCast Broadcasting.
15      Q    You said that you obtained that
16   license in 2004.
17           How long does that license extend
18   for?
19      A    I mean, I'm speaking from memory.
20   I believe that it is for a -- seven years of
21   automatic renewal.  Another ten to seven
22   years.
23      Q    What do you pay PolCast now for
24   that license, or what have you paid
25   originally for that?
```

8 (Pages 26 to 29)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 30

1    BOGUSLAW SPANSKI - VOLUME I
2       MR. ZAVIN: Objection.
3       A    This is confidential information,
4    which is in the contract.
5       THE WITNESS: Unless I be
6    directed by counsel ...
7       MR. ZAVIN: Unless you can tell
8    me why that's conceivably relevant to
9    this -- that's a confidential
10   agreement.
11      MR. WENGER: There's a
12   66 percent allocation for revenue
13   earned for TVP Broadcasting and I
14   think we're entitled to know what SEI
15   pays for its other programming.
16      MR. ZAVIN: No. You are now
17   talking about a confidential
18   agreement with a direct competitor of
19   your client. Sixty-six percent was
20   by agreement. It's fixed. It has
21   nothing to do with whatever the
22   arrangement is with PolCast.
23      And based on the confidential
24   nature of that agreement, unless you can
25   give me a reason that is specifically

Page 31

1    BOGUSLAW SPANSKI - VOLUME I
2    related to this litigation, I'm going to
3    direct the witness not it answer.
4       MR. WENGER: We'll leave that
5    for now.
6       MR. FINK: Hold on. Can I
7    speak to you for a second.
8       THE VIDEOGRAPHER: The time is
9    2:35 p.m. We're going off the
10   record.
11      (A brief recess was
12   taken.)
13      THE VIDEOGRAPHER: The time is
14   2:40 p.m. Back on the record.
15      MR. WENGER: Revisiting where
16   we left off.
17      Our position is that TVP is
18   entitled to know what Spanski is paying
19   for its other programming, nonTVP
20   programming, in order for us to determine
21   the fairness, if at all, of that
22   66 percent attribution to TVP.
23      So are you directing your client
24   not to answer that question?
25      MR. ZAVIN: The fairness has

Page 32

1    BOGUSLAW SPANSKI - VOLUME I
2    nothing to do with this litigation,
3    whether it's too high or too low.
4    It's an agreed-upon amount, so it's
5    not an issue to this litigation.
6       So the answer yes, I'm going to
7    continue to direct the witness not to
8    answer.
9       (Directive to witness.)
10   BY MR. WENGER:
11      Q    For Polsat 2 International, how
12   long does that license extend for?
13      A    Again, I believe it extends till
14   year end of 2012 with also automatic
15   provision for automatic extension.
16      Q    Do you plan to renew your license
17   agreement for Tele 5 and Polsat 2
18   International?
19      A    I do.
20      Q    For the two radio channels, are
21   those also licensed from a Polish entity?
22      A    Correct.
23      Q    Which entity is is that?
24      A    Polskie Radio.
25      Q    How long do those licenses last

Page 33

1    BOGUSLAW SPANSKI - VOLUME I
2    for?
3       A    They have indefinite period of time
4    with respect to the -- there's no specific
5    terms of the license.
6       Q    Is it right that you obtained those
7    licenses in 2002 for their radio channels?
8       A    Either 2002 or 2003. I could not
9    be that specific.
10      Q    With respect to TVP Polonia,
11   TV Polonia, explain to me how SEI and its
12   subsidiaries actually distribute that
13   channel?
14      A    What do you mean "how" we
15   distribute?
16      Q    My question is a technical
17   question.
18      How does the TVP broadcast of
19   TV Polonia get from TVP to a cable
20   subscriber in the United States?
21      A    Excuse me. I'll be using the
22   technical language since you asked me
23   technical question.
24      We downlink the signal from
25   European satellite, which I believe is

9 (Pages 30 to 33)

Page 34

1     BOGUSLAW SPANSKI - VOLUME I
2   Astra, and then we feed the signal to -- for
3   fiberoptic network to New York.
4       Q    Hang on.  Let me stop you there.
5       I'm not familiar with the technical
6   terms.
7       What does "downlink" mean?
8       A    Downlink is downlinking the signal
9   from the satellite to earth.  It's called
10  downlinking.  Reverse action is called
11  uplinking.
12      Q    So it's a method of receiving a
13  satellite signal?
14      A    Yes.
15      Q    Where is that satellite signal
16  received?
17      A    In Warsaw.
18      Q    By whom is it received?
19      A    By our offices.
20      I'm glad you asked the question
21  because I need to correct my previous answer
22  with respect to our employees, and so we
23  also have three employees in Warsaw.
24      Q    Do you have any other offices you
25  haven't told me about?

Page 35

1     BOGUSLAW SPANSKI - VOLUME I
2       A    No.  I think that simply slipped my
3   mind we have an office in Warsaw.
4       Q    Who works there?
5       A    I mean, I can tell you who manages
6   the operation.  The name is Drevitz
7   Loncrist but he has two other employees whom
8   I do not know.
9       I don't recall the names.
10      Q    Do you pay their salaries?
11      A    Correct.
12      Q    Where is the office?
13      A    Warsaw.
14      Q    What's the address?
15      A    It's Chonkey Street.  Shall I
16  spell it for you?
17      Q    No.
18      What number was that?
19      A    To my recollection, 177.
20      Q    How long have you had that office
21  in Warsaw?
22      A    2003 or 2004.
23      Q    Are those full-time employees?
24      A    Yes.
25      Q    Back to the signal and how it's

Page 36

1     BOGUSLAW SPANSKI - VOLUME I
2   transmitted.  So your Warsaw office receives
3   the signal from the Astra satellite, you say
4   downlinks it.
5       And is it recorded then in Warsaw?
6       A    Different signals are treated
7   differently.
8       Q    The TV Polonia?
9       A    TV Polonia is not recorded.
10      Q    So it's downlinked and then what
11  happens to it?
12      A    It goes through various high-tech
13  equipment and is being then fed to fiber
14  optics and cables which delivers the signal
15  to New York from where it goes to
16  Los Angeles, Culver City, where it's being
17  uplinked to domestic satellite called
18  Galaxy 19, from where it's being received by
19  both direct to home subscribers as well as
20  received by cable head ends.
21      Q    Cable what?
22      A    Head ends.  Head ends.  Ending of
23  the head.
24      Q    When you say "cable head ends," are
25  those basically cable companies that receive

Page 37

1     BOGUSLAW SPANSKI - VOLUME I
2   it and then broadcast it to their cable
3   subscribers?
4       A    That's what it is.
5       Q    And just so I understand, there is
6   no actual recording of the broadcasting in
7   Warsaw.
8       There is just essentially a
9   conversion of the signal in your Warsaw
10  office, and then that conversion is
11  transmitted via fiberoptic cable to the
12  New York -- to a New York station or -- is
13  that right so far?
14      A    If you are referring to TV Polonia,
15  that's more or less accurate.
16      Q    Where is it received in New York?
17      A    It's received in one of the
18  telecommunication hubs located in 111th
19  Street, Eighth Avenue, which is then
20  transmitted to another telecommunication hub
21  located in 60 Hudson Street.
22      Q    And then it's sent to Culver City?
23      A    Then it's sent via fiber optics,
24  sent to Culver city.
25      Q    Do you have to pay for that process

10  (Pages 34 to 37)

Page 38

BOGUSLAW SPANSKI - VOLUME I

1    BOGUSLAW SPANSKI - VOLUME I
2  whereby the signal goes from New York to LA
3  through the satellite?
4       A    I do.
5       Q    Who do you pay?
6       A    TeliaSonera.
7            The largest telecommunication
8  operator in the world, most likely.  Public
9  company located in Sweden.
10      Q    And for TVP Info, is it the same
11 process of getting the signal from the
12 satellite to subscribers here?
13      A    No.
14      Q    Describe that process for me for
15 TVP Info.
16      A    It is downlinked from the same
17 satellite as TVP Polonia.
18           And then it being recorded in
19 Warsaw, and then there is a play list
20 created to adjust to the time difference of
21 six hours.
22           And then this program is being sent
23 via fiber optics in the same location as
24 described before.
25      Q    And then it follows the same path

Page 40

BOGUSLAW SPANSKI - VOLUME I

1    BOGUSLAW SPANSKI - VOLUME I
2  very often ends its broadcast at 11 p.m.,
3  sometimes 1 p.m. -- or not 1 p.m, 1 a.m.
4            And then you have simply a black
5  screen.
6            Because it's done directly for
7  domestic market.  So it would be simply
8  irresponsible on our part to provide the
9  signal live which would provide the venture
10 with a black screen at prime time.
11           So it was the practice established
12 a long time and agreed that at the time of
13 TVP that's how we would do it and that's how
14 we're doing it.
15      Q    Do you have any plans to change the
16 way you receive and transmit TV Polonia on
17 TVP Info?
18      A    I have many plans.
19           Or I should say I had many plans
20 but life verifies those plans.  I did not
21 plan to be here today.
22      Q    I just wanted to know if you have
23 any plans to change the way you receive or
24 send these channels from Poland.
25      A    We have a flexibility of changing

Page 39

BOGUSLAW SPANSKI - VOLUME I

1    BOGUSLAW SPANSKI - VOLUME I
2  as the TV Polonia?
3       A    Correct.
4       Q    Why do you do it differently for
5  TV Polonia and TVP Info?
6       A    Initially when we obtained license
7  for TVP Info, it was called at that time
8  TVP 3.
9            There was a content which was
10 unauthorized or did not have the rights to
11 distribution in North America.  Our
12 obligation was to remove that content in
13 order to end distribute in North America
14 only the content that TVP had the rights to
15 distribute.
16           And as with time progress, TVP 3
17 has emerged to become TVP Info, with less
18 and less content being not having the rights
19 for distribution in North America.
20           Nevertheless, at the current,
21 contrary to TV Polonia where there are
22 programming blocks done specifically for
23 particular markets like for European markets
24 or for North American markets, TVP Info does
25 not have that.  It is a news channel which

Page 41

BOGUSLAW SPANSKI - VOLUME I

1    BOGUSLAW SPANSKI - VOLUME I
2  the way we receive channels, and if the need
3  will arise, we will adopt.  But I don't
4  have, sitting right now I don't have any
5  plans to change.
6       Q    What other options were you
7  thinking about?
8       A    It's not that I'm thinking about
9  it.
10      Q    You told me you had some other
11 options.
12      A    There are always options.
13      Q    Tell me what they are.
14      A    I mean, instead of doing downlink
15 from satellite, we can use terrestrial
16 broadcast.
17      Q    What does that mean, what does a
18 terrestrial broadcast mean?
19      A    Terrestrial broadcast is
20 terrestrial broadcast.
21           If you are asking me what
22 "terrestrial" means?
23      Q    I'm asking you to explain it to me
24 as a layperson what does it mean -- how is a
25 terrestrial broadcast different than what we

11 (Pages 38 to 41)

Page 42

1    BOGUSLAW SPANSKI - VOLUME I
2  just discussed?
3    A    Contrary to satellite broadcast,
4  terrestrial broadcast is you stick the
5  antenna through your window and you receive
6  terrestrial broadcast.  You don't need to
7  have cable.  You don't need to have
8  satellite.
9        It's just like a radio.
10   Q    So how would the signal come from
11 the Astra satellite to a subscriber under
12 this terrestrial broadcast method?
13   A    We would simply not downlink it
14 from Astra satellite.  We will simply have a
15 terrestrial antenna.
16       Maybe I'll step back, if you will
17 allow me --
18   Q    Please.
19   A    -- since you want me to explain it
20 to you.
21       Poland is right now in the process
22 of changing from analog broadcast to digital
23 broadcast, which simply makes the fact that
24 from -- terrestrial broadcast is becoming
25 high-quality digital broadcast.

Page 43

1    BOGUSLAW SPANSKI - VOLUME I
2        Instead of downlinking from
3  satellite, you can obtain the same quality
4  signal just having the little antenna on
5  your roof.  And simply you omit one link,
6  which is the satellite.  As we would have
7  the signal just in the air, we would simply
8  put into the fiber optics and transport it.
9        So that's one of the options.
10   Q    I don't really follow that.
11       You have this signal coming off a
12 satellite.
13       So an alternative is to basically
14 equip the subscribers with a certain way of
15 receiving that signal directly from the
16 satellite?
17   A    No.  You missed me completely.
18 Because what we're talking about, we are
19 talking about Warsaw versus we're talking,
20 say, New York.
21   Q    But your subscribers are in the
22 United States and Canada.
23   A    Yes.
24   Q    So how would they receive the
25 signal from the Astra satellite in this

Page 44

1    BOGUSLAW SPANSKI - VOLUME I
2  other format that you are describing?
3    A    You asked me how I would change,
4  what I would do, and I told you that one of
5  the things which might change is to stop
6  using the satellite or downlinking the
7  signal in Warsaw and, instead, I would use
8  the terrestrial broadcast.
9        I was not talking about how our
10 subscribers in the Astra would receive it.
11 I was talking about how we would receive the
12 signal for farther transporting it to the
13 United States.
14   Q    So the Warsaw to New York to LA
15 link would stay the same.  There would just
16 be perhaps another option for your Warsaw
17 office to receive the TVP broadcast?
18   A    Yes.
19   Q    What third-party distributors does
20 SEI or its subsidiaries do business with?
21   A    The list of all our distributors I
22 believe were provided to TVP as well as to
23 you.
24       But if you want me to, from my
25 memory to go by every cable company --

Page 45

1    BOGUSLAW SPANSKI - VOLUME I
2  that's what you want me to do?
3    Q    I just asked a question.  You can
4  try to answer it to the best of your
5  ability, but if you prefer I list them, I
6  can do that.
7        So go ahead.
8    A    In respect to satellite in the
9  United States, satellite distribution direct
10 to home distribution is called GlobeCast.
11       And to be specific, you want to
12 talk about present, not in the past.
13   Q    That's correct.
14   A    So GlobeCast is a satellite direct
15 to home.
16       And then we were talking about
17 cable companies being Cablevision, Cox
18 Communications, Time Warner, ComCast, AT&T,
19 Verizon.
20       I don't know if they are still
21 doing that, RCA.  That would be United
22 States.  And I believe that RCA is not doing
23 any longer.  That's the reason I'm hesitant
24 to stay they're doing.
25       They used to.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

**A-206**

BOGUSLAW SPANSKI - VOLUME I

1       BOGUSLAW SPANSKI - VOLUME I
2       In Canada, we have --
3    Q    Let's just take the United States
4 first.
5       These entities you just mentioned,
6 Cablevision, Cox, ComCast, AT&T, Verizon and
7 Time Warner, are -- any of those fall within
8 the IMD umbrella?
9    A    Except GlobeCast and except Time
10 Warner, I believe they do.
11    Q    So Cablevision, Cox, ComCast, AT&T
12 and Verizon, those five fall underneath the
13 IMD packaging?
14    A    IMD, yes.
15    Q    Is Direct TV another US --
16    A    They used to be. They used to be.
17 They no longer.
18    Q    Since when?
19    A    I believe that we've terminated our
20 relation, it was May of last year.
21    Q    Why?
22    A    They decided that they are not
23 going to pursue international programming
24 anymore.
25    Q    And the distributors in Canada, who

1       BOGUSLAW SPANSKI - VOLUME I
2 are those?
3    A    I mean, there is satellite
4 distributors, used to be called Bell Express
5 View, but right now they're Bell. And then
6 there's cable companies, Rogers Cable,
7 Cogeco, Teles and recently added MTS.
8       I believe those are the ones.
9    Q    Is Shaw another one?
10    A    Oh, yes. Shaw is another one.
11    Q    What does "MTS" stand for?
12    A    Something to do with Manitoba
13 Telecommunications Systems.
14    Q    How many subscribers do you have
15 through MTS?
16    A    Fifty or a hundred.
17    Q    What are your three largest cable
18 company distributors or satellite
19 distributors?
20    A    Where?
21    Q    In general.
22    A    I mean, the largest would be
23 Cablevision.
24       And the second would come, I would
25 guess would be Rogers.

1       BOGUSLAW SPANSKI - VOLUME I
2       But I might be mistaken but I would
3 say those are the two largest.
4    Q    What would be the next one after
5 Rogers?
6    A    I mean, I don't want to provide you
7 with incorrect information.
8       I mean, I don't recall those
9 numbers off hand.
10       I know the ones which I gave you
11 are the most significant.
12    Q    Most significant in terms of the
13 number of subscribers?
14    A    Number of subscribers, yes.
15    Q    Are you in negotiation with any
16 other third-party distributors or cable
17 companies?
18    A    I mean, I'm in constant
19 negotiations in respect to expanding our
20 subscriber base, but due to the ongoing
21 litigations certain things have been put on
22 hold.
23    Q    You mean this litigation?
24    A    That's correct.
25    Q    Why are things put on hold because

1       BOGUSLAW SPANSKI - VOLUME I
2 of this litigation?
3    A    Because I'm preoccupied with
4 litigation.
5    Q    So there are negotiations that you
6 stopped because you are preoccupied with
7 this litigation?
8    A    Actually, there were negotiations
9 which would, for example, we would like to
10 offer more to our subscribers in order to
11 expand the number of subscribers. But due
12 to the position which was taken by TVP, we
13 were not in position to expand on those
14 negotiations, as things which seems to be
15 natural of providing additional content to
16 subscribers to make them happy and more --
17 and retain them simply did not materialize.
18    Q    I don't think you answered my
19 question.
20       I'm asking whether you are in
21 negotiations with other entities,
22 third-party cable company distributors --
23    A    Besides those --
24    Q    Besides these nine or ten that you
25 listed -- to distribute the broadcasting

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 50

1    BOGUSLAW SPANSKI - VOLUME I
2  that your companies distribute.
3    A    No.
4    Q    So what did you refer to that you
5  stopped because of this litigation?
6    A    I just tried to explain, obviously
7  unsuccessful.
8    Q    Were you referring to content, that
9  you were trying to add to your current
10 offerings rather than negotiations with
11 additional entities?
12   A    I was trying to expand the offering
13 to TVP channels to existing.
14   Q    To existing customers rather than
15 to expand your network to other third-party
16 distributors?
17   A    To be precise, there are not more,
18 if any, additional third-party distributors
19 besides the ones that we have agreements
20 with.
21   Q    What do you mean "there are not
22 more"?  Are there not more in the market or
23 are there not more that you are negotiating
24 with?
25   A    To my knowledge, we have agreements

Page 51

1    BOGUSLAW SPANSKI - VOLUME I
2  with all cable companies.
3         We have had an agreement with the
4  largest satellite company in the United
5  States, Direct TV, which decided to scale
6  down and not remove entirely out of
7  international essay broadcasting.
8         And we also had a relationship with
9  second largest direct-to-home operator.
10        So what I meant was that I don't
11 that there are other parties besides the
12 ones with whom we have or had relations.
13   Q    The company Optimum Online, is that
14 part of Cablevision or is that a separate
15 company?
16   A    Optimum Online?
17        I understand that Cablevision has
18 the digital platform which is called "O" and
19 I don't know whether it's Optimum, but may
20 extend to Optimum.
21   Q    I'm going to call them third-party
22 distributors, just so we're clear.
23        The financial terms with these
24 companies, generally, are that they keep a
25 certain percentage of the revenue that they

Page 52

1    BOGUSLAW SPANSKI - VOLUME I
2  collect from individual subscribers and then
3  give you the balance of that revenue?
4    A    Usually, there is a revenue-sharing
5  formula.
6    Q    You say "usually."  Are there some
7  entities that pass through to you a hundred
8  percent of the revenue that they earn?
9    A    No.
10   Q    So why do you say usually?
11   A    Because they are usual.  To me it's
12 usual.  I say it's usual.
13   Q    And what percentage do they keep?
14   A    I will again use the word "usually"
15 because they may vary, but currently the
16 rule of the thumb is that the distributor or
17 cable company keeps 60 percent, providing
18 the program content provider 40 percent.
19        And I underline the word "usually"
20 because depends when the agreement is
21 negotiated, what are the prevailing of the
22 agreements, terms and so on.  Some companies
23 are more determined to stick to 60/40.  Some
24 agree to 50/50.
25   Q    What is the best split that you

Page 53

1    BOGUSLAW SPANSKI - VOLUME I
2  have from your perspective in terms of the
3  splitting with third-party distributors?
4    A    I believe that you are privy to
5  this information already, but I believe it's
6  confidential to the agreement which we have
7  with one of the distributors.
8        THE WITNESS:  Shall I ask my
9  counsel if I shall divulge that
10 confidential information, if they
11 haven't already?
12        MR. ZAVIN:  May I talk to my
13 client a moment.
14        MR. WENGER:  Sure.
15        THE VIDEOGRAPHER:  The time is
16 3:07 p.m.  We're going off the
17 record.
18        (A brief recess was
19 taken.)
20        THE VIDEOGRAPHER:  The time is
21 3:08 p.m.  We're back on the record.
22        MR. WENGER:  Court Reporter, do
23 you mind reading back the last
24 question?
25        (Requested portion of record read:

14  (Pages 50 to 53)

Page 54

BOGUSLAW SPANSKI - VOLUME I

1
2      "Q. What is the best split that
3   you have from your perspective in terms
4   of the splitting with third-party
5   distributors?
6      "A. I believe that you are privy
7   to this information already, but I
8   believe it's confidential to the
9   agreement which we have with one of the
10  distributors.")
11     (End of read-back.)
12  BY MR. WENGER:
13     Q   I'll rephrase the question.
14        From the agreements that you have
15  with third-party distributors, which one of
16  them has the best revenue share, from your
17  company's perspective?
18     A   GlobeCast.
19     Q   What percentage is is that?
20     A   We receive 75 percent.
21     Q   So if they collect $10 a month from
22  a subscriber, they keep 2.50, you keep 7.50?
23     A   That's correct.
24     Q   And what is the most
25  disadvantageous in terms from your company's

Page 55

BOGUSLAW SPANSKI - VOLUME I

1
2   perspective.  Is that a 50/50 split or
3   something else?
4      A   Yes.  It's 50/50.
5      Q   And which company is that with?
6      A   I believe that most of our
7   distributors have, if not all, have 50/50
8   agreements.
9      Q   Do any of the agreements with these
10  third-party distributors prevent those
11  third-party distributors from communicating
12  directly with TVP?
13     A   I don't recall if they do.  I don't
14  have such recollection.
15     Q   Have you ever told third-party
16  distributors not to communicate with TVP?
17     A   I don't recall.
18        I might in view of litigation which
19  was with Echostar.
20        This issue might have been --
21     Q   How about in the last two years,
22  have you directed any of the third-party
23  distributors not to communicate with TVP
24  directly?
25     A   I may.

Page 56

BOGUSLAW SPANSKI - VOLUME I

1
2      Q   But you're not sure?
3      A   I'm not sure.  I don't recall.
4      Q   Is there a reason why you would
5   tell third-party distributors not to
6   communicate with TVP directly?
7      A   If I would, I would simply do it
8   not to interfere with our licenses.  That
9   was the purpose.
10     Q   But you wouldn't have any other
11  reason to tell them not to communicate with
12  TVP?
13     A   I mean, I don't understand the
14  question.  What would be the reason?
15     Q   I'm asking you.  If there is no
16  other reason, then you can just say that.
17     A   I mean, I said that we have a
18  license, and if we were licensing somebody
19  else on the products which we were licensee,
20  then obviously we didn't want them to
21  communicate on those licenses with our
22  licensor.
23     Q   What would be the concern?
24     A   The concern would be repetition of
25  the situation from 2006 where we had

Page 57

BOGUSLAW SPANSKI - VOLUME I

1
2   litigation with Dish Network.  We're about
3   to settle for very substantial amount of
4   money as well as extremely favorable terms
5   for farther distribution.
6         An individual representing TVP has
7   tuffled all the work and efforts which
8   resulted that Dish Network has removed
9   themselves from settlement and we went to
10  litigation.  Fortunately, we won the
11  litigation, but we lost a great opportunity
12  solely due to interference by TVP into our
13  business dealings and territory.
14        So that was the reason.
15     Q   Is Dish Network another third-party
16  distributor that SEI or subsidiaries could
17  potentially contract with?
18     A   It is.
19     Q   What are some of the main
20  competitors in the United States for Polish
21  television broadcasting?
22        MR. ZAVIN:  Objection.
23        David, I let this go on.  Is there
24  any relationship between this question
25  and this litigation?

15 (Pages 54 to 57)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 58

BOGUSLAW SPANSKI - VOLUME I

1     BOGUSLAW SPANSKI - VOLUME I
2          I mean, you've got seven hours and
3     I guess you can spend it any way you
4     want.
5          But other than exploring the
6     general market in the United States,
7     please tell me how this is related to
8     this litigation.
9          MR. WENGER:  Well, all
10    subscribers, one of the first things
11    that come to mind is competition.  So
12    let's find out what the competition
13    is.
14         MR. ZAVIN:  Okay.
15    BY MR. WENGER:
16         Q    What are the main competitors for
17    Polish television broadcasting in the United
18    States with the broadcasting that you
19    distribute?
20         A    The competitors in respect to the
21    broadcasters or distributors?
22         Q    I'm talking from the perspective of
23    a subscriber.
24         If I want to watch Polish
25    television, I can either subscribe to

Page 59

1     BOGUSLAW SPANSKI - VOLUME I
2     TV Polonia or TVP Info in your package, or
3     what are the other options to me, available
4     to me?
5          A    The other option is Dish Network,
6     which you mentioned before, which offers
7     other Polish channels.
8          Q    Is there any other offering on
9     television of Polish language broadcasting?
10         A    There is Polvision, which is very
11    significant because they literally compete
12    in the largest market in the United States,
13    being Chicago, and beyond because they also
14    broadcast in other markets.
15         But I would say that competition
16    would be those two, Polvision and Dish
17    Network.
18         Q    And that's with respect to
19    television competition?
20         A    Correct.
21         Q    Does TVN, the company TVN, offer
22    any of its television programming in the
23    United States?
24         A    They do.
25         Q    Through which company?

Page 60

1     BOGUSLAW SPANSKI - VOLUME I
2          Q    I mean, they offer it through cable
3     as well as Dish Network.
4          Q    So is that another competitor as
5     well?
6          A    As well as IPTV.
7          Q    Right now we're just focused on
8     television.
9          Is TVN another competitor with your
10    television package?
11         A    I know why I misunderstood your
12    question, because when talking about
13    competitors I thought you were referring to
14    mainly distributors.  Because TVN is on Dish
15    Network as well as recently they also
16    launched their channel in some of the cable
17    system, of which as a matter of fact we're
18    also.  So there's more complementing than
19    competing.
20         Q    Are there any other entities like
21    TVN that you haven't mentioned that offer
22    Polish language television?
23         A    There's Polsat and there are some
24    other channels.
25         Do you want me to spell them out.

Page 61

1     BOGUSLAW SPANSKI - VOLUME I
2          Q    Yeah, please.
3          A    There is Silesia TV, TVS, and there
4     used to be, I don't know if they still do
5     it, it's Kino Polska.  There's TVM 24 which
6     is equivalent of TVP 84.
7          And there is a number of --
8     quintessential number of channels which is
9     on the same platform they have also launched
10    our channels on.
11         And they're too numerous to list
12    them.  I mean, I don't even recall their
13    names, but there's probably close to 20.
14         But in respect to competition, I
15    think the ones I mentioned are the main
16    ones.
17         Q    Just so I'm clear, there is
18    approximately 20 other Polish channels
19    available to a subscriber, let's say, in New
20    York to wants to watch Polish TV?
21         A    On IPTV is television.  It's not
22    Internet.
23         Q    Okay.
24         So that is television.
25         Let's talk about the Internet.

16 (Pages 58 to 61)

Page 62

1    BOGUSLAW SPANSKI - VOLUME I
2          There is TV Polonia.com.
3          What are the other major Websites
4    that offer Polish language programming via
5    the Internet?
6      A    One, which used to, is IBM Plus
7    Records.
8          And I have no knowledge of -- I
9    mean, I can assume is that TVN might have
10   their own.
11         I do not know.  I'm not aware of
12   Polsat Internet platform beside the ones
13   which we do, but we do only for Canada.
14         So that's basically my answer.
15     Q    So would you say that your main
16   competitor in terms of Web subscribers would
17   be TVN?
18     A    I do the know if TVN offers their
19   programs to North America.  I'm not
20   following their presence on the Internet.
21     Q    Does anyone in your company do
22   market research?
23     A    We have a person who is a -- if you
24   are referring to Internet?  I want to be
25   specific.

Page 63

1    BOGUSLAW SPANSKI - VOLUME I
2      Q    Television or Internet.
3      A    Internet.
4      A    In respect to Internet, the person
5    who is looking after and who does his best
6    to be on top of things is Mr. Tom Glavowski,
7    who is our Web master.
8          In respect to television, we rely
9    on IMD in our mutual endeavors in respect to
10   trying to keep our tabs on what is happening
11   in the marketplace.
12     Q    Do you know what percentage of the
13   market or market share you have for your
14   programming amongst Polish -- the Polish
15   viewing audience?
16     A    Yes.  We know that we have the
17   largest.
18     Q    What percentage?  If you can
19   approximate, that's fine.
20     A    It's not what percentage.  We know
21   what our competitors have in respect to
22   subscribers, and we hold the lead among
23   subscribers.  We have the biggest number of
24   subscribers.
25     Q    So you say you have a slight lead

Page 64

1    BOGUSLAW SPANSKI - VOLUME I
2    over which company?
3      A    TVN.
4      Q    So TVN and Polsat have more
5    subscribers than you?
6      A    No.
7      Q    If you add all your competitors
8    together, do they have more subscribers than
9    you?
10     A    No.
11         Excuse me.
12         I would qualify my answer because
13   if you add subscribers who have two
14   channels, Polsat and TVN as two, then you
15   can get into this type of automatics that
16   have more.  But if you have one subscriber
17   who subscribes to Polsat and TVN as one,
18   then we have more.
19     Q    What's your opinion of the general
20   trend of the cable TV market in the United
21   States?
22     A    General?
23     Q    General trends of the cable TV
24   market?
25         MR. ZAVIN:  Objection.  If he

Page 65

1    BOGUSLAW SPANSKI - VOLUME I
2    can answer.  That's --
3          MR. WENGER:  This is somebody
4    who has been --
5          MR. FINK:  He's objecting.
6    He's allowing him to answer.
7          That's a good question.
8      A    My opinion is that cable market is
9    steady.  It's becoming very competitive to
10   satellite or direct-to-home market due to
11   the offer called triple play which
12   satellite companies cannot offer.
13     Q    Have you seen a trend of people
14   leaving television subscriptions in favor of
15   watching programming on the Internet?
16     A    As a matter of fact, we tried to
17   participate in this trend, but Internet, I
18   think we need to be very specific because
19   IPTV, which is the regular television
20   delivered via Internet, is not what Internet
21   television is.
22         For example, tvpoland.com is
23   strictly a Web page that offers the services
24   but it is not IPTV.
25         Maybe I need to explain it to you.

17 (Pages 62 to 65)

Page 66

BOGUSLAW SPANSKI - VOLUME I

1   BOGUSLAW SPANSKI - VOLUME I
2   You may be well aware of that, but since I
3   started, this is the television which simply
4   delivers the signal instead of cable via
5   Internet.
6       But the effect is the same. It's
7   hooked up to TV and you watch on the
8   television same as if you watched satellite
9   or cable company.
10      Q   But you need an IPTV-compatible
11  television to watch IPTV, correct?
12      A   Not -- IPTV compatible is simply
13  the box which is very small in size. You
14  need a little device.
15      Q   Right. I'm referring, though,
16  specifically to television versus a dot com
17  site.
18      Is there any trend of people going
19  away from the television watching, either
20  IPTV or satellite or cable, to strictly dot
21  com site, so that people would leave
22  television to watch programs on a Website?
23      MR. ZAVIN: Objection. Just to
24  specify, you are talking about in the
25  package market or entire television

Page 67

1   BOGUSLAW SPANSKI - VOLUME I
2   market in the United States in
3   general.
4       Q   Let's talk about the Polish market
5   specifically.
6       A   I'm glad you have clarified that
7   because what you referred about migration
8   from traditional television to Internet,
9   including the mobile devices, the iPads or
10  four-inch Smart Phones, young generation,
11  you are talking about people 20-plus
12  something, definitely this is the trend.
13      Our viewers of -- and I'll be
14  specific of TV Polonia, are 50 plus people.
15      We have people who are eighty years
16  old. They have a great difficulty of
17  adapting to any change, and as a matter of
18  fact, this is the majority and major sector
19  of our viewers and they are far from
20  becoming iPad 2, 3 or 5 users.
21      Q   What are the most popular channels
22  in Poland domestically?
23      MR. ZAVIN: Objection.
24      A   I don't want to hurt feelings of
25  present here TVP representatives, but I

Page 68

1   BOGUSLAW SPANSKI - VOLUME I
2   guess the most popular channel is TVN.
3       And that also depends on the age
4   group you are talking about.
5       Because the age group of who is the
6   most sought after 16 to 49, I believe that's
7   TVN. Maybe Polsat, then would be TVP.
8       Q   I'm just talking about overall
9   subscribers. Is your answer still the same?
10      A   There's no subscribers because --
11      Q   Overall viewers, I should say.
12      A   The largest viewership might be
13  TVPD. Due to their share presence they are
14  simply everywhere in respect to the
15  infrastructure where their signals can be
16  received.
17      The new or newer commercial
18  competitors do not have infrastructure but
19  they are coming very strong.
20      Q   Is there any reason to believe that
21  competitors such as TVN that have a large
22  market share in -- domestically in Poland
23  would compete any differently in the US with
24  TVP's channels?
25      MR. ZAVIN: Objection. I don't

Page 69

1   BOGUSLAW SPANSKI - VOLUME I
2   understand the question.
3       MR. FINK: You can answer.
4       A   I do not know that they would
5   compete differently.
6       I know that TVN was in discussions
7   with me personally at the time when they
8   were planning to become distributed in the
9   United States.
10      And you know, their program is very
11  good. It's geared to the younger viewers,
12  and I have alarmed TVP or my contacts at TVP
13  at that time about certain lacks in
14  programming which would make TV Polonia much
15  more competitive and sought after versus TVN
16  as it was entering the market.
17      But to -- my suggestions fell
18  through the air.
19      Q   Just so I'm clear, you suggested to
20  TVP that it make some changes to its
21  programming to attract a younger audience,
22  but that was not followed by TVP, is that
23  what you said?
24      A   Specifically there was a lack of
25  sporting events, and TVN has entered the

18 (Pages 66 to 69)

Page 70

1    BOGUSLAW SPANSKI - VOLUME I
2  United States on the strength of soccer
3  which they had obtained license to.  They
4  were striking because TVP did nothing to
5  really fill the vacuum.
6        But -- and I have advised and
7  informed TVP and executives at that time
8  that certain things could improve
9  marketability of the -- of its programming
10  in North America.
11        Some things were adopted, some
12  things were not.
13    Q    The Complaint that you filed in
14  this action, did you read it?
15    A    Did I read it?  Yes, I did.
16    Q    Before it was filed or afterward?
17    A    Before it was filed.
18    Q    Describe to me what your claim is
19  with respect to Polvision.
20    A    Polvision was licensed by TVP to
21  the programming which we hold exclusive
22  license in the territory.
23        And this license was for the core,
24  the most sought after programming of TV
25  Polonia.

Page 71

1    BOGUSLAW SPANSKI - VOLUME I
2  I mean ... it literally destroyed
3  our market in the place where Polvision is
4  available, as Polvision is offered free to
5  air.
6    Q    When do you claim that TVP started
7  licensing to Polvision programs that, as you
8  say, were the main programs on your -- on TV
9  Polonia?
10    MR. ZAVIN:  Objection.  When
11  you say "claim," you mean you want
12  the best of his knowledge when they
13  started, are you asking what's in the
14  Complaint?  I don't understand your
15  question.
16  BY MR. WENGER:
17    Q    You can answer if you understand
18  the question.
19    MR. FINK:  Why don't you read
20  it back.
21    (Requested portion of record read:
22    "Q.  When do you claim that TVP
23  started licensing to Polvision programs
24  that, as you say, were the main programs
25  on your -- on TV Polonia?")

Page 72

1    BOGUSLAW SPANSKI - VOLUME I
2    (End of read-back.)
3    A    If I understand your question
4  correctly, when I've learned, I've learned
5  shortly after we have entered and executed
6  the settlement agreement.
7        The settlement agreement was
8  executed August 11 of 2009.
9        In the course of this litigation, I
10  also learned that particular programming, if
11  not all, which was licensed later on was
12  also made available, licensed to Polvision,
13  prior to that date.
14    Q    So it is your position that prior
15  to August 2009, TVP licensed certain
16  programs to Polvision that breached TVP's
17  agreements with Spanski and its
18  subsidiaries?
19    A    I believe that's what we have
20  learned from the documents in the discovery.
21    Q    So again, is it your position that
22  TVP breached the agreements with SEI before
23  August 2009?
24    A    I'm not an attorney, so I will tell
25  you that I understand that we have entered

Page 73

1    BOGUSLAW SPANSKI - VOLUME I
2  into a settlement agreement of
3  August 11th.
4        There was -- later on it was
5  brought to my attention that Polvision was
6  broadcasting the most sought after and the
7  core programming components of TV Polonia.
8        And I would like to emphasize that
9  TV Polonia's popularity relies, I would
10  guess, risk the statement, on 90 percent of
11  attractiveness of the mini-series which
12  happen to be also licensed to Polvision.
13    Q    I don't think I got an answer to my
14  question.
15        I want to know -- and you have sued
16  TVP and I want to know what your claim is.
17        So my question to you is:  Before
18  August 2009, is it your position that TVP
19  did anything that violated its agreements
20  with your companies?
21    A    My position is that we have learned
22  in discovery that the programs which we have
23  claimed were licensed illegally by TVP to
24  Polvision were also, and I also do not know
25  to what extent, made available to Polvision.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 74

BOGUSLAW SPANSKI - VOLUME I
1
2    Our claim is post settlement, which
3  is after August 11, 2009.
4    Q    So if I understand what you are
5  saying, you don't have a claim for any
6  activity that TVP did before August 2009?
7    MR. ZAVIN:  Objection.  This
8  is -- now you are asking for a legal
9  conclusion.
10    The Complaint is what it is.  The
11  Complaint -- and we've made this clear in
12  Interrogatory answers -- and if you don't
13  want me to make a speaking objection, I
14  won't, but you are asking for a legal
15  conclusion.
16    MR. FINK:  We're asking him to
17  answer question.  You can take the
18  position that it's a legal
19  conclusion.  The judge can decide
20  what it is.
21    Are you directing him not to answer
22  because you think it's a legal
23  conclusion?
24    MR. ZAVIN:  Yes.  I'm not going
25  to go down the path where you are

Page 75

BOGUSLAW SPANSKI - VOLUME I
1
2  asking for legal conclusions.
3    If you want to ask for facts, fine.
4    But don't ask him what legal claims
5  are stated.
6    MR. WENGER:  I've asked when
7  his claims began to arise.  That's
8  just a time period.
9    Is it starting in August 2009 or
10  are there any claims for March 2008 or
11  before?
12    Are you going to allow him to the
13  to answer that question?
14    MR. ZAVIN:  I don't want to be
15  confused in the speaking objection
16  but I think this is a confusion.
17    You are using the word "claim."
18    The word "claim" in the Complaint,
19  the claims are for post August 9, 2011
20  because there were releases granted in
21  the settlement agreement.
22    If you are asking whether -- if you
23  want to ask him whether he believes that
24  TVP violated the agreement before 2009,
25  you can ask him that, but what was

Page 76

BOGUSLAW SPANSKI - VOLUME I
1
2  confusing is you're asking was there a
3  claim for that.
4    I'll stipulate right now that
5  unless the Complaint is amended, the
6  current claim is only the things that
7  happened post August 9, 2009.
8    If you are asking him whether as a
9  matter of fact he believes that TVP
10  violated the agreement, you can ask him
11  that.
12    MR. WENGER:  My question was
13  addressed to the Complaint, but I'm
14  happy to take your stipulation to the
15  claim.  But I'm happy to take your
16  suggestion.
17    Now let me move to the second part,
18  and that is whether he believes there was
19  a violation before August 2009.
20  BY MR. WENGER:
21    Q    So I'll ask you:  Before
22  August 2009, do you believe that TVP
23  violated any agreement it had with you as a
24  result of this relationship with Polvision?
25    A    I believe so, yes.

Page 77

BOGUSLAW SPANSKI - VOLUME I
1
2    Q    What is the basis for that belief?
3    A    Because they've licensed
4  programming to which we were exclusive right
5  holders.
6    Q    So let's take a look and I'd like
7  to mark as Exhibit 1.
8    This is a combination of the 1994
9  agreement and the two addenda.
10    MR. ZAVIN:  May we go off the
11  record?
12    THE VIDEOGRAPHER:  The time is
13  3:37 p.m.  Going off the record.
14    (A brief recess was
15  taken.)
16    THE VIDEOGRAPHER:  The time is
17  3:47 p.m., November 8, 2011.  This is
18  Tape Number 2 in the videotaped
19  deposition of Mr. Boguslaw Spanski.
20    (Spanski Exhibit 1, Set of
21  three documents:  1994 agreement
22  and two addenda; 1999 addendum; and
23  2002 amendments, was marked for
24  Identification.)
25    MR. WENGER:  We've marked as

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 78

BOGUSLAW SPANSKI - VOLUME I

1        BOGUSLAW SPANSKI - VOLUME I
2  Exhibit 3, a set of three documents.
3  It's a 1994 -- I'm sorry.
4        Spanski Exhibit 1 a set of three
5  documents. It's the 1994 agreement and
6  the two addenda.
7        The 1999 addendum and the 2002
8  addenda -- or amendments.
9  BY MR. WENGER:
10    Q   Just back to my question
11  previously.
12        Is it your position, Mr. Spanski,
13  that prior to the settlement agreement, TVP
14  was not allowed to license to Polvision
15  episodes of certain shows that had already
16  appeared on TVP?
17    A  It is, and it is not only my
18  understanding, but it is also TVP's at the
19  time when the agreements were entered into.
20    Q   If you look at Page 2 of the
21  Exhibit 1 --
22        MR. ZAVIN: Objection.
23        You previously stated this was the
24  agreement between the parties. It was
25  not. It is a translation.

Page 79

1        BOGUSLAW SPANSKI - VOLUME I
2  If you want him to opine on the
3  agreement, I suggest you give him the
4  original agreement that was signed in
5  Polish.
6        MR. WENGER: Let's see if we
7  can work with this translation.
8        This is the translation that was
9  used in the last deposition and
10  throughout the last case.
11        If you have a real objection to any
12  particular --
13        MR. ZAVIN: It was not the
14  translation that was used. There
15  were two translations that were used
16  at different times for different
17  purposes and there were issues
18  regarding the translation.
19        MR. FINK: All right. You can
20  state your objection to the use of
21  the exhibit. But he's using that
22  exhibit and he'll answer the
23  questions as best he can based on
24  that exhibit, and if it turns out the
25  exhibit is an incorrect exhibit, you

Page 80

1        BOGUSLAW SPANSKI - VOLUME I
2  can raise that issue.
3  BY MR. WENGER:
4    Q   Page 2 on top of the page, there is
5  a Clause 2. Section 2, Clause 2.
6        And it says "TVP grants to SEI the
7  exclusive right to one-off use of TV Polonia
8  shows as part of the programming service."
9        MR. ZAVIN: Objection.
10    A  That's not what the contract
11  states. That's what this exhibit states.
12    Q   Mr. Spanski, is it your position
13  that the Polish version of this agreement
14  does not have this clause as -- as I just
15  read it?
16    A  It's incorrectly translated, that's
17  true.
18    Q   Well, looking at this translation,
19  what does "one-off use" mean to you?
20        MR. ZAVIN: Objection.
21    A  Frankly -- I don't understand what
22  in English what "one-off use" means.
23    Q   Have you ever heard of the term
24  "one-off use" before today?
25    A  No.

Page 81

1        BOGUSLAW SPANSKI - VOLUME I
2    Q   So in the litigation that happened
3  between 2007 and 2009, you never came across
4  the term "one-off use"?
5    A  To my best recollection it was
6  differently translated.
7    Q   Is it true that in your two
8  submissions to the Court in connection with
9  the summary judgment motion in the 2007
10  litigation that there was not the term
11  "one-off use" in there?
12    A  I don't recall what was in 2007. I
13  can tell you that it looks to me that this
14  is different translation and incorrect
15  translation.
16    Q   Is it your position that the 1994
17  agreement gave you right to both first runs
18  and reruns of TV Polonia?
19    A  My position is that 1994 agreement
20  gave us exclusive rights to the programming
21  content of TV Polonia for the use in
22  territory. That's my understanding.
23    Q   And is that exclusive rights to run
24  it for the first time or the exclusive
25  rights forever?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 82

BOGUSLAW SPANSKI - VOLUME I

1    BOGUSLAW SPANSKI - VOLUME I
2        A    On TV Polonia alone the shows are
3    being rerun constantly.  That being run, and
4    a rerun and a rerun.  It is something that
5    is done throughout the whole duration of our
6    agreement since 1994.
7        So right to one use of -- it simply
8    would not make sense but that's how I
9    understand it.
10       Q    I'm not sure if you answered my
11   question.
12           MR. FINK:  Just have her read
13       it back.
14           MR. WENGER:  Please read back
15       the question.
16           (Requested portion of record read:
17           "Q.  And is that exclusive rights
18       to run it for the first time or the
19       exclusive rights forever?")
20           (End of read-back.)
21       A    My understanding is that as long as
22   it's on TV Polonia, it's our own exclusive
23   rights.
24       Q    What do you mean "as long as it's
25   on TV Polonia"?

Page 83

1    BOGUSLAW SPANSKI - VOLUME I
2        A    As I just said, on TV Polonia you
3    have programming that is on rerun.  Certain
4    position of programming, that being rerun
5    every couple months, every year as repeats,
6    and so on, so on.
7        This also dealt with the
8    programming which, you know, among others,
9    if we would produce other programming based
10   on those shows.
11           MR. FINK:  Can we have you read
12       it back one last time and ask the
13       witness to give a yes or no answer.
14           (Requested portion of record read:
15           "Q.  And is that exclusive rights
16       to run it for the first time or the
17       exclusive rights forever?")
18           (End of read-back.)
19       A    The answer is forever.
20       Q    So just so we're clear, your
21   position is that before the settlement
22   agreement, as long as a program appeared on
23   TV Polonia, even if it appeared ten years
24   prior, you had the exclusive rights to that
25   program and TVP could not distribute that

Page 84

1    BOGUSLAW SPANSKI - VOLUME I
2    program even ten years later through any
3    other entity?
4        A    The answer is yes.
5        Q    Do you have an option to renew the
6    1994 agreement when it expires in 2019?
7        A    I believe so, both parties do have
8    that option.
9        Q    Can you show me where that right is
10   in that agreement or where that option is
11   contained in the agreement?
12           I could help you out.  It's
13   Section 10, Clause 1.
14           Is that the source of your claim
15   right to an option to renew this agreement
16   for ten years?
17           MR. ZAVIN:  Objection.  Again,
18       you are pointing to a translation,
19       not pointing to the agreement.  And I
20       don't agree with this translation.
21           MR. FINK:  You can answer.
22       A    Yes, sir.
23       Q    My question is:  What in the
24   agreement here gives you the option to renew
25   the agreement for ten years?

Page 85

1    BOGUSLAW SPANSKI - VOLUME I
2        A    That's what it says.
3        I mean, this is a translation which
4    I do not know is accurate or not, but
5    relying on this translation, says, "TVP and
6    SEI may extend its term of validity for
7    consecutive ten-year periods."
8        Q    So you view that wording there --
9    and we'll go with this translation -- you
10   view this wording here as giving you a
11   unilateral option at your decision to renew
12   the agreement even over, for example, TVP's
13   objection?
14           MR. ZAVIN:  Objection.
15       You may answer if you can.
16       A    That's what it says, yes.
17       Q    Was one of your claims in the 2007
18   litigation that TVP tried to bypass your
19   rights to TV Polonia and TVP Info by
20   creating another channel that would have the
21   same programming as TV Polonia and TVP Info?
22       A    You are asking me if that was --
23       Q    Was that one of your claims?
24       A    To my best recollection, yes.
25           MR. WENGER:  Let's mark as

22  (Pages 82 to 85)

Page 86

1      BOGUSLAW SPANSKI - VOLUME I
2 Spanski Exhibit 2, the August 11,
3 2009 settlement agreement.
4     (Spanski Exhibit 2, Settlement
5     Agreement dated August 11, 2009,
6     was marked for Identification.)
7 BY MR. WENGER:
8    Q   Specifically take a look at
9 Clause E, 2E, on Page 2.
10     The clause states "TVP shall not
11 distribute or offer to distribute or permit
12 the distribution of any other channels in
13 North and South America that contain any of
14 the same programming that is contained, has
15 been contained or will be contained in
16 either TV Polonia other TVP Info."
17     What do you understand this clause
18 to mean, Mr. Spanski?
19    A   I understand what the clause says,
20 namely, that any channels which contain the
21 programming to which we are exclusive
22 licensee about which there is exact
23 description, a precise description in 2A
24 cannot be distributed in the territory.
25    Q   So why doesn't it just say that?

Page 87

1      BOGUSLAW SPANSKI - VOLUME I
2 Why not refer back to Clause A and just say
3 that?
4    A   You are asking me a question why,
5 because A says what it says.
6     I mean, the paragraph says "SEI is
7 and shall remain the exclusive distributor
8 of TV Polonia and TVP programming content in
9 the territory."
10    Q   So why not say in Clause E, TVP
11 shall not distribute or offer to distribute
12 or permit the distribution of any
13 programming content that is contained, has
14 been contained or will be contained in
15 either TV Polonia or TVP Info.
16     Why does it refer to the
17 distribution of channels?
18    A   Because the channels contain
19 programming content. You cannot have
20 channels without the content. The channel
21 is not empty channel.
22     So if in Point A it is spelled out
23 very clearly and without any doubt that we
24 are and shall remain the exclusive
25 distributors of programming content, and

Page 88

1      BOGUSLAW SPANSKI - VOLUME I
2 then Point E refers to that if TVP will come
3 to an idea, like they came in the past, to
4 create TVP 4 Polonia or any other creation
5 in the minds in Warsaw to do go-around, then
6 this will not happen. And that's why
7 Section E is worded as it is.
8    Q   So your testimony is, just so I'm
9 clear, E is written as it is to address your
10 claim or to prevent TVP from creating other
11 channels that contain TV Polonia
12 programming?
13    A   Not to create, to distribute any
14 other channels which would contain the
15 programming content to which we are
16 exclusive licensee in the territory.
17    Q   Who drafted the settlement
18 agreement?
19    A   Loeb & Loeb.
20    Q   Loeb & Loeb?
21    A   That's correct.
22    Q   That's SEI's law firm, correct?
23    A   That's correct.
24    Q   TVP's law firm in the prior case,
25 were they involved in drafting this

Page 89

1      BOGUSLAW SPANSKI - VOLUME I
2 settlement agreement?
3    A   They were involved in reviewing it,
4 replying to it, making changes, as far as I
5 recall.
6    Q   Were there a lot of changes from
7 the TVP side?
8    A   I thought I had a good memory, but
9 you know, it was an intensive period of
10 time. We're talking a couple years ago. I
11 don't recall if there was a couple changes
12 or just few.
13    Q   Do you know why there is a "1" at
14 the bottom of the settlement agreement?
15    A   Yes.
16    Q   Why?
17    A   V1 would suggest Version 1.
18    Q   What happened to the long form
19 agreement that was intended by this
20 settlement agreement?
21    A   Long form was proposed, was
22 proposed to TVP, but we received information
23 that due to lack of rights and thematic
24 channels, TVP is not willing to accept it,
25 which we have learned later on it was not

23 (Pages 86 to 89)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

| Page 90 | Page 92 |
|---|---|

Page 90

1    BOGUSLAW SPANSKI - VOLUME I
2  true.
3    Q    I don't know what that means.
4      Explain, please.
5      What wasn't true?
6    A    The statement made by here present,
7  Ms. Nadolna.
8    Q    Which statement made by Ms. Nadolna
9  was not true?
10    A    That TVP had not licensed the
11  thematic channels because they don't contain
12  rights for the territory.
13    Q    So that representation by
14  Ms. Nadolna is the reason why a long form
15  settlement agreement was not entered?
16    A    I believe there was the one and
17  only reason which was given to me.
18    Q    And your counsel mentioned this
19  before but I want to make sure you have the
20  same view.
21      On Page 1, Clause 1E, do you view
22  Clause 1E to mean that both parties are
23  releasing each other from any claims that
24  either were asserted or could have been
25  asserted up to the date of this settlement

Page 92

1    BOGUSLAW SPANSKI - VOLUME I
2    A    Now I am.
3    Q    When did you become aware of that?
4    A    During the course of the
5  litigation.
6    Q    So prior to this litigation, prior
7  to October 2010, you had no knowledge that
8  TVP had entered into agreements with
9  Polvision other than the licensing agreement
10  in August 2009?
11    A    When you are talking "agreements,"
12  any agreements?
13    Q    Right.
14    A    No, I was aware that TVP used the
15  services of Polvision.  I was aware of that.
16    Q    You are aware that they used the
17  services of Polvision for what?
18    A    For some local reporting or some
19  news from Chicago, because it appeared on
20  the programming of TV Polonia.
21    Q    So what were you not aware of that
22  you became aware of through this litigation?
23    A    I'm aware of what you just said a
24  moment ago.  You used the word "barter."
25      I wasn't aware of barter

Page 91

1    BOGUSLAW SPANSKI - VOLUME I
2  agreement?
3    A    I have to underline that I'm not a
4  trained attorney nor a lawyer, but I believe
5  that's the intent of this.
6    Q    When you signed this settlement
7  agreement, is that what you understood 1E to
8  mean?
9    A    Yes.  I mean, to my limited
10  knowledge that I understand that's what the
11  exchange of releases is.
12    Q    You mentioned that you had two
13  barter agreements that TVP entered in 2008.
14      I shouldn't say two, but you had
15  barter agreements that TVP had with
16  Polvision in 2008 originally.
17      MR. ZAVIN:  Objection.
18      MR. WENGER:  I'll start that
19  again.
20      MR. ZAVIN:  Misstates the
21  testimony.
22  BY MR. WENGER:
23    Q    Are you aware that TVP had
24  agreements with Polvision prior to the
25  August 2009 licensing agreement?

Page 93

1    BOGUSLAW SPANSKI - VOLUME I
2  agreements.
3      MR. WENGER:  Let's mark these
4  two as Spanski Exhibits 3 and 4.
5      Exhibit 3 is a March 17, 2008
6  barter agreement between TVP and
7  Polvision.  And Spanski Exhibit 4 is a
8  June 27, 2008 license agreement between
9  TVP and Polvision.
10      Exhibit 3 is Bates Number beginning
11  with POL-38 through POL-53.
12      And Exhibit 4 begins with POL-54
13  through POL-57.
14      (Spanski Exhibit 3, Barter
15  Agreement dated March 17, 2008,
16  Bates Numbers POL-38 through
17  POL-53, was marked for
18  Identification.)
19      (Spanski Exhibit 4, License
20  Agreement dated June 27, 2008,
21  Bates Numbers POL-54 through
22  POL-57, was marked for
23  Identification.)
24      MR. WENGER:  John, here is a
25  translation of the Barter Agreement.

24  (Pages 90 to 93)

Page 94

```
 1        BOGUSLAW SPANSKI - VOLUME I
 2        And the License Agreement is in
 3   English.
 4   BY MR. WENGER:
 5        Q    Mr. Spanski, are these the two
 6   agreements that you referred to before that
 7   you had learned of as a result of this
 8   litigation?
 9        A    I believe those are the agreements,
10   yes. I know if I have seen them before. I
11   know that they were agreement between
12   Polvision and TVP before the August 2009.
13        Q    Let's look at the Barter Agreement,
14   Exhibit 3,and specifically the very last
15   page of that agreement.
16        It lists a list of series, TV
17   series.
18        The last two series, do you see
19   where it says "Klan up to 51" --
20        A    You are talking about the last
21   page?
22        Q    Yes.
23        A    There's no Klan.
24        Q    It should be the third-to-last
25   page.
```

Page 95

```
 1        BOGUSLAW SPANSKI - VOLUME I
 2        A    So it's POL-50?
 3        Q    POL-50, yes.
 4        Do you see the "Klan through 51"
 5   and "Zlotopolsky through 51"?
 6        A    I do. Zlotopolsky.
 7        Q    What do you understand this
 8   attachment to be showing?
 9        MR. ZAVIN:  Objection.
10        This man isn't a party to this
11   agreement.
12        If you are asking him to read the
13   attachment he can, but he can't possibly
14   testify as to the intent of this
15   agreement other than anyone else reading
16   it.
17        Q    You can answer if you can.
18        A    It shows the mini-series, shows a
19   list of mini-series. And among those, there
20   are two, the last one is called Klan and
21   Zlotopolsky. K-L-A-N,
22   Z-L-O-T-O-P-O-L-S-C-Y.
23        So I see those two, yes.
24        Q    Let's take a look at the License
25   Agreement, Exhibit 4.
```

Page 96

```
 1        BOGUSLAW SPANSKI - VOLUME I
 2        The first page of that?
 3        A    Yes.
 4        Q    Under "Program" right at the very
 5   first page.
 6        Do you see where it says "Na Dobre,
 7   Plebania"?
 8        A    Yes.
 9        Q    And just below that, it says
10   Episodes 1 to 100 or Episodes 1 to a
11   hundred?
12        A    Yes.
13        Q    Do you understand this to mean that
14   TVP and Polvision are agreeing to TVP would
15   license to Polvision Na Dobre 1 to a hundred
16   and Plebania 1 to a hundred?
17        MR. ZAVIN:  Objection you are
18        asking him to interpret an agreement
19        which he is not a party.  He cannot
20        do that.
21        He can say he saw it, but you can't
22        get through this witness what this
23        agreement means.
24        Q    Do you understand what that
25   agreement is showing?
```

Page 97

```
 1        BOGUSLAW SPANSKI - VOLUME I
 2        A    I mean, I see the schedule. I see
 3   the programming to which we are exclusive
 4   licensee here.  That's what I see on this
 5   front page and I see license agreement
 6   number so-and-so on June 27, 2008.
 7        Q    Would you agree with me that these
 8   two agreements appear to be TVP licensing to
 9   Polvision, Klan and Zlotopolsky 1 to 51 and
10   Plebania and Na Dobre 1 to a hundred?
11        MR. ZAVIN:  Objection.  You can
12        answer based on your looking at this.
13        A    I see a list of programs to which
14   we are exclusive license in territory.  And
15   if those are license agreements to
16   Polvision, then obviously simply show, black
17   and white, the breach of our rights.
18        MR. FINK:  Could you read the
19        question back.
20        And ask the witness to answer it.
21        (Requested portion of record read:
22        "Q.  Would you agree with me that
23   these two agreements appear to be TVP
24   licensing to Polvision, Klan and
25   Zlotopolsky 1 to 51 and Plebania and Na
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 98

1      BOGUSLAW SPANSKI - VOLUME I
2  Dobre 1 to a hundred?")
3     (End of read-back.)
4   A   I agree they appear to be.
5     MR. WENGER: Let's mark as
6  Spanski Exhibit 5, the August 31,
7  2009 licensing agreement between TVP
8  and Polvision.
9    (Spanski Exhibit 5, Licensing
10  Agreement dated August 31, 2009,
11  Bates Numbers POL-58 through
12  POL-62, was marked for
13  Identification.)
14     MR. WENGER: This agreement,
15  Spanski Exhibit 5, starts at Bates
16  Number POL-58 and goes through
17  POL-62.
18   Q   If I could please direct your
19  attention to the Schedule Number 1 to the
20  agreement.
21     Do you agree with me that Schedule
22  Number 1 appears to be TVP licensing to
23  Polvision the next episodes of the series
24  that we just discussed; namely, Klan and
25  Zlotopolsky 52 through 150 and Na Dobre and

Page 99

1      BOGUSLAW SPANSKI - VOLUME I
2  Plebania 101 through 200?
3     MR. ZAVIN: Objection. You may
4  want to rephrase the question. You
5  asked Schedule 1. You may want to
6  ask whether the agreement appears to
7  be that. Schedule 1 doesn't appear
8  to be a license at all. It's just a
9  schedule.
10   A   They appear to be.
11   Q   So between the two, 2008 agreement
12  and the License Agreement, it appears to the
13  extent of your reading of these agreements
14  that TVP is licensing to Polvision, Na Dobre
15  101 through 200 -- I'm sorry, Na Dobre 1
16  through 200, Plebania 1 through 200, Klan 1
17  through 150, and Zlotopolsky 1 through 150?
18   A   Looks like it, yes.
19     MR. WENGER: Let's mark as
20  Spanski Exhibit 6. This is a
21  July 16, 2010 annex to the August 31,
22  2009 TVP Polvision licensing
23  agreement beginning with Bates Number
24  POL-63 through Bates Number POL-65.
25    (Spanski Exhibit 6, July 16,

Page 100

1      BOGUSLAW SPANSKI - VOLUME I
2  2010 Annex to the August 31, 2009
3  TVP Polvision Licensing Agreement,
4  was marked for Identification.)
5  BY MR. WENGER:
6   Q   Please take a minute or two to look
7  at this agreement, Mr. Spanski.
8     Have you seen this agreement before
9  today?
10   A   Don't recall.
11   Q   Were you aware of this agreement
12  before today?
13   A   I believe that I have been aware or
14  I have been advised there were some
15  extension or some amendment to the agreement
16  between TVP and Polvision.
17   Q   How did you learn about this
18  agreement?
19   A   During the discovery process.
20   Q   So before this litigation or before
21  the discovery process started in this
22  litigation, you were not aware of this
23  annex?
24   A   Never, no.
25   Q   Let's take a look at the first page

Page 101

1      BOGUSLAW SPANSKI - VOLUME I
2  about halfway down.
3     And it says -- and I'm reading in
4  English but you can tell me if my
5  translation is wrong. Please correct me if
6  I'm wrong.
7     "From the date of conclusion of
8  this agreement until August 1, 2010,
9  Polvision broadcast once or will broadcast
10  the following series: Plebania up to 191,
11  Zlotopolsky up to 193, Klan up to 91,
12  Na Dobre up to 142."
13     Do you see that?
14   A   Yes, I do.
15   Q   Do you understand this clause to
16  mean that from the date of the agreement,
17  meaning August 31, 2009 until August 1,
18  2010, Polvision -- so between those two
19  dates, Polvision broadcast the enumerated
20  series here, namely Plebania through 191,
21  Zlotopolsky through 93, Klan through 91, and
22  Na Dobre through 142.
23     MR. ZAVIN: Objection.
24     Are you asking whether that
25  actually happened or whether that's what

26  (Pages 98 to 101)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 102

BOGUSLAW SPANSKI - VOLUME I

1  BOGUSLAW SPANSKI - VOLUME I
2  the agreement says?
3      MR. WENGER:  Do we need to read
4  back the question?
5      MR. ZAVIN:  Yes.
6      MR. FINK:  He was asking if he
7  understands it from reading the
8  agreement.
9      MR. ZAVIN:  But he understands
10  that it actually happened.
11      MR. WENGER:  Does he understand
12  this to mean what I just described it
13  as. He's looking at a Polish
14  original and I just to make sure he
15  agrees with my reading of it.
16      MR. ZAVIN:  Are you asking him
17  whether the translation is correct?
18      Q    You can answer the question if you
19  are able to.
20      A    Your translation was pretty good.
21  I mean, that's what it says, yes.
22      Q    Let's take a look at the schedule
23  to this agreement which is the last page.
24      What do you understand, if you
25  know, this schedule to be showing?

Page 103

1  BOGUSLAW SPANSKI - VOLUME I
2      MR. ZAVIN:  Objection. Same
3  thing. He's not a party to this
4  agreement. He can read it for you.
5      MR. FINK:  Okay. We have your
6  objection.
7      A    I see the schedule of the
8  programming with title, number of episodes
9  and value.
10      Q    So now let's turn back to the
11  second page of this agreement.
12      Article 1, Clause 2. I'm sorry.  I
13  meant Article 1, Clause 3.
14      It says here that "Clause 3" -- I'm
15  on Article 1, Clause 3.
16      A    Article 1, Clause 3.  Okay.
17      Q    Article 3 says "Scope of the rights
18  granted shall be amended as follows:"
19      Am I on the same place you are?
20      A    Yes.
21      Q    It says "Clause 3.2 is given the
22  following wording:  'The licensee shall be
23  authorized to make a one-time premiere
24  broadcast of each episode of a given series
25  specified in Schedule Number 1 during the

Page 104

1  BOGUSLAW SPANSKI - VOLUME I
2  period as specified in schedule Number 1 and
3  to rebroadcast each episode on two occasions
4  within seven days of the premiere broadcast
5  of the episode of the series.'"
6      Is my reading generally accurate of
7  the Polish original?
8      A    Yes.
9      Q    Do you understand this clause in
10  combination with Schedule Number 1 to be
11  giving Polvision the rights to broadcast the
12  episodes enumerated in Schedule Number 1?
13      MR. ZAVIN:  Objection.
14      A    That's what this reading says, yes.
15      Q    Let's go back to Schedule Number 1.
16      Have any of the episodes listed in
17  any of the shows and the respective episodes
18  of those shows, have any of them, to your
19  knowledge, ever appeared on TV Polonia?
20      A    I could not answer that and
21  basically I'm not watching, you know,
22  everyday TV Polonia, nor am I taking notice
23  of what particular episodes of what
24  mini-series are being broadcast.
25      Q    Are there any particular broadcasts

Page 105

1  BOGUSLAW SPANSKI - VOLUME I
2  here that you know have been on TV Polonia?
3      A    I could not answer your question.
4      Q    If I were to represent to you, and
5  it is in fact the case, that none of these
6  episodes have ever appeared, none of the
7  episodes of these series ever appeared on TV
8  Polonia, would you agree with me that there
9  is no problem with TVP licensing these
10  episodes to Polvision?
11      A    I would not agree with you.
12      Q    Why not?
13      A    Because we have exclusive rights to
14  those programming which has been, is or will
15  be broadcast.
16      It is in total contradiction and
17  contravention of our exclusive license.
18      Q    If I represent to you, and it is in
19  fact true but let's leave it as theoretical
20  for now, that none of these episodes have
21  ever been on TV Polonia and will ever be
22  on TV Polonia.
23      Is there anything about TVP's
24  licensing of these episodes to Polvision
25  that would violate your agreement with TVP?

27  (Pages 102 to 105)

Page 106

BOGUSLAW SPANSKI - VOLUME I

1      BOGUSLAW SPANSKI - VOLUME I
2      MR. ZAVIN: Objection.
3    A   It is in my view and I'm deeply
4  convinced it is.
5    Q   You said that before and you
6  pointed out your right to TV Polonia
7  broadcasting, either broadcasting that was
8  contained on Polonia, is contained or will
9  be contained.
10    And I'm telling you that none of
11  this programming has been contained, is
12  contained or will be contained on Polonia.
13    MR. ZAVIN: Objection.
14  Mr. Wenger, you certainly can't
15  represent that it never will be on
16  Polonia. You are not willing to make
17  a representation, are you.
18    MR. WENGER: Based on the
19  current understanding -- let's leave
20  it in the theory for now.
21    Q   In theory, if this will never be on
22  the Polonia, and it's never been on Polonia,
23  is there anything about TVP licensing these
24  series to Polvision that violates your
25  agreement with TVP?

Page 107

1      BOGUSLAW SPANSKI - VOLUME I
2    A   It does because the agreement
3  basically -- you are talking about the
4  programming which has been broadcast for
5  many, many years on TV Polonia, based on
6  which it has built an audience who is
7  accustomed to those mini-series, follows the
8  lives of the main characters. And if, as
9  you said in theory, this will never be
10  broadcast on TV Polonia, it would violate
11  the spirit of all our agreements that we had
12  with TV Polonia.
13    And it will also -- I mean, going
14  farther to your thinking, you can remove
15  every programming from TV Polonia and then
16  say that nothing will be broadcast on TV
17  Polonia, we'll just put the happy face of
18  whomever from TVP is and then you will have
19  TV Polonia. That will also create and, in
20  my view and opinion, it would be a violation
21  of the agreement.
22    Q   I'm not asking you for things that
23  are violations of the spirit of the
24  agreement in terms of TVP removing certain
25  programming from TV Polonia.

Page 108

1      BOGUSLAW SPANSKI - VOLUME I
2    I'm asking you, strictly speaking,
3  this license agreement licensing these shows
4  to Polvision, is that licensing agreement a
5  breach of your agreement with TVP?
6    A   It is because any sane person would
7  assume that the programming that goes for
8  ten years and is being broadcast in Poland
9  and other stations of TVP should continue to
10  be broadcast on TV Polonia, not to be
11  removed only to cover the wrongdoing on TVP
12  in instance of its license to Polvision.
13    Q   I am going to go with your position
14  for now that removing something from TVP
15  would perhaps violate the spirit of the
16  agreement.
17    Let's say -- and I don't agree with
18  that -- but let's just go with your view
19  that removing something from TVP violates
20  the security agreement with TV Polonia,
21  violates the security agreement.
22    Once that has been done, though, is
23  there anything that prevents TVP taking from
24  that show, as you say removed off Polonia
25  improperly, is there anything that prevents

Page 109

1      BOGUSLAW SPANSKI - VOLUME I
2  TVP from licensing that show to
3  Polvision?
4    A   I mean, I'm not an attorney but one
5  wrongdoing does not allow continuation of
6  the wrongdoing.
7    So I would say that definitely it
8  would be a continuation of the breach of the
9  agreement and our rights.
10    Q   What rights would that be a breach
11  of?
12    A   Breach of the content that is
13  available and it's intentionally removed for
14  the purpose of not making available to tens
15  of thousands of viewers who are entitled to
16  view something which has been and should be
17  on TV Polonia.
18    Q   Now, where do you get the word
19  "should be" from?
20    A   I will allow myself a little
21  digression.
22    If you have Yankee games on
23  television stations here and suddenly there
24  is a dispute between the broadcaster who has
25  devised and distributor and there is no more

28 (Pages 106 to 109)

Page 110

BOGUSLAW SPANSKI - VOLUME I
1
2 Yankee games available to Yankee fans in New
3 York, the question is why should there be
4 Yankee games on the television. Because the
5 public has been the right to watch it and
6 the parties who have been involved in this
7 type of arrangement respect that.
8        This, it is done, because
9 technically, as you said, will never appear
10 on TV Polonia, will breach this right not
11 only to our agreement and our rights, but to
12 all the viewers and the viewership which you
13 have built over 15 or 16 years of our doing.
14    Q   I still don't think you have
15 answered my question.
16    A   I'm trying my best.
17    Q   Of course. And your digression is
18 fine, too, but it doesn't respond to what
19 I'm saying.
20        You are saying it is the violation
21 of the spirit of the agreement, whatever
22 that means, for TVP to remove certain
23 programming from Polonia.
24        Now, if that programming is in fact
25 removed from Polonia and not be on Polonia,

Page 111

BOGUSLAW SPANSKI - VOLUME I
1
2 what prevents TVP from licensing that
3 programming to Polvision, for example?
4    A   I think that you have zoomed in on
5 the word which is the "spirit" of the
6 agreement.
7        I think that removing the
8 programming which has been run on TV Polonia
9 for tens of years which is not stopped being
10 produced because there is, you know, no
11 demand, it is being produced, it is being
12 broadcast by other channels of TVP and is
13 done solely, solely for the purpose to
14 circumvent, you know, the agreement terms,
15 it is a breach of this agreement.
16        MR. WENGER: Let's mark as
17 Spanski Exhibit 7. This is a chart.
18        (Spanski Exhibit 7, TV series
19 histories chart, no Bates numbers,
20 was marked for Identification.)
21 BY MR. WENGER:
22    Q   I'm just going to walk you through,
23 Mr. Spanski, the columns in this chart.
24        Column 1 is what we looked at in
25 Exhibits 3 and 4.

Page 112

BOGUSLAW SPANSKI - VOLUME I
1
2 Those are the 2008 Barter and
3 License agreements between TVP and
4 Polvision.
5        Do you agree that this column
6 represents the episodes of those series that
7 TVP had provided to Polvision under the 2008
8 Barter Agreement?
9        MR. ZAVIN: Objection. You can
10 ask the witness whether he recognizes
11 is document. You can't ask him to
12 verify a document that he hasn't
13 prepared and I suspect was prepared
14 by your firm for the purposes of this
15 litigation.
16        Ask him whether he recognizes it.
17        MR. FINK: We'll take care of
18 it.
19        MR. WENGER: Assume this is
20 correct and if there are any -- if
21 it's not correct, we'll let
22 Mr. Spanski correct it. This is just
23 a graphical aid for our discussion
24 and if there's anything incorrect
25 we'll going to go through all of it.

Page 113

BOGUSLAW SPANSKI - VOLUME I
1
2 If there's anything in correct here,
3 you can correct it or Mr. Spanski can
4 correct it.
5        MR. ZAVIN: Since you marked it
6 as an exhibit and this witness
7 clearly can't identify it, because I
8 suspect I'm correct it is prepared by
9 your firm, are you going to make a
10 representation as to what the exhibit
11 is?
12        MR. WENGER: This is a chart
13 of -- it's self-identified, a TV
14 series history and there's five
15 columns and we're going to go through
16 each one of them with Mr. Spanski.
17 If there's anything incorrect in
18 here, he can correct it and we'll --
19        MR. ZAVIN: Prepared by whom?
20        MR. WENGER: This was prepared
21 by DLA Piper.
22 BY MR. WENGER:
23    Q   Column 1, Mr. Spanski, is there
24 anything incorrect about Column 1? Column 1
25 being a list of the numbers of episodes of

29 (Pages 110 to 113)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 114

BOGUSLAW SPANSKI - VOLUME I
1
2 the four series that TVP provided to
3 Polvision under the 2008 agreements which
4 we've just looked at.
5    A    You are asking me if those are the
6 episodes provided to Polvision?  That's what
7 it says here.
8    Q    Based on the agreements that we
9 just looked at, do those agreements appear
10 to show that TVP agreed to provide Polvision
11 with the episodes listed of these series?
12        And you can refer back to the
13 agreements.  Please look back at them.  I
14 that think we've looked at the agreements
15 which have shown that TVP 1, which is
16 Polvision, Na Dobre 1 to a hundred, Plebania
17 1 to a hundred --
18    A    The original agreements or --
19    Q    The two 2008 agreements and those
20 are Exhibits 3 and 4.
21        I can help you find where it says
22 that, if that's helpful.  Move this along.
23    A    Okay.  So you are referring to
24 POL-50.
25        Klan is 51.  So 1 to 51.

Page 115

BOGUSLAW SPANSKI - VOLUME I
1
2        It says "Number of episodes, 51."
3 It says "1 to 51."
4    Q    Right.
5        Now look at the other, Exhibit 4,
6 which is the June 2008 licensing agreement.
7 The first page, does that show that --
8    A    One hundred episodes, yes.  And one
9 hundred episodes, yes.  So that makes --
10    Q    Now, we just looked before also at
11 the licensing agreement, the August 31, 2009
12 licensing agreement.
13        That was Exhibit 5.
14    A    Yes.
15    Q    Does that appear to show that
16 TVP -- this appears to be the annex.
17        I am looking at Exhibit 5.
18    A    This is 5.
19    Q    Right.
20        So does Exhibit 5 appear to show --
21 that TVP licensed to Polvision:  Episodes
22 101 to 200 of Na Dobre and Plebania and
23 Episodes 52 to 150 of Klan and Zlotopolsky.
24    A    That's what it appears to show,
25 yes.

Page 116

BOGUSLAW SPANSKI - VOLUME I
1
2    Q    Let's look to the annex of the
3 License Agreement again and that is
4 Exhibit 6.
5        And I'll refer you to the first
6 page of the agreement.
7        And the same clause we looked at
8 before, Clause 1.
9        Does this appear to be consistent
10 with the third column here, namely, that
11 between the time this agreement was signed
12 and August 1, 2010, Polvision had broadcast
13 Na Dobre 101 through 142, 101 through 191
14 for Plebania, 52 through 91 for Klan, and 52
15 through 93 for Zlotopolsky?
16        MR. ZAVIN:  Are you asking
17    whether he actually did it or that's
18    what it the agreement says.
19        MR. WENGER:  What the agreement
20    says.
21        MR. ZAVIN:  So all you are
22    asking him to confirm is that's what
23    the agreement says, whether it's true
24    or not.
25        MR. WENGER:  Right.

Page 117

BOGUSLAW SPANSKI - VOLUME I
1
2        MR. FINK:  That's a form of a
3    speaking objection.  Duly noted.
4        We understand that's going to be
5    true for the rest of the questions.
6    Q    My question was whether this
7 Column 3, which lists the shows actually
8 broadcasted by Polvision under the 2009
9 licensing agreement, is that consistent with
10 the annex to the Polvision TVP licensing
11 agreement; namely, that Na Dobre 101 to 142,
12 Plebania 101 to 191, Klan 52 to 91 and
13 Zlotopolsky 52 to 93 were broadcast by
14 Polvision under the licensing agreement?
15        MR. ZAVIN:  Objection.
16    A    Yes, if that's what it is, it's
17 simply coherent with what it says.
18        I can only add that those episodes
19 in Column 3 were broadcast on TV Polonia.
20    Q    Do you know when these episodes
21 were broadcast on TV Polonia, the episodes
22 listed in Column 3?
23    A    I cannot tell you specifically when
24 they were broadcast, but they were
25 broadcast.  And to my knowledge, right now

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 118

BOGUSLAW SPANSKI - VOLUME I

1
2  they are being rerun as we speak.
3      So because the mini-series
4  Zlotopolsky are being rerun and from Episode
5  1 going onward.
6      And this is being done currently.
7      And then all the episodes of Klan
8  from 1 to 52, and right now we're talking
9  probably Episode Number 2000. The same
10 applies to Plebania or Na Dobre.
11     Q    But you don't know when those were
12 shown originally, those episodes on Polonia?
13     A    I don't, but I think it's fairly
14 easy to get that information from TVPN.
15     Q    Now, looking at Column 4, I'll
16 represent to you these are in fact the dates
17 that these episodes were originally shown on
18 TV Polonia.
19     Do you have any reason to believe
20 that those dates that those episodes were
21 shown originally on TV Polonia are in
22 correct?
23     A    Are you referring the dates in
24 2004, 2005?
25     Q    For example, Na Dobre 101 to 142, I

Page 119

BOGUSLAW SPANSKI - VOLUME I

1
2  will tell you was broadcast on Na Dobre
3  between November 2002 and November 2003.
4      And Plebania 101 through 191 was
5  broadcast between August '04 and April '05.
6      Klan 52 to 91 was broadcast
7  February '98 through June '98, and
8  Zlotopolsky 52 to 93 was broadcast between
9  February '99 through August '99.
10     Do you have any reason to believe
11 the dates that I've just given you for those
12 episodes for those series are incorrect?
13     A    I do.
14     Q    Why is that?
15     A    Because, as I mentioned just
16 moments ago, that Zlotopolsky, for example,
17 is being rerun as we speak.
18     Q    Not talking about reruns. Just
19 talking about the first time it was
20 broadcast.
21     A    Oh, first time. I have no reason
22 to doubt that the first one -- as I said
23 earlier in my testimony, TV Polonia has been
24 built on reruns. The programming, you know,
25 a number of movies are being run every

Page 120

BOGUSLAW SPANSKI - VOLUME I

1
2  couple of years. The same applies to
3  mini-series, and so on, so forth.
4      And so there is nothing, you know,
5  premiers as such. Something that was run in
6  1999 does not mean it starts all over from
7  episode Number 1 in 2010 or 2011.
8      This has been the policy, it is the
9  policy and hopefully will stay the policy.
10     Q    I'm not sure I follow that.
11     MR. FINK: Actually, move to
12 strike it because it wasn't
13 responsive to any question.
14 BY MR. WENGER:
15     Q    In Column 5, there is a list, and I
16 will represent to you that this is a list of
17 episodes that were being broadcast on TV
18 Polonia between September 2009 and
19 August 2010.
20     And, namely, they are: Na Dobre
21 396 to 4006, Plebania 1320 to 1488, Klan
22 1698 to 1890. 1890 ending in June 2010.
23 And Zlotopolsky 1029 through 1067.
24     Do you have any reason to question
25 the accuracy of the numbers in Column 15 on

Page 121

BOGUSLAW SPANSKI - VOLUME I

1
2  Exhibit 7?
3      A    I have no reason to question it. I
4  have only reason to ask question, were there
5  other episodes between the ones which, you
6  know, answered to 142 and then goes to 396.
7      Q    So we are not here for you to ask
8  me questions. I'm asking you questions.
9      So if you have no reason to doubt
10 it, then we'll keep going.
11     So just looking at this chart here,
12 it appears to me, and this is in fact the
13 case, that the episodes that were broadcast
14 by Polvision under the 2009 licensing
15 agreement in the case of Na Dobre and
16 Plebania -- sorry -- in the case of Klan and
17 Zlotopolsky were shown approximately ten
18 years earlier.
19     In the case of Na Dobre and
20 Plebania, these episodes were shown
21 approximately seven and five years earlier.
22 Is that right?
23     MR. ZAVIN: Objection. That is
24 a complete misstatement of his
25 testimony. And you changed the

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 122

1      BOGUSLAW SPANSKI - VOLUME I
2  question and he changed the answer.
3      MR. WENGER: No.
4      MR. ZAVIN: You changed the
5  question and he changed the answer.
6      MR. FINK: Read the question
7  back.
8      (Requested portion of record read:
9      "Q. So we are not here for you to
10  ask me questions. I'm asking you
11  questions.
12      "So if you have no reason to doubt
13  it, then we'll keep going.
14      "So just looking at this chart
15  here, it appears to me, and this is in
16  fact the case, that the episodes that
17  were broadcast by Polvision under the
18  2009 licensing agreement in the case of
19  Na Dobre and Plebania -- sorry -- in the
20  case of Klan and Zlotopolsky were shown
21  approximately ten years earlier.
22      "In the case of Na Dobre and
23  Plebania, these episodes were shown
24  approximately seven and five years
25  earlier. Is that right?")

Page 123

1      BOGUSLAW SPANSKI - VOLUME I
2      (End of read-back.)
3      MR. FINK: Give everybody an
4  opportunity to see if that's true.
5      MR. ZAVIN: Would you like to
6  hear how you changed the question?
7      MR. WENGER: I'll start it
8  again.
9  BY MR. WENGER:
10     Q  Mr. Spanski, do you have any reason
11  to disagree with the fact that Klan and
12  Zlotopolsky, the episodes that Polvision
13  have broadcast of Klan and Zlotopolsky under
14  the 2009 licensing agreement were episode
15  numbers that had previously been broadcast
16  on Polonia approximately ten years earlier?
17      MR. ZAVIN: Objection.
18      MR. FINK: You can answer.
19     A  I do know you are showing me the
20  chart which shows -- which supports what you
21  just said, and you are asking me if I agree
22  to that. And if I rely on this chart and
23  say that those information are correct, I
24  might say yes, they were broadcast seven
25  years ago or ten years ago.

Page 124

1      BOGUSLAW SPANSKI - VOLUME I
2     Q  No. I don't think you answered my
3  question.
4      My question is: Do you have any
5  reason to disagree with that, that being
6  with respect to Klan and Zlotopolsky, the
7  episodes that were being broadcast by
8  Polvision were broadcast on Polonia
9  previously ten years earlier?
10      MR. ZAVIN: Objection. You
11  represented --
12      MR. FINK: Just "Objection."
13      MR. ZAVIN: No. Your question
14  is based on -- you said this chart
15  was when they were first broadcast.
16      MR. WENGER: Right.
17      MR. ZAVIN: Now your question
18  is were they ever broadcast.
19      Are you representing that this is
20  the only time they were broadcast?
21      MR. WENGER: That wasn't my
22  question.
23      MR. ZAVIN: Well, because
24  that's where --
25      MR. FINK: It's really a

Page 125

1      BOGUSLAW SPANSKI - VOLUME I
2  speaking objection.
3      MR. WENGER: Sounds like a lot
4  of coaching.
5      MR. ZAVIN: No. You are asking
6  what your exhibit says.
7      MR. FINK: He asked to be clear
8  if the witness has any reason, based
9  upon what he knows, to disagree with
10  what this exhibit shows. There may
11  be things he doesn't know or doesn't
12  remember that would cause him to
13  disagree with the exhibit.
14      But the question to the witness
15  right now is: As he looks at this
16  exhibit does he know something that would
17  cause him to believe it is incorrect.
18      MR. ZAVIN: But the question
19  is -- you prepared this exhibit and
20  you represented that it is and you
21  are asking him to verify it. My
22  question is, are you asking him to --
23  Mr. Wenger first said these dates are
24  when they were first broadcast. Are
25  you now saying that these are the

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 126

1 BOGUSLAW SPANSKI - VOLUME I
2 only dates this were broadcast? What
3 is he confirming here?
4 MR. WENGER: We'll leave it at
5 first and I'll repeat the whole
6 question again so you don't have any
7 problems.
8 Q Let's take it from the bottom.
9 Zlotopolsky. With respect to the
10 Zlotopolsky show, Mr. Spanski, do you have
11 any reason to doubt that the episodes that
12 had been broadcast by Polvision under the
13 2009 licensing agreement, namely,
14 Episodes 52 to 93, that those episodes of
15 the Zlotopolsky show were not shown for the
16 first time between February and August of
17 2009?
18 Do you have any reason to disagree
19 with that?
20 MR. ZAVIN: Objection.
21 A I have no recollection. I cannot
22 confirm that they were. Basically, I have
23 no knowledge.
24 I know that they were broadcast on
25 TV Polonia. If you state that they were

Page 127

1 BOGUSLAW SPANSKI - VOLUME I
2 broadcast first time in February '99, that's
3 what you are saying and I have no way of
4 saying yes or no.
5 I know that Zlotopolskys are being
6 currently broadcast on TV Polonia, and those
7 are the same episodes which are listed here
8 which were licensed by agreement of 2009.
9 Q So your position is that currently
10 today, there are episodes of Zlotopolsky
11 being broadcast on Polonia that are which
12 numbers?
13 A I mean, they might be the episodes
14 which were licensed by to Polvision under
15 the 2009 agreement, 52 to 150.
16 Q They might be or do you know that
17 they are?
18 A They might be.
19 Q With respect to Klan, do you have
20 any reason to disagree that the episodes
21 that were broadcast by Polvision under the
22 2009 licensing agreement, namely,
23 Episodes 52 to 91, were broadcast
24 approximately ten years earlier between
25 February of '98 and June of '98?

Page 128

1 BOGUSLAW SPANSKI - VOLUME I
2 MR. ZAVIN: Objection.
3 A Again, I have no knowledge to
4 verify that's correct. I only know that the
5 Klan has been removed from the programming
6 of TV Polonia after the license was done
7 with Polvision.
8 Q I'll ask the same question and
9 combine it:
10 Between Na Dobre and Plebania, the
11 episodes listed here are, namely, 101 to 142
12 for Na Dobre, 101 to 91 Plebania.
13 Do you have any reason to disagree
14 with the fact that these episodes were
15 previously shown on Polonia between
16 November 2002 and November 2003 with respect
17 to Na Dobre and between August '04 and
18 April '05 with respect to Plebania?
19 MR. ZAVIN: Objection.
20 A I don't know.
21 Q Column 5 is a list of what I
22 represent to you as the episodes that were
23 broadcast on Polonia between September 2009
24 and August 2010.
25 Do you have any reason to doubt the

Page 129

1 BOGUSLAW SPANSKI - VOLUME I
2 accuracy of Column 5, namely, that Na Dobre
3 396 through 406 was broadcast on Polonia
4 between September '09 and August 2010;
5 And Plebania 1320 to 1488 in the
6 same time frame;
7 Klan 1698 to 1890 in the same time
8 frame ending in June 2010;
9 And Zlotopolsky 1029 through 1067
10 in the same time frame?
11 A I do not.
12 MR. ZAVIN: Objection.
13 Q Looking at this exhibit here, and
14 again, we can talk about this exhibit or
15 talk generically. Is there any reason why a
16 particular subscriber watching current
17 episodes of Polonia, let's take Plebania for
18 example, watching Episode 1488 of Plebania,
19 would cancel a subscription to your
20 broadcast of TV Polonia or your distribution
21 of TV Polonia in order to watch episodes
22 that had been broadcast five years earlier?
23 MR. ZAVIN: Objection.
24 A There is a number of reasons, main
25 being that he's getting this for free. And

33 (Pages 126 to 129)

Case 14-1115, Document 33-2, 07/15/2014, 1271659, Page57 of 130

## Page 130

BOGUSLAW SPANSKI - VOLUME I

1  it has been old enough, it is like
2  reliving -- the reason is that you might
3  want to watch the movie you've seen before
4  because you like it. You know, it's nothing
5  uncommon for people to go to the movies for
6  a second or third time. It's not abnormal
7  for one particular episode.
8     Q   But do you think somebody would
9  cancel their subscription to watch current
10  episodes in order to watch old episodes, or
11  are you saying that somebody would also want
12  to watch old episodes?
13     MR. ZAVIN:  Objection.
14     A   I believe that if somebody is
15  incurring the cost of let's say $20 a month
16  and he is paying for -- using the example
17  Klan, and suddenly it appears that it's free
18  to air on my local station, Polish are 50
19  nation (sic) and there was no -- and for $20
20  a month they will no longer cancel
21  subscription.
22     Q   We are not talking about Klan. I'm
23  talking -- I think you are talking about
24  another issue with the removal of the Klan.

## Page 131

BOGUSLAW SPANSKI - VOLUME I

1     Let's just let's talk about
2  Na Dobre, Plebania and Zlotopolsky, for now.
3     Why would any viewer watching, for
4  example, Zlotopolsky, let's say they watch a
5  lot, 50 episodes of Zlotopolsky, and they're
6  watching a soap opera that continues, it's a
7  continuing story, why would they cancel
8  their subscription to watch the continuation
9  of that soap opera in order to watch
10  episodes that had been on Polonia ten years
11  earlier?
12     MR. ZAVIN:  Objection.
13     A   I gave you the reason. It's $20.
14     The answer is $20 per month.
15     So why? Because they will save $20
16  and they will get those free episodes,
17  waiting and watching with family members.
18  They're reliving what they've seen already.
19     Q   Which subscribers pay $20 a month?
20     A   Most.
21     Q   They pay $20 a month to the cable
22  company distributors just to watch Polvision
23  television?
24     A   Yes.

## Page 132

BOGUSLAW SPANSKI - VOLUME I

1     Q   Aren't soap operas continuations?
2  Aren't they stories? So somebody would just
3  stop in the middle of the story to go back
4  eight years or ten years to watch an old
5  version of the story?
6     MR. ZAVIN:  Objection.
7     A   To answer you precisely, one of the
8  most successful thematic channels of TVP is
9  the channel called TVP Serial, which does
10  nothing else but runs old mini-series like
11  Kahn and Zlotopolsky.
12     TV Polonia itself had decided it
13  was in its best interest and the viewers'
14  interest to rerun Zlotopolsky which, as we
15  see here, started in '99. So its rerun is
16  twelve years old and obviously people are
17  watching it.
18     I'm not privy to psychology of most
19  of the viewers, but I understand from that
20  what you've experienced that people cancel
21  simply because they get something for free.
22     Q   What evidence do you have that
23  anybody, in fact, canceled in order to watch
24  the old shows at Polvision?

## Page 133

BOGUSLAW SPANSKI - VOLUME I

1     A   Cancellations and e-mails which we
2  have received in the course of business.
3     Some refer very vividly to
4  cancellation of Klan.
5     Q   Continue. Are you finished?
6     So you said, I think, two things:
7     First, you said that you have
8  evidence of cancellations.
9     So now what evidence do you have,
10  if any, that those cancellations are linked
11  to subscribers going to Polvision?
12     A   The biggest Polish market is in
13  Chicago, and Polvision broadcast free to
14  air, no cost to this market.
15     Basically, our penetration of this
16  market is minuscule due predominantly to the
17  presence of Polvision and offering the
18  channels -- I mean the programming which we
19  hold exclusive license to. So that's what
20  it is.
21     The numbers in respect to
22  subscribers speaks louder than words.
23     Q   Your numbers are minuscule. Was
24  this even before this series TVP licensed

34  (Pages 130 to 133)

Page 134

BOGUSLAW SPANSKI - VOLUME I

1 BOGUSLAW SPANSKI - VOLUME I
2 episodes to Polvision?
3     A    No.  To my understanding, the
4 numbers, we have lost specific numbers of
5 subscribers during the time when those
6 mini-series, this program appeared on
7 Polvision.
8     Q    You said that Polvision is a free
9 to air broadcaster in Chicago that dominates
10 the Chicago market.
11         Did I misstate your testimony?
12     A    I mean Polvision broadcasts --
13     Q    Just answer the question.
14         Did I misstate your testimony?
15     A    You did.
16     Q    Please clarify it then.
17     A    Polvision is free to -- they
18 broadcast, among others, areas in Metro
19 Chicago.  They also broadcast in Wisconsin.
20 They broadcast in other markets.
21         So, you know, they are not only
22 limited to Chicagoland.
23     Q    I don't think you answered my
24 question, but I'm happy to repeat it.
25         In the Chicago market, is it in

Page 135

1 BOGUSLAW SPANSKI - VOLUME I
2 fact the case that Polvision, because of its
3 free to air broadcasting, has a large
4 segment or dominates the market in Chicago?
5     A    Offering programming for free and
6 to basically -- basically is quite popular.
7 I mean, people who not wanting to pay for
8 programming which they would otherwise if
9 they wouldn't be the programming they want
10 to watch.  And they gain popularity offering
11 those programs.
12     Q    What evidence -- and I may have
13 asked this before but I don't think I got an
14 answer -- what evidence do you have that any
15 of the subscribers who have canceled did so
16 in order to watch Polvision?
17     A    I mean, I have not caught anybody,
18 no, installing their free antenna, if you
19 are asking me that.
20         My understanding is Polvision
21 programming is free to broadcast, so when we
22 are losing subscribers in a specific period
23 of time, we can attribute that solely to the
24 same programming which is being broadcast on
25 Polvision.

Page 136

1 BOGUSLAW SPANSKI - VOLUME I
2         Needless to say that we received
3 recent e-mails from viewers who are
4 complaining loudly about removal of Klan
5 from our programming and that was the reason
6 as to cancellation.
7     Q    We'll get back to Klan in a minute.
8 I'm just focused on Polvision now.  It's a
9 separate claim.
10         But correct me if I'm wrong, but I
11 understand your testimony to say that you
12 have cancellations but you have no evidence
13 that any of the people who have canceled did
14 so because they can now watch Polvision?
15     MR. ZAVIN:  Objection.  That
16 misstates what the witness literally
17 just said.
18     A    If you are asking for evidence, I
19 might say we might have, we might have.  I
20 would have to simply go ahead and review
21 e-mails which we received for the reason.
22         We tried to ask people what is the
23 reason they canceled subscription.  Some
24 reply, some don't.
25         In those e-mails, there might be

Page 137

1 BOGUSLAW SPANSKI - VOLUME I
2 reasons saying, you know, I have this
3 programming for free on Polvision.  That's
4 the reason I canceled.
5         I know that we have specific --
6 referring to -- program Klan, which you said
7 we would get to.
8     Q    You are saying there are specific
9 e-mails where subscribers have said:  I have
10 canceled my subscription to TV Polonia
11 because Polvision is now broadcasting these
12 shows?
13     A    We may.
14     Q    Do you have more than 50 e-mails
15 like that?
16     A    I doubt it.
17     Q    Twenty-five?
18     A    It's 1, 5, I don't know.  I would
19 have to look.
20     Q    Have you lost any subscribers in
21 the Chicago area, or anywhere else during
22 this period, not because of Polvision?  For
23 any other reason?
24     MR. ZAVIN:  Objection.
25     A    If you are referring to the fact

35 (Pages 134 to 137)

Page 138

BOGUSLAW SPANSKI - VOLUME I

1    BOGUSLAW SPANSKI - VOLUME I
2  that is known as churn in this industry. We
3  have extremely low churn, if at all. People
4  are attached, they grow attached to TV
5  Polonia, especially what I testified
6  earlier, where we cater mostly or the TV
7  Polonia appeals mostly to people of older
8  age. It is not that they go with the
9  fashion because it's something MTV is
10 becoming hot or something else.
11     So we have a very good loyalty in
12 respect to subscribers. Only when
13 situations like you have unfortunate event
14 with Polvision when they can get something
15 and save $20 per month, that really spurs
16 them that they will cancel. And then they
17 will watch, as you noticed, all the episodes
18 in hopes that they would catch up to the
19 moment they left.
20     MR. FINK: Excuse me. That
21 was, if I might say, gratuitous
22 speculation.
23     Would you please read back the
24 question.
25     And I ask the witness to answer the

Page 139

1    BOGUSLAW SPANSKI - VOLUME I
2  question this time.
3     MR. ZAVIN: Well, since you've
4  commented on the witness' answer, all
5  of these questions are asking him to
6  speculate.
7     MR. FINK: It's actually
8  demonstrably not true what you said.
9  I'm not accusing you of lying. I'm
10 just saying this particular question
11 does not suffer from that criticism
12 at all.
13     I'll ask the reporter to read it
14 back. Perhaps we can get an answer.
15     (Requested portion of record read:
16     "Q. Have you lost any subscribers
17 in the Chicago area, or anywhere else
18 during this period, not because of
19 Polvision? For any other reason?")
20     (End of read-back.)
21 A   My answer would be no.
22 Q   So you have not lost any
23 subscribers in Chicago or anywhere else
24 during this period because they've died or
25 they moved or any other number of reasons

Page 140

1    BOGUSLAW SPANSKI - VOLUME I
2  why subscribers cancel subscriptions?
3  A   You've touched on a very important
4  aspect. When they moved, they might cancel
5  but then they'll resubscribe.
6     I mean, people move. But as I said
7  earlier, the loyalty of our subscribers are
8  extremely high.
9  Q   What reasons have subscribers given
10 in the past for canceling?
11 A   Bad programming.
12 Q   Better programming?
13 A   Bad programming or deteriorating
14 program. I've seen that.
15     I mean, plenty of complaints were
16 due to Klan, but I know you want to get
17 there.
18     Frustration was enormous.
19 Q   Do people cancel because it's just
20 too expensive?
21 A   People complain that it's
22 expensive, but usually I would say that they
23 don't cancel.
24 Q   How many of your subscribers die
25 every month?

Page 141

1    BOGUSLAW SPANSKI - VOLUME I
2     MR. ZAVIN: Objection.
3  Q   You say you have 80-year-old
4  subscribers.
5  A   We are aware of those. I'm not in
6  position to answer this question. I don't
7  know.
8  Q   Could you estimate?
9     MR. ZAVIN: Objection.
10 A   It's becoming a little grotesque
11 for me to estimate how many subscribers of
12 ours die. I don't know if you want to go
13 into estimations of how many subscribers
14 died, but I will not do that.
15 Q   What's your average audience age,
16 if you know?
17 A   I testified earlier that in our
18 view it's 50-plus.
19 Q   Do you monitor Polvision
20 broadcasting on a regular basis?
21 A   I don't.
22 Q   Does anyone in your company monitor
23 the Polvision broadcasting?
24 A   They don't monitor. We know --
25 occasionally review programming guide what

36 (Pages 138 to 141)

Page 142

BOGUSLAW SPANSKI - VOLUME I
1
2   they offer.
3       Q    What factors other than Polvision
4   might have caused subscribers to leave
5   Polonia?
6       MR. ZAVIN:  Objection.
7       I think that calls for speculation.
8       Q    You can answer the question.
9       A    I mean, I will speculate is that
10  obviously deteriorating programming, people
11  being dissatisfied with the number of repeat
12  programming, for example.
13      I mean, we have pretty loyal
14  viewership and I think that shows in the
15  reports which you are receiving and passing
16  to TVP.
17      Q    So you mentioned bad programming,
18  repeat programming.  Those are the only
19  factors you can think of that may cause
20  someone to cancel a subscription to your
21  programming?
22      A    I mean, knowing that, you know --
23  and that's again speculation that, you know,
24  we know that there's competition.  There's
25  some other channels.  Somebody may decide,

Page 143

BOGUSLAW SPANSKI - VOLUME I
1
2   hey, I got tired of this channel.  I can go
3   and get another one.
4       But from our experience, the
5   climate of TV Polonia or TVP channels are
6   very different than the ones that are
7   offered by commercial broadcasters.
8       So therefore, people who subscribe
9   in the first place, you know, they are
10  getting accustomed to this climate and
11  they'd rather not go for commercial, more
12  youth-oriented or American-titled
13  programming which is done by TVN.
14      Q    You mentioned that there are reruns
15  on Polonia earlier episodes?
16      A    Yes.
17      Q    Is it possible that these early
18  episodes that have been broadcast on
19  Polvision actually stirred up more interest
20  in the TV Polonia programming so that
21  certain subscribers say, hey, I want to
22  watch current episodes of Polonia, so let me
23  subscribe to TV Polonia?
24      MR. ZAVIN:  Objection.  Calls
25      for speculation.

Page 144

BOGUSLAW SPANSKI - VOLUME I
1
2       A    That's interesting, what you just
3   said, and you are asking me if this would
4   cause it.  If that would, it has not
5   materialized.
6       Q    So you are only going to attribute
7   a loss of subscribers to Polvision but no
8   possible gains?
9       A    As our situation in respects
10  subscribers, we have noticed declining
11  number of subscribers.
12      Q    But haven't new subscribers also
13  signed up during this period?
14      A    Some did, yes.  That's true.
15      Q    But how do you know why they signed
16  up?
17      A    Because we've offered our service
18  in the extended territories and we
19  constantly expand our penetration.  Just to
20  give you --
21      Q    But you don't know specifically why
22  they signed up; isn't that right?
23      A    It is not that I do not know why
24  they signed up.  They've signed up because
25  we became available.

Page 145

BOGUSLAW SPANSKI - VOLUME I
1
2   Like with Time Warner in the last
3   two months, we became available to the
4   Northeast where we were not available
5   before.  So --
6       Q    So you had no new subscriptions in
7   places where you were previously available
8   during this period?
9       A    I mean, I would guess no, we don't.
10      But we were losing subscribers in
11  the areas which we were --
12      Q    Are you sure about that?
13      A    I mean, to my best recollection.
14      MR. WENGER:  I think it's a
15      good time for a little break.  And I
16      think that we --
17      MR. FINK:  Can you tell me how
18      much time has elapsed?
19      THE VIDEOGRAPHER:  Two hours
20      and 15 minutes.
21      MR. WENGER:  Let's take a break
22      for ten minutes.
23      THE VIDEOGRAPHER:  The time is
24      5:11 p.m.  We're going off the
25      record.

37  (Pages 142 to 145)

Page 146

1    BOGUSLAW SPANSKI - VOLUME I
2         (A brief recess was
3    taken.)
4         THE VIDEOGRAPHER:  The time is
5    5:27 p.m., November 8, 2011.  This is
6    Tape Number 3 in the videotaped
7    deposition of Mr. Boguslaw Spanski.
8    BY MR. WENGER:
9    Q    Mr. Spanski, the subscribers that
10   you claim left SEI broadcasting to go to
11   Polvision, what geographic areas do you
12   claim those subscribers are in?
13        MR. ZAVIN:  Objection.  You
14   might want by time because there are
15   two claims.  You may want to specify.
16   I just want to avoid confusion.
17        MR. WENGER:  What are the two
18   Polvision claims?
19        MR. ZAVIN:  One is up to 2010,
20   and then one they substitute which is
21   the Klan claim.
22        MR. WENGER:  That's a separate
23   cause of action.
24        MR. ZAVIN:  That's what I'm
25   saying, that you may want to skip it.

Page 147

1    BOGUSLAW SPANSKI - VOLUME I
2         MR. WENGER:  Well, you can
3    answer.
4         MR. FINK:  Let's avoid any
5    ambiguity.
6    BY MR. WENGER:
7    Q    So let's just say between
8    August 2009 and August 2010, what geographic
9    areas are your canceled subscribers in?
10   A    I mean Illinois, Wisconsin,
11   Milwaukee areas, there is -- speaking from
12   memory, it's areas like -- I know even New
13   Jersey, Indiana.  In general terms, those
14   are the areas.
15   Q    And are those the same areas that
16   you claim subscribers left to go to
17   Polvision after August 2010?
18   A    I mean, I know that people were
19   canceling subscriptions because they were
20   getting their program free to air.
21        So, you know, it's one thing which
22   also came to my mind as I'm answering this
23   is we were receiving numerous calls to our
24   Chicago office.  I mean, basically people
25   were calling in and literally what was

Page 148

1    BOGUSLAW SPANSKI - VOLUME I
2    really the cause of calls of complaints as
3    to why would they -- why would charging
4    something which is something for free in
5    Polvision.
6         So there was some kind of a
7    frustration that was vented to our telephone
8    lines in Chicago.
9    Q    I don't think I got an answer to
10   the question.
11        My question was after August of
12   2010, you claim that subscribers left -- do
13   you claim that subscribers left, whatever,
14   your cable company distributor
15   subscriptions, to go to Polvision?
16   A    Not only cable --
17   Q    It's yes or no.
18   A    Yes.
19   Q    Now, what geographic areas after
20   August 2010 do you claim subscribers left
21   from to go to Polvision?
22   A    I believe that I just provided some
23   geographic boundaries of Illinois --
24   Q    Let me help you out here.
25        Do you refer to the same geographic

Page 149

1    BOGUSLAW SPANSKI - VOLUME I
2    territories for post August 2010?
3    A    I mean when you are specifically
4    talking about post 2010, you are talking was
5    it when Klan was -- stopped being broadcast
6    on --
7    Q    Right now I'm just limiting it to
8    Polvision which is Count 1 in your
9    Complaint.
10        Is it your claim that because
11   Polvision started certain shows on Polvision
12   that subscribers left your entities to go to
13   Polvision or --
14   A    To watch it for free.
15   Q    To watch Polvision.
16        Where are those subscribers
17   located?
18   A    Predominantly it's Illinois, it's
19   Indiana, it's Milwaukee which would be
20   Wisconsin.
21   Q    And this is for subscribers that
22   left before August 2010 and after
23   August 2010 to go to Polvision or because of
24   the Polvision broadcasting?
25   A    I would guess so.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 150

BOGUSLAW SPANSKI - VOLUME I

1      BOGUSLAW SPANSKI - VOLUME I
2      Q    So it is your position that
3   Polvision broadcast in places other and the
4   Chicago area?
5      A    That's my position and my
6   understanding, yes.
7      Q    How do you know that?
8      A    I know that they are available in
9   places I just mentioned.
10          We know as far as Wisconsin goes.
11          And they also specifically
12   advertise on their Web page where they are
13   available and the list is this.
14     Q    And your knowledge is basically
15   from their Web page as to where they are
16   available?
17     A    To answer, yes.
18     Q    Let's take a look at that Web page
19   and that's Spanski Exhibit 8.
20          This is a copy of the polvision.com
21   Website, the page -- it's the "About Us"
22   page of the Website.
23          P-001657.
24          (Spanski Exhibit 8, Printout
25   of the "About Us" page of the

Page 151

1      BOGUSLAW SPANSKI - VOLUME I
2   polvsion.com Website, was marked
3   for Identification.)
4   BY MR. WENGER:
5      Q    Mr. Spanski, can you show me where
6   on the printout of the Web page do you see
7   Polvision broadcast to the areas you just
8   mentioned?
9      A    It is says "Viewers in Illinois,
10   Wisconsin, Michigan, Iowa, Indiana,
11   Connecticut, New York and New Jersey."
12     Q    Now the way I'm reading this -- and
13   tell me if I'm reading anything wrong. It
14   says "Polvision owns and manages Polish
15   Television Chicago and Polvision and Polish
16   Radio Network Chicago, New York, Florida."
17          So Polnet owns Polvision and
18   Polvision Television Network.
19          It says "Serving ethnic communities
20   since '85, Polnet grew to become the number
21   one media outlet for 2 million
22   Polish-speaking listeners and viewers in
23   Illinois, Wisconsin, Michigan, et cetera,
24   providing live Polish language
25   programming" -- I think it should be "7 days

Page 152

1      BOGUSLAW SPANSKI - VOLUME I
2   a week."
3          Is there anything that says here
4   that Polvision has 2 million subscribers in
5   Illinois, Wisconsin -- or it has viewers in
6   Illinois, Wisconsin, Michigan, Iowa,
7   Indiana, Connecticut and New York.
8          The question was: Is there
9   anything on this Website that says there
10   that are 2 million -- that there are viewers
11   of Polvision in Illinois, Wisconsin,
12   Michigan, Iowa, Indiana, Connecticut, New
13   York and New Jersey?
14     MR. ZAVIN: Objection.
15     A    My knowledge of where the Polvision
16   can be viewed also comes from my direct
17   contacts with people like the owner of
18   Polvision, Mr. Kotaba, who advised me
19   sometime ago where his stations could be
20   viewed.
21          And I explicitly recall it was
22   Illinois, Wisconsin, Michigan, Indiana. Not
23   sure about Iowa or New York.
24          But that's where -- you know, he
25   was telling me that that's where his station

Page 153

1      BOGUSLAW SPANSKI - VOLUME I
2   is being received and viewed.
3      Q    A little bit different than what
4   you told me before that you based your
5   understanding of where it can be viewed only
6   on the Website.
7      A    Did I say only?
8      Q    Yes. But we'll move on.
9          But do you read this as saying
10   there are actually 2 million listeners and
11   viewers of Polnet?
12     A    No.
13     Q    Or does this mean that there are
14   actually 2 million Polish-speaking people in
15   Illinois, Wisconsin, Michigan, et cetera?
16     A    That's how I read it.
17     Q    So is it possible then that this is
18   referring to 2 million Polish-speaking
19   people that live in Illinois, Wisconsin,
20   Michigan, Iowa, Indiana, Connecticut and New
21   Jersey but not that Polvision broadcast to
22   all those places?
23     MR. ZAVIN: Objection.
24     A    I mean, it is possible.
25     Q    Let's just take a look for a moment

39 (Pages 150 to 153)

Page 154

BOGUSLAW SPANSKI - VOLUME I

1    BOGUSLAW SPANSKI - VOLUME I
2  at Spanski Exhibit 5.
3        And this is the Polvision TVP
4  licensing agreement.
5        If you can just please look at
6  Article 3, Section 3.1.
7        And I'll read it in English but
8  tell me if my translation is wrong.
9        "The licensor grants the licensee a
10  license conferring nonexclusive rights in TV
11  broadcast by way of cable or terrestrial
12  television broadcast, territorially
13  restricted to the Chicago agglomeration
14  only."
15        Is my reading correct?
16    A    Your reading is correct.
17    Q    And doesn't that suggest that TVP's
18  license to Polvision only covers the Chicago
19  area?
20        MR. ZAVIN:  Objection.
21    A    I mean, you are asking me does it
22  suggest?
23    Q    Doesn't it say that?
24    A    It says that, yes.
25    Q    Do you have any reason to believe

Page 155

1    BOGUSLAW SPANSKI - VOLUME I
2  that Polvision didn't comply with its
3  licensing agreement with TVP?
4    A    I do have reasons to believe.
5    Q    What are those reasons?
6    A    There's a number of reasons.  First
7  of all is that if the broadcast of Polvision
8  terrestrial broadcast is received in
9  Wisconsin or in Indiana, there is no way
10  that Polvision would limit its reception
11  only to Chicago agglomeration.
12    Q    What does "Chicago agglomeration"
13  mean in your mind?
14    A    It's called Chicagoland.
15    Q    Does that cover Indiana or
16  Wisconsin?
17    A    No, it does not.
18    Q    So just back to our time period
19  again.
20        We looked at the series that TVP
21  licensed to Polvision under the annex to the
22  Polvision agreement which was Exhibit 8 --
23  sorry.  No, Exhibit 6.
24        So -- and I just want to confirm,
25  is it in fact your claim that after this

Page 156

1    BOGUSLAW SPANSKI - VOLUME I
2  annex was signed in July of 2010, SEI was
3  still losing subscribers because of these
4  programs that TVP was giving to Polvision?
5    A    That's my position, yes, it is.
6        I wanted to add something but I
7  don't have to.  Maybe I'll add it since --
8        MR. ZAVIN:  There is no
9  question pending.
10        (Discussion off the record.)
11        MR. FINK:  The court reporter
12  is not supposed to ask questions.
13        MR. WENGER:  Let's mark as
14  Exhibit 9, Spanski Exhibit 9.
15        This is an e-mail from David
16  Moffitt at GlobeCast to
17  spanski@tvpolonia.com, dated Friday,
18  August 12, 2011.
19        It is Bates stamped P-001785
20  through P-001826.
21        (Spanski Exhibit 9, E-mail
22  dated August 12, 2011, Bates
23  Numbers P-001785 through P-001826,
24  was marked for Identification.)
25        MR. WENGER:  I would also like

Page 157

1    BOGUSLAW SPANSKI - VOLUME I
2  to mark as Spanski Exhibit 10, a
3  document called Plaintiff's
4  Objections and Responses to
5  Defendant's First Set of
6  Interrogatories, dated August 15,
7  2011.
8        (Spanski Exhibit 10,
9  Plaintiff's Objections and
10  Responses to Defendant's First Set
11  of Interrogatories, dated
12  August 15, 2011, was marked for
13  Identification.)
14  BY MR. WENGER:
15    Q    Let's take a look at Exhibit 10
16  first, actually.
17        And specifically let's take a look
18  at Page 6 of Exhibit 10.
19        Have you seen this exhibit before,
20  by the way?
21        Have you seen this document before?
22    A    Yes.
23    Q    Did you help prepare this document?
24    A    What do you mean I "helped to
25  prepare"?

1    BOGUSLAW SPANSKI - VOLUME I
2        Q    Did you supply your attorneys with
3    information to help prepare this document?
4        MR. ZAVIN:  Objection.  I think
5    this is getting to privilege
6    territory.  You can certainly ask him
7    if he's seen it before.
8        MR. FINK:  No.  That question
9    he asked is completely proper.
10       Read it back.
11       MR. ZAVIN:  Actually, I'll
12   withdraw the objection.
13       He can answer that one yes or no
14   and we'll see what follows.
15       A    I've seen it, yes, and I didn't --
16       Q    The question was:  Did you supply
17   your attorneys with information to help
18   prepare this document?
19       A    Yes.
20       Q    Was Spanski Exhibit 9 one of the
21   documents you gave to your attorneys?
22       A    Exhibit 9?
23       Q    Yes?
24       A    Yes.
25       Q    Let's look back at Exhibit 10,

1    BOGUSLAW SPANSKI - VOLUME I
2    Page 6, second full paragraph.  It says "In
3    addition, during the time period from
4    August 12, 2009 through the present, SEI has
5    lost at least 1,003 GlobeCast subscribers
6    from TV Polonia in the Polvision territory,"
7    and then goes on to say how much those
8    subscribers would be worth for the rest of
9    the term.
10       And it refers in the first sentence
11   to 1785 through 1826.
12       And that's what we're looking at
13   here, right?
14       A    Uh-huh.
15       Q    So this would show there are 1,003
16   lost subscribers for TV Polonia in the
17   Polvision territory, right?
18       A    Yes.
19       Q    Now, let's just take a look for
20   example at Page 1810 in Spanski Exhibit 9.
21       A    Yes.
22       Q    I just picked a random page but we
23   could probably do this on this any page.
24       About 12 lines down, I see a
25   subscriber in Brooklyn, a little further

1    BOGUSLAW SPANSKI - VOLUME I
2    down there's a subscriber in Phoenix, little
3    further down there's one in Odessa, Florida,
4    and then I see one in Palm Harbor, Florida,
5    Cleveland, Ohio.  Another one in Phoenix.
6        We can do this on any page,
7    actually.
8        Aren't these areas that are outside
9    even the states that we just looked at on
10   the Polvision Website?
11       A    They are.
12       Q    And did someone go through this to
13   come up with 1,003 subscribers that are
14   actually in the territory, or is this a list
15   of all subscribers?
16       A    This is a list of all subscribers
17   that we lost during this period.
18       Q    Do you know how many subscribers
19   are listed here?
20       A    I don't.  I don't know how many
21   subscribers.
22       Q    There are about 35 on each page and
23   we have about, give or take --
24       MR. FINK:  Twenty-three pages,
25   24 pages.

1    BOGUSLAW SPANSKI - VOLUME I
2        Q    Forty pages.  So that's about 1200
3    or maybe 1400.
4        So did someone actually go through
5    this and come up with 1,003 subscribers in
6    the Chicago area, or how did you come up
7    with the 1,003?
8        A    That was done in preparation with
9    my attorneys, so I assume --
10       MR. ZAVIN:  Stop there.  You
11   don't have to assume anything.
12   BY MR. WENGER:
13       Q    The column right after the "State"
14   back on Exhibit 9, what is that column.
15       What are those numbers there?
16       So the one just to the right of the
17   listing of the state?
18       A    Those would be zip codes, I would
19   assume.
20       Q    There are four digits, many of
21   them.
22       A    So they might be incomplete zip
23   codes.
24       Q    What columns are redacted here?
25       A    I don't know.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 162

BOGUSLAW SPANSKI - VOLUME I

1
2    Q   Just looking at the first page
3 here, so I have -- and actually going for
4 the first at least five, six, about the
5 first six pages, they are all before
6 August 31, 2009; are they not?
7    A   They are from July.
8    Q   So are you including subscribers
9 that canceled in July but before the
10 Polvision agreement was signed?
11    MR. ZAVIN:  Objection. He
12 already testified -- I don't know
13 whether they were included in the
14 1,003, frankly, David. I didn't
15 prepare this, either. You can ask
16 him whether he knows, but I don't
17 know whether he does.
18    MR. WENGER:  Okay.
19    A   I mean, I don't know. I have
20 basically received this report from
21 GlobeCast which I have passed to our
22 attorneys.
23    Q   Did you ask GlobeCast to give you a
24 list of subscribers that canceled beginning
25 of July 2009 until the present?

Page 163

BOGUSLAW SPANSKI - VOLUME I

1
2    A   Yeah, I may have.
3    Q   Do you have any idea how many
4 subscribers canceled before August 2010?
5    A   Before August 2010?
6    MR. ZAVIN:  Are you restricting
7 it to GlobeCast?
8    MR. WENGER:  Yeah, I'm
9 restricting it to this document.
10    A   From what period of time?
11    Q   From August 2009 through
12 August 2010.
13    A   Maybe a thousand.
14    Q   A thousand.
15 In the Polvision territory?
16    A   No. I would say that it's rather
17 difficult for me to testify what territory.
18 I'm just speaking from my general knowledge.
19    Q   I'm saying out of this exhibit,
20 GlobeCast subscribers in the Polvision
21 territory.
22    A   And I have not counted those, and I
23 have not made, you know, some kind of
24 manipulation how to get Polvision territory
25 out of this list.

Page 164

BOGUSLAW SPANSKI - VOLUME I

1
2 If we need specific answers, it's
3 probably --
4    Q   Did you review this document before
5 it was submitted to the Court. And I'm
6 referring to Exhibit 10.
7    MR. ZAVIN:  Objection. I don't
8 think anything's been submitted to
9 the Court. I think he misspoke.
10    MR. WENGER:  Sorry. Before it
11 was submitted by your attorneys to
12 us.
13    A   I have reviewed it, yes.
14    Q   Did you check to make sure your
15 attorneys' calculations were right?
16    A   I did not check in respect to the
17 accuracy of my attorneys' calculations.
18    Q   Who came up with the $5 million
19 claim number in the Complaint?
20 Is that a number you came up with
21 or your attorneys came up with?
22    A   That was something which we
23 discussed with our attorneys.
24    MR. ZAVIN:  Objection.
25 You can ask your next question but

Page 165

BOGUSLAW SPANSKI - VOLUME I

1
2 I suspect it's going to be privileged.
3    MR. WENGER:  Is that a
4 reciprocal objection?
5    MR. ZAVIN:  It is.
6 I may be wrong. You may phrase the
7 question so brilliant I can't object to
8 it.
9    Q   So you estimate you lost $5 million
10 as a result of the Polvision allegation?
11    A   In my view, the move which
12 undermines our rights in the territory
13 operated is very, very expensive to assess
14 the damages.
15 So in respect to our losses which,
16 you know, are being presented by the value
17 of subscribers which we have lost, you know,
18 this is the figure which might be less,
19 might be more. It would be in our view
20 defined by the experts who will analyze that
21 in the proper way and fashion.
22 But at this stage, that's the
23 amount we have attributed to that particular
24 breach.
25    Q   It's just an estimate right now?

42  (Pages 162 to 165)

Page 166

1    BOGUSLAW SPANSKI - VOLUME I
2    A    It is the value which we believe
3  which would, as I said, might be less, might
4  be more, but until the expert testimony and
5  the expert report on that matter, it's
6  difficult to pinpoint to dollars and cents.
7    Q    Have you consulted with any experts
8  or accountants to determine how much
9  you've -- what kind of claim you might be
10 able to bring as a result of the Polvision
11 claim?
12    MR. ZAVIN:  Objection, only in
13 that you're not asking what his
14 attorneys may have done, correct?
15 Only what he has done.
16    MR. WENGER:  Exactly.
17    A    I understand that our attorneys --
18    MR. ZAVIN:  Bob, you're not to
19 testify what your attorneys may have
20 done.  You can answer the question.
21    Q    I want to ask you personally.  Have
22 you asked any accountant or anyone else to
23 look at your damages?
24    A    No.
25    Q    Have your attorneys engaged an

Page 167

1    BOGUSLAW SPANSKI - VOLUME I
2  expert or accountant to look at these
3  damages issues?
4    MR. ZAVIN:  Objection.
5  Privileged communication.  Direct the
6  witness not to answer.
7    (Directive to witness.)
8    MR. FINK:  It's not a
9  privileged communication.
10    MR. ZAVIN:  The only way he
11 could determine that is through
12 conversations with his counsel.
13    MR. FINK:  The fact that you
14 met with experts in an effort to
15 calculate damages.
16    Anyway, I'm setting this up so you
17 can pursue your objection but I'm setting
18 it up so that at least you are put on
19 notice why your objection in my view is
20 incorrect so that a Court can --
21    MR. ZAVIN:  I understand but I
22 think I can help you out.
23    I will say that, as I'm sure you
24 have done, we have discussed the matter
25 with experts and that's without waiving

Page 168

1    BOGUSLAW SPANSKI - VOLUME I
2  any work product or privileged
3  conversations, and I don't think you have
4  to ask this witness anything on this.
5    MR. WENGER:  Okay.
6    He could have answered that, too.
7  We'll leave it.
8    Let's mark as the next exhibit
9  which is Spanski Exhibit 10.
10    Sorry.  We're up to Spanski
11 Exhibit 11.  This is actually two e-mails
12 that we'll put together and also a sheet
13 that basically summarizes what is
14 attached to the e-mails, and we'll go
15 through that.
16    The two e-mails are P-01341, an
17 e-mail from Antonio Knott at GlobeCast to
18 Mr. Spanski dated August 28-2009.  And an
19 e-mail to the same individuals dated
20 July 5, 2011.
21    And this is a chart that we've
22 prepared just copying exactly what is in
23 the first page of these two e-mails so we
24 can look at them together.
25    We'll mark them as A, B and C as

Page 169

1    BOGUSLAW SPANSKI - VOLUME I
2  part of Exhibit 11.
3
4    (EVENING SESSION:  6:00 P.M.)
5
6    (Spanski Exhibit 11A, E-mail
7  dated Friday, August 28, 2009,
8  3:22 p.m., Bates Numbers P-001341
9  through P-001344, was marked for
10 Identification.)
11    (Spanski Exhibit 11B, E-mail
12 dated Tuesday, July 5, 2011,
13 12:13 p.m., with attachments, Bates
14 Numbers P-001319 through P-001320,
15 was marked for Identification.)
16    (Spanski Exhibit 11C, Chart
17 summarizing the attachments to
18 Exhibits 11A and 11B, no Bates
19 numbers, was marked for
20 Identification.)
21    MR. WENGER:  A is an August 28,
22 2009 e-mail.
23    B is the July 5, 2011 e-mail.
24    And C is a chart basically
25 combining the two attachments, an

43 (Pages 166 to 169)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 170

1    BOGUSLAW SPANSKI - VOLUME I
2  attachment to each those e-mails and
3  we'll go through that very quickly.
4      The Bates number for A, which is
5  the August 28, 2009 e-mail, is P-01341
6  through P-1344.
7      Exhibit B is the July 5, 2011
8  e-mail, Bates Number 1319 through 1320.
9      And C is a one-page summary of what
10 is attached to Exhibit A and B, no Bates.
11 BY MR. WENGER:
12   Q   Mr. Spanski, what is attached to
13 Exhibit 11A?
14   A   It's a monthly statement which we
15 receive from GlobeCast.
16   Q   Is it accurate to say that this is
17 a summary from GlobeCast of the monthly
18 total subscribers to the GlobeCast service?
19   A   That's accurate.
20   Q   So if we look at the column all the
21 way on the left side, and I'm looking at
22 document Bates stamped P-01342, that shows a
23 number of GlobeCast subscribers beginning in
24 January '07 through August 2009; is that
25 right?

Page 171

1    BOGUSLAW SPANSKI - VOLUME I
2   A   Yes.
3   Q   And if we look at Exhibit 11B which
4  is the July 5, 2011 e-mail, and I'm looking
5  at the attachment to that e-mail which is
6  Bates stamped P-1320, does this show in the
7  left column the monthly subscribers for
8  GlobeCast beginning in January '08 through
9  June 2011?
10   A   It's pretty small print but I
11 presume you have described correctly.
12   Q   I will tell you -- and tell me if
13 there's anything inaccurate about
14 Exhibit 11C being just a combination of the
15 two attachments we just looked at?
16      Do you have any reason to doubt
17 that?
18      MR. ZAVIN:  Objection.  You are
19 again asking him to verify an exhibit
20 that you prepared.  I'm sure you can
21 have one of your witnesses testify to
22 it.
23      But you can't ask this witness to
24 verify a document, a table of numbers
25 that he has never prepared or has never

Page 172

1    BOGUSLAW SPANSKI - VOLUME I
2  seen before.
3      MR. WENGER:  I'm just asking
4  about the left column.
5      MR. ZAVIN:  The only possible
6  answer is "I don't know."  Is there
7  any other possible answer to that?
8      MR. WENGER:  It's good you're
9  not the witness today.
10      MR. FINK:  Well, yes, actually.
11 BY MR. WENGER:
12   Q   Is there any reason to think that
13 the left column of Exhibit 11C not a
14 completely accurate copy of the left column
15 of Exhibits 11A and 11B?
16   A   Besides having full trust in you, I
17 would say I have no reason to doubt that's
18 what you say, and if you have done that.
19   Q   Please take a look at a few random
20 ones if you want to make sure.
21      Just looking at the number of
22 subscribers here.  I'm looking at the left
23 column where you see in, let's say,
24 January '07 there are 7300 subscribers.
25      Going from January through July, is

Page 173

1    BOGUSLAW SPANSKI - VOLUME I
2  it right to say that GlobeCast subscribers
3  have -- that there's been a steadily
4  declining number of GlobeCast subscribers
5  during the period between January '07 and
6  July '09?
7   A   I mean, there's a decline in
8  subscriber numbers, yes.
9   Q   Is there any month that you see on
10 this chart where the subscriber numbers are
11 more than the one before, other than a
12 couple in early '07?
13   A   No.
14   Q   So if we go down now to
15 August 2009, and that is the date August 31,
16 2009 when the Polvision license agreement
17 was signed, right?
18   A   Uh-huh.
19   Q   Going from August 2009 down to
20 June 2011, is there still a rather steady
21 decline of GlobeCast subscribers?
22   A   I mean, we see the declines being
23 100.
24   Q   Sorry.  I think this was that was a
25 yes or no question.

44  (Pages 170 to 173)

Page 174

BOGUSLAW SPANSKI - VOLUME I

1     BOGUSLAW SPANSKI - VOLUME I
2     A    Repeat it, please.
3     Q    The question is:  Do you also see a
4  rather steady decline between August 2009
5  and June 2011 of total GlobeCast
6  subscribers?
7     A    There is a steady decline, yes.
8     Q    Does it appear that the rate of
9  decline between August 2009 and, let's say,
10  August 2010 has decreased from, let's say,
11  August 2008 to August 2009?
12         And I'll just make that more clear.
13         In August 2008, there are 5,077
14  subscribers.  In August 2009, there are
15  4,234 subscribers, a difference of
16  approximately 770.
17         In August 2009, there are 4,234
18  subscribers.  In August 2010, there are
19  4,099 subscribers, a difference of about
20  135.
21         So is it fair to say that based on
22  the difference between August 2008 and
23  August 2009 and the difference between
24  August 2009 and August 2010 that the rate of
25  decline of GlobeCast subscribers decreased

Page 175

1     BOGUSLAW SPANSKI - VOLUME I
2     A    You may say that, but you have to
3  also keep in mind that in 2007 and 2008 and
4  2009 we were on Direct TV, which was the
5  reason why the subscribers on one satellite
6  platform, being GlobeCast, were canceling
7  their subscription of GlobeCast and moving
8  to Direct TV.
9         So that was the factor in this
10  cancellations or decrease in subscription.
11         And as you can notice, we have
12  terminated our arrangement with Direct TV.
13         To my best recollection, that was
14  around May -- May or June of 2009.
15         And the decreases in subscribers
16  were most likely directed for other reasons
17  from migration to Direct TV.
18         MR. WENGER:  Could you read the
19     question back, please.
20         (Requested portion of record read:
21         "Q.  In August 2008, there are
22     5,077 subscribers.  In August 2009, there
23     are 4,234 subscribers, a difference of
24     approximately 770.

Page 176

1     BOGUSLAW SPANSKI - VOLUME I
2         "In August 2009, there are 4,234
3     subscribers.  In August 2010, there are
4     4,099 subscribers, a difference of about
5     135.
6         "So is it fair to say that based on
7     the difference between August 2008 and
8     August 2009 and the difference between
9     August 2009 and August 2010 that the rate
10     of decline of GlobeCast subscribers
11     decreased significantly?")
12         (End of read-back.)
13         MR. ZAVIN:  I think he answered
14     it.  Do you want to ask another
15     question.
16  BY MR. WENGER:
17     Q    The question was whether between
18  the specified periods August 2008 and
19  August 2009, as compared to August 2009 and
20  August 2010, the rate of decline between
21  August 2009 and August 2010 decreased?
22         MR. ZAVIN:  I think it's been
23     asked and answered.
24     A    And I understood that I answered
25  it, explained to you that the decrease was

Page 177

1     BOGUSLAW SPANSKI - VOLUME I
2  caused -- that in the year 2009,
3  August 2009, we had decrease of subscribers
4  in GlobeCast caused by presence of TVP
5  channels on Direct TV.
6         This platform has dropped the
7  services of Polish channels in May or June
8  of 2009, so therefore, these decreases has
9  gotten smaller, as you have noticed.
10     Q    What about from the period, let's
11  say, of May 2007 to May 2009 before the
12  Direct TV subscribers left?
13         MR. ZAVIN:  Objection.
14     Q    Isn't it in fact the case that the
15  subscribers were declining steadily for
16  those two years?
17     A    I mean, 2007 we were on Direct TV.
18  The whole -- I mean --
19     Q    Keep going.  Sorry.
20     A    I mean, marketplace will compare
21  what is more attractive to end user, being
22  subscribers.  And I believe that we have
23  launched our service in 2006, if I am
24  correct, on Direct TV which has caused
25  migration of people who wanted to have or

45  (Pages 174 to 177)

Page 178

BOGUSLAW SPANSKI - VOLUME I

1       BOGUSLAW SPANSKI - VOLUME I
2 were relying on satellite or direct-to-home
3 reception.
4       So the numbers were moving from
5 GlobeCast to Direct TV.
6       And that was continuing from year
7 2007, '8 and mid '09 when the agreement has
8 been terminated.
9       So therefore, as you have noticed,
10 the decreases after that has got smaller and
11 smaller.
12       MR. WENGER: Let's mark as
13 Exhibit 12. This is two e-mails.
14       They're from Colleen Hunt at IMD to
15 Bob Spanski.
16       The first e-mail is dated
17 January 14, 2010 Bates stamped P-431
18 through P-441.
19       The second e-mail is dated
20 January 13, 2011, Bates stamped P-546
21 through P-565.
22       (Spanski Exhibit 12A, E-mail
23 dated Thursday, January 14, 2010,
24 6:58 p.m., with attachments, Bates
25 Numbers P-000431 through P-000441,

Page 179

1       BOGUSLAW SPANSKI - VOLUME I
2 was marked for Identification.)
3       (Spanski Exhibit 12B, E-mail
4 dated Thursday, January 13, 2011,
5 8:48 p.m., Bates Numbers P-000546
6 through P-000565, was marked for
7 Identification.)
8 BY MR. WENGER:
9    Q   Mr. Spanski, do you recognize the
10 documents that have been marked as
11 Exhibits 12A and B?
12    A   Yes, I do.
13    Q   What are they?
14    A   They are statements which we
15 receive from IMD.
16    Q   What is IMD?
17    A   International Media Distributors.
18    Q   Is that a collection of various
19 cable companies that distribute programming
20 to subscribers to TV Polonia?
21    A   That's not precisely what they do.
22 They collect revenues from various cable
23 systems with whom they have agreements.
24    Q   So they act as kind of an of an
25 intermediary between various cable companies

Page 180

1       BOGUSLAW SPANSKI - VOLUME I
2 and yourself to collect the revenue and then
3 forward it to Euro View?
4    A   That's correct.
5    Q   We see here 12A and 12B.
6       End of year December 2009 and
7 December 2010 revenue share files for TV
8 Polonia; is that right?
9    A   Yes.
10    Q   Does IMD have a significant number
11 of Chicago subscribers included within the
12 revenues that IMD has clocked in?
13    A   It's not IMD. I mean, the Chicago
14 revenues would be from ComCast as a cable
15 operator.
16    Q   So does IMD collect revenues from
17 several cable operators that distribute
18 programming in Chicago?
19    A   In Chicago, we have two operators,
20 one being ComCast, the other being AT&T.
21    Q   Tell me if I'm wrong, but I see
22 AT&T SBC, Chicago, Illinois area.
23    A   That's AT&T.
24    Q   And then there's AT&T SBC Chicago,
25 Illinois area packaged.

Page 181

1       BOGUSLAW SPANSKI - VOLUME I
2    A   Yes.
3    Q   I see ComCast and then I see RCN
4 Chicago, Skokie and Chicago area?
5    A   Yes.
6    Q   Are these cable companies that
7 distribute in the Chicago area?
8    A   Correct.
9    Q   Now, let's take a look at
10 Page P-438, which is about eight pages in.
11 Specifically, I want you to take a look at
12 several columns underneath "August 2009" all
13 the way on the right side. There's four
14 columns under "August 2009." Subscriptions
15 Rate, Billing, Receipt.
16       Subscriptions, let's go all the way
17 to the bottom of the page. Does this
18 indicate that as of August -- or for
19 August 2009 there were 9,397 subscriptions
20 for the IMD subscribers?
21       And again, I'm looking at
22 Page P-438.
23       MR. ZAVIN: Which column?
24       MR. WENGER: Fourth from the
25 end under "August 2009" under "Subs."

46 (Pages 178 to 181)

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 182

BOGUSLAW SPANSKI - VOLUME I

1  
2    Q    Do you see that, Mr. Spanski?
3    A    I do here, yes.
4    Q    So let's take a look at the next
5  page, P-439.
6        And we'll be looking at the same
7  column on this page for September -- I'm
8  sorry, I mean 441 because 439, 440 and 441
9  are all part of the same column.
10       Let's look at 441.
11       This is a tally of the same three
12 pages. And I'm looking at September,
13 October, November and December.
14       And we see under the column called
15 "Subs" we had 9,397 in August.
16       In September, we have 9,557.
17       In October, we have 9,876.
18       In November, we have 9,719.
19       In December, 9,999.
20       And let's continue on to the 2010
21 numbers, if we may.
22       And that begins on P-550.
23       And for January, on P-550 for
24 January, I see 10,509.
25       For February, 10,662.

Page 183

BOGUSLAW SPANSKI - VOLUME I

1  
2        For March, 10,777.
3        For April, 11,604.
4        And we may as well continue. We
5  can go to Page P-556.
6        For May, we have 12,231.
7        For June, there's 12,318 -- or 218.
8        For July there's 12,296, et cetera.
9        Don't these numbers suggest to you
10 that in fact IMD subscribers were increasing
11 starting with August 2009?
12       A    I will say something more. I'll
13 answer your question of numbers of IMD
14 subscribers were increasing since 2002.
15       This is work which we have done
16 together with them, which does not mean, of
17 course, that would Polvision not brought
18 broadcast on their station, the key and most
19 sought after programming of TV Polonia,
20 those numbers would be twice as high if not
21 higher.
22       Q    So that's your claim, that even
23 though the numbers were clearly going up
24 during this period, if not for TV Polonia
25 the numbers would have gone up more?

Page 184

BOGUSLAW SPANSKI - VOLUME I

1  
2        A    It's obvious besides the particular
3  losses or cancellation of subscriptions due
4  to the fact that the programs were available
5  on Polvision for free, would we have not had
6  this presence on Polvision, the results on
7  IMD and on other means of distribution would
8  be significantly higher.
9        Q    How do you know?
10       A    We have all reasons to suspect that
11 that would be the case.
12       Q    Isn't there a point when the market
13 is saturated, where you are going to reach
14 all the viewers you are going to reach,
15 maybe a few more but not, I mean, that
16 you'll have double the subscribers every
17 month?
18       A    You are very right. It is
19 saturated when there's fee programming
20 available on terrestrial broadcast. It's
21 becoming very saturated.
22       Q    So you mentioned that you believe
23 that if not for Polvision, you would have
24 had more GlobeCast subscribers than you
25 currently have seen.

Page 185

BOGUSLAW SPANSKI - VOLUME I

1  
2        And you have reasons to suspect
3  that.
4        Beyond that, do you have any more
5  specific evidence, other than reasons to
6  suspect that?
7        A    I think that the evidence are very
8  clear.
9        Just moments ago, we read from the
10 Web page of Polvision that they serve the
11 community of 2 million Polish people.
12       Assuming that nobody watches
13 Polvision, nobody watches the mini-series
14 and soap operas, as they are called, which
15 is the main attraction of TV Polonia, then
16 the claim that we have no reasons to believe
17 that our results were greatly diminished,
18 maybe it would make some sense.
19       But as we know Polvision -- and I
20 believe they broadcast two hours per day,
21 which is repeated twice during the day, and
22 the main programming content is exactly the
23 content which has been licensed unlawfully
24 by TVP, simply created a situation people
25 who would subscribe to our programming

47 (Pages 182 to 185)

Page 186

BOGUSLAW SPANSKI - VOLUME I
1  BOGUSLAW SPANSKI - VOLUME I
2  decide not to.
3      Q   So this is all your speculation,
4  basically?
5          You don't have any evidence, do
6  you, that any one subscriber even would have
7  subscribed to your channels but instead went
8  to Polvision?
9      A   I think that we have evidence in
10  the form of phone calls or e-mails that I
11  mentioned to you, but people when they
12  decide to quit, they don't feel, you know,
13  obligated to give us reasons why they quit.
14      Q   Hold on.  You are talking about
15  quitting, canceled subscribers.
16          We are talking now about increases
17  that IMD saw both overall and also in the
18  Chicago area.
19          Now, you mentioned that you have
20  reasons to believe that if not for
21  Polvision, there would be more or greater
22  increases in the IMD subscription numbers.
23          And my question to you is:  Do you
24  have any evidence of even one subscriber
25  that has told you or that you otherwise

Page 187

1  BOGUSLAW SPANSKI - VOLUME I
2  heard that that subscriber would have joined
3  your program or subscribed to your
4  broadcasting if not for Polvision broadcast?
5      MR. ZAVIN:  Objection.  You may
6  want to rephrase your question.  You
7  said if you have evidence from a
8  subscriber.  That can't be what you
9  meant to say.
10      THE WITNESS:  Should I answer?
11      Q   Answer.
12      A   I believe we have received numerous
13  phone calls at our Chicago office explicitly
14  telling us we can shove our programming, and
15  I will not use explicit words that were
16  used, because why would somebody pay $20
17  when they could get it for free.
18      Q   Why would a new subscriber or
19  potential subscriber call you to tell you
20  you can "shove" your programming?
21      A   You would be surprised what people
22  call us with, and people are calling us for
23  reasons because TVP is fairly well-known
24  entity in Poland.
25          There's a number of reasons.  I

Page 188

1  BOGUSLAW SPANSKI - VOLUME I
2  mean, people call.
3      I mean, we have lines that are
4  fairly busy.
5      Q   Just to be clear, these are people
6  who call you and say that they would have
7  subscribed to SEI broadcasting but for the
8  fact that this programming is shown on
9  Polvision?
10      A   There's no such thing of SEI
11  broadcasting.  They could ...
12      Q   I've seen TV Polonia broadcasting
13  in the USA through SEI and its subsidiaries.
14      And again my question is:  Do you
15  have evidence, even one subscriber who has
16  said that he would have or he or she would
17  have subscribed to your -- to SEI's
18  programming or SEI distribution of Polonia
19  but for Polvision broadcasting?
20      MR. ZAVIN:  Objection.
21      A   To my best knowledge, we received
22  not one but quite a few phone calls to that
23  effect.
24      Q   Have you ever gotten anything like
25  that in writing?

Page 189

1  BOGUSLAW SPANSKI - VOLUME I
2      A   I could not tell you if we did or
3  didn't.  I don't know.
4      Q   Do you know if your attorneys have
5  produced in this litigation even one
6  document suggesting that there are certain
7  subscribers that would have subscribed but
8  for Polvision?
9      A   I don't know.
10      MR. WENGER:  Let's mark as the
11  next exhibit which is 13.
12      Exhibit 13 has a Bates stamped
13  range P-1827 through P-2009.
14      MR. ZAVIN:  I think you gave me
15  five copies of the same thing.
16      MR. FINK:  Give it back.
17      MR. WENGER:  There's --
18      (Spanski Exhibit 13, List of
19  canceled Internet subscriptions,
20  Bates Numbers P-001827 through
21  P-002009, was marked for
22  Identification.)
23      MR. ZAVIN:  While you are doing
24  that, I want to go to the men's room.
25      THE VIDEOGRAPHER:  The time is

48 (Pages 186 to 189)

Page 190

1       BOGUSLAW SPANSKI - VOLUME I
2   6:30 p.m. Going off the record.
3       (A brief recess was
4 taken.)
5       THE VIDEOGRAPHER: The time is
6 6:37 p.m. We're back on the record.
7 BY MR. WENGER:
8   Q   Let's take a quick look at Spanski
9 Exhibit 10, Page 6.
10      Exhibit 10 are SEI's responses to
11 TVP's interrogatories.
12      Page 6, and I'm looking at the
13 first paragraph.
14      It says "During the time period
15 from August 12, 2009 through the present,
16 SEI lost at least 1906 Internet subscribers
17 in the Polvision territory. See 1827
18 through 2009."
19      1827 through 2009 are the documents
20 that we just marked as Exhibit 13.
21      So let's take a look at Exhibit 13.
22      Mr. Spanski, what is Exhibit 13,
23 namely, documents Bates stamped 1827 through
24 2009?
25   A   My best knowledge is the list of

Page 191

1       BOGUSLAW SPANSKI - VOLUME I
2 subscribers who canceled the Internet
3 subscription to TV Polonia?
4   Q   When? What period?
5   A   I believe it's specified under
6 "Cancel Date," you have the dates when they
7 canceled.
8   Q   My question is what period does
9 this cover.
10      So if you don't know, just tell me
11 that.
12   A   I mean, at this moment precisely, I
13 don't know. I have not really reviewed this
14 list in detail but assume it's sometime from
15 August 2009 till present or when this list
16 was produced.
17   Q   And I just want to go back to what
18 you said before.
19      You said to the best of your
20 knowledge this is a list of canceled
21 Internet subscriptions.
22      Do you have some doubt about that
23 or why do you say to the best of your
24 knowledge?
25   A   I have not prepared this list.

Page 192

1       BOGUSLAW SPANSKI - VOLUME I
2   Q   Who prepared this list?
3   A   Our Web master.
4   Q   Did you instruct him to prepare
5 this list?
6   A   Yes.
7   Q   What instructions did you give him?
8   A   I provided -- I asked him to
9 prepare the list of cancellations in the
10 period, to my best recollection, from
11 August 2009 to the present.
12   Q   You started in August 1, 2009 or
13 did you pick up another date in August?
14   A   I don't recall if I asked him 1st
15 of August or 9th of August.
16   Q   The interrogatory we were looking
17 at, Exhibit 10, says "During the time period
18 from August 12 of 2009 through the present."
19      And if we just take a look at, for
20 example, Page 1847, the first subscription
21 listed on 1847 -- 1847 incidentally, for
22 those following, is a separate document, so
23 it's easy to find.
24      1847, the first subscription is
25 August 8, 2009 and this Interrogatory refers

Page 193

1       BOGUSLAW SPANSKI - VOLUME I
2 to August 12 of 2009.
3      So I just question whether somebody
4 checked the dates here against the dates
5 listed in the Interrogatory responses during
6 the time period August 12, 2009.
7      Do you know if someone actually
8 checked that?
9   A   I do not know if somebody checked
10 it exactly, but maybe I may have made a
11 mistake asking for the list to be from the
12 1st of August -- no. Because I see 1st of
13 August 2010, so that's not okay.
14      But this 8-August 2009 may simply
15 be an error.
16   Q   And I'm just looking at the last
17 one on that page, too, appears to indicate
18 March 9, 2009, doesn't it?
19   A   The same page?
20      MR. FINK: 1847.
21   Q   1847, bottom line.
22   A   This is 3rd September.
23   Q   Okay.
24      So it's going the other way.
25   A   Yeah, because in this date system

49 (Pages 190 to 193)

A-243

Page 194

BOGUSLAW SPANSKI - VOLUME I
1    BOGUSLAW SPANSKI - VOLUME I
2    is not the month is first.
3        Q    Let's take a look at the next page,
4    1848, and it's about ten from the bottom.
5    Isn't there one July 21, 2009, a New York
6    subscription?
7        A    Yes, that would indicate 21 of July
8    2009.
9        Q    So isn't that before August 2009?
10        MR. ZAVIN:  We'll stipulate
11    July is before August.
12        A    Obviously, there might have been
13    some errors.
14        Q    If we look at the eighth or maybe
15    the seventh listing on 1848 also is
16    July 2009.
17        So I just question, and I'll ask
18    you, Mr. Spanski, did someone check this
19    carefully or does it need to be rechecked?
20        A    I guess that indicates that there
21    are the dates which are prior August 12, and
22    this can be rerun with a specific date to
23    correct that.
24        Q    Let's take a look, for example, at
25    two pages next to each other.

Page 195

1    BOGUSLAW SPANSKI - VOLUME I
2    I want to look at Page 1829 and
3    Page 1969.
4        And I just use these as examples.
5    If we can just put those two pages next to
6    each other for a minute.
7        MR. ZAVIN:  Can I have the
8    question read back.
9        (Requested portion of record read:
10    "Q.  Let's take a look, for
11    example, at two pages next to each other.
12        "I want to look at Page 1829 and
13    Page 1969.
14        "And I just use these as examples.
15    If we can just put those two pages next
16    to each other for a minute.")
17        (End of read-back.)
18    BY MR. WENGER:
19        Q    Let's look at 1829.  There is a
20    Subscriber 105192.
21        Do you see that?  It's sixth from
22    the bottom.
23        Looking on Page 1829, sixth from
24    the bottom.
25        Is there a Subscriber 105192?

Page 196

1    BOGUSLAW SPANSKI - VOLUME I
2        A    Yes.
3        Q    Now, let's take a look at Page 1969
4    and I'm looking again, from the bottom,
5    105192.
6        A    Yes.
7        Q    Are these the same people,
8    Ulamonica or Urszula Monica?
9        A    No.
10        Q    They are not the same people?
11        A    I mean, basically you have the
12    person Michalowski.
13        Q    I'm looking at Subscriber 105192
14    which is --
15        A    Okay, so it's Horoszwicz.
16        No.  Urszula Ulamonica?
17        A    Horoszwicz.
18        Q    Yeah, Horoszwicz, living at 7521
19    South Shore Drive.  Isn't that the same
20    thing?
21        A    Then you are looking at --
22        Q    101592.
23        Page 1829 and 1969.
24        A    So I have this on 1829, and where
25    is it on 1969?  Where do you see this?

Page 197

1    BOGUSLAW SPANSKI - VOLUME I
2        Q    So do you see that now,
3    Mr. Spanski, 105192 on both 1829 and 1969?
4        A    Yes, I see it.
5        Q    We are not going to spend too much
6    time on these but I'll point out a few
7    others.
8        Take a look at the same pages again
9    and take a look at four from the bottom.
10        First look at 1829, four from the
11    bottom.  It's 105244.
12        And now let's take a look at 1969.
13    Isn't two from the bottom 105244?
14        A    I didn't follow.  Obviously this is
15    one person which is shown in this report
16    twice.
17        Q    So far we have two of them that are
18    on the report twice.
19        Let's take a look at 1829.  We are
20    on 105264 on 1829.
21        Page 1829, we're three from the
22    bottom, 105264.
23        And now let's take a look at
24    Page 1970, also.  And if we look at 1970,
25    the second one is 105264?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 198

1       BOGUSLAW SPANSKI - VOLUME I
2     A   Yes, I see that.
3     Q   And there are many, many of these
4 and I'm not going to go through them all,
5 but --
6     A   Same date of cancellations.
7     Q   But Mr. Spanski, doesn't what I
8 just showed you, and it's just a sample,
9 indicate there are at least some subscribers
10 that are counted twice on these
11 spreadsheets?
12       MR. ZAVIN: Objection.
13       MR. FINK: You can answer.
14       MR. ZAVIN: There's no way of
15 knowing.
16     A   You showed me two subscribers.
17     Q   Three, for the record.
18     A   Three. You were fast. You showed
19 me you say three. I said two.
20     Q   Should we go through them again?
21     A   No. I mean, I take your word there
22 were three subscribers and, you know,
23 obviously I relied on the Web master what
24 kind of glitch there was and, if needed,
25 obviously it would be corrected.

Page 199

1       BOGUSLAW SPANSKI - VOLUME I
2     So this thing can be cleaned up.
3 It's a computer program which picks up the
4 cancellation dates.
5     Q   Is there anything else that's
6 unreliable about this information?
7       MR. ZAVIN: Objection.
8     A   So far we have two or three
9 subscribers out of -- I don't know how many
10 thousands which you have found unreliable.
11     Q   And we also, for the record, have
12 found quite a few subscribers, or at least a
13 few, that is before the Polvision license
14 date?
15     A   That's correct, and that might be
16 my error because I have asked the wrong
17 date.
18     Q   So far we have two things that are
19 unreliable about this data in terms of what
20 it's purporting to represent.
21       MR. ZAVIN: Objection. It's
22 not purporting to represent anything.
23       MR. FINK: Let him finish his
24 question.
25 BY MR. WENGER:

Page 200

1       BOGUSLAW SPANSKI - VOLUME I
2     Q   I'm asking you if there's anything
3 else that needs to be double-checked or is
4 not reliable.
5       MR. ZAVIN: Objection.
6     A   I think anything could be
7 double-checked. I would not agree with you
8 that it is unreliable.
9     Q   Let's take a look at the end of
10 this and I'm looking particularly at 2008.
11     It's all the way at the very end.
12     We actually should start with 2007.
13     So to me it looks like there are
14 three rows being shown here:
15     There is a total number subscribers
16 at the end of the month, percentage of
17 increase of lost subscribers at the end of
18 the month, number of subscribers increase
19 lost at the end of the month.
20     That's right, Mr. Spanski?
21     A   Yes.
22     Q   And if we look at the next page,
23 2008 particularly it's start with
24 August 2009.
25     And I just want to go along the

Page 201

1       BOGUSLAW SPANSKI - VOLUME I
2 bottom column, which is number of
3 subscribers increase lost at the end of each
4 month. Okay.
5     And I'm just going to read across,
6 August 2009, and I'm going to continue
7 through August 2010.
8     So there's 215 lost in August 2009.
9     Sixty-nine gained in September '09.
10     Two lost in October 09.
11     Sixty-nine lost in November '09.
12     435 gained in December '09.
13     Seventy-four gained in January '10.
14     Seventy-five lost in February '10.
15     Fifty-one lost in March '10.
16     845 gained in April 10.
17     127 lost in May '10.
18     287 lost in June '10.
19     545 lost in July '10.
20     184 lost in August '10.
21     115 gained in September '10 and so
22 on.
23     Based on the numbers we just looked
24 at, Mr. Spanski, is there any pattern that
25 emerges in terms of gains or losses during

51 (Pages 198 to 201)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 202

1    BOGUSLAW SPANSKI - VOLUME I
2  the year we just looked at?
3    A   There's one pattern that I can see
4  that, you know, we're gaining some
5  subscribers in December.
6    Q   In December 2009, you gained some
7  subscribers?
8    A   Yes.  We gained some subscribers.
9    Q   You gained some in April, too,
10  right?  And you gained some in the following
11  September, and then some months you lost
12  some, right?
13    A   Correct.
14    Q   Doesn't this just reflect typical
15  fluctuations in Internet subscription rates
16  during this period?
17    A   What we have here is that we have
18  the period starting in January 2008 and the
19  time when even without our knowledge
20  Polvision has been broadcasting.  It is
21  prior the settlement date and prior the
22  second agreement, extension agreement.
23    So we have the fluctuations that
24  shows some months we lose subscribers.  By
25  the same token, our efforts of gaining

Page 203

1    BOGUSLAW SPANSKI - VOLUME I
2  subscribers are most instances not producing
3  results.
4    So I would state that if we would
5  not have programming, key programming
6  available on Polvision, our gain or losses
7  would be smaller, if at all, and we would
8  gain more subscribers.
9    Q   What evidence do you have of that?
10    A   What evidence?
11    Q   I'll be more clear.
12    Do you have even a single piece of
13  paper from any Internet subscriber that
14  suggests that they either canceled or did
15  not sign up because of the Polvision
16  broadcast?
17    A   Yes, we do have and I believe that
18  was presented in this litigation.
19    We have e-mails which provide the
20  reason for cancellation as, among others,
21  loss of Kahn which is ongoing on Polvision.
22    So if you are asking me if we do
23  have evidence, we do have evidence.
24    Q   How many subscribers out of the
25  1906 that you claim are attributable to

Page 204

1    BOGUSLAW SPANSKI - VOLUME I
2  Polvision do you have evidence from?
3    A   I don't know.  It's difficult for
4  me to answer you precisely, but I think
5  there are 20, 30 e-mails.
6    Please keep in mind that people are
7  very hesitant to write.
8    We ask -- there is a specific form
9  which goes to every cancellation but, you
10  know, people simply ignore it.  So only the
11  people who are most frustrated, they reply
12  to that.
13    Q   So you are basing your claim that
14  1906 Internet subscribers canceled as a
15  result of the Polvision licensing agreement
16  on 20, 30 e-mails where people are
17  complaining about Klan leaving TV Polonia?
18    A   I am basing on the fact which is
19  the written correspondence being e-mails,
20  phone calls which you are receiving in our
21  office, and I believe that there's also a
22  whole bunch of correspondence directed to
23  TVP stating people's frustration with lack
24  of certain programming and in particular
25  Klan, which became available nowhere else

Page 205

1    BOGUSLAW SPANSKI - VOLUME I
2  but on Polvision.
3    Q   But you don't have any specific
4  evidence other than Klan complaints that
5  people have canceled their Internet
6  subscriptions because of Polvision?
7    MR. ZAVIN:  Objection.  Asked
8  and answered.
9    MR. FINK:  You can answer
10  again.
11    A   If you are calling what I just said
12  not evidence, I repeat that this is to me is
13  an evidence.
14    And as we are receiving phone calls
15  and we are receiving e-mails and we have
16  received copies of e-mails directed to TVP,
17  for me this is evidence and this for you
18  isn't.
19    Q   Let's take a look again at 1847.
20    That's the second document.  It's
21  the larger document.
22    And I'm just looking at the column
23  under "State."
24    Right away here I see a whole bunch
25  of Canadian-based Internet subscribers as

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 206

BOGUSLAW SPANSKI - VOLUME I

1   BOGUSLAW SPANSKI - VOLUME I
2   well as New York and California, and I can
3   find those throughout this, many. Ontario
4   Internet subscribers. British Columbia,
5   Florida.
6        Many places that are indisputably
7   out of the Polvision territory.
8        Did you actually count to see how
9   many Polvision -- how many Internet
10  subscribers canceled in the Polvision
11  territory?
12    A   I did not do the counting. I did
13  not do the counting.
14    Q   So your attorneys came up with the
15  Number 1906?
16    A   I believe so.
17    Q   Do you know how your attorneys
18  reached their -- made their calculations?
19    A   No, I don't.
20    Q   Do you think there's any difference
21  between an Internet subscriber and a
22  television subscriber in terms of whether
23  they would cancel because of the Polvision
24  broadcast?
25    A   I know what you are referring with

Page 208

1   BOGUSLAW SPANSKI - VOLUME I
2   Polsat International and the two radio
3   channels, your position, Mr. Spanski, is
4   somebody would give up all that just because
5   there's some old programming being shown on
6   Polonia in order to save $7 a month?
7     A   You are mistaken in asking
8   question.
9        You have provided incorrect
10  information.
11       On TV Polonia there is TV Polonia
12  content of which the major star of the
13  contents were those as you called "old
14  shows."
15       And this content is on the
16  supplemented by radio channels. There's no
17  Tele 5 on TV Polonia, neither there is
18  Polsat.
19       There's only TV Polonia.
20    Q   But not the radio stations?
21    A   The radio station. I just said TV
22  Polonia and radio stations.
23       There is no Tele 5 nor Polsat.
24    Q   We'll go through some more of that,
25  but looking at your Website, there are

Page 207

1   BOGUSLAW SPANSKI - VOLUME I
2   a difference for people who have access of
3   programming for free against something they
4   have to pay even a dollar becomes attractive
5   and they are motivated, you know, to cancel.
6     Q   So you think that there would be
7   the same motivation for someone who has
8   Internet subscription to TV Polonia and
9   someone who watches TV Polonia on TV to
10  cancel as a result of the Polvision?
11    A   You are saying the same motivation.
12  The motivation for one is $20 and for
13  another one is $7. So there is a different
14  motivation, different amount of money.
15       But I think that it boils down to
16  the fact that if you get something for free
17  and then you are asked for paying for it,
18  and even if you are using the medium
19  Internet or television or any other form of
20  delivery like IPTV, if you are getting it
21  for free, you are saying why should I pay
22  for it.
23    Q   Somebody who is paying $7 a month
24  for access to all of TV Polonia content and
25  all of the programs you mentioned, Tele 5,

Page 209

1   BOGUSLAW SPANSKI - VOLUME I
2   pictures of Tele 5 and something else, I
3   believe.
4        But we can discuss that some more
5   tomorrow.
6        MR. WENGER: Let's go off the
7   record.
8        THE VIDEOGRAPHER: The time is
9   7:02 p.m. We're going off the
10  record.
11       (A brief recess was
12  taken.)
13       THE VIDEOGRAPHER: The time is
14  7:17 p.m. We're back on the record.
15  BY MR. WENGER:
16    Q   Mr. Spanski, what is your second
17  claim in the Complaint with regard to the
18  unauthorized distributors?
19       MR. ZAVIN: Objection. Can you
20  show him the Complaint. It's a
21  little hard to understand from the
22  description you are talking about.
23       MR. WENGER: It's Claim 2 in
24  the Complaint and we can take a look
25  at the Complaint.

53 (Pages 206 to 209)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 210

BOGUSLAW SPANSKI - VOLUME I
1
2     We'll mark the Complaint then as
3  Exhibit 14.
4     MR. FINK:  It's the Amended
5  Complaint.
6     MR. WENGER:  The Amended
7  Complaint.
8     So Exhibit 14 is the Amended
9  Complaint dated October 1, 2010.
10     (Spanski Exhibit 14, Amended
11     Complaint dated October 1, 2010,
12     was marked for Identification.)
13  BY MR. WENGER:
14     Q    And I'm referring now, Mr. Spanski,
15  to the claim described, among other places,
16  beginning on the bottom of Page 6.
17     Six is a general description of the
18  allegations, and then your claim, your
19  actual claim for relief is on Page 8.
20     Page 6, it says "TVP breached the
21  agreement by failing to support SEI's
22  actions against infringers."
23     If you would like to read this
24  section, please do.
25     When you are ready, let me know.

Page 211

1     BOGUSLAW SPANSKI - VOLUME I
2     MR. FINK:  Do you need the
3  question read back?
4     THE WITNESS:  Could you.
5     MR. ZAVIN:  Perhaps you just
6  want to ask the question now that you
7  said it.
8     Q    My question is:  What is your
9  second claim in this litigation relating to
10  the unauthorized distributors?
11     A    I mean, TVP has breached the
12  agreement by not supporting our action
13  against thieves who were stealing the
14  programming of TVP, infringing on SEI as
15  well as TVP's rights.
16     Q    What kind of support do you claim
17  TVP should have given you?
18     A    TVP should have joined action which
19  we have launched as co-plaintiff, therefore
20  eliminating the need for prolonged cost of
21  litigation.
22     Instead, they decided to get and
23  negotiate with the thieves and pirates to
24  our detriment.
25     Q    You say instead of joining the

Page 212

1     BOGUSLAW SPANSKI - VOLUME I
2  litigation, they've caused it to be
3  prolonged.
4     Is your claim that the litigation
5  has been prolonged because of TVP's failure
6  to join, or is it something else?
7     A    There would not be litigation if
8  TVP had acted as it was supposed to and live
9  up to its commitment under the terms of the
10  agreement.
11     Q    Where in the agreements do you find
12  TVP'S obligation to join the litigation?
13  There are two --
14     (Technical pause.)
15     THE VIDEOGRAPHER:  The time is
16  7:25 p.m.  We're back on the record.
17  BY MR. WENGER:
18     Q    My last question to you,
19  Mr. Spanski, is:  Where in the agreements do
20  you find TVP's obligation to join the
21  litigation, as you say?
22     A    I don't think there is as -- the
23  two covenants in the agreement and the
24  Settlement Agreement which obliged TVP to
25  support us defending TVP's rights.

Page 213

1     BOGUSLAW SPANSKI - VOLUME I
2     One is in I believe first
3  amendment, and the second one is in the
4  Settlement Agreement.
5     Q    We'll take a look at those clauses
6  in a minute but you just said something
7  different.
8     You said that there's an obligation
9  for TVP to support your litigation.
10     Is there an obligation to support
11  the litigation or join the litigation?
12     MR. ZAVIN:  Objection.
13     A    I said I didn't know that it was on
14  the record or not, but I said TVP would join
15  the litigation as co-plaintiff without any
16  cost because I have undertaken to cover all
17  legal expenses of this action.
18     There will be no litigation.
19     It was presented to TVP by our
20  Canadian attorneys that the other parties,
21  the thieves and pirates who for years were
22  infringing the rights of TVP, would settle
23  and cease and desist their infringing would
24  they see there was TVP support.
25     Instead, TVP got into -- I know the

54  (Pages 210 to 213)

Page 214

BOGUSLAW SPANSKI - VOLUME I
1  BOGUSLAW SPANSKI - VOLUME I
2  negotiations, meetings, entertaining their
3  proposals, how to wrestle the rights of SEI
4  and develop the relation with known to TVP
5  thieves.
6  Q   I'm going to ask you again:  Where
7  in the agreements and if you can show me
8  where in the agreements does TVP agree to
9  join a litigation with SEI against
10  unauthorized distributors?
11  MR. ZAVIN:  Objection.
12  A   Can you show me the First
13  Amendment?
14  Q   Sure.
15  A   And the Settlement Agreement.
16  Q   The first one is Exhibit 1.
17  A   And I also have Exhibit 2, is the
18  Settlement Agreement.
19  Q   Right.
20  A   Page 2 of the First Amendment,
21  Section 7, reads "TVP appoints SEI as its
22  representative in the territory authorized
23  to prevent violation and protect the rights
24  of TVP.  All legal acts performed in the
25  name of TVP, in particular those leading to

Page 215

1  BOGUSLAW SPANSKI - VOLUME I
2  the incurring of expenses, may only be
3  performed of its pure consent.  TVP shall
4  provide that proper support for activities
5  of SEI in this respect."
6  That is the first quite broad
7  appointment of us as legal representative to
8  protect the rights of TVP which we tried to
9  do.
10  And then on Settlement Agreement
11  there is section --
12  Q   I don't think you'll find that in
13  the Settlement Agreement but please feel
14  free to keep looking.
15  A   I am pretty sure that there is one
16  clause and I believe it was in Settlement
17  Agreement which obligated TVP to prevent
18  unauthorized use of its content.
19  And you know, I have problems
20  finding it now but I believe that -- I don't
21  know how accurate this copy is.
22  But I'm pretty positive that it was
23  included.
24  But this can be verified and
25  obviously I'll have to review the copy which

Page 216

1  BOGUSLAW SPANSKI - VOLUME I
2  we have.
3  Q   When you filed -- do you need some
4  more time Mr. Spanski?
5  A   I'm trying to locate, that's all.
6  Okay.
7  Q   And when you filed your Complaint
8  and specifically the second claim relating
9  to unauthorized distributors, were you
10  relying upon some clause that you thought
11  was in the Settlement Agreement?
12  A   Excuse me.  I've got it, what I was
13  referring to.
14  Q   Sure.
15  A   It's Section E.
16  "TVP shall not distribute or offer
17  to distribute or permit to distribution --
18  or permit distribution of any other channels
19  in North America that contain any ..."
20  So literally here is a commitment
21  that TVP shall not permit the distribution.
22  TVP has done nothing and they
23  allowed permission by thieves, and they have
24  refused to join the action in which they
25  were assured that there would be no cost to

Page 217

1  BOGUSLAW SPANSKI - VOLUME I
2  them.
3  So there was nothing -- and there
4  will be no action, there will be no
5  litigation as it was explicitly advised by
6  very reputable law firm in Toronto.
7  Q   So in your mind, not permitting
8  something to happen is the same as taking an
9  affirmative step to prevent it from
10  happening?
11  A   What is not permitting?
12  Q   Well, you read the clause here.  It
13  says "TVP shall not permit."
14  A   Yes.  And they did permit.
15  Q   Is that an affirmative obligation,
16  in your mind, to take action to prevent
17  something from happening?  Or is permitting
18  something different?
19  A   The combination of those two
20  covenants, one is saying they will assist in
21  protecting TVP's rights, and then another
22  one enforcing it or reinforcing it, saying
23  they will not permit the distribution, on
24  which both fronts TVP has failed miserably.
25  I mean, that's our opinion.

55  (Pages 214 to 217)

Page 218

BOGUSLAW SPANSKI - VOLUME I
1
2    Q    Now, is there any cause in the
3  agreement that says that TVP is required to
4  join a litigation with SEI?
5    A    There is no clause saying that they
6  are required to join litigation.  The
7  clauses are very difficult ...
8    Q    Let's look at the clause in the
9  addendum for a second.  Page 2 of the
10 addendum.
11   A    Yes.
12   Q    It says, and you read it before,
13 "TVP appoints SEI as its representative in
14 the -- on the territory, authorized to
15 prevent violation and protect the rights of
16 TVP."
17        Now, why would TVP be appointing
18 SEI to prevent violation and protect TVP's
19 rights if TVP itself was obligated to join a
20 litigation?
21   A    Because we are in the territory.
22 We are the ones who can locate the
23 violations first to advise TVP about
24 existence of piracy, and that's what we have
25 been doing for quite some.

Page 219

BOGUSLAW SPANSKI - VOLUME I
1
2    Q    So TVP appoints SEI as its
3  representative to prevent violation and
4  protect the rights of TVP.
5        So in your mind, protecting the
6  rights is just finding infringers?
7    A    No.  We have taken action.
8    Q    But what here in this clause
9  obligates TVP to join that action?
10   A    What it does "shall provide
11 appropriate" -- there a word "appropriate
12 support for activities."
13        Appropriate support was to become
14 co-plaintiff because they would close this
15 pirated site once and for all.  They refused
16 that for no reason whatsoever.
17        So appropriate support combined
18 with not to permit distribution and to --
19 you know, boils down to the fact that we
20 have launched the legal action to shut down
21 the pirates and thieves, asking for the
22 support in form of simply agreeing to be
23 co-plaintiff.  No expenses.  No problems.
24        That the thieves will see there is
25 a united front against them.  It is not only

Page 220

BOGUSLAW SPANSKI - VOLUME I
1
2  Spanski as a licensee but also is TVP whom
3  those thieves have found their way to
4  circumvent, at least in their opinion, that
5  the rights they were stealing the
6  programming to which we had the content
7  rights but we even had the right to the
8  channels.
9        So that's why we believe that's a
10 Claim Number 2.
11        MR. WENGER:  Let's take a look
12   or let's mark as Exhibit 15.
13        This is a letter dated March 24,
14   2011 from TVP to Mr. Spanski.
15        (Spanski Exhibit 15, Letter
16   dated March 24, 2011, no Bates
17   numbers, was marked for
18   Identification.)
19 BY MR. WENGER:
20   Q    Let's just look at the last
21 paragraph, if you don't mind, Mr. Spanski.
22        And my translation says that "In
23 relation to the above-mentioned -- in the
24 event that SEI considers it essential that
25 TVP provide information or deliver evidence

Page 221

BOGUSLAW SPANSKI - VOLUME I
1
2  in the scope of the above-mentioned
3  proceedings before the Court in Canada
4  against IMB records and others.  Please send
5  such request to TVP."
6        Is that a fairly accurate
7  translation of what that paragraph says?
8    A    Close enough.
9    Q    So is TVP offering to provide
10 information or even provide evidence to
11 assist SEI with its action in Canada?
12   A    What the previous paragraph says is
13 even more interesting, advising --
14   Q    Hang on.  Just answer the question.
15        The question was:  Is TVP offering
16 to provide information or deliver evidence
17 in Canada against IMB records?
18   A    No, it doesn't offer.  It advises
19 SEI that we may write the request.  It
20 doesn't say that they will respond to this
21 request.  They're saying you may write the
22 request to TVP.  That's all what it says.
23   Q    Have you ever sent the request to
24 TVP?
25   A    Yeah --

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

A-250

Page 222

BOGUSLAW SPANSKI - VOLUME I

1    BOGUSLAW SPANSKI - VOLUME I
2    Q    Hang on.
3         Did you ever send a request to TVP
4    to provide information or evidence for the
5    proceeding that TVP did not respond to?
6    A    I believe that there was a letter
7    sent by our attorneys from Toronto to TVP
8    requesting those information.  It remained
9    unanswered.
10   Q    What information are you --
11   A    Exactly the ones which you are
12   referring to in this particular paragraph
13   you just quoted.
14   Q    Which information specifically did
15   you request from TVP that TVP has not
16   provided?
17        And I'll ask the same question for
18   evidence.
19        Which evidence specifically did you
20   ask for from TVP that TVP has not provided?
21   A    TVP has a received a letter from
22   our law firm in Toronto advising them in
23   detail the situation what is with IMB
24   advising them that their co-participation is
25   essential in closing this particular action,

Page 223

1    BOGUSLAW SPANSKI - VOLUME I
2    to which TVP has not responded.
3         The letters like that, you know,
4    you can write to ask the letter and then
5    nothing will happen.  I have experienced
6    that in the past and this is one of the
7    examples.
8         We are talking about 24th of
9    March 2011.  At that time, TVP is meeting
10   with the IMB records to conspire, you know,
11   against SEI.
12        So in that time, we shall write the
13   letter asking them to provide us support.
14   Q    So hang on.  We'll get to that, but
15   I still haven't gotten an answer to my
16   question, and that's why I think this is
17   taking more time that it should.
18        What information or evidence did
19   you ask TVP to provide that it has not
20   provided?  And if you don't know, just say
21   you don't know?
22   A    Our attorneys have requested
23   support from TVP to which they have not --
24        MR. FINK:  You're not answering
25   the question.

Page 224

1    BOGUSLAW SPANSKI - VOLUME I
2         He's really not.  We're going to
3    run out of time and it's unfair.  And you
4    don't want a motion to the judge because
5    he just goes on and on and doesn't answer
6    the question.
7         The question is evidence or
8    information, not they wrote a letter
9    asking to join.
10        What information and evidence did
11   you ask for that you didn't get.
12        That is the question.
13        Is there any?
14   THE WITNESS:  I don't know.
15   MR. FINK:  Thank you.
16   THE WITNESS:  Your welcome.
17   BY MR. WENGER:
18   Q    Your claim for damages falling from
19   this failure, as you say, of TVP joining the
20   litigation, what is your claim for damages?
21   A    I believe it's outlined in the
22   claim.  To my best recollection is something
23   like $7.5 million.
24   Q    Where does that number come from?
25   A    We don't know if it will be more or

Page 225

1    BOGUSLAW SPANSKI - VOLUME I
2    it will be less.
3         This is to be litigated.  We will
4    assume we will prevail in this litigation.
5         We don't know at this point what
6    the legal cost will be.
7         We only know we have expended
8    without really starting the litigation, this
9    is still prediscovery time.  We have
10   extended over $100,000 Canadian on this
11   case.
12        And that would not be the case at
13   all would TVP have decided to join as
14   co-plaintiff as it was explained to them.
15   Q    Now your Complaint attributes
16   $7 million of damages to this claim.  How do
17   you get from $100,000 in legal fees to
18   $7 million?
19   A    How?  I mean, it might be less, it
20   might be more.  The time will tell.  We
21   might lose the case due to TVP's action or
22   lack of it.  I don't know.
23        This is something which was in
24   general terms from our previous experience
25   how much money we have already spent

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 226

1      BOGUSLAW SPANSKI - VOLUME I
2  litigating. You know, it was something
3  which myself and attorneys came to the
4  conclusion that shall really encompass
5  potential damages due to this particular --
6      MR. ZAVIN: Move to strike
7  anything about him and his attorneys
8  coming to any conclusion on the case.
9  It's privileged.
10 BY MR. WENGER:
11     Q    Is your claim limited to, as of
12 now, to attorneys' fees, or do you have any
13 other damages arising from this claim?
14     A    It is attorneys' fees and potential
15 loss of this particular litigation.
16     Q    Are you claiming damages for any
17 lost subscribers --
18     A    No.
19     Q    Let me finish the question.
20     -- relating to this claim?
21     A    No.
22     Q    Have you paid your Canadian
23 attorneys any money for anything other than
24 this litigation?
25     A    No.

Page 227

1      BOGUSLAW SPANSKI - VOLUME I
2      Q    When did this issue first arise
3  with IMB?
4      A    It arised probably in 2007 where
5  those thieves started stealing our
6  programming, precisely TV Polonia.
7      We had issued at that time cease
8  and desist to which they reacted positively.
9  They stopped doing that only to find a way
10 of distributing other channels of TVP,
11 trying to circumvent our rights.
12     Q    When was the first time you
13 notified TVP about this. You said you
14 discovered it in 2007.
15     Did you go to TVP right away?
16     A    No. We acted on our representative
17 commitment and to protect rights of TVP, and
18 we have asked our lawyers to take the proper
19 action which was cease and desist demand.
20 And they, as I said just moments ago,
21 stopped breaching the rights.
22     Later, they started doing it
23 through other means.
24     Q    Later when?
25     A    It's difficult for me to precisely

Page 228

1      BOGUSLAW SPANSKI - VOLUME I
2  pinpoint when now, but I believe you do have
3  documentation which specifically provides
4  the dates.
5      You are asking me to remember every
6  detail and, unfortunately, I don't.
7      Q    Was this 2007, 2008, 2009?
8      A    No. It was -- I think it was maybe
9  2008 or 2009. I would say 2009.
10     Q    Early 2009, late 2009?
11     A    You are asking me to speculate
12 right now. I don't remember.
13     Q    Do you remember when the first time
14 you asked TVP to join the litigation was?
15     A    As soon as we have been advised by
16 our attorneys in Toronto that the only way
17 to put an end to this procedure would be to
18 have TVP as co-plaintiff.
19     MR. WENGER: Let's mark as
20 Exhibit 16, these are a set of legal
21 fees -- or -- sorry -- legal --
22 invoices for attorneys' fees, Bates
23 stamped beginning P-1672 through
24 P-1720.
25     (Spanski Exhibit 16, Set of

Page 229

1      BOGUSLAW SPANSKI - VOLUME I
2  invoices for attorneys' fees, Bates
3  Numbers P-001672 through P-001720,
4  was marked for Identification.)
5  BY MR. WENGER:
6      Q    If we take a very quick look at the
7  Exhibit 10, I believe the interrogatory
8  responses, and specifically Page 9.
9      At the bottom of Page 9, it says
10 here that "Subject to the foregoing and the
11 reservations set forth therein, SEI in
12 regard to its second claim for breach of
13 contract seeks damages," I'll skip a few
14 words, "that would have been incurred but
15 for TVP's ongoing contractual beaches. See
16 1672 to 1723."
17     So you've referred to these
18 documents as support for your claim that TVP
19 owes you legal fees; is that right?
20     A    That's correct.
21     Q    Now, the first couple of these are
22 for -- in 2007, right?
23     And then beginning with 1680, you
24 have an invoice in 2010.
25     A    Yes.

58 (Pages 226 to 229)

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 230

BOGUSLAW SPANSKI - VOLUME I
1  BOGUSLAW SPANSKI - VOLUME I
2  Q  Did you ever complain to TVP
3  between 2007 and 2010 that it should join
4  the litigation?
5  A  Between 2007 and -- basically in
6  2007, there is 2007 and then the next one is
7  2010.
8  Q  Right.
9  A  2007, we were litigating with TVP
10  and I had no opportunity to complain.
11  Q  Why not?
12  A  Because we had ongoing litigation
13  with TVP on much more serious matters than
14  this one.
15  Q  You don't view this as a serious
16  matter?
17  A  This is a serious matter, but
18  litigation which was in federal court in New
19  York was on much broader scale and
20  importance.
21  Q  Isn't it true, though, then that
22  your claim arose in 2007?
23  MR. ZAVIN:  Objection.  That
24  calls for a legal conclusion.
25  A  That our claim arose?

Page 231

1  BOGUSLAW SPANSKI - VOLUME I
2  Q  In 2007 when you had the first
3  invoices here.
4  MR. ZAVIN:  He cannot answer
5  that question.
6  He can answer what happened but he
7  can't answer the question when a claim
8  arose.  That's a legal conclusion.
9  MR. WENGER:  It's his claim.
10  He should be able to talk about it.
11  Are you directing him not to
12  answer?
13  MR. ZAVIN:  Yes.  I'm directing
14  him not to answer a legal conclusion
15  as to when a claim arises.  I am
16  absolutely allowing him to answer any
17  factual question you may ask about
18  the claim.
19  You can draw whatever conclusions
20  you want, but you can't ask this witness
21  to draw a legal conclusion.
22  (Directive to witness.)
23  BY MR. WENGER:
24  Q  Mr. Spanski, does the mutual
25  release that you signed in connection with

Page 232

1  BOGUSLAW SPANSKI - VOLUME I
2  the Settlement Agreement, does it exclude
3  this potential claim?
4  MR. ZAVIN:  Objection.
5  Q  I mean, I'm not an attorney, but as
6  my understanding is that as of mutual
7  releases, it releases ourselves from all the
8  past doings, so I would say that 2007 would
9  fall into that.
10  MR. FINK:  Let's go back to --
11  I don't believe that was a legal
12  conclusion.
13  When is the first time you thought
14  that TVP was obligated to reimburse you
15  in connection with the legal fees?
16  THE WITNESS:  I did not think
17  that TVP was obligated to reimburse
18  me for legal fees.  I was and I am
19  convinced TVP was obligated to join
20  the lawsuit as co-plaintiff where
21  they were being assured that we were
22  going to be responsible for all legal
23  fees, and that would simply close the
24  matter.
25  MR. FINK:  When was that?

Page 233

1  BOGUSLAW SPANSKI - VOLUME I
2  THE WITNESS:  That was in, I
3  guess, late 2009.  Yeah, that was
4  most likely 2009.
5  MR. FINK:  So that's when you
6  had a claim against TVP?
7  MR. ZAVIN:  Objection.  Now
8  you've asked the same question.
9  MR. FINK:  No.
10  Is that when you had a claim
11  against TVP, in your mind?
12  Did you have a claim against TVP as
13  soon as it declined to join the
14  litigation?
15  MR. ZAVIN:  Objection.  And now
16  I'm going to object on two grounds:
17  You know as well as I know that one
18  lawyer --
19  MR. FINK:  Well, I was trying
20  to get past your objection which is
21  an improper objection.
22  MR. ZAVIN:  David I'm sure is
23  able to handle it.
24  You can't double-team a witness.
25  BY MR. WENGER:

59 (Pages 230 to 233)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 234

```
1              BOGUSLAW SPANSKI - VOLUME I
2        Q    Is there any other litigation
3    pending or contemplated against unauthorized
4    distributors?
5        A    Not at this moment, no.
6        MR. WENGER:  Call the day.
7        THE VIDEOGRAPHER:  The time is
8    7:54 p.m.  We're going off the
9    record.
10
11
12            (The deposition was adjourned at
13    7:54 p.m.)
14
15    _____
              BOGUSLAW SPANSKI
16
     Subscribed and sworn
17
     to before me this
18
     _____ day of _____, 2011
19
20
     _____
21            Notary Public
22
23
24
25
```

Page 235

```
1              BOGUSLAW SPANSKI - VOLUME I
2    STATE OF NEW YORK   )       PAGE _____ of _____
                             ) ss:
3    COUNTY OF NEW YORK   )
4            I wish to make the following
5    changes, for the following reasons:
6    PAGE  LINE
7    ____  ____      CHANGE: _____
8         REASON: _____
9    ____  ____      CHANGE: _____
10        REASON: _____
11   ____  ____      CHANGE: _____
12        REASON: _____
13   ____  ____      CHANGE: _____
14        REASON: _____
15   ____  ____      CHANGE: _____
16        REASON: _____
17   ____  ____      CHANGE: _____
18        REASON: _____
19   ____  ____      CHANGE: _____
20        REASON: _____
21
     _____       _____
22   Witness's signature            Date
23
24
25
```

Page 236

```
1              BOGUSLAW SPANSKI - VOLUME I
2         C E R T I F I C A T E
     STATE OF NEW YORK   )
3                           : ss.
     COUNTY OF NEW YORK   )
4        I, BARBARA R. ZELTMAN, Shorthand
5    Reporter and Notary Public, within and
6    for the State of New York, do hereby
7    certify:
8        That BOGUSLAW SPANSKI, the witness
9    whose deposition is hereinbefore set
10   forth, was duly sworn by me and that such
11   deposition is a true record of the
12   testimony given by the witness.
13       I further certify that I am not
14   related to any of the parties to this
15   action by blood or marriage, and that I
16   am in no way interested in the outcome of
17   this matter.
18       IN WITNESS WHEREOF, I have hereunto
19   set my hand this 16th day of November,
20   2011.
21
22   _____
         BARBARA R. ZELTMAN
23       Court Reporter and Notary Public
24
25
```

Page 237

```
1              BOGUSLAW SPANSKI - VOLUME I
2         I N D E X
3                                       PAGE
4    Examination by Mr. Wenger          6
5
6
7         E X H I B I T S   M A R K E D
8    SPANSKI       DESCRIPTION          PAGE
9
10   Exhibit 1    Set of three documents: 1994    77
               agreement and two addenda;
11             1999 addendum; and 2002
               amendments
12
     Exhibit 2    Settlement Agreement dated      86
13             August 11, 2009
14   Exhibit 3    Barter Agreement dated March    93
               17, 2008, Bates Numbers
15             POL-38 through POL-53
16   Exhibit 4    License Agreement dated June    93
               27, 2008, Bates Numbers
17             POL-54 through POL-57
18   Exhibit 5    Licensing Agreement dated       98
               August 31, 2009, Bates
19             Numbers POL-58 through POL-62
20   Exhibit 6    July 16, 2010 Annex to the      99
               August 31, 2009 TVP Polvision
21             Licensing Agreement
22   Exhibit 7    TV series histories chart, no   111
               Bates numbers
23
     Exhibit 8    Printout of the "About Us"      150
24             page of the polvsion.com
               Website
25
```

60 (Pages 234 to 237)

Page 238

```
 1          BOGUSLAW SPANSKI - VOLUME I
 2            E X H I B I T S   M A R K E D
 3     SPANSKI          DESCRIPTION          PAGE
 4     Exhibit 9    E-mail dated August 12, 2011,    156
                    Bates Numbers P-001785
 5                  through P-001826
 6     Exhibit 10   Plaintiff's Objections and       157
                    Responses to Defendant's
 7                  First Set of Interrogatories,
                    dated August 15, 2011
 8
       Exhibit 11A  E-mail dated Friday,             169
 9                  August 28, 2009, 3:22 p.m.,
                    Bates Numbers P-001341
10                  through P-001344
11     Exhibit 11B  E-mail dated Tuesday, July 5,    169
                    2011, 12:13 p.m., with
12                  attachments, Bates Numbers
                    P-001319 through P-001320
13
       Exhibit 11C  Chart summarizing the           169
14                  attachments to Exhibits 11A
                    and 11B, no Bates numbers
15
       Exhibit 12A  E-mail dated Thursday,           178
16                  January 14, 2010, 6:58 p.m.,
                    with attachments, Bates
17                  Numbers P-000431 through
                    P-000441
18
       Exhibit 12B  E-mail dated Thursday,           179
19                  January 13, 2011, 8:48 p.m.,
                    Bates Numbers P-000546
20                  through P-000565
21     Exhibit 13   List of canceled Internet        189
                    subscriptions, Bates Numbers
22                  P-001827 through P-002009
23     Exhibit 14   Amended Complaint dated          210
                    October 1, 2010
24
25
```

Page 239

```
 1          BOGUSLAW SPANSKI - VOLUME I
 2            E X H I B I T S   M A R K E D
 3     SPANSKI          DESCRIPTION          PAGE
 4
       Exhibit 15    Letter dated March 24, 2011,    220
 5                   no Bates numbers
 6     Exhibit 16    Set of invoices for             228
                     attorneys' fees, Bates
 7                   Numbers P-001672 through
                     P-001720
 8
 9
10
11
12            R E Q U E S T S
13               NONE.
14
15            D I R E C T I V E S
16            PAGE  LINE
17              32   9
18             167   7
19             231  22
20
21
22
23
24
25
```

61 (Pages 238 to 239)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

SPANSKI ENTERPRISES, INC.,

                        Plaintiff,

      -against-                        Civil Action No.

TELEWIZJA POLSKA S.A.,                 10 CV 4933 (RMB)

                        Defendant.

----------------------------------------x

VIDEOTAPED DEPOSITION OF:
MARIA E. NADOLNA
Wednesday, November 9, 2011
New York, New York
12:10 p.m. - 8:35 p.m.

Reported in stenotype by:
---- Rich Germosen, CCR, CRCR, CRR, CLR ----
Certified Realtime Reporter

Page 2

1
2          Videotaped Deposition of MARIA E. NADOLNA,
3    taken in the above-entitled matter before RICH
4    GERMOSEN, Certified Court Reporter, (License No.
5    30XI00184700), Certified Realtime Court Reporter-NJ,
6    (License No. 30XR00016800), NCRA Registered
7    Professional Reporter, NCRA Certified Realtime
8    Reporter, Certified LiveNote Reporter, and a Notary
9    Public within and for the States of New York, New
10   Jersey and Delaware, taken at the offices of LOEB &
11   LOEB, L.L.P., 345 Park Avenue, New York, New York
12   10154, on Wednesday, November 9, 2011, commencing at
13   12:10 p.m.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2    A P P E A R A N C E S:
3
4    LOEB & LOEB, L.L.P.
5    BY: JONATHAN ZAVIN, ESQ.
6        -and-
7    BY: JOHN PISKORA, ESQ.
8    345 Park Avenue
9    New York, New York  10154
10   (212) 407.4000 / (212) 658.9105 (FAX)
11   jzavin@loeb.com
12   jpiskora@loeb.com
13   Attorneys for the Plaintiff
14
15   DLA PIPER US, L.L.P.
16   BY: DAVID S. WENGER, ESQ.
17       -and-
18   BY: ROBERT F. FINK, ESQ.
19   1251 Avenue of the Americas
20   New York, New York  10020-1104
21   (212) 335.4890 / (212) 884.8590 (FAX)
22   david.wenger@dlapiper.com
23   robert.fink@dlapiper.com
24   Attorneys for the Defendant
25

Page 4

1
2    A P P E A R A N C E S:  (CONT'D.)
3
4    ALSO PRESENT:
5    ALINSON GONZALEZ, Legal Video Specialist
6    KATARZYNA BROCKA, Official Polish Interpreter
7    BOGUSLAW SPANSKI
8    BOGUSLAW PISAREK
9    ROBERT KROBLEWSA
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1
2                      I N D E X
3    WITNESS                    EXAMINATION
4    MARIA E. NADOLNA
5      BY MR. ZAVIN              24
6
7    EVENING SESSION             249
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 to 5)

A-257

```
1
2              E X H I B I T S
3  DESCRIPTION              PAGE  LINE
4  (Exhibit 1 for            43    21
5   identification, multi-page
6   document entitled Answer to
7   Amended Complaint and
8   Counterclaims, not bearing
9   Bates stamps.)
10
11 (Exhibit 2 for            56    10
12  identification, multi-page
13  document bearing Bates stamps
14  P00001 through P00007.)
15
16 (Exhibit 3 for            64    11
17  identification, multi-page
18  document bearing Bates stamps
19  P00016 through P00018.)
20
21 (Exhibit 4 for            66    18
22  identification, multi-page
23  document bearing Bates stamps
24  P00023 through P00025.)
25
```

```
1
2          E X H I B I T S  (CONT'D.)
3  DESCRIPTION              PAGE  LINE
4  (Exhibit 9 for           103    15
5   identification, one-page
6   document bearing Bates stamp
7   TP7006700.)
8
9  (Exhibit 10 for          110    9
10  identification, one-page
11  document bearing Bates stamp
12  P00204.)
13
14 (Exhibit 11 for          112    15
15  identification, one-page
16  document bearing Bates stamp
17  P00203.)
18
19 (Exhibit 12 for          114    4
20  identification, multi-page
21  document bearing Bates stamp
22  TP7003598.)
23
24
25
```

```
1
2          E X H I B I T S  (CONT'D.)
3  DESCRIPTION              PAGE  LINE
4  (Exhibit 5 for            70    8
5   identification, multi-page
6   document bearing Bates stamps
7   P00030 through P00033.)
8
9  (Exhibit 6 for            93    6
10  identification, two-page
11  document bearing Bates stamps
12  SEI 000004 and SEI 000005.)
13
14 (Exhibit 7 for            96    19
15  identification, two-page
16  document bearing Bates stamps
17  TP7000086 and TP7000087.)
18
19 (Exhibit 8 for            98    25
20  identification, multi-page
21  document bearing Bates stamps
22  TP7004249 through TP7004250.)
23
24
25
```

```
1
2          E X H I B I T S  (CONT'D.)
3  DESCRIPTION              PAGE  LINE
4  (Exhibit 13 for          117    25
5   identification, one-page
6   document bearing Bates stamp
7   TP7003479.)
8
9  (Exhibit 14 for          120    8
10  identification, multi-page
11  document bearing Bates stamps
12  POL00038 through POL00045.)
13
14 (Exhibit 15 for          158    10
15  identification, multi-page
16  document bearing Bates stamps
17  POL00054 through POL00057.)
18
19 (Exhibit 16 for          173    11
20  identification, multi-page
21  document bearing Bates stamps
22  POL00058 through POL00062.)
23
24
25
```

3 (Pages 6 to 9)

| | Page 10 |
|---|---|

```
 1
 2              E X H I B I T S  (CONT'D.)
 3   DESCRIPTION              PAGE   LINE
 4   (Exhibit 17 for         192    11
 5    identification, multi-page
 6    document bearing Bates stamps
 7    TVP 1011110338 through TVP
 8    1011110339.)
 9
10   (Exhibit 18 for         218    20
11    identification, two-page
12    document bearing Bates stamp
13    TVP 1011110355.)
14
15   (Exhibit 19 for         221    3
16    identification, two-page
17    document dated December 21st,
18    2009, bearing Bates stamp TVP
19    1011110351.)
20
21   (Exhibit 20 for         222    23
22    identification, one-page
23    document dated December 23rd,
24    2009, bearing Bates stamp
25    P00172.)
```

| | Page 12 |
|---|---|

```
 1
 2              E X H I B I T S  (CONT'D.)
 3   DESCRIPTION              PAGE   LINE
 4   (Exhibit 25 for         241    24
 5    identification, multi-page
 6    document dated March 30th,
 7    2010, bearing Bates stamps
 8    TVP 0720110298 through TVP
 9    0720110299.)
10
11   (Exhibit 26 for         251    17
12    identification, multi-page
13    document entitled note from
14    meeting with a representative
15    of the company Polvision in
16    Chicago on April 1st, 2010,
17    bearing Bates stamps TVP
18    1011110356 through TVP
19    1011110357.)
20
21   (Exhibit 27 for         264    8
22    identification, two-page
23    document dated April 8th,
24    2010, bearing Bates stamp TVP
25    05161100062.)
```

| | Page 11 |
|---|---|

```
 1
 2              E X H I B I T S  (CONT'D.)
 3   DESCRIPTION              PAGE   LINE
 4   (Exhibit 21 for         224    23
 5    identification, two-page
 6    document bearing Bates stamp
 7    TVP 1011110352.)
 8
 9   (Exhibit 22 for         230    23
10    identification, two-page
11    document dated January 25th,
12    2010, bearing Bates stamp TVP
13    05161100044.)
14
15   (Exhibit 23 for         236    25
16    identification, multi-page
17    document dated January 26th,
18    2010, bearing Bates stamps
19    TVP 00045 through TVP 00047.)
20
21   (Exhibit 24 for         239    12
22    identification, two-page
23    document dated February 18th,
24    2010, bearing Bates stamp TVP
25    1011110353.)
```

| | Page 13 |
|---|---|

```
 1
 2              E X H I B I T S  (CONT'D.)
 3   DESCRIPTION              PAGE   LINE
 4   (Exhibit 28 for         266    3
 5    identification, two-page
 6    document dated May 5th, 2010,
 7    bearing Bates stamp TVP
 8    05161100070.)
 9
10   (Exhibit 29 for         268    25
11    identification, two-page
12    document dated May 5th, 2010,
13    bearing Bates stamp TVP
14    05161100290.)
15
16   (Exhibit 30 for         272    15
17    identification, two-page
18    document dated May 13th,
19    2010, bearing Bates stamp TVP
20    05161100071.)
21
22
23
24
25
```

4 (Pages 10 to 13)

```
                                    Page 14
 1
 2            E X H I B I T S  (CONT'D.)
 3    DESCRIPTION              PAGE  LINE
 4    (Exhibit 31 for          274   6
 5     identification, multi-page
 6     document dated May 18th,
 7     2010, bearing Bates stamps
 8     TVP 05161100076 and TVP
 9     05161100077.)
10
11    (Exhibit 32 for          278   24
12     identification, multi-page
13     document dated May 18th,
14     2010, bearing Bates stamps
15     TVP 05161100079 through TVP
16     05161100080.)
17
18    (Exhibit 33 for          281   5
19     identification, one-page
20     document bearing Bates stamp
21     TVP 05161100085.)
22
23
24
25
```

```
                                    Page 16
 1
 2            E X H I B I T S  (CONT'D.)
 3    DESCRIPTION              PAGE  LINE
 4    (Exhibit 37 for          289   24
 5     identification, two-page
 6     document dated July 2nd,
 7     2010, bearing Bates stamps
 8     TVP 05161100095 and TVP
 9     05161100094.)
10
11    (Exhibit 38 for          290   21
12     identification, multi-page
13     document dated July 12th,
14     2010, second and third pages
15     bearing Bates stamp TVP
16     05161100096.)
17
18    (Exhibit 39 for          293   4
19     identification, multi-page
20     document bearing Bates stamps
21     POL00063 through POL00065.)
22
23
24
25
```

```
                                    Page 15
 1
 2            E X H I B I T S  (CONT'D.)
 3    DESCRIPTION              PAGE  LINE
 4    (Exhibit 34 for          283   9
 5     identification, two-page
 6     document dated June 26th,
 7     2010, bearing Bates stamp TVP
 8     05161100088.)
 9
10    (Exhibit 35 for          288   16
11     identification, multi-page
12     document dated July 1st,
13     2010, bearing Bates stamps
14     TVP 05161100089 through TVP
15     05161100092.)
16
17    (Exhibit 36 for          289   12
18     identification, multi-page
19     document dated July 1st,
20     2010, second and third pages
21     bearing Bates stamp TVP
22     05161100093.)
23
24
25
```

```
                                    Page 17
 1
 2            E X H I B I T S  (CONT'D.)
 3    DESCRIPTION              PAGE  LINE
 4    (Exhibit 40 for          318   14
 5     identification, one-page
 6     document bearing Bates stamp
 7     P002010.)
 8
 9    (Exhibit 41 for          324   10
10     identification, multi-page
11     document bearing Bates stamps
12     TVP 05161100053 through TVP
13     05161100055.)
14
15    (Exhibit 42 for          329   2
16     identification, multi-page
17     document bearing Bates stamps
18     TVP 051611000063 through TVP
19     05161100064.)
20
21    (Exhibit 43 for          336   20
22     identification, multi-page
23     document bearing Bates stamps
24     P00154 through P00157.)
25
```

```
                              5 (Pages 14 to 17)
```

A-260

Page 18

```
1
2                E X H I B I T S  (CONT'D.)
3    DESCRIPTION              PAGE  LINE
4    (Exhibit 44 for          338   16
5     identification, multi-page
6     document bearing Bates stamps
7     TVP 05161100122 through TVP
8     05161100132.)
9
10   (Exhibit 45 for          340   14
11    identification, multi-page
12    document bearing Bates stamps
13    TVP 05061100133, TVP
14    05061100134, TVP 05161100133
15    and TVP 05161100134.)
16
17   (Exhibit 46 for          344   14
18    identification, multi-page
19    document bearing Bates stamps
20    TVP 05161100138 and TVP
21    05161100139.)
22
23
24
25
```

Page 20

```
1
2    PRODUCTION OF DOCUMENTS AND/OR INFORMATION
3         Page Line
4         (none)
5
6    DIRECTION TO WITNESS NOT TO ANSWER
7         Page Line
8          91   8
9
10   QUESTIONS MARKED FOR LATER RULING
11        Page Line
12        (none)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 19

```
1
2                E X H I B I T S  (CONT'D.)
3    DESCRIPTION              PAGE  LINE
4    (Exhibit 47 for          347   13
5     identification, multi-page
6     document bearing Bates stamps
7     TVP 05161100140 through TVP
8     05161100142.)
9
10   (Exhibit 48 for          349   21
11    identification, multi-page
12    document dated 3/22/2011, not
13    bearing Bates stamps.)
14   **original exhibits returned with original
     transcript by TRANSPERFECT LEGAL SOLUTIONS to
15   LOEB & LOEB, L.L.P.
     (exhibit index concluded)
16
17
18
19
20
21
22
23
24
25
```

Page 21

```
1
2            IT IS HEREBY STIPULATED AND AGREED, by
3    and between the attorneys for the respective parties
4    herein, that filing and sealing be and the same are
5    hereby waived.
6            IT IS FURTHER STIPULATED AND AGREED
7    that all objections, except as to the form of the
8    question, shall be preserved to the time of trial.
9            IT IS FURTHER STIPULATED AND AGREED
10   that the within deposition may be signed and sworn
11   to before any officer authorized to administer an
12   oath, with the same force and effect as if signed
13   and sworn to before the officer before whom the
14   within deposition was taken.
15
16
17
18
19
20
21
22
23
24
25
```

6 (Pages 18 to 21)

Page 22

MARIA E. NADOLNA

----------------------------------------------

P R O C E E D I N G S

12:10 p.m.

----------------------------------------------

1  THE VIDEOGRAPHER: Stand by,
2  please.
3        This is Tape Number 1 of the
4  videotaped deposition of Maria Nadolna in the
5  matter Spanski Enterprise, Inc. versus Telewizja
6  Polska S.A. on November 9th, 2011 at approximately
7  12:10 p.m.
8        My name is Alinson Gonzalez and I
9  am the legal video specialist.
10        The court reporter is Rich
11  Germosen.
12        Will counsel please introduce
13  themselves beginning with the party noticing this
14  proceeding.
15        MR. ZAVIN: Yes, my name is
16  Jonathan Zavin. I'm with the firm of Loeb & Loeb.
17  Represent Plaintiff in this action.
18        With me is John Piskora also an
19  attorney with my firm and also present is
20  Mr. Boguslaw Spanski representing, as a

Page 23

MARIA E. NADOLNA

1  representative of the Plaintiff.
2        MR. WENGER: David Wenger of
3  DLA Piper for the Defendant Telewizja Polska S.A.
4  With me is Robert Fink also of DLA Piper, Robert
5  Kroblewsa of TVP.
6        THE VIDEOGRAPHER: Okay.
7        Will the court reporter please
8  swear in the witness.
9        COURT REPORTER: (Complies.)
10        (Whereupon, the court reporter
11  administered the oath to the witness.)
12        MR. ZAVIN: Okay.

13  K A T A R Z Y N A   B R O C K A
14  Official Polish Interpreter, is duly sworn or
15  affirmed by a Notary Public within and for the
16  States of New York, New Jersey and Delaware, and
17  interprets under oath as follows:

18  M A R I A   E.   N A D O L N A,
19  having been first duly sworn or affirmed by a
20  Notary Public within and for the States of New
21  York, New Jersey and Delaware, was examined and
22  testified as follows:

Page 24

MARIA E. NADOLNA

1  EXAMINATION BY MR. ZAVIN:
2        Q.    Ms. Nadolna, my name is Jonathan
3  Zavin. I'm an attorney for SEI, the Plaintiff in
4  this action.
5        I understand that English is not
6  your first language and we have an interpreter
7  here who can translate from Polish to English.
8        So far do you need her to
9  interpret what I've said?
10        A.    No.
11        Q.    Okay.
12        By agreement with your counsel you
13  are free to answer in English or Polish if you
14  prefer, whichever you're more comfortable in.
15  You are free to answer without the question being
16  translated or have the translator request the
17  translator translate the question. Again,
18  whichever you're more comfortable with because I
19  don't want any confusion, you know, caused by
20  language if possible.
21        Did you understand that?
22        A.    Yes, I do.
23        Q.    Okay.
24        Could you tell me first your full

Page 25

MARIA E. NADOLNA

1  name.
2        A.    Maria E. Nadolna.
3        Q.    Okay.
4        Are you currently employed by
5  Telewizja Polska?
6        A.    Yes.
7        Q.    How long have you been employed by
8  Telewizja Polska?
9        A.    Since 1997.
10        Q.    What's your current position with
11  Telewizja Polska?
12        A.    I'm managing director of
13  acquisition office.
14        Q.    Okay.
15        When you started with Telewizja
16  Polska in 1997 what was your position?
17        A.    I was the manager in advertising
18  office.
19        Q.    Okay.
20        Could you just briefly tell me
21  what positions you've held between 1997 and your
22  current position?
23        A.    In 1997 I started as managing,
24  manager in advertising office. Then about 2004 I

7 (Pages 22 to 25)

Page 26

MARIA E. NADOLNA
1      MARIA E. NADOLNA
2  became the deputy of managing director
3  responsible for economical financial matters in
4  advertising office.  In 2006 I became for short
5  time the manager in the acquisition office.  It
6  was the international affairs office.  This was
7  changing the names, but it was this office.  Then
8  within short time I became deputy of the managing
9  director of this office responsible for economic
10  and financial matters, uh-huh.
11      Q.    Okay.
12            Let's go back a minute because I
13  just jumped in.
14            Let me do some -- you understand
15  this is your deposition under oath?
16      A.    Yes.
17      Q.    And that you're representing
18  Telewizja Polska in this deposition?
19      A.    Yes.
20      Q.    And have you been designated by
21  Telewizja Polska as their official representative
22  to represent them in this deposition?
23      A.    Yes.
24      Q.    If -- I'm going to be asking
25  questions.  If you don't understand a question,

Page 27

MARIA E. NADOLNA
1      MARIA E. NADOLNA
2  please let me know.  I don't -- I do not want
3  confusion.  So if for any reason you don't
4  understand the question, let me know.  I will try
5  to rephrase it.
6      A.    (Indicating.)
7      Q.    If you want to take a break at any
8  time you're free to do so, you know, just let me
9  know and we will go off the record and you can
10  take a break.
11            You can consult with counsel, your
12  counsel if you'd like with only one exception.
13  What you can't do is if I've asked a question you
14  can't consult with your counsel as to how to
15  answer that question after --
16            MR. FINK:  She can consult on the
17  issue of attorney/client privilege.
18            MR. ZAVIN:  I would get to it.
19            MR. FINK:  Thank you.
20
21  BY MR. ZAVIN:
22      Q.    Generally you can't consult as to
23  how to answer that question.  You can answer the
24  question then ask to consult with counsel.
25            Do you understand that so far?

Page 28

MARIA E. NADOLNA
1      MARIA E. NADOLNA
2      A.    Yes.
3      Q.    If there is a question of
4  privilege where you're not sure which means that
5  I've asked a question which might lead to an
6  answer where there is a conversation with your
7  attorney, indicate that and you can consult with
8  your counsel as to whether it's a question of
9  privilege.
10      A.    Uh-huh.
11      Q.    Do you understand that?
12      A.    Yes.
13      Q.    Okay.
14            Is there any reason that you're
15  not capable of giving your deposition today?
16      A.    No.
17      Q.    You're not tired, you're not ill?
18      A.    No.
19      Q.    Okay.
20            When is the first time that you
21  became involved or aware of the Telewizja Polska
22  agreement with Spanski Enterprises?
23      A.    It was about 2006 if I'm correct.
24      Q.    Okay.
25            Is it fair to say that you were

Page 29

MARIA E. NADOLNA
1      MARIA E. NADOLNA
2  not involved in the negotiation of the original
3  agreement in 1995?
4      A.    Yes, I was not involved.
5            MR. WENGER:  '94.
6            MR. ZAVIN: '4.  Correct.
7
8  BY MR. ZAVIN:
9      Q.    '94 or '95?
10      A.    No.
11      Q.    Nor were you involved -- is it
12  also fair to say you were not involved in any way
13  in the negotiation of the two amendments --
14      A.    No.
15      Q.    -- of the agreement?
16      A.    No.
17      Q.    You were not involved?
18      A.    Not involved.
19      Q.    Okay.
20            Were you involved in the
21  negotiation of the settlement agreement between
22  Spanski Enterprises and Telewizja Polska in 2009?
23      A.    No.
24      Q.    When is the first time that you
25  became involved in any dealings with Spanski

8 (Pages 26 to 29)

Page 30

```
 1              MARIA E. NADOLNA
 2   Enterprises?
 3       A.    About 2007 the people in my office
 4   were collecting the documents for the matter
 5   which was prepared by the lawyers, independent
 6   lawyers.  This was the moment I was somehow
 7   involved.
 8       Q.    Without getting into any
 9   discussions with your lawyers --
10       A.    No.
11       Q.    -- what was your involvement?
12       A.    Just as I was coordinating in
13   order to complete certain documents inside the
14   company.
15       Q.    Was that in connection with a
16   proceeding started by Telewizja Polska against
17   Spanski Enterprises in Warsaw?
18       A.    Yes.
19       Q.    You were present for Mr. Spanski's
20   deposition this morning and yesterday, were you
21   not?
22       A.    Yes.
23       Q.    Did you hear your counsel ask
24   Mr. Spanski whether it was his normal business
25   practice to sue the people he did business with?
```

Page 31

```
 1              MARIA E. NADOLNA
 2       A.    Yes.
 3       Q.    Isn't it true that the first
 4   lawsuit between Spanski Enterprises and Telewizja
 5   Polska was commenced by Telewizja Polska in 2007?
 6       A.    I don't know.
 7       Q.    Are you aware whether Telewizja
 8   Polska did sue Spanski Enterprises in Warsaw?
 9       A.    Just in general.
10       Q.    Well, is it --
11             MR. WENGER:  Are you talking about
12   a lawsuit or another proceeding?
13             MR. ZAVIN:  I'm talking about a
14   legal proceeding started in the courts of Poland
15   in Warsaw in 2007.
16
17   BY MR. ZAVIN:
18       Q.    Are you aware that there was such
19   a proceeding?
20       A.    If I was informed that it is.
21       Q.    Okay.
22             Are you aware of what happened in
23   that proceeding?
24       A.    I don't remember the details.
25       Q.    Do you remember in general what
```

Page 32

```
 1              MARIA E. NADOLNA
 2   happened with it?
 3       A.    I know that something was
 4   conducted.
 5       Q.    Okay.
 6             Are you aware that a court in
 7   State of New York determined that that lawsuit
 8   was improperly started by Telewizja Polska in
 9   Warsaw?
10       A.    I don't know.
11       Q.    In preparation for your deposition
12   today did you talk to anyone else at Telewizja
13   Polska?
14       A.    You mean in general?
15       Q.    With respect to the subject matter
16   of this dispute?
17       A.    Yes.
18       Q.    Who did you talk to?
19       A.    Can you be precise?
20       Q.    Okay.
21             Who did you talk to at Telewizja
22   Polska regarding the dispute between Spanski
23   Enterprises and Telewizja Polska?
24             MR. FINK:  For purposes of
25   testifying here today?
```

Page 33

```
 1              MARIA E. NADOLNA
 2             MR. ZAVIN:  Well, at any time.
 3             MR. WENGER:  For any purposes or --
 4             MR. ZAVIN:  Yes.  For any purposes.
 5
 6   BY MR. ZAVIN:
 7       Q.    Who have you talked to at
 8   Telewizja Polska regarding the dispute between
 9   Spanski Enterprises and Telewizja Polska?
10             THE WITNESS:  Can you translate?
11             THE INTERPRETER:  (Complies.)
12             (Whereupon, the interpreter
13   interpreted the question.)
14       A.    Concerning this deposition?
15
16   BY MR. ZAVIN:
17       Q.    First for any reason about the
18   dispute then we'll get on to the specifics.
19       A.    In Telewizja Polska we are four
20   thousand people, so.
21       Q.    Well, have you talked to all four
22   thousand people about the dispute with Spanski
23   Enterprises?
24       A.    With some of them in general if it
25   was necessary.
```

9 (Pages 30 to 33)

| Page 34 | Page 36 |
|---|---|

**Page 34**

MARIA E. NADOLNA

1
2  Q.   To the best of your recollection
3  can you tell me who you've talked to about, at
4  Telewizja Polska about this dispute?
5  A.   I don't understand the question.
6  Q.   Okay.
7  A.   It's too wide question.
8  Q.   Who did you talk to at Telewizja
9  Polska about the fact that you were going to be
10  deposed?
11  A.   With the president of Telewizja
12  Polska, Juliusz Braun.
13  Q.   Anyone else?
14  A.   With Mr. Kroblewsa.
15  Q.   What's Mr. Kroblewsa's position at
16  Telewizja Polska?
17  A.   He's the director of legal
18  department.
19  Q.   Did you talk to anyone else at
20  Telewizja Polska about the fact you were going to
21  be deposed?
22  A.   Arranging the tickets I had to say
23  that I'm coming here, so the people arranging the
24  tickets giving the permission from the Board of
25  Directors office, they knew that I'm coming here

**Page 35**

MARIA E. NADOLNA

1
2  for this deposition.
3  Q.   Okay.
4      Did you talk to anyone else at
5  Telewizja Polska about the subject matter of the
6  deposition?
7  A.   No.
8  Q.   Okay.
9      Did you talk to anyone at
10  Telewizja Polska who had been involved in the
11  negotiation of any of the agreements with
12  Mr. Spanski or Spanski Enterprises?
13  A.   On this time, no.
14  Q.   Have you at any time talked to
15  anyone at Telewizja Polska who was involved in
16  the negotiation of any of the agreements with
17  Spanski Enterprises?  And just to be clear I'm
18  including the initial agreement in 1994, the two
19  amendments and the settlement agreement.
20  A.   The people from legal department.
21  Q.   Who from the legal department?
22  A.   Shall I mention the names?
23  Q.   Yes.  I'm not asking you
24  conversations.  I'm asking you the names at this
25  point which I think your counsel will agree is

**Page 36**

MARIA E. NADOLNA

1
2  not privileged.
3      MR. WENGER:  You can give the
4  names.
5      (Whereupon, the witness speaks in
6  Polish.)
7  A.   These are the names, Polish name.
8      THE INTERPRETER:  I'm going to give
9  you the spelling.
10
11  BY MR. ZAVIN:
12  Q.   I apologize for my ignorance, is
13  that one person that you just gave me?
14  A.   I'm saying the names.
15  Q.   No, but is that -- the name you've
16  just said, is that one person?
17  A.   It is one person.
18  Q.   Okay.
19  A.   It is one person.
20      THE INTERPRETER:  Counsel, can I
21  give the spelling to the reporter?
22      MR. ZAVIN:  Yes, please.
23      THE INTERPRETER:  The first name,
24  M-a-l-g-o-r-z-a-t-a.  The second name
25  S-t-o-m-p-u-r, and the last name R-o-m-a-n-s-k-a.

**Page 37**

MARIA E. NADOLNA

1
2      COURT REPORTER:  Thank you.
3      MR. ZAVIN:  Okay.
4
5  BY MR. ZAVIN:
6  Q.   Anyone else?
7  A.   Would you repeat the main
8  question?
9  Q.   Okay.
10      My question was who have you
11  talked to in the legal department who was
12  involved in the negotiation of any of the
13  agreements with SEI?
14  A.   Can the question be more precise?
15  Q.   Okay.
16      Who have you talked to in the
17  legal department who was involved in the
18  negotiation or drafting of the agreement in 1994
19  between Spanski Enterprises, Inc. and Telewizja
20  Polska?
21  A.   The last -- which moment you are
22  asking?
23  Q.   I'm asking have you ever
24  discussed --
25  A.   Ever --

10  (Pages 34 to 37)

Page 38

MARIA E. NADOLNA

1
2    Q.    Who have you talked to at the
3  legal department about the subject of the
4  agreement between Spanski and Telewizja Polska
5  who was involved in the negotiation and drafting
6  of the agreement between the two companies in
7  1994?
8    A.    Okay.  If I'm not changing her
9  first name.  Iwona, Iwona Kus.  Sorry.  Iwona
10  Kus, this is the second person from the legal
11  department.
12          MR. ZAVIN:  Could we have a
13  spelling of that?
14          THE INTERPRETER:  Sure.
15          First name, I-w-o-n-a, last name
16  K-u-s.
17          MR. ZAVIN:  Okay.
18
19  BY MR. ZAVIN:
20    Q.    And Ms. Kus was involved, was at
21  TVP or Telewizja Polska in 1994?
22    A.    I don't know.
23    Q.    Okay.
24          Let's see if I can avoid the
25  confusion.  I'm interested in people who were

Page 39

MARIA E. NADOLNA

1
2  actually involved in the negotiation and drafting
3  of the agreement in 1994 between Spanski
4  Enterprises, Inc. and Telewizja Polska.  Do you
5  know who was involved in that?
6    A.    I don't know.
7    Q.    Okay.
8          Now I'm asking with respect to the
9  two amendments, do you know who at Telewizja
10  Polska was involved in negotiating and drafting
11  the amendments in 1999 and 2002 between Telewizja
12  Polska and Spanski Enterprises?
13    A.    I don't.
14          MR. WENGER:  Objection.
15          MR. FINK:  It assumes somebody did
16  such a thing.
17          MR. ZAVIN:  Okay.
18
19  BY MR. ZAVIN:
20    Q.    You've answered you don't.
21    A.    Yes.
22    Q.    Your answer is you don't know?
23    A.    (Indicating.)
24    Q.    Do you know who was involved in
25  the negotiation and/or drafting of the settlement

Page 40

MARIA E. NADOLNA

1
2  agreement between Spanski Enterprises, Inc. and
3  Telewizja Polska in 2009?
4    A.    Yes.
5    Q.    Who was that?
6    A.    Mr. Piotr.
7          THE INTERPRETER:  P-i-o-r-t --
8          MR. WENGER:  T-r.
9          THE INTERPRETER:  Sorry.
10          P-i-o-t-r, and the last name
11  L-e-n-a-r-c-z-y-k.
12
13  BY MR. ZAVIN:
14    Q.    Have you talked to Mr. Lenarczyk
15  about that settlement agreement?
16    A.    No.
17    Q.    Is Mr. Lenarczyk still with
18  Telewizja Polska?
19    A.    No.
20    Q.    Have you made any attempt to talk
21  to Mr. Lenarczyk about that settlement agreement?
22    A.    No.
23    Q.    Is there anyone else you know at
24  Telewizja Polska who was involved in that
25  settlement agreement?

Page 41

MARIA E. NADOLNA

1
2    A.    I'm not sure, so I will say no.
3    Q.    Okay.
4          Prior to your deposition today did
5  you review any documents for the purpose of your
6  deposition?
7    A.    Yes.
8    Q.    What documents did you review?
9    A.    Different types of documents so.
10    Q.    Well, can you tell me what type,
11  what documents or what types of documents they
12  were?
13          MR. WENGER:  To the extent that
14  that's reflecting any legal advice, you shouldn't
15  answer that question.
16          MR. ZAVIN:  I did not ask her
17  anything about discussions with counsel.
18          MR. WENGER:  So these are documents
19  she's reviewed outside of our presence, outside of
20  her discussions with counsel?
21          MR. ZAVIN:  These are documents
22  she's reviewed anywhere at any time.
23
24  BY MR. ZAVIN:
25    Q.    Can you tell me what types of

11 (Pages 38 to 41)

Page 42

1       MARIA E. NADOLNA
2  documents you reviewed in preparation for this
3  deposition?
4       A.    The contracts, the E-mails, the
5  letters, the correspondence.
6       Q.    Okay.
7            Did you review all of the
8  contracts between Spanski Enterprises and
9  Telewizja Polska?
10      A.    I read them.
11      Q.    Okay.
12           Was this the first time you
13 looked, in preparation for your deposition was
14 this the first time you looked at these
15 agreements?
16      A.    Some time ago also.
17      Q.    For what purpose had you looked at
18 them some time ago?
19      A.    At the moment of, at the beginning
20 of 2010 I was reading these documents, this
21 documents.
22      Q.    In 2010 did you read all of the
23 agreements or just the settlement agreement?
24      A.    I don't remember.
25      Q.    In preparation for this deposition

Page 43

1       MARIA E. NADOLNA
2  did you read any E-mails regarding the
3  arrangements between Spanski Enterprises and
4  Telewizja Polska dating back into the
5  nineteen-nineties?
6       A.    No.
7       Q.    Okay.
8            In connection with this litigation
9  are you aware that Telewizja Polska filed an
10 answer and a counterclaim to the claims here?
11      A.    Do I know?  Yes.
12      Q.    Okay.
13      MR. ZAVIN:  Let's have this marked
14 as Nadolna 1.
15      COURT REPORTER:  (Complies.)
16           (Whereupon, multi-page document
17 entitled Answer to Amended Complaint and
18 Counterclaims, not bearing Bates stamps, is
19 received and marked as Nadolna Exhibit 1 for
20 Identification.)
21      MR. WENGER:  Do you have an extra
22 copy or --
23      MR. ZAVIN:  (Indicating.)
24      MR. WENGER:  One more extra or is
25 that it?  If you have one we'll take it.

Page 44

1       MARIA E. NADOLNA
2
3  BY MR. ZAVIN:
4       Q.    Ms. Nadolna, the court reporter
5  has handed you a document that's been marked as
6  Nadolna Exhibit 1.
7            Have you ever seen this document
8  before?
9       A.    No.
10      Q.    Are you aware that this is a
11 document filed by Telewizja Polska's counsel in
12 this action?
13      A.    This document?
14      Q.    Yes.
15      A.    I don't know.
16      Q.    Do you know whether anyone at
17 Telewizja Polska reviewed this document prior to
18 its being filed in this action?
19      A.    I don't know.
20      Q.    Have you -- in connection with the
21 answer and counterclaim, which is what this
22 document is, did you talk to anybody about this
23 document, about the answer and counterclaim
24 before it was filed?
25      A.    I don't know this document so --

Page 45

1       MARIA E. NADOLNA
2      COURT REPORTER:  So what?  I
3  couldn't hear you.
4       A.    I don't know this document, so I
5  didn't talk with --
6       Q.    Okay.
7       A.    -- anybody about it.
8       Q.    Are you aware of whether or not in
9  this lawsuit between Spanski Enterprises and
10 Telewizja Polska Telewizja Polska has made claims
11 against Mr. -- against Spanski Enterprises?
12      A.    In general, yes.
13      Q.    Okay.  Do you know what those
14 claims are?
15      A.    No, I don't remember.
16      Q.    Okay.
17           If you could -- and before I ask
18 this question, again I'm going to ask you to look
19 at the document which I know is in English.
20      A.    Uh-huh.
21      Q.    If you have problems reading it
22 please indicate that and the translator can help
23 translate the document, but I'm going to ask you
24 if you could look on Page 3, I'm sorry, Page 5 of
25 the document.

12  (Pages 42 to 45)

Page 46

MARIA E. NADOLNA

1
2      THE INTERPRETER:  Counsel, do you
3  have a copy for me?
4      MR. WENGER:  (Indicating.)
5      THE INTERPRETER:  Okay.  I got it.
6  This makes it easier.
7      MR. ZAVIN:  (Complies.)
8
9  BY MR. ZAVIN:
10     Q.    Okay.
11     Do you see in that document on
12  Page 5 where it says counterclaims?
13     A.    (Indicating.)
14     Q.    You have to answer verbally
15  because the court reporter can't get it.  You
16  can't just nod yes.
17     Do you see where it says
18  counterclaims?
19     A.    Yes.
20     Q.    Okay.
21     And then on the following page, if
22  you turn to the following page --
23     THE INTERPRETER:  (Indicating.)
24     A.    5, okay.
25     Q.    It says there is a first claim for

Page 47

MARIA E. NADOLNA

1
2  relief breach of contract.
3      Do you see that?
4      THE INTERPRETER:  (Indicating.)
5      A.    First claim, yes.
6      Q.    And it says on Paragraph 10 that
7  and now I'm going to, quote:  SEI has failed to
8  pay TVP certain royalties and other monies due
9  and owing to TVP --
10     A.    Which number is that?  Sorry.
11     Q.    Paragraph 10 on Page 6.
12     THE INTERPRETER:  (Indicating.)
13     A.    Okay, the second sentence of this
14  paragraph, yes?
15     Q.    That's correct.
16     A.    Uh-huh.
17     Q.    And I'm quoting:  SEI has failed
18  to pay TVP certain royalties and other monies due
19  and owing to TVP and has failed to comply with
20  other obligations owed to TVP under the
21  agreements.
22     A.    (Reviews.)
23     Q.    Do you see that?
24     A.    Yes, I see it.
25     Q.    Okay.

Page 48

MARIA E. NADOLNA

1
2      When this document was filed are
3  you aware of what the basis of that claim was?
4      A.    I didn't see the document so --
5      Q.    Okay.
6      Now I'm asking whether without
7  seeing the document when this document was filed,
8  which was in January of this year, are you aware
9  of any information that Telewizja Polska had that
10  Spanski Enterprises had failed to pay royalties
11  or other monies due to SEI -- to Telewizja
12  Polska?
13     A.    May I ask for translation of the
14  sentence?
15     Q.    Of course.
16     THE INTERPRETER:  (Complies.)
17     (Whereupon, the question was
18  interpreted for the witness.)
19     A.    And what is the question?
20     MR. ZAVIN:  Could you read the
21  question back.
22     COURT REPORTER:  (Complies.)
23     (Whereupon, the requested portion
24  is read back by the reporter as follows:
25     "QUESTION.  Okay.

Page 49

MARIA E. NADOLNA

1
2  "Now I'm asking whether without
3  seeing the document when this document was filed,
4  which was in January of this year, are you aware
5  of any information that Telewizja Polska had that
6  Spanski Enterprises had failed to pay royalties
7  or other monies due to SEI -- to Telewizja
8  Polska?")
9      A.    The answer I don't know.
10
11  BY MR. ZAVIN:
12     Q.    Okay.
13     So you don't know whether
14  Telewizja Polska had any evidence that Spanski
15  Enterprises had failed to pay Telewizja Polska
16  any money?
17     MR. WENGER:  I thought the question
18  was whether she had any information?
19     MR. ZAVIN:  Well, she's here as the
20  30(b)(6) witness for Telewizja Polska so she's
21  answering for Telewizja Polska.
22     MR. WENGER:  But I think that you
23  need to ask her whether she has any information or
24  whether anyone at the company has information.
25     MR. ZAVIN:  I will, I will, I will

13 (Pages 46 to 49)

Page 50

MARIA E. NADOLNA

1                MARIA E. NADOLNA
2 ask her.
3         MR. FINK: Then there is an
4 objection to the form of the question.
5         MR. ZAVIN: Okay.
6         I'll take it as such.
7
8 BY MR. ZAVIN:
9     Q.   Ms. Nadolna, do you have any
10 knowledge or evidence that or did you have any
11 knowledge or evidence in January of 2011 that
12 Spanski Enterprises had failed to pay Telewizja
13 Polska any monies due?
14     A.   On that date no knowledge.
15     Q.   Okay.
16         Was there anyone at the company
17 who had such knowledge?
18     A.   I don't know.
19     Q.   Okay.
20         What monies does Telewizja Polska
21 claim that Spanski Enterprises has failed to pay
22 Telewizja Polska?
23     A.   I don't know. How can I?
24     Q.   I'm sorry?
25     A.   I don't know.

Page 51

1                MARIA E. NADOLNA
2     Q.   What evidence does Telewizja
3 Polska have that Spanski Enterprises has failed
4 to pay Telewizja Polska any monies that are due
5 to Telewizja Polska?
6     A.   I don't understand this question
7 not in the language matters. I don't understand
8 the question in general matters.
9     Q.   Well, are you aware of any
10 evidence that Telewizja Polska has that Spanski
11 Enterprises has failed to pay it money that is
12 due to Telewizja Polska?
13     A.   I don't know.
14     Q.   When you say I don't know, do you
15 mean you don't understand the question or you
16 don't know whether you have any evidence?
17     A.   I don't know the answer to this
18 question.
19     Q.   Okay.
20         MR. ZAVIN: Just so that there is
21 no misunderstanding, may I ask the translator to
22 translate that last question into Polish so that
23 it is not a language difficulty we're dealing
24 with?
25         THE INTERPRETER: (Complies.)

Page 52

1                MARIA E. NADOLNA
2     (Whereupon, the question was
3 interpreted for the witness.)
4         THE INTERPRETER: This sentence is
5 general.
6         MR. ZAVIN: I'm sorry?
7         THE INTERPRETER: This sentence is
8 general.
9         MR. ZAVIN: Okay.
10
11 BY MR. ZAVIN:
12     Q.   In what way is it general,
13 Ms. Nadolna?
14     A.   The whole sentence is general.
15     Q.   Well, do you know any specific,
16 have any specific evidence of Spanski Enterprises
17 failing to pay Telewizja Polska any money that is
18 due to Telewizja Polska?
19     A.   It is not your question. Your
20 question was concerning the date so now you
21 change your question?
22     Q.   Yes. I did change my question. I
23 think the record will reflect that. I am asking
24 as of now as you sit here now do you have any
25 evidence of Spanski Enterprises failing to pay

Page 53

1                MARIA E. NADOLNA
2 Telewizja Polska any monies it is due?
3     A.   I don't know.
4     Q.   How much, if you know, is
5 Telewizja Polska claiming that Spanski
6 Enterprises has failed to pay?
7     A.   I don't know this.
8     Q.   Okay.
9         Looking, continuing to look at
10 Page 6 you'll see it says second claim for
11 relief.
12         Do you see that?
13     A.   Yes.
14     Q.   Okay.
15         And then on Page 7 you see in
16 Paragraph 14 it says and I quote: SEI has
17 willfully failed to comply with obligations owed
18 to TVP under the agreements, end quote.
19     A.   (Reviews.)
20     Q.   Do you see that?
21     A.   Yes.
22     Q.   What obligations has SEI failed to
23 comply with?
24     A.   I don't know.
25     Q.   Do you have any evidence that SEI

14 (Pages 50 to 53)

Page 54

```
1              MARIA E. NADOLNA
2  has failed to comply with any of its obligations?
3       A.   No.
4       Q.   The next paragraph says:  SEI has
5  willfully failed to act in good faith toward TVP
6  under the agreements.
7       A.   (Reviews.)
8       Q.   Do you see that?
9       A.   Yes.
10      Q.   How has SEI failed to act in good
11 faith toward TVP?
12      A.   I ask translator, translator to
13 say precisely.
14           THE INTERPRETER:  (Complies.)
15           MR. ZAVIN:  I'm sorry, what?
16           THE INTERPRETER:  No, I said the
17 agreement, I said it in the singular form and she
18 corrected it that it's in the plural form.
19      A.   I don't know.
20
21 BY MR. ZAVIN:
22      Q.   Okay.
23           What evidence does SEI have that,
24 I'm sorry, does TVP, what evidence does TVP have
25 that SEI has willfully failed to act in good
```

Page 55

```
1              MARIA E. NADOLNA
2  faith toward TVP under the agreements?
3       A.   I don't know.
4       Q.   Looking at Paragraph 16 it says,
5  quote:  SEI has by its actions and inactions
6  substantially and fundamentally breached the
7  agreements, end quote.
8            In what way has SEI substantially
9  and fundamentally breached the agreements?
10      A.   I don't know.
11      Q.   What evidence does Telewizja
12 Polska have that SEI has substantially and
13 fundamentally breached the agreements?
14      A.   I don't know.
15      Q.   Okay.
16           MR. ZAVIN:  Off the record.
17           THE VIDEOGRAPHER:  The time is
18 12:48 p.m.
19           And we're going off the record.
20           (Whereupon, a short recess is
21 taken.)
22           THE VIDEOGRAPHER:  Stand by,
23 please.
24           The time is 1:18 p.m.
25           And we are back on the record.
```

Page 56

```
1              MARIA E. NADOLNA
2            MR. ZAVIN:  Okay.
3            I'd like the court reporter to mark
4  a document as Nadolna Exhibit 2.
5            COURT REPORTER:  (Complies.)
6            (Whereupon, multi-page document
7  bearing Bates stamps P00001 through P00007, is
8  received and marked as Nadolna Exhibit 2 for
9  Identification.)
10           COURT REPORTER:  Number 2.
11           THE INTERPRETER:  Can I get a copy?
12           MR. FINK:  You're going to describe
13 it?
14           MR. ZAVIN:  Yes.
15
16 BY MR. ZAVIN:
17      Q.   Ms. Nadolna, I've had the court
18 reporter mark as Exhibit 2 an agreement which is
19 in Polish which I understand to be the first
20 agreement between Spanski Enterprises and
21 Telewizja Polska in 1994.
22      A.   (Reviews.)
23      Q.   Do you recognize this document?
24      A.   I don't know.  Probably.  This is
25 a document.
```

Page 57

```
1              MARIA E. NADOLNA
2       Q.   Well, have you ever seen this
3  document before?
4       A.   I don't know.
5            MR. FINK:  Excuse me, when you say
6  document do you mean Page 8 as well?  Because I
7  could be wrong, but it looks to me like Page 8
8  really doesn't belong in this document.
9            MR. PISKORA:  Yeah.  Hand it to me.
10           MR. FINK:  (Complies.)
11           MR. PISKORA:  (Indicating.)
12           MR. FINK:  As I suspect.
13           MR. ZAVIN:  I think there was an
14 error in copying.
15           MR. FINK:  Oh.
16           MR. ZAVIN:  Okay.
17
18 BY MR. ZAVIN:
19      Q.   Ms. Nadolna, just so I'm sure I
20 understand, do you not know whether you've ever
21 seen this document before?
22      A.   I don't remember.  How can I
23 remember?
24      Q.   Okay.
25           Did you review this document in
```

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 58

MARIA E. NADOLNA

1
2 connection with your deposition here today?
3     A.    No.
4     Q.    Have you ever discussed this
5 document with anyone?
6     A.    For me this is not the document.
7 Where is the register number? What is it?
8     Q.    Well, you're just --
9     A.    Is this a copy or is it -- I mean
10 this is preparation document. This is --
11     Q.    You just have no idea what this
12 document is?
13     A.    I, I don't treat it as -- what is
14 it?
15     Q.    Well, let me ask you this:
16 Looking on Page 7 does this appear to have
17 signatures by, or a signature by Telewizja
18 Polska?
19     A.    Yes, the signature I see.
20     Q.    Do you know who signed it?
21     A.    I can read who signed it.
22     Q.    Well, who signed it?
23     A.    Magdalena Staniszewsko from legal
24 department.
25     Q.    And anybody else?

Page 59

MARIA E. NADOLNA

1
2     A.    And at the end there is not so
3 clear, Walendziak and Borkowski and from the
4 Spanski Enterprises I cannot read it.
5     Q.    Okay.
6     Do you know whether this is the
7 original agreement between Spanski Enterprises
8 and Telewizja Polska?
9     A.    This is the Polish version. If I
10 have -- if I could see both I mean it never works
11 that you have Polish version without the English
12 version as a document. This is not a document as
13 it is. How can I say --
14     Q.    Ms. Nadolna, is it your testimony
15 that there was an English version of the
16 agreement between Spanski Enterprises and --
17     A.    I don't know which one you're
18 talking about, sir.
19     Q.    Well, are you aware that there was
20 an agreement entered into between Spanski
21 Enterprises and Telewizja Polska in 1994?
22     A.    There was agreement. I can
23 confirm.
24     Q.    Okay.
25     A.    Uh-huh.

Page 60

MARIA E. NADOLNA

1
2     Q.    Do you know whether or not there
3 was ever an English version of that agreement
4 that was signed by the parties?
5     A.    I don't remember. Should be.
6     COURT REPORTER: Shouldn't be?
7     THE WITNESS: Should be.
8
9 BY MR. ZAVIN:
10     Q.    Why would there be an English
11 version of an agreement between two Polish
12 speaking parties?
13     A.    We are talking about agreement
14 between Polish company and company from Canada so
15 if there are two companies from different
16 territories there should be both English and
17 Polish version or any other language on Spanski
18 Enterprises.
19     Q.    Okay.
20     Well, I will represent to you that
21 Telewizja Polska has never, not in the course of
22 this litigation or prior litigation, produced an
23 English version of this agreement, and I would
24 request --
25     MR. WENGER: A signed English

Page 61

MARIA E. NADOLNA

1
2 version? There have been --
3     MR. ZAVIN: An English version that
4 was prepared at the time --
5     MR. WENGER: Okay.
6     MR. ZAVIN: -- of this agreement.
7
8 BY MR. ZAVIN:
9     Q.    But to get back to this you're
10 saying you've never seen this document, correct?
11     A.    I don't remember. That's what I
12 said.
13     Q.    Okay.
14     Do you know whether this document
15 provides that Mr. Spanski, I'm sorry, Spanski
16 Enterprises has the exclusive rights to broadcast
17 and use the TVPolonia's signal in North and South
18 America?
19     A.    What is the question?
20     Q.    Do you know whether this agreement
21 provides that Spanski Enterprises has the
22 exclusive right to receive and use the TVPolonia
23 signal in North America and South America?
24     A.    Can you show it in the agreement
25 in order to confirm what you're talking about?

16 (Pages 58 to 61)

Page 62

MARIA E. NADOLNA
1
2      Q.     I'm just handing counsel an
3  English translation of the agreement.
4           And yes, I'd like you to look on
5  Section 2, Number 3 of this agreement on the
6  second page.
7      A.     Uh-huh.
8      Q.     And in the translation that we
9  have it reads:  To implement Section 2 above TVP
10  grants SEI exclusive right to receive and use the
11  signal in the territory, end quote.
12      A.     (Reviews.)
13      Q.     Do you see that?
14      A.     It's different what you say in
15  Polish.
16           (Whereupon, the interpreter speaks
17  in Polish.)
18      THE INTERPRETER:  (Indicating.)
19      A.     So once again?  In order to?
20      Q.     The translation that we have that
21  was used in the prior litigation was, quote:  To
22  implement Section 2 above --
23      A.     Uh-huh.
24      Q.     -- TVP grants SEI the exclusive
25  right to receive and use the signal in the

Page 63

MARIA E. NADOLNA
1
2  territory, end quote.
3      A.     (Reviews.)
4      Q.     Do you see that?
5      A.     Yes, I see it.
6      Q.     Okay.  Is that what it says in
7  Polish?
8      A.     Yes, it is the same.
9      Q.     Okay.
10           Are you aware that in 1994 TVP
11  granted SEI the exclusive right to receive and
12  use the TVPolonia signal in the territory?
13      A.     Yes.
14      Q.     Okay.  Okay.
15           Looking at Exhibit 2 --
16           Withdraw.
17      MR. FINK:  Just let it pass.
18  Actually at 2 o'clock today they're going to have
19  that special emergency broadcast.
20      MR. WENGER:  I don't think we need
21  to keep this on the record, but it's up to you.
22      MR. ZAVIN:  Let's go off the record
23  for a second until this passes.
24      THE VIDEOGRAPHER:  The time is 1:27
25  p.m. and we're going off the record.

Page 64

MARIA E. NADOLNA
1
2           (Whereupon, a short recess is
3  taken.)
4      MR. ZAVIN:  Mark this while we're
5  waiting.
6      COURT REPORTER:  (Complies.)
7           (Whereupon, multi-page document
8  bearing Bates stamps P00016 through P00018, is
9  received and marked as Nadolna Exhibit 3 for
10  Identification.)
11      COURT REPORTER:  Number 3.
12      MR. ZAVIN:  Let's go back on the
13  record.
14      THE VIDEOGRAPHER:  Stand by,
15  please.
16           The time is 1:30 p.m.
17           And we are back on the record.
18      MR. ZAVIN:  Okay.
19
20  BY MR. ZAVIN:
21      Q.     While we were off the record,
22  Ms. Nadolna, I had the court reporter mark a
23  document as Nadolna Exhibit 3 which is a
24  three-page document entitled aneks or aneks,
25  a-n-e-k-s in Polish.

Page 65

MARIA E. NADOLNA
1
2           If you could look at this document,
3  please, and tell me if you recognize it?
4      A.     (Reviews.)
5      Q.     Do you recognize this document?
6      A.     I see annex.
7      Q.     Do you know what this document is?
8      A.     Annex.
9      Q.     Well, what does annex mean?
10      A.     Annex to the, to the, to the
11  agreement.
12      Q.     And when you say to the
13  agreement --
14      A.     To the agreement of the 14th
15  December 1994.
16      Q.     Is that the agreement that was
17  previously looked like it was marked as Nadolna
18  Exhibit 2?
19      A.     Yes.
20      Q.     Have you ever seen this document
21  Nadolna Exhibit 3 before?
22      A.     I have seen the annex.
23      Q.     Have you reviewed it?
24      A.     I read it.
25      Q.     When have you read it?

17 (Pages 62 to 65)

Page 66

MARIA E. NADOLNA

1
2     A.    I don't remember. Several times.
3     Q.    Okay. Why did you read this
4  document?
5     A.    Just to know.
6     Q.    Was it in connection with this
7  litigation?
8     A.    Yes.
9     Q.    Okay. We'll come back to this.
10          MR. ZAVIN: I'm going to mark as
11  Nadolna Exhibit 4 a document that's entitled annex
12  NR2.
13          COURT REPORTER: (Complies.)
14          (Whereupon, multi-page document
15  bearing Bates stamps P00023 through P00025, is
16  received and marked as Nadolna Exhibit 4 for
17  Identification.)
18          COURT REPORTER: Number 4.
19          MR. ZAVIN: It's a three-page
20  document.
21     A.    (Reviews.)
22
23  BY MR. ZAVIN:
24     Q.    And I ask you whether you've ever
25  seen this document before?

Page 67

MARIA E. NADOLNA

1
2     A.    I have seen annex 2.
3     Q.    When did you see it?
4     A.    I don't remember.
5     Q.    Did you read it in connection with
6  this litigation?
7          MR. WENGER: Just to be fair, Jon,
8  are we marking the translations as exhibits or is
9  that just for a reference?
10          MR. ZAVIN: No, I don't believe we
11  separately marked translations because
12  translations are for reference.
13          MR. WENGER: Okay.
14          MR. FINK: But I don't have the
15  original.
16          MR. WENGER: Here we go.
17     A.    No.
18
19  BY MR. ZAVIN:
20     Q.    I'm sorry, the --
21     A.    Not for this litigation,
22  litigation.
23     Q.    Would you --
24     A.    Would you repeat that question?
25          MR. ZAVIN: Could you read the

Page 68

MARIA E. NADOLNA

1
2  question back, please.
3          COURT REPORTER: (Complies.)
4          (Whereupon, the requested portion
5  is read back by the reporter as follows:
6          "QUESTION: Did you read it in
7  connection with this litigation?")
8     A.    The answer is no.
9
10  BY MR. ZAVIN:
11     Q.    Okay. Why did you read it?
12     A.    When?
13     Q.    Why?
14     A.    Why?
15     Q.    Uh-huh.
16     A.    In order to know.
17     Q.    In order to know what?
18     A.    If you are dealing with some
19  matters you should know the documents. That's
20  it.
21     Q.    Why did you not review the
22  original agreement between Spanski Enterprises
23  and TVP?
24     A.    I don't understand.
25     Q.    Well, I think you have testified

Page 69

MARIA E. NADOLNA

1
2  that you have no recollection of seeing the
3  documents that have been marked Nadolna Exhibit
4  2, I mean that you've never seen it before, is
5  that correct?
6     A.    Once again, please?
7          MR. ZAVIN: Read the question back,
8  please.
9          COURT REPORTER: (Complies.)
10          (Whereupon, the requested portion
11  is read back by the reporter as follows:
12          "QUESTION: Well, I think you have
13  testified that you have no recollection of seeing
14  the documents that have been marked Nadolna
15  Exhibit 2, I mean that you've never seen it
16  before, is that correct?")
17     A.    You mean the, you mean the
18  agreement from 1994?
19
20  BY MR. ZAVIN:
21     Q.    That's correct.
22     A.    I don't remember. That's it.
23          MR. ZAVIN: Finally let's mark as
24  Nadolna Exhibit 5 a four-page document that is
25  entitled for settlement purposes only, without

18 (Pages 66 to 69)

Page 70

MARIA E. NADOLNA

1    MARIA E. NADOLNA
2  prejudice subject to FRE408.
3         COURT REPORTER:  (Complies.)
4         (Whereupon, multi-page document
5  bearing Bates stamps P00030 through P00033, is
6  received and marked as Nadolna Exhibit 5 for
7  Identification.)
8         COURT REPORTER:  Number 5.
9
10 BY MR. ZAVIN:
11       Q.    Ms. Nadolna, have you ever seen
12 this document before?
13       A.    I don't remember if I've seen it.
14       Q.    You don't remember whether you've
15 ever seen this document before?
16       A.    That's what I say. I don't
17 remember.
18       Q.    Have you ever talked to any -- am
19 I correct that this you've previously testified
20 that Mr. Lenarczyk negotiated this document on
21 behalf of TVP?
22       A.    I know -- it was different
23 question. You ask me --
24       Q.    I --
25       A.    -- if I know the person?  Can you

Page 71

MARIA E. NADOLNA

1    MARIA E. NADOLNA
2  ask again what you ask me before?
3       Q.    Okay.
4         I believe that I asked you before
5  did you know who at TVP negotiated the settlement
6  agreement with SEI in 2009 and you said
7  Mr. Lenarczyk, is that --
8       A.    It's what I, it's what I know.
9       Q.    Okay.
10        Is this the settlement agreement
11 that Mr. Lenarczyk --
12       A.    I don't know.
13       Q.    -- negotiated?
14       A.    I don't know.
15       Q.    Do you know what Mr. -- what TVP's
16 rights are under this agreement that's been
17 marked as Nadolna Exhibit 5?
18       A.    I don't know. I have to read it.
19       Q.    Well, as you sit here today do you
20 have any idea what rights this gives TVP under --
21       A.    I need to read it in order to say
22 what I know.
23       Q.    Okay.
24       A.    To understand.
25       Q.    And as you sit here today do you

Page 72

MARIA E. NADOLNA

1    MARIA E. NADOLNA
2  have any knowledge as to what rights or
3  obligations Spanski Enterprises has under the
4  settlement agreement entered into with TVP in
5  2009?
6       A.    If you ask more precise question I
7  will tell you what I know.
8       Q.    Well, what do you know about the
9  settlement agreement entered into between Spanski
10 Enterprises and TVP in 2009?
11        MR. WENGER:  Objection.
12        That's a little vague.
13        MR. ZAVIN:  Okay.
14
15 BY MR. ZAVIN:
16       Q.    You can answer.
17        MR. WENGER:  But you can answer,
18 Maria.
19       A.    I know it has made some changes
20 according to the previous documents.
21       Q.    Okay.
22        Do you have any idea what changes
23 it made?
24       A.    I need to take the documents in
25 order to compare.

Page 73

MARIA E. NADOLNA

1    MARIA E. NADOLNA
2       Q.    Okay.
3         Are you aware whether under this
4  settlement agreement that's been marked as
5  Exhibit 5 --
6       A.    Uh-huh.
7       Q.    Actually withdrawn.
8         Looking at Page 4 of this
9  agreement, the last page do you see signatures on
10 that page?
11       A.    Yes, I do.
12       Q.    Whose signatures are those?
13       A.    Piotr Farfal, Boguslaw Spanski.
14        THE INTERPRETER:  Do you want to a
15 spelling?
16        COURT REPORTER:  (Indicating.)
17        THE INTERPRETER:  Piotr, P-i-o-t-r,
18 last name F-a-r-f-a-l.  And Mr. Spanski's first
19 and last name, that's the other one of the parties
20 here.
21        MR. ZAVIN:  Sorry.
22
23 BY MR. ZAVIN:
24       Q.    Who is Mr. Farfal?
25       A.    Mr. Farfal was the vice-president

19 (Pages 70 to 73)

Page 74

MARIA E. NADOLNA

1           MARIA E. NADOLNA
2 of TVP.
3     Q.   And he also -- he seems to have
4 signed as acting as chairperson of the committee.
5     Do you know what committee that
6 was?
7     A.   The committee dealing with this
8 document.
9     Q.   Okay.
10     A.   This matter.
11     Q.   As far as you know was Mr. Farfal
12 authorized to sign agreements with SEI on behalf
13 of TVP?
14     A.   Once again, please?
15     Q.   Was Mr. Farfal authorized to sign
16 agreements on behalf of TVP with SEI?
17     A.   If he signed he should be.
18     Q.   Okay.
19     Do you have any reason to think
20 that this isn't a binding agreement between
21 Telewizja Polska and Spanski Enterprises, Inc.?
22     MR. FINK: Objection to the extent
23 you're asking her to form a legal opinion.
24     MR. ZAVIN: I'll accept the
25 objection.

Page 75

MARIA E. NADOLNA

1           MARIA E. NADOLNA
2     Q.   And ask do you have any reason to
3 think that this was not an agreement entered into
4 between Spanski Enterprises, Inc. and Telewizja
5 Polska?
6     A.   You're asking about legal matters.
7 I'm not a lawyer.
8
9 BY MR. ZAVIN:
10     Q.   No, I don't think I did this time.
11 I'm just asking whether this was an agreement
12 entered into between Spanski Enterprises and
13 Telewizja Polska?
14     A.   It's what I read from this
15 document.
16     Q.   So you have no knowledge of
17 whether this was an agreement at all?
18     MR. WENGER: That's not --
19     MR. ZAVIN: David, she either does
20 or she doesn't. She can say she has no knowledge,
21 she can say she has knowledge.
22
23 BY MR. ZAVIN:
24     Q.   Do you have any knowledge of
25 whether this is an agreement between your company

Page 76

MARIA E. NADOLNA

1           MARIA E. NADOLNA
2 and Spanski Enterprises, Inc.?
3     A.   You're asking about this
4 agreement.
5     Q.   That is correct.
6     A.   I mean this paper?
7     Q.   That is correct. That is correct.
8     A.   I know there is agreement, but I
9 don't know if this is the agreement.
10     Q.   So you, as you sit here today you
11 don't know whether this document Exhibit 5 is, in
12 fact, the agreement between Spanski Enterprises
13 and Telewizja Polska?
14     A.   This agreement, it doesn't say it
15 is the copy of the original, so what can I
16 compare with what?
17     Q.   No, I'm asking you to look at the
18 agreement.
19     A.   (Reviews.)
20     Q.   Based on your knowledge, if you
21 have any, of the agreement between Spanski
22 Enterprises and Telewizja Polska, is this the
23 agreement entered into by the two parties in
24 2009?
25     A.   This is a document showing that

Page 77

MARIA E. NADOLNA

1           MARIA E. NADOLNA
2 Telewizja Polska and Spanski Enterprises have
3 agreement, but this document is not authorized.
4 This document is not the copy of the original. I
5 cannot confirm this is original document.
6     MR. WENGER: Can we take two
7 minutes, Jonathan?
8     MR. ZAVIN: (Indicating.)
9     MR. FINK: Yes.
10     MR. ZAVIN: Off the record.
11     THE VIDEOGRAPHER: The time is 1:44
12 p.m.
13     And this ends Tape Number 1.
14     (Whereupon, a short recess is
15 taken.)
16     THE VIDEOGRAPHER: Stand by,
17 please.
18     The time is 1:48 p.m.
19     And this begins Tape Number 2 of
20 the videotaped deposition of Maria Nadolna.
21     MR. ZAVIN: Let's have the last
22 question read back.
23     COURT REPORTER: (Complies.)
24     (Whereupon, the requested portion
25 is read back by the reporter as follows:

20 (Pages 74 to 77)

Page 78

1          MARIA E. NADOLNA
2          "QUESTION: Based on your
3 knowledge, if you have any, of the agreement
4 between Spanski Enterprises and Telewizja Polska,
5 is this the agreement entered into by the two
6 parties in 2009?")
7     A.    It appears to be this document.
8
9 BY MR. ZAVIN:
10    Q.    Okay.
11          Now, have you discussed with
12 anyone at TVP, and I'm not including lawyers for
13 the moment, but with anyone at TVP what was
14 intended by this agreement?
15    A.    In general, yes.
16          MR. WENGER:  I'll just say, Maria,
17 that to the extent you discussed this with
18 in-house TVP lawyers too, don't reveal those
19 conversations.
20          MR. ZAVIN:  I'm try to be careful.
21 Okay.
22
23 BY MR. ZAVIN:
24    Q.    Who did you discuss it with at
25 TVP, what was intended by this agreement?

Page 79

1          MARIA E. NADOLNA
2     A.    I don't remember.
3     Q.    Do you remember the subject of the
4 conversations?
5     A.    Probably the subject was
6 concerning television contract.
7     Q.    So am I understanding correctly
8 that this Exhibit 5 was discussed internally at
9 TVP in connection with a contract TVP entered
10 into with Polvision?
11    A.    Yeah.
12    Q.    Okay.
13          And you don't remember who those
14 discussions were with?
15    A.    Probably people from my office --
16          COURT REPORTER:  People from my
17 office what?
18    A.    People from my office, I mean the
19 employees from my office.
20    Q.    When you say employees, are these
21 people who report to you?
22    A.    Yes.
23    Q.    Can you discuss this contract with
24 anyone who did not report to you --
25    A.    No.

Page 80

1          MARIA E. NADOLNA
2     Q.    -- who was senior to you?
3     A.    But lawyers, no.
4     Q.    Okay.
5          Taking a look at Paragraph 2A of
6 this agreement which is on Page 2.
7     A.    Uh-huh.
8     Q.    The first sentence of that
9 paragraph reads:  SEI is and shall remain the
10 exclusive distributor of TVPolonia and TVP Info
11 programming content in the territory of North and
12 South America by any and all means of
13 distribution.
14    A.    (Reviews.)
15    Q.    Do you see that?
16    A.    Yes.
17    Q.    Okay.
18          What does is and shall remain mean
19 to you?  Do you have any understanding of what
20 that term means?
21    A.    I'm not the lawyer.  You mean by
22 interpretation?
23          COURT REPORTER:  I can't hear you.
24    Q.    Well, I want --
25    A.    I'm not the lawyer.

Page 81

1          MARIA E. NADOLNA
2     Q.    I understand that, but it is my
3 understanding that you are here as the corporate
4 representative of TVP.  So what I'm now asking
5 you is:  What is TVP's understanding of what does
6 the phrase is and shall remain exclusive
7 distributor mean?
8     A.    I'm here to say the facts.  I'm
9 not the lawyer.
10    Q.    Okay.
11          So is it your testimony that TVP
12 does not have a position on what that phrase
13 means?
14          MR. WENGER:  Objection.
15 She never said that.
16          MR. ZAVIN:  Well, I'm asking it.
17
18 BY MR. ZAVIN:
19    Q.    Is it your testimony that TVP does
20 not have a position on what that phrase means?
21          THE WITNESS:  Could you translate?
22          THE INTERPRETER:  (Complies.)
23          (Whereupon, the question was
24 interpreted for the witness.)
25    A.    I'm not the lawyer.  I'm not --

21 (Pages 78 to 81)

Page 82

MARIA E. NADOLNA

BY MR. ZAVIN:
Q.   I understand that you're not a
lawyer. I'm asking you as a corporate
representative of TVP which is a party to this
agreement, does TVP have an understanding of what
the phrase is and shall remain the exclusive
distributor, does TVP have an understanding of
what that phrase means?
A.   The answer is yes, TVP --
Q.   What is that understanding?
A.   I'm not authorized to say this
one.
Q.   Well --
A.   You're asking me to --
MR. FINK: Well, actually are you
asking her to use different words than the words
in the agreement?
MR. ZAVIN: I'm asking -- Bob, I'm
asking her what TVP's understanding of that phrase
is. Now, she is the 30(b)(6) witness.
MR. FINK: Well, I understand, but
if her understanding is exactly the words in the
agreement --

Page 83

MARIA E. NADOLNA

MR. ZAVIN: Well, careful. Don't
tell her what to say.
MR. FINK: I'm asking you do you
want her to use different words than the words in
the agreement?
MR. ZAVIN: I'm asking if she's got
an understanding. The understanding may be the
exact words and may have no understanding other
than that, but I'm entitled to know what the TVP
position is and this is the witness that's been
produced as the 30(b)(6) witness. Now, if TVP
doesn't know or doesn't have a position, we'll all
have to live with that, but this is the person you
produced as the TVP witness.
MR. FINK: All right.

BY MR. ZAVIN:
Q.   So, Ms. Nadolna, I'm going to
ask --
MR. ZAVIN: No, actually I'm going
to ask that the question be read back one more
time.
A.   So you have to read it.
COURT REPORTER: (Complies.)

Page 84

MARIA E. NADOLNA
(Whereupon, the requested portion
is read back by the reporter as follows:
"QUESTION: What is that
understanding?")
MR. ZAVIN: Why don't you read the
question before that also. Read both.
COURT REPORTER: (Complies.)
(Whereupon, the requested portion
is read back by the reporter as follows:
"QUESTION: I understand that
you're not a lawyer. I'm asking you as a
corporate representative of TVP which is a party
to this agreement, does TVP have an understanding
of what the phrase is and shall remain the
exclusive distributor, does TVP have an
understanding of what that phrase means?")
A.   And the answer was yes.

BY MR. ZAVIN:
Q.   Okay. And what is that
understanding?
A.   Exactly in the, in the contract.
Q.   Okay.
So what does "is" mean that at the

Page 85

MARIA E. NADOLNA
time this contract was entered into SEI was the
exclusive distributor of TVPolonia and TV Info
programming content in North and South America?
MR. FINK: Objection.
Q.   You can answer.
MR. ZAVIN: Read the question back
if you're -- let's have the question translated
also if we may. I don't want any --
MR. FINK: Just to be fair the
objection is to form.
MR. ZAVIN: I understand.
MR. FINK: Okay. I just wanted the
record to be clear.
MR. ZAVIN: You've preserved it.
COURT REPORTER: (Complies.)
(Whereupon, the requested portion
is read back by the reporter as follows:
"QUESTION: Okay.
"So what does "is" mean that at
the time this contract was entered into SEI was
the exclusive distributor of TVPolonia and TV
Info programming content in North and South
America?")
THE INTERPRETER: (Complies.)

22  (Pages 82 to 85)

Page 86

MARIA E. NADOLNA

1
2          (Whereupon, the question was
3     interpreted for the witness.)
4              THE INTERPRETER:  Don't move it.
5              COURT REPORTER:  I'm not moving it.
6              THE INTERPRETER:  Oh, there it is.
7     Okay.
8
9     BY MR. ZAVIN:
10       Q.    Do you understand the question?
11       A.    I think translation was wrong.
12       Q.    Well --
13              THE INTERPRETER:  I read what is
14     written.
15              MR. ZAVIN:  Okay.
16
17     BY MR. ZAVIN:
18       Q.    Well, do you understand the
19     question as it was asked in English?
20       A.    Can we read the question?
21       Q.    Yeah.
22              MR. ZAVIN:  Go ahead.
23              COURT REPORTER:  (Complies.)
24          (Whereupon, the requested portion
25     is read back by the reporter as follows:

Page 87

MARIA E. NADOLNA

1
2          "QUESTION:  Okay.
3          "So what does "is" mean that at
4     the time this contract was entered into SEI was
5     the exclusive distributor of TVPolonia and TV
6     Info programming content in North and South
7     America?")
8              MR. ZAVIN:  Okay.
9
10     BY MR. ZAVIN:
11       Q.    And I'm going to clarify the
12     question.
13       A.    Uh-huh.
14       Q.    Does in TVP's understanding does
15     the word "is" there mean at the time this
16     contract was entered into SEI was the exclusive
17     distributor of TVPolonia in North and South
18     America?
19       A.    In the moment of this contract?
20       Q.    Yes, when the contract was entered
21     into TVP, I'm sorry, SEI was the exclusive
22     distributor of content -- of TVPolonia in North
23     and South America?
24              MR. FINK:  Objection to form.
25              You actually changed your question.

Page 88

MARIA E. NADOLNA

1
2              MR. ZAVIN:  In response to the
3     witness' question, yes.  I'll ask it one more
4     time.
5
6     BY MR. ZAVIN:
7       Q.    Does the word is --
8       A.    Uh-huh.
9       Q.    -- mean that at the time this
10     contract was entered into --
11       A.    Uh-huh.
12       Q.    -- SEI was the exclusive
13     distributor of TVPolonia in North and South
14     America?
15              MR. FINK:  Objection to form.
16              You may answer.
17              THE WITNESS:  I may answer?
18              MR. FINK:  You can answer if you
19     can.  You can answer if you can.
20       A.    As it is written on that date SEI
21     is and shall remain, this is what is in the
22     contract.
23
24     BY MR. ZAVIN:
25       Q.    Okay.

Page 89

MARIA E. NADOLNA

1
2              Was SEI the exclusive distributor
3     of TVPolonia in North and South America before
4     Exhibit 5 was signed?
5       A.    I need to compare it.
6       Q.    Compare it with what?
7       A.    Once again the question?
8       Q.    Was SEI the exclusive distributor
9     of TVPolonia content, programming content in
10     North and South America before Exhibit 5 was
11     signed?
12       A.    I don't know.  I need to compare
13     it, the question, your question -- if you're
14     asking about this document it is, it is, it says.
15     So your asking what was before?  I need to take
16     the document.
17       Q.    Do you know --
18       A.    I'm not a lawyer.
19       Q.    Okay.
20       A.    You're asking lawyer questions.
21       Q.    Well, does TVP know whether in
22     2008, for example, SEI was the exclusive
23     distributor of TVPolonia content in the United
24     States?
25       A.    This is lawyer question, sorry.

23  (Pages 86 to 89)

Page 90

MARIA E. NADOLNA
1
2 Q. Okay.
3 You're telling me that as
4 corporate representative of TVP you can't answer
5 that question?
6 A. In order to answer it is necessary
7 to compare. You are asking me about document and
8 in this document I confirm what I see. It is
9 signed by the person from the company. You are
10 asking me to compare --
11 Q. Ms. Nadolna --
12 A. -- to do the work of the lawyer.
13 Q. Ms. Nadolna, I haven't asked you
14 about a document in this question.
15 A. The question does not --
16 Q. Do you know -- please listen to
17 the question: Do you know whether in 2008 SEI
18 was the exclusive distributor, had the exclusive
19 rights to distribute television TVPolonia in
20 North America?
21 A. If it's written in the contract I
22 can confirm what is in the contract. You want me
23 to make the interpretation an assumption --
24 Q. I'm asking whether you know. You
25 can say you don't know --

Page 91

MARIA E. NADOLNA
1
2 A. I don't know.
3 Q. Okay.
4 Ms. Nadolna, if this case goes to
5 trial are you going to be the witness for TVP?
6 MR. FINK: She can't answer that
7 question.
8 (Direction not to answer the
9 question.)
10 MR. ZAVIN: Are you instructing her
11 not to answer on the grounds of attorney/client
12 privilege?
13 MR. FINK: No, I'm saying she can't
14 answer that question. No decision has been made
15 so how can she --
16 MR. ZAVIN: Then she can answer
17 that, Bob. If she says I don't know because no
18 decision has been made, that's fine.
19
20 BY MR. ZAVIN:
21 Q. I'm asking her right now as you
22 sit here today do you know whether you're going
23 to be the witness for TVP --
24 A. I don't know.
25 Q. -- if this goes to trial? You

Page 92

MARIA E. NADOLNA
1
2 don't know.
3 Q. Do you know whether -- no,
4 withdrawn. Okay.
5 Q. Do you know whether TVP has --
6 Withdrawn for a moment.
7 I know I've sometimes been saying
8 Telewizja Polska.
9 A. Uh-huh.
10 Q. And sometimes I say TVP. We both
11 understand that --
12 A. Yes.
13 Q. -- that's the same thing?
14 A. Of course.
15 Q. Do you know whether TVP has ever
16 told third parties, and when I say third parties
17 what I mean is people other than Spanski or other
18 than TVP, that Spanski Enterprises has the
19 exclusive rights to TVPolonia in North and South
20 America?
21 A. I don't know.
22 Q. Okay. Okay.
23 MR. ZAVIN: Let's mark this as
24 Spanski, sorry, Nadolna Exhibit 6.
25 COURT REPORTER: (Complies.)

Page 93

MARIA E. NADOLNA
1
2 (Whereupon, two-page document
3 bearing Bates stamps SEI 000004 and SEI 000005,
4 is received and marked as Nadolna Exhibit 6 for
5 Identification.)
6 COURT REPORTER: Number 6.
7
8 BY MR. ZAVIN:
9 Q. And I'm handing, I've handed you a
10 two-page document that's marked as Nadolna
11 Exhibit 6 the first page of which is in English,
12 the second page of which is in Polish.
13 Have you ever seen this document
14 before?
15 MR. WENGER: I'm just going to
16 object. This is dated 1995. This is before Maria
17 has said she was involved in this matter or even
18 aware of the agreement with SEI.
19 You can answer the question.
20 MR. ZAVIN: This is the 30(b)(6)
21 witness here, is it not?
22 MR. WENGER: Yeah.
23 MR. ZAVIN: Is --
24 MR. WENGER: You're just asking her
25 about a document that was created long before she

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 94

```
1              MARIA E. NADOLNA
2   had anything to do with this case, so, go ahead.
3        A.   So the question is?
4
5   BY MR. ZAVIN:
6        Q.   Ms. Nadolna, Ms. Nadolna, my first
7   question is:  Have you ever seen this document
8   that's been marked as Exhibit 6?
9        A.   No, I haven't seen it.
10       Q.   It appears to be signed both in
11  the English and Polish version by two people, is
12  that correct?
13       A.   Yeah, that's what I see.
14       Q.   Do you know -- am I correct that
15  the first person is a Mr. Walendziak?
16       A.   (Indicating.)
17       Q.   Do you know who Mr. Walendziak is
18  or was?
19       A.   As it said --
20            (Whereupon, the witness speaks in
21  Polish.)
22       A.   The pres -- Mr. President, the
23  president of the company.
24            COURT REPORTER:  The president of
25  the company?
```

Page 95

```
1              MARIA E. NADOLNA
2        A.   President of the company.  This is
3   from --
4        Q.   He was president of TVP?
5        A.   Yes.
6        Q.   Correct?
7        A.   Yes.
8        Q.   And do you know who Mr. Brodziak
9   was.
10       A.   It is what I can read, the member
11  of the board.
12       Q.   So this is a document signed by
13  the president of the company and a member of the
14  board of TVP, is that correct?
15       A.   It's what I see.
16       Q.   Okay.
17            Do you have any reason to think
18  that this was not signed by Mr. Walendziak and
19  Mr. Brodziak?
20       A.   I don't, I don't see that it is
21  the copy according to the original.  That's only
22  what I can say.
23       Q.   Okay.
24            Reading this document does this
25  document seem to indicate that TVP is telling
```

Page 96

```
1              MARIA E. NADOLNA
2   people that SEI or Mr. Spanski has the exclusive
3   right to receive and rebroadcast in the United
4   States TVPolonia?
5        A.   It's what it says in the document.
6        Q.   That's what it says in the
7   document?
8        A.   Uh-huh.
9        Q.   Is that correct?
10       A.   Uh-huh, on the moment of 1995.
11       Q.   Okay.
12            MR. ZAVIN:  And let's mark this as
13  Nadolna Exhibit 7.
14            COURT REPORTER:  (Complies.)
15            (Whereupon, two-page document
16  bearing Bates stamps TP7000086 and TP7000087, is
17  received and marked as Nadolna Exhibit 7 for
18  Identification.)
19            COURT REPORTER:  Number 7.
20
21  BY MR. ZAVIN:
22       Q.   Ms. Nadolna, I'm showing you a
23  two-page document again the first page in
24  English, the second page in Polish and again
25  signed by Mr. Walendziak and Mr. Brodziak.
```

Page 97

```
1              MARIA E. NADOLNA
2   Do you see this document?
3        A.   Yes, I do.
4        Q.   Have you ever seen it before?
5        A.   No.
6        Q.   Am I correct that this is a
7   document in which TVP announces to the world that
8   Mr. Spanski has the exclusive right to receive
9   and broadcast in Canada the TVPolonia?
10       A.   It says that Telewizja Polska
11  Canada, not Mr. Spanski, Telewizja Polska Canada
12  represented by Mr. Spanski because you said
13  that's Mr. Spanski.  That's not what you are --
14       Q.   You are correct.
15       A.   It's different from what you
16  said --
17       Q.   You are correct.  I apologize.
18       A.   Uh-huh.
19       Q.   I was not trying --
20       A.   Uh-huh.
21       Q.   -- to trick you.
22            Is this TVP saying that Telewizja
23  Polska Canada --
24       A.   Uh-huh.
25       Q.   -- has the exclusive rights to
```

25 (Pages 94 to 97)

Page 98

MARIA E. NADOLNA

1           MARIA E. NADOLNA
2 receive and rebroadcast the satellite program
3 produced by Telewizja Polska, S.A.?
4     A.   And again, sorry, because you say
5 exclusive right. It's granted by the exclusive
6 agreement to receive -- I can read what is here.
7 It's different what you say.
8     Q.   Okay.
9         Does this say anything about them
10 having the exclusive agreement or right to only
11 use the signal one time?
12     A.   This document is connected with
13 the agreement so you are asking this about this
14 document?
15     Q.   About this document.
16     A.   So no. It's not in this document.
17     Q.   Okay.
18     MR. ZAVIN: Let's mark this as --
19     COURT REPORTER: (Complies.)
20     COURT REPORTER: (Complies.)
21     (Whereupon, multi-page document
22 bearing Bates stamps TP7004249 through TP7004250,
23 is received and marked as Nadolna Exhibit 8 for
24 Identification.)
25     MR. ZAVIN: Ms. Nadolna, I'm

Page 99

1           MARIA E. NADOLNA
2 showing you a document that's been -- it's a
3 five-page document that's been marked as Nadolna
4 Exhibit 8 and you'll see that the first couple of
5 pages appears to be a translation of Polish
6 document --
7     A.   I didn't receive it yet. Sorry.
8     Q.   Oh, I'm sorry.
9     COURT REPORTER: Number 8.
10     THE WITNESS: Uh-huh.
11
12 BY MR. ZAVIN:
13     Q.   Have you ever seen this document
14 before either the Polish version or the English
15 version?
16     A.   No, I haven't seen it.
17     Q.   Again, this seems to be signed by
18 Mr. Walendziak, is that correct, who was the
19 president of TVP?
20     A.   It says his name, but I don't know
21 if he was the president of the company at that
22 moment.
23     Q.   Okay.
24         Well, this is in 1995 at the same
25 time these other --

Page 100

1           MARIA E. NADOLNA
2     A.   Yes.
3     Q.   -- documents were signed.
4     A.   Probably, yes.
5     Q.   Okay.
6         And is it correct that this is to,
7 a letter that the president of TVP wrote to the
8 president of the Polish American Congress in the
9 United States?
10     THE WITNESS: Can you translate the
11 question?
12     THE INTERPRETER: (Complies.)
13     (Whereupon, the question was
14 interpreted for the witness.)
15     A.   That's what I see.
16
17 BY MR. ZAVIN:
18     Q.   Okay.
19         And in this document doesn't it
20 say, and I direct your attention to the second
21 page in the second to last paragraph, that
22 Telewizja Polska USA and Telewizja Polska
23 Canada --
24     A.   Which page?
25     Q.   Second page second to last

Page 101

1           MARIA E. NADOLNA
2 paragraph.
3     A.   In accordance with the contract?
4 Which one you are reading?
5     Q.   Yes, that's correct.
6     A.   Uh-huh.
7     Q.   And doesn't it say that, in sum or
8 substance that Telewizja Polska USA and Telewizja
9 Polska Canada have the exclusive right to receive
10 and distribute the satellite programs TVPolonia?
11     A.   It's what is said in the document.
12     Q.   That's what it says in the
13 document?
14     A.   Uh-huh.
15     MR. FINK: You're asking her to
16 confirm that --
17     MR. ZAVIN: Yes.
18     MR. FINK: -- you've read from the
19 document correctly?
20     MR. ZAVIN: That's correct.
21     MR. FINK: He's asking you if he
22 read it correctly.
23     THE WITNESS: If what he is reading
24 is in this document?
25     MR. FINK: Yes.

26 (Pages 98 to 101)

Page 102

MARIA E. NADOLNA

1            MARIA E. NADOLNA
2       THE WITNESS:  It is what I see in
3 the document.
4       MR. ZAVIN:  Okay.
5
6 BY MR. ZAVIN:
7     Q.   Do you have any reason to think
8 that that was, that Mr. Walendziak was incorrect?
9     A.   I don't know.
10    Q.   So you have no reason to know
11 whether he was correct or incorrect?
12    A.   I don't know.
13    Q.   And is there anything in this
14 document that says they only have the exclusive
15 right for one-time use?
16    A.   I need to read the document in
17 order to answer.
18    Q.   You can please read the document.
19    A.   I read the document.
20    Q.   Okay.  Can you answer the
21 question?
22    A.   Can we repeat the question?
23      MR. ZAVIN:  Could the court
24 reporter read the question back, please.
25      COURT REPORTER:  (Complies.)

Page 103

1            MARIA E. NADOLNA
2      (Whereupon, the requested portion
3 is read back by the reporter as follows:
4    "QUESTION:  And is there anything
5 in this document that says they only have the
6 exclusive right for one-time use?")
7    A.   No.
8    Q.   Okay.
9      MR. ZAVIN:  Let's mark this as
10 Nadolna Exhibit 9.
11      COURT REPORTER:  (Complies.)
12      (Whereupon, one-page document
13 bearing Bates stamp TP7006700, is received and
14 marked as Nadolna Exhibit 9 for Identification.)
15      COURT REPORTER:  Number 9.
16      MR. ZAVIN:  Okay.
17
18 BY MR. ZAVIN:
19    Q.   Ms. Nadolna, I've marked as
20 Nadolna Exhibit 9 a one-page document in Polish,
21 in Polish that says on top Opinia Prawna, my
22 pronunciation is undoubtedly terrible,
23 unfortunately I apologize.
24      Do you recognize this document?
25    A.   I see it for the first time.

Page 104

1            MARIA E. NADOLNA
2    Q.   By that you mean you've seen it
3 just now for the first time?  You've never seen
4 it before?
5    A.   This is the first time I see this
6 document.
7    Q.   Okay.
8      Can you tell by looking at the
9 document what it is?
10    A.   You mean to say what is in the
11 document?
12    Q.   Well, do you know generally what
13 the document is by looking at it?
14    A.   I have to read it.
15    Q.   Yes.
16    A.   It's the first time I see it.
17    Q.   Please you can read it.
18      THE INTERPRETER:  Can I see the
19 document?
20      MR. WENGER:  Yes.
21
22 BY MR. ZAVIN:
23    Q.   Have you read the document now?
24    A.   Yes.
25    Q.   Can you tell generally what it is?

Page 105

1            MARIA E. NADOLNA
2    A.   I'm not -- I cannot do it.
3    Q.   Okay.  Do you know who
4 Mr. Swiderski is?
5    A.   I don't know.  I can only read
6 that he's a lawyer.
7    Q.   When you say he's a lawyer --
8    A.   I mean the --
9    Q.   Was he a lawyer --
10    A.   The person from the legal
11 department.
12    Q.   The legal department of TVP?
13    A.   TVP.
14    Q.   And this appears to be the TVP
15 legal department rendering a legal opinion on the
16 agreement between Spanski Enterprises and TVP, is
17 that correct?
18    A.   I don't know.
19    Q.   Do you have any reason to think
20 this document is not a legal opinion by the legal
21 department of TVP?
22    A.   It's the copy of the document.
23 It's not according to the original so I will not
24 confirm if I'm not sure.  I can only read what I
25 see.  This is it.

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 106

MARIA E. NADOLNA

1
2     Q.    Well, assuming this is an exact
3  copy of the original --
4     A.    I cannot assume.  Sorry.
5     Q.    Well, this is a document that your
6  company produced.
7     A.    I don't know.
8     Q.    Because it has --
9     A.    This is the time I was not in the
10 company.
11    Q.    It has on the bottom of it an
12 indication this is TP7006700 which means this was
13 a document produced by your company --
14    A.    I'm --
15    Q.    -- to us in prior litigation?
16    A.    This document, as I said, is the
17 copy of the document.  It should be according to
18 the original authorized.  I cannot confirm.  I'm
19 sorry.
20    Q.    So well, let me ask you another
21 question: In 2008 were you responsible for
22 entering into a barter agreement with Polvision
23 in which you provided --
24    A.    I was not responsible.
25    Q.    Were you involved in it --

Page 107

MARIA E. NADOLNA

1
2     A.    No.
3     Q.    -- in doing it?
4           In 2009 were you involved in
5  entering into a license agreement with Polvision?
6     A.    No.
7     Q.    Who was responsible for entering
8  into that barter agreement in 2008?
9     A.    We need to read it from the
10 agreement.
11    Q.    You don't know?
12    A.    I can presume that there were two
13 people, but it's better to read it from the
14 agreement who sign it.
15    Q.    I'll get to the agreement, but I'm
16 asking you --
17    A.    So I don't know.
18    Q.    You don't know?
19    A.    I don't know.
20    Q.    And you don't know who was
21 involved in the part of TVP in entering into the
22 license agreement in 2009 with Polvision?
23    A.    This was Mr. Lenarczyk, probably
24 he signed it, Mr. Lenarczyk.
25    Q.    Do you know whether anyone at TVP

Page 108

MARIA E. NADOLNA

1
2  before entering into those agreements reviewed
3  this legal opinion that's been marked as Nadolna
4  Exhibit 9?
5     A.    This is old document.  I don't
6  know.
7     Q.    Okay.
8           Do you know when TVP first
9  licensed or gave Polvision --
10          Withdrawn.
11          Do you know who Polvision is?
12    A.    Yes, I do.
13    Q.    Who is Polvision?
14    A.    Our business partner in Chicago.
15    Q.    Okay.
16          Are they, in fact, a broadcaster
17 in Chicago, a broadcast television programming?
18    A.    Yes.
19    Q.    Okay.
20          Do you know when TVP first
21 licensed any of its programming to Polvision?
22    A.    The first license, license
23 agreement was signed after the barter agreement
24 has been finished.
25    Q.    Was there any time prior to the

Page 109

MARIA E. NADOLNA

1
2  barter agreement that TVP had provided
3  programming, its programming to Polvision?
4     A.    On the barter agreement, yes.
5     Q.    No, prior to the barter agreement.
6     MR. WENGER:  Which barter agreement
7  are we talking about?
8     MR. ZAVIN:  I think both the
9  witness and I are talking about the barter
10 agreement of 2008.
11
12 BY MR. ZAVIN:
13    Q.    Is that correct?
14    A.    We're talking in general.
15    Q.    Okay.
16          Well, I'm asking when is the first
17 time to the best of your knowledge that TVP
18 provided television programming, its television
19 programming to Polvision?
20    A.    To my knowledge in 2006 there was
21 barter agreement with Polvision.
22    Q.    Okay.  How about before that?
23    A.    Excuse me?
24    Q.    Any time before that?
25    A.    I don't know.

28  (Pages 106 to 109)

| Page 110 | Page 112 |
|---|---|

Page 110

MARIA E. NADOLNA

1             MARIA E. NADOLNA
2   Q.   Okay.
3         MR. ZAVIN: Let's mark this as
4 Nadolna, Nadolna Exhibit 10.
5         COURT REPORTER: (Complies.)
6         (Whereupon, one-page document
7 bearing Bates stamp P00204, is received and
8 marked as Nadolna Exhibit 10 for Identification.)
9         MR. ZAVIN: I'll give you the
10 translations too.
11         COURT REPORTER: Number 10.
12
13 BY MR. ZAVIN:
14   Q.   Ms. Nadolna, I'm showing you a
15 document marked -- it's a one-page document
16 appears to be a fax from TVP to Polamer, Ltd.
17 which I understand is Polvision.
18         Is Polamer the same as Polvision?
19   A.   How can I know?
20   Q.   Ms. Nadolna, is it your testimony
21 that you just have no idea whether Polamer --
22   A.   You show -- excuse me. You show
23 me document 1995. I was not in the company. You
24 ask me about Polamer, yes, what is it?
25   Q.   I'm asking as of today when

Page 111

1             MARIA E. NADOLNA
2 your -- I'm talking about your business partner.
3   A.   Yes.
4   Q.   Do you know whether Polamer is the
5 same as Polvision?
6   A.   I don't know.
7   Q.   Okay. In the text of this
8 agreement --
9   A.   Uh-huh.
10   Q.   -- it refers to the Polvision
11 programming.
12         Do you see that?
13   A.   Uh-huh.
14   Q.   Do you know whether -- well, no.
15 Next question.
16         Do you know who Ms. Suchodolska is
17 or was who signed this fax?
18         MR. WENGER: Suchodolska.
19         THE WITNESS: Suchodolska, uh-huh.
20   A.   She was one of the employees
21 probably of the office representing TVP in that
22 moment. That's what I read from the document.
23   Q.   Is she saying in this document
24 that TVP could no longer provide Polvision with

Page 112

1             MARIA E. NADOLNA
2 TVP programming as of July 1st, 1995?
3   A.   If it's the translation of this
4 letter which I see, I don't see this English
5 version so I cannot confirm it's exactly the
6 same.
7   Q.   Okay.
8         MR. ZAVIN: I'm going to mark as
9 Exhibit 11 the English version that we have that
10 seems to have been produced. Oops.
11         COURT REPORTER: (Complies.)
12         (Whereupon, one-page document
13 bearing Bates stamp P00203, is received and
14 marked as Nadolna Exhibit 11 for Identification.)
15         MR. ZAVIN: Just put it over this
16 (indicating).
17         COURT REPORTER: Number 11.
18
19 BY MR. ZAVIN:
20   A.   And can we read the question? Can
21 we read the question?
22   Q.   Yes.
23         MR. ZAVIN: Please.
24         COURT REPORTER: (Complies.)
25         (Whereupon, the requested portion

Page 113

1             MARIA E. NADOLNA
2 is read back by the reporter as follows:
3         "QUESTION: Okay.
4         "Is she saying in this document
5 that TVP could no longer provide Polvision with
6 TVP programming as of July 1st, 1995?")
7   A.   It says precisely which programs,
8 not in general.
9
10 BY MR. ZAVIN:
11   Q.   Okay.
12   A.   And the document is from 1995
13 before I was in the company.
14   Q.   Well, I don't think -- you're not
15 taking the position that anything that happened
16 before you joined the company is not effective,
17 are you?
18   A.   I can confirm what is all the
19 facts which I know and you show me documents from
20 over ten years longer.
21   Q.   Okay.
22         I'm going to show you a document
23 that's been marked as, as Nadolna Exhibit 12.
24         COURT REPORTER: (Complies.)
25         (Whereupon, multi-page document

29 (Pages 110 to 113)

Page 114

1           MARIA E. NADOLNA
2  bearing Bates stamp TP7003598, is received and
3  marked as Nadolna Exhibit 12 for Identification.)
4        COURT REPORTER: Number 12.
5
6  BY MR. ZAVIN:
7      Q.   This appears to be a fax from TVP
8  to Mr. Spanski at Spanski Enterprises, is that
9  correct?
10     A.   I can read the document from June
11  1995. It says -- it is concerning Polish
12  television, but it's not authorized. It's a copy
13  not authorized copy of the original so what I
14  have to confirm.
15     Q.   Okay.
16        So you've never seen a you copy of
17  this document before?
18     A.   No, I didn't, no, seen it.
19     Q.   Okay.
20        Do you know whether in making --
21  in answering the complaint in this action these
22  documents were reviewed by anyone at TVP?
23     A.   I don't know.
24     Q.   And is it fair to say that in
25  answering the complaint you didn't review any of

Page 115

1           MARIA E. NADOLNA
2  these documents?
3     A.   No.
4        MR. FINK: Objection to form.
5        MR. ZAVIN: She's answered it.
6        MR. FINK: Could you just pause for
7  a moment before you answer the question so that if
8  we have an objection we can state it?
9        THE WITNESS: (Indicating.)
10       MR. FINK: I just want you to
11  hesitate a moment before you answer.
12       THE WITNESS: Uh-huh.
13       MR. FINK: Thank you.
14
15  BY MR. ZAVIN:
16     Q.   This document seems to indicate
17  that following, immediately following the
18  execution of the original agreement with SEI that
19  TVP believed that that agreement required them to
20  suspend providing any TV programming, TVP
21  programming to anyone else in North and South
22  America.
23        Do you agree with that?
24       MR. WENGER: Objection.
25       MR. FINK: You said immediately

Page 116

1           MARIA E. NADOLNA
2  after?
3        MR. ZAVIN: Or immediately at or
4  about the time of the agreement with Mr. Spanski.
5        MR. WENGER: Objection.
6        You can answer if you can.
7     A.   I don't know.
8
9  BY MR. ZAVIN:
10     Q.   I'm sorry?
11     A.   I don't know.
12     Q.   Okay.
13        Did anything change between
14  2000 -- 1995 and 2008 that gave Mr. Spanski less
15  rights than he had in 1995 with respect to TVP?
16        MR. FINK: Objection to form.
17     Q.   You can answer.
18     A.   I'm not the lawyer. You're asking
19  things --
20     Q.   Ms. Nadolna, I'm asking as far as
21  television -- Telewizja Polska is concerned, was
22  there any change in the arrangements between it
23  and Mr. Spanski between 1995 and 2008 that gave
24  Mr. Spanski less rights than he had in 1995?
25        MR. FINK: Objection to form.

Page 117

1           MARIA E. NADOLNA
2     Q.   Or SEI, not Mr. Spanski. Is the
3  answer you don't know?
4     A.   No, I don't know.
5     Q.   Okay.
6        THE INTERPRETER: Counselor, can I
7  take a quick bathroom break, please?
8        MR. ZAVIN: (No response.)
9        THE INTERPRETER: Counselor, can I
10  take a bathroom break?
11       MR. ZAVIN: (Indicating.)
12       Off the record.
13       THE VIDEOGRAPHER: The time is 2:34
14  p.m.
15       And we're going off the record.
16       (Whereupon, a short recess is
17  taken.)
18       THE VIDEOGRAPHER: Stand by,
19  please.
20       The time is 2:41 p.m.
21       And we're back on the record.
22       (Whereupon, one-page document
23  bearing Bates stamp TP7003479, is received and
24  marked as Nadolna Exhibit 13 for Identification.)
25       COURT REPORTER: Number 13.

TransPerfect Legal Solutions
212-400-8845 — depo@transperfect.com

Page 118

```
1              MARIA E. NADOLNA
2          MR. ZAVIN:  Okay.  This would be
3  the translations.
4
5  BY MR. ZAVIN:
6      Q.   Ms. Nadolna, I've marked as
7  Exhibit 13 a one-page document in Polish that's
8  seems to be dated in June 9th, 1997 from
9  TVPolonia.
10     A.   (Reviews.)
11     Q.   Do you recognize this document?
12     A.   No.  It's the first time I've seen
13 this document.
14     Q.   Okay.
15          It appears to be saying, and I can
16 give you our English translation if you'd like,
17 but you've got the Polish version in front of
18 you, that the distribution rights to the news
19 programs of the TVPolonia program are held by
20 Mr. Boguslaw Spanski, is that correct?
21     A.   Yes.
22     Q.   Who is this signed by?
23     A.   I can read it from the document
24 that Robert Terentiew.
25     Q.   Do you know who Mr. Terentiew was?
```

Page 119

```
1              MARIA E. NADOLNA
2      A.   No, I don't know.
3      Q.   Was he an employee of TVP?
4      A.   I don't know.
5      Q.   Okay.
6          Well, this document would seem to
7  indicate he was an employee of TVP, is that
8  correct?
9      A.   He should be the employee of TVP,
10 but I cannot confirm.  This is document from 1997
11 and this is document I didn't see before.
12     Q.   Okay.
13          MR. FINK:  There is no question
14 pending, is there?
15          MR. ZAVIN:  There is not.
16          MR. FINK:  That's what I thought.
17          MR. ZAVIN:  I'm going to have
18 marked as Nadolna Exhibit 14 an agreement that is
19 entitled, and I apologize for my lousy
20 pronunciation again, Umowa Barterowa.
21     A.   Umowa Barterowa.
22     Q.   I assume it means barter
23 agreement.
24     A.   Uh-huh.
25          MR. ZAVIN:  And this is a Polish
```

Page 120

```
1              MARIA E. NADOLNA
2  version of that agreement.
3          COURT REPORTER:  (Complies.)
4          (Whereupon, multi-page document
5  bearing Bates stamps POL00038 through POL00045,
6  is received and marked as Nadolna Exhibit 14 for
7  Identification.)
8          COURT REPORTER:  Number 14.
9
10 BY MR. ZAVIN:
11     Q.   Ms. Nadolna, have you ever seen
12 this agreement that's been marked as Exhibit 14
13 before?
14     A.   Yes.
15     Q.   What is it?
16     A.   It is barter agreement.
17     Q.   Is this a barter agreement between
18 TVP and Polvision?
19     A.   Yes.
20     Q.   Okay.
21          This is an agreement in March of
22 2008?
23     A.   Yes.
24     Q.   Do you know whether there was an
25 agreement, a barter agreement between TVP and
```

Page 121

```
1              MARIA E. NADOLNA
2  Polvision before this?
3      A.   To my knowledge there were
4  some agreements.  The corporation for sure on the
5  barter basis.
6      Q.   Did -- do you know whether TVP
7  searched its files for all documents relating to
8  Polvision in connection with this litigation?
9          Did you search your records with
10 respect to all documents relating to Polvision?
11         MR. WENGER:  Objection.
12         Which question are you asking?
13         MR. ZAVIN:  First I'm asking the
14 second -- did she personally search any of her
15 files or her department for all documents relating
16 to Polvision?
17     A.   Me personally, not.
18
19 BY MR. ZAVIN:
20     Q.   Did you instruct anyone to search
21 for documents relating to Polvision?
22     A.   I can only confirm that all the
23 documents which were concerning this, concerning
24 Polvision, they were collected in the company and
25 through the lawyers they were --
```

31 (Pages 118 to 121)

Page 122

MARIA E. NADOLNA

1
2  Q.   Okay.
3       Do you know whether the company
4  collected copies of this barter agreement and
5  copies of the one you testified to existed in
6  2006 between the company and Polvision?
7       A.   Concerning this agreement?
8  Q.   No.  I think you said that --
9       A.   To my knowledge, to my knowledge
10 the barter corporation with Polvision between TVP
11 and Polvision was also before, but I don't know
12 on which basis if -- everything what was
13 concerning Polvision was collected, completed in
14 this, in this, between the parties.
15      Q.   Do you have any idea why this,
16 these agreements would not have been turned over
17 to Spanski Enterprises in this litigation?
18      MR. FINK:  Objection.
19 Lack of foundation.
20      MR. ZAVIN:  Bob, we have no record
21 of them ever being produced.
22      MR. FINK:  She didn't say there is
23 a written agreement.
24      MR. ZAVIN:  Well, there is a
25 written agreement in 2008.

Page 123

MARIA E. NADOLNA

1
2       If you'll notice that copy was
3  produced by Polvision to us pursuant to subpoena.
4  It was not produced by TVP.
5       MR. FINK:  You can continue.
6       COURT REPORTER:  I can't hear you,
7  sir.
8       MR. FINK:  You can continue.
9       MR. WENGER:  Is there a question
10 pending?
11      MR. ZAVIN:  Yes.
12
13 BY MR. ZAVIN:
14      Q.   The question was:  Do you know why
15 this barter agreement was not produced to Spanski
16 Enterprises in this litigation?
17      A.   I don't know.
18      Q.   Do you know whether Spanski
19 Enterprises was ever told by anyone at TVP that
20 it was entering into this barter agreement in
21 2008?
22      A.   Should, I think should, but I
23 don't know.
24      Q.   You don't --
25      A.   I don't know.

Page 124

MARIA E. NADOLNA

1
2  Q.   You don't know.
3       Do you know whether Spanski
4  Enterprises was ever told that TVP was entering
5  into a barter agreement with Polvision prior to
6  2008?
7       A.   I think Mr. Spanski knew about
8  every cooperation which was done between the TVP
9  and Polvision.
10      Q.   What's the basis of your saying
11 that?
12      A.   It's to my knowledge.
13      Q.   Okay.
14      Do you know whether in the
15 litigation between TVP and Spanski Enterprises
16 that ended in 2009 TVP ever told Spanski
17 Enterprises about this barter agreement with
18 Polvision?
19      A.   I don't know.
20      Q.   Who signed this barter agreement
21 on behalf of TVP?
22      A.   Joanna Skierska.
23      Q.   Do you know whether Ms. Skierska
24 testified under oath in a deposition on behalf of
25 TVP in the litigation between Spanski Enterprises

Page 125

MARIA E. NADOLNA

1
2  and TVP?
3       A.   I know that she was --
4       COURT REPORTER:  That she was what?
5  I can't hear you.
6       A.   Yes, I know.  Yes, she was.
7       Q.   Do you know that whether during
8  the course of that testimony she said anything
9  about a barter agreement with Polvision?
10      A.   I don't know.
11      Q.   Ms. Nadolna, other than its
12 agreements with Polvision --
13      A.   Uh-huh.
14      Q.   -- to the best of your knowledge,
15 you may know, you may not know, but I'm asking to
16 the best of your knowledge has TVP entered into
17 agreements with anyone other than Polvision and
18 Spanski Enterprises between 1995 and today's date
19 where it's given TVPolonia programming to them
20 for distribution in North and South America?
21      A.   To my knowledge I don't know.
22      Q.   All right.
23      Does that mean to your knowledge
24 no, or that you just don't know?
25      A.   I don't know.

32  (Pages 122 to 125)

Page 126

MARIA E. NADOLNA

1
2     Q.    You don't know whether they have
3  or have not?
4     A.    No.
5     Q.    So they might have, but you don't
6  know about it.  They might not have but you don't
7  know, is that correct?  Is that correct,
8  Ms. Nadolna?  You just don't know whether they
9  have or have not?
10     A.    Polish television is working
11  according to the all legal documents, all legal
12  agreements.  So this is what I can only confirm.
13     Q.    I'm not asking for legal
14  conclusion.  I'm asking what TVP has done, if you
15  know?
16     A.    I don't know.
17     Q.    You don't.  And in --
18     MR. FINK:  And you're referring
19  back to your original question to her?
20     MR. ZAVIN:  That's correct.
21     MR. FINK:  That's fine.
22
23  BY MR. ZAVIN:
24     Q.    And I'm going to be clear:  You
25  don't know whether between 1995 and today TVP has

Page 127

MARIA E. NADOLNA

1
2  granted rights to distribute its programming in
3  North and South America to anyone other than
4  Spanski Enterprises and Polvision?
5     MR. WENGER:  Jonathan, by my count
6  this is the fifth time.
7     MR. ZAVIN:  Well --
8     MR. FINK:  You just changed the
9  question, so I have an objection --
10     MR. ZAVIN:  I --
11     MR. FINK:  -- to the fact that you
12  changed the question.
13     MR. ZAVIN:  Okay.  You can object
14  and then she can answer because I'm going to -- I
15  want to make really sure, Bob, because somehow
16  this didn't come up in the last case and I don't
17  want to find out about another one.
18     MR. FINK:  I have no objection to
19  her answering any of your questions.  I just
20  want --
21     MR. ZAVIN:  Okay.
22     MR. FINK:  -- her to know and I
23  want you to know that you've asked a different
24  question.
25     MR. ZAVIN:  Okay.  I'll assume that

Page 128

MARIA E. NADOLNA

1
2  I did.
3     Read the last question back.
4     COURT REPORTER:  (Complies.)
5     (Whereupon, the requested portion
6  is read back by the reporter as follows:
7     "QUESTION:  And I'm going to be
8  clear:  You don't know whether between 1995 and
9  today TVP has granted rights to distribute its
10  programming in North and South America to anyone
11  other than Spanski Enterprises and Polvision?")
12     A.    No, I don't know.
13
14  BY MR. ZAVIN:
15     Q.    Okay.
16     And the same question in any part
17  of the territory, not just the whole territory,
18  but granted rights to any person or any entity to
19  distribute any TVPolonia programming?
20     MR. FINK:  Objection again.
21     Q.    You can, you can answer.
22     MR. FINK:  You changed the
23  question.
24     You can answer that question.
25     A.    I don't know.

Page 129

MARIA E. NADOLNA

1
2     Q.    Okay.
3     And just to be clear, when I say
4  TVPolonia programming, I mean any show that has
5  appeared on TVP, not just the episode, but any
6  show which any episode has ever appeared on
7  television Polonia, has TVP granted a right to
8  show other episodes of such a show to anyone in
9  North and South America?
10     A.    Excuse me, you changed the
11  question.
12     MR. FINK:  Objection to form.
13     Q.    I did change the question.  I'm
14  asking a different question.
15     MR. FINK:  All right.
16     Do you want it read back so you can
17  hear it?
18     THE WITNESS:  Yeah.
19     MR. FINK:  In fact, can the
20  translator translate that question so she can hear
21  it?
22     THE INTERPRETER:  Is he reading or
23  am I translating?
24     MR. WENGER:  Read that.
25     THE INTERPRETER:  (Complies.)

33  (Pages 126 to 129)

Page 130

```
1           MARIA E. NADOLNA
2           MR. FINK:  And just to be clear I
3  have an objection to form as to that question.
4           MR. ZAVIN:  Okay.
5           MR. FINK:  You may answer if you
6  can.
7      A.    It's so long question.  I need
8  precise question.
9
10 BY MR. ZAVIN:
11     Q.    Okay.  Is it correct that --
12     A.    Like this --
13     Q.    -- that you are the head of the
14 department of TVP --
15     A.    Uh-huh.
16     Q.    -- that licenses programming --
17     A.    Yes.
18     Q.    -- for television Polonia in North
19 and South America?
20     A.    No, I don't license.
21     Q.    Which department in --
22     A.    I license -- my department is
23 dealing with such matters, but we are not
24 licensing.
25     Q.    Okay.
```

Page 131

```
1           MARIA E. NADOLNA
2           And how long have you been head of
3  that department?
4      A.    I was the head, I'm the head from
5  the 6th or 7th of January 2010.
6      Q.    And how long have you been in that
7  department?
8      A.    Since January 2010.
9      Q.    Okay.
10          From January 2010 to the
11 present --
12     A.    Uh-huh.
13     Q.    -- has TVP granted licenses to
14 anyone or provided its shows to anyone in North
15 and South America other than Spanski Enterprises
16 and Polvision?
17          MR. FINK:  Objection to form.
18          MR. WENGER:  This question
19 addresses any shows, right?
20          MR. ZAVIN:  Any shows.
21     A.    Apart from Spanski?
22
23 BY MR. ZAVIN:
24     Q.    And Polvision.
25     A.    Yes, nobody.
```

Page 132

```
1           MARIA E. NADOLNA
2      Q.    Okay.
3           Prior to 2010 are you aware of any
4  licensing by TVP to anyone in North and South
5  America other than Polvision and Spanski of any
6  shows or programming?
7           MR. FINK:  Objection to form.
8           You may answer.
9      A.    Could you repeat the beginning of
10 this question?
11     Q.    Sure.
12          MR. ZAVIN:  Why don't you read it
13 back.
14          COURT REPORTER:  (Complies.)
15          (Whereupon, the requested portion
16 is read back by the reporter as follows:
17          "QUESTION:  Okay.
18          "Prior to 2010 are you aware of
19 any licensing by TVP to anyone in North and South
20 America other than Polvision and Spanski of any
21 shows or programming?")
22     A.    There is no verb in this sentence.
23          THE INTERPRETER:  Are you aware.
24 There is are.
25     A.    What you mean?
```

Page 133

```
1           MARIA E. NADOLNA
2           THE INTERPRETER:  Sorry.
3
4  BY MR. ZAVIN:
5      Q.    Do you not understand the
6  question?
7           MR. FINK:  She doesn't.
8           MR. ZAVIN:  Okay.
9           MR. FINK:  Actually --
10          MR. ZAVIN:  Okay, I'll break it
11 down.
12          MR. FINK:  She says there is no
13 verb in it.
14          MR. ZAVIN:  Well, I think we'll all
15 agree that there is a verb, but I'll ask the
16 question again.
17
18 BY MR. ZAVIN:
19     Q.    You're saying you don't understand
20 the question?
21     A.    Yes.
22     Q.    Okay.
23          From the period 1995 through 2010
24 if you know are you aware of any license given by
25 Polvision --
```

34  (Pages 130 to 133)

Page 134

MARIA E. NADOLNA
1    MARIA E. NADOLNA
2    A.    Uh-huh.
3    Q.    -- I'm sorry, given by TVP --
4    A.    Uh-huh.
5    Q.    -- to use its shows or programming
6    in North and South America, license given to
7    anyone other than Polvision and Spanski
8    Enterprises?
9         MR. FINK:  Objection to form.
10        You may answer.
11   A.    To my knowledge nobody was -- no,
12   no -- none of the companies was offered or given
13   licensing programs.
14   Q.    Okay.
15        Am I correct, I apologize if I've
16   asked this already, you have seen the barter
17   agreement of 2008 between Spanski Enterprises and
18   TVP, have you not?
19        MR. FINK:  I think you've asked
20   that already.
21        MR. ZAVIN:  Yeah, I just told
22   her --
23        MR. FINK:  She has it in front of
24   her.
25   A.    TVP and --

Page 135

1         MARIA E. NADOLNA
2
3    BY MR. ZAVIN:
4    Q.    I'm sorry, TVP and Polvision,
5    you've seen this before?
6         MR. WENGER:  Here.
7    A.    Yes.
8         MR. FINK:  Which exhibit?
9         MR. WENGER:  Exhibit 14, right.
10   A.    Yeah.
11
12   BY MR. ZAVIN:
13   Q.    Okay.
14        Is it correct that under this
15   agreement TVP was providing to Polvision shows
16   that appeared on TVPolonia?
17        MR. FINK:  Objection to form.
18   A.    I don't know.
19   Q.    You don't know what this agreement
20   was doing?
21        MR. FINK:  That's not what she
22   said.  She answered your question.
23   Q.    Well, what don't -- I'm sorry.
24   You don't know whether TVP was providing programs
25   to Polvision under this agreement?

Page 136

1         MARIA E. NADOLNA
2         MR. WENGER:  That wasn't the
3    question.
4         MR. FINK:  That wasn't the
5    question.
6         MR. ZAVIN:  Okay.  I'm asking a
7    different question.
8         MR. FINK:  Oh, all right.  So --
9
10   BY MR. ZAVIN:
11   Q.    Are you saying you don't know
12   whether TVP was providing programming to
13   Polvision under this agreement?
14   A.    No, I don't under --
15        MR. FINK:  Objection to form.
16        Lack of foundation.
17        (Unintelligible, simultaneous
18   testimony interrupted by the court reporter.)
19        COURT REPORTER:  I'm sorry, I need
20   one at a time, please.
21        MR. FINK:  You have to let me
22   object first.
23        So objection to form.
24        Lack of foundation.
25        It's -- you've changed the question

Page 137

1         MARIA E. NADOLNA
2    so and you're suggesting she's already answered it
3    with a negative when the question has not been
4    addressed to her before.  That's my problem with
5    the question.
6
7    BY MR. ZAVIN:
8    Q.    You can answer.
9    A.    But I need the question.
10        MR. ZAVIN:  Read it back.
11        And after you've read it back you
12   don't have to restate your objection.
13        MR. FINK:  I agree with that.
14        COURT REPORTER:  (Complies.)
15        (Whereupon, the requested portion
16   is read back by the reporter as follows:
17        "QUESTION:  Are you saying you
18   don't know whether TVP was providing programming
19   to Polvision under this agreement?")
20   A.    My answer was to the previous
21   question.
22
23   BY MR. ZAVIN:
24   Q.    Okay.
25        How about to this question:  Do

35 (Pages 134 to 137)

Page 138

```
1              MARIA E. NADOLNA
2    you know whether TVP was providing programming to
3    Polvision under the 2008 barter agreement?
4        A.    According to the barter agreement
5    there are programs which belong to TVP.
6        Q.    And those programs were programs
7    that appeared on TVPolonia, is that correct?
8        A.    I don't know.  This is the answer
9    to this question.
10       Q.    So you don't know whether these
11   programs appear on TVPolonia?
12       A.    No, I don't know.
13       Q.    If they did appear on TVPolonia --
14       A.    Excuse me, may I ask for a break?
15   I don't feel well.  I need --
16       Q.    Yes.
17       A.    -- some fresh air.
18             THE VIDEOGRAPHER:  The time is 3:03
19   p.m.
20             And we're going off the record.
21             (Whereupon, a short recess is
22   taken.)
23             THE VIDEOGRAPHER:  Stand by,
24   please.
25             The time is 3:17 p.m.
```

Page 139

```
1              MARIA E. NADOLNA
2             And this begins Tape Number 3 of
3    the videotaped deposition of Ms. Maria Nadolna.
4
5    BY MR. ZAVIN:
6        Q.    Ms. Nadolna, before we just took a
7    break you said you were feeling ill.
8             Are you feeling better now?
9        A.    A little better.
10       Q.    Okay.
11             Are you physically able to have
12   your deposition taken now?
13       A.    Yes, I am.
14       Q.    If at any time you're not I want
15   you to tell me because I don't want to take a
16   deposition, your deposition when you're not
17   capable of giving it your best and fullest
18   attention.
19             Do you understand?
20       A.    Yes, I understand.
21       Q.    Okay.
22             If the shows listed on schedule
23   Number 1 of the barter agreement that you have in
24   front of you --
25       A.    Yes.
```

Page 140

```
1              MARIA E. NADOLNA
2        Q.    -- were, in fact, shows that were
3    on TVPolonia, if they were would that have been a
4    violation of the agreement between TVP and
5    Spanski Enterprises?
6             MR. FINK:  Objection.
7             Calls for a legal opinion.
8
9    BY MR. ZAVIN:
10       Q.    Well, in the view of TVP would it
11   have been a violation of the agreement between --
12             MR. FINK:  You mean --
13       Q.    -- Spanski Enterprises and --
14             MR. FINK:  You want to know TVP's
15   legal opinion?
16             MR. ZAVIN:  I want to know their
17   position.
18             MR. FINK:  Well --
19             MR. ZAVIN:  They have --
20             (Unintelligible, simultaneous
21   testimony interrupted by the court reporter.)
22             COURT REPORTER:  Gentlemen, I need
23   one at a time, please.
24             MR. FINK:  You can call it a
25   position, but it's a legal opinion of whether or
```

Page 141

```
1              MARIA E. NADOLNA
2    not a contract requires or permits something.
3             She can answer, but the value of
4    her answer will be limited if it exists at all
5    because it does call for a legal opinion in my
6    view.  So I'm not directing her not to answer
7    because it calls for a legal opinion although I
8    think we may have precedent for that in this case.
9    I'm just telling you it does call for a legal
10   opinion.
11             MR. ZAVIN:  Okay.
12
13   BY MR. ZAVIN:
14       Q.    You may answer.
15       A.    Telewizja Polska is signing
16   agreements basing on the law.  It's not breaking
17   the law.
18       Q.    Did it have a right under its
19   agreement with SEI to license TVPolonia program
20   to other people in North and South America?
21       A.    Yes.
22       Q.    So is it TVPolonia's, TVP's
23   position that SEI did not have the exclusive
24   rights to TVPolonia programming in North and
25   South America?
```

36 (Pages 138 to 141)

Page 142

MARIA E. NADOLNA

1      MARIA E. NADOLNA
2      MR. FINK: Objection to form.
3      A.    The agreement was signed according
4  to all legal aspects and the agreement is totally
5  clear and nothing is -- none of the law is
6  broken. This is what I can answer.
7      Q.    Ms. Nadolna, I didn't ask you
8  about whether it was a legal agreement between
9  TVP and Polvision.
10      I asked you specifically in 2008
11  had TVP granted the exclusive rights to Spanski
12  Enterprises for TVPolonia programming in North
13  and South America?
14      MR. FINK: Objection.
15      This also calls for a legal opinion
16  especially as you framed it because you are not
17  actually quoting from the contract correctly.
18      MR. ZAVIN: Okay.
19
20  BY MR. ZAVIN:
21      Q.    You can answer.
22      A.    I would repeat this contract was
23  signed according to everything that was written
24  and signed with Spanski Enterprises. It is the
25  contract which is, it has been checked by the

Page 143

1      MARIA E. NADOLNA
2  legal department. It is according to every
3  internal and external aspect, legal aspects.
4      Q.    Well, isn't it true that in 1995
5  when the Spanski agreement was signed that the
6  TVP legal department rendered an opinion
7  specifically on this and said that it would be a
8  violation of its agreement, of TVP's agreement
9  with Spanski to license any television Polonia
10  programs into North America?
11      MR. WENGER: Objection.
12      I think that assumes facts that are
13  not in evidence.
14      MR. ZAVIN: Well, actually they are
15  in evidence.
16      MR. WENGER: All right. You can --
17      A.    First the contract was signed
18  concerning 1994. You are talking about 1995.
19  What contract we are talking about?
20      MR. ZAVIN: Give me the legal
21  opinion.
22      MR. PISKORA: (Complies.)
23
24  BY MR. ZAVIN:
25      Q.    Ms. Nadolna, I direct your

Page 144

1      MARIA E. NADOLNA
2  attention to Exhibit Number 9 which is in front
3  of you. You can take a look at it.
4      A.    (Reviews.)
5      Q.    Isn't it correct that in 1995 the
6  TVP legal department rendered a legal opinion
7  which said that under the agreement between TVP
8  and Spanski Enterprises that Spanski Enterprises
9  had the exclusive rights to the TVPolonia
10  broadcast in the framework of a program, is that
11  correct?
12      A.    I'm not the lawyer.
13      Q.    I didn't ask you whether you were
14  the lawyer. I said --
15      A.    You ask me about termination --
16      Q.    I said --
17      A.    -- of the opinion from 1995. I'm
18  answering your question this way that according
19  to the contract 1994 our legal department
20  checking all the aspects of the contract,
21  prepared, helped us to prepare barter agreement.
22  That's what I can say.
23      Q.    Ms. Nadolna, please answer the
24  question that I asked: Isn't it true that in
25  1995 the TVP legal department specifically said,

Page 145

1      MARIA E. NADOLNA
2  quote: There is no doubt that TVP S.A. granted
3  SEI exclusive, and they underlined exclusive,
4  rights to the use of the TVPolonia broadcast in
5  the framework of the program? Isn't it true that
6  that was their opinion?
7      MR. FINK: He wants to know if he's
8  read the words correctly from this document which
9  is Exhibit 9?
10      A.    If this document is document -- as
11  I said, this document is a copy of the document
12  not authorized so I can only confirm that what
13  you are reading it's on this paper, but I don't
14  know if this paper is authorized paper.
15      Q.    Ms. Nadolna, this document, this
16  piece of paper that you're looking at was
17  prepared and given to us by TVP.
18      Does TVP generally forge
19  documents?
20      MR. WENGER: Objection.
21      MR. FINK: Objection.
22      A.    No.
23      MR. FINK: All she's saying is that
24  she has no knowledge.
25      MR. ZAVIN: No, that's not good

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

**A-292**

Page 146

MARIA E. NADOLNA

1  
2  enough at this point.
3  
4  BY MR. ZAVIN:
5      Q.    Ms. Nadolna --
6      A.    Uh-huh.
7      Q.    -- this is a document given to us
8  by TVP. Are you saying that it's a forgery?
9      A.    No.
10     Q.    Are you -- do you have any reason
11 to think that it isn't an accurate copy made by
12 TVP of a TVP document?
13     A.    I don't know.
14     Q.    You don't know?
15     A.    You show me the copy, not
16 authorized copy.
17     Q.    So you just --
18     A.    If our lawyer showed me the copy I
19 can -- I can say it's --
20     Q.    Well, since this was a document
21 produced by TVP perhaps your lawyers would like
22 to show you the copy so that they would -- that
23 you know it's an accurate copy.
24     MR. WENGER: Yeah, as you know I
25 mean we personally as TVP's lawyers have not

Page 147

MARIA E. NADOLNA

1  
2  produced it. An earlier law firm representing TVP
3  produced the document, but --
4      MR. FINK: Well, actually --
5      MR. WENGER: That's all I'm saying.
6      MR. FINK: -- if the witness agrees
7  that this appears to be a TVP document, the
8  likelihood that there is going to be a fight about
9  it is small. She agrees that you correctly read
10 the words from the document. She can't do more
11 than that. That's what she's told you.
12     MR. ZAVIN: Let me -- this record
13 will speak for itself because this is TVP's
14 30(b)(6) witness.
15     MR. FINK: She's a fact witness
16 and --
17     MR. ZAVIN: Yes.
18     MR. FINK: -- she can't go back and
19 tell you who wrote this opinion in 1995 whether it
20 was a correct opinion, she can't answer any of
21 those questions.
22     MR. ZAVIN: I asked a fact
23 question. I asked whether this was the opinion of
24 the TVP legal department. That's a fact question.
25 She's saying TVP doesn't know.

Page 148

MARIA E. NADOLNA

1  
2      MR. FINK: No.
3      THE WITNESS: No.
4      MR. FINK: She's saying that she
5  does not know.
6      MR. ZAVIN: That's correct as the
7  30(b)(6) witness of TVP.
8      MR. FINK: Look, that's ridiculous.
9      MR. ZAVIN: Okay, we don't need any
10 more colloquy.
11     MR. FINK: Let me finish this.
12     A 30(b)(6) witness doesn't have to
13 know every fact that you could ask about whether
14 it's relevant or irrelevant. They only have to be
15 the most, the best person that you can put up
16 likely to answer the questions that relate to the
17 litigation.
18     MR. ZAVIN: Okay.
19
20 BY MR. ZAVIN:
21     Q.    Ms. Nadolna, as you read this
22 document assuming it's the legal opinion of TVP's
23 legal department, isn't it correct that they are
24 saying that the licensing of shows or programs
25 from TVPolonia to anyone other than Spanski would

Page 149

MARIA E. NADOLNA

1  
2  violate the rights of Spanski Enterprises?
3      MR. ZAVIN: If she doesn't know she
4  doesn't know.
5      MR. WENGER: Objection, but you
6  misstated what it says in this document.
7      MR. ZAVIN: I didn't -- I was not
8  quoting it verbatim. She can say --
9      MR. WENGER: But you're misstating
10 the content, the nature of what this says too.
11     MR. ZAVIN: Then she can agree or
12 disagree, et cetera.
13
14 BY MR. ZAVIN:
15     Q.    But you can answer the question.
16     A.    I hear something different what is
17 in the document than what you say. I don't know
18 what you're --
19     Q.    So you have just zero
20 understanding of what this document says other
21 than the exact words of the document?
22     A.    I don't understand why you are
23 changing the words.
24     Q.    Okay. I will give you the exact
25 words.

38  (Pages 146 to 149)

Page 150

```
1              MARIA E. NADOLNA
2       A.    Uh-huh.
3       Q.    Do you know what it means that TVP
4  grants SEI exclusive rights, that's a direct
5  quote, TVP grants SEI exclusive rights.  Do you
6  have any understanding of what that means?
7       A.    That's okay.  I understand it.
8       Q.    What does it mean?
9       A.    It's what you say.
10      Q.    You have nothing --
11            MR. FINK:  Again, you're asking her
12  to --
13      A.    The interpretation or what?
14            MR. ZAVIN:  Bob, now you're
15  interrupting the questioning.
16            MR. FINK:  It's the exact issue I
17  raised earlier.  If she says these are the words,
18  these are the words that were used in the
19  agreement, these are the words that she sees, she
20  doesn't have to give you different words.
21            MR. ZAVIN:  But she doesn't have
22  to -- let me ask a question.
23
24  BY MR. ZAVIN:
25      Q.    Under your understanding of that,
```

Page 151

```
1              MARIA E. NADOLNA
2  does that mean that TVP can give the same rights
3  to someone else?
4       A.    You're not precise.  I'm sorry.
5       Q.    What wasn't precise about that
6  question?  You're the head of the department that
7  grants rights for TVP, is that correct?
8       A.    Uh-huh, yes.
9       Q.    How many employees do you have
10  working for you?
11      A.    Now at moment?
12      Q.    Yes.
13      A.    Forty-five.
14      Q.    And you're the head of the
15  department and you're the one in charge of doing
16  licensing for TVP, is that correct?
17      A.    Yes.
18      Q.    And do you know what a grant of
19  exclusive rights means?
20      A.    I know, but depends to what kind
21  of rights.
22      Q.    Okay.
23            If you grant someone exclusive
24  rights --
25      A.    Uh-huh.
```

Page 152

```
1              MARIA E. NADOLNA
2       Q.    -- does that mean that you can
3  grant someone else the same rights?
4       A.    No.
5       Q.    Okay.
6            Now, reading this legal opinion it
7  said that in the opinion of TVP's counsel/legal
8  department that TVP granted SEI the exclusive
9  rights to the use of the TVPolonia broadcast in
10  the framework of the program.
11            Do you see that?
12      A.    I don't see your document.  I see
13  the Polish version.
14      Q.    Well, would you like to -- I'll
15  give you the English translation if you'd like.
16      A.    Yeah, maybe I have.
17            MR. FINK:  I don't think you gave
18  her the English translation.
19            MR. ZAVIN:  I'm sorry?
20            MR. FINK:  I don't think you gave
21  her the English translation.
22            MR. WENGER:  (Indicating.)
23      A.    And may I ask the agreement 1994
24  in English version?  The opinion concerns this
25  agreement so --
```

Page 153

```
1              MARIA E. NADOLNA
2
3  BY MR. ZAVIN:
4       Q.    Okay.
5       A.    Uh-huh.
6            MR. WENGER:  I have it.
7            MR. ZAVIN:  Okay.
8
9  BY MR. ZAVIN:
10      Q.    Can you answer the pending
11  question now?
12      A.    Can you repeat the question?
13            MR. ZAVIN:  Please repeat the
14  question.
15            COURT REPORTER:  (Complies.)
16            (Whereupon, the requested portion
17  is read back by the reporter as follows:
18            "QUESTION:  Okay.
19            "Now, reading this legal opinion
20  it said that in the opinion of TVP's counsel
21  legal department that TVP granted SEI the
22  exclusive rights to the use of the TVPolonia
23  broadcast in the framework of the program.
24            "Do you see that?")
25      A.    Yes, I see that.
```

39 (Pages 150 to 153)

Page 154

1           MARIA E. NADOLNA
2
3   BY MR. ZAVIN:
4       Q.   Okay.  Is that correct, in your
5   opinion?
6       A.   It's the -- I can only say it's
7   different from the wording which is in the
8   contract.
9       Q.   I understand that.  They weren't
10  reproducing the contract.  This was their opinion
11  of the contract.  Is that --
12      A.   This is not my opinion myself so I
13  cannot say what does this person mean.  I can
14  only confirm this as it concerns the paragraph of
15  the contract so I can only say that there are
16  different words used.  What does it mean used for
17  the broadcaster, for the broadcaster it is -- I
18  will read it from as it is Paragraph 2, Section
19  3, Paragraph 2, Section 3 to implement Section
20  2 --
21          COURT REPORTER:  Above what?  I
22  didn't understand you.
23          MR. WENGER:  You need Section 2.
24      Q.   Paragraph 2, Section --
25      A.   Paragraph, but in this, in this,

Page 155

1           MARIA E. NADOLNA
2   in this letter, in this opinion it is written
3   that this exclusive rights are also confirmed by
4   Paragraph 2, Section 3.  So if we read it so
5   Paragraph 2, Section 3 says to implement Section
6   2 about TVP --
7          COURT REPORTER:  Above what?  I
8   can't understand you.
9       A.   To implement Section 2 above TVP
10  grants CEI [sic] the exclusive right to receive
11  and use the signal in the territory.  This is
12  what I can confirm from the contract.
13      Q.   Okay.
14          So do you disagree with the legal
15  opinion?
16      A.   I'm not a lawyer.  I'm not going
17  to compare it.
18      Q.   Do you think it's wrong?
19          MR. FINK:  All right.  We agree
20  that my objection --
21          MR. ZAVIN:  Yes, you've got a
22  standing objection.
23          MR. FINK:  Objection.
24
25  BY MR. ZAVIN:

Page 156

1           MARIA E. NADOLNA
2       Q.   Do you think it's wrong or do you
3   just don't know?
4       A.   I see the difference of wording.
5   The rights to the use of the Polonia and this is
6   the right to receive and use.  This is the
7   difference, but we are -- are we going to compare
8   the legal contract with the opinion?
9       Q.   Ms. Nadolna --
10      A.   Uh-huh.
11      Q.   -- I have a simple question:  Was
12  this the legal opinion, the conclusion in this
13  legal opinion wrong?
14      A.   I'm not going to interpret or give
15  an opinion to the opinion.
16      Q.   Okay.  So does --
17      A.   I just --
18      Q.   As the corporate representative of
19  TVP does TVP currently have a position on whether
20  this legal opinion was wrong?
21          MR. FINK:  If she knows.
22      Q.   If you know does TVP believe this
23  legal opinion was wrong?
24      A.   I don't know.
25      Q.   Okay.

Page 157

1           MARIA E. NADOLNA
2          Now, between 1995 when this
3   opinion was written and 2008 are you aware of any
4   change in the relationship between Spanski
5   Enterprises and TVP that would have changed the
6   arrangement regarding exclusivity?
7       A.   From which time to which time?
8       Q.   1995 to 2008.
9       A.   During this period SEI has the
10  exclusive right to one time use of TVPolonia
11  shows in its programming.
12      Q.   Ms. Nadolna, that did not answer
13  my question.
14      A.   This is my answer to the question.
15      Q.   No, no, Ms. Nadolna.
16          MR. FINK:  Well --
17      Q.   You can't give your answer.
18  You've got to answer my questions.
19          My question was:  Between 1995 and
20  2008 did anything change in the relationship
21  between TVP and SEI regarding the exclusive
22  nature of the grant of rights?
23      A.   Between which period?
24      Q.   1995 and 2008.
25      A.   No, there is no change.

40  (Pages 154 to 157)

**A-295**

Page 158

```
1              MARIA E. NADOLNA
2      Q.   Thank you.  Okay.
3              MR. ZAVIN:  I'm going to mark as
4   15.
5              COURT REPORTER:  (Complies.)
6              (Whereupon, multi-page document
7   bearing Bates stamps POL00054 through POL00057,
8   is received and marked as Nadolna Exhibit 15 for
9   Identification.)
10             COURT REPORTER:  Number 15.
11             MR. ZAVIN:  A four-page document
12  that appears to be a license agreement between TVP
13  and Polvision in Chicago, Illinois.
14
15  BY MR. ZAVIN:
16     Q.   And ask you have you ever seen
17  that document before?
18     A.   Yes.
19     Q.   When?
20     A.   Yesterday.
21     Q.   Any time before that?
22     A.   Yes.
23     Q.   When?
24     A.   I don't remember.
25     Q.   Was it at the time it was entered
```

Page 159

```
1              MARIA E. NADOLNA
2   into?
3      A.   Excuse me?
4      Q.   Was it at the time it was entered
5   into this agreement which is June of 2008?  Did
6   you see it in or around June of 2008?
7      A.   No.
8      Q.   Ms. Nadolna, I think you said you
9   became head of your current department in January
10  2010, is that correct?
11     A.   January 2010, yes.
12     Q.   Were you ever with that department
13  prior to January 2010?
14     A.   Yes, I was.
15     Q.   When was that?
16     A.   In 2004 or '5, sorry for not
17  precisely, but it's in the documents, until the
18  November 2007.
19     Q.   And what was your position with
20  the department at that time?
21     A.   I was vice -- I was deputy
22  director of -- responsible for economic financial
23  matters.
24     Q.   Did that include licensing of
25  Polvision content?
```

Page 160

```
1              MARIA E. NADOLNA
2      A.   It meant all financial matters
3   concerning the work done by the, by our office,
4   my office, of this office.
5      Q.   Well, I understand that, but did
6   that include the licensing of television content
7   from Polvision?
8      A.   The clearance of the licensing,
9   yes.
10             COURT REPORTER:  The what?  I
11  didn't understand.  One at a time, please.  The
12  what?
13             THE WITNESS:  The clearance of the
14  contract.
15             COURT REPORTER:  Cleavage?
16             THE WITNESS:  Clearance.
17             THE INTERPRETER:  Clearance.
18
19  BY MR. ZAVIN:
20     Q.   What do you mean by clearance of
21  the contract?
22     A.   Invoicing and the control of the
23  invoices, the control of the income according to
24  the contracts, all the costs of the office,
25  employee salaries, you know, accountants, yes.
```

Page 161

```
1              MARIA E. NADOLNA
2      Q.   Is this -- am I correct that this
3   is a license under which TVP is granting
4   Polvision the right to broadcast certain programs
5   in the United States?
6      A.   This is the license agreement
7   confirmed.
8      Q.   I'm sorry, is my description
9   accurate that this is a license where TVP was
10  granting Polvision the right to broadcast certain
11  programming in the United States?
12             MR. WENGER:  Objection.
13             The United States is a broad
14  characterization in your question.
15     Q.   Well, you can answer.
16     A.   This is the license agreement with
17  non-exclusive free terrestrial rights through
18  cable TV rights only.  Programs to be broadcast
19  through FBT26 point 6 or other free terrestrial
20  channel to be advised by license fourteen days
21  prior to possible change of the broadcaster.
22     Q.   Okay.
23             And am I correct that on Page 1 is
24  a schedule of the programs that were licensed?
25     A.   Yes, the schedule of the programs
```

41 (Pages 158 to 161)

Page 162

```
 1              MARIA E. NADOLNA
 2   which were licensed.
 3        Q.    And isn't it correct that a number
 4   of these programs if not all of them were
 5   programs that appeared on TVPolonia?
 6        A.    As TVPolonia -- yes, they were
 7   broadcast on TVPolonia.
 8        Q.    Okay.
 9              And are you aware whether
10   Mr. Spanski was ever made aware of the existence
11   of this license agreement?
12              THE WITNESS:  Can you translate?
13              THE INTERPRETER:  Sure.
14        A.    To my knowledge my employees
15   informed Mr. Spanski whatever happened on
16   American market.  Mr. Spanski was informed.
17
18   BY MR. ZAVIN:
19        Q.    Which employees informed him?
20        A.    Those who were responsible dealing
21   with the license.
22        Q.    I want their names.  Which
23   employees informed him?
24        A.    Those who are employed on that
25   moment in this office responsible for license.
```

Page 163

```
 1              MARIA E. NADOLNA
 2        Q.    Do you know who those were?
 3        A.    I don't remember.
 4        Q.    Actually, Ms. Nadolna, you just
 5   testified that you were -- you left this office
 6   in November 2007.
 7        A.    Yes.
 8        Q.    You didn't rejoin it until 2010,
 9   is that correct?
10        A.    Yes.
11        Q.    So you weren't in the office when
12   this license was entered into, is that correct?
13        A.    I wasn't in this office.
14        Q.    So you have no idea what those
15   employees did or did not do, do you?
16        A.    I know the procedures which are in
17   the TVP.
18              COURT REPORTER:  In the what?
19        A.    I know all internal procedures
20   which are in Polish television and good relation
21   with, especially with Mr. Spanski, it's what -- I
22   think that the employees from the office were
23   informing, they were in contact with Mr. Spanski.
24        Q.    Actually in 2008 TVP sued
25   Mr. Spanski, hadn't they?
```

Page 164

```
 1              MARIA E. NADOLNA
 2        A.    Yes.  So?
 3        Q.    So in terms of good relations,
 4   you're saying to keep up their good relations
 5   with Mr. Spanski who they were suing and trying
 6   to terminate, they notified him?
 7        A.    If you are sued does it mean that
 8   we should have bad relation?  We have good
 9   relation with Mr. Spanski.
10        Q.    Okay.
11              Ms. Nadolna, is there any writing
12   indicating that Spanski Enterprises was informed
13   of this agreement?
14        A.    To my knowledge, to my knowledge
15   there might be E-mails showing this kind of
16   knowledge.
17        Q.    Have those been produced to, given
18   to your lawyers?
19        A.    I think so.  Everything was given
20   to our lawyers.
21        Q.    Ms. Nadolna, I will represent to
22   you that neither in the prior litigation nor in
23   this litigation have any E-mails been produced or
24   any other written documents showing in any way
25   Spanski Enterprises was ever apprised of this.
```

Page 165

```
 1              MARIA E. NADOLNA
 2              Now, assuming that's the case, are
 3   you saying you gave documents to your lawyers
 4   either this current lawyers or prior lawyers that
 5   weren't produced in --
 6        A.    I don't say that.  I say that TVP
 7   has good relation with Mr. Spanski.
 8   Mr. Spanski's calling our employees, calling my
 9   previous directors.  He's in contact with us and
10   he knows everything what we do on American
11   markets.  This is the answer to your, all your
12   questions.
13        Q.    Ms. Nadolna, you didn't even give
14   a copy of this license agreement to us in this
15   litigation, did you?
16        A.    I don't understand the question.
17        Q.    Well, this license agreement was
18   obtained from Polvision via a legal subpoena.
19              Do you know whether TVP ever
20   produced a copy of this license agreement to
21   Spanski Enterprises in this litigation?
22        A.    I don't know.
23        Q.    Do you know whether it was
24   required to produce a copy of the license
25   agreement?
```

42 (Pages 162 to 165)

Page 166

MARIA E. NADOLNA

1     MARIA E. NADOLNA
2     A.    I don't know.
3     Q.    Do you know -- did Mr. Spanski,
4  did Spanski Enterprises agree to allow TVP to
5  license shows to Polvision?
6     A.    There was no need to agree.
7     Q.    Would there be now -- if TVP
8  wanted to license Polvision shows to Polvision
9  now, would Mr. Spanski have to agree?
10     MR. FINK:  Objection to form.
11     You don't have to answer that
12  question.
13     MR. ZAVIN:  Wait, you're objecting
14  to form and instructing her not to answer.
15     MR. FINK:  I'm not instructing her
16  not to answer.  I'm telling her she doesn't have
17  to because -- read your question.
18     MR. ZAVIN:  Let's read the
19  question.
20     MR. FINK:  If you want to correct
21  it.
22     MR. ZAVIN:  Okay, if I blundered
23  I'll correct it.
24     MR. FINK:  I didn't say you
25  blundered.  I just said she can't answer the

Page 167

1  question.
2     MR. ZAVIN:  Let's, let's --
3     COURT REPORTER:  (Complies.)
4     (Whereupon, the requested portion
5  is read back by the reporter as follows:
6     "QUESTION:  Would there be now --
7  if TVP wanted to license Polvision shows to
8  Polvision now, would Mr. Spanski have to agree?")
9     MR. ZAVIN:  Okay, I will correct
10  the question.
11
12  BY MR. ZAVIN:
13     Q.    If TVP now wanted to license
14  TVPolonia shows to Polvision, would this require
15  Mr. Spanski's agreement?
16     MR. FINK:  Objection to form.
17     A.    According to the agreement,
18  according to the agreement 2009, 2009, this
19  one --
20     MR. FINK:  5.
21     Q.    It's Exhibit 5.
22     MR. WENGER:  You've got it.
23     THE WITNESS:  Uh-huh.
24     A.    According to the agreement 2009 we

Page 168

MARIA E. NADOLNA

1     MARIA E. NADOLNA
2  do not offer and so there was no need for
3  Mr. Spanski to agree or not.
4
5  BY MR. ZAVIN:
6     Q.    Ms. Nadolna, that didn't answer my
7  question.
8     The question was:  Could TVP now
9  license Polvision shows, license TVPolonia shows
10  to Polvision without Mr. Spanski's consent?
11     MR. FINK:  Objection to form.
12     A.    According to the agreement 2009
13  which is said that everything was, is and will be
14  so we are not offering anything to the clients
15  from America South, North and South America to
16  the territories according to this contract
17  nothing is offered.  So there is no need to
18  agree.
19     Q.    So --
20     A.    We are sending -- the clients who
21  are asking us for the content, we are sending
22  directly to Mr. Spanski in order to conduct a
23  contract.
24     Q.    Okay.  But if you entered into a
25  license after this which is dated August 11th --

Page 169

1     MARIA E. NADOLNA
2     A.    Uh-huh.
3     Q.    -- 2009, the license was entered
4  into after August 11th, 2009 to license Polvision
5  content to -- TVPolonia content to Polvision,
6  would that have been in violation of this
7  agreement?
8     MR. WENGER:  Objection to form.
9     A.    We didn't, we didn't license after
10  this date.
11     Q.    There is a license dated August
12  31st, 2009 between TVP and Polvision, is there
13  not?
14     A.    There is, there is agreement with
15  this date, but this is the date of the
16  registration of the agreement.  This is not the
17  date of signing the agreement.  So we didn't, we
18  didn't, we didn't sign the contract after the
19  date of 11th of August 2009.
20     Q.    When was the contract signed by
21  both parties?  When did the last party sign it?
22     A.    The contract was signed in July by
23  the director of, by the head director of the
24  office which had this agreement with Polvision.
25     Q.    And when was it signed by

43  (Pages 166 to 169)

Page 170

MARIA E. NADOLNA

Polvision?

A.   The agreement was signed in July and the agreement was registered on the date of the 31st of August as the agreement arrived to our company on that time.

Q.   And what --

A.   So it was signed by Polvision before the date of the 31st of August 2009.

Q.   When was it signed?

A.   I don't know.

Q.   What --

A.   It was sent to us, but it was -- the contract was conducted in July 2009 and basing on that we are, we have signed the contract. We send the materials to Polvision in order to prepare themselves for broadcasting.

Q.   Is that a legal opinion that that's when the contract was effective, is that your legal opinion?

MR. FINK:  She just gave you facts.

MR. ZAVIN:  No, she didn't.

Let's read back the answer.

COURT REPORTER:  (Complies.)

(Whereupon, the requested portion

Page 171

MARIA E. NADOLNA

is read back by the reporter as follows:

"ANSWER:  It was sent to us, but it was -- the contract was conducted in July 2009 and basing on that we are, we have signed the contract. We send the materials to Polvision in order to prepare themselves for broadcasting.")

MR. FINK:  Those were all facts.

MR. ZAVIN:  Okay.

BY MR. ZAVIN:

Q.   What date did Polvision sign the agreement?

A.   It was before it was sent to us.

Q.   And when was it sent to you?

A.   As Mr. Kotaba was on vacation in August the contract was waiting for him in his office. So it was signed contract. The contract was valid. The contract was -- we had to go through the contract. We send the material and our client was preparing themselves for broadcasting and after signing the contract, after Kotaba coming from the vacation then they sent it to us then we could register and the date which is on the contract is the date of

Page 172

MARIA E. NADOLNA

registration in our accounting department which is responsible for registering all the contracts which are conducted by Polish television.

MR. WENGER:  Maria, I just want to remind you that just answer his question.

THE WITNESS:  Okay.

MR. ZAVIN:  Yeah.

BY MR. ZAVIN:

Q.   Ms. Nadolna, the question was what date was it sent and received, sent to and received by TVP?

A.   I don't remember.

Q.   Well, was it after August 11th?

A.   I don't know.

Q.   Is it possible it was after August 11th?

A.   I don't know.

Q.   At any time after August 11th did TVP tell Polvision that we couldn't, you couldn't enter into a contract, a license, to license programming to TVP -- to Polvision?

MR. FINK:  Objection to form.

A.   The new contract?  Which contract?

Page 173

MARIA E. NADOLNA

Q.   The contract dated August 31st and just so --

MR. ZAVIN:  Okay, let's mark this as 16.

COURT REPORTER:  (Complies.)

(Whereupon, multi-page document bearing Bates stamps POL00058 through POL00062, is received and marked as Nadolna Exhibit 16 for Identification.)

COURT REPORTER:  Number 16.

MR. FINK:  Do you have a copy?

MR. ZAVIN:  Uh-huh.  I'm giving translations too.

BY MR. ZAVIN:

Q.   Ms. Nadolna, I'm showing you a document that's been marked as Nadolna Exhibit 16.

A.   (Reviews.)

Q.   And ask you whether you recognize it?

MR. FINK:  Counselor, did you say you gave her both the Polish and the English?

MR. ZAVIN:  I believe I just gave

44  (Pages 170 to 173)

Page 174

MARIA E. NADOLNA

her the Polish.

A. This is the Polish version.

BY MR. ZAVIN:

Q. Yeah. Do you recognize that document?

A. Yes, I saw this document.

Q. What is the document?

A. License agreement.

Q. And is that a license agreement between TVP and Polvision?

A. That's what it says.

Q. Okay.

And do you disagree with what I just said? It's a license agreement between TVP and Polvision?

A. Yes, this is the license agreement between TVP and Polvision.

Q. Okay.

And when does, when did this agreement expire?

A. This agreement didn't expire as there was annex to the agreement.

Q. Well, let me rephrase the

Page 175

MARIA E. NADOLNA

question.

By its own terms when was this agreement to expire?

A. The contract will expire two years from the moment of signing the agreement.

Q. Okay. And what date is that?

A. It is the date from the moment when the materials, technical materials was sent to the client.

Q. I'm sorry, that isn't what you just read.

A. I didn't read. I interpret. That's different.

Q. You just said this license period expires two years from the signing of the agreement, is that correct?

A. It's more -- it's not written in the contract. It's my explanation.

Q. Well --

A. There is no date that the contract, when the contract will expire. The contract is valid for two years from the moment of signing the contract and the materials are going to be sent after signing the contract.

Page 176

MARIA E. NADOLNA

As the materials were sent in July after signing the contract by TVP from this moment, this is the moment when the contract starts and will last from that moment for one hundred, I'm sorry, for two, for two, for two years.

Q. Ms. Nadolna, there is nothing in this agreement about the contract period running from the sending materials, is there?

A. It is written there when the material is going to be sent after signing the contract and in public media you cannot give them technical material if you are not -- if you didn't sign the contract so first TVP signed a contract then could go and take the tapes from the archives in order to send it to the client. I'm describing the situation.

Q. Ms. Nadolna --

A. It's in the contract written.

Q. I'm looking at the contract. Schedule Number 1 says specifically --

A. May I ask for English version in order to help?

Q. Of course.

Page 177

MARIA E. NADOLNA

MR. FINK: Do you want me to give her mine?

MR. ZAVIN: No, I can give her this one. It's okay.

BY MR. ZAVIN:

Q. Here is an English version.

A. Uh-huh.

Q. Schedule 1 of this agreement specifically says that the license period is two years signing of the agreement, is that correct?

A. It only says license period.

Q. Okay.

My question is: When does the license period expire?

A. It expires after two years from the moment it is signed.

Q. Okay. And what date was that?

A. The date of the signing of the agreement is the date which TVP signed the agreement.

Q. Okay.

A. As of signing this agreement the licensee shall receive DVDs. As TVP after

**A-300**

Page 178

MARIA E. NADOLNA

1 MARIA E. NADOLNA
2 signing the agreement in July sent DVDs to
3 Polvision from this moment this contract is going
4 on and will expire two years from signing the,
5 signing the agreement.
6     Q.    Ms. Nadolna, is there any way
7 looking at this agreement that anyone could tell
8 when the license period expires? And I'm asking
9 the date, there is a date on which this license
10 period expires, is there any way looking at this
11 agreement --
12     A.    Uh-huh, there is no date.
13     Q.    So looking at this agreement --
14 did TVP's legal department prepare this
15 agreement?
16     A.    Yes.
17     Q.    Are you saying that TVP's legal
18 department prepared an agreement where there is
19 no way to tell when the license terminates?
20     A.    There are different ways of
21 telling the date of termination.
22     Q.    And the easiest way is it says two
23 years from signing, correct?
24     A.    Two years this is the license
25 period and the license period started from the

Page 179

1 MARIA E. NADOLNA
2 moment when my partner received the technical
3 materials. Technical materials could not be sent
4 to the client if not signed. We are in the
5 public company. Everything is according to the
6 procedure, everything has to be done on proper
7 way. So that was the way. If you want -- if I
8 need to send the tapes I need to have the
9 contract signed. So the contract was signed and
10 it was sent to the client just to put his
11 signature, but it was valid from that moment.
12     Q.    Wait.
13          Are you saying that the contract
14 is valid once TVP signed it even if the other
15 side never signed it?
16     A.    From the Polish regulation the
17 moment we signed the contract and we gave the
18 material it is the moment that the contract is
19 valid.
20     Q.    You sent the material when?
21     A.    The material was sent by the
22 people responsible for realization of this
23 contract.
24     Q.    When?
25     A.    I don't know exactly.

Page 180

1 MARIA E. NADOLNA
2     Q.    Was it after August 31st?
3     A.    It was in July more or less.
4     Q.    Have you produced any documents
5 that indicate that you were sending anything to
6 Polvision in July?
7     A.    There is correspondence between
8 person from this office, from Polvision office
9 and from TVP. They are corresponding with each
10 other. They are sending -- they are informing
11 each other why we are waiting for Mr. Kotaba to
12 put his signature on the contract which was
13 signed by TVP.
14     THE INTERPRETER: You want a
15 spelling for Kotaba?
16     COURT REPORTER: Yes.
17     THE INTERPRETER: K-o-t-a-b-a.
18     MR. WENGER: H I think.
19     THE INTERPRETER: H where?
20     MR. WENGER: At the end.
21     THE INTERPRETER: Are you sure?
22     MR. WENGER: I think so.
23     THE WITNESS: No, no, it's in the
24 contract.
25     THE INTERPRETER: Okay.

Page 181

1 MARIA E. NADOLNA
2     THE WITNESS: It's in the contract.
3
4 BY MR. ZAVIN:
5     Q.    Ms. Nadolna, I want you to think
6 carefully about the answer here. You just
7 testified there was correspondence going back and
8 forth between TVP and Polvision in July of 2009.
9 Are you sure it was 2009 and not 2010 you were
10 thinking of when you entered into another
11 agreement with Polvision?
12     A.    No, 2009.
13     Q.    Okay.
14     A.    If you send the material you need
15 to know exactly who is going to collect it, when
16 it's going to collect it, how to send it. You
17 need communicate.
18     MR. WENGER: Just answer, answer
19 the question.
20     Q.    Okay.
21     MR. ZAVIN: Mr. Wenger, to the best
22 of our knowledge nothing has been produced that
23 Ms. Nadolna just described.
24     MR. WENGER: And this is -- you
25 mean that nothing has been produced showing that

46 (Pages 178 to 181)