# 14-967(L),

## 14-1115(XAP)

# United States Court of Appeals
## for the
# Second Circuit

SPANSKI ENTERPRISES, INC.,

*Plaintiff-Appellant-Cross-Appellee,*

– v. –

TELEWIZJA POLSKA S.A.,

*Defendant-Appellee-Cross-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume II of XI (Pages A-301 to A-600)

DLA PIPER US LLP (NY)
*Attorneys for Defendant-Appellee-*
   *Cross-Appellant*
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500

LOEB & LOEB LLP
*Attorneys for Plaintiff-Appellant-*
   *Cross-Appellee*
345 Park Avenue
New York, New York 10154
(212) 407-4000

i

# Table of Contents

**Page**

District Court Docket Entries ................................................. A-1

Complaint, Dated June 24, 2010 ............................................ A-14

Amended Complaint, Dated October 1, 2010 ......................... A-20

Plaintiff's First Request for the Production of Documents,
    Dated March 3, 2011 ............................................................ A-30

Defendant's First Request for the Production of Documents,
    Dated March 30, 2011 .......................................................... A-37

Plaintiff's Second Request for the Production of Documents,
    Dated December 28, 2011 .................................................... A-44

Joint Pre-Trial Order, Dated February 7, 2013 ...................... A-49

    Exhibit 1 to Joint Pre-Trial Order -
    Stipulated Facts and Law ................................................. A-59

    Exhibit 2 to Joint Pre-Trial Order -
    Plaintiff's Designations of Deposition Testimony .............. A-62

    Exhibit 3 to Joint Pre-Trial Order -
    Defendant's Designations of Deposition Testimony .......... A-66

    Exhibit 4 to Joint Pre-Trial Order -
    List of Plaintiff's Proposed Exhibits .................................. A-68

    Exhibit 5 to Joint Pre-Trial Order -
    List of Defendant's Proposed Exhibits............................... A-74

Trial Declaration of Maria Nadolna,
    Dated February 27, 2013.................................................... A-76

Trial Declaration of Piotr Lenarczyk,
    Executed on March 1, 2013................................................ A-93

Trial Declaration of Boguslaw Spanski on Behalf of
    Plaintiff, SEI, Dated March 16, 2013................................. A-98

Proposed Findings of Fact and Conclusions of Law
    of Plaintiff Spanski Enterprises, Inc. ("SEI"),
    Dated July 1, 2013.............................................................. A-125

Proposed Findings of Fact and Conclusions of Law
    of Defendant Telewizja Polska, S.A. ("TVP"),
    Dated July 1, 2013.............................................................. A-142

ii

**Page**

Deposition Transcript of Boguslaw Spanski,
  Dated November 8, 2011 ...................................................... A-194

Deposition Transcript of Maria E. Nadolna,
  Dated November 9, 2011 ...................................................... A-255

Deposition Transcript of Stephen Shulman,
  Dated June 7, 2012 ............................................................... A-383

Deposition Transcript of Larry Gerbrandt,
  Dated June 19, 2012 ............................................................. A-483

Transcript of Trial, Dated July 22, 2013 .................................. A-536

Witnesses:

  Stephen Walter Shulman    Cross (by Mr. Wenger)..........    A-539
                            Redirect (by Mr. Piskora)......    A-600

  Tomasz Gladowski          Cross (by Mr. Wenger)..........    A-602
                            Redirect (by Mr. Barnett)......    A-614
                            Recross (by Mr. Wenger)......     A-619

Transcript of Trial, Dated July 23, 2014 .................................. A-622

Witness:

  Maria Nadolna             Cross (by Mr. Zavin)..............    A-623
                            Redirect (by Mr. Wenger) .....    A-710

Transcript of Trial, Dated July 24, 2014 .................................. A-719

Witnesses:

  Marek Wierzbowski         Cross (by Mr. Piskora) ..........    A-720

  Ivan Reyes                Cross (by Mr. Barnett) ..........    A-729
                            Redirect (by Mr. Wenger) .....    A-780
                            Recross (by Mr. Barnett).......    A-784

  Gary Arlen                Cross (by Mr. Zavin).............    A-785
                            Redirect (by Mr. Wenger) .....    A-866
                            Recross (by Mr. Zavin) .........    A-872

Transcript of Trial, Dated July 25, 2014 .................................. A-876

Witnesses:

  Timothy Hart              Cross (by Mr. Piskora) ..........    A-877
                            Redirect (by Mr. Wenger) .....    A-923

iii

**Page**

Boguslaw Spanski      Direct (by Mr. Zavin) ............   A-934
                       Cross (by Mr. Wenger)..........   A-946
                       Redirect (by Mr. Zavin) ........   A-951

Plaintiff SEI's Trial Exhibits:

2      Certified English Translation of December 14, 1994
       Agreement between TVP and SEI (P0008-15) ............   A-956

4      Certified English Translation of November 4, 1999
       First Addendum between TVP and SEI ......................   A-964

6      Certified English Translation of November 4, 1999
       Second Addendum Addendum between TVP and SEI
       (P00026-29).................................................................   A-968

7      Settlement Agreement between TVP and SEI,
       Dated August 11, 2009 (P00030-33)...........................   A-972

9      Letter from Wieslaw Walendziak and Adam Brodziak
       to "To Whom it May Concern," Dated March 10,
       1995 (in English) (SEI 000005) ..................................   A-976

11     Letter from Wieslaw Walendziak and Adam Brodziak
       to "To Whom it May Concern," Dated March 10,
       1995 (in English) (TP 7000087)..................................   A-977

13     Certified English Translation of March 15, 1995
       Letter from Wieslaw Walendziak to Edward Moskal
       (TP 7004249)...............................................................   A-978

15     Certified English Translation of May 24, 1995
       Legal Opinion by Ryszard Swiderski (TP 7006700) ...   A-981

17     Certified English Translation of June 8, 1995 Fax
       from Marta Suchodolska to Andrej Sikora and
       Waclaw Tylawski (TP 7007459).................................   A-983

19     Certified English Translation of June 12, 1995 Fax
       from Marta Suchodolska to Boguslaw M. Spanski
       (TP 7003598)...............................................................   A-985

21     Certified English Translation of June 9, 1997 Letter
       from Robert Telennea to Jack Piotr Latallo
       (TP 7003479)...............................................................   A-987

iv

**Page**

23     Certified English Translation of March 17, 2008
Barter Agreement between TVP and Polvision/
Polstudios (POL00038-45) .......................................... A-990

24     License Agreement between TVP and Polvision,
Dated June 27, 2008 (POL00054-57) ......................... A-999

26     Certified English Translation of August 31, 2009
License Agreement between TVP and Polvision
(POL00058-62) ............................................................ A-1003

28     Certified English Translation of September 3, 2009
Email String between TVP and Polvision (TVP
101111 0338-39) ......................................................... A-1009

30     Certified English Translation of November 28, 2009
Email from TVP to Polvision (TVP 101111 0355) ...... A-1012

32     Certified English Translation of December 21, 2009
Email from TVP to Polvision (TVP 101111 0351) ...... A-1014

33     December 23, 2009 Email String from TVP
to Polvision (P00172) (Polish and Certified
English Translation) ..................................................... A-1016

35     Certified English Translation of January 6, 2010
Email from TVP to Polvision (TVP 10111 0352) ........ A-1018

37     Certified English Translation of January 25, 2010
Letter from TVP to Polvision (TVP 051611 00044) .... A-1020

39     Certified English Translation of January 26, 2010
Letter from Polvision to TVP (TVP 00045-47) ........... A-1022

41     Certified English Translation of February 18, 2010
Internal TVP Letter (TVP 101111 0353) ..................... A-1027

43     Certified English Translation of March 30, 2010
Internal TVP Letter (TVP 072011 0298-99) ................ A-1029

45     Certified English Translation of April 1, 2010
Meeting Notes (TVP 101111 0356-57) ......................... A-1031

47     Certified English Translation of April 8, 2010 Internal
TVP Letter (TVP 051611 00062) ................................. A-1034

49     Certified English Translation of May 5, 2010 Letter
from TVP to Polvision (TVP 051611 00070) .............. A-1036

v

**Page**

51    Certified English Translation of May 5, 2010 Letter
from TVP to SEI (TVP 051611 00290) ...................... A-1038

53    Certified English Translation of May 13, 2010
Internal TVP Letter (TVP 051611 0071) .................... A-1040

55    Certified English Translation of May 18, 2010
Internal TVP Letter (TVP 051611 00076-77).............. A-1042

57    Certified English Translation of May 18, 2010 Letter
from TVP to Polvision (TVP 051611 00079-80)......... A-1045

59    Certified English Translation of June 8, 2010 Letter
from TVP to Polvision (TVP 051611 00085) .............. A-1048

61    Certified English Translation of June 26, 2010 Letter
from TVP to Polvision (TVP 051611 00088) .............. A-1050

63    Certified English Translation of July 1, 2010 Letter
from TVP to Polvision (TVP 051611 00089-92)......... A-1052

65    Certified English Translation of July 1, 2010 Internal
TVP Letter (TVP 051611 00093)................................ A-1059

67    Certified English Translation of July 2, 2010 Letter
from Polvision to TVP (TVP 051611 00094-95)......... A-1062

69    Certified English Translation of July 12, 2010
Internal TVP Letter (TVP 051611 00096) .................. A-1064

71    Certified English Translation of July 16, 2010 Annex
to August 31, 2009 Agreement between TVP and
Polvision (POL00063-65) ............................................ A-1067

73    Certified English Translation of April 7, 2011 Letter
from TVP to Polvision (P00328; P002010) ................. A-1071

79    Certified English Translation of October 5, 2010
Email from IMB+ Records to TVP (TVP 051611
00122-132) .................................................................. A-1072

81    Certified English Translation of October 15, 2010
Notes of Meeting (TVP 051611 00133-34) ................. A-1084

82    Email from IMB+ Records to TVP, Dated October 18,
2010 (in Original Polish and English) (TVP 051611
00138-39) .................................................................... A-1087

**Page**

| | | |
|---|---|---|
| 84 | Certified English Translation of October 27, 2010 Email from IMB+ Records to TVP (TVP 051611 00140-142) | A-1092 |
| 86 | Certified English Translation of March 22, 2011 Letter from IMB+ Records to TVP (TVP 051611 00276-278) | A-1096 |
| 87 | Webpages Concerning Polvision (P001100, 1105, 1655-59, 2073, 2104, 2115; 2148, 2186-87) | A-1102 |
| 88 | Directories of TVP Polonia Programming (TVP 021012 458-493; and www.tvp.pl.prosa/ TVPPolonia) | A-1109 |
| 89 | Polvision Mediakit (2010) and Advertising Rate Card | A-1145 |
| 91 | Quarterly Subscriber Numbers, as referenced in Shulman Report, Exh. II (SEI 000103-140; TVP 051611 00154-191) | A-1157 |
| 92 | Polvision Programming Schedules (P000 329-34, 2031-72) | A-1233 |
| 93 | Spreadsheets of Terminated Internet Subscribers (P001827-2009, 2246-2279) | A-1281 |
| 94 | Spreadsheets of Lost Globecast Subscribers (P001785-1826, 2239-2245) | A-1498 |
| 99 | Email string between Counsel for SEI and Counsel for Polvision, Dated January 2010 (P00225-227) | A-1547 |
| 100 | Email from Counsel for SEI to Counsel for Polvision, Dated January 19, 2010 (P00242) | A-1550 |
| 101 | Letter from Counsel for SEI to Polvision, Dated January 6, 2010 (P00249-250) | A-1551 |
| 104 | Letter from TVP to Counsel for SEI, Dated July 26, 2010 (P00327) | A-1554 |
| 105 | Letter from Counsel for SEI to TVP, Dated August 2, 2010 (P00179-83) | A-1555 |
| 106 | Letter from TVP to Counsel for SEI, Dated May 21, 2010 (P00201-02) | A-1560 |

vii

**Page**

107     May 2007 EchoStar Presentation for TVP
        (TP9000140, 159-163; 172) ........................ A-1562

109     Certified English Translation of February 18, 2009
        Letter from Polvision to TVP (TVP051611 0008-9) ... A-1569

111     Certified English Translation of TVP Form Email
        Regarding "Klan" (TVP 072011 0305)....................... A-1571

113     Certified English Translation of January 28, 1994
        Meeting Notes (TP 7004886-87)................................ A-1572

115     Certified English Translation of February 1994
        Proposal (TP 7006364-70) ........................... A-1575

117     Certified English Translation of February 9, 1994
        TVP Memorandum (TP7006378-79) ........................ A-1583

119     Certified English Translation of March 15, 1995
        Letter from TVP to Moskal (TP 7004249-50) ............ A-1586

121     Certified English Translation of January 7, 1999
        Letter with Legal Opinion (TP 7006672-74) .............. A-1589

122     Letter from TVP, Dated March 24, 1998
        (SEI 000166) ............................................... A-1593

123     Fax from TVP to EchoStar, Dated March 25, 1998
        (SEI 000721) ............................................... A-1594

125     Certified English Translation of April 1999 TVP
        Board of Directors Report on Company Activities
        (TP9000632, 653,669, 682, 542, 628)...................... A-1595

127     Certified English Translation of June 1, 1998 TVP
        Press Release (TP 7005054-55) ................................... A-1603

129     Certified English Translation of February 8, 2007
        Screenshot of TVP Webpage (SEI 000246-49) ........... A-1607

131     Certified English Translation of October 5, 1999
        Internal TVP Letter (TP 7006692) .............................. A-1612

133     Certified English Translation of TVP Board Position
        (SEI 000055-57)......................................... A-1614

134     Email String between TVP and EchoStar,
        Dated April 3, 2002 (TP 7003157-58) ........................ A-1618

**Page**

135    Email from TVP to EchoStar, Dated April 6, 2002
(SEI 001140) ................................................................ A-1620

136    Letter from EchoStar to TVP, Dated June 14, 2002
(TP 7005252)................................................................. A-1621

137    Email from TVP to EchoStar, Dated June 8, 2002
(TP 7003182).................................................................. A-1622

139    Certified English Translation of July 1, 1999 Letter
from TVP to NIK (TP 7001215-18)............................. A-1623

141    Certified English Translation of March 3, 2005 TVP
Internal Memo (TP 7007953-55) ................................. A-1628

142    Shulman Expert Report and Rebuttal Report
(including attachments); Shulman Supplemental
Report (including attachments), Dated
March 18, 2013 ........................................................... A-1633

143    Gerbrandt Rebuttal Report (including attachments),
Dated May 16, 2012 .................................................... A-1958

144    Operating System and Browser Report
(www.tvpolonia.com)................................................... A-1987

145    *Computerworld* Article, Dated January 4, 2013,
Entitled "IE shocker: Microsoft's browser gains
share in 2012"............................................................... A-1988

146    www.netmarketshare.com Report, Dated February
2013, Entitled "Desktop Browser Market Share" ........ A-1991

148    Certified English Translation of September 18, 1995
Fax from TVP's Jerzy Romanski to SEI's Boguslaw
Spanski (TP7003566)................................................... A-1992

150    Certified English Translation of February 19, 1996
Letter from TVP (TP4000183-184) ............................. A-1995

152    Article, Dated June 3, 2013, Entitled "'Klan' is the
time slot leader. 2,700,000 viewers and 43,300,000
zlotys from advertising" (in Original Polish with
Certified English Translation)..................................... A-1997

154    Certified English Translation of Letter from
Boguslaw Spanski to TVP, Dated April 3, 2003
(TP7000323-325) ........................................................ A-2001

ix

**Page**

Defendant TVP's Trial Exhibits:

1   TVP/SEI Agreement, Dated December 14, 1994........ A-2005

2   TVP/SEI Addendum, Dated November 4, 1999 .......... A-2015

3   TVP/SEI Addendum, Dated April 29, 2002 ............... A-2020

4   SEI Quarterly Revenue and Subscriber Reporting
    (2005–2012) .................................................................. A-2025

5   TVP/Polvision Barter Agreement, with Annex,
    Dated March 17, 2008................................................. A-2087

6   TVP/Polvision License Agreement,
    Dated June 27, 2008................................................... A-2120

7   Email from Agnieszka Pokropek to Urszula
    Zaniewska, Dated March 9, 2009................................ A-2124

8   Email from Agnieszka Pokropek to Urszula
    Zaniewska, Dated April 20, 2009............................... A-2127

9   Email from Urszula Zaniewska to Agnieszka
    Pokropek, Dated June 4, 2009.................................... A-2130

10  Emails from Agnieszka Pokropek to Urszula
    Zaniewska, Dated June 4–5, 2009.............................. A-2133

11  Polvision Agreement Certificate,
    Dated June 30, 2009................................................... A-2136

12  Letter from Urszula Zaniewska to Agnieszka
    Pokropek, Dated July 2, 2009 .................................... A-2141

13  Email from Agnieszka Pokropek to Urszula
    Zaniewska, Dated July 24, 2009 ................................ A-2144

14  Emails between Urszula Zaniewska and Agnieszka
    Pokropek, Dated August 4–5, 2009 ........................... A-2147

15  Letter from Urszula Zaniewska to Agnieszka
    Pokropek, Dated August 6, 2009 ............................... A-2151

16  TVP/SEI Settlement Agreement,
    Dated August 11, 2009............................................... A-2154

17  TVP/Polvision Licensing Agreement,
    Dated August 31, 2009............................................... A-2158

x

**Page**

18     Emails between Urszula Zaniewska and Agnieszka
Pokropek, Dated September 1–3, 2009 ...................... A-2170

19     Email from Urszula Zaniewska to Agnieszka
Pokropek, Dated October 23, 2009 ............................ A-2176

20     Email from Elżbieta Herezińska to Agnieszka
Pokropek, Dated November 28, 2009 ........................ A-2179

21     Fax from TVP to Waldemar Kotaba, Dated
November 30, 2009 (in Original Polish with
English Translation) ................................................... A-2182

22     Emails from Piotr Lenarczyk and Urszula Zaniewska
to Agnieszka Pokropek, Dated December 9–21, 2009
(in Original Polish with English Translation) ............. A-2185

23     Email from Urszula Zaniewska to Elżbieta
Herezińska, Dated December 23, 2009 ...................... A-2189

24     Email from Elżbieta Herezińska to Agnieszka
Pokropek, Dated December 23, 2009 (in Original
Polish with English Translation) ................................ A-2192

25     Email from Urszula Zaniewska to Agnieszka
Pokropek, Dated January 6, 2010 (in Original
Polish with English Translation) ................................ A-2195

26     Letter from Waldemar Kotaba to Romulad Orzel,
Dated February 23, 2010 (in Original Polish
with English Translation) ............................................ A-2198

27     TVP/Polvision Meeting Minutes, Dated April 1, 2010
(in Original Polish with English Translation) ............. A-2203

28     Letter from Maria Nadolna to Waldemar Kotaba,
Dated May 5, 2010 (in Original Polish with
English Translation) ................................................... A-2208

29     Letter from Maria Nadolna to Boguslaw Spanski,
Dated May 5, 2010 ..................................................... A-2211

30     Letter from Maria Nadolna to Waldemar Kotaba,
Dated May 13, 2010 (in Original Polish with
English Translation) ................................................... A-2214

xi

**Page**

31  Letter from Romulad Orzel to Waldemar Kotaba,
    Dated May 13, 2010 (in Original Polish with
    English Translation) ...................................................... A-2217

32  Letter from Waldemar Kotaba to Romulad Orzel,
    Dated May 17, 2010 (in Original Polish with
    English Translation) ...................................................... A-2220

33  Letter from Maria Nadolna to Waldemar Kotaba,
    Dated May 18, 2010 (in Original Polish with
    English Translation) ...................................................... A-2223

34  Letter from Waldemar Kotaba to Romulad Orzel,
    Dated May 19, 2010 ...................................................... A-2227

35  Letter from Maria Nadolna to Waldemar Kotaba,
    Dated June 8, 2010 (in Original Polish with
    English Translation) ...................................................... A-2232

36  Letter from Maria Nadolna to Waldemar Kotaba,
    Dated June 14, 2010 (in Original Polish with
    English Translation) ...................................................... A-2235

37  Letter from Maria Nadolna to Waldemar Kotaba,
    Dated June 25, 2010 (in Original Polish with
    English Translation) ...................................................... A-2238

38  Letter from Maria Nadolna to Waldemar Kotaba,
    Dated July 1, 2010 (in Original Polish with
    English Translation) ...................................................... A-2241

39  Letter from Maria Nadolna to Waldemar Kotaba,
    Dated July 8, 2010 (in Original Polish with
    English Translation) ...................................................... A-2251

40  Annex to August 31, 2009 Polvision License
    Agreement, Dated July 16, 2010 (in Original
    Polish with English Translation) .................................. A-2260

41  Letter from Lukasz Boberek to Boguslaw Spanski,
    Dated April 9, 2010 ...................................................... A-2269

42  Letter from Tomasz Sieniutyck to IMB,
    Dated September 3, 2010 ............................................. A-2274

43  Excerpts from Deposition of Boguslaw Spanski,
    Dated November 8, 2011 ............................................. A-2275

xii

Page

44    Amended Statement of Claim in *Spanski Enterprises v.*
*IMB+ Records*, Dated November 19, 2010.................. A-2277

45    Statement of Defence in *Spanski Enterprises v.*
*IMB+ Records*, Dated March 4, 2011 ........................ A-2303

46    Order of Master Barbara McAfee in *Spanski*
*Enterprises v. IMB+ Records*, Dated
November 30, 2011 ................................................... A-2310

47    TV Polonia Webpage — About Us ............................. A-2318

48    Chart of Comparison of TVP Polonia Viewership
Statistics (in Original Polish with English
Translation) ................................................................. A-2320

49    Complaint in *Spanski Enterprises v. Telewizja Polska*
(S.D.N.Y., 07-CV-930), Dated February 8, 2007 ........ A-2323

50    Original Complaint, Dated June 24, 2010.................... A-2337

51    Amended Complaint, Dated October 1, 2010 ............. A-2343

55    Transcript of Oral Argument in *Spanski Enterprises v.*
*Telewizja Polska* (S.D.N.Y., 07-CV-930),
Dated March 16, 2009 ................................................ A-2353

59    Expert Report of Gary Arlen, Dated April 16, 2012,
with Appendices ......................................................... A-2367

60    Expert Report of Tim Hart, Dated April 16, 2012,
with Appendices ......................................................... A-2584

61    Expert Report of Ivan Reyes, Dated April 16, 2012,
with Appendices ......................................................... A-2660

62    Expert Report of Marek Wierzbowski,
Dated April 16, 2012, with Appendices ...................... A-2872

63    Supplemental Expert Report of Tim Hart,
Dated May 16, 2012, with Appendices ....................... A-3066

64    Supplemental Expert Report of Gary Arlen,
Dated May 16, 2012 ................................................... A-3106

66    TV Polonia Webpage — Terms and Conditions.......... A-3114

Plaintiff SEI's Post-Trial Memorandum,
Dated August 16, 2013................................................ A-3117

**xiii**

**Page**

Defendant TVP's Post-Trial Memorandum,
    Dated August 16, 2013 ........................................................... A-3156

Notice of Appeal, Dated April 1, 2014 ..................................... A-3193

Notice of Cross-Appeal, Dated April 9, 2014 ........................... A-3194

**A-301**

Page 182

MARIA E. NADOLNA

1  
2    what, that TVP is asking for Kotaba to sign the
3    contract?
4         MR. ZAVIN: She has just testified
5    to E-mails and communications with Polvision in
6    July of 2009 and to the best of our knowledge
7    there's been no such documents produced.
8         MR. WENGER: You need to look at
9    the documents again because I'm certain that
10   definitely one hundred percent certain that there
11   are correspondence between Polvision and TVP where
12   TVP asks Polvision when will you return to us the
13   signed contract and Polvision responds Mr. Kotaba
14   is away and he'll return it when he comes back and
15   if you give me actually probably a minute I could
16   probably actually show you that document.
17        MR. ZAVIN: Why don't we take a --
18        MR. WENGER: But if I --
19        MR. PISKORA: Let's take a minute.
20        MR. ZAVIN: Let's take a minute.
21        THE VIDEOGRAPHER: The time is 4:09
22   p.m.
23        And we're going off the record.
24        (Whereupon, a short recess is
25   taken.)

Page 183

MARIA E. NADOLNA

1  
2         THE VIDEOGRAPHER: Stand by,
3    please.
4         The time is 4:23 p.m.
5         And we're back on the record.
6  
7    BY MR. ZAVIN:
8         Q.    Ms. Nadolna, under Polish law,
9    which I think you just opined on, is a contract
10   valid when it's signed by one side or by both
11   sides?
12        MR. FINK: Objection.
13        Calls for a legal conclusion.
14        MR. ZAVIN: I think she testified
15   on this very subject, but if she doesn't know, she
16   doesn't know.
17        A.    I said the contract is valid from
18   the moment -- when it is signed by TVP it was
19   started to be valid, it means that you cannot
20   resign from the contract.
21  
22   BY MR. ZAVIN:
23        Q.    Ms. Nadolna, that isn't what I
24   asked.
25        I asked when is it -- under Polish

Page 184

MARIA E. NADOLNA

1  
2    law, if you know, for a contract to be valid does
3    it have to be signed by one side or both sides?
4         MR. WENGER: Objection.
5         Q.    Do you know?
6         A.    I'm not the lawyer.
7         Q.    Okay. So is the answer you don't
8    know?
9         MR. FINK: Is there a question
10   pending?
11        MR. ZAVIN: Yes.
12        MR. FINK: What's the question?
13  
14   BY MR. ZAVIN:
15        Q.    Is the answer you don't know? You
16   do not know under Polish law whether for a
17   contract to be valid it has to be signed by one
18   side or both sides?
19        MR. FINK: All right. I object to
20   the question on the grounds of form. We don't
21   know whether the contract was oral or written or
22   oral and written.
23        Q.    Ms. Nadolna, for a written
24   contract to be valid does it have to be signed by
25   one side or both sides under Polish law? Do you

Page 185

MARIA E. NADOLNA

1  
2    know?
3         A.    The contract is conducted when
4    it's signed by both sides, but it's valid from
5    the moment one side signs it it is -- you cannot
6    resign. You cannot change your mind. Again, you
7    will be sued.
8         Q.    So --
9         A.    This is what I mean.
10        Q.    Ms. Nadolna --
11        A.    Validity.
12        Q.    -- Ms. Nadolna, if TVP were to
13   sign a contract to license programs and send it
14   to a licensee on January 1st, 2012 and the
15   licensee doesn't return it for a year, are you
16   saying that contract is still valid?
17        MR. FINK: Just objection.
18        Hypothetical.
19        MR. ZAVIN: It is a hypothetical.
20  
21   BY MR. ZAVIN:
22        Q.    You can answer the question. You
23   can answer.
24        MR. WENGER: You may answer.
25        MR. FINK: If you can.

47 (Pages 182 to 185)

A-302

Page 186

MARIA E. NADOLNA

1
2     A.    To my knowledge it's valid.
3
4   BY MR. ZAVIN:
5     Q.    So that the other -- your belief
6   is that even if the other side never signs it it
7   remains a valid contract?
8     A.    I put it together with the
9   material.
10    Q.    I thought it was -- Ms. Nadolna --
11          MR. FINK: It's your hypothetical.
12  She's answering your question.
13          MR. ZAVIN: Okay.
14    A.    It's unclear.
15
16  BY MR. ZAVIN:
17    Q.    Okay.
18          So it's your testimony it is valid
19  even if the other side never signs it?
20    A.    Yeah, this is --
21    Q.    Okay.
22          Did TVP seek a legal opinion on
23  that question?
24    A.    I don't know.
25          MR. FINK: On your hypothetical?

Page 187

MARIA E. NADOLNA

1
2          MR. ZAVIN: Well --
3          MR. FINK: How could it?
4
5   BY MR. ZAVIN:
6     Q.    It's TVP's position that it sent a
7   signed agreement to Polvision in July of 2009,
8   correct?
9     A.    (Indicating.)
10    Q.    In August, on August 11th it
11  signed a settlement agreement with Mr. Spanski
12  that I think even you've admitted would prevent
13  TVP from licensing Polvision material --
14  TVPolonia material to Polvision, is that correct?
15          MR. FINK: Objection.
16          That misstates the testimony.
17    Q.    Does the August 11th settlement
18  agreement with Spanski in your view prevent TVP
19  from licensing Polvision content, sorry,
20  TVPolonia content to Polvision?
21          MR. FINK: Objection to form.
22          MR. WENGER: Objection.
23    A.    We didn't license anything after
24  this date so I don't understand your question.
25

Page 188

MARIA E. NADOLNA

1
2   BY MR. ZAVIN:
3     Q.    Wait.
4     A.    We licensed before this date.
5     Q.    That isn't what I asked. I said
6   in your opinion isn't it true that you couldn't
7   license after that date?
8     A.    Yes, we couldn't, but -- and we
9   didn't license anything.
10    Q.    Okay. Did you --
11    A.    So it's theoretical.
12    Q.    Did you get a legal opinion as to
13  whether after you signed that settlement
14  agreement you could terminate your offer to enter
15  into a license with Polvision or the license with
16  Polvision that you say you entered into in July?
17    A.    I don't under -- it's too long. I
18  think the question should be shorter for me --
19    Q.    Okay.
20    A.    -- because --
21    Q.    After you signed the settlement
22  agreement --
23    A.    -- like this (indicating.)
24  Uh-huh.
25    Q.    -- TVP realized it had a problem

Page 189

MARIA E. NADOLNA

1
2   with the Polvision license, didn't it?
3          MR. WENGER: Objection.
4     Q.    Do you know?
5     A.    Television -- TVP didn't realize I
6   have problem. TVP was informed by our good
7   partner that he has -- his opinion is different.
8   This is not --
9     Q.    When did Mr. Spanski inform you of
10  this? When did he --
11    A.    You mean me or the company?
12    Q.    Or the company, when did
13  Mr. Spanski inform TVP of his position with
14  respect to this matter?
15    A.    From my knowledge he informed
16  Mr. Lenarczyk.
17    Q.    And when was that?
18    A.    I don't know. After signing
19  this -- after 11th of August.
20    Q.    How far after the 11th of August?
21    A.    I don't know.
22    Q.    A month after, two months after,
23  three months after?
24    A.    I don't know?
25          I was informed by Lenarczyk that

48  (Pages 186 to 189)

A-303

Page 190

```
1              MARIA E. NADOLNA
2    he was in permanent contact with Mr. Spanski.
3    That's all I know.
4         Q.    Was there any correspondence in
5    August or September between Mr. Lenarczyk and
6    Mr. Spanski with respect to the Polvision
7    license?
8         A.    I don't know.
9         Q.    Do you know whether Mr. Spanski
10   had contacted TVP about the Polvision license
11   before September 15th, 2009?
12        A.    Could you repeat the question?
13        Q.    Do you know whether Mr. Spanski
14   had contacted TVP about the Polvision license
15   before September 15th, 2009?
16        A.    September 15th?
17        Q.    2009.
18        A.    I don't know.
19        Q.    Do you know whether Mr. Spanski
20   ever contacted TVP in writing about the Polvision
21   license?
22             MR. FINK:  I'm sorry?
23        Q.    Do you know whether Mr. Spanski
24   ever contacted TVP in writing about the Polvision
25   license?
```

Page 191

```
1              MARIA E. NADOLNA
2             MR. WENGER:  Ever?
3             MR. FINK:  Objection to form.
4         A.    Ever?  Any time?
5
6    BY MR. ZAVIN:
7         Q.    Yes.
8         A.    Yes.
9         Q.    When was the first time?
10        A.    To my knowledge?
11        Q.    Yes.
12        A.    In 2010 in writing.
13             THE INTERPRETER:  I'm Polish.  I
14   can figure it out.
15             COURT REPORTER:  Should we go off
16   the record?
17             MR. ZAVIN:  Yes, off the record.
18             THE VIDEOGRAPHER:  The time is 4:33
19   p.m.
20             And we're going off the record.
21             (Whereupon, a short recess is
22   taken.)
23             THE VIDEOGRAPHER:  Stand by,
24   please.
25             The time is 4:35 p.m.
```

Page 192

```
1              MARIA E. NADOLNA
2             And we're back on the record.
3             MR. ZAVIN:  Okay.
4             Ms. Nadolna, I'm going to have a
5    document marked as Nadolna 17.
6             COURT REPORTER:  (Complies.)
7             (Whereupon, multi-page document
8    bearing Bates stamps TVP 1011110338 through TVP
9    1011110339, is received and marked as Nadolna
10   Exhibit 17 for Identification.)
11            COURT REPORTER:  Number 17.
12
13   BY MR. ZAVIN:
14        Q.    And it appears to be an E-mail
15   chain between TVP and Polvision in or around
16   September 2009.
17        A.    (Reviews.)
18        Q.    Have you ever seen this document
19   before?  The document I've given you is both an
20   E-mail chain in Polish and an English
21   translation.
22             MR. WENGER:  Can I just clarify
23   something while Maria is looking at that, are we
24   marking just the Polish version of these?
25             MR. ZAVIN:  No, she's been
```

Page 193

```
1              MARIA E. NADOLNA
2    requesting the English versions also so that I've
3    now marked -- when I've handed her a document
4    that's included the whole thing I've marked the
5    whole thing as an exhibit since she's using it.
6             MR. WENGER:  Okay, but we'll see I
7    guess an official set of the exhibits once they're
8    all assembled in terms of which translations were
9    included.
10            MR. ZAVIN:  Yeah.
11            MR. FINK:  Now, the document you
12   gave her has TVP numbers that end in 0338 and 0339
13   and then there is a separate set 0338 and 0339
14   where you use the same numbers with the different
15   language?
16            MR. ZAVIN:  That's correct.
17            MR. FINK:  Okay.
18            MR. ZAVIN:  So that we know which
19   documents the translation is associated with.
20            MR. FINK:  Is there some reason you
21   didn't use the whole document?
22            MR. PISKORA:  What's the question?
23            MR. FINK:  Is there a reason why
24   the whole document isn't being used?
25            MR. PISKORA:  That's the document.
```

49 (Pages 190 to 193)

Page 194

1       MARIA E. NADOLNA
2   I don't understand your question.
3       MR. FINK:  Well, it's Page 1 of 5,
4   Page 2 of 5.  It suggests that there is three
5   missing pages.
6       MR. PISKORA:  I guess that's an
7   issue that David can address with Polvision.
8       MR. WENGER:  No, no, no, the 1 of 5
9   is not relevant for our purposes.  It's just how I
10  got documents from TVP.  That's not relevant.  You
11  have the whole thing.
12      MR. ZAVIN:  Okay.  Okay.
13
14  BY MR. ZAVIN:
15      Q.   Ms. Nadolna, you've had a chance
16  to look at this document now.  Have you ever seen
17  it before?
18      A.   I don't know.
19      Q.   I'm sorry?
20      A.   I don't know.
21      Q.   Well --
22      A.   This is the correspondence so a
23  lot of mails are between the employees so I don't
24  know.  I don't remember.
25      Q.   Okay.

Page 195

1       MARIA E. NADOLNA
2       And actually you weren't in this
3   department in 2009, were you?
4       A.   No.
5       Q.   Okay.
6       Looking on Page 2 there is an
7   E-mail from Ms. Zaniewska, am I pronouncing --
8       A.   Uh-huh.
9       Q.   And it's to Ms. -- and
10  Ms. Zaniewska is at TVP, is that correct?
11      A.   Yes.
12      Q.   And this is an E-mail from her to
13  Ms. Pokropek --
14      A.   Yeah.
15      Q.   -- at --
16      A.   Which date?
17      (Unintelligible, simultaneous
18  testimony interrupted by the court reporter.)
19      COURT REPORTER:  I need one at a
20  time, please.
21      A.   Which date we are talking about?
22      Q.   September 1st --
23      A.   Oh, okay.
24      Q.   -- 2009 at 2:40 a.m.
25      A.   Wait one moment.  It's too small.

Page 196

1       MARIA E. NADOLNA
2       MR. FINK:  On Page 0339.
3       A.   The 1st September 8:27, the time
4   8:27?
5       MR. WENGER:  The next --
6       A.   The next page, okay.
7       MR. WENGER:  The bottom.
8       A.   The date is not so clear for me in
9   the Polish version.
10      MR. FINK:  Do you have the English
11  version?
12      THE WITNESS:  The Polish version
13  the date of this E-mail, it's not clear.
14      MR. FINK:  I'm asking if you have
15  the English version?
16      THE WITNESS:  So I need to compare
17  it.
18      A.   Yes, and the question is?
19
20  BY MR. ZAVIN:
21      Q.   Well, I think my first question is
22  had you ever seen this before and you said no, is
23  that correct?
24      A.   I don't remember.
25      Q.   Okay.

Page 197

1       MARIA E. NADOLNA
2       Looking at this E-mail do you have
3   any reason to think these were not E-mails sent
4   and received by TVP?
5       A.   I don't know if they were
6   received.  I don't remember this E-mail.
7       Q.   That's not my question.
8       A.   Uh-huh.
9       Q.   These are documents produced by
10  TVP to us.
11      A.   Uh-huh.
12      Q.   So at least according to your
13  counsel they came from TVP's files.
14      Do you have any reason to think
15  these are not accurate copies of documents in
16  TVP's records?
17      A.   I don't know.
18      Q.   Okay.
19      A.   Maybe.  I don't know.  That's
20  true.
21      Q.   I'm sorry?
22      A.   It's the truth, I don't know.
23      Q.   Okay.
24      Assuming that these are not fake
25  documents, you have no reason to think they're

50  (Pages 194 to 197)

A-305

Page 198

MARIA E. NADOLNA

1    MARIA E. NADOLNA
2  fake, do you?
3       A.   No.
4       Q.   Okay.
5            Assuming that these are real
6  documents and not fake, it appears that on
7  September 1st, 2009 TVP received a fax on or
8  shortly before that received a fax from Polvision
9  of the signed agreement, correct?
10       A.   Could you repeat?
11       Q.   It appears that shortly on or
12  before September 1st, 2009 TVP received a fax of
13  the signed license agreement with Polvision,
14  correct?
15       A.   It's what it says in this E-mail.
16       Q.   And do you agree that that's what
17  the E-mail says?
18       A.   It is in the E-mail.
19       Q.   Okay.
20       A.   Uh-huh.
21       Q.   Now, isn't it true that based on
22  this E-mail on September 1st, 2009 TVP knew it
23  had a problem with the Polvision license?
24       A.   I don't know.
25       Q.   You don't know?  You're reading

Page 199

MARIA E. NADOLNA

1    MARIA E. NADOLNA
2  this E-mail and you're the head of the department
3  and you don't know whether --
4       MR. FINK:  Actually she wasn't the
5  head of the department.
6       Q.   Well, you're now the head of the
7  department.  As head of the department and you
8  read this E-mail you wouldn't know whether there
9  was a problem or not?
10       MR. FINK:  Objection to form.
11       A.   I have every day problems and I'm
12  solving them, you know.
13       Q.   Well, does this indicate to you
14  that on September 1st, 2009 TVP knew there was a
15  problem with a Polvision license?
16       A.   This is information from the
17  person, so I can confirm only what is in this
18  E-mail.
19       Q.   Ms. Nadolna, do you have no
20  knowledge or information of your own except what
21  is placed in front of you in writing?
22       MR. FINK:  Objection.
23       She's actually testified on her own
24  knowledge repeatedly here, so there is no basis
25  for that question.

Page 200

MARIA E. NADOLNA

1    MARIA E. NADOLNA
2       MR. ZAVIN:  Okay.
3
4  BY MR. ZAVIN:
5       Q.   I'm asking you as TVP's
6  representative on September 1st, 2009 did TVP
7  know there was a problem with a Polvision license
8  and if you're saying you don't know what TVP's
9  position was, I'm not asking you personally, as
10  TVP's corporate representative was there a
11  problem, did TVP know there was a problem with a
12  Polvision license --
13       A.   Where is the words problem in this
14  E-mail?
15       Q.   That's my word and if you disagree
16  with it --
17       A.   You are showing me document which
18  I didn't, I don't remember.  There is nothing
19  about problem.  I mean the word problem is not
20  mentioned.  Complicate corporation, our life is
21  full of complication all the time and you have to
22  solve it.  This is our task every day.
23       Q.   What was the complication that TVP
24  was aware of on September 1st, 2009 with respect
25  to the Polvision license?

Page 201

MARIA E. NADOLNA

1    MARIA E. NADOLNA
2       A.   I don't know because this is not
3  my E-mail.
4       Q.   Okay.
5            I've said this before:  I'm asking
6  you as TVP's corporate representative is TVP's
7  position is that it doesn't know what happened on
8  September 1st, 2009?
9       A.   You are asking about what?
10       MR. FINK:  Objection.
11       A.   E-mails?  Am I understanding this?
12       MR. ZAVIN:  She's a 30(b)(6)
13  witness.  You can't fly the woman thirty-five
14  hundred miles, take up our time doing a deposition
15  and just say, well, she doesn't personally know.
16       Either the company doesn't know or
17  it knows.
18       MR. FINK:  All right.
19       I completely disagree with your
20  description and your assumption.  You have this
21  document which shows the communications that
22  occurred in that department when she was not
23  present.  She doesn't know more than you do about
24  this document she said.
25       MR. ZAVIN:  Okay.

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 202

                    MARIA E. NADOLNA

BY MR. ZAVIN:
     Q.    Does the company know anything
more about this document than you do?
     A.    I don't know.
     Q.    Okay.
           MR. WENGER:  I would just suggest
that you take her through the document and see
what she can answer about it instead of asking her
questions in the abstract about what the company
knew when.
           MR. ZAVIN:  Let's go off the record
for a moment.
           THE VIDEOGRAPHER:  The time is 4:46
p.m.
           And this ends Tape Number 3.
           (Whereupon, a short recess is
taken.)
           THE VIDEOGRAPHER:  Stand by,
please.
           The time is 4:52 p.m.
           And this begins Tape Number 4 of
the videotaped deposition of Maria Nadolna.
           MR. ZAVIN:  Okay.

Page 203

                    MARIA E. NADOLNA

BY MR. ZAVIN:
     Q.    Ms. Nadolna, after the break I'll
just ask the question one more time I hope:  Does
reading this Exhibit 17 indicate to you that as
of September 1st, 2009 TVP knew there was a
problem or complications with the Polvision
license?
           MR. FINK:  Objection to the form.
           You may answer it.
     A.    From this E-mail it shows that
people were aware of some complication.
     Q.    Okay.
           Can you tell from reading this
E-mail what the complication was?
     A.    You want me to translate this
E-mail?
     Q.    No.
           From reading this E-mail can you
tell what the complication was?  Do you have any
understanding from reading the E-mail as to what
the complication was?
     A.    This is the information that
Polvision presented that has to be in contact

Page 204

                    MARIA E. NADOLNA
with Mr. Spanski as there is aware that maybe
some complication can arrive according to old
movies from TVP archives.
     Q.    Weren't they specifically telling
him that Polvision had to get --
           MR. FINK:  Did you stop her from
finishing her answer?
           MR. ZAVIN:  I'm sorry.  I thought
she did.
           THE WITNESS:  Yes, I stopped.
           MR. FINK:  Okay.  I apologize.
           MR. ZAVIN:  A little quick on the
objection.
           MR. FINK:  It was a question.

BY MR. ZAVIN:
     Q.    Mr. Nadolna, isn't this
specifically telling Polvision that they had to
get Spanski's consent before they could broadcast
a number of programs?
     A.    This isn't the advice.  This is
the information.  We cannot read it as
interpretation.
     Q.    So you don't agree that TVP

Page 205

                    MARIA E. NADOLNA
specifically told them they, quote:  Will have to
contact Mr. Spanski to get his consent to
broadcast certain programs?
     A.    There is aware of, there is -- it
doesn't say strictly as you, as you say.  It is
there might be some problems in the future so
maybe it's better to be in contact with
Mr. Spanski.
     Q.    Did I read that wrong?  My -- at
least in English it says you will have to contact
Mr. Spanski to get his consent.  Is that
incorrect?
     A.    I would suggest to contact.  This
is the Polish version.  I would suggest to
contact.  I'm afraid I aware of that there might
be some problems and it is speculation.  It is
not strictly as it is in the translation.  So
this is not -- the translation is not the same as
the Polish version.
     Q.    Does the Polish version say that
Spanski Enterprises and the USA are granted
exclusive rights to the material which has been
and will be broadcast by TVPolonia?
           MR. FINK:  Which one are you

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

A-307

Page 206

MARIA E. NADOLNA
1
2  reading from?
3        MR. ZAVIN:  The same one of
4  September 1st, 2009 at 2:40 a.m.
5        A.     And which sentence does it say in
6  English version?
7
8  BY MR. ZAVIN:
9        Q.     The second sentence.
10       A.     You may obtain information?  Which
11 sentence?  Can you read it?
12       Q.     The second.  Let me read this.
13 The provisions of this -- I'm sorry.  The second
14 sentence of the second paragraph.
15       A.     I'm sorry, this translation is
16 not -- it's not in details the same as it is in
17 Polish version.
18       Q.     Okay.
19             Well, what do you think it says in
20 Polish?  You can translate.  Give me your
21 translation.  What does that second sentence say?
22       A.     The second sentence says that in
23 my E-mail I informed you about settlement
24 agreement --
25             MR. WENGER:  I think you're looking

Page 207

MARIA E. NADOLNA
1
2  at the wrong E-mail.  He's still on the same
3  E-mail.
4        A.     This is the E-mail from the 1st of
5  September.
6        Q.     The 1st of September at 2:40 a.m.
7        A.     2:40.
8             MR. FINK:  It's on Page 0339.
9             THE WITNESS:  This is not clear for
10 me the date and the time.
11            MR. WENGER:  But that's it.
12            THE WITNESS:  That's it?  Okay.
13       A.     So the second sentence maybe you
14 receive the information about the TVP assigned
15 recently settlement with Mr. Spanski company.
16       Q.     And?
17       A.     This is the first stop.
18       Q.     No, and then the following
19 sentence?
20       A.     Unfortunately the settlement
21 slightly complicates our corporation as
22 Mr. Spanski will receive, is receiving so for the
23 future, but I'm going to be a translator of the
24 letters?
25       Q.     Well, you're saying that the

Page 208

MARIA E. NADOLNA
1
2  translation is wrong.
3        A.     Well, as I received not the
4  clear -- it's the same date two different
5  E-mails.
6        Q.     So is the translation that's been
7  provided to you of the E-mail of September 1st,
8  2009 2:40 a.m. incorrect in your view?
9        A.     In my opinion, yes.
10       Q.     Why?
11       A.     It doesn't show the language.
12       Q.     In what way?  What is wrong?
13            MR. FINK:  She just read her
14 translation.
15            MR. ZAVIN:  And she stopped.
16            MR. FINK:  Well, why don't you
17 finish it.
18            As she started the translation it
19 was clearly different than the English version
20 you've given us.
21            So you want to finish reading that
22 sentence, please, translating that sentence,
23 please?
24       A.     The translation is using legal
25 language are granted exclusive rights.  The

Page 209

MARIA E. NADOLNA
1
2  person who is signing, writing this E-mail is not
3  the legal person and saying words which you use
4  in daily life not the words as -- so I --
5
6  BY MR. ZAVIN:
7        Q.     What is the correct translation in
8  your view?
9        A.     It's not the same document.  I'm
10 sorry.
11       Q.     What is the correct translation in
12 your view?
13       A.     It doesn't show this wording.
14       Q.     Ms. Nadolna, what is the correct
15 translation in your view?
16       A.     You're asking me for translator?
17       Q.     Yes.
18       A.     I'm not translator.  I'm just
19 reading the Polish version.
20       Q.     So your testimony is it's wrong,
21 but you won't tell me what the correct
22 translation is?
23       A.     I'm saying that the translation is
24 using words, legal words like are granted -- this
25 is saying -- it is saying that this settlement

53  (Pages 206 to 209)

Page 210

MARIA E. NADOLNA

1  from the settlement the company is achieving, is
2  receiving exclusive rights, exclusivity. It
3  doesn't say about the rights. So this is the
4  correspondence of not the lawyers. This is the
5  correspondence of the somebody advising that
6  there might be some problem in the future. This
7  is the wording of it.
8      Q.   In this correspondence did TVP say
9  would have to consider terminating the agreement
10 with Polvision if they could not -- if Polvision
11 couldn't get Spanski's consent?
12     MR. FINK: Which E-mail segment you
13 want her to look at?
14     MR. ZAVIN: Well, specifically the
15 E-mail September 1st at 8:27 a.m.
16     MR. FINK: So that's on Page 3 --
17 0338 at the bottom?
18     MR. ZAVIN: That's correct.
19     MR. FINK: In Polish.
20     A.   This is the suggestion according
21 to the settlement which arrived in the office to
22 contact Mr. Spanski in order not to have any, any
23 problems, any, any conflict, any -- this is my
24 interpretation. You want me to translate?

Page 211

MARIA E. NADOLNA

1
2  BY MR. ZAVIN:
3      Q.   Did they say that -- you can look
4  at the E-mail. Did they say that, did TVP say in
5  sum or substance they'd have to consider
6  terminating the agreement with Polvision?
7      A.   This is the E-mail. Why -- E-mail
8  is not formal letter saying that we have to
9  terminate. This is the information between
10 somebody who is taking care of the contract and
11 somebody who knows that something is happening.
12 They are aware of some problems in the future.
13 This is not statement. This is not formal
14 information.
15     Q.   Ms. Nadolna, the judge in this
16 case is going to read this E-mail. Are you
17 telling me and the judge --
18     A.   Then let's read all the E-mails.
19     Q.   -- that, that -- did or did not
20 TVP in this E-mail, whoever it was at TVP, say
21 they would have to consider terminating the
22 contract with Polvision? Yes or no? Or I don't
23 know? They either said it --
24     A.   In Polish television --

Page 212

MARIA E. NADOLNA

1
2      Q.   -- or they didn't.
3      A.   In Polish television authorized
4  people can say formal words. This is not formal
5  letter. This is the correspondence showing to
6  awareness. We are taking care of all our
7  clients. This is the way of taking care. This
8  is the way of informing. Something may happen.
9  This is the advice. This is not the formal
10 way -- public media cannot inform formally on the
11 level of, lower level employees.
12     Q.   Is there a reason you can't answer
13 my question?
14     MR. WENGER: Objection.
15     Q.   Yes or no, is there a reason you
16 can't answer my question?
17     MR. FINK: Which question do you
18 think she's not answering?
19     Q.   Did or did not TVP in this E-mail
20 or the person at TVP who wrote it inform
21 Polvision that TVP would have to consider
22 terminating the Polvision agreement unless
23 Polvision could get Spanski's consent? Yes, no,
24 or I don't know?
25     A.   Didn't inform. This is the advice

Page 213

MARIA E. NADOLNA

1
2  and it's not TVP and not Polvision. It's
3  correspondence between two people from the
4  companies -- if it's a question about companies
5  it's not between --
6      Q.   Ms. Nadolna, I didn't ask -- there
7  is no other question pending. Please just answer
8  the questions.
9      A.   I'm answering your question.
10     Q.   Okay. I said yes, no, or I don't
11 know. Those are your answers.
12     MR. FINK: You don't have to do
13 that.
14     MR. ZAVIN: Okay.
15
16 BY MR. ZAVIN:
17     Q.   Who is Ms. Zaniewska?
18     A.   A person who is responsible for
19 the contact between TVP and Polvision on the
20 operational basis.
21     Q.   Right. Is she still with TVP?
22     A.   No, she's not.
23     Q.   When did she leave?
24     A.   I don't know.
25     Q.   Did she leave while you were head

54 (Pages 210 to 213)

Page 214

```
1              MARIA E. NADOLNA
2   of the department?
3        A.    Maybe.  I don't remember.
4        Q.    Have you ever talked to her about
5   this correspondence?
6        A.    No, because she's not anymore.
7        Q.    Okay.
8        A.    In the company.
9        Q.    Well, did she die?
10       A.    No, she's not in the company.
11       Q.    I said did she die?
12       A.    No, I don't know.
13       Q.    So it's possible to talk to her
14  even if she's not employed by the company, isn't
15  it?
16       A.    Why should I talk to her?
17       Q.    Okay.
18             This same person from TVP says:  A
19  decision has been made that TVP will try to
20  renegotiate a provision that is unfavorable in
21  our cooperation in the settlement agreement
22  between TVP and Spanski Enterprises.
23             I'm sorry, at least in the English
24  version --
25       A.    Which date?
```

Page 215

```
1              MARIA E. NADOLNA
2        Q.    The last E-mail on September 3rd,
3   2009 --
4             MR. WENGER:  The top.
5        A.    On the top.
6        Q.    -- it says:  A decision has been
7   made that TVP will be trying to renegotiate a
8   provision which is unfavorable to our cooperation
9   in the settlement agreement between TVP and
10  Spanski Enterprises.
11       A.    (Reviews.)
12       Q.    Do you see that?
13       A.    Yeah, I see it, uh-huh.
14       Q.    Okay.
15             Was there -- did TVP ever attempt
16  to negotiate, renegotiate that provision?
17       A.    I don't know.
18       Q.    Do you know whether at this time
19  Mr. Spanski even knew about the Polvision
20  license?
21       A.    I don't know.
22       Q.    Do you know whether TVP ever
23  reached out to him to tell him about it?
24       A.    To my knowledge he was informed by
25  the previous director of this department and I
```

Page 216

```
1              MARIA E. NADOLNA
2   was also informing Mr. Spanski when I arrived to
3   this department we were in permanent contact
4   sometimes daily basis day by day.
5        Q.    Ms. Nadolna, you say to your
6   personal knowledge the prior director of the
7   department notified Mr. Spanski, is that correct?
8        A.    Excuse me?
9        Q.    You just testified to your
10  personal knowledge that Mr. Lenarczyk notified
11  Mr. Spanski of the Polvision agreement, is that
12  correct?
13       A.    Still I don't know what,
14  understand one word.
15       Q.    Which word don't you understand?
16       A.    If you can repeat I will tell you.
17       Q.    Do you have personal knowledge of
18  whether Mr. Lenarczyk told Mr. Spanski about the
19  Polvision agreement?
20       A.    I know from Mr. Lenarczyk that he
21  was in contact, permanent contact with
22  Mr. Spanski.
23       Q.    Ms. --
24       A.    This is all I know.
25       Q.    Ms. Nadolna, that is not what I
```

Page 217

```
1              MARIA E. NADOLNA
2   asked.
3             Do you know whether Mr. Lenarczyk
4   told Mr. Spanski about the Polvision agreement?
5        A.    I don't know.
6        Q.    Okay.
7             Have you talked to Mr. Lenarczyk
8   about it?
9        A.    Once.
10       Q.    When?
11       A.    He called me once telling that I
12  have to be in contact with Mr. Spanski because of
13  this case.  That's it.
14       Q.    When was that?
15       A.    I don't know exactly.  I don't
16  remember exactly.
17       Q.    Was it this year?  Was it 2011?
18       A.    It was the beginning of 2010.
19       Q.    Okay.  Is Mr. Lenarczyk still with
20  TVP?
21       A.    No.
22       Q.    Is he dead?
23       A.    I don't know.
24       Q.    Do you have any reason to think
25  he's dead?
```

Page 218

MARIA E. NADOLNA
1
2      A.    This is -- I can presume
3  something, but it's not the case.
4      Q.    You can presume what?
5      A.    He didn't answer the letter so
6  maybe he died.
7      Q.    Okay.
8           Have you tried to reach out to him
9  to ask him --
10     A.    To sending the letters, yes.
11     Q.    Okay.
12          MR. ZAVIN:  Let's mark this as
13  Defendant's Exhibit, I'm sorry, Nadolna Exhibit
14  18.
15          COURT REPORTER:  (Complies.)
16          (Whereupon, two-page document
17  bearing Bates stamp TVP 1011110355, is received
18  and marked as Nadolna Exhibit 18 for
19  Identification.)
20          COURT REPORTER:  Number 18.
21          MR. FINK:  That's 18 coming up?
22          MR. ZAVIN:  Uh-huh.  Okay.
23
24  BY MR. ZAVIN:
25     Q.    There is an exhibit marked as

Page 219

MARIA E. NADOLNA
1
2  18 -- Nadolna 18.  It's a one E-mail dated
3  November 28th, 2009.  I provide the English
4  translation also.
5           Have you ever seen this E-mail
6  before?
7      A.    I don't remember if I saw it.
8      Q.    Okay.  Who is Elzbieta Herezinska?
9      A.    Elzbieta, she is in my office in
10  the department which is dealing with the sales so
11  she is one of the team, selling team.
12     Q.    Okay.
13          Do you have any reason to think
14  that she did not send this E-mail?
15     A.    I don't know.
16     Q.    Well, this was provided to us by
17  your attorneys.
18     A.    Why you say it wasn't sent?
19     Q.    I'm sorry?
20     A.    I didn't understand.
21     Q.    Did you have any reason to think
22  that this is a false document?
23     A.    No.
24     Q.    So is it reasonable to assume that
25  this was an E-mail sent by Ms. Herezinska to

Page 220

MARIA E. NADOLNA
1
2  Ms. Pokropek --
3      A.    Yes.
4      Q.    -- at Polvision?
5      A.    Uh-huh.
6      Q.    Okay.
7           And am I correct that in this
8  E-mail she's saying that, directing Polvision not
9  to further broadcast certain programs?
10     A.    Shall I confirm what I read?
11     Q.    Yes, is that in sum or substance
12  what she's saying?
13     A.    Are you reading what is translated
14  or are you --
15     Q.    You can look at the Polish or the
16  English, whichever you prefer.
17     A.    Okay, but what is the question?
18     Q.    I'm going to withdraw it.  Let's
19  go on.
20          MR. ZAVIN:  Okay, let's mark this
21  as Defendant's Exhibit -- Nadolna Exhibit 19.
22          COURT REPORTER:  (Complies.)
23          (Whereupon, two-page document
24  dated December 21st, 2009, bearing Bates stamp
25  TVP 1011110351, is received and marked as Nadolna

Page 221

MARIA E. NADOLNA
1
2  Exhibit 19 for Identification.)
3          COURT REPORTER:  Number 19.
4
5  BY MR. ZAVIN:
6      Q.    And I've marked a two-page of
7  E-mails with first page in English, English
8  translation, second page is Polish.
9      A.    (Reviews.)
10     Q.    Okay.
11          This is a letter -- it appears to
12  be a letter, I'm sorry, appears to be an E-mail
13  on this page dated December 21st, 2009 from
14  Ms. Zaniewska again to Polvision, is that
15  correct?
16     A.    The 21st of December?
17     Q.    That's correct.
18     A.    Zaniewska to Pokropek.
19          MR. ZAVIN:  P-o-k-r-o-p-e-k.
20     A.    Uh-huh.
21     Q.    Do you have any reason to think
22  that this is a fake document?
23     A.    No.
24     Q.    Okay.
25          So can we assume that this was, in

56 (Pages 218 to 221)

Page 222

MARIA E. NADOLNA

1  fact, sent by TVP to Polvision?
2
3      A.    I can confirm what I see probably
4  it was sent.
5      Q.    Okay.
6            And do you know why TVP told
7  Polvision to stop broadcasting series received
8  from TVP?
9      A.    TVP -- I can say that probably
10 people from the office in connection with this
11 agreement from 2009 with Spanski, they presume
12 that there might be some problem so in good faith
13 they are asking to stop broadcasting.  This is
14 what I understand.
15     Q.    Okay.
16           MR. ZAVIN:  And then let's mark
17 this as Nadolna Exhibit 20.
18           COURT REPORTER:  (Complies.)
19           (Whereupon, one-page document
20 dated December 23rd, 2009, bearing Bates stamp
21 P00172, is received and marked as Nadolna Exhibit
22 20 for Identification.)
23           COURT REPORTER:  Number 20.
24           MR. WENGER:  Do you have the
25 original of this?

Page 223

MARIA E. NADOLNA

1
2      A.    English version only?
3            MR. ZAVIN:  As far as we know this
4  is the original or --
5            MR. FINK:  You think there is no
6  Polish version?
7            MR. ZAVIN:  We're checking.
8
9  BY MR. ZAVIN:
10     Q.    In the meantime perhaps I can
11 shorten this.
12           Ms. Nadolna, have you ever seen
13 this E-mail in either in English or Polish
14 version before?
15     A.    I don't remember.
16     Q.    Okay.
17           Do you know whether again on
18 December 23rd TVP instructed Polvision not to air
19 various serials including Plebania, Zlotopolscy,
20 Klan Na dobre i na zle?
21     A.    Uh-huh.
22     Q.    Do you know whether those
23 instructions were given?
24     A.    If they were given or why?
25     Q.    Do you know whether TVP gave the

Page 224

MARIA E. NADOLNA

1
2  instruction to Polvision?
3      A.    It is what is said in this E-mail.
4      Q.    Okay.
5            So you have no reason to think
6  this is incorrect?
7      A.    No.
8            MR. WENGER:  Sorry, just what do
9  you mean by incorrect?
10           MR. ZAVIN:  That she has no reason
11 to think that that instruction was not given.  And
12 I think the witness understood that.
13     Q.    Didn't you?
14     A.    Uh-huh.
15     Q.    Okay.
16           MR. ZAVIN:  Let's mark this as
17 Nadolna Exhibit 21.
18           COURT REPORTER:  (Complies.)
19           (Whereupon, two-page document
20 bearing Bates stamp TVP 1011110352, is received
21 and marked as Nadolna Exhibit 21 for
22 Identification.)
23           COURT REPORTER:  Number 21.
24
25 BY MR. ZAVIN:

Page 225

MARIA E. NADOLNA

1
2      Q.    I'm showing you a two-page
3  document there is both an English and a Polish
4  version of an E-mail again from Ms. Zaniewska on
5  January 6th, 2010.
6      A.    (Reviews.)
7      Q.    Do you see this document?
8      A.    Yes.
9      Q.    Do you have any reason to think
10 this is not a correct copy of an E-mail from
11 TVP's files?
12     A.    No.
13     Q.    Okay.
14           In this E-mail Ms. Zaniewska is
15 offering Polvision some programs, is that
16 correct?
17     A.    Yes.
18     Q.    And she says that -- which have
19 not been broadcast in the last two years, is that
20 correct?
21     A.    Yes.
22     Q.    Okay.
23           Do you know whether these programs
24 were ever broadcast on TVPolonia or TVPolonia?
25     A.    I don't know.

57 (Pages 222 to 225)

Page 226

MARIA E. NADOLNA

2  Q.   Okay.
3       It also says that Mr. Lenarczyk
4  seems to be a director of --
5  A.   Uh-huh.
6  Q.   -- the International Cooperation
7  Office, correct?
8  A.   It's what is said in this E-mail.
9  Q.   Yeah, and is this the position
10 that you took over in January of 2010?
11 A.   Yes.
12 Q.   When did you take it over in 2010?
13 A.   The 6th of January 2010.
14 Q.   Okay.
15      Did you discuss any of this matter
16 with Ms. Zaniewska at that time when you took
17 over as the head of the department?
18 A.   Directly, no.
19      COURT REPORTER:  The what?
20 A.   Directly, no.
21 Q.   How about indirectly?
22 A.   No.
23 Q.   Did you discuss this --
24 A.   At this moment, no.
25 Q.   Did you discuss -- I didn't say at

Page 227

MARIA E. NADOLNA

2  this moment.  I said after you took over as the
3  head of the department, did there come a time
4  when you discussed this matter with
5  Ms. Zaniewska?
6  A.   No.
7  Q.   Did you discuss it with someone
8  else?
9  A.   Yes.
10 Q.   Who?
11 A.   With Mrs. Elzbieta Herezinska,
12 sorry, and Mr. Nogod Foland [phonetic].
13 Q.   Are they still with TVP?
14 A.   Yes.
15 Q.   What was the sum and substance of
16 your discussions with them?
17 A.   They informed me that there might
18 be some problems with the contract with
19 Polvision.
20 Q.   What did -- what problems did they
21 inform you of?
22 A.   Exactly they wanted me to, just to
23 inform that there is a contract and they needed
24 somehow some kind of help, advice, what shall
25 they do for the future concerning this contract.

Page 228

MARIA E. NADOLNA

2  Q.   What did they need advice on?
3  A.   As they heard that there might be
4  some problems concerning both the contract with
5  Polvision, realization of this contract in the
6  future and the settlement -- the contract which
7  in 2009 the settlement which was signed with
8  Mr. -- with CEI [sic] company.
9  Q.   And what did they tell you the
10 conflict was?  I want you to tell me to the best
11 of your recollection what they told you.
12 A.   Employees on the operational basis
13 level, they were not fully informed by the
14 company concerning the contract, the wording of
15 the contract, the new contract with CEI [sic]
16 company.  They heard that something has changed
17 and they knew that the contract with Polvision
18 was signed and there was this information in the
19 company so they wanted to know what shall they
20 do.  I was also the new coming director and as I
21 received phone calls from Mr. Spanski telling me
22 to immediately cancel the contract with Polvision
23 we started to investigate what is the wording of
24 the contract, one contract, the other contract,
25 what shall we do?  This was the beginning of

Page 229

MARIA E. NADOLNA

2  January and as we wanted to be correct and have
3  no problems any conflict with both partners as
4  they are both very important for us that's why we
5  started some action just not to have another
6  process in front of the Court as we were after
7  long and very expensive legal aspects.  So that's
8  why we started to solve this problem which will
9  come in future or will be treated as a problem.
10 Q.   Well, I appreciate your answer
11 this time.
12      Now, if you could just go back and
13 say in your first conversation with them what did
14 they say to you, what did they tell you?
15 A.   They informed me that there is an
16 agreement with Polvision and they wanted advice.
17 That's it.
18 Q.   Did they tell you that TVP had
19 instructed Polvision not to broadcast any of the
20 series?
21 A.   They told me that they received
22 different information from different sides and
23 they wanted me to solve this problem.  This was
24 the first contact me as coming director with them
25 taking care of the clients.

58 (Pages 226 to 229)

Page 230

```
1              MARIA E. NADOLNA
2        Q.    And what was your solution to the
3   problem?
4        A.    To investigate all the documents
5   step by step and as I found that Polvision wasn't
6   paying on time so I sent the letter that I'm
7   canceling this contract because they are not
8   paying on time.
9        Q.    Okay.  Actually --
10       A.    Then I asked the legal
11  department --
12       Q.    You've anticipated --
13       A.    -- to give me information how can
14  I deal with this things.
15       Q.    Okay.
16             MR. ZAVIN:  Let's mark this as
17  Nadolna 22.
18             COURT REPORTER:  (Complies.)
19             (Whereupon, two-page document
20  dated January 25th, 2010, bearing Bates stamp TVP
21  05161100044, is received and marked as Nadolna
22  Exhibit 22 for Identification.)
23             COURT REPORTER:  Number 22.
24
25  BY MR. ZAVIN:
```

Page 231

```
1              MARIA E. NADOLNA
2        Q.    Is this the letter, this Exhibit
3   22 a copy of the letter with translation that you
4   sent to Mr. Kotaba --
5        A.    Yes.
6        Q.    -- in or about January 25th, 2010?
7        A.    Yes.
8        Q.    Okay.
9              Why in addition to terminating the
10  agreement -- well, actually I have a question:
11  Is everything in this letter true?
12       A.    Should be true.  Yes.
13       Q.    And it's accurate and true?  I
14  want you to take another, a close look at it.
15       A.    This is, this is my letter.
16       Q.    Okay.
17       A.    So it is true.
18       Q.    Take a look at the first sentence.
19  Does it say when the contract between Polvision
20  and TVP was entered into?
21       A.    It was conducted on the 31st of
22  August.
23       Q.    Well, the English translation is,
24  says that TVP is terminating the contract with
25  Polvision that was entered into on August 31st,
```

Page 232

```
1              MARIA E. NADOLNA
2   2009.  Is that an accurate translation?
3        A.    I don't know.
4        Q.    Well, you can look at the Polish
5   version?
6        A.    But I'm not the linguistic person.
7   It's not my profession language.
8        Q.    Ms. Nadolna, you wrote this
9   letter.  Did you say that --
10       A.    This is true.  I wrote it.
11       Q.    And isn't it true that this says
12  it's terminating the agreement that was entered
13  into on August 31st, 2009?
14       A.    But it still confirm that the
15  agreement started its life before and the date
16  31st of August this was a date of registering the
17  agreement in the company.  This is the procedure
18  which it is usually done with every contract.  So
19  this is true that it was conducted on that day.
20  Final the registration -- it's the final
21  administrative work, but it is not saying that it
22  wasn't before valid.
23       Q.    Okay.
24             What is the Polish word that's
25  been translated here as entered?
```

Page 233

```
1              MARIA E. NADOLNA
2        A.    (Indicating.)
3              (Whereupon, the witness speaks in
4   Polish.)
5        A.    So what?
6        Q.    And what is -- what does that
7   mean?  If you know in English?
8              MR. WENGER:  I think Jonathan is
9   asking for what the word is in the letter.
10             MR. ZAVIN:  Yeah.
11             MR. WENGER:  In the Polish letter.
12       A.    This is Polish word.
13             MR. ZAVIN:  She just gave it to me.
14
15  BY MR. ZAVIN:
16       Q.    And what does that word mean in
17  English?  What's the proper translation of that
18  word?
19       A.    You're asking me?
20       Q.    Yes, if you know?  You can say you
21  don't know?
22       A.    I don't know.
23       Q.    Okay.
24             In this letter you also in
25  addition to terminating, purporting to terminate
```

59 (Pages 230 to 233)

Page 234

MARIA E. NADOLNA

1    the agreement for failure to pay say, ask them to
2    immediately cease airing four specific series.
3            Do you see that? It's the second
4    to last paragraph.
5        A.    Yes.
6        Q.    Why did you do that?
7        A.    In order to work in good faith, in
8    order to not to bring any risk to the company and
9    before I received the information that in future
10   there might be problems that would be the only
11   way to go, and according to the situation that
12   Polvision didn't pay on time and it was the only
13   way to stop the contract, but I couldn't stop it.
14       Q.    Why couldn't you stop it?
15       A.    Because it was legally conducted
16   in July 2009 and it should operate. If other
17   side didn't agree to counsel, didn't agree to
18   resign from the agreement the agreement was valid
19   and should be operated.
20       Q.    Then you receive a response to your
21   letter to Mr. Kotaba?
22       A.    I receive a lot, many letters from
23   Mr. Kotaba.
24       Q.    Well, did you specifically receive

Page 235

MARIA E. NADOLNA

1    a response to that letter of January 25th?
2        A.    I don't know. I need to look.
3    I'm -- every day I'm signing a lot of documents.
4    I'm corresponding with my clients. I'm taking
5    care of my clients, receiving and having
6    conversation with my clients.
7            MR. FINK: Okay.
8        Q.    How often --
9            MR. FINK: There is no question.
10       Q.    How often do your clients threaten
11   to sue you?
12       A.    I don't know.
13       Q.    Well, more than ten times a year?
14       A.    I don't know.
15       Q.    Is it unusual for your clients to
16   threaten to sue you?
17       A.    I'm not legal department.
18       Q.    I wasn't asking about the legal
19   department.
20           Is it unusual --
21       A.    We are thirty-three units in the
22   company employing four thousand people and each
23   unit is responsible for its duties and legal
24   department is responsible for legal matters, so

Page 236

MARIA E. NADOLNA

1    this is the only department which can give
2    answer, precise answer to your question.
3        Q.    No. You may have misunderstood
4    it. I didn't ask how many times people ask to
5    sue, I said that was just going to sue TVP.
6            I said specifically how many times
7    a year do your clients tell you that they're
8    going to sue TVP because of something you've
9    done?
10       A.    It happens sometimes. I mean
11   during the -- you are asking about conversation?
12       Q.    Or letters.
13       A.    People say different things when
14   they are getting angry, but it doesn't show --
15           MR. ZAVIN: Let's mark this as
16   Exhibit 24.
17           MR. PISKORA: 23.
18           MR. ZAVIN: 23.
19           COURT REPORTER: (Complies.)
20           (Whereupon, multi-page document
21   dated January 26th, 2010, bearing Bates stamps
22   TVP 00045 through TVP 00047, is received and
23   marked as Nadolna Exhibit 23 for Identification.)
24           COURT REPORTER: Number 23.

Page 237

MARIA E. NADOLNA

1
2    BY MR. ZAVIN:
3        Q.    Do you recognize this document?
4        A.    Yes.
5        Q.    It is in English and -- a Polish
6    document with an English translation attached.
7            Was this Mr. Kotaba's response to
8    you, your E-mail or letter E-mail January 25th?
9        A.    Yes.
10       Q.    Okay.
11           In this letter Mr. Kotaba states
12   on the third paragraph that on August 31st, 2009
13   a licensing agreement was entered into between
14   Telewizja Polska and Polvision, is that correct?
15       A.    Could you repeat?
16       Q.    In the first sentence of what
17   appears to be the third paragraph it says: On
18   August 31st, 2009 a licensing agreement was
19   entered into between Telewizja Polska and
20   Polvision, is that correct?
21       A.    This is what's in this letter,
22   yes.
23       Q.    Okay.
24           Do you know why Mr. Kotaba said

60 (Pages 234 to 237)

Page 238

MARIA E. NADOLNA

1    MARIA E. NADOLNA
2  that the license agreement was entered into on
3  August 31st?
4        A.    As it was registered on that day.
5        Q.    He didn't say it was registered on
6  that day, did he?  He said it was entered into,
7  didn't he?
8        A.    The letter -- the agreement was
9  registered on that day.  It was -- it was
10 conducted before.  That's it.
11       Q.    How did -- did you respond to this
12 letter?
13       A.    I always respond letters which I
14 receive.
15       Q.    And what --
16       A.    This is my job.
17       Q.    And what was your response?
18       A.    I don't know.  I don't remember.
19       Q.    Did you continue to take the
20 position that the contract with Polvision was
21 terminated?
22       MR. WENGER:  Objection.
23       Q.    Did you?
24       A.    That was my position.
25       Q.    And Mr. Kotaba's letter didn't

Page 239

1    MARIA E. NADOLNA
2  change that position?
3        A.    No.
4        Q.    In fact, I'm showing you a
5  document that's been marked, that I'm having
6  marked as Exhibit 24.
7        COURT REPORTER:  (Complies.)
8        (Whereupon, two-page document
9  dated February 18th, 2010, bearing Bates stamp
10 TVP 1011110353, is received and marked as Nadolna
11 Exhibit 24 for Identification.)
12       COURT REPORTER:  Number 24.
13
14 BY MR. ZAVIN:
15       Q.    Do you recognize Exhibit 24?
16       A.    Yes.
17       Q.    And what is that?
18       A.    This is my letter sent to
19 accountant department.
20       Q.    And what was the purpose of this
21 letter?
22       A.    As in my opinion the contract was
23 canceled basing on the regulation which is in the
24 contract that when the client doesn't pay I can
25 cancel.  This was my opinion on that moment that

Page 240

1    MARIA E. NADOLNA
2  I can cancel this contract because they are not
3  paying.
4        Q.    Did your opinion ever change?
5        A.    Yes, as I received the information
6  from legal department which I asked for the
7  opinion and I was informed that the contract is
8  valid.  I cannot cancel it and also the client
9  paid his payment, has done his payment according
10 to the contract, so I was informed that the only
11 way to cancel the contract is basing on mutual
12 cooperation.  And on that time I have to mention
13 that Mr. Spanski was insisting and calling me to
14 cancel the contract.  So having situation that
15 might be conflict, a risk for the company, I was
16 doing my best not to make any risk for the
17 company trying to cancel the contract.  I
18 couldn't do it so the only way was to negotiate
19 with Polvision.
20       Q.    Okay.
21       MR. FINK:  Can we take a break,
22 please?
23       MR. ZAVIN:  I'd like to make it
24 very short.  Obviously I will concede if you'd
25 like, but I'd like to keep going at this point so

Page 241

1    MARIA E. NADOLNA
2  how long a break do you want?
3        MR. FINK:  Five minutes.
4        MR. ZAVIN:  Okay.  Let's make it no
5  more than five.
6        THE VIDEOGRAPHER:  The time is 5:41
7  p.m.
8        And we're going off the record.
9        (Whereupon, a short recess is
10 taken.)
11       THE VIDEOGRAPHER:  Stand by,
12 please.
13       The time is 5:46 p.m.
14       And we're back on the record.
15       MR. ZAVIN:  Okay.
16       Let's mark this as Nadolna Exhibit
17 25.
18       COURT REPORTER:  (Complies.)
19       (Whereupon, multi-page document
20 dated March 30th, 2010, bearing Bates stamps TVP
21 0720110298 through TVP 0720110299, is received
22 and marked as Nadolna Exhibit 25 for
23 Identification.)
24       Q.    And, Ms. Nadolna --
25       COURT REPORTER:  Number 25.

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 242

1              MARIA E. NADOLNA
2       MR. ZAVIN:  Yeah.
3
4   BY MR. ZAVIN:
5       Q.   Ms. Nadolna, the court reporter
6   has handed you a document that we've marked as
7   Exhibit 25 which again I'm marking both the
8   original Polish document and the translation for
9   ease.
10      A.   (Reviews.)
11           MR. WENGER:  Do we have two
12  translations here or --
13           MR. ZAVIN:  I believe I only -- I
14  have only one.  So I'm not quite sure what you're
15  referring to.
16           MR. WENGER:  A few pages in I think
17  five pages in I have just another version of a
18  translation.
19           MR. ZAVIN:  I think it's a
20  duplicate document.
21           MR. WENGER:  It's a different
22  translation, but that's fine.  I just want to --
23           MR. FINK:  Is your document that
24  you're working from six pages long?
25           MR. ZAVIN:  Four pages long.

Page 243

1              MARIA E. NADOLNA
2           MR. FINK:  We have six pages.
3           MR. ZAVIN:  May I have that?  Let
4   me see what's done here.
5           MR. FINK:  Just tear it apart.
6           MR. WENGER:  It's the same document
7   being translated.
8           MR. ZAVIN:  Let's just take off the
9   last two pages.
10          THE WITNESS:  This is the
11  translation with the signature?
12
13  BY MR. ZAVIN:
14      Q.   To avoid confusion just remove the
15  last two pages because I think, Ms. Nadolna, what
16  I gave you is a four-page document?
17      A.   This is the translation and --
18  March --
19          MR. FINK:  There seem to be two
20  different translations to the same document.
21      Q.   Let me remove if I may the last
22  two pages.
23      A.   Okay.
24      Q.   So that Exhibit 25 is a four-page
25  document.  Okay.

Page 244

1              MARIA E. NADOLNA
2       Ms. Nadolna, do you recognize
3   Exhibit 25?
4       A.   I don't have it.  You took it.
5       Q.   I apologize.
6       A.   Thank you.
7       Q.   Let me ask that question again now
8   that I've actually given you the exhibit.
9           Do you recognize Exhibit 25?
10      A.   I recognize the Polish version.
11      Q.   Okay.  What is it?
12      A.   It's a letter from the 30th of
13  March 2010.
14      Q.   And is this a letter that you
15  wrote?
16      A.   I signed it, yes.
17      Q.   Well, did you write the letter?
18      A.   There is person who is preparing
19  the wording and I'm accepting the wording and I'm
20  signing the document.  This is the procedure.
21      Q.   Okay.
22           And to the best of your knowledge
23  everything in this is true and accurate?
24           MR. FINK:  This being the English?
25           MR. ZAVIN:  This being the Polish.

Page 245

1              MARIA E. NADOLNA
2       A.   Polish one.
3           MR. ZAVIN:  I'm asking her whether
4   the document she signed is true and accurate.
5       A.   Yes.
6
7   BY MR. ZAVIN:
8       Q.   Okay.  Who is this letter to?
9       A.   This is the letter to the director
10  of TVPolonia chief editor of this channel.
11      Q.   Okay.
12           In this letter to the director of
13  TVPolonia, didn't you tell them that in light of
14  the settlement agreement signed by TVP with
15  Spanski it was impossible to implement the
16  provisions of the license agreement entered into
17  between TVP and Polvision?
18      A.   Could you repeat?
19           MR. ZAVIN:  Why don't you read the
20  question back.
21           COURT REPORTER:  (Complies.)
22           (Whereupon, the requested portion
23  is read back by the reporter as follows:
24           "QUESTION:  Okay.
25           "In this letter to the director of

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 246

MARIA E. NADOLNA

1
2   TVPolonia, didn't you tell them that in light of
3   the settlement agreement signed by TVP with
4   Spanski it was impossible to implement the
5   provisions of the license agreement entered into
6   between TVP and Polvision?")
7       A.   Yes.
8
9   BY MR. ZAVIN:
10      Q.   Why was it impossible to implement
11  the provisions of the licensing agreements
12  entered into between TVP and Polvision?
13      A.   According to my knowledge and
14  communication with Mr. Spanski it showed that
15  there might be some problem in future concerning
16  the agreement with Polvision.
17      Q.   Did you use the word
18  impossibility?
19      A.   You mean in the letter or --
20      Q.   Yes.  Did you say it was
21  impossible to further implement the agreement
22  with Polvision?
23      A.   Yes, to my knowledge it was what I
24  meant at that time.
25      Q.   Okay.

Page 247

MARIA E. NADOLNA

1
2           What were you asking the director
3   to do in this letter?
4       A.   I was requesting him to consider
5   the possibility of --
6           COURT REPORTER:  What?  I didn't
7   understand what you said.
8       A.   I was requesting Mr. Laskowski to
9   consider the possibility to postponing the date
10  of the premiere of TVPolonia series according to
11  the attachment.
12      Q.   And these were shows -- the
13  premiere on TVPolonia would have been postponed,
14  but the shows would have been shown later on
15  TVPolonia, correct?
16      A.   I don't know.
17      Q.   Well, in your letter don't you
18  specifically say that the series could be shown
19  in the TVPolonia channel following the expiration
20  of the license with Polvision?
21      A.   Yes, it is in this letter.
22      Q.   And let's assume that
23  Mr. Laskowski had agreed to do this and postpone
24  the premieres on TVPolonia knowing that they
25  would be on TVPolonia two years later, would that

Page 248

MARIA E. NADOLNA

1
2   have violated your settlement agreement with
3   Mr. Spanski with SEI?
4           MR. FINK:  Objection.
5           Calls for a legal conclusion.
6       Q.   To the best of your knowledge?
7           MR. FINK:  Same objection.
8       Q.   You can answer if you can.
9       A.   It's your theoretical question.
10      Q.   Well, actually that's exactly what
11  you were suggesting in this letter, isn't it?
12  It's your --
13      A.   It might cause, it might, might be
14  after, might be.  It doesn't show that they will
15  be.
16          MR. FINK:  I'm sorry, what is it
17  that you think she's suggesting in this letter?
18      Q.   Are you suggesting in this letter
19  that the premiere of certain series on TVPolonia
20  be deferred?
21      A.   Postponed.  The date of the
22  premiere, the possibility of changing the date of
23  the premiere.
24      Q.   You didn't suggest in the letter
25  that these shows never be shown on TVPolonia?

Page 249

MARIA E. NADOLNA

1
2       A.   I --
3       Q.   Did you?
4       A.   I could not suggest to the editor
5   or chief editor of any channel.  I can only ask
6   and I can only say that after finishing this
7   contract there might be for the admission.
8       Q.   But you were suggesting that they
9   be deferred, correct?
10      A.   I'm --
11      Q.   That's what you're suggesting?
12      A.   I'm not suggesting.  I'm asking,
13  I'm requesting, kindly requesting to think about
14  the possibility of changing the date of the
15  premiere of certain series.
16      Q.   And if and this is hypothetical,
17  if TVP had knowingly deferred the premiere of
18  those series license to the Polvision and then
19  subsequently put it on -- license it to Polvision
20  and then subsequently put it on TVPolonia, that
21  would have been a clear breach of the settlement
22  agreement with Mr. Spanski, wouldn't it?
23          MR. FINK:  Objection.
24          Calling for a legal conclusion.
25      Q.   Do you know?

63  (Pages 246 to 249)

Page 250

MARIA E. NADOLNA

1    A.    It's the theory.  I cannot ask,
2
3 say anything about weather tomorrow, so I cannot
4 say something about this theory.
5    Q.    Ms. Nadolna, are you saying you're
6 incapable of answering hypothetical questions?
7    A.    I'm here to say facts and the
8 truth and I will do everything to say facts and
9 the truth.
10    Q.    Okay.
11        And isn't it the truth that you
12 requested that the premiere, the date of the
13 premiere be deferred?
14        MR. FINK:  Actually she testified
15 to change, not defer.
16        MR. ZAVIN:  Okay.
17
18 BY MR. ZAVIN:
19    Q.    Isn't it a fact that you requested
20 it to be changed?
21    A.    I requested, kindly requested to
22 think about the possibility of changing the date
23 of the premiere.
24    Q.    Well, we'll let you explain that
25 difference to the judge at the trial.

Page 251

MARIA E. NADOLNA

1
2        MR. WENGER:  I don't think that
3 comment is necessary.
4        MR. ZAVIN:  Boy, it's
5 well-deserved.
6        MR. WENGER:  But it's not
7 necessary.
8        MR. ZAVIN:  Okay.
9        Let's mark this as Nadolna 26.
10        COURT REPORTER:  (Complies.)
11        (Whereupon, multi-page document
12 entitled note from meeting with a representative
13 of the company Polvision in Chicago on April 1st,
14 2010, bearing Bates stamps TVP 1011110356 through
15 TVP 1011110357, is received and marked as Nadolna
16 Exhibit 26 for Identification.)
17        COURT REPORTER:  Number 26.
18
19 BY MR. ZAVIN:
20    Q.    Ms. Nadolna, I'm showing you an
21 exhibit that's been marked as Nadolna Exhibit 26.
22    A.    (Reviews.)
23    Q.    Do you recognize this document?
24    A.    Yes.
25    Q.    Okay.  What is this document?

Page 252

MARIA E. NADOLNA

1    A.    It's internal document.  Internal
2
3 note, memo.
4    Q.    Of what?
5    A.    The memo of the meeting.
6    Q.    And it was a meeting that you
7 participated in?
8    A.    Yes.
9    Q.    Okay.  And who else was at this
10 meeting?
11    A.    The people from the sales team and
12 the representative of Polvision.
13    Q.    Okay.
14        And what was the purpose of this
15 meeting?
16    A.    The topic of the meeting was to
17 discuss the terms, the regulation, the conditions
18 of cooperation between TVP and Polvision in
19 accordance to the contract in reference to the
20 settlement of CEI [sic].
21    Q.    So if I understand this correctly
22 the subject of the meeting was to terminate the
23 agreement of August 31st, 2009?
24    A.    It wasn't the subject of this
25 meeting.

Page 253

MARIA E. NADOLNA

1
2    Q.    And -- well, and to enter into a
3 new agreement?
4    A.    As I said, the meeting, the topic
5 of the meeting was to discuss with Polvision that
6 the conditions, the regulation of the cooperation
7 between TVP and Polvision after the license
8 agreement was canceled.  It's not the same word.
9    Q.    By the way, did you -- a couple of
10 things.
11        First in the first sentence this
12 again refers to the agreement concluded on August
13 31st, 2009, doesn't it?
14    A.    This is internal, this is internal
15 document.  This is a memo showing who was meeting
16 whom, what was intention.  This is the summary of
17 this meeting.
18    Q.    That isn't what I asked.  Is it
19 correct that this document says that the purpose
20 of the meeting is to discuss the termination by
21 TVP of the licensing agreement concluded with
22 this company on August 31st, 2009?
23    A.    No.
24    Q.    It doesn't say --
25    A.    It is to discuss the condition

64  (Pages 250 to 253)

Page 254

MARIA E. NADOLNA
1
2  after termination of the contract of the license
3  between TVP and Polvision.
4       Q.    And doesn't it say that the
5  licensing agreement was concluded on August 31st,
6  2009? That's what it says, doesn't it?
7       MR. FINK:  You're asking if the
8  words August --
9       MR. ZAVIN:  Yes.
10      MR. FINK:  -- 31st, 2009 appear on
11 the --
12      MR. ZAVIN:  Yes.
13      MR. FINK:  -- document?
14
15 BY MR. ZAVIN:
16      Q.    No, and it says that the licensing
17 agreement was concluded on August 31st, 2009,
18 that's what it says, doesn't it?
19      A.    It was conducted.  I don't -- we
20 are talking about the word -- we are talking
21 about the words?
22      Q.    What's the word in Polish that's
23 been translated concluded?
24      A.    The final -- when you final
25 conduct the final moment that you have the

Page 255

MARIA E. NADOLNA
1
2  complete documents is the registration that this
3  is the date of the registration.  This is the
4  final step of the process.
5       Q.    What's the word in Polish that's
6  been translated in this document concluded?
7       A.    (Indicating.)
8            (Whereupon, the witness speaks in
9  Polish.)
10      Q.    And what is the proper translation
11 of that word into English if you know?
12      A.    I don't know.
13      Q.    Okay.
14            Now, was Mr. Spanski told about
15 this meeting?
16      A.    I don't know.  I don't remember.
17      Q.    Well, did you tell Mr. Spanski or
18 anyone from SEI about this meeting?
19      A.    I'm cooperating with three hundred
20 clients.  Shall I inform Mr. Spanski about every
21 meeting I'm having?  This meeting was in purpose
22 to solve the problems which might be risky for
23 the company and it was according to the phone
24 calls of Mr. Spanski to do my best to consult, to
25 change -- this confirms my best wishes to do

Page 256

MARIA E. NADOLNA
1
2  everything that both clients, very important for
3  me, will be satisfied.
4       Q.    Did you keep Mr. Spanski informed
5  about arrangements you were making with other
6  distributors in North America in this case?
7       MR. FINK:  Objection to form.
8            Other distributors?
9       MR. ZAVIN:  Other distributors of
10 TVP content?
11      MR. FINK:  Your question to her is
12 does she remember she informed Mr. Spanski
13 about --
14      MR. ZAVIN:  It wasn't does she
15 remember.  It was did you.
16
17 BY MR. ZAVIN:
18      Q.    Did you keep Mr. Spanski informed
19 about arrangements you were making with Polvision
20 in North America?
21      A.    Mr. Spanski was informed
22 permanently about everything what was concerning
23 the subject.  So I don't know if he was informed,
24 but there is no reason to, not to inform.
25      Q.    Well, actually you agreed to a

Page 257

MARIA E. NADOLNA
1
2  confidentiality provision at this meeting, didn't
3  you, with a penalty of fifty thousand Polish
4  zlotys if someone breached it, didn't you?
5       A.    In which sentence?
6       Q.    Please look at the last sentence
7  on the indented paragraph.
8       MR. FINK:  Third hashmark.
9       Q.    Third hashmark.
10      A.    So what is the question?  I'm
11 sorry.
12      Q.    There is an agreement that the
13 terms of the agreement with Polvision were to be
14 kept confidential, correct?
15      MR. WENGER:  Which agreement with
16 Polvision?
17      MR. ZAVIN:  Okay.
18
19 BY MR. ZAVIN:
20      Q.    What is the -- what was the intent
21 of the paragraph that's in English that says a
22 clause regarding confidentiality?  It's in the
23 first paragraph, the third hashmark.  I'll adopt
24 your counsel's term.
25      MR. WENGER:  Just to be clear, I

65 (Pages 254 to 257)

Page 258

MARIA E. NADOLNA
1 think, Mr. Zavin, that you need to show her the
2 top line and a half there that is on top of that
3 document so that she has a full understanding of
4 what she --
5 MR. ZAVIN: Okay.
6
7 BY MR. ZAVIN:
8 Q. Obviously you can look at that
9 entire paragraph if you'd like.
10 MR. WENGER: Okay.
11 A. During this meeting we were
12 discussing the conditions of the annex to the
13 agreement and the different conditions mentioned
14 here and the clause, standard clause, this is
15 what I --
16 Q. It's a standard clause? This
17 confidentiality provision is found in all of your
18 licensing agreements?
19 A. I don't remember.
20 Q. Well, what do you mean by a
21 standard clause?
22 A. When you sign a contract you
23 always have confidentiality of the contract.
24 This is standard.

Page 259

MARIA E. NADOLNA
1 Q. This was no contract. This was a
2 material term that you were discussing --
3 A. It's what we discussed so.
4 Q. And just out of curiosity do any
5 of your contracts with Mr. Spanski or SEI have a
6 confidentiality clause with a penalty of fifty
7 thousand zlotys?
8 MR. FINK: Any of the contracts?
9 MR. ZAVIN: Any of TVP's contracts
10 with --
11 MR. FINK: There is only one
12 contract. There is more than one contract?
13 MR. ZAVIN: It's been amended three
14 times. Any of the contracts or amendments --
15 MR. FINK: There is one contract
16 with amendments.
17
18 BY MR. ZAVIN:
19 Q. Any of the contracts or amendments
20 with SEI have a confidentiality clause that has a
21 penalty of fifty thousand Polish zlotys?
22 MR. FINK: Objection to form.
23 A. This is the standard form of the
24 agreements we are signing in the company that the

Page 260

MARIA E. NADOLNA
1 party which is -- where in the contract would ask
2 not to inform other parties. Just this is the
3 confidential of business.
4 Q. All right.
5 Ms. Nadolna, that didn't answer my
6 question. I asked specifically do any of the
7 contracts with SEI --
8 A. I don't know. You're asking me
9 about things -- I'm telling you what was the --
10 what else on the meeting.
11 Q. And, in fact, had TVP informed
12 Mr. Spanski about the content of that annex that
13 was going to be negotiated with Polvision it
14 would have been in violation of this
15 confidentiality agreement, wouldn't it?
16 MR. WENGER: Objection.
17 That calls for a legal conclusion
18 and also this here is discussing that TVP will
19 prepare a draft annex containing certain terms.
20 MR. ZAVIN: Okay.
21
22 BY MR. ZAVIN:
23 Q. You can answer.
24 A. So what is the question?

Page 261

MARIA E. NADOLNA
1 Q. If this clause was contained in
2 the annex TVP could not have told Mr. Spanski
3 about it?
4 A. But it is a theory. You cannot --
5 Q. You agreed to this, didn't you?
6 You agreed -- you were at this meeting.
7 A. This is the meeting, this is the
8 relation from the meeting what we were talking
9 about, that we are talking about. This is what
10 was discussed.
11 Q. So you --
12 A. And it doesn't say -- what was
13 discussed in the meeting concerning this subject.
14 Q. And then did you tell Mr. Spanski
15 about this meeting?
16 A. I don't know. I was in permanent
17 contact with Mr. Spanski on phone. I was doing
18 my best.
19 Q. When you say permanent contact
20 with Mr. Spanski --
21 A. When he was calling me I was on
22 contact with him.
23 Q. How many times did you speak to
24 Mr. Spanski --

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 262

MARIA E. NADOLNA

1              MARIA E. NADOLNA
2     A.   I don't know.
3          (Unintelligible, simultaneous
4 testimony interrupted by the court reporter.)
5        COURT REPORTER:  I need one at a
6 time, please.
7     Q.   How many times did you speak to
8 Mr. Spanski --
9     A.   Very often.
10    Q.   -- in 2010?  How many?
11    A.   Very often.
12    Q.   More than ten times?
13    A.   I don't know.  I'm concentrating
14 on the business and not counting how many
15 phones --
16    Q.   What do you mean by very often?
17    A.   Not -- more than one or two.
18    Q.   In all of 2010?
19    A.   No, I -- I'm not going to answer.
20 Sorry.
21    Q.   You're not going to answer?
22    A.   I don't remember, sir.  I don't
23 remember.  I'm telling that I'm very often in
24 contact with Mr. Spanski.  It's what I should do
25 and I was doing it.

Page 263

1              MARIA E. NADOLNA
2    Q.   And, Ms. Nadolna, you've said very
3 often and I'm asking what do you mean by very
4 often?
5    A.   This word says everything.
6    Q.   Well, does it mean thirty times a
7 month, every day?  Does it mean thirty times a
8 year to you?  Does it mean five times a year?
9 What does very often mean?
10    A.   As many times as it was necessary
11 to be in contact with my best client and when he
12 was calling me I was answering the phones.  This
13 is what it says in often.
14    Q.   Okay.
15         In this meeting was it also
16 discussed that certain programs would be withheld
17 from TVPolonia during the license to Polvision?
18    A.   They will be withheld if they are
19 agreed by the chief editor of TVPolonia.
20    Q.   Yes, and that withholding would be
21 for the duration of the license to Polvision, is
22 that correct?
23    A.   Yes.
24    Q.   Okay.
25        MR. ZAVIN:  I'm going to have a

Page 264

1              MARIA E. NADOLNA
2 document I'd like to mark as Nadolna Exhibit 27.
3        COURT REPORTER:  (Complies.)
4        (Whereupon, two-page document
5 dated April 8th, 2010, bearing Bates stamp TVP
6 05161100062, is received and marked as Nadolna
7 Exhibit 27 for Identification.)
8        COURT REPORTER:  Number 27.
9
10 BY MR. ZAVIN:
11    Q.   Ms. Nadolna, can you tell me what
12 Exhibit 27 is?  Do you know what Exhibit 27 is?
13    A.   Yes.
14    Q.   What is it?
15    A.   This is the letter to the chief
16 editor director of TVPolonia.
17    Q.   Did you write the letter?
18    A.   I signed it for sure.
19    Q.   And in this you revoke your
20 request to withhold airing this various series
21 from TVPolonia, is that correct?
22    A.   Could you repeat?
23    Q.   In this letter you revoke your
24 request, prior request regarding withholding of
25 series from TVPolonia, is that correct?

Page 265

1              MARIA E. NADOLNA
2        THE WITNESS:  Can you translate?
3        THE INTERPRETER:  (Complies.)
4        (Whereupon, the question was
5 interpreted for the witness.)
6        THE WITNESS:  One more time,
7 please.
8        THE INTERPRETER:  (Complies.)
9        (Whereupon, the question was
10 interpreted for the witness.)
11    A.   It is not directly what is in this
12 letter.
13
14 BY MR. ZAVIN:
15    Q.   Well, so do you agree that's what
16 you basically did?
17    A.   Yes.
18    Q.   Okay.
19        MR. ZAVIN:  Okay.
20        Let's mark this as Nadolna Exhibit
21 28.
22        COURT REPORTER:  (Complies.)
23        (Whereupon, two-page document
24 dated May 5th, 2010, bearing Bates stamp TVP
25 05161100070, is received and marked as Nadolna

67 (Pages 262 to 265)

A-322

Page 266

```
 1              MARIA E. NADOLNA
 2   Exhibit 28 for Identification.)
 3              COURT REPORTER:  Number 28.
 4
 5   BY MR. ZAVIN:
 6        Q.    Ms. Nadolna, do you recognize the
 7   document that's been marked as Nadolna Exhibit
 8   28?
 9        A.    Yes.
10        Q.    What is it?
11        A.    A letter from the 5th of May 2010.
12        Q.    Did you write it?
13        A.    I signed it.
14        Q.    Okay.
15              What was the purpose of that
16   letter?
17        A.    The first paragraph is the
18   information and the second paragraph is the
19   request is the question if Mr. Kotaba accepts the
20   proposal of exchange of the content --
21        Q.    Well --
22        A.    -- and to sign, and to sign the
23   annex amendment --
24        Q.    Okay.
25        A.    -- which was sent to him on the
```

Page 267

```
 1              MARIA E. NADOLNA
 2   7th of May.
 3        Q.    Okay.
 4              Now, did you tell Mr. Kotaba that
 5   in the event he failed to do what you wanted,
 6   you'd commence proceedings associated with the
 7   termination of the contract?
 8        A.    This is the question?
 9        Q.    Yes.
10        A.    Can you repeat the question?
11              MR. ZAVIN:  Can you please repeat
12   it?
13              COURT REPORTER:  (Complies.)
14              (Whereupon, the requested portion
15   is read back by the reporter as follows:
16              "QUESTION:  Okay.
17              "Now, did you tell Mr. Kotaba that
18   in the event he failed to do what you wanted,
19   you'd commence proceedings associated with the
20   termination of the contract?")
21        A.    Yes.
22
23   BY MR. ZAVIN:
24        Q.    What was the basis of you telling
25   him that?
```

Page 268

```
 1              MARIA E. NADOLNA
 2              MR. FINK:  I don't understand the
 3   question.
 4        Q.    Well, what grounds did you have
 5   for terminating the contract?
 6              MR. FINK:  Objection to form.
 7        Q.    You can answer.
 8              MR. FINK:  You don't have to have
 9   grounds to terminate a contract.
10        A.    This was my will to terminate the
11   contract.
12        Q.    Okay.
13              And you were going to commence
14   proceedings to do that, correct?
15        A.    I will start the procedures if we
16   don't agree.
17        Q.    Okay.
18              MR. ZAVIN:  And let's mark this as
19   Exhibit 29.
20              COURT REPORTER:  (Complies.)
21              (Whereupon, two-page document
22   dated May 5th, 2010, bearing Bates stamp TVP
23   05161100290, is received and marked as Nadolna
24   Exhibit 29 for Identification.)
25              COURT REPORTER:  Number 29.
```

Page 269

```
 1              MARIA E. NADOLNA
 2
 3   BY MR. ZAVIN:
 4        Q.    Is this a letter -- Exhibit 29, do
 5   you recognize this?
 6        A.    Yes.
 7        Q.    Is it a letter from you to
 8   Mr. Spanski?
 9        A.    Yes.
10        Q.    Did you tell him that on January
11   25th TVP canceled the contract with Polvision?
12        A.    Yes.
13        Q.    And that any further broadcasting
14   will take place without your knowledge and
15   without your agreement?
16        A.    This was my intention on that
17   time.
18        Q.    Well, actually the contract had
19   not been canceled at that point, had it?
20        A.    It couldn't be canceled.
21        Q.    But you told him that it was
22   canceled?
23        A.    It's what I thought at this
24   moment.
25        Q.    Well, you thought on May 5th that
```

68 (Pages 266 to 269)

Page 270

MARIA E. NADOLNA
1
2  the contract had been canceled on January 25th?
3      A.   Yes.
4      Q.   Did you have any reason to think
5  that Polvision had stopped broadcasting TVP
6  programming on January 25th?
7      A.   I wanted them to stop
8  broadcasting.
9      Q.   I understand you wanted them.  Did
10 you think they had?
11     A.   I wanted them to stop.
12     Q.   Ms. Nadolna, did you think they
13 had stopped?
14     A.   I don't know.
15          MR. WENGER:  Could I just ask Maria
16 to take a look at the Polish version of this
17 letter?  Does it, in fact, translate into
18 canceled?
19          MR. ZAVIN:  I didn't refer to the
20 letter.  I asked her --
21     A.   It doesn't say in Polish that it
22 was canceled.
23     Q.   What does it say in Polish?
24     A.   Maybe she can translate it.
25          (Whereupon, the witness speaks in

Page 271

MARIA E. NADOLNA
1
2  Polish.)
3          MR. SPANSKI:  Terminate the
4  agreement.
5      A.   No.
6          (Whereupon, the witness speaks in
7  Polish.)
8      A.   It means that one side says -- one
9  side says that this agreement is not convenient.
10 One side.  This is one side, but doesn't mean it
11 is canceled.
12          THE INTERPRETER:  Breach, terminate
13 the agreement.
14          MR. ZAVIN:  Terminate.
15          THE INTERPRETER:  Yeah.
16     Q.   One side has terminated the
17 agreement?
18     A.   One side, uh-huh.
19     Q.   Okay.
20          MR. ZAVIN:  We have to take a break
21 to change the tape.
22          THE VIDEOGRAPHER:  The time is 6:25
23 p.m.
24          And this ends Tape Number 4.
25          (Whereupon, a short recess is

Page 272

MARIA E. NADOLNA
1
2  taken.)
3          THE VIDEOGRAPHER:  Stand by,
4  please.
5          The time is 6:32 p.m.
6          And this begins Tape Number 5 of
7  the videotaped deposition of Maria Nadolna.
8          MR. ZAVIN:  Okay.
9          Let's mark this as Exhibit 30.
10         COURT REPORTER:  (Complies.)
11         (Whereupon, two-page document
12 dated May 13th, 2010, bearing Bates stamp TVP
13 05161100071, is received and marked as Nadolna
14 Exhibit 30 for Identification.)
15         COURT REPORTER:  Number 30.
16
17 BY MR. ZAVIN:
18     Q.   Ms. Nadolna, I'm showing you a
19 document that's been marked as Exhibit 30.
20     A.   (Reviews.)
21     Q.   Can you tell me what that is?
22     A.   Is this a question?
23     Q.   Yes, can you tell me what that
24 document is?
25     A.   This is the letter from Mr. Kotaba

Page 273

MARIA E. NADOLNA
1
2  from the May 13th, 2010.
3      Q.   Okay.
4          And this is a letter from you to
5  Mr. Kotaba, correct?
6      A.   From me to Mr. Kotaba.
7      Q.   Yeah.  And in this letter you
8  asked him to stop airing four series, is that
9  correct?
10     A.   Could you repeat the question?
11     Q.   In this letter you stopped, you
12 asked Polvision to stop airing four TVP series,
13 is that correct?
14     A.   Yes.
15     Q.   So as of May 13th you knew the
16 series were still airing, correct?
17     A.   Yes.
18     Q.   This is despite the fact that
19 eight days before you told Mr. Spanski that any
20 airing of these series would be without your
21 knowledge, correct?
22     A.   Yes.
23         MR. ZAVIN:  Let's mark, let's mark
24 this as Nadolna 31.
25         COURT REPORTER:  (Complies.)

69 (Pages 270 to 273)

Page 274

```
 1              MARIA E. NADOLNA
 2         (Whereupon, multi-page document
 3   dated May 18th, 2010, bearing Bates stamps TVP
 4   05161100076 and TVP 05161100077, is received and
 5   marked as Nadolna Exhibit 31 for Identification.)
 6         COURT REPORTER:  Number 31.
 7         MR. WENGER:  Do you have another
 8   one?
 9         MR. ZAVIN:  Okay.
10
11   BY MR. ZAVIN:
12      Q.    Ms. Nadolna, can you tell me what
13   this document is that's been marked as Nadolna
14   31?
15      A.    This is the report to the
16   president of the company, to Mr. Orzel.
17      Q.    A report from whom?
18      A.    From me.
19      Q.    And this is a report to the
20   president of TVP?
21      A.    Yes.
22      Q.    Okay.
23            Isn't it a fact that you told the
24   president of the company in this letter or in
25   this report that in light of the settlement
```

Page 275

```
 1              MARIA E. NADOLNA
 2   between TVP and Spanski that the airing by
 3   Polvision of certain TVP series violates the
 4   right of Spanski Enterprises?
 5      A.    You need to add after receiving
 6   this information from CEI [sic] company.
 7      Q.    But, Ms. Nadolna, that isn't what
 8   I asked you.  You told the president of the
 9   company that the airing of certain programs by
10   Polvision violates the rights of Spanski, didn't
11   you?
12            MR. WENGER:  She's already -- she
13   just answered you and she said that you left out a
14   cause, a thought.
15            MR. ZAVIN:  I'm not reading the
16   agreement.
17
18   BY MR. ZAVIN:
19      Q.    I'm saying in sum or substance
20   didn't you tell the president of TVP that the
21   airing of certain programs by Polvision violates
22   the rights of SEI.
23      A.    Basing on the information from
24   SEI.
25      Q.    Well, did you think that was wrong
```

Page 276

```
 1              MARIA E. NADOLNA
 2   information?
 3            MR. WENGER:  Which information?
 4      Q.    The information that you received
 5   from SEI about the breach?
 6      A.    This is what I had to add.  This
 7   part of the sentence after receiving the
 8   information from SEI that this agreement with
 9   Polvision, this is -- I only added the background
10   of this information what I --
11      Q.    I understand that's the
12   background, but you told the president that this
13   airing by Polvision did violate the rights of
14   SEI, correct?
15            MR. WENGER:  No.
16      A.    No.
17            MR. WENGER:  That's a
18   mischaracterization of what this letter says.
19            MR. FINK:  And what she's testified
20   twice it says.
21
22   BY MR. ZAVIN:
23      Q.    Actually perhaps this is another
24   complete mistranslation, but the phrase that you
25   just cited after having obtained information from
```

Page 277

```
 1              MARIA E. NADOLNA
 2   SEI, doesn't that relate to your having analyzed
 3   the possibilities of changing the content?
 4            MR. FINK:  I'm sorry, I couldn't
 5   follow.
 6            Objection to form.
 7      Q.    Do you understand the question?
 8      A.    No.
 9      Q.    What did you suggest is the
10   possibility to the president for solving this
11   problem?
12      A.    As I --
13            MR. WENGER:  Objection.
14            Form.
15            Go ahead.
16            Which problem are you talking
17   about?
18            MR. ZAVIN:  Well, you're clearly --
19   never mind.
20
21   BY MR. ZAVIN:
22      Q.    You can answer the question.
23      A.    This is the explanation why they
24   were -- we had to -- we -- we made the
25   analyzing -- we -- of change -- we -- we were
```

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 278

```
1              MARIA E. NADOLNA
2    thinking about changing the content, it says
3    clearly why we should -- we -- it informs clearly
4    the president why --
5         Q.    So in your view that this letter
6    is clear as to what it says, it's accurate and
7    clear?
8         A.    Yes.
9         Q.    And if we could all agree on a
10   Polish translation whatever that translation is
11   that is what you were informing the president?
12        A.    I informed about the situation.
13        Q.    Okay.
14             MR. ZAVIN:  Let's mark this as
15   exhibit --
16             MR. PISKORA:  32.
17             MR. ZAVIN:  -- 32.
18             COURT REPORTER:  (Complies.)
19             (Whereupon, multi-page document
20   dated May 18th, 2010, bearing Bates stamps TVP
21   05161100079 through TVP 05161100080, is received
22   and marked as Nadolna Exhibit 32 for
23   Identification.)
24             MR. FINK:  Now, are you giving the
25   witness the English translation as well?
```

Page 279

```
1              MARIA E. NADOLNA
2             MR. ZAVIN:  Yes, I have been.  It's
3    just easier.  I'm not asking her to certify as to
4    the translations.
5
6    BY MR. ZAVIN:
7         Q.    And, Ms. Nadolna, just so there is
8    no confusion, when I ask you if you recognize a
9    document --
10        A.    Yes?
11        Q.    -- I'm asking you about the Polish
12   document.  I'm not suggesting that you --
13        A.    Polish document, I know this
14   document.
15        Q.    Okay.  So do you recognize Exhibit
16   32?
17        A.    Yes.
18        Q.    What is it?
19        A.    This is letter to Mr. Kotaba from
20   the May 18th, 2010.
21        Q.    And you wrote the letter?
22        A.    I signed it.
23        Q.    Everything in it accurate and
24   correct?
25        A.    Yes.
```

Page 280

```
1              MARIA E. NADOLNA
2             MR. FINK:  Read it.  You want to
3    read it first?
4         Q.    Okay.
5         A.    Yes.
6
7    BY MR. ZAVIN:
8         Q.    Okay.
9             In that letter you suggested that
10   under some circumstances Polvision could send a
11   financial, a financial proposal for termination
12   of the Polvision agreement.
13        A.    (Reviews.)
14        Q.    Do you see that?
15        A.    Yes.
16        Q.    Did you ever receive such a
17   proposal from Polvision?
18        A.    No.
19        Q.    Do you know why not?
20        A.    I don't know.
21        Q.    Okay.
22             MR. ZAVIN:  Did I ask about this
23   one yet?
24             COURT REPORTER:  No.
25             (Whereupon, one-page document
```

Page 281

```
1              MARIA E. NADOLNA
2    bearing Bates stamp TVP 05161100085, is received
3    and marked as Nadolna Exhibit 33 for
4    Identification.)
5             MR. ZAVIN:  Okay.
6
7    BY MR. ZAVIN:
8         Q.    I'm showing you a document that's
9    been marked as Exhibit 33 and ask you whether you
10   can identify it.
11             COURT REPORTER:  Number 33.
12        A.    (Reviews.)
13        Q.    Do you recognize that letter?
14        A.    Yes.
15        Q.    It's a letter you wrote to
16   Mr. Kotaba?
17        A.    I signed it.
18        Q.    And you renewed your request for
19   them to provide you a closed amount of
20   compensation for terminating the agreement?
21        A.    Could you repeat?
22        Q.    You renewed your request --
23        A.    Yes.
24        Q.    -- for them to provide you --
25        A.    Yes.
```

Page 282

```
1              MARIA E. NADOLNA
2     Q.    -- an amount of compensation?
3           Again, did you ever receive such
4  an amount?
5     A.    No.
6     Q.    Did you ever propose an amount to
7  Polvision?
8     A.    (No response.)
9     Q.    Did TVP ever propose an amount to
10 Polvision that it would pay to terminate the
11 agreement?
12    A.    No.
13    Q.    Was there any discussion within
14 TVP about paying Polvision an amount to terminate
15 the agreement?
16    A.    No.
17    Q.    Did you have the authority to pay
18 Polvision on your own --
19          MR. FINK:  Objection.
20          Form.
21    Q.    -- to terminate the agreement?
22          MR. FINK:
23          Form.
24    A.    As I didn't have, so I didn't
25 propose anything.
```

Page 283

```
1              MARIA E. NADOLNA
2           MR. ZAVIN:  Let's mark this as
3  Nadolna 34.
4           COURT REPORTER:  (Complies.)
5           (Whereupon, two-page document
6  dated June 26th, 2010, bearing Bates stamp TVP
7  05161100088, is received and marked as Nadolna
8  Exhibit 34 for Identification.)
9           COURT REPORTER:  Number 34.
10
11 BY MR. ZAVIN:
12    Q.    Ms. Nadolna, do you recognize this
13 document that's been marked as Exhibit 34?
14    A.    Yes.
15    Q.    What is it?
16    A.    The letter to Mr. Kotaba from the
17 25th of August 2010.
18    Q.    Okay.
19          MR. WENGER:  Is this June or
20 August?  It's hard to see on the original, but --
21          THE INTERPRETER:  June, June, June.
22          MR. ZAVIN:  I believe it's --
23          THE WITNESS:  It's too small
24 letters.
25          MR. ZAVIN:  I believe it's June.
```

Page 284

```
1              MARIA E. NADOLNA
2     A.    So in my Polish letter it's
3  August.
4           THE INTERPRETER:  This looks like
5  an 8.
6           MR. ZAVIN:  Okay.
7
8  BY MR. ZAVIN:
9     Q.    In this letter you mentioned that
10 there are -- you're conducting talks with other
11 U.S. contractors regarding this programming.
12          Do you see that?
13    A.    So what is the question?
14    Q.    Well, in this letter you seem to
15 indicate that you're conducting talks with other
16 U.S. contractors for the programming you're
17 discussing with Mr. Kotaba.
18          Do you see that?
19    A.    We are not conducting.  It doesn't
20 say we are conducting.
21    Q.    Doesn't this letter indicate that
22 you are presently holding talks with U.S.
23 contractors?
24    A.    It doesn't say so.
25    Q.    The English translation says:  We
```

Page 285

```
1              MARIA E. NADOLNA
2  are ready to withdraw from talks that are
3  presently being held with U.S. contractors.
4           Is that simply a complete
5  mistranslation?
6     A.    Shall I translate?
7           COURT REPORTER:  I can't hear you,
8  ma'am.
9           MR. FINK:  She's talking to
10 herself.
11    A.    The second paragraph that there is
12 interest from other American companies that they
13 would like to achieve the mentioned titles.  It
14 doesn't show that we are --
15
16 BY MR. ZAVIN:
17    Q.    And doesn't it --
18    A.    It is information about the
19 interests.
20    Q.    I understand that.  Then doesn't
21 it later in that same paragraph say we are ready
22 to withdraw from talks that are presently being
23 held?
24    A.    Okay.  We need to say something
25 not to read only the document.  The offer which
```

Page 286

MARIA E. NADOLNA

1      MARIA E. NADOLNA
2  provision --
3      Q.   Ms. Nadolna --
4           MR. FINK:  Let her finish the
5  answer.
6           MR. ZAVIN:  No, no, she's now
7  saying -- I asked her a very specific question.
8  I've got two hours left.  I'm entitled her just to
9  answer my question.
10     A.   Uh-huh.
11     Q.   Did you say to Mr. Kotaba that you
12 were willing to withdraw from talks being
13 presently held with other U.S. contractors?
14     A.   No, it's not what is said in this
15 letter.
16     Q.   Okay.  You're saying this is a
17 mistranslation.
18          Were there talks being held with
19 U.S. contractors?  Were there talks being held
20 with other U.S. contractors regarding
21 distribution of TVPolonia programs?
22     A.   No.
23     Q.   How did you know that they were
24 interested in these programs?
25     A.   They were not interested in

Page 287

1      MARIA E. NADOLNA
2  TVPolonia programs.  They were interested in
3  archives, TVP archives.
4      Q.   Okay.
5           Were there -- I'm sorry, were
6  there talks being held with U.S. contractors
7  about TV archives?
8      A.   You didn't want let me explain so.
9      Q.   I apologize.
10          Now, my question is:  Were there
11 talks being held with U.S. contractors about TVP
12 archives?
13     A.   The talks were not conducted
14 concerning TVPolonia content.
15     Q.   That wasn't my question.
16          My question was were there talks
17 being conducted with respect to any TVP product?
18     A.   Any TVP material?
19     Q.   Yes.
20     A.   Not the product.
21     Q.   Material.  I'll accept your word.
22 Were there talks?
23     A.   Yes.
24     Q.   Who were the contractors?
25     A.   This is the information from my

Page 288

1      MARIA E. NADOLNA
2  sales department that there was interest from
3  American companies asking, sending questions,
4  asking on the exhibitions we are attending.
5      Q.   Okay.
6           MR. ZAVIN:  Let's mark this as
7  exhibit --
8           MR. PISKORA:  35.
9           MR. ZAVIN:  -- 35.
10          COURT REPORTER:  (Complies.)
11          (Whereupon, multi-page document
12 dated July 1st, 2010, bearing Bates stamps TVP
13 05161100089 through TVP 05161100092, is received
14 and marked as Nadolna Exhibit 35 for
15 Identification.)
16          COURT REPORTER:  Number 35.
17          MR. ZAVIN:  Sorry.
18
19 BY MR. ZAVIN:
20     Q.   Do you recognize this document?
21          MR. FINK:  Give her one second.
22 We're getting there.  Pass the stapler, the
23 stapler.
24     A.   I recognize the letter.
25     Q.   Is this a letter that you sent?

Page 289

1      MARIA E. NADOLNA
2      A.   The letter I signed.
3      Q.   Okay.
4           MR. ZAVIN:  Let's mark this as
5  Exhibit 36.
6           COURT REPORTER:  (Complies.)
7           (Whereupon, multi-page document
8  dated July 1st, 2010, second and third pages
9  bearing Bates stamp TVP 05161100093, is received
10 and marked as Nadolna Exhibit 36 for
11 Identification.)
12          COURT REPORTER:  Number 36.
13
14 BY MR. ZAVIN:
15     Q.   Is that a letter you signed?
16     A.   Yes.
17          MR. ZAVIN:  Let's mark this as
18 Exhibit 37.
19          COURT REPORTER:  (Complies.)
20          (Whereupon, two-page document
21 dated July 2nd, 2010, bearing Bates stamps TVP
22 05161100095 and TVP 05161100094, is received and
23 marked as Nadolna Exhibit 37 for Identification.)
24          COURT REPORTER:  Number 37.
25          MR. WENGER:  Do you have copies,

73 (Pages 286 to 289)

Page 290

MARIA E. NADOLNA

1  MARIA E. NADOLNA
2  Jon?
3
4  BY MR. ZAVIN:
5      Q.    This appears to be a letter by
6  Mr. Kotaba to Mr. Orzel with a copy to you.
7      A.    (Reviews.)
8      Q.    Did you receive a copy of this
9  letter?
10          MR. WENGER:  You're on 37, right?
11          MR. ZAVIN:  That's correct.
12      A.    I don't know.
13      Q.    Have you ever seen it before?
14          MR. ZAVIN:  Number 38.
15          COURT REPORTER:  (Complies.)
16          (Whereupon, multi-page document
17  dated July 12th, 2010, second and third pages
18  bearing Bates stamp TVP 05161100096, is received
19  and marked as Nadolna Exhibit 38 for
20  Identification.)
21      A.    Yes.
22
23  BY MR. ZAVIN:
24      Q.    I'm sorry?
25      A.    Yes.

Page 291

1  MARIA E. NADOLNA
2      Q.    You have seen it before?
3      A.    (Indicating.)
4      Q.    Okay.
5          I'm going to show you a document
6  that's been marked Nadolna Exhibit 38.
7          COURT REPORTER:  Number 38.
8          MR. ZAVIN:  Yes.
9
10  BY MR. ZAVIN:
11      Q.    And ask you if you've ever seen
12  that before?
13      A.    Yes.
14      Q.    Is that a letter that you wrote to
15  Mr. Kotaba?  I'm sorry.
16      A.    I signed to Mr. Orzel, the
17  president of Telewizja Polska.
18      Q.    I misspoke.  It is a letter that
19  you signed to the president of Telewizja Polska?
20      A.    Yes.
21      Q.    And in that letter you refer to
22  signing an appendix with Polvision to their
23  original license agreement of 2009, is that
24  correct?
25      A.    This letter doesn't say that, what

Page 292

1  MARIA E. NADOLNA
2  you say.
3      Q.    Well, it does say an appendix has
4  been signed with the company Polvision, is that
5  correct?
6      A.    It says that it will be signed
7  appendix.  We are planning to sign appendix.
8  This is what is in this letter.
9      Q.    Do you know when the appendix was
10  signed?
11      A.    In August 2010.
12      Q.    What date?
13      A.    31st.
14          MR. WENGER:  Why don't you just
15  show her a copy of it, Jonathan.  I don't think
16  she has that --
17          MR. ZAVIN:  Okay.  I'm going to do
18  the same thing.  I'm going to mark it with the
19  translation.
20          Let's mark this as exhibit --
21          MR. PISKORA:  39.
22          MR. ZAVIN:  -- Exhibit 39.
23          COURT REPORTER:  (Complies.)
24          (Whereupon, multi-page document
25  bearing Bates stamps POL00063 through POL00065,

Page 293

1  MARIA E. NADOLNA
2  is received and marked as Nadolna Exhibit 39 for
3  Identification.)
4          MR. WENGER:  So we're clear, I
5  think we agreed to this before, but we're not
6  agreeing to any of these translations.
7          MR. ZAVIN:  I absolutely agree with
8  you.
9          MR. WENGER:  Okay.
10          We'll look at all of them another
11  time.
12          COURT REPORTER:  Number 39.
13          MR. ZAVIN:  Okay.
14
15  BY MR. ZAVIN:
16      Q.    Do you recognize the document
17  that's been marked as Exhibit 39?
18      A.    Yes.
19      Q.    What is it?
20      A.    Appendix to the agreement of 31st
21  of August 2009.
22      Q.    And this is an agreement, appendix
23  to the agreement between TVP and Polvision, is
24  that correct?
25      A.    Yes.

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 294

1          MARIA E. NADOLNA
2      Q.   And what did this appendix do in
3  general terms?
4      A.   It shows the conditions of the
5  appendix.
6      Q.   Did this license to Polvision
7  after certain episodes of the television series
8  Klan?
9          MR. FINK:  What did you say?
10     Q.   Did this license to Polvision the
11 right to broadcast certain episodes of this
12 television series Klan spelled K-l-a-n?
13         MR. FINK:  Objection to form.
14     A.   The answer is yes.
15         MR. WENGER:  Okay.
16     Q.   Okay.
17         Was Klan a series that had been
18 broadcast on TVPolonia for some time?
19     A.   In general, yes.
20     Q.   How many years?
21     A.   I don't remember.
22     Q.   Well, was it more than ten?
23     A.   Long time.
24     Q.   Well, do you know whether it's
25 more than ten?  You can say I don't know.

Page 295

1          MARIA E. NADOLNA
2      A.   I don't know.
3      Q.   You don't know.  It could have
4  been more than ten?
5      A.   I don't know.
6      Q.   Do you know whether Klan continues
7  to be broadcast on TVP in Poland?
8      A.   From when or --
9      Q.   As we speak now are there new
10 episodes of Klan being broadcast on TVP in
11 Poland?
12     A.   I don't --
13         MR. WENGER:  What is TVP in Poland?
14     Q.   Do you know what TVP in Poland is?
15     A.   It's the institution where I work.
16     Q.   Okay.
17         Do you know does it broadcast
18 shows in Poland?
19     A.   Any shows?  Yes.
20     Q.   Okay.
21         And does it do so on certain
22 channels?
23     A.   We have channels so we broadcast
24 on channels.
25     Q.   Including TVP 1, is that a TVP

Page 296

1          MARIA E. NADOLNA
2  channel?
3      A.   Yes.
4      Q.   And TVP 2, is that --
5      A.   Yes.
6      Q.   Okay.
7          On any of its channels does it
8  continue to broadcast new episodes of Klan?
9      A.   I don't know.
10     Q.   Okay.
11         As of the time this annex was
12 entered into in July of 2010 did TVPolonia stop
13 broadcasting new episodes of Klan?
14     A.   TVPolonia stopped broadcasting
15 Klan.
16     Q.   Okay, but was it continued at that
17 time, were new episodes still created of Klan?
18     A.   I don't know.
19     Q.   Well, what did you license to
20 Polvision?
21     A.   We licensed Klan.
22     Q.   Did you license new episodes of
23 Klan that hadn't been shown on TVPolonia?
24     A.   We licensed those which have not
25 been shown to, on TVPolonia.

Page 297

1          MARIA E. NADOLNA
2      Q.   When were those episodes created?
3      A.   You mean the date?
4      Q.   Yes.
5      A.   Production?
6      Q.   Yes.
7      A.   I don't know.
8      Q.   When were those episodes shown on
9  TVP channels in Poland?
10     A.   They were broadcast on TVP
11 channels except TVPolonia.
12     Q.   These new episodes?
13     A.   Which one?
14     Q.   The new episodes that had not
15 been -- what I'm calling new episodes are
16 episodes that had not been broadcast on
17 TVPolonia.
18         Will you agree to call those new
19 episodes?  Do you understand if I say new
20 episodes those are the episodes I'm referring to?
21     A.   I don't understand you.
22     Q.   Okay.
23         As of sometime in July or August
24 2010 TVPolonia stopped broadcasting any new
25 episodes of Klan, is that correct?

75 (Pages 294 to 297)

A-330

Page 298

1          MARIA E. NADOLNA
2        A.    No.  TVPolonia stopped
3   broadcasting around May 2010.
4        Q.    When was the last time in 2010
5   that TVPolonia broadcast an episode of Klan?
6        A.    May, July.  I don't remember
7   exactly.
8        Q.    Okay.
9             And is May the end of the season
10  for Klan for that season?  Is that the reason the
11  last episode was in May?
12            MR. WENGER:  She said she doesn't
13  know if the last episode was in May or not.
14            MR. ZAVIN:  Okay.
15
16  BY MR. ZAVIN:
17       Q.    Were any episodes created of Klan
18  after May of 2010?
19       A.    I don't know if they produced.
20  You are talking about production.
21       Q.    What did you get, what did you
22  license to Polvision?
23       A.    We licensed the episodes of Klan
24  which were not admitted on TVPolonia.
25       Q.    And when were those episodes

Page 299

1          MARIA E. NADOLNA
2   produced?
3             MR. FINK:  She didn't say they were
4   produced.
5        Q.    Were they produced?  When were the
6   episodes that you were licensing to Polvision
7   produced or would they be produced?
8             MR. FINK:  Objection to form.
9        Q.    Do you know?
10       A.    They were produced before we
11  offered them to Polvision and were not admitted
12  on TVPolonia.
13       Q.    Is TVP still producing new
14  episodes of Klan?
15       A.    I don't know.
16       Q.    What do you -- okay.
17            In the agreement, the annex, if
18  you look at Paragraph 1, I'm sorry, Article 4,
19  I'm sorry, Section 1 4 on Page 2, doesn't it say
20  that the episodes of Klan to be licensed to
21  Polvision will be sent to them to Polvision after
22  they have been produced?
23       A.    You always send when something is
24  produced.  You don't send something what is not
25  produced.  I don't understand the question.

Page 300

1          MARIA E. NADOLNA
2        Q.    That doesn't indicate to you that
3   the episodes haven't been yet produced when this
4   agreement was signed?
5             MR. FINK:  I don't understand that
6   question.
7        Q.    Did you send them the episodes of
8   Klan that they were licensed for at the time when
9   this agreement was signed?
10       A.    (No response.)
11            MR. FINK:  Objection to form.
12       Q.    Ms. Nadolna, were you involved in
13  negotiating this agreement?
14       A.    Yes.
15       Q.    Do you understand what this
16  agreement said?
17       A.    Yes.
18       Q.    Okay.
19            You licensed, you being TVP,
20  licensed to Polvision episodes 1891 through 2113
21  of Klan, is that correct?
22       A.    Would you repeat your question?
23       Q.    Ms. Nadolna, you licensed, TVP
24  licensed episodes 1891 through episode 2113 of
25  Klan to Polvision, did you not?

Page 301

1          MARIA E. NADOLNA
2        A.    Yes.
3        Q.    Do you know when those episodes
4   were sent to Polvision?
5        A.    After signing the contract.
6        Q.    I'm sorry?
7        A.    After signing the contract.
8        Q.    How long after signing the
9   contract.
10       A.    As this appendix is changing the
11  main agreement with Polvision, the condition was
12  that Polvision will return all DVDs and we
13  received the new DVDs concerning the appendix.
14       Q.    At the time you signed this
15  contract in July of 2010 did those episodes you
16  licensed to Klan all exist?
17            MR. WENGER:  To Polvision.
18       Q.    To Polvision all exist?
19       A.    If I license something it exists.
20       Q.    But you can't license something
21  you're going to create in the future?
22       A.    No.
23       Q.    Okay.
24            I'm going -- we'll take an answer
25  to this and move on:  To the best of your

76 (Pages 298 to 301)

Page 302

```
 1              MARIA E. NADOLNA
 2  knowledge as a representative of TVP is TVP
 3  producing Klan episodes as we speak?  Are they
 4  still continuing to produce new Klan episodes?
 5       A.   I don't know.
 6       Q.   Okay.
 7            MR. WENGER:  Well --
 8       Q.   Do you know how much it cost to
 9  produce an episode of Klan?
10            MR. WENGER:  What's the relevance
11  of that?
12            MR. ZAVIN:  That's relevant.
13
14  BY MR. ZAVIN:
15       Q.   Do you know how much --
16            MR. WENGER:  Can you explain that
17  because that's proprietary information.  Why is
18  that, how is that relevant at all?
19            MR. ZAVIN:  Because I think TVP is
20  spending a lot of money to produce Klan that it's
21  intentionally not putting on TVPolonia.
22
23  BY MR. ZAVIN:
24       Q.   Ms. Nadolna, do you know how much
25  it costs?
```

Page 303

```
 1              MARIA E. NADOLNA
 2       A.   It's confidential information.
 3       Q.   Okay.
 4            MR. ZAVIN:  We can mark it --
 5            MR. FINK:  We actually didn't hear
 6  about the stip earlier today when we were told we
 7  couldn't --
 8            MR. ZAVIN:  No, it's a different
 9  issue and you know it, Bob.
10
11  BY MR. ZAVIN:
12       Q.   So are you declining to answer the
13  question?
14       A.   What was the question?
15       Q.   How much does it cost to produce
16  an episode of Klan?
17       A.   I don't know.
18       Q.   Okay.
19            Ms. Nadolna, is it TVP's position
20  that it is not in violation of its agreement with
21  SEI by licensing certain episodes of Klan to
22  Polvision because these episodes have never
23  appeared on TVPolonia?
24            MR. FINK:  Objection to form.
25       A.   Could you repeat the question?
```

Page 304

```
 1              MARIA E. NADOLNA
 2            MR. ZAVIN:  Read it back, please.
 3            MR. FINK:  Slowly.
 4            COURT REPORTER:  (Complies.)
 5            (Whereupon, the requested portion
 6  is read back by the reporter as follows:
 7            "QUESTION:  Okay.
 8            "Ms. Nadolna, is it TVP's position
 9  that it is not in violation of its agreement with
10  SEI by licensing episodes of Klan to
11  Polvision because these episodes have never
12  appeared on TVPolonia?")
13       A.   Those which didn't appear on
14  TVPolonia they are not violating the contract.
15
16  BY MR. ZAVIN:
17       Q.   And the only reason it doesn't
18  violate the contract is that they haven't
19  appeared, those episodes haven't appeared on
20  TVPolonia, is that your position?  Is that TVP's
21  position?
22       A.   TVP can offer those programs which
23  are not admitted on TVPolonia.
24       Q.   Okay.
25            Do you know the difference between
```

Page 305

```
 1              MARIA E. NADOLNA
 2  a program and an episode?
 3       A.   Episode it is also the program.
 4       Q.   Are you saying there is no
 5  difference between a program and an episode?
 6       A.   It is academic.  We need to
 7  prepare the definition.
 8       Q.   Your understanding, do you have
 9  any understanding what the word program means?
10       A.   Everything what is admitted it's
11  the program.
12       Q.   I'm familiar with American
13  television rather than Polish television.
14            Are you familiar at all with
15  American television?
16       A.   No.
17       Q.   Did you ever watch American
18  series, television series?
19       A.   Some.
20       Q.   Have you ever watched, for
21  example, the American television series Friends?
22       A.   No.
23       Q.   Or Seinfeld?
24       A.   (No response.)
25       Q.   Well, what American series have
```

77 (Pages 302 to 305)

A-332

Page 306

```
1              MARIA E. NADOLNA
2   you watched?
3       A.    (Indicating.)
4       Q.    Yes.
5       A.    It's -- you are -- I don't have to
6   answer what I'm watching.
7       Q.    Okay.  Well, I'll tell you what --
8       A.    It's my free time.  I can do
9   whatever I want.
10          MR. WENGER:  Let's move into
11  another direction.
12          MR. ZAVIN:  Okay.
13
14  BY MR. ZAVIN:
15      Q.    Is Klan a program or an episode?
16          MR. FINK:  Or something else?
17      Q.    Or something else?  Is it -- if
18  you're talking about Klan are you talking about a
19  program or are you talking about an episode or
20  are you talking about something else?
21      Klan is series.
22      Q.    I'm sorry?
23      A.    Klan is for me series.
24          MR. WENGER:  Series.
25      A.    Series.
```

Page 307

```
1              MARIA E. NADOLNA
2          THE INTERPRETER:  Series.
3       Q.    It's a series.  It's not a
4   program?
5       A.    (No response.)
6          COURT REPORTER:  Is the word
7   serious or series?
8          MR. ZAVIN:  Series.
9          THE INTERPRETER:  Series.
10      Q.    It's not a program?
11          MR. FINK:  She answered your
12  question.
13
14  BY MR. ZAVIN:
15      Q.    Is that correct, your testimony is
16  it's not a program?
17          MR. FINK:  No, her testimony is she
18  considers it a series.  That's what she testified
19  to.
20          MR. ZAVIN:  I want the witness to
21  answer.  I know when she considers it a series.
22
23  BY MR. ZAVIN:
24      Q.    Do you also consider it a program?
25      A.    You are talking about definition.
```

Page 308

```
1              MARIA E. NADOLNA
2       Q.    That's exactly what I'm talking
3   about, Ms. Nadolna, a definition.
4       A.    I don't know.
5       Q.    Okay.
6          In your view is there a difference
7   between a program and a show?  In your view is
8   there a difference between a program and a show?
9          MR. FINK:  Objection to form and --
10  all right.  I don't think there's been any
11  definition of a show.
12      A.    You need my private opinion?
13      Q.    No, your professional opinion.  In
14  Telewizja Polska's view as a representative of
15  Telewizja Polska is there a difference between a
16  program and a show?
17          MR. FINK:  Objection to that
18  question.
19      Q.    Is there?
20      A.    That's my answer.
21      Q.    What's your answer?
22      A.    (Indicating.)
23      Q.    This is not, a gesture is not an
24  answer.  The video will record it.  I want to
25  know do you not know or do you have no opinion or
```

Page 309

```
1              MARIA E. NADOLNA
2   there is a difference or there isn't a difference
3   from Telewizja Polska as their 30(b)(6)
4   representative is there a difference between a
5   program and a show?
6       A.    I am selling the content of Polish
7   Telewizja Polska which is very big and consists
8   of different titles.  The titles are in the
9   archives and according to the rights which
10  Telewizja Polska has, this is my work.
11      Q.    Okay.  So you can't answer the
12  question?
13      A.    No.
14      Q.    Okay.
15          Do you know that those are defined
16  terms in your contract with Mr. Spanski?
17      A.    Could you repeat?
18      Q.    Do you know that the terms program
19  and show are defined terms in TVP's contract with
20  Spanski Enterprises, Inc.?
21          MR. FINK:  Are you talking about in
22  the original contract?
23          MR. ZAVIN:  As you pointed out
24  there is only one.
25          MR. WENGER:  But that's not an
```

78  (Pages 306 to 309)

Page 310

1      MARIA E. NADOLNA
2  accurate representation.  There is no definition
3  of the word program in the contract.
4           MR. FINK:  Isn't the original
5  contract something she said she hasn't seen?
6           MR. ZAVIN:  I beg your pardon.
7           MR. WENGER:  We'll take it one at a
8  time.  There is no definition of the word program
9  in the original contract with between TVP and SEI.
10
11  BY MR. ZAVIN:
12      Q.    Ms. Nadolna, I refer you to
13  Section 1 of exhibit --
14           MR. FINK:  2.
15      Q.    -- 2.
16      A.    Which document?  Exhibit which
17  one?
18           MR. PISKORA:  2.
19      Q.    Exhibit 2.
20           MR. FINK:  Didn't she testify she
21  hadn't seen this before?
22           MR. WENGER:  Do you want to borrow
23  mine?  Here you go, Maria.
24           MR. ZAVIN:  Okay.
25           MR. FINK:  Your question was was

Page 311

1      MARIA E. NADOLNA
2  she aware that any of these words were defined
3  terms in the contract?
4           MR. FINK:  That's correct.
5           MR. WENGER:  Or both of these words
6  actually.  Okay.
7      A.    So.
8      Q.    Were you aware of whether or not
9  these are defined terms in the contract?
10      A.    It is defined in the program.
11  There is two definitions.  One is --
12           (Whereupon, the witness speaks in
13  Polish.)
14      A.    -- and one is --
15           (Whereupon, the witness speaks in
16  Polish.)
17      A.    This is a Polish word.
18           MR. WENGER:  Is it program or
19  program and service?
20           MR. ZAVIN:  I beg your pardon.
21  This is not --
22      A.    I'm reading Polish words.
23
24  BY MR. ZAVIN:
25      Q.    Okay.

Page 312

1      MARIA E. NADOLNA
2           And is there a difference in the
3  definition of program or show?
4      A.    This is legal question.
5      Q.    No, no, in the contract is there a
6  definition -- is there --
7      A.    This is legal question.
8      Q.    So looking at this contract you
9  can't tell --
10      A.    This is legal question.
11      Q.    Ms. Nadolna, let me finish.  I'm
12  asking you as a representative of TVP looking at
13  a contract signed by TVP do you know and does TVP
14  have a position on whether there is any
15  difference between what program means and show
16  means in the contract with Mr. Spanski?
17           MR. FINK:  I object to your asking
18  the witness this question because she testified
19  earlier today that she has not seen this contract
20  before.
21           MR. ZAVIN:  Okay.
22           MR. FINK:  So how would she come
23  here knowing what TVP's position was on the
24  meaning of the word in the contract she hadn't
25  seen?

Page 313

1      MARIA E. NADOLNA
2           MR. ZAVIN:  Well, that's what she
3  is supposed to be doing.  She's here as a 30(b)(6)
4  witness.
5           MR. FINK:  Well, actually we
6  disagree on how much she should be forced to know
7  to testify as a 30(b)(6) witness.
8
9  BY MR. ZAVIN:
10      Q.    Do you know -- so Ms. Nadolna,
11  perhaps the answer is you just don't know, is
12  that correct, you just don't know?
13           MR. FINK:  Tell her what the
14  question is, please.
15      Q.    You don't know what TVP's position
16  is as to whether there is a difference between
17  the definition between program and show?
18      A.    This is a legal question.
19      Q.    Is the answer that you don't know?
20      A.    I don't know.
21      Q.    Okay.
22           Now, in the settlement agreement
23  that was signed by Mr. Spanski and TVP in 2009 in
24  Section 2A it refers to programming content.
25      A.    There is this one?

79  (Pages 310 to 313)

Page 314

```
1              MARIA E. NADOLNA
2          THE INTERPRETER:  Counsel
3  (indicating).
4          MR. ZAVIN:  (No response.)
5          THE INTERPRETER:  Jonathan
6  (indicating).
7          MR. ZAVIN:  (No response.)
8      A.    The settlement the Exhibit Number
9  5?
10
11  BY MR. ZAVIN:
12     Q.    That's I believe correct, yes.
13     A.    And which point?
14     Q.    On Roman Numeral II, letter A.
15     A.    Uh-huh.
16     Q.    On the second page it says, if I'm
17  reading correctly, SEI is and shall remain the
18  exclusive distributor of TVPolonia and TVP Info
19  programming content, is that correct?
20     A.    You read something different.
21  Programming that is contained.
22         MR. WENGER:  (Indicating.)
23         THE WITNESS:  Okay.  This one.
24     A.    Could you repeat?
25
```

Page 315

```
1              MARIA E. NADOLNA
2  BY MR. ZAVIN:
3      Q.    Doesn't it say SEI is and shall
4  remain the exclusive distributor of TVPolonia and
5  TVP Info programming content in the territory of
6  North and South America?
7          MR. WENGER:  The question is if it
8  says that?
9      A.    Yes.
10     Q.    Okay.
11     A.    It's in this document.
12     Q.    Do you have any knowledge either
13  personally or as a representative of TVP as to
14  what programming content means in that paragraph?
15     A.    This is the legal question.
16     Q.    Okay.
17         So the answer is either personally
18  or as a representative of TVP you don't know what
19  programming content means in that paragraph, is
20  that correct?
21     A.    I don't know.
22     Q.    Okay.
23         Am I correct that nowhere in that
24  paragraph does it refer to episode or show, is
25  that correct?  It only refers --
```

Page 316

```
1              MARIA E. NADOLNA
2      A.    There is no word episode and show.
3      Q.    And is it your, TVP's position
4  that Klan as a program is not TVPolonia
5  programming content despite the fact that it's
6  been on TVPolonia for probably over ten years?
7          MR. FINK:  Objection to form.
8      Argumentative.
9      Q.    You can answer.
10     A.    I don't understand the question.
11     Q.    Is it TVP's position that Klan as
12  a program is not TVPolonia programming content?
13     A.    Which Klan?
14     Q.    The program Klan, all episodes.
15     A.    Klan is a series.  It is a content
16  of episodes.
17     Q.    Is it Klan's position that the
18  series Klan is not TVPolonia programming content?
19     A.    Klan is a series content of
20  episodes.
21     Q.    Can you not answer my question?
22     A.    Yes, I cannot answer the question.
23     Q.    Okay.
24         Is it TVP's position that it could
25  produce ten episodes of a series, put the odd
```

Page 317

```
1              MARIA E. NADOLNA
2  ones, odd numbered ones on TVPolonia and license
3  the even ones to Polvision?
4          MR. FINK:  Objection.
5          Lack of -- hypothetical.
6          No reason to believe that TVP has
7  taken such a position.
8          MR. PISKORA:  You can answer.
9
10  BY MR. ZAVIN:
11     Q.    You can answer.
12     A.    I don't understand the question.
13     Q.    Is it TVP's position that you
14  would have the right to create a series where you
15  take all the odd number episodes and broadcast
16  them on TVPolonia and take all the even number
17  episodes and license them to Polvision?
18         MR. FINK:  Objection.  Same
19  objection.
20     A.    I don't know.
21         MR. ZAVIN:  Let's take a break.
22         THE VIDEOGRAPHER:  The time is 7:29
23  p.m.
24         And this ends Tape Number 5.
25         (Whereupon, a short recess is
```

80  (Pages 314 to 317)

Page 318

MARIA E. NADOLNA

1
2    taken.)
3          THE VIDEOGRAPHER:  Stand by,
4    please.
5          The time is 7:39 p.m.
6          And this begins Tape Number 6 of
7    the videotaped deposition of Maria Nadolna.
8          MR. ZAVIN:  Okay.
9          I'm marking this as Exhibit 40.
10         COURT REPORTER:  (Complies.)
11         (Whereupon, one-page document
12   bearing Bates stamp P002010, is received and
13   marked as Nadolna Exhibit 40 for Identification.)
14         COURT REPORTER:  Number 40.
15         MR. ZAVIN:  And I apologize, I
16   don't have English translations of this.  It's
17   very short.  Your colleague can translate it.
18
19   BY MR. ZAVIN:
20      Q.    Ms. Nadolna, I'm showing you a
21   document that's been marked as Exhibit 40.
22      A.    (Reviews.)
23      Q.    Could you tell me what it is?
24      A.    This is the letter to Mr. Kotaba
25   of the 7th of April 2011.

Page 319

MARIA E. NADOLNA

1
2      Q.    Okay.  Did you write this letter?
3      A.    I signed this letter.
4      Q.    Okay.
5            And is it correct to say that in
6    this letter in April you informed Mr. Kotaba that
7    because of the agreements between TVP and SEI
8    that there is no cooperation of, there is no
9    possibility of further cooperation with this
10   company until 2019 when the agreement with SEI
11   expires?
12      A.    Yes, this is what it says.
13      Q.    Okay.
14            Ms. Nadolna, am I correct that the
15   rights granted under the annex which we've been
16   discussing that was signed in July of 2010 with
17   Mr. -- with Polvision --
18      A.    Yes.
19      Q.    -- do those rights expire at the
20   end of this year on December 31st, 2011?
21      A.    Yes.
22      Q.    Okay.
23            Has TVP had any negotiations,
24   further negotiations with Polvision to extend
25   those rights?

Page 320

MARIA E. NADOLNA

1
2      A.    No.
3      Q.    Has TVP had any negotiations with
4    Polvision to grant them other rights in
5    programming that was ever on TVP --
6            Well, let me withdraw that.
7            Has TVP had any negotiations with
8    Polvision to grant them any rights after December
9    31st, 2011?
10      A.    Could you repeat the question?
11           MR. ZAVIN:  You can read it.
12           COURT REPORTER:  (Complies.)
13           (Whereupon, the requested portion
14   is read back by the reporter as follows:
15           "QUESTION:  Has TVP had any
16   negotiations with Polvision to grant them other
17   rights in programming that was ever on TVP --
18           "Well, let me withdraw that.
19           "Has TVP had any negotiations with
20   Polvision to grant them any rights after December
21   31st, 2011?")
22      A.    Could you repeat, please?
23           MR. ZAVIN:  Read it again.
24           COURT REPORTER:  (Complies.)
25           (Whereupon, the requested portion

Page 321

MARIA E. NADOLNA

1
2    is read back by the reporter as follows:
3            "QUESTION:  "Has TVP had any
4    negotiations with Polvision to grant them any
5    rights after December 31st, 2011?")
6      A.    No.
7            MR. ZAVIN:  Okay.
8
9    BY MR. ZAVIN:
10      Q.    Does TVP intend to grant Polvision
11   any rights to any of its programming after
12   December 31st, 2011?
13           MR. FINK:  Objection to form.
14           Lack of foundation.
15      A.    I don't know what will be the
16   weather tomorrow, so I cannot answer this
17   question.
18      Q.    Well, I guess the answer to that
19   is the same if I asked you whether Polvision --
20   TVP ever intends to put the episodes of Klan that
21   are on, currently on Polvision on TVPolonia you
22   wouldn't know the answer to that either because
23   that's a future event, is that correct?
24      A.    I don't know.
25      Q.    Okay.

81  (Pages 318 to 321)

Page 322

```
1              MARIA E. NADOLNA
2         Now I'm asking to the best of your
3    knowledge TVP's present intention.  I understand
4    that things could change in the future, but as we
5    sit here today do you, are you aware of any
6    intention on the part of TVP to license any
7    rights to Polvision after December 31st, 2011?
8         A.   No.
9         Q.   Okay.
10        Do you know how much money TVP
11   received from Polvision for the rights granted to
12   Polvision both in the agreement of August 31st,
13   2009 and the amendment annexed to that agreement?
14        MR. FINK:  Objection to form.
15        A.   I don't know.
16        Q.   There are amounts recited in the
17   various agreements.  To the best of your
18   knowledge were those amounts paid?
19        A.   It's a matter of checking.
20        Q.   Well, do you have any knowledge
21   one way or the other of whether those amounts
22   were paid or not?
23        A.   I don't know.
24        Q.   Okay.
25        Do you have any reason to believe
```

Page 323

```
1              MARIA E. NADOLNA
2    that a higher or lower amount was paid than
3    recited in those agreements?
4         A.   I don't know.
5         Q.   Does that mean it's possible that
6    a higher amount was paid than is recited in the
7    agreements?
8         A.   It doesn't mean nothing.  I don't
9    know.
10        Q.   So as you sit here you have no
11   idea whether a higher or lower amount was paid to
12   TVP than is recited in those agreements, is that
13   correct?
14        A.   I know what I supposed to do and
15   I'm doing it in the company.  Everything is under
16   control.  We are public media.  Nothing can be
17   speculated.  If there is contract there is
18   certain date, certain invoice, certain payment.
19   If it's not paid there is penalty.  That's my
20   business.
21        Q.   So you have every reason to think
22   that the amounts paid to TVP are the amounts
23   recited in the contract, is that correct?
24        A.   This is why we have contract.
25   This is why we sign contract.
```

Page 324

```
1              MARIA E. NADOLNA
2         Q.   I give up on that question.
3         MR. ZAVIN:  Okay.  I'm going to
4    mark this as Exhibit 41.
5         COURT REPORTER:  (Complies.)
6         (Whereupon, multi-page document
7    bearing Bates stamps TVP 05161100053 through TVP
8    05161100055, is received and marked as Nadolna
9    Exhibit 41 for Identification.)
10        MR. FINK:  What is this?
11        MR. ZAVIN:  This is late.  This is
12   a three-page document that appears to be a fax
13   from a Canadian law firm to TVP.
14
15   BY MR. ZAVIN:
16        Q.   And, Ms. Nadolna, I'm asking if
17   you recognize the document that I marked as
18   Exhibit 41?
19        COURT REPORTER:  Number 41.
20        A.   So what is the question?
21        Q.   Do you recognize the document?
22        A.   I don't remember.  I don't know.
23        Q.   On the first page there seems to
24   be handwriting.
25        A.   I recognize the handwriting of our
```

Page 325

```
1              MARIA E. NADOLNA
2    previous vice-president who died this year.  I
3    recognize his signature.  I recognize my name.
4         Q.   Okay.
5         This -- are you aware that at some
6    point SEI asked TVP to join in an action in
7    Canada against an infringer of the TVPolonia
8    programming in Canada?
9         A.   Yes.
10        Q.   Okay.
11        In light of that is this a letter
12   that is part of that request?
13        MR. FINK:  Objection.
14        Are you asking her to speculate?
15        MR. ZAVIN:  No, if she knows.
16        A.   As I told you I don't remember.
17
18   BY MR. ZAVIN:
19        Q.   Okay.
20        Was this request something that
21   you dealt with in your capacity as head of your
22   department?
23        MR. FINK:  Objection to form.
24        This request being the request in
25   this exhibit?
```

82 (Pages 322 to 325)

Page 326

MARIA E. NADOLNA

1
2       MR. ZAVIN: The request, request
3   the request -- she's already testified she's aware
4   of the request.
5
6   BY MR. ZAVIN:
7       Q.    The request by SEI that TVP join
8   in an action against a company called
9   IMB+Records?
10      A.    Any request or one request?
11      Q.    Well, was there more than one
12  request?
13      A.    There were several answers to
14  these requests, so there were several requests.
15      Q.    And is it fair to say that TVP
16  declined to join as a Plaintiff in this action
17  against the IMB+Records in Canada?
18      THE WITNESS:  Can you translate?
19      THE INTERPRETER:  (Complies.)
20      (Whereupon, the question was
21  interpreted for the witness.)
22      A.    No.
23      MR. ZAVIN:  Could you read the
24  question back?
25      COURT REPORTER:  (Complies.)

Page 327

MARIA E. NADOLNA

1
2       (Whereupon, the requested portion
3   is read back by the reporter as follows:
4       "QUESTION:  And is it fair to say
5   that TVP declined to join as a Plaintiff in this
6   action against the IMB+Records in Canada?")
7
8   BY MR. ZAVIN:
9       Q.    Is TVP willing today to join that
10  action as a Plaintiff?
11      A.    According to the contract we are
12  willing to support.
13      Q.    That isn't what I asked.  The
14  answer -- this is a yes or no question:  Is TVP
15  today willing to join that action in Canada as a
16  Plaintiff?
17      A.    As concerns the will, yes.
18      Q.    I'm sorry, I didn't hear the
19  answer.
20      A.    You're asking if TVP is willing to
21  join, but it doesn't mean that it has to join.
22      Q.    Well, Ms. Nadolna, perhaps we can
23  eliminate some of the litigation here.  Will TVP
24  join that lawsuit as a Plaintiff in Canada?
25      A.    You changed it the question.

Page 328

MARIA E. NADOLNA

1
2       Q.    Well, I said willing.
3       A.    To join.  It's different than will
4   to join.  Am I right?
5       Q.    No.  I don't think in English you
6   are.
7       A.    So I need translation both
8   questions.
9       MR. FINK:  Why don't you ask a new
10  question.
11      MR. ZAVIN:  Okay.
12
13  BY MR. ZAVIN:
14      Q.    The new question:  Will TVP join
15  that lawsuit as a Plaintiff in Canada?
16      A.    No, there is no need to join
17  according to the agreement.
18      Q.    Okay.
19      MR. ZAVIN:  Let's mark this as
20  Exhibit 42.
21      COURT REPORTER:  (Complies.)
22      (Whereupon, multi-page document
23  bearing Bates stamps TVP 051611000063 through TVP
24  05161100064, is received and marked as Nadolna
25  Exhibit 42 for Identification.)

Page 329

MARIA E. NADOLNA

1
2       COURT REPORTER:  Number 42.
3       MR. FINK:  Could you pass our
4   copies over?
5       MR. ZAVIN:  Absolutely.
6
7   BY MR. ZAVIN:
8       Q.    Do you recognize this document,
9   Ms. Nadolna?
10      A.    I don't remember this document.
11      Q.    Okay.  Who is Mr. Boberek?
12      A.    Previous director of legal
13  department.
14      Q.    Okay.
15      Were you aware of the request by
16  Mr. Spanski or Spanski Enterprises that TVP join
17  the action in Canada as a Plaintiff?
18      A.    I don't understand the question.
19      Q.    Okay.
20      MR. FINK:  Does it have to do with
21  this document?
22      MR. ZAVIN:  Yes.
23      MR. FINK:  Give us a minute.
24      MR. ZAVIN:  What's the pending
25  question?

83  (Pages 326 to 329)

Page 330

```
1              MARIA E. NADOLNA
2         MR. FINK:  Is there one?
3         MR. ZAVIN:  I believe there is.
4         COURT REPORTER:  (Complies.)
5         (Whereupon, the requested portion
6  is read back by the reporter as follows:
7  "QUESTION:  Okay.
8         "Were you aware of the request by
9  Mr. Spanski or Spanski Enterprises that TVP join
10 the action in Canada as a Plaintiff?")
11        MR. ZAVIN:  In Canada as a
12 Plaintiff.
13        THE WITNESS:  Can you translate?
14        THE INTERPRETER:  (Complies.)
15        MR. FINK:  Did you add in Canada as
16 a Plaintiff at the end?
17        THE INTERPRETER:  I said in Canada.
18        MR. FINK:  Because he added that at
19 the end of the question.
20        MR. ZAVIN:  No, I didn't.
21        THE INTERPRETER:  Yeah.
22        MR. ZAVIN:  I didn't add it.  I
23 corrected the transcript.
24        MR. FINK:  I know.  That's what I'm
25 saying.  Oh, well, it wasn't there so.  I think
```

Page 331

```
1              MARIA E. NADOLNA
2  she was reading the question.
3
4  BY MR. ZAVIN:
5         Q.    Were you aware of this,
6  Ms. Nadolna?
7         A.    Of the question, of the request of
8  Mr. Spanski, I was aware.
9         Q.    Okay.
10        And you're aware that TVP
11 declined, refused to do it, correct?
12        MR. FINK:  Objection to form.
13        A.    TVP has shown its position in this
14 matters in the amendment from the 4th of November
15 1994.  Excuse me, 1999 which was amendment to an
16 agreement of 1994.
17        Q.    Okay.
18        The question is very simple:  Did
19 or did not TVP decline to join as a Plaintiff?
20 Yes or no?
21        A.    To my knowledge, yes.
22        Q.    It declined to join as a
23 Plaintiff, that's correct?  Okay.
24        Now, turning this amendment which
25 you've just cited which I believe is Exhibit --
```

Page 332

```
1              MARIA E. NADOLNA
2         MR. PISKORA:  3.
3         Q.    -- 3 and I believe you were
4  referring to Section 5 of the amendment, is that
5  correct?
6         A.    Yes.
7         Q.    And it says among other things TVP
8  will provide appropriate support to SEI actions
9  in this regard, and this regard is with respect
10 to the actions against infringers, correct?
11        A.    Yes.
12        Q.    Okay.
13        In your -- do you have an
14 understanding of what was -- the people who
15 negotiated this agreement 1999 meant by
16 appropriate support?
17        A.    Appropriate support.
18        Q.    Do you have any understanding what
19 appropriate support is?
20        A.    You mean you want me to interpret
21 it?
22        Q.    Well, does TVP, you're here as the
23 representative of TVP, does TVP have a position
24 as to what appropriate support meant in that
25 agreement?
```

Page 333

```
1              MARIA E. NADOLNA
2         A.    At that moment, yes.
3         Q.    What?
4         A.    I don't know.
5         Q.    Okay.
6         I'm asking whether TVP currently
7  has a position as to what appropriate support
8  means?
9         A.    Yes.
10        Q.    What is TVP's position?
11        A.    I don't know.
12        Q.    So you know that TVP has a
13 position, but you don't know what it is, is that
14 correct?
15        A.    Yes.
16        Q.    Okay.
17        Does appropriate support mean in
18 your view negotiating with the infringer against
19 Mr. Spanski?
20        MR. FINK:  Objection to form.
21        Argumentative.
22        Lack of evidence.
23        Q.    You can answer.
24        A.    Could you repeat the question?
25        Q.    Does appropriate support in your
```

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 334

| | MARIA E. NADOLNA |
|---|---|
1    view mean negotiating with the infringer against
2    Mr. Spanski or against SEI?
3         MR. FINK: I repeat my objection.
4    It's a facetious question.
5         A.   This sentence is opposed to each
6    other. The half of it is different, says
7    something different and half of it is something
8    different. You're asking two questions in one
9    question.
10        Q.   Is the infringer that's been sued
11   by SEI in Canada a company called IMB+Records?
12        A.   What is the question?
13        Q.   Is the infringer that's been sued
14   in Canada a company called IMB+Records?
15        MR. FINK: You mean the alleged
16   infringer?
17        Q.   Alleged infringer.
18        A.   Is this information or a question?
19   I don't understand.
20        Q.   It's a question.
21        MR. FINK: It's a question.
22        Q.   Is that the name of the infringer
23   that's been sued in Canada?
24        A.   I don't know.

Page 335

1              MARIA E. NADOLNA
2         Q.   Okay.
3              I refer you to the letter Exhibit
4    42 from the head of the TVP legal department who
5    refers to the alleged infringer as IMB.
6              Does that refresh your
7    recollection as to the name of the alleged
8    infringer?
9              MR. FINK: You have to look at the
10   exhibit.
11             THE WITNESS: I don't have it.
12             MR. FINK: The last one you got,
13   it's Exhibit 42.
14             MR. WENGER: There, that one.
15             MR. FINK: He wants to know if you
16   look at this exhibit if that reminds you --
17        A.   So 42, yes?
18             MR. FINK: Yes.
19
20   BY MR. ZAVIN:
21        Q.   Does that remind you that of the
22   name of the infringer that or alleged infringer
23   that SEI has sued in Canada?
24        A.   So what is the question?
25             MR. FINK: Does that document --

Page 336

1              MARIA E. NADOLNA
2         A.   Is this name mentioned in this
3    letter? You are asking me to find the name of
4    this company in this letter?
5         Q.   Yes.
6         A.   In order to find it? Shall I read
7    it to find the name?
8         Q.   Okay. Let's cut this short
9    because you said you've never seen that letter,
10   right?
11        A.   Yes.
12        Q.   Okay.
13             MR. ZAVIN: Let's mark this one as
14   Exhibit 43.
15             COURT REPORTER: (Complies.)
16             (Whereupon, multi-page document
17   bearing Bates stamps P00154 through P00157, is
18   received and marked as Nadolna Exhibit 43 for
19   Identification.)
20             COURT REPORTER: Number 43.
21
22   BY MR. ZAVIN:
23        Q.   And this is a four-page document
24   including fax sheet. It seems to be a letter to
25   you of March --

Page 337

1              MARIA E. NADOLNA
2         A.   It is addressed to me, but it is
3    the letter to legal department and it was passed
4    to legal department.
5         Q.   I'm sorry, Ms. Nadolna, was this a
6    letter addressed to you?
7         A.   This is a letter addressed to me.
8         Q.   Okay.
9         A.   And this letter was sent
10   immediately to legal department.
11        Q.   Did you receive it?
12        A.   Yes, I receive it.
13        Q.   Did you read it?
14        A.   I sent it to the legal department.
15        Q.   I didn't ask that. I said did you
16   read it?
17        A.   I don't remember.
18        Q.   Okay.
19             Does this refresh your
20   recollection as to the name of the company that
21   SEI has sued in Canada for allegedly infringing
22   TVPolonia content?
23        A.   I see the name of the company --
24        Q.   Okay.
25        A.   -- in this letter so.

85  (Pages 334 to 337)

Page 338

MARIA E. NADOLNA

1
2     Q.    Okay.
3           Now, my question, next question is
4    has TVP had any dealings with IMB?
5     A.    To my knowledge, no.
6     Q.    There's been no contact whatsoever
7    between TVP and IMB to your knowledge?
8     A.    I don't know.
9           MR. ZAVIN: Let's mark this as
10   Exhibit 44.
11          COURT REPORTER: (Complies.)
12          (Whereupon, multi-page document
13   bearing Bates stamps TVP 05161100122 through TVP
14   05161100132, is received and marked as Nadolna
15   Exhibit 44 for Identification.)
16          COURT REPORTER: Number 44.
17
18   BY MR. ZAVIN:
19    Q.    Ms. Nadolna, I'm handing you a
20   document that's been marked as Nadolna Exhibit
21   44.
22    A.    (Reviews.)
23    Q.    Do you recognize this document?
24    A.    I see it for the first time.
25    Q.    So this is the first time you've

Page 339

MARIA E. NADOLNA

1
2    ever seen it?
3     A.    Yes.
4     Q.    Were you aware that this document
5    existed?
6           MR. FINK: What is this document?
7     Q.    This document being Exhibit 44.
8     A.    So can you repeat the question?
9     Q.    Were you aware that this document
10   existed?
11    A.    No.
12    Q.    Okay.
13          Who is Mr. and I'm going to
14   butcher the pronunciation, I'm sorry, Sieniutycz
15   Tomasz, how is that pronounced?
16    A.    Sieniutycz Tomasz.
17    Q.    Tomasz.
18    A.    Uh-huh.
19    Q.    Who is Mr. Sieniutycz?
20    A.    Director of IT, ITVP HD channel.
21    Q.    Okay.
22          Does this indicate that there was
23   a contact between IMB and TVP on October, in
24   October 2010?
25    A.    From the document it shows that it

Page 340

MARIA E. NADOLNA

1
2    is, this E-mail was sent to him.
3     Q.    Okay. Okay.
4           MR. ZAVIN: Let's mark this as
5    exhibit --
6           MR. PISKORA: 45.
7           MR. ZAVIN: -- 45.
8           COURT REPORTER: (Complies.)
9           (Whereupon, multi-page document
10   bearing Bates stamps TVP 05061100133, TVP
11   05061100134, TVP 05161100133 and TVP 05161100134,
12   is received and marked as Nadolna Exhibit 45 for
13   Identification.)
14          COURT REPORTER: Number 45.
15          MR. ZAVIN: Okay.
16
17   BY MR. ZAVIN:
18    Q.    Have you ever seen the document
19   that's been marked as Exhibit 45 before?
20    A.    No.
21    Q.    Do you know whether there -- this
22   seems to be reciting what took place at a meeting
23   in your offices, is that correct, on October
24   14th, 2010?
25          MR. FINK: Can I hear the question,

Page 341

MARIA E. NADOLNA

1
2    please?
3     Q.    This seems to be a summary of
4    discussions that took place in TVP's offices in
5    Warsaw on October 14th, 2010, is that correct?
6     A.    It is said in this document.
7     Q.    Okay.
8           Now, there is a list of
9    participants in that meeting, is that correct?
10    A.    I see the list of participants.
11    Q.    And do any of those participants
12   report to you?
13    A.    No.
14    Q.    Does Mr. Romanski report to you?
15    A.    No.
16    Q.    Do you know who Mr. Romanski is?
17    A.    TVP employee.
18    Q.    And Mrs. Sieniutycz is a TVP
19   employee, correct?
20    A.    Sieniutycz?
21    Q.    Yes, and the next person after
22   that whose name I won't try to pronounce, if you
23   could pronounce it it would be helpful.
24    A.    Maybe it's better to write it from
25   the paper.

86 (Pages 338 to 341)

**A-341**

---

Page 342

MARIA E. NADOLNA
1
2    Q.    Okay.
3          (Whereupon, the witness speaks in
4    Polish.)
5    Q.    Okay.  Is that person a TVP
6    employee?
7    A.    These were the employees.
8    Q.    And does that indicate that there
9    was a meeting between this company that has
10   allegedly infringed TVPolonia and TVP --
11   A.    This is written in this document.
12         COURT REPORTER:  I didn't hear what
13   you just said.
14   A.    It is written in the document
15   which I have.
16         MR. FINK:  You're not asking her if
17   she has independent knowledge of it?
18         MR. FINK:  No.
19         MR. FINK:  You're asking her just
20   how the document appears to her?
21         MR. ZAVIN:  That's correct.
22         MR. FINK:  All right.
23
24   BY MR. ZAVIN:
25   Q.    And do you know whether this

---

Page 343

MARIA E. NADOLNA
1
2    document was received by TVP?
3    A.    I don't know.
4    Q.    Well, I'll represent to you that
5    it was turned over to us by TVP's counsel.  Does
6    that -- do you now think that it was received by
7    TVP?
8    A.    I don't understand the question.
9    Q.    Withdrawn.
10         MR. ZAVIN:  Okay.
11         Let's mark this as exhibit --
12         MR. PISKORA:  46.
13         MR. ZAVIN:  -- 46.
14         COURT REPORTER:  (Complies.)
15         Number 46.
16         MR. ZAVIN:  This is just another
17   version of this.  This is the same thing.
18         MR. WENGER:  This looks like a copy
19   of what we just saw.
20         MR. ZAVIN:  Yes, okay.
21         MR. PISKORA:  Let me see.
22         MR. ZAVIN:  It is a copy of what we
23   saw.  Let's withdraw that exhibit so there will be
24   no Exhibit 46.
25         Mark this as Exhibit 47.

---

Page 344

MARIA E. NADOLNA
1
2          MR. FINK:  Why don't we mark this
3    as 46?
4          MR. ZAVIN:  Okay.
5          We'll just mark this as 46.  It
6    will be easier.
7          MR. WENGER:  So here just -- do you
8    have another 46?
9          COURT REPORTER:  (Complies.)
10         (Whereupon, multi-page document
11   bearing Bates stamps TVP 05161100138 and TVP
12   05161100139, is received and marked as Nadolna
13   Exhibit 46 for Identification.)
14         COURT REPORTER:  Number 46.
15
16   BY MR. ZAVIN:
17   Q.    Have you -- Ms. Nadolna, have you
18   ever seen this document that's been marked as
19   Exhibit 46 before?
20   A.    No.
21   Q.    It was again addressed to Tomasz
22   Sieniutycz?
23   A.    Sieniutycz.
24   Q.    Sieniutycz.  I'm sorry, from IMB,
25   is that correct?

---

Page 345

MARIA E. NADOLNA
1
2          MR. FINK:  You're asking how the
3    document appears to her?
4          MR. ZAVIN:  That's correct.
5          MR. FINK:  Because she's not seen
6    this document.
7          MR. ZAVIN:  That's correct.
8          MR. FINK:  Oh.
9    A.    So you want me to find in this
10   E-mail who is addressing this E-mail?
11
12   BY MR. ZAVIN:
13   Q.    Well, it says right at the top
14   it's from Mr. Pulkowski, correct?
15   A.    Yes, correct.
16   Q.    And if you look at the first
17   sentence of the letter after it says dear
18   Mr. Director, it says it's on behalf of
19   IMB+Records, does it not?
20   A.    Yes, it's written in the document.
21   Q.    Okay.
22         And now can you tell whether
23   Mr. Pulkowski is offering to aid TVP against SEI?
24   A.    I don't know.  I don't know this
25   document.

87  (Pages 342 to 345)

Page 346

```
1              MARIA E. NADOLNA
2      Q.    Well, why don't you read --
3              MR. FINK:  What's the advantage of
4  having the witness read this document if she
5  hasn't seen it before?
6              MR. ZAVIN:  Well, are you -- let me
7  ask.  You're right.
8
9  BY MR. ZAVIN:
10     Q.    Are you unaware that this offer
11 was made to TVP that Mr. -- that IMB would
12 cooperate with TVP against SEI?
13     A.    I don't know.
14     Q.    Okay.
15           And do you know whether there were
16 any discussions at TVP with respect to
17 cooperating with IMB against Spanski Enterprises?
18     A.    To my knowledge I know that TVP
19 strongly asked IMB to stop doing, showing
20 anything on its website concerning TVP content.
21 This is my knowledge about IMB.
22     Q.    Do you have any knowledge of
23 whether or not there was any discussion with IMB
24 about IMB cooperating with TVP against Spanski?
25     A.    No knowledge.
```

Page 347

```
1              MARIA E. NADOLNA
2      Q.    Okay.
3              MR. ZAVIN:  Let's mark this as
4  Exhibit 48?
5              MR. FINK:  47.
6              MR. PISKORA:  47.
7              MR. ZAVIN:  47.
8              COURT REPORTER:  (Complies.)
9              (Whereupon, multi-page document
10 bearing Bates stamps TVP 05161100140 through TVP
11 05161100142, is received and marked as Nadolna
12 Exhibit 47 for Identification.)
13             COURT REPORTER:  47.
14
15 BY MR. ZAVIN:
16     Q.    Have you ever seen this document
17 before?
18     A.    No.
19     Q.    Is it a proposal from IMB or does
20 it appear to be a proposal from IMB to TVP?
21     A.    It is what is in the letter.
22     Q.    Okay.
23     A.    So I don't know what is in the
24 letter.
25     Q.    And does this say it's further to
```

Page 348

```
1              MARIA E. NADOLNA
2  our discussions the date is unclear because it
3  reads 14/19/2010, but I'm sending you the initial
4  offer of business terms?
5      A.    It's in the letter.  You want me
6  to confirm what is in the letter?
7      Q.    Does it say that?  Does it say
8  that?
9      A.    If you read it from the letter it
10 is in the letter.
11     Q.    Okay.
12           Now I'll ask something that isn't
13 in the letter:  Do you know anything about those
14 discussions that this letter is referring to?
15     A.    No.
16     Q.    Do you know whether they took
17 place?
18     A.    No.
19             MR. WENGER:  It's asked and
20 answered.  It's referring to the same meeting on
21 October 14th, 2010.  She's already testified she
22 has no knowledge of this conversation.
23             MR. FINK:  In 46, it referred to
24 the same meeting.
25             MR. ZAVIN:  I'm not sure it's the
```

Page 349

```
1              MARIA E. NADOLNA
2  same meeting.
3              MR. FINK:  It is.
4              MR. WENGER:  It is.
5              MR. FINK:  If you look at the
6  original it's clear that it's October 14th.  If
7  you look at Exhibit 46 it's October, it says
8  10/14.  It's the same.
9              THE WITNESS:  Uh-huh.
10             MR. FINK:  David is right.
11             MR. ZAVIN:  Okay.
12             MR. WENGER:  For once.
13             MR. FINK:  It's in the record.
14             MR. ZAVIN:  Okay.
15 Let's mark this as Exhibit 48.
16             COURT REPORTER:  (Complies.)
17             (Whereupon, multi-page document
18 dated 3/22/2011, not bearing Bates stamps, is
19 received and marked as Nadolna Exhibit 48 for
20 Identification.)
21             COURT REPORTER:  Number 48.
22
23 BY MR. ZAVIN:
24     Q.    Ms. Nadolna, I'm showing you a
25 document that's been marked as Exhibit 48.
```

88  (Pages 346 to 349)

Page 350

1           MARIA E. NADOLNA
2      A.   (Reviews.)
3      Q.   Have you ever seen this document
4  before?
5      A.   No.
6      Q.   Okay.
7           This appears to be a letter again
8  from IMB+Records again to TVP, is that correct?
9      A.   It's what I see from the letter.
10     Q.   Okay.
11          Now, this is four to five months
12 after the meeting in October, is it not?  It's
13 March of 2011?
14          MR. FINK:  Can we just say it's
15 four or five months after October because there is
16 no evidence of the meeting other than a reference
17 in a letter that she couldn't identify?
18          MR. ZAVIN:  Okay.
19
20 BY MR. ZAVIN:
21     Q.   This is four or five -- March, I
22 think you'll agree March 22nd, 2011 is four or
23 five months after mid October 2010, is that
24 correct?
25     A.   If we take the calendar we can

Page 351

1           MARIA E. NADOLNA
2  check it.
3      Q.   Yeah.  Are you saying sitting here
4  you'd need a calendar to figure out whether there
5  is four or five months after that?
6      A.   If you want me I can add it on the
7  paper.
8      Q.   No, I don't think -- I think the
9  record will be clear on that.  Thank you though.
10          Do you know whether between
11 October 2010 and March 2011 there were continuing
12 contact between TVP and IMB+?
13          MR. FINK:  Okay.  Since she was
14 unaware of any contacts to October the idea of
15 continuing contacts is --
16          MR. ZAVIN:  Well, she can say she's
17 not aware of it.
18     A.   No.
19          MR. FINK:  All right.  So lack of
20 foundation.
21
22 BY MR. ZAVIN:
23     Q.   Were you aware of any contacts --
24     A.   No.
25     Q.   -- between TVP and IMB+ in those

Page 352

1           MARIA E. NADOLNA
2  five months between October and March?
3      A.   I don't know.
4      Q.   Do you see in the first sentence
5  of this letter to TVP IMB is thanking TVP for its
6  question?
7      A.   Yes, it is in this document.
8      Q.   Okay.
9           Now, there is also a request for a
10 meeting between, a further meeting between IMB
11 and TVP?
12          MR. FINK:  Lack of foundation.
13     Q.   Do you see that?  If you look at
14 the last sentence of the first page.
15     A.   Which sentence?
16          MR. FINK:  Objection.
17          Lack of foundation.
18     A.   Which sentence you want me to read
19 from the paper?
20     Q.   The last, the last -- is there a
21 proposal for -- there is a proposal for a further
22 meeting?
23          MR. WENGER:  Let just be clear who
24 the proposal is from.
25          MR. ZAVIN:  The proposal is from

Page 353

1           MARIA E. NADOLNA
2  IMBD.  I'm not trying to fool the witness.
3
4  BY MR. ZAVIN:
5      Q.   There is a proposal from IMBD
6  for -- IMB+ for a further meeting between IMB+
7  and TVP, is that correct?
8          MR. FINK:  You're asking if those
9  words are on a document?
10          MR. ZAVIN:  This is foundational.
11
12 BY MR. ZAVIN:
13     Q.   There is a request for a meeting,
14 right?
15     A.   You want me to check if this
16 sentence what you say is in this document?
17     Q.   Yes.
18     A.   In which part of this document?
19     Q.   Well, in the English translation
20 it's the last sentence on the first page.
21     A.   There is nothing about a meeting
22 on the last --
23          MR. WENGER:  (Indicating.)
24     A.   In the last sentence on the page
25 or in the letter?

TransPerfect Legal Solutions
212-400-8845 - depo@transperfect.com

Page 354

MARIA E. NADOLNA
1
2    Q.    On the first page.
3    A.    On the first page.  It is in the
4 translation.
5    Q.    Okay.
6          Do you know whether there was a
7 further meeting?
8    A.    I don't know.
9    Q.    Do you know whether there's been
10 any further contact between IMB+ and TVP since
11 March 2011?
12    A.    I don't know.
13    Q.    Did you inform or did you or
14 anyone else at TVP inform Mr. Spanski that you
15 were having separate dealings with IMB?
16          MR. FINK:  Objection to form.
17          Lack of foundation.
18    Q.    You can answer.
19    A.    Shall we inform Mr. Spanski about
20 any, any meetings we are conducting in the
21 company?
22    Q.    I am specifically asking about a
23 meeting with IMB+, a company that was being sued
24 for infringing the TVPolonia?
25    A.    So what is the question?

Page 355

MARIA E. NADOLNA
1
2    Q.    Did you or anyone else at TVP
3 inform Mr. Spanski at SEI that TVP was having
4 discussions and meetings with IMB+?
5    A.    These are two questions.  Can you
6 ask me one question, please?
7    Q.    Did you or anyone else at TVP
8 inform Mr. Spanski that TVP was having
9 discussions with IMB+?
10    A.    Excuse me, you're asking me two
11 questions.
12    Q.    Did you inform Mr. Spanski that
13 TVP was having discussions with IMB+?
14    A.    I didn't inform as I didn't know.
15    Q.    Okay.
16          To your knowledge did anyone at
17 TVP inform Mr. Spanski that TVP was having
18 discussions with IMB+?
19    A.    I don't know.
20    Q.    The same question with respect to
21 meetings, did you inform Mr. Spanski that TVP was
22 meeting with IMB+?
23    A.    I didn't know about a meeting so I
24 didn't inform Mr. Spanski.
25    Q.    Did anyone at TVP inform

Page 356

MARIA E. NADOLNA
1
2 Mr. Spanski that TVP was meeting with IMB+?
3    A.    I don't know.
4    Q.    If TVP was meeting with IMB+ and
5 not informing Mr. Spanski about this, do you
6 consider that appropriate support pursuant to the
7 litigation -- pursuant to the agreement between
8 TVP and SEI?
9          MR. FINK:  Objection.
10          MR. ZAVIN:  She can answer?
11          MR. FINK:  Calls for a legal
12 conclusion.
13          MR. ZAVIN:  She can --
14          MR. FINK:  Lacks foundation.
15          MR. ZAVIN:  I'm asking whether --
16          MR. FINK:  You can answer.
17
18 BY MR. ZAVIN:
19    Q.    You can answer.
20    A.    It is theoretical question.
21    Q.    No, it's not theoretical,
22 Ms. Nadolna.  There is evidence now that TVP was
23 meeting with IMB.  It's not theoretical.
24    A.    So what is the question?
25    Q.    The question is do you consider

Page 357

MARIA E. NADOLNA
1
2 TVP meeting with the very company that SEI was
3 suing, do you consider that appropriate support
4 under your agreement with Mr. --
5    A.    This is a different question.
6    Q.    I'm asking as a representative of
7 TVP do you consider that appropriate support
8 under your agreement with SEI?
9          MR. FINK:  Objection.
10          Lack of foundation.
11          She doesn't know anything about any
12 conversations or meetings.  Just had some letters,
13 apparent letters which suggested they occurred.
14 She said she doesn't know anything about it.
15    Q.    You can answer the question.
16          Does TVP consider that appropriate
17 support under its agreement with Mr. Spanski?
18          MR. FINK:  If you're asking her TVP
19 formed a conclusion about that?
20          MR. ZAVIN:  She's the
21 representative of TVP.
22          MR. FINK:  You've said that many
23 times.
24
25 BY MR. ZAVIN:

90 (Pages 354 to 357)

Page 358

1          MARIA E. NADOLNA
2     Q.    Does TVP have a position on
3  whether meeting with the alleged infringer --
4     A.    I don't know.
5     Q.    You don't know whether TVP
6  considers that appropriate support?
7          MR. FINK:  She doesn't know what
8  TVP --
9     A.    I don't know the position of TVP
10 or what you're asking.
11    Q.    Do you think it's appropriate
12 support?
13    A.    I'm here to say facts and the
14 truth.  This is what I supposed to say, to do.
15    Q.    Okay.
16         MR. ZAVIN:  Let's take a two-minute
17 break.
18         THE VIDEOGRAPHER:  The time is 7 --
19 sorry.  The time is 8:24 p.m.
20         And we're going off the record.
21         (Whereupon, a short recess is
22 taken.)
23         THE VIDEOGRAPHER:  Stand by,
24 please.
25         The time is 8:30 p.m.

Page 359

1          MARIA E. NADOLNA
2          And we're back on the record.
3
4  BY MR. ZAVIN:
5     Q.    Ms. Nadolna, you've worked for TVP
6  now for well over ten years, correct?
7     A.    Fifteen.
8     Q.    Fifteen.  Congratulations.
9     A.    (Indicating.)
10    Q.    Do you consider yourself having
11 some knowledge about the television business in
12 general?
13    A.    Yes.
14    Q.    Okay.
15         In your opinion if you have -- if
16 there is more than one station in a market
17 showing the same product does that tend to reduce
18 the number of people who watch any one station?
19         MR. WENGER:  Can you clarify what
20 product means?
21         MR. ZAVIN:  Material -- same show
22 or similar -- same or similar in programming.
23         MR. FINK:  Well, anyway objection
24 to form --
25         MR. ZAVIN:  Okay.

Page 360

1          MARIA E. NADOLNA
2          MR. FINK:  -- because it's a
3  confusing question.
4
5  BY MR. ZAVIN:
6     Q.    Do you understand the question?
7     A.    I understand the question.
8     Q.    In your experience if you have two
9  stations in the same market broadcasting similar
10 material, does it tend to reduce the number of
11 people who will watch any one of those stations?
12    A.    This is not the question of the
13 knowledge.  This is the question of opinion.
14    Q.    I understand that.  Do you have an
15 opinion on that?
16    A.    I don't know.
17    Q.    You don't know whether you have an
18 opinion on that?
19    A.    (Indicating.)
20    Q.    Okay.
21         That's your answer.  You don't
22 know whether you have an opinion?
23    A.    I didn't think about opinion.
24    Q.    Okay.
25    A.    In order to have opinion you have

Page 361

1          MARIA E. NADOLNA
2  to analyze something --
3     Q.    Okay.
4     A.    -- to think.
5     Q.    But you have no opinion on that
6  question in general, is that correct?
7     A.    I said you want my knowledge.  I'm
8  ready to give you my knowledge concerning TV
9  business, not the opinions about, excuse me.
10    Q.    Okay.
11         As you sit here today do you have
12 any basis on which you think that TVP can
13 terminate its agreement with SEI?
14         MR. WENGER:  Objection.
15         Calls for a legal conclusion.
16         MR. FINK:  Absolutely.
17
18 BY MR. ZAVIN:
19    Q.    You can answer.
20    A.    I don't know.
21    Q.    Do you have, do you have any
22 evidence of a breach by SEI that would in your
23 view justify TVP terminating the agreement with
24 SEI?
25         MR. FINK:  Do not answer to the

91  (Pages 358 to 361)

Page 362

```
 1              MARIA E. NADOLNA
 2   extent it involves a conversation with counsel.
 3        Q.    You can answer.
 4        A.    I don't know.
 5        Q.    So is it fair to say you as you
 6   sit here today do not know of any evidence that
 7   would justify terminating TVP's agreement with
 8   SEI?
 9        MR. FINK:  Objection.
10        Calls for legal conclusion.
11        She wouldn't even know what
12   evidence was that would allow for the termination
13   of the agreement.
14        Q.    You can answer.
15        A.    I don't know.
16        Q.    Well, you sent a letter to
17   Polvision saying that you were going to terminate
18   that agreement, didn't you?
19        A.    Which letter?
20        Q.    I'm sorry?
21        A.    Which letter we are talking about?
22        Q.    We can find it from the exhibits,
23   but I think everyone in the room remembers that
24   there was a series of letters from you to
25   Polvision in early 2010 purporting to terminate
```

Page 363

```
 1              MARIA E. NADOLNA
 2   the agreement, is that correct?
 3        A.    Not reporting.  If it's saying
 4   that I want to terminate, to cancel the
 5   agreement.
 6        Q.    Well, you among other things sent
 7   a letter terminating the agreement based on their
 8   failure to pay, correct?
 9        A.    To cancel the agreement.
10        Q.    All right.
11        Do you have any grounds, are you
12   aware of any grounds to cancel the agreement
13   between TVP and SEI?
14        MR. FINK:  Objection to form.
15        A.    No.
16        MR. ZAVIN:  No further questions.
17        MR. FINK:  All right.
18        MR. PISKORA:  Anything?
19        MR. WENGER:  Want to give us a
20   minute?
21        MR. PISKORA:  Sure.
22        MR. FINK:  Let's go outside if you
23   want.
24        MR. ZAVIN:  Off the record.
25        THE VIDEOGRAPHER:  Are you sure?
```

Page 364

```
 1              MARIA E. NADOLNA
 2        MR. FINK:  We have no questions.
 3        MR. ZAVIN:  I told you they were
 4   better than that.
 5        THE VIDEOGRAPHER:  The time is 8:35
 6   p.m. and this ends Tape Number 6.
 7        COURT REPORTER:  Mr. Wenger, are
 8   you ordering a transcript?
 9        MR. WENGER:  Yes, yes, we are.
10        (Time noted:  8:35 p.m.)
11
12   _____
              MARIA E. NADOLNA
13
14   Subscribed and sworn to before me
15   this _____ day of _____ 2011.
16
17
     _____
18   Notary Public
     My Commission Expires:
19
20   /
21   /
22
23
24
25
```

Page 365

```
 1
 2   STATE OF _____)     Pg. of Pgs.
 3                 ) ss.:
 4   COUNTY OF _____)
 5        I wish to make the following changes, for
 6   the following reasons:
 7   PAGE LINE
 8   ____ ____  CHANGE: _____
 9            REASON: _____
10   ____ ____  CHANGE: _____
11            REASON: _____
12   ____ ____  CHANGE: _____
13            REASON: _____
14   ____ ____  CHANGE: _____
15            REASON: _____
16   ____ ____  CHANGE: _____
17            REASON: _____
18   ____ ____  CHANGE: _____
19            REASON: _____
20   ____ ____  CHANGE: _____
21            REASON: _____
22   ____ ____  CHANGE: _____
23            REASON: _____
24   ____ ____  CHANGE: _____
25            REASON: _____
```

92  (Pages 362 to 365)

Page 366

```
 1
 2   PAGE LINE
 3   ___ ___   CHANGE: _____
 4          REASON: _____
 5   ___ ___   CHANGE: _____
 6          REASON: _____
 7   ___ ___   CHANGE: _____
 8          REASON: _____
 9   ___ ___   CHANGE: _____
10          REASON: _____
11   ___ ___   CHANGE: _____
12          REASON: _____
13   ___ ___   CHANGE: _____
14          REASON: _____
15   ___ ___   CHANGE: _____
16          REASON: _____
17   ___ ___   CHANGE: _____
18          REASON: _____
19   ___ ___   CHANGE: _____
20          REASON: _____
21   ___ ___   CHANGE: _____
22          REASON: _____
23   ___ ___   CHANGE: _____
24          REASON: _____
25
```

Page 367

```
 1
 2          C E R T I F I C A T E
 3   STATE OF _____)
                          ) :ss.
 4   COUNTY OF _____)
 5          I, RICH GERMOSEN, a Certified Court
 6   Reporter, (License No. 30XI00184700), New Jersey
 7   Certified Realtime Court Reporter, (License No.
 8   30XR00016800), NCRA Certified Realtime Reporter, and
 9   Notary Public within and for the States of New York,
10   New Jersey and Delaware, do hereby certify:
11          That MARIA E. NADOLNA, the witness
12   whose deposition is hereinbefore set forth, having
13   been duly sworn by a Notary Public of the States of
14   New York, New Jersey and Delaware, and that such
15   deposition is a true record of the testimony of said
16   witness.
17          I further certify that I am not related
18   to any of the parties to this action by blood or
19   marriage, and that I am in no way interested in the
20   outcome of this matter.
21          IN WITNESS WHEREOF, I have hereunto set
22   my hand this____day of_____ 2011.
23
24   _____
     RICH GERMOSEN, CCR, CRCR, RPR, CRR, CLR
25   LICENSE NO. 30XI00184700
```

93 (Pages 366 to 367)

| A | | | |
|---|---|---|---|
| **able** 139:11 | **administered** 23:12 | 73:4,9 74:20 75:3 | 229:16 231:10 | **alleged** 334:16,18 |

**able** 139:11
**above-entitled** 2:3
**absolutely** 293:7
   329:5 361:16
**abstract** 202:11
**academic** 305:6
**accept** 74:24
   287:21
**accepting** 244:19
**accepts** 266:19
**accountant** 239:19
**accountants** 160:25
**accounting** 172:2
**accurate** 146:11,23
   161:9 197:15
   231:13 232:2
   244:23 245:4
   278:6 279:23
   310:2
**achieve** 285:13
**achieving** 210:2
**acquisition** 25:14
   26:5
**act** 54:5,10,25
**acting** 74:4
**action** 1:7 22:22
   24:5 44:12,18
   114:21 229:5
   325:6 326:8,16
   327:6,10,15
   329:17 330:10
   367:10
**actions** 55:5 332:8
   332:10
**add** 275:5 276:6
   330:15,22 351:6
**added** 276:9 330:18
**addition** 231:9
   233:25
**address** 194:7
**addressed** 137:4
   337:2,6,7 344:21
**addresses** 131:19
**addressing** 345:10
**administer** 21:11

**administered** 23:12
**administrative**
   232:21
**admission** 249:7
**admitted** 187:12
   298:24 299:11
   304:23 305:10
**adopt** 257:23
**advantage** 346:3
**advertising** 25:18
   25:25 26:4
**advice** 41:14
   204:22 212:9,25
   227:24 228:2
   229:16
**advised** 161:20
**advising** 210:6
**affairs** 26:6
**affirmed** 23:17,22
**afraid** 205:16
**ago** 42:16,18
**agree** 35:25 115:23
   133:15 137:13
   149:11 155:19
   166:4,6,9 167:9
   168:3,18 198:16
   204:25 234:18,18
   265:15 268:16
   278:9 293:7
   297:18 350:22
**agreed** 21:2,6,9
   247:23 256:25
   261:6,7 263:19
   293:5
**agreeing** 293:6
**agreement** 24:13
   28:22 29:3,15,21
   35:18,19 37:18
   38:4,6 39:3 40:2
   40:15,21,25 42:23
   54:17 56:18,20
   59:7,16,20,22
   60:3,11,13,23
   61:6,20,24 62:3,5
   65:11,13,14,16
   68:22 69:18 71:6
   71:10,16 72:4,9

73:4,9 74:20 75:3
75:11,17,25 76:4
76:8,9,12,14,18
76:21,23 77:3
78:3,5,14,25 80:6
82:7,19,25 83:6
84:14 93:18 98:6
98:10,13 105:16
106:22 107:5,8,10
107:14,15,22
108:23,23 109:2,4
109:5,6,10,21
111:8 115:18,19
116:4 119:18,23
120:2,12,16,17,21
120:25,25 122:4,7
122:23,25 123:15
123:20 124:5,17
124:20 125:9
134:17 135:15,19
135:25 136:13
137:19 138:3,4
139:23 140:4,11
141:19 142:3,4,8
143:5,8,8 144:7
144:21 150:19
152:23,25 158:12
159:5 161:6,16
162:11 164:13
165:14,17,20,25
167:16,18,19,25
168:12 169:7,14
169:16,17,24
170:3,4,5 171:13
174:10,11,16,18
174:22,23,24
175:4,6,17 176:9
177:10,12,21,22
177:24 178:2,5,7
178:11,13,15,18
181:11 187:7,11
187:18 188:14,22
198:9,13 206:24
210:10 211:7
212:22 214:21
215:9 216:11,19
217:4 222:11

229:16 231:10
232:12,15,17
234:2,19,19
237:14,19 238:2,8
245:14,16 246:3,5
246:16,21 248:2
249:22 252:23
253:3,8,12,21
254:5,17 257:12
257:13,15 258:14
260:16 269:15
271:4,9,13,17
275:16 276:8
280:12 281:20
282:11,15,21
291:23 293:20,22
293:23 299:17
300:4,9,13,16
301:11 303:20
304:9 313:22
319:10 322:12,13
328:17 331:16
332:15,25 356:7
357:4,8,17 361:13
361:23 362:7,13
362:18 363:2,5,7
363:9,12
**agreements** 35:11
   35:16 37:13 42:15
   42:23 47:21 53:18
   54:6 55:2,7,9,13
   74:12,16 108:2
   121:4 122:16
   125:12,17 126:12
   141:16 246:11
   258:19 259:25
   319:7 322:17
   323:3,7,12
**agrees** 147:6,9
**ahead** 86:22 94:2
   277:15
**aid** 345:23
**air** 138:17 223:18
**airing** 234:3 264:20
   273:8,12,16,20
   275:2,9,21 276:13
**Alinson** 4:5 22:13

**alleged** 334:16,18
   335:5,7,22 358:3
**allegedly** 337:21
   342:10
**allow** 166:4 362:12
**amended** 6:7 43:17
   259:14
**amendment** 266:23
   322:13 331:14,15
   331:24 332:4
**amendments** 29:13
   35:19 39:9,11
   259:15,17,20
**America** 61:18,23
   61:23 80:12 85:4
   85:24 87:7,18,23
   88:14 89:3,10
   90:20 92:20
   115:22 125:20
   127:3 128:10
   129:9 130:19
   131:15 132:5,20
   134:6 141:20,25
   142:13 143:10
   168:15,15 256:6
   256:20 315:6
**American** 100:8
   162:16 165:10
   285:12 288:3
   305:12,15,17,21
   305:25
**Americas** 3:19
**amount** 281:19
   282:2,4,6,9,14
   323:2,6,11
**amounts** 322:16,18
   322:21 323:22,22
**analyze** 361:2
**analyzed** 277:2
**analyzing** 277:25
**and/or** 20:2 39:25
**aneks** 64:24,24
**angry** 236:15
**annex** 65:6,8,9,10
   65:22 66:11 67:2
   174:24 258:13
   260:13,20 261:3

266:23 296:11
299:17 319:15
**annexed** 322:13
**announces** 97:7
**answer** 6:6 20:6
24:14,16 27:15,23
27:23 28:6 39:22
41:15 43:10,17
44:21,23 46:14
49:9 51:17 68:8
72:16,17 82:11
84:18 85:6 88:16
88:17,18,19 90:4
90:6 91:6,8,11,14
91:16 93:19
102:17,20 115:7
115:11 116:6,17
117:3 127:14
128:21,24 130:5
132:8 134:10
137:8,20 138:8
141:3,4,6,14
142:6,21 144:23
147:20 148:16
149:15 153:10
157:12,14,17,18
161:15 165:11
166:11,14,16,25
168:6 170:23
171:3 172:6 181:6
181:18,18 184:7
184:15 185:22,23
185:24 202:10
203:11 204:8
212:12,16 213:7
218:5 229:10
236:3,3 248:8
260:6,24 262:19
262:21 268:7
277:22 286:5,9
294:14 301:24
303:12 306:6
307:21 308:20,21
308:24 309:11
313:11,19 315:17
316:9,21,22 317:8
317:11 321:16,18

321:22 327:14,19
333:23 354:18
356:10,16,19
357:15 360:21
361:19,25 362:3
362:14
**answered** 39:20
115:5 135:22
137:2 275:13
307:11 348:20
**answering** 49:21
114:21,25 127:19
144:18 186:12
212:18 213:9
250:6 263:12
**answers** 213:11
326:13
**anticipated** 230:12
**anybody** 44:22
45:7 58:25
**anymore** 214:6
**anyway** 359:23
**apart** 131:21 243:5
**apologize** 36:12
97:17 103:23
119:19 134:15
204:12 244:5
287:9 318:15
**apparent** 357:13
**appear** 58:16
138:11,13 254:10
304:13 347:20
**appeared** 129:5,6
135:16 138:7
162:5 303:23
304:12,19,19
**appears** 78:7 94:10
99:5 105:14
110:16 114:7
118:15 147:7
158:12 192:14
198:6,11 221:11
221:12 237:18
290:5 324:12
342:20 345:3
350:7
**appendix** 291:22

292:3,7,7,9
293:20,22 294:2,5
301:10,13
**appreciate** 229:10
**apprised** 164:25
**appropriate** 332:8
332:16,17,19,24
333:7,17,25 356:6
357:3,7,16 358:6
358:11
**approximately**
22:11
**April** 12:16,23
251:13 264:5
318:25 319:6
**archives** 176:17
204:4 287:3,3,7
287:12 309:9
**Argumentative**
316:8 333:21
**arrangement** 157:6
**arrangements** 43:3
116:22 256:5,19
**arranging** 34:22,23
**arrive** 204:3
**arrived** 170:5
210:22 216:2
**Article** 299:18
**asked** 27:13 28:5
71:4 86:19 90:13
127:23 134:16,19
142:10 144:24
147:22,23 183:24
183:25 188:5
217:2 230:10
240:6 253:18
260:7 270:20
273:8,12 275:8
286:7 321:19
325:6 327:13
346:19 348:19
**asking** 26:24 35:23
35:24 37:22,23
39:8 48:6 49:2
52:23 74:23 75:6
75:11 76:3,17
81:4,16 82:5,16

82:18,20,21 83:4
83:7 84:12 89:14
89:15,20 90:7,10
90:24 91:21 93:24
98:13 101:15,21
107:16 109:16
110:25 116:18,20
121:12,13 125:15
126:13,14 129:14
136:6 150:11
168:21 178:8
182:2 196:14
200:5,9 201:5,9
202:10 209:16
222:13 233:9,19
235:19 236:12
245:3 247:2
249:12 254:7
260:9 263:3 279:3
279:11 288:3,4
312:12,17 322:2
324:16 325:14
327:20 333:6
334:9 336:3
342:16,19 345:2
353:8 354:22
355:10 356:15
357:6,18 358:10
**asks** 182:12
**aspect** 143:3
**aspects** 142:4 143:3
144:20 229:7
**assembled** 193:8
**assigned** 207:14
**associated** 193:19
267:6,19
**assume** 106:4
119:22 127:25
219:24 221:25
247:22
**assumes** 39:15
143:12
**assuming** 106:2
148:22 165:2
197:24 198:5
**assumption** 90:23
201:20

**attached** 237:7
**attachment** 247:11
**attempt** 40:20
215:15
**attending** 288:4
**attention** 100:20
139:18 144:2
**attorney** 22:24 24:4
28:7
**attorneys** 3:13,24
21:3 219:17
**attorney/client**
27:17 91:11
**August** 168:25
169:4,11,19 170:5
170:9 171:17
172:15,17,20
173:2 180:2
187:10,10,17
189:19,20 190:5
231:22,25 232:13
232:16 237:13,19
238:3 252:23
253:12,22 254:5,8
254:17 283:17,20
284:3 292:11
293:21 297:23
322:12
**authority** 282:17
**authorized** 21:11
74:12,15 77:3
82:13 106:18
114:12,13 145:12
145:14 146:16
212:3
**Avenue** 2:11 3:8,19
**avoid** 38:24 243:14
**aware** 28:21 31:7
31:18,22 32:6
43:9 44:10 45:8
48:3,8 49:4 51:9
59:19 63:10 73:3
93:18 132:3,18,23
133:24 157:3
162:9,10 200:24
203:13 204:2
205:5,16 211:13

311:2,8 322:5
325:5 326:3
329:15 330:8
331:5,8,10 339:4
339:9 351:17,23
363:12
**awareness** 212:6
**a-n-e-k-s** 64:25
**a.m** 195:24 206:4
207:6 208:8
210:16

**B**

**B** 6:2 7:2 8:2 9:2
10:2 11:2 12:2
13:2 14:2 15:2
16:2 17:2 18:2
19:2 23:15
**back** 26:12 43:4
48:21,24 55:25
61:9 64:12,17
66:9 68:2,5 69:7
69:11 77:22,25
83:22 84:3,10
85:7,18 86:25
102:24 103:3
113:2 117:21
126:19 128:3,6
129:16 132:13,16
137:10,11,16
147:18 153:17
167:6 170:23
171:2 181:7
182:14 183:5
192:2 229:12
241:14 245:20,23
267:15 304:2,6
320:14 321:2
326:24 327:3
330:6 359:2
**background** 276:9
276:12
**bad** 164:8
**barter** 106:22
107:8 108:23
109:2,4,5,6,9,21
119:22 120:16,17

120:25 121:5
122:4,10 123:15
123:20 124:5,17
124:20 125:9
134:16 138:3,4
139:23 144:21
**Barterowa** 119:20
119:21
**based** 76:20 78:2
198:21 363:7
**basically** 265:16
**basing** 141:16
170:15 171:5
239:23 240:11
275:23
**basis** 48:3 121:5
122:12 124:10
199:24 213:20
216:4 228:12
267:24 361:12
**Bates** 6:9,13,18,23
7:6,11,16,21 8:6
8:11,16,21 9:6,11
9:16,21 10:6,12
10:18,24 11:6,12
11:18,24 12:7,17
12:24 13:7,13,19
14:7,14,20 15:7
15:13,21 16:7,15
16:20 17:6,11,17
17:23 18:6,12,19
19:6,13 43:18
56:7 64:8 66:15
70:5 93:3 96:16
98:22 103:13
110:7 112:13
114:2 117:23
120:5 158:7 173:8
192:8 218:17
220:24 222:20
224:20 230:20
236:22 239:9
241:20 251:14
264:5 265:24
268:22 272:12
274:3 278:20
281:2 283:6

288:12 289:9,21
290:18 292:25
318:12 324:7
328:23 336:17
338:13 340:10
344:11 347:10
349:18
**bathroom** 117:7,10
**bearing** 6:8,13,18
6:23 7:6,11,16,21
8:6,11,16,21 9:6
9:11,16,21 10:6
10:12,18,24 11:6
11:12,18,24 12:7
12:17,24 13:7,13
13:19 14:7,14,20
15:7,13,21 16:7
16:15,20 17:6,11
17:17,23 18:6,12
18:19 19:6,13
43:18 56:7 64:8
66:15 70:5 93:3
96:16 98:22
103:13 110:7
112:13 114:2
117:23 120:5
158:7 173:8 192:8
218:17 220:24
222:20 224:20
230:20 236:22
239:9 241:20
251:14 264:5
265:24 268:22
272:12 274:3
278:20 281:2
283:6 288:12
289:9,21 290:18
292:25 318:12
324:7 328:23
336:17 338:13
340:10 344:11
347:10 349:18
**beg** 310:6 311:20
**beginning** 22:18
42:19 132:9
217:18 228:25
**begins** 77:19 139:2

202:23 272:6
318:6
**behalf** 70:21 74:12
74:16 124:21,24
345:18
**belief** 186:5
**believe** 67:10 71:4
156:22 173:25
242:13 283:22,25
314:12 317:6
322:25 330:3
331:25 332:3
**believed** 115:19
**belong** 57:8 138:5
**best** 34:2 109:17
125:14,16 139:17
148:15 181:21
182:6 228:10
240:16 244:22
248:6 255:24,25
261:19 263:11
301:25 322:2,17
**better** 107:13 139:8
139:9 205:8
341:24 364:4
**big** 309:7
**binding** 74:20
**blood** 367:18
**blundered** 166:22
166:25
**board** 34:24 95:11
95:14
**Bob** 82:20 91:17
122:20 127:15
150:14 303:9
**Boberek** 329:11
**Boguslaw** 4:7,8
22:25 73:13
118:20
**Borkowski** 59:3
**borrow** 310:22
**bottom** 106:11
196:7 210:18
**Boy** 251:4
**Braun** 34:12
**breach** 47:2 249:21
271:12 276:5

361:22
**breached** 55:6,9,13
257:4
**break** 27:7,10
117:7,10 133:10
138:14 139:7
203:4 240:21
241:2 271:20
317:21 358:17
**breaking** 141:16
**briefly** 25:21
**bring** 234:9
**broad** 161:13
**broadcast** 61:16
63:19 97:9 108:17
144:10 145:4
152:9 153:23
161:4,10,18 162:7
204:20 205:4,24
220:9 225:19,24
229:19 294:11,18
295:7,10,17,23
296:8 297:10,16
298:5 317:15
**broadcaster** 108:16
154:17,17 161:21
**broadcasting**
170:17 171:7,22
222:7,13 269:13
270:5,8 296:13,14
297:24 298:3
360:9
**BROCKA** 4:6
**Brodziak** 95:8,19
96:25
**broken** 142:6
**business** 30:24,25
108:14 111:2
260:4 262:14
323:20 348:4
359:11 361:9
**butcher** 339:14

**C**

**C** 3:2 4:2 22:3
23:15 367:2,2
**cable** 161:18

calendar 350:25
  351:4
call 140:24 141:5,9
  297:18
called 217:11 326:8
  334:12,15
calling 165:8,8
  240:13 249:24
  261:22 263:12
  297:15
calls 140:7 141:7
  142:15 183:13
  228:21 248:5
  255:24 260:18
  356:11 361:15
  362:10
Canada 60:14 97:9
  97:11,11,23
  100:23 101:9
  325:7,8 326:17
  327:6,15,24
  328:15 329:17
  330:10,11,15,17
  334:12,15,24
  335:23 337:21
Canadian 324:13
cancel 228:22
  239:25 240:2,8,11
  240:14,17 363:4,9
  363:12
canceled 239:23
  253:8 269:11,19
  269:20,22 270:2
  270:18,22 271:11
canceling 230:7
capable 28:15
  139:17
capacity 325:21
care 211:11 212:6,7
  229:25 235:6
careful 78:20 83:2
carefully 181:6
case 91:4 94:2
  127:16 141:8
  165:2 211:17
  217:13 218:3
  256:6

cause 248:13
  275:14
caused 24:20
CCR 1:24 367:24
cease 234:3
CEI 155:10 228:8
  228:15 252:20
  275:6
certain 30:13 47:8
  47:18 161:4,10
  182:9,10 205:4
  220:9 248:19
  249:15 260:20
  263:16 275:3,9,21
  294:7,11 295:21
  303:21 304:10
  323:18,18,18
Certified 1:25 2:4,5
  2:7,8 367:5,7,8
certify 279:3
  367:10,17
cetera 149:12
chain 192:15,20
chairperson 74:4
chance 194:15
change 52:21,22
  116:13,22 129:13
  157:4,20,25
  161:21 185:6
  239:2 240:4
  250:15 255:25
  271:21 277:25
  322:4 365:8,10,12
  365:14,16,18,20
  365:22,24 366:3,5
  366:7,9,11,13,15
  366:17,19,21,23
changed 87:25
  127:8,12 128:22
  129:10 136:25
  157:5 228:16
  250:20 327:25
changes 72:19,22
  365:5
changing 26:7 38:8
  149:23 248:22
  249:14 250:22

277:3 278:2
  301:10
channel 161:20
  245:10 247:19
  249:5 296:2
  339:20
channels 295:22,23
  295:24 296:7
  297:9,11
characterization
  161:14
charge 151:15
check 351:2 353:15
checked 142:25
checking 144:20
  223:7 322:19
Chicago 12:16
  108:14,17 158:13
  251:13
chief 245:10 249:5
  263:19 264:15
circumstances
  280:10
cited 276:25 331:25
Civil 1:7
claim 46:25 47:5
  48:3 50:21 53:10
claiming 53:5
claims 43:10 45:10
  45:14
clarify 87:11
  192:22 359:19
clause 257:22
  258:15,15,17,22
  259:7,21 261:2
clear 35:17 59:3
  85:14 126:24
  128:8 129:3 130:2
  142:5 196:8,13
  207:9 208:4
  249:21 257:25
  278:6,7 293:4
  349:6 351:9
  352:23
clearance 160:8,13
  160:16,17,20
clearly 208:19

277:18 278:3,3
Cleavage 160:15
client 171:21
  175:10 176:17
  179:4,10 239:24
  240:8 263:11
clients 168:14,20
  212:7 229:25
  235:5,6,7,11,16
  236:8 255:20
  256:2
close 231:14
closed 281:19
CLR 1:24 367:24
colleague 318:17
collect 181:15,16
collected 121:24
  122:4,13
collecting 30:4
colloquy 148:10
come 66:9 127:16
  227:3 229:9
  312:22
comes 182:14
comfortable 24:15
  24:19
coming 34:23,25
  171:23 218:21
  228:20 229:24
commence 267:6
  267:19 268:13
commenced 31:5
commencing 2:12
comment 251:3
Commission
  364:18
committee 74:4,5,7
communicate
  181:17
communication
  246:14
communications
  182:5 201:21
companies 38:6
  60:15 134:12
  213:4,4 285:12
  288:3

company 12:15
  30:14 49:24 50:16
  60:14,14 75:25
  90:9 94:23,25
  95:2,13 99:21
  106:6,10,13
  110:23 113:13,16
  121:24 122:3,6
  170:6 179:5
  189:11,12 201:16
  202:4,11 207:15
  210:2 214:8,10,14
  228:8,14,16,19
  232:17 234:9
  235:23 240:15,17
  251:13 253:22
  255:23 259:25
  274:16,24 275:6,9
  292:4 319:10
  323:15 326:8
  334:12,15 336:4
  337:20,23 342:9
  354:21,23 357:2
compare 72:25
  76:16 89:5,6,12
  90:7,10 155:17
  156:7 196:16
compensation
  281:20 282:2
complaint 6:7
  43:17 114:21,25
complete 30:13
  255:2 276:24
  285:4
completed 122:13
completely 201:19
Complicate 200:20
complicates 207:21
complication
  200:21,23 203:13
  203:16,21,23
  204:3
complications
  203:8
Complies 23:10
  33:11 43:15 46:7
  48:16,22 51:25

54:14 56:5 57:10
64:6 66:13 68:3
69:9 70:3 77:23
81:22 83:25 84:8
85:16,25 86:23
92:25 96:14 98:19
98:20 100:12
102:25 103:11
110:5 112:11,24
113:24 120:3
128:4 129:25
132:14 137:14
143:22 153:15
158:5 167:4
170:24 173:6
192:6 218:15
220:22 222:18
224:18 230:18
236:20 239:7
241:18 245:21
251:10 264:3
265:3,8,22 267:13
268:20 272:10
273:25 278:18
283:4 288:10
289:6,19 290:15
292:23 304:4
318:10 320:12,24
324:5 326:19,25
328:21 330:4,14
336:15 338:11
340:8 343:14
344:9 347:8
349:16
**comply** 47:19 53:17
53:23 54:2
**concede** 240:24
**concentrating**
262:13
**concerned** 116:21
**concerning** 33:14
52:20 79:6 114:11
121:23,23 122:7
122:13 143:18
160:3 227:25
228:4,14 246:15
256:22 261:14

287:14 301:13
346:20 361:8
**concerns** 152:24
154:14 327:17
**concluded** 19:15
253:12,21 254:5
254:17,23 255:6
**conclusion** 126:14
156:12 183:13
248:5 249:24
260:18 356:12
357:19 361:15
362:10
**condition** 253:25
301:11
**conditions** 252:17
253:6 258:13,14
294:4
**conduct** 168:22
254:25
**conducted** 32:4
170:14 171:4
172:4 185:3
231:21 232:19
234:16 238:10
254:19 287:13,17
**conducting** 284:10
284:15,19,20
354:20
**confidential** 257:14
260:4 303:2
**confidentiality**
257:2,22 258:18
258:24 259:7,21
260:16
**confirm** 59:23
61:25 77:5 90:8
90:22 101:16
105:24 106:18
112:5 113:18
114:14 119:10
121:22 126:12
145:12 154:14
155:12 199:17
220:10 222:3
232:14 348:6
**confirmed** 155:3

161:7
**confirms** 255:25
**conflict** 210:24
228:10 229:3
240:15
**confusing** 360:3
**confusion** 24:20
27:3 38:25 243:14
279:8
**Congratulations**
359:8
**Congress** 100:8
**connected** 98:12
**connection** 30:15
43:8 44:20 58:2
66:6 67:5 68:7
79:9 121:8 222:10
**consent** 168:10
204:20 205:3,12
210:12 212:23
**consider** 210:10
211:6,22 212:21
247:4,9 307:24
356:6,25 357:3,7
357:16 359:10
**considers** 307:18
307:21 358:6
**consists** 309:7
**consult** 27:11,14,16
27:22,24 28:7
255:24
**contact** 163:23
165:9 190:2
203:25 205:3,8,11
205:14,16 210:23
213:19 216:3,21
216:21 217:12
229:24 261:18,20
261:23 262:24
263:11 338:6
339:23 351:12
354:10
**contacted** 190:10
190:14,20,24
**contacts** 351:14,15
351:23
**contained** 261:2

314:21
**containing** 260:20
**content** 80:11 85:4
85:23 87:6,22
89:9,9,23 149:10
159:25 160:6
168:21 169:5,5
187:19,20 256:10
260:13 266:20
277:3 278:2
287:14 309:6
313:24 314:19
315:5,14,19 316:5
316:12,15,18,19
337:22 346:20
**continue** 123:5,8
238:19 296:8
**continued** 296:16
**continues** 295:6
**continuing** 53:9
302:4 351:11,15
**contract** 47:2 79:6
79:9,23 84:23
85:2,21 87:4,16
87:19,20 88:10,22
90:21,22 101:3
141:2 142:17,22
142:25 143:17,19
144:19,20 154:8
154:10,11,15
155:12 156:8
160:14,21 168:16
168:23 169:18,20
169:22 170:14,16
170:19 171:4,6,17
171:18,19,20
171:22,25 172:22
172:25,25 173:2
175:5,19,22,22,23
175:24,25 176:3,4
176:9,13,15,16,20
176:21 178:3
179:9,9,13,17,18
179:23 180:12,24
181:2 182:3,13
183:9,17,20 184:2
184:17,21,24

185:3,13,16 186:7
211:11,23 227:18
227:23,25 228:4,5
228:6,14,15,15,17
228:22,24,24,24
230:7 231:19,24
232:18 234:14
238:20 239:22,24
240:2,7,10,11,14
240:17 249:7
252:19 254:2
258:23,24 259:2
259:13,13,16
260:2 267:7,20
268:5,9,11 269:11
269:18 270:2
301:5,7,9,15
304:14,18 309:16
309:19,22 310:3,5
310:9 311:3,9
312:5,8,13,16,19
312:24 323:17,23
323:24,25 327:11
**contractors** 284:11
284:16,23 285:3
286:13,19,20
287:6,11,24
**contracts** 42:4,8
160:24 172:3
259:6,9,10,15,20
260:8
**control** 160:22,23
323:16
**CONT'D** 4:2 7:2
8:2 9:2 10:2 11:2
12:2 13:2 14:2
15:2 16:2 17:2
18:2 19:2
**convenient** 271:9
**conversation** 28:6
229:13 235:7
236:12 348:22
362:2
**conversations**
35:24 78:19 79:4
357:12
**cooperate** 346:12

**cooperating** 255:19 346:17,24
**cooperation** 124:8 214:21 215:8 226:6 240:12 252:18 253:6 319:8,9
**coordinating** 30:12
**copies** 122:4,5 197:15 289:25 329:4
**copy** 43:22 46:3 56:11 58:9 76:15 77:4 95:21 105:22 106:3,17 114:12 114:13,16 123:2 145:11 146:11,15 146:16,18,22,23 165:14,20,24 173:12 225:10 231:3 290:6,8 292:15 343:18,22
**copying** 57:14
**corporate** 81:3 82:5 84:13 90:4 156:18 200:10 201:6
**corporation** 121:4 122:10 200:20 207:21
**correct** 28:23 29:6 47:15 61:10 69:5 69:16,21 70:19 76:5,7,7 94:12,14 95:6,14 96:9 97:6 97:14,17 99:18 100:6 101:5,20 102:11 105:17 109:13 114:9 118:20 119:8 126:7,7,20 130:11 134:15 135:14 138:7 144:5,11 147:20 148:6,23 151:7,16 154:4 159:10 161:2,23 162:3 163:9,12

166:20,23 167:10 175:17 177:12 178:23 187:8,14 193:16 195:10 196:23 198:9,14 209:7,11,14,21 210:19 216:7,12 220:7 221:15,17 225:10,16,20 226:7 229:2 237:15,21 247:15 249:9 253:19 257:14 263:22 264:21,25 268:14 273:5,9,13,16,21 276:14 279:24 290:11 291:24 292:5 293:24 297:25 300:21 307:15 311:4 313:12 314:12,19 315:20,23,25 319:5,14 321:23 323:13,23 331:11 331:23 332:5,10 333:14 340:23 341:5,9,19 342:21 344:25 345:4,7,14 345:15 350:8,24 353:7 359:6 361:6 363:2,8
**corrected** 54:18 330:23
**correctly** 79:7 101:19,22 142:17 145:8 147:9 252:21 314:17
**correspondence** 42:5 180:7 181:7 182:11 190:4 194:22 210:5,6,9 212:5 213:3 214:5
**corresponding** 180:9 235:5
**cost** 302:8 303:15
**costs** 160:24 302:25
**counsel** 22:17

24:13 27:11,12,14 27:24 28:8 30:23 35:25 36:20 41:17 41:20 44:11 46:2 62:2 153:20 197:13 234:18 314:2 343:5 362:2
**Counselor** 117:6,9 173:23
**counsel's** 257:24
**counsel/legal** 152:7
**count** 127:5
**counterclaim** 43:10 44:21,23
**counterclaims** 6:8 43:18 46:12,18
**counting** 262:14
**COUNTY** 365:4 367:4
**couple** 99:4 253:9
**course** 48:15 60:21 92:14 125:8 176:25
**court** 1:2 2:4,5 22:15 23:8,10,11 32:6 37:2 43:15 44:4 45:2 46:15 48:22 56:3,5,10 56:17 60:6 64:6 64:11,22 66:13,18 68:3 69:9 70:3,8 73:16 77:23 79:16 80:23 83:25 84:8 85:16 86:5,23 92:25 93:6 94:24 96:14,19 98:19,20 99:9 102:23,25 103:11,15 110:5 110:11 112:11,17 112:24 113:24 114:4 117:25 120:3,8 123:6 125:4 128:4 132:14 136:18,19 137:14 140:21,22 153:15 154:21 155:7 158:5,10

160:10,15 163:18 167:4 170:24 173:6,11 180:16 191:15 192:6,11 195:18,19 218:15 218:20 220:22 221:3 222:18,23 224:18,23 226:19 229:6 230:18,23 236:20,25 239:7 239:12 241:18,25 242:5 245:21 247:6 251:10,17 262:4,5 264:3,8 265:22 266:3 267:13 268:20,25 272:10,15 273:25 274:6 278:18 280:24 281:11 283:4,9 285:7 288:10,16 289:6 289:12,19,24 290:15 291:7 292:23 293:12 304:4 307:6 318:10,14 320:12 320:24 324:5,19 326:25 328:21 329:2 330:4 336:15,20 338:11 338:16 340:8,14 342:12 343:14 344:9,14 347:8,13 349:16,21 364:7 367:5,7
**courts** 31:14
**CRCR** 1:24 367:24
**create** 301:21 317:14
**created** 93:25 296:17 297:2 298:17
**CRR** 1:24 367:24
**curiosity** 259:5
**current** 25:11,23 159:9 165:4
**currently** 25:5

156:19 321:21 333:6
**cut** 336:8
**CV** 1:8

**D**

**D** 5:2 22:3 23:21
**daily** 209:4 216:4
**date** 50:14 52:20 88:20 125:18 169:10,15,15,17 169:19 170:4,9 171:12,24,25 172:12 175:7,8,21 177:19,20,21 178:9,9,12,21 187:24 188:4,7 195:16,21 196:8 196:13 207:10 208:4 214:25 232:15,16 247:9 248:21,22 249:14 250:12,22 255:3 292:12 297:3 323:18 348:2
**dated** 10:17,23 11:11,17,23 12:6 12:23 13:6,12,18 14:6,13 15:6,12 15:19 16:6,13 19:12 93:16 118:8 168:25 169:11 173:2 219:2 220:24 221:13 222:20 230:20 236:22 239:9 241:20 264:5 265:24 268:22 272:12 274:3 278:20 283:6 288:12 289:8,21 290:17 349:18
**dating** 43:4
**David** 3:16 23:3 75:19 194:7 349:10
**david.wenger@d...**

3:22
**day** 199:11 200:22
216:4,4 232:19
235:4 238:4,6,9
263:7 364:15
367:22
**days** 161:20 273:19
**dead** 217:22,25
**deal** 230:14
**dealing** 51:23 68:18
74:7 130:23
162:20 219:10
**dealings** 29:25
338:4 354:15
**dealt** 325:21
**dear** 345:17
**December** 10:17,23
65:15 220:24
221:13,16 222:20
223:18 319:20
320:8,20 321:5,12
322:7
**decision** 91:14,18
214:19 215:6
**decline** 331:19
**declined** 326:16
327:5 331:11,22
**declining** 303:12
**Defendant** 1:9 3:24
23:4
**Defendant's** 218:13
220:21
**defer** 250:15
**deferred** 248:20
249:9,17 250:13
**defined** 309:15,19
311:2,9,10
**definitely** 182:10
**definition** 305:7
307:25 308:3,11
310:2,8 312:3,6
313:17
**definitions** 311:11
**Delaware** 2:10
23:18,24 367:10
367:14
**department** 34:18

35:20,21 37:11,17
38:3,11 58:24
105:11,12,15,21
121:15 130:14,21
130:22 131:3,7
143:2,6 144:6,19
144:25 147:24
148:23 151:6,15
152:8 153:21
159:9,12,20 172:2
178:14,18 195:3
199:2,5,7,7
201:22 214:2
215:25 216:3,7
219:10 226:17
227:3 230:11
235:18,20,25
236:2 239:19
240:6 288:2
325:22 329:13
335:4 337:3,4,10
337:14
**depends** 151:20
**deposed** 34:10,21
**deposition** 1:15 2:2
21:10,14 22:9
26:15,18,22 28:15
30:20 32:11 33:14
35:2,6 41:4,6 42:3
42:13,25 58:2
77:20 124:24
139:3,12,16,16
201:14 202:24
272:7 318:7
367:12,15
**deputy** 26:2,8
159:21
**describe** 56:12
**described** 181:23
**describing** 176:18
**description** 6:3 7:3
8:3 9:3 10:3 11:3
12:3 13:3 14:3
15:3 16:3 17:3
18:3 19:3 161:8
201:20
**designated** 26:20

**despite** 273:18
316:5
**details** 31:24
206:16
**determined** 32:7
**die** 214:9,11
**died** 218:6 325:2
**difference** 156:4,7
250:25 304:25
305:5 308:6,8,15
309:2,2,4 312:2
312:15 313:16
**different** 41:9
60:15 62:14 70:22
82:18 83:5 97:15
98:7 127:23
129:14 136:7
149:16 150:20
154:7,16 175:14
178:20 189:7
193:14 208:4,19
229:22,22 236:14
242:21 243:20
258:14 303:8
309:8 314:20
328:3 334:7,8,9
357:5
**difficulty** 51:23
**direct** 100:20
143:25 150:4
**directing** 141:6
220:8
**direction** 20:6 91:8
306:11
**directly** 168:22
226:18,20 265:11
**director** 25:13 26:2
26:9 34:17 159:22
169:23,23 215:25
216:6 226:4
228:20 229:24
245:9,12,25 247:2
264:16 329:12
339:20 345:18
**directors** 34:25
165:9
**disagree** 149:12

155:14 174:15
200:15 201:19
313:6
**discuss** 78:24 79:23
226:15,23,25
227:7 252:17
253:5,20,25
**discussed** 37:24
58:4 78:11,17
79:8 227:4 259:4
261:11,14 263:16
**discussing** 258:13
259:3 260:19
284:17 319:16
**discussion** 282:13
346:23
**discussions** 30:9
41:17,20 79:14
227:16 341:4
346:16 348:2,14
355:4,9,13,18
**dispute** 32:16,22
33:8,18,22 34:4
**distribute** 90:19
101:10 127:2
128:9,19
**distribution** 80:13
118:18 125:20
286:21
**distributor** 80:10
81:7 82:9 84:16
85:3,22 87:5,17
87:22 88:13 89:2
89:8,23 90:18
314:18 315:4
**distributors** 256:6
256:8,9
**DISTRICT** 1:2,3
**DLA** 3:15 23:4,5
**dobre** 223:20
**document** 6:6,13
6:18,23 7:6,11,16
7:21 8:6,11,16,21
9:6,11,16,21 10:6
10:12,17,23 11:6
11:11,17,23 12:6
12:13,23 13:6,12

13:18 14:6,13,20
15:6,12,19 16:6
16:13,20 17:6,11
17:17,23 18:6,12
18:19 19:6,12
43:16 44:5,7,11
44:13,17,22,23,25
45:4,19,23,25
46:11 48:2,4,7,7
49:3,3 56:4,6,23
56:25 57:3,6,8,21
57:25 58:5,6,10
58:12 59:12,12
61:10,14 64:7,23
64:24 65:2,5,7,20
66:4,11,14,20,25
69:24 70:4,12,15
70:20 74:8 75:15
76:11,25 77:3,4,5
78:7 89:14,16
90:7,8,14 93:2,10
93:13,25 94:7
95:12,24,25 96:5
96:7,15,23 97:2,7
98:12,14,15,16,21
99:2,3,6,13
100:19 101:11,13
101:19,24 102:3
102:14,16,18,19
103:5,12,20,24
104:6,9,11,13,19
104:23 105:20,22
106:5,13,16,17
108:5 110:6,15,15
110:23 111:22,24
112:12 113:4,12
113:22,25 114:10
114:17 115:16
117:22 118:7,11
118:13,23 119:6
119:10,11 120:4
145:8,10,10,11,11
145:15 146:7,12
146:20 147:3,7,10
148:22 149:6,17
149:20,21 152:12
158:6,11,17 173:7

173:18 174:7,8,9
182:16 192:5,7,18
192:19 193:3,11
193:21,24,25
194:16 200:17
201:21,24 202:5,9
209:9 218:16
219:22 220:23
221:22 222:19
224:19 225:3,7
230:19 236:21
237:4,7 239:5,8
241:19 242:6,8,20
242:23 243:6,16
243:20,25 244:20
245:4 251:11,23
251:25 252:2
253:15,19 254:13
255:6 258:4 264:2
264:4 265:23
266:7 268:21
272:11,19,24
274:2,13 278:19
279:9,12,13,14
280:25 281:8
283:5,13 285:25
288:11,20 289:7
289:20 290:16
291:5 292:24
293:16 310:16
315:11 318:11,21
324:6,12,17,21
328:22 329:8,10
329:21 335:25
336:16,23 338:12
338:20,23 339:4,6
339:7,9,25 340:9
340:18 341:6
342:11,14,20
343:2 344:10,18
345:3,6,20,25
346:4 347:9,16
349:17,25 350:3
352:7 353:9,16,18
**documents** 20:2
30:4,13 41:5,8,9
41:11,11,18,21

42:2,20,21 68:19
69:3,14 72:20,24
100:3 113:19
114:22 115:2
121:7,10,15,21,23
126:11 145:19
159:17 164:24
165:3 180:4 182:7
182:9 193:19
194:10 197:9,15
197:25 198:6
230:4 235:4 255:2
**doing** 107:3 135:20
151:15 201:14
240:16 261:18
262:25 313:3
323:15 346:19
**doubt** 145:2
**draft** 260:20
**drafting** 37:18 38:5
39:2,10,25
**due** 47:8,18 48:11
49:7 50:13 51:4
51:12 52:18 53:2
**duly** 23:16,22
367:13
**duplicate** 242:20
**duration** 263:21
**duties** 235:24
**DVDs** 177:25 178:2
301:12,13

———————
E
———————
**E** 1:15 2:2 3:2,2 4:2
4:2 5:2,4 6:2 7:2
8:2 9:2 10:2 11:2
12:2 13:2 14:2
15:2 16:2 17:2
18:2 19:2 22:1,3,3
23:1,21 24:1 25:1
25:3 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1

46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1

187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
277:1 278:1 279:1
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1 300:1
301:1 302:1 303:1
304:1 305:1 306:1
307:1 308:1 309:1
310:1 311:1 312:1
313:1 314:1 315:1
316:1 317:1 318:1
319:1 320:1 321:1
322:1 323:1 324:1
325:1 326:1 327:1

328:1 329:1 330:1
331:1 332:1 333:1
334:1 335:1 336:1
337:1 338:1 339:1
340:1 341:1 342:1
343:1 344:1 345:1
346:1 347:1 348:1
349:1 350:1 351:1
352:1 353:1 354:1
355:1 356:1 357:1
358:1 359:1 360:1
361:1 362:1 363:1
364:1,12 367:2,2
367:11
**earlier** 147:2
150:17 303:6
312:19
**early** 362:25
**ease** 242:9
**easier** 46:6 279:3
344:6
**easiest** 178:22
**economic** 26:9
159:22
**economical** 26:3
**editor** 245:10 249:4
249:5 263:19
264:16
**effect** 21:12
**effective** 113:16
170:19
**eight** 273:19
**either** 75:19 99:14
165:4 201:16
211:24 223:13
315:12,17 321:22
**eliminate** 327:23
**Elzbieta** 219:8,9
227:11
**emergency** 63:19
**employed** 25:5,8
162:24 214:14
**employee** 119:3,7,9
160:25 341:17,19
342:6
**employees** 79:19,20
111:20 151:9

162:14,19,23
163:15,22 165:8
194:23 212:11
228:12 342:7
**employing** 235:23
**ended** 124:16
**ends** 77:13 202:17
271:24 317:24
364:6
**English** 24:6,8,14
45:19 59:11,15
60:3,10,16,23,25
61:3 62:3 86:19
93:11 94:11 96:24
99:14 112:4,9
118:16 152:15,18
152:21,24 173:24
176:23 177:8
192:20 193:2
196:10,15 205:11
206:6 208:19
214:23 219:3
220:16 221:7,7
223:2,13 225:3
231:23 233:7,17
237:6,7 244:24
255:11 257:21
278:25 284:25
318:16 328:5
353:19
**enter** 172:22
188:14 253:2
**entered** 59:20 72:4
72:9 75:3,12
76:23 78:5 79:9
85:2,21 87:4,16
87:20 88:10
125:16 158:25
159:4 163:12
168:24 169:3
181:10 188:16
231:20,25 232:12
232:25 237:14,20
238:2,6 245:16
246:5,12 296:12
**entering** 106:22
107:5,7,21 108:2

123:20 124:4
**Enterprise** 22:10
**Enterprises** 1:5
28:22 29:22 30:2
30:17 31:4,8
32:23 33:9,23
35:12,17 37:19
39:4,12 40:2 42:8
43:3 45:9,11
48:10 49:6,15
50:12,21 51:3,11
52:16,25 53:6
56:20 59:4,7,16
59:21 60:18 61:16
61:21 68:22 72:3
72:10 74:21 75:4
75:12 76:2,12,22
77:2 78:4 92:18
105:16 114:8
122:17 123:16,19
124:4,15,17,25
125:18 127:4
128:11 131:15
134:8,17 140:5,13
142:12,24 144:8,8
149:2 157:5
164:12,25 165:21
166:4 205:22
214:22 215:10
275:4 309:20
329:16 330:9
346:17
**entire** 258:10
**entitled** 6:6 12:13
43:17 64:24 66:11
69:25 83:10
119:19 251:12
286:8
**entity** 128:18
**episode** 129:5,6
298:5,11,13
300:24 302:9
303:16 305:2,3,5
306:15,19 315:24
316:2
**episodes** 129:8
294:7,11 295:10

296:8,13,17,22
297:2,8,12,14,15
297:16,19,20,20
297:25 298:17,23
298:25 299:6,14
299:20 300:3,7,20
300:24 301:3,15
302:3,4 303:21,22
304:10,11,19
316:14,16,20,25
317:15,17 321:20
**error** 57:14
**especially** 142:16
163:21
**ESQ** 3:5,7,16,18
et 149:12
**EVENING** 5:7
**event** 267:5,18
321:23
**evidence** 49:14
50:10,11 51:2,10
51:16 52:16,25
53:25 54:23,24
55:11 143:13,15
333:22 350:16
356:22 361:22
362:6,12
**exact** 83:9 106:2
149:21,24 150:16
**exactly** 82:24 84:23
112:5 179:25
181:15 217:15,16
227:22 248:10
298:7 308:2

**EXAMINATION**
5:3 24:2
**examined** 23:24
**example** 89:22
305:21
**exception** 27:12
**exchange** 266:20
**exclusive** 61:16,22
62:10,24 63:11
80:10 81:6 82:8
84:16 85:3,22
87:5,16,21 88:12
89:2,8,22 90:18

90:18 92:19 96:2
97:8,25 98:5,5,10
101:9 102:14
103:6 141:23
142:11 144:9
145:3,3 150:4,5
151:19,23 152:8
153:22 155:3,10
157:10,21 205:23
208:25 210:3
314:18 315:4
**exclusivity** 157:6
210:3
**excuse** 57:5 109:23
110:22 129:10
138:14 159:3
216:8 331:15
355:10 361:9
**execution** 115:18
**exhibit** 6:4,11,16
6:21 7:4,9,14,19
8:4,9,14,19 9:4,9
9:14,19 10:4,10
10:15,21 11:4,9
11:15,21 12:4,11
12:21 13:4,10,16
14:4,11,18 15:4
15:10,17 16:4,11
16:18 17:4,9,15
17:21 18:4,10,17
19:4,10,15 43:19
44:6 56:4,8,18
63:15 64:9,23
65:18,21 66:11,16
69:3,15,24 70:6
71:17 73:5 76:11
79:8 89:4,10
92:24 93:4,11
94:8 96:13,17
98:23 99:4 103:10
103:14,20 108:4
110:4,8 112:9,14
113:23 114:3
117:24 118:7
119:18 120:6,12
135:8,9 144:2
145:9 158:8

167:22 173:9,18
192:10 193:5
203:6 218:13,13
218:18,25 220:21
220:21 221:2
222:17,21 224:17
224:21 230:22
231:2 236:17,24
239:6,11,15
241:16,22 242:7
243:24 244:3,8,9
251:16,21,21
264:2,7,12,12
265:20 266:2,7
268:19,24 269:4
272:9,14,19 274:5
278:15,22 279:15
281:3,9 283:8,13
288:7,14 289:5,10
289:18,23 290:19
291:6 292:20,22
293:2,17 310:13
310:16,19 314:8
318:9,13,21 324:4
324:9,18 325:25
328:20,25 331:25
335:3,10,13,16
336:14,18 338:10
338:15,20 339:7
340:5,12,19
343:11,23,24,25
344:13,19 347:4
347:12 349:7,15
349:19,25
**exhibitions** 288:4
**exhibits** 19:14 67:8
193:7 362:22
**exist** 301:16,18
**existed** 122:5 339:5
339:10
**existence** 162:10
**exists** 141:4 301:19
**expensive** 229:7
**experience** 360:8
**expiration** 247:19
**expire** 174:22,23
175:4,5,22 177:16

178:4 319:19
**expires** 175:16
177:17 178:8,10
319:11 364:18
**explain** 250:24
287:8 302:16
**explanation** 175:19
277:23
**extend** 319:24
**extent** 41:13 74:22
78:17 362:2
**external** 143:3
**extra** 43:21,24
**E-mail** 192:14,20
195:7,12 196:13
197:2,6 198:15,17
198:18,22 199:2,8
199:18 200:14
201:3 203:12,16
203:18,20,22
206:23 207:2,3,4
208:7 209:2
210:13,16 211:5,8
211:8,17,21
212:19 215:2
219:2,5,14,25
220:8 221:12
223:13 224:3
225:4,10,14 226:8
237:9,9 340:2
345:10,10
**E-mails** 42:4 43:2
164:15,23 182:5
197:3 201:11
208:5 211:19
221:7

**F**

**F** 3:18 367:2
**facetious** 334:5
**fact** 34:9,20 76:12
108:16 127:11
129:19 140:2
147:15,22,24
148:13 222:2
239:4 250:19
260:12 270:17

273:18 274:23
316:5
**facts** 81:8 113:19
143:12 170:21
171:8 250:7,8
358:13
**failed** 47:7,17,19
48:10 49:6,15
50:12,21 51:3,11
53:6,17,22 54:2,5
54:10,25 267:5,18
**failing** 52:17,25
**failure** 234:2 363:8
**fair** 28:25 29:12
67:7 85:10 114:24
326:15 327:4
362:5
**faith** 54:5,11 55:2
222:12 234:8
**fake** 197:24 198:2,6
221:22
**false** 219:22
**familiar** 305:12,14
**far** 24:9 27:25
74:11 116:20
189:20 223:3
**Farfal** 73:13,24,25
74:11,15
**fax** 3:10,21 110:16
111:17 114:7
198:7,8,12 324:12
336:24
**FBT26** 161:19
**February** 11:23
239:9
**feel** 138:15
**feeling** 139:7,8
**Fifteen** 359:7,8
**fifth** 127:6
**fifty** 257:3 259:7,22
**fight** 147:8
**figure** 191:14 351:4
**filed** 43:9 44:11,18
44:24 48:2,7 49:3
**files** 121:7,15
197:13 225:11
**filing** 21:4

**final** 232:20,20
254:24,24,25
255:4
**Finally** 69:23
**financial** 26:3,10
159:22 160:2
280:11,11
**find** 127:17 336:3,6
336:7 345:9
362:22
**fine** 91:18 126:21
242:22
**finish** 148:11
208:17,21 286:4
312:11
**finished** 108:24
**finishing** 204:8
249:6
**Fink** 3:18 23:5
27:16,19 32:24
39:15 50:3 56:12
57:5,10,12,15
63:17 67:14 74:22
77:9 82:17,23
83:4,16 85:5,10
85:13 87:24 88:15
88:18 91:6,13
101:15,18,21,25
115:4,6,10,13,25
116:16,25 119:13
119:16 122:18,22
123:5,8 126:18,21
127:8,11,18,22
128:20,22 129:12
129:15,19 130:2,5
131:17 132:7
133:7,9,12 134:9
134:19,23 135:8
135:17,21 136:4,8
136:15,21 137:13
140:6,12,14,18,24
142:2,14 145:7,21
145:23 147:4,6,15
147:18 148:2,4,8
148:11 150:11,16
152:17,20 155:19
155:23 156:21

157:16 166:10,15
166:20,24 167:17
167:21 168:11
170:21 171:8
172:24 173:12,23
177:2 183:12
184:9,12,19
185:17,25 186:11
186:25 187:3,15
187:21 190:22
191:3 193:11,17
193:20,23 194:3
196:2,10,14 199:4
199:10,22 201:10
201:18 203:10
204:7,12,15
205:25 207:8
208:13,16 210:13
210:17,20 212:17
213:12 218:21
223:5 235:8,10
240:21 241:3
242:23 243:2,5,19
244:24 248:4,7,16
249:23 250:14
254:7,10,13 256:7
256:11 257:8
259:9,12,16,23
268:2,6,8 276:19
277:4 278:24
280:2 282:19,22
285:9 286:4
288:21 294:9,13
299:3,8 300:5,11
303:5,24 304:3
306:16 307:11,17
308:9,17 309:21
310:4,14,20,25
312:17,22 313:5
313:13 316:7
317:4,18 321:13
322:14 324:10
325:13,23 328:9
329:3,20,23 330:2
330:15,18,24
331:12 333:20
334:4,16,22 335:9

335:12,15,18,25
339:6 340:25
342:16,19,22
344:2 345:2,5,8
346:3 347:5
348:23 349:3,5,10
349:13 350:14
351:13,19 352:12
352:16 353:8
354:16 356:9,11
356:14,16 357:9
357:18,22 358:7
359:23 360:2
361:16,25 362:9
363:14,17,22
364:2
**firm** 22:21,24
147:2 324:13
**first** 23:22 24:7,25
28:20 29:24 31:3
33:17 36:23 38:9
38:15 42:12,14
46:25 47:5 56:19
73:18 80:8 93:11
94:6,15 96:23
99:4 103:25 104:3
104:5,16 108:8,20
108:22 109:16
118:12 121:13
136:22 143:17
176:15 191:9
196:21 207:17
221:7 229:13,24
231:18 237:17
253:11,11 257:23
266:17 280:3
324:23 338:24,25
345:16 352:4,14
353:20 354:2,3
**five** 241:3,5 242:17
263:8 350:11,15
350:21,23 351:5
352:2
**five-page** 99:3
**fly** 201:13
**Foland** 227:12
**follow** 277:5

following 46:21,22
115:17,17 207:18
247:19 365:5,6
follows 23:19,25
48:24 68:5 69:11
77:25 84:3,10
85:18 86:25 103:3
113:2 128:6
132:16 137:16
153:17 167:6
171:2 245:23
267:15 304:6
320:14 321:2
327:3 330:6
fool 353:2
force 21:12
forced 313:6
forge 145:18
forgery 146:8
form 21:7 50:4
54:17,18 74:23
85:11 87:24 88:15
115:4 116:16,25
129:12 130:3
131:17 132:7
134:9 135:17
136:15,23 142:2
166:10,14 167:17
168:11 169:8
172:24 184:20
187:21 191:3
199:10 203:10
256:7 259:23,24
268:6 277:6,14
282:20,23 294:13
299:8 300:11
303:24 308:9
316:7 321:13
322:14 325:23
331:12 333:20
354:16 359:24
363:14
formal 211:9,14
212:4,4,9
formally 212:10
formed 357:19
forth 181:8 367:12

Forty-five 151:13
found 230:5 258:18
foundation 122:19
136:16,24 321:14
351:20 352:12,17
354:17 356:14
357:10
foundational
353:10
four 33:19,21 234:3
235:23 242:25
273:8,12 350:11
350:15,21,22
351:5
fourteen 161:20
four-page 69:24
158:11 243:16,24
336:23
framed 142:16
framework 144:10
145:5 152:10
153:23
free 24:14,16 27:8
161:17,19 306:8
fresh 138:17
FRE408 70:2
Friends 305:21
front 118:17
134:23 139:24
144:2 199:21
229:6
full 24:25 200:21
258:4
fullest 139:17
fully 228:13
fundamentally
55:6,9,13
further 21:6,9
220:9 246:21
269:13 319:9,24
347:25 352:10,21
353:6 354:7,10
363:16 367:17
future 205:7
207:23 210:7
211:13 227:25
228:6 229:9

234:10 246:15
301:21 321:23
322:4
F-a-r-f-a-l 73:18

## G

G 22:3
general 31:9,25
32:14 33:24 45:12
51:8 52:5,8,12,14
78:15 109:14
113:8 294:3,19
359:12 361:6
generally 27:22
104:12,25 145:18
Gentlemen 140:22
Germosen 1:24 2:4
22:16 367:5,24
gesture 308:23
getting 30:8 236:15
288:22
give 36:3,8,21
110:9 118:16
143:20 149:24
150:20 151:2
152:15 156:14
157:17 165:13
176:13 177:2,4
182:15 206:20
230:13 236:2
288:21 324:2
329:23 361:8
363:19
given 125:19
133:24 134:3,6,12
145:17 146:7
164:17,19 192:19
208:20 223:23,24
224:11 244:8
gives 71:20
giving 28:15 34:24
139:17 173:13
278:24
go 26:12 27:9 63:22
64:12 67:16 86:22
94:2 147:18
171:19 176:16

191:15 202:13
220:19 229:12
234:12 277:15
310:23 363:22
goes 91:4,25
going 26:24 34:9,20
36:8 45:18,23
47:7 55:19 56:12
63:18,25 66:10
83:19,21 87:11
91:5,22 93:15
112:8 113:22
117:15 119:17
126:24 127:14
128:7 138:20
147:8 155:16
156:7,14 158:3
175:25 176:12
178:3 181:7,15,16
182:23 191:20
192:4 207:23
211:17 220:18
236:6,9 240:25
241:8 260:14
262:19,21 263:25
268:13 291:5
292:17,18 301:21
301:24 324:3
339:13 358:20
362:17
Gonzalez 4:5 22:13
good 54:5,10,25
145:25 163:20
164:3,4,8 165:7
189:6 222:12
234:8
grant 151:18,23
152:3 157:22
320:4,8,16,20
321:4,10
granted 63:11 98:5
127:2 128:9,18
129:7 131:13
142:11 145:2
152:8 153:21
205:22 208:25
209:24 319:15

322:11
granting 161:3,10
grants 62:10,24
150:4,5 151:7
155:10
grounds 91:11
184:20 268:4,9
363:11,12
guess 193:7 194:6
321:18

## H

H 6:2 7:2 8:2 9:2
10:2 11:2 12:2
13:2 14:2 15:2
16:2 17:2 18:2
19:2 180:18,19
half 258:3 334:7,8
hand 57:9 367:22
handed 44:5 93:9
193:3 242:6
handing 62:2 93:9
338:19
handwriting
324:24,25
happen 212:8
happened 31:22
32:2 113:15
162:15 201:7
happening 211:12
happens 236:11
hard 283:20
hashmark 257:8,9
257:23
HD 339:20
head 130:13 131:2
131:4,4 151:6,14
159:9 169:23
199:2,5,6,7
213:25 226:17
227:3 325:21
335:4
hear 30:23 45:3
80:23 123:6 125:5
129:17,20 149:16
285:7 303:5
327:18 340:25

342:12
**heard** 228:3,16
**held** 25:22 118:19
285:3,23 286:13
286:18,19 287:6
287:11
**help** 45:22 176:24
227:24
**helped** 144:21
**helpful** 341:23
**hereinbefore**
367:12
**hereunto** 367:21
**Herezinska** 219:8
219:25 227:11
**hesitate** 115:11
**he'll** 182:14
**higher** 323:2,6,11
**holding** 284:22
**hope** 203:5
**hours** 286:8
**hundred** 176:6
182:10 201:14
255:19
**hypothetical**
185:18,19 186:11
186:25 249:16
250:6 317:5

**I**

**idea** 58:11 71:20
72:22 110:21
122:15 163:14
323:11 351:14
**identification** 6:5
6:12,17,22 7:5,10
7:15,20 8:5,10,15
8:20 9:5,10,15,20
10:5,11,16,22
11:5,10,16,22
12:5,12,22 13:5
13:11,17 14:5,12
14:19 15:5,11,18
16:5,12,19 17:5
17:10,16,22 18:5
18:11,18 19:5,11
43:20 56:9 64:10

66:17 70:7 93:5
96:18 98:24
103:14 110:8
112:14 114:3
117:24 120:7
158:9 173:10
192:10 218:19
221:2 222:22
224:22 230:22
236:24 239:11
241:23 251:16
264:7 266:2
268:24 272:14
274:5 278:23
281:4 283:8
288:15 289:11,23
290:20 293:3
318:13 324:9
328:25 336:19
338:15 340:13
344:13 347:12
349:20
**identify** 281:10
350:17
**ignorance** 36:12
**II** 314:14
**ill** 28:17 139:7
**Illinois** 158:13
**IMB** 335:5 338:4,7
339:23 344:24
346:11,17,19,21
346:23,24 347:19
347:20 351:12,25
352:5,10 353:6,6
354:10,15,23
355:4,9,13,18,22
356:2,4,23
**IMBD** 353:2,5
**IMB+Records**
326:9,17 327:6
334:12,15 345:19
350:8
**immediately**
115:17,25 116:3
228:22 234:3
337:10
**implement** 62:9,22

154:19 155:5,9
245:15 246:4,10
246:21
**important** 229:4
256:2
**impossibility**
246:18
**impossible** 245:15
246:4,10,21
**improperly** 32:8
**inactions** 55:5
**incapable** 250:6
**include** 159:24
160:6
**included** 193:4,9
**including** 35:18
78:12 223:19
295:25 336:24
**income** 160:23
**incorrect** 102:8,11
205:13 208:8
224:6,9
**indented** 257:7
**independent** 30:5
342:17
**index** 19:15
**indicate** 28:7 45:22
95:25 115:16
119:7 180:5
199:13 203:6
284:15,21 300:2
339:22 342:8
**indicating** 27:6
39:23 43:23 46:4
46:13,23 47:4,12
57:11 62:18 73:16
77:8 94:16 112:16
115:9 117:11
152:22 164:12
187:9 188:23
233:2 255:7 291:3
306:3 308:22
314:3,6,22 353:23
359:9 360:19
**indication** 106:12
**indirectly** 226:21
**Info** 80:10 85:3,23

87:6 314:18 315:5
**inform** 189:9,13
212:10,20,25
227:21,23 255:20
256:24 260:3
354:13,14,19
355:3,8,12,14,17
355:21,24,25
**information** 20:2
48:9 49:5,18,23
49:24 199:16,20
203:24 204:23
206:10 207:14
211:10,15 228:18
229:22 230:13
234:10 240:5
266:18 275:6,23
276:2,3,4,8,10,25
285:18 287:25
302:17 303:2
334:19
**informed** 31:20
162:15,16,19,23
164:12 189:6,15
189:25 206:23
215:24 227:17
228:13 229:15
240:7,10 256:4,12
256:18,21,23
260:12 278:12
319:6
**informing** 163:23
180:10 212:8
216:2 278:11
356:5
**informs** 278:3
**infringed** 342:10
**infringer** 325:7
333:18 334:2,11
334:14,17,18,23
335:5,8,22,22
358:3
**infringers** 332:10
**infringing** 337:21
354:24
**initial** 35:18 348:3
**inside** 30:13

**insisting** 240:13
**institution** 295:15
**instruct** 121:20
**instructed** 223:18
229:19
**instructing** 91:10
166:14,15
**instruction** 224:2
224:11
**instructions** 223:23
**intend** 321:10
**intended** 78:14,25
**intends** 321:20
**intent** 257:20
**intention** 253:16
269:16 322:3,6
**intentionally**
302:21
**interest** 285:12
288:2
**interested** 38:25
286:24,25 287:2
367:19
**interests** 285:19
**internal** 143:3
163:19 252:2,2
253:14,14
**internally** 79:8
**international** 26:6
226:6
**interpret** 24:10
156:14 175:13
332:20
**interpretation**
80:22 90:23
150:13 204:24
210:25
**interpreted** 33:13
48:18 52:3 81:24
86:3 100:14 265:5
265:10 326:21
**interpreter** 4:6
23:16 24:7 33:11
33:12 36:8,20,23
38:14 40:7,9 46:2
46:5,23 47:4,12
48:16 51:25 52:4

52:7 54:14,16
56:11 62:16,18
73:14,17 81:22
85:25 86:4,6,13
100:12 104:18
117:6,9 129:22,25
132:23 133:2
160:17 162:13
180:14,17,19,21
180:25 191:13
265:3,8 271:12,15
283:21 284:4
307:2,9 314:2,5
326:19 330:14,17
330:21
**interprets** 23:19
**interrupted** 136:18
140:21 195:18
262:4
**interrupting**
150:15
**introduce** 22:17
**investigate** 228:23
230:4
**invoice** 323:18
**invoices** 160:23
**Invoicing** 160:22
**involved** 28:21 29:2
29:4,11,12,17,18
29:20,25 30:7
35:10,15 37:12,17
38:5,20 39:2,5,10
39:24 40:24 93:17
106:25 107:4,21
300:12
**involvement** 30:11
**involves** 362:2
**in-house** 78:18
**irrelevant** 148:14
**issue** 27:17 150:16
194:7 303:9
**ITVP** 339:20
**Iwona** 38:9,9,9
**I-w-o-n-a** 38:15

**J**

**January** 11:11,17

48:8 49:4 50:11
131:5,8,10 159:9
159:11,13 185:14
225:5 226:10,13
229:2 230:20
231:6 235:2
236:22 237:9
269:10 270:2,6
**Jersey** 2:10 23:18
23:24 367:6,10,14
**Joanna** 124:22
**job** 238:16
**John** 3:7 22:23
**join** 325:6 326:7,16
327:5,9,15,21,21
327:24 328:3,4,14
328:16 329:16
330:9 331:19,22
**joined** 113:16
**Jon** 67:7 290:2
**Jonathan** 3:5 22:21
24:3 77:7 127:5
233:8 292:15
314:5
**jpiskora@loeb.c...**
3:12
**judge** 211:16,18
250:25
**Juliusz** 34:12
**July** 15:12,19 16:6
16:13 112:2 113:6
169:22 170:3,14
171:4 176:2 178:2
180:3,6 181:8
182:6 187:7
188:16 234:17
288:12 289:8,21
290:17 296:12
297:23 298:6
301:15 319:16
**jumped** 26:13
**June** 15:6 114:10
118:8 159:5,6
283:6,19,21,21,21
283:25
**justify** 361:23
362:7

**jzavin@loeb.com**
3:11

**K**

**K** 23:15,15
**KATARZYNA** 4:6
**keep** 63:21 164:4
240:25 256:4,18
**kept** 257:14
**kind** 151:20 164:15
227:24
**kindly** 249:13
250:21
**Klan** 223:20 294:8
294:12,17 295:6
295:10 296:8,13
296:15,17,21,23
297:25 298:5,10
298:17,23 299:14
299:20 300:8,21
300:25 301:16
302:3,4,9,20
303:16,21 304:10
306:15,18,21,23
316:4,11,13,14,15
316:18,19 321:20
**Klan's** 316:17
**knew** 34:25 124:7
198:22 199:14
202:12 203:7
215:19 228:17
273:15
**know** 24:20 27:2,4
27:8,9 31:6 32:3
32:10 38:22 39:5
39:6,9,22,24
40:23 43:11 44:15
44:16,19,25 45:4
45:13,19 49:9,13
50:18,23,25 51:13
51:14,16,17 52:15
53:3,4,7,24 54:19
55:3,10,14 56:24
57:4,20 58:20
59:6,17 60:2
61:14,20 65:7
66:5 68:16,17,19

70:22,25 71:5,8
71:12,14,15,18,22
72:7,8,19 74:5,11
76:8,9,11 83:10
83:13 89:12,17,21
90:16,17,24,25
91:2,17,22,24
92:2,3,5,7,15,21
94:14,17 95:8
99:20 102:9,10,12
104:12 105:3,5,18
106:7 107:11,17
107:18,19,20,25
108:6,8,11,20
109:25 110:19
111:4,6,14,16
113:19 114:20,23
116:7,11 117:3,4
118:25 119:2,4
120:24 121:6
122:3,11 123:14
123:17,18,23,25
124:2,3,14,19,23
125:3,6,7,10,15
125:15,21,24,25
126:2,6,7,8,15,16
126:25 127:22,23
128:8,12,25
133:24 135:18,19
135:24 136:11
137:18 138:2,8,10
138:12 140:14,16
145:7,14 146:13
146:14,23,24
147:25 148:5,13
149:3,4,17 150:3
151:18,20 156:3
156:22,24 160:25
163:2,16,19
165:19,22,23
166:2,3 170:11
172:16,19 179:25
181:15 183:15,16
184:2,5,8,15,16
184:21 185:2
186:24 189:4,18
189:21,24 190:3,8

190:9,13,18,19,23
193:18 194:18,20
194:24 197:5,17
197:19,22 198:24
198:25 199:3,8,12
200:7,8,11 201:2
201:7,15,16,23
202:4,6 211:24
212:24 213:11,24
214:12 215:17,18
215:21,22 216:13
216:20,24 217:3,5
217:15,23 219:15
222:6 223:3,17,22
223:25 225:23,25
228:19 232:3
233:7,20,21,22
235:3,13,15
237:25 238:18
247:16 249:25
255:11,12,16
256:23 260:9
261:17 262:2,13
264:12 270:14
279:13 280:19,20
286:23 290:12
292:9 294:24,25
295:2,3,5,6,14,17
296:9,18 297:7
298:13,19 299:9
299:15 301:3
302:5,8,15,24
303:9,17 304:25
307:21 308:4,25
308:25 309:15,18
312:13 313:6,10
313:11,12,15,19
313:20 315:18,21
317:20 321:15,22
321:24 322:10,15
322:23 323:4,9,14
324:22 330:24
333:4,11,12,13
334:25 335:15
338:8 340:21
341:16 342:25
343:3 345:24,24

346:13,15,18
347:23 348:13,16
351:10 352:3
354:6,8,9,12
355:14,19,23
356:3 357:11,14
358:4,5,7,9
360:16,17,22
361:20 362:4,6,11
362:15
**knowing** 247:24
312:23
**knowingly** 249:17
**knowledge** 50:10
50:11,14,17 72:2
75:16,20,21,24
76:20 78:3 109:17
109:20 121:3
122:9,9 124:12
125:14,16,21,23
134:11 145:24
162:14 164:14,14
164:16 181:22
182:6 186:2
189:15 191:10
199:20,24 215:24
216:6,10,17
244:22 246:13,23
248:6 269:14
273:21 302:2
315:12 322:3,18
322:20 331:21
338:5,7 342:17
346:18,21,22,25
348:22 355:16
359:11 360:13
361:7,8
**knows** 156:21
165:10 201:17
211:12 325:15
**Kotaba** 171:16,23
180:11,15 182:2
182:13 231:4
234:22,24 237:12
237:25 266:19
267:4,17 272:25
273:5,6 279:19

281:16 283:16
284:17 286:11
290:6 291:15
318:24 319:6
**Kotaba's** 237:8
238:25
**Kroblewsa** 4:9 23:6
34:14
**Kroblewsa's** 34:15
**Kus** 38:9,10,20
**K-l-a-n** 294:12
**K-o-t-a-b-a** 180:17
**K-u-s** 38:16

**L**

**L** 23:21
**lack** 122:19 136:16
136:24 317:5
321:14 333:22
351:19 352:12,17
354:17 357:10
**Lacks** 356:14
**language** 24:7,21
51:7,23 60:17
193:15 208:11,25
232:7
**Laskowski** 247:8
247:23
**late** 324:11
**law** 141:16,17
142:5 147:2 183:8
184:2,16,25
324:13
**lawsuit** 31:4,12
32:7 45:9 327:24
328:15
**lawyer** 75:7 80:21
80:25 81:9,25
82:5 84:12 89:18
89:20,25 90:12
105:6,7,9 116:18
144:12,14 146:18
155:16 184:6
**lawyers** 30:5,6,9
78:12,18 80:3
121:25 146:21,25
164:18,20 165:3,4

165:4 210:5
**lead** 28:5
**leave** 213:23,25
**left** 163:5 275:13
286:8
**legal** 4:5 19:14
22:14 31:14 34:17
35:20,21 37:11,17
38:3,10 41:14
58:23 74:23 75:6
105:10,12,15,15
105:20,20 108:3
126:11,11,13
140:7,15,25 141:5
141:7,9 142:4,8
142:15 143:2,3,6
143:20 144:6,6,19
144:25 147:24
148:22,23 152:6
153:19,21 155:14
156:8,12,13,20,23
165:18 170:18,20
178:14,17 183:13
186:22 188:12
208:24 209:3,24
229:7 230:10
235:18,19,24,25
240:6 248:5
249:24 260:18
312:4,7,10 313:18
315:15 329:12
335:4 337:3,4,10
337:14 356:11
361:15 362:10
**legally** 234:16
**Lenarczyk** 40:14
40:17,21 70:20
71:7,11 107:23,24
189:16,25 190:5
216:10,18,20
217:3,7,19 226:3
**letter** 100:7 112:4
155:2 211:9 212:5
218:5 221:11,12
230:6 231:2,3,11
231:15 232:9
233:9,11,24

234:22 235:2
237:9,12,22 238:8
238:12,25 239:18
239:21 244:12,14
244:17 245:8,9,12
245:25 246:19
247:3,17,21
248:11,17,18,24
264:15,17,23
265:12 266:11,16
269:4,7 270:17,20
272:25 273:4,7,11
274:24 276:18
278:5 279:19,21
280:9 281:13,15
283:16 284:2,9,14
284:21 286:15
288:24,25 289:2
289:15 290:5,9
291:14,18,21,25
292:8 314:14
318:24 319:2,3,6
325:11 335:3
336:3,4,9,24
337:3,6,7,9,25
345:17 347:21,24
348:5,6,9,10,13
348:14 350:7,9,17
352:5 353:25
362:16,19,21
363:7
**letters** 42:5 207:24
218:10 234:23
236:13 238:13
283:24 357:12,13
362:24
**let's** 26:12 38:24
43:13 63:22 64:12
69:23 77:21 85:8
92:23 96:12 98:18
103:9 110:3
166:18 167:3,3
170:23 173:4
182:19,20 202:13
211:19 218:12
220:18,20 222:16
224:16 230:16

236:16 241:4,16
243:8 247:22
251:9 265:20
268:18 272:9
273:23,23 278:14
283:2 288:6 289:4
289:17 292:20
306:10 317:21
328:19 336:8,13
338:9 340:4
343:11,23 347:3
349:15 358:16
363:22
**level** 212:11,11
228:13
**license** 2:4,6 107:5
107:12 108:22,22
130:20,22 133:24
134:6 141:19
143:9 158:12
161:3,6,9,16,20
162:11,21,25
163:12 165:14,17
165:20,24 166:5,8
167:8,14 168:9,9
168:25 169:3,4,9
169:11 172:22,22
174:10,11,16,18
175:15 177:11,13
177:16 178:8,9,19
178:24,25 185:13
187:23 188:7,9,15
188:15 189:2
190:7,10,14,21,25
198:13,23 199:15
200:7,12,25 203:9
215:20 238:2
245:16 246:5
247:20 249:18,19
253:7 254:2
263:17,21 291:23
294:6,10 296:19
296:22 298:22
301:19,20 317:2
317:17 322:6
367:6,7,25
**licensed** 108:9,21

161:24 162:2
188:4 296:21,24
298:23 299:20
300:8,19,20,23,24
301:16
**licensee** 177:25
185:14,15
**licenses** 130:16
131:13
**licensing** 130:24
132:4,19 134:13
148:24 151:16
159:24 160:6,8
187:13,19 237:14
237:19 246:11
253:21 254:5,16
258:19 299:6
303:21 304:10
**life** 200:20 209:4
232:15
**light** 245:13 246:2
274:25 325:11
**likelihood** 147:8
**limited** 141:4
**line** 6:3 7:3 8:3 9:3
10:3 11:3 12:3
13:3 14:3 15:3
16:3 17:3 18:3
19:3 20:3,7,11
258:3 365:7 366:2
**linguistic** 232:6
**list** 341:8,10
**listed** 139:22
**listen** 90:16
**litigation** 43:8
60:22,22 62:21
66:7 67:6,21,22
68:7 106:15 121:8
122:17 123:16
124:15,25 148:17
164:22,23 165:15
165:21 327:23
356:7
**little** 72:12 139:9
204:13
**live** 83:14
**LiveNote** 2:8

**Loeb** 2:10,11 3:4,4
19:15,15 22:21,21
**long** 25:8 93:25
130:7 131:2,6
188:17 229:7
241:2 242:24,25
294:23 301:8
**longer** 111:25
113:5,20
**look** 45:18,24 53:9
62:4 65:2 76:17
80:5 144:3 148:8
182:8 194:16
210:14 211:4
220:15 231:14,18
232:4 235:3 257:6
258:9 270:16
293:10 299:18
335:9,16 345:16
349:5,7 352:13
**looked** 42:13,14,17
65:17
**looking** 53:9 55:4
58:16 63:15 73:8
104:8,13 145:16
176:21 178:7,10
178:13 192:23
195:6 197:2
206:25 312:8,12
**looks** 57:7 284:4
343:18
**lot** 194:23 234:23
235:4 302:20
**lousy** 119:19
**lower** 212:11 323:2
323:11
**L-e-n-a-r-c-z-y-k**
40:11
**L.L.P** 2:11 3:4,15
19:15

**M**

**M** 23:21
**Magdalena** 58:23
**mails** 194:23
**main** 37:7 301:11
**making** 114:20

256:5,19
**manager** 25:18,25
26:5
**managing** 25:13,24
26:2,8
**March** 12:6 120:21
241:20 243:18
244:13 336:25
350:13,21,22
351:11 352:2
354:11
**Maria** 1:15 2:2 5:4
22:1,9 23:1 24:1
25:1,3 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1,18
73:1 74:1 75:1
76:1 77:1,20 78:1
78:16 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1,16 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1

126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1,3
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
172:5 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
192:23 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
202:24 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1

261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1,15 271:1
272:1,7 273:1
274:1 275:1 276:1
277:1 278:1 279:1
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1 300:1
301:1 302:1 303:1
304:1 305:1 306:1
307:1 308:1 309:1
310:1,23 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1,7 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1 339:1 340:1
341:1 342:1 343:1
344:1 345:1 346:1
347:1 348:1 349:1
350:1 351:1 352:1
353:1 354:1 355:1
356:1 357:1 358:1
359:1 360:1 361:1
362:1 363:1 364:1
364:12 367:11
**mark** 56:3,18 64:4
64:22 66:10 69:23
92:23 96:12 98:18
103:9 110:3 112:8
158:3 173:4
218:12 220:20
222:16 224:16
230:16 236:16
241:16 251:9
264:2 265:20

268:18 272:9
273:23,23 278:14
283:2 288:6 289:4
289:17 292:18,20
303:4 324:4
328:19 336:13
338:9 340:4
343:11,25 344:2,5
347:3 349:15
**marked** 20:10
43:13,19 44:5
56:8 64:9 65:17
66:16 67:11 69:3
69:14 70:6 71:17
73:4 93:4,10 94:8
96:17 98:23 99:3
103:14,19 108:3
110:8,15 112:14
113:23 114:3
117:24 118:6
119:18 120:6,12
158:8 173:9,18
192:5,9 193:3,4
218:18,25 220:25
221:6 222:21
224:21 230:21
236:24 239:5,6,10
241:22 242:6
251:15,21 264:6
265:25 266:7
268:23 272:13,19
274:5,13 278:22
281:3,9 283:7,13
288:14 289:10,23
290:19 291:6
293:2,17 318:13
318:21 324:8,17
328:24 336:18
338:14,20 340:12
340:19 344:12,18
347:11 349:19,25
**market** 162:16
359:16 360:9
**markets** 165:11
**marking** 67:8
192:24 242:7
318:9

**marriage** 367:19
**material** 171:20
176:12,14 179:18
179:20,21 181:14
186:9 187:13,14
205:23 259:3
287:18,21 359:21
360:10
**materials** 170:16
171:6 175:9,9,24
176:2,10 179:3,3
**matter** 2:3 22:10
30:4 32:15 35:5
74:10 93:17
189:14 226:15
227:4 322:19
367:20
**matters** 26:3,10
51:7,8 68:19 75:6
130:23 159:23
160:2 235:25
331:14
**ma'am** 285:8
**mean** 32:14 51:15
57:6 58:9 59:10
65:9 69:4,15,17
69:17 76:6 79:18
80:18,21 81:7
84:25 85:20 87:3
87:15 88:9 92:17
104:2,10 105:8
125:23 129:4
132:25 140:12
146:25 150:8
151:2 152:2
154:13,16 160:20
164:7 181:25
185:9 189:11
200:19 224:9
233:7,16 236:11
246:19 258:21
262:16 263:3,6,7
263:8,9 271:10
297:3 323:5,8
327:21 332:20
333:17 334:2,16
**meaning** 312:24

**means** 28:4 80:12
80:20 81:13,20
82:10 84:17
106:12 119:22
150:3,6 151:19
183:19 271:8
305:9 312:15,16
315:14,19 333:8
359:20
**meant** 160:2
246:24 332:15,24
**media** 176:13
212:10 323:16
**meeting** 12:14
251:12 252:5,6,10
252:15,16,22,25
253:4,5,15,17,20
255:15,18,21,21
257:2 258:12
260:11 261:7,8,9
261:14,16 263:15
340:22 341:9
342:9 348:20,24
349:2 350:12,16
352:10,10,22
353:6,13,21 354:7
354:23 355:22,23
356:2,4,23 357:2
358:3
**meetings** 354:20
355:4,21 357:12
**member** 95:10,13
**memo** 252:3,5
253:15
**mention** 35:22
240:12
**mentioned** 200:20
258:14 284:9
285:13 336:2
**mid** 350:23
**miles** 201:14
**mind** 185:6 277:19
**mine** 177:3 310:23
**minute** 26:12
182:15,19,20
329:23 363:20
**minutes** 77:7 241:3

**mischaracterizat...**
276:18
**missing** 194:5
**misspoke** 291:18
**misstated** 149:6
**misstates** 187:16
**misstating** 149:9
**mistranslation**
276:24 285:5
286:17
**misunderstanding**
51:21
**misunderstood**
236:4
**moment** 30:6 37:21
42:19 78:13 87:19
92:6 96:10 99:22
111:22 115:7,11
151:11 162:25
175:6,8,23 176:4
176:4,5 177:18
178:3 179:2,11,17
179:18 183:18
185:5 195:25
202:14 226:24
227:2 239:25
254:25 269:24
333:2
**money** 49:16 51:11
52:17 302:20
322:10
**monies** 47:8,18
48:11 49:7 50:13
50:20 51:4 53:2
**month** 189:22
263:7
**months** 189:22,23
350:11,15,23
351:5 352:2
**morning** 30:20
**move** 86:4 301:25
306:10
**movies** 204:4
**moving** 86:5
**multi-page** 6:5,12
6:17,22 7:5,20
8:20 9:10,15,20

10:5 11:16 12:5
12:12 14:5,12
15:11,18 16:12,19
17:10,16,22 18:5
18:11,18 19:5,11
43:16 56:6 64:7
66:14 70:4 98:21
113:25 120:4
158:6 173:7 192:7
236:21 241:19
251:11 274:2
278:19 288:11
289:7 290:16
292:24 324:6
328:22 336:16
338:12 340:9
344:10 347:9
349:17
**mutual** 240:11
**M-a-l-g-o-r-z-a-t-a**
36:24

**N**

**N** 3:2 4:2 5:2 22:3
23:15,21,21
**Nadolna** 1:15 2:2
5:4 22:1,9 23:1
24:1,3 25:1,3 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1,14,19
44:1,4,6 45:1 46:1
47:1 48:1 49:1
50:1,9 51:1 52:1
52:13 53:1 54:1
55:1 56:1,4,8,17
57:1,19 58:1 59:1
59:14 60:1 61:1
62:1 63:1 64:1,9
64:22,23 65:1,17
65:21 66:1,11,16
67:1 68:1 69:1,3
69:14,24 70:1,6
70:11 71:1,17

**A-364**

72:1 73:1 74:1
75:1 76:1 77:1,20
78:1 79:1 80:1
81:1 82:1 83:1,19
84:1 85:1 86:1
87:1 88:1 89:1
90:1,11,13 91:1,4
92:1,24 93:1,4,10
94:1,6,6 95:1 96:1
96:13,17,22 97:1
98:1,23,25 99:1,3
100:1 101:1 102:1
103:1,10,14,19,20
104:1 105:1 106:1
107:1 108:1,3
109:1 110:1,4,4,8
110:14,20 111:1
112:1,14 113:1,23
114:1,3 115:1
116:1,20 117:1,24
118:1,6 119:1,18
120:1,6,11 121:1
122:1 123:1 124:1
125:1,11 126:1,8
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1,3,6 140:1
141:1 142:1,7
143:1,25 144:1,23
145:1,15 146:1,5
147:1 148:1,21
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1,9
157:1,12,15 158:1
158:8 159:1,8
160:1 161:1 162:1
163:1,4 164:1,11
164:21 165:1,13
166:1 167:1 168:1
168:6 169:1 170:1
171:1 172:1,11
173:1,9,17,18
174:1 175:1 176:1
176:8,19 177:1

178:1,6 179:1
180:1 181:1,5,23
182:1 183:1,8,23
184:1,23 185:1,10
185:12 186:1,10
187:1 188:1 189:1
190:1 191:1 192:1
192:4,5,9 193:1
194:1,15 195:1
196:1 197:1 198:1
199:1,19 200:1
201:1 202:1,24
203:1,4 204:1,18
205:1 206:1 207:1
208:1 209:1,14
210:1 211:1,16
212:1 213:1,6
214:1 215:1 216:1
216:5,25 217:1
218:1,13,18 219:1
219:2 220:1,21,25
221:1 222:1,17,21
223:1,12 224:1,17
224:21 225:1
226:1 227:1 228:1
229:1 230:1,17,21
231:1 232:1,8
233:1 234:1 235:1
236:1,24 237:1
238:1 239:1,10
240:1 241:1,16,22
241:24 242:1,5
243:1,15 244:1,2
245:1 246:1 247:1
248:1 249:1 250:1
250:5 251:1,9,15
251:20,21 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1,6
261:1 262:1 263:1
263:2 264:1,2,6
264:11 265:1,20
265:25 266:1,6,7
267:1 268:1,23
269:1 270:1,12
271:1 272:1,7,13

272:18 273:1,24
274:1,5,12,13
275:1,7 276:1
277:1 278:1,22
279:1,7 280:1
281:1,3 282:1
283:1,3,7,12
284:1 285:1 286:1
286:3 287:1 288:1
288:14 289:1,10
289:23 290:1,19
291:1,6 292:1
293:1,2 294:1
295:1 296:1 297:1
298:1 299:1 300:1
300:12,23 301:1
302:1,24 303:1,19
304:1,8 305:1
306:1 307:1 308:1
308:3 309:1 310:1
310:12 311:1
312:1,11 313:1,10
314:1 315:1 316:1
317:1 318:1,7,13
318:20 319:1,14
320:1 321:1 322:1
323:1 324:1,8,16
325:1 326:1 327:1
327:22 328:1,24
329:1,9 330:1
331:1,6 332:1
333:1 334:1 335:1
336:1,18 337:1,5
338:1,14,19,20
339:1 340:1,12
341:1 342:1 343:1
344:1,12,17 345:1
346:1 347:1,11
348:1 349:1,19,24
350:1 351:1 352:1
353:1 354:1 355:1
356:1,22 357:1
358:1 359:1,5
360:1 361:1 362:1
363:1 364:1,12
367:11
**name** 22:13,20 24:3

25:2 36:7,15,23
36:24,25 38:9,15
38:15 40:10 73:18
73:19 99:20 325:3
334:23 335:7,22
336:2,3,7 337:20
337:23 341:22
**names** 26:7 35:22
35:24 36:4,7,14
162:22
**nature** 149:10
157:22
**NCRA** 2:6,7 367:8
**necessary** 33:25
90:6 251:3,7
263:10
**need** 24:9 49:23
63:20 71:21 72:24
89:5,12,15 102:16
107:9 130:7
136:19 137:9
138:15 140:22
148:9 154:23
166:6 168:2,17
179:8,8 181:14,17
182:8 195:19
196:16 228:2
235:3 258:2 262:5
275:5 285:24
305:6 308:12
328:7,16 351:4
**needed** 227:23
**negative** 137:3
**negotiate** 215:16
240:18
**negotiated** 70:20
71:5,13 260:14
332:15
**negotiating** 39:10
300:13 333:18
334:2
**negotiation** 29:2,13
29:21 35:11,16
37:12,18 38:5
39:2,25
**negotiations**
319:23,24 320:3,7

320:16,19 321:4
**neither** 164:22
**never** 59:10 60:21
61:10 69:4,15
81:15 104:3
114:16 179:15
186:6,19 248:25
277:19 303:22
304:11 336:9
**new** 1:3,16,16 2:9,9
2:11,11 3:9,9,20
3:20 23:18,18,23
23:24 32:7 172:25
228:15,20 253:3
295:9 296:8,13,17
296:22 297:12,14
297:15,18,19,24
299:13 301:13
302:4 328:9,14
367:6,9,10,14,14
**news** 118:18
**nineteen-nineties**
43:5
**nod** 46:16
**Nogod** 227:12
**non-exclusive**
161:17
**normal** 30:24
**North** 61:17,23
80:11 85:4,23
87:6,17,22 88:13
89:3,10 90:20
92:19 115:21
125:20 127:3
128:10 129:9
130:18 131:14
132:4,19 134:6
141:20,24 142:12
143:10 168:15
256:6,20 315:6
**Notary** 2:8 23:17
23:23 364:18
367:9,13
**note** 12:13 251:12
252:3
**noted** 364:10
**notice** 123:2

noticing 22:18
notified 164:6
  216:7,10
**November** 1:16
  2:12 22:11 159:18
  163:6 219:3
  331:14
**NR2** 66:12
**number** 22:8 47:10
  56:10 58:7 62:5
  64:11 66:18 70:8
  77:13,19 93:6
  96:19 99:9 103:15
  110:11 112:17
  114:4 117:25
  120:8 139:2,23
  144:2 158:10
  162:3 173:11
  176:22 192:11
  202:17,23 204:21
  218:20 221:3
  222:23 224:23
  230:23 236:25
  239:12 241:25
  251:17 264:8
  266:3 268:25
  271:24 272:6,15
  274:6 281:11
  283:9 288:16
  289:12,24 290:14
  291:7 293:12
  314:8 317:15,16
  317:24 318:6,14
  324:19 329:2
  336:20 338:16
  340:14 343:15
  344:14 349:21
  359:18 360:10
  364:6
**numbered** 317:2
**numbers** 193:12,14
**Numeral** 314:14

**O**

**O** 22:3 23:15,21
**oath** 21:12 23:12
  23:19 26:15

124:24
**object** 93:16 127:13
  136:22 184:19
  312:17
**objecting** 166:13
**objection** 39:14
  50:4 72:11 74:22
  74:25 81:14 85:5
  85:11 87:24 88:15
  115:4,8,24 116:5
  116:16,25 121:11
  122:18 127:9,18
  128:20 129:12
  130:3 131:17
  132:7 134:9
  135:17 136:15,23
  137:12 140:6
  142:2,14 143:11
  145:20,21 149:5
  155:20,22,23
  161:12 166:10
  167:17 168:11
  169:8 172:24
  183:12 184:4
  185:17 187:15,21
  187:22 189:3
  191:3 199:10,22
  201:10 203:10
  204:14 212:14
  238:22 248:4,7
  249:23 256:7
  259:23 260:17
  268:6 277:6,13
  282:19 294:13
  299:8 300:11
  303:24 308:9,17
  316:7 317:4,18,19
  321:13 322:14
  325:13,23 331:12
  333:20 334:4
  352:16 354:16
  356:9 357:9
  359:23 361:14
  362:9 363:14
**objections** 21:7
**obligations** 47:20
  53:17,22 54:2

72:3
**obtain** 206:10
**obtained** 165:18
  276:25
**Obviously** 240:24
  258:9
**occurred** 201:22
  357:13
**October** 339:23,24
  340:23 341:5
  348:21 349:6,7
  350:12,15,23
  351:11,14 352:2
**odd** 316:25 317:2
  317:15
**offer** 168:2 188:14
  285:25 304:22
  346:10 348:4
**offered** 134:12
  168:17 299:11
**offering** 168:14
  225:15 345:23
**office** 25:14,19,25
  26:4,5,6,7,9 30:3
  34:25 79:15,17,18
  79:19 111:21
  160:3,4,4,24
  162:25 163:5,11
  163:13,22 169:24
  171:18 180:8,8
  210:22 219:9
  222:10 226:7
**officer** 21:11,13
**offices** 2:10 340:23
  341:4
**official** 4:6 23:16
  26:21 193:7
**Oh** 57:15 86:6 99:8
  136:8 195:23
  330:25 345:8
**okay** 23:7,13 24:12
  24:24 25:4,15,20
  26:11 28:13,19,24
  29:19 31:21 32:5
  32:20 34:6 35:3,8
  36:18 37:3,9,15
  38:8,17,23 39:7

39:17 41:3 42:6
  42:11 43:7,12
  45:6,13,16 46:5
  46:10,20,24 47:13
  47:25 48:5,25
  49:12 50:5,15,19
  51:19 52:9 53:8
  53:14 54:22 55:15
  56:2 57:16,24
  59:5,24 60:19
  61:5,13 63:6,9,14
  63:14 64:18 66:3
  66:9 67:13 68:11
  71:3,9,23 72:13
  72:21 73:2 74:9
  74:18 78:10,21
  79:12 80:4,17
  81:10 84:21,24
  85:13,19 86:7,15
  87:2,8 88:25
  89:19 90:2 91:3
  92:4,22,22 95:16
  95:23 96:11 98:8
  98:17 99:23 100:5
  100:18 102:4,20
  103:8,16 104:7
  105:3 108:7,15,19
  109:15,22 110:2
  111:7,23 112:7
  113:3,11,21
  114:15,19 116:12
  117:5 118:2,14
  119:5,12 120:20
  122:2 124:13
  127:13,21,25
  128:15 129:2
  130:4,11,25 131:9
  132:2,17 133:8,10
  133:22 134:14
  135:13 136:6
  137:24 139:10,21
  141:11 142:18
  148:9,18 149:24
  150:7 151:22
  152:5 153:4,7,18
  154:4 155:13
  156:16,25 158:2

161:22 162:8
  164:10 166:22
  167:10 168:24
  171:9 172:7 173:4
  174:14,20 175:7
  177:5,14,19,23
  180:25 181:13,20
  184:7 186:13,17
  186:21 188:10,19
  192:3 193:6,17
  194:12,12,25
  195:5,23 196:6,25
  197:18,23 198:4
  198:19 200:2
  201:4,25 202:7,25
  203:14 204:12
  206:18 207:12
  213:10,14 214:7
  214:17 215:14
  217:6,19 218:7,11
  218:22 219:8,12
  220:6,17,20
  221:10,24 222:5
  222:15 223:16
  224:4,15 225:13
  225:22 226:2,14
  230:9,15 231:8,16
  232:23 233:23
  235:8 237:11,24
  240:20 241:4,15
  243:23,25 244:11
  244:21 245:8,11
  245:24 246:25
  250:10,16 251:8
  251:25 252:9,13
  255:13 257:17
  258:6,11 260:21
  263:14,24 265:18
  265:19 266:14,24
  267:3,16 268:12
  268:17 271:19
  272:8 273:3 274:9
  274:22 278:13
  279:15 280:4,8,21
  281:5 283:18
  284:6 285:24
  286:16 287:4

288:5 289:3 291:4
292:17 293:9,13
294:15,16 295:16
295:20 296:6,10
296:16 297:22
298:8,14 299:16
300:18 301:23
302:6 303:3,18
304:7,24 306:7,12
308:5 309:11,14
310:24 311:6,25
312:21 313:21
314:23 315:10,16
315:22 316:23
318:8 319:2,4,13
319:22 321:7,25
322:9,24 324:3
325:4,10,19
328:11,18 329:11
329:14,19 330:7
331:9,17,23
332:12 333:5,16
335:2 336:8,12
337:8,18,24 338:2
339:12,21 340:3,3
340:15 341:7
342:2,5 343:10,20
344:4 345:21
346:14 347:2,22
348:11 349:11,14
350:6,10,18
351:13 352:8
354:5 355:15
358:15 359:14,25
360:20,24 361:3
361:10
**old** 108:5 204:3
**once** 62:19 69:6
74:14 89:7 179:14
193:7 217:9,11
349:12
**ones** 317:2,2,3
**one-page** 8:5,10,15
9:5 10:22 14:19
17:5 103:12,20
110:6,15 112:12
117:22 118:7

222:19 280:25
318:11
**one-time** 102:15
103:6
**Oops** 112:10
**operate** 234:17
**operated** 234:20
**operational** 213:20
228:12
**opined** 183:9
**Opinia** 103:21
**opinion** 74:23
105:15,20 108:3
140:7,15,25 141:5
141:7,10 142:15
143:6,21 144:6,17
145:6 147:19,20
147:23 148:22
152:6,7,24 153:19
153:20 154:5,10
154:12 155:2,15
156:8,12,13,15,15
156:20,23 157:3
170:18,20 186:22
188:6,12 189:7
208:9 239:22,25
240:4,7 308:12,13
308:25 359:15
360:13,15,18,22
360:23,25 361:5
**opinions** 361:9
**opposed** 334:6
**oral** 184:21,22
**order** 30:13 61:25
62:19 68:16,17
71:21 72:25 90:6
102:17 168:22
170:17 171:7
176:17,24 210:23
234:8,9 336:6
360:25
**ordering** 364:8
**original** 19:14,14
29:2 59:7 67:15
68:22 76:15 77:4
77:5 95:21 105:23
106:3,18 114:13

115:18 126:19
222:25 223:4
242:8 283:20
291:23 309:22
310:4,9 349:6
**Orzel** 274:16 290:6
291:16
**outcome** 367:20
**outside** 41:19,19
363:22
**owed** 47:20 53:17
**owing** 47:9,19
**o'clock** 63:18

**P**

**P** 3:2,2 4:2,2 22:3
**page** 6:3 7:3 8:3 9:3
10:3 11:3 12:3
13:3 14:3 15:3
16:3 17:3 18:3
19:3 20:3,7,11
45:24,24 46:12,21
46:22 47:11 53:10
53:15 57:6,7
58:16 62:6 73:8,9
73:10 80:6 93:11
93:12 96:23,24
100:21,24,25
161:23 194:3,4
195:6 196:2,6
207:8 210:17
221:7,8,13 299:19
314:16 324:23
352:14 353:20,24
354:2,3 365:7
366:2
**pages** 15:20 16:14
99:5 194:5 242:16
242:17,24,25
243:2,9,15,22
289:8 290:17
**paid** 240:9 322:18
322:22 323:2,6,11
323:19,22
**paper** 76:6 145:13
145:14,14,16
341:25 351:7

352:19
**paragraph** 47:6,11
47:14 53:16 54:4
55:4 80:5,9
100:21 101:2
154:14,18,19,24
154:25 155:4,5
206:14 234:5
237:13,18 257:7
257:21,23 258:10
266:17,18 285:11
285:21 299:18
315:14,19,24
**pardon** 310:6
311:20
**Park** 2:11 3:8
**part** 107:21 128:16
276:7 322:6
325:12 353:18
**participants** 341:9
341:10,11
**participated** 252:7
**parties** 21:3 60:4
60:12 73:19 76:23
78:6 92:16,16
122:14 169:21
260:3 367:18
**partner** 108:14
111:2 179:2 189:7
**partners** 229:3
**party** 22:18 82:6
84:13 169:21
260:2
**pass** 63:17 288:22
329:3
**passed** 337:3
**passes** 63:23
**pause** 115:6
**pay** 47:8,18 48:10
49:6,15 50:12,21
51:4,11 52:17,25
53:6 234:2,13
239:24 282:10,17
363:8
**paying** 230:6,8
240:3 282:14
**payment** 240:9,9

323:18
**penalty** 257:3
259:7,22 323:19
**pending** 119:14
123:10 153:10
184:10 213:7
329:24
**people** 30:3,25
33:20,22 34:23
35:20 38:25 79:15
79:16,18,21 92:17
94:11 96:2 107:13
141:20 179:22
203:13 212:4
213:3 222:10
235:23 236:5,14
252:11 332:14
359:18 360:11
**percent** 182:10
**period** 133:23
157:9,23 175:15
176:9 177:11,13
177:16 178:8,10
178:25,25
**permanent** 190:2
216:3,21 261:17
261:20
**permanently**
256:22
**permission** 34:24
**permits** 141:2
**person** 36:13,16,17
36:19 38:10 70:25
83:14 90:9 94:15
105:10 128:18
148:15 154:13
180:8 199:17
209:2,3 212:20
213:18 214:18
232:6 244:18
341:21 342:5
**personal** 216:6,10
216:17
**personally** 121:14
121:17 146:25
200:9 201:15
315:13,17

**Pg** 365:2
**Pgs** 365:2
**phone** 228:21
  255:23 261:18
**phones** 262:15
  263:12
**phonetic** 227:12
**phrase** 81:6,12,20
  82:8,10,21 84:15
  84:17 276:24
**physically** 139:11
**piece** 145:16
**Piotr** 40:6 73:13,17
**Piper** 3:15 23:4,5
**PISAREK** 4:8
**Piskora** 3:7 22:23
  57:9,11 143:22
  182:19 193:22,25
  194:6 236:18
  278:16 288:8
  292:21 310:18
  317:8 332:2 340:6
  343:12,21 347:6
  363:18,21
**place** 269:14
  340:22 341:4
  348:17
**placed** 199:21
**Plaintiff** 1:6 3:13
  22:22 23:2 24:4
  326:16 327:5,10
  327:16,24 328:15
  329:17 330:10,12
  330:16 331:19,23
**planning** 292:7
**please** 22:7,17 23:8
  27:2 36:22 45:22
  55:23 64:15 65:3
  68:2 69:6,8 74:14
  77:17 90:16
  102:18,24 104:17
  112:23 117:7,19
  136:20 138:24
  140:23 144:23
  153:13 160:11
  183:3 191:24
  195:20 202:21

208:22,23 213:7
240:22 241:12
257:6 262:6 265:7
267:11 272:4
304:2 313:14
318:4 320:22
341:2 355:6
358:24
**Plebania** 223:19
**plural** 54:18
**point** 35:25 146:2
  161:19 240:25
  269:19 314:13
  325:6
**pointed** 309:23
**Pokropek** 195:13
  220:2 221:18
**Polamer** 110:16,18
  110:21,24 111:4
**Poland** 31:14 295:7
  295:11,13,14,18
  297:9
**Polish** 4:6 23:16
  24:8,14 36:6,7
  51:22 56:19 59:9
  59:11 60:11,14,17
  62:15,17 63:7
  64:25 93:12 94:11
  94:21 96:24 99:5
  99:14 100:8
  103:20,21 114:11
  118:7,17 119:25
  126:10 152:13
  163:20 172:4
  173:24 174:2,3
  179:16 183:8,25
  184:16,25 191:13
  192:20,24 196:9
  196:12 205:15,20
  205:21 206:17,20
  209:19 210:20
  211:25 212:3
  220:15 221:8
  223:6,13 225:3
  232:4,24 233:4,11
  233:12 237:6
  242:8 244:10,25

245:2 254:22
255:5,9 257:3
259:22 270:16,21
270:23 271:2,7
278:10 279:11,13
284:2 305:13
309:6 311:13,16
311:17,22 342:4
**Polonia** 129:7
  130:18 143:9
  156:5
**Polska** 1:8 22:11
  23:4 25:6,9,12,17
  26:18,21 28:21
  29:22 30:16 31:5
  31:5,8 32:8,12,22
  32:23 33:8,9,19
  34:4,9,12,16,20
  35:5,10,15 37:20
  38:4,21 39:4,10
  39:12 40:3,18,24
  42:9 43:4,9 44:17
  45:10,10 48:9,12
  49:5,8,14,15,20
  49:21 50:13,20,22
  51:3,4,5,10,12
  52:17,18 53:2,5
  55:12 56:21 58:18
  59:8,21 60:21
  74:21 75:5,13
  76:13,22 77:2
  78:4 92:8 97:10
  97:11,23 98:3
  100:22,22 101:8,9
  116:21 141:15
  237:15,20 291:17
  291:19 308:15
  309:3,7,10
**Polska's** 44:11
  308:14
**Polvision** 12:15
  79:10 106:22
  107:5,22 108:9,11
  108:13,21 109:3
  109:19,21 110:17
  110:18 111:5,10
  111:25 113:5

120:18 121:2,8,10
121:16,21,24
122:6,10,11,13
123:3 124:5,9,18
125:9,12,17 127:4
128:11 131:16,24
132:5,20 133:25
134:7 135:4,15,25
136:13 137:19
138:3 142:9
158:13 159:25
160:7 161:4,10
165:18 166:5,8,8
167:8,9,15 168:9
168:10 169:4,5,12
169:24 170:2,8,16
171:6,12 172:21
172:23 174:12,17
174:19 178:3
180:6,8 181:8,11
182:5,11,12,13
187:7,13,14,19,20
188:15,16 189:22
190:6,10,14,20,24
192:15 194:7
198:8,13,23
199:15 200:7,12
200:25 203:8,25
204:6,19 210:11
210:11 211:7,23
212:21,22,23
213:2,19 215:19
216:11,19 217:4
220:4,8 221:14
222:2,7 223:18
224:2 225:15
227:19 228:5,17
228:22 229:16,19
230:5 231:19,25
234:13 237:15,21
238:20 240:19
245:17 246:6,12
246:16,22 247:20
249:18,19 251:13
252:12,18 253:5,7
254:3 256:19
257:13,16 260:14

263:17,21 269:11
270:5 273:12
275:3,10,21 276:9
276:13 280:10,12
280:17 282:7,10
282:14,18 291:22
292:4 293:23
294:6,10 296:20
298:22 299:6,11
299:21,21 300:20
300:25 301:4,11
301:12,17,18
303:22 304:11
317:3,17 319:17
319:24 320:4,8,16
320:20 321:4,10
321:19,21 322:7
322:11,12 362:17
362:25
**POL00038** 9:12
  120:5
**POL00045** 9:12
  120:5
**POL00054** 9:17
  158:7
**POL00057** 9:17
  158:7
**POL00058** 9:22
  173:8
**POL00062** 9:22
  173:8
**POL00063** 16:21
  292:25
**POL00065** 16:21
  292:25
**portion** 48:23 68:4
  69:10 77:24 84:2
  84:9 85:17 86:24
  103:2 112:25
  128:5 132:15
  137:15 153:16
  167:5 170:25
  245:22 267:14
  304:5 320:13,25
  327:2 330:5
**position** 25:11,17
  25:23 34:15 81:12

81:20 83:11,13
113:15 140:17,25
141:23 156:19
159:19 187:6
189:13 200:9
201:7 226:9
238:20,24 239:2
303:19 304:8,20
304:21 312:14,23
313:15 316:3,11
316:17,24 317:7
317:13 331:13
332:23 333:7,10
333:13 358:2,9
**positions** 25:22
**possibilities** 277:3
**possibility** 247:5,9
248:22 249:14
250:22 277:10
319:9
**possible** 24:21
161:21 172:17
214:13 323:5
**postpone** 247:23
**postponed** 247:13
248:21
**postponing** 247:9
**practice** 30:25
**Prawna** 103:21
**precedent** 141:8
**precise** 32:19 37:14
72:6 130:8 151:4
151:5 236:3
**precisely** 54:13
113:7 159:17
**prefer** 24:15
220:16
**prejudice** 70:2
**premiere** 247:10,13
248:19,22,23
249:15,17 250:12
250:13,23
**premieres** 247:24
**preparation** 32:11
42:2,13,25 58:10
**prepare** 144:21
170:17 171:7

178:14 260:20
305:7
**prepared** 30:5 61:4
144:21 145:17
178:18
**preparing** 171:21
244:18
**pres** 94:22
**presence** 41:19
**present** 4:4 22:24
30:19 131:11
201:23 322:3
**presented** 203:25
**presently** 284:22
285:3,22 286:13
**preserved** 21:8
85:15
**president** 34:11
94:22,23,24 95:2
95:4,13 99:19,21
100:7,8 274:16,20
274:24 275:8,20
276:12 277:10
278:4,11 291:17
291:19
**presume** 107:12
218:2,4 222:11
**prevent** 187:12,18
**previous** 72:20
137:20 165:9
215:25 325:2
329:12
**previously** 65:17
70:19
**prior** 41:4 44:17
60:22 62:21
106:15 108:25
109:5 124:5 132:3
132:18 159:13
161:21 164:22
165:4 216:6
264:24
**private** 308:12
**privilege** 27:17
28:4,9 91:12
**privileged** 36:2
**probably** 56:24

79:5,15 100:4
107:23 111:21
182:15,16 222:3,9
316:6
**problem** 137:4
188:25 189:6
198:23 199:9,15
200:7,11,11,13,19
200:19 203:8
210:7 222:12
229:8,9,23 230:3
246:15 277:11,16
**problems** 45:21
199:11 205:7,17
210:24 211:13
227:18,20 228:4
229:3 234:11
255:22
**procedure** 179:6
232:17 244:20
**procedures** 163:16
163:19 268:15
**proceeding** 22:19
30:16 31:12,14,19
31:23
**proceedings** 267:6
267:19 268:14
**process** 229:6
255:4
**produce** 165:24
302:4,9,20 303:15
316:25
**produced** 60:22
83:12,15 98:3
106:6,13 112:10
122:21 123:3,4,15
146:21 147:2,3
164:17,23 165:5
165:20 180:4
181:22,25 182:7
197:9 298:19
299:2,4,5,7,7,10
299:22,24,25
300:3
**producing** 299:13
302:3
**product** 287:17,20

359:17,20
**production** 20:2
297:5 298:20
**profession** 232:7
**professional** 2:7
308:13
**program** 98:2
118:19 141:19
144:10 145:5
152:10 153:23
305:2,3,5,9,11
306:15,19 307:4
307:10,16,24
308:7,8,16 309:5
309:18 310:3,8
311:10,18,19
312:3,15 313:17
316:4,12,14
**programming**
80:11 85:4,23
87:6 89:9 108:17
108:21 109:3,3,18
109:19 111:11
112:2 113:6
115:20,21 125:19
127:2 128:10,19
129:4 130:16
132:6,21 134:5
136:12 137:18
138:2 141:24
142:12 157:11
161:11 172:23
270:6 284:11,16
313:24 314:19,21
315:5,14,19 316:5
316:12,18 320:5
320:17 321:11
325:8 359:22
**programs** 101:10
113:7 118:19
134:13 135:24
138:5,6,6,11
143:10 148:24
161:4,18,24,25
162:4,5 185:13
204:21 205:4
220:9 225:15,23

263:16 275:9,21
286:21,24 287:2
304:22
**pronounce** 341:22
341:23
**pronounced** 339:15
**pronouncing** 195:7
**pronunciation**
103:22 119:20
**proper** 179:6
233:17 255:10
**proposal** 266:20
280:11,17 347:19
347:20 352:21,21
352:24,25 353:5
**propose** 282:6,9,25
**proprietary** 302:17
**provide** 111:25
113:5 219:3
281:19,24 332:8
**provided** 106:23
109:2,18 131:14
208:7 219:16
**provides** 61:15,21
**providing** 115:20
135:15,24 136:12
137:18 138:2
**provision** 214:20
215:8,16 257:2
258:18 286:2
**provisions** 206:13
245:16 246:5,11
**public** 2:9 23:17,23
176:13 179:5
212:10 323:16
364:18 367:9,13
**Pulkowski** 345:14
345:23
**purporting** 233:25
362:25
**purpose** 41:5 42:17
239:20 252:14
253:19 255:21
266:15
**purposes** 32:24
33:3,4 69:25

194:9
**pursuant** 123:3
356:6,7
**put** 112:15 148:15
179:10 180:12
186:8 249:19,20
316:25 321:20
**putting** 302:21
**P-i-o-r-t** 40:7
**P-i-o-t-r** 40:10
73:17
**P-o-k-r-o-p-e-k**
221:19
**p.m** 1:17,17 2:13
22:4,12 55:18,24
63:25 64:16 77:12
77:18 117:14,20
138:19,25 182:22
183:4 191:19,25
202:16,22 241:7
241:13 271:23
272:5 317:23
318:5 358:19,25
364:6,10
**P00001** 6:14 56:7
**P00007** 6:14 56:7
**P00016** 6:19 64:8
**P00018** 6:19 64:8
**P00023** 6:24 66:15
**P00025** 6:24 66:15
**P00030** 7:7 70:5
**P00033** 7:7 70:5
**P00154** 17:24
336:17
**P00157** 17:24
336:17
**P00172** 10:25
222:21
**P002010** 17:7
318:12
**P00203** 8:17 112:13
**P00204** 8:12 110:7

**Q**
**question** 21:8 24:16
24:18 26:25 27:4
27:13,15,23,24

28:3,5,8 33:13
34:5,7 37:8,10,14
41:15 45:18 48:17
48:19,21,25 49:17
50:4 51:6,8,15,18
51:22 52:2,19,20
52:21,22 61:19
67:24 68:2,6 69:7
69:12 70:23 72:6
77:22 78:2 81:23
83:22 84:4,7,11
85:7,8,19 86:2,10
86:19,20 87:2,12
87:25 88:3 89:7
89:13,13,25 90:5
90:14,15,17 91:7
91:9,14 93:19
94:3,7 100:11,13
102:21,22,24
103:4 106:21
111:15 112:20,21
113:3 115:7
119:13 121:12
123:9,14 126:19
127:9,12,24 128:3
128:7,16,23,24
129:11,13,14,20
130:3,7,8 131:18
132:10,17 133:6
133:16,20 135:22
136:3,5,7,25
137:3,5,9,17,21
137:25 138:9
144:18,24 147:23
147:24 149:15
150:22 151:6
153:11,12,14,18
156:11 157:13,14
157:19 161:14
165:16 166:12,17
166:19 167:2,7,11
168:7,8 172:6,11
175:2 177:15
181:19 184:9,12
184:20 185:22
186:12,23 187:24
188:18 190:12

193:22 194:2
196:18,21 197:7
199:25 203:5
204:15 212:13,16
212:17 213:4,7,9
220:17 231:10
235:10 236:3
244:7 245:20,24
248:9 256:11
257:10 260:7,25
265:4,9 266:19
267:8,10,16 268:3
272:22 273:10
277:7,22 284:13
286:7,9 287:10,15
287:16 299:25
300:6,22 303:13
303:14,25 304:7
307:12 308:18
309:12 310:25
312:4,7,10,18
313:14,18 315:7
315:15 316:10,21
316:22 317:12
320:10,15 321:3
321:17 324:2,20
326:20,24 327:4
327:14,25 328:10
328:14 329:18,25
330:7,19 331:2,7
331:18 333:24
334:5,10,13,19,21
334:22 335:24
338:3,3 339:8
340:25 343:8
352:6 354:25
355:6,20 356:20
356:24,25 357:5
357:15 360:3,6,7
360:12,13 361:6
**questioning** 150:15
**questions** 20:10
26:25 89:20
127:19 147:21
148:16 157:18
165:12 202:11
213:8 250:6 288:3

328:8 334:9 355:5
355:11 363:16
364:2
**quick** 117:7 204:13
**quite** 242:14
**quote** 47:7 53:16
53:18 55:5,7
62:11,21 63:2
145:2 150:5 205:2
**quoting** 47:17
142:17 149:8

**R**
**R** 3:2 4:2 22:3
23:15,15,21 367:2
**raised** 150:17
**reach** 218:8
**reached** 215:23
**read** 42:10,22 43:2
48:20,24 58:21
59:4 65:24,25
66:3 67:5,25 68:5
68:6,11 69:7,11
71:18,21 75:14
77:22,25 83:22,24
84:3,6,7,10 85:7
85:18 86:13,20,25
95:10 98:6 101:18
101:22 102:16,18
102:19,24 103:3
104:14,17,23
105:5,24 107:9,13
111:22 112:20,21
113:2 114:10
118:23 128:3,6
129:16,24 132:12
132:16 137:10,11
137:16 145:8
147:9 148:21
153:17 154:18
155:4 166:17,18
167:6 170:23
171:2 175:12,13
199:8 204:23
205:10 206:11,12
208:13 211:17,19
220:10 245:19,23

267:15 280:2,3
285:25 304:2,6
314:20 320:11,14
320:23 321:2
326:23 327:3
330:6 336:6
337:13,16 346:2,4
348:9 352:18
**reading** 42:20
45:21 95:24 101:4
101:23 129:22
145:13 152:6
153:19 198:25
203:6,15,20,22
206:2 208:21
209:19 220:13
275:15 311:22
314:17 331:2
**reads** 62:9 80:9
348:3
**ready** 285:2,21
361:8
**real** 198:5
**realization** 179:22
228:5
**realize** 189:5
**realized** 188:25
**really** 57:8 127:15
**Realtime** 1:25 2:5,7
367:7,8
**reason** 27:3 28:14
33:17 74:19 75:2
95:17 102:7,10
105:19 146:10
193:20,23 197:3
197:14,25 212:12
212:15 217:24
219:13,21 221:21
224:5,10 225:9
256:24 270:4
298:10 304:17
317:6 322:25
323:21 365:9,11
365:13,15,17,19
365:21,23,25
366:4,6,8,10,12
366:14,16,18,20

366:22,24
**reasonable** 219:24
**reasons** 365:6
**rebroadcast** 96:3
98:2
**receive** 61:22 62:10
62:25 63:11 96:3
97:8 98:2,6 99:7
101:9 155:10
156:6 177:25
207:14,22 234:21
234:23,25 238:14
280:16 282:3
290:8 337:11,12
**received** 43:19 56:8
64:9 66:16 70:6
93:4 96:17 98:23
103:13 110:7
112:13 114:2
117:23 120:6
158:8 172:12,13
173:9 179:2 192:9
197:4,6 198:7,8
198:12 208:3
218:17 220:25
222:7,21 224:20
228:21 229:21
230:21 234:10
236:23 239:10
240:5 241:21
251:15 264:6
265:25 268:23
272:13 274:4
276:4 278:21
281:2 283:7
288:13 289:9,22
290:18 293:2
301:13 318:12
322:11 324:8
328:24 336:18
338:14 340:12
343:2,6 344:12
347:11 349:19
**receiving** 207:22
210:3 235:6 275:5
276:7
**recess** 55:20 64:2

77:14 117:16
138:21 182:24
191:21 202:18
241:9 271:25
317:25 358:21
**recited** 322:16
323:3,6,12,23
**reciting** 340:22
**recognize** 56:23
65:3,5 103:24
118:11 173:21
174:6 237:4
239:15 244:2,9,10
251:23 266:6
269:5 279:8,15
281:13 283:12
288:20,24 293:16
324:17,21,25
325:3,3 329:8
338:23
**recollection** 34:2
69:2,13 228:11
335:7 337:20
**record** 27:9 52:23
55:16,19,25 63:21
63:22,25 64:13,17
64:21 77:10 85:14
117:12,15,21
122:20 138:20
147:12 182:23
183:5 191:16,17
191:20 192:2
202:13 241:8,14
308:24 349:13
351:9 358:20
359:2 363:24
367:15
**records** 121:9
197:16
**reduce** 359:17
360:10
**refer** 270:19 291:21
310:12 315:24
335:3
**reference** 67:9,12
252:19 350:16
**referred** 348:23

**referring** 126:18
242:15 297:20
332:4 348:14,20
**refers** 111:10
253:12 313:24
315:25 335:5
**reflect** 52:23
**reflecting** 41:14
**refresh** 335:6
337:19
**refused** 331:11
**regard** 332:9,9
**regarding** 32:22
33:8 43:2 157:6
157:21 257:22
264:24 284:11
286:20
**register** 58:7
171:24
**registered** 2:6
170:4 238:4,5,9
**registering** 172:3
232:16
**registration** 169:16
172:2 232:20
255:2,3
**regulation** 179:16
239:23 252:17
253:6
**rejoin** 163:8
**relate** 148:16 277:2
**related** 367:17
**relating** 121:7,10
121:15,21
**relation** 163:20
164:8,9 165:7
261:9
**relations** 164:3,4
**relationship** 157:4
157:20
**relevance** 302:10
**relevant** 148:14
194:9,10 302:12
302:18
**relief** 47:2 53:11
**remain** 80:9,18
81:6 82:8 84:15

88:21 314:17
315:4
**remains** 186:7
**remember** 31:24,25
42:24 45:15 57:22
57:23 60:5 61:11
66:2 67:4 69:22
70:13,14,17 79:2
79:3,13 158:24
163:3 172:14
194:24 196:24
197:6 200:18
214:3 217:16
219:7 223:15
238:18 255:16
256:12,15 258:20
262:22,23 294:21
298:6 324:22
325:16 329:10
337:17
**remembers** 362:23
**remind** 172:6
335:21
**reminds** 335:16
**remove** 243:14,21
**rendered** 143:6
144:6
**rendering** 105:15
**renegotiate** 214:20
215:7,16
**renewed** 281:18,22
**repeat** 37:7 67:24
102:22 132:9
142:22 153:12,13
190:12 198:10
216:16 237:16
245:18 264:22
267:10,11 273:10
281:21 300:22
303:25 309:17
314:24 320:10,22
333:24 334:4
339:8
**repeatedly** 199:24
**rephrase** 27:5
174:25
**report** 79:21,24

274:15,17,19,25
341:12,14
**Reported** 1:24
**reporter** 1:25 2:4,7
2:8,8 22:15 23:8
23:10,11 36:21
37:2 43:15 44:4
45:2 46:15 48:22
48:24 56:3,5,10
56:18 60:6 64:6
64:11,22 66:13,18
68:3,5 69:9,11
70:3,8 73:16
77:23,25 79:16
80:23 83:25 84:3
84:8,10 85:16,18
86:5,23,25 92:25
93:6 94:24 96:14
96:19 98:19,20
99:9 102:24,25
103:3,11,15 110:5
110:11 112:11,17
112:24 113:2,24
114:4 117:25
120:3,8 123:6
125:4 128:4,6
132:14,16 136:18
136:19 137:14,16
140:21,22 153:15
153:17 154:21
155:7 158:5,10
160:10,15 163:18
167:4,6 170:24
171:2 173:6,11
180:16 191:15
192:6,11 195:18
195:19 218:15,20
220:22 221:3
222:18,23 224:18
224:23 226:19
230:18,23 236:20
236:25 239:7,12
241:18,25 242:5
245:21,23 247:6
251:10,17 262:4,5
264:3,8 265:22
266:3 267:13,15

268:20,25 272:10
272:15 273:25
274:6 278:18
280:24 281:11
283:4,9 285:7
288:10,16 289:6
289:12,19,24
290:15 291:7
292:23 293:12
304:4,6 307:6
318:10,14 320:12
320:14,24 321:2
324:5,19 326:25
327:3 328:21
329:2 330:4,6
336:15,20 338:11
338:16 340:8,14
342:12 343:14
344:9,14 347:8,13
349:16,21 364:7
367:6,7,8
**Reporter-NJ** 2:5
**reporting** 363:3
**represent** 22:22
26:22 60:20
164:21 343:4
**representation**
310:2
**representative**
12:14 23:2 26:21
81:4 82:6 84:13
90:4 156:18 200:6
200:10 201:6
251:12 252:12
302:2 308:14
309:4 312:12
315:13,18 332:23
357:6,21
**represented** 97:12
**representing** 22:25
26:17 111:21
147:2
**reproducing**
154:10
**request** 24:17
60:24 264:20,24
264:24 266:19

281:18,22 325:12
325:20,24,24
326:2,2,3,4,7,10
326:10,12 329:15
330:8 331:7 352:9
353:13
**requested** 48:23
68:4 69:10 77:24
84:2,9 85:17
86:24 103:2
112:25 128:5
132:15 137:15
153:16 167:5
170:25 245:22
250:12,19,21,21
267:14 304:5
320:13,25 327:2
330:5
**requesting** 193:2
247:4,8 249:13,13
**requests** 326:14,14
**require** 167:15
**required** 115:19
165:24
**requires** 141:2
**resign** 183:20 185:6
234:19
**respect** 32:15 39:8
116:15 121:10
189:14 190:6
200:24 287:17
332:9 346:16
355:20
**respective** 21:3
**respond** 238:11,13
**responds** 182:13
**response** 88:2
117:8 234:21
235:2 237:8
238:17 282:8
300:10 305:24
307:5 314:4,7
**responsible** 26:3,9
106:21,24 107:7
159:22 162:20,25
172:3 179:22
213:18 235:24,25

**restate** 137:12
**return** 182:12,14
185:15 301:12
**returned** 19:14
**reveal** 78:18
**review** 41:5,8 42:7
57:25 68:21
114:25
**reviewed** 41:19,22
42:2 44:17 65:23
108:2 114:22
**Reviews** 47:22
53:19 54:7 56:22
62:12 63:3 65:4
66:21 76:19 80:14
118:10 144:4
173:20 192:17
215:11 221:9
225:6 242:10
251:22 272:20
280:13 281:12
290:7 318:22
338:22 350:2
**revoke** 264:19,23
**Rich** 1:24 2:3 22:15
367:5,24
**ridiculous** 148:8
**right** 61:22 62:10
62:25 63:11 83:16
91:21 96:3 97:8
98:5,10 101:9
102:15 103:6
125:22 129:7,15
131:19 135:9
136:8 141:18
143:16 155:10,19
156:6 157:10
161:4,10 184:19
201:18 213:21
260:5 275:4
290:10 294:11
308:10 317:14
328:4 336:10
342:22 345:13
346:7 349:10
351:19 353:14
363:10,17

**rights** 61:16 71:16
71:20 72:2 90:19
92:19 97:25
116:15,24 118:18
127:2 128:9,18
141:24 142:11
144:9 145:4 149:2
150:4,5 151:2,7
151:19,21,24
152:3,9 153:22
155:3 156:5
157:22 161:17,18
205:23 208:25
210:3,4 275:10,22
276:13 309:9
319:15,19,25
320:4,8,17,20
321:5,11 322:7,11
**risk** 234:9 240:15
240:16
**risky** 255:22
**RMB** 1:8
**Robert** 3:18 4:9
23:5,5 118:24
**robert.fink@dla...**
3:23
**Roman** 314:14
**Romanski** 341:14
341:16
**room** 362:23
**royalties** 47:8,18
48:10 49:6
**RPR** 367:24
**RULING** 20:10
**running** 176:9
**R-o-m-a-n-s-k-a**
36:25

_____

**S**

**S** 3:2,16 4:2 6:2 7:2
8:2 9:2 10:2 11:2
12:2 13:2 14:2
15:2 16:2 17:2
18:2 19:2 22:3
**salaries** 160:25
**sales** 219:10 252:11
288:2

**satellite** 98:2
101:10
**satisfied** 256:3
**saw** 174:8 219:7
343:19,23
**saying** 36:14 61:10
91:13 92:7 97:22
111:24 113:4
118:15 124:10
133:19 136:11
137:17 145:23
146:8 147:5,25
148:4,24 164:4
165:3 178:17
179:13 185:16
200:8 207:25
209:3,23,25,25
211:9 220:8,12
232:21 250:5
275:19 286:7,16
305:4 330:25
351:3 362:17
363:3
**says** 46:12,17,25
47:6 53:10,16
54:4 55:4 63:6
89:14 91:17 96:5
96:6 97:10 99:20
101:12 102:14
103:5,21 113:7
114:11 133:12
149:6,10,20
150:17 155:5
174:13 176:22
177:11,13 178:22
198:15,17 205:11
206:19,22 214:18
215:6 225:18
226:3 231:24
232:11 237:18
253:19 254:6,16
254:18 257:21
263:5,13 271:8,9
276:18,20 278:2,6
284:25 292:6
314:16 315:8
319:12 332:7

334:7 345:13,17
345:18 349:7
**schedule** 139:22
161:24,25 176:22
177:10
**sealing** 21:4
**search** 121:9,14,20
**searched** 121:7
**season** 298:9,10
**second** 15:20 16:14
36:24 38:10 47:13
53:10 62:6 63:23
93:12 96:24
100:20,21,25,25
121:14 206:9,12
206:13,14,21,22
207:13 221:8
234:4 266:18
285:11 288:21
289:8 290:17
314:16
**Section** 62:5,9,22
154:18,19,19,23
154:24 155:4,5,5
155:9 299:19
310:13 313:24
332:4
**see** 38:24 46:11,17
47:3,23,24 48:4
53:10,12,15,20
54:8 58:19 59:10
62:13 63:4,5 65:6
67:3 73:9 80:15
90:8 94:13 95:15
95:20 97:2 99:4
100:15 102:2
103:25 104:5,16
104:18 105:25
111:12 112:4,4
119:11 152:11,12
152:12 153:24,25
156:4 159:6 193:6
202:9 215:12,13
222:3 225:7 234:4
243:4 280:14
283:20 284:12,18
337:23 338:24

341:10 343:21
350:9 352:4,13
**seeing** 48:7 49:3
69:2,13
**seek** 186:22
**seen** 44:7 57:2,21
61:10 65:20,22
66:25 67:2 69:4
69:15 70:11,13,15
93:13 94:7,9 97:4
99:13,16 104:2,3
114:16,18 118:12
120:11 134:16
135:5 158:16
192:18 194:16
196:22 219:5
223:12 290:13
291:2,11 310:5,21
312:19,25 336:9
339:2 340:18
344:18 345:5
346:5 347:16
350:3
**sees** 150:19
**segment** 210:13
**SEI** 7:12,12 24:4
37:13 47:7,17
48:11 49:7 53:16
53:22,25 54:4,10
54:23,25 55:5,8
55:12 62:10,24
63:11 71:6 74:12
74:16 80:9 85:2
85:21 87:4,16,21
88:12,20 89:2,8
89:22 90:17 93:3
93:3,18 96:2
115:18 117:2
141:19,23 145:3
150:4,5 152:8
153:21 157:9,21
248:3 255:18
259:6,21 260:8
275:22,24 276:5,8
276:14 277:2
303:21 304:10
310:9 314:17

315:3 319:7,10
325:6 326:7 332:8
334:3,12 335:23
337:21 345:23
346:12 355:3
356:8 357:2,8
361:13,22,24
362:8 363:13
**Seinfeld** 305:23
**selling** 219:11
309:6
**send** 170:16 171:6
171:20 176:17
179:8 181:14,16
185:13 219:14
280:10 299:23,24
300:7
**sending** 168:20,21
176:10 180:5,10
218:10 288:3
348:3
**senior** 80:2
**sent** 170:13 171:3
171:14,15,24
172:12,12 175:9
175:25 176:2,12
178:2 179:3,10,20
179:21 187:6
197:3 219:18,25
222:2,4 230:6
231:4 239:18
266:25 288:25
299:21 301:4
337:9,14 340:2
362:16 363:6
**sentence** 47:13
48:14 52:4,7,14
80:8 132:22 206:5
206:9,11,14,21,22
207:13,19 208:22
208:22 231:18
237:17 253:11
257:5,6 276:7
334:6 345:17
352:4,14,15,18
353:16,20,24
**separate** 193:13

354:15
**separately** 67:11
**September** 190:5
190:11,15,16
192:16 195:22
196:3 198:7,12,22
199:14 200:6,24
201:8 203:7 206:4
207:5,6 208:7
210:16 215:2
**serials** 223:19
**series** 222:7 229:20
234:3 247:10,18
248:19 249:15,18
264:20,25 273:8
273:12,16,20
275:3 294:7,12,17
305:18,18,21,25
306:21,23,24,25
307:2,3,7,8,9,18
307:21 316:15,18
316:19,25 317:14
362:24
**serious** 307:7
**service** 311:19
**SESSION** 5:7
**set** 193:7,13 367:12
367:21
**settlement** 29:21
35:19 39:25 40:15
40:21,25 42:23
69:25 71:5,10
72:4,9 73:4
187:11,17 188:13
188:21 206:23
207:15,20 209:25
210:2,22 214:21
215:9 228:6,7
245:14 246:3
248:2 249:21
252:20 274:25
313:22 314:8
**sheet** 336:24
**short** 26:4,8 55:20
64:2 77:14 117:16
138:21 182:24
191:21 202:18

240:24 241:9
271:25 317:25
318:17 336:8
358:21
**shorten** 223:11
**shorter** 188:18
**shortly** 198:8,11
**show** 61:24 110:22
110:22 113:19,22
129:4,6,8,8
146:15,22 182:16
208:11 209:13
236:15 248:14
258:2 285:14
291:5 292:15
308:7,8,11,16
309:5,19 312:3,15
313:17 315:24
316:2 359:21
**showed** 146:18
246:14
**showing** 76:25
96:22 99:2 110:14
164:15,24 173:17
181:25 200:17
212:5 225:2 239:4
251:20 253:15
272:18 281:8
318:20 346:19
349:24 359:17
**shown** 247:14,18
248:25 296:23,25
297:8 331:13
**shows** 131:14,19,20
132:6,21 134:5
135:15 139:22
140:2 148:24
157:11 166:5,8
167:8,15 168:9,9
201:21 203:12
247:12,14 248:25
294:4 295:18,19
339:25
**sic** 155:10 228:8,15
252:20 275:6
**side** 179:15 183:10
184:3,18,25 185:5

186:6,19 234:18
271:8,9,10,10,16
271:18
**sides** 183:11 184:3
184:18,25 185:4
229:22
**Sieniutycz** 339:14
339:16,19 341:18
341:20 344:22,23
344:24
**sign** 74:12,15
107:14 169:18,21
171:12 176:15
182:2 185:13
258:23 266:22,22
292:7 323:25
**signal** 61:17,23
62:11,25 63:12
98:11 155:11
**signature** 58:17,19
179:11 180:12
243:11 325:3
**signatures** 58:17
73:9,12
**signed** 21:10,12
58:20,21,22 60:4
60:25 74:4,17
89:4,11 90:9
94:10 95:12,18
96:25 99:17 100:3
107:24 108:23
111:17 118:22
124:20 142:3,23
142:24 143:5,17
169:20,22,25
170:3,8,10,15
171:5,18 176:15
177:18,21 179:4,9
179:9,14,15,17
180:13 182:13
183:10,18 184:3
184:17,24 185:4
187:7,11 188:13
188:21 198:9,13
228:7,18 244:16
245:4,14 246:3
264:18 266:13

279:22 281:17
289:2,15 291:16
291:19 292:4,6,10
300:4,9 301:14
312:13 313:23
319:3,16
**signing** 141:15
169:17 171:22
175:6,16,24,25
176:3,12 177:12
177:20,24 178:2,4
178:5,23 189:18
209:2 235:4
244:20 259:25
291:22 301:5,7,8
**signs** 185:5 186:6
186:19
**similar** 359:22,22
360:9
**simple** 156:11
331:18
**simply** 285:4
**simultaneous**
136:17 140:20
195:17 262:3
**singular** 54:17
**sir** 59:18 123:7
262:22
**sit** 52:24 71:19,25
76:10 91:22 322:5
323:10 361:11
362:6
**sitting** 351:3
**situation** 176:18
234:12 240:14
278:12
**six** 242:24 243:2
**Skierska** 124:22,23
**slightly** 207:21
**Slowly** 304:3
**small** 147:9 195:25
283:23
**solution** 230:2
**SOLUTIONS**
19:14
**solve** 200:22 229:8
229:23 255:22

**solving** 199:12
277:10
**somebody** 39:15
210:6 211:11,12
**sorry** 38:9 40:9
45:24 47:10 50:24
52:6 54:15,24
61:15 67:20 73:21
87:21 89:25 92:24
98:4 99:7,8 106:4
106:19 116:10
133:2 134:3 135:4
135:23 136:19
151:4 152:19
159:16 161:8
175:11 176:6
187:19 190:22
194:19 197:21
204:9 206:13,15
209:10 214:23
218:13 219:19
221:12 224:8
227:12 248:16
257:11 262:20
277:4 287:5
288:17 290:24
291:15 299:18,19
301:6 306:22
327:18 337:5
339:14 344:24
358:19 362:20
**South** 61:17,23
80:12 85:4,23
87:6,17,23 88:13
89:3,10 92:19
115:21 125:20
127:3 128:10
129:9 130:19
131:15 132:4,19
134:6 141:20,25
142:13 168:15,15
315:6
**SOUTHERN** 1:3
**Spanski** 1:5 4:7
22:10,25 28:22
29:22,25 30:17,24
31:4,8 32:22 33:9

33:22 35:12,12,17
37:19 38:4 39:3
39:12 40:2 42:8
43:3 45:9,11
48:10 49:6,14
50:12,21 51:3,10
52:16,25 53:5
56:20 59:4,7,16
59:20 60:17 61:15
61:15,21 68:22
72:3,9 73:13
74:21 75:4,12
76:2,12,21 77:2
78:4 92:17,18,24
96:2 97:8,11,12
97:13 105:16
114:8,8 116:4,14
116:23,24 117:2
118:20 122:17
123:15,18 124:3,7
124:15,16,25
125:18 127:4
128:11 131:15,21
132:5,20 134:7,17
140:5,13 142:11
142:24 143:5,9
144:8,8 148:25
149:2 157:4
162:10,15,16
163:21,23,25
164:5,9,12,25
165:7,21 166:3,4
166:9 167:9 168:3
168:22 187:11,18
189:9,13 190:2,6
190:9,13,19,23
204:2 205:3,9,12
205:22 207:15,22
210:23 214:22
215:10,19 216:2,7
216:11,18,22
217:4,12 222:11
228:21 240:13
245:15 246:4,14
248:3 249:22
255:14,17,20,24
256:4,12,18,21

259:6 260:13
261:3,15,18,21,25
262:8,24 269:8
271:3 273:19
275:2,4,10 309:16
309:20 312:16
313:23 329:16,16
330:9,9 331:8
333:19 334:3
346:17,24 354:14
354:19 355:3,8,12
355:17,21,24
356:2,5 357:17
**Spanski's** 30:19
73:18 165:8
167:16 168:10
204:20 210:12
212:23
**speak** 147:13
261:24 262:7
295:9 302:3
**speaking** 60:12
**speaks** 36:5 62:16
94:20 233:3 255:8
270:25 271:6
311:12,15 342:3
**special** 63:19
**specialist** 4:5 22:14
**specific** 52:15,16
234:3 286:7
**specifically** 142:10
143:7 144:25
176:22 177:11
204:5,19 205:2
210:15 234:25
236:7 247:18
260:7 354:22
**specifics** 33:18
**speculate** 325:14
**speculated** 323:17
**speculation** 205:17
**spelled** 294:12
**spelling** 36:9,21
38:13 73:15
180:15
**spending** 302:20
**ss** 365:3 367:3

stamp 8:6,11,16,21
9:6 10:12,18,24
11:6,12,24 12:24
13:7,13,19 14:20
15:7,21 16:15
17:6 103:13 110:7
112:13 114:2
117:23 218:17
220:24 222:20
224:20 230:20
239:9 264:5
265:24 268:22
272:12 281:2
283:6 289:9
290:18 318:12
stamps 6:9,13,18
6:23 7:6,11,16,21
9:11,16,21 10:6
11:18 12:7,17
14:7,14 15:13
16:7,20 17:11,17
17:23 18:6,12,19
19:6,13 43:18
56:7 64:8 66:15
70:5 93:3 96:16
98:22 120:5 158:7
173:8 192:8
236:22 241:20
251:14 274:3
278:20 288:12
289:21 292:25
324:7 328:23
336:17 338:13
340:10 344:11
347:10 349:18
Stand 22:6 55:22
64:14 77:16
117:18 138:23
183:2 191:23
202:20 241:11
272:3 318:3
358:23
standard 258:15,17
258:22,25 259:24
standing 155:22
Staniszewsko
58:23

stapler 288:22,23
start 268:15
started 25:16,24
30:16 31:14 32:8
178:25 183:19
208:18 228:23
229:5,8 232:15
starts 176:5
state 32:7 115:8
365:2 367:3
statement 211:14
states 1:2 2:9 23:18
23:23 89:24 96:4
100:9 161:5,11,13
237:12 367:9,13
station 359:16,18
stations 360:9,11
stenotype 1:24
step 230:5,5 255:4
stip 303:6
STIPULATED
21:2,6,9
stop 204:7 207:17
222:7,13 234:14
234:14,15 270:7
270:11 273:8,12
296:12 346:19
stopped 204:11
208:15 270:5,13
273:11 296:14
297:24 298:2
strictly 205:6,18
strongly 346:19
subject 32:15 35:5
38:3 70:2 79:3,5
183:15 252:22,24
256:23 261:14
subpoena 123:3
165:18
Subscribed 364:14
subsequently
249:19,20
substance 101:8
211:6 220:11
227:15 275:19
substantially 55:6
55:8,12

Suchodolska
111:16,18,19
sue 30:25 31:8
235:12,17 236:6,6
236:9
sued 163:24 164:7
185:7 334:11,14
334:24 335:23
337:21 354:23
suggest 202:8
205:14,15 248:24
249:4 277:9
suggested 280:9
357:13
suggesting 137:2
248:11,17,18
249:8,11,12
279:12
suggestion 210:21
suggests 194:4
suing 164:5 357:3
sum 101:7 211:6
220:11 227:15
275:19
summary 253:16
341:3
support 327:12
332:8,16,17,19,24
333:7,17,25 356:6
357:3,7,17 358:6
358:12
supposed 313:3
323:14 358:14
sure 28:4 38:14
41:2 57:19 105:24
121:4 127:15
132:11 162:13
180:21 181:9
242:14 264:18
348:25 363:21,25
suspect 57:12
suspend 115:20
swear 23:9
Swiderski 105:4
sworn 21:10,13
23:16,22 364:14
367:13

S-t-o-m-p-u-r
36:25
S.A 1:8 22:11 23:4
98:3 145:2

T

T 6:2 7:2 8:2 9:2
10:2 11:2 12:2
13:2 14:2 15:2
16:2 17:2 18:2
19:2 23:15 367:2
367:2
take 27:7,10 43:25
50:6 72:24 77:6
89:15 117:7,10
139:15 144:3
176:16 182:17,19
182:20 201:14
202:9 226:12
231:14,18 238:19
240:21 243:8
269:14 270:16
271:20 301:24
310:7 317:15,16
317:21 350:25
358:16
taken 2:3,10 21:14
55:21 64:3 77:15
117:17 138:22
139:12 182:25
191:22 202:19
241:10 272:2
317:7 318:2
358:22
talk 32:12,18,21
34:8,19 35:4,9
40:20 44:22 45:5
214:13,16
talked 33:7,21 34:3
35:14 37:11,16
38:2 40:14 70:18
214:4 217:7
talking 31:11,13
59:18 60:13 61:25
109:7,9,14 111:2
143:18,19 195:21
254:20,20 261:9

261:10 277:16
285:9 298:20
306:18,18,19,20
307:25 308:2
309:21 362:21
talks 284:10,15,22
285:2,22 286:12
286:18,19 287:6
287:11,13,16,22
tape 22:8 77:13,19
139:2 202:17,23
271:21,24 272:6
317:24 318:6
364:6
tapes 176:16 179:8
task 200:22
team 219:11,11
252:11
tear 243:5
technical 175:9
176:14 179:2,3
television 79:6
90:19 108:17
109:18,18 114:12
116:21 126:10
129:7 130:18
143:9 160:6
163:20 172:4
189:5 211:25
212:3 294:7,12
305:13,13,15,18
305:21 359:11
Telewizja 1:8 22:10
23:4 25:6,9,12,16
26:18,21 28:21
29:22 30:16 31:4
31:5,7 32:8,12,21
32:23 33:8,9,19
34:4,8,11,16,20
35:5,10,15 37:19
38:4,21 39:4,9,11
40:3,18,24 42:9
43:4,9 44:11,17
45:10,10 48:9,11
49:5,7,14,15,20
49:21 50:12,20,22
51:2,4,5,10,12

52:17,18 53:2,5
55:11 56:21 58:17
59:8,21 60:21
74:21 75:4,13
76:13,22 77:2
78:4 92:8 97:10
97:11,22 98:3
100:22,22 101:8,8
116:21 141:15
237:15,20 291:17
291:19 308:14,15
309:3,7,10
**tell** 24:25 25:21
34:3 41:10,25
65:3 72:7 83:3
104:8,21 139:11,8
147:19 172:21
178:7,19 203:15
203:21 209:21
215:23 216:16
228:9,10 229:14
229:18 236:8
245:13 246:2
255:17 261:15
264:11 267:4,17
269:10 272:21,23
274:12 275:20
306:7 312:9
313:13 318:23
345:22
**telling** 90:3 95:25
141:9 166:16
178:21 204:5,19
211:18 217:11
228:21 260:10
262:23 267:24
**ten** 113:20 235:14
262:12 294:22,25
295:4 316:6,25
359:6
**tend** 359:17 360:10
**Terentiew** 118:24
118:25
**term** 80:20 257:24
259:3
**terminate** 164:6
188:14 211:10

233:25 252:22
268:9,10 271:3,12
271:14 282:10,14
282:21 361:13
362:17,25 363:4
**terminated** 238:21
271:16
**terminates** 178:19
**terminating** 210:10
211:7,22 212:22
231:9,24 232:12
233:25 268:5
281:20 361:23
362:7 363:7
**termination** 144:15
178:21 253:20
254:2 267:7,20
280:11 362:12
**terms** 164:3 175:3
193:8 252:17
257:13 260:20
294:3 309:16,18
309:19 311:3,9
348:4
**terrestrial** 161:17
161:19
**terrible** 103:22
**territories** 60:16
168:16
**territory** 62:11
63:2,12 80:11
128:17,17 155:11
315:5
**testified** 23:25
68:25 69:13 70:19
122:5 124:24
163:5 181:7 182:4
183:14 199:23
216:9 250:14
276:19 307:18
312:18 326:3
348:21
**testify** 310:20 313:7
**testifying** 32:25
**testimony** 59:14
81:11,19 110:20
125:8 136:18

140:21 186:18
187:16 195:18
209:20 262:4
307:15,17 367:15
**text** 111:7
**Thank** 27:19 37:2
115:13 158:2
244:6 351:9
**thanking** 352:5
**theoretical** 188:11
248:9 356:20,21
356:23
**theory** 250:2,4
261:5
**they'd** 211:6
**thing** 39:16 92:13
193:4,5 194:11
292:18 343:17
**things** 116:19
230:14 236:14
253:10 260:10
322:4 332:7 363:6
**think** 35:25 49:22
52:23 57:13 63:20
68:25 69:12 74:19
75:3,10 86:11
95:17 102:7
105:19 109:8
113:14 122:8
123:22 124:7
133:14 134:19
141:8 143:12
146:11 152:17,20
155:18 156:2
159:8 163:22
164:19 180:18,22
181:5 183:9,14
187:12 188:18
196:21 197:3,14
197:25 206:19,25
212:18 217:24
219:13,21 221:21
223:5 224:5,11,12
225:9 233:8
242:16,19 243:15
248:17 249:13
250:22 251:2

258:2 270:4,10,12
275:25 292:15
293:5 302:19
308:10 323:21
328:5 330:25
343:6 350:22
351:8,8 358:11
360:23 361:4,12
362:23
**thinking** 181:10
278:2
**third** 15:20 16:14
92:16,16 237:13
237:18 257:8,9,23
289:8 290:17
**thirty** 263:6,7
**thirty-five** 201:13
**thirty-three** 235:22
**thought** 49:17
119:16 186:10
204:9 269:23,25
275:14
**thousand** 33:20,22
235:23 257:3
259:8,22
**threaten** 235:11,17
**three** 189:23 194:4
255:19 259:14
**three-page** 64:24
66:19 324:12
**tickets** 34:22,24
**time** 21:8 26:5,8
27:8 28:20 29:24
33:2 35:13,14
41:22 42:12,14,16
42:18 55:17,24
61:4 63:24 64:16
75:10 77:11,18
83:23 85:2,21
87:4,15 88:4,9
98:11 99:25
103:25 104:3,5,16
106:9 108:25
109:17,24 116:4
117:13,20 118:12
127:6 136:20
138:18,25 139:14

140:23 157:7,7,10
158:21,25 159:4
159:20 160:11
170:6 172:20
182:21 183:4
191:4,9,18,25
195:20 196:3
200:21 201:14
202:15,22 203:5
207:10 215:18
226:16 227:3
229:11 230:6,8
234:13 240:12
241:6,13 246:24
262:6 265:6
269:17 271:22
272:5 293:11
294:18,23 296:11
296:17 298:4
300:8 301:14
306:8 310:8
317:22 318:5
338:24,25 358:18
358:19,25 364:5
364:10
**times** 66:2 235:14
236:5,7 259:15
261:24 262:7,12
263:6,7,8,10
357:23
**tired** 28:17
**titles** 285:13 309:8
309:8
**today** 28:15 32:12
32:25 41:4 58:2
63:18 71:19,25
76:10 91:22
110:25 126:25
128:9 303:6
312:19 322:5
327:9,15 361:11
362:6
**today's** 125:18
**told** 92:16 123:19
124:4,16 134:21
147:11 205:2
216:18 217:4

222:6 228:11
229:21 255:14
261:3 269:21
273:19 274:23
275:8 276:12
303:6 325:16
364:3
**Tomasz** 339:15,16
339:17 344:21
**tomorrow** 250:3
321:16
**top** 103:21 215:4,5
258:3,3 345:13
**topic** 252:16 253:4
**totally** 142:4
**TP7000086** 7:17
96:16
**TP7000087** 7:17
96:16
**TP7003479** 9:7
117:23
**TP7003598** 8:22
114:2
**TP7004249** 7:22
98:22
**TP7004250** 7:22
98:22
**TP7006700** 8:7
103:13 106:12
**transcript** 19:14
330:23 364:8
**translate** 24:8,18
33:10 45:23 51:22
81:21 100:10
129:20 162:12
203:17 206:20
210:25 265:2
270:17,24 285:6
318:17 326:18
330:13
**translated** 24:17
85:8 220:13
232:25 243:7
254:23 255:6
**translating** 129:23
208:22
**translation** 48:13

62:3,8,20 86:11
99:5 112:3 118:16
152:15,18,21
192:21 193:19
205:18,19 206:15
206:21 208:2,6,14
208:18,24 209:7
209:11,15,22,23
219:4 221:8 231:3
231:23 232:2
233:17 237:7
242:8,18,22
243:11,17 255:10
278:10,10,25
284:25 292:19
328:7 353:19
354:4
**translations** 67:8
67:11,12 110:10
118:3 173:14
193:8 242:12
243:20 279:4
293:6 318:16
**translator** 24:17,18
45:22 51:21 54:12
54:12 129:20
207:23 209:16,18
**TRANSPERFECT**
19:14
**treat** 58:13
**treated** 229:9
**trial** 21:8 91:5,25
250:25
**trick** 97:21
**tried** 218:8
**true** 31:3 143:4
144:24 145:5
188:6 197:20
198:21 231:11,12
231:13,17 232:10
232:11,19 244:23
245:4 367:15
**truth** 197:22 250:8
250:9,11 358:14
**try** 27:4 78:20
214:19 341:22
**trying** 97:19 164:5

215:7 240:17
353:2
**turn** 46:22
**turned** 122:16
343:5
**turning** 331:24
**TV** 85:3,22 87:5
115:20 161:18
287:7 361:8
**TVP** 10:7,7,13,18
11:7,12,19,19,24
12:8,8,17,18,24
13:7,13,19 14:8,8
14:15,15,21 15:7
15:14,14,21 16:8
16:8,15 17:12,12
17:18,18 18:7,7
18:13,13,14,15,20
18:20 19:7,7 23:6
38:21 47:8,9,18
47:19,20 53:18
54:5,11,24,24
55:2 62:9,24
63:10 68:23 70:21
71:5,20 72:4,10
74:2,13,16 78:12
78:13,18,25 79:9
79:9 80:10 81:4
81:11,19 82:6,7,9
82:11 83:10,12,15
84:13,14,16 87:21
89:21 90:4 91:5
91:23 92:5,10,15
92:18 95:4,14,25
97:7,22 99:19
100:7 105:12,13
105:14,16,21
107:21,25 108:8
108:20 109:2,17
110:16 111:21,25
112:2 113:5,6
114:7,22 115:19
115:20 116:15
119:3,7,9 120:18
120:25 121:6
122:10 123:4,19
124:4,8,15,16,21

124:25 125:2,16
126:14,25 128:9
129:5,7 130:14
131:13 132:4,19
134:3,18,25 135:4
135:15,24 136:12
137:18 138:2,5
140:4,10 142:9,11
143:6 144:6,7,25
145:2,17,18 146:8
146:12,12,21
147:2,7,24,25
148:7 150:3,5
151:2,7,16 152:8
153:21 155:6,9
156:19,19,22
157:5,21 158:12
161:3,9 163:17,24
165:6,19 166:4,7
167:8,14 168:8
169:12 172:13,21
172:23 174:12,16
174:19 176:3,15
177:21,25 179:14
180:9,13 181:8
182:2,11,12
183:18 185:12
186:22 187:13,18
188:25 189:5,6,13
190:10,14,20,24
192:8,8,15 193:12
194:10 195:10
197:4,10 198:7,12
198:22 199:14
200:6,11,23 203:7
204:4,25 207:14
210:9 211:5,21,21
212:19,20,21
213:2,19,21
214:18,19,22
215:7,9,15,22
217:20 218:17
220:25 222:2,6,8
222:9 223:18,25
224:20 227:13
229:18 230:20
231:20,24 236:6,9

236:23,23 239:10
241:20,21 245:14
245:17 246:3,6,12
249:17 251:14,15
252:18 253:7,21
254:3 256:10
260:12,19 261:3
264:5 265:24
268:22 269:11
270:5 272:12
273:12 274:3,4,20
275:2,3,20 278:20
278:21 281:2
282:9,14 283:6
287:3,11,17,18
288:12,13 289:9
289:21,22 290:18
293:23 295:7,10
295:13,14,25,25
296:4 297:9,10
299:13 300:19,23
302:2,2,19 304:22
310:9 312:12,13
312:13 313:23
314:18 315:5,13
315:18 317:6
319:7,23 320:3,5
320:7,15,17,19
321:3,10,20 322:6
322:10 323:12,22
324:7,7,13 325:6
326:7,15 327:5,9
327:14,20,23
328:14,23,23
329:16 330:9
331:10,13,19
332:7,22,23,23
333:6,12 335:4
338:4,7,13,13
339:23 340:10,10
340:11,11 341:17
341:18 342:5,10
343:2,7 344:11,11
345:23 346:11,12
346:16,18,20,24
347:10,10,20
350:8 351:12,25

352:5,5,11 353:7
354:10,14 355:2,3
355:7,8,13,17,17
355:21,25 356:2,4
356:8,22 357:2,7
357:16,18,21
358:2,5,8,9 359:5
361:12,23 363:13
**TVPolonia** 61:22
63:12 80:10 85:3
85:22 87:5,17,22
88:13 89:3,9,23
90:19 92:19 96:4
97:9 101:10 118:9
118:19 125:19
128:19 129:4
135:16 138:7,11
138:13 140:3
141:19,24 142:12
144:9 145:4
148:25 152:9
153:22 157:10
162:5,6,7 167:15
168:9 169:5
187:14,20 205:24
225:24,24 245:10
245:13 246:2
247:10,13,15,19
247:24,25 248:19
248:25 249:20
263:17,19 264:16
264:21,25 286:21
287:2,14 294:19
296:12,14,23,25
297:11,17,24
298:2,5,24 299:12
302:21 303:23
304:12,14,20,23
314:18 315:4
316:4,6,12,18
317:2,16 321:21
325:7 337:22
342:10 354:24
**TVPolonia's** 61:17
141:22
**TVP's** 71:15 81:5
82:21 87:14

140:14 141:22
143:8 146:25
147:13 148:22
152:7 153:20
178:14,17 187:6
197:13,16 200:5,8
200:10 201:6,6
225:11 259:10
303:19 304:8,20
309:19 312:23
313:15 316:3,11
316:24 317:13
322:3 333:10
341:4 343:5 362:7
**twice** 276:20
**two** 29:13 35:18
38:6 39:9 60:11
60:15 76:23 77:6
78:5 94:11 107:12
175:5,16,23 176:6
176:6,6 177:11,17
178:4,22,24
189:22 208:4
213:3 225:19
242:11 243:9,15
243:19,22 247:25
262:17 286:8
311:11 334:9
355:5,10 360:8
**two-minute** 358:16
**two-page** 7:10,15
10:11,16 11:5,10
11:22 12:22 13:5
13:11,17 15:5
16:5 93:2,10
96:15,23 218:16
220:23 221:6
224:19 225:2
230:19 239:8
264:4 265:23
268:21 272:11
283:5 289:20
**type** 41:10
**types** 41:9,11,25
**T-r** 40:8

**uh-huh** 26:10
28:10 45:20 47:16
59:25 62:7,23
68:15 73:6 80:7
87:13 88:8,11
92:9 96:8,10
97:18,20,24 99:10
101:6,14 111:9,13
111:19 115:12
119:24 125:13
130:15 131:12
134:2,4 146:6
150:2 151:8,25
153:5 156:10
167:24 169:2
173:13 177:9
178:12 188:24
195:8 197:8,11
198:20 215:13
218:22 220:5
221:20 223:21
224:14 226:5
271:18 286:10
314:15 339:18
349:9
**Umowa** 119:20,21
**unaware** 346:10
351:14
**unclear** 186:14
348:2
**underlined** 145:3
**understand** 24:6,22
26:14,25 27:4,25
28:11 34:5 51:6,7
51:15 56:19 57:20
68:24 71:24 81:2
82:4,23 84:11
85:12 86:10,18
92:11 110:17
133:5,19 139:19
139:20 149:22
150:7 154:9,22
155:8 160:5,11
165:16 187:24
194:2 216:14,15
219:20 222:14
247:7 252:21

268:2 270:9
276:11 277:7
285:20 297:19,21
299:25 300:5,15
316:10 317:12
322:3 329:18
334:20 343:8
360:6,7,14
**understanding**
79:7 80:19 81:3,5
82:7,9,12,21,24
83:8,8,9 84:5,14
84:17,22 87:14
149:20 150:6,25
201:11 203:22
258:4 305:8,9
332:14,18
**understood** 224:12
**undoubtedly**
103:22
**unfavorable**
214:20 215:8
**unfortunately**
103:23 207:20
**Unintelligible**
136:17 140:20
195:17 262:3
**unit** 235:24
**United** 1:2 89:23
96:3 100:9 161:5
161:11,13
**units** 235:22
**unusual** 235:16,21
**USA** 100:22 101:8
205:22
**use** 61:17,22 62:10
62:25 63:12 82:18
83:5 98:11 102:15
103:6 134:5 145:4
152:9 153:22
155:11 156:5,6
157:10 193:14,21
209:3 246:17
**usually** 232:18
**U.S** 284:11,16,22
285:3 286:13,19
286:20 287:6,11

**V**

**vacation** 171:16,23
**vague** 72:12
**valid** 171:19 175:23
179:11,14,19
183:10,17,19
184:2,17,24 185:4
185:16 186:2,7,18
232:22 234:19
240:8
**Validity** 185:11
**value** 141:3
**various** 223:19
264:20 322:17
**verb** 132:22 133:13
133:15
**verbally** 46:14
**verbatim** 149:8
**version** 59:9,11,12
59:15 60:3,11,17
60:23 61:2,3
94:11 99:14,15
112:5,9 118:17
120:2 152:13,24
174:3 176:23
177:8 192:24
196:9,11,12,15
205:15,20,21
206:6,17 208:19
209:19 214:24
223:2,6,14 225:4
232:5 242:17
244:10 270:16
343:17
**versions** 193:2
**versus** 22:10
**vice** 159:21
**vice-president**
73:25 325:2
**video** 4:5 22:14
308:24
**VIDEOGRAPH...**
22:6 23:7 55:17
55:22 63:24 64:14
77:11,16 117:13
117:18 138:18,23

182:21 183:2
191:18,23 202:15
202:20 241:6,11
271:22 272:3
317:22 318:3
358:18,23 363:25
364:5
**videotaped** 1:15
2:2 22:9 77:20
139:3 202:24
272:7 318:7
**view** 140:10 141:6
187:18 208:8
209:8,12,15 278:5
308:6,7,14 333:18
334:2 361:23
**violate** 149:2
276:13 304:18
**violated** 248:2
**violates** 275:3,10
275:21
**violating** 304:14
**violation** 140:4,11
143:8 169:6
260:15 303:20
304:9

**W**

**Wait** 166:13 179:12
188:3 195:25
**waiting** 64:5
171:17 180:11
**waived** 21:5
**Walendziak** 59:3
94:15,17 95:18
96:25 99:18 102:8
**want** 24:20 27:2,7
73:14 80:24 83:5
85:9 90:22 115:10
127:15,17,20,23
129:16 139:14,15
140:14,16 162:22
166:20 172:5
177:2 179:7
180:14 181:5
203:17 208:21
210:14,25 228:10

231:14 241:2
242:22 280:2
287:8 306:9
307:20 308:24
310:22 332:20
345:9 348:5 351:6
352:18 353:15
361:7 363:4,19,23
**wanted** 85:13 166:8
167:8,14 227:22
228:19 229:2,16
229:23 267:5,18
270:7,9,11
**wants** 145:7 335:15
**Warsaw** 30:17 31:8
31:15 32:9 341:5
**wasn't** 136:2,4
151:5 163:13
199:4 219:18
230:5 232:22
235:19 252:24
256:14 287:15
330:25
**watch** 305:17
359:18 360:11
**watched** 305:20
306:2
**watching** 306:6
**way** 29:12 52:12
55:8 144:18
164:24 178:6,10
178:19,22 179:7,7
208:12 212:7,8,10
234:12,14 240:11
240:18 253:9
322:21 367:19
**ways** 178:20
**weather** 250:3
321:16
**website** 346:20
**Wednesday** 1:16
2:12
**well-deserved**
251:5
**Wenger** 3:16 23:3
23:3 29:5 31:11
33:3 36:3 39:14

40:8 41:13,18
43:21,24 46:4
49:17,22 60:25
61:5 63:20 67:7
67:13,16 72:11,17
75:18 77:6 78:16
81:14 93:15,22,24
104:20 109:6
111:18 115:24
116:5 121:11
123:9 127:5
129:24 131:18
135:6,9 136:2
143:11,16 145:20
146:24 147:5
149:5,9 152:22
153:6 154:23
161:12 167:23
169:8 172:5
180:18,20,22
181:18,21,24
182:8,18 184:4
185:24 187:22
189:3 191:2
192:22 193:6
194:8 196:5,7
202:8 206:25
207:11 212:14
215:4 222:24
224:8 233:8,11
238:22 242:11,16
242:21 243:6
251:2,6 257:15,25
258:11 260:17
270:15 274:7
275:12 276:3,15
276:17 277:13
283:19 289:25
290:10 292:14
293:4,9 294:15
295:13 298:12
301:17 302:7,10
302:16 306:10,24
309:25 310:7,22
311:5,18 314:22
315:7 335:14
343:18 344:7

348:19 349:4,12
352:23 353:23
359:19 361:14
363:19 364:7,9
**weren't** 154:9
163:11 165:5
195:2 204:5
**we'll** 33:18 43:25
66:9 83:13 133:14
193:6 250:24
293:10 301:24
310:7 344:5
**we're** 51:23 55:19
63:25 64:4 109:14
117:15,21 138:20
182:23 183:5
191:20 192:2
223:7 241:8,14
288:22 293:4,5
358:20 359:2
**we've** 242:6 319:15
**whatsoever** 338:6
**WHEREOF**
367:21
**whichever** 24:15,19
220:16
**wide** 34:7
**willfully** 53:17 54:5
54:25
**willing** 286:12
327:9,12,15,20
328:2
**wish** 365:5
**wishes** 255:25
**withdraw** 63:16
220:18 285:2,22
286:12 320:6,18
343:23
**withdrawn** 73:7
92:4,6 108:10
343:9
**withheld** 263:16,18
**withhold** 264:20
**withholding** 263:20
264:24
**witness** 5:3 20:6
23:9,12 33:10

36:5 48:18 49:20
52:3 60:7 81:21
81:24 82:22 83:11
83:12,15 86:3
88:3,17 91:5,23
93:21 94:20 99:10
100:10,14 101:23
102:2 109:9
111:19 115:9,12
129:18 147:6,14
147:15 148:3,7,12
160:13,16 162:12
167:24 172:7
180:23 181:2
196:12,16 201:13
204:11 207:9,12
224:12 233:3
243:10 255:8
265:2,5,6,10
270:25 271:6
278:25 283:23
307:20 311:12,15
312:18 313:4,7
314:23 326:18,21
330:13 335:11
342:3 346:4 349:9
353:2 367:11,16
367:21
**woman** 201:13
**word** 87:15 88:7
200:15,19 216:14
216:15 232:24
233:9,12,16,18
246:17 253:8
254:20,22 255:5
255:11 263:5
287:21 305:9
307:6 310:3,8
311:17 312:24
316:2
**wording** 154:7
156:4 209:13
210:8 228:14,23
244:19,19
**words** 82:18,18,24
83:5,5,9 145:8
147:10 149:21,23

149:25 150:17,18
150:19,20 154:16
200:13 209:3,4,24
209:24 212:4
254:8,21 311:2,5
311:22 353:9
**work** 90:12 160:3
232:21 234:8
295:15 309:10
**worked** 359:5
**working** 126:10
151:10 242:24
**works** 59:10
**world** 97:7
**wouldn't** 199:8
249:22 260:16
321:22 362:11
**write** 244:17
264:17 266:12
319:2 341:24
**writing** 164:11
190:20,24 191:12
199:21 209:2
**written** 86:14 88:20
90:21 122:23,25
142:23 155:2
157:3 164:24
175:18 176:11,20
184:21,22,23
342:11,14 345:20
**wrong** 57:7 86:11
155:18 156:2,13
156:20,23 205:10
207:2 208:2,12
209:20 275:25
**wrote** 100:7 147:19
212:20 232:8,10
244:15 279:21
281:15 291:14

**X**

**x** 1:4,10 5:2 6:2 7:2
8:2 9:2 10:2 11:2
12:2 13:2 14:2
15:2 16:2 17:2
18:2 19:2

**Y**

**Y** 23:15
**Yeah** 57:9 79:11
86:21 93:22 94:13
129:18 134:21
135:10 146:24
152:16 172:8
174:6 186:20
193:10 195:14
215:13 226:9
233:10 242:2
271:15 273:7
330:21 351:3
**year** 48:8 49:4
185:15 217:17
235:14 236:8
263:8,8 319:20
325:2
**years** 113:20 175:5
175:16,23 176:7
177:12,17 178:4
178:23,24 225:19
247:25 294:20
316:6 359:6
**yesterday** 30:20
158:20
**York** 1:3,16,16 2:9
2:11,11 3:9,9,20
3:20 23:18,24
32:7 367:9,14

**Z**

**Z** 23:15
**Zaniewska** 195:7
195:10 213:17
221:14,18 225:4
225:14 226:16
227:5
**Zavin** 3:5 5:5 22:20
22:21 23:13 24:2
24:4 27:18,21
29:6,8 31:13,17
33:2,4,6,16 36:11
36:22 37:3,5
38:12,17,19 39:17
39:19 40:13 41:16
41:21,24 43:13,23

44:3 46:7,9 48:20
49:11,19,25 50:5
50:8 51:20 52:6,9
52:11 54:15,21
55:16 56:2,14,16
57:13,16,18 60:9
61:3,6,8 63:22
64:4,12,18,20
66:10,19,23 67:10
67:19,25 68:10
69:7,20,23 70:10
72:13,15 73:21,23
74:24 75:9,19,23
77:8,10,21 78:9
78:20,23 81:16,18
82:3,20 83:2,7,18
83:21 84:6,20
85:7,12,15 86:9
86:15,17,22 87:8
87:10 88:2,6,24
91:10,16,20 92:23
93:8,20,23 94:5
96:12,21 98:18,25
99:12 100:17
101:17,20 102:4,6
102:23 103:9,16
103:18 104:22
109:8,12 110:3,9
110:13 112:8,15
112:19,23 113:10
114:6 115:5,15
116:3,9 117:8,11
118:2,5 119:15,17
119:25 120:10
121:13,19 122:20
122:24 123:11,13
126:20,23 127:7
127:10,13,21,25
128:14 130:4,10
131:20,23 132:12
133:4,8,10,14,18
134:21 135:3,12
136:6,10 137:7,10
137:23 139:5
140:9,16,19
141:11,13 142:18
142:20 143:14,20

143:24 145:25
146:4 147:12,17
147:22 148:6,9,18
148:20 149:3,7,11
149:14 150:14,21
150:24 152:19
153:3,7,9,13
154:3 155:21,25
158:3,11,15
160:19 162:18
166:13,18,22
167:3,10,13 168:5
170:22 171:9,11
172:8,10 173:4,13
173:16,25 174:5
177:4,7 181:4,21
182:4,17,20 183:7
183:14,22 184:11
184:14 185:19,21
186:4,13,16 187:2
187:5 188:2 191:6
191:17 192:3,13
192:25 193:10,16
193:18 194:12,14
196:20 200:2,4
201:12,25 202:3
202:13,25 203:3
204:9,13,17 206:3
206:8 208:15
209:6 210:15,19
211:3 213:14,16
218:12,22,24
220:20 221:5,19
222:16 223:3,7,9
224:10,16,25
230:16,25 233:10
233:13,15 236:16
236:19 237:3
239:14 240:23
241:4,15 242:2,4
242:13,19,25
243:3,8,13 244:25
245:3,7,19 246:9
250:16,18 251:4,8
251:19 254:9,12
254:15 256:9,14
256:17 257:17,19

258:2,6,8 259:10
259:14,19 260:21
260:23 263:25
264:10 265:14,19
266:5 267:11,23
268:18 269:3
270:19 271:14,20
272:8,17 273:23
274:9,11 275:15
275:18 276:22
277:18,21 278:14
278:17 279:2,6
280:7,22 281:5,7
283:2,11,22,25
284:6,8 285:16
286:6 288:6,9,17
288:19 289:4,14
289:17 290:4,11
290:14,23 291:8
291:10 292:17,22
293:7,13,15
298:14,16 302:12
302:14,19,23
303:4,8,11 304:2
304:16 306:12,14
307:8,14,20,23
309:23 310:6,11
310:24 311:4,20
311:24 312:21
313:2,9 314:4,7
314:11 315:2
317:10,21 318:8
318:15,19 320:11
320:23 321:7,9
324:3,11,15
325:15,18 326:2,6
326:23 327:8
328:11,13,19
329:5,7,22,24
330:3,11,20,22
331:4 335:20
336:13,22 338:9
338:18 340:4,7,15
340:17 342:18,21
342:24 343:10,13
343:16,20,22
344:4,16 345:4,7

345:12 346:6,9
347:3,7,15 348:25
349:11,14,23
350:18,20 351:16
351:22 352:25
353:4,10,12
356:10,13,15,18
357:20,25 358:16
359:4,21,25 360:5
361:18 363:16,24
364:3
**zero** 149:19
**zle** 223:20
**Zlotopolscy** 223:19
**zlotys** 257:4 259:8
259:22

---

**0**

**000004** 7:12 93:3
**000005** 7:12 93:3
**00045** 11:19 236:23
**00047** 11:19 236:23
**0338** 193:12,13
210:18
**0339** 193:12,13
196:2 207:8
**05061100133** 18:13
340:10
**05061100134** 18:14
340:11
**051611000063**
17:18 328:23
**05161100044** 11:13
230:21
**05161100053** 17:12
324:7
**05161100055** 17:13
324:8
**05161100062** 12:25
264:6
**05161100064** 17:19
328:24
**05161100070** 13:8
265:25
**05161100071** 13:20
272:13
**05161100076** 14:8

274:4
**05161100077** 14:9
274:4
**05161100079** 14:15
278:21
**05161100080** 14:16
278:21
**05161100085** 14:21
281:2
**05161100088** 15:8
283:7
**05161100089** 15:14
288:13
**05161100092** 15:15
288:13
**05161100093** 15:22
289:9
**05161100094** 16:9
289:22
**05161100095** 16:8
289:22
**05161100096** 16:16
290:18
**05161100122** 18:7
338:13
**05161100132** 18:8
338:14
**05161100133** 18:14
340:11
**05161100134** 18:15
340:11
**05161100138** 18:20
344:11
**05161100139** 18:21
344:12
**05161100140** 19:7
347:10
**05161100142** 19:8
347:11
**05161100290** 13:14
268:23
**0720110298** 12:8
241:21
**0720110299** 12:9
241:21

---

**1**

**1** 6:4 22:8 43:14,19
44:6 77:13 139:23
161:23 176:22
177:10 194:3,8
295:25 299:18,19
310:13
**1st** 12:16 15:12,19
112:2 113:6
185:14 195:22
196:3 198:7,12,22
199:14 200:6,24
201:8 203:7 206:4
207:4,6 208:7
210:16 251:13
288:12 289:8
**1:18** 55:24
**1:27** 63:24
**1:30** 64:16
**1:44** 77:11
**1:48** 77:18
**10** 1:8 6:11 8:9 9:14
17:9 47:6,11
110:4,8,11
**10/14** 349:8
**10020-1104** 3:20
**1011110338** 10:7
192:8
**1011110339** 10:8
192:9
**1011110351** 10:19
220:25
**1011110352** 11:7
224:20
**1011110353** 11:25
239:10
**1011110355** 10:13
218:17
**1011110356** 12:18
251:14
**1011110357** 12:19
251:15
**10154** 2:12 3:9
**103** 8:4
**11** 6:16 8:14 9:19
10:4 112:9,14,17
**11th** 168:25 169:4
169:19 172:15,18

172:20 187:10,17
189:19,20
**110** 8:9
**112** 8:14
**114** 8:19
**117** 9:4
**12** 8:19 11:21 15:17
113:23 114:3,4
**12th** 16:13 290:17
**12:10** 1:17 2:13
22:4,12
**12:48** 55:18
**120** 9:9
**1251** 3:19
**13** 9:4 19:4 117:24
117:25 118:7
**13th** 13:18 272:12
273:2,15
**14** 9:9 17:4 18:10
119:18 120:6,8,12
135:9
**14th** 65:14 340:24
341:5 348:21
349:6
**14/19/2010** 348:3
**15** 8:4,14 9:14
13:16 158:4,8,10
**15th** 190:11,15,16
**158** 9:14
**16** 9:19 15:10 18:4
55:4 173:5,9,11
173:19
**17** 10:4 12:11 192:5
192:10,11 203:6
**173** 9:19
**18** 6:21 10:10
218:14,18,20,21
219:2,2
**18th** 11:23 14:6,13
239:9 274:3
278:20 279:20
**1891** 300:20,24
**19** 7:14 10:15
220:21 221:2,3
**192** 10:4
**1994** 35:18 37:18

38:7,21 39:3
56:21 59:21 63:10
65:15 69:18
143:18 144:19
152:23 331:15,16
**1995** 29:3 93:16
96:10 99:24
110:23 112:2
113:6,12 114:11
116:14,15,23,24
125:18 126:25
128:8 133:23
143:4,18 144:5,17
144:25 147:19
157:2,8,19,24
**1997** 25:10,17,22
25:24 118:8
119:10
**1999** 39:11 331:15
332:15

---

**2**

**2** 6:11 17:15 56:4,8
56:10,18 62:5,9
62:22 63:15,18
65:18 67:2 69:4
69:15 77:19 80:6
154:18,19,20,23
154:24 155:4,5,6
155:9 194:4 195:2
296:4 299:19
310:14,15,18,19
**2A** 80:5 313:24
**2nd** 16:6 289:21
**2:34** 117:13
**2:40** 195:24 206:4
207:6,7 208:8
**2:41** 117:20
**20** 10:10,21 17:21
222:17,22,23
**2000** 116:14
**2002** 39:11
**2004** 25:25 159:16
**2006** 26:4 28:23
109:20 122:6
**2007** 30:3 31:5,15
159:18 163:6

**2008** 89:22 90:17
106:21 107:8
109:10 116:14,23
120:22 122:25
123:21 124:6
134:17 138:3
142:10 157:3,8,20
157:24 159:5,6
163:24
**2009** 10:18,24
29:22 40:3 71:6
72:5,10 76:24
78:6 107:4,22
124:16 167:19,19
167:25 168:12
169:3,4,12,19
170:9,14 171:4
181:8,9,12 182:6
187:7 190:11,15
190:17 192:16
195:3,24 198:7,12
198:22 199:14
200:6,24 201:8
203:7 206:4 208:8
215:3 219:3
220:24 221:13
222:11,20 228:7
232:2,13 234:17
237:13,19 252:23
253:13,22 254:6
254:10,17 291:23
293:21 313:23
322:13
**2010** 11:12,18,24
12:7,16,24 13:6
13:12,19 14:7,14
15:7,13,20 16:7
16:14 42:20,22
131:5,8,10 132:3
132:18 133:23
159:10,11,13
163:8 181:9
191:12 217:18
225:5 226:10,12
226:13 230:20
231:6 236:22
239:9 241:20

244:13 251:14
262:10,18 264:5
265:24 266:11
268:22 272:12
273:2 274:3
278:20 279:20
283:6,17 288:12
289:8,21 290:17
292:11 296:12
297:24 298:3,4,18
301:15 319:16
339:24 340:24
341:5 348:21
350:23 351:11
362:25
**2011** 1:16 2:12
22:11 50:11
217:17 318:25
319:20 320:9,21
321:5,12 322:7
350:13,22 351:11
354:11 364:15
367:22
**2012** 185:14
**2019** 319:10
**21** 6:4 11:4 16:11
19:10 224:17,21
224:23
**21st** 10:17 220:24
221:13,16
**2113** 300:20,24
**212** 3:10,10,21,21
**218** 10:10
**22** 11:9 230:17,22
230:23 231:3
**22nd** 350:22
**221** 10:15
**222** 10:21
**224** 11:4
**23** 10:21 11:4,9,15
236:18,19,24,25
**23rd** 10:23 222:20
223:18
**230** 11:9
**236** 11:15
**239** 11:21
**24** 5:5 11:21 12:4

14:11 16:4 236:17
239:6,11,12,15
**241** 12:4
**249** 5:7
**25** 7:19 9:4 11:15
12:4 13:10 241:17
241:22,25 242:7
243:24 244:3,9
**25th** 11:11 230:20
231:6 235:2 237:9
269:11 270:2,6
283:17
**251** 12:11
**26** 12:11 251:9,16
251:17,21
**26th** 11:17 15:6
236:22 283:6
**264** 12:21
**266** 13:4
**268** 13:10
**27** 12:21 264:2,7,8
264:12,12
**272** 13:16
**274** 14:4
**278** 14:11
**28** 13:4 265:21
266:2,3,8
**28th** 219:3
**281** 14:18
**283** 15:4
**288** 15:10
**289** 15:17 16:4
**29** 13:10 268:19,24
268:25 269:4
**290** 16:11
**293** 16:18

___
**3**
___

**3** 6:16 10:15 13:4
45:24 62:5 64:9
64:11,23 65:21
139:2 154:19,19
155:4,5 202:17
210:17 332:2,3
**3rd** 215:2
**3/22/2011** 19:12
349:18

**3:03** 138:18
**3:17** 138:25
**30** 13:16 272:9,14
272:15,19
**30th** 12:6 241:20
244:12
**30XI00184700** 2:5
367:6,25
**30XR00016800** 2:6
367:8
**30(b)(6)** 49:20
82:22 83:12 93:20
147:14 148:7,12
201:12 309:3
313:3,7
**31** 14:4 273:24
274:5,6,14
**31st** 169:12 170:5,9
173:2 180:2
231:21,25 232:13
232:16 237:13,19
238:3 252:23
253:13,22 254:5
254:10,17 292:13
293:20 319:20
320:9,21 321:5,12
322:7,12
**318** 17:4
**32** 14:11 278:16,17
278:22 279:16
**324** 17:9
**329** 17:15
**33** 14:18 281:3,9,11
**335.4890** 3:21
**336** 17:21
**338** 18:4
**34** 15:4 283:3,8,9
283:13
**340** 18:10
**344** 18:17
**345** 2:11 3:8
**347** 19:4
**349** 19:10
**35** 15:10 288:8,9,14
288:16
**36** 15:17 289:5,10
289:12

**37** 16:4 289:18,23
289:24 290:10
**38** 16:11 290:14,19
291:6,7
**39** 16:18 292:21,22
293:2,12,17

___
**4**
___

**4** 6:21 8:19 16:18
29:6 66:11,16,18
73:8 202:23
271:24 299:18,19
**4th** 331:14
**4:09** 182:21
**4:23** 183:4
**4:33** 191:18
**4:35** 191:25
**4:46** 202:15
**4:52** 202:22
**40** 17:4 318:9,13,14
318:21
**407.4000** 3:10
**41** 17:9 324:4,9,18
324:19
**42** 17:15 328:20,25
329:2 335:4,13,17
**43** 6:4 17:21 336:14
336:18,20
**44** 18:4 338:10,15
338:16,21 339:7
**45** 18:10 340:6,7,12
340:14,19
**46** 18:17 343:12,13
343:15,24 344:3,5
344:8,13,14,19
348:23 349:7
**47** 19:4 343:25
347:5,6,7,12,13
**48** 19:10 347:4
349:15,19,21,25
**4933** 1:8

___
**5**
___

**5** 7:4 14:18 45:24
46:12,24 69:24
70:6,8 71:17 73:5
76:11 79:8 89:4

89:10 159:16
167:21,22 194:3,4
194:8 272:6 314:9
317:24 332:4
**5th** 13:6,12 265:24
266:11 268:22
269:25
**5:41** 241:6
**5:46** 241:13
**56** 6:11

**6**

**6** 7:9,9 14:4 47:11
53:10 92:24 93:4
93:6,11 94:8
161:19 318:6
364:6
**6th** 131:5 225:5
226:13
**6:25** 271:22
**6:32** 272:5
**64** 6:16
**658.9105** 3:10
**66** 6:21

**7**

**7** 7:14 53:15 58:16
96:13,17,19
358:18
**7th** 131:5 267:2
318:25
**7:29** 317:22
**7:39** 318:5
**70** 7:4

**8**

**8** 7:4,19 9:9 12:21
20:8 57:6,7 98:23
99:4,9 284:5
**8th** 12:23 264:5
**8:24** 358:19
**8:27** 196:3,4 210:16
**8:30** 358:25
**8:35** 1:17 364:5,10
**884.8590** 3:21

**9**

**9** 1:16 2:12 8:4,9
15:4 103:10,14,15
103:20 108:4
144:2 145:9
**9th** 22:11 118:8
**91** 20:8
**93** 7:9
**94** 29:5,9
**95** 29:9
**96** 7:14
**98** 7:19

A-383

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO. 10 CV 4933 (RMB)


SPANSKI ENTERPRISES, INC.,

     Plaintiff,

  vs.

TELEWIZJA POLSKA S.A.,

     Defendant.
-----------------------------------------

TRANSCRIPT OF
DEPOSITION OF STEPHEN SHULMAN


     TRANSCRIPT of the stenographic

notes of the proceedings in the

above-entitled matter, as taken by and

before TAB PREWETT, a Registered

Professional Reporter, a Certified

Shorthand Reporter, a Certified LiveNote

Reporter, and Notary Public, held at the

Offices of DLA Piper LLP, 1251 Avenue of

the Americas, New York, New York

10020-1104, on Thursday, June 7, 2012,

commencing at 9:30 a.m.

Page 2

1
2   A P P E A R A N C E S :
3
4       DLA PIPER LLP (US)
        BY:  DAVID S. WENGER, ESQ.
5       1251 Avenue of the Americas
        New York, New York  10020-1104
6       Attorneys for the Defendant
7
8
        LOEB & LOEB, LLP
9       BY:  JOHN PISKORA, ESQ.
        345 Park Avenue
10      New York, New York  10154
        Attorneys for the Plaintiff
11
12  Also Present:
13
        Credibility International
14      Laura E. Connor, Director
        1701 Pennsylvania Avenue, NW
15      Suite 300
        Washington, DC  20006
16
17
18
19
20
21
22
23
24
25

Page 3

1           Stephen Shulman
2       P R O C E E D I N G S
3   STEPHEN SHULMAN,
4   doing business at Anchin Block and Anchin,
5   New York, New York,
6   having been sworn by the notary public to
7   testify to the truth, testified as follows:
8   DIRECT EXAMINATION
9   BY DAVID WENGER:
10      Q    Would you please state your
11  name for the record.
12      A    Stephen, with a P-H,
13  S-T-E-P-H-E-N, W, Shulman, S-H-U-L-M-A-N.
14      Q    And which firm are you with,
15  Mr. Shulman?
16      A    I'm with Anchin Block and
17  Anchin.
18      Q    Well, good morning.  My name is
19  David Wenger.  I represent Telewizja
20  Polska, SA in this litigation between
21  Spanski Enterprises and Telewizja Polska.
22  We'll call the two entities SEI and TVP for
23  short.
24          So I'll be asking you
25  questions, and you'll be answering them.

Page 4

1           Stephen Shulman
2   If you don't understand my question, please
3   ask me to rephrase the question.  If you
4   want me to try to expand on a question to
5   help you understand that, I'm happy to do
6   it.  I'm happy to try to change the
7   question if you need to understand it.  But
8   if you answer my question, I'm assuming
9   that you fully understand it.  Is that
10  clear?
11      A    Yes.
12      Q    Is there any reason why you
13  can't give complete and accurate testimony
14  today?
15      A    No.
16      Q    Have you ever worked with Loeb
17  & Loeb as an expert witness before?
18      A    Yes.
19      Q    How many times?
20      A    As an expert witness, I think
21  once or twice.
22      Q    Have you done expert consulting
23  for them as well?
24      A    I have been asked to do some
25  consulting.

Page 5

1           Stephen Shulman
2       Q    For a few different kinds of
3   cases?
4       A    Generally.
5       Q    Have you worked with
6   Mr. Piskora before?
7       A    Yes.
8       Q    And Mr. Zavin?
9       A    No.
10      Q    How many times have you worked
11  with Mr. Piskora?
12      A    I believe on one particular
13  case.
14      Q    And what kind of case was that?
15      A    That involved helping a foreign
16  individual fight off challenges from other
17  foreign entities.
18      Q    Did you give an opinion
19  concerning damages in -- related to that
20  case?
21      A    No.
22      Q    What is the nature of your
23  typical everyday work?
24      A    Well, I am the partner in
25  charge of the litigation, forensic

2 (Pages 2 to 5)

A-385

Page 6

1          Stephen Shulman
2   valuation, and business risk services group
3   at Anchin Block and Anchin.  So my workday
4   today pretty much covers working on client
5   matters and supervising the staff and the
6   department.
7      Q    When you say "client matters,"
8   who are your typical clients?
9      A    They can range -- individuals
10  corporations, trusts, other types of
11  businesses.  I've worked for the
12  government.
13     Q    And is part of your work, as
14  indicated by your title, giving consulting
15  advice or serving as a litigation expert in
16  litigation?
17     A    Yes.
18     Q    What percentage of your work is
19  related to litigation in terms of giving
20  litigation consulting advice, serving as an
21  expert witness?
22     A    I think the department is about
23  50 percent litigation.
24     Q    What about your personal work?
25     A    Well, I work on all of the

Page 7

1          Stephen Shulman
2   matters, so I will have -- would have
3   worked on that.
4          My workable billable time is
5   about 40 percent of my entire time; so,
6   therefore, maybe 20 percent of my time is
7   spent on, you know, litigation and that
8   sort of thing.
9      Q    So the other 60 percent of your
10  nonbillable time is administrative-type
11  work?
12     A    Yes.
13     Q    Of that 40 percent of your
14  billable time, you say about half of your
15  work relates to litigation?
16     A    Thereabouts.  I -- you know, I
17  don't quantify it like that, so I can't
18  give you an exact number.
19     Q    And what is the general nature
20  of your nonlitigation-type work?  And by
21  that I mean, do you do accountant-type
22  work?  Forensic accounting valuations?
23  Just generally describe what is the nature
24  of the -- your nonlitigation work.
25     A    To a large degree, it's

Page 8

1          Stephen Shulman
2   valuation work.  I am certified in
3   valuation, and I supervise the other work
4   that goes on around the office as
5   valuation, business risk services, we -- I
6   get involved with, and other just
7   consulting matters that people come and ask
8   me to, you know, discuss with them, on a
9   wide range of matters.
10     Q    What kind of industries do you
11  work for mostly?
12     A    I work across the board in many
13  industries, and I think my CV gives you the
14  breadth of my exposure.
15     Q    Have you worked for media
16  companies before?
17     A    Yes.
18     Q    In what?  What was the nature
19  of that work?
20     A    I did a fair amount of work,
21  but not currently, working with licensing
22  of film rights, and -- and other media
23  would also include some licensing audits
24  and that sort of thing.
25     Q    What was the nature of that

Page 9

1          Stephen Shulman
2   work?  Was it valuation?  Something else?
3      A    It primarily went around
4   participation in licensing audits and
5   determining, on loans made to production
6   companies and film companies, what happened
7   to the money.
8      Q    And in connection with your
9   litigation experience, what experience do
10  you have working for media-related
11  companies or in media-related litigation?
12     A    I would have to review my
13  history because you -- you know, whatever
14  you have, by the way, is that I actually
15  produced either a report, testimony, or
16  deposition, is in my CV, so you can pick
17  that out of there.  But I would have to
18  look through my, I don't know, 20 years of
19  work to figure out what other media work I
20  had done.
21     Q    So nothing comes to mind right
22  now?
23     A    You know, I work on a lot of
24  stuff.
25     Q    Have you ever worked in

3 (Pages 6 to 9)

Page 10

1           Stephen Shulman
2  connection with foreign programming, media
3  programming?  And I refer to television,
4  radio, any media.
5      A    Yes, I remember one instance
6  that comes to mind.
7      Q    And what was that?
8      A    That was working for one of the
9  film producers in France.
10     Q    Was that litigation related or
11 otherwise?
12     A    It was dispute related.  It was
13 primarily -- I think, came about as a
14 result of some reporting of revenues.
15     Q    Have you ever given an expert
16 report in a case involving media-related
17 litigation?
18     A    If it is, it's in my CV.
19     Q    But you don't recall one right
20 now?
21     A    No.
22     Q    How did you get involved in
23 this matter?
24     A    Well, I was approached by John
25 and asked if I could be an expert witness

Page 11

1           Stephen Shulman
2  in this case and do the work necessary for
3  the damage calculation.
4      Q    And was that in connection with
5  claims brought by SEI, counterclaims bought
6  by TVP, or both?
7      A    At the time, it wasn't that
8  specific.
9      Q    And you agreed to take on the
10 matter, I guess?
11     A    Yes.
12     Q    Mr. Larry Gerbrandt is also an
13 expert in this case.  Are you aware of
14 that?
15     A    We brought him in.  I think I
16 referred to him in my first report.  So
17 it's clear in the report.
18     Q    That was my next question.
19          So after you were retained, you
20 brought Larry in, as you say?
21     A    Yes.
22     Q    Did you introduce Larry to the
23 team, to Mr. Piskora?
24     A    Yes.
25     Q    How do you know Larry?

Page 12

1           Stephen Shulman
2      A    We did some research to find
3  some people that could help us with some of
4  the technical issues of the case, and
5  Larry, as you can read in his CV, is very
6  well qualified.
7      Q    You didn't know Larry before
8  this matter?
9      A    No.
10     Q    So you had a conversation with
11 Mr. Piskora to the effect of, "We need to
12 have someone help us out on this case," and
13 then you identified Mr. Gerbrandt as an
14 expert; is that right?
15     A    In general.
16     Q    Did you consider anyone else
17 other than Mr. Gerbrandt?
18     A    We looked at other, you know,
19 CVs that came up and, you know, we decided
20 on Mr. Gerbrandt because of his background.
21     Q    How soon after you got involved
22 did Mr. Gerbrandt get involved?
23     A    Well, our -- I'd have to look
24 at my time records to see exactly when we
25 started working on this, but I believe we

Page 13

1           Stephen Shulman
2  started working on this -- I don't know --
3  about a month or so into -- before we
4  issued our report is, I think, when we
5  really started doing some work.
6      Q    When was the first time you
7  heard about the case?
8      A    I don't recall.
9      Q    Was it 2011?
10     A    I would have to look at my time
11 records.
12     Q    Or do you think it's in this --
13     A    I don't know.
14     Q    -- year?
15     A    You know, I have a retention
16 agreement with Loeb & Loeb, so I don't have
17 that.  I don't remember the date of it.  So
18 that would probably dictate about or around
19 the time we were retained.
20     Q    And when you say "we," were
21 you -- you mean Anchin?
22     A    Yes.  Anchin was retained in
23 the retainer agreement to do the work,
24 understanding that I would be the expert
25 witness representing Anchin.

4 (Pages 10 to 13)

Page 14

Stephen Shulman
1
2    Q    So how long after Anchin was
3  retained was Mr. Gerbrandt retained, if you
4  know?
5    A    I can tell you in relation to
6  the report when he was retained.  It was
7  probably somewhere around maybe two to
8  three weeks before, you know, we finalized
9  our report.
10    Q    Did you think about whether you
11  might be able to do the report without
12  Mr. Gerbrandt?
13    A    Initially, I thought maybe we
14  would.  But the way I operate our
15  department is, we have a very large network
16  of consultants that we can draw on for
17  niche areas and technical areas that the --
18  you know, we think we may need in order to
19  do an appropriate job.
20    Q    So if I understand what you
21  said correctly, initially, you thought you
22  would be able to proceed on your own, but
23  then you thought you'd bring aboard one of
24  these consultants in your network?
25    A    Yes.  I thought it would help

Page 15

Stephen Shulman
1
2  strengthen the case.
3    Q    What do you mean by "help
4  strengthen the case"?
5    A    Just to make sure we weren't
6  making any mistakes with respect to
7  technical terms, technology, description of
8  technical aspects of the industry.
9    Q    So that, in your mind, is what
10  Mr. Gerbrandt's role is limited to?  And
11  when I say "that," I mean to make sure you
12  weren't making any mistakes with respect to
13  terms, technology, description of the
14  technical aspects of the industry?
15    MR. PISKORA:  Objection to the
16  form.  I'm sorry to interrupt.
17    Objection to the form.
18    You need it read back?
19    THE WITNESS:  Yes.  Sure.
20    MR. WENGER:  I can rephrase the
21  question.
22    Q    Mr. Shulman --
23    MR. PISKORA:  Before you -- the
24  reason I objected was because I think
25  it's -- it will be unclear, the nature

Page 16

Stephen Shulman
1
2  of the question you asked, whether
3  you're referring to his initial -- or
4  Larry Gerbrandt's initial assistance
5  with Mr. Shulman's report or the
6  rebuttal report.  If you're more
7  particular, maybe you'd get a clearer
8  record.
9    Q    Right now, I'm talking about
10  your initial report, when you were
11  initially brought on.  And you mentioned
12  that you -- or you testified that you
13  thought Mr. Shulman should be brought on
14  board -- and I'm paraphrasing here -- to
15  make sure you were right on technical terms
16  and technical aspects of the industry; is
17  that right?
18    A    Yes.  As we got into writing
19  the report and developing it, I felt it was
20  a good idea to do that.
21    Q    So do you rely, in your report,
22  on any information supplied by
23  Mr. Gerbrandt, or was he there, as you say,
24  basically to verify the technical aspects
25  of the report?

Page 17

Stephen Shulman
1
2    A    I think, if you remember from
3  the report, I footnote a particular section
4  that he helped out with, and also in
5  general about, like I said before,
6  description for terminology and that sort
7  of thing.
8    Q    Did he have any role in
9  drafting the report?  And by "the report,"
10  I mean the expert report of
11  Stephen Shulman.
12    A    He read and commented on the
13  section in which he participated in giving
14  us information, which was -- which I can be
15  specific about.  It's about the description
16  of the scenario one damage.  I mean, he --
17  and he also did read the entire report for
18  context.
19    Q    How is Mr. Gerbrandt getting
20  paid?  And by that I mean, is he being paid
21  directly by Loeb & Loeb, or does your firm
22  pay him?
23    A    Yes, he is a reimbursable on
24  our bill.  It's a pass-through.
25    Q    Okay.  Does he work for himself

5 (Pages 14 to 17)

Page 18

1           Stephen Shulman
2    or for a company?
3       A    He works -- it's in his CV.
4    You can read it.
5       Q    Have you worked with anyone
6    affiliated with Mr. Gerbrandt before?
7       A    No.
8       Q    Would you say Mr. Gerbrandt
9    agrees with everything in your report?
10      A    I believe he does.  He's read
11   it and has commented on it.  He knows the
12   positions that we've taken.
13      Q    When you say before that he
14   read it and gave some comments on the
15   report, did you make changes to the report
16   based on his comments?
17      A    Well, you know, some of it was
18   English; some of it was context.  So we
19   might have made some changes or comments --
20   made changes based on his comments.
21      Q    How did you actually write the
22   report?  What was the writing process?
23      A    I wrote it.
24      Q    So you just sat down and wrote
25   a draft out, the whole draft?

Page 19

1           Stephen Shulman
2       A    Yes.
3       Q    And then sent it to counsel for
4    review?
5       A    Counsel gave me comments.
6       Q    How many drafts of the report
7    go through?
8       A    I don't know.  It all depends
9    what you call a draft.
10      Q    But you were working on the
11   report for about a month, you say?
12      A    Actually, less.
13      Q    And you have a few damages
14   theories, and we'll get into them in
15   specific detail.  But how did you come to
16   develop these damages theories?
17      A    Well, we went through the
18   record, the information that was available,
19   and we determined what we believed would be
20   an appropriate measure of the damages based
21   on what was produced in discovery.
22      Q    When you say "we," does that
23   include you and Mr. Piskora or you and
24   Mr. Gerbrandt or the three of you?
25      A    Actually, it's myself and one

Page 20

1           Stephen Shulman
2    of my staff people in the department.
3       Q    Okay.  So --
4       A    With the help of others who,
5    you know, went through certain other
6    documents.
7       Q    So you, meaning your staff,
8    reviewed the materials supplied by counsel,
9    and you developed these damages theories.
10   Is that your testimony?
11      A    Yes.
12      Q    Did you develop these damages
13   theories before Mr. Gerbrandt got involved
14   in the case?
15      A    Actually, I think we did.
16      Q    Did the theories -- I'm talking
17   about the high-level damages theories
18   themselves -- did they change after
19   Mr. Gerbrandt got involved?
20      A    No.
21      Q    Did you ever discuss with
22   Mr. Gerbrandt the alternative -- possible
23   alternative damages theories?
24      A    Yeah, we talked, but he
25   didn't -- he didn't contribute any

Page 21

1           Stephen Shulman
2    alternatives.  But we did talk about how we
3    could look at this thing.
4       Q    Did you consider other damages
5    theories other than -- other than the ones
6    you've offered?
7       A    Well, we did consider damage
8    theories based on lost revenues, lost
9    subscribers, actually, related to the first
10   claim on the Polvision.
11      Q    And why didn't you use that
12   theory?
13      A    We went through the record.  We
14   went through the detail.  All providers --
15   we didn't have information on all the
16   providers that they were using, as to their
17   cancellations, and we didn't feel it was
18   adequate in total to use that -- use that
19   theory for -- of lost subscribers.
20      Q    Just be a little more specific
21   in your answer.
22           You're saying that you didn't
23   have information about the distributors,
24   you say?
25      A    There are many providers that

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 22

Stephen Shulman

1  were involved in distributing, or shall
2  we -- you used the word, as you're using
3  it, "distributing." It's actually
4  providing. It's not distributing.
5       And there are many providers.
6  In order to do that analysis correctly, you
7  would have to have all of the detailed
8  information on all of the cancellations
9  from all of the providers, which was not in
10 the Chicago area, in order to do that, so
11 we didn't have that information.
12 Q   You said "all the providers,
13 which was not in the Chicago area." Do you
14 mean that you need information from
15 cancellations -- information on
16 cancellations from providers not in the
17 Chicago area or in the area?
18 A   Well, in the Chicago area. We
19 didn't have the detail of the Chicago area.
20 Q   What kind of detail didn't you
21 have?
22 A   We didn't have the subscribers
23 that were detailed cancellations and was in
24 a practical form that we were able to look

Page 23

Stephen Shulman

1  at it.
2  Q   I don't know what you mean by
3  "subscribers that were detailed
4  cancellations."
5       Did you not have information on
6  who canceled?
7  A   We didn't have it from all --
8  from the providers, and we didn't have that
9  detailed cancellation information in the
10 Chicago area.
11 Q   I still don't understand.
12      What do you mean by "detailed
13 cancellation information"?
14 A   You know, all the cancellations
15 and the practical -- the ability to
16 practically determine the cancellations
17 that took place in Chicago during that
18 period.
19 Q   Are you aware of about how SEI
20 receives information from these various
21 providers as to the number of subscribers
22 they have in any given month?
23 MR. PISKORA: Objection to the
24 form.

Page 24

Stephen Shulman

1  You can answer.
2  A   Well, what we got, what was on
3  the record, what was in discovery -- so
4  that's the information we received.
5  Q   I'm going to ask the question
6  again.
7       Do you know how SEI receives
8  information from various distributors as to
9  the number of subscribers they have every
10 month or every quarter?
11 MR. PISKORA: Objection to the
12 form. Same objection. You keep
13 talking about the number of
14 subscribers they have. You mean SEI
15 or --
16 MR. WENGER: The provider.
17 MR. PISKORA: The providers, he
18 means.
19 A   I believe we had the number of
20 subscribers they had.
21 Q   On a monthly basis?
22 A   I can't tell you whether it was
23 monthly, quarterly, or whatever. I don't
24 recall what the time period was.

Page 25

Stephen Shulman

1  Q   Well --
2  A   I believe -- go ahead.
3  Q   Are you finished with your
4  answer?
5  A   No. Yeah. Yes.
6  Q   Whether you have them on a
7  monthly -- whether you have this
8  information on a monthly basis or a
9  quarterly basis, can't you just look at the
10 various subscriber reports and evaluate who
11 canceled during that time period?
12 MR. PISKORA: Objection to the
13 form.
14 A   Not unless it details all of
15 the cancellations. I mean, having the
16 total subscribers is a lot different than
17 knowing who cancels. I mean, you've got
18 people coming in; you've got people going
19 out.
20 Q   But if there is data from these
21 providers saying that during this month 100
22 people -- from one provider, during this
23 month 100 people canceled, you would know
24 how many people canceled that month, right?

7 (Pages 22 to 25)

Page 26

```
1           Stephen Shulman
2       MR. PISKORA:  Objection to the
3   form.
4           You can answer.
5       A    If we were comfortable with the
6   data that we had, and that it was accurate
7   and that it clearly represented that
8   cancellation.
9       Q    Did you ask for that data?
10      A    Yes, I believe we did.
11      Q    And did you receive that data?
12      A    We received certain
13  information, but we found that we couldn't
14  rely -- we weren't comfortable with the --
15  some of the cancellation information we
16  received to make a good -- a good estimate
17  of who would have canceled in the Chicago
18  area as a result of Polvision's presence.
19      Q    So you added a little something
20  to the end of your answer now where you
21  said you that you could not -- and I'll
22  repeat.
23          You said you weren't
24  comfortable with some of the cancellation
25  information you received to make an
```

Page 27

```
1           Stephen Shulman
2   estimate of who would have cancelled in the
3   Chicago area as a result of Polvision's
4   presence.
5           So was your problem that you
6   couldn't attribute cancellations to the
7   Polvision broadcast, or was it something
8   else?
9       A    I think in the end, that's the
10  bottom line, is we didn't feel comfortable
11  that we could attribute the cancellations
12  to Polvision.
13      Q    So it wasn't really that you
14  didn't know how many cancellations there
15  were altogether; it's just that you didn't
16  know how many cancellations could be
17  attributed to Polvision?
18      A    Well, I think it's a
19  combination of the two.  I think we were
20  not comfortable with the data we had, as
21  well as being able to attribute it to the
22  Polvision cancellations.
23      Q    And why couldn't you -- why
24  weren't you comfortable with attributing
25  subscriber cancellation numbers to the
```

Page 28

```
1           Stephen Shulman
2   Polvision broadcast?
3       A    Well, I don't -- we didn't have
4   the detail in the cancellations that made
5   us comfortable that we could attribute it
6   to them.  So we had to look at alternative
7   measures.
8       Q    When you say "the detail in the
9   cancellations," what detail would you have
10  needed to make you comfortable that you
11  could attribute cancellations to Polvision?
12      A    We would have to know all of
13  the cancellations from all of the various
14  providers, and that were -- that they were
15  using in the Chicago area, as well as to
16  try and determine whether or not we could
17  attribute those to Polvision.
18      Q    You're not answering my
19  question, and maybe I'm just not being
20  clear.
21          You say that you needed to have
22  certain detail on the cancellations in
23  order to be comfortable to attribute those
24  cancellations to Polvision.
25          So my question is:
```

Page 29

```
1           Stephen Shulman
2           What detail specifically would
3   you have needed to be able to, to be
4   comfortable with attributing those
5   cancellations to Polvision?
6       MR. PISKORA:  Objection to the
7   form.
8           You can answer it.
9       A    At some point in time, we just
10  abandoned it because it wasn't produced in
11  discovery.  We didn't have the information
12  in discovery.  We were limited, to a large
13  degree.  I think we were limited to what
14  was produced in discovery, with the
15  exception of any, maybe, information that
16  was made part of the first litigation that
17  was taken over.  So we began to think of
18  other ways of looking at the damages.
19      Q    You think you didn't have the
20  information because it wasn't produced in
21  discovery, or you were limited to what was
22  produced in discovery.  Are you saying that
23  TVP needed to produce information to SEI
24  about the number of -- about subscriber
25  cancellations?
```

8 (Pages 26 to 29)

Page 30

```
1              Stephen Shulman
2     A    No.
3     Q    So what are you saying?
4     A    We got everything produced in
5   discovery by both sides.
6     Q    Right.
7     A    So I wasn't referring to TVP in
8   general.
9     Q    Are you aware, though, that SEI
10  gets regular reporting, broken down by
11  month, from all of its distributors that
12  lists how many subscribers it has from each
13  of those distributors?
14            MR. PISKORA:  Objection to the
15      form.
16            You can answer it.
17      A    I've seen -- I've seen those
18  reports, but those are -- what you just
19  described are reports that list
20  subscribers, not -- you didn't list in that
21  cancellations.
22      Q    Are you aware that on these
23  reports it says, "Here are the number of
24  subscribers that canceled every month"?
25            MR. PISKORA:  Objection to the
```

Page 31

```
1              Stephen Shulman
2       form.  There's no foundation for that
3   question.  I mean, establish it.
4       Q    Well, if I were to represent to
5   you that on those reports there is
6   information saying how many subscribers
7   cancel every month, would that be the kind
8   of information that you need?
9             MR. PISKORA:  Objection to the
10      form.
11            You can answer.
12      A    It would be a start.
13      Q    Do you know if SEI does not
14  have this information?
15            MR. PISKORA:  Objection to the
16      form.
17            You can answer.
18      A    I think -- I'd have to run
19  by -- we looked at a lot of documents, so I
20  would have to refresh my memory of exactly
21  what those documents say.
22      Q    So if you would be able to
23  know, based on these documents, how many
24  subscribers canceled every month from these
25  various providers, would you then be able
```

Page 32

```
1              Stephen Shulman
2   to determine, based on that information, a
3   damages claim grounded in lost subscribers
4   for the Polvision claim?
5             MR. PISKORA:  Objection to the
6       form.
7             You can answer.
8       A    No, not necessarily.
9       Q    And why not?  And I'm sorry if
10  we're being repetitive.  I just want to be
11  clear.
12      A    Because those cancellations
13  include cancellations for many reasons.  So
14  I believe that we would need additional
15  data, and I -- in order to figure that out.
16      Q    And by "additional data," what
17  kind of data would you need?
18      A    Well, I -- since we didn't
19  pursue that line of damages, we didn't go
20  into that detail because we were working
21  with what was produced by both sides in
22  discovery.
23      Q    Okay.  But you said that, if
24  you had information about the
25  cancellations, the number of cancellations,
```

Page 33

```
1              Stephen Shulman
2   you would still need additional data to
3   figure that out.  What do you have in mind
4   now by "additional data"?
5       A    I would have to give it some
6   thought because it's a very -- it's a very
7   difficult thing to do.  And we'd have to
8   give it some thought.  And at this point,
9   at this table, I wouldn't want to not give
10  a complete, you know, rendition of what it
11  is that we would need to be able to do
12  that, given all the circumstances.
13      Q    You said at the beginning of
14  your response there that it is a very
15  difficult thing to do.  And by that, do you
16  mean attributing the reason for a
17  subscriber cancellation to any one factor?
18      A    Yes.  It's not an easy -- it's
19  not an easy exercise.
20      Q    Is that because there are many
21  reasons, as you say, that subscribers
22  cancel?
23      A    Yes.
24      Q    You were talking about the
25  Chicago area with respect to the Polvision
```

9 (Pages 30 to 33)

Page 34

1          Stephen Shulman
2   claim.  Is it your view that only viewers,
3   subscribers, in the Chicago area would have
4   been affected by the Polvision
5   distribution?
6          MR. PISKORA:  Objection to the
7       form.
8          You can answer.
9       A    If that was the only place in
10  which Polvision was showing their
11  broadcasts, then that would be the area
12  that would be affected.
13      Q    So it's just an assumption --
14      A    Yes.
15      Q    Sorry.  Just let me finish the
16  question.
17      A    Yes.
18      Q    It's an assumption built into
19  your response, is that the subscribers are
20  limited to the Chicago area as they relate
21  to Polvision, right?
22      A    Yes, I am building into my
23  assumption that Chicago is the only
24  affected area.
25      Q    Okay.  Did you discuss this

Page 35

1          Stephen Shulman
2   subscriber cancellation issue that we've
3   been discussing, namely attributing
4   subscriber cancellations to Polvision's
5   broadcast, did you discuss that with
6   Mr. Gerbrandt?
7       A    I can't recall, to tell you the
8   truth.  It might have come up in
9   conversation, but I can't really recall a
10  specific conversation.
11      Q    Do you recall any conversation
12  with Mr. Gerbrandt to the effect of:
13          "We can't make a lost
14  subscriber claim for the Polvision claim
15  because we can't attribute cancellations of
16  subscribers to the Polvision broadcast"?
17          MR. PISKORA:  Objection to the
18      form.
19          You can answer.
20      A    I don't recall a conversation
21  about that.
22      Q    What is the cause of action, as
23  you understand it, that SEI is alleging
24  relating to the Polvision claim?
25      A    The way I understand it, it is

Page 36

1          Stephen Shulman
2   the violation of the exclusivity clause in
3   the agreements that they have, and there
4   are -- you know, as amended.
5       Q    And by "violation of the
6   exclusivity clause," what do you mean by
7   that?
8       A    My understanding is that TVP
9   licensed the content to Polvision, which
10  was in direct violation of the exclusivity
11  clause that was in the agreements that they
12  had, which indicated that they didn't have
13  the right to do that.
14      Q    So your understanding, if I
15  have it correctly, is that TVP did not have
16  the right, based on its exclusivity clause
17  with Spanski, to license certain
18  programming to Polvision?
19      A    Yes.  That is what the cause
20  is, as you call it, you know, the cause of
21  action.
22      Q    Do you have any opinion on
23  whether TVP was indeed allowed to license
24  individual programming to Polvision?
25          MR. PISKORA:  Objection to the

Page 37

1          Stephen Shulman
2   form.
3          You can answer it.
4       A    As it's clear throughout our
5   report, we weren't making legal conclusions
6   about the agreements.
7       Q    So your report, though,
8   presupposes that TVP was not allowed to
9   license this programming to Polvision, or
10  assumes, if you like that word better?
11      A    Yes, it's in our report.
12      Q    But what kind of claim is this?
13  Is it a breach of contract claim,
14  essentially?
15          MR. PISKORA:  Objection to the
16      form.
17          You can answer it.
18      A    My understanding, it's a breach
19  of contract of the exclusivity clause.
20      Q    What kind of damages, in your
21  experience, are available for a breach of
22  contract claim?
23          MR. PISKORA:  Objection to the
24      form.
25          But you can answer it.

10  (Pages 34 to 37)

Page 38

```
1          Stephen Shulman
2     A   I think the one that is
3   specific here is the violation of the
4   exclusivity clause.  And in the exclusivity
5   clause, one of the damages is, you can look
6   to the -- what the other side received for
7   what it is that they sold into the
8   territory as a damage.  If you look at the
9   Dunn, Dunn talks about that.
10    Q    Is that something you cited in
11  your report?
12    A   No.
13    Q   Why not?
14    A   I didn't think it was
15  necessary.
16    Q    Is lost profits another form of
17  damages?
18        MR. PISKORA:  Objection to the
19    form.
20        You can answer it.
21    A   Yes.
22    Q   Are --
23    A   But let my clarify.
24        Lost profits is a broad term.
25  How you measure the damages as a result of
```

Page 39

```
1          Stephen Shulman
2   lost profits, you have a number of
3   alternative ways of doing it.
4     Q    Is it your opinion that --
5   withdrawn.
6         Are you offering a breach -- a
7   damages theory grounded in lost profits?
8     A   We're offering a damage claim
9   as it relates to the measure of the lost
10  profits as a result of an exclusivity
11  clause.
12    Q    So you are offering an opinion
13  in this case that is a lost profits theory,
14  and, as you say, the way to -- tell me if
15  I'm wrong -- is the way to measure the lost
16  profits here is based on the exclusivity
17  clause.  Is that not fair?
18    A   No.
19        MR. PISKORA:  Objection to the
20    form.
21    Q    So please correct what was
22  wrong about what I said.
23    A   No.  Generally, in a contract,
24  you can -- in a breach of the contract,
25  there's a lost profits, you know, how was
```

Page 40

```
1          Stephen Shulman
2   I -- what was the damage, it's a lost
3   profit.
4         There are three types --
5   generally, three types of breaches you can
6   have in a contract.  It could be -- it
7   could be premature termination.  It can be
8   a violation of the exclusivity clause, or
9   it could be a result of not fulfilling, you
10  know, on a contract.
11        So the measure of the damages
12  in a lost profits.  There are a number of
13  alternative ways that you can measure what
14  those lost profits are; and, if it's a
15  violation of the exclusivity clause, as
16  it -- as this case is about, then one of
17  the measures of damages is what the
18  transgressor received as a benefit or as
19  value or as economic benefit that they
20  received.
21        In this particular case, TVP
22  sold the license into -- into the market,
23  and they received a value for it.
24    Q    So the value that TVP received
25  for the license that it sold is the way
```

Page 41

```
1          Stephen Shulman
2   that you are measuring lost profits in this
3   case?
4     A   Yes.
5         MR. PISKORA:  Objection to the
6    form.
7         You can answer the question.
8     A   We gave three scenarios based
9   primarily on what it is that TVP got for
10  selling of the license.
11    Q    I understand that.  You have
12  different ways of evaluating the value of
13  what TVP got.  But my question is something
14  else.
15        My question is:
16        Is that value -- and then you
17  have a few different numbers on it -- a
18  measure of the lost profits?
19        MR. PISKORA:  Objection to the
20    form.
21        You can answer the question.
22    A   Yes.
23    Q    So your theory is that SEI lost
24  a certain amount of profits as a result of
25  TVP's violation of the exclusivity clause,
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

**A-394**

Page 42

```
1              Stephen Shulman
2  and the way that you are measuring those
3  lost profits here is by the value TVP
4  received as a result of violating the
5  exclusivity clause?
6         MR. PISKORA: Objection to the
7    form.
8         You can answer the question.
9    A    Yes.
10   Q    Does this kind of theory of
11 lost profits, as you put it, the value of
12 the exclusivity -- the value derived by TVP
13 as a result of the breach of the
14 exclusivity clause, does that kind of
15 theory of lost profits exclude an
16 alternative theory?
17        MR. PISKORA: Objection to the
18   form.
19        You can answer the question.
20   A    No.
21   Q    So, theoretically, SEI, in this
22 case, could have claimed damages based on
23 your damages theory, as well as a claim for
24 lost subscribers resulting from the same
25 breach?
```

Page 43

```
1              Stephen Shulman
2    A    Yes. And, in fact, I think
3  their interrogatory mentions that that's a
4  possibility as well, the response in one of
5  their interrogatories.
6    Q    So in your view here, if you
7  would have been able to attribute lost
8  subscribers to Polvision, you would have
9  been able to offer a damages theory based
10 on these two -- these two alternatives
11 cumulatively, meaning they would both be
12 damages theories here?
13   A    No.
14   Q    Not alternatively?
15   A    It would be alternatively.
16   Q    Okay. So you basically -- and
17 this is hypothetical again.
18        If SEI would be able to bring a
19 claim based on lost subscribers, you would
20 have offered one alternative, one
21 alternative or the other, either an
22 alternative based on the value derived
23 from -- by TVP from the violation of the
24 exclusivity clause or a
25 lost-subscribers-based theory?
```

Page 44

```
1              Stephen Shulman
2         MR. PISKORA: Objection to the
3    form.
4         You can answer it.
5    A    We chose the best measure of
6  the lost profits that we could come up
7  with. TVP, in their interrogatory, used
8  their best estimate of canceled
9  subscribers.
10   Q    That wasn't exactly my
11 question, but I think that you've answered
12 my question, so I'll move along.
13        What is your definition of
14 "lost profits"?
15        MR. PISKORA: Objection to the
16   form.
17        You can answer it.
18   A    Lost profits is a -- is a broad
19 term. It's used to try and compensate a
20 contracting party for damages that were
21 incurred as a result or but for somebody
22 else's actions that were in violation of an
23 agreement.
24   Q    Explain that to me in a little
25 bit more detail, if you could.
```

Page 45

```
1              Stephen Shulman
2         MR. PISKORA: Objection to the
3    form.
4         You can answer.
5         MR. WENGER: Let me just finish
6    the question.
7         MR. PISKORA: Go ahead.
8    Q    You say that lost profits "is
9  used to try and compensate a contracting
10 party for damages that were incurred but
11 for someone else's actions." And I'll stop
12 there.
13        When you say "damages that were
14 incurred," what does that mean?
15        MR. PISKORA: Objection to the
16   form.
17        You can answer it, if you can.
18   A    I'm not sure what the
19 differential is.
20   Q    Well, let me try to clarify my
21 question, then.
22        Damages that were incurred,
23 does this mean that a party would have been
24 able to realize some profit, but, as a
25 result of someone else's actions, that
```

12 (Pages 42 to 45)

**A-395**

Page 46

1          Stephen Shulman
2   party is damaged, and, therefore, they are
3   now making a claim for lost profits?
4       A    Yeah, broadly.
5       Q    Is there anything wrong with my
6   description of what you mean by damages
7   that would have -- that were incurred?
8       A    Let's read it back.
9       Q    I described your phrase
10  "damages that were incurred" as meaning a
11  profit that a party would have realized,
12  but for the other party's actions.
13      A    Yes, that's generally it.
14      Q    Does that definition presuppose
15  that a party could have made those profits
16  that it's seeking as lost profits, meaning,
17  can a party, if it's -- is a party limited
18  to claiming lost profits as damages, is it
19  limited to claiming damages that it would
20  have been able to make as lost -- as
21  profit?
22          MR. PISKORA:  Objection to the
23      form.
24          You can answer the question.
25      A    Damages it would have made?

Page 47

1          Stephen Shulman
2   I'm not sure what this means.
3       Q    I'm sorry.  Profits it would
4   have made?
5          MR. PISKORA:  Objection.
6       A    In a broad sense, that is what
7   you're trying to get at, however you decide
8   to measure what that is, and you have these
9   alternative ways of measuring.
10      Q    So bringing our discussion of
11  lost profits to this case, does your theory
12  assume, then, that SEI would have been able
13  to realize the profits that TVP had made
14  from the Polvision licensing agreement?
15          MR. PISKORA:  Objection to the
16      form.
17          You can answer.
18      A    In a broad sense, yes,
19  that's -- that is another measure of what
20  the lost profit could be in the violation
21  of an exclusivity clause, is what the other
22  person made off of it.
23      Q    You said, "In a broad sense,
24  yes," and I just want to make sure I have a
25  clear answer.

Page 48

1          Stephen Shulman
2       Q    Does your theory assume that
3   SEI would have been able to realize the
4   profits that TVP had made from the
5   Polvision licensing agreement?
6          MR. PISKORA:  Objection to the
7      form.
8          You can answer the question.
9       A    That -- I believe that is the
10  overall theory in the breach of an
11  exclusivity clause.  You're, in effect,
12  expunging the profits that the other people
13  made.
14      Q    That's not my question.
15          My question is:
16          Does your theory presuppose or
17  assume that SEI would have been able to
18  realize the profits that TVP had made?
19          MR. PISKORA:  Objection to the
20      form.
21          You can answer it again.
22      A    I'm going to say, in a broad
23  sense.
24      Q    So to turn that question
25  around, if SEI would not have, for whatever

Page 49

1          Stephen Shulman
2   reason, been able to realize profits from a
3   licensing to Polvision, it could not, then,
4   have claimed damages for the value of TVP's
5   license to Polvision?
6          MR. PISKORA:  Objection to the
7      form.
8          You can answer.
9       A    No, I don't think that is the
10  exact theory.  There could also be -- I
11  think that the theory is, if the other
12  person made money off of the breach of the
13  exclusivity, the profits could be expunged
14  from them.  And that's -- and that's what
15  that theory is about, is that, if they made
16  the money, they went into the territory and
17  they made a profit in violation of the
18  exclusivity agreement, that the other side
19  would be able to claim that as their
20  damages.
21      Q    And is it your opinion
22  that that measure of damages is
23  irrespective of whether the party making
24  the claim could have realized the value
25  that the breaching party realized as a

13  (Pages 46 to 49)

Page 50

1          Stephen Shulman
2  result of breaching the agreement?
3          MR. PISKORA: Objection to the
4      form.
5          You can answer the question.
6      A    Whether or not they would have
7  gone out and licensed it themselves and
8  gotten the money is not -- is not
9  necessarily the issue because they may not
10 have wanted to do that. They may not have
11 wanted to go out and sell to a competitor,
12 which is what TVP did.
13     Q    My question is not whether they
14 would have wanted to or not. My question
15 is whether your theory assumes that the
16 breaching party, the party claiming
17 damages, in this case SEI, would have been
18 able to -- legally to license or to realize
19 a profit from licensing the content that,
20 in this case, TVP licensed.
21         MR. PISKORA: Objection to the
22     form.
23         You can answer.
24     A    It does -- now I think I hear
25 what you're getting to.

Page 51

1          Stephen Shulman
2          It does assume that SEI has the
3  right to -- to that content and has the
4  exclusive right to that content to do
5  whatever it wants with that content. If
6  that's what -- if that's what you're
7  getting at, that -- that is correct.
8          We made the assumption that
9  they had the right to license it if they
10 wanted to because they had the exclusive
11 right to the content that was licensed.
12     Q    And to put it another way, if
13 SEI did not have the legal right to license
14 this content to Polvision, your damages
15 theory would not work here?
16     A    Correct.
17     Q    Now, you mentioned briefly
18 before about whether SEI would want to
19 license this content to Polvision -- and
20 just so I understand, is it your view that,
21 even if SEI would not want to license this
22 content to Polvision, it still could make a
23 claim for the value of that licensed
24 content?
25         MR. PISKORA: Objection to the

Page 52

1          Stephen Shulman
2  form.
3          You can answer it.
4      A    Yes.
5      Q    Explain that to me, because you
6  mentioned that this damages theory is a
7  form of measuring lost profits. So doesn't
8  your damages theory suppose or include the
9  assumption that a party is actually willing
10 or would be able to or would want to
11 realize those profits?
12         MR. PISKORA: Objection to the
13     form.
14     A    No, I don't think it assumes
15 that. I think I made that clear in my
16 report.
17     Q    Okay.
18     A    That Polvision -- I mean, I'm
19 sorry -- SEI would not have licensed into
20 their own territory a competitor -- a
21 competing product with their -- they've
22 never done it in the past, and they weren't
23 considering it in the future, you know, at
24 least at that point; or from what I
25 understand, they would never consider it.

Page 53

1          Stephen Shulman
2      Q    You just alluded to my next
3  question.
4          So the fact that SEI had never
5  licensed this content to any other --
6  anyone else, in terms of licensing
7  individual content -- well, let me start
8  that question again.
9          Does the fact that SEI never
10 licensed this individual programming
11 content to another channel matter in terms
12 of your damages theory?
13         MR. PISKORA: Objection to the
14     form. It presumes a fact. There is
15     no foundation.
16         You can answer it if --
17     A    You left out a big, important
18 word in your question; and so the way you
19 phrased the question, I would say they may
20 consider sublicensing.
21     Q    That wasn't my question.
22         My question was -- and I will
23 represent to you that SEI never --
24         MR. PISKORA: Objection. Why
25     don't you just ask it hypothetically,

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 54

1           Stephen Shulman
2    if that were the --
3           MR. WENGER:  Because I don't
4    want to.
5        Q    I'm going to represent to you,
6    and it's actually in your report --
7           MR. PISKORA:  No, it's not.
8    Now, you're just misrepresenting the
9    record.
10          MR. WENGER:  So let's mark --
11          MR. PISKORA:  You're
12   misrepresenting the record.  Mark the
13   report and point to what you're
14   talking about.
15          MR. WENGER:  Let's mark as
16   Exhibit 1 the report of
17   Stephen Shulman.
18          (Exhibit No. 1, Expert Report
19   of Stephen Shulman, is marked by the
20   reporter for identification.)
21       Q    Are you aware of how SEI earns
22   revenue?
23       A    Yes.
24       Q    And how is that?
25       A    It has -- it's distributed on a

Page 55

1           Stephen Shulman
2    subscription basis by cable providers,
3    satellite providers, and telcos, sometimes
4    known as MVPDs.
5        Q    Well, we'll discuss that a
6    little bit more soon.  But Exhibit 1, is
7    that the expert report that you submitted
8    in this litigation?
9        A    Yes.
10       Q    Let's take a look at
11   paragraph 38.  And just read for me, if you
12   would to yourself the last sentence.
13       A    "Based upon the materials
14   provided to us, including documentary
15   materials and testimony, it doesn't appear
16   SEI has ever licensed program content to a
17   competing channel, such as Polvision."
18       Q    Are you saying here that SEI
19   never licensed programming content to
20   another channel?
21       A    No.
22       Q    So what are you saying?
23       A    I'm saying to a competing
24   channel.
25       Q    Do you know if SEI has ever

Page 56

1           Stephen Shulman
2    licensed content to a noncompeting channel?
3        A    My recollection is, I've had a
4    conversation about it; and I believe they
5    might have licensed, but not to a competing
6    channel.
7        Q    But you don't recall which
8    channel?
9        A    No.
10       Q    We were talking about how SEI
11   earns revenues, and you said that SEI
12   distributes TVP programming content
13   through, you said, cable TV operators,
14   satellite operators, and telcos, right?
15   Are any of those entities that we just
16   mentioned channels?
17       A    No.
18       Q    So SEI basically provides the
19   channels of TVPolonia and TVP Info to those
20   entities to provide to the public; is that
21   right?
22       A    They provide them to those
23   entities to distribute as a channel on
24   their systems.
25       Q    And by a channel, you mean a

Page 57

1           Stephen Shulman
2    channel like TVPolonia, the TVPolonia
3    channel?
4        A    Channel, 43 channel 44, you
5    know, whatever the channel number may be.
6        Q    You understand that SEI's
7    provision of programming to those providers
8    is different than SEI providing programming
9    to a channel such as Polvision; is that
10   right?  Or is there no difference in your
11   mind?
12       A    You're trying to equate giving
13   it to them versus giving it to Polvision?
14       Q    I'm not equating.  I'm just
15   asking you:
16          Is there a difference between
17   SEI's distribution of TVPolonia as a
18   channel to those other -- to those
19   providers of SEI's distribution of
20   programming content to Polvision, if it
21   would do so?
22       A    Yes.
23       Q    Do you know if SEI -- I may
24   have asked you this -- has ever given
25   content to a channel such as Polvision?

15  (Pages 54 to 57)

Page 58

```
1              Stephen Shulman
2         MR. PISKORA:  Objection to the
3   form.
4         You can answer.
5    A   I don't know that.
6    Q   Is this --
7    A   I --
8    Q   -- what --
9    A   I --
10   Q   Sorry.  Is this what you recall
11  hearing, or is that --
12   A   I recall that they have never
13  put it to a competing channel, a channel in
14  which they're actually competing in the
15  same market.
16   Q   And by "competing," explain
17  what you mean.
18   A   Competing for the same viewers.
19   Q   So another channel that's
20  competing with SEI's distribution network
21  for the same viewers?  Is that what you
22  mean?  Because SEI is not a channel, right?
23  SEI is distributing to channels through
24  providers?
25   A   That's right.
```

Page 59

```
1              Stephen Shulman
2    Q   So do you mean that -- a
3   channel that is competing with SEI's
4   distribution network?
5    A   What I'm saying is they
6   wouldn't sell to another group who was
7   going to come in and view and provide the
8   same material in markets where they know
9   they are trying to get subscribers, and,
10  thus, in a way, cannibalize their own
11  market.
12   Q   In light -- in light of what
13  you just said, though, you still maintain,
14  is it correct, that SEI could seek damages
15  for a value received by TVP from licensing
16  to a competing channel?
17        MR. PISKORA:  Objection to the
18   form.
19        You can answer it again.
20   A   No.  That's not what the
21  problem is with TVP.
22   Q   You were saying that -- and
23  I'll paraphrase -- that SEI wouldn't sell
24  to another group that they knew would come
25  in and distribute the same material in a
```

Page 60

```
1              Stephen Shulman
2   market that they are trying to get
3   subscribers, and, "thus, in a way
4   cannibalize their own market."
5         In the light of that, is it
6   still your view that SEI could seek damages
7   here for TVP's licensing of content to a
8   competing channel?
9         MR. PISKORA:  Objection to the
10   form.
11        You can answer the question.
12   A   They could seek damages for
13  that and more.
14   Q   Even though, as you said, they
15  wouldn't distribute content?
16   A   Even though SEI wouldn't
17  distribute that content.  Yes.  That's a
18  breach of the exclusivity clause, as long
19  as -- as long as SEI, of course, had the
20  right to that content, the exclusive right
21  to that content.
22   Q   And, again, just to be clear,
23  you're not offering an opinion, though, on
24  whether SEI had the right to distribute
25  content to Polvision; you assumed that in
```

Page 61

```
1              Stephen Shulman
2   your opinion?
3         MR. PISKORA:  Objection to the
4    form.
5         You can answer.
6    A   Correct, correct.
7    Q   Let's take a look at the
8   Appendix A to your report, which is your --
9   identified as the curriculum vitae of
10  Stephen Shulman.  And I'm looking at the
11  fourth page, underneath where it says:
12        "Since 1998, he has rendered a
13  written expert report or has given
14  testimony as an expert in ...."
15        And then it lists a bunch of
16  matters.
17        Can you tell me, Mr. Shulman,
18  which one of these or which ones of these
19  matters involved a -- an opinion relating
20  to lost profits?
21   A   Yes.
22   Q   Okay.  Can you point those out
23  to me?
24   A   Let me go down them one at a
25  time.
```

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 62

```
1          Stephen Shulman
2       The one, two, three, four --
3  fifth one.
4       Q    Is that the Quicksilver matter?
5       A    That's the Quicksilver.
6       Q    Okay.
7       A    That's the one that involves
8  lost profits.
9       Q    Please continue on to the next
10 page, unless you've done this already.  I'm
11 asking about --
12      A    Everything?
13      Q    Right, all of your -- all the
14 cases listed here and on the next few
15 pages.
16      A    The Amcore matter.
17      Q    Okay.
18      A    The Atlantic Veal matter.
19 Atlantic Veal, as in the little calves.
20      The 109 45th Street versus
21 Minervini case.
22      MR. PISKORA:  That's spelled
23 M-I-N-E-R-V-I-N-I.
24      Go ahead.
25      A    Those are the four.
```

Page 63

```
1          Stephen Shulman
2       Q    So you identified four cases.
3  Let's just take a look, quickly, at them.
4       The Quicksilver matter, you
5  note here that this was a commercial
6  litigation in which you represented the
7  defendant to calculate damages for lost
8  profits?
9       A    Yes.
10      Q    And other losses.
11      Did you, in this matter, offer
12 an opinion concerning whether a party
13 can -- I'll withdraw that.
14      Did you, in this case, offer a
15 damages theory similar to the one you've
16 offered here with respect to the Polvision
17 claim?
18      MR. PISKORA:  Objection to the
19 form.
20      You can answer it.
21      A    No.
22      Q    And to clarify, you offered a
23 damages theory for the defendant there that
24 calculated lost profits on some other
25 basis?
```

Page 64

```
1          Stephen Shulman
2       A    Correct.
3       Q    And I'll have the same question
4  for the next three cases, whether the lost
5  profits opinions that you offered in those
6  cases offered a damages theory based on the
7  value that the breaching party received
8  from the violation of an exclusive
9  distribution or licensing agreement.
10      MR. PISKORA:  Objection to the
11 form.
12      You can answer.
13      A    That is a complicated question.
14 You'll have to simplify it.
15      Q    Well, you're offering a damages
16 theory here in this case, and I'm talking
17 about the Polvision claim, grounded in
18 the -- the theory that SEI should be
19 entitled to the value that TVP received
20 from Polvision as a measure of SEI's lost
21 profits, correct?
22      MR. PISKORA:  You can answer.
23      Q    What's your response?
24      A    I'm sorry.  I got confused by
25 all of -- what was the question again?
```

Page 65

```
1          Stephen Shulman
2       MR. WENGER:  So please read
3  back the question, Mr. Reporter.
4       (Reporter read back pending
5  question.)
6       MR. PISKORA:  Objection to the
7  form.
8       You can answer it.
9       A    Yes, as it relates to the
10 exclusivity clause, which I thought I heard
11 in there, but it was not read back.
12      Q    Did you offer a similar kind of
13 opinion in either of these three cases in
14 which -- the next three cases in which
15 you've identified you've offered a lost
16 profits theory?
17      A    No, because these didn't
18 involve the breach of an exclusivity
19 clause.
20      Q    So this is the first case in
21 your memory and based on your resume here
22 that you've offered this kind of lost
23 profits theory?
24      A    In a -- in a -- in what I've
25 produced, you know, in a -- on a written
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 66

1          Stephen Shulman
2    record.  I've dealt with it before; but
3    they didn't get to court, and they weren't
4    subject to a written report.
5          Q    Do you remember where you've
6    dealt with this before?
7          A    Other -- from time to time,
8    other consultations I had where exclusivity
9    was breached.
10         Q    Has this -- this kind of theory
11   ever been offered in a case that you've
12   been involved with a litigation case?
13         A    If it was -- would have, it
14   would be here.
15         Q    Not by you, by any expert, your
16   opposition, a third party, otherwise?
17         A    Not that I recall that anybody
18   took and somebody else ran with the
19   contest?  Is that what you mean?
20         Q    That's what I mean, yeah.
21         A    No.
22         Q    Have you ever heard of a case
23   or do you know of a case in which this kind
24   of theory was offered as a measure of lost
25   profits?

Page 67

1          Stephen Shulman
2          A    Well, I can't recall, but, if
3    you go into Dunn, they'll give you some
4    reference.
5          Q    But other than from reading
6    Dunn, I'm talking about:
7               In your practical experience,
8    have you heard of a case in which this kind
9    of theory has been offered?
10         MR. PISKORA:  Objection to the
11   form.
12              You can answer it.
13         A    I don't recall.
14         Q    Okay.  If you were advising SEI
15   on a valuation of SEI as an entity, would
16   you include SEI's ability to syndicate
17   individual programming or license
18   individual programming as some value in
19   your valuation of the company?
20         MR. PISKORA:  Objection to the
21   form.
22              You can answer it.
23         A    I don't know what that all
24   means.  What do you mean, with respect to
25   the valuation of the company?

Page 68

1          Stephen Shulman
2          Q    You do valuations of companies?
3          A    Yes.
4          Q    And are there different
5    intellectual property rights or licensing
6    rights that are sometimes included in
7    valuations of companies?
8          A    Now, you're asking me to talk
9    to you about valuation theory, and
10   valuation theory doesn't necessarily
11   involve the valuation of specific assets
12   within a company.
13         Q    Have you ever done a valuation
14   where you've evaluated specific assets
15   within a company?
16         A    Yes.
17         Q    If you were evaluating SEI,
18   hypothetically, would you place a value on
19   SEI's alleged right to license individual
20   programming?
21         MR. PISKORA:  Objection to the
22   form.
23              You can answer it.
24         A    In valuing SEI, you would
25   follow three particular ways of valuing it.

Page 69

1          Stephen Shulman
2    You can valuate it on an asset-based
3    methodology.  You can valuate with an
4    income approach, or you can valuate in a
5    comparable market approach or a market
6    approach.
7          Q    And --
8          A    And --
9          Q    Sorry.
10         A    You're asking about whether or
11   not you would value these assets in the
12   valuation, which would fall under the asset
13   approach.
14         Q    Um-hum.
15         A    And that would only be done if
16   the company is primarily considered a
17   holding company, was in liquidation.  It's
18   not generally one of an operating -- you
19   don't use it in an operating company that's
20   a going concern.
21         Q    Is your answer no, then?
22         MR. PISKORA:  Objection to the
23   form.
24              You can --
25         A    The answer is, it's too

18 (Pages 66 to 69)

Page 70

1          Stephen Shulman
2    complicated.  It's a too involved question
3    to answer in a yes or no.  You're now going
4    into valuation theory.
5        Q    You're experienced with
6    valuations, right?
7        A    Yes.
8        Q    I'm not asking you to explain
9    to me various valuation theories.  I am
10   asking you now whether, under any valuation
11   theory, you would deem it appropriate to
12   place a value on SEI's alleged right to
13   license individual programming.
14          MR. PISKORA:  Objection to the
15       form.
16          You can answer the question.
17       A    If I was using an asset-based
18   approach.
19       Q    You would ascribe some value --
20       A    In an asset-based approach.
21       Q    Hang on.
22          -- to SEI's alleged ability to
23   license individual programming?
24          MR. PISKORA:  Objection to the
25       form.

Page 71

1          Stephen Shulman
2          You can answer.
3        A    In an asset-based approach.
4        Q    And that is regardless of the
5    fact that SEI never licensed individual
6    content to a competing channel?
7          MR. PISKORA:  Objection to the
8       form.
9          You can answer it.
10       A    Now, you're getting really
11   specific.  I was -- let me now clarify.
12          If you're asking me, would you
13   value a license agreement --
14       Q    Not a license agreement.  My
15   question was the -- the ability to license
16   an asset belonging to a company, would you
17   place some value on that in this case?
18          MR. PISKORA:  Objection to the
19       form.
20          You can answer the question.
21       A    Your statement is
22   non-answerable, basically, based on the way
23   you phrased it.
24          A right is given pursuant to an
25   agreement.  It's the agreement that you

Page 72

1          Stephen Shulman
2    would value.
3        Q    Okay.  But as part of
4    evaluating the agreement, you would
5    consider the individual rights granted
6    under that agreement, correct?
7          MR. PISKORA:  Objection to the
8       form.
9          You can answer.
10       A    If there was an agreement to
11   sublicense and they had the right to do it
12   and you were using an asset-based approach,
13   then you would value the value of that
14   agreement.
15       Q    Okay.  And I'm asking you here
16   specifically:
17          Assuming that there is a right,
18   assuming that there is -- that SEI has the
19   right under an agreement to license
20   individual content to other licensees,
21   would you place a value on that right
22   regardless of the fact that SEI had never
23   done so in the past?
24          MR. PISKORA:  Objection to the
25       form.

Page 73

1          Stephen Shulman
2          You can answer.
3        Q    Hang on.
4          And that it wouldn't do so, as
5    you've said?
6        A    That's not an agreement.
7          MR. PISKORA:  Objection to the
8       form.
9        A    It assumes you have an
10   agreement to sublicense, meaning you've got
11   a sublicense agreement.  If I have a
12   sublicense agreement with somebody to
13   sublicense to them, and I am sublicensing
14   it, you would value it.
15       Q    Your opinion, you told me
16   before, assumes that SEI in its agreement
17   with TVP has the right to license
18   individual content to Polvision.  That
19   means SEI has this right under an agreement
20   with TVP.
21          And my question is very simple.
22   It's not a trick question.  All I'm asking
23   is whether you were valuating or evaluating
24   SEI as a company and including its various
25   license agreements as part of that

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

A-402

Page 74

1          Stephen Shulman
2    valuation, including the rights under those
3    agreements.
4          Would you include this right --
5    I say alleged right, but we're assuming
6    it's a right -- to license content to -- to
7    licensees, individual content?
8          MR. PISKORA:  Objection to the
9      form.
10         You can answer it.
11     A    I wouldn't value that specific
12   right under an asset-based approach.  You
13   would value the agreement that they have
14   with TVP.
15     Q    And as part of valuating the
16   agreement, would you consider that right,
17   or would you ascribe a certain value to
18   that particular right as a subpart of the
19   valuation of that agreement?
20         MR. PISKORA:  Objection to the
21     form.
22         You can answer it.
23     A    As somebody doing an appraisal,
24   I wouldn't necessarily give income that
25   isn't projected by the company on how

Page 75

1          Stephen Shulman
2    they're going to exploit those rights or
3    that agreement.
4      Q    Is it -- would you not only --
5    is it only because such income is not
6    projected that you wouldn't give those
7    rights?
8          MR. PISKORA:  Objection to the
9      form.
10         You can answer the question.
11     A    When somebody comes in and does
12   a valuation, they work with available
13   projections and information.  And that's --
14   usually, when you look at projections,
15   that's the income approach.  You'd use an
16   income approach to -- or a market approach
17   on the value of that license agreement.
18     Q    So --
19     A    To the --
20     Q    Sorry.  Go ahead.
21     A    To the extent that it includes
22   the ability and the company's projection of
23   their revenue that may include or may not
24   include that, you would include it in your
25   valuation of that agreement.

Page 76

1          Stephen Shulman
2      Q    If you were doing a projection
3    for SEI, financial projections, you were
4    doing that, would you include this right to
5    license as a source of potential revenue?
6          MR. PISKORA:  Objection to the
7      form.
8          You can answer it.
9      A    Not if the company was not
10   going to do it.
11     Q    How about if we take a few
12   minutes.
13     A    Yeah.
14     Q    If you're in the middle --
15     A    Let me add something to that.
16     Q    Sure.
17     A    Because you're -- when you go
18   in and you value an agreement, you've got
19   to give it a lot of thought.  It's not
20   something you do at a desk, that we're
21   doing now.  You'd have to look at for what
22   purpose are we valuing that agreement and
23   how you would calculate that value.
24     Q    Okay.
25         MR. WENGER:  All right.  Let's

Page 77

1          Stephen Shulman
2    take two minutes.
3          MR. PISKORA:  Absolutely.  Take
4    five minutes if you want.
5          (A break is taken.)
6          MR. WENGER:  Back on the
7      record.
8      Q    Your Polvision theory assumes,
9    for each of the scenarios, that -- a
10   damages calculation based on 860 episodes;
11   is that fair?
12     A    That's my recollection.
13         What page are you on?
14     Q    It's -- paragraph 54 is one
15   that I'll look at now, but it's in various
16   places in your report.  It's in
17   paragraph 52 as well.
18         And we'll -- I'm going to mark
19   a few exhibits so that we see actually the
20   agreements that are referenced here and
21   which episodes you are including from those
22   agreements.  Okay?
23         MR. WENGER:  Let's mark this
24   license agreement between TVP and
25   Polvision dated June 27, 2008, Bates

20  (Pages 74 to 77)

Page 78

1          Stephen Shulman
2    stamp POL 00054 as Exhibit 2.
3          (Exhibit No. 2, License
4    Agreement Between TVP and Polvision
5    Dated June 27, 2008, Bates No.
6    POL 00054, is marked by the reporter
7    for identification.)
8      Q    Mr. Shulman, do you recognize
9    this document?
10     A    Yes.
11     Q    Is this the June 27, 2008
12   agreement to which you refer in
13   paragraph 54?
14     A    Yes.
15     Q    And you say in paragraph 54,
16   under the June 27th, 2008 agreement, "200,"
17   meaning 200 episodes, correct?
18     A    Correct.
19     Q    Is that the same 200 episodes
20   that we see in bold number -- under bold
21   number 2 in this agreement, meaning episode
22   one to a hundred -- episodes one to a
23   hundred times two here, corresponding to
24   the programs above that?
25     A    Yes.

Page 79

1          Stephen Shulman
2      Q    And then you have in
3    paragraph 54 a prorated for damage period
4    50 percent, which reduces the number of
5    episodes that you count, if you will, to a
6    hundred; is that right?
7      A    Yes.
8          MR. WENGER:  Let mark as
9    Exhibit 3, an August 31 -- sorry.
10         (There was a discussion off the
11   record.)
12         MR. WENGER:  An August 31, 2009
13   licensing agreement between TVP and
14   Polvision with the translation, Bates
15   stamped POL 00058.
16         And the translation is ours.
17   It's not a certified translation, but
18   for present purposes I think it will
19   be perfectly fine.
20         (Exhibit No. 3, August 31, 2009
21   Licensing Agreement Between TVP and
22   Polvision With Translation, Bates No.
23   POL 00058, is marked by the reporter
24   for identification.)
25     A    All right.  I've got the Polish

Page 80

1          Stephen Shulman
2    version one underneath it.
3      Q    Behind the blue sheet is the
4    English version.
5      A    Got it.
6      Q    Mr. Shulman, are you familiar
7    with this document?
8      A    Yes.
9      Q    Is this the licensing agreement
10   dated August 31, 2009, that you referred to
11   in paragraph 54, August 31, 2009 agreement?
12     A    Yes.
13         MR. WENGER:  Let's mark --
14     A    Given this is the same basic
15   translation that I had.
16     Q    Okay.
17     A    Right.
18         MR. WENGER:  Let's mark as
19   Exhibit 4 the July 16, 2010 annex to
20   the August 31, 2009 licensing
21   agreement.
22         (Exhibit No. 4, July 16, 2010
23   annex to the August 31, 2009 licensing
24   agreement between TVP and Polvision,
25   is marked by the reporter for

Page 81

1          Stephen Shulman
2    identification.)
3      Q    This is a licensing agreement
4    between -- or an annex to the licensing
5    agreement between Polvision and TVP.
6          Mr. Shulman, are you familiar
7    with this document?
8      A    Yes.
9      Q    Let's take a look at the first
10   page of the translation.
11     A    Of which agreement?
12     Q    Of the one we just marked,
13   Exhibit Number 4.
14     A    First page.
15         MR. PISKORA:  It should say
16   "annex" at the top of the translation.
17   I'm not sure you're looking at --
18   maybe we have different --
19     A    We have different versions.
20     Q    Just turn back one page.
21     A    Oh, I'm sorry.
22     Q    And look at paragraph number
23   one here.  It says:
24         "From the date of the
25   conclusion of the agreement until

                    21  (Pages 78 to 81)

Page 82

```
1              Stephen Shulman
2    August 1, 2010, Polvision Home Studios
3    broadcasted once or will broadcast the
4    following series."
5              And then it lists Plebania up
6    to 191, Zlotopolscy up to episode 93, Klan
7    up to episode 91, and Na Dobre up to
8    episode 142.
9              Do you see that?
10   A   Yes.
11   Q    Is this sentence the source of
12   your 215 episodes listed in paragraph 54 of
13   your report next to -- under the
14   August 31, 2009 agreement as renegotiated?
15   A    I believe it plays into that
16   reconciliation.
17   Q    Explain that to me.
18   A    It plays into the
19   reconciliation that they were still going
20   to be able to have 215 episodes.
21             If you go to paragraph 61 of my
22   report, it lists the 215 episodes that it
23   still -- although, let me just read that
24   paragraph.
25             Yes, I believe these are the
```

Page 83

```
1              Stephen Shulman
2    215 -- yes, the 215 is what was ultimately
3    paid for in the August 31, 2009 agreement
4    as amended.  They received 26-odd thousand
5    dollars for the 215 episodes that were
6    aired.  And I believe it refers to that
7    paragraph number one.
8    Q    So -- and this is not a trick.
9              So Na Dobre and Plebania 1 to
10   100 are licensed as part of the June 2008
11   agreement we just looked at marked as
12   Exhibit 2, and then you have an
13   additional -- basically, you have episodes
14   101 through 191 pursuant to the annex of
15   Plebania, right?  And then there is 90 --
16   I'm sorry, 101 to 142 of Na Dobre.
17             And then which episodes are you
18   including of Zlotopolscy and Klan?
19   A    You mean the 40 and the 42?
20   Q    Yeah.  Is that because the
21   episodes one to -- 1 to 50 of each of those
22   were previously licensed, so you're --
23   A    Well, it's the -- you have got
24   to go back, I believe, to the original
25   agreement, right?
```

Page 84

```
1              Stephen Shulman
2    Q    Yep.
3    A    Because they were only given
4    101 to 200 -- oh.  Well, for the Klan they
5    were given 52 to 150, right?  Which was --
6    Q    You're counting episodes 52 to
7    91 of Klan?
8    A    Pardon me.
9    Q    Are you counting episodes 52 to
10   91 of Klan?
11   A    It's episodes up to 91, which
12   is 40.
13   Q    Right.
14   A    So, consequently, I think it
15   goes --
16   Q    And the same, then, with
17   Zlotopolscy, you're counting episodes 52 to
18   93, right?
19   A    Yes.
20   Q    Okay.
21   A    I believe so.
22   Q    How did you determine which
23   episodes to include as part of this
24   reaching the 860?
25   A    We included the 215,000 -- 215
```

Page 85

```
1              Stephen Shulman
2    episodes that they -- that they were paying
3    the 26-odd thousand dollars of moneys paid
4    to TVP for those particular episodes.
5    Right?  That's what -- how we reconciled
6    the annex to the regular agreement.  They
7    paid 26-odd grand for the use of the
8    episodes they used to that date.
9              MR. PISKORA:  You have to
10   listen to his question because I think
11   he made -- he had moved on.  He asked
12   you a much more general question.
13             THE WITNESS:  Oh, I'm sorry.
14             MR. PISKORA:  Maybe he will ask
15   it again.
16   A    What's the question?
17   Q    Mr. Piskora -- I always
18   appreciate when he helps out my
19   questioning, but, yeah, my question was a
20   little different.
21             It was:
22             How did you decide which
23   episodes you would include and which ones
24   you wouldn't include in your calculation of
25   860 episodes?
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 86

Stephen Shulman

2  A   Of the 860, how did we include
3  all of the ones, right?
4  Q   How did you decide which ones
5  to include and which ones to exclude?
6  A   Okay.  We included 50 percent
7  of the June 27th episodes.
8      Now, let me actually go back
9  and ask you a question.
10      Which scenario are you
11  referring to?
12  Q   Are there a different number of
13  episodes for different scenarios?
14  A   Well, if you noticed, in
15  scenario number one we didn't refer to
16  episodes.  We referred to actual moneys
17  received.  I'm not -- scenario three -- in
18  scenario three, sorry.
19      In scenario three, we
20  calculated based on the moneys that were
21  received, except for the June period.  We
22  took 50 percent of it.  That's on page --
23  paragraph 62.
24  Q   Okay.  I got it.
25  A   So which -- what -- which

Page 87

Stephen Shulman

2  scenario are you asking?  And maybe you can
3  be clear.
4  Q   For one and two, you have 860
5  episodes that are the basis for your
6  damages calculation.
7  A   Right.
8  Q   How did you --
9  A   Arrive at it?
10  Q   -- decide which ones to include
11  and which ones to exclude?
12  A   Well, we took the agreements
13  that they had.  We know that TVP received
14  certain amounts of money for each one of
15  those agreements.
16      You have the June agreement;
17  they received 40 grand; it was a two-year
18  deal.  We took 50 percent because it was
19  about 50 percent.
20  MR. PISKORA:  His question was
21  about episodes and how you came to 860
22  episodes.
23  THE WITNESS:  Yeah, and I'm
24  trying to get there because what I'm
25  doing is, I'm taking -- this is what

Page 88

Stephen Shulman

2  they got, and we translated it into
3  the episodes for which they were
4  paying for in scenario number 2.
5  MR. WENGER:  Let's mark one
6  more exhibit here for now.  The --
7  it's referred to in paragraph -- a
8  little bit earlier.  It's referred to
9  in paragraph -- paragraphs 20 and 23
10  of your report.
11      This is the March 17, 2008
12  TVP/Polvision barter agreement, along
13  with amendment number one to that
14  barter agreement, dated
15  December 2, 2008.
16      And I'll mark them together as
17  one exhibit, just for convenience.
18  It's an agreement with an amendment to
19  that agreement.
20      (Exhibit No. 5, March 17, 2008
21  TVP/Polvision Barter Agreement, Along
22  With Amendment Number One to Barter
23  Agreement, Dated December 2, 2008, is
24  marked by the reporter for
25  identification.)

Page 89

Stephen Shulman

2  Q   You have not included episodes
3  in these -- in this agreement, as amended,
4  as part of your damages calculation; is
5  that right?
6  A   What's this agreement, the
7  barter agreement?
8  Q   Yes.
9  A   They're not included in the
10  agreement.
11  Q   Why not?
12  A   Because they were prior to the
13  settlement date, which is the beginning of
14  the damage period.
15  Q   Do you mean --
16  A   It wasn't part of the damage
17  period.
18  Q   What was prior to the
19  settlement date?
20  A   The barter agreement was prior
21  to the settlement date, which is the
22  beginning of the damage period.
23  Q   You mean the date of the barter
24  agreement?
25  A   Yes.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 90

```
1          Stephen Shulman
2      Q    So why did you include the
3  June 27, 2008 agreement?
4      A    We included 50 percent of that,
5  which was during the damage period.
6      Q    So you didn't really just base
7  your decision to exclude on the date of the
8  agreement, right?  It's actually, rather,
9  according to what you've said, based on
10 when the episodes were broadcast?  Or am
11 I --
12         MR. PISKORA:  Objection to the
13 form.
14     Q    Am I wrong?
15     A    No.  It was for the -- it
16 was -- we only included those episodes
17 or -- or for that period of the barter
18 agreement -- that period of the agreement
19 that pertained to the damage period, which
20 would be after the settlement date.  And
21 the June 27th agreement covered a two-year
22 period.  One of those years fell within the
23 damage period.
24     Q    How long did the -- how long
25 did the March 17, 2008 agreement as amended
```

Page 91

```
1          Stephen Shulman
2  by the December '08 amendment extend for,
3  in your view?
4      A    You mean the barter agreement?
5      Q    Right.
6      A    In paragraph 22, we indicated
7  that the barter agreement provided for a
8  one-year term from its execution.
9      Q    Is that from the date of the
10 execution of the barter agreement or the
11 amendment?
12     A    One second.
13         I think that was referring to
14 the regular -- the original barter
15 agreement.  The barter agreement provided
16 for the one term.
17     Q    Okay.  So you didn't consider
18 whether the -- whether the annex, the
19 December 2008 annex, extended the period of
20 the barter agreement?
21     A    We didn't include the barter
22 agreement in our damages.
23     Q    Basically, on the assumption,
24 you say, that the term of that agreement
25 concluded before the settlement
```

Page 92

```
1          Stephen Shulman
2  agreement -- before the licensing
3  agreement?
4      A    Well --
5      Q    Settlement agreement?
6      A    The settlement agreement, I
7  believe, was in August of 2009.  We didn't
8  include the barter agreement because it
9  was -- we -- we didn't think it went into
10 the damage period.
11     Q    And on what basis did you
12 prorate the June 27th -- the episodes from
13 the June 27, 2008 agreement?
14     A    We did it based on the term of
15 the agreement.
16     Q    So you took half of the
17 episodes because you figured approximately
18 half of the agreement was -- half of the
19 term of the agreement had elapsed?
20     A    Yes.
21     Q    But you don't, in fact, know
22 whether more than half of the episodes were
23 broadcast before the halfway point of the
24 term of the agreement?
25     A    At the time, we didn't consider
```

Page 93

```
1          Stephen Shulman
2  that.  I read it in Mr. Hart's report.  I
3  guess it was his rebuttal report.  I read
4  that he had indicated that the episodes had
5  not been -- whether some or all of them had
6  been used up to that point.
7      Q    Does that change your view as
8  to whether you should still prorate the
9  June agreement by 60 percent?
10     A    No.
11     Q    Why not?
12     A    Because it's a two-year
13 agreement and it calls for 100 episodes.
14 It doesn't call for when they could use
15 them, how they could use them.  The
16 revenues would be earned over the term of
17 the agreement.
18         If they wanted to front-load
19 them, you know, that was fine.  If they
20 wanted to end-load them, that would have
21 been, you know, fine with Polvision, as
22 long as it fell within their constraints on
23 how they could air those agreements.  This
24 is an agreement that ran for a two-year
25 period.  It wasn't conditioned upon when
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 94

1         Stephen Shulman
2  those episodes were run.
3         Q    Your theory of the Polvision
4  damages claim -- and tell me if I'm not
5  saying this correctly -- but is it that TVP
6  should be liable for the value that SEI
7  could have achieved as a result of
8  licensing these episodes to Polvision?
9         A    No, it's not based on what they
10 could have received if they licensed it to
11 Polvision.  It's based on what TVP
12 received.
13        Q    What TVP actually received?
14        A    We gave three scenarios.  So
15 they received, in scenario three, cash.
16 That was the value of what they received.
17 They received actual money.
18        Scenarios two and three were
19 based on values of those properties, of
20 what they gave, versus what the cash was
21 they received.
22        There were three different ways
23 of looking at it.  One, cash they received
24 or the value of what it is they gave up.
25        Q    What TVP gave up, you mean?

Page 95

1         Stephen Shulman
2         A    Yes.
3         Q    So your view does not -- your
4  opinion does not take into account what SEI
5  could have achieved had it licensed these
6  episodes to Polvision; it's just based on
7  what TVP either actually received or could
8  have received?
9         A    The damage scenario one is
10 actually based on what they might have
11 received -- or is the fair value of the
12 agreement given the fact that it takes into
13 account a premium because SEI would not
14 sell into their competing market or to a
15 competitor and would require a premium.  So
16 that would be the fair value when you take
17 into consideration the seller.
18        Q    So then aren't you now saying
19 that it's the value that SEI would have
20 realized, including the premium that they
21 would have charged?
22        MR. PISKORA:  Objection to the
23     form.
24        You can answer it.
25        A    It takes into account a factor

Page 96

1         Stephen Shulman
2  that SEI would require a premium for the
3  content that they would license in, if they
4  were licensing that product.
5         Q    That wasn't so clear from your
6  prior answer.
7         A    Okay.
8         Q    So I'm glad you clarified that.
9         For SEI to license the product,
10 as you say, it has to have a willing
11 purchaser; is that fair?
12        A    One of the conditions, it would
13 have to have a willing purchaser.
14        Q    If Polvision had already
15 broadcast more than half of these episodes
16 from the June 27, 2008 agreement before
17 August 2009, the beginning of your damages
18 period, why would Polvision license these
19 additional episodes from SEI?
20        MR. PISKORA:  Objection to the
21     form.
22        You can answer it.
23        A    We're taking a value for the
24 period without regard in the June period as
25 to when those episodes were actually aired.

Page 97

1         Stephen Shulman
2  We are assuming -- we made the presumption
3  for the value purposes, because it was a
4  two-year period, that half of those
5  episodes would still remain available.
6  We're taking the fair value of a 50 percent
7  of that agreement, as it relates to half of
8  that agreement.
9         Q    But if Polvision had to be
10 broadcast -- let's use an example --
11 90 percent of the episodes already, doesn't
12 your model ignore reality in that SEI would
13 have not been able to sell another 100 of
14 these episodes to Polvision at that point?
15        Your theory is a but-for
16 scenario, right, but for -- I'll take that
17 back.
18        Your theory is that TVP could
19 have licensed -- or, sorry, that SEI could
20 have realized a certain value from
21 licensing half of these episodes to
22 Polvision, and that's the measure of
23 damages.
24        But how is that a measure of --
25 how is that a proper measure of damages if

25  (Pages 94 to 97)

Page 98

```
1              Stephen Shulman
2  Polvision would have never bought those
3  episodes from SEI?
4              MR. PISKORA:  Object to the
5       form.  I think what's confusing about
6       your question is, first --
7              MR. WENGER:  John, if he
8       doesn't understand the question, he
9       can ask me for an explanation.
10      Q    So if you can answer the
11  question, Mr. Shulman, I think you need to.
12      A    What we're looking at is the
13  value of what it is that TVP did and the
14  value of -- it's not the value of what was
15  remaining as a -- as a value for that
16  particular -- for the damage period.
17             In looking -- in looking at the
18  damage, we're looking at what it is they
19  received during that period, what TVP
20  received.  Consequently, we're looking at
21  the revenues that they received translated
22  into episodes so that we could then
23  calculate what those -- what the value of
24  that 50 percent of that agreement was based
25  on a value per episode.
```

Page 99

```
1              Stephen Shulman
2       So we're looking at the fact
3  that, if 50 percent of the agreement was
4  earned during that period, it represents
5  100 percent of the episodes, and -- 100
6  episodes.  And then we're applying a value
7  to it.
8       Q    Well, let's take a look at
9  paragraph 14 of your report.  And I don't
10  mean to belabor this -- but under the
11  first -- damage scenario one, in the box,
12  this is, as you put it:
13             "The value of the licenses from
14  TVP to Polvision utilizing industry
15  standard market values plus the royalty SEI
16  would have had to pay TVP had SEI entered
17  into such licenses."
18             Right?
19             Again, you have the same
20  language concluding each one of these
21  theories, "had SEI entered into such
22  licenses, right?
23             Doesn't this use, as a basis
24  for calculating the value for each of these
25  scenarios, the value of the licenses had
```

Page 100

```
1              Stephen Shulman
2  SEI entered into such licenses, meaning SEI
3  would have had to enter such licenses, and
4  that assumes -- you agreed with me -- that
5  SEI would have a purchaser to license the
6  products to?
7       But -- and I'll ask the same
8  question again.
9             Why would Polvision had
10  bought -- why would it have bought these
11  episodes from SEI --
12             MR. PISKORA:  Objection to the
13       form.
14      Q    -- if it had already
15  broadcast --
16             MR. WENGER:  You're not letting
17       me finish, though.
18      Q    -- if Polvision had already
19  broadcast more than half of these episodes?
20             MR. PISKORA:  Objection to the
21       form.  I think that's what confusing
22       here -- and I really don't mean to do
23       anything but try and help you -- is
24       that the last time you asked the
25       question, you guys were talking at
```

Page 101

```
1              Stephen Shulman
2  cross purposes.
3             And it would help, I think,
4  this witness if you said the same
5  question and related it to one of his
6  calculations so that he doesn't start
7  talking about claim three when you're
8  talking about claim one.
9             MR. WENGER:  Sorry, John.  I'm
10       not going to do it like that because
11       these -- at least two of the scenarios
12       assume 860 episodes as the value
13       calculation.
14      Q    And I'm asking you --
15             MR. PISKORA:  Ask about one of
16       them.
17      Q    It applies to both.
18             How can you assume 860 episodes
19  of out of these 860 episodes you are
20  counting 100 episodes that you have no
21  reason to believe Polvision would have
22  bought from SEI?
23             MR. PISKORA:  Objection to the
24       form.  He already answered that
25       question.
```

26  (Pages 98 to 101)

Page 102

Stephen Shulman

```
1              Stephen Shulman
2       Q    Let him answer again, then.
3       A    What we're looking to do is
4   create a value for the licenses for the
5   periods that fall into the damage.  And
6   like I said before, we're taking 50 percent
7   because 50 percent of the license fell
8   within the damage period.
9              And, as a result, we're
10  attaching -- because we're looking at it
11  from a value per episode, we have to take
12  half of the episodes, whether they were
13  aired or not.
14      Q    So is it your view that each --
15  if all of the episodes of the June 27, 2008
16  agreement were aired as of the end of
17  May 2009, it would still be proper to
18  include half of the episodes from the
19  June '08 agreement in your damages
20  scenarios?
21      A    Yes.
22           MR. PISKORA:  Objection to the
23      form.
24           Go ahead.
25      A    Yes.
```

Page 103

```
1              Stephen Shulman
2       Q    For at least two of these
3   damages scenarios, you included 545
4   episodes from the July annex; is that
5   right?
6              I refer you specifically to
7   paragraph 60, if you would.
8       A    Yes.
9       Q    Actually, I have a more general
10  question before we get into that.
11             In paragraph 52, which is 52 of
12  your report, which is the last paragraph of
13  damages scenario one, all right, it says:
14             "Had the 860 episodes
15  ultimately provided to Polvision been
16  licensed to a competitor at the fair
17  value" -- and you calculate the license
18  fees to be $656,000 accordingly.  And then
19  you subtract the 8 percent royalty to
20  arrive at your $603,000 damages figure,
21  approximately.
22             So scenario one here refers to
23  the 860 episodes here in paragraph 52.
24             You expand in paragraph 54 on
25  kind of how you got to that 860 episodes.
```

Page 104

```
1              Stephen Shulman
2   And then in paragraph 60, I mean, you seem
3   to -- well, 58 through 60, you seem to even
4   expand a little more -- through 61, a
5   little more on that.
6              How did this order come about?
7   I mean, why would you not kind of say how
8   you got the 860 episodes earlier on in the
9   report?
10      A    Right of authorship.
11      Q    Fine.  So you didn't move --
12  switch around these damages scenarios after
13  you initially drafted this; did you?
14      A    I think we did.
15      Q    So might that explain why
16  there's --
17      A    That could explain it, yes.
18      Q    Do you know why you would have
19  switched around the order of the damages
20  scenarios?
21      A    I think it was to go from high
22  to low.
23      Q    Do you remember which one of
24  these are -- which two of these -- or I
25  should say, the order that you came up with
```

Page 105

```
1              Stephen Shulman
2   these damages scenarios in -- well, that
3   wasn't a great question.  Let me ask that a
4   different way.
5              Was there any particular order
6   that you arrived at these particular
7   damages scenarios, meaning, did you say:
8              "Okay, here is one way to do
9   it; there is a second way to do it; there
10  is a third way to do it"?
11             MR. PISKORA:  Objection to the
12      form.
13      Q    Or is this the order they came
14  to you in?
15      A    No.  What do you mean, they
16  came to me?
17      Q    That you thought about them in?
18      A    We thought about all our
19  damages theories, right.  We put them down
20  on paper.  We don't give any order to them.
21  And then we write our report.
22      Q    So why did you initially, then,
23  have the last damages scenario as your
24  first scenario, if that's right?
25             MR. PISKORA:  Objection to the
```

27 (Pages 102 to 105)

Page 106

Stephen Shulman

1   form.
2   A    The reason -- I'm not -- I
3   can't relate exactly why we might have
4   changed it.  We went from low to high, from
5   high to low.
6   Q    You're still of the view,
7   though, that damages scenario one is the
8   most proper damages scenario that should be
9   applied?
10  A    What I said is damage scenario
11  number one would be a good way of basing
12  the damages.  The idea of this report is
13  giving a range of damages.
14  Q    Do you think any one of these
15  scenarios are more correct than another
16  one?
17  A    We're leaving that to the
18  court.  We gave the court a range.  And
19  that's what we intended to do all along, is
20  to give them a range, and as the case
21  unfolds, the judge will have an ability to
22  use this as a guide if liability is found.
23  Q    If the judge says,
24  "Mr. Shulman, I think that SEI is right on

Page 107

Stephen Shulman

1   the Polvision claim, and I need to decide
2   damages; which damages scenario do you view
3   to be most correct," what's your response
4   to that?
5   A    I would have to hear the whole
6   case in order to make that determination,
7   just like a judge would.
8   Q    How about right now?
9   A    I'm not in a position because I
10  didn't do a legal analysis of this.  I made
11  a clear -- I didn't do a legal analysis
12  that would allow me to come to a conclusion
13  like that.
14  Q    But that's built into my
15  question.
16  My question is:
17  It has already been decided
18  that TVP breached its relationship with
19  Polvision -- its agreement with SEI by
20  licensing to Polvision, and now we're
21  determining damages.  Which damages
22  scenario is most proper to be used?
23  MR. PISKORA:  Objection to the
24  form.

Page 108

Stephen Shulman

1   You can answer.
2   A    I really can't do that because
3   that's not what I analyzed this whole thing
4   about.
5   Q    So you have no view, sitting
6   here today, whether your first damages
7   theory is better or worse than damages
8   scenario one?
9   A    Like I said --
10  Q    Or is it three?
11  A    The purpose was to give a range
12  so that the court can provide, based on the
13  way the case unfolds, the number that the
14  court feels is the appropriate.
15  Q    Right.  Is that different than
16  what you're saying in paragraph 34?
17  A    Yes -- is that different?  No,
18  it's not different.
19  Q    You say in paragraph 34:
20  "It is our opinion," meaning
21  Mr. Shulman's opinion, "that damage
22  scenario number one represents the best
23  basis upon which to calculate damages
24  because it's based on industry standard

Page 109

Stephen Shulman

1   market value," et cetera.
2   Are you saying here that
3   damages scenario one is the best theory, or
4   something else?
5   A    What I say --
6   Q    Best scenario?
7   A    What I said here, it provides
8   the best basis so that, if the judge wanted
9   to adjust any of the input factors for one
10  reason or another, he could do that.  And
11  so see scenario one gives them a basis for
12  making any changes that they would like.
13  As you -- if you read on, and
14  it's clear in here -- is that we try to
15  give the judge the upper limit of, you
16  know, what the potential value is by
17  setting the inputs at a very high value.
18  As a result, that's the -- you know, in a
19  way, the maximum range that we would feel
20  comfortable saying the judge could
21  consider.
22  Q    So -- but you feel comfortable
23  recommending this first damages scenario?
24  A    As to -- I recommended for the

28  (Pages 106 to 109)

Page 110

1          Stephen Shulman
2    judge to use it as a basis for coming up
3    with a number.
4       Q    Okay.  Well, let's get back to
5    the episodes.
6          So we were talking about the
7    545 episodes from the July annex that form
8    a portion of the 860 episodes using your
9    Polvision damages scenarios.
10         Are you aware of whether some
11   or any of these episodes were ever
12   broadcast on TVPolonia?
13      A    I think this gets to the legal
14   question that a judge and the court is
15   going to have to come to as what content is
16   covered by the agreement.
17      Q    And, again, it's your view
18   that, if for some reason SEI cannot make a
19   claim relating to this content, then these
20   episodes shouldn't be included?
21      A    If they don't have the right,
22   you can't do that.
23      Q    But you're not, again, offering
24   any opinion as to whether SEI has the right
25   or can claim damages relating to any of

Page 111

1          Stephen Shulman
2    these episodes?
3       A    We are not making a legal
4    conclusion about the right.  We are
5    presuming they have the right.  I think we
6    stated that in the report.
7       Q    Do you feel it's your
8    obligation to -- as an expert witness, to
9    make sure you're comfortable with
10   assumptions that are given to you on
11   liability?
12         MR. PISKORA:  Objection to the
13   form.
14         You can answer the question.
15      A    When I take on a case, I always
16   look at the integrity of the case and
17   whether or not we're being used
18   inappropriately, I think is what you're
19   getting at, in calculating damages.
20         So the answer is, yeah, we do.
21   What we do is, we overall consider whether
22   or not there is a -- whether or not we want
23   to be associated with the case.  Let me
24   just put it that way.
25      Q    That's a little different than

Page 112

1          Stephen Shulman
2    what my question was, so I appreciate your
3    answer.
4          My question was:
5          You're on a case, and you're
6    given a particular assumption:
7    "Mr. Shulman, assume TVP is liable for
8    this, or assume this."
9          Do you vet that assumption,
10   kind of, through your mind in some way, or
11   do you, you know, just take the assumption
12   and then go with your damages claim?
13      A    It all depends what the
14   assumption is.
15      Q    For this assumption that 545
16   episodes should be included, did you look
17   at this at all?
18      A    Did I look --
19      Q    Did you evaluate whether you
20   should indeed be including these 545
21   episodes?
22      A    This is the basic premise of
23   the entire case, is that they had the right
24   and they had the right to the content that
25   was in these agreements.  That is the

Page 113

1          Stephen Shulman
2    subject of the entire litigation, in a way:
3          Did they or did they not have
4    the right to this content?  Did they have
5    the right to some?  Did they have the right
6    to all?
7          That's the premise of the
8    entire case.
9          It didn't seem unreasonable to
10   us, in order to come to a range of values
11   that needed to be presented, if, in fact,
12   they did have the right to the content.  I
13   mean, they had agreements, and the
14   agreements went through in quite -- you
15   know, in different details with different
16   descriptions of what it was they were
17   entitled to; so, consequently, it seemed
18   like -- it didn't seem outrageous to me to
19   do that.
20      Q    I'm going to represent to you
21   for purposes of this question that none of
22   these 545 episodes were ever broadcast on
23   TVPolonia.  Does that change your view as
24   to whether these should be included in your
25   damages scenarios?

29  (Pages 110 to 113)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 114

Stephen Shulman

1
2       MR. PISKORA:  Objection to the
3    form.
4       You can answer.
5    A    You know, that would end up
6    going -- getting into a discussion with the
7    attorneys, you know, about so why are we
8    including these if they've never been
9    shown, and whether or not it fell within
10   the description of what it is that, you
11   know, they're trying to do.
12   Q    I'm not sure if you answered my
13   question.
14      MR. WENGER:  Can you read back
15   the question, Mr. Reporter, please?
16      (Reporter read back pending
17   question.)
18      MR. PISKORA:  Objection to the
19   form.  But just so you have the record
20   right, I think his question is 545
21   episodes.
22      (Reporter read back pending
23   question.)
24      MR. PISKORA:  Objection to the
25   form.

Page 115

Stephen Shulman

1    You can answer.
2
3    A    As I understand the case, even
4    though they were not shown, there is some
5    question about what content is included,
6    whether or not it was shown, not shown,
7    could have been shown.  I think that's one
8    of the questions in this case that the
9    judge has to decide, so --
10   Q    Let's take a look at the
11   footnote 36 there.  Right?  It says -- and
12   footnote 36 is a footnote to paragraph 61,
13   which describes the annex generally, right?
14      And you say in footnote 36
15   that:
16      "The annex specifically
17   recognized in the `whereas' section that
18   the amendments as to the purportedly
19   licensed works was required, in part, due
20   to the fact that a third party, presumably
21   SEI, had claimed that Polvision's prior
22   distribution infringed the third party's
23   exclusive rights."
24      Right?
25      So you're citing a "whereas"

Page 116

Stephen Shulman

1
2    clause from the Polvision agreement that
3    recognizes that the -- there was some
4    amendments to the prior agreement because
5    there was an infringement of the -- SEI's
6    rights, or SEI had claimed an infringement
7    of its rights.  Is that what you're
8    generally saying there?  You're --
9    A    Well, that's the way, you know,
10   this is reading, is that it says, "... as
11   purportedly what is required, in part due
12   to the fact that the" -- well, it's "in
13   part."  I don't -- you know, I'd have to
14   go -- it's a quote, I believe.  And I would
15   have to, you know, look to see -- no, it's
16   not a quote.  I'm sorry.
17      I'd have to, you know, reread
18   it to get, you know, a deeper
19   interpretation.
20      The reason why we stuck it in
21   here, to tell you the truth, is because we
22   wanted to be able to state that everybody
23   knew at the time of the annex that there
24   was a litigation -- there was potential for
25   litigation.

Page 117

Stephen Shulman

1
2    Q    But do you understand this
3    "whereas" clause as saying that the parties
4    are attempting to address SEI's claims?
5    A    You know, I'd have to now
6    read -- go back and read it in its context.
7    So it's a little unfair to take it out of
8    context and say, you know, what I meant by
9    it.
10   Q    Okay.  Let's look at
11   paragraph 38 of your report.  And -- well,
12   the heading right above 38, there's a
13   footnote 28.  And footnote 28 says:
14      "As stated, we consulted with
15   Larry Gerbrandt, out industry expert, to
16   help in our analysis and opinions as to
17   this section of the report."
18      And then I also just want to
19   direct your attention, also, to paragraph
20   five of your report, and that's to a
21   similar effect.  You say:
22      "Due to the specific industry
23   knowledge required for the work involved in
24   determining the fair value of similar and
25   television episodes licensed from Poland

30  (Pages 114 to 117)

**A-413**

Page 118

1          Stephen Shulman
2    for broadcast in the Chicago metropolitan
3    area, we utilized the" experience --
4    "expertise of Larry Gerbrandt."
5          This damage scenario number one
6    here -- I'm back again to paragraph 38 --
7    are these your opinions?  Are these
8    Gerbrandt's opinions?  Are they a mixture
9    of both?  Just explain to me how that
10   works.
11        A    One of the things we wanted to
12   do, even before Larry was, you know, in a
13   way, brought, detailed into the picture,
14   was to give a range of values taking into
15   account the fair value of the agreements
16   had SEI had -- taking into consideration
17   that it would have -- SEI would have
18   required a premium if it was going to sell
19   it to a competitor.  We came up with a
20   concept of trying to determine the value
21   that that would be.
22        So, consequently, Larry helped
23   us with this section and helped us
24   basically make sure that we were coming up
25   with a value that took into account how the

Page 119

1          Stephen Shulman
2    industry would look at it.
3        Q    And you refer to this, if I'm
4    understanding you correctly, if paragraph
5    40, where you say -- and it's the second
6    sentence, right?
7        "If SEI were to license the
8    same programming to a hypothetical
9    competitor, SEI would have demanded a
10   premium to compensate SEI for their
11   exposure to the lost customers."
12        Is this what you were just
13   talking about where you -- you wanted
14   Gerbrandt to assist you with calculating
15   this premium, or is that something else?
16        A    No.  It's just a general
17   concept.  We didn't ask him to necessarily
18   come up with the premium.  Like I said, we
19   set the inputs at a high parameter, at the
20   highest range, and -- so that we could
21   get the highest range of value that could
22   be considered and --
23        Q    Are you done?
24        A    So Larry -- we worked with
25   Larry to make sure that we were using a

Page 120

1          Stephen Shulman
2    model that would allow us to do that, and
3    we set parameters at the highest level.
4        Q    So you acknowledge that, under
5    damage scenario one, that, potentially,
6    even under this scenario, this theory,
7    there could be lower inputs that may be
8    proper?
9        A    Yes.
10       Q    You don't put those forth,
11   right?
12       A    No.
13       Q    Why not?
14       A    Well, we actually do, in that
15   we gave you a scenario number two.  And
16   this was, what, 30 percent higher than that
17   scenario in the end.  We gave a range.
18       Q    But that's a different theory.
19       A    It's a different theory.
20       Q    You were saying that you
21   checked with Gerbrandt on the inputs into
22   this scenario, unless I was mistaken,
23   unless I misunderstood.
24       A    The model.
25       Q    Right.  So this is one model.

Page 121

1          Stephen Shulman
2    Damage scenario one is one model as a
3    subset of the Polvision damages theory.
4    And you're saying that for this model you
5    used high-end inputs, but you could have
6    used lower inputs; is that right?
7        A    We could have used lower if we
8    wanted to not get to the, you know, maximum
9    value.
10       Q    But why didn't you say, though,
11   that, for each of the inputs, there is a
12   range -- there's a high-end range in this
13   scenario, and then there's a low-end range?
14       MR. PISKORA:  Objection to the
15   form.
16       You can answer.
17       A    Because I thought we were clear
18   that we made it at the maximum, and we were
19   trying to do that in order to get the
20   maximum, you know, high-end-of-the-range
21   value.  I didn't think it -- it's kind of
22   redundant to say that, yes, you could apply
23   other inputs.  It's almost implied.
24       I didn't think -- it didn't
25   come across at the time I was reading it

31  (Pages 118 to 121)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 122

Stephen Shulman
1
2  that I needed to do that.  I thought it was
3  pretty much implied.
4      Q    So if the judge says,
5  "Mr. Shulman, I agree with your theory,
6  theory number one, that we should use the
7  industry standard market model, but I don't
8  agree with various inputs," you would
9  recalculate this damages scenario with
10 lower inputs?
11     A    Possibly.
12     Q    There are a few different
13 inputs in here.  I'll walk you through it.
14 Tell me if I get anything wrong.  I'm just
15 trying to move this along a little bit.
16 Okay?  And I'm starting with 38.
17         We're looking at -- paragraph
18 38, we're looking at damages scenario one.
19 This is the industry standard market model.
20 The first input that I see here is a -- or
21 the first input I want to talk about for
22 present purposes is a hundred percent
23 sellout.  Okay?
24         That's in paragraph 45.  Okay?
25 And you are calculating here a maximum

Page 123

Stephen Shulman
1
2  advertising revenue per hour of viewing.
3  Okay.  You assume a full 12 minutes per
4  hour, and then you say a hundred percent
5  sellout is my next input, is another input.
6  Okay?
7          Another input that you have
8  here is an appropriate spot rate for a
9  30-second spot, which is in paragraph 44.
10 Okay?
11         Then you also have an
12 appropriate volume discount, again towards
13 the end of 45, which you say is none.
14         And then you have, on the next
15 page, in paragraph 47 -- well, it's 46 and
16 47 -- you have a 40 percent ratio of
17 program spending to -- as a percentage of
18 gross billing.  Is that all right so far?
19     A    Yes.
20     Q    Are you offering an opinion on
21 these four inputs, these four specific
22 inputs that I've identified?  And I'll
23 review them.
24         They're the advertising sellout
25 rate, sellout level, the appropriate spot

Page 124

Stephen Shulman
1
2  rate, appropriate volume discount, and
3  program spending to gross advertising
4  billings.
5          Are you offering that opinion,
6  or is that based on Gerbrandt's knowledge?
7      A    I'm offering that input to set
8  the values at their -- at a high range.
9      Q    On what basis, though, are you
10 making that assumption, are you offering
11 those inputs?  Are these just assumptions,
12 or is this based on something else?
13     A    No.  It's what we thought the
14 highest value of the inputs were.  You
15 can't go more than 100 percent of time,
16 right?
17     Q    Right.
18     A    And there is a rate card that
19 existed, that we had, which was -- we
20 assumed was the highest rate.  Maybe it
21 could be higher, but that's what we used.
22 The 40 percent, we actually gave you a
23 rationale for and actually showed you some
24 backup for.  And volume discounts could
25 range anywhere from zero to 100, so --

Page 125

Stephen Shulman
1
2      Q    But it is your view that these
3  are proper inputs, right, to use in a
4  damages theory?
5      A    They're proper inputs in this
6  model.
7      Q    And your view is that this is a
8  proper model based on these inputs?
9      A    Yes.
10     Q    So you're really offering the
11 opinion that, for example, a
12 hundred percent sellout rate is an
13 appropriate input for a damages model in
14 this here?
15     A    That's not what I said.  That's
16 not what I said.
17     Q    So explain to me, then, what I
18 have wrong.
19     A    You need to take into account a
20 sellout level.  That is my opinion.  My
21 opinion is, you need to take out a sellout
22 opinion.  And in order to get to a highest
23 range of what the possible value could be,
24 would be to set that parameter at
25 100 percent.

32  (Pages 122 to 125)

Page 126

1           Stephen Shulman
2      Q    But you were saying that this
3  damages scenario number one represents a
4  proper damages model.  Doesn't that
5  necessarily mean that a hundred percent
6  sellout level, which is one of your inputs,
7  is a proper sellout level?
8      A    No.
9      Q    Okay.  My question is the same
10  with the spot rate.  Okay?
11          You're saying that the
12  appropriate spot rate here to be used in
13  your model is $159 per a 30-second spot
14  rate; is that right?
15      A    If I want to maximize the range
16  and get maximum value.
17      Q    You're offering a damages
18  theory here, and you're saying, "Judge, you
19  should, as one alternative, consider my
20  damages scenario one."
21          Your damages scenario one uses,
22  as a basis for it, a spot rate which you --
23  so are you opining that this is a proper
24  spot rate to go -- that should form the
25  basis of your damages scenario one?

Page 127

1           Stephen Shulman
2      A    That's the spot rate that is on
3  the Polvision rate card that was available
4  to us.
5      Q    And I have a similar line of
6  questions with respect to the volume
7  discount.
8          Are you offering an opinion as
9  an expert that it is proper to use a
10  damages theory that assumes no volume
11  discount?
12      A    If I want to try and achieve
13  the highest value of the range that I'm
14  trying to give the court to consider, then
15  you would use a zero.
16      Q    But this a proper damages
17  range, in your view, meaning that the judge
18  could consider anywhere from, let's say, a,
19  you know, 50 percent volume discount to no
20  volume discount, with your opinion being --
21      A    Well, we --
22      Q    Hang on, hang on.
23          -- with your opinion being that
24  no volume discount is a proper assumption?
25      A    Remember the underlying theory

Page 128

1           Stephen Shulman
2  of setting these inputs at their highest
3  rate, so to speak, is to try and take into
4  account a premium above and beyond maybe
5  another number that SEI would require and
6  demand if they were going to sell it into a
7  competitor.
8      Q    So who is opining on that
9  premium?  Is it on what that premium is
10  worth?
11      A    Well, we're not opining on the
12  premium, but we're saying this is the
13  maximum value that would include a premium.
14      Q    So is it your theory, then, or
15  your view, that it is proper to use the
16  maximum values for each of the four inputs
17  we're discussing because SEI would demand a
18  premium?
19      A    Yes.  And that's one way of
20  getting -- using this model to establish a
21  value that would be included -- that would
22  include a premium.  But you can't use
23  parameters greater than, you know, probably
24  ones we've used here.
25      Q    But this premium that SEI would

Page 129

1           Stephen Shulman
2  have demanded justifies, then, or -- the
3  use of the maximum levels of each of these?
4      A    We felt it was one way of
5  figuring out what that premium would be, is
6  to set the maximum -- the level -- the
7  inputs at their maximum to get the maximum
8  range.
9      Q    Again, this is a combination of
10  your view and Gerbrandt's view that there
11  should be a premium.  Is that --
12      A    Larry certainly thinks there is
13  a premium that would be attached to SEI if,
14  in fact, they would ever, you know, sell
15  into a competitor.
16      Q    Do you agree with that?
17      A    I agreed there should be a
18  premium taking into account -- because you
19  have to take into account the seller.  In
20  many of these situations, everybody wants
21  to take into account the buyer, the willing
22  buyer, what's he willing to pay, you know.
23          But in many respects, a lot of
24  people don't give enough attention to the
25  seller because it's a two-part theory:

33 (Pages 126 to 129)

A-416

Page 130

1          Stephen Shulman
2          "Oh, the buyer may to want pay
3     this."
4          But the seller may not want to
5     take it.
6          "Thank you very much.  We're
7     going home."
8          So you have to take into
9     account the seller, to some degree, if
10    you're going to try and come up with what
11    would be a fair value.
12    Q     But you need a willing buyer to
13    make a deal, right?  You need a seller
14    willing to sell at a certain level and a
15    willing buyer?
16    A     You need a willing buyer,
17    right.
18    Q     I'm not sure if you responded
19    to my previous question precisely.  I'll
20    ask it again, and then we can move on.
21         Is it your view, though, your
22    personal view, not Gerbrandt's view, your
23    personal view, that the premium here that
24    SEI would have demanded justifies using the
25    highest level inputs for all of these

Page 131

1          Stephen Shulman
2     inputs?
3          MR. PISKORA:  Objection to the
4     form.
5          You can answer.
6     A     It definitely justifies doing
7     that to give you the highest range, and
8     then the court needs to decide where the
9     numbers are going to fall.
10    Q     Did you feel qualified to offer
11    an opinion on things like appropriate
12    advertising sellout levels, volume
13    discounts, program spending to gross
14    advertising billings for television
15    programming?
16         MR. PISKORA:  Objection to the
17    form.
18         You can answer.
19    A     We never had to -- I wasn't
20    considering, you know, other levels than
21    the highest levels that you could set here.
22    So it's not something I gave consideration
23    to.
24    Q     So are you -- do you have
25    sufficient expertise, in your own view, to

Page 132

1          Stephen Shulman
2     offer an opinion as to what kind of volume
3     discounts advertisers receive for
4     advertising programming?
5     A     I would have to get -- either
6     do a significant amount of research, as any
7     expert would, in order to come up with what
8     those numbers might be, and rely on Larry
9     to help me do that because he does have
10    intimate knowledge of those things.
11    Q     So in this report, then, you're
12    not really saying that in this case it is
13    proper to use these highest numbers; you're
14    just saying then that -- because of the
15    premium where "I'm using the highest
16    numbers"?
17    A     Yes.  I was trying to get to a
18    maximum end of the range that could be
19    considered, and that's why we set these
20    parameters the way we did.
21    Q     All right.  Your description of
22    the -- looking at paragraph 32, and this is
23    your -- I guess, a summary of your various
24    damages scenarios, you talk about:
25         "For introductory purposes,

Page 133

1          Stephen Shulman
2     these fair value analyses can be summarized
3     as follows based on the fair value of the
4     licenses purportedly granted to Polvision
5     based on an economic market model," et
6     cetera.
7          So your opinion here, is this a
8     fair value or is this a maximum value, or
9     are those synonymous or otherwise?
10    A     Well, I go on to say:
11         "Presuming that SEI would have
12    licensed the subject content" competitor --
13    compete -- "to a competitor for
14    distribution in the Chicago market at an
15    economically justified premium rate that
16    would have been competitive to SEI."
17    Q     I see that.
18    A     I mean, I keep going back to
19    that.  You keep coming back on other stuff.
20    Q     It's your view then that this
21    is a fair value here?  Even though it is
22    the highest value, it's a fair value?
23    A     It's a fair value -- given, if
24    you were going to incorporate some sort of
25    premium, it's a fair value at its highest

34 (Pages 130 to 133)

**A-417**

Page 134

```
1           Stephen Shulman
2    level.
3        Q    The premium justifies using the
4    highest level inputs as a fair value, in
5    your view?
6        A    The concept of the premium is
7    why we set it at the high values.
8        Q    But this theory, as we've
9    discussed before, is a theory grounded in
10   what value could SEI achieve selling this
11   program to Polvision at a -- is that right?
12       A    No.
13       MR. PISKORA:  Objection.
14       Q    What was wrong with that
15   description?
16       A    Because you specifically said
17   "Polvision."  We're not saying it's
18   Polvision.  It could be any --
19       Q    Okay.  Another competitor?
20       A    Another competitor or somebody
21   else.  Who knows?
22       Q    But the theory is that this is
23   the value that SEI could have achieved
24   selling this to Polvision or another
25   competitor, correct?
```

Page 135

```
1           Stephen Shulman
2        A    It's one of the --
3        Q    Measures?
4        A    -- measures of the value that
5    they would have needed had they found a
6    buyer and they went out into the
7    marketplace and they found a buyer in
8    the -- pretty much in the -- you know,
9    participant in the market that they're in
10   or the business that they're in.
11       Q    So your theory, though,
12   presupposes that this -- Polvision or
13   another competitor would have sold
14   advertising at a hundred percent level
15   during that -- during that programming; is
16   that right?
17       A    No.
18       MR. PISKORA:  Objection to the
19   form.
20       Q    Why not?
21       A    Because whether or not they
22   would sell a hundred percent wasn't the --
23   wasn't how this is set up.  This was to set
24   up a premium that SEI would want to have.
25       That doesn't mean then that the
```

Page 136

```
1           Stephen Shulman
2    other side is going to sell a
3    hundred percent.  They could sell less than
4    that but still make it economically viable
5    for them to do so, depending upon a whole
6    host of whatever their unique circumstances
7    are.
8        Q    But aren't you coming up with
9    the amount that they would pay for the
10   particular programming, this other channel
11   would pay for the particular programming,
12   based on a certain ratio which takes into
13   account an assumption that they would sell
14   100 percent of their advertising?
15       MR. PISKORA:  Objection to the
16   form.
17       You can answer it.
18       A    It's not that they would sell
19   it a hundred percent.  They may sell only
20   95 percent, and, okay, but they may --
21   they've got to be willing to pay, you know,
22   a premium -- if SEI is asking for a
23   premium, somebody else has got to be
24   willing to pay a premium.
25       Q    But you're saying that
```

Page 137

```
1           Stephen Shulman
2    another -- this buyer who has to be willing
3    to pay is going to consider "how much can I
4    get in advertising revenue" during this --
5    let's use one programming, a half hour:
6        "How much can I get in
7    advertising revenue, and then what
8    percentage of that revenue will I pay to
9    get the program?"
10       So in making that calculation,
11   you're assuming that this other entity will
12   suppose or will project that it will make
13   100 percent or will sell 100 percent of its
14   advertising; are you not?
15       MR. PISKORA:  Objection to the
16   form.
17       You can answer it again.
18       A    No.  I answered it.  I thought
19   I answered it before.
20       Q    This might just be a typo.
21   It's a small point.  But shouldn't this be
22   3861 as you have it in paragraph 47, or is
23   it 3816, as you have it in the numbers
24   below it?
25       A    47 versus what?
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 138

1       Stephen Shulman
2       Q   47, in the text of 47, it says
3   "3861" at the end of that second line.
4       A   In what paragraph?
5       Q   Paragraph 47.
6       A   I see it at the end of the
7   first line.
8       Q   Then if you just look down kind
9   of where it's broken out into that --
10      A   Yes, it might have been a typo.
11      Q   So, I mean, if you just do the
12  math, it goes from 763 to 772.  But, I
13  mean, we'll just leave that.  I'm just -- a
14  small point.
15      But that is a typo?  It's 3861?
16      A   One of them is right.  One of
17  them is wrong.  I'd have to go through the
18  math to figure it out.  Sorry.
19      Q   All right.  So are you assuming
20  in this -- in this theory that Polvision
21  could earn from this programming -- that it
22  could have earned from this programming
23  $3800 of advertising revenue per hour?
24      MR. PISKORA:  Objection to the
25  form.

Page 139

1       Stephen Shulman
2   You can answer it.
3       A   I think I answered that before.
4   No.
5       Q   But yet, again, you still think
6   that's a proper basis for calculating what
7   SEI -- what TVP should pay in terms of
8   valuating the value of this programming?
9       MR. PISKORA:  Objection to the
10  form.
11      You can answer.
12      A   TVP should pay --
13      Q   Yes.
14      A   -- for it?
15      You mean as a damage?
16      Q   Yes, yes.
17      A   Well, the judge is going to
18  have to determine what the premium is --
19  should be, or not be, for that matter, in
20  his -- in his decision based on how the
21  case unfolds.
22      Q   So the inputs that you have
23  here are really completely separate and
24  apart from what Polvision would have
25  actually realized or could earn in terms --

Page 140

1       Stephen Shulman
2       A   I wasn't thinking of Polvision.
3   I was thinking of any buyer.
4       Q   Any entity?
5       A   They don't necessarily have to
6   earn that revenue to make this thing work.
7       Q   But is it your opinion that any
8   company could earn this amount, any
9   broadcasting company, Polvision or someone
10  else, could have earned this amount of
11  revenue per hour of broadcasting of this
12  content?
13      A   That wasn't our opinion.  That
14  wasn't what we're saying here.
15      Q   I mean, in paragraph 47 you
16  say:
17      "40 percent of" gross -- the
18  40 percent of -- "ratio of program spending
19  as a percentage of gross billing was
20  applied to the maximum potential gross
21  advertising billings calculated for
22  Polvision of 3861."
23      Am I just misunderstanding
24  that?  It seems to be --
25      A   Now where --

Page 141

1       Stephen Shulman
2       Q   Paragraph 47.  And I read the
3   first sentence of that.  You know, you can
4   take a look at it, but it seems to me
5   you're saying that this 40 percent ratio
6   was applied to the maximum potential gross
7   advertising billings calculated for
8   Polvision of 3861.
9       Aren't you saying here that
10  Polvision had this potential max gross
11  advertising billing of 3861?
12      A   That might be just -- you know,
13  that might be sloppy wording.  That's not
14  what it -- it's not supposed to -- it's not
15  supposed to imply that this is the number
16  Polvision, you know, would get.
17      We're actually saying the
18  maximum potential gross advertising
19  billings, you know, calculated, but we're
20  not -- I'm not -- that's not what we had
21  in -- what you said is not necessarily what
22  we had in mind for what -- how we were
23  treating this model.
24      Q   Is it not necessarily what you
25  had in mind, or is it not what you had in

36 (Pages 138 to 141)

Page 142

1       Stephen Shulman
2   mind?
3       A    Let me explain what we had in
4   mind.
5       Q    Okay.
6       A    We set the parameter -- for the
7   purposes of valuing it for a -- to take
8   into account a premium that SEI would want,
9   we set the parameters at the highest if
10  they were going to go out into the
11  marketplace and want to sell to a
12  competitor.
13      And we set it there -- we set
14  the parameters high.  This is what we got.
15  We applied a 40 percent percentage to it
16  because that's what -- to ad hours, the
17  average ad hour, ad billings per hour
18  calculated.
19      Q    So you set a parameter, you
20  say, for the purpose of valuating to take
21  into account a premium that SEI would want.
22  You set the parameters at the highest.  You
23  arrived at the 3861 number, though?
24      A    We used Polvision's rate card
25  because that was the only --

Page 143

1       Stephen Shulman
2       Q    Right.
3       A    That's what we utilized for
4   what we believed to be, you know, a maximum
5   value for the rate card.
6       Q    You're using Polvision as an
7   example?
8       A    Yes.
9       Q    And in this example, this
10  example entity, Polvision in this case,
11  would also, in your view, be able to sell
12  100 percent of its advertising revenue and
13  not give any volume discount, and charge
14  159 --
15      MR. PISKORA:  Objection to the
16  form.
17      You can answer.
18      A    No.  I keep answering that
19  question.
20      You're trying to say that
21  because it's determined -- once the value
22  is determined in the model to be that way,
23  then the people on other side who are going
24  to buy it are going to have those same
25  matters or inputs that they're going to be

Page 144

1       Stephen Shulman
2   able to achieve.  That's not the case.
3       They may be willing -- they
4   have to be willing to pay a premium.
5   Whatever models they have internally may
6   not be the same, but they're willing to
7   still pay a premium for the rights to the
8   program content.
9       Q    Maybe I'll -- I mean, you're
10  testifying that this a realistic damages
11  model.  So don't you have to assume that
12  there is some entity somewhere that would
13  pay these amounts of money for this
14  programming?
15      A    It would have to pay $763.
16      Q    Yeah, but that's derived from
17  your top level number of 3861?
18      A    Yeah, but it doesn't mean that
19  they have to extract exactly the same
20  inputs as this.
21      Q    But your view is that this is a
22  proper way to arrive at the number that
23  they would be willing to pay?
24      A    It's a -- it's a range that
25  would get to a premium that SEI would want

Page 145

1       Stephen Shulman
2   and somebody would have to pay.
3       Q    Well, why did you use the $159
4   spot rate for a 30-second unit that you say
5   you saw in Polvision's rate card?
6       A    That was what we had available
7   that would give us an indication of what
8   potentially was the maximum amount of --
9   maximum amount charged for a 30-second spot
10  in Polvision's rate card.
11      Q    Where did you get that
12  Polvision rate card from?
13      A    We got it from Polvision.
14      Q    Is that something that's
15  available publicly?
16      A    I gave it as an example.
17      Oh, is it publicly available?
18  No.  You have to go to Polvision to get it.
19      Q    Do you know if Polvision ever
20  realized those rates?
21      A    I don't.
22      Q    Does it make a difference to
23  your analysis?
24      A    No, because we were setting it
25  at a high spot rate.

37  (Pages 142 to 145)

Page 146

```
1            Stephen Shulman
2       Q    Do you know if any entity
3   similar to Polvision ever could achieve
4   these spot rates, or is that something you
5   can't testify on?
6       A    I can't opine on that.
7       Q    So you're not familiar with
8   kind of the advertising ranges for spot
9   rates? This is not within your purview?
10      A    I didn't do enough research on
11  it. We just took what Polvision said that
12  may be indicative of the market.
13      Q    Of the market of channel -- of
14  stations similarly situated to Polvision?
15      A    You know -- you know, the rate
16  card for people who would sell into a
17  market in a niche Polish-speaking area.
18      Q    That's a pretty limited market;
19  is it not? I mean --
20           Just give a verbal answer so
21  the reporter can get it.
22           MR. PISKORA: Objection to the
23      form.
24           You can answer.
25      A    Yeah, it's a specific market.
```

Page 147

```
1            Stephen Shulman
2       Q    A limited market?
3       A    A limited market.
4       Q    Would the rate that Polvision
5   actually charged to advertisers for a
6   30-second spot be relevant to your opinion
7   as to what Polvision or a similarly
8   situated competitor could receive for a
9   30-second spot?
10      A    You keep going back to saying
11  that this is what they could receive.
12      Q    Um-hum.
13      A    They could receive less and
14  still make this, maybe a -- you know, make
15  it a viable economic venture for
16  themselves.
17      Q    But you have to assume, you're
18  saying, because this is a proper model,
19  that someone somewhere would be willing to
20  pay this; do you not?
21      A    Somebody somewhere would have
22  to be willing to pay a premium.
23      Q    At the levels you're assuming,
24  if you --
25      A    A premium.
```

Page 148

```
1            Stephen Shulman
2       Q    -- for your analysis to be
3   right?
4            Not just a premium, but be
5   willing to pay 777 per half hour?
6       A    No. They don't have to
7   generate that particular number in order to
8   make it work for them.
9       Q    But you're saying this there is
10  an industry standard market model, meaning
11  there is a standard in the industry of
12  someone, at the high end of the standard,
13  if you will, is willing to pay $772 per
14  program half hour?
15      A    We're saying that there could
16  be somebody or would be somebody out there
17  that would be willing to pay a premium
18  equal to $763 per 30 second spot, as a
19  maximum.
20      Q    Do you have any company in
21  mind?
22      A    No.
23      Q    Did you research who might be
24  willing to pay these numbers?
25      A    We did not do extensive
```

Page 149

```
1            Stephen Shulman
2   research, extensive research on that.
3       Q    Do you have any view as to
4   whether Polvision itself would have been
5   able to offer $772?
6       A    We weren't looking specifically
7   to Polvision.
8       Q    Do you have any --
9       A    So as a result, we weren't --
10  we weren't saying that this is what
11  Polvision could do.
12      Q    So you didn't evaluate whether
13  Polvision --
14      A    I didn't evaluate whether
15  Polvision could do it.
16      Q    Mr. Kotaba, I'll represent to
17  you the owner of Polvision has testified
18  that Polvision was actually receiving 40 to
19  90 dollars per spot. Kotaba -- that
20  is K-o-t-a-b-a, I believe -- he testified
21  that Polvision was actually receiving 40 to
22  90 dollars per spot, and the spots range
23  from 15 seconds to one minute. Are you
24  aware of that?
25      A    I saw that.
```

38 (Pages 146 to 149)

Page 150

1          Stephen Shulman
2      Q    Does -- that still doesn't
3  change your view as to what the proper spot
4  rate to be used here is?
5      A    No.
6      Q    But at the same time, in
7  footnote 30 you say that -- you quote
8  Kotaba's testimony that Polvision's
9  advertising rates didn't change, right, and
10 on that basis you kept the same rates.
11         So you used Polvision for some
12 things and not for other things, right?
13     A    We were just -- that the -- if
14 those rates didn't change, then we assumed
15 that the rate card didn't change, if that's
16 what you mean.
17     Q    But you're using Polvision's
18 rate card even though Mr. Kotaba testifies
19 that these were the rates he actually
20 received, and it's still your view that
21 this is a proper high-end input to use?
22     A    This is the high input.
23     Q    In paragraph 44, you also note
24 that Polvision's rate card has discounts
25 available for volume buys, but yet you

Page 151

1          Stephen Shulman
2  chose to not include any volume discounts.
3         Can you explain that?
4      A    It says:
5         "Our analysis utilizes the
6  maximum potential rate of 159."
7      Q    But there are volume discounts
8  that Polvision admittedly offers?
9      A    I keep going back to the same
10 statement.
11     Q    That you're just using the
12 maximum inputs across the board?
13     A    To get the maximum value, so
14 that there's the lowest to the highest
15 range.
16     Q    But you don't have a lowest
17 range there?
18     A    I've got a low range.
19     Q    Not for this damages scenario.
20 I think we --
21     A    What do you mean?  Oh, for this
22 damages -- I meant between --
23         (There was a discussion off the
24         record.)
25     Q    So what my question was, I

Page 152

1          Stephen Shulman
2  believe, just that:
3         You have used the high-end
4  damages scenario -- high-end inputs for
5  this damages scenario, but have not used
6  low-end inputs for this damages scenario,
7  correct?
8      A    Correct.
9         MR. PISKORA:  Objection to the
10 form.
11         You can answer.
12     A    Correct.
13     Q    You have offered the opinion
14 that -- in paragraphs 46 to 47, that, based
15 on data compiled by SNL Kagan, you've
16 arrived at this ratio of -- I guess you
17 show that the resulting ratio ranged from
18 30 percent to 38 percent, 38 percent
19 occurred in '09, the year in which the bulk
20 of the episodes were licensed, and then you
21 use the 40 percent number.
22         Is that upwards adjustment from
23 the high-end number from the Kagan data,
24 this 2 percent upward adjustment, is that
25 because of the premium SEI would charge

Page 153

1          Stephen Shulman
2  that we spoke about?
3      A    Well, actually, it was just a
4  nominal 2 percent to account for the fact
5  that these -- this 40 percent -- or, I'm
6  sorry, their 38 percent in 2009 was
7  probably smaller -- was probably a larger
8  percent of the revenue generated from
9  purchased material because, as I said here,
10 the ratio that comes out of Kagan is what
11 they pay for content.  And it's applied on
12 a ratio that includes revenues from
13 nonpurchased content.
14         So if you looked at the
15 percentage that -- what they paid to the
16 revenues earned on that which was
17 purchased, that percent would be higher.
18     Q    You didn't explain that in your
19 report, though, right?
20     A    Yes, I think I did.
21     Q    Where is that explained?  Is
22 that what you're saying in the last
23 sentence of 46?
24     A    Yes.  In reality, yeah, that's
25 what I'm saying.

39  (Pages 150 to 153)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 154

Stephen Shulman

1  
2      Q    This SNL Kagan data, do you
3  know if it's a compilation of data from
4  subscription-based stations -- that means
5  stations that derive their revenue from
6  subscriptions -- or from stations that
7  derive their revenue from advertisements or
8  a mixture of both?
9      A    Yeah.  That was --
10         MR. PISKORA:  Objection to the
11  form.
12         You can answer.
13     A    Yes, that was one of the things
14  that we relied on Larry to do because, if
15  you read his resume, he spent a number of
16  years at Kagan, actually after Mr. Ireland,
17  and he gathered that information for us and
18  gave us the underlying rationale for it.
19     Q    Is your answer to my question
20  that you don't know?
21     A    Know what?
22     Q    Whether this data includes
23  stations that have a subscription-based
24  model or a advertisement-based model or a
25  mixture of the two?

Page 155

Stephen Shulman

1  
2      A    I don't know --
3         MR. PISKORA:  Objection to the
4  form.
5         You can answer.
6      A    I don't -- I'm not -- I don't
7  have the recollection of whether or not
8  it's just broadcast TV or it includes other
9  types of TV, like cable.
10     Q    You mean like free-to-air
11  broadcast versus subscription-based?
12     A    Yes.
13     Q    Is this something that
14  SNL Kagan published?  Do you know?
15     A    This is a big -- we extracted
16  this information --
17     Q    And I'm looking at Exhibit 7,
18  just to be clear.
19     A    Larry extracted this
20  information from the survey.  It was
21  extracted from a very big survey.  You
22  won't see this chart anywhere.  You have to
23  go into there and extract it.
24     Q    And is this survey, the
25  SNL Kagan advertising forecast 2010, or is

Page 156

Stephen Shulman

1  
2  that something else?
3      A    It says "2010."
4      Q    So is that the name of the
5  survey that Larry extracted this
6  information from?
7      A    I believe -- you know, I --
8  once again, I don't know the exact title of
9  it.  It could have.  It could be that, or
10  it could be something which varies off of
11  that.  I mean, that's the way we put it in.
12  I don't remember the name of it.  I saw it,
13  but I don't remember the name.
14     Q    Larry really basically gave
15  this to you, this exhibit, and he said --
16     A    Yes.
17     Q    -- he said, "Mr. Shulman, here
18  are numbers I've come up with" --
19     A    Yes.
20     Q    -- "you can rely upon them for
21  your report"?
22     A    Well, we checked them to make
23  sure he extracted the information
24  correctly.  We got the report, and we
25  traced it in.

Page 157

Stephen Shulman

1  
2      Q    Why didn't you attach the whole
3  report to your report?
4      A    Because if you want it, you can
5  go get it.
6      Q    The source data, let's look
7  at -- looking at Exhibit 7, the source data
8  here indicates that an average of
9  33 percent is what you're saying, right?
10  Well, sorry.
11         My question is:
12         Does 30 -- is the average of
13  these four years, is that 30 percent,
14  approximately -- 33 percent, approximately?
15         MR. PISKORA:  Objection to the
16  form.
17         You can answer.
18     A    It's not on here, so I can't
19  tell you.  If you want, you can calculate
20  it, but -- did you calculate it?
21     Q    Yeah.  It is 33 percent.
22     A    All right.  So --
23     Q    But your number is seven
24  percentage points above that average,
25  right, your 40 percent premium?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 158

Stephen Shulman

1          Stephen Shulman
2    A   Yes.
3    Q   Now, there is -- 2008 is
4  30 percent; 2010 and '11 are 32 percent;
5  2009 is 38 percent -- a significant
6  increase above the other years, right?
7    A   Yes.
8    Q   Did you consider why there is a
9  higher number in 2009 than the other years?
10   A   We looked to see whether or not
11 the other information was pulled correctly
12 out of there.  It could be just, you know,
13 in 2009 that what -- that's what the market
14 could have been.
15   Q   Right.  But isn't it the case,
16 if you look at these numbers, the station
17 spending generally stayed even across
18 the -- across the -- across the board here,
19 but gross advertising billings were
20 significantly different in 2009?  Right?
21       Do you see that in 2009, that
22 16,000 number is significantly lower than
23 any of the others, but all the other inputs
24 seem to be similar?
25   A   Yes.

Page 159

Stephen Shulman

1          Stephen Shulman
2    Q   So doesn't that account for the
3  38 percent, rather than any kind of change
4  in station spending for that year?
5    A   Well, I think it would
6  contribute to that.
7    Q   Do you agree that this
8  38 percent number is a little bit of an
9  anomaly for that year?
10       MR. PISKORA:  Objection to the
11 form.
12       You can answer it.
13   A   Yeah.  I wouldn't know if I'd
14 call it an anomaly; but it is -- you know,
15 as you pointed out, it is different.
16   Q   Did you consider whether there
17 would be any reason to discount from the
18 40 percent number in this particular case?
19   A   Well, one of the reasons why we
20 were comfortable with the 40 percent number
21 was also because of the cost structure of a
22 digital station subcarrier.  There are no
23 real variable costs, so they can afford to
24 pay more for their content than a broadcast
25 could.

Page 160

Stephen Shulman

1          Stephen Shulman
2    Q   But you didn't consider
3  factors, I suppose, such as the age of the
4  episodes here, the limited distribution of
5  Polvision in terms of its limited reach,
6  any other factors that should go into this
7  ratio, did you, besides for Polvision's
8  being -- what did you refer to it as, a --
9  as a station subcarrier?
10   A   Yes.  Well, we actually thought
11 of it in terms -- we had other things we,
12 you know, thought as well -- is that, if
13 you want to get to the Polish-speaking
14 Chicago public, this is your -- you know,
15 as an advertiser, this is pretty much your
16 only show in town.
17       So that in an of itself could
18 create a need to or a willingness to pay a
19 premium for the time, because it's a unique
20 market.  So we did consider, you know,
21 that.
22       And we also considered the
23 fact -- like I said before, it's a class A
24 subcarrier that has -- can afford to pay
25 more because they have much -- they have no

Page 161

Stephen Shulman

1          Stephen Shulman
2  variable costs; or they do have some, but,
3  you know, it's not like a broadcaster.
4    Q   And you don't think it would be
5  that the age of the particular episodes
6  we're dealing with here or any other
7  factors would be relevant in terms of
8  determining a discount on the 40 percent?
9    A   No.
10       MR. WENGER:  I think this is a
11 good time to break for lunch.  We
12 should have food here.  I don't know
13 why it's not here yet, but I'll go
14 check on that.
15       (There was a discussion off the
16 record.)
17       (A lunch recess was taken.)
18   Q   When we left off before lunch,
19 Mr. Shulman, we were talking about some
20 factors that you may or may not have
21 considered in terms of adjusting this
22 40 percent ratio that you've opined on.
23       Have you -- did you consider
24 the restricted territory of the Polvision
25 license as well as the use of restrictions

41 (Pages 158 to 161)

Page 162

1          Stephen Shulman
2  in the Polvision licenses in terms of
3  limitations on broadcasting as part of the
4  ratio that you came up with, the 40 percent
5  ratio?
6      A   No.
7      Q   Let's talk about scenario
8  number two under the Polvision damages
9  theory.
10         Just explain to me briefly:
11         What is the model that you have
12 put forth as damages scenario number two?
13     A   Well, the scenario number two
14 is taking and valuing the episodes based on
15 the previous -- the agreement just before
16 the settlement agreement whereby Klan and
17 Zlotopolscy were valued at $600 stated
18 value in the barter agreement, which is the
19 agreement that was the -- I guess you could
20 say the last, at least, amended agreement
21 before the settlement agreement, because
22 there was a stated value in that agreement.
23     Q   And as you've explained, you're
24 valuing the episodes based on that $600
25 stated value?

Page 163

1          Stephen Shulman
2      A   Correct.
3      Q   Right.  And it's your view that
4  this was the market value of these
5  episodes, "this" meaning $600 per episode;
6  is that right?
7      A   Yes.  It's actually -- if you
8  look at 53, "market values," in quotes.  I
9  think that's what they used in the barter
10 agreement as the terminology of what the
11 $600 represented.
12     Q   Earlier, you had said that you
13 did not include the episodes from the
14 March 2008 as amended in December 2008
15 barter agreement because you thought the
16 term had ended before the beginning of the
17 damages period.
18         But it's still appropriate, in
19 your view, to use the market value stated
20 in those -- in that barter agreement for
21 purposes of this damages scenario?
22     A   Yes.
23     Q   Did you consider any other
24 factors besides for the stated value of
25 $600 that you referred to in determining

Page 164

1          Stephen Shulman
2  that this was the market -- that $600 is
3  the market value for these episodes?
4      A   No.  We took it based on the
5  simple fact that that's what TVP put on
6  these episodes as market value.
7      Q   What does "market value" mean?
8      A   Well, you'd have to ask them
9  what they think it means.
10     Q   What does it mean in your view?
11     A   Market value is what they
12 would -- in their case, I assumed or I
13 concluded -- I don't want to be too
14 presumptuous.
15         But it sounded to me from that,
16 that these would have been sold to -- in
17 the market for $600 an episode.  But they
18 chose to discount them.
19     Q   Is it your view that these
20 episodes have a $600 market value, $600 per
21 episode market value?
22     A   Well, that's what they stated
23 the value to be.  So we thought -- we took
24 the position that that's -- that's what
25 they designated the market value to be.

Page 165

1          Stephen Shulman
2  And that's what we used in order to give
3  some various points in a range of values,
4  or give one point in a -- middle point to
5  a -- one point in the range of values.
6      Q   Is it proper, in your view, to
7  determine the market value of a particular
8  product or episode of programming in this
9  case just by looking at one agreement
10 selling that product or episode here?
11         MR. PISKORA:  Objection to the
12     form.
13         You can answer the question.
14     A   In this case I did because it
15 was the -- it was an agreement where they
16 actually stated it.  And that's why I felt
17 it was relevant.
18     Q   Now -- and that agreement --
19 and you mentioned before, when you were
20 explaining the theory, that agreement is
21 for the Klan and Zlotopolscy episodes,
22 right?
23     A   Well, it included them.  The
24 barter agreement?
25     Q   Right.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 166

```
 1            Stephen Shulman
 2      A    Yeah.  In the annex, in the
 3  amendment, they were included.
 4      Q    Does the barter agreement
 5  include any other of the episodes -- or any
 6  other shows of the four shows that we're
 7  discussing here?
 8      A    I think it did.  Let me look at
 9  the barter agreement because the barter
10  agreement really has it -- this is -- if
11  you look -- where -- what exhibit was it?
12      Q    Number 5.
13      A    These both start in Polish.
14          This is 4.
15      Q    5 is a combination of the
16  barter agreement with the -- with the
17  annex.
18          I can save you some time.  You
19  should probably refer to the annex of
20  page 50, is where there's a listing of the
21  episodes.
22      A    You mean Bates stamp number 50?
23      Q    Yes, Bates stamp POL 50, yes.
24      A    Well, I recognize Klan and
25  Zlotopolscy as being part of the other
```

Page 167

```
 1            Stephen Shulman
 2  agreements.  I would have to go one by one
 3  and check if the others -- you're asking if
 4  any of these bartered -- bartered episodes
 5  were included in the August or July?
 6      Q    No.  My question is a little
 7  different.
 8          The August and July -- the
 9  August agreement, for example, includes
10  other programs, Na Dobre and Plebania.
11  Those programs are not listed here; is that
12  right?
13      A    Yeah, they're not here.
14      Q    So there's no real basis in
15  this agreement for saying those episodes
16  are worth $600?
17      A    Not based on this.
18      Q    So how did you ascribe a $600
19  market value to those episodes, to those
20  programs, as well?
21      A    What we did was, because the
22  Klan and Zlotopolscy were also included
23  with the others and they stated the market
24  value in the barter agreement, we took the
25  position and we were told to presume that
```

Page 168

```
 1            Stephen Shulman
 2  all the quality of them would be basically
 3  the same.
 4      Q    But you don't have any document
 5  suggesting that those episodes are -- even
 6  have a stated market value of $600, right?
 7      A    No, I haven't.
 8      Q    And this $600 stated market
 9  value per episode here, do you -- that was
10  never actually paid between -- in terms of
11  cash exchange between TVP and Polvision, as
12  you understand the barter agreement; was
13  it?
14      A    Yeah.  No cash was.
15      Q    Do you still think it's proper
16  to ascribe a market value to something if
17  it was never actually paid for in cash?
18      A    Yes.
19      Q    And that's because they, the
20  parties, stated that it was $600 -- worth
21  $600 in the agreement?
22      A    Yes.  And they don't
23  necessarily have had to have the obligation
24  to transfer it at that value.  They could
25  have chosen to discount it, which is what
```

Page 169

```
 1            Stephen Shulman
 2  they did, for reason that really isn't on
 3  the record.  But there could be lots of
 4  reasons why, or a number of reasons why,
 5  they might have chosen to discount it.
 6      Q    But it's your view, though,
 7  that the discounted $300 per episode value
 8  is not the market value?
 9      A    Correct.
10      Q    Let's take a look at the
11  Exhibit 2, which is the June agreement.
12          There's a value ascribed to the
13  two episodes here.  I'm looking at number
14  15, the two programs licensed under this
15  agreement.  There's a value there that says
16  270 for Na Dobre and 130 for Plebania.
17  Isn't this a more accurate way of
18  determining the actual value of the
19  episodes of these programs?
20      A    Well, this column is the
21  license fee.  It's not -- they don't
22  subscribe that this is the value.  This is
23  the license fee.  This is what was paid.
24  And there could be, once again, reasons why
25  the actual amount paid may not reflect the
```

43 (Pages 166 to 169)

Page 170

1        Stephen Shulman
2  fair value, and that in order to get to
3  fair value, you may have to look at other
4  things.
5        Q    But it's your view that, even
6  though the barter agreement didn't identify
7  these particular episodes, didn't include
8  these episodes -- I'm sorry -- episodes of
9  these programs, and these programs are
10  specifically licensed for a certain fee in
11  the June '08 agreement, that you should
12  still use the $600 market value stated for
13  Klan and Zlotopolscy?
14        A    Yes, because in the future
15  agreements they were included in the same
16  group in the list of licenses, I believe,
17  that Klan and Zlotopolscy were, so they
18  were all put together.  And I think in
19  those agreements -- let's look.  Where is
20  that August agreement?
21        I wish they put the English one
22  first.
23        Thanks.
24        You could see that Klan,
25  Zlotopolscy were given the same value as

Page 171

1        Stephen Shulman
2  Plebania and Na Dobre -- Na Dobre was
3  higher -- but that they would all at least
4  have a similar value of Klan and
5  Zlotopolscy equal to the market rate in the
6  barter agreement because this was the
7  lowest value they -- or price that they
8  ascribed to at least the original agreement
9  in the -- of the August agreement.
10        Q    Why wouldn't -- why didn't you
11  use these figures here as a market value of
12  the episodes?
13        A    Because these are just the
14  prices per episode, and that they were
15  previously stated to have a market value
16  much higher.  Something is at play here.  I
17  can't tell you exactly what's at play, but
18  something is at play here, which is --
19  which could lead one to believe that these
20  don't really represent the fair value
21  because they're even less than the $300
22  that was ascribed on the discounted rate in
23  the barter agreement.
24        So there's something at play
25  here, which means -- and it may come out in

Page 172

1        Stephen Shulman
2  court that we have to look at adjusting
3  what was paid, which as we did in scenario
4  one, for maybe some non arm's length issues
5  that pop up in this transaction.
6        Q    When you say "adjusting what
7  was paid" --
8        A    Yes.
9        Q    -- these are actually values
10  that were paid?
11        A    Yes.
12        Q    So you might adjust these
13  values for some other factors?
14        A    Well, what I'm referring to is
15  scenario one where we look at what they
16  paid for these episodes, which in the range
17  of scenarios one, two and three produced
18  the smallest value.  If there was a
19  question about whether or not that
20  represented the fair value, if it was
21  discounted, or if TVP was not selling into
22  the market at market rates, then we look at
23  other alternative values.
24        Q    So -- but you basically took
25  the highest value from all of these

Page 173

1        Stephen Shulman
2  agreements, in terms of the $600 market
3  value stated in the barter agreement, and
4  used that value as opposed to the prices
5  listed in the June 2008 agreement for the
6  two episodes, for episodes of those two
7  programs, or the prices listed in the
8  August 31, 2009 licensing agreement for
9  these episodes?
10        MR. PISKORA:  Objection to the
11  form.
12        You can answer the question.
13        Q    Right?
14        A    We actually used these numbers.
15  We didn't ignore these numbers.  We used
16  them, and we used them in scenario three.
17  We valued it based on what was actually
18  paid.
19        Q    I'm talking about scenario
20  number two.
21        A    Well, scenario number two is
22  just an alternative to scenario number
23  three where we chose the stated market
24  value.
25        Q    But when you chose the stated

44 (Pages 170 to 173)

Page 174

1          Stephen Shulman
2   market value of -- in scenario number two,
3   you used the highest number that was
4   ascribed in any of these agreements to the
5   episodes of these programs?
6          MR. PISKORA:  Objection to the
7   form.
8      Q   Is that right?
9          MR. PISKORA:  You can answer.
10      A   We stated what they stated to
11  be the market value.
12      Q   Of two of the programs?
13      A   Of two of the programs.  That's
14  correct.
15      Q   The barter agreement did not
16  involve, as you understand it, the exchange
17  of cash payments, right?
18      A   That's correct.
19      Q   It was the exchange of
20  programming for some other kind of
21  programming, right, basically?
22      A   And amended to also include
23  transfer rights.
24      Q   Okay.  Wouldn't it be more
25  proper to base an opinion on the market

Page 175

1          Stephen Shulman
2   value of an episode of a program on what
3   someone actually paid for that episode
4   rather than what is stated as a value in a
5   barter agreement?
6          MR. PISKORA:  Objection to the
7   form.
8          You can answer it, if you can.
9      A   So long as it represented a
10  fair value and that they weren't selling
11  into the market less than its real value.
12      Q   I'm not sure I understand your
13  answer.
14      A   I'm giving you an analogy,
15  another example.
16          Competitors or people on
17  another side of a contract can dump product
18  into a market at less than its fair value
19  in order to achieve some -- just call it
20  result.  So you have to be careful to look
21  at stuff to see if there's evidence that
22  what's being paid is not fair value.  If
23  it's not fair value, then you have to
24  consider other alternatives, which is what
25  we did.

Page 176

1          Stephen Shulman
2      Q   Do you have any evidence that,
3   in fact, what is being paid here is not
4   fair value, and that a better value to use
5   is the one stated in the barter agreement?
6      A   Well, we saw only indications
7   that it might not have represented the fair
8   value.  We saw the values of them popping
9   around, 600, 300, 110.  We saw and heard
10  that there might have been accommodations
11  that were made somewhere along the line
12  because Polvision was claiming some sort of
13  maybe financial duress.
14          We -- we saw -- and this is in
15  the matter of litigation, in a way, where
16  allegations are being thrown around which
17  might indicate that they might have been
18  put into the market at lower than value.
19          So we just came up with
20  alternative ways of looking to see what
21  could be the real market value or fair
22  value for the episodes.  And one of them we
23  chose was purely what TVP stated was the
24  fair value just prior to the settlement.
25      Q   But you chose the highest

Page 177

1          Stephen Shulman
2   number available?
3          MR. PISKORA:  Objection to the
4   form.
5          You can answer.
6      A   There is -- I think what you're
7   saying is that in all these agreements
8   there's no other number that equates to
9   $600 being stated anywhere, and the answer
10  is, correct.
11      Q   You mentioned before that you
12  had some questions -- I'm paraphrasing --
13  about the values listed in, for example,
14  the August 31, 2009 agreement because
15  Polvision might have been under duress or
16  otherwise.
17          Let's take a look at
18  paragraph 37 of your report here, and let's
19  look at the last sentence specifically.
20  You say:
21          "More importantly, the
22  agreements of Polvision were entered into
23  with the strong possibility that SEI would
24  bring an action against TVP which could
25  ultimately affect the financial realities

45  (Pages 174 to 177)

Page 178

1          Stephen Shulman
2   and motivations of any license fees
3   designated in the agreement between TVP and
4   Polvision."
5          What are you suggesting in
6   that, in that last sentence?
7      A    All I'm suggesting is that
8   there was this threat of litigation.  If
9   there's a threat of litigation, because of
10  that, that would -- and they took that into
11  account in the pricing, then that
12  automatically is going to get you out of
13  fair value because they were creating a
14  price under somewhat of an exposure to this
15  litigation; so, consequently, that could be
16  a reason for discounting what -- off of the
17  fair value.
18     Q    You say that:
19         "A strong possibility that SEI
20  would bring an action against TVP."
21     Right?
22         Wouldn't that -- I'm looking at
23  the last sentence.
24         Wouldn't that actually be a
25  motivation for TVP to charge SEI -- to

Page 179

1          Stephen Shulman
2   charge Polvision something more, to cover
3   that litigation risk?
4      A    No.
5      Q    Isn't that what you're saying
6   here?
7      A    No.
8      Q    What are you saying, then?
9      A    I thought I mentioned it
10  before.  I'm just saying, anybody entering
11  into a transaction that's under the threat
12  of dispute or litigation is going to say,
13  "Hey, I can be drawn into this."  A buyer
14  of this content from TVP would basically
15  say:
16         "I could be drawn into this
17  stuff.  I'm not going to -- I'm going to
18  have to adjust for that."
19     Q    But you're talking about a
20  possibility that SEI would bring an action
21  against TVP?
22     A    Yes.
23     Q    TVP was the seller, the
24  licensor, in this context?
25     A    That's right.

Page 180

1          Stephen Shulman
2      Q    So wouldn't the licensor, if
3   it's faced with a threat of litigation,
4   charge some premium to account for that,
5   certainly not a discount?
6      A    No.
7      Q    On scenario number three,
8   explain to me what the theory here is for
9   scenario number three of the Polvision
10  claim.
11     A    This is the most
12  straightforward of them all, which is --
13  this is what TVP received in cash for the
14  licenses it sold.
15     Q    Did you know what TVP actually
16  received for these licenses?
17     A    We went by what the agreement
18  said they were supposed to have received.
19  I don't know if they did not completely
20  collect.  That's a different deal that
21  would not enter into the fair value.  It
22  wouldn't enter into the value even if they
23  didn't collect it.  That's called a bad
24  debt, and I don't think -- that would not
25  have factored in.

Page 181

1          Stephen Shulman
2      Q    What if TVP and Polvision had a
3   deal that -- or made a deal one day that
4   we're going to give you a discount, a
5   20 percent discount, on any license fees,
6   and then TVP -- then Polvision actually
7   paid 80 percent less than what is stated
8   here?  Would that affect your opinion as to
9   the value paid?
10         MR. PISKORA:  Objection to the
11  form.
12         You can answer the question.
13         You can answer.
14     A    I can.
15         Would it affect me?  The answer
16  is --
17     Q    Would it affect your opinion?
18     A    Of what?
19     Q    Of damage scenario number
20  three?
21     A    No.
22     Q    Why not?
23     A    Because if they stated there
24  was a discount, then it's what they
25  contracted for in that agreement, would be

46 (Pages 178 to 181)

Page 182

1     Stephen Shulman
2  the key point. It's what they contracted
3  for. If they're making accommodations to a
4  price and lowering it, then what they're
5  doing is they're selling it below value.
6     And I think I spoke of that
7  before, is you have to be careful that
8  amounts paid, amounts received, amounts
9  contracted are not for less than their fair
10 value. That would -- that would be
11 inappropriate to use that as fair value.
12    Q    But in paragraph 32, subpart C,
13 you describe -- you describe this theory
14 as:
15    "The fair value of licenses
16 purportedly granted to Polvision based on
17 the consideration actually provided for in
18 the licenses."
19    That the license agreements
20 entered into between TVP were negotiated --
21 sorry. I'll read in the parentheses.
22    "And presuming although the
23 parties clearly dispute the issue that the
24 license agreements entered into between TVP
25 and Polvision were negotiated on

Page 183

1     Stephen Shulman
2  arm's length and for fair value."
3     So if these agreements were
4  actually negotiated at arm's length, but
5  there was also an understanding that we're
6  going to incorporate some discounts into
7  these agreements, would that not affect
8  your damages scenario number three?
9     MR. PISKORA: Objection to the
10 form.
11    You can answer.
12    A    That, to me, indicates it's
13 lower than fair value, and that the
14 contracted amount is the right amount to
15 use if I'm going to use what was really
16 negotiated as the value, which would be
17 that value before. And if they made an
18 accommodation for it, it's not really part
19 of the fair value.
20    Q    Wouldn't that affect, though,
21 the actual value that TVP received from
22 Polvision?
23    MR. PISKORA: Objection to the
24 form.
25    You can answer it again.

Page 184

1     Stephen Shulman
2     A    It certainly affects what they
3  got, but it doesn't affect the fair value
4  of the agreement.
5     Q    Claim two, which relates to the
6  Canadian legal expense claim.
7     Okay. Explain to me here what
8  your opinion is, as a damages expert, and
9  what it's not, if you'd like.
10    MR. PISKORA: Objection to the
11 form.
12    You can answer.
13    A    My opinion here is that these
14 were the legal fees paid in relation to
15 this lawsuit against the pirates, and that
16 was what was paid to the law firm for the
17 legal fees.
18    Q    On what do you base your --
19 that part of your opinion stating that
20 these were the legal fees paid in relation
21 to the lawsuit against the pirates?
22    A    The affidavit and attached
23 exhibits that we received from the law firm
24 in Canada who handled it. We assumed that
25 it was accurate.

Page 185

1     Stephen Shulman
2     Q    You didn't check, though?
3     A    Well, we had the bills --
4     Q    Right.
5     A    -- that were given to us, and
6  then -- you know, as part of discovery, and
7  we compared it to the list that they gave
8  us, primarily to make sure that none of the
9  legal fees fell prior to the beginning of
10 the damage period.
11    Q    Did you review the legal bills,
12 detailed legal bills, describing the actual
13 work performed or just summary bills with a
14 total at the end?
15    A    I believe what we looked at is
16 what's here. We attached it as an exhibit.
17 So whatever is here is it, what we looked
18 at.
19    But if you look at Exhibit 2,
20 Exhibit 2 says:
21    "These are the bills related to
22 the international media broadcasting."
23    So, you know.
24    Q    You don't know, though, based
25 on that document or based on your Exhibit E

47 (Pages 182 to 185)

Page 186

1       Stephen Shulman
2   here, the declaration of K.C. Chisek,
3   what -- or what part of this work was
4   actually done for the litigation and what
5   work might have been done for something
6   else? Can you know that?
7       MR. PISKORA: Objection to the
8   form.
9       You can answer it.
10      A   We took the position -- we --
11  it's our understanding that it was for the
12  litigation related to IMB.
13      Q   But you didn't form an
14  independent opinion of that; you understood
15  that based on representations to you by
16  counsel or by Mr. Chisek?
17      MR. PISKORA: Objection to the
18  form.
19      You can answer.
20      A   I based it on the exhibit and
21  discussions we had with counsel.
22      Q   Just to be clear, you didn't
23  review the detailed description of the
24  legal work performed?
25      MR. PISKORA: Objection to the

Page 187

1       Stephen Shulman
2   form.
3       You can answer.
4       A   No.
5       Q   Did you inquire at all as to
6   the legal basis for this claim?
7       A   Yes.
8       Q   What did you ask about?
9       A   Well, it came in part of
10  discussion when we were discussing the
11  claim.
12      Q   How was it described to you,
13  the legal basis for this claim?
14      A   The legal basis for this claim
15  is that in an agreement TVP was responsible
16  for helping fight pirates, and this would
17  be a cost of helping to fight pirates.
18      Q   The whole cost of fighting
19  pirates?
20      A   I think that's a question for
21  the court, and whether or not it's all a
22  portion, we couldn't -- you know, we're not
23  going to make an interpretation of the
24  legal arguments. And, you know, whatever
25  is in any papers, the court is going to

Page 188

1       Stephen Shulman
2   have to decide whether it's a portion of
3   it.
4       Q   So you're not putting forth an
5   opinion on whether TVP should be
6   responsible for 100 percent of the legal
7   fees or some other percentage? You
8   basically just added up the invoices,
9   correct?
10      A   We're not putting -- we're not
11  putting an opinion on they're entitled to
12  100 percent.
13      Q   Did you review the contracts
14  between TVP and SEI relating to this
15  obligation you mentioned that TVP would
16  support SEI in fights against pirates?
17      A   I think I saw some language on
18  it.
19      Q   Did you see language to the
20  effect that SEI was appointed as TVP's
21  representative to protect against
22  infringements in the territory?
23      A   You know, you're asking me to
24  recall documents that I probably looked at
25  without -- just show me the documents.

Page 189

1       Stephen Shulman
2       Q   Yeah. If I showed you a
3   document saying that SEI was appointed a
4   TVP representative in the territory to
5   protect against infringement, would that
6   change your view of this claim?
7       A   No.
8       Q   Why not?
9       A   Because you would have read it
10  in the context of everything else. If they
11  were supposed to participate in helping not
12  only to give them the right to be the
13  representative, but also to cover costs
14  related to that, then these would be legal
15  costs that the court would have to review
16  and determine, like I said before, what
17  percent or how much of it may be the
18  responsibility of TVP.
19      Q   Do you recall ever seeing any
20  clause saying that TVP should be obligated
21  to or TVP would be obligated to pay SEI's
22  legal fees in connection with protecting
23  against infringement?
24      MR. PISKORA: Objection to the
25  form.

48 (Pages 186 to 189)

Page 190

Stephen Shulman

1
2      You can answer.
3      A    I don't recall any specific
4   documents that I reviewed that might have
5   said that, but that's not to say they don't
6   exist.
7      Q    If, in fact, there is no such
8   clause in the agreements here, do you think
9   that the term "appropriate support" would
10  encompass an obligation to pay legal fees?
11         MR. PISKORA:  Objection to the
12     form.
13     A    I'm a layman with that stuff.
14     Q    You didn't really question this
15  assumption then that TVP was responsible
16  for a hundred percent of legal fees; you
17  just took that assumption and, like you
18  say, added, up these invoices?
19     A    I don't think there was an
20  assumption that there's a hundred percent
21  they -- you know, that they were
22  responsible for a hundred percent.  I
23  didn't hear that.  I was never told that
24  they were responsible for a hundred
25  percent.  They could be.  I don't -- I was

Page 191

Stephen Shulman

1
2   told they could be held a hundred percent,
3   but the assumption isn't that they will be.
4      Q    Paragraph 65 of your report
5   says.
6         "We were asked by counsel to
7   presume for these purposes that, if SEI
8   proves its claim of breaches against TVP
9   for a hundred percent of the legal fees
10  incurred during their historical damage
11  period, to calculate SEI's value of the
12  legal invoices from Cassells on this
13  matter."
14         So you're presuming that TVP
15  would be responsible for a hundred percent
16  of the legal costs and calculating the
17  value of those legal invoices, right?
18     A    Yeah.  We were asked to presume
19  that, at least as a starting point.
20     Q    You didn't question that
21  presumption, though?
22     A    No.
23     Q    Do you know whether SEI ever
24  demanded that TVP pay all of its legal fees
25  or just that TVP --

Page 192

Stephen Shulman

1
2      A    Let me go back to that last
3   question because it's the lingering --
4      Q    Sure.
5      A    We had discussions about this
6   with counsel, and they indicated that, you
7   know -- you know, it's not sure how the
8   court is going to come out on it.  So I
9   don't want to give you the impression that
10  we were okay with the assumption of a
11  hundred percent.
12         What we were starting with
13  is -- really, this is the starting point
14  from which you can -- the court can then
15  decide how much is then maybe the
16  responsibility of TVP.
17     Q    Do you have a view, based on
18  your experience as a damages expert,
19  whether TVP should be responsible for a
20  hundred percent of these legal fees?
21         MR. PISKORA:  Objection to the
22     form.
23         You can answer.
24     A    That -- that's based on the
25  agreement.  You've got to read the

Page 193

Stephen Shulman

1
2   agreement.
3      Q    Do you have an opinion on that?
4      A    On the agreement?
5         MR. PISKORA:  Objection to the
6     form.
7      Q    You know how to read
8   agreements.  Do you have an opinion on
9   that?
10         MR. PISKORA:  Objection to the
11     form.
12         You can answer the question.
13     A    No, I don't have an opinion.
14     Q    Just quickly, you have a number
15  here of 143,254.  Explain to me how you got
16  that number.  And you refer to the -- I
17  guess, the last page or two of your report,
18  Exhibit Number 2.  Just show me how where
19  that number comes from.  Of course, there
20  is also the Exhibit E, which is
21  Mr. Chisek's declaration.
22     A    Yeah.  If you add up all the
23  ones that come from -- that start with the
24  damage period, you will come to 143,000.
25     Q    Which ones are you excluding?

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 194

Stephen Shulman

1       Stephen Shulman
2  Is it the '07 entries?
3       A    Well, definitely the '07
4  entries.
5       Q    And the --
6       A    Maybe the -- I guess the -- I'd
7  would have to look at the work paper and
8  have a calculator, but everything probably
9  up to August 2010.
10      Q    Why August of 2010?
11      A    Well, the -- when was the
12 settlement agreement? I mean '09, '09. Up
13 to '09. When was -- the settlement
14 agreement was August of '09.
15      Q    Right.
16      A    So everything up to August
17 of '09, which I guess is the '07.
18      Q    I'm calculating about $15,000
19 on '07. How do you get the 143?
20      A    Well, I'd have to go back to
21 the work papers and see how we got to the
22 143.
23      Q    Okay. We can move along, I
24 mean, if you're not familiar with it right
25 now.

Page 195

1       Stephen Shulman
2       A    Right.
3       MR. PISKORA: If you're really
4  curious, I think there is an exhibit
5  on that. You can move on or not.
6  It's Exhibit I.
7       A    Oh, the detail of the legal
8  invoices. All right.
9       MR. PISKORA: There must be
10 some Canadian dollar conversion.
11      A    Oh, right. Right, right. This
12 is in Canadian dollars. You've got to
13 convert it to US dollars. And if you go
14 to --
15      Q    There's no Exhibit I here. I'm
16 just trying to understand --
17      A    Yeah. I --
18      MR. PISKORA: No. Right here.
19      MR. WENGER: Oh, okay.
20      MR. PISKORA: Exhibit 1, I'm
21 sorry, Roman numeral I.
22      A    That's interesting. My version
23 doesn't have and Exhibit I. What is this?
24 What am I looking at?
25      Q    We can move on here.

Page 196

1       Stephen Shulman
2       A    No wonder.
3       Q    It's in there.
4       A    It is?
5       Q    Yeah. It's right after your
6  report, right after the text of your
7  report.
8       A    Oh, when you had Exhibit 2 all
9  the way, so that was -- I got it. I
10 understand now.
11      MR. PISKORA: I think it's
12 before you -- I think he's moving on.
13      A    Okay. Let's go.
14      Q    Do you know why -- or why
15 haven't you put forth a claim for lost
16 subscribers relating to this -- to the
17 pirates, the --
18      MR. PISKORA: Is that the
19 question? I object to the form.
20      MR. WENGER: Okay.
21      MR. PISKORA: Go ahead.
22      A    Well, we never thought of it.
23 And the question is, why would we? I'm not
24 sure what the damage is. It's not TVP's
25 problem. There was a pirate taking

Page 197

1       Stephen Shulman
2  subscribers away. So I don't know why
3  there would be a damage there.
4       Q    Let's talk about claim three.
5  Is that a Klan claim?
6       And let's -- before we get to
7  the Klan claim, I want to talk about one
8  more issue on the Polvision claim.
9       You had mentioned that you were
10 not able to get information, detailed
11 information, about subscriber
12 cancellations; is that right?
13      A    Well, not enough for us to feel
14 comfortable that we could make a
15 calculation from it.
16      MR. WENGER: Let's mark as
17 Exhibit 6 Plaintiff's Objections and
18 Amended Interrogatories -- and Amended
19 Responses to Defendant's
20 Interrogatories, dated
21 February 15, 2012.
22      (Exhibit No. 6, Plaintiff's
23 Objections and Amended Responses to
24 Defendant's Interrogatories, is marked
25 by the reporter for identification.)

50 (Pages 194 to 197)

**A-433**

Page 198

1          Stephen Shulman
2      Q     And I want to direct your
3    attention, Mr. Shulman, to page five going
4    into page six.
5          And first, have you seen this
6    document before?
7      A    Yes.
8      Q     And do you see that the
9    paragraph starting on the top of page six
10   says:
11         "During this time period, SEI
12   lost at least 2,487 internet subscribers,"
13   et cetera?
14         The next paragraph starts:
15         "In addition, during this time
16   period from August '09 through
17   December 2011, SEI lost at least 1,085
18   GlobeCast subscribers."
19     A    Hold on.
20         Okay.  Got it.
21     Q    Do you see that?
22     A    Yes.
23     Q     These are numbers that SEI
24   presumably was able to calculate based on
25   documents that you cited to here.

Page 199

1          Stephen Shulman
2         Were you not comfortable with
3    these subscriber numbers in terms of
4    forming a damages theory based on lost
5    subscribers?
6          MR. PISKORA:  Objection to the
7      form.
8          You can answer.
9      A    I -- yeah.  I think I mentioned
10   it before, that there wasn't -- we didn't
11   feel comfortable enough using it, using
12   this and any other information that was on
13   the record.
14     Q    And just to be clear, is
15   that -- is that because you weren't able to
16   attribute these subscriber cancellations to
17   Polvision or because you weren't
18   comfortable with the actual number of
19   canceled subscriptions?
20         MR. PISKORA:  Objection to the
21     form.
22         You can answer it again.
23     A    I have to go back, but yes to
24   the fact that you couldn't distinguish why.
25   And the other thing, I'd have to go back to

Page 200

1          Stephen Shulman
2    all the detailed records we got to see
3    whether or not we had it for going back
4    long enough.  Maybe we didn't have it going
5    back long enough.  I'd have to check all
6    the documents.
7      Q    Well, let's -- sorry.
8          What is your Klan claim theory?
9          MR. PISKORA:  Objection to the
10     form.
11     Q    The theory of damages?
12         MR. PISKORA:  Objection to the
13     form.
14         But you can answer it.
15     A    The claim for three was to, in
16   this case, try to determine, using a before
17   and after damage model, what the effect was
18   for the removal of Klan starting, I
19   believe, in July of '10.
20     Q    And describe to me what -- the
21   nature of this before and after damages
22   model that you have come up with.
23         MR. PISKORA:  Objection to the
24     form.
25         You can answer.

Page 201

1          Stephen Shulman
2      A    We looked at what the Klan --
3    I'm sorry.
4          We looked at subscriber growth
5    prior to the barter agreement, and looked
6    to see what the historical growth was.  We
7    then took that growth, and we projected
8    what the subscribers should have been based
9    on that growth, and then we looked at what
10   actually occurred.  And we came up with a
11   difference during the period in which Klan
12   was removed through December 31st, 2011.
13     Q    Why do you use the barter
14   agreement as a -- as something to
15   distinguish between your various growth
16   rates --
17     A    Because we were just trying to
18   factor --
19     Q    Let me finish the question so
20   we have a clean record.  Okay.
21     A    I'm sorry.
22     Q    But go ahead.  Answer the
23   question.
24         MR. PISKORA:  Objection to the
25     form.

                    51 (Pages 198 to 201)

Page 202

```
1            Stephen Shulman
2        Go ahead.
3        A    We went to there because we
4   were trying to filter out the effect of the
5   introduction of Polvision license agreement
6   in Chicago.
7        Q    You had testified before,
8   though, that you didn't include the barter
9   agreement in your damages calculation in
10  terms of the -- counting the episodes
11  because the term of that agreement was
12  before the licensing agreement -- before
13  the settlement agreement.
14           MR. PISKORA:  Objection.
15       Q    But you still think this is
16  a -- a -- I don't have the right word, but
17  something that should be used to
18  distinguish between prior growth rates and
19  subsequent growth rates?
20       A    Yes.
21       Q    Let's take a look at page 12 of
22  the exhibit we were just looking at,
23  Number 6.  And here, this is SEI's response
24  to TVP's question about the damages
25  theories relating to the Klan claim.  And
```

Page 203

```
1            Stephen Shulman
2   TVP -- I'm sorry.  SEI says here, through
3   its counsel:
4        "Although investigation and
5   discovery remains ongoing," et cetera,
6   "during the time period from July 26, 2010,
7   through December 31, 2011, SEI lost at 3378
8   internet subscribers."
9        And then if you go down towards
10  the next paragraph:
11       "In addition, during the time
12  period from July 26, 2010, through
13  December 31, 2011, SEI lost at least 972
14  GlobeCast subscribers."
15       And then in each of these
16  paragraphs, it goes on to say what the
17  lifetime customer value of these
18  subscribers would be, and then that is
19  calculated through December 2019, the
20  expiration of the license.
21       Do you see that?
22       A    Well, you went really fast.  I
23  didn't see the last part you were referring
24  to, where they said they went through 2019.
25       Q    Okay.  But do you see that this
```

Page 204

```
1            Stephen Shulman
2   is generally a theory described as the
3   value of lost subscribers?
4            MR. PISKORA:  Objection to the
5   form.
6        Q    Is that right?
7        A    I see it as their concept.
8        Q    Is this a little different than
9   your concept?
10           MR. PISKORA:  Objection to the
11  form.
12       A    Yes.
13       Q    How so?
14       A    We weren't looking at the
15  cancellations that were made.  We were
16  looking at what it was -- the growth in the
17  subscribers should have been before Klan
18  was removed, and then looked at it
19  afterward.  It's a before and after.  So we
20  weren't looking at specific cancellations.
21  They were.  But we were looking at the
22  overall effect on the company of removing
23  the Klan by looking at the net number, not
24  the cancellation number.
25       Q    Why didn't you use the actual
```

Page 205

```
1            Stephen Shulman
2   cancellation number as your damages theory?
3        A    Well, once again, I don't think
4   we had really -- we weren't comfortable
5   with the data for doing it.  We -- but --
6   and so that was number one.
7        Number two, there was also
8   something that should be taken into
9   consideration about the effect that it had
10  on future subscribers or new subscribers
11  and what kind of effect that would have,
12  which this doesn't take into account.
13       We were looking, basically, at
14  the overall growth that we would have --
15  expected to have and we didn't have before
16  and after the Klan.
17       Q    You mentioned a few things in
18  your previous answer.
19       You started off saying that you
20  don't think "we were really comfortable
21  with the data for doing it."  By "it," I
22  mean -- I guess you mean putting forth the
23  damages theory based on actual lost
24  subscribers.
25       What kind of data would you
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

A-435

Page 206

```
1            Stephen Shulman
2   have needed to make that theory?
3       A    Well, once again, we would have
4   had to figure out what cancellations
5   accrued to Klan.  In order to do that, you
6   have to have -- one thing you have to have
7   is what was the historical cancellations
8   going back many, many periods, to get an
9   idea of what the historical cancellation
10  rate was so you could compare it to the
11  current cancellation that took place in the
12  damages.  I don't believe we had all that
13  historical data to do that.
14          We did have it for the growth.
15  We went back all the way to 2002.  We went
16  from there right up to, I guess, 2008.  And
17  that was a pretty significant period.  So
18  we had what we would have expected to see
19  in the growth period after we adjusted
20  conservatively to take out spikes as a
21  result of new systems coming in and that
22  sort of thing, and came up with, you know,
23  1.7 percent growth rate.
24      Q    I asked you in my previous
25  question what kind of data you would have
```

Page 207

```
1            Stephen Shulman
2   needed to put forth the damages theory
3   based on actual lost subscribers, and your
4   response -- you started off your response,
5   and I will quote.
6          "Well, once again, we would
7   have to figure out what cancellations had
8   accrued to the client."
9          What do you mean by that?
10      A    We would have to take all these
11  cancellations and determine which
12  cancellations were a result of removing the
13  Klan.
14      Q    How would you do that?
15      A    Well, that's a difficult
16  process, and we weren't comfortable with
17  the information we had in order to do that.
18      Q    Why is that a difficult
19  process?
20      A    Well, you have to have a
21  measure of what normal cancellations would
22  have been normally for their -- all their
23  different providers.
24      Q    And if you don't have that
25  measure?
```

Page 208

```
1            Stephen Shulman
2       A    It would be hard to come up
3   with a number you would be comfortable with
4   to represent cancellations.  So we went
5   with sort of a more conservative approach.
6       Q    Is the problem that you can't
7   attribute any given cancellation to Klan?
8       A    That's part of it, unless you
9   have maybe additional information.
10      Q    Like what?
11      A    Well, maybe it's another before
12  and after.  If you had a cancellation going
13  back for every provider in each of their,
14  you know, venues and you looked at the
15  historical cancellation rate before there
16  was any issues, you might have been able to
17  use that, compare it to what the
18  cancellation rate was during the damage
19  period.  And then you could say:
20          "Hey, the difference is what's
21  attributable to the Klan."
22      Q    If you had that information,
23  would you be -- would you automatically be
24  able to make that conclusion that the
25  difference between the cancellations before
```

Page 209

```
1            Stephen Shulman
2   and afterward are necessarily attributable
3   to Klan, or do you need to know more
4   information?
5       A    It's never as simple as you
6   think it is.
7       Q    Why not?
8       A    So, consequently -- because
9   there are all these other factors that come
10  into play.
11      Q    Factors that cause people to
12  cancel subscriptions?
13      A    It could be that.  It could be
14  recordkeeping.  Records aren't available.
15  They're incomplete.  We got these unusual
16  anomalies.  What do you do with them?  You
17  know, it's not an easy thing to do.
18      Q    So instead of offering a theory
19  based on actual lost subscribers, you have
20  a theory based on -- and I'll characterize
21  it; tell me if I'm wrong -- a diminution in
22  growth rate for subscribers?
23      A    Well, I think that is --
24  ultimately, that's what you had, is a
25  growth rate that didn't keep up with its
```

53 (Pages 206 to 209)