Page 210

1          Stephen Shulman
2   historical growth.
3       Q    That's your theory.  It's based
4   on a diminution --
5       A    Before and after.
6       Q    -- diminution in growth rate?
7       A    It's a before and after.
8       Q    Why couldn't you use this same
9   theory, diminution in growth rate, for the
10  Polvision claim?
11      A    Because I didn't think -- my
12  recollection is we didn't have the data to
13  be able to do it going back historically,
14  that you would have -- we went back all the
15  way to 2002.
16         So you'd have to be able to
17  look at it using a historical rate that you
18  could be comfortable with.  And my
19  recollection is that's not what we have.
20      Q    Why don't you have --
21      A    I don't think we have that
22  information.
23      Q    You have data from 2002, you
24  say?
25      A    Yes.  But I don't know if it

Page 211

1          Stephen Shulman
2   included cancellation rates for Chicago.
3       Q    If it did, you would be able to
4   offer similar theories for -- you would
5   otherwise be able to offer a similar theory
6   for the Polvision claim?
7       A    It's possible.  And -- but,
8   like I said, it's never as simple as you
9   think.  You've got to spend a lot of time
10  seeing what you've got.
11      Q    Again, it's your view that
12  SEI -- or you didn't have access to the
13  particular data showing you enough in
14  terms -- to make a conclusion for Polvision
15  with respect to diminution in growth, but
16  you did have that data for Klan?
17      A    Yes.
18      Q    Why don't you make a claim for
19  the -- relating to Klan that you made for
20  Polvision?  And that is --
21         MR. PISKORA:  Objection to the
22  form.
23      Q    -- a theory grounded in the
24  value of the episodes license.
25         MR. PISKORA:  Objection to the

Page 212

1          Stephen Shulman
2   form.
3         You can answer it.
4       A    It's a different situation.
5   Polvision -- I mean -- I'm sorry.  TVP
6   didn't sell Klan and reap the benefit.  It
7   wasn't -- it wasn't a breach of an
8   exclusivity clause.  It actually was the
9   breach of a, maybe, fulfillment where SEI
10  expected to always have the Klan and
11  they -- and TVP decided, "We're not giving
12  it to you anymore."
13         It's not the same type of
14  situation.
15      Q    Take a look at paragraph 60 of
16  your report.  The bottom -- the very last
17  line there in that spreadsheet on
18  paragraph -- on the top of the next page.
19      A    On what?  What paragraph are we
20  talking about?
21      Q    Just before paragraph 61.  I'm
22  looking there.
23      A    Just before the paragraph.
24  That's the table.
25      Q    Yes, the table, right.

Page 213

1          Stephen Shulman
2       A    Right.
3       Q    There are 223 episodes of Klan
4   here, right?  And these are licenses --
5   these are episodes that you included in
6   your Polvision calculation as -- as -- and
7   you actually ascribe a value to these,
8   24,530.
9         Why couldn't you make a claim
10  for Klan based -- for the Klan program
11  based on the value of these episodes?
12      A    Because in this particular
13  case, we're trying to figure out the effect
14  that it had on SEI.  This is a different
15  type of damage.  It's a different type of
16  claim.  This is an exclusivity claim where
17  there were damages, and we're trying to see
18  what it is TVP got as fair value or didn't
19  get as fair value for the episodes that
20  were involved.  This is a totally different
21  claim.
22      Q    Are you aware of SEI's claim
23  insofar as it relates to the reason TVP
24  purportedly removed Klan from the TVPolonia
25  lineup?

54 (Pages 210 to 213)

Page 214

Stephen Shulman

1    A    You mean, why did TVP actually
2    do it or why the other side -- what the
3    other side alleges they do? Yes. I
4    think --
5    Q    The latter.
6    A    -- I mention it in here.
7    Q    And what is it? What is their
8    claim?
9    A    I think they -- they -- I think
10   its their claim; they pulled the Klan in
11   response to -- how should a I say -- sort
12   of a retaliatory measure, I think is a way
13   of explaining it.
14   Q    Did you --
15   A    Let's look and see, because I
16   do mention it, I believe, yeah:
17   "... in an apparent
18   after-the-fact attempt to justify its
19   licensing and distributing of this program
20   series to the Chicago distributor, removed
21   the series Klan, further alleged to be the
22   longest running and popular series aired on
23   TVP, in further breach of the agreement."
24   Q    So you're quoting the amended

Page 215

Stephen Shulman

1    complaint filed by SEI here which alleges
2    that SEI, to justify its licensing of the
3    Klan program or certain episodes of the
4    Klan program to Polvision, removed Klan
5    from TVPolonia?
6         MR. PISKORA: Objection to the
7    form. I think you just misspoke,
8    David. I think you said "SEI to
9    justify its licensing."
10        MR. WENGER: I mean TVP, I
11   should say. And let me ask the
12   question again.
13   Q    You quote here a segment from
14   SEI's amended complaint where SEI alleges
15   that TVP, in an attempt to justify its
16   licensing of episodes of Klan to Polvision,
17   removed Klan from TVPolonia.
18        So, in essence, what the claim
19   is, is that SEI -- or that TVP licensed the
20   Klan episodes to Polvision and pulled them
21   off of TVPolonia to the detriment of SEI?
22   A    Yes. That's what this seems to
23   say. That's -- I'm quoting this. I mean,
24   you know, I'm sure you had lengthy

Page 216

Stephen Shulman

1    discussions with the other side on what
2    this is all about, but this is in general
3    what they did.
4    Q    So my question is what I've
5    asked of -- a little while ago.
6         Why then couldn't you bring a
7    similar claim here as you asserted for the
8    Polvision claim?
9         MR. PISKORA: Objection to the
10   form.
11        You can answer it again.
12   Q    Meaning a theory based on the
13   fact that TVP made a certain amount of
14   money from licensing these Klan episodes,
15   wrongly, according to SEI, to Polvision?
16   A    That wouldn't be the
17   appropriate measure of damage here.
18   Q    Why not?
19   A    The appropriate measure of
20   damage is the lost profits of how they were
21   actually damaged financially themselves.
22        Remember what I said is why we
23   used the alternative where the fair value
24   of what it was TVP got or didn't get was

Page 217

Stephen Shulman

1    because it was the violation of an
2    exclusivity clause. This is not the
3    violation of an exclusivity clause.
4    Q    Yeah, but you include 223
5    episodes in paragraph 60, in the table on
6    paragraph 60, 223 Klan episodes, as part of
7    the 860 episodes that violated the
8    exclusivity clause.
9         So these 223 episodes, the Klan
10   episodes, are they not a violation of
11   the -- wasn't it a violation of the
12   exclusivity clause by licensing those
13   episodes to Polvision? Isn't that what
14   you're claiming?
15        MR. PISKORA: Objection to the
16   form.
17        You can answer it.
18   A    Yes, it was. It was a
19   violation of the exclusivity clause, and we
20   valued it appropriately in claim one. I'm
21   not sure how this relates to your question
22   about claim three.
23   Q    And a portion of the 860
24   episodes, would you agree with me that a

55 (Pages 214 to 217)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 218

1          Stephen Shulman
2    portion of it, approximately a quarter of
3    those episodes, is Klan episodes?
4          MR. PISKORA:  Objection to the
5    form.
6          You can answer it.
7      A    Well, it definitely included
8    whatever percent it is.  It's 223, a value
9    of 24 grand out of --
10     Q    By episode numbers?
11     A    -- whatever that comes out.
12     Q    But in terms of episode
13   numbers, 223 is approximately 25 percent of
14   860.  Okay.
15         So you're seeking damages in
16   the Polvision claim, or SEI is seeking
17   damages, based on Klan episodes.  Is it, in
18   your view, not a double damages claim for
19   them to now seek additional damages for
20   these -- for the Klan episodes?
21         MR. PISKORA:  Objection to the
22   form.
23         You can answer.
24     A    Now, I understand what you're
25   asking about.  That's a different question.

Page 219

1          Stephen Shulman
2          We didn't aggregate the claims.
3    We put a claim for each claim.  To the
4    extent that there might be some
5    duplication, then that may come out in
6    court and may be something that needs to be
7    considered.
8      Q    Is there a duplication, or is
9    there not?
10     A    There is a -- there is a
11   possibility it could be considered, in that
12   this claim is to take away profits that
13   they earned to bring it back to SEI in the
14   form of where what they got really should
15   adhere.
16         Claim three is a damage that
17   relates not to the actual economic loss --
18   I mean, the claim on one, where we're using
19   the value they got, is not -- doesn't
20   consider the economic loss that they
21   incurred through lost cancellations or lost
22   subscribers.  Klan claim three is really
23   the effect of what happened with the --
24   with the Klan.
25     Q    But you agree with me, I think

Page 220

1          Stephen Shulman
2    you've said a few minutes ago, that there's
3    some overlap here --
4      A    Possible.
5      Q    -- because it's the same
6    conduct or similar conduct?
7          These Klan episodes, there's an
8    overlap?
9      A    It's not the same --
10         MR. PISKORA:  Objection to the
11   form.
12         You can answer.
13     A    It's not the same conduct.
14   It's actually different conduct, to tell
15   you the truth.  It's much different
16   conduct.
17         The first claim, you're
18   getting -- you're actually expunging
19   profits.  This claim is just:
20   "So how was I hurt by the
21   claim?"
22     Q    But I'm talking about the
23   conduct giving rise to the claim, namely
24   the licensing of -- the removal of the Klan
25   to TVP in order, as SEI claims, to license

Page 221

1          Stephen Shulman
2    it to Polvision.
3      A    Well, that's pretty indirect.
4    I would -- I don't know if I can make that
5    leap.  I would have to think about it.
6      Q    Okay.  Did you discuss this
7    issue with Gerbrandt in terms of whether
8    there is any overlap in the damages claimed
9    for --
10     A    Not that I --
11     Q    Hang on.
12         -- for one and three?
13     A    Not that I recall.
14     Q    All right.  Are you aware that
15   SEI alleged its damage for the Klan claim
16   to exceed $10 million in its complaint, as
17   well as in its -- in its complaint?
18     A    I've read it.
19     Q    Your theory is much less in
20   terms of the quantum, right?
21     A    Yes.
22         MR. WENGER:  Do you mind if we
23   take five minutes?
24         (A break is taken.)
25     Q    Your damages theory for Klan,

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 222

Stephen Shulman
1  Stephen Shulman
2  as we were talking about, is based on
3  a diminished growth rate in subscribers,
4  correct?
5    A    Yeah, that's one of the bases
6  for which it's a before and after using the
7  growth rate.
8    Q    Are you making a causation --
9  are you offering an opinion on causation in
10 terms of saying that the Klan program
11 caused -- the removal of the Klan program
12 caused the diminished growth rate?
13   A    We were not giving an opinion
14 about causation.  We're not -- we weren't
15 asked to determine cause.  We were asked to
16 presume that Klan caused -- that the
17 removal of the Klan would have been
18 responsible for a diminution in that
19 growth.
20   Q    You told me before that
21 subscribers cancel subscriptions for all
22 kinds of reasons.
23   A    I did.
24   Q    Would you agree that it's not
25 necessarily the case that any subscriber

Page 223

1  Stephen Shulman
2  that canceled during -- following the
3  removal of the Klan program did so because
4  of the removal of the Klan program?
5    A    Well --
6      MR. PISKORA:  Objection to the
7  form.
8      Can you just wait a second?
9      Objection to the form.
10     You can try and answer it.  Do
11 you need it read back?
12   A    Would you?
13   Q    My question is:
14     Would you agree with me that
15 it's possible that there are subscribers
16 that canceled following the removal of the
17 Klan program for reasons not related to the
18 removal of the Klan program?
19   A    Yes, you could say.
20   Q    But, again, your theory is
21 not -- your opinion is not addressing that.
22 Your opinion is just comparing the growth
23 rates before and after without dealing with
24 the reasons for changes -- for subscriber
25 cancellations in the after period?

Page 224

1  Stephen Shulman
2      MR. PISKORA:  Objection to the
3  form.
4      You can answer.
5    A    The methodology we chose,
6  because we had the historical record, made
7  it appropriate for us to be able to do that
8  calculation without consideration to the
9  actual reasons why cancellations might have
10 taken place.
11   Q    So you would agree with me that
12 there may be some other reason for some of
13 the subscriber cancellations after the
14 removal of Klan?
15     MR. PISKORA:  Objection to the
16 form.
17   Q    That is not related to the Klan
18 removal?
19   A    Not on the way we base our
20 calculation.  We think that the diminution
21 as resulting from the diminished growth
22 rate takes that all into account.  And if
23 the Klan -- the removal the Klan was the
24 primary major event, then the diminution in
25 those subscribers would represent the

Page 225

1  Stephen Shulman
2  effect of the removal of the Klan.
3    Q    All of the subscribers, right?
4    A    The ones we calculated.
5    Q    But you didn't analyze other
6  potential reasons for subscriber
7  cancellations?
8      MR. PISKORA:  Objection to the
9  form.
10     You can answer.
11     THE WITNESS:  Yeah.
12   A    No.  The before and after takes
13 that into account.
14   Q    It does take into account other
15 reasons for subscriber cancellations, or it
16 doesn't?
17   A    It does.
18   Q    Where does it?
19   A    When you look at the history
20 and you take out the spikes that we did, you
21 have people coming in and out for all sorts
22 of reasons.  That's not going to change in
23 the after period, you know, the damage
24 period.  People are coming out for one
25 reason or another.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 226

Stephen Shulman

1      If people are behaving the same
2   way in the historical period, you -- for
3   the period that we got, like eight years,
4   there's no reason for us to believe that
5   people aren't behaving the same way in the
6   damage period -- so they -- that historical
7   rate that we're using takes into account, I
8   think, you know, those other reasons why
9   people cancel.
10      Q    SEI's distribution model is
11   through the various providers, as we've
12   discussed, right?
13      A    Yes.
14      Q    If one of those providers, for
15   example, would have stopped distributing
16   during the post removal of Klan period,
17   that would affect the -- potentially, a
18   large number of subscribers, right?
19      A    Yes.  And we tried to address
20   the spikes in those movements like that,
21   like, for instance, groups coming in,
22   right, would distort it as well, and maybe
23   a group going out.  So we did -- we did try
24   to adjust where we knew there were spikes

Page 227

Stephen Shulman

1   and unusual differences.
2      Q    You adjusted for spikes in the
3   period.  And I'm looking here at
4   appendix -- or Exhibit 3 to your report.
5   You have listed in the top portion of that
6   table spikes, or six periods.  But you
7   don't have any spikes or other adjustments
8   to the subscriber growth rates post second
9   quarter of 2010; do you?
10      A    I'm sorry.  What?  You're now
11   jumping to after the second quarter of '10?
12      Q    Right.
13      A    No.
14      Q    So you're not really taking
15   into account other adjustments here?
16      A    Well, we did in the historical
17   period.  We took the adjustments into
18   effect.  If there were people that came in
19   and went out because of that, I think in
20   Mr. Hart's analysis it was apparent, you
21   know, from what he identified, there
22   were -- there's more people being added
23   because of new than what's coming out for
24   old.

Page 228

Stephen Shulman

1      So it actually was a
2   conservative way of just leaving that
3   period alone because it was more coming in
4   than going out.
5      Q    But my question is:
6      You didn't factor into the
7   growth rate that you arrived at for the
8   post 2010 period or even for the post
9   second quarter '08 period, you did not
10   factor in any other factors other than
11   subscriber numbers?
12      MR. PISKORA:  Objection to the
13   form.
14      You can answer.
15      A    No.
16      Q    So you didn't assume -- you
17   didn't take into account in that period
18   economic conditions, price changes, changes
19   in the distribution network, competition in
20   the marketplace, any of those other
21   factors?
22      MR. PISKORA:  Objection to the
23   form.
24      You can answer it again.

Page 229

Stephen Shulman

1      A    Well, no.  They would have come
2   into play because it would -- those are
3   similar things that would have happened in
4   the historical period at one point or
5   another.  So those types of items would be
6   embedded into these numbers and were also
7   embedded into the historical numbers.
8      Q    The Klan program was removed
9   from the TVPolonia lineup in July of 2010,
10   let's say.
11      In your view, is there a
12   particular time period after that July 2010
13   date that subscriber behavior is not
14   affected by the removal of Klan?
15      A    Mr. Spanski testified in his
16   deposition that it was an ongoing issue.
17   It could be an ongoing issue with respect
18   to future people.  If people were
19   subscribing because of the Klan, then you
20   wouldn't have new subscribers maybe coming
21   in because of the Klan.  So it becomes an
22   ongoing issue.
23      Q    And what about for existing
24   subscribers?  Is it your view that there

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

A-441

Page 230

1          Stephen Shulman
2  would have been some subscribers that
3  subscribed before the removal of Klan that
4  waited, for example, a year after the
5  removal of Klan to cancel their
6  subscription because of the removal of
7  Klan?
8          MR. PISKORA: Objection to the
9      form.
10         You can answer.
11     A   I can see that happening.
12     Q   Do you have any industry
13 experience that would support that view?
14     A   Well, I'm not sure that I need
15 industry experience to support the view.
16 I'm sure there are people who do that.
17 It's called procrastination.
18     Q   So they would wait a year, year
19 and a half to cancel because of a program
20 that was removed?
21     A   If I go on my own personal
22 experience, which I do that, I'm sure there
23 are other people like me.  But you're
24 right.  It's not an industry expertise I'm
25 giving.  You just asked me, is it a

Page 231

1          Stephen Shulman
2  possibility that they could.  And I could
3  say yes based on my own experience, knowing
4  I'm not the only person in the world that
5  procrastinates.
6      Q   Did you discuss this issue with
7  Mr. Gerbrandt?
8          MR. PISKORA: Objection to the
9      form.
10         You can try and answer.
11     A   I don't recall.
12     Q   Why did you pick December 2011,
13 December 31, 2011, as an end date for your
14 damages period, if you will?
15     A   We were given -- that was the
16 damage period we were given by the
17 attorneys.  I think that is the date in
18 which the agreements -- the -- that's -- I
19 think that's the period in which, I guess,
20 Polvision agreements were up, thereabouts.
21 But --
22     Q   Well, we're talking about the
23 removal of the Klan program and its effect
24 on subscribers.
25     A   This was --

Page 232

1          Stephen Shulman
2      Q   Hang on.
3      A   Yes.
4      Q   Is it your view that the
5  removal of Klan did not have any effect on
6  subscribers as of December 31, 2011?
7      A   What was that again?
8      Q   Is it your opinion that, after
9  December 31, 2011, so January 1, 2012, no
10 subscriber would have been motivated or
11 affected by the removal of Klan?
12     A   No, not necessarily.  But we
13 were given that as an end date to the
14 damage calculation.
15     Q   By who?
16     A   By the attorneys.
17     Q   If the trial was, for example,
18 in December of 2012, you would still stay
19 with the view that it is only up to
20 December 31, 2011, that subscriber behavior
21 was affected by the Klan program?
22     A   It's a hypothetical, and we
23 would have to -- we would have to look at
24 it.
25     Q   My question is whether this end

Page 233

1          Stephen Shulman
2  of your damages period is a fixed date or
3  is it subject to change?
4      A   Well, it's not subject to my
5  change, but it's a fixed date.
6      Q   Would you support the opinion
7  that subscriber behavior after
8  December 31, 2011, was affected by the
9  removal of Klan?
10     A   I haven't given any thought to
11 it, so I wouldn't be able to give you an
12 answer to that.
13     Q   Then your Klan theory is that
14 the removal of Klan affected both existing
15 subscribers and potential new subscribers,
16 right?
17     A   Yes.
18     Q   Let's take a look at
19 paragraph 76 of your report.
20         Do you agree with me that based
21 on the table here in paragraph 76, from the
22 end -- this is subscribers at the end of
23 two thousand and -- at the end of
24 June 2010, until the subscribers -- and
25 this is compare -- as compared with the

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 234

1      Stephen Shulman
2  subscriber number, let's say, at
3  December 31, 2011, there is a significant
4  growth in subscribers, 3,000 some-odd
5  subscribers?
6      A    You're looking at paragraph 76?
7      Q    Yeah, the table in
8  paragraph 76.
9      A    This isn't the -- 44,329 is the
10  subscribers at the end.
11     Q    Right.
12     A    49 is the estimated subscriber
13  it should have been at the end of that, at
14  the end of the fourth quarter of 2011.
15     Q    Look at the actual number.
16     A    Okay.  46.  Yes.
17     Q    So the difference between
18  46,976 and 44,329 is 2,647.  So there
19  was --
20     A    Yes.
21     Q    There was actually a net
22  subscriber gain during this period; is that
23  right?
24     A    Yes.
25     Q    And that doesn't affect your

Page 235

1      Stephen Shulman
2  opinion as to whether there was an adverse
3  effect on SEI subscribers as a result of
4  the removal of Klan?
5      A    It keeps -- it doesn't change
6  my opinion about 2,071.
7      Q    Your calculation -- your
8  calculation of the diminished growth rate,
9  that is using net subscriber numbers,
10  right?
11     A    Yes.
12     Q    So you don't consider the
13  actual amount of cancellations versus
14  additions in any given quarter.  You're
15  looking at net changes, correct?
16     A    Correct.
17     Q    So it's possible that, if you
18  have a net change of 100 subscribers, let's
19  say, a net change of 100 subscribers less,
20  right, it could be that during that period
21  300 people canceled and 200 people
22  subscribed, right?
23     A    Yes.
24     Q    And, also, if you had 100 more
25  subscribers, it could be that during that

Page 236

1      Stephen Shulman
2  period 100 people canceled and 200 people
3  subscribed?
4      A    Okay.
5      Q    So the number of cancellations
6  and additions during any given period could
7  vary widely, but the net subscriber numbers
8  may be similar for -- on a month-to-month
9  basis; is that right?
10     A    Yes.
11     Q    But based on your numbers, you
12  can't really determine how many subscribers
13  canceled or added during any given period
14  in terms of the individual additions and
15  cancellations, right?
16     A    Yes.  We used -- correct.  We
17  used the net.
18     Q    You just -- let's turn back to
19  Exhibit 3.  Take a look at that.  It's
20  right after the text of your report, so a
21  few pages after that.
22     A    Okay.
23     Q    And I want to first discuss
24  with you this growth rate calculations
25  here.

Page 237

1      Stephen Shulman
2  You have what you've calculated
3  to be, after removing spikes, a 1.7 percent
4  growth rate from the fourth quarter of '03
5  through the first quarter of '08, correct?
6      MR. PISKORA:  Objection.
7  Objection to the form.
8      But you can answer the
9  question.
10     A    Yes.  We removed spikes for
11  that where it's indicated.
12     Q    You said before that you used
13  the -- well, withdrawn.
14     The Polvision distribution
15  arrangement, which began in, based on
16  your -- the damages, you are -- or the
17  agreements you're relying on began in June
18  of 2008; is that right?
19     A    Yes.
20     MR. PISKORA:  Objection to the
21  form.
22     You can answer.
23     A    We're going to the first
24  quarter -- I'm sorry.  I might have lost
25  you there.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 238

1           Stephen Shulman
2           We went through the first
3    quarter of '08 for the growth.  Is that
4    what you're referring to?
5       Q    No, no.  My question was
6    different.  It's the Polvision claim,
7    right?
8       A    Okay.
9       Q    The Polvision distribution
10   arrangement or distribution of programs
11   that were licensed extends from the second
12   quarter of 2008 all through the end of
13   2010.  Would you agree with that?
14      A    You mean claim one?
15      Q    Yes.
16      A    Claim one starts at the
17   settlement date, which would be August
18   of '09.
19      Q    But there were --
20      A    Which would be the second or
21   third quarter of '09.
22      Q    But there were episodes being
23   distributed by Polvision before that time,
24   right?  And those were the ones you removed
25   from your -- from the June '08 agreement?

Page 239

1           Stephen Shulman
2       A    Yeah, and the barter agreement.
3       Q    Right.  So during the period in
4    the middle row here between the second
5    quarter of '08 and the first quarter of
6    2010, there were programming -- there was
7    programming being distributed by Polvision;
8    is that right?
9       A    Yes.
10      Q    TVP programming, I mean.
11          So is it your view that it's
12   possible subscribers would have canceled
13   because of the Polvision distribution of
14   TVP programming?
15      A    Yes, I think that's a
16   possibility.
17      Q    So isn't it then incorrect for
18   you to ascribe a growth rate after the
19   barter agreement through the fourth quarter
20   of 2011 solely based on the Klan changes?
21   Weren't there subscribers that may have
22   canceled because of the Polvision
23   distribution during that period?
24      A    That's possible.
25      Q    So then the diminished growth

Page 240

1           Stephen Shulman
2    rate might be for some other reasons --
3    this might be another reason, besides for
4    the Klan removal, that you may have had a
5    diminished growth rate?
6       A    It's possible.
7       Q    Going back to the adjustments
8    for the spikes here.
9       A    Hold on a second.  Let's make
10   sure you stated that correctly.
11          We're starting with June
12   of 2010, right?  And then we grew it so
13   that the period from what you call the
14   second quarter of '08 to the first quarter
15   of '10 is not part of the diminished growth
16   rate.  We just took whatever the
17   subscribers were at June 2010 and increased
18   it going forward to the fourth quarter
19   of 2011.  So the Polvision issue is not
20   part of the diminished growth rate.
21      Q    But back in Exhibit 2 it says,
22   on the right side in bold, on the bottom:
23          "Average growth rate after the
24   barter agreement was 0.7 percent per
25   quarter."

Page 241

1           Stephen Shulman
2       The barter agreement was in
3    March of '08.
4       A    Um-hum.
5       Q    So aren't you arriving at the
6    0.7 percent average calculating the growth
7    rate starting in the second quarter
8    of 2008?
9       A    Yes.  But we don't use it for
10   anything.
11      Q    Isn't that the basis for your
12   Klan theory?
13      A    Go to our calculation.
14      Q    Okay.
15      A    Which is page 76.
16      Q    Paragraph 76?
17      A    Paragraph 76.
18          We're looking at the actual
19   subscribers in June '10, when the Klan was
20   pulled, then we're ascribing 1.7 growth
21   rate based on historical growth rate,
22   right?  That gave you 49, versus the actual
23   numbers of subscribers at the end of
24   December 31, 2011, was 46,976.
25          So we're looking at the

Page 242

1          Stephen Shulman
2  difference as a result of what happened
3  between the time they pulled it in June of
4  '10 to what we would have expected the
5  subscriber level to be.  So it's not about
6  the, necessarily, diminished growth rate
7  that includes any period from the second
8  quarter of '08 to the first quarter of
9  2010, if I'm looking at this correctly and
10  I'm understanding what you're asking -- or
11  stating.
12      Q    Back onto the question I wanted
13  to ask you about the spikes here:
14          Did you actually adjust for
15  these spikes, or did you just remove those
16  percent changes from your calculation?
17      A    We removed them.
18      Q    But you're essentially removing
19  here one, two, three, four, five -- six out
20  of about 18 quarters, about a third of the
21  data.
22      A    Yes.
23      Q    Doesn't this actually, I mean,
24  make this data somewhat suspect?
25      A    Well, we're still left with a

Page 243

1          Stephen Shulman
2  number of data points, and so consequently,
3  we average the remaining data points.  It's
4  not like we're left with two or three data
5  points.
6      Q    But each of these quarters --
7  for example, let's take a look at the
8  second quarter of 2007.  You show a
9  1.2 percent adjusted growth rate.  Doesn't
10  that necessarily build on the periods
11  before it?
12      A    No.  It's before and after.
13      Q    It says --
14      A    It's just the period before and
15  the -- it's the change in the monthly rate.
16      Q    As compared to the previous
17  month?
18      A    Yes.
19      Q    But which -- the previous month
20  takes into account a very -- or is a very
21  large growth rate during that previous
22  month, which you have removed from the
23  analysis?
24      A    We're just averaging monthly
25  growth rates.

Page 244

1          Stephen Shulman
2      Q    No, I understand.
3      A    That's what we're applying to
4  try and figure out what's the monthly
5  average growth rate.
6      Q    I understand.  But, for
7  example, let's take a look at this first
8  quarter of '07.  It shows or indicates an
9  8.2 percent change in subscribers.  That's
10  a spike which you removed.  And then in the
11  second quarter of '07, there's a
12  1.2 percent growth rate, growth in
13  subscribers.
14      A    Yes.
15      Q    But that 1.2 percent builds on
16  the 8.2 percent in the period before; does
17  it not?
18      A    It's just a change in the
19  monthly rate of what happened during the
20  month.  It doesn't build on anything before
21  it.
22      Q    But it builds on the subscriber
23  numbers that were there before it?
24      A    Yes.  It's the -- so it's the
25  monthly change, and that month was

Page 245

1          Stephen Shulman
2  1.2 percent.
3      Q    Back to what I was asking you
4  before about Polvision and how that might
5  affect the growth rate.
6          Polvision was still
7  distributing content after the second
8  quarter of 2010; isn't that right?
9      A    After the second quarter of
10  2010?
11      Q    Right.
12      A    Yes, it was.
13      Q    So during this third period at
14  the bottom right, where you actually have
15  what -- where you estimate a certain amount
16  of subscribers that SEI should have
17  achieved, it's possible some of the
18  subscribers that SEI should have achieved
19  may not have been achieved because of
20  Polvision, right?
21      A    Yes, that's possible.
22      Q    So, again, there may be some
23  overlap here in these claims?
24      A    That's possible.
25      Q    So these net changes in

62  (Pages 242 to 245)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 246

```
1              Stephen Shulman
2    subscribers that you have identified here
3    and your estimated number of actual
4    subscribers that should have subscribed, or
5    estimated numbers of subscribers that
6    should have subscribed or would have
7    subscribed, this is a consolidation of
8    Euro View subscribers and TVP Canada
9    subscribers; is that right?
10        A    Yes.
11        Q    And is it also a consolidation
12   of internet and cable subscribers?
13        A    It's everybody.
14        Q    And Euro View subscribers, you
15   are aware, include subscribers to satellite
16   and cable mediums, right?
17        A    Yeah.  All of the -- you know,
18   in total, the way we did it includes all
19   distribution to all the three primary
20   sources.
21        Q    And is it your assumption that
22   cable subscribers and satellite subscribers
23   and internet subscribers all would behave
24   in the same manner --
25        A    No.
```

Page 247

```
1              Stephen Shulman
2        Q    -- in terms of reacting to
3    programming changes?
4        A    They could react differently.
5        Q    So if there were -- if there
6    were, during one period, many new internet
7    subscribers, but as many canceled satellite
8    subscribers, the data wouldn't really show
9    the -- wouldn't show that because, again,
10   you're -- you're showing data on a net
11   basis?
12        A    Yeah.  We're looking at the
13   whole company, it all being affected by the
14   Klan, whether it's internet, whether it's
15   cable or whether it's Telco or satellite.
16        Q    And the quarterly lost revenue
17   that you have come up with based on these
18   lost subscribers, does that account for the
19   various rates that are paid by internet and
20   cable subscribers?
21        A    Yes.  I would say it's an
22   average, all of them, all of the revenues
23   and all of the subscribers that they had.
24        Q    Well, how did you come up with
25   the quarterly revenue per subscriber?  And
```

Page 248

```
1              Stephen Shulman
2    I'm looking at Exhibit 4 here.
3        A    Yes.  We took it off the
4    reports to TVP of what their income was,
5    and then we grossed it up because we were
6    under the understanding that it was -- it
7    was at 66 percent.  So we took the gross.
8        Q    All of that was at 66 percent?
9        A    Well, that was our assumption.
10   And I read Mr. Hart's report indicating
11   that he looked at the detail.  And if we
12   missed it, then we'd have to correct for
13   those two periods.
14        Q    Any other corrections that you
15   might have to make to this?
16        A    Not that I know of.
17        Q    Are you aware that certain
18   distributors stopped distributing during
19   your calculated growth rate period, meaning
20   from the second quarter of 2010 through the
21   fourth quarter of 2011?
22        A    That -- they stopped.  So it
23   would have reduced the subscribers --
24        Q    Exactly.
25        A    -- during that period.
```

Page 249

```
1              Stephen Shulman
2        No.  We weren't -- I'm not
3    aware of anything specific other than what
4    was -- what Mr. Hart identified in his
5    report.
6        Q    If two major distributors, for
7    example, had stopped distributing during
8    this period, wouldn't that have had a large
9    effect on the number of subscribers that
10   SEI could expect to achieve at the end of
11   the growth period?
12             MR. PISKORA:  Objection to the
13        form.
14        You can answer.
15        A    Well, it could have an effect
16   on the calculation.
17        Q    Would your --
18        A    Along with what new -- new
19   systems came in as well.  So if there was
20   more coming in than went out, then -- as a
21   result of new systems, then it would have
22   an effect of the opposite of what you were
23   talking about.
24        Q    But you would have to adjust
25   these calculations if there were some
```

63 (Pages 246 to 249)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 250

1        Stephen Shulman
2  significant changes based on either new --
3  either lost distribution avenues or new
4  distribution avenues, correct?
5      A    Yeah. We would have to -- we
6  would have to look at it, see if it had a
7  negative effect on our calculation.
8      Q    Would changing prices also have
9  a potential effect on the number of
10 subscribers?
11     A    Well, prices can move, you
12 know, in the historical period, might have
13 moved at the end. Those are one of the
14 things that might have been consumed in
15 both periods.
16     Q    If the turn rate -- and by that
17 I mean the typical attrition rate for
18 subscribers -- is different for internet
19 subscribers and cable satellite
20 subscribers, wouldn't you want to separate
21 the internet subscribers and the cable
22 subscribers here in terms of talking about
23 what percentage of overall subscribers were
24 internet subscribers in the historic growth
25 period during versus the current growth

Page 251

1        Stephen Shulman
2  period?
3        MR. PISKORA: Objection to the
4    form.
5        Just let him finish.
6        Do you need to read back by
7    him?
8        THE WITNESS: No. I think I
9    got it.
10     A    If all that information from
11 the historical period -- you could look at
12 different increases historically to see
13 whether historical overall net changes
14 compares to -- if you could get a
15 historical rate by each one of those
16 individuals and compare it to the actual
17 net additions, then maybe we may find
18 there's a small difference or some
19 difference.
20       But consolidating them
21 altogether, if they behave the same way
22 before and they behave the same way after,
23 you're going to come up -- they're included
24 in both periods; so it would sort of
25 account for the themselves in both periods.

Page 252

1        Stephen Shulman
2      Q    Doesn't that assume, though,
3  that there is the same proportion of
4  internet subscribers to cable subscribers
5  in the previous period and the present
6  growth period?
7      A    It may have an effect. I'd
8  have to think it through.
9      Q    Okay. You mentioned early on
10 in our discussion today about the access to
11 the documents that you were given, and I
12 just want to be clear.
13       Were you given access or had a
14 chance to review all the documents produced
15 in this case by both parties?
16     A    Yes.
17     Q    And in the previous case?
18     A    No. We just asked for certain
19 documents that might have existed in the
20 first case that could help us in the
21 analysis here.
22     Q    Did you ask for other documents
23 besides for documents that had been
24 produced?
25     A    In one case or another?

Page 253

1        Stephen Shulman
2      Q    Um-hum.
3      A    Well, whatever we asked for is
4  here. It would be listed here if it wasn't
5  produced in the, you know, discovery.
6      Q    So it's possible, though, that
7  SEI has additional data about its
8  subscribers that you wouldn't have seen?
9      A    I don't know that.
10     Q    Do you think that you have
11 received all information that SEI has about
12 its subscribers in terms of cancellations,
13 additions, number of subscribers, et
14 cetera?
15     A    I can't make a judgment on
16 that.
17     Q    Based on what you've seen, is
18 that --
19     A    Do I think they have more than
20 what they produced? I don't -- I don't
21 have a basis for making that judgment.
22 They made a claim. This is what they have.
23     Q    Let's take a look at your
24 rebuttal report, and we'll mark that as
25 Exhibit 7 now.

64  (Pages 250 to 253)

Page 254

```
1           Stephen Shulman
2       (Exhibit No. 7, Rebuttal Report
3    of Stephen Shulman, is marked by the
4    reporter for identification.)
5       Q    You take issue with Mr. Hart's
6    description of a rolling reserve; is that
7    right?  And I'm referring specifically to
8    25.
9       A    I don't know if I take issue
10   with his -- what did you call it?
11   Description or --
12      Q    Um-hum.
13      A    -- of the rolling reserve?
14      I'm not sure that the total
15   nature of the rolling reserve was
16   understood, but I think what -- and that's
17   how that paragraph is.
18      Q    What is your criticism of
19   Mr. Hart's claim relating to the rolling
20   reserve adjustment pre-2009?
21      A    Well, pre-2009, there's a
22   number of questions which are raised.  One
23   is, does a settlement agreement cut off,
24   you know, any claims prior to the
25   settlement agreement.  I think that's kind
```

Page 255

```
1           Stephen Shulman
2    of, you know, a significant point that has
3    to be decided.
4       The other points related is --
5    are the adjustments that were made, I
6    think, in 2011, appropriate to make prior
7    to 2009.  Is there any reason to believe
8    that they had to be made?  And if they had
9    to be made, why would they be in the same
10   percentage as those adjustments made in
11   2011?
12      So the whole -- it raises a
13   whole question about, on all those levels
14   of, you know, whether or not the
15   pre-August 2009 adjustment for the rolling
16   reserve is an appropriate reserve -- damage
17   or calculation to make.
18      Q    But you agree that Mr. Hart
19   included post April '09 in his analysis of
20   the rolling reserve adjustment percentage?
21      MR. PISKORA:  Objection to the
22   form.
23      You can answer it, if you can.
24      A    What part of '09 did he use?
25   Or -- he did make a calculation for after
```

Page 256

```
1           Stephen Shulman
2    2009, if that's what you're asking.
3       Q    I'm talking about whether his
4    calculation included a portion of '09.
5       A    Pre August, yeah, would have --
6    his post-adjustment was post August 2009,
7    correct?
8       Q    Right, right.  And the
9    quarterly reporting extends back for a few
10   months before, before August '09, right?
11      MR. PISKORA:  Objection to the
12   form.
13      A    Quarterly reporting for what?
14      Q    For the period around
15   August 2009?
16      MR. PISKORA:  Objection to the
17   form.
18      You can answer.
19      A    You've got to be clearer.
20      Q    All right.  Let's look at
21   Hart's report.
22      (Exhibit No. 8, Mr. Hart's
23   Report, is marked by the reporter for
24   identification.)
25      Q    Let's take a look at Appendix
```

Page 257

```
1           Stephen Shulman
2    L.  It's the very last page of the report.
3    Well, we can start with the paragraph 94.
4       All right.  Mr. Hart says in
5    94:
6       "As detailed in Appendix K, to
7    assess the counterclaim damages associated
8    with the rolling reserve adjustments and
9    SEI's underreporting of internet revenue
10   pre April of 2009, I first estimated the
11   internet revenue prior to any adjustments
12   for the period between 2002 and March 2009.
13   I then adjusted SEI's estimated internet
14   revenue based upon the rolling reserve
15   historical adjustments made by SEI for
16   April 2009 through December 2011 with its
17   reporting for the fourth quarter of 2011.
18   Footnote 100, see" Appendix -- "Appendices
19   K and L."
20      And let's take a look at those
21   appendices.
22      And appendix L is a compilation
23   or a summary of SEI's adjusted revenue for
24   those periods based on its rolling reserve
25   adjustments.
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 258

1        Stephen Shulman
2     Q    Do you see that?
3     A    Yes.
4     Q    Okay.  And the periods covered
5 here by SEI's adjustments begin in the
6 second quarter of 2010, starting in April
7 of 2009, through the third quarter of 2011.
8        Do you see that?
9     A    Yes.
10    Q    And the percentages here are
11 generally between 41 and 49 percent, give
12 or take.
13        Do you see that?
14    A    You mean in the last column?
15    Q    Yes, yes.
16    A    Yes.
17    Q    The adjusted revenue as
18 reported by SEI, right?
19    A    Yes.
20    Q    So Mr. Hart's report of SEI's
21 own adjustments actually includes a
22 substantial period of 2009.
23        And do you see that?
24    A    Yep.
25    Q    It's three quarters in 2009?

Page 259

1        Stephen Shulman
2     A    Yes.
3     Q    So, I mean, you don't really
4 have any data showing that the first
5 quarter of 2009, for example, or 2008 is
6 any different than the adjustments as
7 reported by SEI for these quarters; do you?
8     A    I don't know what that means.
9     Q    Do you have any basis for your
10 criticism of Mr. Hart's application of this
11 adjusted revenue percentage for the
12 quarters prior to when SEI made this
13 adjustment?
14        MR. PISKORA:  Objection to the
15    form.
16        You can answer it.
17    A    What I'm saying is, there was
18 no discussion, there's no argument; there
19 is no basis that these same adjustments
20 apply to prior quarters.  That's all I'm
21 saying, that he didn't present a case that
22 he should take these and apply it to every
23 year going back to 2002.
24    Q    Is there anything that changed
25 before 2009 or anything different about the

Page 260

1        Stephen Shulman
2 period 2009 which suggests to you that he
3 should be using different numbers for that
4 period?
5     A    I think he --
6        MR. PISKORA:  Objection to the
7    form.
8        You can answer it.
9     A    If I'm not mistaken, his --
10 his -- his basis for these numbers is what
11 SEI reported --
12    Q    Um-hum.
13    A    -- for these quarters.
14    Q    Right.
15    A    So --
16    Q    Do you have any reason to
17 believe that the quarter -- that the
18 adjustments should be different for prior
19 quarters?
20        MR. PISKORA:  Objection to the
21    form.
22        You can answer.
23    A    You know, that's -- that's like
24 a way of phrasing the question, is that I
25 don't see any reason why it should be,

Page 261

1        Stephen Shulman
2 because SEI didn't correct for, you know,
3 prior quarters.  And this is only going
4 from the second quarter.
5        So I don't have any reason to
6 think that it should or should not, but
7 Mr. Hart did not come up with a basis, a
8 conclusion, for why it should be.  He just
9 didn't.  That's -- you know, that's all I'm
10 saying.
11    Q    But, Mr. Shulman, let's take a
12 look back again at your rebuttal report,
13 paragraph 25.  And I'm looking at the
14 sentence towards the bottom of that page
15 there.  You say:
16        "In fact, my review of the
17 related bank statements indicated that the
18 rolling reserve adjustments as noted by
19 Credit Corp Bank" account statements --
20 "Credit Corp Bank bank account statements
21 used to deposit credit card receipts was
22 between 5 and 10 percent in '08 and '09."
23        I take it you mean 2008 and the
24 first quarter of 2009?
25    A    Hold it.  Where are you

66 (Pages 258 to 261)

Page 262

1         Stephen Shulman
2   reading?
3       Q    I was reading towards the end
4   of that paragraph, but --
5       A    Where it says the "rolling
6   reserve may vary significantly"?
7       Q    Right.
8       A    Okay.
9       Q    Then the next sentence.
10      "In fact" --
11      A    Yeah.
12      Q    Let me know when you've had a
13  chance to read that.
14      A    Okay.  Got it.
15      Q    You say that the rolling
16  reserve adjustments used to deposit credit
17  card receipts was between 5 and 10 percent
18  in 2008 and 2009.
19      A    Yes.
20      Q    First of all, I take it you
21  mean the first quarter of 2009, not the
22  whole 2009, because SEI itself adjusted its
23  revenues for the rest of 2009 far exceeding
24  5 to 10 percent.
25          Would you agree with that?

Page 263

1         Stephen Shulman
2       A    We're just looking based on the
3   statements.  So we didn't analyze how or
4   what, you know -- you know, those reports
5   are.  We were just looking at what the
6   credit card -- what the statements showed.
7       Q    You're saying that SEI gave TVP
8   a gift?
9       A    I'm not sure.  I mean, I'm not
10  privy to how that all was done.  All I'm
11  saying is, we looked at the statements, if
12  you look at the charges.
13      Q    It hasn't happened before, so
14  I'm just wondering why SEI would have done
15  so now.
16          MR. PISKORA:  Objection to the
17      form.
18      Q    Footnote 18 for that -- your
19  statement there that it was between 5 and
20  10 percent, you refer to MasterCard
21  receipts.
22          Did you have any other more
23  comprehensive data supporting your
24  statement here that it was between 5 and
25  10 percent in 2008 and 2009?

Page 264

1         Stephen Shulman
2       A    You mean, did we provide any
3   support here?
4       Q    Yes.
5       A    No.  We just put a footnote as
6   to what we did.
7       Q    Did you do an audit of the bank
8   account statements during that period to
9   determine that it was between 5 and
10  10 percent, or is it just based on this
11  statement that you cite in footnote 18?
12      A    It's based on --
13      Q    The receipt you cite?  I'm
14  sorry.
15      A    We looked --
16      Q    Go ahead.
17      A    We looked at -- I think we
18  looked at the year on what the -- how it's
19  marked on the statement.  We looked through
20  the year.
21      Q    The whole year of statements,
22  or did you just look at this receipt here
23  as an example of a 5 percent adjustment or
24  rolling reserve?
25      A    Yes.  We looked at -- we looked

Page 265

1         Stephen Shulman
2   at the receipts for the year based on their
3   rolling reserve adjustments.
4       Q    All the receipts?
5       A    Not the receipts, the
6   statements.
7       Q    So the statements for the whole
8   year?
9       A    Yes.
10      Q    Well, why didn't you include
11  that or cite that here?
12      A    You mean include those
13  statements?
14      Q    Include -- sorry.
15          Include the basis for your 5 to
16  10 percent statement.  You said that was
17  part of the basis for your assessment that
18  the rolling reserve adjustments was between
19  5 and 10 percent in 2008 and 2009.
20      A    You have the same statements,
21  so you can look and see.  I'm not sure what
22  you're referring to.
23      Q    My question is:
24          You made a statement in here
25  saying that your review of the bank

67  (Pages 262 to 265)

Page 266

```
1            Stephen Shulman
2  statements indicated that the rolling
3  reserve adjustments as noted by Credit Corp
4  Bank account statements used to deposit
5  credit receipts was between 5 and
6  10 percent in 2008 and 2009.
7        And my question to you is:
8        These bank account statements
9  that you reviewed, have you included them
10 as an appendix or otherwise summarized
11 them?
12    A   No, we didn't.
13    Q   So you're just citing this
14 receipt as an example, basically?
15    A   These were just examples of
16 what we saw.
17    Q   But it's your testimony, then,
18 that it was 5 to 10 percent in 2008 and
19 2009, the rolling reserve adjustment?
20    A   Our review of the line items
21 that called for the reserve, every time
22 there was a receipt and there was a reserve
23 held, you know, it came out to, you know,
24 between 5 and 10 percent.
25    Q   But you have no explanation for
```

Page 267

```
1            Stephen Shulman
2  why beginning in the second quarter of 2009
3  the adjustment would have been in the
4  40 percent range?
5        MR. PISKORA:  Objection to the
6  form.
7        You can answer.
8    A   No.
9    Q   Let's take a look at the
10 rebuttal report as it related to TVP's
11 claim for failing to maximize subscribers.
12    A   Okay.
13    Q   I'm looking at paragraph --
14 starting at paragraph 12.
15        So you refer to Mr. Arlen's
16 opinion that SEI should have had 150,000
17 subscribers by 2006.  You refer to
18 Mr. Gerbrandt's criticism of that.  And
19 then you say basically that:
20        "Notwithstanding the factual
21 issues, there are legal conclusions that
22 Hart and Arlen made that were beyond the
23 scope of their expertise."
24        And, also, you say that, in
25 paragraph 14, that Hart ignores the
```

Page 268

```
1            Stephen Shulman
2  settlement agreement between SEI and TVP,
3  and also the interrogatory responses.
4        Now, other than these
5  criticisms, do you have any criticisms of
6  the quantum of damages that Mr. Hart put
7  forth based on Mr. Arlen's view?
8    A   Well, if -- we said, if Arlen
9  is wrong, Hart is wrong.  And Larry, in his
10 report, showed all the reasons why his
11 numbers were wrong; and, therefore,
12 Mr. Hart is wrong, not because Mr. Hart did
13 anything inappropriately, of course.  He
14 relied on Mr. Arlen, who was an expert just
15 like we brought in Larry.  So that's
16 what -- that's --
17    Q   My question is whether you have
18 any criticism of Mr. Hart's calculations.
19        Assuming that SEI had the
20 obligation to maximize subscribers, SEI
21 should have had 150,000 subscribers,
22 settlement doesn't bar claims.
23        Assuming all of that, do you
24 have any criticisms of the calculations
25 that Mr. Hart made, if those assumptions
```

Page 269

```
1            Stephen Shulman
2  are correct?
3    A   If you're -- what -- talking
4  about mathematical errors or conceptuals?
5    Q   Yeah.
6    A   Well, whatever we said here is
7  what our issue is.
8    Q   So if the court would accept
9  that SEI should have achieved -- had an
10 obligation to achieve a certain number of
11 subscribers, let's say, 150,000
12 subscribers, and it didn't achieve those
13 subscribers, and the settlement agreement
14 did not waive TVP's claims for that, or
15 relating to that, you would expect
16 Mr. Hart's damages theory -- damages
17 amount?
18    A   I think we were okay with the
19 calculations.  We didn't have a problem
20 with the mathematical calculations.
21    Q   And I have a similar question
22 relating to the allocation of
23 revenue pre -- cable revenue pre
24 August 2009.  I'm looking at paragraph
25 beginning with 17 -- I'm sorry, paragraph
```

68  (Pages 266 to 269)

Page 270

1         Stephen Shulman
2   beginning with 19, so paragraph 19 of your
3   rebuttal.
4       A    Um-hum.
5       Q    And, again, you criticize
6   Mr. Hart's calculation of damages for SEI's
7   allocation of cable revenue by saying that
8   the settlement agreement confirmed that
9   there were -- that SEI was in material
10  compliance with the agreement, and you
11  refer also, again, to TVP's interrogatory
12  responses.
13      You conclude at the end of 20:
14      "Hart's calculation of
15  purported damages for this period appears
16  to be in direct conflict with TVP's
17  position as detailed in the interrogatory
18  responses," et cetera.
19      But you don't have any critique
20  here of the quantum of Mr. Hart's
21  calculation; is that correct?
22      A    No.  We didn't -- we didn't --
23  after we got this far, we didn't have any
24  more criticism of his numbers, his
25  mathematical calculations.

Page 271

1         Stephen Shulman
2       To be -- to be maybe
3   forthright, once we got to this point, we
4   didn't look through a microscope at those,
5   you know, calculations.  But we did check
6   them, and we checked the calculations.
7       Q    And they seemed okay to you?
8       A    They seemed okay.
9       MR. WENGER:  I think that we're
10  done for today, but I just want to
11  take two minutes to consult with my
12  colleague; and then I might have a few
13  more questions.  And then Mr. Piskora,
14  if he has any redirect, we'll pick it
15  up and then we'll wrap up.  Okay.
16      (A break is taken.)
17      MR. WENGER:  I have nothing
18  further from this side.
19  CROSS EXAMINATION
20  BY MR. PISKORA:
21      Q    Mr. Shulman, I'm sorry, I can't
22  resist asking at least two questions.
23      Do you remember earlier today
24  Mr. Wenger was asking you some questions
25  about your expert report and specifically

Page 272

1         Stephen Shulman
2   your calculations of damages thereunder
3   related to the Klan claim?
4       A    Yes.
5       Q    Okay.  Let me point you to
6   paragraph 13 of your report, which has been
7   marked as Exhibit 1.  You state in there,
8   in the last sentence:
9       "Accordingly, our opinions
10  concerning damages are limited, unless
11  otherwise noted, to the period between
12  August 12, 2009, and February 15, 2012,
13  which we then define as the historical
14  damage period."
15      Do you see that?
16      A    Yes.
17      Q    Okay.  And my question, I
18  guess, is on the February 12th E-Mail --
19  sorry.  Withdrawn.
20      On February 15, 2012, did you
21  have information concerning SEI's
22  subscribers for the first quarter of 2012?
23      A    Well, we would have only gotten
24  information up to February 15th, so we
25  wouldn't have it for the full quarter, if

Page 273

1         Stephen Shulman
2   that's what you're referring to.
3       Q    Okay.  And looking at
4   Exhibit 3, which is later on in your report
5   but near the front, you see this -- the
6   chart ends at fourth quarter 2011.
7       Do you see that?
8       A    Correct.
9       Q    And Mr. Wenger asked you some
10  questions about why you may have calculated
11  only through December 31, 2011.
12      Do you remember those
13  questions?
14      A    Yes.
15      Q    Do you know whether or not you
16  had any information beyond the fourth
17  quarter of 2011?
18      A    Well, if we had it, we probably
19  would have used it.  One of the reasons why
20  we wouldn't necessarily have the fourth
21  quarter of '12 is because they reported --
22  they reported to TVP on a quarterly basis.
23      Q    I think I understand your
24  answer, except in one regard.
25      You mentioned the fourth

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

A-452

Page 274

1          Stephen Shulman
2   quarter of 2012, but I was talking about
3   the first quarter of 2012.
4       A    Yes.  Did I say the fourth
5   quarter of --
6       Q    Did you just misspeak?
7       A    Maybe.  Yes.  What did I say?
8       Q    Well, it just -- let me re-ask
9   the question so then we have a clear record
10  of it.
11          Did you have, at the time you
12  prepared this Exhibit 3, any data
13  concerning the first quarter of 2012?
14      A    No.  We wouldn't have had it
15  because the first quarter of 2012 would
16  have been beyond the close of discovery.
17  So you wouldn't have that first quarterly
18  report for 2012.
19      Q    Okay.  And then I had one other
20  question --
21      A    Yeah.
22      Q    -- and hopefully get everybody
23  out of here fairly quickly.
24          It's on this Exhibit 3.
25  Mr. Wenger earlier today was asking you

Page 276

1          Stephen Shulman
2   those quarters that you eliminated the data
3   and wrote "spike," my question wasn't on
4   the percentage change, but what change
5   would there be on your damage calculation?
6       A    It would have been much larger
7   because we would have used 3.4 percent as
8   our growth rate.
9       Q    I'm no mathematician.  I don't
10  have all these letters after my name like
11  you do.  But if it's the difference between
12  1.7 percent and 3.4 percent, would that
13  just double the damages if you used the
14  3.4?
15      A    It would come close.
16          MR. PISKORA:  Okay.  I don't
17  have any further questions.
18          MR. WENGER:  Neither do I.
19          MR. PISKORA:  Mr. Shulman, I
20  want to thank you for your
21  hospitality, but I'd also like to
22  thank Mr. Wenger for having us in
23  today.
24          MR. WENGER:  You're very
25  welcome.

Page 275

1          Stephen Shulman
2   about there are six spike listings in the
3   top of this chart.
4          Do you remember that
5   questioning?
6       A    Yes.
7       Q    Okay.  And there was some
8   testimony -- we don't need to revisit it, I
9   guess -- about the data points.
10          Do you remember that?
11      A    Yes.
12      Q    If instead of eliminating the
13  data for those six spike entries, if you
14  considered it, what would be the effect on
15  your damage calculation?
16      A    If I actually put in a number
17  for those spikes, if I had -- if I had
18  included those spikes, it would have been a
19  3.4 percent increase.
20          Let me read back your question.
21      Q    My -- I think you're halfway to
22  answering it, almost.
23          My question was:
24          If you did consider the data,
25  the percentage in change of subscribers for

Page 277

1          Stephen Shulman
2   We can go off the record now.
3   (Deposition adjourned, 3:59 p.m.)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

## Page 278

```
1
2              J U R A T
3
4      I DO HEREBY CERTIFY that I have
5   read the foregoing transcript of my
6   deposition testimony.
7
8
9
10
11  SWORN TO AND SUBSCRIBED
12  BEFORE ME THIS
13  DAY OF 2012
14  – – – – – – – – – – –
15
16
17
18
19
20
21
22
23
24
25
```

## Page 280

```
1
2       E X H I B I T S
3   NUMBER   DESCRIPTION     PAGE
4
5   Exhibit No. 1, Expert Report of   54
    Stephen Shulman
6   Exhibit No. 2, License Agreement   78
    Between TVP and Polvision Dated
7   June 27, 2008, Bates No.
    POL 00054,
8
    Exhibit No. 3, August 31, 2009   79
9   Licensing Agreement Between TVP
    and Polvision With Translation,
10  Bates No. POL 00058
11  Exhibit No. 4, July 16, 2010    80
    annex to the August 31, 2009
12  licensing agreement between TVP
    and Polvision
13
    Exhibit No. 5, March 17, 2008    88
14  TVP/Polvision Barter Agreement,
    Along With Amendment Number One
15  to Barter Agreement, Dated
    December 2, 2008
16
    Exhibit No. 6, Plaintiff's    197
17  Objections and Amended Responses
    to Defendant's Interrogatories
18
    Exhibit No. 7, Rebuttal Report of  254
19  Stephen Shulman
20  Exhibit No. 8, Mr. Hart's Report   256
21
22
23
24
25
```

## Page 279

```
1
2         I N D E X
3   WITNESS        DIRECT    CROSS
4
5   STEPHEN SHULMAN
6
7   BY MR. WENGER       3
8
9
10  BY MR. PISKORA        271
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 281

```
1
2          CERTIFICATE
3
4      I, TAB PREWETT, A Registered
    Professional Reporter, Notary Public,
5   Certified LiveNote Reporter, and Certified
    Shorthand Reporter, do hereby certify that
6   prior to the commencement of the
    examination STEPHEN SHULMAN was sworn by
7   the notary public to testify the truth, the
    whole truth and nothing but the truth.  I
8   certify that neither STEPHEN SHULMAN nor
    counsel for STEPHEN SHULMAN requested to
9   review the transcript to make changes to
    form or substance.
10     I DO FURTHER CERTIFY that the
    foregoing is a true and accurate transcript
11  of the testimony as taken stenographically
    by and before me at the time, place and on
12  the date hereinbefore set forth.  I DO
    FURTHER CERTIFY that I am neither a
13  relative nor employee nor attorney nor
    counsel of any of the parties to this
14  action, and that I am neither a relative
    nor employee of such attorney or counsel,
15  and that I am not financially interested in
    the action.
16
17  _____
    Notary Public
18
    My Commission expires February 9, 2014
19  Dated:  June 11, 2012
20
21
22
23
24
25
```

71  (Pages 278 to 281)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

**A**

**abandoned** 29:10
**ability** 23:16 67:16
  70:22 71:15 75:22
  106:22
**able** 14:11,22 22:25
  27:21 29:3 31:22
  31:25 33:11 43:7
  43:9,18 45:24
  46:20 47:12 48:3
  48:17 49:2,19
  50:18 52:10 82:20
  97:13 116:22
  143:11 144:2
  149:5 197:10
  198:24 199:15
  208:16,24 210:13
  210:16 211:3,5
  224:7 233:11
**aboard** 14:23
**above-entitled** 1:16
**Absolutely** 77:3
**accept** 269:8
**access** 211:12
  252:10,13
**accommodation**
  183:18
**accommodations**
  176:10 182:3
**account** 95:4,13,25
  118:15,25 125:19
  128:4 129:18,19
  129:21 130:9
  136:13 142:8,21
  153:4 159:2
  178:11 180:4
  205:12 224:22
  225:13,14 226:8
  227:16 228:18
  243:20 247:18
  251:25 261:19,20
  264:8 266:4,8
**accountant-type**
  7:21
**accounting** 7:22
**accrued** 206:5

207:8
**accurate** 4:13 26:6
  169:17 184:25
  281:10
**achieve** 127:12
  134:10 144:2
  146:3 175:19
  249:10 269:10,12
**achieved** 94:7 95:5
  134:23 245:17,18
  245:19 269:9
**acknowledge** 120:4
**action** 35:22 36:21
  177:24 178:20
  179:20 281:14,15
**actions** 44:22 45:11
  45:25 46:12
**actual** 86:16 94:17
  169:18,25 183:21
  185:12 199:18
  204:25 205:23
  207:3 209:19
  219:17 224:9
  234:15 235:13
  241:18,22 246:3
  251:16
**ad** 142:16,17,17
**add** 76:15 193:22
**added** 26:19 188:8
  190:18 227:23
  236:13
**addition** 198:15
  203:11
**additional** 32:14,16
  33:2,4 83:13
  96:19 208:9
  218:19 253:7
**additions** 235:14
  236:6,14 251:17
  253:13
**address** 117:4
  226:20
**addressing** 223:21
**adequate** 21:18
**adhere** 219:15
**adjourned** 277:3
**adjust** 109:10

172:12 179:18
  226:25 242:14
  249:24
**adjusted** 206:19
  227:3 243:9
  257:13,23 258:17
  259:11 262:22
**adjusting** 161:21
  172:2,6
**adjustment** 152:22
  152:24 254:20
  255:15,20 259:13
  264:23 266:19
  267:3
**adjustments** 227:8
  227:16,18 240:7
  255:5,10 257:8,11
  257:15,25 258:5
  258:21 259:6,19
  260:18 261:18
  262:16 265:3,18
  266:3
**administrative-t...**
  7:10
**admittedly** 151:8
**adverse** 235:2
**advertisements**
  154:7
**advertisement-b...**
  154:24
**advertiser** 160:15
**advertisers** 132:3
  147:5
**advertising** 123:2
  123:24 124:3
  131:12,14 132:4
  135:14 136:14
  137:4,7,14 138:23
  140:21 141:7,11
  141:18 143:12
  146:8 150:9
  155:25 158:19
**advice** 6:15,20
**advising** 67:14
**affect** 177:25 181:8
  181:15,17 183:7
  183:20 184:3

226:18 234:25
  245:5
**affidavit** 184:22
**affiliated** 18:6
**afford** 159:23
  160:24
**afterward** 204:19
  209:2
**after-the-fact**
  214:19
**age** 160:3 161:5
**aggregate** 219:2
**ago** 216:6 220:2
**agree** 122:5,8
  129:16 159:7
  217:25 219:25
  222:24 223:14
  224:11 233:20
  238:13 255:18
  262:25
**agreed** 11:9 100:4
  129:17
**agreement** 13:16
  13:23 44:23 47:14
  48:5 49:18 50:2
  64:9 71:13,14,25
  71:25 72:4,6,10
  72:14,19 73:6,10
  73:11,12,16,19
  74:13,16,19 75:3
  75:17,25 76:18,22
  77:24 78:4,12,16
  78:21 79:13,21
  80:9,11,21,25
  81:3,5,11,25
  82:14 83:3,11,25
  85:6 87:16 88:12
  88:14,18,19,21,23
  89:3,6,7,10,20,24
  90:3,8,18,18,21
  90:25 91:4,7,10
  91:15,15,20,22,24
  92:2,3,5,6,8,13,15
  92:18,19,24 93:9
  93:13,17,24 95:12
  96:16 97:7,8
  98:24 99:3 102:16

102:19 107:20
  110:16 116:2,4
  162:15,16,18,19
  162:20,21,22
  163:10,15,20
  165:9,15,18,20,24
  166:4,9,10,16
  167:9,15,24
  168:12,21 169:11
  169:15 170:6,11
  170:20 171:6,8,9
  171:23 173:3,5,8
  174:15 175:5
  176:5 177:14
  178:3 180:17
  181:25 184:4
  187:15 192:25
  193:2,4 194:12,14
  201:5,14 202:5,9
  202:11,12,13
  214:24 238:25
  239:2,19 240:24
  241:2 254:23,25
  268:2 269:13
  270:8,10 280:6,9
  280:12,14,15
**agreements** 36:3,11
  37:6 73:25 74:3
  77:20,22 87:12,15
  93:23 112:25
  113:13,14 118:15
  167:2 170:15,19
  173:2 174:4 177:7
  177:22 182:19,24
  183:3,7 190:8
  193:8 231:18,20
  237:17
**agrees** 18:9
**ahead** 25:3 45:7
  62:24 75:20
  102:24 196:21
  201:22 202:2
  264:16
**air** 93:23
**aired** 83:6 96:25
  102:13,16 214:23
**allegations** 176:16

**alleged** 68:19 70:12
  70:22 74:5 214:22
  221:15
**alleges** 214:4 215:2
  215:15
**alleging** 35:23
**allocation** 269:22
  270:7
**allow** 107:13 120:2
**allowed** 36:23 37:8
**alluded** 53:2
**alternative** 20:22
  20:23 28:6 39:3
  40:13 42:16 43:20
  43:21,22 47:9
  126:19 172:23
  173:22 176:20
  216:24
**alternatively** 43:14
  43:15
**alternatives** 21:2
  43:10 175:24
**altogether** 27:15
  251:21
**Amcore** 62:16
**amended** 36:4 83:4
  89:3 90:25 162:20
  163:14 174:22
  197:18,18,23
  214:25 215:15
  280:17
**amendment** 88:13
  88:18,22 91:2,11
  166:3 280:14
**amendments**
  115:18 116:4
**Americas** 1:22 2:5
**amount** 8:20 41:24
  132:6 136:9 140:8
  140:10 145:8,9
  169:25 183:14,14
  216:14 235:13
  245:15 269:17
**amounts** 87:14
  144:13 182:8,8,8
**analogy** 175:14
**analyses** 133:2

**analysis** 22:7
  107:11,12 117:16
  145:23 148:2
  151:5 227:21
  243:23 252:21
  255:19
**analyze** 225:5
  263:3
**analyzed** 108:4
**Anchin** 3:4,4,16,17
  6:3,3 13:21,22,25
  14:2
**annex** 80:19,23
  81:4,16 83:14
  85:6 91:18,19
  103:4 110:7
  115:13,16 116:23
  166:2,17,19
  280:11
**anomalies** 209:16
**anomaly** 159:9,14
**answer** 4:8 21:21
  24:2 25:5 26:4,20
  29:8 30:16 31:11
  31:17 32:7 34:8
  35:19 37:3,17,25
  38:20 41:7,21
  42:8,19 44:4,17
  45:4,17 46:24
  47:17,25 48:8,21
  49:8 50:5,23 52:3
  53:16 58:4 59:19
  60:11 61:5 63:20
  64:12,22 65:8
  67:12,22 68:23
  69:21,25 70:3,16
  71:2,9,20 72:9
  73:2 74:10,22
  75:10 76:8 95:24
  96:6,22 98:10
  102:2 108:2
  111:14,20 112:3
  114:4 115:2
  121:16 131:5,18
  136:17 137:17
  139:2,11 143:17
  146:20,24 152:11

154:12,19 155:5
  157:17 159:12
  165:13 173:12
  174:9 175:8,13
  177:5,9 181:12,13
  181:15 183:11,25
  184:12 186:9,19
  187:3 190:2
  192:23 193:12
  199:8,22 200:14
  200:25 201:22
  205:18 212:3
  216:12 217:18
  218:6,23 220:12
  223:10 224:4
  225:10 228:15,25
  230:10 231:10
  233:12 237:8,22
  249:14 255:23
  256:18 259:16
  260:8,22 267:7
  273:24
**answered** 44:11
  101:24 114:12
  137:18,19 139:3
**answering** 3:25
  28:18 143:18
  275:22
**anybody** 66:17
  179:10
**anymore** 212:12
**apart** 139:24
**apparent** 214:18
  227:21
**appear** 55:15
**appears** 270:15
**appendices** 257:18
  257:21
**appendix** 61:8
  227:5 256:25
  257:6,18,22
  266:10
**application** 259:10
**applied** 106:10
  140:20 141:6
  142:15 153:11
**applies** 101:17

**apply** 121:22
  259:20,22
**applying** 99:6
  244:3
**appointed** 188:20
  189:3
**appraisal** 74:23
**appreciate** 85:18
  112:2
**approach** 69:4,5,6
  69:13 70:18,20
  71:3 72:12 74:12
  75:15,16,16 208:5
**approached** 10:24
**appropriate** 14:19
  19:20 70:11
  108:15 123:8,12
  123:25 124:2
  125:13 126:12
  131:11 163:18
  190:9 216:18,20
  224:7 255:6,16
**appropriately**
  217:21
**approximately**
  92:17 103:21
  157:14,14 218:2
  218:13
**April** 255:19
  257:10,16 258:6
**area** 22:11,14,18,18
  22:19,20 23:11
  26:18 27:3 28:15
  33:25 34:3,11,20
  34:24 118:3
  146:17
**areas** 14:17,17
**argument** 259:18
**arguments** 187:24
**Arlen** 267:22 268:8
  268:14
**Arlen's** 267:15
  268:7
**arm's** 172:4 183:2
  183:4
**arrangement**
  237:15 238:10

**arrive** 87:9 103:20
  144:22
**arrived** 105:6
  142:23 152:16
  228:8
**arriving** 241:5
**ascribe** 70:19 74:17
  167:18 168:16
  213:7 239:18
**ascribed** 169:12
  171:8,22 174:4
**ascribing** 241:20
**asked** 4:24 10:25
  16:2 57:24 85:11
  100:24 191:6,18
  206:24 216:6
  222:15,15 230:25
  252:18 253:3
  273:9
**asking** 3:24 57:15
  62:11 68:8 69:10
  70:8,10 71:12
  72:15 73:22 87:2
  101:14 136:22
  167:3 188:23
  218:25 242:10
  245:3 256:2
  271:22,24 274:25
**aspects** 15:8,14
  16:16,24
**asserted** 216:8
**assess** 257:7
**assessment** 265:17
**asset** 69:12 71:16
  69:11
**asset-based** 69:2
  70:17,20 71:3
  72:12 74:12
**assist** 119:14
**assistance** 16:4
**associated** 111:23
  257:7
**assume** 47:12 48:2
  48:17 51:2 101:12
  101:18 112:7,8
  123:3 144:11

147:17 228:17
252:2
**assumed** 60:25
124:20 150:14
164:12 184:24
**assumes** 37:10
50:15 52:14 73:9
73:16 77:8 100:4
127:10
**assuming** 4:8 72:17
72:18 74:5 97:2
137:11 138:19
147:23 268:19,23
**assumption** 34:13
34:18,23 51:8
52:9 91:23 112:6
112:9,11,14,15
124:10 127:24
136:13 190:15,17
190:20 191:3
192:10 246:21
248:9
**assumptions**
111:10 124:11
268:25
**Atlantic** 62:18,19
**attach** 157:2
**attached** 129:13
184:22 185:16
**attaching** 102:10
**attempt** 214:19
215:16
**attempting** 117:4
**attention** 117:19
129:24 198:3
**attorney** 281:13,14
**attorneys** 2:6,10
114:7 231:17
232:16
**attributable** 208:21
209:2
**attribute** 27:6,11
27:21 28:5,11,17
28:23 35:15 43:7
199:16 208:7
**attributed** 27:17
**attributing** 27:24

29:4 33:16 35:3
**attrition** 250:17
**audit** 264:7
**audits** 8:23 9:4
**August** 79:9,12,20
80:10,11,20,23
82:2,14 83:3 92:7
96:17 167:5,8,9
170:20 171:9
173:8 177:14
194:9,10,14,16
198:16 238:17
256:5,6,10,15
269:24 272:12
280:8,11
**authorship** 104:10
**automatically**
178:12 208:23
**available** 19:18
37:21 75:12 97:5
127:3 145:6,15,17
150:25 177:2
209:14
**Avenue** 1:21 2:5,9
2:14
**avenues** 250:3,4
**average** 142:17
157:8,12,24
240:23 241:6
243:3 244:5
247:22
**averaging** 243:24
**aware** 11:13 23:20
30:9,22 54:21
110:10 149:24
213:22 221:14
246:15 248:17
249:3
**a.m** 1:24

**B**
**B** 280:2
**back** 15:18 46:8
65:3,4,11 77:6
81:20 83:24 86:8
97:17 110:4
114:14,16,22

117:6 118:6
133:18,19 147:10
151:9 192:2
194:20 199:23,25
200:3,5 206:8,15
208:13 210:13,14
219:13 223:11
236:18 240:7,21
242:12 245:3
251:6 256:9
259:23 261:12
275:20
**background** 12:20
**backup** 124:24
**bad** 180:23
**bank** 261:17,19,20
261:20 264:7
265:25 266:4,8
**bar** 268:22
**barter** 88:12,14,21
88:22 89:7,20,23
90:17 91:4,7,10
91:14,15,20,21
92:8 162:18 163:9
163:15,20 165:24
166:4,9,9,16
167:24 168:12
170:6 171:6,23
173:3 174:15
175:5 176:5 201:5
201:13 202:8
239:2,19 240:24
241:2 280:14,15
**bartered** 167:4,4
**base** 90:6 174:25
184:18 224:19
**based** 18:16,20
19:20 21:8 31:23
32:2 36:16 39:16
41:8 42:22 43:9
43:19,22 55:13
64:6 65:21 71:22
77:10 86:20 90:9
92:14 94:9,11,19
95:6,10 98:24
108:13,25 124:6
124:12 125:8

133:3,5 136:12
139:20 152:14
162:14,24 164:4
167:17 173:17
182:16 185:24,25
186:15,20 192:17
192:24 198:24
199:4 201:8
205:23 207:3
209:19,20 210:3
213:10,11 216:13
218:17 222:2
231:3 233:20
236:11 237:15
239:20 241:21
247:17 250:2
253:17 257:14,24
263:2 264:10,12
265:2 268:7
**bases** 222:5
**basic** 80:14 112:22
**basically** 16:24
43:16 56:18 71:22
83:13 91:23
118:24 156:14
168:2 172:24
174:21 179:14
188:8 205:13
266:14 267:19
**basing** 106:12
**basis** 24:22 25:9,10
55:2 63:25 87:5
92:11 99:23
108:24 109:9,12
110:2 124:9
126:22,25 139:6
150:10 167:14
187:6,13,14 236:9
241:11 247:11
253:21 259:9,19
260:10 261:7
265:15,17 273:22
**Bates** 77:25 78:5
79:14,22 166:22
166:23 280:7,10
**began** 29:17 237:15
237:17

**beginning** 33:13
89:13,22 96:17
163:16 185:9
267:2 269:25
270:2
**behave** 246:23
251:21,22
**behaving** 226:2,6
**behavior** 229:14
232:20 233:7
**belabor** 99:10
**believe** 5:12 12:25
18:10 24:20 25:3
26:10 32:14 48:9
56:4 82:15,25
83:6,24 84:21
92:7 101:21
116:14 149:20
152:2 156:7
170:16 171:19
185:15 200:19
206:12 214:17
226:5 255:7
260:17
**believed** 19:19
143:4
**belonging** 71:16
**benefit** 40:18,19
212:6
**best** 44:5,8 108:23
109:4,7,9
**better** 37:10 108:8
176:4
**beyond** 128:4
267:22 273:16
274:16
**big** 53:17 155:15,21
**bill** 17:24
**billable** 7:4,14
**billing** 123:18
140:19 141:11
**billings** 124:4
131:14 140:21
141:7,19 142:17
158:19
**bills** 185:3,11,12,13
185:21

**bit** 44:25 55:6 88:8 122:15 159:8
**Block** 3:4,16 6:3
**blue** 80:3
**board** 8:12 16:14 151:12 158:18
**bold** 78:20,20 240:22
**bottom** 27:10 212:16 240:22 245:14 261:14
**bought** 11:5 98:2 100:10,10 101:22
**box** 99:11
**breach** 37:13,18,21 39:6,24 42:13,25 48:10 49:12 60:18 65:18 212:7,9 214:24
**breached** 66:9 107:19
**breaches** 40:5 191:8
**breaching** 49:25 50:2,16 64:7
**breadth** 8:14
**break** 77:5 161:11 221:24 271:16
**briefly** 51:17 162:10
**bring** 14:23 43:18 177:24 178:20 179:20 216:7 219:13
**bringing** 47:10
**broad** 38:24 44:18 47:6,18,23 48:22
**broadcast** 27:7 28:2 35:5,16 82:3 90:10 92:23 96:15 97:10 100:15,19 110:12 113:22 118:2 155:8,11 159:24
**broadcasted** 82:3
**broadcaster** 161:3
**broadcasting** 140:9

140:11 162:3 185:22
**broadcasts** 34:11
**broadly** 46:4
**broken** 30:10 138:9
**brought** 11:5,15,20 16:11,13 118:13 268:15
**build** 243:10 244:20
**building** 34:22
**builds** 244:15,22
**built** 34:18 107:15
**bulk** 152:19
**bunch** 61:15
**business** 3:4 6:2 8:5 135:10
**businesses** 6:11
**but-for** 97:15
**buy** 143:24
**buyer** 129:21,22 130:2,12,15,16 135:6,7 137:2 140:3 179:13
**buys** 150:25

**C**

**C** 2:2 3:2 182:12
**cable** 55:2 56:13 155:9 246:12,16 246:22 247:15,20 250:19,21 252:4 269:23 270:7
**calculate** 63:7 76:23 98:23 103:17 108:24 157:19,20 191:11 198:24
**calculated** 63:24 86:20 140:21 141:7,19 142:18 203:19 225:4 237:2 248:19 273:10
**calculating** 99:24 111:19 119:14 122:25 139:6

191:16 194:18 241:6
**calculation** 11:3 77:10 85:24 87:6 89:4 101:13 137:10 197:15 202:9 213:6 224:8 224:20 232:14 235:7,8 241:13 242:16 249:16 250:7 255:17,25 256:4 270:6,14,21 275:15 276:5
**calculations** 101:6 236:24 249:25 268:18,24 269:19 269:20 270:25 271:5,6 272:2
**calculator** 194:8
**call** 3:22 19:9 36:20 93:14 159:14 175:19 240:13 254:10
**called** 180:23 230:17 266:21
**calls** 93:13
**calves** 62:19
**Canada** 184:24 246:8
**Canadian** 184:6 195:10,12
**cancel** 31:7 33:22 209:12 222:21 226:10 230:5,19
**canceled** 23:7 25:12,24,25 26:17 30:24 31:24 44:8 199:19 223:2,16 235:21 236:2,13 239:12,22 247:7
**cancellation** 23:10 23:14 26:8,15,24 27:25 33:17 35:2 204:24 205:2 206:9,11 208:7,12 208:15,18 211:2
**cancellations** 21:17

22:9,16,17,24 23:5,15,17 25:16 27:6,11,14,16,22 28:4,9,11,13,22 28:24 29:5,25 30:21 32:12,13,25 32:25 35:4,15 197:12 199:16 204:15,20 206:4,7 207:7,11,12,21 208:4,25 219:21 223:25 224:9,13 225:7,15 235:13 236:5,15 253:12
**cancelled** 27:2
**cancels** 25:18
**cannibalize** 59:10 60:4
**card** 124:18 127:3 142:24 143:5 145:5,10,12 146:16 150:15,18 150:24 261:21 262:17 263:6
**careful** 175:20 182:7
**case** 1:3 5:13,14,20 10:16 11:2,13 12:4,12 13:7 15:2 15:4 20:14 39:13 40:16,21 41:3 42:22 47:11 50:17 50:20 62:21 63:14 64:16 65:20 66:11 66:12,22,23 67:8 71:17 106:21 107:7 108:14 111:15,16,23 112:5,23 113:8 115:3,8 132:12 139:21 143:10 144:2 158:15 159:18 164:12 165:9,14 200:16 213:13 222:25 252:15,17,20,25 259:21

**cases** 5:3 62:14 63:2 64:4,6 65:13 65:14
**cash** 94:15,20,23 168:11,14,17 174:17 180:13
**Cassells** 191:12
**causation** 222:8,9 222:14
**cause** 35:22 36:19 36:20 209:11 222:15
**caused** 222:11,12 222:16
**certain** 20:5 26:12 28:22 36:17 41:24 74:17 87:14 97:20 130:14 136:12 170:10 215:4 216:14 245:15 248:17 252:18 269:10
**certainly** 129:12 180:5 184:2
**CERTIFICATE** 281:2
**certified** 1:18,19 8:2 79:17 281:5,5
**certify** 278:4 281:5 281:8,10,12
**cetera** 109:2 133:6 198:13 203:5 253:14 270:18
**challenges** 5:16
**chance** 252:14 262:13
**change** 4:6 20:18 93:7 113:23 150:3 150:9,14,15 159:3 189:6 225:22 233:3,5 235:5,18 235:19 243:15 244:9,18,25 275:25 276:4,4
**changed** 106:5 259:24
**changes** 18:15,19

18:20 109:13
223:24 228:19,19
235:15 239:20
242:16 245:25
247:3 250:2
251:13 281:9
**changing** 250:8
**channel** 53:11
55:17,20,24 56:2
56:6,8,23,25 57:2
57:3,4,4,5,9,18,25
58:13,13,19,22
59:3,16 60:8 71:6
136:10 146:13
**channels** 56:16,19
58:23
**characterize**
209:20
**charge** 5:25 143:13
152:25 178:25
179:2 180:4
**charged** 95:21
145:9 147:5
**charges** 263:12
**chart** 155:22 273:6
275:3
**check** 161:14 167:3
185:2 200:5 271:5
**checked** 120:21
156:22 271:6
**Chicago** 22:11,14
22:18,19,20 23:11
23:18 26:17 27:3
28:15 33:25 34:3
34:20,23 118:2
133:14 160:14
202:6 211:2
214:21
**Chisek** 186:2,16
**Chisek's** 193:21
**chose** 44:5 151:2
164:18 173:23,25
176:23,25 224:5
**chosen** 168:25
169:5
**circumstances**
33:12 136:6

**cite** 264:11,13
265:11
**cited** 38:10 198:25
**citing** 115:25
266:13
**claim** 21:10 32:3,4
34:2 35:14,14,24
37:12,13,22 39:8
42:23 43:19 46:3
49:19,24 51:23
63:17 64:17 94:4
101:7,8 107:2
110:19,25 112:12
180:10 184:5,6
187:6,11,13,14
189:6 191:8
196:15 197:4,5,7
197:8 200:8,15
202:25 210:10
211:6,18 213:9,16
213:16,21,22
214:9,11 215:19
216:8,9 217:21,23
218:16,18 219:3,3
219:12,16,18,22
220:17,19,21,23
221:15 238:6,14
238:16 253:22
254:19 267:11
272:3
**claimed** 42:22 49:4
115:21 116:6
221:8
**claiming** 46:18,19
50:16 176:12
217:15
**claims** 11:5 117:4
219:2 220:25
245:23 254:24
268:22 269:14
**clarified** 96:8
**clarify** 38:23 45:20
63:22 71:11
**class** 160:23
**clause** 36:2,6,11,16
37:19 38:4,5
39:11,17 40:8,15

41:25 42:5,14
43:24 47:21 48:11
60:18 65:10,19
116:2 117:3
189:20 190:8
212:8 217:3,4,9
217:13,20
**clean** 201:20
**clear** 4:10 11:17
28:20 32:11 37:4
47:25 52:15 60:22
87:3 96:5 107:12
109:15 121:17
155:18 186:22
199:14 252:12
274:9
**clearer** 16:7 256:19
**clearly** 26:7 182:23
**client** 6:4,7 207:8
**clients** 6:8
**close** 274:16 276:15
**colleague** 271:12
**collect** 180:20,23
**column** 169:20
258:14
**combination** 27:19
129:9 166:15
**come** 8:7 19:15
35:8 44:6 59:7,24
104:6 107:13
110:15 113:10
119:18 121:25
130:10 132:7
156:18 171:25
192:8 193:23,24
200:22 208:2
209:9 219:5 229:2
247:17,24 251:23
261:7 276:15
**comes** 9:21 10:6
75:11 153:10
193:19 218:11
**comfortable** 26:5
26:14,24 27:10,20
27:24 28:5,10,23
29:4 109:21,23
111:9 159:20

197:14 199:2,11
199:18 205:4,20
207:16 208:3
210:18
**coming** 25:19 110:2
118:24 133:19
136:8 206:21
225:21,24 226:22
227:24 228:4
229:21 249:20
**commencement**
281:6
**commencing** 1:24
**commented** 17:12
18:11
**comments** 18:14,16
18:19,20 19:5
**commercial** 63:5
**Commission**
281:19
**companies** 8:16 9:6
9:6,11 68:2,7
**company** 18:2
67:19,25 68:12,15
69:16,17,19 71:16
73:24 74:25 76:9
140:8,9 148:20
204:22 247:13
**company's** 75:22
**comparable** 69:5
**compare** 206:10
208:17 233:25
251:16
**compared** 185:7
233:25 243:16
**compares** 251:14
**comparing** 223:22
**compensate** 44:19
45:9 119:10
**compete** 133:13
**competing** 52:21
55:17,23 56:5
58:13,14,16,18,20
59:3,16 60:8 71:6
95:14
**competition** 228:20
**competitive** 133:16

**competitor** 50:11
52:20 95:15
103:16 118:19
119:9 128:7
129:15 133:12,13
134:19,20,25
135:13 142:12
147:8
**Competitors**
175:16
**compilation** 154:3
257:22
**compiled** 152:15
**complaint** 215:2,15
221:16,17
**complete** 4:13
33:10
**completely** 139:23
180:19
**compliance** 270:10
**complicated** 64:13
70:2
**comprehensive**
263:23
**concept** 118:20
119:17 134:6
204:7,9
**conceptuals** 269:4
**concern** 69:20
**concerning** 5:19
63:12 272:10,21
274:13
**conclude** 270:13
**concluded** 91:25
164:13
**concluding** 99:20
**conclusion** 81:25
107:13 111:4
208:24 211:14
261:8
**conclusions** 37:5
267:21
**conditioned** 93:25
**conditions** 96:12
228:19
**conduct** 220:6,6,13
220:14,16,23

**confirmed** 270:8
**conflict** 270:16
**confused** 64:24
**confusing** 98:5
  100:21
**connection** 9:8 10:2
  11:4 189:22
**Connor** 2:14
**consequently** 84:14
  98:20 113:17
  118:22 178:15
  209:8 243:2
**conservative** 208:5
  228:3
**conservatively**
  206:20
**consider** 12:16 21:4
  21:7 52:25 53:20
  72:5 74:16 91:17
  92:25 109:22
  111:21 126:19
  127:14,18 137:3
  158:8 159:16
  160:2,20 161:23
  163:23 175:24
  219:20 235:12
  275:24
**consideration**
  95:17 118:16
  131:22 182:17
  205:9 224:8
**considered** 69:16
  119:22 132:19
  160:22 161:21
  219:7,11 275:14
**considering** 52:23
  131:20
**consolidating**
  251:20
**consolidation**
  246:7,11
**constraints** 93:22
**consult** 271:11
**consultants** 14:16
  14:24
**consultations** 66:8
**consulted** 117:14

**consulting** 4:22,25
  6:14,20 8:7
**consumed** 250:14
**content** 36:9 50:19
  51:3,4,5,11,14,19
  51:22,24 53:5,7
  53:11 55:16,19
  56:2,12 57:20,25
  60:7,15,17,20,21
  60:25 71:6 72:20
  73:18 74:6,7 96:3
  110:15,19 112:24
  113:4,12 115:5
  133:12 140:12
  144:8 153:11,13
  159:24 179:14
  245:7
**contest** 66:19
**context** 17:18 18:18
  117:6,8 179:24
  189:10
**continue** 62:9
**contract** 37:13,19
  37:22 39:23,24
  40:6,10 175:17
**contracted** 181:25
  182:2,9 183:14
**contracting** 44:20
  45:9
**contracts** 188:13
**contribute** 20:25
  159:6
**convenience** 88:17
**conversation** 12:10
  35:9,10,11,20
  56:4
**conversion** 195:10
**convert** 195:13
**Corp** 261:19,20
  266:3
**corporations** 6:10
**correct** 39:21 51:7
  51:16 59:14 61:6
  61:6 64:2,21 72:6
  78:17,18 106:16
  107:4 134:25
  152:7,8,12 163:2

169:9 174:14,18
  177:10 188:9
  222:4 235:15,16
  236:16 237:5
  248:12 250:4
  256:7 261:2 269:2
  270:21 273:8
**corrections** 248:14
**correctly** 14:21
  22:7 36:15 94:5
  119:4 156:24
  158:11 240:10
  242:9
**corresponding**
  78:23
**cost** 159:21 187:17
  187:18
**costs** 159:23 161:2
  189:13,15 191:16
**counsel** 19:3,5 20:8
  186:16,21 191:6
  192:6 203:3 281:8
  281:13,14
**count** 79:5
**counterclaim** 257:7
**counterclaims** 11:5
**counting** 84:6,9,17
  101:20 202:10
**course** 60:19
  193:19 268:13
**court** 1:2 66:3
  106:19,19 108:13
  108:15 110:14
  127:14 131:8
  172:2 187:21,25
  189:15 192:8,14
  219:6 269:8
**cover** 179:2 189:13
**covered** 90:21
  110:16 258:4
**covers** 6:4
**create** 102:4 160:18
**creating** 178:13
**Credibility** 2:13
**credit** 261:19,20,21
  262:16 263:6
  266:3,5

**criticism** 254:18
  259:10 267:18
  268:18 270:24
**criticisms** 268:5,5
  268:24
**criticize** 270:5
**critique** 270:19
**cross** 101:2 271:19
  279:3
**cumulatively** 43:11
**curious** 195:4
**current** 206:11
  250:25
**currently** 8:21
**curriculum** 61:9
**customer** 203:17
**customers** 119:11
**cut** 254:23
**CV** 1:3 8:13 9:16
  10:18 12:5 18:3
**CVs** 12:19

**D**

**D** 3:2 279:2
**damage** 11:3 17:16
  21:7 38:8 39:8
  40:2 79:3 89:14
  89:16,22 90:5,19
  90:23 92:10 95:9
  98:16,18 99:11
  102:5,8 106:11
  108:22 118:5
  120:5 121:2
  139:15 181:19
  185:10 191:10
  193:24 196:24
  197:3 200:17
  208:18 213:15
  216:18,21 219:16
  221:15 225:23
  226:7 231:16
  232:14 255:16
  272:14 275:15
  276:5
**damaged** 46:2
  216:22
**damages** 5:19

19:13,16,20 20:9
  20:12,17,23 21:4
  29:18 32:3,19
  37:20 38:5,17,25
  39:7 40:11,17
  42:22,23 43:9,12
  44:20 45:10,13,22
  46:6,10,18,19,25
  49:4,20,22 50:17
  51:14 52:6,8
  53:12 59:14 60:6
  60:12 63:7,15,23
  64:6,15 77:10
  87:6 89:4 91:22
  94:4 96:17 97:23
  97:25 102:19
  103:3,13,20
  104:12,19 105:2,7
  105:19,23 106:8,9
  106:13,14 107:3,3
  107:22,22 108:7,8
  108:24 109:4,24
  110:9,25 111:19
  112:12 113:25
  121:3 122:9,18
  125:4,13 126:3,4
  126:17,20,21,25
  127:10,16 132:24
  144:10 151:19,22
  152:4,5,6 162:8
  162:12 163:17,21
  183:8 184:8
  192:18 199:4
  200:11,21 202:9
  202:24 205:2,23
  206:12 207:2
  213:17 218:15,17
  218:18,19 221:8
  221:25 231:14
  233:2 237:16
  257:7 268:6
  269:16,16 270:6
  270:15 272:2,10
  276:13
**data** 25:21 26:6,9
  26:11 27:20 32:15
  32:16,17 33:2,4

152:15,23 154:2,3
154:22 157:6,7
205:5,21,25
206:13,25 210:12
210:23 211:13,16
242:21,24 243:2,3
243:4 247:8,10
253:7 259:4
263:23 274:12
275:9,13,24 276:2
**date** 13:17 81:24
85:8 89:13,19,21
89:23 90:7,20
91:9 229:14
231:13,17 232:13
233:2,5 238:17
281:12
**dated** 77:25 78:5
80:10 88:14,23
197:20 280:6,15
281:19
**David** 2:4 3:9,19
215:9
**day** 181:3 278:13
**DC** 2:15
**deal** 87:18 130:13
180:20 181:3,3
**dealing** 161:6
223:23
**dealt** 66:2,6
**debt** 180:24
**December** 88:15,23
91:2,19 163:14
198:17 201:12
203:7,13,19
231:12,13 232:6,9
232:18,20 233:8
234:3 241:24
257:16 273:11
280:15
**decide** 47:7 85:22
86:4 87:10 107:2
115:9 131:8 188:2
192:15
**decided** 12:19
107:18 212:11
255:3

**decision** 90:7
139:20
**declaration** 186:2
193:21
**deem** 70:11
**deeper** 116:18
**defendant** 1:9 2:6
63:7,23
**Defendant's** 197:19
197:24 280:17
**define** 272:13
**definitely** 131:6
194:3 218:7
**definition** 44:13
46:14
**degree** 7:25 29:13
130:9
**demand** 128:6,17
**demanded** 119:9
129:2 130:24
191:24
**department** 6:6,22
14:15 20:2
**depending** 136:5
**depends** 19:8
112:13
**deposit** 261:21
262:16 266:4
**deposition** 1:11
9:16 229:17 277:3
278:6
**derive** 154:5,7
**derived** 42:12
43:22 144:16
**describe** 7:23
182:13,13 200:20
**described** 30:19
46:9 187:12 204:2
**describes** 115:13
**describing** 185:12
**description** 15:7,13
17:6,15 46:6
114:10 132:21
134:15 186:23
254:6,11 280:3
**descriptions**
113:16

**designated** 164:25
178:3
**desk** 76:20
**detail** 19:15 21:14
22:20,21 28:4,8,9
28:22 29:2 32:20
44:25 195:7
248:11
**detailed** 22:8,24
23:4,10,13 118:13
185:12 186:23
197:10 200:2
257:6 270:17
**details** 25:15
113:15
**determination**
107:7
**determine** 23:17
28:16 32:2 84:22
118:20 139:18
165:7 189:16
200:16 207:11
222:15 236:12
264:9
**determined** 19:19
143:21,22
**determining** 9:5
107:22 117:24
161:8 163:25
169:18
**detriment** 215:22
**develop** 19:16
20:12
**developed** 20:9
**developing** 16:19
**dictate** 13:18
**difference** 57:10,16
145:22 201:11
208:20,25 234:17
242:2 251:18,19
276:11
**differences** 227:2
**different** 5:2 25:17
41:12,17 57:8
68:4 81:18,19
85:20 86:12,13
94:22 105:4

108:16,18,19
111:25 113:15,15
120:18,19 122:12
158:20 159:15
167:7 180:20
204:8 207:23
212:4 213:14,15
213:20 218:25
220:14,15 238:6
250:18 251:12
259:6,25 260:3,18
**differential** 45:19
**differently** 247:4
**difficult** 33:7,15
207:15,18
**digital** 159:22
**diminished** 222:3
222:12 224:21
235:8 239:25
240:5,15,20 242:6
**diminution** 209:21
210:4,6,9 211:15
222:18 224:20,24
**direct** 3:8 36:10
117:19 198:2
270:16 279:3
**directly** 17:21
**Director** 2:14
**discount** 123:12
124:2 127:7,11,19
127:20,24 143:13
159:17 161:8
164:18 168:25
169:5 180:5 181:4
181:5,24
**discounted** 169:7
171:22 172:21
**discounting** 178:16
**discounts** 124:24
131:13 132:3
150:24 151:2,7
183:6
**discovery** 19:21
24:4 29:11,12,14
29:21,22 30:5
32:22 185:6 203:5
253:5 274:16

**discuss** 8:8 20:21
34:25 35:5 55:5
221:6 231:6
236:23
**discussed** 134:9
226:13
**discussing** 35:3
128:17 166:7
187:10
**discussion** 47:10
79:10 114:6
151:23 161:15
187:10 252:10
259:18
**discussions** 186:21
192:5 216:2
**dispute** 10:12
179:12 182:23
**distinguish** 199:24
201:15 202:18
**distort** 226:23
**distribute** 56:23
59:25 60:15,17,24
**distributed** 54:25
238:23 239:7
**distributes** 56:12
**distributing** 22:2,4
22:5 58:23 214:20
226:16 245:7
248:18 249:7
**distribution** 34:5
57:17,19 58:20
59:4 64:9 115:22
133:14 160:4
226:11 228:20
237:14 238:9,10
239:13,23 246:19
250:3,4
**distributor** 214:21
**distributors** 21:23
24:9 30:11,13
248:18 249:6
**DISTRICT** 1:2,2
**DLA** 1:21 2:4
**Dobre** 82:7 83:9,16
167:10 169:16
171:2,2

**document** 78:9
80:7 81:7 168:4
185:25 189:3
198:6
**documentary** 55:14
**documents** 20:6
31:19,21,23
188:24,25 190:4
198:25 200:6
252:11,14,19,22
252:23
**doing** 3:4 13:5 39:3
74:23 76:2,4,21
87:25 131:6 182:5
205:5,21
**dollar** 195:10
**dollars** 83:5 85:3
149:19,22 195:12
195:13
**double** 218:18
276:13
**draft** 18:25,25 19:9
**drafted** 104:13
**drafting** 17:9
**drafts** 19:6
**draw** 14:16
**drawn** 179:13,16
**due** 115:19 116:11
117:22
**dump** 175:17
**Dunn** 38:9,9 67:3,6
**duplication** 219:5,8
**duress** 176:13
177:15

**E**

**E** 2:2,2,14 3:2,2
185:25 193:20
279:2 280:2
**earlier** 88:8 104:8
163:12 271:23
274:25
**early** 252:9
**earn** 138:21 139:25
140:6,8
**earned** 93:16 99:4
138:22 140:10

153:16 219:13
**earns** 54:21 56:11
**easy** 33:18,19
209:17
**economic** 40:19
133:5 147:15
219:17,20 228:19
**economically**
133:15 136:4
**effect** 12:11 35:12
48:11 117:21
188:20 200:17
202:4 204:22
205:9,11 213:13
219:23 225:2
227:19 231:23
232:5 235:3 249:9
249:15,22 250:7,9
252:7 275:14
**eight** 226:4
**either** 9:15 43:21
65:13 95:7 132:5
250:2,3
**elapsed** 92:19
**eliminated** 276:2
**eliminating** 275:12
**else's** 44:22 45:11
45:25
**embedded** 229:7,8
**employee** 281:13
281:14
**encompass** 190:10
**ended** 163:16
**ends** 273:6
**end-load** 93:20
**English** 18:18 80:4
170:21
**enter** 100:3 180:21
180:22
**entered** 99:16,21
100:2 177:22
182:20,24
**entering** 179:10
**Enterprises** 1:5
3:21
**entire** 7:5 17:17
112:23 113:2,8

**entities** 3:22 5:17
56:15,20,23
**entitled** 64:19
113:17 188:11
**entity** 67:15 137:11
140:4 143:10
144:12 146:2
**entries** 194:2,4
275:13
**episode** 78:21 82:6
82:7,8 98:25
102:11 163:5
164:17,21 165:8
165:10 168:9
169:7 171:14
175:2,3 218:10,12
**episodes** 77:10,21
78:17,19,22 79:5
82:12,20,22 83:5
83:13,17,21 84:6
84:9,11,17,23
85:2,4,8,23,25
86:7,13,16 87:5
87:21,22 88:3
89:2 90:10,16
92:12,17,22 93:4
93:13 94:2,8 95:6
96:15,19,25 97:5
97:11,14,21 98:3
98:22 99:5,6
100:11,19 101:12
101:18,19,20
102:12,15,18
103:4,14,23,25
104:8 110:5,7,8
110:11,20 111:2
112:16,21 113:22
114:21 117:25
152:20 160:4
161:5 162:14,24
163:5,13 164:3,6
164:20 165:21
166:5,21 167:4,15
167:19 168:5
169:13,19 170:7,8
170:8 171:12
172:16 173:6,6,9

174:5 176:22
202:10 211:24
213:3,5,11,19
215:4,17,21
216:15 217:6,7,8
217:10,11,14,25
218:3,3,17,20
220:7 238:22
**equal** 148:18 171:5
**equate** 57:12
**equates** 177:8
**equating** 57:14
**errors** 269:4
**ESQ** 2:4,9
**essence** 215:19
**essentially** 37:14
242:18
**establish** 31:3
128:20
**estimate** 26:16 27:2
44:8 245:15
**estimated** 234:12
246:3,5 257:10,13
**et** 109:2 133:5
198:13 203:5
253:13 270:18
**Euro** 246:8,14
**evaluate** 25:11
112:19 149:12,14
**evaluated** 68:14
**evaluating** 41:12
68:17 72:4 73:23
**event** 224:24
**everybody** 116:22
129:20 246:13
274:22
**everyday** 5:23
**evidence** 175:21
176:2
**exact** 7:18 49:10
156:8
**exactly** 12:24 31:20
44:10 106:4
144:19 171:17
248:24
**examination** 3:8
271:19 281:6

**example** 97:10
125:11 143:7,9,10
145:16 167:9
175:15 177:13
226:16 230:4
232:17 243:7
244:7 249:7 259:5
264:23 266:14
**examples** 266:15
**exceed** 221:16
**exceeding** 262:23
**exception** 29:15
**exchange** 168:11
174:16,19
**exclude** 42:15 86:5
87:11 90:7
**excluding** 193:25
**exclusive** 51:4,10
60:20 64:8 115:23
**exclusivity** 36:2,6
36:10,16 37:19
38:4,4 39:10,16
40:8,15 41:25
42:5,12,14 43:24
47:21 48:11 49:13
49:18 60:18 65:10
65:18 66:8 212:8
213:16 217:3,4,9
217:13,20
**execution** 91:8,10
**exercise** 33:19
**exhibit** 54:16,18
55:6 78:2,3 79:9
79:20 80:19,22
81:13 83:12 88:6
88:17,20 155:17
156:15 157:7
166:11 169:11
185:16,19,20,25
186:20 193:18,20
195:4,6,15,20,23
196:8 197:17,22
202:22 227:5
236:19 240:21
248:2 253:25
254:2 256:22
272:7 273:4

274:12,24 280:4,6
280:8,11,13,16,18
280:20
**exhibits** 77:19
184:23
**exist** 190:6
**existed** 124:19
252:19
**existing** 229:24
233:14
**expand** 4:4 103:24
104:4
**expect** 249:10
269:15
**expected** 205:15
206:18 212:10
242:4
**expense** 184:6
**experience** 9:9,9
37:21 67:7 118:3
192:18 230:13,15
230:22 231:3
**experienced** 70:5
**expert** 4:17,20,22
6:15,21 10:15,25
11:13 12:14 13:24
17:10 54:18 55:7
61:13,14 66:15
111:8 117:15
127:9 132:7 184:8
192:18 268:14
271:25 280:4
**expertise** 118:4
131:25 230:24
267:23
**expiration** 203:20
**expires** 281:19
**explain** 44:24 52:5
58:16 70:8 82:17
104:15,17 118:9
125:17 142:3
151:3 153:18
162:10 180:8
184:7 193:15
**explained** 153:21
162:23
**explaining** 165:20

214:14
**explanation** 98:9
266:25
**exploit** 75:2
**exposure** 8:14
119:11 178:14
**expunged** 49:13
**expunging** 48:12
220:18
**extend** 91:2
**extended** 91:19
**extends** 238:11
256:9
**extensive** 148:25
149:2
**extent** 75:21 219:4
**extract** 144:19
155:23
**extracted** 155:15
155:19,21 156:5
156:23
**E-Mail** 272:18

**F**
**faced** 180:3
**fact** 43:2 53:4,9,14
71:5 72:22 92:21
95:12 99:2 113:11
115:20 116:12
129:14 153:4
160:23 164:5
176:3 190:7
199:24 216:14
261:16 262:10
**factor** 33:17 95:25
201:18 228:7,11
**factored** 180:25
**factors** 109:10
160:3,6 161:7,20
163:24 172:13
209:9,11 228:11
228:22
**factual** 267:20
**failing** 267:11
**fair** 8:20 39:17
77:11 95:11,16
96:11 97:6 103:16

117:24 118:15
130:11 133:2,3,8
133:21,22,23,25
134:4 170:2,3
171:20 172:20
175:10,18,22,23
176:4,7,21,24
178:13,17 180:21
182:9,11,15 183:2
183:13,19 184:3
213:18,19 216:24
**fairly** 274:23
**fall** 69:12 102:5
131:9
**familiar** 80:6 81:6
146:7 194:24
**far** 123:18 262:23
270:23
**fast** 203:22
**February** 197:21
272:12,18,20,24
281:19
**fee** 169:21,23
170:10
**feel** 21:17 27:10
109:20,23 111:7
131:10 197:13
199:11
**feels** 108:15
**fees** 103:18 178:2
181:5 184:14,17
184:20 185:9
188:7 189:22
190:10,16 191:9
191:24 192:20
**fell** 90:22 93:22
102:7 114:9 185:9
**felt** 16:19 129:4
165:16
**fifth** 62:3
**fight** 5:16 187:16
187:17
**fighting** 187:18
**fights** 188:16
**figure** 9:19 32:15
33:3 103:20
138:18 206:4

207:7 213:13
244:4
**figured** 92:17
**figures** 171:11
**figuring** 129:5
**filed** 215:2
**film** 8:22 9:6 10:9
**filter** 202:4
**finalized** 14:8
**financial** 76:3
176:13 177:25
**financially** 216:22
281:15
**find** 12:2 251:17
**fine** 79:19 93:19,21
104:11
**finish** 34:15 45:5
100:17 201:19
251:5
**finished** 25:4
**firm** 3:14 17:21
184:16,23
**first** 11:16 13:6
21:9 29:16 65:20
81:9,14 98:6
99:11 105:24
108:7 109:24
122:20,21 138:7
141:3 170:22
198:5 220:17
236:23 237:5,23
238:2 239:5
240:14 242:8
244:7 252:20
257:10 259:4
261:24 262:20,21
272:22 274:3,13
274:15,17
**five** 77:4 117:20
198:3 221:23
242:19
**fixed** 233:2,5
**follow** 68:25
**following** 82:4
223:2,16
**follows** 3:7 133:3
**food** 161:12

**footnote** 17:3
115:11,12,12,14
117:13,13 150:7
257:18 263:18
264:5,11
**forecast** 155:25
**foregoing** 278:5
281:10
**foreign** 5:15,17
10:2
**forensic** 5:25 7:22
**form** 15:16,17
22:25 23:25 24:13
25:14 26:3 29:7
30:15 31:2,10,16
32:6 34:7 35:18
37:2,16,24 38:16
38:19 39:20 41:6
41:20 42:7,18
44:3,16 45:3,16
46:23 47:16 48:7
48:20 49:7 50:4
50:22 52:2,7,13
53:14 58:3 59:18
60:10 61:4 63:19
64:11 65:7 67:11
67:21 68:22 69:23
70:15,25 71:8,19
72:8,25 73:8 74:9
74:21 75:9 76:7
90:13 95:23 96:21
98:5 100:13,21
101:24 102:23
105:12 106:2
107:25 110:7
111:13 114:3,19
114:25 121:15
126:24 131:4,17
135:19 136:16
137:16 138:25
139:10 143:16
146:23 152:10
154:11 155:4
157:16 159:11
165:12 173:11
174:7 175:7 177:4
181:11 183:10,24

184:11 186:8,13
186:18 187:2
189:25 190:12
192:22 193:6,11
196:19 199:7,21
200:10,13,24
201:25 204:5,11
211:22 212:2
215:8 216:11
217:17 218:5,22
219:14 220:11
223:7,9 224:3,16
225:9 228:14,24
230:9 231:9 237:7
237:21 249:13
251:4 255:22
256:12,17 259:15
260:7,21 263:17
267:6 281:9
**forming** 199:4
**forth** 120:10
162:12 188:4
196:15 205:22
207:2 268:7
281:12
**forthright** 271:3
**forward** 240:18
**found** 26:13 106:23
135:5,7
**foundation** 31:2
53:15
**four** 62:2,25 63:2
123:21,21 128:16
157:13 166:6
242:19
**fourth** 61:11
234:14 237:4
239:19 240:18
248:21 257:17
273:6,16,20,25
274:4
**France** 10:9
**free-to-air** 155:10
**front** 273:5
**front-load** 93:18
**fulfilling** 40:9
**fulfillment** 212:9

**full** 123:3 272:25
**fully** 4:9
**further** 214:22,24
271:18 276:17
281:10,12
**future** 52:23
170:14 205:10
229:19

### G

**G** 3:2
**gain** 234:22
**gathered** 154:17
**general** 7:19 12:15
17:5 30:8 85:12
103:9 119:16
216:3
**generally** 5:4 7:23
39:23 40:5 46:13
69:18 115:13
116:8 158:17
204:2 258:11
**generate** 148:7
**generated** 153:8
**Gerbrandt** 11:12
12:13,17,20,22
14:3,12 16:23
17:19 18:6,8
19:24 20:13,19,22
35:6,12 117:15
118:4 119:14
120:21 221:7
231:7
**Gerbrandt's** 15:10
16:4 118:8 124:6
129:10 130:22
267:18
**getting** 17:19 50:25
51:7 71:10 111:19
114:6 128:20
220:18
**gift** 263:8
**give** 4:13 5:18 7:18
33:5,8,9 67:3
74:24 75:6 76:19
105:20 106:21
108:12 109:16

118:14 127:14
129:24 131:7
143:13 145:7
146:20 165:2,4
181:4 189:12
192:9 233:11
258:11
**given** 10:15 23:23
33:12 57:24 61:13
71:24 80:14 84:3
84:5 95:12 111:10
112:6 133:23
170:25 185:5
208:7 231:15,16
232:13 233:10
235:14 236:6,13
252:11,13
**gives** 8:13 109:12
**giving** 6:14,19
17:13 57:12,13
106:14 175:14
212:11 220:23
222:13 230:25
**glad** 96:8
**GlobeCast** 198:18
203:14
**go** 19:7 25:3 32:19
45:7 50:11 61:24
62:24 67:3 75:20
76:17 82:21 83:24
86:8 102:24
104:21 112:12
116:14 117:6
124:15 126:24
133:10 138:17
142:10 145:18
155:23 157:5
160:6 161:13
167:2 192:2
194:20 195:13
196:13,21 199:23
199:25 201:22
202:2 203:9
230:21 241:13
264:16 277:2
**goes** 8:4 84:15
138:12 203:16

**going** 24:6 25:19
48:22 54:5 59:7
69:20 70:3 75:2
76:10 77:18 82:19
101:10 110:15
113:20 114:6
118:18 128:6
130:7,10 131:9
133:18,24 136:2
137:3 139:17
142:10 143:23,24
143:25 147:10
151:9 178:12
179:12,17,17
181:4 183:6,15
187:23,25 192:8
198:3 200:3,4
206:8 208:12
210:13 225:22
226:24 228:5
237:23 240:7,18
251:23 259:23
261:3
**good** 3:18 16:20
26:16,16 106:12
161:11
**gotten** 50:8 272:23
**government** 6:12
**grand** 85:7 87:17
218:9
**granted** 72:5 133:4
182:16
**great** 105:3
**greater** 128:23
**grew** 240:12
**gross** 123:18 124:3
131:13 140:17,19
140:20 141:6,10
141:18 158:19
248:7
**grossed** 248:5
**grounded** 32:3 39:7
64:17 134:9
211:23
**group** 6:2 59:6,24
170:16 226:24
**groups** 226:22

**growth** 201:4,6,7,9
201:15 202:18,19
204:16 205:14
206:14,19,23
209:22,25 210:2,6
210:9 211:15
222:3,7,12,19
223:22 224:21
227:9 228:8 234:4
235:8 236:24
237:4 238:3
239:18,25 240:5
240:15,20,23
241:6,20,21 242:6
243:9,21,25 244:5
244:12,12 245:5
248:19 249:11
250:24,25 252:6
276:8
**guess** 11:10 93:3
132:23 152:16
162:19 193:17
194:6,17 205:22
206:16 231:19
272:18 275:9
**guide** 106:23
**guys** 100:25

### H

**H** 280:2
**half** 7:14 92:16,18
92:18,22 96:15
97:4,7,21 100:19
102:12,18 137:5
148:5,14 230:19
**halfway** 92:23
275:21
**handled** 184:24
**hang** 70:21 73:3
127:22,22 221:11
232:2
**happened** 9:6
219:23 229:4
242:2 244:19
263:13
**happening** 230:11
**happy** 4:5,6

hard 208:2
Hart 249:4 255:18
  257:4 261:7
  267:22,25 268:6,9
  268:12,12,25
Hart's 93:2 227:21
  248:10 254:5,19
  256:21,22 258:20
  259:10 268:18
  269:16 270:6,14
  270:20 280:20
heading 117:12
hear 50:24 107:6
  190:23
heard 13:7 65:10
  66:22 67:8 176:9
hearing 58:11
held 1:20 191:2
  266:23
help 4:5 12:3,12
  14:25 15:3 20:4
  100:23 101:3
  117:16 132:9
  252:20
helped 17:4 118:22
  118:23
helping 5:15
  187:16,17 189:11
helps 85:18
hereinbefore
  281:12
Hey 179:13 208:20
high 104:21 106:5
  106:6 109:18
  119:19 124:8
  134:7 142:14
  145:25 148:12
  150:22
higher 120:16
  124:21 153:17
  158:9 171:3,16
highest 119:20,21
  120:3 124:14,20
  125:22 127:13
  128:2 130:25
  131:7,21 132:13
  132:15 133:22,25

134:4 142:9,22
  151:14 172:25
  174:3 176:25
high-end 121:5,12
  150:21 152:3,4,23
high-end-of-the-...
  121:20
high-level 20:17
historic 250:24
historical 191:10
  201:6 206:7,9,13
  208:15 210:2,17
  224:6 226:3,7
  227:17 229:5,8
  241:21 250:12
  251:11,13,15
  257:15 272:13
historically 210:13
  251:12
history 9:13 225:19
Hold 198:19 240:9
  261:25
holding 69:17
home 82:2 130:7
hopefully 274:22
hospitality 276:21
host 136:6
hour 123:2,4 137:5
  138:23 140:11
  142:17,17 148:5
  148:14
hours 142:16
hundred 78:22,23
  79:6 122:22 123:4
  125:12 126:5
  135:14,22 136:3
  136:19 190:16,20
  190:22,24 191:2,9
  191:15 192:11,20
hurt 220:20
hypothetical 43:17
  119:8 232:22
hypothetically
  53:25 68:18

I

idea 16:20 106:13

206:9
identification
  54:20 78:7 79:24
  81:2 88:25 197:25
  254:4 256:24
identified 12:13
  61:9 63:2 65:15
  123:22 227:22
  246:2 249:4
identify 170:6
ignore 97:12
  173:15
ignores 267:25
IMB 186:12
implied 121:23
  122:3
imply 141:15
important 53:17
importantly 177:21
impression 192:9
inappropriate
  182:11
inappropriately
  111:18 268:13
include 8:23 19:23
  32:13 52:8 67:16
  74:4 75:23,24,24
  76:4 84:23 85:23
  85:24 86:2,5
  87:10 90:2 91:21
  92:8 102:18
  128:13,22 151:2
  163:13 166:5
  170:7 174:22
  202:8 217:5
  246:15 265:10,12
  265:14,15
included 68:6
  84:25 86:6 89:2,9
  90:4,16 103:3
  110:20 112:16
  113:24 115:5
  128:21 165:23
  166:3 167:5,22
  170:15 211:2
  213:5 218:7
  251:23 255:19

256:4 266:9
  275:18
includes 75:21
  153:12 154:22
  155:8 167:9 242:7
  246:18 258:21
including 55:14
  73:24 74:2 77:21
  83:18 95:20
  112:20 114:8
income 69:4 74:24
  75:5,15,16 248:4
incomplete 209:15
incorporate 133:24
  183:6
incorrect 239:17
increase 158:6
  275:19
increased 240:17
increases 251:12
incurred 44:21
  45:10,14,22 46:7
  46:10 191:10
  219:21
independent
  186:14
indicate 176:17
indicated 6:14
  36:12 91:6 93:4
  192:6 237:11
  261:17 266:2
indicates 157:8
  183:12 244:8
indicating 248:10
indication 145:7
indications 176:6
indicative 146:12
indirect 221:3
individual 5:16
  36:24 53:7,10
  67:17,18 68:19
  70:13,23 71:5
  72:5,20 73:18
  74:7 236:14
individuals 6:9
  251:16
industries 8:10,13

industry 15:8,14
  16:16 99:14
  108:25 117:15,22
  119:2 122:7,19
  148:10,11 230:12
  230:15,24
Info 56:19
information 16:22
  17:14 19:18 21:15
  21:23 22:9,12,15
  22:16 23:6,10,14
  23:21 24:5,9 25:9
  26:13,15,25 29:11
  29:15,20,23 31:6
  31:8,14 32:2,24
  75:13 154:17
  155:16,20 156:6
  156:23 158:11
  197:10,11 199:12
  207:17 208:9,22
  209:4 210:22
  251:10 253:11
  272:21,24 273:16
infringed 115:22
infringement 116:5
  116:6 189:5,23
infringements
  188:22
initial 16:3,4,10
initially 14:13,21
  16:11 104:13
  105:22
input 109:10
  122:20,21 123:5,5
  123:7 124:7
  125:13 150:21,22
inputs 109:18
  119:19 120:7,21
  121:5,6,11,23
  122:8,10,13
  123:21,22 124:11
  124:14 125:3,5,8
  126:6 128:2,16
  129:7 130:25
  131:2 134:4
  139:22 143:25
  144:20 151:12

152:4,6 158:23
**inquire** 187:5
**insofar** 213:23
**instance** 10:5
226:22
**integrity** 111:16
**intellectual** 68:5
**intended** 106:20
**interested** 281:15
**interesting** 195:22
**internally** 144:5
**international** 2:13
185:22
**internet** 198:12
203:8 246:12,23
247:6,14,19
250:18,21,24
252:4 257:9,11,13
**interpretation**
116:19 187:23
**interrogatories**
43:5 197:18,20,24
280:17
**interrogatory** 43:3
44:7 268:3 270:11
270:17
**interrupt** 15:16
**intimate** 132:10
**introduce** 11:22
**introduction** 202:5
**introductory**
132:25
**investigation** 203:4
**invoices** 188:8
190:18 191:12,17
195:8
**involve** 65:18 68:11
174:16
**involved** 5:15 8:6
10:22 12:21,22
20:13,19 22:2
61:19 66:12 70:2
117:23 213:20
**involves** 62:7
**involving** 10:16
**Ireland** 154:16
**irrespective** 49:23

**issue** 35:2 50:9
182:23 197:8
221:7 229:17,18
229:23 231:6
240:19 254:5,9
269:7
**issued** 13:4
**issues** 12:4 172:4
208:16 267:21
**items** 229:6 266:20

**J**

**J** 278:2
**January** 232:9
**job** 14:19
**John** 2:9 10:24
98:7 101:9
**judge** 106:22,24
107:8 109:9,16,21
110:2,14 115:9
122:4 126:18
127:17 139:17
**judgment** 253:15
253:21
**July** 80:19,22 103:4
110:7 167:5,8
200:19 203:6,12
229:10,13 280:11
**jumping** 227:12
**June** 1:23 77:25
78:5,11,16 83:10
86:7,21 87:16
90:3,21 92:12,13
93:9 96:16,24
102:15,19 169:11
170:11 173:5
233:24 237:17
238:25 240:11,17
241:19 242:3
280:7 281:19
**justified** 133:15
**justifies** 129:2
130:24 131:6
134:3
**justify** 214:19
215:3,10,16

**K**

**K** 257:6,19
**Kagan** 152:15,23
153:10 154:2,16
155:14,25
**keep** 24:13 133:18
133:19 143:18
147:10 151:9
209:25
**keeps** 235:5
**kept** 150:10
**key** 182:2
**kind** 5:14 8:10
22:21 31:7 32:17
37:12,20 42:10,14
65:12,22 66:10,23
67:8 103:25 104:7
112:10 121:21
132:2 138:8 146:8
159:3 174:20
205:11,25 206:25
254:25
**kinds** 5:2 222:22
**Klan** 82:6 83:18
84:4,7,10 162:16
165:21 166:24
167:22 170:13,17
170:24 171:4
197:5,7 200:8,18
201:2,11 202:25
204:17,23 205:16
206:5 207:13
208:7,21 209:3
211:16,19 212:6
212:10 213:3,10
213:10,24 214:11
214:22 215:4,5,5
215:17,18,21
216:15 217:7,10
218:3,17,20
219:22,24 220:7
220:24 221:15,25
222:10,11,16,17
223:3,4,17,8
224:14,17,23,23
225:2 226:17

229:9,15,20,22
230:3,5,7 231:23
232:5,11,21 233:9
233:13,14 235:4
239:20 240:4
241:12,19 247:14
272:3
**knew** 59:24 116:23
226:25
**know** 7:7,16 8:8
9:13,18,23 11:25
12:7,18,19 13:2
13:13,15 14:4,8
14:18 18:17 19:8
20:5 23:3,15 24:8
25:24 27:14,16
28:12 31:13,23
33:10 36:4,20
39:25 40:10 52:23
55:25 57:5,23
58:5 59:8 65:25
66:23 67:23 87:13
92:21 93:19,21
104:18 109:17,19
112:11 113:15
114:5,7,11 116:9
116:13,15,17,18
117:5,8 118:12
121:8,20 127:19
128:23 129:14,22
131:20 135:8
136:21 141:3,12
141:16,19 143:4
145:19 146:2,15
146:15 147:14
154:3,20,21 155:2
155:14 156:7,8
158:12 159:13,14
160:12,14,20
161:3,12 180:15
180:19 185:6,23
185:24 186:6
187:22,24 188:23
190:21 191:23
192:7,7 193:7
196:14 197:2
206:22 208:14

209:3,17 210:25
215:25 221:4
225:23 226:9
227:22 246:17
248:16 250:12
253:5,9 254:9,24
255:2,14 259:8
260:23 261:2,9
262:12 263:4,4
266:23,23 271:5
273:15
**knowing** 25:18
231:3
**knowledge** 117:23
124:6 132:10
**known** 55:4
**knows** 18:11
134:21
**Kotaba** 149:16,19
150:18
**Kotaba's** 150:8
**K-o-t-a-b-a** 149:20
**K.C** 186:2

**L**

**L** 257:2,19,22
**language** 99:20
188:17,19
**large** 7:25 14:15
29:12 226:19
243:21 249:8
**larger** 153:7 276:6
**Larry** 11:12,20,22
11:25 12:5,7 16:4
117:15 118:4,12
118:22 119:24,25
129:12 132:8
154:14 155:19
156:5,14 268:9,15
**Laura** 2:14
**law** 184:16,23
**lawsuit** 184:15,21
**layman** 190:13
**lead** 171:19
**leap** 221:5
**leave** 138:13
**leaving** 106:18

228:3
**left** 53:17 161:18
242:25 243:4
**legal** 37:5 51:13
107:11,12 110:13
111:3 184:6,14,17
184:20 185:9,11
185:12 186:24
187:6,13,14,24
188:6 189:14,22
190:10,16 191:9
191:12,16,17,24
192:20 195:7
267:21
**legally** 50:18
**length** 172:4 183:2
183:4
**lengthy** 215:25
**letters** 276:10
**letting** 100:16
**let's** 46:8 54:10,15
55:10 61:7 63:3
76:25 77:23 80:13
80:18 81:9 88:5
97:10 99:8 110:4
115:10 117:10
127:18 137:5
157:6 162:7
169:10 170:19
177:17,18 196:13
197:4,6,16 200:7
202:21 214:16
229:11 233:18
234:2 235:18
236:18 240:9
243:7 244:7
253:23 256:20,25
257:20 261:11
267:9 269:11
**level** 120:3 123:25
125:20 126:6,7
129:6 130:14,25
134:2,4 135:14
144:17 242:5
**levels** 129:3 131:12
131:20,21 147:23
255:13

**liability** 106:23
111:11
**liable** 94:6 112:7
**license** 36:17,23
37:9 40:22,25
41:10 49:5 50:18
51:9,13,19,21
67:17 68:19 70:13
70:23 71:13,14,15
72:19 73:17,25
74:6 75:17 76:5
77:24 78:3 96:3,9
96:18 100:5 102:7
103:17 119:7
161:25 169:21,23
178:2 181:5
182:19,24 202:5
203:20 211:24
220:25 280:6
**licensed** 36:9 50:7
50:20 51:11,23
52:19 53:5,10
55:16,19 56:2,5
71:5 83:10,22
94:10 95:5 97:19
103:16 115:19
117:25 133:12
152:20 169:14
170:10 215:20
238:11
**licensees** 72:20
74:7
**licenses** 99:13,17
99:22,25 100:2,3
102:4 133:4 162:2
170:16 180:14,16
182:15,18 213:4
**licensing** 8:21,23
9:4 47:14 48:5
49:3 50:19 53:6
59:15 60:7 64:9
68:5 79:13,21
80:9,20,23 81:3,4
92:2 94:8 96:4
97:21 107:21
173:8 202:12
214:20 215:3,10

215:17 216:15
217:13 220:24
280:9,12
**licensor** 179:24
180:2
**lifetime** 203:17
**light** 59:12,12 60:5
**limit** 109:16
**limitations** 162:3
**limited** 15:10 29:12
29:13,21 34:20
46:17,19 146:18
147:2,3 160:4,5
272:10
**line** 27:10 32:19
127:5 138:3,7
176:11 212:17
266:20
**lineup** 213:25
229:10
**lingering** 192:3
**liquidation** 69:17
**list** 30:19,20 170:16
185:7
**listed** 62:14 82:12
167:11 173:5,7
177:13 227:6
253:4
**listen** 85:10
**listing** 166:20
**listings** 275:2
**lists** 30:12 61:15
82:5,22
**litigation** 3:20 5:25
6:15,16,19,20,23
7:7,15 9:9,11
10:10,17 29:16
55:8 63:6 66:12
113:2 116:24,25
176:15 178:8,9,15
179:3,12 180:3
186:4,12
**little** 21:20 26:19
44:24 55:6 62:19
85:20 88:8 104:4
104:5 111:25
117:7 122:15

159:8 167:6 204:8
216:6
**LiveNote** 1:19
281:5
**LLP** 1:21 2:4,8
**loans** 9:5
**Loeb** 2:8,8 4:16,17
13:16,16 17:21,21
**long** 14:2 60:18,19
90:24,24 93:22
175:9 200:4,5
**longest** 214:23
**look** 9:18 12:23
13:10 21:3 22:25
25:10 28:6 38:5,8
55:10 61:7 63:3
75:14 76:21 77:15
81:9,22 99:8
111:16 112:16,18
115:10 116:15
117:10 119:2
138:8 141:4 157:6
158:16 163:8
166:8,11 169:10
170:3,19 172:2,15
172:22 175:20
177:17,19 185:19
194:7 202:21
210:17 212:15
214:16 225:19
232:23 233:18
234:15 236:19
243:7 244:7 250:6
251:11 253:23
256:20,25 257:20
261:12 263:12
264:22 265:21
267:9 271:4
**looked** 12:18 31:19
83:11 153:14
158:10 185:15,17
188:24 201:2,4,5
201:9 204:18
208:14 248:11
263:11 264:15,17
264:18,19,25,25
**looking** 29:18

61:10 81:17 94:23
98:12,17,17,18,20
99:2 102:3,10
122:17,18 132:22
149:6 155:17
157:7 165:9
169:13 176:20
178:22 195:24
202:22 204:14,16
204:20,21,23
205:13 212:22
227:4 234:6
235:15 241:18,25
242:9 247:12
248:2 261:13
263:2,5 267:13
269:24 273:3
**loss** 219:17,20
**losses** 63:10
**lost** 21:8,8,19 32:3
35:13 38:16,24
39:2,7,9,13,15,25
40:2,12,14 41:2
41:18,23 42:3,11
42:15,24 43:7,19
44:6,14,18 45:8
46:3,16,18,20
47:11,20 52:7
61:20 62:8 63:7
63:24 64:4,20
65:15,22 66:24
119:11 196:15
198:12,17 199:4
203:7,13 204:3
205:23 207:3
209:19 216:21
219:21,21 237:24
247:16,18 250:3
**lost-subscribers-...**
43:25
**lot** 9:23 25:17
31:19 76:19
129:23 211:9
**lots** 169:3
**low** 104:22 106:5,6
151:18
**lower** 120:7 121:6

121:7 122:10
158:22 176:18
183:13
**lowering** 182:4
**lowest** 151:14,16
171:7
**low-end** 121:13
152:6
**lunch** 161:11,17,18

**M**

**maintain** 59:13
**major** 224:24 249:6
**making** 15:6,12
37:5 46:3 49:23
109:13 111:3
124:10 137:10
182:3 222:8
253:21
**manner** 246:24
**March** 88:11,20
90:25 163:14
241:3 257:12
280:13
**mark** 54:10,12,15
77:18,23 79:8
80:13,18 88:5,16
197:16 253:24
**marked** 54:19 78:6
79:23 80:25 81:12
83:11 88:24
197:24 254:3
256:23 264:19
272:7
**market** 40:22 58:15
59:11 60:2,4 69:5
69:5 75:16 95:14
99:15 109:2 122:7
122:19 133:5,14
135:9 146:12,13
146:17,18,25
147:2,3 148:10
158:13 160:20
163:4,8,19 164:2
164:3,6,7,11,17
164:20,21,25
165:7 167:19,23

168:6,8,16 169:8
170:12 171:5,11
171:15 172:22,22
173:2,23 174:2,11
174:25 175:11,18
176:18,21
**marketplace** 135:7
142:11 228:21
**markets** 59:8
**MasterCard**
263:20
**material** 59:8,25
153:9 270:9
**materials** 20:8
55:13,15
**math** 138:12,18
**mathematical**
269:4,20 270:25
**mathematician**
276:9
**matter** 1:16 10:23
11:10 12:8 53:11
62:4,16,18 63:4
63:11 139:19
176:15 191:13
**matters** 6:5,7 7:2
8:7,9 61:16,19
143:25
**max** 141:10
**maximize** 126:15
267:11 268:20
**maximum** 109:20
121:8,18,20
122:25 126:16
128:13,16 129:3,6
129:7,7 132:18
133:8 140:20
141:6,18 143:4
145:8,9 148:19
151:6,12,13
**mean** 7:21 13:21
15:3,11 17:10,16
17:20 22:15 23:3
23:13 24:15 25:16
25:18 31:3 33:16
36:6 45:14,23
46:6 52:18 56:25

58:17,22 59:2
66:19,20 67:24
83:19 89:15,23
91:4 94:25 99:10
100:22 104:2,7
105:15 113:13
126:5 133:18
135:25 138:11,13
139:15 140:15
144:9,18 146:19
150:16 151:21
155:10 156:11
164:7,10 166:22
194:12,24 205:22
205:22 207:9
212:5 214:2
215:11,24 219:18
238:14 239:10
242:23 250:17
258:14 259:3
261:23 262:21
263:9 264:2
265:12
**meaning** 20:7
43:11 46:10,16
73:10 78:17,21
100:2 105:7
108:21 127:17
148:10 163:5
216:13 248:19
**means** 24:19 47:2
67:24 73:19 154:4
164:9 171:25
259:8
**meant** 117:8
151:22
**measure** 19:20
38:25 39:9,15
40:11,13 41:18
44:5 47:8,19
49:22 64:20 66:24
97:22,24,25
207:21,25 214:13
216:18,20
**measures** 28:7
40:17 135:3,4
**measuring** 41:2

42:2 47:9 52:7
**media** 8:15,22 9:19
10:2,4 185:22
**media-related** 9:10
9:11 10:16
**mediums** 246:16
**memory** 31:20
65:21
**mention** 214:7,17
**mentioned** 16:11
51:17 52:6 56:16
165:19 177:11
179:9 188:15
197:9 199:9
205:17 252:9
273:25
**mentions** 43:3
**methodology** 69:3
224:5
**metropolitan** 118:2
**microscope** 271:4
**middle** 76:14 165:4
239:4
**million** 221:16
**mind** 9:21 10:6
15:9 33:3 57:11
112:10 141:22,25
142:2,4 148:21
221:22
**Minervini** 62:21
**minute** 149:23
**minutes** 76:12 77:2
77:4 123:3 220:2
221:23 271:11
**misrepresenting**
54:8,12
**missed** 248:12
**misspeak** 274:6
**misspoke** 215:8
**mistaken** 120:22
260:9
**mistakes** 15:6,12
**misunderstanding**
140:23
**misunderstood**
120:23
**mixture** 118:8

154:8,25
**model** 97:12 120:2
120:24,25 121:2,4
122:7,19 125:6,8
125:13 126:4,13
128:20 133:5
141:23 143:22
144:11 147:18
148:10 154:24,24
162:11 200:17,22
226:11
**models** 144:5
**money** 9:7 49:12,16
50:8 87:14 94:17
144:13 216:15
**moneys** 85:3 86:16
86:20
**month** 13:3 19:11
23:23 24:11 25:22
25:24,25 30:11,24
31:7,24 243:17,19
243:22 244:20,25
**monthly** 24:22,24
25:8,9 243:15,24
244:4,19,25
**months** 216:10
**month-to-month**
236:8
**morning** 3:18
**motivated** 232:10
**motivation** 178:25
**motivations** 178:2
**move** 44:12 104:11
122:15 130:20
194:23 195:5,25
250:11
**moved** 85:11
250:13
**movements** 226:21
**moving** 196:12
**MVPDs** 55:4
**M-I-N-E-R-V-I-...**
62:23

**N**

**N** 2:2 3:2 279:2
**name** 3:11,18 156:4

156:12,13 276:10
**nature** 5:22 7:19,23
8:18,25 15:25
200:21 254:15
**near** 273:5
**necessarily** 32:8
50:9 68:10 74:24
119:17 126:5
140:5 141:21,24
168:23 209:2
222:25 232:12
242:6 243:10
273:20
**necessary** 11:2
38:15
**need** 4:7 12:11
14:18 15:18 22:15
31:8 32:14,17
33:2,11 98:11
107:2 125:19,21
130:12,13,16
160:18 209:3
223:11 230:14
251:6 275:8
**needed** 28:10,21
29:3,23 113:11
122:2 135:5 206:2
207:2
**needs** 131:8 219:6
**negative** 250:7
**negotiated** 182:20
182:25 183:4,16
**neither** 276:18
281:8,12,14
**net** 204:23 234:21
235:9,15,18,19
236:7,17 245:25
247:10 251:13,17
**network** 14:15,24
58:20 59:4 228:20
**never** 52:22,25
53:4,9,23 55:19
58:12 71:5 72:22
98:2 114:8 131:19
168:10,17 190:23
196:22 209:5
211:8

**new** 1:2,22,22 2:5,5
2:10,10 3:5,5
205:10 206:21
227:24 229:21
233:15 247:6
249:18,18,21
250:2,3
**niche** 14:17 146:17
**nominal** 153:4
**non** 172:4
**nonbillable** 7:10
**noncompeting** 56:2
**nonlitigation** 7:24
**nonlitigation-type**
7:20
**nonpurchased**
153:13
**non-answerable**
71:22
**normal** 207:21
**normally** 207:22
**notary** 1:20 3:6
281:4,7,17
**note** 63:5 150:23
**noted** 261:18 266:3
272:11
**notes** 1:15
**noticed** 86:14
**Notwithstanding**
267:20
**number** 7:18 23:22
24:10,14,20 29:24
30:23 32:25 39:2
40:12 57:5 78:20
78:21 79:4 81:13
81:22 83:7 86:12
86:15 88:4,13,22
106:12 108:14,23
110:3 118:5
120:15 122:6
126:3 128:5
141:15 142:23
144:17,22 148:7
152:21,23 154:15
157:23 158:9,22
159:8,18,20 162:8
162:12,13 166:12

166:22 169:4,13
173:20,21,22
174:2,3 177:2,8
180:7,9 181:19
183:8 193:14,16
193:18,19 199:18
202:23 204:23,24
205:2,6,7 208:3
226:19 234:2,15
236:5 243:2 246:3
249:9 250:9
253:13 254:22
269:10 275:16
280:3,14
**numbers** 27:25
41:17 131:9 132:8
132:13,16 137:23
148:24 156:18
158:16 173:14,15
198:23 199:3
218:10,13 228:12
229:7,8 235:9
236:7,11 241:23
244:23 246:5
260:3,10 268:11
270:24
**numeral** 195:21
**NW** 2:14

**O**

**O** 3:2
**object** 98:4 196:19
**objected** 15:24
**objection** 15:15,17
23:24 24:12,13
25:13 26:2 29:6
30:14,25 31:9,15
32:5 34:6 35:17
36:25 37:15,23
38:18 39:19 41:5
41:19 42:6,17
44:2,15 45:2,15
46:22 47:5,15
48:6,19 49:6 50:3
50:21 51:25 52:12
53:13,24 58:2
59:17 60:9 61:3

63:18 64:10 65:6
67:10,20 68:21
69:22 70:14,24
71:7,18 72:7,24
73:7 74:8,20 75:8
76:6 90:12 95:22
96:20 100:12,20
101:23 102:22
105:11,25 107:24
111:12 114:2,18
114:24 121:14
131:3,16 134:13
135:18 136:15
137:15 138:24
139:9 143:15
146:22 152:9
154:10 155:3
157:15 159:10
165:11 173:10
174:6 175:6 177:3
181:10 183:9,23
184:10 186:7,17
186:25 189:24
190:11 192:21
193:5,10 199:6,20
200:9,12,23
201:24 202:14
204:4,10 211:21
211:25 215:7
216:10 217:16
218:4,21 220:10
223:6,9 224:2,15
225:8 228:13,23
230:8 231:8 237:6
237:7,20 249:12
251:3 255:21
256:11,16 259:14
260:6,20 263:16
267:5
**Objections** 197:17
197:23 280:17
**obligated** 189:20
189:21
**obligation** 111:8
168:23 188:15
190:10 268:20
269:10

**occurred** 152:19
201:10
**offer** 43:9 63:11,14
65:12 131:10
132:2 149:5 211:4
211:5
**offered** 21:6 43:20
63:16,22 64:5,6
65:15,22 66:11,24
67:9 152:13
**offering** 39:6,8,12
60:23 64:15
110:23 123:20
124:5,7,10 125:10
126:17 127:8
209:18 222:9
**offers** 151:8
**office** 8:4
**Offices** 1:21
**oh** 81:21 84:4 85:13
130:2 145:17
151:21 195:7,11
195:19 196:8
**okay** 17:25 20:3
32:23 34:25 43:16
52:17 61:22 62:6
62:17 67:14 72:3
72:15 76:24 77:22
80:16 84:20 86:6
86:24 91:17 96:7
105:8 110:4
117:10 122:16,23
122:24 123:3,6,10
126:9,10 134:19
136:20 142:5
174:24 184:7
192:10 194:23
195:19 196:13,20
198:20 201:20
203:25 218:14
221:6 234:16
236:4,22 238:8
241:14 252:9
258:4 262:8,14
267:12 269:18
271:7,8,15 272:5
272:17 273:3

274:19 275:7
276:16
**old** 227:25
**once** 4:21 82:3
143:21 156:8
169:24 205:3
206:3 207:6 271:3
**ones** 21:5 61:18
85:23 86:3,4,5
87:10,11 128:24
193:23,25 225:4
238:24
**one-year** 91:8
**ongoing** 203:5
229:17,18,23
**operate** 14:14
**operating** 69:18,19
**operators** 56:13,14
**opine** 146:6
**opined** 161:22
**opining** 126:23
128:8,11
**opinion** 5:18 36:22
39:4,12 49:21
60:23 61:2,19
63:12 65:13 73:15
95:4 108:21,22
110:24 123:20
124:5 125:11,20
125:21,22 127:8
127:20,23 131:11
132:2 133:7 140:7
140:13 147:6
152:13 174:25
181:8,17 184:8,13
184:19 186:14
188:5,11 193:3,8
193:13 222:9,13
223:21,22 232:8
233:6 235:2,6
267:16
**opinions** 64:5
117:16 118:7,8
272:9
**opposed** 173:4
**opposite** 249:22
**opposition** 66:16

**order** 14:18 22:7
22:11 28:23 32:15
104:6,19,25 105:5
105:13,20 107:7
113:10 121:19
125:22 132:7
148:7 165:2 170:2
175:19 206:13
207:17 220:25
**original** 83:24
91:14 171:8
**outrageous** 113:18
**overall** 48:10
111:21 204:22
205:14 250:23
251:13
**overlap** 220:3,8
221:8 245:23
**owner** 149:17

---

**P**

**P** 2:2,2 3:2
**page** 61:11 62:10
77:13 81:10,14,20
86:22 123:15
166:20 193:17
198:3,4,9 202:21
212:18 241:15
257:2 261:14
280:3
**pages** 62:15 236:21
**paid** 17:20,20 83:3
85:3,7 153:15
168:10,17 169:23
169:25 172:3,7,10
172:16 173:18
175:3,22 176:3
181:7,9 182:8
184:14,16,20
247:19
**paper** 105:20 194:7
**papers** 187:25
194:21
**paragraph** 55:11
77:14,17 78:13,15
79:3 80:11 81:22
82:12,21,24 83:7

86:23 88:7,9 91:6
99:9 103:7,11,12
103:23,24 104:2
108:17,20 115:12
117:11,19 118:6
119:4 122:17,24
123:9,15 132:22
137:22 138:4,5
140:15 141:2
150:23 177:18
182:12 191:4
198:9,14 203:10
212:15,18,19,21
212:23 217:6,7
233:19,21 234:6,8
241:16,17 254:17
257:3 261:13
262:4 267:13,14
267:25 269:24,25
270:2 272:6
**paragraphs** 88:9
152:14 203:16
**parameter** 119:19
119:20 125:24
142:6,19
**parameters** 120:3
128:23 132:20
142:9,14,22
**paraphrase** 59:23
**paraphrasing**
16:14 177:12
**Pardon** 84:8
**parentheses** 182:21
**Park** 2:9
**part** 6:13 29:16
72:3 73:25 74:15
83:10 84:23 89:4
89:16 115:19
116:11,13 162:3
166:25 183:18
184:19 185:6
186:3 187:9
203:23 208:8
217:7 240:15,20
255:24 265:17
**participant** 135:9
**participate** 189:11

**participated** 17:13
**participation** 9:4
**particular** 5:12
16:7 17:3 40:21
68:25 74:18 85:4
98:16 105:5,6
112:6 136:10,11
148:7 159:18
161:5 165:7 170:7
211:13 213:12
229:13
**parties** 117:3
168:20 182:23
252:15 281:13
**partner** 5:24
**party** 44:20 45:10
45:23 46:2,11,15
46:17,17 49:23,25
50:16,16 52:9
63:12 64:7 66:16
115:20
**party's** 46:12
115:22
**pass-through** 17:24
**pay** 17:22 99:16
129:22 130:2
136:9,11,21,24
137:3,8 139:7,12
144:4,7,13,15,23
145:2 147:20,22
148:5,13,17,24
153:11 159:24
160:18,24 189:21
190:10 191:24
**paying** 85:2 88:4
**payments** 174:17
**pending** 65:4
114:16,22
**Pennsylvania** 2:14
**people** 8:7 12:3
20:2 25:19,19,23
25:24,25 48:12
129:24 143:23
146:16 175:13
209:11 225:21,24
226:2,6,10 227:19
227:23 229:19,19

230:16,23 235:21
235:21 236:2,2
**percent** 6:23 7:5,6
7:9,13 79:4 86:6
86:22 87:18,19
90:4 93:9 97:6,11
98:24 99:3,5
102:6,7 103:19
120:16 122:22
123:4,16 124:15
124:22 125:12,25
126:5 127:19
135:14,22 136:3
136:14,19,20
137:13,13 140:17
140:18 141:5
142:15 143:12
152:18,18,18,21
152:24 153:4,5,6
153:8,17 157:9,13
157:14,21,25
158:4,4,5 159:3,8
159:18,20 161:8
161:22 162:4
181:5,7 188:6,12
189:17 190:16,20
190:22,25 191:2,9
191:15 192:11,20
206:23 218:8,13
237:3 240:24
241:6 242:16
243:9 244:9,12,15
244:16 245:2
248:7,8 258:11
261:22 262:17,24
263:20,25 264:10
264:23 265:16,19
266:6,18,24 267:4
275:19 276:7,12
276:12
**percentage** 6:18
123:17 137:8
140:19 142:15
153:15 157:24
188:7 250:23
255:10,20 259:11
275:25 276:4

**percentages** 258:10
**perfectly** 79:19
**performed** 185:13
186:24
**period** 23:19 24:25
25:12 79:3 86:21
89:14,17,22 90:5
90:17,18,19,22,23
91:19 92:10 93:25
96:18,24,24 97:4
98:16,19 99:4
102:8 163:17
185:10 191:11
193:24 198:11,16
201:11 203:6,12
206:17,19 208:19
223:25 225:23,24
226:3,4,7,17
227:4,18 228:4,9
228:10,18 229:5
229:13 231:14,16
231:19 233:2
234:22 235:20
236:2,6,13 239:3
239:23 240:13
242:7 243:14
244:16 245:13
247:6 248:19,25
249:8,11 250:12
250:25 251:2,11
252:5,6 256:14
257:12 258:22
260:2,4 264:8
270:15 272:11,14
**periods** 102:5
206:8 227:7
243:10 248:13
250:15 251:24,25
257:24 258:4
259:20
**person** 47:22 49:12
231:4
**personal** 6:24
130:22,23 230:21
**pertained** 90:19
**phrase** 46:9
**phrased** 53:19

71:23
**phrasing** 260:24
**pick** 9:16 231:12
271:14
**picture** 118:13
**Piper** 1:21 2:4
**pirate** 196:25
**pirates** 184:15,21
187:16,17,19
188:16 196:17
**Piskora** 2:9 5:6,11
11:23 12:11 15:15
15:23 19:23 23:24
24:12,18 25:13
26:2 29:6 30:14
30:25 31:9,15
32:5 34:6 35:17
36:25 37:15,23
38:18 39:19 41:5
41:19 42:6,17
44:2,15 45:2,7,15
46:22 47:5,15
48:6,19 49:6 50:3
50:21 51:25 52:12
53:13,24 54:7,11
58:2 59:17 60:9
61:3 62:22 63:18
64:10,22 65:6
67:10,20 68:21
69:22 70:14,24
71:7,18 72:7,24
73:7 74:8,20 75:8
76:6 77:3 81:15
85:9,14,17 87:20
90:12 95:22 96:20
98:4 100:12,20
101:15,23 102:22
105:11,25 107:24
111:12 114:2,18
114:24 121:14
131:3,16 134:13
135:18 136:15
137:15 138:24
139:9 143:15
146:22 152:9
154:10 155:3
157:15 159:10

165:11 173:10
174:6,9 175:6
177:3 181:10
183:9,23 184:10
186:7,17,25
189:24 190:11
192:21 193:5,10
195:3,9,18,20
196:11,18,21
199:6,20 200:9,12
200:23 201:24
202:14 204:4,10
211:21,25 215:7
216:10 217:16
218:4,21 220:10
223:6 224:2,15
225:8 228:13,23
230:8 231:8 237:6
237:20 249:12
251:3 255:21
256:11,16 259:14
260:6,20 263:16
267:5 271:13,20
276:16,19 279:10
**place** 23:18 34:9
68:18 70:12 71:17
72:21 206:11
224:10 281:11
**places** 77:16
**Plaintiff** 1:6 2:10
**Plaintiff's** 197:17
197:22 280:16
**play** 171:16,17,18
171:24 209:10
229:3
**plays** 82:15,18
**please** 3:10 4:2
39:21 62:9 65:2
114:15
**Plebania** 82:5 83:9
83:15 167:10
169:16 171:2
**plus** 99:15
**point** 29:9 33:8
52:24 54:13 61:22
92:23 93:6 97:14
137:21 138:14

165:4,4,5 182:2
191:19 192:13
229:5 255:2 271:3
272:5
**pointed** 159:15
**points** 157:24 165:3
243:2,3,5 255:4
275:9
**POL** 78:2,6 79:15
79:23 166:23
280:7,10
**Poland** 117:25
**Polish** 79:25 166:13
**Polish-speaking**
146:17 160:13
**Polska** 1:8 3:20,21
**Polvision** 21:10
27:7,12,17,22
28:2,11,17,24
29:5 32:4 33:25
34:4,10,21 35:14
35:16,24 36:9,18
36:24 37:9 43:8
47:14 48:5 49:3,5
51:14,19,22 52:18
55:17 57:9,13,20
57:25 60:25 63:16
64:17,20 73:18
77:8,25 78:4
79:14,22 80:24
81:5 82:2 93:21
94:3,8,11 95:6
96:14,18 97:9,14
97:22 98:2 99:14
100:9,18 101:21
103:15 107:2,20
107:21 110:9
116:2 121:3 127:3
133:4 134:11,17
134:18,24 135:12
138:20 139:24
140:2,9,22 141:8
141:10,16 143:6
143:10 145:12,13
145:18,19 146:3
146:11,14 147:4,7
149:4,7,11,13,15

149:17,18,21
150:11 151:8
160:5 161:24
162:2,8 168:11
176:12 177:15,22
178:4 179:2 180:9
181:2,6 182:16,25
183:22 197:8
199:17 202:5
210:10 211:6,14
211:20 212:5
213:6 215:5,17,21
216:9,16 217:14
218:16 221:2
231:20 237:14
238:6,9,23 239:7
239:13,22 240:19
245:4,6,20 280:6
280:9,12
**Polvision's** 26:18
27:3 35:4 115:21
142:24 145:5,10
150:8,17,24 160:7
**pop** 172:5
**popping** 176:8
**popular** 214:23
**portion** 110:8
187:22 188:2
217:24 218:2
227:6 256:4
**position** 107:10
164:24 167:25
186:10 270:17
**positions** 18:12
**possibility** 43:4
177:23 178:19
179:20 219:11
231:2 239:16
**possible** 20:22
125:23 211:7
220:4 223:15
235:17 239:12,24
240:6 245:17,21
245:24 253:6
**Possibly** 122:11
**post** 226:17 227:9
228:9,9 255:19

256:6
**post-adjustment**
256:6
**potential** 76:5
109:17 116:24
140:20 141:6,10
141:18 151:6
225:6 233:15
250:9
**potentially** 120:5
145:8 226:18
**practical** 22:25
23:16 67:7
**practically** 23:17
**pre** 256:5 257:10
269:23,23
**precisely** 130:19
**premature** 40:7
**premise** 112:22
113:7
**premium** 95:13,15
95:20 96:2 118:18
119:10,15,18
128:4,9,9,12,13
128:18,22,25
129:5,11,13,18
130:23 132:15
133:15,25 134:3,6
135:24 136:22,23
136:24 139:18
142:8,21 144:4,7
144:25 147:22,25
148:4,17 152:25
157:25 160:19
180:4
**prepared** 274:12
**presence** 26:18
27:4
**present** 2:12 79:18
122:22 252:5
259:21
**presented** 113:11
**presumably** 115:20
198:24
**presume** 167:25
191:7,18 222:16
**presumes** 53:14

**presuming** 111:5
133:11 182:22
191:14
**presumption** 97:2
191:21
**presumptuous**
164:14
**presuppose** 46:14
48:16
**presupposes** 37:8
135:12
**pretty** 6:4 122:3
135:8 146:18
160:15 206:17
221:3
**previous** 130:19
162:15 205:18
206:24 243:16,19
243:21 252:5,17
**previously** 83:22
171:15
**PREWETT** 1:17
281:4
**pre-August** 255:15
**pre-2009** 254:20,21
**price** 171:7 178:14
182:4 228:19
**prices** 171:14 173:4
173:7 250:8,11
**pricing** 178:11
**primarily** 9:3 10:13
41:9 69:16 185:8
**primary** 224:24
246:19
**prior** 89:12,18,20
96:6 115:21 116:4
176:24 185:9
201:5 202:18
254:24 255:6
257:11 259:12,20
260:18 261:3
281:6
**privy** 263:10
**probably** 13:18
14:7 128:23 153:7
153:7 166:19
188:24 194:8

273:18
**problem** 27:5 59:21
196:25 208:6
269:19
**proceed** 14:22
**proceedings** 1:15
**process** 18:22
207:16,19
**procrastinates**
231:5
**procrastination**
230:17
**produce** 29:23
**produced** 9:15
19:21 29:10,14,20
29:22 30:4 32:21
65:25 172:17
252:14,24 253:5
253:20
**producers** 10:9
**product** 52:21 96:4
96:9 165:8,10
175:17
**production** 9:5
**products** 100:6
**Professional** 1:18
281:4
**profit** 40:3 45:24
46:11,21 47:20
49:17 50:19
**profits** 38:16,24
39:2,7,10,13,16
39:25 40:12,14
41:2,18,24 42:3
42:11,15 44:6,14
44:18 45:8 46:3
46:15,16,18 47:3
47:11,13 48:4,12
48:18 49:2,13
52:7,11 61:20
62:8 63:8,24 64:5
64:21 65:16,23
66:25 216:21
219:12 220:19
**program** 55:16
123:17 124:3
131:13 134:11

137:9 140:18
144:8 148:14
175:2 213:10
214:20 215:4,5
222:10,11 223:3,4
223:17,18 229:9
230:19 231:23
232:21
**programming** 10:2
10:3 36:18,24
37:9 53:10 55:19
56:12 57:7,8,20
67:17,18 68:20
70:13,23 119:8
131:15 132:4
135:15 136:10,11
137:5 138:21,22
139:8 144:14
165:8 174:20,21
239:6,7,10,14
247:3
**programs** 78:24
167:10,11,20
169:14,19 170:9,9
173:7 174:5,12,13
238:10
**project** 137:12
**projected** 74:25
75:6 201:7
**projection** 75:22
76:2
**projections** 75:13
75:14 76:3
**proper** 97:25
102:17 106:9
107:23 120:8
125:3,5,8 126:4,7
126:23 127:9,16
127:24 128:15
132:13 139:6
144:22 147:18
150:3,21 165:6
168:15 174:25
**properties** 94:19
**property** 68:5
**proportion** 252:3
**prorate** 92:12 93:8

**prorated** 79:3
**protect** 188:21
189:5
**protecting** 189:22
**proves** 191:8
**provide** 56:20,22
59:7 108:13 264:2
**provided** 55:14
91:7,15 103:15
182:17
**provider** 24:17
25:23 208:13
**providers** 21:14,16
21:25 22:6,10,13
22:17 23:9,22
24:18 25:22 28:14
31:25 55:2,3 57:7
57:19 58:24
207:23 226:12,15
**provides** 56:18
109:8
**providing** 22:5
57:8
**provision** 57:7
**public** 1:20 3:6
56:20 160:14
281:4,7,17
**publicly** 145:15,17
**published** 155:14
**pulled** 158:11
214:11 215:21
241:20 242:3
**purchased** 153:9
153:17
**purchaser** 96:11,13
100:5
**purely** 176:23
**purported** 270:15
**purportedly**
115:18 116:11
133:4 182:16
213:24
**purpose** 76:22
108:12 142:20
**purposes** 79:18
97:3 101:2 113:21
122:22 132:25

142:7 163:21
191:7
**pursuant** 71:24
83:14
**pursue** 32:19
**purview** 146:9
**put** 42:11 51:12
58:13 99:12
105:19 111:24
120:10 156:11
162:12 164:5
170:18,21 176:18
196:15 207:2
219:3 264:5 268:6
275:16
**putting** 188:4,10,11
205:22
**P-H** 3:12
**p.m** 277:3

**Q**
**qualified** 12:6
131:10
**quality** 168:2
**quantify** 7:17
**quantum** 221:20
268:6 270:20
**quarter** 24:11
218:2 227:10,12
228:10 234:14
235:14 237:4,5,24
238:3,12,21 239:5
239:5,19 240:14
240:14,18,25
241:7 242:8,8
243:8 244:8,11
245:8,9 248:20,21
257:17 258:6,7
259:5 260:17
261:4,24 262:21
267:2 272:22,25
273:6,17,21 274:2
274:3,5,13,15
**quarterly** 24:24
25:10 247:16,25
256:9,13 273:22
274:17

**quarters** 242:20
243:6 258:25
259:7,12 260:13
260:19 261:3
276:2
**question** 4:2,3,4,7,8
11:18 15:21 16:2
24:6 28:19,25
31:3 34:16 41:7
41:13,15,21 42:8
42:19 44:11,12
45:6,21 46:24
48:8,14,15,24
50:5,13,14 53:3,8
53:18,19,21,22
60:11 64:3,13,25
65:3,5 70:2,16
71:15,20 73:21,22
75:10 85:10,12,16
85:19 86:9 87:20
98:6,8,11 100:8
100:25 101:5,25
103:10 105:3
107:16,17 110:14
111:14 112:2,4
113:21 114:13,15
114:17,20,23
115:5 126:9
130:19 143:19
151:25 154:19
157:11 165:13
167:6 172:19
173:12 181:12
187:20 190:14
191:20 192:3
193:12 196:19,23
201:19,23 202:24
206:25 215:13
216:5 217:22
218:25 223:13
228:6 232:25
237:9 238:5
242:12 255:13
260:24 265:13
266:7 268:17
269:21 272:17
274:9,20 275:20

275:23 276:3
**questioning** 85:19
275:5
**questions** 3:25
115:8 127:6
177:12 254:22
271:13,22,24
273:10,13 276:17
**quickly** 63:3
114:3 274:23
**Quicksilver** 62:4,5
63:4
**quite** 113:14
**quote** 116:14,16
150:7 207:5
215:14
**quotes** 163:8
**quoting** 214:25
215:24

**R**
**R** 2:2 3:2 278:2
**radio** 10:4
**raised** 254:22
**raises** 255:12
**ran** 66:18 93:24
**range** 6:9 8:9
106:14,19,21
108:12 109:20
113:10 118:14
119:21 120:17
121:12,12,13
124:8,25 125:23
126:15 127:13,17
129:8 131:7
132:18 144:24
149:22 151:15,17
151:18 165:3,5
172:16 267:4
**ranged** 152:17
**ranges** 146:8
**rate** 123:8,25 124:2
124:18,20 125:12
126:10,12,14,22
126:24 127:2,3
128:3 133:15
142:24 143:5

145:4,5,10,12,25
146:15 147:4
150:4,15,18,24
151:6 171:5,22
206:10,23 208:15
208:18 209:22,25
210:6,9,17 222:3
222:7,12 224:22
226:8 228:8 235:8
236:24 237:4
239:18 240:2,5,16
240:20,23 241:7
241:21,21 242:6
243:9,15,21 244:5
244:12,19 245:5
248:19 250:16,17
251:15 276:8
**rates** 145:20 146:4
146:9 150:9,10,14
150:19 172:22
201:16 202:18,19
211:2 223:23
227:9 243:25
247:19
**ratio** 123:16 136:12
140:18 141:5
152:16,17 153:10
153:12 160:7
161:22 162:4,5
**rationale** 124:23
154:18
**reach** 160:5
**reaching** 84:24
**react** 247:4
**reacting** 247:2
**read** 12:5 15:18
17:12,17 18:4,10
18:14 46:8 55:11
65:2,4,11 82:23
93:2,3 109:14
114:14,16,22
117:6,6 141:2
154:15 182:21
189:9 192:25
193:7 221:18
223:11 248:10
251:6 262:13

275:20 278:5
**reading** 67:5
116:10 121:25
262:2,3
**real** 159:23 167:14
175:11 176:21
**realistic** 144:10
**realities** 177:25
**reality** 97:12
153:24
**realize** 45:24 47:13
48:3,18 49:2
50:18 52:11
**realized** 46:11
49:24,25 95:20
97:20 139:25
145:20
**really** 13:5 27:13
35:9 71:10 90:6
100:22 108:3
125:10 132:12
139:23 156:14
166:10 169:2
171:20 183:15,18
190:14 192:13
195:3 203:22
205:4,20 219:14
219:22 227:15
236:12 247:8
259:3
**reap** 212:6
**reason** 4:12 15:24
33:16 49:2 101:21
106:3 109:11
110:18 116:20
159:17 169:2
178:16 213:23
224:12 225:25
226:5 240:3 255:7
260:16,25 261:5
**reasons** 32:13
33:21 159:19
169:4,4,24 222:22
223:17,24 224:9
225:6,15,22 226:9
240:2 268:10
273:19

**rebuttal** 16:6 93:3
253:24 254:2
261:12 267:10
270:3 280:18
**recalculate** 122:9
**recall** 10:19 13:8
24:25 35:7,9,11
35:20 56:7 58:10
58:12 66:17 67:2
67:13 188:24
189:19 190:3
221:13 231:11
**receipt** 264:13,22
266:14,22
**receipts** 261:21
262:17 263:21
265:2,4,5 266:5
**receive** 26:11 132:3
147:8,11,13
**received** 24:5 26:12
26:16,25 38:6
40:18,20,23,24
42:4 59:15 64:7
64:19 83:4 86:17
86:21 87:13,17
94:10,12,13,15,16
94:17,21,23 95:7
95:8,11 98:19,20
98:21 150:20
180:13,16,18
182:8 183:21
184:23 253:11
**receives** 23:21 24:8
**receiving** 149:18,21
**recess** 161:17
**recognize** 78:8
166:24
**recognized** 115:17
**recognizes** 116:3
**recollection** 56:3
77:12 155:7
210:12,19
**recommended**
109:25
**recommending**
109:24
**reconciled** 85:5

**reconciliation**
82:16,19
**record** 3:11 16:8
19:18 21:13 24:4
54:9,12 66:2 77:7
79:11 114:19
151:24 161:16
169:3 199:13
201:20 224:6
274:9 277:2
**recordkeeping**
209:14
**records** 12:24
13:11 200:2
209:14
**redirect** 271:14
**reduced** 248:23
**reduces** 79:4
**redundant** 121:22
**refer** 10:3 78:12
86:15 103:6 119:3
160:8 166:19
193:16 263:20
267:15,17 270:11
**reference** 67:4
**referenced** 77:20
**referred** 11:16
80:10 86:16 88:7
88:8 163:25
**referring** 16:3 30:7
86:11 91:13
172:14 203:23
238:4 254:7
265:22 273:2
**refers** 83:6 103:22
**reflect** 169:25
**refresh** 31:20
**regard** 96:24
273:24
**regardless** 71:4
72:22
**Registered** 1:17
281:4
**regular** 30:10 85:6
91:14
**reimbursable**
17:23

**relate** 34:20 106:4
**related** 5:19 6:19
10:10,12 21:9
101:5 185:21
186:12 189:14
223:17 224:17
255:4 261:17
267:10 272:3
**relates** 7:15 39:9
65:9 97:7 184:5
213:23 217:22
219:17
**relating** 35:24
61:19 110:19,25
188:14 196:16
202:25 211:19
254:19 269:15,22
**relation** 14:5
184:14,20
**relationship** 107:19
**relative** 281:13,14
**relevant** 147:6
161:7 165:17
**relied** 154:14
268:14
**rely** 16:21 26:14
132:8 156:20
**relying** 237:17
**remain** 97:5
**remaining** 98:15
243:3
**remains** 203:5
**remember** 10:5
13:17 17:2 66:5
104:23 127:25
156:12,13 216:23
271:23 273:12
275:4,10
**removal** 200:18
220:24 222:11,17
223:3,4,16,18
224:14,18,23
225:2 226:17
229:15 230:3,5,6
231:23 232:5,11
233:9,14 235:4
240:4

**remove** 242:15
**removed** 201:12
204:18 213:24
214:21 215:5,18
229:9 230:20
237:10 238:24
242:17 243:22
244:10
**removing** 204:22
207:12 237:3
242:18
**rendered** 61:12
**rendition** 33:10
**renegotiated** 82:14
**repeat** 26:22
**repetitive** 32:10
**rephrase** 4:3 15:20
**report** 9:15 10:16
11:16,17 13:4
14:6,9,11 16:5,6
16:10,19,21,25
17:3,9,9,10,17
18:9,15,15,22
19:6,11 37:5,7,11
38:11 52:16 54:6
54:13,16,18 55:7
61:8,13 66:4
77:16 82:13,22
88:10 93:2,3 99:9
103:12 104:9
105:21 106:13
111:6 117:11,17
117:20 132:11
153:19 156:21,24
157:3,3 177:18
191:4 193:17
196:6,7 212:16
227:5 233:19
236:20 248:10
249:5 253:24
254:2 256:21,23
257:2 258:20
261:12 267:10
268:10 271:25
272:6 273:4
274:18 280:4,18
280:20

**reported** 258:18
259:7 260:11
273:21,22
**reporter** 1:18,19,20
54:20 65:3,4 78:6
79:23 80:25 88:24
114:15,16,22
146:21 197:25
254:4 256:23
281:4,5,5
**reporting** 10:14
30:10 256:9,13
257:17
**reports** 25:11 30:18
30:19,23 31:5
248:4 263:4
**represent** 3:19 31:4
53:23 54:5 113:20
149:16 171:20
208:4 224:25
**representations**
186:15
**representative**
188:21 189:4,13
**represented** 26:7
63:6 163:11
172:20 175:9
176:7
**representing** 13:25
**represents** 99:4
108:23 126:3
**requested** 281:8
**require** 95:15 96:2
128:5
**required** 115:19
116:11 117:23
118:18
**reread** 116:17
**research** 12:2
132:6 146:10
148:23 149:2,2
**reserve** 254:6,13,15
254:20 255:16,16
255:20 257:8,14
257:24 261:18
262:6,16 264:24
265:3,18 266:3,19

266:21,22
**resist** 271:22
**respect** 15:6,12
  33:25 63:16 67:24
  127:6 211:15
  229:18
**respects** 129:23
**responded** 130:18
**response** 33:14
  34:19 43:4 64:23
  107:4 202:23
  207:4,4 214:12
**responses** 197:19
  197:23 268:3
  270:12,18 280:17
**responsibility**
  189:18 192:16
**responsible** 187:15
  188:6 190:15,22
  190:24 191:15
  192:19 222:18
**rest** 262:23
**restricted** 161:24
**restrictions** 161:25
**result** 10:14 26:18
  27:3 38:25 39:10
  40:9 41:24 42:4
  42:13 44:21 45:25
  50:2 94:7 102:9
  109:19 149:9
  175:20 206:21
  207:12 235:3
  242:2 249:21
**resulting** 42:24
  152:17 224:21
**resume** 65:21
  154:15
**retained** 11:19
  13:19,22 14:3,3,6
**retainer** 13:23
**retaliatory** 214:13
**retention** 13:15
**revenue** 54:22
  75:23 76:5 123:2
  137:4,7,8 138:23
  140:6,11 143:12
  153:8 154:5,7

247:16,25 257:9
  257:11,14,23
  258:17 259:11
  269:23,23 270:7
**revenues** 10:14
  21:8 56:11 93:16
  98:21 153:12,16
  247:22 262:23
**review** 9:12 19:4
  123:23 185:11
  186:23 188:13
  189:15 252:14
  261:16 265:25
  266:20 281:9
**reviewed** 20:8
  190:4 266:9
**revisit** 275:8
**re-ask** 274:8
**right** 9:21 10:19
  12:14 16:9,15,17
  25:25 30:6 34:21
  36:13,16 51:3,4,9
  51:11,13 56:14,21
  57:10 58:22,25
  60:20,20,24 62:13
  68:19 70:6,12
  71:24 72:11,17,19
  72:21 73:17,19
  74:4,5,6,12,16,18
  76:4,25 79:6,25
  80:17 83:15,25
  84:5,13,18 85:5
  86:3 87:7 89:5
  90:8 91:5 97:16
  99:18,22 103:5,13
  104:10 105:19,24
  106:25 107:9
  108:16 110:21,24
  111:4,5 112:23,24
  113:4,5,5,12
  114:20 115:11,13
  115:24 117:12
  119:6 120:11,25
  121:6 123:18
  124:16,17 125:3
  126:14 130:13,17
  132:21 134:11

135:16 138:16,19
  143:2 148:3 150:9
  150:12 153:19
  157:9,22,25 158:6
  158:15,20 163:3,6
  165:22,25 167:12
  168:6 173:13
  174:8,17,21
  178:21 179:25
  183:14 185:4
  189:12 191:17
  194:15,24 195:2,8
  195:11,11,11,18
  196:5,6 197:12
  202:16 204:6
  206:16 212:25
  213:2,4 221:14,20
  225:3 226:13,19
  226:23 227:13
  230:24 233:16
  234:11,23 235:10
  235:20,22 236:9
  236:15,20 237:18
  238:7,24 239:3,8
  240:12,22 241:22
  245:8,11,14,20
  246:9,16 254:7
  256:8,8,10,20
  257:4 258:18
  260:14 262:7
**rights** 8:22 68:5,6
  72:5 74:2 75:2,7
  115:23 116:6,7
  144:7 174:23
**rise** 220:23
**risk** 6:2 8:5 179:3
**RMB** 1:3
**role** 15:10 17:8
**rolling** 254:6,13,15
  254:19 255:15,20
  257:8,14,24
  261:18 262:5,15
  264:24 265:3,18
  266:2,19
**Roman** 195:21
**row** 239:4
**royalty** 99:15

103:19
**run** 31:18 94:2
**running** 214:23

## S

**S** 2:2,4 3:2 280:2
**SA** 3:20
**sat** 18:24
**satellite** 55:3 56:14
  246:15,22 247:7
  247:15 250:19
**save** 166:18
**saw** 145:5 149:25
  156:12 176:6,8,9
  176:14 188:17
  266:16
**saying** 21:22 25:22
  29:22 30:3 31:6
  55:18,22,23 59:5
  59:22 94:5 95:18
  108:17 109:3,21
  116:8 117:3
  120:20 121:4
  126:2,11,18
  128:12 132:12,14
  134:17 136:25
  140:14 141:5,9,17
  147:10,18 148:9
  148:15 149:10
  153:22,25 157:9
  167:15 177:7
  179:5,8,10 189:3
  189:20 205:19
  222:10 259:17,21
  261:10 263:7,11
  265:25 270:7
**says** 30:23 61:11
  81:23 103:13
  106:24 115:11
  116:10 117:13
  122:4 138:2 151:4
  156:3 169:15
  185:20 191:5
  198:10 203:2
  240:21 243:13
  257:4 262:5
**scenario** 17:16

86:10,15,17,18,19
  87:2 88:4 94:15
  95:9 97:16 99:11
  103:13,22 105:23
  105:24 106:8,9,11
  107:3,23 108:9,23
  109:4,7,12,24
  118:5 120:5,6,15
  120:17,22 121:2
  121:13 122:9,18
  126:3,20,21,25
  151:19 152:4,5,6
  162:7,12,13
  163:21 172:3,15
  173:16,19,21,22
  174:2 180:7,9
  181:19 183:8
**scenarios** 41:8 77:9
  86:13 94:14,18
  99:25 101:11
  102:20 103:3
  104:12,20 105:2,7
  106:16 110:9
  113:25 132:24
  172:17
**scope** 267:23
**second** 91:12 105:9
  119:5 138:3
  148:18 223:8
  227:9,12 228:10
  238:11,20 239:4
  240:9,14 241:7
  242:7 243:8
  244:11 245:7,9
  248:20 258:6
  261:4 267:2
**seconds** 149:23
**section** 17:3,13
  115:17 117:17
  118:23
**see** 12:24 77:19
  78:20 82:9 109:12
  116:15 122:20
  133:17 138:6
  155:22 158:10,21
  170:24 175:21
  176:20 188:19

194:21 198:8,21
200:2 201:6
203:21,23,25
204:7 206:18
213:17 214:16
230:11 250:6
251:12 257:18
258:2,8,13,23
260:25 265:21
272:15 273:5,7
**seeing** 189:19
211:10
**seek** 59:14 60:6,12
218:19
**seeking** 46:16
218:15,16
**seen** 30:17,17 198:5
253:8,17
**segment** 215:14
**SEI** 3:22 11:5
23:20 24:8,15
29:23 30:9 31:13
35:23 41:23 42:21
43:18 47:12 48:3
48:17,25 50:17
51:2,13,18,21
52:19 53:4,9,23
54:21 55:16,18,25
56:10,11,18 57:8
57:23 58:22,23
59:14,23 60:6,16
60:19,24 64:18
67:14,15 68:17,24
71:5 72:18,22
73:16,19,24 76:3
94:6 95:4,13,19
96:2,9,19 97:12
97:19 98:3 99:15
99:16,21 100:2,2
100:5,11 101:22
106:25 107:20
110:18,24 115:21
116:6 118:16,17
119:7,9,10 128:5
128:17,25 129:13
130:24 133:11,16
134:10,23 135:24

136:22 139:7
142:8,21 144:25
152:25 177:23
178:19,25 179:20
188:14,16,20
189:3 191:7,23
198:11,17,23
203:2,7,13 211:12
212:9 213:14
215:2,3,9,15,20
215:22 216:16
218:16 219:13
220:25 221:15
235:3 245:16,18
249:10 253:7,11
257:15 258:18
259:7,12 260:11
261:2 262:22
263:7,14 267:16
268:2,19,20 269:9
270:9
**SEI's** 57:6,17,19
58:20 59:3 64:20
67:16 68:19 70:12
70:22 116:5 117:4
189:21 191:11
202:23 213:22
215:15 226:11
257:9,13,23 258:5
258:20 270:6
272:21
**sell** 50:11 59:6,23
95:14 97:13
118:18 128:6
129:14 130:1
135:22 136:2,3,13
136:18,19 137:13
142:11 143:11
146:16 212:6
**seller** 95:17 129:19
129:25 130:4,9,13
179:23
**selling** 41:10
134:10,24 165:10
172:21 175:10
182:5
**sellout** 122:23

123:5,24,25
125:12,20,21
126:6,7 131:12
**sense** 47:6,18,23
48:23
**sent** 19:3
**sentence** 55:12
82:11 119:6 141:3
153:23 177:19
178:6,23 261:14
262:9 272:8
**separate** 139:23
250:20
**series** 82:4 214:21
214:22,23
**services** 6:2 8:5
**serving** 6:15,20
**set** 119:19 120:3
124:7 125:24
129:6 131:21
132:19 134:7
135:23,23 142:6,9
142:13,13,19,22
281:12
**setting** 109:18
128:2 145:24
**settlement** 89:13,19
89:21 90:20 91:25
92:5,6 162:16,21
176:24 194:12,13
202:13 238:17
254:23,25 268:2
268:22 269:13
270:8
**seven** 157:23
**sheet** 80:3
**short** 3:23
**Shorthand** 1:19
281:5
**show** 152:17
160:16 188:25
193:18 243:8
247:8,9
**showed** 124:23
189:2 263:6
268:10
**showing** 34:10

211:13 247:10
259:4
**shown** 114:9 115:4
115:6,6,7
**shows** 166:6,6
244:8
**Shulman** 1:11 3:1,3
3:13,15 4:1 5:1
6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1,22
16:1,13 17:1,11
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1,17,19 55:1
56:1 57:1 58:1
59:1 60:1 61:1,10
61:17 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1,8
79:1 80:1,6 81:1,6
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1,11 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1,25 107:1
108:1 109:1 110:1
111:1 112:1,7
113:1 114:1 115:1
116:1 117:1 118:1

119:1 120:1 121:1
122:1,5 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
156:17 157:1
158:1 159:1 160:1
161:1,19 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
198:3 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1

254:3 255:1 256:1
257:1 258:1 259:1
260:1 261:1,11
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1,21 272:1
273:1 274:1 275:1
276:1,19 277:1
279:5 280:5,19
281:6,8,8
**Shulman's** 16:5
108:22
**side** 38:6 49:18
136:2 143:23
175:17 214:3,4
216:2 240:22
271:18
**sides** 30:5 32:21
**significant** 132:6
158:5 206:17
234:3 250:2 255:2
**significantly**
158:20,22 262:6
**similar** 63:15 65:12
117:21,24 127:5
146:3 158:24
171:4 211:4,5
216:8 220:6 229:4
236:8 269:21
**similarly** 146:14
147:7
**simple** 73:21 164:5
209:5 211:8
**simplify** 64:14
**sitting** 108:6
**situated** 146:14
147:8
**situation** 212:4,14
**situations** 129:20
**six** 198:4,9 227:7
242:19 275:2,13
**sloppy** 141:13
**small** 137:21
138:14 251:18
**smaller** 153:7
**smallest** 172:18

**SNL** 152:15 154:2
155:14,25
**sold** 38:7 40:22,25
135:13 164:16
180:14
**solely** 239:20
**somebody** 44:21
66:18 73:12 74:23
75:11 134:20
136:23 145:2
147:21 148:16,16
**somewhat** 178:14
242:24
**some-odd** 234:4
**soon** 12:21 55:6
**sorry** 15:16 32:9
34:15 47:3 52:19
58:10 64:24 69:9
75:20 79:9 81:21
83:16 85:13 86:18
97:19 101:9
116:16 138:18
153:6 157:10
170:8 182:21
195:21 200:7
201:3,21 203:2
212:5 227:11
237:24 264:14
265:14 269:25
271:21 272:19
**sort** 7:8 8:24 17:6
133:24 176:12
206:22 208:5
214:12 251:24
**sorts** 225:21
**sounded** 164:15
**source** 76:5 82:11
157:6,7
**sources** 246:20
**SOUTHERN** 1:2
**Spanski** 1:5 3:21
36:17 229:16
**speak** 128:3
**specific** 11:8 17:15
19:15 21:20 35:10
38:3 68:11,14
71:11 74:11

117:22 123:21
146:25 190:3
204:20 249:3
**specifically** 29:2
72:16 103:6
115:16 134:16
149:6 170:10
177:19 254:7
271:25
**spelled** 62:22
**spend** 211:9
**spending** 123:17
124:3 131:13
140:18 158:17
159:4
**spent** 7:7 154:15
**spike** 244:10 275:2
275:13 276:3
**spikes** 206:20
225:20 226:21,25
227:3,7,8 237:3
237:10 240:8
242:13,15 275:17
275:18
**spoke** 153:2 182:6
**spot** 123:8,9,25
126:10,12,13,22
126:24 127:2
145:4,9,25 146:4
146:8 147:6,9
148:18 149:19,22
150:3
**spots** 149:22
**spreadsheet** 212:17
**staff** 6:5 20:2,7
**stamp** 78:2 166:22
166:23
**stamped** 79:15
**standard** 99:15
108:25 122:7,19
148:10,11,12
**start** 31:12 53:7
101:6 166:13
193:23 257:3
**started** 12:25 13:2
13:5 205:19 207:4
**starting** 122:16

191:19 192:12,13
198:9 200:18
240:11 241:7
258:6 267:14
**starts** 198:14
238:16
**state** 3:10 116:22
272:7
**stated** 111:6 117:14
162:17,22,25
163:19,24 164:22
165:16 167:23
168:6,8,20 170:12
171:15 173:3,23
173:25 174:10,10
175:4 176:5,23
177:9 181:7,23
240:10
**statement** 71:21
151:10 263:19,24
264:11,19 265:16
265:24
**statements** 261:17
261:19,20 263:3,6
263:11 264:8,21
265:6,7,13,20
266:2,4,8
**STATES** 1:2
**stating** 184:19
242:11
**station** 158:16
159:4,22 160:9
**stations** 146:14
154:4,5,6,23
**stay** 232:18
**stayed** 158:17
**stenographic** 1:14
**stenographically**
281:11
**Stephen** 1:11 3:1,3
3:12 4:1 5:1 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1,11 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1

26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1,17,19
55:1 56:1 57:1
58:1 59:1 60:1
61:1,10 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1

166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1,3
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 279:5
280:5,19 281:6,8
281:8
**stop** 45:11
**stopped** 226:16
248:18,22 249:7
**straightforward**
180:12
**Street** 62:20
**strengthen** 15:2,4

**strong** 177:23
178:19
**structure** 159:21
**stuck** 116:20
**Studios** 82:2
**stuff** 9:24 133:19
175:21 179:17
190:13
**subcarrier** 159:22
160:9,24
**subject** 66:4 113:2
133:12 233:3,4
**sublicense** 72:11
73:10,11,12,13
**sublicensing** 53:20
73:13
**submitted** 55:7
**subpart** 74:18
182:12
**subscribe** 169:22
**subscribed** 230:3
235:22 236:3
246:4,6,7 278:11
**subscriber** 25:11
27:25 29:24 33:17
35:2,4,14 197:11
199:3,16 201:4
222:25 223:24
224:13 225:6,15
227:9 228:12
229:14 232:10,20
233:7 234:2,12,22
235:9 236:7 242:5
244:22 247:25
**subscribers** 21:9,19
22:23 23:4,22
24:10,15,21 25:17
30:12,20,24 31:6
31:24 32:3 33:21
34:3,19 35:16
42:24 43:8,19
44:9 59:9 60:3
196:16 197:2
198:12,18 199:5
201:8 203:8,14,18
204:3,17 205:10
205:10,24 207:3

209:19,22 219:22
222:3,21 223:15
224:25 225:3
226:19 229:21,25
230:2 231:24
232:6 233:15,15
233:22,24 234:4,5
234:10 235:3,18
235:19,25 236:12
239:12,21 240:17
241:19,23 244:9
244:13 245:16,18
246:2,4,5,8,9,12
246:14,15,22,22
246:23 247:7,8,18
247:20,23 248:23
249:9 250:10,18
250:19,20,21,22
250:23,24 252:4,4
253:8,12,13
267:11,17 268:20
268:21 269:11,12
269:13 272:22
275:25
**subscribing** 229:20
**subscription** 55:2
230:6
**subscriptions**
154:6 199:19
209:12 222:19
**subscription-based**
154:4,23 155:11
**subsequent** 202:19
**subset** 121:3
**substance** 281:9
**substantial** 258:22
**subtract** 103:19
**sufficient** 131:25
**suggesting** 168:5
178:5,7
**suggests** 260:2
**Suite** 2:15
**summarized** 133:2
266:10
**summary** 132:23
185:13 257:23
**supervise** 8:3

**supervising** 6:5
**supplied** 16:22
20:8
**support** 188:16
190:9 230:13,15
233:6 264:3
**supporting** 263:23
**suppose** 52:8
137:12 160:3
**supposed** 141:14
141:15 180:18
189:11
**sure** 15:5,11,19
16:15 45:18 47:2
47:24 76:16 81:17
111:9 114:12
118:24 119:25
130:18 156:23
175:12 185:8
192:4,7 196:24
215:25 217:22
230:14,16,22
240:10 254:14
263:9 265:21
**survey** 155:20,21
155:24 156:5
**suspect** 242:24
**switch** 104:12
**switched** 104:19
**sworn** 3:6 278:11
281:6
**syndicate** 67:16
**synonymous** 133:9
**systems** 56:24
206:21 249:19,21
**S-H-U-L-M-A-N**
3:13
**S-T-E-P-H-E-N**
3:13
**S.A** 1:8

**T**

**T** 278:2 280:2
**TAB** 1:17 281:4
**table** 33:9 212:24
212:25 217:6
227:7 233:21

234:7
**take** 11:9 55:10
61:7 63:3 76:11
77:2,3 81:9 95:4
95:16 97:16 99:8
102:11 111:15
112:11 115:10
117:7 125:19,21
128:3 129:19,21
130:5,8 141:4
142:7,20 169:10
177:17 202:21
205:12 206:20
207:10 212:15
219:12 221:23
225:14,20 228:18
233:18 236:19
243:7 244:7
253:23 254:5,9
256:25 257:20
258:12 259:22
261:11,23 262:20
267:9 271:11
**taken** 1:16 18:12
29:17 77:5 161:17
205:8 221:24
224:10 271:16
281:11
**takes** 95:12,25
136:12 224:22
225:12 226:8
243:20
**talk** 21:2 68:8
122:21 132:24
162:7 197:4,7
**talked** 20:24
**talking** 16:9 20:16
24:14 33:24 54:14
56:10 64:16 67:6
100:25 101:7,8
110:6 119:13
161:19 173:19
179:19 212:20
220:22 222:2
231:22 249:23
250:22 256:3
269:3 274:2

**talks** 38:9
**team** 11:23
**technical** 12:4
14:17 15:7,8,14
16:15,16,24
**technology** 15:7,13
**Telco** 247:15
**telcos** 55:3 56:14
**television** 10:3
117:25 131:14
**Telewizja** 1:8 3:19
3:21
**tell** 14:5 24:23 35:7
39:14 61:17 94:4
116:21 122:14
157:19 171:17
209:21 220:14
**term** 38:24 44:19
91:8,16,24 92:14
92:19,24 93:16
163:16 190:9
202:11
**termination** 40:7
**terminology** 17:6
163:10
**terms** 6:19 15:7,13
16:15 53:6,11
139:7,25 160:5,11
161:7,21 162:2
168:10 173:2
199:3 202:10
211:14 218:12
221:7,20 222:10
236:14 247:2
250:22 253:12
**territory** 38:8
49:16 52:20
161:24 188:22
189:4
**testified** 3:7 16:12
149:17,20 202:7
229:16
**testifies** 150:18
**testify** 3:7 146:5
281:7
**testifying** 144:10
**testimony** 4:13

9:15 20:10 55:15
61:14 150:8
266:17 275:8
278:6 281:11
**text** 138:2 196:6
236:20
**thank** 130:6 276:20
276:22
**Thanks** 170:23
**theoretically** 42:21
**theories** 19:14,16
20:9,13,16,17,23
21:5,8 43:12 70:9
99:21 105:19
202:25 211:4
**theory** 21:12,19
39:7,13 41:23
42:10,15,16,23
43:9,25 47:11
48:2,10,16 49:10
49:11,15 50:15
51:15 52:6,8
53:12 63:15,23
64:6,16,18 65:16
65:23 66:10,24
67:9 68:9,10 70:4
70:11 77:8 94:3
97:15,18 108:8
109:4 120:6,18,19
121:3 122:5,6
125:4 126:18
127:10,25 128:14
129:25 134:8,9,22
135:11 138:20
162:9 165:20
180:8 182:13
199:4 200:8,11
204:2 205:2,23
206:2 207:2
209:18,20 210:3,9
211:5,23 216:13
221:19,25 223:20
233:13 241:12
269:16
**thereabouts** 7:16
231:20
**thereunder** 272:2

**thing** 7:8 8:24 17:7
21:3 33:7,15
108:4 140:6
199:25 206:6,22
209:17
**things** 118:11
131:11 132:10
150:12,12 154:13
160:11 170:4
205:17 229:4
250:14
**think** 4:20 6:22
8:13 10:13 11:15
13:4,12 14:10,18
15:24 17:2 20:15
27:9,18,19 29:13
29:17,19 31:18
38:2,14 43:2
44:11 49:9,11
50:24 52:14,15
79:18 84:14 85:10
91:13 92:9 98:5
98:11 100:21
101:3 104:14,21
106:15,25 110:13
111:5,18 114:20
115:7 121:21,24
139:3,5 151:20
153:20 159:5
161:4,10 163:9
164:9 166:8
168:15 170:18
177:6 180:24
182:6 187:20
188:17 190:8,19
195:4 196:11,12
199:9 202:15
205:3,20 209:6,23
210:11,21 211:9
214:5,10,10,13
215:8,9 219:25
221:5 224:20
226:9 227:20
231:17,19 239:15
251:8 252:8
253:10,19 254:16
254:25 255:6

260:5 261:6
264:17 269:18
271:9 273:23
275:21
**thinking** 140:2,3
**thinks** 129:12
**third** 66:16 105:10
115:20,22 238:21
242:20 245:13
258:7
**thought** 14:13,21
14:23,25 16:13
33:6,8 65:10
76:19 105:17,18
121:17 122:2
124:13 137:18
160:10,12 163:15
164:23 179:9
196:22 233:10
**thousand** 83:4 85:3
233:23
**threat** 178:8,9
179:11 180:3
**three** 14:8 19:24
40:4,5 41:8 62:2
64:4 65:13,14
68:25 86:17,18,19
94:14,15,18,22
101:7 108:11
172:17 173:16,23
180:7,9 181:20
183:8 197:4
200:15 217:23
219:16,22 221:12
242:19 243:4
246:19 258:25
**thrown** 176:16
**Thursday** 1:23
**time** 7:4,5,6,10,14
11:7 12:24 13:6
13:10,19 24:25
25:12 29:9 61:25
66:7,7 92:25
100:24 116:23
121:25 124:15
150:6 160:19
161:11 166:18

198:11,15 203:6
203:11 211:9
229:13 238:23
242:3 266:21
274:11 281:11
**times** 4:19 5:10
78:23
**title** 6:14 156:8
**today** 4:14 6:4
108:7 252:10
271:10,23 274:25
276:23
**told** 73:15 167:25
190:23 191:2
222:20
**top** 81:16 144:17
198:9 212:18
227:6 275:3
**total** 21:18 25:17
185:14 246:18
254:14
**totally** 213:20
**town** 160:16
**traced** 156:25
**transaction** 172:5
179:11
**transcript** 1:11,14
278:5 281:9,10
**transfer** 168:24
174:23
**transgressor** 40:18
**translated** 88:2
98:21
**translation** 79:14
79:16,17,22 80:15
81:10,16 280:9
**treating** 141:23
**trial** 232:17
**trick** 73:22 83:8
**tried** 226:20
**true** 281:10
**trusts** 6:10
**truth** 3:7 35:8
116:21 220:15
281:7,7,7
**try** 4:4,6 28:16
44:19 45:9,20

100:23 109:15
127:12 128:3
130:10 200:16
223:10 226:24
231:10 244:4
**trying** 47:7 57:12
59:9 60:2 87:24
114:11 118:20
121:19 122:15
127:14 132:17
143:20 195:16
201:17 202:4
213:13,17
**turn** 48:24 81:20
236:18 250:16
**TV** 56:13 155:8,9
**TVP** 3:22 11:6
29:23 30:7 36:8
36:15,23 37:8
40:21,24 41:9,13
42:3,12 43:23
44:7 47:13 48:4
48:18 50:12,20
56:12,19 59:15,21
64:19 73:17,20
74:14 77:24 78:4
79:13,21 80:24
81:5 85:4 87:13
94:5,11,13,25
95:7 97:18 98:13
98:19 99:14,16
107:19 112:7
139:7,12 164:5
168:11 172:21
176:23 177:24
178:3,20,25
179:14,21,23
180:13,15 181:2,6
182:20,24 183:21
187:15 188:5,14
188:15 189:4,18
189:20,21 190:15
191:8,14,24,25
192:16,19 203:2
212:5,11 213:18
213:23 214:2,24
215:11,16,20

216:14,25 220:25
239:10,14 246:8
248:4 263:7 268:2
273:22 280:6,9,12
**TVPolonia** 56:19
57:2,2,17 110:12
113:23 213:24
215:6,18,22
229:10
**TVP's** 41:25 49:4
60:7 188:20
196:24 202:24
267:10 269:14
270:11,16
**TVP/Polvision**
88:12,21 280:14
**twice** 4:21
**two** 3:22 14:7 27:19
43:10,10 62:2
77:2 78:23 87:4
94:18 101:11
103:2 104:24
120:15 154:25
162:8,12,13
169:13,14 172:17
173:6,6,20,21
174:2,12,13 184:5
193:17 205:7
233:23 242:19
243:4 248:13
249:6 271:11,22
**two-part** 129:25
**two-year** 87:17
90:21 93:12,24
97:4
**type** 212:13 213:15
213:15
**types** 6:10 40:4,5
155:9 229:6
**typical** 5:23 6:8
250:17
**typo** 137:20 138:10
138:15

**U**

**U** 278:2
**ultimately** 83:2

103:15 177:25
209:24
**Um-hum** 69:14
147:12 241:4
253:2 254:12
260:12 270:4
**unclear** 15:25
**underlying** 127:25
154:18
**underneath** 61:11
80:2
**underreporting**
257:9
**understand** 4:2,5,7
4:9 14:20 23:12
35:23,25 41:11
51:20 52:25 57:6
98:8 115:3 117:2
168:12 174:16
175:12 195:16
196:10 218:24
244:2,6 273:23
**understanding**
13:24 36:8,14
37:18 119:4 183:5
186:11 242:10
248:6
**understood** 186:14
254:16
**unfair** 117:7
**unfolds** 106:22
108:14 139:21
**unique** 136:6
160:19
**unit** 145:4
**UNITED** 1:2
**unreasonable**
113:9
**unusual** 209:15
227:2
**upper** 109:16
**upward** 152:24
**upwards** 152:22
**use** 21:11,18,18
69:19 75:15 85:7
93:14,15 97:10
99:23 106:23

110:2 122:6 125:3
127:9,15 128:15
128:22 129:3
132:13 137:5
145:3 150:21
152:21 161:25
163:19 170:12
171:11 176:4
182:11 183:15,15
201:13 204:25
208:17 210:8
241:9 255:24
**uses** 126:21
**usually** 75:14
**utilized** 118:3
143:3
**utilizes** 151:5
**utilizing** 99:14

**V**

**valuate** 69:2,3,4
**valuating** 73:23
74:15 139:8
142:20
**valuation** 6:2 8:2,3
8:5 9:2 67:15,19
67:25 68:9,10,11
68:13 69:12 70:4
70:9,10 74:2,19
75:12,25
**valuations** 7:22
68:2,7 70:6
**value** 40:19,23,24
41:12,16 42:3,11
42:12 43:22 49:4
49:24 51:23 59:15
64:7,19 67:18
68:18 69:11 70:12
70:19 71:13,17
72:2,13,13,21
73:14 74:11,13,17
75:17 76:18,23
94:6,16,24 95:11
95:16,19 96:23
97:3,6,20 98:13
98:14,14,15,23,25
99:6,13,24,25

101:12 102:4,11
103:17 109:2,17
109:18 117:24
118:15,20,25
119:21 121:9,21
124:14 125:23
126:16 127:13
128:13,21 130:11
133:2,3,8,8,21,22
133:22,23,25
134:4,10,23 135:4
139:8 143:5,21
151:13 162:18,22
162:25 163:4,19
163:24 164:3,6,7
164:11,20,21,23
164:25 165:7
167:19,24 168:6,9
168:16,24 169:7,8
169:12,15,18,22
170:2,3,12,25
171:4,7,11,15,20
172:18,20,25
173:3,4,24 174:2
174:11 175:2,4,10
175:11,18,22,23
176:4,4,8,18,21
176:22,24 178:13
178:17 180:21,22
181:9 182:5,10,11
182:15 183:2,13
183:16,17,19,21
184:3 191:11,17
203:17 204:3
211:24 213:7,11
213:18,19 216:24
218:8 219:19
**valued** 162:17
173:17 217:21
**values** 94:19 99:15
113:10 118:14
124:8 128:16
134:7 163:8 165:3
165:5 172:9,13,23
176:8 177:13
**valuing** 68:24,25
76:22 142:7

162:14,24
**variable** 159:23
161:2
**varies** 156:10
**various** 23:21 24:9
25:11 28:13 31:25
70:9 73:24 77:15
122:8 132:23
165:3 201:15
226:12 247:19
**vary** 236:7 262:6
**Veal** 62:18,19
**venture** 147:15
**venues** 208:14
**verbal** 146:20
**verify** 16:24
**version** 80:2,4
195:22
**versions** 81:19
**versus** 57:13 62:20
94:20 137:25
155:11 235:13
241:22 250:25
**vet** 112:9
**viable** 136:4 147:15
**view** 34:2 43:6
51:20 59:7 60:6
91:3 93:7 95:3
102:14 106:7
107:3 108:6
110:17 113:23
125:2,7 127:17
128:15 129:10,10
130:21,22,22,23
131:25 133:20
134:5 143:11
144:21 149:3
150:3,20 163:3,19
164:10,19 165:6
169:6 170:5 189:6
192:17 211:11
218:18 229:12,25
230:13,15 232:4
232:19 239:11
246:8,14 268:7
**viewers** 34:2 58:18
58:21

**viewing** 123:2
**violated** 217:8
**violating** 42:4
**violation** 36:2,5,10
38:3 40:8,15
41:25 43:23 44:22
47:20 49:17 64:8
217:2,4,11,12,20
**vitae** 61:9
**volume** 123:12
124:2,24 127:6,10
127:19,20,24
131:12 132:2
143:13 150:25
151:2,7
**vs** 1:7

**W**

**W** 3:13
**wait** 223:8 230:18
**waited** 230:4
**waive** 269:14
**walk** 122:13
**want** 4:4 32:10
33:9 47:24 51:18
51:21 52:10 54:4
77:4 111:22
117:18 122:21
126:15 127:12
130:2,4 135:24
142:8,11,21
144:25 157:4,19
160:13 164:13
192:9 197:7 198:2
236:23 250:20
252:12 271:10
276:20
**wanted** 50:10,11,14
51:10 93:18,20
109:9 116:22
118:11 119:13
121:8 242:12
**wants** 51:5 129:20
**Washington** 2:15
**wasn't** 11:7 27:13
29:10,20 30:7
44:10 53:21 89:16

93:25 96:5 105:3
131:19 135:22,23
140:2,13,14
199:10 212:7,7
217:12 253:4
276:3
**way** 9:14 14:14
35:25 39:14,15
40:25 42:2 51:12
53:18 59:10 60:3
71:22 105:4,8,9
105:10 106:12
108:14 109:20
111:24 112:10
113:2 116:9
118:13 128:19
129:4 132:20
143:22 144:22
156:11 169:17
176:15 196:9
206:15 210:15
214:13 224:19
226:3,6 228:3
246:18 251:21,22
260:24
**ways** 29:18 39:3
40:13 41:12 47:9
68:25 94:22
176:20
**weeks** 14:8
**welcome** 276:25
**Wenger** 2:4 3:9,19
15:20 24:17 45:5
54:3,10,15 65:2
76:25 77:6,23
79:8,12 80:13,18
88:5 98:7 100:16
101:9 114:14
161:10 195:19
196:20 197:16
215:11 221:22
271:9,17,24 273:9
274:25 276:18,22
276:24 279:7
**went** 9:3 19:17 20:5
21:13,14 49:16
92:9 106:5 113:14

135:6 180:17
202:3 203:22,24
206:15,15 208:4
210:14 227:20
238:2 249:20
**weren't** 15:5,12
26:14,23 27:24
37:5 52:22 66:3
149:6,9,10 175:10
199:15,17 204:14
204:20 205:4
207:16 222:14
239:21 249:2
**we'll** 3:22 19:14
55:5 77:18 138:13
253:24 271:14,15
**we're** 32:10 39:8
74:5 76:20 96:23
97:6 98:12,18,20
99:2,6 102:3,6,9
102:10 106:18
107:21 111:17
122:17,18 128:11
128:12,17 130:6
134:17 140:14
141:17,19 148:15
161:6 166:6 181:4
183:5 187:22
188:10,10 212:11
213:13,17 219:18
222:14 226:8
231:22 237:23
240:11 241:18,20
241:25 242:25
243:4,24 244:3
247:12 263:2
271:9
**we've** 18:12 35:2
128:24 134:8
226:12
**wide** 8:9
**widely** 236:7
**willing** 52:9 96:10
96:13 129:21,22
130:12,14,15,16
136:21,24 137:2
144:3,4,6,23

147:19,22 148:5
148:13,17,24
**willingness** 160:18
**wish** 170:21
**withdraw** 63:13
**withdrawn** 39:5
237:13 272:19
**witness** 4:17,20
6:21 10:25 13:25
15:19 85:13 87:23
101:4 111:8
225:11 251:8
279:3
**wonder** 196:2
**wondering** 263:14
**word** 22:3 37:10
53:18 202:16
**wording** 141:13
**work** 5:23 6:13,18
6:24,25 7:11,15
7:20,22,24 8:2,3
8:11,12,19,20 9:2
9:19,19,23 11:2
13:5,23 17:25
51:15 75:12
117:23 140:6
148:8 185:13
186:3,5,24 194:7
194:21
**workable** 7:4
**workday** 6:3
**worked** 4:16 5:5,10
6:11 7:3 8:15
9:25 18:5 119:24
**working** 6:4 8:21
9:10 10:8 12:25
13:2 19:10 32:20
**works** 18:3 115:19
118:10
**world** 231:4
**worse** 108:8
**worth** 128:10
167:16 168:20
**wouldn't** 33:9 59:6
59:23 60:15,16
73:4 74:11,24
75:6 85:24 159:13

171:10 174:24
178:22,24 180:2
180:22 183:20
216:17 229:21
233:11 247:8,9
249:8 250:20
253:8 272:25
273:20 274:14,17
**wrap** 271:15
**write** 18:21 105:21
**writing** 16:18 18:22
**written** 61:13 65:25
66:4
**wrong** 39:15,22
46:5 90:14 122:14
125:18 134:14
138:17 209:21
268:9,9,11,12
**wrongly** 216:16
**wrote** 18:23,24
276:3

---

**X**

**X** 279:2 280:2

---

**Y**

**yeah** 20:24 25:6
46:4 66:20 76:13
83:20 85:19 87:23
111:20 144:16,18
146:25 153:24
154:9 157:21
159:13 166:2
167:13 168:14
189:2 191:18
193:22 195:17
196:5 199:9
214:17 217:5
222:5 225:11
234:7 239:2
246:17 247:12
250:5 256:5
262:11 269:5
274:21
**year** 13:14 152:19
159:4,9 230:4,18
230:18 259:23

264:18,20,21
265:2,8
**years** 9:18 90:22
154:16 157:13
158:6,9 226:4
**Yep** 84:2 258:24
**York** 1:2,22,22 2:5
2:5,10,10 3:5,5

---

**Z**

**Zavin** 5:8
**zero** 124:25 127:15
**Zlotopolscy** 82:6
83:18 84:17
162:17 165:21
166:25 167:22
170:13,17,25
171:5

---

**$**

**$10** 221:16
**$15,000** 194:18
**$159** 126:13 145:3
**$300** 169:7 171:21
**$3800** 138:23
**$600** 162:17,24
163:5,11,25 164:2
164:17,20,20
167:16,18 168:6,8
168:20,21 170:12
173:2 177:9
**$603,000** 103:20
**$656,000** 103:18
**$763** 144:15 148:18
**$772** 148:13 149:5

---

**0**

**0.7** 240:24 241:6
**00054** 78:2,6 280:7
**00058** 79:15,23
280:10
**03** 237:4
**07** 194:2,3,17,19
244:8,11
**08** 91:2 102:19
170:11 228:10
237:5 238:3,25

239:5 240:14
241:3 242:8
261:22
**09** 152:19 194:12
194:12,13,14,17
198:16 238:18,21
255:19,24 256:4
256:10 261:22

---

**1**

**1** 54:16,18 55:6
82:2 83:9,21
195:20 232:9
272:7 280:4
**1,085** 198:17
**1.2** 243:9 244:12,15
245:2
**1.7** 206:23 237:3
241:20 276:12
**10** 1:3 200:19
227:12 240:15
241:19 242:4
261:22 262:17,24
263:20,25 264:10
265:16,19 266:6
266:18,24
**100** 25:22,24 83:10
93:13 97:13 99:5
99:5 101:20
124:15,25 125:25
136:14 137:13,13
143:12 188:6,12
235:18,19,24
236:2 257:18
**10020-1104** 1:23
2:5
**101** 83:14,16 84:4
**10154** 2:10
**109** 62:20
**11** 158:4 281:19
**110** 176:9
**12** 123:3 202:21
267:14 272:12
273:21
**12th** 272:18
**1251** 1:21 2:5
**13** 272:6

**130** 169:16
**14** 99:9 267:25
**142** 82:8 83:16
**143** 194:19,22
**143,000** 193:24
**143,254** 193:15
**15** 149:23 169:14
197:21 272:12,20
**15th** 272:24
**150** 84:5
**150,000** 267:16
268:21 269:11
**159** 143:14 151:6
**16** 80:19,22 280:11
**16,000** 158:22
**17** 88:11,20 90:25
269:25 280:13
**1701** 2:14
**18** 242:20 263:18
264:11
**19** 270:2,2
**191** 82:6 83:14
**197** 280:16
**1998** 61:12

---

**2**

**2** 78:2,3,21 83:12
88:4,15,23 152:24
153:4 169:11
185:19,20 193:18
196:8 240:21
280:6,15
**2,071** 235:6
**2,487** 198:12
**2,647** 234:18
**20** 7:6 9:18 88:9
181:5 270:13
**200** 78:16,17,19
84:4 235:21 236:2
**20006** 2:15
**2002** 206:15 210:15
210:23 257:12
259:23
**2006** 267:17
**2007** 243:8
**2008** 77:25 78:5,11
78:16 83:10 88:11

88:15,20,23 90:3
90:25 91:19 92:13
96:16 102:15
158:3 163:14,14
173:5 206:16
237:18 238:12
241:8 259:5
261:23 262:18
263:25 265:19
266:6,18 280:7,13
280:15
**2009** 79:12,20
80:10,11,20,23
82:14 83:3 92:7
96:17 102:17
153:6 158:5,9,13
158:20,21 173:8
177:14 255:7,15
256:2,6,15 257:10
257:12,16 258:7
258:22,25 259:5
259:25 260:2
261:24 262:18,21
262:22,23 263:25
265:19 266:6,19
267:2 269:24
272:12 280:8,11
**2010** 80:19,22 82:2
155:25 156:3
158:4 194:9,10
203:6,12 227:10
228:9 229:10,13
233:24 238:13
239:6 240:12,17
242:9 245:8,10
248:20 258:6
280:11
**2011** 13:9 198:17
201:12 203:7,13
231:12,13 232:6,9
232:20 233:8
234:3,14 239:20
240:19 241:24
248:21 255:6,11
257:16,17 258:7
273:6,11,17
**2012** 1:23 197:21

---

232:9,18 272:12
272:20,22 274:2,3
274:13,15,18
278:13 281:19
**2014** 281:19
**2019** 203:19,24
**215** 82:12,20,22
83:2,2,5 84:25
**215,000** 84:25
**22** 91:6
**223** 213:3 217:5,7
217:10 218:8,13
**23** 88:9
**24** 218:9
**24,530** 213:8
**25** 218:13 254:8
261:13
**254** 280:18
**256** 280:20
**26** 203:6,12
**26-odd** 83:4 85:3,7
**27** 77:25 78:5,11
90:3 92:13 96:16
102:15 280:7
**27th** 78:16 86:7
90:21 92:12
**270** 169:16
**271** 279:10
**28** 117:13,13

**3**

**3** 79:9,20 227:5
236:19 273:4
274:12,24 279:7
280:8
**3,000** 234:4
**3.4** 275:19 276:7,12
276:14
**3:59** 277:3
**30** 120:16 148:18
150:7 152:18
157:12,13 158:4
**30-second** 123:9
126:13 145:4,9
147:6,9
**300** 2:15 176:9
235:21

**31** 79:9,12,20 80:10
80:11,20,23 82:14
83:3 173:8 177:14
203:7,13 231:13
232:6,9,20 233:8
234:3 241:24
273:11 280:8,11
**31st** 201:12
**32** 132:22 158:4
182:12
**33** 157:9,14,21
**3378** 203:7
**34** 108:17,20
**345** 2:9
**36** 115:11,12,14
**37** 177:18
**38** 55:11 117:11,12
118:6 122:16,18
152:18,18 153:6
158:5 159:3,8
**3816** 137:23
**3861** 137:22 138:3
138:15 140:22
141:8,11 142:23
144:17

**4**

**4** 80:19,22 81:13
166:14 248:2
280:11
**40** 7:5,13 83:19
84:12 87:17 119:5
123:16 124:22
140:17,18 141:5
142:15 149:18,21
152:21 153:5
157:25 159:18,20
161:8,22 162:4
267:4
**41** 258:11
**42** 83:19
**43** 57:4
**44** 57:4 123:9
150:23
**44,329** 234:9,18
**45** 122:24 123:13
**45th** 62:20

**46** 123:15 152:14
153:23 234:16
**46,976** 234:18
241:24
**47** 123:15,16
137:22,25 138:2,2
138:5 140:15
141:2 152:14
**49** 234:12 241:22
258:11
**4933** 1:3

**5**

**5** 88:20 166:12,15
261:22 262:17,24
263:19,24 264:9
264:23 265:15,19
266:5,18,24
280:13
**50** 6:23 79:4 83:21
86:6,22 87:18,19
90:4 97:6 98:24
99:3 102:6,7
127:19 166:20,22
166:23
**52** 77:17 84:5,6,9
84:17 103:11,11
103:23
**53** 163:8
**54** 77:14 78:13,15
79:3 80:11 82:12
103:24 280:4
**545** 103:3 110:7
112:15,20 113:22
114:20
**58** 104:3

**6**

**6** 197:17,22 202:23
280:16
**60** 7:9 93:9 103:7
104:2,3 212:15
217:6,7
**600** 176:9
**61** 82:21 104:4
115:12 212:21
**62** 86:23

**65** 191:4
**66** 248:7,8

**7**

**7** 1:23 155:17 157:7
253:25 254:2
280:18
**76** 233:19,21 234:6
234:8 241:15,16
241:17
**763** 138:12
**772** 138:12
**777** 148:5
**78** 280:6
**79** 280:8

**8**

**8** 103:19 256:22
280:20
**8.2** 244:9,16
**80** 181:7 280:11
**860** 77:10 84:24
85:25 86:2 87:4
87:21 101:12,18
101:19 103:14,23
103:25 104:8
110:8 217:8,24
218:14
**88** 280:13

**9**

**9** 281:19
**9:30** 1:24
**90** 83:15 97:11
149:19,22
**91** 82:7 84:7,10,11
**93** 82:6 84:18
**94** 257:3,5
**95** 136:20
**972** 203:13

Page 1

LARRY GERBRANDT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
SPANSKI ENTERPRISES, INC.,

        Plaintiff,

        vs.      Index No. 10 CV 4933 (ALC)

TELEWIZJA POLSKA S.A.,

        Defendant.
----------------------------------------X

DEPOSITION OF LARRY GERBRANDT

New York, New York

Tuesday, June 19, 2012

REPORTED BY:  BARBARA R. ZELTMAN
               Professional Stenographic Reporter

Page 2

1               LARRY GERBRANDT

2

3             June 19, 2012

4             9:40 a.m.

5

6      Deposition of LARRY GERBRANDT, taken by

7   Defendant, pursuant to Notice, at the offices of

8   DLA Piper, 1251 Avenue of the Americas, New York,

9   New York, before BARBARA R. ZELTMAN, a Professional

10  Stenographic Reporter and Notary Public within and

11  for the State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1               LARRY GERBRANDT

2  A P P E A R A N C E S :

3

4   LOEB & LOEB LLP

5   Attorneys for Plaintiff

6      345 Park Avenue

7      New York, New York 10154

8      BY: MICHAEL BARNETT, ESQ.

9

10

11  DLA PIPER LLP (US)

12  Attorneys for Defendant

13     1251 Avenue of the Americas

14     New York, New York 10020

15     BY: DAVID S. WENGER, ESQ.

16

17

18

19

20

21

22

23

24

25

Page 4

1               LARRY GERBRANDT

2

3      IT IS HEREBY STIPULATED AND AGREED

4   by and between the attorneys for the respective

5   parties herein that filing and sealing be and

6   the same are hereby waived.

7      IT IS FURTHER STIPULATED AND AGREED

8   that all objections, except as to the form of

9   the question, shall be reserved to the time

10  of trial.

11     IT IS FURTHER STIPULATED AND AGREED

12  that the within deposition may be signed and

13  sworn to before any officer authorized to

14  administer an oath with the same force and

15  effect as if signed and sworn to before

16  the Court.

17

18

19

20

21

22

23

24

25

Page 5

1               LARRY GERBRANDT

2            LARRY GERBRANDT,

3     having been first duly sworn by

4   Barbara R. Zeltman, Notary Public, was

5   examined and testified as follows:

6      EXAMINATION BY MR. WENGER:

7    Q   Please state your full name for the

8   record.

9    A   Yes. Larry Gerbrandt.

10   Q   Which firm are you with,

11  Mr. Gerbrandt?

12   A   Well, I have -- I wear two hats

13  balanced on each side.

14     One is managing director of Janas

15  Consulting where I run their valuation

16  practice and I help with investment banking.

17     And the other is Media Valuation

18  Partners in which I am principal.

19   Q   Good morning. My name is David

20  Wenger. I'm with DLA Piper. I represent

21  Telewizja Polska SA, the defendant in this

22  litigation brought by Plaintiff Spanski

23  Enterprises, Inc.

24     We are here for your deposition

25  today.

2 (Pages 2 to 5)

Page 6

LARRY GERBRANDT

1
2    You've been deposed quite a few
3 times before; is that right?
4    A  I have.
5    Q  So you generally know the procedure
6 here. I'll be asking you questions. You'll
7 be answering them. If you need any
8 clarification, please let me know. If you
9 don't understand a question, I can try to
10 rephrase it for you.
11    Is that clear?
12    A  I think so.
13    Q  Is there any reason why you can't
14 give full and accurate testimony today?
15    A  None other than the fact that my
16 body still says it's 6:30 in the morning,
17 but I'm awake.
18    I just came in from the West Coast.
19    Q  You don't feel too tired, though,
20 to give your testimony here?
21    A  No.
22    Q  How many times have you been
23 deposed?
24    A  I've given testimony -- provided
25 testimony in some form in about 75 or more

Page 7

LARRY GERBRANDT

1
2 cases.
3    Not all of those have led to
4 depositions, but probably 50, 60 times.
5    Q  Have you ever been involved in
6 a deposition where you were a party to
7 a litigation?
8    A  No.
9    Q  Have you worked with the Loeb &
10 Loeb firm before this case?
11    A  Not in a litigation setting.
12    Q  In a consulting setting?
13    A  It's possible when I was at Kagan.
14 We did a large volume of valuation and
15 consulting work.
16    And I was sort of running things
17 through my memory last night in anticipation
18 of this question, and I seem to recall
19 matters involving Loeb & Loeb over the years
20 or Loeb & Loeb clients, but nothing that I
21 can recall specifically.
22    They have a large entertainment
23 practice in Los Angeles and we were a West
24 Coast-based firm, so I wouldn't be surprised
25 if we weren't involved in projects for their

Page 8

LARRY GERBRANDT

1
2 clients, but like I said, not that I recall,
3 you know, litigation.
4    Q  Have you ever been disqualified as
5 an expert in a litigation?
6    A  I have not.
7    Q  Tell me about your everyday work
8 now during this time period.
9    A  Well, if you can be specific about
10 the time period, I'd be happy --
11    Q  Over the last couple years, but I
12 mean presently.
13    What does your everyday work
14 consistent of?
15    A  Usually I'm meeting one kind of
16 deadline or another either for Janas. We're
17 currently work on a couple of projects.
18    Recently finished a valuation
19 project for Rosemead Oil, for instance.
20    I've recently hit several deadlines
21 for MVP, Media Valuation Partners, clients
22 in various kinds of litigations.
23    Recently finished a report on
24 over-the-top television for on an online
25 research company called GigaOm.

Page 9

LARRY GERBRANDT

1
2    Just finished a consulting
3 consignment through a roundtable group
4 regarding the economics of management
5 practices at Dream Works.
6    So you wouldn't know the kinds of
7 things I do. It's usually consulting or
8 valuation within the entertainment industry.
9    Q  What are your -- withdraw that.
10    What is the nature of your
11 valuation services, meaning what are you
12 valuing?
13    A  Well, first of all, you are usually
14 trying to come up with either fair value or
15 sometimes fair market value. Sometimes
16 another type of value of, in my case,
17 a media or entertainment asset of some kind.
18    It can be a hard asset, such as
19 an inventory of tapes. It could be
20 an operating company. Very often it's a
21 library of intellectual property.
22    And with Janas, I've used -- I've
23 been doing valuations now for 25 years and
24 I'm rather well-schooled in the basics, if
25 not some of the finer points of it and have

3 (Pages 6 to 9)

Page 10

LARRY GERBRANDT

1
2  been expanding into other industry sectors.
3      So it's fairly wide ranging.
4      Q    What are these valuations used for?
5  Are they for litigations for accounting
6  purposes or for something else, or is it a
7  mix?
8      A    It's a mix of those things as well
9  as it's not unusual.  As a matter of fact,
10  two of my most recent valuations involved
11  buying out minority partners in a firm.  So
12  that was basically an entirely private
13  transaction.
14      Q    So, you valuate media entities, as
15  well?
16      A    Well, I think I said that's
17  among -- I do media and entertainment and
18  recently have branched out into servicing
19  other Janas clients.
20      Q    Do you have a graduate degree?
21      A    Beyond my BA in business
22  administration, I do not.
23      Q    In terms of your media expertise --
24  and I've gone through your CV and you seem
25  to have quite a bit of expertise in media --

Page 11

LARRY GERBRANDT

1
2  what areas in general do you focus on, if
3  you have any focus?
4      A    At different times in my career
5  I've actually been an operating officer for
6  different media companies:  Publishing,
7  extensive experience in the publishing
8  industry.  I've run cable systems.  Managed
9  a research company which is also a
10  publishing company.
11      I was a principal and corporate
12  officer in a film and television production
13  company.
14      So my -- over the last 25 years, I
15  have focused -- the only industry I haven't
16  really spent a lot of time with, ironically,
17  is the radio industry.  It's not that I
18  don't understand it.  It's just I haven't
19  had many occasions to delve into the
20  economics of that sector.
21      Probably what I am best known for
22  is the creator of the Kagan Economics of
23  Basic Cable Networks database, which is the
24  definitive source on financials and
25  economics of -- as the name would suggest --

Page 12

LARRY GERBRANDT

1
2  basic cable networks.
3      Q    You mentioned that you ran a cable
4  system.
5      Was that for Orion Cable?
6      A    I believe we pronounced it "Orion."
7      Q    Orion, yes, okay.
8      What do you mean you ran a cable
9  system?
10      Describe that some more.
11      A    I was responsible for -- I think my
12  title was operations manager.  And I was
13  responsible for the day-to-day operation of
14  a dozen small cable systems along the Front
15  Range of Colorado.
16      Q    Orion is a cable company that
17  delivered cable television programming to
18  businesses or individuals?  Or is it
19  something else?
20      A    Technically, the sector that we
21  were operating in was known as SMA TV:
22  Stands for satellite master in television.
23      This was in the very early '80s and
24  we were using some of the leading-edge
25  technologies.  The prices had come down to

Page 13

LARRY GERBRANDT

1
2  make it affordable for large MDs,
3  multiple-dwelling unit properties, which
4  could be condos or residential units, to
5  operate their own cable systems.
6      As long as you didn't cross any
7  public rights of way, then you didn't have
8  to get a franchise.
9      And we essentially operated cable
10  systems that we then sold the programming to
11  the residents, collected the bills and we
12  gave a percentage of the proceeds to the
13  owner of the MDU.
14      And we had a dozen of those
15  facilities, often serving up to several
16  hundred customers in each case along the
17  Front Range.
18      Q    You worked there during college?
19      A    No.
20      Q    You received your Bachelor of Arts
21  degree in 1985; is that correct?
22      A    I had about a ten-year interruption
23  between my junior and senior year.  So I
24  started my college education in 1970 at
25  Colorado State University and ultimately

4 (Pages 10 to 13)

A-487

Page 14

LARRY GERBRANDT

1
2  wound up finishing my degree while I was
3  gainfully employed but raising a family.
4      Q    And you worked for Orion for two
5  years; is that right?
6      A    I think it was a little bit longer
7  than that, but it was from late -- my
8  recollection, it was from late '81 to May of
9  '84.
10     Q    Have you ever worked for any other
11  companies that were involved in distributing
12  cable programming, cable or satellite
13  program?
14     A    On a consulting basis, literally
15  hundreds of times.
16     Q    But not for a company itself?
17     A    No. I spent almost 20 years of my
18  career at Kagan, so that was a large chunk
19  of my career.
20     Q    Who are the principal clients of
21  Kagan? I don't need their names, if that's
22  confidential. I just want kinds of
23  companies.
24     A    Well, I don't know who they are
25  now. It's now a division of a company

Page 15

LARRY GERBRANDT

1
2  called SNL.
3      But during my tenure, we provided
4  research analysis and consulting to every
5  single major media and entertainment company
6  in the country.
7      We had something on the order of
8  2,000 clients.
9      That also included many of the
10  research firms, Wall Street firms, many of
11  the major law firms and individual
12  investors.
13     Q    What kind of consulting services
14  did Kagan provide to cable and television
15  companies?
16     A    Well, you have to understand that
17  there were quite a few senior analyst
18  companies each with different areas of
19  responsibility.
20      So I wasn't always aware of what
21  everybody else was doing.
22      I can speak to my own practice
23  within the company. I can't necessarily
24  speak with authority what the entire company
25  was doing. It would be helpful if -- you

Page 16

LARRY GERBRANDT

1
2  know, I was there for 20 years.
3      Let me see if I can help you, just
4  so we don't waste a lot of time.
5      Q    I'm interested in your experience,
6  particularly.
7      A    My focus was on -- I ran the
8  entertainment division and that included the
9  delivery of movie, television, video
10  programming across pretty much any platform.
11      That was my focus, was to look at
12  the economic -- understanding the economics
13  as well as the practicalities of delivering
14  entertainment.
15      And I especially focused on
16  emergent technologies as they came on the
17  scene.
18      So over a 20-year time span, I saw
19  quite a few technologies come and go.
20      From a consulting standpoint, we
21  would very often be sought out by companies
22  who were looking to enter the arena and
23  needed someone sometimes to do a reality
24  check.
25      And I've written many business

Page 17

LARRY GERBRANDT

1
2  plans for startup cable networks. When Bob
3  Wright, who became chairman of NBC, before
4  he took his position he bought a day of our
5  time, and I spent a day with Bob Wright
6  giving him our view of the future of the
7  broadcasting business.
8      And this was something -- he was
9  going around the country gathering
10  intelligence in anticipation of taking on
11  that position.
12      That was not an atypical kind of
13  consulting assignment, since you were asking
14  me about consulting assignments.
15      But I did a lot of work in terms of
16  startup cable networks because that was a
17  period in which they were flourishing.
18     Q    By "startup cable networks," do you
19  mean a cable company, distributor? I'm
20  thinking of Optimum Online, Verizon or
21  Cablevision, things like that. Or something
22  else?
23     A    It's actually a term or art.
24  A start-up cable network is -- you are
25  talking about distributors?

5 (Pages 14 to 17)

Page 18

```
1              LARRY GERBRANDT
2      Q    Uh-huh.
3      A    These are Nostalgia Network was a
4   client.  The Discovery Channel is a client.
5   The Learning Channel.  We did a lot of
6   consulting with the shopping networks.  So
7   JC Penney Shopping Channel, which no longer
8   exists, was a client.
9          In some cases these networks have
10  gone on to be -- the Learning Channel is now
11  known as TLC.
12     Q    In layman's terms, I think of those
13  as channels, but they are networks.  I
14  understand what you are saying.
15     A    You watch them on a channel.
16     Q    I understand.
17     A    But they are a network.
18     Q    Have you also done consulting work
19  for cable company distributors such as
20  Time Warner, Optimum Online, those kinds of
21  companies?
22     A    Over the course of my time at
23  Kagan, dozens if not hundreds of times.
24     Q    What was the nature of your
25  consulting work to those distributors?
```

Page 19

```
1              LARRY GERBRANDT
2      A    The vast majority of those were
3   valuations.
4          Periodically, they would ask us to
5   take on more specific assignments.  Wasn't
6   unusual for them to own programming entities
7   or networks or what I would describe as
8   channels.
9          Did a lot of work with what was
10  then Jones Intercable, and Jones owned
11  several networks that they needed valuations
12  for at various points in time.
13         We also did a lot of work on
14  valuating Jones Intercable franchises.  They
15  had a lot of limited partnerships that were
16  periodically rolled up and Kagan would
17  provide the valuation opinion on what those
18  were worth.
19     Q    Have you worked with Mr. Stephen
20  Schulman before in this case?
21     A    I have not.
22     Q    Did you know him?
23     A    I did not.
24     Q    Did you know Gary Arlen before this
25  case?
```

Page 20

```
1              LARRY GERBRANDT
2      A    I did.
3      Q    In what capacity?
4      A    Well, Arlen's name first came up
5   when -- shortly after I joined Kagan in
6   1984, I became aware that Mr. Arlen had been
7   a predecessor for a previous employee at
8   Kagan.
9          I think he had specifically been
10  an editor on the paid TV newsletter.
11         I later met Gary, Mr. Arlen, in
12  person probably a couple years -- within a
13  couple years of having joined Kagan and we
14  have known each other personally and
15  professionally ever since.
16     Q    Do you consider him an expert in
17  the cable television distribution area?
18     A    I know that he presents himself as
19  a consultant in this area.  I've never had
20  an opportunity to work with him or evaluate
21  anything he's done until his latest expert
22  report.
23         MR. BARNETT:  I'm sorry.  Just
24  to clarify.  Which report?
25         THE WITNESS:  The report in
```

Page 21

```
1              LARRY GERBRANDT
2   this case.
3      Q    How did you get involved in this
4   case?
5      A    I got a phone call from someone who
6   worked for Anchin, not Mr. Schulman, an
7   associate, who had found me on an Internet
8   search.
9          I think it was April 3rd or 4th.
10         MR. WENGER:  Let's mark
11  Mr. Schulman's report as Exhibit 1.
12         (Gerbrandt Exhibit 1, Expert
13  Report of Stephen W. Schulman, was
14  marked for Identification.)
15  BY MR. WENGER:
16     Q    Do you recognize that document as
17  the Expert Report of Stephen Schulman
18  submitted in this case?
19     A    Yes.
20     Q    Do you agree with everything in
21  this report?
22     A    I have not read this report -- when
23  you say I've seen it, I've gone through it.
24  I haven't read it from the perspective of
25  whether I agreed or disagreed with any of
```

6 (Pages 18 to 21)

Page 22

LARRY GERBRANDT

1            LARRY GERBRANDT
2  the statements involved.
3      In my cursory review, I didn't find
4  anything I disagree with.
5    Q   Have you read other drafts of this
6  report?
7    A   No.  Actually, I was not -- I
8  actually saw this only after it had already
9  been filed.  At least that's my
10  recollection.
11    Q   So you got the report after it was
12  submitted in this litigation?
13    A   Yes.
14    Q   The report is not dated but I take
15  it you reviewed a signed copy.  Is that
16  right?  As far as you recall?
17    A   I don't recall seeing it.
18    I believe I saw a signed version.
19    (Pause.)
20  BY MR. WENGER:
21    Q   So Footnote 28 of Mr. Schulman's
22  report is about seven or eight pages in.
23    Just take a look at that and also
24  Paragraph 5 of the report, second page of
25  the report.

Page 23

1            LARRY GERBRANDT
2    Both of these sentences basically
3  say that --
4    MR. BARNETT:  Which sentences
5  are we talking about?
6    MR. WENGER:  The sentences I
7  was just referring to.
8  BY MR. WENGER:
9    Q   So what's stated in Paragraph 5, in
10  Footnote 28, is basically "This report was
11  prepared in consultations with Larry
12  Gerbrandt to help in our analysis and
13  opinion for this report."
14    And Footnote 28 refers to this
15  specific section, actually.
16    So you spoke to Mr. Schulman during
17  the drafting of this report?  Is that
18  generally right?
19    A   I did speak to him, yes.
20    Q   How many times?
21    A   It was a combination with
22  Mr. Schulman and his associate.  At least
23  half a dozen times, if not more.
24    Q   Do you view this report to be
25  a joint report by yourself and Mr. Schulman

Page 24

1            LARRY GERBRANDT
2  or is this Mr. Schulman's report?
3    A   It's definitely Mr. Schulman's
4  report.
5    Q   But you said you agreed with
6  everything here or you don't disagree with
7  everything?  You don't disagree with
8  anything; isn't that what you said?
9    A   What I said was I didn't read this
10  from the perspective of coming to
11  a conclusion one way or the other.
12    I did -- I have subsequent to his
13  filing the report, I did have occasion to
14  see it.  I took a quick read through it.
15    I didn't see anything that I
16  disagreed with.
17    Q   Did you ever ask why you were not
18  issuing your own report?
19    A   I don't recall asking that specific
20  question.  It was implicit from the start
21  that they were -- they made it clear that I
22  was being retained as a consultant at that
23  point, not as a testifying expert.
24    Q   Did that change some time along the
25  way?

Page 25

1            LARRY GERBRANDT
2    A   It did.
3    Q   And then you issued your expert
4  rebuttal report; is that right?
5    A   Yes.  They did ask me to provide
6  rebuttal to portions of Mr. Arlen's report.
7    Q   Had you consulted in such a manner
8  in previous cases where an expert report
9  cites consultations with you but you don't
10  issue a report?
11    A   I've acted as consulting expert
12  many times over the years.
13    Q   But do you know if expert reports
14  that were submitted in litigations cited to
15  consultations with you in instances where
16  you had not actually submitted an initial
17  expert report?
18    A   Yes.
19    Q   Do you remember any specific
20  instances?
21    A   Yeah.  There was one actually
22  fairly -- within the last three years there
23  was one.  Actually, it involved a joint
24  venture between a Mexico-based publishing
25  company and Playboy.

7 (Pages 22 to 25)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 26

LARRY GERBRANDT

1
2   It had to do with a Mexican version
3 of a Playboy magazine that was going to be
4 put out in Mexico.
5       And there were issues related to
6 the valuation that the expert had done in
7 that case.
8       And he was clearly the testifying
9 expert but they felt that he needed
10 additional support in valuation using cash
11 flow multiples or specifically a EBITDA
12 multiples related to media and publishing
13 properties. And that's something in which I
14 have fairly extensive expertise.
15      Even though he was the testifying
16 expert and was a CPA, he hadn't dealt with
17 that specific area before. And I was
18 brought in to consult with him, advise him,
19 provide perspective and offer him whatever
20 expertise I could from my own experience.
21      And if I think back over my career,
22 I know there have been other instances in
23 that regard, but that's the most recent.
24  Q   When you were contacted by
25 Mr. Schulman's associate, what were you

Page 27

LARRY GERBRANDT

1
2 told?
3   A   That while Mr. Schulman had
4 considerable knowledge and some experience
5 in the entertainment industry, that
6 wasn't -- that he was more of a generalist.
7 And as they got into the specifics of this
8 case, they wanted someone who had more
9 specific knowledge to make sure that things
10 were being interpreted properly or they were
11 getting a full understanding of the
12 marketplace.
13  Q   Have you done consulting work
14 relating to the distribution of foreign
15 language television programming?
16  A   Yes.
17  Q   Can you elaborate?
18  A   On a consulting basis, I've done
19 extensive valuation over in Europe for
20 companies such as Media Set, consulted
21 extensively in Israel with both cable and
22 satellite distributors there who were
23 distributing actually foreign language
24 programming within Israel.
25      I've done valuation work for

Page 28

LARRY GERBRANDT

1
2 companies in Italy, Germany.
3       While I was at Kagan, we were
4 retained to value the entire library of the
5 Canadian Broadcasting Corporation, including
6 all of their Quebecois. And I have no idea
7 how to spell that, but that refers to their
8 French -- Canadian-French or French-Canadian
9 language programming and what their value is
10 worldwide.
11      So even though a fair amount of it
12 was English, from the perspective of
13 American, it was still foreign language
14 programming.
15      And I have specifically testified
16 in a case involving Echo Star and the
17 distribution of Azteca America here in the
18 United States.
19  Q   Do you have any other experience
20 besides Azteca America with a distribution
21 of foreign language programming in the
22 United States?
23  A   Many of the libraries that I have
24 valued over the years have included foreign
25 language programming.

Page 29

LARRY GERBRANDT

1
2 Dozen of occasions.
3   Q   Do you have experience with
4 providing consulting services or otherwise
5 in connection with the distribution of
6 foreign language programming in the United
7 States?
8       MR. BARNETT: Asked and
9 answered.
10  A   I'll try to take some pity on you,
11 Counsel.
12  Q   Please don't.
13  A   Distribution comes in many forms
14 and distribution rights come in many forms.
15 So you can distribute individual programs,
16 which is what the studios and independents
17 do, or you can distribute entire channels of
18 programming, which is what the MVPDs often
19 do, which stand for multichannel video
20 program distributors.
21      So I'm offering up to you a chance
22 to be more specific in terms of what kind of
23 distribution you are referring to.
24  Q   Why don't you tell me what
25 experience you have with the distribution of

8 (Pages 26 to 29)

Page 30

LARRY GERBRANDT

1
2    foreign language programming in the United
3    States.
4         MR. BARNETT:  Asked and
5    answered.
6         But ...
7    A    Okay.  See if I can do it.
8         I was retained as an expert in the
9    Echo Star v. Azteca America case.  And I
10   testified on behalf of Azteca America in
11   regards to issues related to standards and
12   practices in distribution of programming in
13   the United States.
14        I have also valued dozens of
15   libraries that have included foreign
16   language programming that have been
17   distributed here in the United States.
18        And I've also valued all of the
19   output -- all of the intellectual property
20   of the Canadian Broadcasting Corporation
21   which included -- which was, in essence, all
22   of it was at least non-US programming.
23        And I have consulted with TV Globo,
24   who is the largest broadcaster in Brazil, on
25   the economics and future of online

Page 31

LARRY GERBRANDT

1
2    distribution.
3    Q    Have you ever provided consulting
4    services or other services to companies that
5    actually distribute programming -- foreign
6    language programming in the United States?
7         And by that I mean cable company
8    distributors in connection with their
9    distribution of foreign language programming
10   in the United States.
11   A    I was also involved in the
12   litigation that dealt with the initial
13   attempts to distribute BBC America
14   programming in the United States, which
15   would be foreign programming in the US.
16        The reason I'm taking a little bit
17   of time in trying to answer your question is
18   that during my Kagan tenure, there were so
19   many assignments that we took on.  We were
20   often asked to evaluate the relative
21   economics of different kinds of programming
22   which could be carried on a cable system.
23        And I believe some of those
24   assignments involved packages of foreign
25   language programming.

Page 32

LARRY GERBRANDT

1
2         Sitting here, I can't remember
3    specific assignments.  I do know that they
4    were part of the kinds of things that were
5    frequently looked at.
6    Q    Do you have any experience with the
7    distribution of Polish language programming
8    prior to this case?
9    A    There may have been the odd Polish
10   language movie in some of the libraries that
11   we have valued, but nothing sticks out.
12   Q    Did you read the transcript of
13   Mr. Schulman's deposition?
14   A    I gave it a scan.  I didn't read it
15   in careful detail.
16   Q    Did you come across anything that
17   you disagreed with in reviewing the
18   deposition of Mr. Schulman?
19        MR. BARNETT:  Objection for
20   vagueness.
21        But you can answer if you know what
22   he's saying.
23   A    I read it to see sort of how the
24   deposition flowed.  And I was particularly
25   interested to see if my name popped up at

Page 33

LARRY GERBRANDT

1
2    any point.
3         I didn't really read it from the
4    perspective of dissecting it and analyzing
5    and coming to a conclusion one way or the
6    other.
7    Q    But you are an industry expert.  If
8    you read something, you would be evaluating
9    it, I suppose.
10        Did anything stick out in your mind
11   as "Here's something I don't agree with"?
12   A    In my cursory review, there wasn't
13   anything that I said, you know, "I disagree
14   with that."  So nothing that jumped off the
15   page.
16   Q    Did you read any of the other
17   deposition transcripts in this case?
18   Mr. Arlen's, for example?
19   A    Yes.  I actually did read
20   Mr. Arlen's.
21   Q    Any others?
22   A    Not that I recall.
23   Q    Which expert reports have you
24   reviewed in this case?
25        I can ask you specific reports, if

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 34

LARRY GERBRANDT

1
2  that would help you.
3      A    Let's see.  Obviously, I saw
4  Mr. Arlen's report.  I believe I had access
5  to Mr. Hart's report and I reviewed it
6  sufficiently to know that he was relying in
7  part on Mr. Arlen, which I think I noted in
8  my rebuttal report.
9          I saw Mr. Schulman's report after
10  it had already been filed.  And I think I
11  also saw Mr. Arlen's rebuttal report.
12     Q    How about Mr. Hart's rebuttal
13  report?
14     A    That, I don't recall.
15     Q    How about Mr. Reyes' or
16  Mr. Weirzbowski's reports?
17     A    I don't recall seeing those.
18     Q    Did counsel for SEI direct you to
19  any particular part of Mr. Schulman's
20  deposition?
21     A    They did not.
22     Q    Which documents did you review in
23  preparation for this deposition?
24     A    I took a look at my own report and
25  I briefly reviewed Mr. Arlen's, both his

Page 35

LARRY GERBRANDT

1
2  original report and his rebuttal.
3          And I believe I had access to
4  Mr. Schulman's report but most of it
5  involves aspects in which I did not provide
6  any opinions.  I only looked at the areas in
7  which I provided consulting.
8          So I think that's pretty much it in
9  terms of documents or reports.  That's what
10  I reviewed.
11         MR. WENGER:  Let's mark as
12  Exhibit 2, the Expert Rebuttal Report
13  of Larry Gerbrandt.
14         (Gerbrandt Exhibit 2, Expert
15  Rebuttal Report of Larry Gerbrandt,
16  was marked for Identification.)
17  BY MR. WENGER:
18     Q    Mr. Gerbrandt, do you recognize
19  this as your expert rebuttal report that you
20  submitted in this litigation?
21     A    Yes.
22     Q    Let's take a look at Paragraph 17.
23         The second sentence says "I was
24  asked to prepare this rebuttal report to
25  discuss the extent that I disagree with

Page 36

LARRY GERBRANDT

1
2  Mr. Arlen's approach, information utilized
3  and opinions reached."
4          Does this report contain every
5  issue on which you disagree with Mr. Arlen's
6  report about?
7      A    It contains a rebuttal opinion to
8  the areas I felt were substantive.
9      Q    Is there anything else in
10  Mr. Arlen's report that you disagreed with
11  that is not identified in your rebuttal
12  report?
13     A    Not that I recall, but I identified
14  the substantive issues that I felt I
15  disagreed with.
16     Q    What is your experience with
17  evaluating the population numbers of a
18  particular ethnic group in the United
19  States?
20     A    Over the years, I've had frequent
21  occasion to fairly closely examine the
22  demographics of the TV audience in the
23  United States, both from the various -- both
24  from the standard demographic categories as
25  well as some of the psychographics and in

Page 37

LARRY GERBRANDT

1
2  particular looking at languages spoken.
3          If you're a cable programming
4  analyst, which I certainly have been over
5  the years, you can't do that without being
6  aware of the various kinds of potential
7  audiences for non-English programming; and
8  specifically the rapid growth of the
9  Hispanic population here in the US.
10         I also have worked at Nielson,
11  which is a company that is literally based
12  on the US census.  I mean, that is -- US
13  census provides -- it literally dictates the
14  composition of the company's measurement
15  technology and sample sizes.
16         So as an executive with that
17  company, I was certainly familiar with the
18  various -- all their potential audiences for
19  potential programming in the United States.
20     Q    Have you done any in-depth analyses
21  of any particular ethnic groups, the
22  demographics of any particular ethic group?
23     A    Yes.  I wrote the first business
24  plan for what is today TV One, is actually a
25  channel now owned by Comcast, but is now

10  (Pages 34 to 37)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 38

LARRY GERBRANDT

1    being proposed by a group of radio stations
2    owned by Radio One.  And those were a group
3    of -- let's call it urban programming, but
4    it was geared towards the African-American
5    population.
6        And I spent a lot of time looking
7    at the demographics of that particular --
8    let's call it the urban segments in
9    preparation for writing that business plan.
10   Q    Have you done any in-depth analyses
11   of any ethnic group of a foreign origin --
12   by that, I mean Polish-speaking people in
13   the United States, German-speaking people in
14   the United States, et cetera.
15   A    As part of my work on the Azteca
16   America case, I reviewed all of the
17   affiliation agreements that Echo Star had
18   reached with foreign language programmers.
19       And some of that included
20   demographic information about US markets, US
21   population.
22       So I was certainly exposed to it
23   and aware of that and that covered at least
24   a dozen different languages.

Page 39

LARRY GERBRANDT

1    Q    What was the Azteca America case?
2    You mentioned that a few times.
3        Just tell me about that.  Describe
4    that briefly.
5    A    It was a lawsuit brought by Echo
6    Star against Azteca America claiming that
7    Azteca America had provided -- had provided
8    what Echo Star thought they were supposed to
9    provide in terms of either -- quality of
10   programming.  I think the biggest objection
11   that Echo Star had was that Azteca, at least
12   at the time, Azteca's America's commercial
13   breaks were not well defined or
14   standardized.  Typical for programming in
15   Mexico, but didn't necessarily fit in to the
16   US market.
17       There were other issues.  It's now
18   been enough years.  I can't recall the other
19   items, but that is something I do recall in
20   particular.
21   Q    Azteca America, was that Spanish
22   language programming?
23   A    Considering it was -- as I
24   identified, it's a Mexican-based network,

Page 40

LARRY GERBRANDT

1    certainly.
2    Q    So is your response basically that
3    you did some evaluations of the demographics
4    of Spanish-speaking people in the United
5    States?
6    A    Well, I certainly looked at that
7    issue many times.
8    Q    Have you evaluated the demographics
9    of other people who speak other languages in
10   the United States?
11       MR. BARNETT:  Just to clarify,
12   before this case?
13       MR. WENGER:  Yeah, that's what
14   we're talking about.
15   A    I know that in both consulting
16   projects and various research reports that I
17   have reviewed US census data on foreign
18   language speakers in the US.
19   Q    Any particular groups?
20   A    I didn't focus on specific groups;
21   although something that pretty much all of
22   us in the TV business have become acutely
23   aware of is the extraordinary growth of the
24   Hispanic population in the last 20 years.

Page 41

LARRY GERBRANDT

1    There was a major surprise in the
2    2000 census, and even the 2010 census turns
3    out to have -- turns out that all the
4    interim projections that were done still
5    undercounted the total size of the Hispanic
6    population.
7        So the issue of non-English
8    speakers in the United States has been of
9    keen interest to anybody in the television
10   business.
11       And now when we're talking about
12   the television business specifically,
13   there's often a focus on what languages are
14   spoken regionally.
15       For instance, it's not unusual for
16   LA -- LA has a very large Korean population.
17   There is a Korean TV station.
18       Now that we're talking about this,
19   I remember projects related specifically to
20   San Francisco, which we were involved in
21   some of the consulting.  They were looking
22   at what the demographics -- what were the
23   languages spoken in the Bay Area which had
24   waves of migration into it; in terms of what

11 (Pages 38 to 41)

Page 42

LARRY GERBRANDT

1
2  kinds of local channels and local kinds of
3  programming they should carry.
4          Within Los Angeles, there is
5  a large Russian community and there is a
6  known market for Russian language
7  programming, often delivered using SMA TV
8  technology.
9          So, you know, if you are in the
10  business, if you are an analyst, it's
11  something you pay attention to.
12     Q    Do you consider yourself an expert
13  in demographics?
14     A    I would describe it more that I
15  have acquired a fairly extensive knowledge
16  of demographics over the course of my
17  career.
18          And it's almost essential if --
19  first of all, if you work at Nielson, you
20  can't avoid the topic.  You quickly become
21  inculcated in it because that's the life
22  blood of the company.
23          Secondly, I actually conducted
24  primary research while I was at Nielson, and
25  your primary research must follow or account

Page 43

LARRY GERBRANDT

1
2  for demographics for it to have any
3  validity.
4          I have subsequently in litigation
5  settings conducted national surveys.  Again,
6  demographics are crucial to making sure that
7  you have valid results.
8          I have written reports for Nielson.
9  One was entitled Benchmarking the Digital
10  Household.  That looked at technology
11  adoption.  And all of it was cut by various
12  demographic profiles.
13          So I was retained by a client
14  called Nixle, N-I-X-L-E, which was a startup
15  Internet company, and I was given access to
16  and we actually acquired rights to a very
17  detailed demographic database covering the
18  United States that tracked -- it's really
19  rather extraordinary the amount of
20  information you can get down to the block
21  level on US citizens.  And we were running
22  very detailed demographic and psychographic
23  profiles of neighborhoods that Nixle was
24  targeting for its particular services.
25          And I spent six months deeply

Page 44

LARRY GERBRANDT

1
2  probing, running demographic sorts for the
3  company for the kinds of services they were
4  hoping to offer.
5          I mean, it was a very deep emersion
6  into demographics.
7          So I have a lot of experience in
8  it, but I'm not formally trained as a
9  demographer.
10     Q    Let's take a look at Paragraph 29
11  of Exhibit 2, your rebuttal report.
12          In this section of your report, you
13  are taking issue with Mr. Arlen's opinions
14  regarding the Polish-speaking market in the
15  United States and Canada.
16          Here you say in 29 that:  "The US
17  Census' 'Language Use in the United States,
18  2007,' shows that the population of Polish
19  speakers in the US was 667,000" --
20  approximately -- "in 2000 which had declined
21  to 638,000 in 2007.  And according to
22  Statistics Canada at the 2006 population
23  census there were 211,000 Polish speakers in
24  Canada."
25          If you add these two numbers up,

Page 45

LARRY GERBRANDT

1
2  you'd get about 849,000 Polish speakers in
3  the US and Canada; is that generally right?
4     A    I'll accept your representation.
5     Q    And again, you take issue with
6  Mr. Arlen's number of Polish speakers in the
7  United States.
8          Do you have any criticism of the
9  opinions that Mr. Arlen has made insofar as
10  the response rate to the census?
11     A    I know those are Mr. Arlen's
12  opinion.  I don't know anybody who routinely
13  inflates the data from the US Census in the
14  manner in which he does.
15          The response rate is always
16  an issue in any census.  They go through
17  extraordinary lengths to deal with that.
18          I mean, at the end of the day, I
19  understand what the US Census does, which is
20  it was designed to apportion representation
21  in the House of Representatives.  That body
22  is intensely interested in getting
23  a representative or as good a census as we
24  can possibly get because it determines
25  Congressional districts.

12  (Pages 42 to 45)

A-495

Page 46

LARRY GERBRANDT

1
2       And is probably one of the most
3   important national activities we conduct
4   every ten years.
5       So ...
6       But I can certainly tell you that
7   Nielson doesn't adjust the US Census numbers
8   in the way that Mr. Arlen does.
9       And the television industry uses
10  the Nielson numbers to apportion $70 billion
11  worth of advertising each year.
12      THE WITNESS:  And I'd like to
13  take a quick break unless you have a
14  very quick question.  I don't want to
15  take you off your train here.
16      MR. WENGER:  We can just take
17  a break.  Let's take five minutes.
18  Seven minutes.
19      THE WITNESS:  Sure.  That's all
20  I need.
21      (A brief recess was
22  taken.)
23  BY MR. WENGER:
24      Q   We were talking about the census
25  before we took a break.

Page 47

LARRY GERBRANDT

1
2       Are you aware that the 2000 US
3   Census reported a 67 percent response rate?
4       A   I recall seeing that, yes.
5       Q   Did you agree that the response
6   rate for Polish people might be less than
7   that 67 percent national response rate?
8       MR. BARNETT:  What do you mean
9   by "Polish people"?
10      MR. WENGER:  If you have an
11  objection, you can make an objection.
12  You can't ask for clarification.
13      If the witness doesn't understand a
14  question, he can ask for clarification.
15      A   I think I would have to answer it
16  in a slightly different fashion.  And that
17  is that the census methodology across the
18  board is designed to take into account
19  response rates.
20      So if you apply it twice, as
21  Mr. Arlen does, you basically are doubling
22  adjusting, and there's no justification for
23  that.
24      And I'm not aware of any specific
25  research that would suggest that the

Page 48

LARRY GERBRANDT

1
2   response rates of Polish speakers in the US
3   would be significantly different than that
4   of any other ethnic or demographic segment.
5       So I'm not aware that there is
6   a study that says Polish-speaking people
7   respond in a significantly different manner
8   to US Census questions than other segments.
9       Q   I want to get back to what you said
10  in the beginning part of your answer.
11      Your view is the census numbers
12  take into account the response rate.  In
13  other words, if the census report says there
14  are 500,000 Polish-speaking people in the
15  United States, then they are actually --
16  they've actually accounted for or heard from
17  two-thirds of that amount and then they
18  adjust it upwards to account for the
19  response rate.
20      Or are you saying something else?
21      A   My understanding is that the
22  techniques for making adjustments are much
23  more sophisticated than what you have just
24  described.
25      And more important, especially

Page 49

LARRY GERBRANDT

1
2   since the 2000 census, that the Polish
3   speaking -- it's actually a survey of any of
4   the major foreign languages spoken in the
5   United States has actually been handed over
6   to a specific group within the US Census
7   bureau.
8       It's called the American Community
9   Survey.  And they don't wait ten years.  I
10  think it's every two years that they conduct
11  their surveys of foreign language, foreign
12  languages spoken in the US, as well as how
13  well the individuals within those households
14  also speak English, which is of critical
15  interest to various governmental
16  individuals, especially education.
17      Q   Not sure that you answered my
18  question.  And I think it was pretty simple.
19      The question was if the US Census
20  Bureau, or an entity that it appoints to do
21  a particular survey for the Bureau,
22  published a number of a certain amount of
23  Polish speakers or any foreign language
24  speakers, had they heard from each one of
25  those people and that's how they reached

13 (Pages 46 to 49)

Page 50

LARRY GERBRANDT

1
2  their number?  Or had they heard from a
3  certain percentage of those people and then
4  mark up the number to account for the
5  response rate?
6      A    Again, I was trying to explain.
7  It's always -- what the US Census reports is
8  a national number.  Sometimes they do state
9  by state as well.  But they are based on the
10  responses that they get and then a
11  projection based on those responses.
12      So it's always a national or a
13  state projection based on the level of
14  responses, which are not equal state by
15  state.  I mean, some states have higher
16  response rates than others which is why you
17  can't apply sort of a national fudge factor.
18  It has to be done on a state-by-state basis.
19      But there is at least within the
20  last few -- last 40 or 50 years, the census
21  has always been based on a projection off of
22  total responses.  And those varied year to
23  year or census to census as well as state by
24  state.
25      But the numbers that they report

Page 51

LARRY GERBRANDT

1
2  when the US Census Bureau puts out a report
3  and they say "This is the national number,"
4  it's based on the information that they have
5  collected and then a projection is made for
6  the rest of the country.
7      Q    So they don't have an individual
8  response, in your point of view, for each
9  one of the individuals that they've
10  identified make up the population of
11  a particular foreign language speaking
12  group?
13      A    They do not have a response from
14  every single resident in the United States.
15      Q    Do they have a response from every
16  household from which they derive their
17  numbers?
18      A    They do not.
19      Q    You mentioned you weren't aware of
20  any study of the response rates of
21  the Polish-speaking population in the United
22  States?
23      A    Not specifically, no.
24      Q    So is it your view then that the
25  Polish -- the response rate of the

Page 52

LARRY GERBRANDT

1
2  Polish-speaking population in the United
3  States would be the same as the national
4  response rate or lower or higher, or do you
5  not have an opinion on that?
6      A    I don't have any reason to disagree
7  with the conclusions reported by the
8  American Community Survey of the US Census.
9      Q    That wasn't my question, though.
10      My question is just on the response
11  rate of just among Polish speakers, would
12  you agree or disagree that that would be
13  lower than the national response rate?
14      A    Don't have any reason to believe it
15  would be lower or higher than any other
16  demographic or ethnic group.
17      And if such a factor is known to
18  the US Census, it would have been taken into
19  account.
20      Q    In Paragraph 32 of your report you
21  say basically:  "Irrespective of the actual
22  Polish-speaking market in the United States
23  and Canada, the most egregious error Mr.
24  Arlen commits is assuming the relevant
25  potential market for subscribers for Polish

Page 53

LARRY GERBRANDT

1
2  language programming is the total population
3  of Polish-speaking people."
4      Is it your view that it is improper
5  to assess a market for subscribers based
6  upon the total amount of people interested
7  in subscribing?
8      A    Yeah.  I'm saying that the
9  methodology, the calculations that he ran
10  were improper.
11      Q    So just explain that to me.
12      I'm trying to understand what your
13  criticism is.
14      A    You are?
15      Q    That's what we're here for.
16      So is it your view that it's
17  improper to reach a particular target number
18  of subscribers based on a particular
19  population number?
20      A    It is fundamentally wrong to
21  conflate or to equate households with
22  individuals.
23      It is television -- it's not even
24  Television 101, it's Television 100.
25      There's over 300 billion residents

14  (Pages 50 to 53)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 54

LARRY GERBRANDT

1
2  in the United States with approximately
3  115 million households.
4        And penetration figures are always
5  calculated against households.  Always.
6    Q    So is it your -- I just want to
7  make sure I have an answer to my question.
8        Is it your view that it's improper
9  to reach a particular target number of
10  subscribers based on a total population
11  number, accounting for the fact there are
12  multiple individuals per household?
13    A    The only time I think you would
14  consider individuals in terms of
15  subscriptions would be in terms of mobile
16  phones, for instance, where -- mobile phones
17  are almost always -- although increasingly
18  there are family plans, at least until the
19  last few years, mobile phones were
20  subscribers with individual contracts.
21        So in that case, it would be
22  appropriate to look at individual
23  subscribers.
24        But when it comes to programming
25  service, you don't have -- if you had three

Page 55

LARRY GERBRANDT

1
2  Polish speakers in a household, you wouldn't
3  expect to sell, ever, three separate
4  subscriptions to that household.  There
5  would be no reason for it.  You only sell
6  one subscription to the household
7  irrespective of the number of people in that
8  household.
9    Q    And I understand what you are
10  saying.
11        But if in my mind I say or I make
12  the calculation that there are a certain
13  number of people out there and out of those
14  certain number of people, two or three of
15  each of those people live in a household
16  together.
17        And based on that, I come up with
18  a number of subscribers, a number of
19  households that should subscribe based on
20  that total population, accounting for the
21  fact that there are multiple individuals per
22  households.
23        Explain to me what is flawed with
24  that calculation?
25    A    I'm not even sure I understand that

Page 56

LARRY GERBRANDT

1
2  kind of tortured logic that we'd go into
3  somebody -- I mean, it's simply fathomless
4  to try to pervert a calculation of -- you do
5  the calculation against households because
6  you are only going to sell one -- we're
7  talking about video subscriptions now.
8        You sell one subscription to
9  a household.  We do know that
10  occasionally -- and there's good data on
11  this -- that households will subscribe --
12  and this was particularly the case very
13  early on in the rollout of satellite,
14  someone would subscribe to both cable and
15  satellite.  And that was because satellite
16  at the time did not have local channels, so
17  you could actually sell two multichannel
18  subscriptions into one household.
19        That's not what we're talking about
20  here.
21        But it's always been per household.
22        The relevant population is not --
23  is never total -- when you are talking about
24  selling video subscriptions, the relevant
25  population is the household.  You can't get

Page 57

LARRY GERBRANDT

1
2  away from that.
3    Q    I understand you have to have
4  a population of households when you are
5  making such a calculation, but --
6    A    No.  No.  You don't -- you sell the
7  programming.  You license it.  You send
8  a bill to a household.
9    Q    Got it.
10        So you need -- when you are making
11  this kind of calculation, you want to know
12  how many households there are available,
13  correct?
14        You want to know how many
15  households would potentially subscribe; is
16  that what you are saying?  Are you not?
17    A    That's the metric.  That is what
18  you are selling is subscriptions to
19  households.
20    Q    Now, isn't one way of determining
21  how many households there are based on the
22  number of people there are that live in
23  those households?
24    A    No.
25    Q    So that if you have a certain

15  (Pages 54 to 57)

Page 58

LARRY GERBRANDT

1
2 number of people, you can't figure out how
3 many households approximately those people
4 live in?
5     A    You can but that's not -- that's
6 not what you do your calculation against.
7        Mr. Arlen did his calculation
8 against population of speakers.  He did not
9 reduce it ever, to my knowledge, to
10 households or didn't acknowledge.
11        All his calculations were done
12 against -- his assumption was the relevant
13 universe were individuals.  And he didn't
14 take into account that not every household
15 has television nor did he take into account
16 that you have multiple individuals living in
17 each household, and that that's to whom --
18 you only sell video programming services to
19 households that have television.
20     Q    But Mr. Arlen has an opinion that
21 there are a certain number of households
22 that should subscribe.
23        Is that how you understand his
24 opinion?
25     A    No.  He based his metrics -- his

Page 59

LARRY GERBRANDT

1
2 calculations were always done against
3 individuals.  All of his references, all of
4 his references were to individuals.  Never
5 did he reduce it to households.  Never did
6 he reduce it to television households.
7     Q    Well, when Mr. Arlen talks about
8 subscribers, you understand that to mean
9 individuals versus households?
10        Meaning Mr. Arlen has an opinion
11 that there should be a given number of
12 subscribers.  You understand that he's
13 referring to individuals as opposed to
14 subscribing households?
15     A    Very hard to tell because
16 the calculations he does are against --
17 well, first of all -- I don't want to --
18 whatever his methodology he claims it is, it
19 is, and whatever he testified, I don't want
20 to rephrase what he testified to, although I
21 think he said he came up with the number and
22 then backed into all of his calculations.
23        But if anybody should know what the
24 industry standard and practice is for
25 calculating subscriber penetration is

Page 60

LARRY GERBRANDT

1
2 Mr. Arlen.  And industry standard and
3 practice has always been to calculate
4 subscriptions -- penetration is always
5 against households.
6     Q    Have you seen SEI's business plan
7 that was prepared together with the
8 negotiation of the 1994 contract?
9     A    No, but I don't know how it would
10 be relevant since there had been at least
11 two litigations where it's only, I think,
12 subsequent -- the only -- everything up
13 through 2009, I believe, has been litigated
14 and resolved.
15        So but no, I have not reviewed the
16 1994 business plan.
17     Q    We'll get to that in a minute.
18        But is it part of your opinion as
19 an expert in this case that there can be no
20 claims brought relating to activity before
21 August of 2009?
22     A    My understanding -- and it's not
23 an expert understanding, it's just a general
24 understanding -- that that is, at least from
25 the perspective of, I guess it would be the

Page 61

LARRY GERBRANDT

1
2 defendants in this case, that those issues
3 have already been resolved.
4        That may not be the plaintiff's
5 perspective, but from the perspective of the
6 defendants, I believe it is.
7     Q    But you're not offering an opinion
8 about that, right?  This is something that
9 counsel has told you, that there is a
10 prospectus?
11     A    That's correct.  I think I also
12 referenced it in my report.  And that's
13 ultimately a matter of law.
14        MR. WENGER:  Let's mark as
15 Gerbrandt Exhibit 3, the TV Polonia
16 Broadcasting Systems, Inc. Business
17 Plan, TP-8000639 through TP-8000663.
18        MR. BARNETT:  The Bates numbers
19 you are referring to, are they from
20 this litigation?
21        MR. WENGER:  They are not.
22        (Gerbrandt Exhibit 3, TV
23 Polonia Broadcasting Systems, Inc.
24 Business Plan, Bates Numbers
25 TP-8000639 through TP-8000663, was

16 (Pages 58 to 61)

Page 62

```
1              LARRY GERBRANDT
2         marked for Identification.)
3    BY MR. WENGER:
4         Q    So let's take a look at Page
5    Number 642.
6              And it says here, "Considering the
7    results of research on the Polish-speaking
8    society conducted in Canada and the size of
9    Polish population in America, as well as
10   technical potential of retransmission of
11   TV Polonia, the company Spanski Enterprises,
12   Inc. established the following aims:"
13        Aim 5 is "Reaching the level of
14   2 million of TV Polonia subscribers within
15   five years and territorial range from Canada
16   to Central America."
17             In your view, this would have been
18   effectively impossible, Mr. Gerbrandt,
19   because there are not 2 million TV Polonia
20   subscribers in the territorial range from
21   Canada or Central America?
22        A    What year was this?
23        Q    1994.  This is a business plan,
24   I'll submit to you for purposes of
25   questioning, prepared by Spanski
```

Page 63

```
1              LARRY GERBRANDT
2    Enterprises, Inc. in connection with its
3    negotiation with TVP to distribute
4    TV Polonia.
5         A    First of all, I can't come to the
6    conclusion that you asked me to because I
7    haven't done any work regarding the size of
8    the potential market in -- and of course,
9    according to this it's Canada, US and
10   Central America.  And I have not studied the
11   market in Central America.
12             And I certainly hadn't done it as
13   of 1994.  So I really do not have an opinion
14   on this.
15        Q    So you don't disagree that there
16   may be 2 million subscribers in the range
17   described there from Canada to Central
18   America?
19        A    Do I have to repeat myself?
20        Q    I asked the question, so if you
21   think you answered it, just please answer it
22   again.
23        A    Since I have not done a study of
24   the market, of the relevant market in the
25   relevant time frame, I can't even begin to
```

Page 64

```
1              LARRY GERBRANDT
2    tell you what the correct number should have
3    been.  Nor am I privy to what the contents
4    of the programming, what their marketing
5    plans were, what their distribution
6    methodology was, all of the kinds of things
7    that you would want to take into account.
8              I can tell you that the market in
9    1994 is dramatically different than it was
10   20 years later.  Especially technologically.
11             So I would need to take a lot of
12   things into account, none of which I have
13   done and therefore I have no opinion.
14        Q    Let's take a look at Page 659 and
15   660.
16             And this is a little further detail
17   here getting to the 2 million number, you
18   see at the end of 660.
19             And it basically shows a projected
20   number of subscribers obtained in each one
21   of these years, December '95,
22   December '96 through December '99.
23             Do you have any opinion whether
24   these are theoretically possible
25   projections?  Meaning what -- were there
```

Page 65

```
1              LARRY GERBRANDT
2    500,000 possible subscribers in
3    December '97 and 2 million possible
4    subscribers in 1999?
5         MR. BARNETT:  Objection.  Asked
6    and answered.
7         A    Without doing the proper kind of
8    analytical due diligence, I can't have
9    an opinion on that.
10             I would further add that the MVPD
11   environment in this period is significantly
12   different than it was in the period
13   subsequent to December 1999.
14             Major technological changes
15   occurred.
16        Q    Have you done any research or do
17   you have any data to support a
18   three-people-to-household figure for
19   Polish-speaking residents in the United
20   States?
21        A    I've certainly reviewed the Echo
22   Star document which supports that.
23             We also know that the average
24   across the United States is in excess of
25   2.5, closer to 2.6.  It actually tends to be
```

17 (Pages 62 to 65)

Page 66

LARRY GERBRANDT

1
2  higher in urban environments and major
3  markets which is where a lot of the
4  Polish-speaking population is concentrated.
5       So it would be highly unlikely that
6  it would be less than the national average.
7       And therefore, I have no reason to
8  disagree with Echo Star's calculations.
9       Q    And in offering that opinion, are
10 you taking into account the possibility that
11 the average age of the Polish speaker in the
12 United States might be older than the
13 average age of a US citizen?
14      A    I am aware that the population of
15 Polish speakers is declining, and that is a
16 combination of age as well as the fact that
17 the Polish economy is one of the strongest
18 in Europe and there's been a certain amount
19 of -- what Mitt Romney calls reverse
20 migration, reverse immigration.
21      Q    So is it your opinion that the
22 amount of Polish speakers per household is
23 the same as the national average?
24      A    I think I've already testified to
25 what my opinion is.

Page 67

LARRY GERBRANDT

1
2       Q    Just please give it to me again.
3       A    Okay.
4       What we know -- we know what the
5  average is for the population at large.  We
6  also know that it tends to be higher in
7  urban/suburban areas, especially in the
8  areas where they have the highest
9  concentration of Polish speakers.
10      And we also know that Echo Star
11 calculated that ratio at 3.  And based on
12 what I know, I have no reason to disagree
13 with that number.
14      We know it has to be at least -- I
15 mean, there's no reason to believe it's
16 substantially less than the national average
17 which is 2.5/2.6 range.
18      Q    Let's take a look at Paragraph 21
19 of your report.
20      And before that, did you write this
21 report, Mr. Gerbrandt?
22      A    I did.
23      Q    Did you write the first draft of
24 the report?
25      A    I did.

Page 68

LARRY GERBRANDT

1
2       Q    Is all this writing yours?
3       A    Yes.
4       I typed every last word myself.
5       Q    You said in 21, in the second
6  sentence, "As an initial matter, however, it
7  is worth noting, as I have been advised by
8  counsel, that TVP has not alleged
9  a counterclaim against SEI for failure to
10 maximize subscribers with any particularity
11 and thus the claim may be barred in its
12 entirety ..." et cetera.
13      You're not offering an opinion
14 about this, are you?
15      A    No, I'm just stating a fact.
16      Q    And is that the case also with
17 Paragraph 22?  You're not offering
18 an opinion about whether -- what the effect
19 of a settlement agreement is, are you?
20      A    No.  But I'm also not blind to the
21 fact that should these issues, at least
22 dates be found to be relevant that
23 Mr. Arlen's opinion becomes irrelevant.
24      Q    In Paragraph 23, you say that --
25 you criticize Mr. Arlen's opinion that

Page 69

LARRY GERBRANDT

1
2  an exclusive licensing agreement necessarily
3  includes the implied obligation to maximize
4  subscribers.
5       You said, "That's a legal matter
6  beyond the scope of an industry expert's
7  purview and should instead be a legal
8  finding of the Court."
9       Do you actually have an opinion on
10 this issue in terms of whether an exclusive
11 licensing agreement has an implied
12 obligation to maximize subscribers?
13      A    My understanding is that the legal
14 standard is the one of a reasonable effort.
15      And all of my review of
16 distribution documents, I don't think I've
17 ever come across the term "maximize."
18      So I'm not sure that's even
19 a legally defensible term or would be
20 a legally -- I'm not sure it would be
21 a standard legal term.
22      But, Mr. Arlen has created a legal
23 opinion in effect that it is.
24      And I certainly don't -- my
25 experience doesn't encompass the terminology

18  (Pages 66 to 69)

**A-501**

LARRY GERBRANDT

1
2  that -- the use of the term "maximize."
3      Q    So you used the term "reasonable
4  effort" in the beginning your response.
5          Is that the standard that you would
6  apply to a distributor in an exclusive
7  licensing arrangement?
8      A    That is my understanding of what
9  the legal standard is.  But not being an
10 attorney, I do not -- at least in this case,
11 I have not been asked to interpret what that
12 means.  And I have no opinion.
13     Q    So you don't have an opinion on
14 whether this 1994 agreement as amended
15 includes an obligation, to use your words,
16 to use reasonable efforts to reach
17 subscribers?
18     A    No.  What I said is I don't have
19 an interpretation of what "reasonable
20 efforts" would mean.
21     Q    And my question is:  Did you have
22 an opinion as to whether this agreement
23 includes any obligation to use reasonable
24 efforts?
25     A    And when you refer to "this

LARRY GERBRANDT

1
2  agreement" ...
3      Q    I mean the '94 agreement as amended
4  between Spanski and TVP.
5      A    And am I holding in my hands, which
6  you labeled Exhibit 3, the business plan as
7  amended?
8      Q    You don't have the agreement right
9  in front of you.
10         But have you reviewed the
11 agreements between TVP and Spanski?
12     A    I believe I testified that I have
13 not.
14     Q    So you haven't reviewed the 1994
15 agreement, the 1999 addendum to that
16 agreement, the 2002 addendum to that
17 agreement and the 2009 settlement agreement?
18     A    I may have seen the 2009 settlement
19 agreement, though I don't a hundred percent
20 recall.
21     Q    But the '94 agreement with the two
22 addenda, you have not seen?
23     A    Not to my recollection.
24     Q    Okay.
25         So let's just talk generally about

LARRY GERBRANDT

1
2  an exclusive distribution agreement.
3          Would you say that a general
4  exclusive distribution agreement includes
5  an obligation on the part of the distributor
6  to use reasonable efforts to distribute
7  whatever is the subject of that agreement?
8      A    Well, I would first defer to
9  whatever the language of any particular
10 agreement actually says.
11     Q    And what if the agreement doesn't
12 say anything about that?
13     A    Well, I was about to say it's not
14 a legal opinion.  My understanding is that
15 in contract law, reasonable effort is the
16 legal standard in the absence of specific
17 language.
18     Q    In Paragraph 24 of your rebuttal
19 report, you talk about Mr. Arlen's opinion
20 on the unusually low royalty percentage, as
21 Mr. Arlen refers to it.
22         Is it your view that this is not
23 an unusually low royalty percentage?  And I
24 mean an 8 percent royalty percentage agreed
25 to by the parties here.

LARRY GERBRANDT

1
2      A    Well, I haven't undertaken a study
3  of what was common under these circumstances
4  18 years ago.
5          I can tell you that 18 years ago
6  there were a variety of distribution
7  methodologies -- there were not the variety
8  of distribution methodologies which exist
9  today, were not available back then.
10 Significantly different market.
11         It would have been very early on in
12 efforts to introduce non-English language
13 programming into the US and it would have --
14 these efforts would have been underway at
15 a time when the cable industry was
16 struggling with the after effects of the
17 Cable Act of 1992 and regulation of the
18 cable industry, especially rate regulation.
19         So it was a very difficult time in
20 the industry.
21         And this would have been considered
22 a pioneering effort by a first-time entrant
23 into the US market.
24         So given that circumstance of that
25 particular period of time, doesn't totally

19 (Pages 70 to 73)

Page 74

LARRY GERBRANDT

1 surprise me. It is low, but not -- but
2 given the circumstances at the time, I can
3 see how circumstances, strategic plans, you
4 know, various factors could have resulted in
5 a negotiation that came up with that number.
6    Q   Do you think that's a low number
7 today, given the circumstances today?
8    A   It's a much more competitive
9 environment. It's a very different market
10 today.
11    Q   Given what you know about these two
12 entities, if they were negotiating today,
13 what do you think would be a reasonable
14 royalty percentage?
15    A   I haven't spent any time
16 considering it. I don't have a conclusion.
17    Q   In Paragraph 40 of your report, you
18 talk about HBO and Showtime and the number
19 of subscribers they have.
20    And then you say about halfway
21 through that paragraph, "A 15.3 percent
22 penetration figure is very respectable,
23 given that SEI was operating in a highly
24 competitive multichannel environment with

Page 75

LARRY GERBRANDT

1 Dish Network which was offering four
2 channels of Polish programming and achieved
3 nearly the same penetration as SEI."
4    You recognize that Polish language
5 programming is significantly different than
6 programming on HBO and Showtime, do you not,
7 in terms of the market for it and other
8 factors?
9    A   What I'm recognizing is that it is
10 a premium service that would be sold for
11 an extra charge. And in that regard, that's
12 the definition of HBO and Showtime.
13    Q   But you're not drawing any other
14 parallels between HBO and Showtime and the
15 SEI-offered programming, are you?
16    A   Other than the fact that this is
17 an a la carte premium service that would be
18 sold into a household at a premium a la
19 carte price.
20    Q   Would it be more appropriate to
21 compare SEI programming to a foreign
22 language programming sold at a premium
23 price?
24    A   In that case it holds up very well,

Page 76

LARRY GERBRANDT

1 doesn't it.
2    Q   I'm not sure if I follow your
3 response.
4    I'm asking whether it would be more
5 appropriate to compare SEI-distributed
6 programming to another distribution of
7 foreign language programming?
8    A   Which I did. And it held up very
9 nice, very well.
10    I mean, you just read it.
11    Q   You are talking about HBO and
12 Showtime?
13    A   No.
14    Q   I'm talking about with respect to
15 HBO and Showtime.
16    A   No. You asked me whether it would
17 be more appropriate to compare it to, and I
18 said yes, and I did and you read it.
19    Q   Tell me where you are saying that.
20    A   "15.3 percent figure is actually
21 very respectable given that SEI was
22 operating in a highly competitive
23 multichannel environment with Dish Network
24 which was offering four channels of Polish

Page 77

LARRY GERBRANDT

1 programming and had achieved nearly the same
2 penetration as SEI."
3    So I did compare it to another
4 Polish language, foreign language
5 programming service. And it's equivalent.
6    Q   So you were talking about Dish
7 Network's offering of other Polish language
8 programming, including SEI's or not
9 including SEI's?
10    A   No not SEI. It's a competing
11 service.
12    Q   But SEI offered programming through
13 Dish Network at a certain point. Are you
14 aware of that?
15    A   Yes. But not at this particular
16 point in time.
17    Q   Which particular point in time?
18    A   The point in time that we're
19 talking about here.
20    Q   And what is that?
21    A   About right now. Or at the time
22 that Dish Network was -- at the time that
23 Dish Network reported its numbers, they were
24 two competing services.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

A-503

LARRY GERBRANDT

1
2     Q     When did Dish Network report its
3  numbers?
4     A     I believe in first quarter 2007.
5     Q     And during that time, Dish Network
6  reported its numbers to whom?
7     A     In the presentation that it made to
8  TVP.
9     Q     But Dish Network is not a similar
10  entity to the SEI, is it?  And by that I
11  mean Dish Network makes a whole range of
12  programming available, including Polish
13  programming, to subscribers.  And SEI
14  distributes programming to various
15  distributors such as Dish Network.
16        Do you see that distinction?
17     A     I realized they both do some of the
18  same things and they do different things.
19  Nonetheless, at the end of the day, both
20  sell foreign language programming into the
21  relevant market.
22     Q     Do you agree that SEI has reached
23  as many Polish viewers as it could reach in
24  the United States and Canada?
25     A     I have not been asked to consider

LARRY GERBRANDT

1
2  that and I have no opinion in that regard.
3     Q     Mr. Arlen's opinion is that SEI has
4  not done so.  Did you agree with that or
5  disagree with that?
6     A     Based on the way Mr. Arlen
7  described his methodology in his report,
8  given that he was applying percentages, or
9  at least checking his percentages against
10  individuals instead of households and not
11  taking into account TV household -- whether
12  or not making any adjustments for TV
13  ownership.
14        If I actually made the proper
15  corrections to his methodology, I came up
16  with almost exactly the same number that SEI
17  actually had achieved.
18        So if I actually did it the way he
19  said he was doing it and used the proper
20  relevant markets and made the proper
21  industry standard adjustments to it, I came
22  up with almost exactly the same figure.
23     Q     So making those adjustments, it is
24  your view, then, that SEI has reached as
25  many Polish viewers as it could?

LARRY GERBRANDT

1
2     A     No.
3        But if I make the proper
4  adjustments to Mr. Arlen's numbers, both
5  accounting for households and TV set
6  ownership, you actually come up with
7  the number that SEI actually had achieved.
8  As a matter of fact, they achieved more than
9  what that number would be.
10        I'm not rendering an opinion
11  whether that's the maximum number or the
12  number they should have achieved.  But if
13  Mr. Arlen purports that those percentages
14  are the right percentage penetration of the
15  actual relevant market, then he's proven
16  that they actually did achieve what he
17  thinks the right percentage penetration
18  should be.
19     Q     So am I right you have no opinion
20  on whether SEI has reached all the viewers
21  that it could have reached?
22     A     You are using nonstandard
23  industry -- "viewers" are related to
24  advertising and ratings.
25     Q     Call it what you want.  Call it

LARRY GERBRANDT

1
2  subscribers.
3     A     I have no idea whatsoever regarding
4  viewers.
5     Q     Call them subscribers.
6     A     These are terms of art in the
7  industry.  You are asking me to be
8  a professional and to carefully consider my
9  answers.
10        And that's just wrong.
11     Q     Has SEI reached as many subscribers
12  as it could have, in your view?
13     A     I have not been asked to consider
14  that issue and have not done any studies to
15  formally come to a conclusion in that
16  regard.
17     Q     Do you not have an opinion on that
18  question?
19     A     Whether they have reached all
20  subscribers they could possibly reach, no, I
21  do not.
22     Q     Do you agree or disagree with
23  Mr. Arlen's conclusion that there is
24  a generally increasing availability of
25  foreign language programming in the United

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 82

```
1              LARRY GERBRANDT
2    States?
3              And I'll say -- let's leave that to
4    the last five years.
5         A   I'd say that there has been -- that
6    the growth in most sectors, with the
7    exception of Hispanic language, has actually
8    been decelerating -- and there are a number
9    of reasons for that.  The most important of
10   which there would be some serious
11   limitations in terms of channel capacity as
12   well as issues regarding license fees.
13             Having said that, I think it's
14   notable that the purveyors of foreign
15   language programming here in the US are
16   actually beginning to look at launching
17   English language programming geared at those
18   ethnic segments.
19             So we've actually seen, if
20   anything, very recently a reversal of the
21   trend.
22             So the English language programming
23   geared to the same ethnic groups.
24        Q   Have you watched programming on
25   TV Polonia?
```

Page 83

```
1              LARRY GERBRANDT
2         A   I have not.
3         Q   Have you subscribed to SEI's
4    Website, tvpolonia.com?
5         A   I think I visited the Website.  I
6    did not subscribe.
7         Q   Why did you visit the Website?
8         A   Just curiosity.
9         Q   What did you think of the Website?
10        A   Nothing about the Website
11   particularly stood out.
12             Had all the usual requisite
13   characteristics of a Website, or at least
14   a home page.
15        Q   But you don't actually know the
16   functionality of the Website for subscribers
17   because you haven't subscribed, correct?
18        A   I haven't tested its functionality.
19        Q   You answered this earlier, but have
20   you read Mr. Reyes' report, Ivan Reyes?
21        A   No.
22        Q   Have you been asked to consider
23   Mr. Reyes' conclusions regarding SEI's
24   Website?
25        A   No.  Only Mr. Arlen's.
```

Page 84

```
1              LARRY GERBRANDT
2         Q   And what conclusions about the
3    Website by Mr. Arlen have you been asked to
4    consider?
5         A   Not of the Website, but of their
6    Web distribution strategy.
7         Q   And what is your view of what
8    Mr. Arlen has said?
9             And you talk about it in
10   Paragraph 45 through 47.
11             So you cited Mr. Arlen's statement,
12   "SEI's efforts to distribute TVP's
13   programming via the Internet have been
14   deficient."
15             And you conclude that paragraph by
16   saying "Such comparisons are grossly
17   misleading," referring to Mr. Arlen's
18   comparisons to YouTube, Hulu and NetFlix.
19             So what is your opinion regarding
20   SEI's efforts to distribute TVP program via
21   the Internet.
22             Are you saying they have not been
23   deficient, or something else?
24        A   Something else.
25        Q   What is your view of SEI's
```

Page 85

```
1              LARRY GERBRANDT
2    distribution efforts via the Internet?
3         A   My view is that Mr. Arlen used --
4    compared them improperly both in terms of
5    time frame and in his choice of comparables.
6             If you are going to compare them,
7    compare them to other like programming
8    efforts or like-scale programming efforts
9    that are designed to reach like-scale
10   audiences, not the top players in the
11   business, and certainly take into account
12   the time frames that you are actually
13   comparing them to.
14             I mean, he's comparing SEI's
15   efforts to companies during a period in
16   which some of these companies weren't even
17   operating or were in startup phases of their
18   own.  So it's just wrong.
19        Q   For today, 2012, do you disagree
20   with Mr. Arlen's view that SEI's efforts
21   have been deficient via the Internet?
22        A   But that's not his opinion.  His
23   opinion wasn't about 2012.
24             You are misrepresenting his opinion
25   now.
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

A-505

Page 86

LARRY GERBRANDT

1
2    Q    Yeah, so I'm asking you then today,
3  do you agree or disagree -- I'm asking you
4  just generally today, 2012, do you view
5  SEI's efforts to distribute via the Internet
6  to be deficient in any way?
7    A    I have not undertaken a study in
8  2012 of their efforts.
9    Q    So you are just criticizing
10 Mr. Arlen's comparisons to NetFlix, You
11 Tube, Amazon, et cetera.
12       Are you taking any issue with
13 Mr. Arlen's conclusions?
14   A    Well, if the basis of his inputs
15 are incorrect, his conclusions can't be
16 correct, or at least they are fundamentally
17 flawed.
18       He's comparing their efforts, SEI's
19 efforts to companies in a time frame to
20 companies that hadn't even launched yet.
21       How is that a relevant comparison?
22   Q    Mr. Arlen notes in his report that
23 "The Website has a confusing interface,
24 doesn't include intuitive navigation format.
25 There is no Spanish or Portuguese versions

Page 87

LARRY GERBRANDT

1
2  of the site, which would be useful for South
3  America."
4        Do you agree with those conclusions
5  or do you disagree with those conclusions?
6    A    Well, this is going to sound tacky,
7  but considering that Mr. Arlen confuses
8  households and individuals, I'm not sure
9  about his ability to recognize a confusing
10 Website.
11       The problem with those words,
12 "confusing," is that they're highly
13 subjective.
14       And to my knowledge, Mr. Arlen did
15 not provide any examples of what he found
16 confusing that could then be subject to
17 scrutiny.
18       I also have come to recognize that
19 a Website that is geared to reaching
20 non-English speaking individuals, and
21 especially individuals who may have grown up
22 in a different culture, are often confusing
23 to native English speakers, which I believe
24 Mr. Arlen is.
25       As I actually I grew up bilingual,

Page 88

LARRY GERBRANDT

1
2  I spoke Portuguese as a child, so I'm
3  probably more sensitive to the multi-culture
4  nature of Websites.
5        So the first thing I'd want to take
6  into account is:  Is my confusion partially
7  based on the fact that I am looking at this
8  as an American media analyst and not as
9  someone -- I'm not the target audience for
10 this Website.
11       In my line of work, I frequently
12 visit foreign Websites, media company
13 Websites, products, services as part of
14 research work that I do.
15       Frankly, I find most of them highly
16 confusing.  They are not designed for me.
17 They're designed for specific cultures.
18 Most of them are aware that different
19 cultures, mostly European cultures, have
20 different kinds of graphics, colors, you
21 know, choices, language that is used,
22 different conventions.  Different symbols
23 mean different things.
24       So all of these I think need to be
25 taken into account when you are looking at

Page 89

LARRY GERBRANDT

1
2  a Website that is not designed for the
3  mainstream American public.
4        I didn't see Mr. Arlen taking any
5  of those issues into account.
6    Q    Do you think the Website should
7  have a Spanish or Portuguese version if it's
8  aimed at subscribers in South America and
9  including Brazil?
10   A    I would have to go back and look at
11 the Website.  But my recollection is that
12 a fair amount of the Website was actually in
13 Polish.
14       If you are trying to reach
15 a Polish-speaking -- primarily
16 Polish-speaking population in South America,
17 the most important language on the Website
18 might be Polish rather than an indigenous
19 language.
20   Q    So, you don't think it would be
21 helpful to have a Spanish or Portuguese
22 version, just like there's a Polish and
23 English version?
24   A    It would all depend on what my
25 expectations of -- in those markets might be

23 (Pages 86 to 89)

Page 90

```
1              LARRY GERBRANDT
2    as to whether the expense of creating those
3    versions would be economically useful.
4         The fact that you already can reach
5    the most relevant market with the Polish
6    version of the Website, I think adding any
7    other language to it would probably be
8    a business decision in terms of incremental
9    return on investment.  I would consider
10   that.
11        I don't have any data on which to
12   draw that conclusion.
13   Q    Do you agree or disagree that
14   the traditional soap opera format in terms
15   of shows like Days of Our Lives is in
16   decline?
17   A    I would say in terms of daytime
18   soaps, it has been in decline but recently
19   has stabilized.  There's a certain number
20   that are still around and the expectations
21   are that they will continue to be around.
22        Many of those shows have moved onto
23   dedicated cable channels, so they haven't
24   gone away.  They're just being shown at
25   other venues.
```

Page 91

```
1              LARRY GERBRANDT
2         And soap operas are not just
3    daytime soap operas.  But until recently
4    daytime soaps, many daytime soaps were
5    canceled and replaced by less expensive talk
6    shows.
7    Q    Do you consider shows like
8    Desperate Housewives, Revenge, Dallas to be
9    soap operas?
10   A    I think the usual term are "prime
11   time soaps."
12   Q    Are they soap operas or not?  I'm
13   not sure if I understood what you said.
14   A    They could certainly be considered
15   soap operas.
16        They are in very much the very same
17   kind of vein or genre.  The only difference
18   is they're weekly as opposed to daily.
19   Q    In Paragraph 53 and 54 of your
20   report, actually 52 as well, you talk
21   about -- and we'll start with 52.
22        "The success that HBO had with Sex
23   and the City and Sopranos and then a stalled
24   subscriber growth when those series went off
25   the air."
```

Page 92

```
1              LARRY GERBRANDT
2         And then in 53 and 54 you referred
3    to Homeland and L Word, Weeds,
4    Californication as being credited to
5    Showtime executives as helping to grow that
6    network's subscriber base.
7         Do you have any data showing that
8    subscribers would leave a channel or not
9    subscribe to a channel because of
10   a particular program?
11        These to me seem anecdotal in terms
12   of you have the subscriber numbers and you
13   talk about the shows that are being played
14   there.  But do you have any particular data
15   showing subscribers subscribing, for
16   example, to HBO or Showtime because of
17   a particular show?
18   A    I'm sorry I'm laughing, but when
19   executives of a network directly reference
20   the absence of this programming, I would
21   hardly call that anecdotal.  They are
22   percipients.  They aren't outside industry
23   observers making the connection.  These are
24   the guys in charge.  These are the guys who
25   are looking at the data every single day
```

Page 93

```
1              LARRY GERBRANDT
2    obsessively.  I know these guys personally.
3    Richard Peppler is somebody I've known much
4    of my career.
5         These guys know.  I mean, they do
6    studies of exactly what the cause and effect
7    of their every move is, so when they state
8    publicly the cause and effect, it's not
9    anecdotal.
10        Furthermore -- furthermore, over my
11   career I was the official industry keeper of
12   the data of subscribers to the various paid
13   services that was run in the Kagan paid TV
14   newsletter.  It was the only source of
15   individual subscriber numbers for the
16   individual services.  They were provided
17   based on my relationship with executives at
18   each of the networks.
19        I spent a lot of time looking at
20   the cause and effect.
21        During -- I was at Kagan in
22   collecting these numbers during the time
23   that Sex and the City and Sopranos into
24   prominence.  And I spent a lot of time
25   looking at that.  That would be -- that's
```

24  (Pages 90 to 93)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 94

LARRY GERBRANDT

1
2 anecdotal. I'm looking at the data from the
3 outside.
4          They're looking at it from the
5 inside.
6          But what we could see was that at
7 the very least, these signature programs
8 caused a much higher level of retention. It
9 didn't necessarily grow the subscriber base
10 but it retained the subscriber base during
11 a very critical phase of the industry's
12 evolution. That, we could most definitively
13 isolate.
14          And I was actually the person in
15 the industry who had the data to be able to
16 do that analysis. And everybody else
17 actually cited my data that I personally
18 collected.
19     Q    You said that signature programs
20 caused a higher level of retention.
21          Is it your view then that the
22 removal of these signature programs caused
23 cancellations as well?
24     A    Well, I was no longer at Kagan
25 collecting the data during the period that

Page 95

LARRY GERBRANDT

1
2 they're discussing right here. So it's
3 their observation that in that period after
4 no new episodes of Sopranos and Sex and the
5 City were on, by their own failure to come
6 up with equivalent hits, that they saw
7 a decline.
8     Q    Where do you see that they saw
9 a decline?
10     A    The leveling off of HBO's growth.
11     Q    Leveling off of growth, does that
12 refer to cancellations, too, or is that just
13 a diminished growth rate, or something else?
14     A    They're talking about absolute
15 numbers.
16     Q    So they are not really saying no,
17 people have canceled because shows have been
18 removed. They are just saying they have
19 a less of a growth rate?
20     A    At a time when the competition is
21 rapidly gaining subscribers.
22     Q    So they are not saying, though,
23 that we've lost subscribers because -- I'm
24 sorry, we've experienced cancellations of
25 subscriptions because we've removed or

Page 96

LARRY GERBRANDT

1
2 stopped one of these programs.
3     A    No, it was both of them.
4     Q    "Both of them" meaning what?
5     A    Sopranos and Sex and the City.
6     Q    Yeah, I'm sorry. I referred to
7 both of these programs.
8     A    No, you referred to one of them.
9     Q    My question is whether this article
10 says anything about these executives'
11 reflections on subscriber cancellations
12 because of the removal of these programs or
13 the discontinuation of their broadcast.
14     A    No. What they specifically
15 referenced was the leveling off of growth.
16          However, I can tell you that from
17 the numbers I saw, HBO actually hit --
18 actually piqued out in the 30, 31 million
19 range and has come back to the 28 to
20 29 million range.
21          So they're putting the best face on
22 it, but I know -- I tracked the actual
23 trajectory of numbers.
24          So the time frame they're talking
25 about here, which is January 12, 2012, you

Page 97

LARRY GERBRANDT

1
2 know, the network has come back to bounce
3 around in this 28 to $29 million range.
4 Growth has definitely leveled off, but it is
5 down from where it was at the peak.
6     Q    But again, you don't have any data,
7 and including from this article here, that
8 is saying that subscribers are canceling
9 because of a particular show being removed?
10     A    The leveling off of HBO's growth,
11 as executives conceded, can be traced in
12 part to a fallow period in its series
13 development about four years ago.
14          MR. WENGER: Let's take a break
15 for lunch here.
16          (A luncheon recess was
17 taken at 12:29 p.m. through
18 1:18 p.m.)
19     A F T E R N O O N   S E S S I O N
20          LARRY GERBRANDT
21 resumed, having been previously
22 duly sworn, was examined
23 and testified further as follows:
24 CONTINUED EXAMINATION BY MR. WENGER:
25     Q    You understand you are still under

25 (Pages 94 to 97)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 98

LARRY GERBRANDT

1
2  oath, Mr. Gerbrandt?
3      A    Yes.
4      Q    Let's talk about SEI's damages
5  claims in this case.
6          And we'll start with the Polvision
7  claim.
8          What do you understand SEI to be
9  claiming as damages related to the Polvision
10  claim?
11     A    Actually, I don't really have any
12  opinion in that regard.  It was not
13  something I was asked to look at.
14         I'm only really vaguely aware of
15  the details.
16     Q    So take a look at your report,
17  which is marked as Exhibit 1, and
18  Paragraph 38.
19         I'm sorry not that report,
20  Mr. Gerbrandt.  Mr. Schulman's report.
21         Paragraph 38.  And I refer you to
22  this footnote here.  Footnote 28 says, "We
23  consulted with Larry Gerbrandt, our industry
24  expert, to help in our analysis and opinions
25  as to this section of our report."

Page 99

LARRY GERBRANDT

1
2          Are you familiar with the analysis
3  and opinions offered in this section of the
4  report?
5      A    I am.
6      Q    So this section of the report
7  concerns the Polvision claim.
8          And the heading here is "Damages
9  Scenario 1:  The values of the licenses from
10  TVP to Polvision utilizing an industry
11  standard market model, less the royalty SEI
12  would pay TVP had SEI entered into such
13  licenses."
14         Do you understand this to be
15  the first damages scenario put forth by
16  Mr. Schulman relating to the Polvision
17  claim?
18     A    I see that's how it's identified
19  here.
20     Q    Are you familiar with the model
21  Mr. Schulman uses to support this damages
22  scenario?
23     A    I'm familiar with this section.
24  Actually, it was never presented to me as
25  Damage Scenario 1.  It was put together

Page 100

LARRY GERBRANDT

1
2  after my input.
3      Q    Did you understand your
4  consultations to be in connection with
5  a damages scenario that Mr. Schulman was
6  developing?
7      A    I did understand that was the
8  ultimate end goal of what he was trying to
9  accomplish as.
10     Q    Did you discuss with Mr. Schulman
11  what damages theories might be used in
12  connection with the Polvision claim?
13     A    Not really.
14         He had pretty much determined what
15  his approach was going to be.  And I was
16  primarily being responsive to various
17  questions that they had regarding their
18  industry standards and practices or sourcing
19  particular data or benchmarks.
20         So he knew where he wanted to go.
21  He just needed additional input or
22  confirmation.
23     Q    What do you understand SEI to be
24  claiming as damages in Damages Scenario 1
25  here?

Page 101

LARRY GERBRANDT

1
2      A    I'm not going to interpret what
3  SEI, whatever it says.
4          It says whatever it says.  I don't
5  have a separate understanding of what his
6  intent was.
7      Q    I'll represent to you that Damage
8  Scenario 1, Damage Scenario 2 and Damage
9  Scenario 3 are offering three alternatives
10  for evaluating damages under a theory that
11  SEI should be entitled to the value of
12  licenses that TVP licensed to Polvision.
13     A    Okay.
14     Q    And an alternative potential
15  damages theory for the Polvision claim could
16  have been a claim based on subscribers lost
17  by SEI as a result of TVP's license to
18  Polvision.
19         Do you understand that?
20     A    Well, I understand the words, but
21  I'll accept whatever it is you are -- I
22  mean, I understand the concept, but that's
23  as far as it goes.
24     Q    Do you have any idea why
25  Mr. Schulman has put forth a damages model

26  (Pages 98 to 101)

LARRY GERBRANDT

1
2  based on the value of the licenses from TVP
3  to Polvision as opposed to a damages model
4  based on a loss of subscribers as a result
5  of the Polvision license?
6      A    He and I never discussed that kind
7  of valuation philosophy.
8      Q    So Mr. Schulman basically came to
9  you and said here's my damages theory, it's
10 based on the value of the licenses TVP
11 licensed to Polvision and I'd like your
12 input with respect to certain matters.
13     Is that generally right?
14     A    I don't know if that was
15 the precise sequence.  I think he was
16 evolving his calculations as he was talking
17 to me.
18     But we didn't really discuss the
19 model itself.  Just various inputs he had
20 and there were -- and the applicability of
21 certain data he had.
22     Q    So if I understand you correctly,
23 you never discussed with Mr. Schulman
24 the possibility of him offering a damages
25 theory based on lost subscribers?

LARRY GERBRANDT

1
2      A    That was not my role in this
3  portion of the assignment.
4      Q    But did you discuss that issue with
5  him?
6      A    Not that I recall.
7      Q    Do you offer an opinion in
8  connection with your support of this report
9  that TVP was not permitted to syndicate
10 individual programming that was on
11 TV Polonia to other distributors, in this
12 case Polvision?
13     A    I have not interpreted the
14 contract.
15     Q    Do you have a view of whether TVP
16 was allowed to do that based on your
17 understanding of these contracts?
18     A    Not of these contracts.  I could
19 tell you most exclusive contracts tend to be
20 exclusive; in other words, rights are
21 granted to a particular territory, usually
22 a particular technology.  In many cases it's
23 blanket technologies and there's almost
24 always a time period.
25     Q    But you told me earlier you haven't

LARRY GERBRANDT

1
2  read these agreements, right, so you have
3  not seen them?
4      A    Well, if I've seen them, I haven't
5  done so in a way, you know, to come to these
6  conclusions.
7      Q    So just to be clear, you're not
8  offering an opinion based on agreements
9  whether TVP was permitted or not permitted
10 to syndicate individual programming to
11 others?
12     A    Not at present.  I haven't been
13 asked to come to a conclusion.
14     Q    What is your understanding of
15 the -- if it's an industry term, and tell me
16 if not, not.
17     What is your understanding of the
18 term "one-off use," the rights to one-off
19 use of programming.
20     Meaning if I agree to license to
21 you to one-off use to certain programming,
22 what rights do you have?
23     A    Highly contextual.
24     Q    What is your general understanding,
25 if you have one, of what the term means

LARRY GERBRANDT

1
2  without getting into specific --
3      A    I understand -- I understand what
4  one-off means.  It's basically separating
5  out something from a group or it's
6  identifying this is a one time only or one
7  of a kind.
8      But what it actually means is
9  highly contextual.
10     Q    Are you aware of any restriction
11 that was placed on TVP based on the
12 agreements -- and again having not read them
13 maybe this is not an appropriate question --
14 but are you aware of any restrictions placed
15 on TVP based on the agreements from
16 licensing content that had already appeared
17 on TV Polonia to others?
18     A    I'm aware that's one of the central
19 issues in the case.  I haven't been asked to
20 opine, nor have I examined the issue.
21     Q    So you're not offering an opinion
22 on that?
23     A    I am not.
24     Q    You told me earlier, and correct me
25 if I'm wrong, that you have reviewed the

27  (Pages 102 to 105)

Page 106

LARRY GERBRANDT

1  August 2009 settlement agreement?
2
3     A    I think I've seen it.  "Review"
4  would be overly generous.
5     Q    Fine.  Let's take a look at it.
6        MR. WENGER:  Let's mark the
7     August 11, 2009 settlement agreement
8     between SEI and TVP as Gerbrandt
9     Exhibit 4.
10       (Gerbrandt Exhibit 4,
11    Settlement Agreement dated
12    August 11, 2009, was marked for
13    Identification.)
14  BY MR. WENGER:
15    Q    Do you recognize that document?
16    A    I actually can't sit here and say I
17  have reviewed this or not.  It looks similar
18  to some of the other things I've looked at,
19  but I didn't study it in enough detail to
20  come to any conclusions about it since I
21  wasn't being asked to opine on it or draw
22  anything from it.
23    Q    Let's take a look at the second
24  page under Heading Number 2 and Clause
25  Number E.

Page 107

LARRY GERBRANDT

1
2        Take your time to read that clause
3  and tell me what it is preventing TVP from
4  doing or what it prevents TVP from doing.
5     A    It's always dangerous to take one
6  paragraph of a legal contract out of
7  context, but I'll stipulate that that's what
8  I'm doing.
9        And I'm not an attorney and I have
10  no prior context for this other than this
11  one paragraph.
12       With those stipulations, what I
13  would interpret this and say is that TVP
14  won't allow, won't encourage, it would do
15  whatever it can to prevent the distribution
16  of other channels in North and South America
17  that contain any of the programming that is,
18  was or will be contained in either
19  TV Polonia or TVP Info.
20       And that's what it says.
21    Q    In your view, is this clause
22  focused on the distribution of other
23  channels or individual programming, or is
24  that not a fair choice?
25       MR. BARNETT:  Objection.  Asks

Page 108

LARRY GERBRANDT

1
2  for a legal conclusion.
3     A    Well, actually when you realize
4  what channels contain, the really relevant
5  part is "same programming."
6        So you know, most programming is
7  delivered in a channel -- on channel of some
8  form.  Channel being what the viewer sees.
9        But the relevant part here is what
10  they're actually saying can't be allowed is
11  the programming that is contained on
12  TV Polonia or TVP Info.  Cannot appear
13  anywhere else.
14    Q    Back to what we were talking about
15  a few minutes ago.  I was looking at
16  Mr. Schulman's deposition and the question
17  was: "Did you ever discuss with
18  Mr. Gerbrandt the alternative or possible
19  alternative damages theories?"
20       Response: "Yes, we talked but he
21  didn't contribute any alternatives.  But we
22  did talk about how we could look at this
23  thing."
24       Question: "Did you consider any
25  other damages theories other than the ones

Page 109

LARRY GERBRANDT

1
2  you've offered?"
3        Answer: "Well, we did consider
4  damages theories based on loss revenues,
5  lost subscribers actually related to the
6  first claim on Polvision."
7        Is your recollection refreshed
8  about discussing alternative damages
9  theories with Mr. Schulman?
10    A    You actually asked if he considered
11  them, not whether he discussed them with me.
12       I think he answered that he had
13  considered them.
14       I can offer, for instance, that one
15  of the very first issues that we discussed
16  was if he was -- if I was aware of a source
17  for comparable royalty rates.
18       And they had come up with some
19  royalty rates that -- I mean, there are
20  databases out there.  One's called Royalty
21  Source.  But none of the things that they
22  were coming up with when we discussed them
23  were comparable or were royalties that would
24  have been applied to programming; nor was I
25  aware of a source or a database that had

28  (Pages 106 to 109)

Page 110

LARRY GERBRANDT

1
2  a compilation of royalties.
3      Q   I'm really focused on damages
4  theories.
5          Maybe that's what you are talking
6  about.
7      A   Well, that was actually where our
8  discussions began.
9          So they quickly didn't go anywhere,
10 but that's one of the first things we
11 discussed.
12     Q   Why did they quickly not go
13 anywhere?
14     A   Because whatever royalties they
15 could find weren't comparable, in my
16 opinion, had no relevance to programming.
17 They may have been entertainment related but
18 they weren't related to programming.
19     Q   I think we spoke past each other.
20         My question is on alternative
21 damages theories, and by that I mean
22 a theory based on lost subscribers caused by
23 the Polvision license versus the theory put
24 forth here, damages relating to TVP's -- the
25 value received by TVP from Polvision.

Page 111

LARRY GERBRANDT

1
2          Those are two alternative damages
3  theories.
4          Did you understand that?
5      A   I did.  And I don't recall
6  discussing the theory in any detail with
7  Mr. Schulman.
8      Q   Do you have a view, sitting here
9  today, whether SEI would have a valid claim
10 relating to the Polvision licenses for
11 subscribers lost by SEI as a result of the
12 Polvision licenses?
13     A   I did not have an opinion nor -- I
14 haven't formulated any and I do not have
15 an opinion.
16     Q   During Mr. Schulman's deposition he
17 was asked -- and I'll quote.
18         Question:  "You said at the
19 beginning of your response" -- referring to
20 the previous response -- "that it is a very
21 difficult thing to do.  And by that, do you
22 mean attributing a reason for a subscriber
23 cancellation to any one factor."
24         Response:  "Yes, it's easy, it's
25 not an easy exercise."

Page 112

LARRY GERBRANDT

1
2          Question:  "Is that because there
3  are many reasons that you say subscribers
4  cancel?"
5          Response:  "Yes."
6          It is your view that it's difficult
7  to attribute or to determine one particular
8  reason for any subscriber cancellation
9  without actually asking that subscriber?
10     A   Again, I think you have to look at
11 that answer in context.
12         It is difficult for someone outside
13 the transaction to know.
14         It is in my experience very -- in
15 most cases either the program provider or
16 especially the program distributor -- I'm
17 talking about the MVPD -- will know why
18 someone is canceling.
19     Q   When you say "MVPD," I just want to
20 be clear, what are you referring to?
21     A   I thought we had defined that very
22 early on, but it's the term the FCC has
23 chosen to describe -- it stands for
24 multichannel video program distributors.
25 And applies in a blanket or umbrella fashion

Page 113

LARRY GERBRANDT

1
2  to wireline cable operators, satellite
3  distributors, telco, video -- or telcos that
4  are distributing multichannel video.  It can
5  also apply to SMA TV, MMVS, also known as
6  wireless cable, and a variety of other
7  multichannel distribution systems.
8      Q   Is SEI an MVPD?
9      A   I don't think that they would --
10 since they're distributing a single channel,
11 not usually.  They would be considered
12 a channel, a programmer, program
13 distributor.  They do have in some cases
14 primary relationships with the customer,
15 especially through the Internet.
16         But they don't quite rise to the
17 level of an MVPD.
18     Q   You just said earlier that the MVPD
19 would know why a subscriber cancels, so in
20 this case is it your view that, for example,
21 GlobeCast would know why a subscriber
22 canceled?
23     A   They might if they chose to try to
24 collect that information.
25         So it depends on what instructions

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 114

LARRY GERBRANDT

1
2  are given to the CSR, customer service
3  representatives, who are generally tasked
4  with taking either connect or disconnect
5  orders.
6     Q    But without information from the
7  MVPDs, would you be comfortable offering
8  your view on why subscribers cancel
9  a subscription?
10     A    It's possible that in a particular
11  situation, given access to suitable amount
12  of information, I could do some forensic
13  analysis that would allow me to draw certain
14  conclusions.
15     Q    But you haven't done any of that
16  here, have you?
17     A    I have not.
18     Q    Do you understand that
19  Mr. Schulman's damages theory presupposes
20  that SEI has a legal right to license out
21  individual programming to Polvision in order
22  to realize the value that TVP had realized
23  on licensing a programming to Polvision?
24     A    In order -- and I'm just reacting
25  theoretically without really looking at

Page 115

LARRY GERBRANDT

1
2  this.
3        Such a model sort of -- it doesn't
4  presume the right, it presumes the action.
5  In other words, you have to isolate the
6  individual programs that were distributed.
7  It doesn't have to assume that they have
8  the contractual right to do so, but it can
9  postulate the action and the consequences of
10  that action.
11        I mean, I've had to do those kinds
12  of things in damage calculations before.  It
13  doesn't require a legal conclusion.  It just
14  has to assume a set of facts.
15     Q    And again theoretically, if this
16  contract did not give SEI the right
17  to license individual programming, do you
18  think that that would still be a proper
19  damages model?
20     A    If he was trying to analyze the
21  actions of another party that had done that,
22  I don't know how else you would do it unless
23  you took those specific programs out of
24  a channel lineup and licensed them
25  individually.

Page 116

LARRY GERBRANDT

1
2        I mean, you don't have to have the
3  legal right to do it to postulate
4  a hypothetical model to understand what was
5  done.
6     Q    But isn't the valuation based on
7  the notion that Polvision -- or SEI could
8  have licensed these programs directly to
9  Polvision, would have realized a certain
10  value and therefore TVP should pay that
11  value -- whatever it is, there's a few
12  scenarios -- to SEI?
13     A    You know, I haven't looked at this
14  closely enough to come to any opinion on
15  that.  It's beyond the conceptual nature.
16  Now you are starting to get into the details
17  of who had what right, and I don't feel
18  comfortable going there.
19     Q    So are you saying that if this
20  matter goes to trial, you will not offer
21  an opinion as to the rights of the parties
22  relating to the Polvision damages claim?
23     A    No, that's not what I'm saying at
24  all.
25     Q    But you're not offering an opinion

Page 117

LARRY GERBRANDT

1
2  today; is that what you are saying?
3     A    Correct.  I'd be happy to respond
4  to whatever question is posed and if it's
5  within my knowledge or if it's something I
6  have studied between now and trial I will be
7  happy to be responsive.  But it's not
8  an opinion I'm prepared to give today.
9     Q    Do you have any opinion, sitting
10  here today, on whether it is appropriate for
11  SEI to put forth a damages scenario based on
12  the value of licenses TVP earned from -- the
13  value of the licenses that TVP licensed to
14  Polvision, even though SEI had never
15  licensed individual episodes to another
16  entity?
17     A    Just from -- just reacting to that
18  from a very conceptual standpoint, the fact
19  that SEI hasn't done it doesn't mean it
20  couldn't be done.  And if it could be done,
21  you could analyze it.
22     Q    Well, my question is simply:
23        Does the fact that SEI has never
24  done this in the past, in the past 19 years
25  or 18 years since it's been distributing the

30  (Pages 114 to 117)

Page 118

LARRY GERBRANDT

1  programming, does the fact that SEI had
2  never done so, is that relevant to
3  determining whether SEI could put forth
4  a damages claim based on the licensing of
5  individual episodes?
6      A    Based on what I've just been able
7  to interpret from this, not at all.  If
8  someone else, I guess in this case TVP,
9  licensed the same programming that it was
10 giving SEI, the fact that -- the first issue
11 is whether TVP had the right to do that.
12 And I'm not expressing any opinion in that
13 regard.
14     The fact that SEI chose to
15 distribute the programming in, let's say,
16 a linear fashion, if it had the right to
17 distribute it on a one-off basis, but chose
18 not to do so, is of no consequence to your
19 question because it's their choice how to
20 distribute the programming in the way they
21 best see fit.
22     But the fact that they chose not
23 to, but had the right to do so, you know,
24 that -- I'll give you a common example.

Page 119

LARRY GERBRANDT

1      Very often in the industry
2  a station or a network will license six runs
3  of a TV series.  They may only play three of
4  them.  Does that mean -- what does that mean
5  to the other three?  Does it mean they have
6  no value?  Does that mean somebody else can
7  go in and sell those three?  No.  It means
8  they made a decision not to air the fourth,
9  fifth and sixth run that they had contracted
10 for.
11     There's -- you can't draw any
12 inference from that.
13     Q    Do you understand that the damages
14 scenario is being offered related to the
15 Polvision claim as damages for lost profits?
16     A    I realize that lost profits is
17 a particular term or art and I'd want to do
18 a little more research before I responded to
19 that.
20     We're now getting into legal
21 definition territory and I've done enough of
22 these cases to know where to tread softly
23 and hold my tongue.
24     Q    Let's take a look at that

Page 120

LARRY GERBRANDT

1  settlement agreement again, Exhibit 4.
2      Let's look at Clause G.
3      MR. BARNETT:  This is under
4  Section 2?
5      MR. WENGER:  Yeah.
6      Q    Have you had a chance to read that?
7      A    I have.
8      Q    What do you understand the
9  royalties that are to be paid by SEI to TVP
10 as being calculated from?
11     A    I don't think G can be understood
12 and properly interpreted -- and this is just
13 me speaking as an industry analyst with
14 a fair amount of experience in this --
15 without considering Paragraph A.
16     Q    Can you just please respond to my
17 question.
18     A    I can't.  I'm trying to.  I'm
19 really trying to be responsive.
20     Q    Well, you said you need to consider
21 Paragraph A, so if you need to consider,
22 please consider that and you can consider
23 whatever else you'd like.
24     I'm just asking you based on your

Page 121

LARRY GERBRANDT

1  understanding here and your view of this
2  document, what do you understand the
3  royalties that are to be paid by SEI to TVP
4  as being calculated or derived from?
5      A    Well, the calculation specifically
6  says "8 percent of subscriber and
7  advertising fees that SEI actually receives
8  related to SEI's exploitation of TVP's
9  programming in the territory."
10     And you would then look to other
11 paragraphs here that would define what those
12 rights and what those terms are.
13     So that's the danger of just
14 looking at these paragraphs in isolation is
15 that they refer to things and rights and
16 territories that are defined in other
17 paragraphs.
18     Q    Did you see anything in Clause G or
19 anywhere else in this agreement that relates
20 to or discusses royalties being calculated
21 from licensing fees?
22     A    I'm getting there.  Just give me
23 a second here.
24     Q    Sure.  Take your time.

31  (Pages 118 to 121)

Page 122

LARRY GERBRANDT

1  
2    A    It actually does envision  
3  a situation in which it wouldn't be by  
4  subscription or advertising.  
5        And in any event, the paragraph  
6  that trumps all of it is A.  
7        So for instance, for Video on  
8  Demand, Video on Demand is not subscription,  
9  it can be but not always. And it's not  
10  advertising, at least not always. It is  
11  often sold on a per program basis.  
12        So that's neither a subscription  
13  nor advertising, but it does give the right  
14  to SEI to distribute over VOD even though it  
15  doesn't specifically call out what  
16  that economic model might be.  
17    Q    Do you know whether SEI has ever  
18  earned any revenue from VOD purchases of its  
19  programming other than through its Website?  
20    A    You've answered your question, so  
21  obviously they have.  
22    Q    The Website, it's a subscriber  
23  based --  
24    A    I thought you said "other than on  
25  its Website."

Page 123

LARRY GERBRANDT

1  
2    Q    I wouldn't consider the Website  
3  a per-program purchase because it is  
4  a subscriber-based model, a monthly  
5  subscriber-based model.  
6        I'm talking about the television  
7  and satellite distribution model.  
8        Do you know whether SEI ever  
9  received any revenue relating to purchases  
10  of individual programs broadcast through  
11  television or satellite?  
12    A    I don't know. But they do have the  
13  exclusive right to that, just as they have  
14  the exclusive right to be the distributor of  
15  the programming content of the two channels,  
16  the exclusive. And the only exceptions are  
17  clearly distinguished here.  
18    Q    So is it your view that Clause G  
19  refers to 8 percent of subscriber and  
20  advertising fees that SEI receives, but  
21  those are not the exclusive means by which  
22  SEI could earn revenue. So that SEI could  
23  earn relative from licensing, from VOD, from  
24  other sources, but Clause G just happens to  
25  refer to subscriber and advertising fees?

Page 124

LARRY GERBRANDT

1  
2    A    Well, I think it's set -- I think  
3  again you have to look at G in context of I.  
4        I, for instance, uses the same  
5  royalty of 8 percent but applies it to  
6  a different form -- actually applies it to  
7  a licensing scenario. Clearly says  
8  "licensed."  
9        Sir, let me finish. I know you may  
10  not like that, but let me finish.  
11        It clearly says "licensed or  
12  distributed" and -- but it now in  
13  conjunction with another medium, radio, and  
14  it spells out how the revenues from those  
15  packages should be apportioned but provides  
16  a model by which the 8 percent royalty is  
17  still applied to that licensing revenue.  
18        So in this particular case, they  
19  clearly envisioned a specific scenario and  
20  called out how the royalty -- it's still the  
21  same royalty, but what portion of the  
22  licensing revenue would go -- what portion  
23  of the licensing revenue to which royalty  
24  would be applied.  
25    Q    Clause I, is that referring to the

Page 125

LARRY GERBRANDT

1  
2  channel as a whole or -- the channels as  
3  a whole or individual programming?  
4    A    They're relevant because A trumps  
5  that. Totally relevant.  
6    Q    Just so wrap this up.  
7        Clause G does not change your view  
8  as to whether SEI had the right to license  
9  individual programming to others?  
10    A    Actually, nothing here would  
11  specifically prohibit it from doing so. I  
12  mean, it's not -- there are certain things  
13  that it's told it can not do or does not  
14  have the right to do.  
15        But again, A says the exclusive  
16  distributor of the programming content of  
17  those two channels and it actually envisions  
18  individual programs being made available on  
19  demand.  
20        So this is really the first time  
21  I've taken this thing apart. I'm doing it  
22  the same way I would -- I do a lot of  
23  valuation work in which I have to try to  
24  understand what rights were given.  
25        And so I'm opining from that

32  (Pages 122 to 125)

Page 126

1          LARRY GERBRANDT
2    perspective.
3          Q    If you were doing a valuation of
4    SEI, would you include in that valuation as
5    part of SEI's assets the right to syndicate
6    individual programming to other networks
7    such as Polvision?
8          A    It doesn't specifically call that
9    right out, but in the business, exclusive
10   distributor of not the channels -- this is
11   in A -- it doesn't say exclusively
12   distributor of the channels.  It's the
13   exclusive distributor of the programming
14   content of those channels.
15          It further acknowledges that not
16   all of the content on those channels
17   necessarily is owned and controlled by TVP
18   and, therefore, they don't have the right to
19   that programming.
20          So it's actually referring to
21   having the exclusive right to specific
22   programming controlled by TVP.
23          That's how I would interpret that.
24          And it can be distributed on
25   a one-off basis, just as Video on Demand.

Page 127

1          LARRY GERBRANDT
2          On the other hand, it could be
3    bundled with other things.
4          A is as raw as any language I've
5    seen in a contract and excludes only some
6    very specific things.
7          Q    So is your response that you would
8    include this right -- withdrawn.
9          Is it your response that you would
10   include a right to license individual
11   programming to others in a valuation you
12   would form of SEI?
13          A    Yes.  Especially because of E.
14   Because it's also specifically preventing
15   TVP from distributing or permitting to
16   distribute any specific program which would
17   imply syndication.  That's how --
18          So you really have to take a look
19   at both sides.  Again, I'm not an attorney.
20   I'm an analyst who deals with these issues
21   on a practical matter on a regular basis.
22          So taken in toto, it gives -- SEI
23   has a pretty broad-blanket license to do
24   pretty much whatever it wants with the
25   programming with specific cull-outs for what

Page 128

1          LARRY GERBRANDT
2    it doesn't have.
3          But as with most of these things,
4    you can't envision every single potential
5    use because it changes.  So that's why you
6    give them blanket coverage and you exclude
7    what you know at the time you can't do or
8    don't want them to do but you give them the
9    right to do everything else.
10         Q    And the fact that SEI has never in
11   the last 18 years or so licensed individual
12   programming to other channels would not
13   change your view?  You would still include
14   this right in a valuation of SEI?
15         A    No different than the fact that
16   they've chosen not to distribute by Video on
17   Demand.  They have the right to do so.
18   They've chosen not to.
19         So you know, the fact that they
20   haven't used the right doesn't preclude the
21   right.  And nowhere in here do I see
22   language creating that kind of exception
23   either.
24         Q    So is your answer yes, that you
25   would still include this right in

Page 129

1          LARRY GERBRANDT
2    a valuation of SEI, the right to syndicate
3    individual programming even though SEI had
4    never done so for the 18 years that this
5    agreement was in effect?
6          A    I don't see any language here that
7    would eliminate that or other forms of
8    distribution that only recently have become
9    possible.
10         Q    Would you include that right in
11   a valuation of SEI, yes or no?
12         MR. BARNETT:  Objection.  Asked
13   and answered.
14         A    If it were appropriate, yes.
15         Q    What would make it appropriate or
16   inappropriate?
17         A    Contextually, if there is a value
18   to me having exclusive right to air
19   something on a channel that I control
20   because I have the ability to control that,
21   choose to take the whole channel, I could
22   rearrange it.  I've got the right to the
23   content.
24         If I am going to license that to
25   somebody else, I have to take a look at what

33  (Pages 126 to 129)

A-516

---

LARRY GERBRANDT

1
2  that does to my existing channel and see if
3  there is an economic, if there's a net/net
4  economic benefit to doing so.
5      Do I harm -- is it incremental?  If
6  it's incremental, I could make the case of
7  putting the value in there or I could
8  subcontract that right out to somebody else
9  if I didn't feel that it was going to hurt
10  my core business.
11      So again, you'd have to look at
12  context and look at whether it made sense in
13  the business plan.
14      If syndicating it out -- and of
15  course, we're talking about programming in
16  sort of the same window.  It's when
17  programming is available, given --
18  especially, you know, I did look at the
19  Chicago market and there's a very large
20  concentration of Polish speakers in Chicago.
21      If I or SEI were to license
22  programming to Polvision in Chicago, I
23  wouldn't want to -- I would want to consider
24  what the impact were on the subscriptions to
25  my channel in that same market, the one I

---

LARRY GERBRANDT

1
2  control.  I'm licensing it to something I
3  don't control.  It's a business decision.
4      Doesn't mean there's no value to
5  it.  It just means that I have to know --
6  what's happened here from my understanding
7  is that TVP has done something that SEI
8  could no longer control and derives no
9  benefit from.
10      As a matter of fact, could very
11  well have harmed SEI's effort in the largest
12  Chicago -- largest Polish-speaking market in
13  the US.  Second largest, depending on who
14  gets the bragging rights.
15      So they could have had a very good
16  business reason for not doing so.
17      At the same time, you could
18  postulate that SEI says okay, it makes much
19  more sense for us to shut down our channel
20  and take this package of program rights and
21  distribute to half a dozen other entities
22  and net/net we'll make more money that way.
23      Those are business decisions over
24  which it has control.
25      So one of the things you are taught

---

LARRY GERBRANDT

1
2  as an appraiser is to look at what the
3  business plan is for exploiting the content.
4  And then in this case, to my understanding,
5  is that TVP took that business plan decision
6  out of SEI's hands and sold those programs
7  to someone else.
8      Q   I appreciate your response.
9      But in response to my previous
10  question you said, "If it was appropriate to
11  include the syndication rights in
12  a valuation of SEI, you would.  If not,
13  not."
14      And I'm asking you based on what
15  you know of the business plan of SEI and the
16  business model, would it be appropriate if
17  you were evaluating SEI to include or to
18  assign a particular value to these alleged
19  syndication rights?
20      MR. BARNETT:  Objection.  Asked
21  and answered.
22      A   Well, I'm not going to comment on
23  be the "alleged" part of your question.
24      Q   I'm not asking you to.
25      A   Yes, you are.  By putting the word

---

LARRY GERBRANDT

1
2  in you are asking me to assume it's part of
3  the hypothetical.
4      Q   Call them syndication rights for
5  the present purposes.
6      A   If I'm controlling both and if it
7  makes business sense, yes.
8      Q   And if it doesn't make business
9  sense, is the answer no?  Meaning if it
10  wouldn't make business sense for SEI to
11  license individual content to a competing
12  channel such as Polvision, would you then
13  not include syndication rights in evaluation
14  of SEI?
15      A   One of the interesting aspects of
16  valuation is it always is from a particular
17  perspective.
18      Would the valuation be from SEI's
19  perspective or would it be from the
20  perspective of someone who is acquiring SEI
21  and all the rights?
22      Q   You tell me if that makes
23  a difference.
24      A   I'm asking you.  It's predicate to
25  my answer.

---

34  (Pages 130 to 133)

1           LARRY GERBRANDT
2      Q    Well, we'll start from SEI's
3  perspective.
4      A    If it doesn't make sense from SEI's
5  perspective, then no, I wouldn't put
6  a separate value on it.
7      I may acknowledge the fact that I
8  have it, but I wouldn't put a separate value
9  on it.
10      Q    Let's move on.
11      A    By the way, I need to qualify, my
12  last answer was in the context of valuing
13  a company in the classic willing
14  buyer/willing seller situation.
15      Q    You understand that Mr. Schulman
16  has offered three different damages
17  scenarios in connection with the Polvision
18  claim, right?
19      A    I'm aware that there are, yes.
20      Q    Do you have an opinion as to which
21  damages scenario is most proper to be
22  applied?
23      A    I know he indicates Number 1 in his
24  opinion is.  I haven't studied them enough
25  to come to a conclusion.

1           LARRY GERBRANDT
2      Q    Do you have any opinion whether
3  Damages Scenario 1 is an appropriate damages
4  model?
5      A    I was not asked to form an opinion.
6  I was just asked to provide input.
7      Q    Mr. Gerbrandt, you understand that
8  at trial if you offer opinions on these
9  kinds of things, then I'm going to tell you
10  that at your deposition you said you don't
11  have any opinion on that.
12      You understand that?
13      A    And I think my response was I was
14  not asked to form an opinion on that.
15      Whether I do so subsequent to this
16  conversation, the answer may change.
17      Q    But you don't have any opinion
18  today on whether that's a proper damages
19  model?
20      A    That is correct.
21      Q    And I have the same question with
22  respect to the other two scenarios.  Do you
23  have any opinion, sitting here today,
24  whether those are proper damages models
25  relating to the Polvision claim?

1           LARRY GERBRANDT
2      A    I was going to say, all three
3  damage models may be appropriate.  Some may
4  be better than others, but I haven't been
5  asked either the question of whether they
6  were appropriate or which one's the best.
7      Q    You haven't been asked the
8  question, but do you have an opinion,
9  sitting here now, as to which one is the
10  best?
11      A    I have not studied the three in
12  sufficient detail to render an opinion at
13  this point.
14      Q    So you reviewed the report.  You
15  said you know about all three damages
16  scenarios, but you don't have any opinion as
17  to whether one is better than the other two
18  or which one is the best?
19      A    I have not been asked to come to
20  a conclusion.
21      Q    Theory Number 1, Damages Scenario
22  Number 1, I should say, again is a scenario
23  based on the value of the licenses from TVP
24  to Polvision utilizing an industry standard
25  market model.

1           LARRY GERBRANDT
2      And there are a few assumptions in
3  this model or a few variable factors, if you
4  will.
5      And I want to ask you about them.
6      And the first one is referenced in
7  Paragraph 45 in one instance.
8      And Mr. Schulman says here that
9  "Using the inputs shown below, the net
10  results of these inputs establishes that
11  the maximum advertising revenue per hour of
12  viewing, assuming a full 12 minutes per hour
13  of threshold inventory, 100 percent sellout
14  and no volume discount, would be 3,861 of
15  gross ad billings."
16      And my first question is on the
17  sell-out rate.
18      In your experience does programming
19  frequently or ever achieve a one hundred
20  percent sellout of ad space?
21      A    On a day-part-by-day-part basis,
22  yes.
23      Q    What do you mean by "a day part by
24  day part"?
25      A    In other words, prime time

Page 138

LARRY GERBRANDT

1 LARRY GERBRANDT
2 television. Especially local avails in
3 prime time television. Local network
4 affiliates always sell out, or almost always
5 sell out, especially in the top, couple top
6 rating shows.
7 So day part by day part, a hundred
8 percent sellouts are not unusual.
9 Q What about for nonprime time
10 programming?
11 A Again, day part by day part.
12 Q Are you saying day part by day
13 part, in other words, being prime time
14 television?
15 A Well, a day part is prime time.
16 Q So my question is whether other day
17 parts, besides for prime time day part,
18 achieve a hundred percent sell-out rates,
19 typically?
20 A Late night programming, especially
21 overnight often doesn't sell out at top of
22 rate card or may not sell out a hundred
23 percent unless it's bundled in some fashion
24 with other day part.
25 Q So is it your general opinion that

Page 139

LARRY GERBRANDT

1 LARRY GERBRANDT
2 the sell-out rate for programming depends on
3 what it's broadcast?
4 I should say the sell-out rate for
5 advertising during a particular program
6 depends on when that program is broadcast?
7 A It's a factor of multiple things.
8 What the program is, is certainly a factor.
9 When it is aired. How it's packaged.
10 For instance, I do know in the case
11 of Polvision is they do repeat the show
12 overnight, but that advertising is bundled
13 in. So it's not sold separately.
14 If you buy the ad in prime time,
15 you get the late night repeat. So it's not
16 sold separately. So how it's packaged is
17 important.
18 There may be other factors,
19 including scarcity that make something more
20 valuable and thus more likely to sell out.
21 So it's not just one factor.
22 Q So it's a handful of factors, you
23 are saying, determine the sell-out rate for
24 advertising during a programming?
25 A By and large.

Page 140

LARRY GERBRANDT

1 LARRY GERBRANDT
2 Q Do you have any basis for thinking
3 that Polvision would be able to achieve
4 a one hundred percent sell-out rate for its
5 programming?
6 A There are no major impediments to
7 it doing so.
8 In other words, there's no -- there
9 are no restrictions to it doing so. And the
10 pricing -- that you can set the pricing to
11 a point that it's guaranteed never to sell
12 out. You could also set the pricing where
13 it always sells out.
14 The goal -- I think you have to
15 look at what the -- generally speaking, in
16 television terms, the goal of the station is
17 always to not leave any money on the table.
18 So you only get a chance to sell it once.
19 It's like hotel inventory.
20 On the other hand, you don't want
21 to do deals that down the road may set
22 a precedent that you can't unring the bell.
23 Q Sorry. Are you finished? I don't
24 want to interrupt.
25 A I'm finished.

Page 141

LARRY GERBRANDT

1 LARRY GERBRANDT
2 Q My question was: Just in this
3 particular case based on what you know about
4 the Polvision contract and Polvision rates
5 and whatever else you know about Polvision,
6 do you have any basis to believe that
7 Polvision would have achieved a 100 percent
8 sell-out rate during the programming
9 licensed to Polvision?
10 MR. BARNETT: Objection. Asked
11 and answered.
12 A There's no fundamental reason why
13 it could not have.
14 Q My question was whether do you have
15 any basis for believing it could have. And
16 I take it your response is kind of the
17 converse of that, you have no basis for
18 determining that it would not have.
19 MR. BARNETT: Sorry. Can you
20 read back the last question.
21 (Requested portion of record read:
22 "Q. My question was whether do you
23 have any basis for believing it could
24 have. And I take it your response is
25 kind of the converse of that, you have no

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 142

LARRY GERBRANDT

1
2 basis for determining that it would not
3 have.")
4        (End of read-back.)
5    A    No, that's not actually not what I
6 said.  There's nothing that prevented from
7 doing so.
8    Q    Do you have an opinion as to what
9 is a proper sell-out rate to be used in this
10 damages model?
11        Mr. Schulman has testified that --
12 and I'll paraphrase -- that the hundred
13 percent was the maximum level that he used.
14 He set a maximum possible value.
15        Do you have any opinion as to what
16 is a proper sell-out value to be applied in
17 this scenario?
18    A    Our discussion was always in the
19 context of -- he said, look, I need to put
20 an upper boundary -- I need an upper
21 boundary.  That would be full sell-out at
22 rate card.
23    Q    But if the Court says to you,
24 Mr. Gerbrandt, you are an industry expert
25 and I'm looking to you for your opinion.

Page 143

LARRY GERBRANDT

1
2 Assuming I go with his first damages model,
3 what sell-out rate should I use, what would
4 your response be?
5    A    It's something I could definitely
6 consider.  I'd need a lot more information.
7 I did not think about it in terms of if the
8 judge's goal says what's the industry
9 average as opposed to maximum.  When -- I'd
10 have to consider if I could do it.  If I
11 could, what that would be.
12        But it's not something that I have
13 been asked to do or sitting here I'm
14 prepared to give you an off-the-cuff answer
15 to.
16    Q    Do you think your response would be
17 a hundred percent or something else?
18    A    Well, you very rarely see TV
19 programming that has blanks in it.  In other
20 words, you know, it goes to blank.
21        So something is being put into
22 every time slot -- into every avail slot.
23        So the question is how do you value
24 that.
25        So you'd want to look at what --

Page 144

LARRY GERBRANDT

1
2 even things like self-promotions have
3 a value.
4        There's often an opportunity cost
5 that has to be taken into consideration.
6 PR -- even self-PR has value.
7        But what we do know is the only
8 time you see a blank screen is when somebody
9 has made a big mistake and probably won't
10 last long in the job.
11    Q    But basically you are telling me
12 you don't have a number right now.
13    A    I do know a hundred percent of the
14 avails are filled.
15        The issue then may be what's the
16 average price if -- if you assume a hundred
17 percent sellout at something other than top
18 of rate card, you know, sitting here, I just
19 posited one of the facts that you -- you
20 have in effect if not a hundred percent
21 sellout, you have hundred percent -- you've
22 expended a hundred percent of your
23 inventory.
24        That's what's different between
25 television and the hospitality business.

Page 145

LARRY GERBRANDT

1
2 They can't put a warm body in a room if they
3 don't have a warm body in the lobby.
4        Stations can choose to promote
5 their own programs.
6        They could also choose to do
7 barter.
8    Q    Have you reviewed the Polvision
9 rate card that Mr. Schulman refers to in
10 Paragraph 44?
11    A    I'm actually trying to remember if
12 I saw the rate card or not.  I know one may
13 have been obtained.  I think I may have seen
14 it.
15    Q    Have you seen Mr. Kotaba, the owner
16 of Polvision, it's his testimony that
17 Polvision had actually achieved a spot rate
18 of 40 to $90 for a 15-second to 1-minute
19 spot?
20    A    I also know that Mr. Kotaba has --
21 uses it to promote some of his own
22 businesses, at least that's what I've
23 understood.  So pricing is really
24 self-dealing and becomes rather irrelevant
25 under those circumstances.

37  (Pages 142 to 145)

Page 146

LARRY GERBRANDT

1
2    Q    So it's your view that the rate
3  card is what is to be used but not the rates
4  that Mr. Kotaba has testified Polvision has
5  actually achieved?
6    A    Well, if he's selling it to
7  himself, then it's very difficult to
8  forensically come to any kind of open market
9  conclusion.
10       I haven't read Mr. Kotaba's
11  testimony. I've heard snippets about it.
12       To my knowledge, there's no gun to
13  Mr. Kotaba's head to set the pricing.
14       He thinks the top of the rate card
15  should be in his market and to memorialize
16  that in a rate card.
17       I mean, he's the one that set that
18  number totally outside of any litigation
19  setting.
20    Q    Do you think it is more proper to
21  use a number that Mr. Kotaba says he's
22  actually been able to achieve versus the
23  high-end number on his rate card?
24       MR. BARNETT: Objection. Asked
25    and answered.

Page 147

LARRY GERBRANDT

1
2    A    A, I haven't come to a conclusion.
3  B, I've heard enough that I'm not sure this
4  doesn't fall under special circumstances
5  that there's a -- he may have personal
6  reasons for wanting to keep inventory to
7  himself and to price it very low to himself.
8       I don't know. I just know that
9  it's not a clean arm's length situation
10  here.
11       So I don't know if that's
12  appropriate.
13    Q    So based on what you do know, is
14  $159 a proper -- is that a proper number to
15  be used in this damages model, $159 per
16  30-second spot?
17    A    For calculating the maximum,
18  absolutely. It's a price that he set
19  independently of anything else. He put
20  the value on it. Mr. Schulman didn't.
21    Q    My question is the same as I asked
22  you the last time: If the judge asks you,
23  Mr. Gerbrandt, given what you know about the
24  circumstances here, what rate should I
25  assign to a 30-second spot on Polvision?

Page 148

LARRY GERBRANDT

1
2  What number would you give?
3       Would it be 159 or something else?
4    A    I would need to know a lot more
5  than I know sitting here right now.
6    Q    What would you need to know?
7    A    I think I've already been through
8  all of that.
9       I'd be happy to take up deposition
10  time and go through the list again.
11    Q    Well, you're not ready to sit here
12  today and say that $159 is a proper rate to
13  be used in a damages model?
14    A    It's certainly the appropriate rate
15  to calculate the maximum.
16    Q    By "maximum," just so I'm clear.
17       Is this a maximum -- a theoretical
18  maximum or is this a maximum that you would
19  actually say here is my view of what you
20  should use?
21    A    Mr. Kotaba would be thrilled to --
22  Mr. Kotaba set a rate that he thinks
23  the inventory is worth.
24       If you were to buy just one --
25  usually the way rate cards work is if you

Page 149

LARRY GERBRANDT

1
2  buy one spot, you pay the top of the rate
3  card. That is what one spot is worth.
4       Maybe there's a situation where
5  there are a lot of people who want one spot,
6  but, you know, would I put a premium to
7  that? No. He set what he thinks is the
8  maximum he could get if he sold the spots
9  one at a time.
10       It is what it is. It's the
11  maximum.
12    Q    So this is an actual number that
13  you would say should properly be used in
14  a damages model?
15       MR. BARNETT: Objection. Asked
16    and answered.
17    A    For the maximum set by Mr. Kotaba.
18       If I could sell, you know, this is
19  what I think it's worth selling spots one at
20  a time individually. Not going to be
21  higher. It's the maximum. Sort of by
22  definition.
23    Q    You just mentioned a few minutes
24  ago that if you bought one spot, you would
25  pay the full amount perhaps, but maybe if

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

LARRY GERBRANDT

you bought multiple spots you might pay
less.

       Is that a volume discount? Is that
what you are talking about?

    A   Volume discounts up to a point. I
mean, once there may be some discount for
volume, but it's always calculated off the
top.

       And you look at what other demand
there is in the marketplace.

       So there may be a discount but you
try not to go very far off.

    Q   Is it your view that a proper
damages model should assume one hour of
programming or advertising during that
programming and that none of these
advertisements receive a volume discounted
such that if we use a theoretical hour in
our model, we should not apply volume
discount to any of the advertising bought
during that hour?

    A   Again, if the approach is to
calculate the maximum, the maximum by
definition would be top of rate card for

LARRY GERBRANDT

every spot within the hour. It's not going
to be more than the rate card. That defines
the theoretical maximum.

       It's not a hard concept.

    Q   But there's a difference between
a theoretical maximum and something that you
would say it is my opinion that this is
a proper number to be applied.

       Do you recognize the difference
between those two concepts?

    A   I do. And to calculate the
maximum, what the owner has set as the top
end of the rate card defines what that
maximum is.

    Q   What about with the volume
discount, would you say it's fair to use --

    A   There's no such thing as an average
in that regard.

    Q   That's what I wanted to know.

    MR. BARNETT:  Is there
a question pending?

    MR. WENGER:  Are you asking me?

    MR. BARNETT:  Yes.

    MR. WENGER:  I don't have to

LARRY GERBRANDT

answer.

    Q   But go ahead.

    A   But then you're no longer
calculating the maximum. You are
calculating an alternative situation.

       So what he did was -- he clearly
stated I'm going to calculate the maximum,
not an alternative to the maximum. It can't
be more than this.

    Q   I asked Mr. Schulman, "Do you have
sufficient expertise in your view to offer
an opinion as to what kind of volume
discounts advertisers receive for
advertising programming, generally?"

       Answer: "I would have to either do
a significant amount of research in order to
come up with what those numbers might be and
rely on Larry to help me with that because
he does have intimate knowledge of these
things."

       But with your intimate knowledge,
you don't really have an average volume
discount rate, I take it?

    A   There are -- when it comes to local

LARRY GERBRANDT

advertising, the conventions are somewhat
different than they are, let's say, at the
network level.

       For instance, at the network level
there's something called the upfronts.
We've just been through that. They ended
a week ago.

       The networks sell a specific number
of their inventory, as the name suggests,
upfront. And advertising is sold against
an audience guarantee at the network level.

       The advertisers who do not buy
during the upfront may be able to buy a show
that is struggling later on in the season at
a lower price.

       They may also find themselves,
gees, I really need to be in Glee and almost
all of the inventory is sold out and I'm
going to have to pay a premium to what
somebody else paid.

       So it happens all the time. So
there are many circumstances in which the
rate card at one particular point in time
actually changes and switches to a premium

Page 154

LARRY GERBRANDT

1    LARRY GERBRANDT
2    on what they call a scatter market.
3         In this year, if you don't buy
4    your -- lock in your inventory right now, I
5    guarantee you at about October 20th,
6    you're not going to be able to buy anything
7    because presumably Mitt and Obama have
8    bought everything else up.
9         Q    I don't mean to interrupt you.
10        A    But this is the real world. It's
11   not clean. It's not pretty. It can't be
12   reduced to a nice little average.
13        Q    Your point is there are a lot of
14   different factors that would affect the
15   volume discounts?
16        A    And I want to consider all of them.
17        Q    Okay. Fair enough.
18        The last factor here in this
19   Damages Scenario 1 or the last variable is
20   a 40 percent ratio in terms of a markup --
21   or ratio of program spending as
22   a representation of gross advertising
23   billings.
24        Let's take look at Mr. Schulman's
25   Paragraph 46.

Page 155

LARRY GERBRANDT

1    LARRY GERBRANDT
2         At the end of 46, Mr. Schulman
3    refers to Exhibit 7. And this is where
4    Mr. Schulman gets his -- or calculates this
5    40 percent number in part.
6         So let's take a look at that,
7    Exhibit 7. It's right after the text of the
8    report.
9         Let me know when you've had
10   a chance to look at that.
11        A    I've got it here.
12        Q    Mr. Schulman testified that "This
13   was one of the things we relied on Larry to
14   do because if you read his resume, he spent
15   a number of years at Kagan and he gathered
16   that information for us and gave us the
17   underlying rationale for it."
18        Is that accurate in terms of
19   Exhibit 7?
20        A    Yes.
21        Q    And the last number here, the last
22   line here, last row, Program Percent Ads.
23   30 percent for 2008, et cetera.
24        These are the numbers from which
25   Schulman derived his 40 percent ratio; is

Page 156

LARRY GERBRANDT

1    LARRY GERBRANDT
2    that right?
3         A    Well, I calculated that ratio. I
4    provided this data to him.
5         Q    You calculated the 40 percent
6    ratio?
7         A    No. I calculated the program
8    percent ads.
9         Q    So is it fair to say that for 2009
10   the percentage here is significantly higher
11   than the other three years identified here?
12        A    It is higher than 2008.
13        I will say that 2010 and '11 are
14   actually projections. So 2009 would be
15   actual. So would 2008.
16        Q    In terms of the actual numbers
17   here, the total station spending is actually
18   fairly steady. It fluctuates from 5800 to
19   6300.
20        But there appears to be more of
21   a fluctuation in the total local advertising
22   where, for example, from 2008 to 2009 you go
23   down by almost $5,000.
24        So isn't the number we have here
25   for 2009 really a reflection of the reduced

Page 157

LARRY GERBRANDT

1    LARRY GERBRANDT
2    advertising for 2009 rather than something
3    else?
4         A    Well, actually you need to take
5    into account that 2008 is, one, an election
6    year. It's also an Olympic year.
7         So where syndicating program
8    doesn't vary by year to year all that much,
9    you can give these spikes in ad revenue that
10   had nothing to do with the underlying
11   programming.
12        Q    I'm asking you: Which numbers here
13   are more typical. Is it the 30 and
14   32 percent numbers, or is it the 38 percent
15   number? Which one is closer to what you
16   would say -- what would apply in an average
17   year?
18        A    Probably something -- if you were
19   to average this out over a longer period of
20   time, it would probably reach out into the
21   mid 30s.
22        2008 isn't normally -- 2009 is
23   a bit of an anomaly as well because we had
24   a global economic meltdown.
25        Q    Is this for subscription-based

40 (Pages 154 to 157)

Page 158

LARRY GERBRANDT

1  LARRY GERBRANDT
2  programming, like HBO advertisements, or is
3  it for free-to-air programming or is this
4  both?
5     A    This is only over-the-air
6  broadcasting, terrestrial broadcasting.
7     Q    Free to viewers?
8     A    Terrestrial broadcasting.  It's not
9  free to viewers.  It can.
10    Q    So you mean land-based
11  broadcasting.  Is that what you mean by
12  "terrestrial"?  Explain to me what you mean.
13    A    Local over-the-air terrestrial
14  broadcasting.  I don't know how to explain
15  it more specifically than that.
16    Q    Is some of the local terrestrial
17  broadcasting subscription based where people
18  pay a certain amount every month to get that
19  kind of channel?
20    A    I almost guarantee you that you do.
21        How do you get your local
22  television stations.
23    Q    I'm asking --
24    A    It's a simple question.  How do you
25  get your local television stations.

Page 159

LARRY GERBRANDT

1  LARRY GERBRANDT
2     Q    Through a cable company.
3     A    Who do you pay?
4     Q    Well, you pay the cable company, I
5  suppose.
6     A    Okay.  So a subscription to
7  somebody is involved.
8     Q    My question is whether these
9  concern channels where you pay certain
10  amount per channel.  Like you would pay
11  a premium amount for HBO and other
12  subscription channels as opposed to
13  something that would come as part of your
14  basic cable package.
15    A    These are not premium channels.
16  This is the advertising revenue received --
17  I mean, it's very clear.  I don't know how
18  to make it clearer.
19        It says Gross Advertising Billings.
20  Station Revenue.  National Spot, Local Spot.
21  Total Advertising.
22        It's exactly what it says it is.
23    Q    And why do you use 40 percent here
24  if you are saying that the number is
25  somewhere around the mid 30s for an average

Page 160

LARRY GERBRANDT

1  LARRY GERBRANDT
2  year?
3     A    Why are you saying that I used 40?
4     Q    Well, Mr. Schulman uses 40.  He
5  says that he based this section of his
6  report on consultations with you.
7        And my question is whether you were
8  involved in consultations that resulted in
9  the 40 percent ratio being applied?
10    A    You asked Mr. Schulman that
11  question in his deposition.  What was
12  Mr. Schulman's answer?  Because I can't --
13  you are asking me about something I didn't
14  do.  But you did ask Mr. Schulman that
15  question.
16        This is the data I provided him.
17    Q    And my question is:  Are you aware
18  of a reason why Mr. Schulman would have or
19  should have increased his ratio from let's
20  say a mid 30s number to a 40 percent?
21    A    I'm aware of what he's written
22  here, the justification for it, and what he
23  told you at deposition his justification
24  was.
25    Q    What is his justification?

Page 161

LARRY GERBRANDT

1  LARRY GERBRANDT
2     A    Well, I'll read it here and then
3  why don't we find his deposition and read
4  his justification from the deposition
5  because I can't cite it from memory.
6        You are asking me what his words
7  were.  It's not a memory test.
8     Q    No, no.  It's not a memory test,
9  certainly.
10        Mr. Schulman offered an opinion
11  here, a damages scenario based on
12  a 40 percent ratio.  He says that he
13  developed that scenario based on
14  consultations with you.
15        Let's just do it one step at
16  a time.
17        Did you discuss the 40 percent
18  ratio with Mr. Schulman?
19    A    Only to the extent that at the end
20  of the discussions he had with me, that's
21  the conclusion -- that was his conclusion as
22  to what the appropriate number should be to
23  express the maximum.
24    Q    Do you agree that 40 percent is
25  an appropriate number to express the maximum

41  (Pages 158 to 161)

Page 162

LARRY GERBRANDT

1
2  of -- maximum ratio program spending to
3  gross billing?
4      A    Total program spending to gross
5  billing, yes.  I don't have an argument with
6  that.
7      Q    Did you consider the age of the
8  particular episodes that were licensed --
9  the vintage of the episodes in arriving at
10 the 40 percent or in your discussions
11 regarding the ratio to be applied here?
12     A    Well, to the extent that the broad
13 category of syndicated programming includes
14 an awful lot of vintage programming.  There
15 are an awful lot of programs of Cheers,
16 MASH, Happy Days.
17         I mean, I could go on.  Seinfeld.
18 Seinfeld is now getting long in the tooth.
19 A lot of programming on television falls
20 into vintage.
21         So, you know, it's an important
22 part of the syndicating programming number.
23     Q    My question is:  In this damages
24 scenario where you are evaluating
25 a particular programming license to

Page 163

LARRY GERBRANDT

1
2  Polvision, did you consider the fact that
3  much of that programming was of -- was
4  significantly old, dated?
5         MR. BARNETT:  Objection.  Asked
6  and answered.
7      A    My understanding is that wasn't all
8  of the programming.  It was some of the
9  programming was a mixture of new and vintage
10 which is what you find on a mixture -- take
11 a look at the average TV station, you're
12 going to find a mixture of new programs and
13 classic syndicated series.
14     Q    So you did consider that in your
15 discussions?
16     A    Yeah, I think we did discuss it
17 includes both.
18         And I think people understand what
19 syndicated programming means, sophisticated
20 people in the industry.
21     Q    If you were advising Polvision in
22 terms of helping it with revenue
23 projections, what amount would you tell
24 Polvision it could expect to achieve in
25 gross advertising billings per hour of

Page 164

LARRY GERBRANDT

1
2  programming during the programming that was
3  licensed to Polvision by TVP?
4      A    I haven't done that calculation.
5  I'd have to know, as a classic line, assumes
6  a lot of facts not in evidence.
7         I haven't been retained to do
8  something like that.  I have no idea -- I
9  know what Polvision has set as their rate
10 card.
11     Q    You know some of the factors here
12 are based on these discussions, and I'm just
13 asking you not for an official eval of
14 revenue for it to be used in public
15 offerings.
16         I'm asking you based on your
17 industry expertise, give me
18 a back-of-the-napkin calculation of what you
19 would advise Polvision it could expect to
20 achieve during -- in advertising during
21 these programs.
22     A    You are asking me to do something
23 that goes beyond an SEC public offering.
24         You are asking me to offer expert
25 testimony in a case on the back of

Page 165

LARRY GERBRANDT

1
2  an envelope.  I don't do business like that.
3      Q    I'm asking for your opinion.
4      A    No, you are asking me to do
5  something inappropriate.
6         As an industry analyst with
7  a reputation who would testify to a number
8  in open court.  That's borderline offensive
9  and diminishes what I do for a living.
10     Q    Well, I certainly don't mean to
11 offend you.
12     A    No, yeah, of course you did.  And
13 you were going to then use it in open court
14 as a reasoned analysis.
15         I don't play that game.
16     Q    You, or Mr. Schulman here relying
17 upon you, offered a number, 3,861, as
18 an hourly averaged ad billings.
19         My question to you is:  Would you
20 expect Polvision to achieve that number or
21 some other number as an average ad billings
22 per hour?
23     A    That is the maximum they could get
24 if they sold out a hundred percent of the
25 inventory at a rate card that was set absent

42  (Pages 162 to 165)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 166

1           LARRY GERBRANDT
2    any other market influence other than what
3    the station would hope to sell for
4    an individual spot.
5        Q    But you're not prepared, you say,
6    to say what you would have advised Polvision
7    it could have achieved in terms of -- it
8    could have actually achieved in terms of
9    hourly ad billings?
10           MR. BARNETT:  Objection.  Asked
11    and answered.
12       A    Totally different set of -- haven't
13    been retained by Polvision to do that kind
14    of analysis.  Nor would I do it off the top
15    of my head on the back of an envelope.
16       Q    I just say that because you've
17    acknowledged and Mr. Schulman acknowledged
18    that these are maximum numbers.
19           And I'm just trying to understand
20    whether you, sitting here today, have
21    an opinion as to what is an actual number,
22    not a maximum number, but an actual
23    realistic industry number.
24           We don't have that in this report.
25    I agree with you on that.  But there may

Page 167

1           LARRY GERBRANDT
2    come a time where the judge might say these
3    are all maximum numbers.  I want to know in
4    your industry expertise what number should I
5    use?
6           And if you're not prepared to give
7    a number, that's fine, I just want to know
8    that.
9           MR. BARNETT:  Is there
10    a question pending?
11       Q    Are you prepared to give a number?
12       A    Not today.
13           MR. BARNETT:  Can we take
14    a five minute break?
15           MR. WENGER:  I was going to go
16    on for a few more minutes and I think
17    it would be a good time to break, but
18    if you want to take it right now I'm
19    happy with that.
20           MR. BARNETT:  We can break in
21    a few minutes.
22    BY MR. WENGER:
23       Q    Mr. Schulman has testified, and
24    I'll quote:  "We're saying that there could
25    be somebody or would be somebody out there

Page 168

1           LARRY GERBRANDT
2    that would be willing to pay a premium equal
3    to -- or derived from $763" -- sorry.
4           Start over.
5           Question:  "You are saying that
6    there is an industry standard market model,
7    meaning there is a standard in the industry
8    of someone at the high end of the standard,
9    if you will, is willing to pay $77 [sic] to
10    advertise during a half hour of
11    programming."
12           Response:  "We're saying there
13    could be somebody or would be somebody out
14    there that would be willing to pay premium
15    equal to $763 per half hour programming, for
16    advertising during a half hour of
17    programming."
18           Do you agree with that?
19           And I'll rephrase it to make it
20    shorter.
21       A    That was such an ugly question.  I
22    am not even sure that that's actually what
23    was calculated here.
24       Q    Okay.  Well, Schulman says in 47
25    "value of program license per half hour,

Page 169

1           LARRY GERBRANDT
2    763."
3           We determined this was a little bit
4    of a mathematical error here.  And it should
5    be 772, because the top number should be
6    3861.
7           But 763 or 772.
8           My question is:  Is there someone
9    out there who would be willing to pay for
10    this programming $772 per -- or $763 for
11    a half hour of programming based on the
12    numbers that could be achieved?
13       A    I understand.
14           I could certainly posit a scenario
15    where someone -- we have to assume that
16    somebody actually has the right to sell this
17    programming to the marketplace, so I have to
18    presume that and --
19       Q    Of course.
20       A    You say "Of course," now but you've
21    been objecting to that concept all day long.
22           But let's assume somebody had the
23    right to do that and a competitor in the
24    marketplace for strategic reasons wants to
25    get into the Polish programming business.

43  (Pages 166 to 169)

Page 170

LARRY GERBRANDT

1  There's enough overhead, there's enough room
2  here to say, you know:  I'm willing to pay
3  50 percent of ad revenue.  I have other
4  reasons, other programs I can bundle in with
5  this.  I'll pay more.
6       So sure.  That's the kind of thing
7  that -- I've done competitive analyses for
8  markets all the time.
9       I've done it for new entrants
10 coming in and those are the kinds of things
11 they think about.  So it's a possibility.
12      Schulman hasn't pushed the program
13 spending percent gross billings to the point
14 where there's no margin left, by any means.
15 I mean, we're actually starting with this is
16 a bit above the base line average for
17 a number of years, as I testified earlier.
18      So that's easily one scenario where
19 you could see the value be higher in
20 a competitive bidding situation.
21      This actually presumes no bidding.
22 Just an industry -- little bit above
23 an industry average number for just
24 syndicated programming, not all programming.

Page 171

LARRY GERBRANDT

1       Q    Do you have a particular entity in
2  mind that would pay this, to distribute this
3  Polish programming?
4       A    No.  I'm just positing that
5  competition occurs every day in the
6  marketplace.
7       Q    Are you aware of other channels
8  that distribute Polish programming besides
9  Polvision and SEI's distribution network?
10      A    I think we also discussed Dish and
11 we also discussed -- we haven't discussed
12 but I'm aware that Direct TV also offers
13 Polish language programming.
14      Q    And it's your view that one of
15 those channels or someone else would pay or
16 could pay the amounts referenced in
17 Paragraph 47 for TVP's Polish programming?
18      MR. BARNETT:  Objection.  Asked
19 and answered.
20      A    Not what I said at all.
21      Q    Okay.  So please explain what you
22 said.
23      A    I said there are other distributors
24 of Polish programming in the US.  Not

Page 172

LARRY GERBRANDT

1  necessarily -- you know, for it to compete
2  with Polvision -- could happen at two
3  levels.
4       One, it could be a one-off
5  competitor to Polvision just specifically in
6  the Chicago market, or it could be
7  a national competitor who is essentially
8  buying out all of the markets across the
9  country.  And that's what a national network
10 in effect does.  It's basically buying up
11 all the programming rights for every DMA in
12 the country.
13      Designated market area.
14      MR. WENGER:  Why don't we take
15 a break now.
16      (A brief recess was
17 taken.)
18 BY MR. WENGER:
19      Q    Damages Scenario 2 in Schulman's
20 report beginning with Paragraph 53.
21      Did you have any input into this
22 damages scenario?
23      A    I don't recall having any input
24 into that.

Page 173

LARRY GERBRANDT

1       Q    Do you agree with this damages
2  scenario?
3       A    I believe I testified that I
4  haven't reviewed it nor do I have any
5  opinion.
6       Q    I think you said that you've read
7  this report.
8       So you haven't -- I take it you
9  haven't read this report in sufficient
10 detail to decide whether you have an opinion
11 on this damages scenario?
12      THE WITNESS:  Isn't this when
13 you are supposed to say "Asked and
14 answered five times"?
15      MR. BARNETT:  You can fend for
16 yourself.
17      A    I have not read this report in
18 sufficient detail to come to an opinion on
19 this model.
20      I didn't have any input into it.  I
21 haven't read it and reviewed it.  I haven't
22 been asked to come to an opinion on it.
23      I haven't studied it.
24      Reading it is different from

44  (Pages 170 to 173)

Page 174

LARRY GERBRANDT

1
2  analyzing it, breaking it down and studying
3  it and coming to an expert opinion,
4  especially in this context.
5      Q    The 860 episodes that are referred
6  to in Paragraph 52 as part of Damages
7  Scenario Number 1. And it also is carried
8  through to Damages Scenario Number 2 as well
9  as Damages Scenario Number 3.
10     Do you have any view as to whether
11 these damages scenarios should include 860
12 episodes or some other number of episodes?
13     A    No opinion whatsoever in that
14 regard.
15     Q    Mr. Schulman includes as part of
16 his 860 episodes, you can see in
17 Paragraph 54, 545 episodes under the annex
18 to the August 31, 2009 agreement.
19     Do you see that on the top of --
20 Paragraph 54 on the top of the page.
21     You see 545 episodes that are part
22 of the annex to the August 31, 2009
23 agreement?
24     A    Yes, between 54 and 55, yeah. I
25 see the 545 number.

Page 175

LARRY GERBRANDT

1
2      Q    And again, you had no input and you
3  have no opinion as to the proprietary
4  including 545 episodes for the annex to the
5  August 31, '09 agreement?
6      A    I didn't review any contracts
7  related to this nor formed any opinion.
8      Q    The SEI's second claim related to
9  legal fees.
10     Are you offering any opinion as to
11 whether SEI is entitled to the legal fees
12 that it is claiming?
13     A    No.
14     Q    Have you been asked to consider
15 that claim at all?
16     A    No.
17     Q    Have you considered that claim at
18 all?
19     A    No.
20     Q    How about Claim 3, the Klan claim.
21     And that starts with Paragraph 69.
22     Do you offer any opinions in
23 connection with the Klan claim?
24     A    I do not.
25     Q    Did you discuss the damages

Page 176

LARRY GERBRANDT

1
2  scenario Mr. Schulman puts forthwith
3  Mr. Schulman?
4      A    I did not.
5      Q    So you had no discussions of the
6  Klan claim, either the claim or the damages
7  scenario as put forth?
8      A    I believe that's what I testified
9  to.
10     Q    What do you understand this claim
11 to be?
12     A    Without spending time reviewing it,
13 I really -- I think it would be unfair to
14 ask me to summarize it and put in my own
15 terms. I don't have an opinion.
16     Q    I just want to make sure we're
17 clear on this.
18     Is it fair to say that Claim 3 here
19 is solely Mr. Schulman's work? By
20 "Mr. Schulman," I mean him and his firm and
21 is not derived from any consultations with
22 you?
23     A    Well, I see that in 85 that he
24 references data from the American Community
25 Survey.

Page 177

LARRY GERBRANDT

1
2      And that may have been information
3  that he acquired through my work on this
4  case, but I did not discuss it with him.
5      Q    Did you discuss the possibility of
6  SEI putting forth a claim -- a damages claim
7  related to Klan based on loss subscribers?
8      A    I don't recall having specific
9  discussion with him in that regard.
10     Q    Did you ever discuss with
11 Mr. Schulman the fact that there is
12 a different kind of damages scenario put
13 forth for the third -- the Klan claim and
14 the Polvision claim?
15     A    I don't even know what that
16 question means.
17     Q    For the Polvision claim, we
18 discussed that the damages theory is
19 basically the SEI seeks damages based on the
20 value TVP received from Polvision, correct?
21     And the Klan claim, I'll represent
22 to you that the theory here is based on
23 a diminished growth rate of subscribers.
24 Those are different theories.
25     Theoretically, SEI could have made

45 (Pages 174 to 177)

Page 178

LARRY GERBRANDT

1           LARRY GERBRANDT
2 a claim for Klan based on the value of TVP
3 received for licensing Klan to Polvision.
4      Did you ever discuss the relative
5 merits of each of those different types of
6 theories?
7     A   Not that I recall.
8     Q   Do you have any opinion on whether
9 one of those theories is better than the
10 other?
11     A   I have no -- I have not been asked
12 to evaluate the relative merits nor have I
13 at this point come to a conclusion.
14     Q   In your view, I think you
15 testified -- withdrawn.
16     I think you testified earlier that
17 subscriber behavior can be influenced by the
18 retention or removal of a particular program
19 on a channel; is that correct?
20     A   What I did was actually quote
21 industry executives, the people who actually
22 run the channel making those statements and
23 observed that they were making those
24 statements.
25     Q   And you agree with those

Page 179

1           LARRY GERBRANDT
2 statements, I take it?
3     A   It corroborates information I
4 gathered from those companies during my
5 tenure at Kagan.
6     Q   Did you agree with the notion that
7 the retention or removal of a specific
8 program on a channel can affect subscriber
9 behavior?
10     A   There clearly seems to be a cause
11 and effect.
12     Q   How long after, for example,
13 a particular program is removed from
14 a channel -- assuming that subscribers would
15 react to that, how long after would
16 subscribers react?
17     A   I think it would depend.  In my
18 experience, it would depend on certain
19 factors including how long certain episodes
20 are repeated, how they're programmed --
21     Q   Sorry. I don't mean to interrupt
22 you. There's some issue with the LiveNote.
23     My question is:  How long after
24 a particular program was removed from
25 a channel, how long would it take

Page 180

1           LARRY GERBRANDT
2 a subscriber to react to that?
3     A   I'll stick with that.
4     Q   You said, "It depends on a certain
5 number of factors."  And you started saying
6 the factors, including how long certain
7 episodes are repeated, how they're
8 programmed.
9     Anything else?
10     A   How popular they were at the end.
11     In the case of Sex and the City,
12 there were a couple more -- there was
13 some -- theatrical movies made, so there may
14 have been some additional interest in the
15 series afterwards, a tie-in to the
16 theatrical film.
17     Sopranos, on the other hand, a lot
18 of people weren't happy with the way the
19 series ended.  That may have left -- that
20 may have had an impact on whether they
21 wanted to see repeats or not.
22     So there are a lot of things to
23 take into account.
24     Q   Is it possible that subscribers who
25 cancel their description to a particular

Page 181

1           LARRY GERBRANDT
2 channel because a program is removed would
3 do so a year later?
4     Or would made their decision
5 within, I don't know, the first six months
6 or some other period.
7     We're talking generally.  There may
8 be some outliers, but I'm just asking
9 generally.
10     A   I'm not sure -- to come to those
11 kinds of conclusions with the specificity
12 you are asking for, there are so many
13 variables at play.  It's hard to hold enough
14 of them constant to identify the one that
15 causes someone to pull the trigger.
16     With perfect foresight, if you
17 knew, if you were trying to figure that kind
18 of thing out and collected enough
19 information, you might be able to do it, but
20 you'd have to know ahead of time and
21 instruct your CSRs to collect certain -- to
22 ask certain questions of somebody who is
23 calling in to downgrade.  And you might be
24 able to build a cause and effect.
25     You can also do focus group

46 (Pages 178 to 181)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 182

LARRY GERBRANDT

1
2   studies. So it's possible to do certain
3   kinds of forensic analysis that may be
4   projectable and involving those things as
5   well.
6       It all depends on how much money do
7   you want to spend to get a particular
8   answer, versus spending the effort to create
9   another hit.
10      Q   Were you asked to do any focus
11  groups or surveys in this case?
12      A   I was not.
13      Q   Did you suggest it?
14      A   It didn't seem appropriate to do
15  so, nor was there time to do it
16  appropriately.
17      Q   And just back to my previous
18  question.
19      Is it your testimony then that it
20  is possible that a subscriber who cancels
21  a subscription because of a particular show
22  no longer being available would wait a year
23  after that show was removed from the
24  channel?
25      A   I could see somebody taking that

Page 183

LARRY GERBRANDT

1
2   long. It's a cumulative thing and suddenly
3   they become aware, you know, I haven't seen
4   that show in ages and you know what, I'm not
5   watching this thing nearly as often as I
6   used to.
7       It's not unusual for somebody to
8   make a decision or be forced into making
9   a decision when renewal comes up or when
10  their credit card expires, and then they'll
11  sit and they'll make sort of a qualitative
12  analysis of why do I -- you know, do I use
13  this enough? Do I still enjoy it enough to
14  take the time to go and renew my
15  information.
16      And we observe those kinds of
17  behaviors in the marketplace. And it can
18  take a year, sometimes two years for that to
19  happen. But the cumulative impact of what
20  goes into their finally making a decision
21  is -- the only way you'd find out is to
22  actually sit down and do some fairly
23  detailed focused groups which are quite
24  expensive to do.
25      Q   You talked about cumulative impact

Page 184

LARRY GERBRANDT

1
2   as a basis for decision-making, but what if
3   somebody were canceling just because they
4   liked this program, now they don't have this
5   program anymore. Would you expect them to
6   wait a year or more to react or would they
7   react sooner?
8       A   If they had become fans or become
9   subscribers primarily for that program and
10  didn't find anything else engaging and -- I
11  mean, people are used to programs sort of
12  cycling for the summer and doesn't come
13  back.
14      And I think even with the Sopranos,
15  it was sort of an erratic schedule and
16  people learned that you kind of had to -- it
17  didn't follow the traditional pattern of
18  seasons as it used to, so they waited
19  a little bit longer.
20      It's possible.
21      Q   Would you say that a majority of
22  such subscribers would cancel sooner than
23  a year after a particular program was
24  removed?
25      A   Well, if that was their sole reason

Page 185

LARRY GERBRANDT

1
2   for subscribing. There are a lot of
3   variables here. You'd have to match up
4   the original cause, why they subscribed,
5   with the effect, the program change, and see
6   if those things matched up.
7       It's one of those things where at
8   the end of the day you have to take a step
9   back as an analyst and say there's a lot of
10  little moving pieces that go in, but what's
11  the end result here?
12      What happened in the case of HBO
13  and Sopranos and Sex and the City is, as
14  they acknowledged, you know what, we, one,
15  we screwed up. We waited too long to try
16  new things and as a result we hit a rough
17  patch in subscriber growth that extended
18  several years.
19      You only see that sort of in
20  hindsight. If you could perfectly
21  anticipate it, you would do your best not to
22  let that happen.
23      They admitted that in hindsight
24  they could see it.
25      So that's often when the insight

47 (Pages 182 to 185)

Page 186

LARRY GERBRANDT

comes to you and it often takes -- and in
the case in HBO, it took several years.

One of the things we do know is
when the programs are new, you see a much
more one-to-one cause and effect; in other
words, I want to see the new episodes right
away so I can talk about it at the water
cooler. So I'm going to subscribe now.
Whereas, when the show goes away, it's
nowhere near as one to one. It's more of
a gradual tapering off.

So the slope of the ingest of
subscribers is different from the decline,
for sort of logical, water cooler reasons.

Q   What about for people who would
subscribe to a channel but don't subscribe
because a particular show is no longer
available.

So if I'm on the fence about
subscribing to HBO, I kind of like Sex and
the City and then all of a sudden Sex and
the City is no longer on HBO, so I decide
not to subscribe to HBO.

How long after the removal of

Page 187

LARRY GERBRANDT

a particular show would you say that
a potential new subscriber's behavior is
affected in the manner that I described?

A   Well, in your scenario, they were
never a subscriber in the first place.

Q   The Klan claim here, it's a claim
for diminished growth rate for subscribers
which, as I understand it and I may be
wrong, incorporates subscribers that
canceled and subscribers that have not
subscribed which would otherwise go to the
growth rate.

And my question is: With respect
to subscribers that did not subscribe
because in this case Klan is no longer
available on TV Polonia, how long after Klan
is no longer available would potential new
subscriber behavior be affected by the fact
that Klan is no longer available?

A   Somehow I would have to become
aware that Klan is no longer available.

Part of that is presumably within
this community would be word-of-mouth issue.

I only thought about that enough to

Page 188

LARRY GERBRANDT

give a high level response to it.

It's one of those things it's
certainly a factor. How much of a factor --
what it really does is it affects your
marketing. That's usually the way it
expresses itself.

So you have one less tool in your
tool kit to promote to subscribers. And
that's sort of how as an industry analyst I
would have to think about it, is how is it
affecting the things I have to market.

Because usually you don't just go
out there and promote the brand name,
although there is a value to doing that.
It's these days, HBO, we're HBO and we have
Game of Thrones. So we want you to watch
Game of Thrones, which guess what, you can
only get it if you subscribe to HBO.

So it expresses itself in terms of
one less marketing hook that you can bring
to bear in your efforts to acquire
subscribers.

That plays itself out over a period
of time.

Page 189

LARRY GERBRANDT

Q   Would it be forever, or how long
after a show is no longer part of potential
marketing contents would that have an
impact?

MR. BARNETT: Objection. Asked
and answered.

A   You no longer have it. You can't
use it.

So to that effect, it lasts
forever. If it was a really important show,
very successful, central, why people -- you
know, a major retention. I think in the
case of HBO they said it lasted for several
years.

Q   Would you say that television and
Internet subscribers to programming would
react in the same manner or differently to
programming no longer being available in
terms of canceling their subscription?

A   I'm not aware of studies that
Internet or online subscribers are different
from regular subscribers. I would want to
think about that a little bit.

There might be some demographic

48  (Pages 186 to 189)

A-531

1        LARRY GERBRANDT
2    differences.
3        One could argue that the online
4    audiences tend to be upscale and actually
5    ironically not the young people a lot of
6    people think they are, but they you will
7    actually skew a little older than the 18 to
8    34 demographic. And that's simply to be
9    online, you have to have at broadband
10   subscription. And when you are 18 years
11   old, it's probably mom and dad's broadband
12   subscription rather than yours.
13       So it kind of skews the
14   demographics a bit.
15       Q    But you don't have an opinion
16   whether reaction times would be different?
17       A    All I'm knowledging is the online
18   audience demographically is different from
19   the average television audience.
20       To what extent those differences
21   impact this particular scenario, I haven't
22   really thought about it.
23       Q    In your experience, when there is
24   an arrangement for distribution of
25   a particular channel between a distributor

1        LARRY GERBRANDT
2    and a producer of the programming, does the
3    program producer typically retain control
4    over decisions about the programming
5    content? Or is that sometimes ceded in part
6    or in total to the distributor?
7        A    In most cases, the producer turns
8    over -- unless they consciously say, okay,
9    I'm going to retain international rights,
10   you have all domestic, or we want home video
11   and you get everything else, if that's not
12   negotiated upfront, the producer will turn
13   over all distribution rights to
14   a distributor.
15       However, one of the factors that
16   also is in play is how much of the
17   production cost did the producer put up
18   versus the distributor or the network. It's
19   usually whoever puts up the bulk of the
20   money gets to dictate what the distribution
21   mechanism is and has the control, which is
22   sort of as it should be.
23       Q    My question was more about the
24   content.
25       A    I understand. We are talking

1        LARRY GERBRANDT
2    specifically about the content.
3        Q    You mentioned distribution
4    mechanism, so I'm more interested in the
5    content of the program being distributed.
6        A    How is that different from the
7    programming?
8        Q    It's not, but you talked about
9    dictating the distribution mechanism.
10       A    Right.
11       In other words, is it going to be
12   distributed VOD, do you have online rights,
13   do you have paid TV rights. Do you have
14   free-to-air rights, do you have
15   international, domestic. All those things.
16       I have seen cases where -- I've
17   actually been involved in litigations where
18   the producer retained the right to block the
19   airing of, let's say, the movie in which
20   they were involved on over-the-air
21   television. And the studio couldn't
22   distribute it, couldn't sell it to
23   over-the-air television without the producer
24   giving the okay.
25       So it's unusual, but it certainly

1        LARRY GERBRANDT
2    happens.
3        Q    Do you have experience where it's
4    the opposite way around, where the
5    distributor is able to control what kind of
6    programming is produced by the programmer?
7        A    We're beginning to use some terms
8    of art.
9        So a programmer, a network is
10   a programmer.
11       Q    I'll rephrase it so we're more
12   accurate. I apologize.
13       Do you have any experience in cases
14   in which a distributor has control over the
15   content that is produced by a program
16   producer and put on a particular channel
17   that is distributed by that distributor?
18       A    Again, it all depends who is
19   putting up the production money.
20       Q    In cases where the program producer
21   puts up all the production money.
22       A    Even in those cases, the
23   distributor always retains the right to say
24   this doesn't meet my standard. I mean,
25   that's Entertainment Economics 101. There's

49 (Pages 190 to 193)

Page 194

1    LARRY GERBRANDT
2  always a clause in there that says you have
3  to deliver to me something that I consider
4  it fits within certain industry standards.
5  So absolutely.
6    Q    But would a distributor typically,
7  or ever in your experience, be able to
8  control which particular named programs the
9  program producer would include in
10  a programming lineup?
11    A    Well, a distributor is always --
12  well, I mean, there are -- a distributor
13  always can -- almost always -- can control
14  what they decide to put on the air.  I mean,
15  that's --
16    One of the problems is we're using
17  some industry terms I'm a little
18  uncomfortable with.
19    An MVPD is a distributor.
20    Q    Uh-huh.
21    A    They distribute channels.
22    Q    Okay.
23    A    Even then, I've seen the
24  affiliation agreements, they can say, you
25  know what, we don't consider this

Page 195

1    LARRY GERBRANDT
2  programming suitable and under the terms of
3  our agreement, we can choose not to carry --
4  not to carry you going forward.
5    For whatever reasons, you've hit
6  a threshold that we no longer find
7  satisfactory and we're going to use that to
8  drop the channel.  Okay.
9    That's one form of distribution.
10    There's also the form of
11  distribution where a pay TV network, HBO.
12    HBO is a distributor of
13  programming.  It has output, deals with
14  studios.  They had contracted ahead of time
15  for the rights to movies to be named later.
16  They don't even know what those movies are
17  going to be.
18    If those movies fall within
19  a certain parameter, they have to take those
20  films, irrespective of whether they like
21  them or not because the movies fall within
22  the parameters that were called for in the
23  output agreement.
24    So that's why rights in these
25  contracts are so important is that they try

Page 196

1    LARRY GERBRANDT
2  to anticipate these scenarios and cover
3  them.
4    Q    Are you offering an opinion in this
5  particular case about whether SEI had any
6  right to or any control over the programming
7  that was or was not included on TV Polonia?
8    A    Well, this is clearly something I
9  know a lot about, but at this point, I
10  haven't been asked to come to a conclusion.
11    Q    Do you understand that SEI is
12  making a claim for damages based on the
13  TVP's removal of the Klan program from
14  TV Polonia?
15    A    I'm aware that's one of the issues.
16    Q    You said you haven't reviewed the
17  1994 agreement.
18    I'm just going to read one clause
19  from it to you.
20    This clause is 9.4 and: "TVP
21  reserves the right to make changes to the
22  TV Polonia programming service, to the name
23  or logo of TV Polonia while retaining the
24  general character of that program."
25    MR. BARNETT:  I'm sorry.  Is

Page 197

1    LARRY GERBRANDT
2  there a copy for the witness?
3  BY MR. WENGER:
4    Q    So my question is:  Based on that
5  clause that I read, do you have any view as
6  to whether SEI had any rights to control
7  TVP's programming content?
8    A    First of all, I think it's unfair
9  to ask me to react to something I can't read
10  for myself.
11    And more important, as we
12  discovered in forensically analyzing
13  Exhibit 4, you really need -- maybe it was
14  another one -- you really need to take these
15  things -- it wasn't Exhibit 4.  It was
16  another one.
17    You really need to take these
18  things, all the paragraphs into context.  So
19  if you just pluck one paragraph out and ask
20  me to come to a conclusion, that's not how
21  these things are constructed, drafted,
22  implemented, interpreted.  I just think it's
23  patently unfair.
24    Q    But again, you're not offering any
25  opinion on whether TVP did anything wrong by

50  (Pages 194 to 197)

LARRY GERBRANDT

1   LARRY GERBRANDT
2   removing Klan from the TV Polonia
3   programming?
4       A   That's a different question. I'm
5   not offering an opinion.
6       Q   Did you evaluate that issue?
7       A   Only tangentially to the extent
8   that Mr. Arlen made reference to it.
9       Q   Can you elaborate on that?
10      A   Go to Paragraph 48 of my report.
11  "In Section C of his report, Mr. Arlen
12  claims, 'TVP's decision to remove the Klan
13  program, a long running soap opera, is
14  consistent with general television trends in
15  the United States showing the declining
16  popularity of soap operas.'"
17      So that's why I said tangentially.
18      Q   So you only commented as far as
19  Mr. Arlen's report concerning the popularity
20  of soap operas, but not any of the other
21  factors that went into TVP's removal of the
22  Klan program?
23      A   I think what I did stands for
24  itself.
25      Q   Did you consider the other reasons

LARRY GERBRANDT

1   LARRY GERBRANDT
2   that Mr. Arlen listed that were part of
3   TVP's calculations or motivations to remove
4   the Klan program from TV Polonia?
5       A   Well, in 49, I also comment,
6   "Mr. Arlen's observations about the
7   cancellation of daytime soaps on three US
8   broadcast networks led him to the sweeping
9   conclusion that 'US viewers have little or
10  no current exposure to the soap opera
11  format, hence TVP's decision to drop
12  episodes of Klan abided by current practices
13  in the TV industry.'"
14      And I set forth my reasons for
15  disagreeing with that statement.
16      Q   And again, this is about the
17  popularity or the exposure to soap operas,
18  right?
19      A   Well, you asked me if anything had
20  to do with Klan, so I'm responding to that.
21      Q   But there were some other factors
22  Mr. Arlen listed in his report that went
23  into TVP's decision to remove the Klan
24  program. But again, you said your report
25  speaks for itself. And I don't see that

LARRY GERBRANDT

1   LARRY GERBRANDT
2   you've taken issue with the other factors
3   Mr. Arlen mentioned.
4       So my question is whether you
5   considered any of the other factors that he
6   mentions.
7       A   I didn't feel like -- retract that.
8       I commented on factual errors in
9   Mr. Arlen's report. There were things I
10  knew to be absolutely incorrect.
11      Q   How does Paragraph 50 and 51 relate
12  to SEI's Polvision claim, if at all?
13      A   Well, he's just simply wrong.
14      Q   So you are just taking issue with
15  Mr. Arlen's --
16      A   Ignorance.
17      Q   But you're not saying that the fact
18  that Polvision is a multicast channel on
19  a full-powered Class A broadcast TV station
20  has any impact on the Polvision claim?
21      A   Oh, it absolutely does.
22      He tries to dismiss it as if it's
23  nothing. Well, he's just wrong. I mean --
24  and I lay out why he's wrong. He's
25  incredibly wrong. He's wrong -- he appears

LARRY GERBRANDT

1   LARRY GERBRANDT
2   to be completely ignorant that this channel
3   is actually carried on a local cable system,
4   on a dedicated channel.
5       Not only cable but telco.
6       I mean, it's a big difference to
7   what he dismisses: Oh, it's just
8   a low-powered TV station. Can't be viewed
9   from more than a few miles away.
10      Wrong.
11      Q   Are you aware that Mr. Kotaba also
12  testified that Polvision's only available in
13  the Chicago Metro area? Chicago and
14  suburbs, I should say.
15      A   Well, of course. That's his
16  market. That's the DMA assigned to him by
17  the FCC and he's carried on cable systems in
18  that market. He's not a national network.
19  He's a carry in Chicago. Of course he is.
20      Q   So are you saying that the
21  Polvision signal was available in places
22  other than a few thousand miles around
23  Chicago?
24      A   I think you should reread your
25  question.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

## Page 202

LARRY GERBRANDT

1
2  Q    Are you saying that the Polvision
3  signal is available in places other than
4  a few dozen miles around Chicago.
5  A    I heard "few thousand miles."
6       It is available in the Chicago DMA.
7  It's not a low-powered station with no
8  carriage.
9       It's on a Class A station and it's
10 carried in the Chicago DMA in cable and
11 telco households.
12 Q    The Polvision claim here is based
13 on the value that TVP received from
14 Polvision.
15 A    By the way, he says it's "only
16 available in the northwest section of
17 Chicago on a low- powered signal." That's
18 simply not the case.  He's just flat out
19 wrong.
20 Q    The Polvision claim here is based
21 on the value that TVP received from
22 Polvision.  So I'm trying to understand if
23 this part of your report has any relevance
24 to the claim.
25 A    Sure it does.  It has to do with

## Page 203

LARRY GERBRANDT

1
2  where Polvision is available and why they
3  have a rate card of $159.
4       MR. WENGER:  Nothing further
5  from me.
6       MR. BARNETT:  Could we take
7  five.
8       (A brief recess was
9  taken.)
10      MR. BARNETT:  No questions at
11 this time.
12
13      (Continued on next page.)
14
15
16
17
18
19
20
21
22
23
24
25

## Page 204

LARRY GERBRANDT

1
2
3       MR. WENGER:  Mr. Gerbrandt,
4  thank you for coming here today and
5  answering my questions.
6
7
8       (The deposition was concluded at
9  4:08 p.m.)
10
11
        _____
        LARRY GERBRANDT
12
13
14 Subscribed and sworn
15 to before me this
16 _____ day of _____, 2012
17
18 _____
        Notary Public
19
20
21
22
23
24
25

## Page 205

LARRY GERBRANDT

1
2  STATE OF NEW YORK   )     PAGE _____ of _____
                      ) ss:
3  COUNTY OF NEW YORK  )
4       I wish to make the following
5  changes, for the following reasons:
6  PAGE  LINE
7  ____  ____    CHANGE: _____
8            REASON: _____
9  ____  ____    CHANGE: _____
10           REASON: _____
11 ____  ____    CHANGE: _____
12           REASON: _____
13 ____  ____    CHANGE: _____
14           REASON: _____
15 ____  ____    CHANGE: _____
16           REASON: _____
17 ____  ____    CHANGE: _____
18           REASON: _____
19 ____  ____    CHANGE: _____
20           REASON: _____
21
22 _____      _____
   Witness's signature          Date
23
24
25

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Page 206

```
 1            LARRY GERBRANDT
 2          C E R T I F I C A T E
   STATE OF NEW YORK   )
 3                     : ss.
   COUNTY OF NEW YORK  )
 4         I, BARBARA R. ZELTMAN, Shorthand
 5      Reporter and Notary Public, within and
 6      for the State of New York, do hereby
 7      certify:
 8         That LARRY GERBRANDT, the witness
 9      whose deposition is hereinbefore set
10      forth, was duly sworn by me and that such
11      deposition is a true record of the
12      testimony given by the witness.
13         I further certify that I am not
14      related to any of the parties to this
15      action by blood or marriage, and that I
16      am in no way interested in the outcome of
17      this matter.
18         IN WITNESS WHEREOF, I have hereunto
19      set my hand this 25th day of June, 2012.
20
21
                 _____
22          BARBARA R. ZELTMAN (BOBBIE)
            Court Reporter and Notary Public
23
24
25
```

Page 207

```
 1            LARRY GERBRANDT
 2              I N D E X
 3
 4   Witness                    Page
 5   LARRY GERBRANDT              5
 6
 7
 8
 9          E X H I B I T S
10   GERBRANDT       DESCRIPTION      PAGE
11
12   Exhibit 1   Expert Report of Stephen W.    21
                 Schulman
13
     Exhibit 2   Expert Rebuttal Report of      35
14               Larry Gerbrandt
15   Exhibit 3   TV Polonia Broadcasting        61
                 Systems, Inc. Business Plan,
16               Bates Numbers TP-8000639
                 through TP-8000663
17
     Exhibit 4   Settlement Agreement dated     106
18               August 11, 2009
19
20
21
22
23
24
25
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

1

D7MASPA1ps

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------x

SPANSKI ENTERPRISES, INC. (SEI),

                    Plaintiff,

          v.                          10 CV 4933 (ALC)

TELEWIZJA POLSKA, S.A. (TVP),

                    Defendant.

------------------------------x

                                      New York, N.Y.
                                      July 22, 2013
                                      10:00 a.m.


Before:

              HON. ANDREW L. CARTER, JR.

                                      District Judge


                    APPEARANCES

LOEB & LOEB LLP
     Attorneys for Plaintiff
BY:  JONATHAN ZAVIN, ESQ.
     JOHN A. PISKORA, ESQ.
     MICHAEL S. BARNETT, ESQ.

DLA PIPER US LLP
     Attorneys for Defendant
BY:  DAVID S. WENGER, ESQ.






                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

```
                                                          2
         D7MASPA1ps
 1                  (In open court)
 2                  THE CLERK:  Civil cause for a bench trial in Case
 3       No. 10 CV 4933, SEI v. TVP.  Counsel please state your
 4       appearance for the plaintiff.
 5                  MR. ZAVIN:  Good morning, your Honor.  Jonathan Zavin,
 6       Z-a-v-i-n, of Loeb & Loeb, for the plaintiffs, Spanki Inc.,
 7       SEI.  And with me are John Piskora from my office --
 8                  MR. PISKORA:  Good morning.
 9                  MR. ZAVIN:  -- and Michael Barnett, also another
10       attorney with Loeb & Loeb.  And to my left is the plaintiff,
11       representative Boguslaw Spanski.
12                  THE CLERK:  And for the defendant.
13                  MR. WENGER:  Good morning, your Honor.  David Wenger
14       from DLA Piper for Telewizja Polska.  And with me is Denise
15       Sonnoski with my firm, and a client, Robert Kroplewski.
16                  THE COURT:  Good morning.
17                  Just a couple of housekeeping matters.  I don't need
18       any opening statements from either party.  I've reviewed many
19       of the affidavits already.  You can go ahead since this is a
20       bench trial and start with the witnesses.  Who is the first
21       witness to be called today?
22                  MR. ZAVIN:  Your Honor, by agreement of the parties,
23       what we've got is, we've got two witnesses that will be called
24       today and cross-examined by the defendant.  The first witness
25       is a plaintiff expert, Mr. Shulman.  And the second witness
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300
```

3
D7MASPA1ps
 1   will be Mr. Gladkowski, also to be cross-examined by the
 2   defendant.
 3           We've set up a schedule that should have this trial
 4   ending by Wednesday afternoon or Thursday.  Just for your
 5   Honor's information, we've got the agreed-upon witnesses
 6   tomorrow are Ms. Nadolna, who will be first.  Professor
 7   Riskovski -- I'm probably mispronouncing that -- will be
 8   second.  And third will be Mr. Reyes.  All three of those are
 9   defense witnesses who will be cross-examined.  On Wednesday it
10   will be Mr. Arlen will be cross-examined by plaintiff and
11   Mr. Hart.  At that point the only thing left would be rebuttal
12   witnesses if any.
13           THE COURT:  All right.  Thank you.
14           Now, is there any issue with -- I know there are
15   people in the audience, which is fine.  Are there any issues
16   with anyone in the audience who is a potential witness in this
17   case hearing the testimony of anyone else?
18           MR. ZAVIN:  Ms. Nadolna is in the courtroom.  We have
19   no objection to her staying.  She is a defense witness but we
20   are not asking to exclude her.
21           MR. WENGER:  And similarly no objections to
22   plaintiff's witnesses.
23           THE COURT:  Fine.  So let's have the first witness
24   take the stand and be sworn and cross-examined.
25           MR. WENGER:  I call Stephen Shulman.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
                                                              4
     D7MASPA1ps
1              MR. ZAVIN:  Your Honor, with the Court's permission,
2    Mr. Shulman will be defended by Mr. Piskora of my office, who
3    will be handling the direct, and Mr. Gladkowski will be handled
4    by Mr. Barnett.
5              THE COURT:  OK.  Let's have the witness sworn.
6     STEPHEN WALTER SHULMAN,
7         called as a witness by the plaintiff,
8         having been duly sworn, testified as follows:
9              THE COURT:  Before we start, let me just see counsel
10   at the sidebar.  We don't need to be on the record for this.
11             (Discussion held off the record at the sidebar)
12   CROSS EXAMINATION
13   BY MR. WENGER:
14   Q.  Good morning, Mr. Shulman.  My name is Dave Wenger.  We've
15   met before.  I'm here to talk with you about your expert
16   witness testimony and report in this case.  I want to give you
17   a few documents that we'll use during our discussion today.
18             I've handed up to you, the top document is your
19   report, with the supplement in front of it.  The next document
20   is a set of deposition transcripts that have been designated by
21   TVP in this case.  And the next three documents are a set of
22   TVP's trial exhibits.  Do you see those?
23   A.  Yes.
24             MR. WENGER:  I have an extra copy of those, your
25   Honor, if you need them.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

D7MASPA1ps                    Shulman - cross

1          THE COURT:  OK.  That's fine.  Do I have it in front
2    of me?  Which numbers are we talking about?  I have the
3    exhibits in front of me.  Which numbers are we talking about?
4    Are we talking about 142, Plaintiff 142?  Or which numbers are
5    we talking about?
6          MR. PISKORA:  Your Honor, Plaintiff's 142 is all of
7    Mr. Shulman's report, so that is correct.
8          THE COURT:  My binder for some reason, I have a tab
9    for 142 and then I have this sheet of paper that says no
10   information.  Thank you.
11         MR. WENGER:  So, your Honor, I've handed you Stephen
12   Shulman's expert report and a set of designations.
13         THE COURT:  Thank you.
14   Q.  Mr. Shulman, your SEI's expert witness on damages issues in
15   this case; is that right?
16   A.  Yes.
17   Q.  You're not offering any opinion on the liability issues,
18   right?
19   A.  No.
20   Q.  So your opinion is concerning the damages issue.
21   A.  Correct.
22   Q.  And you've offered your opinion on damages issues with
23   respect to SEI's three claims here.  And those are relating to
24   TVP's contracts with Polvision, relating to SEI's litigation in
25   Canada, and relating to TVP's removal of the Klan program from
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
D7MASPA1ps                    Shulman - cross
```
1    the TVP Polonia Channel.  Is that right?
2    A.  Yes.
3    Q.  With respect to the Polvision claims, the first claim, your
4    opinion essentially is that SEI is entitled to have earned the
5    value of TVP's agreements with Polvision.  Is that correct?
6    A.  I wouldn't quite state it like that.
7    Q.  How would you state it?
8    A.  The damages that were calculated for claim 1 is a lost
9    profits damage, measured by what it is that TVP received.
10   Q.  To quote your report in paragraph 31, you say, "We were
11   asked to calculate the damages arising from TVP's alleged
12   improper licensing of programming content to Polvision based on
13   the fair value of such licenses."
14           THE COURT:  Hold on just a second.  Do you have that?
15   A.  Which paragraph?
16   Q.  31.  I'll just read it to you again.  To quote paragraph
17   31, you say, "We were asked to calculate the damages arising
18   from TVP's alleged improper licensing of programming content to
19   Polvision based upon the fair value of such licenses."  Etc.
20   Right?
21   A.  Yes.
22   Q.  And you said something before about the lost profits
23   theory, right?
24   A.  Yes.  It's measured by the value that TVP received for its
25   license agreements with Polvision.  And since Polvision's

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
D7MASPA1ps                    Shulman - cross
```

1    license is an asset, we characterized it as the fair value of
2    that.
3    Q.  And you've offered three alternative ways to calculate what
4    you describe here as the fair value of the programming content
5    TVP's licensed to Polvision, right?
6    A.  Yes.
7    Q.  As you describe it in paragraph 32, the next paragraph, "In
8    general, three ways of calculating the value of those licenses
9    are (1) based on an economic market value of the programming;
10   (2) based upon the market value rates stated in the TVP
11   Polvision agreement; and (3) based upon the amounts actually
12   paid by Polvision to TVP."  Is that right?
13   A.  Correct.
14   Q.  Do you remember giving an expert report in a case involving
15   media-related litigation; is that right?
16   A.  I've never given testimony on it.  I have written reports,
17   a while back, prior to 1998, related to the licensing of
18   libraries and some audits we did on the royalties that were --
19   or the license fees that were due on those particular products.
20   Q.  You have a BlackBerry?
21   A.  No.
22   Q.  What was the first part of your answer?
23   A.  We -- libraries.
24   Q.  Libraries.
25   A.  Yes, media libraries.  And they go back to Crdit Lyonnais,

```
       D7MASPA1ps                 Shulman - cross
 1     the old Crdit Lyonnais' libraries.
 2     Q.  Is that mentioned in your report?
 3     A.  It was prior to 1998.  I listed all the cases that we were
 4     involved with that went to trial or that were submitted for
 5     trial.  But we were involved in cases earlier than that that
 6     did not go to trial.  And they just happened to relate to
 7     media.
 8     Q.  Is it fair to say that you've never given testimony in a
 9     case involving media-related litigation and in 15 years you
10     have not been involved in a case relating to media?
11     A.  Correct.
12     Q.  And this is the first case in which you've offered this
13     kind of lost profits theory, based on lost revenues from lost
14     opportunities to syndicate content.
15             MR. PISKORA:  Objection.
16     Q.  Is that right?
17             THE COURT:  Basis?
18             MR. PISKORA:  It's vague because he offers three
19     different --
20             THE COURT:  That's overruled.
21     A.  In a court case that went to trial, that is correct.
22     Q.  And actually in your practical experience, this is the
23     first time you've ever heard of this kind of theory being
24     offered; isn't that right?
25     A.  Well, this is a similar theory to noncompetes, and as a
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
```

9

D7MASPA1ps                    Shulman - cross

1   result in the work I've done, which has not been part of a case
2   that has gone to court, we've valued the noncompetes, which is
3   very similar, based on what other people might have earned as
4   a -- you know, in breach of those noncompetes.
5   Q.  So in your practical experience, have you heard this kind
6   of theory being offered in a case?
7   A.  Yes.  In my past experience, I've known that in a case of
8   this nature you can use what it is that the person who breached
9   the contract received as compensation or earned as a measure of
10  the lost profit damages.
11  Q.  In this case, is this a lost profits theory, though, or is
12  it just, as you've said before, or is this a theory based on,
13  as you've just said now, what the -- taking away what one side
14  has earned?
15  A.  Taking away and using as your measure of the lost profit
16  can be what the group that breached the contract earned as a
17  result of that breach.  So it is a lost profits theory.  But
18  the measure of the lost profit is based on what it is in this
19  case TVP received for licensing Polvision into the market as a
20  breach of their exclusivity clause.
21  Q.  And your opinion is based on the assumption that SEI could
22  have made these damages, this profit, so your theory is lost
23  profits theory.  Is that right?
24  A.  Well, I think what underlies that whole concept of using
25  TVP's, what they earned, as a measure of the damage.  The

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
D7MASPA1ps                    Shulman - cross
```

1   underlying theory is that SEI had the ability to license in.
2   They took away that market to do that, and as a result, it is
3   what it is that TVP received.
4           The underlying assumption is that they had the
5   exclusive right to do that.
6   Q.  You mention in your report on paragraph 38 that in the
7   nearly 19 years --
8           THE COURT:  Hold on just a second.  Do you have that?
9           THE WITNESS:  I do.
10  Q.  -- that in the nearly 19 years that SEI has been
11  distributing TVP's programming, it has never syndicated
12  programming content to a competing channel, such as Polvision.
13  Do you see that?  That's in paragraph 38.
14  A.  Yes.
15  Q.  So even though, in the 19 years SEI has been distributing
16  TVP's programming, it never once syndicated contents to another
17  channel, you're still offering the damages theory based on
18  SEI's lost profits resulting from TVP's licensing of such
19  content.  Right?
20  A.  Yes.
21  Q.  Have you ever seen an SEI business plan stating that SEI
22  plans to license content to a competing channel?
23  A.  No.  I've never seen the business plan on that.
24  Q.  Have you ever seen any evidence at all that SEI considered
25  licensing content to any channel such as Polvision, licensing

```
                                                         11
        D7MASPA1ps                Shulman - cross
 1   syndicating?
 2   A.  It was related to me, to the attorneys, that SEI would not
 3   do that and had not done that.  I think Mr. Spanski, I believe
 4   Mr. Spanski testified to the fact that he wouldn't do that.
 5   Q.  You're not offering any opinion, right, that SEI had the
 6   right under the parties' agreement to syndicate individual
 7   programming contents to another channel, are you?
 8   A.  No.  I think -- that's a legal issue, and I try to stay
 9   away from legal issues.  We assume that they had the right do
10   that.  As part of the breach of their exclusivity clause they
11   did do it.  And we presumed that they weren't allowed to do
12   that.
13   Q.  I'm sorry.  Did you say they did do it?
14   A.  TVP licensed into the market in breach of the exclusivity
15   clause.
16   Q.  So your opinion is assuming that, even though SEI has not
17   syndicated individual content for 19 years, it has the right to
18   do that.
19   A.  Different question.  I interpret it as a different
20   question.  As having an exclusive right to license into that
21   market, then they, if they chose, could have had the right to
22   license into that market.
23           THE COURT:  Let me interrupt you for a second.  I
24   think some of the confusion between counsel and yourself, could
25   you describe "they" when you're talking about "they".  Who is
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

D7MASPA1ps                    Shulman - cross

1    the "they" you're referring to?
2            THE WITNESS:  SEI, as a result of their exclusive,
3    exclusivity clause had the right if they chose to license into
4    that market.  They were the ones with the exclusive right to do
5    that.  And there wasn't -- it's a legal interpretation.  We
6    presume because they had the exclusive right that they could do
7    that.
8    Q.  But as you said in the 19 years that they've been
9    distributing programming, they have never done that and you've
10   never seen any evidence that they have planned to do that.
11   Right?
12   A.  Correct.
13   Q.  Do you know if Larry Gerbrandt, SEI's other expert, has any
14   opinion on whether SEI has the right under the parties'
15   agreement to syndicate individual programming content to
16   another channel such as Polvision?
17   A.  I don't believe that in his report he addressed that issue.
18   You would have to ask him whether he had an opinion on it.
19   Q.  Have you seen his deposition testimony where he says he has
20   no opinion on that?
21   A.  You know, I did go through his deposition, but that's too
22   specific and I hadn't -- I didn't read it recently.
23   Q.  Is it correct that if SEI did not have the right to
24   syndicate individual content to another channel such as
25   Polvision, then your damages theory for the Polvision claim

D7MASPA1ps                    Shulman - cross

1    would not -- would be incorrect?
2    A.  Once again I think that deals with a legal interpretation
3    that the Court has to deal with.
4    Q.  I'm asking you to assume that if the Court makes a legal
5    determination that SEI did not have the right to syndicate
6    individual content to another channel, such as Polvision, if
7    the Court made that determination, then your damages theory for
8    the Polvision claim is incorrect, is it not?
9    A.  Is that to say -- can I ask you a question to clarify? --
10   is that the same as saying that the Court concludes that they
11   did not -- that TVP did not breach their exclusivity clause?
12   Q.  No, that wasn't my question.  My question was, if the Court
13   finds that SEI did not have the right to syndicate in the
14   original content to another channel such as Polvision, rather,
15   SEI had the right what they do, distribute the TVP Polonia
16   Channel as a collection of programming, if that's what the
17   Court determines, then your damage theory for Polvision is
18   incorrect, is it not?
19   A.  It would be unless the Court decides that because they
20   breached the exclusivity clause, that they are entitled to
21   damages and whatever they paid TVP to Polvision, whatever
22   Polvision paid to TVP for those licenses may be considered a
23   damage related to that breach.
24   Q.  So you're saying that even if the Court determines that SEI
25   had no right to syndicate content to Polvision, for example,

D7MASPA1ps                      Shulman - cross

1    that the measure of SEI's damages should be what TVP earned
2    from syndicating from that?
3    A.  I didn't say "should."  I said "could."  And I'm not sure
4    how the Court is going to look at that.
5    Q.  Well, what's your opinion?  Is your opinion that even if
6    SEI had no right to syndicate content, that the value that TVP
7    earned from syndicating could be a measure of SEI's damages?
8    A.  I think it could be.  And they could -- the Court could
9    look at it that way, because if they did breach the exclusivity
10   clause, they would then have to -- Court has to come up with a
11   damage number.  So they would have to at least consider what it
12   is TVP earned from Polvision in that breach.  So I'm not in the
13   position of the Judge to make that decision, but it does give
14   him a measure or a benchmark from which to make a decision if
15   he decides there's an actual breach, because there can be a
16   breach.  It's hard, to me, to conclude that -- if there was a
17   breach of the exclusivity clause and the breach was Polvision
18   licensing into Chicago was that breach, then it's hard to say
19   that that act was not a breach of the contract and that it
20   would seem like, by extension, making a decision like that
21   would indicate that SEI would have had the right to do that as
22   well if they had the exclusivity clause.
23              (Continued on next page)
24
25

15

D7MUSPA2                    Shulman - cross

1   BY MR. WENGER:
2   Q.  This is a lost profits theory?
3   A.  Right.
4   Q.  So your answer is, under a lost profits theory, SEI could
5   collect damages for lost profits even if it didn't have a right
6   to make those profits?
7   A.  Yes.  Actually, the theory behind it is that SEI did not
8   have to have the ability to make those profits or make those
9   profits that TVP did in order to claim those as damages.
10  Q.  Would you agree that financial projections are important to
11  a company's ability to conduct business?
12  A.  I find that an interesting question because I deal with
13  companies all the time.  A lot of them make projections, a lot
14  of them don't.  Even public companies from time to time when we
15  do intangible values as relates to goodwill impairment, asset
16  impairment -- or other companies, sometimes they don't have
17  projections, yet they run very profitably.  My opinion as a
18  businessman, it is always a good idea to do projections, but I
19  see a lot of successful companies that don't generally do
20  short-term, long-term, medium-term projections.  I find it a
21  bit astounding, but it is true.
22  Q.  There are a lot of companies that rely on projections to
23  make business decisions about allocating resources or hiring,
24  decisions like that, right?
25  A.  Yes, many companies.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

D7MUSPA2                    Shulman - cross

1   Q.  And banks, in many instances, rely, at least in part, on
2   financial projections to decide whether to loan a company
3   money, is that right?
4   A.  Yes, that's correct.
5   Q.  And investors rely sometimes, at least in part, upon
6   financial projections to determine whether to invest in a
7   company, right?
8   A.  Yes.
9   Q.  You have testified at your deposition that if you were
10  doing a financial projection for SEI, that if SEI would not
11  syndicate individual TV Polonia content to another network, you
12  would not include that right that as a source of potential
13  revenue for SEI --
14          MR. PISKORA:  Objection.  Lack of foundation.
15  Q.  -- do you remember that testimony?
16          THE COURT:  I will allow it.
17  A.  I do remember the context of that and the answer is, what
18  you are really asking is, if they didn't include it in their
19  projections, then I would not consider it as part of their cash
20  flow projections that --
21  Q.  Can you explain why, if SEI would not syndicate contents to
22  other networks, you wouldn't include that revenue in financial
23  projections for SEI but you have included that revenue in a
24  claim for lost profits for SEI?
25  A.  Yes, you would.

D7MUSPA2                    Shulman - cross

1   Q.  Can you explain the difference between why you would not
2   include this source of revenue in a financial projection of
3   SEI's revenues, but you are advancing a claim that SEI has lost
4   revenue, lost profits because of this?
5   A.  I think it is the same answer that relates to your question
6   about if they would never have gone into the market, how can
7   you possibly attribute a value to it and, as a result, a
8   measure of the lost profit related to that.
9           And the answer to that is, this is a lost profit
10  calculation or theory related on a breach of a contract.  It is
11  really unrelated to cash flow because the damage, as we are
12  putting forth here, is what it is that TVP received in that
13  breach of contract, whether or not SEI would have explored
14  those same revenue streams.
15  Q.  There are other ways to calculate lost profits, in general,
16  right, besides for what TVP would have earned?
17  A.  Yes, there are other measures.
18  Q.  For example, how many subscribers SEI might have lost from
19  this licensing?
20  A.  That is correct.  From the very beginning, we have looked
21  at both ways.
22  Q.  I want to switch topics a little bit, but I am still going
23  to be discussing these three ways that you have calculated SEI
24  damages.  My questions now are focused on the number of
25  episodes that you have used in your calculation.  All three

D7MUSPA2                    Shulman - cross

1   ways of calculating damages use 860 episodes TVP licensed to
2   Polvision in several agreements as a basis for calculating SEI
3   damages, is that right?
4   A.   That is correct.
5   Q.   And under each of these theories, each of the three ways of
6   calculating damages, you basically arrived at a different per
7   episode value, multiplied that value by 860 episodes to come up
8   with your three ways of calculating the damages, right?
9   A.   That was the methodology.
10  Q.   I'm sorry?
11  A.   That was the methodology to come up with a value per
12  episode.
13  Q.   For each of the three different ways of calculating
14  damages?
15  A.   Yes.
16  Q.   I am just going to put up this board here to help our
17  discussion along on the number of episodes that you used.
18           THE COURT:  Can you see that?
19           THE WITNESS:  Yes.  I just had an eye exam.
20  Q.   I will hand you this other copy, if that would be helpful?
21  A.   No.  I believe I can see it.
22  Q.   And this is from paragraph 54 of your report, the same
23  information is there.  So we are talking about the 860 episodes
24  that you used as a basis for your Polvision damages.  These
25  consist of 100 episodes from the June 27, 2008 agreement, is

D7MUSPA2                    Shulman - cross
1    that right?
2    A.  That's correct.
3    Q.  You basically took the 200 episodes licensed in the June
4    2008 agreement and you have included 100 of those episodes,
5    right?
6    A.  Yes.
7    Q.  And the next set of episodes are 215 episodes from the
8    August 2009 agreement, is that right?
9    A.  Yes.  As renegotiated by the annex agreement to the August
10   31, 2009.
11   Q.  What you mean is that, in the annex, Polvision, TVP agreed
12   that only 215 episodes had been broadcast or would be broadcast
13   under the August 2009 agreement so you have included those 215
14   episodes, correct?
15   A.  Yes.
16   Q.  Finally, you have included 545 episodes from the episodes
17   licensed by TVP to Polvision in the July 2010 annex, the
18   replacement content for the content originally licensed in the
19   August 2009 agreement, correct?
20   A.  Correct.
21   Q.  As for the first 100 episodes, you have included those 100
22   episodes because you have assumed that half of them had been
23   broadcast before August 2009 and the other 100 having been
24   broadcast after August 2009, correct?
25   A.  That was not the assumption for that 50 percent allocation.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

```
                                                             20
     D7MUSPA2              Shulman - cross
1    Q.  What is the assumption?  When you say prorated for damages
2    period in 54, what do you mean?
3    A.  That was just for the purposes of the way that we were
4    presented, we looked at the revenue that should have been
5    earned during the prorated period of the damage period, and
6    half of the revenue should have been earned during that period.
7    And for ease of making the calculation, we said, OK, let's just
8    take 100 episodes, we will add it to the other episodes as a
9    proxy for the 50 percent of the revenue that was earned during
10   that period.
11   Q.  You haven't seen any evidence that even one of these 100
12   episodes was broadcast after August of 2009, have you?
13   A.  No, because it really wasn't something we were looking for.
14   It wasn't relevant to our calculation because what we were
15   looking for here is what it is that TVP earned during the
16   period and they didn't earn their revenues when episodes got
17   broadcast; they earned it because the license agreement had a
18   two-year period and you would have amortized that revenue over
19   the two-year period.
20   Q.  So your opinion doesn't take into account when the episodes
21   were actually broadcast even though the broadcasting of those
22   episodes is the purported violation of the SEI/TVP agreements,
23   right?
24   A.  Correct.  The theories behind it is what it was that TVP
25   earned.  It wasn't what it was that Polvision did, didn't do in
```

D7MUSPA2                    Shulman - cross

1   their actions.
2   Q.  Do you know what Polvision paid TVP for this time?
3   A.  No, I do not recall.
4   Q.  If your theory as to these 100 episodes is incorrect, then
5   each of your damages theories are incorrect because each did
6   not use 860 episodes as a basis for calculating damages, is
7   that right?
8   A.  If it is not correct, if our theory on the 100 -- the
9   earnings of revenues is incorrect then, yes, you have 100 less.
10  Q.  Take a look at TVP Exhibit 6, if you don't mind.
11          The first page of this licensing agreement, this is a
12  June 27, 2008 licensing agreement.  Under number 1 it says
13  programs, Na Dobre and Plebania.  And number 2 it says episodes
14  1 to 100 for each one of those programs.  Do you see that?
15  A.  Yes.
16  Q.  Look to Exhibit 17, please.  This is the August 2009
17  licensing agreement.  And if you look at page 6 of that
18  agreement which is the schedule number 1, do you see there are
19  Na Dobre and Plebania 101 to 200.  So this agreement appears to
20  be a license for the next 100 episodes of each of these series,
21  in part, is that right?
22  A.  Yes.
23  Q.  Do you have any idea why Polvision would be licensing in
24  August 2009, the next 100 episodes of each of these programs if
25  it had not broadcast the first 100 episodes yet?

D7MUSPA2                    Shulman - cross

1   A.  Well, I don't know what was in TVP's mind when they made
2   this license agreement.
3   Q.  As to the 545 episodes that you used from the July 2010
4   annex, you are not offering any opinion, right, that SEI had
5   the exclusive right to distribute those individual episodes,
6   are you?
7   A.  You are asking me if I have an opinion?
8   Q.  I am asking you if you are offering the Court any opinion
9   on whether SEI had the exclusive right to distribute those 545
10  episodes in --
11  A.  No, we are not opining on it.  We made the presumption that
12  they were covered by the agreements and the breach.
13  Q.  Let's take a look at TVP Exhibit 40 which is the last
14  exhibit in the first binder.  In the first binder Volume 1 of
15  3, it is the last exhibit.  This is the July 2010 annex that we
16  have been talking about.  And if we look at the last page, it
17  is Bates stamped POL 65.  Do you see that, Mr. Shulman?
18  A.  Yes.  The schedule number 1?
19  Q.  Right.  So now as to the Klan and Plebania episodes, number
20  10 and number 12 which consist of 186 episodes of Plebania, 222
21  episodes of Klan, where it says ODC that means episodes.  So
22  there are 186 episodes of Plebania, 222 episodes of Klan.  For
23  those 480 episodes that you have included in your 545 episodes,
24  you are relying, are you not, on SEI's opinion that it has the
25  exclusive right to those episodes because other episodes of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                              23
D7MUSPA2                        Shulman - cross
1   those series have been broadcast on TV Polonia, is that right?
2   A.  No.
3   Q.  Have you seen any evidence that any of these individual
4   episodes of Plebania or Klan -- for Plebania, I mean episodes
5   713 through 899; for Klan, I mean 1891 through 2113 -- have
6   ever been broadcast on TV Polonia?
7   A.  No.  We made the presumption that they were for purposes of
8   our calculation.
9   Q.  That they were broadcast?
10  A.  Yes.
11  Q.  But you have not seen any evidence, for example, in the TV
12  Polonia programming schedule that the parties have produced
13  that these were actually broadcast, these particular episodes?
14  A.  I personally don't recall that.  We do make some reference
15  to historical programming in that report.
16  Q.  And after all of the other episodes, 137 episodes in total,
17  have you seen any evidence that even other episodes of these
18  same series had ever been broadcast on TV Polonia?
19  A.  No.  We didn't search for that.
20  Q.  So what is your basis for including these 545 episodes if
21  you actually had never seen any evidence that any one of those
22  episodes were broadcast on TV Polonia?
23  A.  Well, in speaking with the attorneys and what it is that
24  they asked us to calculate, we presumed that TVP did breach
25  their license agreement by licensing all of these into the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

D7MUSPA2                    Shulman - cross

1   market and were a breach of that exclusivity and a breach of
2   the settlement agreement and, as a result, we included them as
3   a presumption for calculating the claim.
4   Q.  Did you consider that presumption any further?  In other
5   words, did you ask counsel or anyone, let me see some evidence
6   that even one of these episodes should form the basis of a
7   damage claim because I don't have any evidence that any of them
8   were broadcast on TV Polonia?
9   A.   Well, the settlement agreement extended the definition of
10  what it was that was going to be included as a program.  It
11  included those things which were broadcast, could be broadcast,
12  would be broadcast -- it had a whole -- a much broader
13  definition of what fell under the exclusive right; it wasn't
14  just those that were broadcasted.  So when we spoke to the
15  attorneys and we talked about it, they indicated that they were
16  going to, in trial or in evidence show that this fell within
17  that whole definition of what programs would have been included
18  as part of that exclusivity agreement as amended by the
19  settlement agreement.
20  Q.  Just to be clear, you have not seen any evidence that any
21  one of these 540 episodes either had been broadcast or would be
22  broadcast on TV Polonia?
23  A.  Correct.
24  Q.  These 545 episodes should not be included in the Polvision
25  damages theory, then each one of them is incorrect as it stands

D7MUSPA2      Shulman - cross

1 today?

2 A.  Correct.

3 Q.  So let's talk now about the three methodologies that you

4 have used.  We discussed the number of episodes.  You have used

5 for all three.  Let's talk about the methodology for them.

6    Your first methodology or the first way that you have

7 calculated the value of the programming TVP licensed to

8 Polvision is, as you said, based on the industry standard value

9 of the episodes, is that right?

10 A.  I think a clarification is that the first one presented was

11 that model, but we sort of calculated first scenario 3, and

12 then we went to 1 or 2.

13 Q.  I don't want to quibble about the order, but I am talking

14 about paragraph 32A, a fair value of the licenses granted to

15 Polvision based on an economic market value of the programming,

16 is that right?

17 A.  Yes.

18    Let me just clarify that.  It is based on the model

19 for the economic condition.  I think what we said was that it

20 was a good basis for which to calculate a market value.

21 Q.  And I put up on the board here, this is from your report,

22 paragraph 47.

23    Can you see that, Mr. Shulman, or do you want me to

24 hand you up a sheet?

25 A.  No, I can see it.

26

D7MUSPA2                    Shulman - cross
1   Q.  So the way you calculate the value of the individual
2   episodes -- we are talking about the 860 episodes in the first
3   methodology -- is based on a number of assumptions, is that
4   correct?
5   A.  Correct.
6   Q.  And the first assumption you have made is that SEI would be
7   able to sell to a channel such as Polvision 100 percent of all
8   24 30-second advertising units available per hour, is that
9   right?
10  A.  Yes.
11  Q.  So if there are 12 minutes of advertising, there is 24
12  30-second advertising spots.  And you have assumed that SEI
13  would be able to sell to Polvision 100 percent of those
14  spots -- to a channel such as Polvision, 100 percent of those
15  spots?
16  A.  Yes.  Those spots would be available for revenue.
17  Q.  Your next assumption, the second part bolded there, you
18  assumed that what a network such as Polvision would charge for
19  one of these advertising spots during this theoretical
20  licensing of programming, and you used $159 per 30-second
21  advertising spot, correct?
22  A.  Yes.
23  Q.  And you have basically multiplied 24 30-second advertising
24  spots by $159 per spot to arrive at $3,816 as what you
25  described the average ad billing per hour of programming,
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

D7MUSPA2                    Shulman - cross

1   right?
2   A.  Correct.
3   Q.  And your third assumption is that a network such as
4   Polvision would pay a certain percentage of that total
5   advertising revenue to acquire programming for which it could
6   earn that revenue, so you took 40 percent of 3,816 and you
7   arrived at a value of 1,526 per episode per hour, take half of
8   that, 763, you have what you have used as the value of a
9   program license per half hour of programming, correct?
10  A.  Right.
11  Q.  Let's talk about the first assumption in bold, the
12  assumption that a network such as Polvision would be able to
13  sell 100 percent of its advertising time.  Did you think that
14  is a fair assumption to make, that a network would
15  automatically sell 100 percent of its advertising time?
16  A.  In the context of making this calculation, yes.  The
17  context of this calculation was to provide the Court with the
18  uppermost maximum that the value of these licenses could be.
19  We gave three scenarios.  The third scenario is exactly what
20  TVP received for the licenses that they got, but we were
21  concerned that that might not have been fair value.  We were
22  concerned that TVP might have gotten intangible value from
23  going into the market and, as a result, would be willing to
24  take less than the fair value.  So we gave the Court an
25  option -- two options, one of which was to show what the

D7MUSPA2                    Shulman - cross

1  maximum value could be on the market and also to take into
2  account the nature of the license agreement, to filter out the
3  noise and to understand that, if SEI was going to license into
4  the market, they would want a premium for that because they are
5  direct competitors.
6  Q.  You made a couple of points.  You talked about giving the
7  Court a maximum value.  Do you see that anywhere in your report
8  that you have given the Court a maximum value?
9  A.  I thought so.
10 Q.  Can you show me where?
11          Maybe I can help you.  Are you talking about paragraph
12 45?
13 A.  I don't know.
14 Q.  Or 43, is that what you mean by maximum?
15 A.  Yes.  "Fair value based on industry model would be at its
16 maximum."
17 Q.  But you have characterized this as an economic market value
18 model.  You don't call this a maximum possible economic market
19 value model, correct?
20 A.  The way I set the inputs created a maximum.  I just wanted
21 to make a range from the lowest to the potentially highest
22 amounts that those agreements might have been worth.
23 Q.  Have you offered any evidence suggesting that a 100 percent
24 sell-out rate is ever proper?
25 A.  No.

```
     D7MUSPA2                    Shulman - cross
 1   Q.  When we watch TV, networks routinely insert advertising for
 2   their own programming, not paid advertising, if you will, is
 3   that right?
 4            MR. PISKORA:  Objection.  Lack of foundation.
 5            THE COURT:  I will allow it.
 6   A.  Yes.  They do, but it has an intangible value.  In fact I
 7   believe that, internally, if the sports department is
 8   advertising on Modern Family, they get charged for the
 9   advertising dollar.  There is an intangible value to that, that
10   would make it as valuable as if they went out and bought it
11   themselves.  So in that particular instance, it is a value, but
12   it is intangible.
13   Q.  But you can't charge an outside advertiser for that
14   value --
15   A.  No, they are charging themselves internally, another
16   department for that.  It has value, because I think I said
17   before -- or I will say it again -- that the value of these
18   licenses is not only what it is that TVP received in cash, but
19   there is probably intangible values that it received as a
20   result of entering into these agreements as well which a model
21   like this would take into effect as well as the second scenario
22   that we used.
23   Q.  You are talking here, though, about the value of content to
24   someone selling this advertising space, are you not?
25   A.  Yeah.  But I am also looking at it as a proxy for the value
```

D7MUSPA2                    Shulman - cross

1   that TVP received as well.  We are trying to determine what it
2   is TVP received as a measure of the damages of lost profit.  So
3   it received not only cash, but it received intangible benefits
4   that is always hard to value, but this would include some of
5   those intangible values.  And intangible values would mean
6   things like publicity, like you just mentioned before, having
7   their name out there.  It could also include the value of
8   putting pressure on SEI because they seem to always be -- they
9   have a history of going at loggerheads, so there could be a
10  value of licensing into that market.  And to TVP, that is an
11  intangible value.
12  Q.  Where does your report talk about intangible value?
13  A.  You know, it doesn't.  And in preparing for trial, I tried
14  to articulate in my mind what these different things mean and
15  what they should be.
16  Q.  Mr. Shulman, this 100 percent advertising sell-out rate is
17  not based on reality, is it?
18  A.  Well, reality meaning what?
19  Q.  The reality of the markets, a television channel doesn't
20  sell 100 percent of its advertising?
21  A.  Generally not.
22  Q.  The second input you used in bold up there is the rate on
23  networks such as Polvision would charge for a 30-second
24  advertising during its programming.  And in this case you used
25  $159 as you described in your report in paragraph 44 based on a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7MUSPA2                    Shulman - cross

1    Polvision rate card which priced a 30-second unit at $159.  We
2    can quibble about whether that rate card has ever been
3    published or not, but that's where you got the 159 from, right?
4    A.  Yes.
5    Q.  Even though, as you note in your report in paragraph 44,
6    that the rate card itself says that volume discounts, volume
7    advertising discounts are available, you didn't take any volume
8    discounts into account, right?
9    A.  Not in this calculation.
10   Q.  You don't know if Polvision ever realized $159 per
11   30-second advertising space, do you?
12   A.  No.  I have never seen their history of what they have
13   charged for.
14   Q.  You don't know if any entity similar to Polvision could
15   ever achieve these advertising rates, do you?
16   A.  Actually, they can.
17   Q.  Have you presented any evidence of that?
18   A.  I didn't present any evidence, but I did some research but
19   I didn't include it in my report.  I spoke with media buyers
20   for foreign ethnic channels.  And when I spoke to the media
21   buyer, we talked about values that can range up to $159 for a
22   spot.  This is not a lot of money, but it is on an ethnic
23   station, but ethnic stations can charge that.
24   Q.  Have you had these conversations since your deposition or
25   before your deposition?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

D7MUSPA2                        Shulman - cross

1   A.  No, this was before.
2   Q.  Well, let's just take a look at the second volume you have
3   in front of you and there's a tab Shulman, and I want you to
4   look at page 146.
5   A.  What tab?
6   Q.  It is under the Shulman tab there.  Do you see it, Mr.
7   Shulman?
8   A.  Yes.  I see 146.
9   Q.  And I am going to read from the top there.
10          The question is:  "Do you know if any entity similar
11  to Polvision ever could achieve these spot rates or is that
12  something you can't testify on?"
13          Your answer:  "I can't opine on that."
14          My question:  "So you are not familiar with the
15  advertising ranges for spot rates, this is not within your
16  purview?
17          Your answer:  "I didn't do enough research on it.  We
18  just took what Polvision said that may be indicative of the
19  market."
20          Sir, are you changing your answer that you have
21  actually spoken to people to get this market rate?
22  A.  I am not changing my answer.  What this asks is, if you
23  know of any entity similar to Polvision.  I just said that
24  ethnic stations can demand as much as $160 an hour, not
25  necessarily Polish-speaking items.  I was just saying ethnic,

D7MUSPA2                    Shulman - cross

```
 1   in general.
 2   Q.  Did you ever take into account the testimony of the owner
 3   of Polvision, Walter Kotaba, who said that between 2009 and
 4   2011, Polvision charged between $40 and $90 per advertising
 5   spot, and advertising spots 40 to 90 dollars could be as long
 6   as one minute?  Did you take that into account?
 7   A.  Yes.  I did know of that testimony.  Like I said, the
 8   purpose of this one was to try and come up with a maximum value
 9   using maximum rates.
10   Q.  Is the maximum based on reality or is it just a fictional
11   maximum?
12   A.  Well, it is a maximum that is potentially available if
13   somebody wanted to get into this market and wanted to get to
14   Polish-speaking people in Chicago, primarily because it is the
15   largest market, I think, next to New York, of Polish-speaking
16   people in the country.  So there is an advantage there.  I am
17   also looking at it for a proxy as damages on the breach.  I
18   just was setting these parameters.  And I made no bones about
19   it in the report, it was really to maximize what a potential
20   range could be.
21   Q.  I have a similar question.  Did you take into account
22   Kotaba's testimony that some of his advertisers may have
23   actually been charged less than 40 to 90 dollars for
24   advertising spots and some of -- Polvision broadcast some of
25   its commercials for free.  Did you take that into account in
```

D7MUSPA2                    Shulman - cross

1    valuing what this advertising is actually worth?
2    A.  No.  I read it, but like I said, we were trying to come up
3    with the maximum value that it could be, so we used the rate
4    card of 100 which is a spot market and for, basically,
5    advertising among Polish.
6    Q.  But your maximum has to be based in reality, doesn't it?
7    A.  Not in this particular -- I don't see it.  I am seeing this
8    as an ability to calculate a maximum value.  Is it in reality?
9    It is in reality because there are 24 spots.  There is a rate
10   card.  There is a potential rate card, and you have a 40
11   percent program spending percentage.
12   Q.  You don't consider either whether advertisers might have
13   paid different amounts for different broadcasts at different
14   times of the day?
15   A.  No.  That was not the purpose of this calculation.
16   Q.  And I assume your answer is the same.  You haven't taken
17   into account Kotaba's testimony that only 20 or 30 percent of
18   its viewers, of Polvision's viewers, tune in to watch
19   television series, but most are interested in news so that
20   advertisers are much more interested in paying for advertising
21   during the news content that is always being broadcast rather
22   than the television series?  You have not taken that into
23   account either, is that right?
24   A.  No, we didn't take that into account.
25   Q.  Just to sum this up, the number that you offered the Court

```
        D7MUSPA2                   Shulman - cross
1     for this spot rate is actually incorrect; it ignores what
2     Polvision actually charged its customers and it is not based on
3     the reality of what advertisers would actually pay for
4     advertising during this content?
5              THE COURT:  I will sustain the objection.
6              Rephrase the question.
7     Q.  Let's move on to your third assumption.  Your third
8     assumption is that a network such as Polvision would spend 40
9     percent of its gross advertising billing during particular
10    programming to acquire that programming, right?  And you
11    relied, as you described on page 46 of your report on
12    certain --
13             THE COURT:  There was no answer to that first --
14    Q.  Just please give me a spoken answer so the court reporter
15    can get it down.
16             My question is that your third assumption is that a
17    network such as Polvision would spend 40 percent of its gross
18    advertising billings during particular programming to acquire
19    that programming, correct?
20    A.  Well, not necessarily Polvision, but another group who
21    could represent the market would look at 40 percent of their
22    advertising revenue as a reasonable way of profit sharing with
23    TVP or SEI.
24    Q.  In my question I said a network such as Polvision, but I
25    apologize if you didn't hear it.
```

```
                                                        36
     D7MUSPA2              Shulman - cross
 1              As you describe in paragraph 46, you relied on certain
 2   data from SNL Kagan which indicates a range for this particular
 3   ratio of 38 percent for 2008 and 2011, but you used 40 percent,
 4   higher than the highest number in the SNL Kagan range, right?
 5   A.  Yes.  We used and based it on the 2009 number which is the
 6   year in which all of the -- just about all of these episodes
 7   were licensed.  So we used the appropriate year, and in that
 8   year, Kagan reported 38 percent.
 9   Q.  Did you say almost all the episodes were licensed in
10   2009 --
11   A.  They would have aired.
12   Q.  Let me finish my question.
13              Are you ignoring the 545 episodes from 2010 and the
14   100 episodes from 2008 that we looked at earlier?
15   A.  No.  We used the '09 -- we used the '09 as the basis.
16   Q.  Did you take into account at all in coming up with that
17   ratio the age of the episodes that would be licensed there, for
18   example, the fact that the majority of the episodes were more
19   than ten years old, many of them were six years old?  Did you
20   take that into account?
21   A.  We understood that they were old episodes, but we also
22   understood that they are still popular.
23   Q.  Did you adjust that ratio based on the limited use right
24   that Polvision was receiving, basically, one broadcast, one
25   rerun only in the Chicago area?  Did you take that into account
```

37

D7MUSPA2                          Shulman — cross

1   in determining what ratio to use?
2   A.  No.
3   Q.  So your final calculation, just to review, based on a 100
4   percent sell-out rate for all 24 30-second spots at $159 per
5   30-second advertising spot, and that 40 percent ratio for each
6   half hour of programming, so you arrived at a value for the
7   half-hour programming of 763.  Have you seen any evidence that
8   any company has ever paid that amount to TVP for a half hour of
9   its programming?
10  A.  No.  I would not know what they would have paid to TVP.
11  Q.  Have you seen any evidence of what any company has paid TVP
12  for a half hour of its programming?
13  A.  No.
14  Q.  Mr. Shulman, I have put up here a summary that I have
15  created from the three licensing agreements we have been
16  discussing, and it shows which episodes are the series, from
17  which episodes were licensed and the amount paid by Polvision
18  to TVP for each of those series.
19          Did you want to change your answer that you gave the
20  Court before?  Have you actually seen what anyone has paid TVP
21  for its programming?
22  A.  You meant other than Polvision?  OK.  Obviously, I saw what
23  Polvision had --
24  Q.  These amounts listed here show say what Polvision paid TVP
25  for a half hour of its programming, right?

D7MUSPA2                         Shulman - cross
1    A.  Yes, that's correct.
2    Q.  And you see here in the June 2008 agreement, it is 270 per
3    episode Na Dobre and $130 per episode for Plebania.  And we can
4    look through the rest, but we see in the August 2009 and the
5    July 2010 agreements, there are five series for which Polvision
6    paid TVP $180 per episode and the rest of them are $110 per
7    episode, correct?
8    A.  It seems that way from your chart.
9    Q.  So your assumptions leading to $763, they are not based --
10   the only example that we have of anyone paying TVP for its
11   content, they are not close to that, are they?
12   A.  That was not the purpose of that scenario.  If you want to
13   look at the scenario that measures the value based on these,
14   you should go to scenario 3 because that's what that particular
15   damage is calculated based on, what TVP -- we weren't ignoring
16   what TVP actually received from them.  That is scenario 3.  We
17   were offering two other alternatives in case the Court sees
18   that these particular values were really not fair value and
19   that it was something at play here where TVP was willing to
20   accept a lot less than what these particular episodes were
21   really worth, either on the open market or even to them.
22   Q.  Let's move on to your second methodology for the Polvision
23   damages claim.  For that methodology, which you described in
24   paragraph 32 as the fair value of the licenses based upon the
25   market rate expressly stated -- do you see that?  It is 32B.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

D7MUSPA2                    Shulman - cross
1    A.  Yeah.
2    Q.  For this methodology, you used a value of $600, right, for
3    all of the episodes that we have been discussing, the 860
4    episodes, right?
5    A.  Yes.
6    Q.  And if we take a look at Exhibit 5, TVP Exhibit 5, I am
7    looking at number 4 -- section 2, number 4 on page 2.  It says
8    that TVP obligates itself to provide to Polvision -- 4B -- up
9    to two episodes per week, etc., with a market value of one
10   episode of U.S. dollar 600 dollars.  That's where you got your
11   $600 figure from, correct?
12   A.  Yes.
13   Q.  But you ignore, do you not, the very next number in this
14   agreement where it says, for the amounts mentioned above,
15   Polvision shall grant a 50 percent discount after the discount
16   value of the episode shall be the following, and it says $300
17   for one episode of the serial show.  You ignore the fact that
18   this agreement actually valued -- the value of the episodes
19   shall be $300, right?
20   A.  Yes, I saw that.
21   Q.  Did you ignore that in your calculation?
22   A.  Yes.  We are using the $600 which is the stated market
23   value.
24   Q.  Isn't the definition of a barter agreement, an agreement --
25   let me just back up for a second.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D7MUSPA2                    Shulman - cross

1          Exhibit 5, this is the March 2008 barter agreement, is
2  that right?
3  A.  Yes.
4  Q.  Different than the June 2008 licensing agreement?
5  A.  Correct.
6  Q.  So SEI is not asserting damages claim relating to this
7  barter agreement, right?
8  A.  Correct.
9  Q.  Isn't the definition of a barter agreement, an agreement
10 when something of value is exchanged for something else of
11 value other than cash?
12 A.  Correct.
13 Q.  So isn't it possible then that, because this is a barter
14 agreement, that the true value of these episodes is something
15 different than the stated value of $300?
16 A.  Not necessarily.  Barter agreements are an interesting
17 animal and, basically, what they are trying to do is come up
18 with a net value between the two.
19          My experience with barter agreements is that they are
20 tax oriented.  The amounts of what it is that is in the
21 agreement, what they got, what they stated the exchange value
22 is, is the value for tax purposes, as well as the fact that
23 barter agreements can have a sense of, if they are not read
24 correctly, diminishing value when there really was no
25 diminished value.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

41

D7MUSPA2                        Shulman - cross

1   Q.  My question was whether it is possible that a stated value
2   in a barter agreement doesn't reflect a true value of what is
3   being described?  Is that possible?
4   A.  Sure.  Anything is possible.
5   Q.  So you used $600 per episode for this methodology.
6          Let's take a look at this blow-up here.  In the June
7   agreement, do you see that TVP charged Polvision -- when there
8   is actually money changing hands in these three agreements, TVP
9   charged $270 per Na Dobre episodes, $130 for Plebania episodes.
10  And for the rest, they are either a handful of $80 per
11  episodes -- most are $110 per episode.
12         Does your second methodology take into account these
13  numbers which come from agreements where money actually changed
14  hands between the parties?
15  A.  No.  It doesn't take into account these values.  It takes
16  into account the stated value that TVP put on its own
17  programming.
18  Q.  That $600 value?
19  A.  That $600 value.  That's what they felt that their
20  programming was really worth.
21  Q.  It is true that in all of the times the parties actually
22  exchanged money, they never used the $600?
23  A.  No, we did not, unless there was an intangible value, like
24  I had testified before, which implies there is some intangible
25  value that TVP is getting and it is not necessarily requiring

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

42

D7MUSPA2                    Shulman - cross
1  Polvision to pay them for it.
2  Q.  If the $600 is not the actual proper value you assigned to
3  these episodes, then those damages methodology is incorrect,
4  right?
5  A.  Yeah, sure.
6  Q.  Your third damage methodology says, as you have described
7  it, the amount Polvision paid for TVP for the content is the
8  measure of SEI damages, correct?
9  A.  Correct.
10  Q.  And this methodology relies on the same underlying
11  assumptions as the other two.  First, that SEI had distribution
12  exclusivity as to these individual programs, right?
13  A.  Yes.
14  Q.  Also, that SEI had the right to and would have syndicated
15  these individual programs to another channel such as Polvision?
16  A.  Well, they wouldn't have to have done it.  I testified that
17  they only needed to have that exclusivity clause, and if TVP
18  sold it into the market, well, that's the measure of that lost
19  profit.
20  Q.  This methodology also assumes all 860 episodes should be
21  included, right?
22  A.  Yes.
23  Q.  So, for example, if 100 episodes from the June 2008
24  agreement, those episodes should not be included or the 545
25  episodes from the July 2010 annex, that those shouldn't be
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

D7MUSPA2                    Shulman - cross

1    included, this damages methodology is incorrect, right?
2    A.  If the Court decides it is not 860, it is some other
3    number, then that could be the number that they choose to, you
4    know, replace it with.
5    Q.  Your report has not given the Court alternative damage
6    amounts?
7    A.  I did give alternative damage amounts.
8    Q.  Alternative damages amounts if some of these episodes
9    shouldn't be included, correct?
10   A.  Correct, I didn't.
11   Q.  I want to move to the Klan claim.  This is SEI's third
12   claim.  Your opinion as to SEI's damages is that, essentially,
13   TVP's removal of this program from the TV Polonia channel
14   caused SEI to lose subscriber revenue both in the past, before
15   your report was issued and going forward, is that right?
16   A.  Yes.  I am just going to the pages where I spoke about
17   that.  OK.
18   Q.  Can you describe the way you have calculated SEI loss of
19   subscriber revenue for this claim?
20   A.  Yes.
21   Q.  Please do.
22   A.  We did what is called in the damage industry as a before
23   and after.  A before and after analysis is an analysis that
24   takes and sees what the activity was before the breach occurred
25   and then takes a look at the activity after the breach occurred

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7MUSPA2                    Shulman - cross

1    to see what the differential was, assuming and keeping all
2    things being equal.  In other words, if the same behavior
3    occurred before and the same behavior was going to occur after
4    and similar types of events occurred before and after and the
5    only event that was the defining moment, the breach, then it
6    would give us an indication of what it was, that the lost
7    subscribers were attributable to that breach.
8    Q.  You basically calculated what you have assessed as a 1.7
9    percent growth rate for SEI's subscribers per quarter from the
10   end of 2003 through the end of the second quarter of 2010?
11   A.  I believe --
12   Q.  I am looking at paragraphs 73 to 75 of your report.
13   A.  Yes.
14   Q.  You have used that historical growth rate of 1.7 percent,
15   which you calculated, compared to the actual growth rate you
16   calculated after TVP removed the Klan program to arrive at what
17   you have described as a diminished subscriber growth rate,
18   correct?
19   A.  I will correct you.  The actual historical growth rate was
20   not 1.7.  The actual historical growth rate was 3.4, but it
21   included a significant number of big spikes.  And if you go to
22   Exhibit 3 of our report, you can see that there are six
23   particular quarterly growths that were much larger than what we
24   would have expected and were as a result of some sort of an
25   event that drove up those growth periods.  We took out those
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

D7MUSPA2                    Shulman - cross

1   spikes because they were not representative of what we felt of
2   what the normal growth would be.  And we attributed it to other
3   events.  They were just too large and we felt it distorted the
4   growth.  So we took them out and we came down to what we call
5   on this particular schedule the adjusted average growth which
6   was 1.7 percent.
7   Q.  I take that from your report.  I am just trying to help us
8   move along by summarizing your conclusions.  So I recognize how
9   you got to that.
10          And you basically have calculated SEI lost subscriber
11  revenue as a result of this diminished subscriber growth rate
12  from the end of the second quarter of 27 -- I'm sorry -- the
13  second quarter of 2010 through the end of the second quarter of
14  2011 which you have described as your historical damage period.
15  And you have also done a forward-looking damages model from
16  2012 through the end of the term of the parties' agreement,
17  correct?
18  A.  I wouldn't characterize it that way either.  We did not
19  actually look at any growth during that subsequent period.  We
20  could have made an assumption that there were lost customers
21  that would not have subscribed to the service during that
22  period but didn't because the Klan wasn't there.  What we did
23  was, we just shut it off and we took the 2,071 lost subscribers
24  and we reduced it over the period of the license agreement for
25  an attrition rate.  So we did not, you know, continue that same

D7MUSPA2                    Shulman - cross

1  analysis as you said.  We just took the 2000.  Those weren't
2  there.  They weren't coming back and, as a result -- overall,
3  there would be an attrition rate because we would lose
4  subscribers.
5  Q.  You mentioned the lost subscribers.  Basically, your theory
6  is that SEI's loss as a result of this diminished subscriber
7  growth rate, 2,071 subscribers and you multiplied those
8  allegedly lost subscribers by SEI's monthly subscription
9  revenues through 2019 to arrive at your damages calculation of
10  approximately 1 and a quarter million dollars, right?
11  A.  Correct.
12  Q.  Now, you have testified at your deposition with respect to
13  the Polvision claim that initially SEI's theory was a theory of
14  lost subscribers too, that SEI claimed, as a result of TVP
15  licensing to Polvision, SEI lost subscribers.
16          You testified, though, with respect to that claim, you
17  were not comfortable that subscriber cancellations, that should
18  be attributable to TVP licensing to Polvision.  I will quote
19  from your deposition, page 26, line 19, you said:
20          "I think in the end, that's the bottom line.  We
21  didn't feel comfortable that we could attribute the
22  cancellations to Polvision."
23          Do you remember that testimony?
24  A.  I do.
25  Q.  By not attributable to Polvision, what you mean is that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

47

D7MUSPA2                    Shulman - cross

1   there is potentially a causation problem, that you were not
2   comfortable saying that SEI lost a given number of subscribers
3   as a result of Polvision's broadcast of these series, correct?
4   A.  No.  It was not a causation problem.  It was a
5   documentation problem.  The problem with determining the lost
6   subscribers in Chicago is that there wasn't enough information
7   to do a before and after.  There was no historical information
8   and the information was incomplete.
9           The only cancellation information that was provided
10  was for GlobeCast and the Internet.  GlobeCast is satellite --
11  even though Mr. Hart refers to it as cable.  It is only
12  satellite, and it is only a small proportion of what the actual
13  domestic revenues are, which I think was about 12 percent.  The
14  only cancellation provided were for those two.  It left out
15  cable TV which was provided by IMB and in the Chicago area,
16  which was basically Comcast and AT&T.  So the information was
17  incomplete and didn't have enough of it in order to make a
18  calculation to do a before and after.
19  Q.  Whose information was incomplete?
20  A.  The information in discovery -- that we had in discovery.
21  Q.  But the subscribers pay SEI, don't they?  The subscriber
22  revenue flows to SEI?
23  A.  Yes, through third parties like IMB, GlobeCast, they get a
24  share of those.
25  Q.  Why couldn't you go to SEI and find out how many
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

D7MUSPA2                    Shulman - cross
1   subscribers --
2   A.  We asked for all of that cancellation.  It is basically
3   discovery.  We worked off what information was in discovery and
4   we didn't have that information available.
5   Q.  So when you said we didn't feel comfortable that we could
6   attribute the cancellation to Polvision, what you mean is that
7   you couldn't go to your client which collects all of the
8   subscriber revenue and get information as to which subscribers
9   cancelled in which place?
10  A.  I believe we asked to see if we could get it.  I don't
11  think we could get it.  So that we were left with -- just like
12  Mr. Hart was -- what it was that was in discovery.  But we had
13  an alternative way of looking at it.  We had the alternative
14  way of looking at it as what did TVP receive because, in the
15  end, if we had perfect information and we were able to do a
16  before and after, those two methodologies combined, we would
17  still have to take the greater of the two.  So if the
18  cancellations were, you know, that lost profits came out more
19  than what TVP received, then that probably would be a more
20  appropriate damage, but if it came out less, TVP still received
21  damages that SEI would be entitled to.
22  Q.  You don't say that lost profits from subscribers is a
23  potential alternative way of calculating damages in your
24  report, do you?
25  A.  No.  We didn't make reference to it.  We just made
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

D7MUSPA2                          Shulman - cross

1  reference to the methodology that we used.
2  Q.  Basically what you are saying is that you were not
3  comfortable with attributing subscriber cancellations in the
4  Polvision situation, but for some reason you did feel
5  comfortable in attributing subscriber cancellations from the
6  removal of the one program from TV Polonia?
7  A.  Yes.  We had enough history on the total global subscriber
8  and revenue level for SEI that allowed us to do a before and
9  after, which we didn't have in the Polvision claim, as you call
10 it.
11 Q.  When someone dies and their television subscription is
12 cancelled, correct?
13 A.  Yes.
14 Q.  When someone moves, their television subscription is
15 cancelled?
16 A.  Yeah, a lot of times --
17 Q.  Go ahead.  I'm sorry.  I didn't mean to interrupt.
18 A.  That second one, you know, there is a lot of movement that
19 goes around in cable and satellite.  People move.  They cancel.
20 And they take it out again wherever it is they do move.  So you
21 have them canceling over here.  You have them increasing over
22 here.  And there's lots of movement that takes place in cable,
23 satellite.  And they may go from one type of provider to a
24 different type of provider.
25 Q.  And people sometimes just cancel their subscription because

```
     D7MUSPA2              Shulman - cross
1    they can't afford it, right?
2    A.   That is true too.
3    Q.   Does your report take into account typical attrition as a
4    reason for potential subscriber cancellations?
5    A.   Once again, it is before and after.  Typical attrition
6    reasons existed before.  The same attrition reasons would
7    consider afterwards.  We are taking as the delta, the
8    difference.  And we were taking the net which was really what
9    was the growth rate because that takes into account new people
10   we might not have gotten and people that have left and we are
11   only looking at the delta.
12   Q.   2009 to 2010 was a tough financial period for many people,
13   wasn't it?
14   A.   Maybe not 2010.  It may depend on what economics you are
15   referring to, the crash of '08 which probably went into '09.
16   But there are certain indications too that in '09, the market
17   came around.
18   Q.   Would it be fair, in your view, to describe a substantial
19   number of SEI subscribers as lower income earning people?
20   A.   I didn't do a demographics of it.
21   Q.   Did you take into account at all the economic conditions as
22   a potential reason for cancellations?
23   A.   Remember, our before period goes up to March of '08, before
24   the crash starts, and in the second quarter at '10.  And I
25   think if you look at economic reports, things were doing better
```

D7MUSPA2                    Shulman - cross
1  than in '08 and '09 -- not saying that there weren't people out
2  of work.
3  Q.  Right.
4  A.  But the fact is that we are already in '10, and we are in
5  the second quarter of '10.
6  Q.  Does your report consider price changes to the subscription
7  to TV Polonia as a potential reason for cancellation?
8  A.  It is the same question.  Did people --
9  Q.  Price changes for the particular programming, to subscribe?
10  A.  It is the same question.  Are you asking did people leave
11  because the price of the subscription went up?
12  Q.  Did you take that into account?
13  A.  No.
14  Q.  Did you take into account changes in SEI's distribution
15  network as a potential reason for loss of subscribers?
16  A.  Well, we looked at these spikes and we looked at the
17  subsequent period.  There was some minor shifting back and
18  forth from one provider to another.  It happened before.  It
19  happened after, just like price increases happened before and
20  they happened after.  So because they happened before and
21  after, that typical behavior is going to be in both periods.
22  So when we do the before and after, it is all things being
23  equal except the claim.
24  Q.  If there was a major change to a distribution network, for
25  example, GlobeCast stopped distributing or DIRECTV stopped

52

D7MUSPA2                    Shulman - cross
1    distributing SEI's channels, is that something that you did not
2    take into account at all?
3    A.   No.   We took it into account.   If some provider falls out,
4    a new provider comes in because they are managing the provider.
5    Actually, subscribers did go up during that period, it wasn't
6    that they went down.   It is just a matter of what was the
7    differential in the growth.
8
9                 (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

D7MASPA3ps                    Shulman - cross

1  Q.  So even though you could have had access to any substantial
2  changes in the distribution model, meaning the cable networks,
3  distributing SEI channel, you just didn't take that into
4  account because you assumed that there was some before, some
5  after?
6  A.  Well, we had what was available in discovery.  It's not
7  like we could walk into their offices and get this.
8  Q.  I'm talking about your client.  I'm talking about your
9  client, to the TVP.
10 A.  Yes, the attorneys.  I have my retaining letter with the
11 attorneys.
12 Q.  OK.  We're talking about one show, the Klan show.  Have you
13 seen any evidence, or anecdotal information, anywhere,
14 suggesting that subscribers canceled subscriptions to their
15 television programming because one show from a channel has been
16 removed from that channel?
17 A.  Well, anecdotally, Mr. Spanski, in his testimony --
18 Q.  Aside from --
19 A.  -- indicating that in describing -- I know we had
20 discussions with Larry.  But, you know, when HBO stopped
21 producing The Sopranos, I think there was a decline -- you
22 know, it might have affected their subscriber base.
23 Q.  It might have or --
24 A.  Yeah.
25 Q.  -- do you have evidence --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7MASPA3ps                    Shulman - cross

1   A.  I remember -- I'm not citing evidence for it.  I think,
2   anecdotally, Mr. Holland referred to that, and I'd have to
3   review Mr. Gerbrandt's, maybe you can too, to see whether or
4   not he addresses that issue about specific one-show issues
5   driving a particular network's subscription.
6   Q.  But this is not what you've --
7   A.  No.
8   Q.  You said before you haven't given expert testimony in a
9   media case.
10  A.  Well, before and after was to try to isolate all events
11  being equal.  This was presumably a very big event.  And it was
12  a big event for everybody.
13  Q.  You said, you've also said that you looked at SEI's
14  purported diminished subscriber growth rate from the second
15  quarter point and when the Klan was removed through the end of
16  2011; is that right?
17  A.  Yes.
18  Q.  So is it your view that subscribers, even if they would
19  cancel a subscription because of a removal of one show from a
20  channel, would do so up to a year and a half after that show
21  was removed from the channel?
22  A.  Well, we're not saying exactly that.  What we're saying is,
23  the growth rate was diminished, which means that we weren't
24  attracting the same number of subscribers to the channel
25  because the Klan was not there.  And it's very possible that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7MASPA3ps                    Shulman - cross
1   some people might have become disenchanted with it, you know,
2   within a year or so.  You know.  I'm a procrastinator.  Gosh, I
3   still have AOL, and I'm saying, why do I have AOL when I can go
4   to Gmail.  Go figure.
5   Q.  But your view is that subscribers canceled their
6   subscriptions, resulting in this diminished subscriber growth
7   rate, even a year and a half later because one show was removed
8   from programming?
9           MR. PISKORA:  Objection.
10  A.  I'm not saying that.
11          MR. PISKORA:  He's asked and answered.
12          THE COURT:  Overruled.
13  A.  I'm not saying that.  I'm looking at the growth rate.  And
14  the growth rate was affected by the Klan, apparently, from this
15  before and after, if we define that the major event that
16  occurred was the Klan.
17  Q.  Did you review the discussion during the testimony of
18  Boguslaw Spanski that SEI's website has cookies allowing SEI to
19  analyze the user viewing habits through its website?
20  A.  No.
21  Q.  I think you've never asked about these cookies on SEI's
22  website to determine whether the Klan was a popular program
23  among the website viewers.
24  A.  No, I did not.
25  Q.  You testified at your deposition, and I think you've
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

56

D7MASPA3ps                    Shulman - cross
 1   described it here too, that for the period in which you claim
 2   SEI suffered from a diminished subscriber growth rate you
 3   focused on net subscribers, in other words, subscribers gained
 4   minus subscribers lost during a particular period.  Right?  But
 5   you didn't consider in more detail for each of these periods
 6   how many of these subscribers actually subscribed and how many
 7   canceled, did you?
 8   A.  No.  That information, that detailed information, wasn't
 9   available.  But we felt we captured it when we look at our
10   growth rates, because the growth rate includes people that come
11   in and people that go out.
12   Q.  That's not true.  Because in fact your analysis wouldn't
13   accurately reflect true cancellations, because if you have one
14   period where 20 people subscribe, right, but 19 cancel, you
15   would have a low net additional subscriber rate during this
16   period, one new subscriber during that period.  But in reality
17   there are only a few cancellations during this period.  Isn't
18   that true?
19   A.  We're looking to find out what the result was of not only
20   subscribers that canceled but those that didn't come to the
21   station because the Klan wasn't on there.  There are two things
22   that are in play here.  One is, who didn't come, and who might
23   have left.  So the growth in a particular quarter reflects that
24   very same information.  So it's not necessary to look at
25   individual cancellations or individual growth.  We can do it by

D7MASPA3ps                    Shulman - cross
1   looking at the effect on the overall growth rate.
2   Q.  You're talking about people who didn't -- potential
3   subscribers, not subscribers.  Does your report consider
4   whether there were any new alternatives to TV Polonia in the
5   marketplace, other Polish programming that became available
6   during this time period?
7   A.  No, we didn't.
8   Q.  Does your report address the fact that SEI had actually
9   gained some 20,600 subscribers during your period?
10  A.  Yes.
11  Q.  Your report doesn't distinguish in cable Internet
12  subscribers; is that right?
13  A.  Correct, on claims breach.
14  Q.  Do you know whether there is a significantly different
15  typical churn rate, by that I mean typical cancellation rate,
16  between cable and Internet subscribers?
17  A.  Yes.  They behave differently.  But the question is not how
18  they relate differently between themselves.  It's how they, if
19  their behavior changed from before the event, after the event.
20  It's not the difference between the three.  It's how they
21  behaved before and after.  And that's the critical point.
22  Q.  Your report also doesn't address whether it's possible that
23  during the time period people are becoming more and more
24  accustomed to watching video contests on the Internet rather
25  that than on television, right?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

58

D7MASPA3ps                    Shulman - cross

1   A.  Actually I think there are studies which show that really
2   that isn't -- watching TV on the Internet isn't yet really
3   driving viewers down from cable.  Cable is still growing.  I
4   think during -- if we looked at the growth in this period,
5   cable here increased almost 18 percent over a period of time.
6   That's not the issue.  And that's not what the numbers reflect.
7   Q.  You didn't discuss evidence either way on those issues,
8   have you, in your report?
9   A.  Not in the report.  But I --
10  Q.  You say in your deposition that if a major distributor had
11  stopped distributing TVP programming for SEI during your
12  calculated growth period, or if a new distributor joined SEI's
13  distribution network, that would skew your calculation of SEI's
14  growth rates, right?
15  A.  If it was significant material.
16  Q.  But your report ignored the fact that their exclusivity
17  stopped distributing the TV Polonia channel during the third
18  quarter of 2010, resulting in a loss of 624 subscribers, right?
19  A.  Yes.  But they seemed to have picked it up in other ways
20  too.  So those types of movement -- 600 is not a lot of
21  movement in subscribers.
22  Q.  Well, it's a third of your subscribers, right?
23  A.  Well, in that regard, but as part of the whole base, it's
24  not a significant movement in my entire base because I have
25  providers coming in and I have providers going out.  SEI isn't

D7MASPA3ps                    Shulman - cross

1   standing still.  So in fact my subscriber rates went up.  But
2   they're managing their providers.  So those are what we
3   consider minor moves, where you have some coming in, some going
4   out.
5   Q.  So you're saying that if one system went directly offline
6   and they lose 624 subscribers, it's a minor move?
7   A.  Yes.  Because they're going to replace it.  They're overall
8   going to replace them with other providers, over time.
9   Q.  I still don't understand why your report didn't address
10  these issues.  You had access to SEI information.  SEI knows
11  about its distribution network, who it distributes the TV
12  Polonia Channel through.
13  A.  When you look at, if you look on Exhibit 3, second quarter
14  to fourth quarter, you're going to see that there are not a lot
15  of major -- there's no major spikes here, like there are in the
16  before period.  It just is a normal reaction to the ins and
17  outs of what happens in the industry.  There's nothing that
18  jumps out here.
19  Q.  In terms of the per-subscriber revenue that you calculated
20  for SEI according to lost subscribers, you took the historical
21  revenue allocated by SEI to TVP and you increased that by 66
22  percent, right, and you did that to account for SEI's
23  allocation of its revenues to distributing TVP programming,
24  right?
25  A.  We made a calculation to do that, yes.  However, I think in

D7MASPA3ps     Shulman — cross

1 your deposition you pointed out that we might have had an error
2 in three of the quarters.
3 Q.  You didn't correct that error?
4 A.  Yes, we did actually.  We went back and recalculated the
5 two things.  We went back and we calculated for those changes
6 you saw in the calculation for those three quarters, I believe
7 it was.  And also you came up with an idea, well, we didn't
8 prorate the third quarter because it started July 26.  So we
9 went back and we recalculated it.  And it came out to about a
10 4.4 percent reduction in the damage that we came up with.
11 Q.  Where would we see this?
12 A.  I did -- I'm telling you I did it based on your deposition
13 because when people point out things to us we want to look at
14 it and see what the --
15 Q.  But your report is incorrect as it stands now, right?
16 A.  It's about 4.4 percent less.
17 Q.  You haven't shown new calculations, right?
18 A.  I have not personally, no.
19 Q.  You've acknowledged at your deposition that there is some
20 double counting as to damages between Klan and Polvision,
21 right, because of the 860 episodes that form the basis for your
22 Polvision claim, 222 of those are the Klan episodes, so SEI is
23 seeking damages for the value of TVP's license of those
24 episodes to Polvision as the replacement programming and at the
25 same time seeking damages as part of the Klan claim for

D7MASPA3ps                    Shulman - cross

```
 1    removing that programming from TV Polonia, right?
 2          MR. PISKORA:  Objection, lacks foundation.
 3          THE COURT:  I'll allow it.
 4    Q.  Do you recall that testimony?
 5    A.  I recall the context of it, but it's not as you explained
 6    it.
 7    Q.  So what did you agree with me was the double counting?
 8    A.  I said there was a possibility --
 9    Q.  Wait until I'm finished.
10    A.  I'm sorry.
11    Q.  My question is, what do you recall about your testimony as
12    to the double counting between the Polvision and the Klan
13    damage claim?
14    A.  I said there might be a possibility that the subscribe --
15    there were lost subscribers in the Chicago area attributable to
16    Polvision that we might have included as lost subscribers in
17    claim 3, when you brought up the, you know, this so-called
18    double-dipping.  And so that really, to me, was a question of
19    whether or not that actually took place.  But in Hart's report,
20    based on his calculation, he said the double-dipping was
21    minimal or not material.  So consequently -- and we didn't do
22    that lost subscriber calculation in the Chicago Polvision claim
23    because we just didn't have all the information and we
24    didn't -- and we moved to the damage calculation we've got in
25    there.  But Mr. Hart did an analysis, and he came to a
```

```
D7MASPA3ps                    Shulman - cross
```

1   conclusion that the double-dipping was minimal for that.
2   Q.  I'll just break it down so it will be easier.  Out of the
3   860 episodes that formed the basis for the Polvision claim, as
4   we've seen previously, 222 of those are Klan episodes, right?
5   A.  I'll take what you say as correct.  I mean, I, I don't know
6   the exact number, off the top of my head.  I'll take it --
7   Q.  It's in Exhibit 40.  222 of the 540 episodes in July, 545
8   in July 2010 are Klan episodes.  So SEI is seeking damages for
9   222 Klan episodes, licensed by TVP to Polvision, right?
10  A.  Well, what we're doing is, we're really seeking damages
11  based on what it was that TVP received for licensing into the
12  market.
13  Q.  Understood.  And did you understand that SEI's theory is
14  that TVP removed the client program from TV Polonia in order to
15  be able to license these 222 episodes to Polvision?  Do you
16  understand that?
17  A.  Yes.
18  Q.  So you're asserting a claim for a lost subscriber resulting
19  from TVP's removal of the Klan program from TV Polonia --
20  A.  Yes.
21  Q.  And at the same time you're also asserting a damages claim
22  for 222 Klan episodes licensed to Polvision.  So isn't there,
23  in effect, damages being sought twice for TVP's removal of the
24  Klan episodes and TV Polonia?
25  A.  I don't think I see it that way.  What I see is that, with

D7MASPA3ps                    Shulman - cross

1    TVP licensed into the market, Klan that wasn't available on,
2    you know, to SEI anymore.  So in effect they're licensing into
3    the market to take away -- in breach of their exclusivity
4    clause.  So what's the value of what that breach is, what TVP
5    received?  Now I'm looking at the Klan, right, and they're
6    overall, but SEI doesn't have that Klan, doesn't have the Klan
7    to show.  So I'm not really double-dipping.  I'm just showing
8    what their damage was by not having the Klan available to their
9    subscribers in claim 3.
10   Q.  I want to read your testimony on pages 218 and 219 of the
11   book in front of you.  I'm starting on page 218 at line 15.  My
12   question is:  "So you're" --
13              THE COURT:  Hold on.
14   Q.  It's in the tab on page 218.
15   A.  Yes, I see it.  OK.
16   Q.  The question is:
17   "Q. So you're seeking damages in the Polvision claim, or SEI is
18   seeking damages, based on Klan episodes.  Is it in your view
19   not a double damages claim for them to now seek additional
20   damages for the Klan episodes?"
21              There's an objection.  The response is:
22   "A. Now I understand what you're asking about.  That's a
23   different question.  We didn't aggregate the claims.  We put up
24   claims for each Klan.  To the extent there might be some
25   duplication, then that might come out in the court and may be
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

D7MASPA3ps                    Shulman - cross

1    something that needs to be considered.

2    "Q. Is there duplication or is there not?

3    "A. There's a possibility that it could be considered in that

4    this claim is to take away profits that they earned to bring it

5    back to SEI in the form of where what they got really should

6    appear."

7            So I don't know -- the response is not entirely clear.

8    Is it your testimony that there is no double counting, or is

9    there double counting?

10   A.  The double counting is as I said it was.  That's the way

11   I'm thinking of it.  And Mr. Hart did a calculation and said it

12   wasn't material.  And so consequently, that's my testimony.

13          MR. WENGER:  TVP moves to have Mr. Shulman's report

14   stricken from the record on the basis that his assumptions are

15   not grounded in reality.  But we'll have no further

16   cross-examination.

17          THE COURT:  All right.

18          Plaintiffs are responding?

19          MR. PISKORA:  Your Honor, we submit that for the

20   reasons stated in Mr. Shulman's report, including his

21   background qualifications and the fact that Mr. Shulman does

22   not need to opine as to every fact issue in the case, that the

23   motion be denied.

24          THE COURT:  All right.  That's fine.  That motion is

25   denied.

```
                                                    65
        D7MASPA3ps                 Shulman - cross
 1               Any redirect?
 2               MR. PISKORA:  Can we take five minutes, your Honor?
 3               THE COURT:  Sure.  Let's take a ten-minute break.
 4               MR. PISKORA:  OK.
 5               (Recess)
 6               THE COURT:  Any redirect?
 7               MR. PISKORA:  Yes, your Honor, perhaps five minutes.
 8      REDIRECT EXAMINATION
 9      BY MR. PISKORA:
10      Q.  Mr. Shulman, how are you?
11      A.  Good.
12      Q.  On cross-examination, do you remember testifying as to some
13      revisions that you made to the calculation of damages for claim
14      3, which was the removal of Klan, based upon some criticisms
15      that you had received from TVP's expert?
16      A.  Yes.
17               MR. PISKORA:  I'd like to present the witness and mark
18      for identification a document related to the three
19      calculations.
20               THE COURT:  OK.  Show it to counsel.
21               So the record is clear, which exhibit number is that?
22               MR. PISKORA:  It hasn't been marked.  We're going to
23      attempt to just do that.
24               THE COURT:  You want this marked as Plaintiff's 151 or
25      what do you want this as?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```