# 14-967(L),

## 14-1115(XAP)

# United States Court of Appeals
## for the
## Second Circuit

---

SPANSKI ENTERPRISES, INC.,

*Plaintiff-Appellant-Cross-Appellee,*

– v. –

TELEWIZJA POLSKA S.A.,

*Defendant-Appellee-Cross-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume X of XI (Pages A-2701 to A-2950)

DLA PIPER US LLP (NY)
*Attorneys for Defendant-Appellee-*
*Cross-Appellant*
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500

LOEB & LOEB LLP
*Attorneys for Plaintiff-Appellant-*
*Cross-Appellee*
345 Park Avenue
New York, New York 10154
(212) 407-4000

i

# Table of Contents

**Page**

District Court Docket Entries .................................................. A-1

Complaint, Dated June 24, 2010 ........................................... A-14

Amended Complaint, Dated October 1, 2010 ......................... A-20

Plaintiff's First Request for the Production of Documents,
    Dated March 3, 2011 ............................................................ A-30

Defendant's First Request for the Production of Documents,
    Dated March 30, 2011 .......................................................... A-37

Plaintiff's Second Request for the Production of Documents,
    Dated December 28, 2011 .................................................... A-44

Joint Pre-Trial Order, Dated February 7, 2013 ...................... A-49

    Exhibit 1 to Joint Pre-Trial Order -
    Stipulated Facts and Law ..................................................... A-59

    Exhibit 2 to Joint Pre-Trial Order -
    Plaintiff's Designations of Deposition Testimony .............. A-62

    Exhibit 3 to Joint Pre-Trial Order -
    Defendant's Designations of Deposition Testimony .......... A-66

    Exhibit 4 to Joint Pre-Trial Order -
    List of Plaintiff's Proposed Exhibits .................................. A-68

    Exhibit 5 to Joint Pre-Trial Order -
    List of Defendant's Proposed Exhibits................................ A-74

Trial Declaration of Maria Nadolna,
    Dated February 27, 2013 ..................................................... A-76

Trial Declaration of Piotr Lenarczyk,
    Executed on March 1, 2013.................................................. A-93

Trial Declaration of Boguslaw Spanski on Behalf of
    Plaintiff, SEI, Dated March 16, 2013 ................................. A-98

Proposed Findings of Fact and Conclusions of Law
    of Plaintiff Spanski Enterprises, Inc. ("SEI"),
    Dated July 1, 2013............................................................... A-125

Proposed Findings of Fact and Conclusions of Law
    of Defendant Telewizja Polska, S.A. ("TVP"),
    Dated July 1, 2013............................................................... A-142

ii

**Page**

Deposition Transcript of Boguslaw Spanski,
Dated November 8, 2011 ...................................................... A-194

Deposition Transcript of Maria E. Nadolna,
Dated November 9, 2011 ...................................................... A-255

Deposition Transcript of Stephen Shulman,
Dated June 7, 2012 ............................................................... A-383

Deposition Transcript of Larry Gerbrandt,
Dated June 19, 2012 ............................................................. A-483

Transcript of Trial, Dated July 22, 2013 .................................. A-536

Witnesses:

    Stephen Walter Shulman     Cross (by Mr. Wenger).......... A-539
                                         Redirect (by Mr. Piskora)...... A-600

    Tomasz Gladowski     Cross (by Mr. Wenger).......... A-602
                                         Redirect (by Mr. Barnett)...... A-614
                                         Recross (by Mr. Wenger)...... A-619

Transcript of Trial, Dated July 23, 2014 .................................. A-622

Witness:

    Maria Nadolna     Cross (by Mr. Zavin)............. A-623
                                         Redirect (by Mr. Wenger)..... A-710

Transcript of Trial, Dated July 24, 2014 .................................. A-719

Witnesses:

    Marek Wierzbowski     Cross (by Mr. Piskora) .......... A-720

    Ivan Reyes     Cross (by Mr. Barnett) .......... A-729
                                         Redirect (by Mr. Wenger)..... A-780
                                         Recross (by Mr. Barnett)....... A-784

    Gary Arlen     Cross (by Mr. Zavin)............. A-785
                                         Redirect (by Mr. Wenger)..... A-866
                                         Recross (by Mr. Zavin) ......... A-872

Transcript of Trial, Dated July 25, 2014 .................................. A-876

Witnesses:

    Timothy Hart     Cross (by Mr. Piskora) .......... A-877
                                         Redirect (by Mr. Wenger)..... A-923

iii

|  |  | Page |
|---|---|---|
| Boguslaw Spanski | Direct (by Mr. Zavin) ............ | A-934 |
|  | Cross (by Mr. Wenger).......... | A-946 |
|  | Redirect (by Mr. Zavin) ........ | A-951 |

Plaintiff SEI's Trial Exhibits:

2   Certified English Translation of December 14, 1994 Agreement between TVP and SEI (P0008-15) ............   A-956

4   Certified English Translation of November 4, 1999 First Addendum between TVP and SEI ......................   A-964

6   Certified English Translation of November 4, 1999 Second Addendum Addendum between TVP and SEI (P00026-29).................................................................   A-968

7   Settlement Agreement between TVP and SEI, Dated August 11, 2009 (P00030-33)...........................   A-972

9   Letter from Wieslaw Walendziak and Adam Brodziak to "To Whom it May Concern," Dated March 10, 1995 (in English) (SEI 000005) .................................   A-976

11   Letter from Wieslaw Walendziak and Adam Brodziak to "To Whom it May Concern," Dated March 10, 1995 (in English) (TP 7000087).................................   A-977

13   Certified English Translation of March 15, 1995 Letter from Wieslaw Walendziak to Edward Moskal (TP 7004249).................................................................   A-978

15   Certified English Translation of May 24, 1995 Legal Opinion by Ryszard Swiderski (TP 7006700) ...   A-981

17   Certified English Translation of June 8, 1995 Fax from Marta Suchodolska to Andrej Sikora and Waclaw Tylawski (TP 7007459).................................   A-983

19   Certified English Translation of June 12, 1995 Fax from Marta Suchodolska to Boguslaw M. Spanski (TP 7003598).................................................................   A-985

21   Certified English Translation of June 9, 1997 Letter from Robert Telennea to Jack Piotr Latallo (TP 7003479).................................................................   A-987

iv

**Page**

23  Certified English Translation of March 17, 2008
    Barter Agreement between TVP and Polvision/
    Polstudios (POL00038-45)............................................. A-990

24  License Agreement between TVP and Polvision,
    Dated June 27, 2008 (POL00054-57) ......................... A-999

26  Certified English Translation of August 31, 2009
    License Agreement between TVP and Polvision
    (POL00058-62) ............................................................. A-1003

28  Certified English Translation of September 3, 2009
    Email String between TVP and Polvision (TVP
    101111 0338-39) ......................................................... A-1009

30  Certified English Translation of November 28, 2009
    Email from TVP to Polvision (TVP 101111 0355)...... A-1012

32  Certified English Translation of December 21, 2009
    Email from TVP to Polvision (TVP 101111 0351)...... A-1014

33  December 23, 2009 Email String from TVP
    to Polvision (P00172) (Polish and Certified
    English Translation) .................................................... A-1016

35  Certified English Translation of January 6, 2010
    Email from TVP to Polvision (TVP 10111 0352)........ A-1018

37  Certified English Translation of January 25, 2010
    Letter from TVP to Polvision (TVP 051611 00044).... A-1020

39  Certified English Translation of January 26, 2010
    Letter from Polvision to TVP (TVP 00045-47) ........... A-1022

41  Certified English Translation of February 18, 2010
    Internal TVP Letter (TVP 101111 0353) .................... A-1027

43  Certified English Translation of March 30, 2010
    Internal TVP Letter (TVP 072011 0298-99)............... A-1029

45  Certified English Translation of April 1, 2010
    Meeting Notes (TVP 101111 0356-57)........................ A-1031

47  Certified English Translation of April 8, 2010 Internal
    TVP Letter (TVP 051611 00062)................................ A-1034

49  Certified English Translation of May 5, 2010 Letter
    from TVP to Polvision (TVP 051611 00070) .............. A-1036

v

Page

51    Certified English Translation of May 5, 2010 Letter
      from TVP to SEI (TVP 051611 00290) ...................... A-1038

53    Certified English Translation of May 13, 2010
      Internal TVP Letter (TVP 051611 0071) .................... A-1040

55    Certified English Translation of May 18, 2010
      Internal TVP Letter (TVP 051611 00076-77).............. A-1042

57    Certified English Translation of May 18, 2010 Letter
      from TVP to Polvision (TVP 051611 00079-80)......... A-1045

59    Certified English Translation of June 8, 2010 Letter
      from TVP to Polvision (TVP 051611 00085) .............. A-1048

61    Certified English Translation of June 26, 2010 Letter
      from TVP to Polvision (TVP 051611 00088) .............. A-1050

63    Certified English Translation of July 1, 2010 Letter
      from TVP to Polvision (TVP 051611 00089-92)......... A-1052

65    Certified English Translation of July 1, 2010 Internal
      TVP Letter (TVP 051611 00093)................................ A-1059

67    Certified English Translation of July 2, 2010 Letter
      from Polvision to TVP (TVP 051611 00094-95)......... A-1062

69    Certified English Translation of July 12, 2010
      Internal TVP Letter (TVP 051611 00096) .................. A-1064

71    Certified English Translation of July 16, 2010 Annex
      to August 31, 2009 Agreement between TVP and
      Polvision (POL00063-65) ............................................ A-1067

73    Certified English Translation of April 7, 2011 Letter
      from TVP to Polvision (P00328; P002010) ................. A-1071

79    Certified English Translation of October 5, 2010
      Email from IMB+ Records to TVP (TVP 051611
      00122-132) ................................................................... A-1072

81    Certified English Translation of October 15, 2010
      Notes of Meeting (TVP 051611 00133-34) ................. A-1084

82    Email from IMB+ Records to TVP, Dated October 18,
      2010 (in Original Polish and English) (TVP 051611
      00138-39) ..................................................................... A-1087

Page

84    Certified English Translation of October 27, 2010
      Email from IMB+ Records to TVP (TVP 051611
      00140-142) .................................................................. A-1092

86    Certified English Translation of March 22, 2011
      Letter from IMB+ Records to TVP (TVP 051611
      00276-278) .................................................................. A-1096

87    Webpages Concerning Polvision (P001100, 1105,
      1655-59, 2073, 2104, 2115; 2148, 2186-87)............... A-1102

88    Directories of TVP Polonia Programming (TVP
      021012 458-493; and www.tvp.pl.prosa/
      TVPPolonia) ................................................................. A-1109

89    Polvision Mediakit (2010) and Advertising
      Rate Card ..................................................................... A-1145

91    Quarterly Subscriber Numbers, as referenced
      in Shulman Report, Exh. II (SEI 000103-140;
      TVP 051611 00154-191) ............................................. A-1157

92    Polvision Programming Schedules
      (P000 329-34, 2031-72) .............................................. A-1233

93    Spreadsheets of Terminated Internet Subscribers
      (P001827-2009, 2246-2279) ....................................... A-1281

94    Spreadsheets of Lost Globecast Subscribers
      (P001785-1826, 2239-2245) ....................................... A-1498

99    Email string between Counsel for SEI and Counsel
      for Polvision, Dated January 2010 (P00225-227)........ A-1547

100   Email from Counsel for SEI to Counsel for Polvision,
      Dated January 19, 2010 (P00242) ............................... A-1550

101   Letter from Counsel for SEI to Polvision,
      Dated January 6, 2010 (P00249-250).......................... A-1551

104   Letter from TVP to Counsel for SEI,
      Dated July 26, 2010 (P00327).................................... A-1554

105   Letter from Counsel for SEI to TVP,
      Dated August 2, 2010 (P00179-83).............................. A-1555

106   Letter from TVP to Counsel for SEI,
      Dated May 21, 2010 (P00201-02)................................ A-1560

vii

**Page**

107    May 2007 EchoStar Presentation for TVP
(TP9000140, 159-163; 172) ........................ A-1562

109    Certified English Translation of February 18, 2009
Letter from Polvision to TVP (TVP051611 0008-9) ... A-1569

111    Certified English Translation of TVP Form Email
Regarding "Klan" (TVP 072011 0305)....................... A-1571

113    Certified English Translation of January 28, 1994
Meeting Notes (TP 7004886-87).................................. A-1572

115    Certified English Translation of February 1994
Proposal (TP 7006364-70) ........................................ A-1575

117    Certified English Translation of February 9, 1994
TVP Memorandum (TP7006378-79) ........................ A-1583

119    Certified English Translation of March 15, 1995
Letter from TVP to Moskal (TP 7004249-50) ............ A-1586

121    Certified English Translation of January 7, 1999
Letter with Legal Opinion (TP 7006672-74) .............. A-1589

122    Letter from TVP, Dated March 24, 1998
(SEI 000166) ............................................................... A-1593

123    Fax from TVP to EchoStar, Dated March 25, 1998
(SEI 000721) ............................................................... A-1594

125    Certified English Translation of April 1999 TVP
Board of Directors Report on Company Activities
(TP9000632, 653,669, 682, 542, 628)....................... A-1595

127    Certified English Translation of June 1, 1998 TVP
Press Release (TP 7005054-55) ................................... A-1603

129    Certified English Translation of February 8, 2007
Screenshot of TVP Webpage (SEI 000246-49) .......... A-1607

131    Certified English Translation of October 5, 1999
Internal TVP Letter (TP 7006692) .............................. A-1612

133    Certified English Translation of TVP Board Position
(SEI 000055-57)........................................................... A-1614

134    Email String between TVP and EchoStar,
Dated April 3, 2002 (TP 7003157-58) ........................ A-1618

**Page**

135    Email from TVP to EchoStar, Dated April 6, 2002
       (SEI 001140) ................................................................. A-1620

136    Letter from EchoStar to TVP, Dated June 14, 2002
       (TP 7005252)................................................................. A-1621

137    Email from TVP to EchoStar, Dated June 8, 2002
       (TP 7003182)................................................................. A-1622

139    Certified English Translation of July 1, 1999 Letter
       from TVP to NIK (TP 7001215-18)............................... A-1623

141    Certified English Translation of March 3, 2005 TVP
       Internal Memo (TP 7007953-55) .................................. A-1628

142    Shulman Expert Report and Rebuttal Report
       (including attachments); Shulman Supplemental
       Report (including attachments), Dated
       March 18, 2013 ............................................................ A-1633

143    Gerbrandt Rebuttal Report (including attachments),
       Dated May 16, 2012 ..................................................... A-1958

144    Operating System and Browser Report
       (www.tvpolonia.com)..................................................... A-1987

145    *Computerworld* Article, Dated January 4, 2013,
       Entitled "IE shocker: Microsoft's browser gains
       share in 2012".............................................................. A-1988

146    www.netmarketshare.com Report, Dated February
       2013, Entitled "Desktop Browser Market Share" ........ A-1991

148    Certified English Translation of September 18, 1995
       Fax from TVP's Jerzy Romanski to SEI's Boguslaw
       Spanski (TP7003566)................................................... A-1992

150    Certified English Translation of February 19, 1996
       Letter from TVP (TP4000183-184) .............................. A-1995

152    Article, Dated June 3, 2013, Entitled "'Klan' is the
       time slot leader. 2,700,000 viewers and 43,300,000
       zlotys from advertising" (in Original Polish with
       Certified English Translation)...................................... A-1997

154    Certified English Translation of Letter from
       Boguslaw Spanski to TVP, Dated April 3, 2003
       (TP7000323-325) ......................................................... A-2001

ix

**Page**

Defendant TVP's Trial Exhibits:

1    TVP/SEI Agreement, Dated December 14, 1994........ A-2005

2    TVP/SEI Addendum, Dated November 4, 1999 .......... A-2015

3    TVP/SEI Addendum, Dated April 29, 2002 ............... A-2020

4    SEI Quarterly Revenue and Subscriber Reporting
(2005–2012) .................................................................. A-2025

5    TVP/Polvision Barter Agreement, with Annex,
Dated March 17, 2008.................................................. A-2087

6    TVP/Polvision License Agreement,
Dated June 27, 2008..................................................... A-2120

7    Email from Agnieszka Pokropek to Urszula
Zaniewska, Dated March 9, 2009................................. A-2124

8    Email from Agnieszka Pokropek to Urszula
Zaniewska, Dated April 20, 2009................................. A-2127

9    Email from Urszula Zaniewska to Agnieszka
Pokropek, Dated June 4, 2009...................................... A-2130

10   Emails from Agnieszka Pokropek to Urszula
Zaniewska, Dated June 4–5, 2009................................ A-2133

11   Polvision Agreement Certificate,
Dated June 30, 2009 ..................................................... A-2136

12   Letter from Urszula Zaniewska to Agnieszka
Pokropek, Dated July 2, 2009 ...................................... A-2141

13   Email from Agnieszka Pokropek to Urszula
Zaniewska, Dated July 24, 2009 .................................. A-2144

14   Emails between Urszula Zaniewska and Agnieszka
Pokropek, Dated August 4–5, 2009 ............................. A-2147

15   Letter from Urszula Zaniewska to Agnieszka
Pokropek, Dated August 6, 2009 ................................. A-2151

16   TVP/SEI Settlement Agreement,
Dated August 11, 2009................................................. A-2154

17   TVP/Polvision Licensing Agreement,
Dated August 31, 2009................................................. A-2158

x

**Page**

18   Emails between Urszula Zaniewska and Agnieszka
     Pokropek, Dated September 1–3, 2009 ...................... A-2170

19   Email from Urszula Zaniewska to Agnieszka
     Pokropek, Dated October 23, 2009 ............................ A-2176

20   Email from Elżbieta Herezińska to Agnieszka
     Pokropek, Dated November 28, 2009 ........................ A-2179

21   Fax from TVP to Waldemar Kotaba, Dated
     November 30, 2009 (in Original Polish with
     English Translation) ..................................................... A-2182

22   Emails from Piotr Lenarczyk and Urszula Zaniewska
     to Agnieszka Pokropek, Dated December 9–21, 2009
     (in Original Polish with English Translation) ............. A-2185

23   Email from Urszula Zaniewska to Elżbieta
     Herezińska, Dated December 23, 2009 ....................... A-2189

24   Email from Elżbieta Herezińska to Agnieszka
     Pokropek, Dated December 23, 2009 (in Original
     Polish with English Translation) ................................ A-2192

25   Email from Urszula Zaniewska to Agnieszka
     Pokropek, Dated January 6, 2010 (in Original
     Polish with English Translation) ................................ A-2195

26   Letter from Waldemar Kotaba to Romulad Orzel,
     Dated February 23, 2010 (in Original Polish
     with English Translation) ........................................... A-2198

27   TVP/Polvision Meeting Minutes, Dated April 1, 2010
     (in Original Polish with English Translation) ............. A-2203

28   Letter from Maria Nadolna to Waldemar Kotaba,
     Dated May 5, 2010 (in Original Polish with
     English Translation) ................................................... A-2208

29   Letter from Maria Nadolna to Boguslaw Spanski,
     Dated May 5, 2010 ..................................................... A-2211

30   Letter from Maria Nadolna to Waldemar Kotaba,
     Dated May 13, 2010 (in Original Polish with
     English Translation) ................................................... A-2214

xi

**Page**

31    Letter from Romulad Orzel to Waldemar Kotaba,
Dated May 13, 2010 (in Original Polish with
English Translation) ...................................................... A-2217

32    Letter from Waldemar Kotaba to Romulad Orzel,
Dated May 17, 2010 (in Original Polish with
English Translation) ...................................................... A-2220

33    Letter from Maria Nadolna to Waldemar Kotaba,
Dated May 18, 2010 (in Original Polish with
English Translation) ...................................................... A-2223

34    Letter from Waldemar Kotaba to Romulad Orzel,
Dated May 19, 2010 ...................................................... A-2227

35    Letter from Maria Nadolna to Waldemar Kotaba,
Dated June 8, 2010 (in Original Polish with
English Translation) ...................................................... A-2232

36    Letter from Maria Nadolna to Waldemar Kotaba,
Dated June 14, 2010 (in Original Polish with
English Translation) ...................................................... A-2235

37    Letter from Maria Nadolna to Waldemar Kotaba,
Dated June 25, 2010 (in Original Polish with
English Translation) ...................................................... A-2238

38    Letter from Maria Nadolna to Waldemar Kotaba,
Dated July 1, 2010 (in Original Polish with
English Translation) ...................................................... A-2241

39    Letter from Maria Nadolna to Waldemar Kotaba,
Dated July 8, 2010 (in Original Polish with
English Translation) ...................................................... A-2251

40    Annex to August 31, 2009 Polvision License
Agreement, Dated July 16, 2010 (in Original
Polish with English Translation) .................................. A-2260

41    Letter from Lukasz Boberek to Boguslaw Spanski,
Dated April 9, 2010 ...................................................... A-2269

42    Letter from Tomasz Sieniutyck to IMB,
Dated September 3, 2010 ............................................. A-2274

43    Excerpts from Deposition of Boguslaw Spanski,
Dated November 8, 2011 ............................................. A-2275

xii

**Page**

44  Amended Statement of Claim in *Spanski Enterprises v. IMB+ Records*, Dated November 19, 2010.................. A-2277

45  Statement of Defence in *Spanski Enterprises v. IMB+ Records*, Dated March 4, 2011 ........................ A-2303

46  Order of Master Barbara McAfee in *Spanski Enterprises v. IMB+ Records*, Dated November 30, 2011 ..................................... A-2310

47  TV Polonia Webpage — About Us ............................. A-2318

48  Chart of Comparison of TVP Polonia Viewership Statistics (in Original Polish with English Translation) .................................. A-2320

49  Complaint in *Spanski Enterprises v. Telewizja Polska* (S.D.N.Y., 07-CV-930), Dated February 8, 2007 ........ A-2323

50  Original Complaint, Dated June 24, 2010.................... A-2337

51  Amended Complaint, Dated October 1, 2010 .............. A-2343

55  Transcript of Oral Argument in *Spanski Enterprises v. Telewizja Polska* (S.D.N.Y., 07-CV-930), Dated March 16, 2009 .................................. A-2353

59  Expert Report of Gary Arlen, Dated April 16, 2012, with Appendices ........................... A-2367

60  Expert Report of Tim Hart, Dated April 16, 2012, with Appendices ........................... A-2584

61  Expert Report of Ivan Reyes, Dated April 16, 2012, with Appendices ........................... A-2660

62  Expert Report of Marek Wierzbowski, Dated April 16, 2012, with Appendices ...................... A-2872

63  Supplemental Expert Report of Tim Hart, Dated May 16, 2012, with Appendices ....................... A-3066

64  Supplemental Expert Report of Gary Arlen, Dated May 16, 2012 ................................... A-3106

66  TV Polonia Webpage — Terms and Conditions.......... A-3114

Plaintiff SEI's Post-Trial Memorandum, Dated August 16, 2013.................................... A-3117

**xiii**

**Page**

Defendant TVP's Post-Trial Memorandum,
    Dated August 16, 2013 ........................................................ A-3156

Notice of Appeal, Dated April 1, 2014 .................................... A-3193

Notice of Cross-Appeal, Dated April 9, 2014 .......................... A-3194

**A-2701**

22. Administracyjnoprawna sytuacja osób fizycznych

w: Prawo administracyjne, str. 526-561, LexisNexis, 2008 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska, Jacek Jagielski, Karolina Zielińska

23. Podstawowe pojęcia teoretyczne w nauce prawa administacyjnego

w: Prawo administracyjne, str. 91-142, LexisNexis, 2008 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska, Piotr Przybysz, Marek Szubiakowski

24. Prawne formy działania administracji

w: Prawo administracyjne, str. 277-309, LexisNexis, 2008 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

25. Terenowe jednostki organizacyjne administracji specjalnej

w: Prawo administracyjne, str. 216-223, LexisNexis, 2008 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

26. Wybrane zagadnienia administracyjnoprawnej gegulacji gospodarki

w: Prawo administracyjne, str. 349-452, LexisNexis, 2008 (Esej lub rozdział w książce)

Jacek Lang, Maksymilian Cherka, Rafał Stankiewicz, Krzysztof Glibowski, Marek Wierzbowski, Marcin Dyl, Ewa Stefańska, Jarosław Maćkowiak, Janusz Malanowski, Krzysztof Wąsowski, Filip Elżanowski, Paweł Wajda, Alicja Szymanowska

27. Administracyjnoprawna sytuacja osób fizycznych

w: Prawo administacyjne, str. 492-521, LexisNexis, 2007 (Esej lub rozdział w książce)

Jacek Jagielski, Marek Wierzbowski, Aleksandra Wiktorowska, Karolina Zielińska

28. Podstawowe pojęcia teoretyczne w nauce prawa administracyjnego

w: Prawo administacyjne, str. 91-135, LexisNexis, 2007 (Esej lub rozdział w książce)

Piotr Przybysz, Marek Szubiakowski, Marek Wierzbowski, Aleksandra Wiktorowska

29. Wybrane zagadnienia administacyjnoprawnej regulacji gospodarki

w: Prawo administacyjne, str. 327-425, LexisNexis, 2007 (Esej lub rozdział w książce)

Maksymilian Cherka, Rafał Stankiewicz, Marcin Dyl, Krzysztof Glibowski, Jacek Lang, Alicja Szymanowska, Janusz Malanowski, Jarosław Maćkowiak, Ewa Stefańska, Romuald Szewczuk, Wojciech Wąsowicz, Filip Elżanowski, Marek Wierzbowski

30.     Administracja w dziedzinie oświaty, nauki i kultury

w: Prawo administracyjne, str. 468-501, LexisNexis, 2006 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska, Karolina Zielińska

31.     Administracyjnoprawna sytuacja osób fizycznych

w: Prawo administracyjne, str. 502-532, LexisNexis, 2006 (Esej lub rozdział w książce)

Jacek Jagielski, Marek Wierzbowski, Aleksandra Wiktorowska, Karolina Zielińska

32.     Podstawowe pojęcia teoretyczne w nauce prawa administracyjnego

w: Prawo administracyjne, str. 91-135, LexisNexis, 2006 (Esej lub rozdział w książce)

Piotr Przybysz, Marek Szubiakowski, Marek Wierzbowski, Aleksandra Wiktorowska

33.     Prawne formy działania administracji

w: Prawo administracyjne, str. 263-296, LexisNexis, 2006 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

34.     Przedmowa

w: Prawo administracyjne, str. 11-12, LexisNexis, 2006 (Esej lub rozdział w książce)

Marek Wierzbowski (Autor oryginału)

35.     Terenowe jednostki organizacyjne administracji specjalnej

w: Prawo administracyjne, str. 232-239, LexisNexis, 2006 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

36.     Wybrane zagadnienia administracyjnoprawnej regulacji gospodarki

w: Prawo administracyjne, str. 337-395, LexisNexis, 2006 (Esej lub rozdział w książce)

Jacek Lang, Rafał Stankiewicz, Maksymilian Cherka, Janusz Malanowski, Jarosław Maćkowiak, Ewa Stefańska, Romuald Szewczuk, Alicja Szymanowska, Krzysztof Wąsowski, Filip Elżanowski, Marek Wierzbowski, Marcin Dyl

37.     Istota i rozwój postępowania administracyjnego

w: postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi, str. 1-4, C.H.Beck, 2004 (Esej lub rozdział w książce)

Marek Wierzbowski (Autor oryginału)

38.     Paragraf 10 Doręczenia i Paragraf 11 Wezwania

w: Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi, str. 65-69, C.H.Beck, 2004 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

39.    Postępowanie uproszczone

w: Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi, str. 238-243, C.H.Beck, 2004 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

40.    Przedmioty orzekające

w: Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi, str. 30-43, C.H.Beck, 2004 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

41.    Uprawnienia prokuratora i Rzecznika Praw Obywatelskich w postępowaniu administracyjnym

w: Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi, str. 227-230, C.H.Beck, 2004 (Esej lub rozdział w książce)

Marek Wierzbowski (Autor oryginału)

42.    Zagadnienia ogólne

w: Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi, str. 9-14, C.H.Beck, 2004 (Esej lub rozdział w książce)

Marek Wierzbowski (Autor oryginału)

43.    Administracja w dziedzinie oświaty, nauki i kultury

w: Prawo administracyjne, str. 517-532, LexisNexis, 2003 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

44.    Administracyjnoprawna sytuacja osób fizycznych

w: Prawo administracyjne, str. 533-545, LexisNexis, 2003 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska, Jacek Jagielski

45.    Niezależne organy regulacyjne

w: Prawo gospodarcze. Zagadnienia administracyjnoprawne, str. 114-119, LexisNexis, 2003 (Esej lub rozdział w książce)

Marek Wierzbowski (Autor oryginału)

**A-2704**

46.    Podstawowe pojęcia teoretyczne w nauce prawa administracyjnego

w: Prawo administracyjne, str. 91-127, LexisNexis, 2003 (Edycja źródeł)

Marek Wierzbowski, Aleksandra Wiktorowska, Piotr Przybysz

47.    Prawne formy działania administracji

w: Prawo administracyjne, str. 357-361, LexisNexis, 2003 (Esej lub rozdział w książce)

Aleksandra Wiktorowska, Marek Wierzbowski

48.    Publicznoprawna problematyka ubezpieczeń

w: Prawo gospodarcze. Zagadnienia administracyjnoprawne, str. 262-269, LexisNexis, 2003 (Esej lub rozdział w książce)

Marek Wierzbowski (Autor oryginału)

49.    Publicznoprawne aspekty obrotu papierami wartościowymi

w: Prawo gospodarcze. Zagadnienia administracyjnoprawne, str. 290-314, LexisNexis, 2003 (Esej lub rozdział w książce)

Marek Wierzbowski (Autor oryginału)

50.    Terenowe jednostki organizacyjne administracji specjalnej

w: Prawo administracyjne, str. 265-298, LexisNexis, 2003 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

51.    Wybrane zagadnienia administracyjnoprawnej regulacji gospodarki

w: Prawo administracyjne, str. 336-516, LexisNexis, 2003 (Esej lub rozdział w książce)

Jacek Lang, Marek Wierzbowski, Jarosław Maćkowiak, Marcin Dyl, Ewa Stefańska, Krzysztof Glibowski, Romuald Szewczuk, Maksymilian Cherka, Rafał Stankiewicz

* * * 2009 (numbers of publications: 5) * * *

WIERZBOWSKI Marek * "Nie" dla odrębnego sądu finansowego. Rzeczposp. 2009 nr 209.

WIERZBOWSKI Marek * Kryzys ekonomiczny a prawo administracyjne. W: Między tradycją ... s. 776-780, { Między tradycją a przyszłością w nauce prawa administracyjnego. Księga jubileuszowa dedykowana Profesorowi Janowi Bociowi. Red. Jerzy Supernat. Wstęp Adam Błaś. Wrocław 2009 UWr. ss. 844, bibliogr.,}

WIERZBOWSKI Marek, JAGIELSKI Jacek * Organy regulacyjne - wybrane problemy. W: Księga jubileuszowa Prof. J.M. Langa ... s. 351-369, { Współczesne zagadnienia prawa i procedury administracyjnej. Księga jubileuszowa dedykowana Prof.zw.dr.hab. Jackowi M. Langowi. Red. Marek Wierzbowski, Jacek Jagielski, Aleksandra Wiktorowska, Ewa Stefańska. Wwa 2009 Wolters Kluwer ss. 393,}

WIERZBOWSKI Marek * Prawo nie zastąpi kalkulacji ryzyka. [Dot. rynków kapitałowych]. Wywiad. Rzeczposp. 2009 nr 3.

KULGAWCZUK Dariusz, KWAŚNICKI Radosław L., WIERZBOWSKI Marek * Najnowsze zmiany w kodeksie spółek handlowych. Prawo Spółek 2009 nr 1 s. 2-10.

* * * 2008 (numbers of publications: 1) * * *

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi. Red. Marek Wierzbowski. Wyd. 12 zm i uaktual. Wwa 2008 C.H. Beck ss. XX + 462.

* * * 2007 (numbers of publications: 1) * * *

WIERZBOWSKI Marek, SZUBIAKOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi. Red. Marek Wierzbowski. Wyd. 11. Wwa 2007 C.H. Beck ss. XX + 452, bibliogr., indeks rzeczowy.

* * * 2006 (numbers of publications: 1) * * *

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi. Red. Marek Szubiakowski. Wyd. 10 zm. i uaktual. Wwa 2006 C.H. Beck ss. XX + 448, indeks rzeczowy.

* * * 2005 (numbers of publications: 4) * * *

WIERZBOWSKI Marek * Postępowanie wyjaśniające przed Komisją Papierów Wartościowych i Giełd. Prz.Prawa Handl. 2005 nr 4 s. 12-14.

WIERZBOWSKI Marek * Skąpe prawa komisji. [Dot. obrotu papierami wartościowymi]. Rzeczposp. 2005 nr 90.

JAGIELSKI Jacek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Nietypowe podmioty administrujące - kilka refleksji na tle organizacyjnych form wykonywania zadań publicznych. W: Podmioty administracji ... s. 203-222, { Podmioty administracji publicznej i prawne formy ich działania. Studia i materiały z Konferencji Naukowej Poświęconej Jubileuszowi 80-tych urodzin Profesora Eugeniusza Ochendowskiego. Toruń 2005 TNOiK ss. 483,}

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi. Red. Marek Wierzbowski. Wyd. 9 zm. i uaktual. Wwa 2005 C.H. Beck ss. 448, bibliogr.

* * * 2004 (numbers of publications: 1) * * *

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi. Red. Marek Szubiakowski. Wyd. 8 zm. i uaktual. Wwa 2004 C.H. Beck ss. XXIII + 440, bibliogr., indeks.

* * * 2003 (numbers of publications: 3) * * *

WIERZBOWSKI Marek * Oferta jak świnka. Wyrok, który może spowodować perturbacje na polskim rynku kapitałowym. Rzeczposp. 2003 nr 237.

SZYMANOWSKA Alicja, WIERZBOWSKI Marek * Zbliża się termin złożenia wniosków. Pomoc publiczna dla przedsiębiorców o szczególnym znaczeniu dla rynku pracy. Rzeczposp. 2003 nr 14.

CZERNIAWSKI Ryszard, WIERZBOWSKI Marek * Ustawa Prawo o publicznym obrocie papierami wartościowymi. Komentarz. Wwa 2002 Dom Wydawn.ABC ss. 618 + CD-ROM, bibliogr.

* * * 2002 (numbers of publications: 4) * * *

WIERZBOWSKI Marek, SZYMANOWSKA Alicja, MACGREGOR Anne * Ochrona przed nadmiernym przywozem towarów do Polski. Prz.Prawa Handl. 2002 nr 12 s. 24-31.

WIERZBOWSKI Marek * Zależności oraz porozumienia akcjonariuszy w prawie o publicznym obrocie papierami wartościowymi. Prz.Prawa Handl. 2002 nr 5 s. 1-6.

WIERZBOWSKI Marek, DYL Marcin * Znaczne pakiety akcji spółek publicznych. Wwa 2002 C.H. Beck ss. 104, indeks rzeczowy.

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne: ogólne, podatkowe i egzekucyjne. Red. Marek Szubiakowski. Wyd. 5 uzup. i 6. Wwa 2002 C.H. Beck ss. XX + 411; + 415, bibliogr., indeks rzeczowy.

* * * 2000 (numbers of publications: 2) * * *

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne: ogólne, podatkowe i egzekucyjne. Wyd. 4 uzup. Wwa 2000 C.H. Beck ss. XX + 409, bibliogr., indeks rzeczowy.

CZERNIAWSKI Ryszard, WIERZBOWSKI Marek * Ustawa Prawo o publicznym obrocie papierami wartościowymi. Komentarz. Wwa 2000 Dom Wydawn.ABC ss. 524.

* * * 1998 (numbers of publications: 3) * * *

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne - ogólne, podatkowe i egzekucyjne. Wyd. 2. Wwa 1998 C.H.Beck ss. 359.

BIELECKA Zofia, WIERZBOWSKI Marek * Przygotowanie emisji przez polską spółkę. Rzeczposp. 1998 nr 65.

BIELECKA Zofia, WIERZBOWSKI Marek * Papiery dłużne. Zagadnienia praktyczne. Wwa 1998 "Parkiet" Sp. z o.o. ss. 160.

* * * 1997 (numbers of publications: 1) * * *

WIERZBOWSKI Marek * Nadzór państwa nad funduszami powierniczymi. W: Prawo, administracja ... s. 389-393, { Prawo, administracja, obywatele. Profesorowi

Eugeniuszowi Smoktunowiczowi - Księga pamiątkowa. Białystok 1997 Temida 2 ss. 414,}

* * * 1996 (numbers of publications: 2) * * *

CZERNIAWSKI Ryszard, WIERZBOWSKI Marek * Prawo o publicznym obrocie papierami wartościowymi i funduszach powierniczych. Komentarz. Stan prawny na 15.III.1996 Wwa 1996 Wydawn.Prawn. ss. 235.

  Recenzja:

  Grabowski Jan. PiP 1996 nr 12 s. 90-91.

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne - ogólne, podatkowe i egzekucyjne. Wwa 1996 Wydawn.C.H.Beck ss. 388.

* * * 1995 (numbers of publications: 3) * * *

WIERZBOWSKI Marek * Glosa do postanowienia NSA z 29.XII.1993 II SA 1576/93. [Dot. rachunku za nielegalne pobieranie energii lub paliwa ze wspólnej sieci]. Monitor Prawniczy 1995 nr 7 s. 213-214.

WIERZBOWSKI Marek * Kwity depozytowe (ADRy i GDRy) sposobem na pozyskiwanie kapitałów zagranicznych. Monitor Prawniczy 1995 nr 11 s. 321-323.

FRANKOWSKA-BUDZEŃ Anna, WIERZBOWSKI Marek * Przejmowanie spółek giełdowych. Rzeczposp. 1995 nr 185.

* * * 1994 (numbers of publications: 4) * * *

WIERZBOWSKI Marek * Glosa do postanowienia NSA z 3.IX.1992 III SA 1407/92. [Dot. niedopuszczalności skargi na pozostawienie sprawy bez rozpoznania]. OSP 1994 nr 6 poz. 104 aa.

WIERZBOWSKI Marek * Glosa do wyroku SN z 24.VI.1993 III ARN 33/93. [Dot. dopuszczalności decyzji reformacyjnej - art. 139 k.p.a.]. PiP 1994 nr 9 s. 111-115.

WIERZBOWSKI Marek * Nowelizacja prawa o publicznym obrocie papierami wartościowymi. Prz.Sądowy 1994 nr 9 s. 3-17.

WIERZBOWSKI Marek * Problemy obrotu prawami do polskich papierów wartościowych na rynkach obcych. PiP 1994 nr 5 s. 20-28.

* * * 1993 (numbers of publications: 4) * * *

WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Podstawowe pojęcia teoretyczne w nauce prawa administracyjnego. W: Samorząd terytorialny ... s. 31-85, { Samorząd terytorialny i rozwój lokalny. Red. i wstęp Andrzej Piekara, Zygmunt Niewiadomski. Wwa 1992 UW ss. 368,}

WIERZBOWSKI Marek * Sposób na zdobycie obcych kapitałów. [Dot. amerykańskich kwitów depozytowych]. Rzeczposp. 1993 nr 245.

ROSENZWEIG Francis, WIERZBOWSKI Marek * Zagadnienia prawne pozyskiwania kapitałów amerykańskich dla inwestowania w polskie papiery wartościowe. PiP 1993 nr 5 s. 70-78.

HICKS William, WIERZBOWSKI Marek * Eksterytorialny zasięg amerykańskiego prawa papierów wartościowych. Prz.Sądowy 1993 nr 7/8 s. 53-67.

* * * 1992 (numbers of publications: 1) * * *

WIERZBOWSKI Marek * Prawo administracyjne w Stanach Zjednoczonych. W: Zarys prawa Stanów ... s. 169-197 { Zarys prawa Stanów Zjednoczonych. Cz. 2. Red. Jan Głuchowski. [Cz.1. zob. XXIV]. Toruń 1991 UMK ss. 233,}

* * * 1990 (numbers of publications: 2) * * *

WIERZBOWSKI Marek * Administracyjnoprawna regulacja ochrony zdrowia. W: Księga z okazji ... s. 323-328, { Księga z okazji 40-lecia pracy naukowej profesora Jana Jendrośki. Wstęp oprac. koledzy i uczniowie. Acta UWr.Prawo 1990 nr 168 s. 3-348, Rés., Zsf., Sum., Soderż.,}

WIERZBOWSKI Marek * Stabilizacja regulacji prawnej w zakresie rad narodowych. Stud.Iur. 1990 nr 18 s. 213-221, { Organizacja i funkcjonowanie administracji państwowej. Księga poświęcona Jerzemu Służewskiemu. Red. Jacek Lang. Stud.Iur. 1990 nr 18 s. 1-244, bibliogr.,}

* * * 1989 (numbers of publications: 1) * * *

WIERZBOWSKI Marek * Nowe prawo o stowarzyszeniach. PiP 1989 nr 7 s. 13-22.

* * * 1987 (numbers of publications: 3) * * *

[WIERZBOWSKI Marek * Jakość wyrobów. Zagadnienia administracyjno-prawne. Wrocław 1984, zob. XXII]

  Recenzja:

Rabska Teresa. PiP 1987 nr 4 s. 108-110.

WIERZBOWSKI Marek * Prawo a kultura organizacji życia społecznego. ND 1986 nr 10 s. 33-41.

WIERZBOWSKI Marek * Wpływ administracji państwowej na działalność jednostek gospodarki nieuspołecznionej. W: Aktualne problemy administracji ... s.192-203 { Aktualne problemy administracji i prawa administracyjnego. W czterdziestolecie pracy zawodowej i naukowej prof. Zygmunta Rybickiego. Red. Adam Jaroszyński. Wwa 1987 PWN ss. 283}

* * * 1985 (numbers of publications: 2) * * *

WIERZBOWSKI Marek * Administracyjnoprawne formy świadczenia usług. Acta UWr.Prawo 1985 nr 143 s. 341-350.

[WIERZBOWSKI Marek * Jakość wyrobów. Zagadnienia administracyjnoprawne. Wrocław 1984]

Recenzja:

Jełowicki Marcin. OMT 1985 nr 8/9 s. 63-64.

* * * 1984 (numbers of publications: 1) * * *

WIERZBOWSKI Marek * Jakość wyrobów. Zagadnienia administracyjnoprawne. Wrocław 1984 Ossolineum, IPiP ss. 244.

* * * 1983 (numbers of publications: 1) * * *

WIERZBOWSKI Marek * Sądowa kontrola administracji w administracji w Stanach Zjednoczonych. W: Prawo, administracja, gospodarka... s. 531-545, { Prawo, administracja, gospodarka. Księga ku czci Profesora Ludwika Bara. Red. Janusz Łętowski, Jan P. Pruszyński. Tłum. częściowo z bułgarskiego, niem., ros. Wwa 1983 Ossolineum IPiP ss. 559}

* * * 1982 (numbers of publications: 2) * * *

WIERZBOWSKI Marek * Nadzór w systemie rad narodowych i terenowych organów administracji. Stud.Iur. t. 11: 1982 s. 51-63.

WIERZBOWSKI Marek * Nadzór w zdecentralizowanym aparacie państwowym. W: Model władzy ... s. 139-149, { Model władzy lokalnej w systemie reformy gospodarczej. Red. Michał Kulesza. Wwa 1982 UW ss. 220, na prawach rkpsu.,}

* * * 1981 (numbers of publications: 3) * * *

WIERZBOWSKI Marek * Glosa do wyroku SN z 7.XII.1979 I CR 371/79. [Dot. charakteru czynności ZBoWiD polegającej na wydaniu lub odmowie wydania zaświadczenia o uprawnieniach kombatanckich; dopuszczalności drogi sądowej w sprawach ze stosunku członkostwa w ZBoWiD]. OSPiKA 1981 poz. 5 c.

WIERZBOWSKI Marek * Zasady i tryb wydawania zaświadczeń według kodeksu postępowania administracyjnego. PiP 1981 nr 1 s. 42-52.

WIERZBOWSKI Marek * Zgodność z prawem decyzji administracyjnych. OMT 1981 nr 2 s. 13-16.

* * * 1980 (numbers of publications: 3) * * *

WIERZBOWSKI Marek * Administracyjno prawne instytucje kształtowania i kontroli jakości wyrobów. Stud.Prawn. 1980 nr 3 s. 3-43, Soderż., Sum.

WIERZBOWSKI Marek * Charakter prawny zaświadczeń (rozważania na tle projektu noweli do k.p.a.). OMT 1980 nr 1 s. 17-20.

WIERZBOWSKI Marek * Nowe przepisy o radach narodowych w ZSRR. OMT 1980 nr 12 s. 34-37.

* * * 1979 (numbers of publications: 2) * * *

[WIERZBOWSKI Marek * Akty normatywne organizacji spółdzielczych. Wwa 1977]

**A-2710**

Recenzja:

Piekara Andrzej. PiP 1979 nr 12 s. 121-124.

WIERZBOWSKI Marek * Upoważnienia do załatwiania spraw a przekazywanie kompetencji administracji państwowej. OMT 1979 nr 5 s. 22-24, 32.

* * * 1978 (numbers of publications: 2) * * *

WIERZBOWSKI Marek * Organy administracji terenowej w Stanach Zjednoczonych Ameryki Północnej. OMT 1978 nr 5 s. 23-26.

WIERZBOWSKI Marek * Postępowanie administracyjne w USA. OMT 1978 nr 3 s. 30-34.

* * * 1977 (numbers of publications: 6) * * *

WIERZBOWSKI Marek * Akty normatywne organizacji spółdzielczych. Wwa 1977 UW ss. 208.

[WIERZBOWSKI Marek * Charakter prawny stosunków w organizacjach społecznych. Wwa 1976]

Recenzja:

Ura Edward. Zesz.Nauk.ASW 1977 nr 17 s. 209-212.

WIERZBOWSKI Marek * Nadzór w systemie rad narodowych i terenowych organów administracji. W: Terenowe organy administracji ... s. 265-309, { Terenowe organy administracji i rady narodowe po reformie. Red. Jerzy Służewski. Wwa 1977 Wiedza Powszechna ss. 432,}

WIERZBOWSKI Marek * Postępowanie administracyjne w Anglii. OMT 1977 nr 12 s. 32-34.

WIERZBOWSKI Marek * Pozycja prawna centralnych związków spółdzielczych. PiP 1977 nr 8/9 s. 92-103.

WIERZBOWSKI Marek * Uprawnienia rad narodowych i terenowych organów administracji w stosunku do jednostek im nie podporządkowanych. W: Terenowe organy administracji ... s. 349-388, { Terenowe organy administracji i rady narodowe po reformie. Red. Jerzy Służewski. Wwa 1977 Wiedza Powszechna ss. 432,}

* * * 1976 (numbers of publications: 3) * * *

WIERZBOWSKI Marek * Charakter prawny stosunków w organizacjach społecznych. Wwa 1976 MSW ss. 113, bibliogr., do użytku służb.

WIERZBOWSKI Marek * Problemy prawne wprowadzania EMC [Elektronicznych Maszyn Cyfrowych] do administracji państwowej. OMT 1976 nr 2 s. 9-13.

WIERZBOWSKI Marek * Unifikacja zarządzania zespołami miejskimi (doświadczenia państw socjalistycznych). OMT 1976 nr 1 s. 13-16.

\* \* \* 1975 (numbers of publications: 2) \* \* \*

WIERZBOWSKI Marek \* Unifikacja zarządzania zespołami miejskimi (studium porównawcze przygotowane w oparciu o doświadczenia państw zachodnich). OMT 1975 nr 7 s. 14-20.

URA Edward, WIERZBOWSKI Marek \* Podstawy prawne dobrowolnych drużyn ludowych w ZSRR. Służba MO 1975 nr 1 s. 5-15.

\* \* \* 1974 (numbers of publications: 1) \* \* \*

STAROŚCIAK Jerzy, WIERZBOWSKI Marek \* Ustawodawstwo o postępowaniu administracyjnym europejskich krajów socjalistycznych. Wrocław 1974 Ossolineum, INP ss. 225.

\* \* \* 1973 (numbers of publications: 2) \* \* \*

WIERZBOWSKI Marek \* Rozstrzyganie spraw wynikających z członkostwa w stowarzyszeniach. PiP 1973 nr 11 s. 57-69.

WIERZBOWSKI Marek \* Zaskarżalność rozstrzygnięć organu administracji państwowej. [Dot. BRL, WRL, CSRS, SFRJ]. RN Gosp.-Admin. 1973 nr 6.

\* \* \* 1972 (numbers of publications: 1) \* \* \*

WIERZBOWSKI Marek \* Z zagadnień trwałości decyzji administracyjnej. OMT 1972 nr 6 s. 14-15.

\* \* \* 1971 (numbers of publications: 2) \* \* \*

WIERZBOWSKI Marek \* Posiedzenia prezydiów rad narodowych. Gosp.Admin.Teren. 1971 nr 10 s. 34-35.

WIERZBOWSKI Marek \* Współdziałanie rad narodowowych z organizacjami społecznymi. Gosp.Admin.Teren. 1971 nr 4 s. 35-36.

\* \* \* 1970 (numbers of publications: 2) \* \* \*

WIERZBOWSKI Marek \* Charakter prawny stosunków w organizacjach społecznych. PiP 1970 nr 8/9 s. 302-312.

WIERZBOWSKI Marek \* Organizacja wewnętrzna wydziałów (wyniki ankiety GiAT [Gospodarki i Administracji Terenowej]). Gosp.Admin.Teren. 1970 nr 10 s. 42-43.

**A-2712**

Appendix 2

Dz.U. 1993 Nr 7 poz. 34

## USTAWA

### z dnia 29 grudnia 1992 r.

### o radiofonii i telewizji

Opracowano na podstawie tj. Dz. U. z 2011 r. Nr 43, poz. 226, Nr 85, poz. 459, Nr 112, poz. 654, Nr 153, poz. 903, Nr 160, poz. 963.

### Rozdział 1

### Przepisy ogólne

#### Art. 1.

1. Zadaniem radiofonii i telewizji jest:

    1) dostarczanie informacji;

    2) udostępnianie dóbr kultury i sztuki;

    3) ułatwianie korzystania z oświaty, sportu i dorobku nauki;

    3a) upowszechnianie edukacji obywatelskiej;

    4) dostarczanie rozrywki;

    5) popieranie krajowej twórczości audiowizualnej.

1a. Zadania radiofonii i telewizji, o których mowa w ust. 1, są realizowane przez dostarczanie usług medialnych w postaci programów radiowych i telewizyjnych.

2. Odbiór krajowych i zagranicznych programów przeznaczonych przez dostawców usług medialnych do powszechnego odbioru jest wolny, z zachowaniem warunków określonych przepisami prawa.

#### Art. 1a.

1. Ustawę stosuje się do dostawców usług medialnych ustanowionych na terytorium Rzeczypospolitej Polskiej.

2. Dostawcę usługi medialnej uważa się za ustanowionego na terytorium Rzeczypospolitej Polskiej, jeżeli spełnia on co najmniej jeden z warunków:

    1) ma swoją siedzibę w Rzeczypospolitej Polskiej oraz:

        a) decyzje redakcyjne dotyczące usługi medialnej są podejmowane na terytorium Rzeczypospolitej Polskiej lub

        b) istotna część osób zatrudnionych na podstawie stosunku pracy lub umowy cywilnoprawnej przy świadczeniu usługi medialnej działa na terytorium Rzeczypospolitej Polskiej, a decyzje redakcyjne dotyczące usługi medialnej są podejmowane w innym państwie członkowskim Unii Europejskiej, lub

        c) istotna część osób zatrudnionych na podstawie stosunku pracy lub umowy cywilnoprawnej przy świadczeniu usługi medialnej działa za-

TVP 021012 358

Appendix 2

równo na terytorium Rzeczypospolitej Polskiej, jak i w innym państwie członkowskim Unii Europejskiej;

2) decyzje redakcyjne dotyczące usługi medialnej są podejmowane na terytorium Rzeczypospolitej Polskiej oraz istotna część osób zatrudnionych na podstawie stosunku pracy lub umowy cywilnoprawnej przy świadczeniu usługi medialnej działa na terytorium Rzeczypospolitej Polskiej, a dostawca usługi medialnej ma swoją siedzibę w innym państwie członkowskim Unii Europejskiej;

3) rozpoczął świadczenie usługi medialnej na terytorium Rzeczypospolitej Polskiej lub na podstawie prawa Rzeczypospolitej Polskiej i utrzymuje stabilne i efektywne związki gospodarcze z Rzecząpospolitą Polską, chyba że:

    a) zarówno siedziba dostawcy usługi medialnej znajduje się w innym państwie członkowskim Unii Europejskiej, jak i decyzje redakcyjne dotyczące usługi medialnej są podejmowane w innym państwie członkowskim Unii Europejskiej lub

    b) istotna część osób zatrudnionych na podstawie stosunku pracy lub umowy cywilnoprawnej przy świadczeniu usługi medialnej działa w innym państwie członkowskim Unii Europejskiej, w którym dostawca usługi medialnej ma swoją siedzibę, lub decyzje redakcyjne dotyczące usługi medialnej są podejmowane na terytorium innego państwa członkowskiego Unii Europejskiej.

3. Za ustanowionego na terytorium Rzeczypospolitej Polskiej uważa się także dostawcę usługi medialnej, jeżeli istotna część osób zatrudnionych na podstawie stosunku pracy lub umowy cywilnoprawnej przy świadczeniu usługi medialnej działa na jej terytorium oraz dostawca ten:

1) ma swoją siedzibę na terytorium Rzeczypospolitej Polskiej, a decyzje redakcyjne dotyczące usługi medialnej są podejmowane w państwie niebędącym państwem członkowskim Unii Europejskiej, albo

2) ma swoją siedzibę w państwie niebędącym państwem członkowskim Unii Europejskiej, a decyzje redakcyjne dotyczące usługi medialnej są podejmowane na terytorium Rzeczypospolitej Polskiej.

4. Ustawę stosuje się także do dostawcy usługi medialnej, który:

1) korzysta ze stacji dosyłowej do satelity zlokalizowanej na terytorium Rzeczypospolitej Polskiej albo

2) nie korzysta z tej stacji, ale korzysta z łącza satelitarnego należącego do Rzeczypospolitej Polskiej

– mimo że nie odpowiada on warunkom określonym w ust. 2 i 3 i nie został uznany za dostawcę usługi medialnej ustanowionego w państwie członkowskim Unii Europejskiej na podstawie przepisów prawa tego państwa odpowiadających warunkom określonym w ust. 2 i 3.

### Art. 2.

1. Prawo rozpowszechniania programów radiowych i telewizyjnych przysługuje jednostkom publicznej radiofonii i telewizji oraz osobom fizycznym, osobom prawnym i osobowym spółkom handlowym, które uzyskały koncesję na taką działalność, albo – w przypadku programów telewizyjnych rozpowszechnianych wyłącznie w systemach teleinformatycznych – wpis do rejestru takich programów.

2. Ustawy nie stosuje się do:

2011-09-09

Appendix 2

©Kancelaria Sejmu

1) programu rozpowszechnianego lub rozprowadzanego wyłącznie w obrębie jednego budynku;

2) programu rozpowszechnianego lub rozprowadzanego w systemie, w którym urządzenia nadawcze i odbiorcze należą do tej samej osoby, prowadzącej działalność gospodarczą lub inną zarejestrowaną działalność publiczną, a treść programu ogranicza się do spraw związanych z tą działalnością i jest adresowana do pracowników lub innego określonego kręgu osób związanych z nadawcą;

3) programu rozprowadzanego w sieci kablowej, jeżeli liczba indywidualnych odbiorców nie przekracza 250;

4) programów radiowych rozpowszechnianych wyłącznie w systemach teleinformatycznych oraz audialnych usług na żądanie;

5) korespondencji prowadzonej z wykorzystaniem środków komunikacji elektronicznej;

6) elektronicznych wersji dzienników i czasopism oraz prasy udostępnianej w systemie teleinformatycznym pod warunkiem że nie składają się w przeważającej części z audycji audiowizualnych;

7) gier losowych i zakładów wzajemnych, chyba że są częścią audycji usługi medialnej.

### Art. 3.

Do rozpowszechniania programów radiowych i telewizyjnych stosuje się przepisy prawa prasowego, o ile ustawa nie stanowi inaczej.

### Art. 3a.

Dostawcy usług medialnych, mając na względzie realizację obowiązków określonych w ustawie, w szczególności w art. 14a, art. 16b ust. 3a i art. 18a mogą tworzyć i przystępować do kodeksów dobrych praktyk w rozumieniu ustawy z dnia 23 sierpnia 2007 r. o przeciwdziałaniu nieuczciwym praktykom rynkowym (Dz. U. Nr 171, poz. 1206).

### Art. 4.

W rozumieniu ustawy:

1) usługą medialną jest usługa w postaci programu, za którą odpowiedzialność redakcyjną ponosi jej dostawca i której podstawowym zadaniem jest dostarczenie przez sieci telekomunikacyjne ogółowi odbiorców audycji, w celach informacyjnych, rozrywkowych lub edukacyjnych; usługą medialną jest także przekaz handlowy;

2) audycją jest ciąg ruchomych obrazów z dźwiękiem lub bez niego (audycja audiowizualna) albo ciąg dźwięków (audycja radiowa), stanowiący, ze względu na treść, formę, przeznaczenie lub autorstwo, odrębną całość w stworzonym przez dostawcę usługi medialnej programie lub katalogu audycji udostępnianych publicznie, zwanym dalej „katalogiem";

3) odpowiedzialnością redakcyjną jest sprawowanie faktycznej kontroli nad wyborem audycji i sposobem ich zestawienia w programie lub w katalogu; nie uchybia to zasadom odpowiedzialności prawnej za treść audycji lub świadczenie usługi;

2011-09-09

TVP 021012 360

Appendix 2

4) dostawcą usługi medialnej jest osoba fizyczna, osoba prawna lub osobowa spółka handlowa ponosząca odpowiedzialność redakcyjną za wybór treści usługi medialnej i decydująca o sposobie zestawienia tej treści, będąca nadawcą;

5) nadawcą jest osoba fizyczna, osoba prawna lub osobowa spółka handlowa, która tworzy i zestawia program oraz rozpowszechnia go lub przekazuje innym osobom w celu rozpowszechniania;

6) programem jest usługa medialna stanowiąca uporządkowany zestaw audycji, przekazów handlowych lub innych przekazów, rozpowszechniany w całości, w sposób umożliwiający jednoczesny odbiór przez odbiorców w ustalonym przez nadawcę układzie;

7) rozpowszechnianiem jest emisja programu drogą bezprzewodową lub przewodową do odbioru przez odbiorców;

8) rozprowadzaniem jest przejmowanie rozpowszechnionego programu w całości i bez zmian oraz równoczesne, wtórne jego rozpowszechnianie;

9) dostarczaniem usługi medialnej jest jej rozpowszechnianie;

10) nadawcą społecznym jest nadawca:

   a) którego program upowszechnia działalność wychowawczą i edukacyjną, działalność charytatywną, respektuje chrześcijański system wartości, za podstawę przyjmując uniwersalne zasady etyki, oraz zmierza do ugruntowania tożsamości narodowej,

   b) w którego programie nie są rozpowszechniane audycje ani inne przekazy, o których mowa w art. 18 ust. 5,

   c) który nie nadaje przekazów handlowych,

   d) który nie pobiera opłat z tytułu rozpowszechniania, rozprowadzania lub odbierania jego programu;

11) osobą zagraniczną jest osoba zagraniczna w rozumieniu art. 5 pkt 2 ustawy z dnia 2 lipca 2004 r. o swobodzie działalności gospodarczej (Dz. U. z 2010 r. Nr 220, poz. 1447 i Nr 239, poz. 1593);

12) zespołem twórczym jest zespół osób tworzących audycje, do którego zalicza się w szczególności: reżysera, autora scenariusza, scenografa, operatora, odtwórców głównych ról i kompozytora;

13) programem wyspecjalizowanym jest program, w którym nie mniej niż 70 % czasu nadawania programu w ciągu miesiąca, w godzinach 6–23, stanowią audycje i inne przekazy realizujące przyjętą specjalizację programu;

14) audycją wytworzoną pierwotnie w języku polskim jest audycja spełniająca wymogi audycji europejskiej w rozumieniu niniejszej ustawy i powstała na podstawie scenariusza wytworzonego pierwotnie w języku polskim, której pierwotna rejestracja została dokonana w języku polskim;

15) audycją dla dzieci jest audycja, która ze względu na czas nadania i treść jest skierowana głównie do dzieci;

16) przekazem handlowym jest każdy przekaz, w tym obrazy z dźwiękiem lub bez dźwięku albo tylko dźwięki, mający służyć bezpośrednio lub pośrednio promocji towarów, usług lub renomy podmiotu prowadzącego działalność gospodarczą lub zawodową, towarzyszący audycji lub włączony do niej, w zamian za opłatę lub podobne wynagrodzenie, albo w celach autopromocji, w szczególności reklama, sponsorowanie, telesprzedaż i lokowanie produktu;

TVP 021012 361

Appendix 2

17) reklamą jest przekaz handlowy, pochodzący od podmiotu publicznego lub prywatnego, w związku z jego działalnością gospodarczą lub zawodową, zmierzający do promocji sprzedaży lub odpłatnego korzystania z towarów lub usług; reklamą jest także autopromocja;

18) sponsorowaniem jest każdy wkład w finansowanie usługi medialnej lub audycji, przez podmiot, który nie dostarcza usług medialnych i nie produkuje audycji, w celu promocji jego nazwy, firmy, renomy, działalności, towaru lub usługi, znaku towarowego lub innego oznaczenia indywidualizującego;

19) telesprzedażą jest przekaz handlowy zawierający bezpośrednią ofertę sprzedaży towarów lub odpłatnego świadczenia usług;

20) ukrytym przekazem handlowym jest przedstawianie w audycjach towarów, usług, nazwy, firmy, znaku towarowego lub działalności przedsiębiorcy będącego producentem towaru lub świadczącego usługi, jeżeli zamiarem dostawcy usługi medialnej, w szczególności związanym z wynagrodzeniem lub uzyskaniem innej korzyści, jest osiągnięcie skutku reklamowego oraz możliwe jest wprowadzenie publiczności w błąd co do charakteru przekazu;

21) lokowaniem produktu jest przekaz handlowy polegający na przedstawieniu lub nawiązywaniu do towaru, usługi lub ich znaku towarowego w taki sposób, że stanowią one element samej audycji w zamian za opłatę lub podobne wynagrodzenie, a także w postaci nieodpłatnego udostępnienia towaru lub usługi;

22) lokowaniem tematu jest przekaz handlowy polegający na nawiązywaniu do towaru, usługi lub ich znaku towarowego w scenariuszu lub liście dialogowej audycji w zamian za opłatę lub podobne wynagrodzenie;

23) autopromocją jest każdy przekaz pochodzący od dostawcy usługi medialnej mający służyć bezpośrednio lub pośrednio promocji jego audycji, towarów lub usług;

24) przekazem tekstowym jest zbiór tekstów i nieruchomych obrazów, rozpowszechnianych za pomocą sygnału telewizyjnego lub radiowego równocześnie z programem;

25) producentem jest osoba fizyczna lub osoba prawna, lub jednostka organizacyjna, o której mowa w art. $33^1$ § 1 Kodeksu cywilnego, która podejmuje inicjatywę, faktycznie organizuje i ponosi odpowiedzialność za kreatywny, organizacyjny i finansowy proces produkcji utworu audiowizualnego;

26) producentem niezależnym wobec danego nadawcy jest producent niepozostający w stosunku pracy z danym nadawcą, niebędący sam nadawcą i nieposiadający udziałów w organizacji nadawcy oraz w którym nadawca ani żaden podmiot od niego zależny bądź należący do tej samej grupy kapitałowej nie posiada żadnych udziałów, a w zarządach nie zasiadają żadne osoby pozostające w stosunku pracy z danym nadawcą lub będące nadawcami;

27) przedsiębiorcą jest przedsiębiorca w rozumieniu ustawy z dnia 2 lipca 2004 r. o swobodzie działalności gospodarczej;

28) audiodeskrypcją jest werbalny, dźwiękowy opis obrazu i treści wizualnych zawartych w audycji audiowizualnej przeznaczony dla osób niepełnosprawnych z powodu dysfunkcji narządu wzroku, umieszczony w audycji lub rozpowszechniany równocześnie z audycją;

2011-09-09

TVP 021012 362

Appendix 2

29) systemem teleinformatycznym jest system teleinformatyczny w rozumieniu ustawy z dnia 18 lipca 2002 r. o świadczeniu usług drogą elektroniczną (Dz. U. Nr 144, poz. 1204, z późn. zm.[1]);

30) siecią telekomunikacyjną jest sieć telekomunikacyjna w rozumieniu ustawy z dnia 16 lipca 2004 r. – Prawo telekomunikacyjne (Dz. U. Nr 171, poz. 1800, z późn. zm.[2]).

### Rozdział 2
### Krajowa Rada Radiofonii i Telewizji

#### Art. 5.

Tworzy się Krajową Radę Radiofonii i Telewizji, zwaną dalej „Krajową Radą", jako organ państwowy właściwy w sprawach radiofonii i telewizji.

#### Art. 6.

1. Krajowa Rada stoi na straży wolności słowa w radiu i telewizji, samodzielności dostawców usług medialnych i interesów odbiorców oraz zapewnia otwarty i pluralistyczny charakter radiofonii i telewizji.

2. Do zadań Krajowej Rady należy w szczególności:

   1) projektowanie w porozumieniu z Prezesem Rady Ministrów kierunków polityki państwa w dziedzinie radiofonii i telewizji;

   2) określanie, w granicach upoważnień ustawowych, warunków prowadzenia działalności przez dostawców usług medialnych;

   3) podejmowanie, w zakresie przewidzianym ustawą, rozstrzygnięć w sprawach koncesji na rozpowszechnianie programów, wpisu do rejestru programów, zwanego dalej „rejestrem", oraz prowadzenie tego rejestru;

   3a) uznawanie za nadawcę społecznego lub odbieranie tego przymiotu, na warunkach określonych ustawą;

   4) sprawowanie w granicach określonych ustawą kontroli działalności dostawców usług medialnych;

   5) organizowanie badań treści i odbioru programów radiowych i telewizyjnych;

   6) ustalanie wysokości opłat za udzielenie koncesji oraz wpis do rejestru;

   6a) ustalanie, na zasadach określonych w ustawie z dnia 21 kwietnia 2005 r. o opłatach abonamentowych (Dz. U. Nr 85, poz. 728 i Nr 157, poz. 1314 oraz z 2010 r. Nr 13, poz. 70 i Nr 152, poz. 1023), wysokości opłat abonamentowych;

   7) opiniowanie projektów aktów ustawodawczych oraz umów międzynarodowych dotyczących radiofonii i telewizji;

---

[1] Zmiany wymienionej ustawy zostały ogłoszone w Dz. U. z 2004 r. Nr 96, poz. 959 i Nr 173, poz. 1808, z 2007 r. Nr 50, poz. 331, z 2008 r. Nr 171, poz. 1056 i Nr 216, poz. 1371 oraz z 2009 r. Nr 201, poz. 1540.

[2] Zmiany wymienionej ustawy zostały ogłoszone w Dz. U. z 2004 r. Nr 273, poz. 2703, z 2005 r. Nr 163, poz. 1362 i Nr 267, poz. 2258, z 2006 r. Nr 12, poz. 66, Nr 104, poz. 708 i 711, Nr 170, poz. 1217, Nr 220, poz. 1600, Nr 235, poz. 1700 i Nr 249, poz. 1834, z 2007 r. Nr 23, poz. 137, Nr 50, poz. 331 i Nr 82, poz. 556, z 2008 r. Nr 17, poz. 101 i Nr 227, poz. 1505, z 2009 r. Nr 11, poz. 59, Nr 18, poz. 97 i Nr 85, poz. 716 oraz z 2010 r. Nr 81, poz. 530, Nr 86, poz. 554, Nr 106, poz. 675, Nr 182, poz. 1228, Nr 219, poz. 1443, Nr 229, poz. 1499 i Nr 238, poz. 1578.

2011-09-09

TVP 021012 363

Case 14-1115, Document 42-1, 07/15/2014, 1271746, Page32 of 134

A-2718

Appendix 2

7a) (utracił moc);[3]

8) inicjowanie postępu naukowo-technicznego i kształcenia kadr w dziedzinie radiofonii i telewizji;

9) organizowanie i inicjowanie współpracy z zagranicą w dziedzinie radiofonii i telewizji, w tym współpracy z organami regulacyjnymi państw członkowskich Unii Europejskiej, właściwymi w sprawach usług medialnych;

10) współpraca z właściwymi organizacjami i instytucjami w zakresie ochrony praw autorskich, praw wykonawców, praw producentów oraz dostawców usług medialnych;

11) przeprowadzanie jawnych i otwartych konkursów na stanowiska członków rad nadzorczych w jednostkach publicznej radiofonii i telewizji;

12) propagowanie samoregulacji lub współregulacji w zakresie świadczenia usług medialnych objętych ustawą, w tym przedstawianie, na wniosek dostawcy usługi medialnej, opinii o kodeksie, o którym mowa w art. 3a;

13) upowszechnianie umiejętności świadomego korzystania z mediów (edukacji medialnej) oraz współpraca z innymi organami państwowymi, organizacjami pozarządowymi i innymi instytucjami w zakresie edukacji medialnej.

## Art. 7.

1. W skład Krajowej Rady wchodzi pięciu członków powoływanych: 2 przez Sejm, 1 przez Senat i 2 przez Prezydenta, spośród osób wyróżniających się wiedzą i doświadczeniem w zakresie środków społecznego przekazu.

2. (utracił moc).[3]

2a. (uchylony).

2b. Przewodniczącego Krajowej Rady wybierają ze swojego grona i odwołują członkowie Krajowej Rady.

3. Krajowa Rada wybiera ze swego grona, na wniosek Przewodniczącego, zastępcę Przewodniczącego Krajowej Rady.

4. Kadencja członków Krajowej Rady trwa 6 lat, licząc od dnia powołania ostatniego członka. Członkowie Krajowej Rady pełnią swe funkcje do czasu powołania następców.

5. Członek Krajowej Rady nie może być powołany na kolejną pełną kadencję.

6. Organ uprawniony do powołania członka Krajowej Rady odwołuje go wyłącznie w przypadku:

1) zrzeczenia się swej funkcji;

2) choroby trwałe uniemożliwiającej sprawowanie funkcji;

3) skazania prawomocnym wyrokiem za popełnienie przestępstwa z winy umyślnej;

3a) złożenia niezgodnego z prawdą oświadczenia lustracyjnego, stwierdzonego prawomocnym orzeczeniem sądu;

4) naruszenia przepisów ustawy stwierdzonego orzeczeniem Trybunału Stanu.

[3] Na podstawie wyroku Trybunału Konstytucyjnego z dnia 23 marca 2006 r. sygn. akt K 4/06 (Dz. U. Nr 51, poz. 377).

2011-09-09

TVP 021012 364

Appendix 2

7. W przypadku odwołania członka lub jego śmierci przed upływem kadencji, właściwy organ powołuje nowego członka Krajowej Rady na okres do końca tej kadencji.

### Art. 8.

1. Pracodawca zatrudniający członka Krajowej Rady udzieli mu, na jego wniosek, urlopu bezpłatnego na czas sprawowania funkcji. Okres urlopu wlicza się do stażu pracy, od którego zależą uprawnienia wynikające ze stosunku pracy.

2. (uchylony).

3. W okresie kadencji członków Krajowej Rady ulega zawieszeniu ich członkostwo:

   1) (utracił moc)[4];

   2) we władzach stowarzyszeń, związków zawodowych, związków pracodawców, organizacji kościelnych lub związków wyznaniowych.

*[4. Nie można łączyć funkcji członka Krajowej Rady z posiadaniem udziałów albo akcji spółki bądź w inny sposób uczestniczyć w podmiocie będącym nadawcą lub producentem radiowym lub telewizyjnym oraz wszelką działalnością zarobkową, z wyjątkiem pracy dydaktyczno-naukowej w charakterze nauczyciela akademickiego lub pracy twórczej.]*

<4. Nie można łączyć funkcji członka Krajowej Rady z posiadaniem udziałów albo akcji spółki bądź w inny sposób uczestniczyć w podmiocie będącym dostawcą usługi medialnej lub producentem radiowym lub telewizyjnym oraz wszelką działalnością zarobkową, z wyjątkiem pracy dydaktyczno-naukowej w charakterze nauczyciela akademickiego lub pracy twórczej.>

Nowe brzmienie ust. 4 w art. 8 wchodzi w życie od dn. 1.07.2011 r. (Dz. U. z 2011 r. Nr 85, poz. 459).

### Art. 9.

1. Na podstawie ustaw i w celu ich wykonania Krajowa Rada wydaje rozporządzenia i uchwały.

2. Krajowa Rada podejmuje uchwały większością 2/3 głosów ustawowej liczby członków.

3. Krajowa Rada uchwala regulamin swych obrad.

### Art. 10.

1. Przewodniczący Krajowej Rady kieruje jej pracami, reprezentuje Krajową Radę oraz wykonuje zadania określone w ustawie.

2. Przewodniczący Krajowej Rady może żądać od dostawcy usługi medialnej przedstawienia materiałów, dokumentów i udzielenia wyjaśnień w zakresie niezbędnym dla kontroli zgodności działania tego dostawcy z przepisami ustawy, warunkami koncesji lub wiążącymi go aktami samoregulacji.

3. Przewodniczący Krajowej Rady może wezwać dostawcę usługi medialnej do zaniechania działań w zakresie dostarczania usług medialnych, jeżeli naruszają one przepisy ustawy, uchwały Krajowej Rady lub warunki koncesji.

---

[4] Na podstawie wyroku Trybunału Konstytucyjnego z dnia 10 kwietnia 2002 r. sygn. akt K. 26/00 (Dz. U. Nr 56, poz. 517).

2011-09-09



Appendix 2

4. Przewodniczący Krajowej Rady na podstawie uchwały Rady może wydać decyzję nakazującą zaniechanie przez dostawcę usługi medialnej działań w zakresie, o którym mowa w ust. 3.

5. Przepisy ust. 2–4 stosuje się odpowiednio do rozprowadzania programów radiowych i telewizyjnych.

### Art. 11.

1. Krajowa Rada wykonuje swoje zadania przy pomocy Biura Krajowej Rady.

2. Organizację i tryb działania Biura Krajowej Rady określa regulamin uchwalany przez Krajową Radę.

3. Koszty działalności Krajowej Rady i Biura Krajowej Rady są pokrywane z budżetu państwa.

4. Do pracowników Biura Krajowej Rady stosuje się przepisy o pracownikach urzędów państwowych.

### Art. 12.

1. Krajowa Rada przedstawia corocznie do końca marca Sejmowi, Senatowi i Prezydentowi sprawozdanie ze swej działalności za rok poprzedzający oraz informację o podstawowych problemach radiofonii i telewizji.

2. Krajowa Rada przedstawia corocznie Prezesowi Rady Ministrów informację o swojej działalności oraz o podstawowych problemach radiofonii i telewizji.

3. Sejm i Senat uchwałami przyjmują lub odrzucają sprawozdanie, o którym mowa w ust. 1. Uchwała o przyjęciu sprawozdania może zawierać uwagi i zastrzeżenia.

4. W wypadku odrzucenia sprawozdania przez Sejm i Senat kadencja wszystkich członków Krajowej Rady wygasa w ciągu 14 dni, liczonych od dnia ostatniej uchwały, z zastrzeżeniem ust. 5.

5. Wygaśnięcie kadencji Krajowej Rady nie następuje, jeżeli nie zostanie potwierdzone przez Prezydenta Rzeczypospolitej Polskiej.

### Rozdział 3

### Programy radiowe i telewizyjne

### Art. 13.

1. Nadawca kształtuje program samodzielnie w zakresie zadań określonych w art. 1 ust. 1 i ponosi odpowiedzialność za jego treść.

2. Przepis ust. 1 nie narusza przepisów dotyczących odpowiedzialności innych osób za treść poszczególnych audycji, reklam lub innych przekazów.

### Art. 14.

1. Nałożenie na nadawcę obowiązku lub zakazu rozpowszechniania określonej audycji lub przekazu może nastąpić wyłącznie na podstawie ustawy.

2. Audycje i przekazy niepochodzące od nadawcy powinny być wyraźnie wyodrębnione w programie i oznaczone w sposób niebudzący wątpliwości, że nie pochodzą od nadawcy.

2011-09-09

TVP 021012 366

Case 14-1115, Document 42-1, 07/15/2014, 1271746, Page35 of 134

A-2721

Appendix 2

### Art. 14a.

1. Nadawca jest obowiązany do zapewnienia odbiorcom łatwego, bezpośredniego i stałego dostępu do informacji umożliwiających identyfikację programu i jego nadawcy, a w szczególności do informacji o:

    1) nazwie programu;

    2) nazwisku, nazwie lub firmie tego nadawcy;

    3) adresie jego siedziby;

    4) danych kontaktowych, w tym adresu korespondencyjnego, adresu poczty elektronicznej oraz witryny internetowej.

2. Nadawca jest obowiązany do wskazania Krajowej Rady jako organu właściwego w sprawach radiofonii i telewizji.

3. Krajowa Rada może określić, w drodze rozporządzenia, sposób zapewniania przez nadawców dostępu do informacji umożliwiających identyfikację programu i jego nadawcy oraz inne niż wskazane w ust. 1 informacje, uwzględniając potrzeby odbiorców, integralność przekazów, sposób rozpowszechniania programu i oddziaływanie na interesy odbiorców oraz dążąc do nieobciążania dostawców nadmiernymi utrudnieniami i kosztami w związku z zapewnianiem informacji.

### Art. 15.

1. Nadawcy programów telewizyjnych przeznaczają co najmniej 33% kwartalnego czasu nadawania programu na audycje wytworzone pierwotnie w języku polskim, z wyłączeniem serwisów informacyjnych, reklam, telesprzedaży, transmisji sportowych, przekazów tekstowych i teleturniejów.

*[2. Nadawcy programów radiowych i telewizyjnych przeznaczają co najmniej 33% kwartalnego czasu nadawania w programie utworów słowno-muzycznych na utwory, które są wykonywane w języku polskim.]*

<2. Nadawcy programów radiowych, z wyłączeniem programów tworzonych w całości w języku mniejszości narodowej lub etnicznej, lub w języku regionalnym w rozumieniu art. 19 ustawy z dnia 6 stycznia 2005 r. o mniejszościach narodowych i etnicznych oraz o języku regionalnym (Dz. U. Nr 17, poz. 141, Nr 62, poz. 550 oraz z 2009 r. Nr 31, poz. 206 i Nr 157, poz. 1241), przeznaczają co najmniej 33 % miesięcznego czasu nadawania w programie utworów słowno-muzycznych na utwory, które są wykonywane w języku polskim, z tego co najmniej 60%[5] w godzinach 5-24.>

<2a. Przy ustalaniu czasu nadawania w godzinach 5-24, o którym mowa w ust. 2, czas nadawania utworu słowno-muzycznego w tych godzinach wykonywanego w języku polskim przez debiutanta jest liczony jako 200 % czasu nadawania utworu.

2b. Za utwór wykonywany przez debiutanta uważa się utwór słowno-muzyczny wykonywany w języku polskim, który w danym okresie rozliczeniowym został rozpowszechniony w programie radiowym, a od daty pierwszego rozpowszechnienia nie minęło 18 miesięcy, przy czym za debiutanta uważa się wyłącznie artystę lub zespół muzyczny, który w powyższym okresie 18 mie-

Nowe brzmienie ust. 2, dodane ust. 2a i 2b oraz nowe brzmienie ust. 4 w art. 15 wchodzą w życie od 1.01.2012 r. (Dz. U. z 2011 r. Nr 85, poz. 459).

---

[5] W 2012 r. jest to co najmniej 40%, a w 2013 r. – co najmniej 50% (Dz. U. z 2011 r. Nr 85, poz. 459, art. 9).

2011-09-09

TVP 021012 367

A-2722

Appendix 2

©Kancelaria Sejmu                                                                                                              s. 11/45

sięcy po raz pierwszy opublikował album zawierający utwory słowno-
muzyczne lub pojedyncze nagranie utworu słowno-muzycznego.>

3. Nadawcy programów telewizyjnych przeznaczają ponad 50% kwartalnego czasu
nadawania programu na audycje europejskie, z wyłączeniem serwisów informa-
cyjnych, reklam, telesprzedaży, transmisji sportowych, przekazów tekstowych i
teleturniejów.

[4. *Krajowa Rada określi, w drodze rozporządzenia, niższy udział w programie
radiowym lub telewizyjnym audycji, o których mowa w ust. 1 i 3, dla:*

1) *nadawców w pierwszym roku rozpowszechniania przez nich programu,*

2) *programów wyspecjalizowanych, dla których brak jest wystarczającej liczby
audycji, o których mowa w ust. 1 i 3,*

3) *programów rozpowszechnianych wyłącznie w sposób satelitarny lub kablo-
wy dostępnych w całości za opłatą, z wyłączeniem opłat abonamentowych w
rozumieniu ustawy z dnia 21 kwietnia 2005 r. o opłatach abonamentowych i
podstawowych opłat pobieranych przez operatorów satelitarnych lub opera-
torów sieci kablowych*

— *uwzględniając konieczność zachowania proporcji audycji wytworzonych pier-
wotnie w języku polskim i audycji europejskich.]*

<4. **Krajowa Rada określi, w drodze rozporządzenia, niższy udział w progra-
mie telewizyjnym audycji, o których mowa w ust. 1 i 3, oraz w programie
radiowym utworów, o których mowa w ust. 2, dla:**

1) **nadawców w pierwszym roku rozpowszechniania przez nich programu,**

2) **programów wyspecjalizowanych, dla których brak jest wystarczającej
liczby audycji, o których mowa w ust. 1 i 3, lub utworów, o których
mowa w ust. 2,**

3) **programów, na których nadawanie przyznano koncesję określającą, że
programy te są przeznaczone dla mniejszości narodowych i etnicznych
oraz społeczności posługującej się językiem regionalnym,**

4) **programów rozpowszechnianych wyłącznie w systemach teleinforma-
tycznych**

— **uwzględniając konieczność zachowania proporcji audycji wytworzonych
pierwotnie w języku polskim i audycji europejskich oraz uwzględniając
możliwość realizacji tych obowiązków w danych kategoriach programów.>**

**Art. 15a.**

1. Nadawcy programów telewizyjnych przeznaczają co najmniej 10% kwartalnego
czasu nadawania programu na audycje europejskie wytworzone przez producen-
tów niezależnych, z wyłączeniem serwisów informacyjnych, reklam, telesprze-
daży, transmisji sportowych, przekazów tekstowych i teleturniejów. W czasie
przeznaczonym na audycje europejskie wytworzone przez producentów nieza-
leżnych, audycje wytworzone w okresie 5 lat przed rozpowszechnieniem w pro-
gramie powinny stanowić co najmniej 50%.

2. Krajowa Rada określi, w drodze rozporządzenia, w odniesieniu do audycji, o
których mowa w art. 15 ust. 1 i 3 oraz w ust. 1:

1) sposób prowadzenia przez nadawcę ewidencji czasu nadawania,

2) czas przechowywania ewidencji, nie krótszy niż 1 rok,

2011-09-09

TVP 021012 368

Appendix 2

   3) zakres informacji zawartych w ewidencji, w tym dane o terminie rozpowszechniania audycji, rzeczywisty czas trwania audycji, tytuł i producenta audycji

– uwzględniając możliwość prowadzenia ewidencji w formie elektronicznej, konieczność zapewnienia przejrzystości oraz jawności informacji znajdujących się w ewidencji oraz nieobciążania nadawców nadmiernymi utrudnieniami i kosztami w związku z prowadzeniem ewidencji.

3. Krajowa Rada określi, w drodze rozporządzenia, niższy udział audycji europejskich wytworzonych przez producentów niezależnych w okresie 5 lat przed rozpowszechnieniem w programie dla programów telewizyjnych, dla których ze względu na wyspecjalizowany charakter programu brak jest wystarczającej liczby tych audycji, uwzględniając wpływ charakteru programów na możliwość realizacji przez nadawców tych obowiązków.

### Art. 15b.

*[1. Audycją europejską jest audycja, która pochodzi z:*

   *1) państwa członkowskiego Unii Europejskiej lub*

   *2) państwa będącego stroną Europejskiej konwencji o telewizji ponadgranicznej, sporządzonej w Strasburgu dnia 5 maja 1989 r. (Dz. U. z 1995 r. Nr 32, poz. 160 oraz z 2004 r. Nr 28, poz. 250), niestosującego środków dyskryminacyjnych w stosunku do audycji pochodzących z państw członkowskich Unii Europejskiej, lub*

   *3) innego europejskiego państwa trzeciego niestosującego środków dyskryminacyjnych w stosunku do audycji pochodzących z państw członkowskich Unii Europejskiej, o ile spełnia ona wymagania określone w ust. 3.]*

◁1. Audycją europejską jest audycja:

   1) pochodząca z państwa członkowskiego Unii Europejskiej lub

   2) pochodząca z innego państwa będącego stroną Europejskiej konwencji o telewizji ponadgranicznej, sporządzonej w Strasburgu dnia 5 maja 1989 r. (Dz. U. z 1995 r. Nr 32, poz. 160 oraz z 2004 r. Nr 28, poz. 250), zwanej dalej „Europejską konwencją o telewizji ponadgranicznej", niestosującego środków dyskryminacyjnych w stosunku do audycji pochodzących z państw członkowskich Unii Europejskiej, lub

   3) wytworzona w koprodukcji w ramach umowy dotyczącej sektora audiowizualnego zawartej między Unią Europejską a innym państwem trzecim spełniająca wymagania określone w tej umowie, jeżeli państwo to nie stosuje środków dyskryminacyjnych w stosunku do audycji pochodzących z państw członkowskich Unii Europejskiej.▷

2. Audycja pochodzi z państw, o których mowa w ust. 1 pkt 1 i 2, jeżeli większość członków zespołu twórczego stale zamieszkuje na terytorium jednego z tych państw oraz spełniony jest co najmniej jeden z warunków:

   1) audycja jest wyprodukowana przez producenta mającego siedzibę lub stałe miejsce zamieszkania w państwie, o którym mowa w ust. 1 pkt 1 i 2;

   2) produkcja audycji jest nadzorowana i kontrolowana przez osobę fizyczną mającą stałe miejsce zamieszkania w państwie, o którym mowa w ust. 1 pkt 1 i 2, lub przez osobę prawną albo podmiot nieposiadający osobowości prawnej, których siedziba znajduje się w państwie, o którym mowa w ust. 1 pkt 1 i 2;

*Nowe brzmienie ust. 1 oraz uchylony ust. 3 i 5 w art. 15b wchodzi w życie od 1.07.2011 r. (Dz. U. z 2011 r. Nr 85, poz. 459).*

2011-09-09



TVP 021012 369

Appendix 2

3) udział współproducentów, mających siedzibę lub stałe miejsce zamieszkania w państwie, o którym mowa w ust. 1 pkt 1 i 2, w łącznych kosztach produkcji audycji jest większościowy i współprodukcja nie podlega kontroli współproducentów niemających siedziby lub stałego miejsca zamieszkania w państwie, o którym mowa w ust. 1 pkt 1 i 2.

*[3. Za audycję europejską uważa się również audycję, której większość członków zespołu twórczego stale zamieszkuje na terytorium państwa europejskiego oraz która została wyprodukowana samodzielnie lub w koprodukcji z producentem mającym siedzibę lub stałe miejsce zamieszkania w jednym z państw członkowskich Unii Europejskiej przez producenta mającego siedzibę lub stałe miejsce zamieszkania w państwie, o którym mowa w ust. 1 pkt 3, jeżeli państwo to zawarło ze Wspólnotą Europejską umowę w sprawach audiowizualnych. ]*

4. Audycją europejską jest także audycja, która została wyprodukowana w ramach dwustronnych umów o koprodukcji zawartych między państwami członkowskimi Unii Europejskiej i państwami trzecimi, a udział współproducentów, mających siedzibę lub stałe miejsce zamieszkania na terytorium państwa, o którym mowa w ust. 1 pkt 1, w łącznych kosztach produkcji audycji jest większościowy oraz współprodukcja nie podlega kontroli współproducentów niemających siedziby lub stałego miejsca zamieszkania na terytorium państwa, o którym mowa w ust. 1 pkt 1.

*[5. Audycją europejską, w stosunku odpowiadającym proporcji udziału współproducentów mających siedzibę lub stałe miejsce zamieszkania w państwie członkowskim Unii Europejskiej w łącznych kosztach produkcji, jest również audycja niespełniająca wymagań określonych w ust. 1–4, jeżeli większość członków zespołu twórczego stale zamieszkuje w państwie członkowskim Unii Europejskiej.]*

### Art. 16.

1. Przekazy handlowe powinny być łatwo rozpoznawalne.

2. Reklamy i telesprzedaż powinny być łatwo odróżnialne od materiału redakcyjnego. Reklamy i telesprzedaż odróżnia się w programie za pomocą środków wizualnych, dźwiękowych lub przestrzennych.

3. Reklamy i telesprzedaż nie mogą zajmować więcej niż 12 minut w ciągu godziny zegarowej.

4. Ograniczenia określonego w ust. 3 nie stosuje się do:

   1) ogłoszeń nadawcy, zawierających jedynie informację o jego audycjach lub fragmenty tych audycji;

   2) ogłoszeń nadawcy zawierających jedynie informację o dodatkowych produktach uzyskiwanych bezpośrednio z audycji;

   3) wymaganych prawem oznaczeń przekazów handlowych, w tym wskazań sponsorów.

5. Ogłoszenia, o których mowa w ust. 4 pkt 1 i 2, są emitowane pomiędzy audycjami i nie mogą zajmować więcej niż 2 minuty w ciągu godziny zegarowej.

6. Bloki programowe poświęcone wyłącznie telesprzedaży powinny być wyraźnie oznaczone w sposób wizualny i dźwiękowy oraz nadawane w sposób nieprzerwany przez co najmniej 15 minut. Do bloków takich nie stosuje się ograniczenia określonego w ust. 3.

7. Krajowa Rada określi, w drodze rozporządzenia, sposób prowadzenia w programach radiowych i telewizyjnych działalności reklamowej i telesprzedaży, w tym:

TVP 021012 370

**A-2725**

Appendix 2

   1) warunki nadawania, w tym wyodrębniania, oznaczania i umieszczania, reklam i telesprzedaży w programach,

   2) wymagania dotyczące osób, których głos lub wizerunek jest wykorzystywany w reklamach, z uwzględnieniem zakresu ograniczeń w prowadzeniu przez nie innych audycji w programach radiowych i telewizyjnych,

   3) zakres udostępniania przez nadawcę czasu wykorzystywanego na reklamy i telesprzedaż, w tym maksymalny wymiar czasu w okresie rocznym dla jednego przedsiębiorcy lub ugrupowania gospodarczego,

   4) sposób prowadzenia i przechowywania przez nadawcę ewidencji czasu nadawanych reklam i telesprzedaży oraz zakres danych objętych tą ewidencją,

   5) szczegółowe wymagania dla ogłoszeń nadawców, o których mowa w ust. 4 pkt 1 i 2, oraz sposób ich oznaczania i umieszczania w programach

– kierując się ochroną interesu odbiorców i samodzielności nadawców oraz uwzględniając rozwój technik reklamowych.

### Art. 16a.

1. Umieszczanie reklam lub telesprzedaży podczas audycji nie może naruszać integralności audycji, przy uwzględnieniu naturalnych przerw w audycji, jej czasu trwania i charakteru, ani uprawnień podmiotów praw do audycji.

2. W transmisjach zawodów sportowych zawierających przerwy wynikające z przepisów ich rozgrywania oraz w transmisjach innych wydarzeń zawierających przerwy, reklamy lub telesprzedaż mogą być nadawane wyłącznie w tych przerwach.

3. Filmy wyprodukowane dla telewizji, z wyłączeniem serii, seriali i audycji dokumentalnych, oraz filmy kinematograficzne mogą zostać przerwane, w celu nadania reklam lub telesprzedaży, wyłącznie jeden raz podczas każdego okresu pełnych 45 minut przewidzianych w programie.

4. Audycje inne niż określone w ust. 2 mogą być przerywane w celu nadania reklam lub telesprzedaży, jeżeli okres między kolejnymi przerwami w danej audycji wynosi w programie telewizyjnym co najmniej 20 minut, a w programie radiowym co najmniej 10 minut.

5. Za przerwanie audycji uznaje się każde umieszczenie reklamy lub telesprzedaży w trakcie audycji.

6. Nie można przerywać w celu nadania reklam lub telesprzedaży:

   1) serwisów informacyjnych;

   2) audycji o treści religijnej;

   3) audycji publicystycznych i dokumentalnych o czasie krótszym niż 30 minut;

   4) audycji dla dzieci.

7. Nie można przerywać w celu nadania reklam lub telesprzedaży audycji w programach publicznej radiofonii i telewizji, z wyjątkiem audycji, o których mowa w ust. 2.

### Art. 16b.

1. Zakazane jest nadawanie przekazu handlowego:

   1) wyrobów tytoniowych, rekwizytów tytoniowych, produktów imitujących wyroby tytoniowe lub rekwizyty tytoniowe oraz symboli związanych z używaniem tytoniu, w zakresie regulowanym przez ustawę z dnia 9 listopa-

TVP 021012 371

Appendix 2

da 1995 r. o ochronie zdrowia przed następstwami używania tytoniu i wyrobów tytoniowych (Dz. U. z 1996 r. Nr 10, poz. 55, z późn. zm.[6]);

2) napojów alkoholowych, w zakresie regulowanym przez ustawę z dnia 26 października 1982 r. o wychowaniu w trzeźwości i przeciwdziałaniu alkoholizmowi (Dz. U. z 2007 r. Nr 70, poz. 473, z późn. zm.[7]);

3) świadczeń zdrowotnych w rozumieniu przepisów o działalności leczniczej udzielanych wyłącznie na podstawie skierowania lekarza;

4) produktów leczniczych, w zakresie regulowanym przez ustawę z dnia 6 września 2001 r. – Prawo farmaceutyczne (Dz. U. z 2008 r. Nr 45, poz. 271, z późn. zm.[8]);

5) gier cylindrycznych, gier w karty, gier w kości, zakładów wzajemnych, gier na automatach, w zakresie regulowanym ustawą z dnia 19 listopada 2009 r. o grach hazardowych (Dz. U. Nr 201, poz. 1540 oraz z 2010 r. Nr 127, poz. 857);

6) substancji psychotropowych lub środków odurzających oraz środków spożywczych lub innych produktów, w zakresie uregulowanym ustawą z dnia 29 lipca 2005 r. o przeciwdziałaniu narkomanii (Dz. U. Nr 179, poz. 1485, z późn. zm.[9]).

2. Zakazane jest nadawanie przekazów handlowych:

1) nawołujących bezpośrednio małoletnich do nabywania produktów lub usług;

2) zachęcających małoletnich do wywierania presji na rodziców lub inne osoby w celu skłonienia ich do zakupu reklamowanych produktów lub usług;

3) wykorzystujących zaufanie małoletnich, jakie pokładają oni w rodzicach, nauczycielach i innych osobach;

4) w nieuzasadniony sposób ukazujących małoletnich w niebezpiecznych sytuacjach;

5) oddziałujących w sposób ukryty na podświadomość.

3. Przekaz handlowy nie może:

1) naruszać godności ludzkiej;

2) zawierać treści dyskryminujących ze względu na rasę, płeć, narodowość, pochodzenie etniczne, wyznanie lub światopogląd, niepełnosprawność, wiek czy orientację seksualną;

3) ranić przekonań religijnych lub politycznych;

4) zagrażać fizycznemu, psychicznemu lub moralnemu rozwojowi małoletnich;

---

[6] Zmiany wymienionej ustawy zostały ogłoszone w Dz. U. z 1997 r. Nr 88, poz. 554 i Nr 121, poz. 770, z 1999 r. Nr 96, poz. 1107, z 2003 r. Nr 229, poz. 2274 oraz z 2010 r. Nr 81, poz. 529.

[7] Zmiany tekstu jednolitego wymienionej ustawy zostały ogłoszone w Dz. U. z 2007 r. Nr 115, poz. 793 i Nr 176, poz. 1238, z 2008 r. Nr 227, poz. 1505, z 2009 r. Nr 18, poz. 97 i Nr 144, poz. 1175 oraz z 2010 r. Nr 47, poz. 278 i Nr 127, poz. 857.

[8] Zmiany tekstu jednolitego wymienionej ustawy zostały ogłoszone w Dz. U. z 2008 r. Nr 227, poz. 1505 i Nr 234, poz. 1570, z 2009 r. Nr 18, poz. 97, Nr 31, poz. 206, Nr 92, poz. 753, Nr 95, poz. 788 i Nr 98, poz. 817 oraz z 2010 r. Nr 78, poz. 513 i Nr 107, poz. 679.

[9] Zmiany wymienionej ustawy zostały ogłoszone w Dz. U. z 2006 r. Nr 66, poz. 469 i Nr 120, poz. 826, z 2007 r. Nr 7, poz. 48 i Nr 82, poz. 558, z 2009 r. Nr 18, poz. 97, Nr 63, poz. 520, Nr 92, poz. 753 i Nr 98, poz. 817, z 2010 r. Nr 28, poz. 146, Nr 143, poz. 962, Nr 213, poz. 1396 i Nr 228, poz. 1486 oraz z 2011 r. Nr 63, poz. 322.

2011-09-09

Appendix 2

   5) sprzyjać zachowaniom zagrażającym zdrowiu, bezpieczeństwu lub ochronie środowiska.

3a. Audycjom dla dzieci nie powinny towarzyszyć przekazy handlowe dotyczące artykułów spożywczych lub napojów zawierających składniki, których obecność w nadmiernych ilościach w codziennej diecie jest niewskazana.

3b. Krajowa Rada, po zasięgnięciu opinii ministra właściwego do spraw zdrowia, może określić, w drodze rozporządzenia:

   1) rodzaje artykułów spożywczych lub napojów zawierających składniki, których obecność w nadmiernych ilościach w codziennej diecie jest niewskazana,

   2) sposób umieszczania w programach przekazów handlowych dotyczących tych artykułów, tak aby przekazy te nie towarzyszyły audycjom dla dzieci

  – dążąc do zachęcenia nadawców do przeciwdziałania promowaniu niezdrowego odżywiania wśród dzieci oraz uwzględniając charakter programów, ich wpływ na kształtowanie opinii publicznej i oddziaływanie na interesy odbiorców, bez nakładania nieuzasadnionych obowiązków na nadawców.

4. (uchylony).

## Art. 16c.

Zakazane są:

   1) ukryte przekazy handlowe;

   2) lokowanie produktów, z zastrzeżeniem art. 17a;

   3) lokowanie tematów.

## Art. 17.

1. Odbiorcy powinni zostać wyraźnie poinformowani o sponsorowaniu. Sponsorowane audycje lub inne przekazy są oznaczane przez wskazanie sponsora na ich początku, na końcu oraz w momencie wznowienia po przerwie na reklamę lub telesprzedaż. Wskazanie sponsora może zawierać tylko jego nazwę, firmę, znak towarowy lub inne oznaczenie indywidualizujące przedsiębiorcę lub jego działalność, odniesienie do jego towarów, usług lub ich znaku towarowego.

1a. Wskazanie sponsora i żaden element tego wskazania nie może bezpośrednio zachęcać do zakupu lub najmu towarów lub usług, zwłaszcza przez specjalne, promocyjne do nich odniesienie.

2. Wskazanie sponsora nie może zawierać nazwy, firmy, znaku towarowego lub innego oznaczenia indywidualizującego przedsiębiorcę lub jego działalność, widoku towaru albo usługi, których reklama jest zakazana w art. 16b ust. 1.

3. Sponsor nie może wpływać na treść audycji lub innego przekazu oraz ich miejsce w programie w sposób ograniczający samodzielność i niezależność redakcyjną nadawcy. Sponsorowanie nie zwalnia nadawcy od odpowiedzialności za treść audycji.

4. Sponsorowane audycje lub inne przekazy nie mogą zachęcać do kupna lub innego udostępniania towarów lub usług sponsora lub osoby trzeciej.

5. Zabronione jest sponsorowanie audycji lub innych przekazów, z zastrzeżeniem ust. 6, przez:

   1) partie polityczne;

   2) związki zawodowe;

2011-09-09

TVP 021012 373

Appendix 2

    3) organizacje pracodawców;

    4) osoby fizyczne lub osoby prawne, których zasadniczą działalność stanowi produkcja lub sprzedaż towarów lub świadczenie usług, o których mowa w art. 16b ust. 1.

6. Zabronione jest sponsorowanie transmisji sportowych przez podmioty wymienione w ust. 5 pkt 1–3 oraz przez przedsiębiorców, których główna działalność polega na produkcji, sprzedaży lub innym udostępnianiu towarów lub usług, których reklama jest zakazana zgodnie z art. 16b ust. 1 pkt 1 i 2, z zastrzeżeniem art. 13¹ ust. 5 i 6 ustawy o wychowaniu w trzeźwości i przeciwdziałaniu alkoholizmowi.

6a. Zabronione jest sponsorowanie audycji i innych przekazów przez podmioty prowadzące działalność w zakresie gier cylindrycznych, gier w karty, gier w kości, przyjmowania zakładów wzajemnych i gier na automatach.

7. Zabronione jest sponsorowanie:

    1) serwisów informacyjnych, z wyjątkiem sportowych i prognozy pogody;

    2) audycji publicystycznych o treści społeczno-politycznej;

    3) audycji poradniczych i konsumenckich;

    4) audycji wyborczych lub bezpośrednio związanych z kampanią wyborczą.

8. Krajowa Rada określi, w drodze rozporządzenia, sposób sponsorowania audycji lub innych przekazów, z uwzględnieniem zasad określonych w ust. 1–7, w tym w szczególności czas emisji, wskazania sponsora oraz sposób rozpowszechniania informacji o sponsorze w zapowiedzi audycji albo po zakończeniu audycji lub innego przekazu, a także w czasie trwania audycji lub innego przekazu. W rozporządzeniu Krajowa Rada określi sposób prowadzenia i przechowywania przez nadawcę ewidencji sponsorowanych audycji lub innych przekazów oraz zakres informacji objętych tą ewidencją.

### Art. 17a.

1. Lokowanie produktu jest dopuszczalne wyłącznie:

    1) w filmach kinematograficznych, filmach lub serialach wytworzonych na użytek audiowizualnych usług medialnych, a także w audycjach sportowych oraz audycjach rozrywkowych, lub

    2) w postaci nieodpłatnego udostępniania towaru lub usługi do wykorzystania w audycji, w szczególności w charakterze rekwizytu lub nagrody

    – z wyłączeniem audycji dla dzieci.

2. Audycje, w których stosuje się lokowanie produktu, oznacza się w programach telewizyjnych za pomocą znaku graficznego, a w programach radiowych za pomocą sygnału dźwiękowego informujących o fakcie lokowania produktu, na początku, na końcu oraz w momencie wznowienia po przerwie na reklamę lub telesprzedaż.

3. Na końcu audycji, o której mowa w ust. 2, która została wyprodukowana przy udziale nadawcy lub na jego zamówienie, umieszcza się neutralną informację o producencie lub sprzedawcy lokowanego towaru lub podmiocie świadczącym lokowaną usługę oraz o samym towarze lub usłudze.

4. Zastosowanie lokowania produktu nie może naruszać samodzielności i niezależności redakcyjnej nadawcy przez wpływ na treść lub miejsce audycji w programie oraz nie zwalnia nadawcy od odpowiedzialności za treść audycji.

5. Audycje, w których stosuje się lokowanie produktu, nie mogą:

2011-09-09

TVP 021012 374

**A-2729**

Appendix 2

©Kancelaria Sejmu         s. 18/45

1) nadmiernie eksponować danego produktu;

2) zachęcać bezpośrednio do nabycia lub najmu towarów lub usług, zwłaszcza przez promocyjne odniesienia do nich.

6. Zakazane jest lokowanie produktu dotyczące towarów lub usług, o których mowa w art. 16b ust. 1.

7. Nadawca jest obowiązany do prowadzenia i przechowywania ewidencji audycji, w których zastosowano lokowanie produktu.

8. W zakresie niezbędnym dla kontroli zgodności działania nadawcy z przepisami ust. 1–7, Przewodniczący Krajowej Rady może żądać od nadawcy przedstawienia dokumentacji w zakresie lokowania produktu. Przepis art. 10 ust. 2 stosuje się odpowiednio.

9. Krajowa Rada określi, w drodze rozporządzenia:

1) szczegółowe warunki oznaczania przez nadawcę audycji, w których zastosowano lokowanie produktu, w tym wzór znaku graficznego oraz formę sygnału dźwiękowego, o których mowa w ust. 2,

2) sposób prowadzenia oraz przechowywania przez nadawcę ewidencji audycji, w których zastosowano lokowanie produktu, oraz zakres danych objętych tą ewidencją

– uwzględniając interesy odbiorców i możliwość prowadzenia przez nadawcę ewidencji w postaci elektronicznej, bez obciążania nadawców nadmiernymi utrudnieniami i kosztami.

### Art. 18.

1. Audycje lub inne przekazy nie mogą propagować działań sprzecznych z prawem, z polską racją stanu oraz postaw i poglądów sprzecznych z moralnością i dobrem społecznym, w szczególności nie mogą zawierać treści nawołujących do nienawiści lub dyskryminujących ze względu na rasę, niepełnosprawność, płeć, wyznanie lub narodowość.

2. Audycje lub inne przekazy powinny szanować przekonania religijne odbiorców, a zwłaszcza chrześcijański system wartości.

3. Audycje lub inne przekazy nie mogą sprzyjać zachowaniom zagrażającym zdrowiu lub bezpieczeństwu oraz zachowaniom zagrażającym środowisku naturalnemu.

4. Zabronione jest rozpowszechnianie audycji lub innych przekazów zagrażających fizycznemu, psychicznemu lub moralnemu rozwojowi małoletnich, w szczególności zawierających treści pornograficzne lub w sposób nieuzasadniony eksponujących przemoc.

5. Audycje lub inne przekazy, zawierające sceny lub treści mogące mieć negatywny wpływ na prawidłowy fizyczny, psychiczny lub moralny rozwój małoletnich, inne niż te, o których mowa w ust. 4, mogą być rozpowszechniane wyłącznie w godzinach od 23 do 6.

5a. Nadawcy są zobowiązani do oznaczania audycji lub innych przekazów, o których mowa w ust. 5, odpowiednim symbolem graficznym przez cały czas ich emisji telewizyjnej lub zapowiedzią słowną, informującą o zagrożeniach wynikających z treści emisji radiowej.

5b. Nadawcy są zobowiązani do oznaczania audycji i innych przekazów, innych niż te, o których mowa w ust. 5, z wyłączeniem serwisów informacyjnych, reklam, telesprzedaży, transmisji sportowych i przekazów tekstowych, odpowiednim

2011-09-09

TVP 021012 375

**A-2730**

Appendix 2

symbolem graficznym przez cały czas ich emisji telewizyjnej, uwzględniając stopień szkodliwości danej audycji lub przekazu dla małoletnich w poszczególnych kategoriach wiekowych.

6. Krajowa Rada określi, w drodze rozporządzenia:

    1) cechy oraz szczegółowe warunki kwalifikowania, rozpowszechniania i sposób zapowiadania audycji lub innych przekazów, o których mowa w ust. 5,

    2) podział małoletnich na kategorie wiekowe oraz szczegółowe warunki kwalifikowania i rozpowszechniania audycji lub innych przekazów, o których mowa w ust. 5b, z uwzględnieniem godzin nadawania audycji lub innych przekazów przeznaczonych dla danej kategorii wiekowej,

    3) wzory symboli graficznych i formuł zapowiedzi, o których mowa w ust. 5a i 5b, oraz sposób ich prezentacji

– uwzględniając stopień szkodliwości audycji dla małoletnich w poszczególnych kategoriach wiekowych.

7. Nadawcy dbają o poprawność języka swoich programów i przeciwdziałają jego wulgaryzacji.

### &lt;Art. 18a.

1. Nadawcy programów telewizyjnych są obowiązani do zapewniania dostępności programów dla osób niepełnosprawnych z powodu dysfunkcji narządu wzroku oraz osób niepełnosprawnych z powodu dysfunkcji narządu słuchu, przez wprowadzanie odpowiednich udogodnień: audiodeskrypcji, napisów dla niesłyszących oraz tłumaczeń na język migowy, tak aby co najmniej 10 % kwartalnego czasu nadawania programu, z wyłączeniem reklam i telesprzedaży, posiadało takie udogodnienia.

2. Krajowa Rada może określić, w drodze rozporządzenia, niższy niż określony w ust. 1 udział w programie telewizyjnym audycji z udogodnieniami odbioru dla osób niepełnosprawnych z powodu dysfunkcji narządu wzroku oraz osób niepełnosprawnych z powodu dysfunkcji narządu słuchu, uwzględniając różnorodną ofertę programową w różnym czasie antenowym, możliwości techniczne, potrzeby odbiorców, sposób rozpowszechniania i specjalizację programu, bez nakładania nieuzasadnionych obowiązków na nadawców.&gt;

Dodany art. 18a wchodzi w życie z dniem 1.07.2011 r. (Dz. U. z 2011 r. Nr 85, poz. 459).

### Art. 19.

1. Działalność nadawcy polegająca na tworzeniu i zestawianiu programu prowadzona jest w formie redakcji w rozumieniu przepisów prawa prasowego.

2. Do przekazów tekstowych stosuje się odpowiednio przepisy o tworzeniu i rozpowszechnianiu programów radiowych i telewizyjnych.

### Art. 20.

1. Nadawca utrwala audycje, reklamy lub inne przekazy na odpowiednich nośnikach i przechowuje je przez okres 28 dni od dnia rozpowszechnienia audycji, reklamy lub innego przekazu. Po upływie tego okresu przechowuje się zapisy audycji, reklamy lub innego przekazu będącego przedmiotem postępowania przed organem państwowym do czasu zakończenia tego postępowania.

2011-09-09

Appendix 2

1a. Na wezwanie Przewodniczącego Krajowej Rady operator rozprowadzający program jest obowiązany utrwalić program określony w wezwaniu przez okres w nim wskazany, nie dłuższy niż 14 dni, i niezwłocznie przekazać jego zapis.

2. Osobie, która twierdzi, że treść audycji, reklamy lub innego przekazu narusza jej prawa, należy na jej pisemny wniosek i na koszt nadawcy udostępnić zapis audycji, reklamy lub innego przekazu albo wydać taki zapis na jej koszt, w terminie 7 dni od dnia złożenia wniosku.

3. W przypadku odmowy udostępnienia zapisu audycji, reklamy lub innego przekazu, osobie, o której mowa w ust. 2, służy roszczenie o udostępnienie zapisu na drodze sądowej; sądem właściwym w tych sprawach jest sąd okręgowy.

4. Krajowa Rada określi, w drodze rozporządzenia, sposoby utrwalania i przechowywania audycji, reklam i innych przekazów przez nadawców, z uwzględnieniem zakresu informacji o przechowywanych materiałach.

### Art. 20a.

1. Na pisemny wniosek Prezesa Urzędu Ochrony Konkurencji i Konsumentów nadawca jest obowiązany:

    1) ujawnić dane umożliwiające identyfikację zleceniodawcy audycji lub przekazu handlowego;

    2) wydać nieodpłatnie zapis audycji lub przekazu handlowego, w terminie 7 dni od dnia złożenia wniosku.

2. Przepis art. 20 ust. 3 stosuje się odpowiednio.

### Art. 20b.

1. Nadawca programu telewizyjnego może nadać bezpośrednią transmisję z wydarzenia

o zasadniczym znaczeniu społecznym, zwanego dalej „ważnym wydarzeniem", tylko:

    1) w programie ogólnokrajowym w rozumieniu ustawy lub koncesji, dostępnym w całości bez opłaty, z wyłączeniem opłat abonamentowych w rozumieniu ustawy z dnia 21 kwietnia 2005 r. o opłatach abonamentowych i podstawowych opłat pobieranych przez operatorów sieci kablowych, lub

    2) jeżeli to samo wydarzenie jest transmitowane przez nadawcę programu spełniającego wymogi określone w pkt 1, na podstawie umowy z nadawcą, który nabył prawa do transmisji danego wydarzenia, lub z innym uprawnionym, z zastrzeżeniem ust. 6.

2. Ze względu na duże zainteresowanie społeczne za ważne wydarzenia uważa się między innymi:

    1) letnie i zimowe Igrzyska Olimpijskie;

    2) półfinały i finały mistrzostw świata i Europy w piłce nożnej, a także wszelkie inne mecze w ramach tych imprez z udziałem reprezentacji Polski, w tym mecze eliminacyjne;

    3) inne mecze z udziałem reprezentacji Polski w piłce nożnej w ramach oficjalnych rozgrywek oraz mecze z udziałem polskich klubów w ramach Ligi Mistrzów i Pucharu UEFA.

3. Krajowa Rada może, w drodze rozporządzenia, określić listę innych, niż wymienione w ust. 2, ważnych wydarzeń, uwzględniając stopień społecznego zainiere-

2011-09-09

TVP 021012 377

Appendix 2

sowania określonym wydarzeniem i znaczenie tego wydarzenia dla życia spo-
łecznego, gospodarczego i politycznego.

4. Jeżeli przewiduje się organizację ważnego wydarzenia w częściach, to każdą ta-
ką część uważa się za ważne wydarzenie.

5. Przepis ust. 1 stosuje się do nadań z opóźnieniem, jeżeli opóźnienie nadania
transmisji z ważnego wydarzenia nie przekracza 24 godzin i wynika z ważnych
powodów, w szczególności:

   1) z czasu, w którym odbywa się dane wydarzenie, obejmującego okres między
      godziną 24 a godziną 6 czasu obowiązującego na obszarze Rzeczypospolitej
      Polskiej;

   2) z pokrywaniem się w czasie ważnych wydarzeń lub ich części.

6. Przepisu ust. 1 nie stosuje się, jeżeli dany nadawca wykaże, że żaden nadawca
programu spełniającego wymogi określone w ust. 1 pkt 1 nie wyraził gotowości
zawarcia umowy umożliwiającej nadanie transmisji zgodnie z ust. 1 pkt 2.

7. Krajowa Rada w zakresie wynikającym z wiążących Rzeczpospolitą Polską
umów międzynarodowych może, w drodze rozporządzenia, określić:

   1) listy wydarzeń uznanych przez inne państwa europejskie za ważne wydarze-
      nia;

   2) zasady wykonywania wyłącznych praw do telewizyjnych transmisji wyda-
      rzeń, o których mowa w pkt 1, w sposób zapewniający, że wykonywanie
      tych praw przez nadawców podlegających ustawie nie pozbawi odbiorców
      w danym państwie możliwości odbioru tych wydarzeń na zasadach określo-
      nych przez dane państwo zgodnie z przepisami prawa międzynarodowego.

### Art. 20c.

1. Nadawca programu telewizyjnego uprawniony do nadania na zasadzie wyłączno-
ści transmisji z wydarzenia budzącego istotne zainteresowanie społeczne, zwa-
nego dalej „wydarzeniem", jest obowiązany umożliwić innym nadawcom tele-
wizyjnym realizację prawa do krótkiego sprawozdania.

2. Prawo do krótkiego sprawozdania przysługuje każdemu nadawcy ustanowione-
mu w:

   1) Rzeczypospolitej Polskiej;

   2) innym państwie członkowskim Unii Europejskiej lub państwie będącym
      stroną Europejskiej konwencji o telewizji ponadgranicznej, o ile żaden
      nadawca lub inny podmiot w państwie, w którym jest ustanowiony nadawca
      ubiegający się o dostęp, nie jest uprawniony do transmisji danego wydarze-
      nia i nie może zapewnić dostępu do krótkiego sprawozdania z niego.

3. Realizację prawa do krótkiego sprawozdania umożliwia się przez udostępnienie
nadawcy ubiegającemu się o dostęp wybranych przez niego krótkich fragmen-
tów transmisji wydarzenia, łącznie nie dłuższych niż 90 sekund, z sygnału
nadawcy, o którym mowa w ust. 1, za zapłatą kosztów udostępnienia.

4. Nadawca realizujący prawo do krótkiego sprawozdania może nadać udostępnio-
ne mu zgodnie z ust. 3 fragmenty w okresie 24 godzin, w ogólnych audycjach
informacyjnych lub umieszczonych przy nich informacyjnych serwisach spor-
towych, trzykrotnie w danym programie, w wymiarze krótkiej informacji o wy-
darzeniu, nie dłuższej niż 90 sekund, pod warunkiem wyraźnego podania źródła.

5. Nadawca, o którym mowa w ust. 1, jest zwolniony z obowiązku realizacji prawa
do krótkiego sprawozdania w sposób określony w ust. 3, jeżeli nadawca ubiega-

TVP 021012 378

Case 14-1115, Document 42-1, 07/15/2014, 1271746, Page47 of 134

**A-2733**

Appendix 2

jący się o realizację tego prawa ma możliwość wstępu na miejsce wydarzenia i sporządzenia własnego sprawozdania. Przepis ust. 4 stosuje się odpowiednio.

6. Postanowienia umowne uniemożliwiające realizację prawa do krótkiego sprawozdania zgodnie z ust. 1–4 są nieważne.

### Rozdział 4

### Publiczna radiofonia i telewizja

### Art. 21.

1. Publiczna radiofonia i telewizja realizuje misję publiczną, oferując, na zasadach określonych w ustawie, całemu społeczeństwu i poszczególnym jego częściom, zróżnicowane programy i inne usługi w zakresie informacji, publicystyki, kultury, rozrywki, edukacji i sportu, cechujące się pluralizmem, bezstronnością, wyważeniem i niezależnością oraz innowacyjnością, wysoką jakością i integralnością przekazu.

1a. Do zadań publicznej radiofonii i telewizji, wynikających z realizacji misji, o której mowa w ust. 1, należy w szczególności:

1) tworzenie i rozpowszechnianie programów ogólnokrajowych, programów regionalnych, programów dla odbiorców za granicą w języku polskim i innych językach oraz innych programów realizujących demokratyczne, społeczne i kulturalne potrzeby społeczności lokalnych;

2) tworzenie i rozpowszechnianie programów wyspecjalizowanych, na których rozpowszechnianie uzyskano koncesję;

3) budowa i eksploatacja nadawczych i przekaźnikowych stacji radiowych i telewizyjnych;

4) rozpowszechnianie przekazów tekstowych;

5) prowadzenie prac nad nowymi technikami tworzenia i rozpowszechniania programów radiowych i telewizyjnych;

6) prowadzenie działalności produkcyjnej, usługowej i handlowej związanej z twórczością audiowizualną, w tym eksportu i importu;

7) popieranie twórczości artystycznej, literackiej, naukowej oraz działalności oświatowej i działalności w zakresie sportu;

8) upowszechnianie wiedzy o języku polskim;

8a) uwzględnianie potrzeb mniejszości narodowych i etnicznych oraz społeczności posługującej się językiem regionalnym, w tym emitowanie programów informacyjnych w językach mniejszości narodowych i etnicznych oraz języku regionalnym;

9) tworzenie i udostępnianie programów edukacyjnych na użytek środowisk polonijnych oraz Polaków zamieszkałych za granicą;

10) zapewnianie dostępności programów lub ich części i innych usług dla osób niepełnosprawnych z powodu dysfunkcji narządu wzroku oraz osób niepełnosprawnych z powodu dysfunkcji narządu słuchu;

11) upowszechnianie edukacji medialnej.

2. Programy i inne usługi publicznej radiofonii i telewizji powinny:

1) kierować się odpowiedzialnością za słowo i dbać o dobre imię publicznej radiofonii i telewizji;

2011-09-09

TVP 021012 379

Appendix 2

2) rzetelnie ukazywać całą różnorodność wydarzeń i zjawisk w kraju i za gra-
nicą;

3) sprzyjać swobodnemu kształtowaniu się poglądów obywateli oraz formowa-
niu się opinii publicznej;

4) umożliwiać obywatelom i ich organizacjom uczestniczenie w życiu publicz-
nym poprzez prezentowanie zróżnicowanych poglądów i stanowisk oraz
wykonywanie prawa do kontroli i krytyki społecznej;

5) służyć rozwojowi kultury, nauki i oświaty, ze szczególnym uwzględnieniem
polskiego dorobku intelektualnego i artystycznego;

6) respektować chrześcijański system wartości, za podstawę przyjmując uni-
wersalne zasady etyki;

7) służyć umacnianiu rodziny;

7a) służyć kształtowaniu postaw prozdrowotnych;

7b) służyć propagowaniu i upowszechnianiu sportu;

8) służyć zwalczaniu patologii społecznych;

9) (uchylony);

10) służyć edukacji medialnej.

3. Jednostki publicznej radiofonii i telewizji opracowują corocznie w porozumieniu
z Krajową Radą plany finansowo-programowe przedsięwzięć w zakresie re-
alizacji zadań, o których mowa w ust. 1 i 1a, wymagających finansowania
ze środków publicznych, z uwzględnieniem części kosztów funkcjonowania i
rozwoju tych jednostek.

4. Krajowa Rada określi, w drodze rozporządzenia, terminy przedkładania i zakres
planów finansowo-programowych mając na względzie zapewnienie realizacji
misji publicznej przez jednostki publicznej radiofonii i telewizji, a także swobo-
dę nadawców publicznych w kształtowaniu programów.

### Art. 22.

1. Organy państwowe mogą podejmować decyzje w sprawach działalności jedno-
stek publicznej radiofonii i telewizji tylko w przypadkach przewidzianych usta-
wami.

2. Jednostki publicznej radiofonii i telewizji umożliwiają naczelnym organom pań-
stwowym bezpośrednią prezentację oraz wyjaśnianie polityki państwa.

3. Krajowa Rada określa, w drodze rozporządzenia, tryb postępowania w sprawach,
o których mowa w ust. 2.

### Art. 23.

1. Jednostki publicznej radiofonii i telewizji stwarzają partiom politycznym możli-
wość przedstawienia stanowiska w węzłowych sprawach publicznych.

2. Uprawnienia przewidziane w ust. 1 stosuje się odpowiednio do ogólnokrajowych
organizacji związków zawodowych i związków pracodawców.

3. Tryb postępowania w sprawach, o których mowa w ust. 1 i 2, określa, w drodze
rozporządzenia, Krajowa Rada.

2011-09-09

TVP 021012 380

Appendix 2

### Art. 23a.

1. Jednostki publicznej radiofonii i telewizji stwarzają organizacjom pożytku publicznego, o których mowa w ustawie z dnia 24 kwietnia 2003 r. o działalności pożytku publicznego i o wolontariacie (Dz. U. z 2010 r. Nr 234, poz, 1536), możliwość nieodpłatnego informowania o prowadzonej przez te organizacje działalności nieodpłatnej.

2. Przepis ust. 1 nie wyklucza prawa nadawcy do informowania o działalności organizacji pożytku publicznego w szerszym zakresie.

3. Krajowa Rada w porozumieniu z ministrem właściwym do spraw zabezpieczenia społecznego określi, w drodze rozporządzenia, tryb postępowania związanego z nieodpłatnym informowaniem o prowadzonej przez organizacje pożytku publicznego nieodpłatnej działalności pożytku publicznego, w tym sposób przygotowania i emisji audycji oraz czas przeznaczony na ich rozpowszechnianie, uwzględniając różnorodność zadań publicznych określonych w art. 4 ustawy o działalności pożytku publicznego i o wolontariacie oraz ich znaczenie dla społeczności.

### Art. 24.

1. Podmiotom uczestniczącym w wyborach do Sejmu, Senatu, samorządu terytorialnego oraz Parlamentu Europejskiego zapewnia się możliwość rozpowszechniania audycji wyborczych w programach publicznej radiofonii i telewizji na zasadach określonych odrębnymi przepisami.

2. Przepis ust. 1 stosuje się odpowiednio do wyborów na urząd Prezydenta Rzeczypospolitej Polskiej.

3. Podmiotom uprawnionym do udziału w kampanii referendalnej w programach radiowych i telewizyjnych w rozumieniu art. 48 ust. 1 ustawy z dnia 14 marca 2003 r. o referendum ogólnokrajowym (Dz. U. Nr 57, poz. 507, z późn. zm.[10]) zapewnia się możliwość rozpowszechniania audycji referendalnych w programach publicznej radiofonii i telewizji na zasadach określonych odrębnymi przepisami.

### Art. 25.

1. Jednostki publicznej radiofonii i telewizji mogą tworzyć i rozpowszechniać programy dla odbiorców za granicą w języku polskim i w innych językach.

2. Jednostki publicznej radiofonii i telewizji są obowiązane tworzyć i rozpowszechniać audycje oświatowe dla szkół i innych placówek oświatowo-wychowawczych.

3. Audycje oświatowe powinny odpowiadać wymogom zawartym w szkolnych programach nauczania.

4. Koszty tworzenia programów oraz audycji, o których mowa w ust. 1 i 2, są pokrywane z budżetu państwa, w granicach określonych ustawą budżetową.

5. Zakres i sposób prowadzenia działalności przewidzianej w ust. 1 i 2 oraz zasady pokrywania jej kosztów są określane w formie porozumień zawieranych między

---

[10] Zmiany wymienionej ustawy zostały ogłoszone w Dz. U. z 2003 r. Nr 85, poz. 782, z 2007 r. Nr 112, poz. 766, z 2009 r. Nr 68, poz. 573 i Nr 202, poz. 1547 oraz z 2011 r. Nr 21, poz. 113.

2011-09-09

TVP 021012 381

Appendix 2

ministrami właściwymi odpowiednio w sprawach zagranicznych i edukacji na-
rodowej oraz jednostkami publicznej radiofonii i telewizji.

## Art. 26.

1. Jednostki publicznej radiofonii i telewizji działają wyłącznie w formie jednooso-
bowej spółki akcyjnej Skarbu Państwa, zwanej dalej „spółką".

2. Telewizję publiczną tworzy spółka „Telewizja Polska – Spółka Akcyjna", zawią-
zana w celu tworzenia i rozpowszechniania ogólnokrajowych programów I, II i
TV Polonia oraz regionalnych programów telewizyjnych.

2a. Terenowe oddziały spółki „Telewizja Polska – Spółka Akcyjna" mają swoje sie-
dziby w: Białymstoku, Bydgoszczy, Gorzowie Wielkopolskim, Gdańsku, Kato-
wicach, Kielcach, Krakowie, Lublinie, Łodzi, Opolu, Olsztynie, Poznaniu, Rze-
szowie, Szczecinie, Warszawie, Wrocławiu.

3. Radiofonię publiczną tworzą:

   1) spółka „Polskie Radio – Spółka Akcyjna", zawiązana w celu tworzenia i
   rozpowszechniania ogólnokrajowych programów radiowych i programów
   dla odbiorców za granicą;

   2) spółki zawiązane w celu tworzenia i rozpowszechniania regionalnych pro-
   gramów radiowych, zwane dalej „spółkami radiofonii regionalnej".

4. Do spółek wymienionych w ust. 2 i 3 stosuje się, z zastrzeżeniem art. 27–30
ustawy, przepisy Kodeksu spółek handlowych z wyjątkiem art. 312 i 402.

5. Prezes Urzędu Komunikacji Elektronicznej, w porozumieniu z Przewodniczą-
cym Krajowej Rady, dokonuje, w drodze decyzji, rezerwacji częstotliwości nie-
zbędnych do wykonywania ustawowych zadań przez spółki oraz określa warun-
ki wykorzystania tych częstotliwości. Do dokonywania, wprowadzania zmian
lub cofania rezerwacji częstotliwości stosuje się przepisy art. 114 i 115 ustawy z
dnia 16 lipca 2004 r. – Prawo telekomunikacyjne (Dz. U. Nr 171, poz. 1800, z
późn. zm.[11]).

6. Prezes Urzędu Komunikacji Elektronicznej, w porozumieniu z Przewodniczą-
cym Krajowej Rady, zapewnia dla spółek tworzących i rozpowszechniających:

   1) ogólnokrajowe programy telewizyjne – częstotliwości niezbędne do pokry-
   cia kraju zasięgiem odbioru programu „Telewizja Polska I" i „Telewizja
   Polska II";

   2) ogólnokrajowe programy radiowe – częstotliwości niezbędne do pokrycia
   kraju zasięgiem odbioru programu pierwszego, drugiego, trzeciego i czwar-
   tego oraz częstotliwości niezbędne do rozpowszechniania programów ra-
   diowych dla odbiorców za granicą;

   3) regionalne programy telewizyjne – częstotliwości niezbędne do rozpo-
   wszechniania regionalnych programów telewizyjnych;

[11] Zmiany wymienionej ustawy zostały ogłoszone w Dz. U. z 2004 r. Nr 273, poz. 2703, z 2005 r. Nr
163, poz. 1362 i Nr 267, poz. 2258, z 2006 r. Nr 12, poz. 66, Nr 104, poz. 708 i 711, Nr 170, poz.
1217, Nr 220, poz. 1600, Nr 235, poz. 1700 i Nr 249, poz. 1834, z 2007 r. Nr 23, poz. 137, Nr 50, poz.
331 i Nr 82, poz. 556, z 2008 r. Nr 17, poz. 101 i Nr 227, poz. 1505, z 2009 r. Nr 11, poz. 59, Nr 18,
poz. 97 i Nr 85, poz. 716 oraz z 2010 r. Nr 81, poz. 530, Nr 86, poz. 554, Nr 106, poz. 675, Nr 182,
poz. 1228, Nr 219, poz. 1443, Nr 229, poz. 1499 i Nr 238, poz. 1578.

2011-09-09

TVP 021012 382

Appendix 2

    4) regionalne programy radiowe — częstotliwości niezbędne do rozpowszechniania regionalnych programów radiowych,

7. Program TV Polonia jest rozpowszechniany w sposób rozsiewczy satelitarny.

8. Do rezerwacji częstotliwości przeznaczonych do rozpowszechniania lub rozprowadzania programów w sposób cyfrowy, drogą rozsiewczą naziemną lub rozsiewczą satelitarną, stosuje się art. 115 ust. 3 ustawy z dnia 16 lipca 2004 r. — Prawo telekomunikacyjne.

### Art. 27.

1. Zarząd spółki liczy od jednego do trzech członków.

2. Kadencja zarządu trwa cztery lata.

3. Członków zarządu, w tym prezesa zarządu, Krajowa Rada powołuje w drodze uchwały na wniosek rady nadzorczej oraz odwołuje w drodze uchwały na wniosek rady nadzorczej lub walnego zgromadzenia.

4. Do zarządu powołuje się wyłącznie osobę posiadającą kompetencje w dziedzinie zarządzania oraz radiofonii i telewizji, spośród kandydatów wyłonionych w konkursie przeprowadzonym przez radę nadzorczą.

5. Krajowa Rada określi, w drodze rozporządzenia, regulamin konkursu na kandydatów na członków zarządu, w tym sposób ogłaszania, organizację i tryb przeprowadzania konkursu oraz sposób ogłaszania wyników konkursu, uwzględniając potrzebę powszechności dostępu do konkursu, zapewnienia obiektywności i jawności postępowania, sprawnego przeprowadzenia konkursu oraz oceny kompetencji kandydatów, o których mowa w ust. 4.

6. Członek zarządu może być odwołany w przypadku:

    1) skazania prawomocnym wyrokiem sądu za przestępstwo umyślne ścigane z oskarżenia publicznego lub przestępstwo skarbowe;

    2) działania na szkodę spółki;

    3) zaistnienia okoliczności trwale uniemożliwiających sprawowanie funkcji.

7. Członkowie zarządu i osoby zajmujące kierownicze stanowiska w jednostkach publicznej radiofonii i telewizji kierują się w swojej pracy oraz w ocenie dziennikarzy i innych twórców im podległych zasadami profesjonalizmu, uczciwości i rzetelności oraz wskazaniami zawartymi w art. 21 ust. 1a i 2 ustawy.

### Art. 28.

1. Rady nadzorcze spółek „Telewizja Polska – Spółka Akcyjna" i „Polskie Radio – Spółka Akcyjna" liczą po siedmiu członków; pięciu wyłonionych w konkursie przeprowadzonym przez Krajową Radę spośród kandydatów posiadających kompetencje w dziedzinie prawa, finansów, kultury oraz mediów, zgłoszonych przez organy kolegialne uczelni akademickich, jednego powołanego przez ministra właściwego do spraw kultury i ochrony dziedzictwa narodowego oraz jednego powołanego przez ministra właściwego do spraw Skarbu Państwa.

1a. Rady nadzorcze spółek radiofonii regionalnej liczą po pięciu członków wyłonionych w konkursie przeprowadzonym przez Krajową Radę spośród kandydatów posiadających kompetencje w dziedzinie prawa, finansów, kultury oraz mediów, zgłoszonych przez organy kolegialne uczelni akademickich działających w danym regionie oraz jednego powołanego przez ministra właściwego do

TVP 021012 383

**A-2738**

Appendix 2

spraw Skarbu Państwa w porozumieniu z ministrem właściwym do spraw kultury i ochrony dziedzictwa narodowego.

1b. Krajowa Rada określi, w drodze rozporządzenia, regulamin konkursu na członka rady nadzorczej, w tym sposób ogłaszania, organizację i tryb przeprowadzania konkursu, sposób zgłaszania kandydatów oraz sposób ogłaszania wyników konkursu, uwzględniając potrzebę zapewnienia obiektywności i jawności postępowania, sprawnego przeprowadzenia konkursu oraz oceny kompetencji kandydatów, o których mowa w ust. 1 i 1a.

1c. Uchwała Krajowej Rady w sprawie wyników konkursu, wskazująca osoby wyłonione w konkursie, stanowi ich powołanie w skład rady nadzorczej.

1d. Członek rady nadzorczej może być odwołany przez organ, który go powołał, w przypadku:

    1) skazania prawomocnym wyrokiem sądu za przestępstwo umyślne ścigane z oskarżenia publicznego lub przestępstwo skarbowe;

    2) działania na szkodę spółki;

    3) zaistnienia okoliczności trwale uniemożliwiających sprawowanie funkcji.

2. Rada nadzorcza podejmuje uchwały bezwzględną większością głosów w obecności co najmniej połowy składu rady.

3. Rada nadzorcza wybiera ze swego grona przewodniczącego.

4. Rada nadzorcza uchwala regulamin określający tryb jej działania.

5. Kadencja rady nadzorczej trwa trzy lata.

6. Zgody rady nadzorczej wymaga:

    1) nawiązywanie i rozwiązywanie stosunku pracy z osobami zajmującymi stanowiska kierownicze określone w statucie spółki;

    2) zawarcie lub przystąpienie przez spółkę do umowy zbiorowej z przedstawicielami pracowników;

    3) związanie bądź przystąpienie do spółki innej niż spółka, o której mowa w art. 26 ust. 1, a także nabycie lub zbycie udziałów albo akcji w takiej spółce;

    4) zbycie lub obciążenie nieruchomości.

7. (uchylony).

### Art. 28a.

1. Rady programowe publicznej radiofonii i telewizji liczą 15 członków, których powołuje Krajowa Rada; 10 członków rady programowej reprezentuje ugrupowania parlamentarne. Pozostałych 5 powołuje z grona osób legitymujących się dorobkiem i doświadczeniem w sferze kultury i mediów.

2. Kadencja rady programowej trwa 4 lata, a jej członkowie reprezentują społeczne interesy i oczekiwania związane z działalnością programową spółki.

3. Rada programowa podejmuje uchwały zawierające oceny poziomu i jakości programu bieżącego oraz programów ramowych. Uchwały w sprawach programowych, podejmowane większością głosów w obecności co najmniej połowy składu rady, są przedmiotem obrad i postanowień rady nadzorczej.

4. Członkom rady programowej przysługuje dieta wypłacana przez spółkę w wysokości ustalonej przez Krajową Radę.

2011-09-09

TVP 021012 384

Appendix 2

5. Zarząd spółki zapewnia członkom rady programowej organizacyjne i finansowe warunki dokonywania ocen poziomu i jakości wyemitowanego programu, badania jego odbioru oraz zlecania niezależnych badań dotyczących percepcji programu i jego społecznych skutków.

### Art. 29.

1. W walnym zgromadzeniu Skarb Państwa reprezentowany jest przez ministra właściwego do spraw Skarbu Państwa.

2. Zarząd spółki nie jest związany poleceniami i zakazami ustanowionymi przez walne zgromadzenie, jeżeli dotyczą one treści programu.

3. Zmiana statutu spółki wymaga uprzedniej zgody Krajowej Rady.

### Art. 30.

1. Tworzenie i rozpowszechnianie regionalnych programów telewizji publicznej należy do terenowych oddziałów spółki, o której mowa w art. 26 ust. 2.

2. Statut spółki określa zakres działania i zadania terenowego oddziału spółki.

3. Działalnością terenowego oddziału spółki kieruje dyrektor powoływany przez radę nadzorczą na wniosek zarządu spółki.

4. Organem opiniodawczo-doradczym dyrektora terenowego oddziału spółki jest rada programowa oddziału.

4a. Powołując rady programowe oddziałów emitujących programy w językach mniejszości narodowych i etnicznych oraz języku regionalnym, dyrektorzy oddziałów uwzględnią kandydatów zgłaszanych przez organizacje społeczne mniejszości narodowych i etnicznych oraz społeczności posługującej się językiem regionalnym.

5. Krajowa Rada, na wniosek zarządu spółki, po zasięgnięciu opinii dyrektorów terenowych oddziałów, określi minimalny udział audycji tworzonych przez terenowe oddziały spółki w poszczególnych programach ogólnokrajowych.

6. (uchylony).

### Art. 30a.

1. Przepisy dotyczące programów dla odbiorców za granicą stosuje się odpowiednio do programu TV Polonia.

2. Organem opiniodawczo-doradczym w sprawach tworzenia i rozpowszechnienia programu TV Polonia jest rada programowa TV Polonia.

### Art. 31.

1. Przychodami spółek, o których mowa w art. 26 ust. 2 i 3, są wpływy pochodzące:

1) z opłat abonamentowych, odsetek za zwłokę w ich uiszczaniu oraz kar za używanie niezarejestrowanych odbiorników radiofonicznych i telewizyjnych, w rozumieniu przepisów ustawy z dnia 21 kwietnia 2005 r. o opłatach abonamentowych, z zastrzeżeniem przepisu art. 8 ust. 1 tej ustawy;

2) z obrotu prawami do audycji;

3) z reklam i audycji sponsorowanych;

2011-09-09

TVP 021012 385

Appendix 2

4) z innych źródeł.

2. Przychodami spółek mogą być również dotacje z budżetu państwa.

3. Akcjonariuszom spółek, o których mowa w art. 26 ust. 2 i 3, nie przysługuje prawo do udziału w zysku.

### Art. 31a.

1. Spółki, o których mowa w art. 26 ust. 2 i 3, są obowiązane do określenia w dokumentacji, o której mowa w art. 10 ustawy z dnia 29 września 1994 r. o rachunkowości (Dz. U. z 2009 r. Nr 152, poz. 1223, Nr 157, poz. 1241 i Nr 165, poz. 1316 oraz z 2010 r. Nr 47, poz. 278), zasad rachunkowości, w tym zakładowego planu kont, w sposób zapewniający ujęcie w księgach rachunkowych przychodów i związanych z nimi kosztów odrębnie w odniesieniu do działalności, o której mowa w art. 21 ust. 1, oraz pozostałej działalności, a także metod przypisywania kosztów i przychodów do poszczególnych rodzajów prowadzonej działalności.

2. Obowiązek, o którym mowa w ust. 1, nie narusza obowiązków w zakresie rachunkowości i sprawozdawczości wynikających z odrębnych przepisów.

3. Krajowa Rada określi, w drodze rozporządzenia, sposób prowadzenia dokumentacji, o której mowa w ust. 1, oraz sposób sporządzania sprawozdań, o których mowa w art. 31b pkt 1–3, biorąc pod uwagę konieczność zapewnienia przestrzegania zasad jawności i przejrzystości wykorzystania środków przeznaczonych na realizację zadań, o których mowa w art. 21 ust. 1, w sposób niezakłócający konkurencji na rynku.

### Art. 31b.

Zarządy spółek, o których mowa w art. 26 ust. 2 i 3, są obowiązane do składania Krajowej Radzie:

1) rocznego sprawozdania ze sposobu wykorzystania środków, o których mowa w art. 31 ust. 1 i 2, do dnia 15 lutego, za poprzedni rok kalendarzowy;

2) kwartalnych sprawozdań dotyczących sposobu wykorzystania środków przyznawanych zgodnie z art. 31 ust. 1 pkt 1 i ust. 2, do 25. dnia miesiąca następującego po upływie każdego kwartału danego roku kalendarzowego;

3) kwartalnych sprawozdań dotyczących kosztów poniesionych na działalność, o której mowa w art. 21 ust. 1, wraz z określeniem źródeł ich finansowania, do 25. dnia miesiąca następującego po upływie każdego kwartału danego roku kalendarzowego;

4) (uchylony).

### Art. 31c.

Zarządy spółek, o których mowa w art. 26 ust. 2 i 3, przygotowują i publicznie udostępniają, do dnia 15 marca za poprzedni rok kalendarzowy, sprawozdania z wykorzystania wpływów z opłat abonamentowych w rozumieniu ustawy z dnia 21 kwietnia 2005 r. o opłatach abonamentowych, odsetek za zwłokę w ich uiszczaniu oraz kar za używanie niezarejestrowanych odbiorników, na realizację misji publicznej, o której mowa w art. 21 ust. 1, ze wskazaniem środków przeznaczonych na wykonanie poszczególnych zadań wymienionych w art. 21 ust. 1a.

2011-09-09

**A-2741**

Appendix 2

### Art. 32.

W celu realizacji zadań radiofonii i telewizji publicznej spółki mogą tworzyć, za zgodą Krajowej Rady, przedsiębiorców przewidzianych przepisami prawa.

### Rozdział 5

### Koncesje na rozpowszechnianie programów

### Art. 33.

1. Rozpowszechnianie programów radiowych i telewizyjnych, z wyjątkiem programów publicznej radiofonii i telewizji, wymaga uzyskania koncesji.

1a. Nie wymaga uzyskania koncesji rozpowszechnianie programów telewizyjnych wyłącznie w systemach teleinformatycznych, chyba że program taki ma być rozprowadzany naziemnie, satelitarnie lub w sieciach kablowych.

2. Organem właściwym w sprawach koncesji jest Przewodniczący Krajowej Rady.

3. Przewodniczący Krajowej Rady podejmuje decyzję w sprawie koncesji na podstawie uchwały Krajowej Rady. Decyzja w tej sprawie jest ostateczna.

### Art. 34.

1. Przewodniczący Krajowej Rady, po zasięgnięciu opinii Prezesa Urzędu Komunikacji Elektronicznej w zakresie określonym w ust. 1a pkt 3, ogłasza w Dzienniku Urzędowym Rzeczypospolitej Polskiej „Monitor Polski" informacje o możliwościach uzyskania koncesji na rozpowszechnianie w sposób rozsiewczy naziemny programu radiowego lub telewizyjnego oraz ustala termin, nie krótszy niż 45 dni od dnia ogłoszenia, do składania wniosków o udzielenie koncesji.

1a. W ogłoszeniu, o którym mowa w ust. 1, określa się:

1) przedmiot postępowania;

2) warunki programowe rozpowszechniania programu, w tym w szczególności rodzaj i charakter programu;

3) częstotliwości lub kanały oraz maksymalną moc promieniowaną i lokalizację stacji nadawczych przeznaczonych do rozpowszechniania programu lub obszar, na którym mogą być wykorzystywane częstotliwości, chyba że do rozpowszechniania programu nie jest wymagana rezerwacja częstotliwości;

4) liczbę koncesji;

5) czas, na jaki może być udzielona koncesja;

6) termin i miejsce składania wniosków.

1b. Przewodniczący Krajowej Rady, w terminie nie dłuższym niż 14 dni od dnia ogłoszenia, o którym mowa w ust. 1, zamieszcza w co najmniej dwóch drukowanych dziennikach o zasięgu ogólnopolskim informację o tym ogłoszeniu.

1c. Rozpatrzeniu podlegają wyłącznie wnioski o udzielenie koncesji w związku z ogłoszeniem, o którym mowa w ust. 1.

2. Przewodniczący Krajowej Rady podaje do publicznej wiadomości listę wnioskodawców uczestniczących w postępowaniu o udzielenie koncesji. W przypadku złożenia większej liczby wniosków, przekraczających istniejące możliwości rozpowszechniania programów, są one rozpatrywane w ramach jednego postępowania.

2011-09-09

Case 14-1115, Document 42-1, 07/15/2014, 1271746, Page56 of 134

A-2742

Appendix 2

### Art. 35.

1. Koncesja może być udzielona osobie fizycznej, posiadającej obywatelstwo polskie i stałe miejsce zamieszkania na terytorium Rzeczypospolitej Polskiej, osobie prawnej lub osobowej spółce handlowej, które mają siedzibę na terytorium Rzeczypospolitej Polskiej.

2. Koncesja dla spółki z udziałem osób zagranicznych może być udzielona, jeżeli:

   1) udział kapitałowy osób zagranicznych w spółce lub udział osób zagranicznych w kapitale zakładowym spółki nie przekracza 49%,

   2) umowa lub statut spółki przewidują, że:

      a) osobami uprawnionymi do reprezentowania lub prowadzenia spraw spółki albo członkami zarządu spółki będą w większości osoby posiadające obywatelstwo polskie i stałe miejsce zamieszkania w Polsce,

      b) w zgromadzeniu wspólników lub w walnym zgromadzeniu udział głosów osób zagranicznych i spółek zależnych, w rozumieniu Kodeksu spółek handlowych, od osób zagranicznych nie może przekroczyć 49%,

      c) osoby zagraniczne nie mogą dysponować bezpośrednio lub pośrednio większością przekraczającą 49% głosów w osobowej spółce handlowej,

      d) członkami rady nadzorczej spółki będą w większości osoby posiadające obywatelstwo polskie i stałe miejsce zamieszkania w Polsce.

3. Koncesja może być również udzielona:

   1) osobie zagranicznej lub

   2) spółce zależnej, w rozumieniu Kodeksu spółek handlowych, od osoby zagranicznej

– których siedziba lub stałe miejsce zamieszkania znajduje się w państwie członkowskim Europejskiego Obszaru Gospodarczego – bez stosowania ograniczeń zawartych w ust. 2.

### Art. 35a.

1. Nadawca *społeczny*[12] może złożyć wniosek o udzielenie koncesji na kolejny okres, nie później niż 12 miesięcy przed wygaśnięciem posiadanej koncesji.

2. W przypadku złożenia przez nadawcę *społecznego*[12] wniosku, o którym mowa w ust. 1, odmowa udzielenia koncesji na kolejny okres możliwa jest wyłącznie, gdy w stosunku do nadawcy zachodzi którakolwiek z okoliczności wskazanych w art. 38 ust. 1 lub 2.

3. W przypadku złożenia przez nadawcę wniosku, o którym mowa w ust. 1, do postępowania w sprawie udzielenia koncesji nie stosuje się przepisów art. 34 i 36 ust. 1 i 2.

### Art. 36.

1. W postępowaniu o udzielenie koncesji ocenia się w szczególności:

---

[12] Utracił moc w zakresie, w jakim ust. 1 zawiera słowo „społeczny", a ust. 2 zawiera słowo „społecznego", na podstawie wyroku Trybunału Konstytucyjnego, z dnia 23 marca 2006 r. sygn. akt K 4/06 (Dz. U. Nr 51, poz. 377).

TVP 021012 388

Case 14-1115, Document 42-1, 07/15/2014, 1271746, Page57 of 134

A-2743

Appendix 2

    1) stopień zgodności zamierzonej działalności programowej z zadaniami okre-
ślonymi w art. 1 ust. 1 ustawy, z uwzględnieniem stopnia realizacji tych za-
dań przez innych nadawców działających na obszarze objętym koncesją;

    2) możliwości dokonania przez wnioskodawcę koniecznych inwestycji i finan-
sowania programu;

    3) przewidywany udział w programie audycji wytworzonych przez nadawcę
lub na jego zamówienie albo we współdziałaniu z innymi nadawcami;

    4) przewidywany udział audycji, o których mowa w art. 15 ust. 1 i 3, w pro-
gramie telewizyjnym albo utworów, o których mowa w art. 15 ust. 2, w
programie radiowym lub telewizyjnym;

    5) dotychczasowe przestrzeganie przepisów dotyczących radiokomunikacji i
środków masowego przekazu.

2. Koncesji nie udziela się, jeżeli rozpowszechnianie programów przez wniosko-
dawcę mogłoby spowodować:

    1) zagrożenie interesów kultury narodowej, dobrych obyczajów i wychowania,
bezpieczeństwa i obronności państwa oraz zagrożenia dla bezpieczeństwa
informacji niejawnych;

    2) osiągnięcie przez wnioskodawcę pozycji dominującej w dziedzinie środków
masowego przekazu na danym terenie.

3. Koncesja jest udzielana na 10 lat.

## Art. 37.

1. Koncesja określa w szczególności:

    1) nadawcę, jego siedzibę albo miejsce zamieszkania;

    2) przedmiot działalności objętej koncesją;

    3) sposób rozpowszechniania programu (analogowy rozsiewczy naziemny, cy-
frowy rozsiewczy naziemny w multipleksie, rozsiewczy satelitarny, w sie-
ciach telekomunikacyjnych innych niż wykorzystywane do rozpowszech-
niania rozsiewczego naziemnego lub rozsiewczego satelitarnego) oraz:

    – dla rozpowszechniania analogowego rozsiewczego naziemnego:

        a) lokalizację stacji,

        b) wysokość zawieszenia anteny,

        c) maksymalną moc promieniowaną,

        d) charakterystykę promieniowania anteny,

        e) częstotliwość,

        f) polaryzację,

    – dla rozpowszechniania cyfrowego rozsiewczego naziemnego w multiplek-
sie:

        g) multipleks,

        h) obszar rozpowszechniania,

        i) parametry sygnalizacyjne – identyfikatory ID,

    – dla rozpowszechniania rozsiewczego satelitarnego:

        j) nazwę wykorzystywanego satelity,

        k) położenie satelity na orbicie,

        l) częstotliwość,

2011-09-09

TVP 021012 389

**A-2744**

Appendix 2

     m) lokalizację stacji dosyłowej,

   – dla rozpowszechniania w sieciach telekomunikacyjnych innych niż wykorzystywane do rozpowszechniania rozsiewczego naziemnego lub rozsiewczego satelitarnego:

     n) lokalizację stacji głównej,

     o) obszar objęty siecią telekomunikacyjną;

   4) rodzaj programu i czas jego rozpowszechniania;

   5) datę rozpoczęcia rozpowszechniania programu;

   6) termin wygaśnięcia koncesji.

2. Koncesja może określać inne warunki prowadzenia działalności, niezbędne dla realizacji przepisów ustawy.

3. Koncesja w zakresie określonym w ust. 1 pkt 3 jest udzielana w porozumieniu z Prezesem Urzędu Komunikacji Elektronicznej, który zajmuje stanowisko, mając na względzie spełnienie warunków określonych w art. 114 ust. 3 ustawy z dnia 16 lipca 2004 r. – Prawo telekomunikacyjne.

3a. Jeżeli do rozpowszechniania programu radiofonicznego lub telewizyjnego jest wymagana rezerwacja częstotliwości, Prezes Urzędu Komunikacji Elektronicznej dokonuje jej niezwłocznie na rzecz nadawcy, który uzyskał koncesję, chyba że program ten będzie rozpowszechniany przez operatora multipleksu w sposób cyfrowy drogą rozsiewczą naziemną. Do dokonywania, wprowadzania zmian lub cofania rezerwacji częstotliwości stosuje się przepisy art. 114 i 115 ustawy z dnia 16 lipca 2004 r. – Prawo telekomunikacyjne oraz nie stosuje się przepisów art. 116 tej ustawy.

4. Krajowa Rada, po zasięgnięciu opinii Prezesa Urzędu Komunikacji Elektronicznej, określi, w drodze rozporządzenia, dane, które powinien zawierać wniosek, oraz szczegółowy tryb postępowania w sprawach udzielania i cofania koncesji.

### Art. 37a.

Dostawca usługi medialnej jest obowiązany do corocznego składania do Krajowej Rady sprawozdania finansowego, w formie przewidzianej w ustawie z dnia 29 września 1994 r. o rachunkowości.

### Art. 38.

1. Koncesję cofa się, jeżeli:

   1) wydano prawomocne orzeczenie zakazujące nadawcy wykonywania działalności gospodarczej objętej koncesją;

   2) nadawca rażąco narusza warunki określone w ustawie lub w koncesji;

   3) działalność objęta koncesją jest wykonywana w sposób sprzeczny z ustawą lub z warunkami określonymi w koncesji, a nadawca, pomimo wezwania Przewodniczącego Krajowej Rady, w wyznaczonym terminie nie usunął stanu faktycznego lub prawnego niezgodnego z warunkami określonymi w koncesji lub w ustawie;

   4) nadawca, pomimo wezwania Przewodniczącego Krajowej Rady, nie rozpoczął rozpowszechniania programu w terminie ustalonym w koncesji lub trwale zaprzestał wykonywania rozpowszechniania programu za pomocą wszystkich lub niektórych stacji nadawczych – chyba że nadawca wykaże, że opóźnienie rozpoczęcia rozpowszechniania programu lub zaprzestanie

TVP 021012 390

**A-2745**

Appendix 2

rozpowszechniania programu zostały spowodowane okolicznościami od niego niezależnymi. Za trwałe zaprzestanie rozpowszechniania programu uważa się fakt nierozpowszechniania programu przez okres trzech kolejno następujących po sobie miesięcy.

2. Koncesja może być cofnięta, jeżeli:

   1) rozpowszechnianie programu powoduje zagrożenie interesów kultury narodowej, bezpieczeństwa i obronności państwa lub narusza normy dobrego obyczaju;

   2) nastąpi ogłoszenie upadłości nadawcy;

   3) rozpowszechnianie programu powoduje osiągnięcie przez nadawcę pozycji dominującej w dziedzinie środków masowego przekazu na danym rynku właściwym w rozumieniu przepisów o ochronie konkurencji i konsumentów;

   4) nastąpi przejęcie bezpośredniej lub pośredniej kontroli nad działalnością nadawcy przez inną osobę.

3. Przewodniczący Krajowej Rady podaje do publicznej wiadomości informacje o wszczęciu postępowania w sprawie cofnięcia koncesji.

4. W przypadku uprawomocnienia się decyzji w sprawie cofnięcia koncesji Przewodniczący Krajowej Rady niezwłocznie ogłasza o możliwości uzyskania koncesji w zakresie objętym cofniętą koncesją.

### Art. 38a.

1. Uprawnienia wynikające z koncesji są niezbywalne, z zastrzeżeniem ust. 3–5.

2. Uprawnienia, o których mowa w ust. 1, nie przechodzą na nabywcę przedsiębiorstwa upadłego.

3. W przypadku łączenia, podziału albo innego rodzaju przekształceń spółek handlowych, uprawnienia, o których mowa w ust. 1, mogą przejść na inny podmiot za zgodą Krajowej Rady wyrażoną w formie uchwały. Odmowa wyrażenia zgody następuje, gdy:

   1) nadawca osiągnie pozycję dominującą w dziedzinie środków masowego przekazu na danym rynku właściwym w rozumieniu przepisów o ochronie konkurencji i konsumentów;

   2) nastąpi przejęcie bezpośredniej lub pośredniej kontroli nad działalnością nadawcy przez inną osobę.

3a. Osoba fizyczna może przenieść uprawnienia wynikające z koncesji, za zgodą Krajowej Rady wyrażoną w formie uchwały, na spółkę, której jest wspólnikiem i która spełnia warunki, o których mowa w art. 35. Odmowa wyrażenia zgody następuje z przyczyn, o których mowa w art. 36 ust. 2.

4. Na podstawie uchwały Krajowej Rady, Przewodniczący Krajowej Rady wydaje decyzję w sprawie wyrażenia zgody bądź odmowy, o której mowa w ust. 3 i 3a.

5. Do uprawnień wynikających z rezerwacji częstotliwości stosuje się przepisy ustawy z dnia 16 lipca 2004 r. – Prawo telekomunikacyjne.

### Art. 39.

Koncesja na rozpowszechnianie programu telewizyjnego obejmuje również wykorzystanie sygnału telewizyjnego do rozpowszechniania przekazów tekstowych.

2011-09-09

TVP 021012 391

**A-2746**

Appendix 2

### Art. 39a.

1. Koncesja może być udzielona na rozpowszechnianie w sieciach kablowych lub w sposób rozsiewczy satelitarny programu poświęconego wyłącznie:

   1) telesprzedaży;

   2) autopromocji.

2. Do programów, o których mowa w ust. 1, stosuje się odpowiednio przepisy ustawy, z wyłączeniem przepisów art. 15–15b.

3. Do programów, o których mowa w ust. 1 pkt 1, nie stosuje się:

   1) ograniczenia dopuszczalnego wymiaru czasowego reklam i telesprzedaży w ciągu godziny, określonego w art. 16 ust. 3;

   2) przepisów art. 16 ust. 6 oraz art. 16a.

### Art. 39b.

1. O uznanie za nadawcę społecznego może do Krajowej Rady wystąpić:

   1) stowarzyszenie w ramach realizacji celów statutowych;

   2) fundacja w ramach realizacji celów statutowych;

   3) kościelna lub wyznaniowa osoba prawna kościoła lub związku wyznaniowego o uregulowanej w ustawie sytuacji prawnej.

2. Nadawca społeczny jest zwolniony z opłat za udzielenie lub zmianę koncesji.

3. W przypadku naruszenia przez nadawcę społecznego wymogów określonych w art. 4 pkt 10, organ koncesyjny wydaje decyzję o uchyleniu decyzji o uznaniu za nadawcę społecznego. Stwierdza w niej obowiązek uiszczenia opłat, o których mowa w ust. 2, wraz z ustawowymi odsetkami liczonymi od dnia udzielenia lub zmiany koncesji.

### Art. 40.

1. Za udzielenie koncesji pobiera się opłatę, niezależnie od opłat za używanie urządzeń radiokomunikacyjnych oraz używanie częstotliwości, przewidzianych w ustawie o łączności.

2. Krajowa Rada w porozumieniu z ministrem właściwym do spraw finansów publicznych, uwzględniając charakter poszczególnych nadawców i ich programów, ustala, w drodze rozporządzenia, wysokość opłaty, o której mowa w ust. 1, oraz może określić podmioty zwolnione od opłaty.

> Ust. 2 w art. 40 traci moc z dn.4.08.2012 r. na podstawie wyroku TK z dn. 19.07.2011 r., sygn. akt P 9/09 (Dz. U. Nr 160, poz. 963).

### Art. 40a.

1. Nabycie lub objęcie udziałów albo akcji, bądź nabycie prawa z udziałów lub akcji przez osobę zagraniczną w spółce, która posiada koncesję na rozpowszechnianie programu, wymaga zezwolenia Przewodniczącego Krajowej Rady, do którego stosuje się odpowiednio przepisy art. 33 ust. 3, art. 35 ust. 2, art. 36 ust. 2 oraz art. 38.

2. Czynność, o której mowa w ust. 1, dokonaną przez podmiot, w stosunku do którego osoba zagraniczna jest podmiotem dominującym, w rozumieniu Kodeksu spółek handlowych, uważa się za czynność dokonaną przez podmiot dominujący.

**A-2747**

Appendix 2

©Kancelaria Sejmu                      s. 36/45

3. Przewodniczący Krajowej Rady wydaje i cofa zezwolenie, o którym mowa w ust. 1, na podstawie uchwały Krajowej Rady.

4. Czynności, o których mowa w ust. 1, dokonane bez zezwolenia są nieważne.

5. Przepisów ust. 1–3 nie stosuje się do osób zagranicznych lub spółek zależnych, w rozumieniu Kodeksu spółek handlowych, do osób zagranicznych, których siedziby lub miejsce zamieszkania znajdują się w państwach będących członkami Europejskiego Obszaru Gospodarczego.

### Art. 40b.

Do kontroli działalności gospodarczej przedsiębiorcy, o której mowa w art. 33, stosuje się przepisy rozdziału 5 ustawy z dnia 2 lipca 2004 r. o swobodzie działalności gospodarczej.

### Rozdział 6

### Rozpowszechnianie niektórych programów telewizyjnych i rozprowadzanie programów

### Art. 41.

1. Zgłoszenia do rejestru wymaga:

    1) program rozprowadzany;

    2) program telewizyjny rozpowszechniany wyłącznie w systemie teleinformatycznym.

2. Obowiązek określony w ust. 1 pkt 1 nie dotyczy programów, o których mowa w art. 43 ust. 1.

3. Organem prowadzącym rejestr jest Przewodniczący Krajowej Rady.

4. Do postępowania w sprawach wpisu do rejestru stosuje się przepisy Kodeksu postępowania administracyjnego, chyba że ustawa stanowi inaczej.

5. Rejestr jest jawny.

### Art. 42.

1. Za wpis do rejestru pobiera się opłatę.

2. Krajowa Rada w porozumieniu z ministrem właściwym do spraw finansów publicznych ustala, w drodze rozporządzenia, wysokość opłaty, o której mowa w ust. 1, oraz może określać podmioty zwolnione od opłaty.

### Art. 43.

1. Operator rozprowadzający program, z wyłączeniem podmiotu rozprowadzającego program w sposób cyfrowy drogą rozsiewczą naziemną w multipleksie, jest obowiązany do rozprowadzania programów „Telewizja Polska I", „Telewizja Polska II" i jednego regionalnego programu telewizyjnego rozpowszechnianego przez Telewizję Polską S.A. oraz programów rozpowszechnianych w dniu wejścia w życie ustawy z dnia 30 czerwca 2011 r. o wdrożeniu naziemnej telewizji cyfrowej (Dz. U. Nr 153, poz. 903) na podstawie koncesji na rozpowszechnianie tych programów w sposób analogowy drogą rozsiewczą naziemną przez Telewizję Polsat S.A., TVN S.A., Polskie Media S.A., Telewizję Puls Sp. z o.o. W przypadku operatora rozprowadzającego programy w sieciach

2011-09-09

TVP 021012 393

A-2748

Appendix 2

telekomunikacyjnych innych niż wykorzystywane do rozpowszechniania rozsiewczego naziemnego lub rozsiewczego satelitarnego obowiązek rozprowadzania regionalnego programu telewizyjnego dotyczy regionalnego programu telewizyjnego właściwego dla danego obszaru.

2. Nadawca, który rozpowszechnia program, wymieniony w ust. 1, nie może odmówić operatorowi rozprowadzającemu program w sieci telekomunikacyjnej, o której mowa w ust. 1, zgody na rozprowadzanie tego programu, ani też nie może uzależnić udzielenia takiej zgody od uiszczenia jakiegokolwiek wynagrodzenia, w tym w szczególności z tytułu udzielenia licencji za korzystanie z nadania.

3. Przewodniczący Krajowej Rady przeprowadza ocenę realizacji obowiązku, o którym mowa w ust. 1, nie rzadziej niż raz na dwa lata, kierując się interesem społecznym w zakresie dostarczania informacji, udostępniania dóbr kultury i sztuki, ułatwiania korzystania z oświaty, sportu i dorobku nauki i upowszechniania edukacji obywatelskiej.

4. Wyniki oceny Przewodniczący Krajowej Rady przedstawia ministrowi właściwemu do spraw kultury i ochrony dziedzictwa narodowego, który podejmuje działania konieczne do zapewnienia, aby obowiązki, o których mowa w ust. 1, były proporcjonalne i przejrzyste oraz nakładane jedynie wtedy, gdy jest to niezbędne do realizacji celów określonych w ust. 3.

### Art. 43a.

1. Nadawca, który rozpowszechnia program, wymieniony w art. 43 ust. 1, jest obowiązany do nieodpłatnego udostępniania tego programu na wniosek operatora rozprowadzającego program, w terminie 14 dni od dnia złożenia wniosku.

2. Jeżeli nadawca nie wykonał obowiązku polegającego na nieodpłatnym udostępnianiu programu, Przewodniczący Krajowej Rady, na wniosek operatora rozprowadzającego program, wzywa nadawcę do udostępnienia tego programu temu operatorowi, w terminie 14 dni od dnia doręczenia wezwania.

3. Operator rozprowadzający program, jest obowiązany:

    1) rozprowadzać i oferować program, który został mu nieodpłatnie udostępniony;

    2) umieszczać w swojej ofercie informację, że program ten jest przeznaczony do powszechnego i nieodpłatnego odbioru również w sposób cyfrowy drogą rozsiewczą naziemną.

### Art. 44.

1. Organ rejestracyjny dokonuje wpisu do rejestru programu, o którym mowa w art. 41 ust. 1 pkt 1, na podstawie zgłoszenia.

2. Operator rozprowadzający program dokonuje zgłoszenia programu do rejestru nie później niż na miesiąc przed rozpoczęciem jego rozprowadzania.

3. Zgłoszenie, o którym mowa w ust. 1:

    1) wskazuje wnioskodawcę, jego siedzibę lub miejsce zamieszkania, adres korespondencyjny, w tym poczty elektronicznej, zapewniający skuteczny i szybki kontakt;

    2) wskazuje program przewidziany do rozprowadzania i jego nadawcę;

    3) określa obszar, na którym program ma być rozprowadzany.

4. Operator rozprowadzający program dołącza do zgłoszenia:

2011-09-09

TVP 021012 394

Appendix 2

　　1) dokumenty wskazujące, że rozprowadzanie programu nie będzie naruszało praw nadawcy programu;

　　2) dokumenty wskazujące, że program jest rozpowszechniany, a w przypadku programu przekazywanego przez nadawcę operatorowi – umowę z nadawcą programu.

5. (uchylony).

6. Wpis do rejestru zawiera w szczególności dane, o których mowa w ust. 3, z wyjątkiem adresu miejsca zamieszkania, jeżeli jest on inny niż adres siedziby.

7. Rozprowadzanie programu można rozpocząć, jeżeli organ rejestracyjny nie odmówił rejestracji w terminie miesiąca od dnia zgłoszenia, pod warunkiem uiszczenia przez operatora opłaty, o której mowa w art. 42 ust. 1.

8. Organ rejestracyjny może wezwać operatora rozprowadzającego program do uzupełnienia zgłoszenia w terminie 14 dni od dnia otrzymania wezwania. W sytuacji gdy organ rejestracyjny wezwał operatora do uzupełnienia zgłoszenia, termin, o którym mowa w ust. 7, biegnie od dnia wpływu uzupełnienia zgłoszenia.

9. Operator rozprowadzający program jest obowiązany zgłaszać organowi rejestracyjnemu, w terminie 14 dni, zmiany stanu faktycznego i prawnego objętego wpisem do rejestru, powstałe po dniu dokonania wpisu. Do zgłaszania zmian stosuje się odpowiednio przepisy o wpisie do rejestru.

### Art. 44a.

1. Organ rejestracyjny dokonuje wpisu do rejestru programu, o którym mowa w art. 41 ust. 1 pkt 2, na podstawie zgłoszenia.

2. Nadawca programu telewizyjnego rozpowszechnianego wyłącznie w systemie teleinformatycznym dokonuje zgłoszenia programu do rejestru nie później niż na miesiąc przed rozpoczęciem jego rozpowszechniania.

3. Zgłoszenie, o którym mowa w ust. 1:

　　1) wskazuje nadawcę, jego siedzibę lub miejsce zamieszkania, adres korespondencyjny, w tym poczty elektronicznej, zapewniający skuteczny i szybki kontakt;

　　2) zawiera podstawowe informacje o programie przewidzianym do rozpowszechniania;

　　3) określa sposób rozpowszechniania programu.

4. Wpis do rejestru zawiera w szczególności dane, o których mowa w ust. 3, z wyjątkiem adresu miejsca zamieszkania, jeżeli jest on inny niż adres siedziby.

5. Rozpowszechnianie programu można rozpocząć, jeżeli organ rejestracyjny nie odmówił rejestracji w terminie miesiąca od dnia zgłoszenia.

6. Organ rejestracyjny może wezwać nadawcę do uzupełnienia zgłoszenia w terminie 14 dni od dnia otrzymania wezwania. W sytuacji gdy organ rejestracyjny wezwał nadawcę do uzupełnienia zgłoszenia, termin, o którym mowa w ust. 5, biegnie od dnia wpływu uzupełnienia zgłoszenia.

7. Nadawca jest obowiązany zgłaszać organowi rejestracyjnemu, w terminie 14 dni, zmiany stanu faktycznego i prawnego objętego wpisem do rejestru, powstałe po dniu dokonania wpisu. Do zgłaszania zmian stosuje się odpowiednio przepisy o wpisie do rejestru.

TVP 021012 395

Appendix 2

### Art. 45.

1. Organ rejestracyjny wykreśla z rejestru program, o którym mowa w art. 41 ust. 1 pkt 2, jeżeli w programie tym, w okresie ostatnich 12 miesięcy, co najmniej dwukrotnie zostały zamieszczone treści poważnie naruszające przepisy art. 18 ust. 1, 4 i 5.

2. Organ rejestracyjny odmawia wpisu do rejestra programu, o którym mowa w art. 41 ust. 1 pkt 1, jeżeli w programie tym, w okresie ostatnich 12 miesięcy, co najmniej dwukrotnie zostały zamieszczone treści poważnie naruszające przepisy art. 18 ust. 1, 4 i 5.

3. Organ rejestracyjny wykreśla z rejestru program rozprowadzany, jeżeli:

    1) w programie tym, w okresie ostatnich 12 miesięcy, co najmniej dwukrotnie zostały zamieszczone treści poważnie naruszające przepisy art. 18 ust. 1, 4 i 5;

    2) operator bez zezwolenia nadawcy wprowadza zmiany do programu, rozpowszechnia go nie w całości lub nierównocześnie.

    3) (uchylony).

4. Odmowa wpisu lub jego wykreślenie, o których mowa w ust. 1–3, następuje w drodze decyzji administracyjnej, do której stosuje się odpowiednio przepis art. 33 ust. 3.

### Art. 46.

Krajowa Rada określi, w drodze rozporządzenia, szczegółowy sposób i tryb prowadzenia rejestru programów rozpowszechnianych wyłącznie w systemie teleinformatycznym i programów rozprowadzanych, w tym:

    1) wzór rejestru,

    2) wzór zgłoszenia o wpis do rejestru

– uwzględniając możliwość prowadzenia rejestru oraz zgłaszania do niego wniosków w systemie teleinformatycznym, konieczność zapewnienia przejrzystości i kompletności zapisu informacji znajdujących się w rejestrze oraz sprawność postępowania rejestracyjnego, a także nieobciążanie dostawców usług medialnych utrudnieniami w zakresie wykonywanej działalności.

### Art. 46a.

1. Jeżeli nadawca programu, o którym mowa w art. 45 ust. 3 pkt 1, jest ustanowiony w innym państwie członkowskim Unii Europejskiej, Krajowa Rada zawiadamia tego nadawcę i Komisję Europejską o stwierdzonych naruszeniach oraz o zamiarze wykreślenia rozprowadzanego programu z rejestru. Program jest wykreślany z rejestru, jeżeli w ciągu dwóch miesięcy od zawiadomienia, w wyniku konsultacji prowadzonych przez Krajową Radę z państwem, w którym jest ustanowiony nadawca, i z Komisją Europejską, nie nastąpi zaniechanie naruszeń.

2. Środki, o których mowa w ust. 1, muszą być obiektywnie niezbędne, stosowane w sposób niedyskryminacyjny i proporcjonalny do zamierzonych celów oraz gdy zostały spełnione następujące warunki:

    1) Krajowa Rada powiadomiła Komisję Europejską i państwo członkowskie, w którym nadawca ma swoją siedzibę, o zamiarze podjęcia takich środków i uzasadniła swoją ocenę oraz

    2) Komisja Europejska stwierdziła, że środki te są zgodne z prawem unijnym.

2011-09-09

TVP 021012 396

Appendix 2

©Kancelaria Sejmu                                                                    s. 40/45

### Art. 46b.

1. Jeżeli program nadawcy ustanowionego w innym państwie członkowskim Unii Europejskiej jest kierowany w całości lub w przeważającej części na terytorium Rzeczypospolitej Polskiej, Przewodniczący Krajowej Rady może wystąpić do państwa, w którym ustanowiony jest nadawca tego programu w celu zastosowania odpowiedniego rozwiązania, w tym zwłaszcza zapewniającego poszanowanie w tym programie zasad ochrony interesu publicznego określonych w ustawie oraz w przepisach odrębnych.

2. Jeżeli w ciągu dwóch miesięcy od wystąpienia, o którym mowa w ust. 1, nie dojdzie do zastosowania odpowiedniego rozwiązania, a nadawca danego programu jest ustanowiony w innym państwie członkowskim Unii Europejskiej w celu obejścia przepisów obowiązujących w Rzeczypospolitej Polskiej, Przewodniczący Krajowej Rady może zawiadomić Komisję Europejską oraz państwo, w którym ustanowiony jest nadawca, o zamiarze odmowy wpisu do rejestru lub wykreślenia z rejestru programu, lub zastosowania innego przewidzianego prawem niezbędnego, niedyskryminacyjnego i proporcjonalnego środka. Do zawiadomienia dołącza się uzasadnienie.

3. Oceniając, czy program, o którym mowa w ust. 1, jest w całości lub w przeważającej części kierowany na terytorium Rzeczypospolitej Polskiej, Krajowa Rada może się odwołać do takich kryteriów, jak źródło dochodów z reklam telewizyjnych lub abonamentu, główny język danej usługi lub obecność audycji lub przekazów handlowych skierowanych bezpośrednio do widzów w państwie członkowskim, w którym są one odbierane.

4. Przewodniczący Krajowej Rady może wydać decyzję o odmowie wpisu do rejestru lub wykreśleniu z rejestru programu, o którym mowa w ust. 1 i 2, lub innym środku, wyłącznie jeżeli Komisja Europejska, w drodze decyzji, nie stwierdzi, w terminie trzech miesięcy od zawiadomienia, o którym mowa w ust. 2, że byłoby to sprzeczne z prawem Unii Europejskiej.

5. Przewodniczący Krajowej Rady dokonuje wystąpienia, o którym mowa w ust. 1, oraz zawiadomienia, o którym mowa w ust. 2, na podstawie uchwały Krajowej Rady.

### Art. 47. (uchylony).

### Rozdział 7
(uchylony)

### Rozdział 8
#### Odpowiedzialność prawna

### Art. 52.

1. Kto rozpowszechnia program radiowy lub telewizyjny bez koncesji
   – podlega grzywnie, karze ograniczenia wolności albo pozbawienia wolności do lat 2.

2. Kto rozprowadza program radiowy lub telewizyjny bez wpisu do rejestru

2011-09-09

TVP 021012 397

**A-2752**

Appendix 2

– podlega grzywnie, karze ograniczenia wolności albo pozbawienia wolności do roku.

### Art. 53.

1. Jeżeli nadawca narusza obowiązek wynikający z przepisów art. 14a ust. 1 i 2, art. 15 ust. 1, 2 i 3, art. 15a ust. 1, art. 16 ust. 1–6, art. 16b ust. 1–3, art. 16c, art. 17 ust. 1–7, art. 17a ust. 1–7, art. 18 ust. 1–5b, art. 18a ust. 1, art. 20 ust. 1, art. 20b ust. 1 i 6, art. 20c ust. 1–5, art. 43 ust. 2, art. 43a ust. 1 lub z przepisów wydanych na podstawie art. 14a ust. 3, art. 15 ust. 4, art. 15a ust. 2 i 3, art. 16 ust. 7, art. 16b ust. 3b, art. 17 ust. 8, art. 17a ust. 9, art. 18 ust. 6 i art. 18a ust. 2 lub nie zastosował się do wezwania, o którym mowa w art. 43a ust. 2, Przewodniczący Krajowej Rady wydaje decyzję nakładającą na nadawcę karę pieniężną w wysokości do 50% rocznej opłaty za używanie częstotliwości przeznaczonej do nadawania programu, a w przypadku gdy nadawca nie uiszcza opłaty za częstotliwość, karę pieniężną w wysokości do 10% przychodu nadawcy, osiągniętego w poprzednim roku podatkowym, uwzględniając zakres i stopień szkodliwości naruszenia, dotychczasową działalność nadawcy oraz jego możliwości finansowe.

2. Przewodniczący Krajowej Rady może nałożyć karę, o której mowa w ust. 1, także w decyzji wydanej na podstawie art. 10 ust. 4.

3. Kara pieniężna jest płatna z dochodu po opodatkowaniu lub z innej formy nadwyżki przychodów nad wydatkami, zmniejszonej o podatki.

4. Kary pieniężnej nie można nałożyć, jeżeli od naruszenia obowiązku, o którym mowa w ust. 1, upłynął jeden rok.

### Art. 53a.

1. Jeżeli dostawca usługi medialnej rozpowszechnia program telewizyjny w systemie teleinformatycznym bez wpisu do rejestru, Przewodniczący Krajowej Rady wydaje decyzję nakładającą na dostawcę karę pieniężną w wysokości do 10 % przychodu dostawcy, osiągniętego w poprzednim roku podatkowym. Przepisy art. 53 ust. 3 i 4 stosuje się odpowiednio.

2. W pierwszym roku prowadzonej działalności kara, o której mowa w ust. 1, nie może przekraczać wysokości dziesięciokrotności przeciętnego miesięcznego wynagrodzenia w sektorze przedsiębiorstw w kwartale poprzedzającym wydanie decyzji nakładającej karę, włącznie z wypłatami z zysku, ogłaszanego przez Prezesa Głównego Urzędu Statystycznego w Dzienniku Urzędowym Rzeczypospolitej Polskiej „Monitor Polski".

### Art. 53b.

1. Jeżeli operator rozprowadzający program narusza obowiązek, o którym mowa w art. 43 ust. 1 lub art. 43a ust. 3, Przewodniczący Krajowej Rady wydaje decyzję nakładającą karę pieniężną w wysokości do 10% przychodu tego operatora, osiągniętego w poprzednim roku podatkowym, uwzględniając zakres i stopień szkodliwości naruszenia, dotychczasową działalność operatora oraz jego możliwości finansowe.

2. W przypadku gdy okres działania operatora, o którym mowa w ust. 1, jest krótszy niż rok kalendarzowy, za podstawę wymiaru kary przyjmuje się kwotę 500 tys. zł.

2011-09-09

TVP 021012 398

**A-2753**

Appendix 2

3. Przewodniczący Krajowej Rady może żądać od operatora, o którym mowa w ust. 1, udzielenia wyjaśnień, przedstawienia dokumentów, w szczególności rocznego sprawozdania finansowego za poprzedni rok podatkowy, w zakresie wykonania obowiązku, o którym mowa w art. 43 ust. 1 lub art. 43a ust. 3.

### Art. 54.

1. Jeżeli osoba kierująca działalnością dostawcy usługi medialnej nie wykonuje decyzji wydanych na podstawie art. 10 ust. 4, Przewodniczący Krajowej Rady może wydać decyzję nakładającą na nią karę pieniężną, nieprzekraczającą jednak jej sześciomiesięcznego wynagrodzenia.

2. Tej samej karze może podlegać osoba kierująca działalnością dostawcy usługi medialnej za nieudzielenie lub udzielenie nierzetelnych informacji na żądanie Przewodniczącego Krajowej Rady, przewidziane przepisem art. 10 ust. 2.

3. Decyzja nakładająca karę nie może być wydana, jeżeli od daty wydania decyzji, o której mowa w ust. 1, upłynęły dwa lata.

### Art. 55.

Kary, o których mowa w art. 53–54, podlegają wpłacie do budżetu państwa.

### Art. 56.

1. Od decyzji Przewodniczącego Krajowej Rady wydanych na podstawie art. 10 ust. 4 oraz art. 53–54 służy odwołanie do Sądu Okręgowego w Warszawie – sądu gospodarczego.

2. W postępowaniu w sprawach odwołań od decyzji, o których mowa w ust. 1, stosuje się odpowiednio przepisy Kodeksu postępowania cywilnego dotyczące spraw z zakresu przeciwdziałania praktykom monopolistycznym.

3. W razie złożenia odwołania od decyzji Przewodniczącego Krajowej Rady do sądu, stronie nie przysługują środki prawne wzruszenia decyzji przewidziane w Kodeksie postępowania administracyjnego, w szczególności dotyczące wznowienia postępowania, uchylenia, zmiany oraz stwierdzenia nieważności decyzji.

### Rozdział 9

### Zmiany w przepisach obowiązujących, przepisy przejściowe i końcowe

### Art. 57–62. (pominięte).[13]

### Art. 63.

1. Znosi się Komitet do Spraw Radia i Telewizji „Polskie Radio i Telewizja", zwany dalej „Komitetem". Przewodniczący Komitetu kieruje działalnością państwowej jednostki organizacyjnej „Polskie Radio i Telewizja" do czasu zarejestrowania spółek, o których mowa w art. 26 ust. 2 i 3.

---

[13] Zamieszczone w obwieszczeniu Marszałka Sejmu Rzeczypospolitej Polskiej z dnia 18 lutego 2011 r. w sprawie ogłoszenia jednolitego tekstu ustawy o radiofonii i telewizji (Dz. U. Nr 43, poz. 226).

2011-09-09

TVP 021012 399

Appendix 2

2. Przewidziane w ustawach szczególnych zadania Komitetu oraz Przewodniczącego Komitetu w zakresie tworzenia i rozpowszechniania programów radiowych i telewizyjnych przechodzą na jednostki publicznej radiofonii i telewizji, odpowiednio do zakresu ich zadań ustawowych i statutowych.

3. Przewidziane w ustawach szczególnych zadania Komitetu oraz Przewodniczącego Komitetu w zakresie administracji państwowej przechodzą do właściwości Krajowej Rady.

4. Funkcje organu założycielskiego w stosunku do przedsiębiorstw państwowych oraz uprawnienia nadzorcze w stosunku do jednostek badawczo-rozwojowych podległych Komitetowi przejmuje Przewodniczący Krajowej Rady.

5. Zezwolenia na używanie urządzeń telekomunikacyjnych przeznaczonych do nadawania programów radiowych i telewizyjnych wygasają z dniem rozpoczęcia działalności na tym samym terenie przez nadawcę, któremu przyznano w koncesji częstotliwość wykorzystywaną dotychczas do nadawania programu, lecz nie później niż po upływie roku od dnia wejścia ustawy w życie.

6. Przepis ust. 5 nie dotyczy uprawnień wydanych na podstawie ustawy, o której mowa w art. 59.

7. Do nadawców posiadających zezwolenie, o którym mowa w ust. 5, i do nadawców posiadających zezwolenia wydane w związku z ustawą, o której mowa w art. 59, przepisu art. 52 nie stosuje się.

8. Podmioty rozprowadzające programy w sieciach kablowych dostosują swoją działalność do wymogów określonych w rozdziale 6 w terminie 6 miesięcy od dnia wejścia ustawy w życie.

### Art. 64.

1. Minister właściwy do spraw Skarbu Państwa zawiąże:

   1) spółkę, o której mowa w art. 26 ust. 2, z siedzibą w Warszawie i oddziałami terenowymi w Bydgoszczy, Gdańsku, Katowicach, Krakowie, Lublinie, Łodzi, Poznaniu, Rzeszowie, Szczecinie, Warszawie i we Wrocławiu;

   2) spółkę, o której mowa w art. 26 ust. 3 pkt 1, z siedzibą w Warszawie oraz spółki, o których mowa w art. 26 ust. 3 pkt 2, z siedzibami w Białymstoku, Bydgoszczy, Gdańsku, Katowicach, Kielcach, Krakowie, Koszalinie, Lublinie, Łodzi, Opolu, Olsztynie, Poznaniu, Rzeszowie, Szczecinie, Warszawie, we Wrocławiu i w Zielonej Górze.

2. Minister właściwy do spraw Skarbu Państwa może zawiązać spółki radiofonii regionalnej z siedzibami w innych miejscowościach niż wymienione w ust. 1 pkt 2.

3. Minister właściwy do spraw Skarbu Państwa uzgodni treść statutów spółek, o których mowa w ust. 1 i 2, z Krajową Radą. Statut spółki, o której mowa w art. 26 ust. 2, może przewidywać oddziały terenowe w innych miejscowościach niż wymienione w ust. 1 pkt 1.

4. Pierwsze zarządy spółek, o których mowa w ust. 1 i 2, powoła Krajowa Rada.

2011-09-09

Appendix 2

### Art. 65.

1. Minister właściwy do spraw Skarbu Państwa wniesie do spółek, o których mowa w art. 64 ust. 1, mienie pozostałe po likwidacji państwowej jednostki organizacyjnej „Polskie Radio i Telewizja”, zwanej dalej „PRTV”.

2. Rada Ministrów określi, w drodze rozporządzenia, w terminie 1 miesiąca od dnia wejścia ustawy w życie, szczegółowy tryb inwentaryzacji mienia wymienionego w ust. 1, zasadę podziału i przekazywania tego mienia oraz tryb rozpoznawania spraw spornych.

3. Czynności podejmowane w wykonaniu art. 64 ust. 1 i 2 są wolne od opłat sądowych i skarbowych; do opłat za czynności notarialne związane z zawiązaniem tych spółek stosuje się odpowiednio przepisy o przekształcaniu przedsiębiorstwa państwowego w spółkę.

### Art. 66.

1. Grunty stanowiące własność Skarbu Państwa, będące w dniu wejścia w życie ustawy w zarządzie PRTV, z dniem zarejestrowania spółek stają się z mocy prawa przedmiotem użytkowania wieczystego tych spółek. Do użytkowania wieczystego nie stosuje się przepisów *art. 41 ust. 1 ustawy z dnia 29 kwietnia 1985 r. o gospodarce gruntami i wywłaszczaniu nieruchomości (Dz. U. z 1991 r. Nr 30, poz. 127, Nr 103, poz. 446 i Nr 107, poz. 464)[14)]* w części dotyczącej pierwszej opłaty.

2. Budynki i inne urządzenia oraz lokale znajdujące się na gruntach stanowiących własność Skarbu Państwa, będących w dniu wejścia w życie ustawy w zarządzie PRTV, z dniem zarejestrowania spółek stają się z mocy prawa własnością tych spółek. Nabycie własności następuje nieodpłatnie.

3. Nabycie prawa użytkowania wieczystego gruntów, o których mowa w ust. 1, oraz własności budynków, innych urządzeń i lokali, o których mowa w ust. 2, stwierdza się decyzją wojewody. W decyzji tej określa się również warunki użytkowania wieczystego, z zachowaniem zasad określonych w art. 236 Kodeksu cywilnego.

### Art. 67.

1. Pracownicy PRTV stają się z mocy prawa pracownikami właściwej spółki, z zastrzeżeniem ust. 2.

2. Stosunek pracy pracowników zatrudnionych na stanowiskach kierowniczych, określonych przez Krajową Radę, ustaje z mocy prawa z dniem wpisania spółki do rejestru handlowego. Ustanie stosunku pracy jest równoznaczne w skutkach prawnych z rozwiązaniem stosunku pracy wskutek wypowiedzenia umowy o pracę przez zakład pracy. Zatrudnienie tych pracowników w spółce może nastąpić na warunkach uzgodnionych przez strony.

3. Za zobowiązania wynikające ze stosunku pracy, powstałe przed wpisaniem spółki do rejestru handlowego, odpowiada spółka.

---

[14)] Obecnie: ustawy z dnia 21 sierpnia 1997 r. o gospodarce nieruchomościami (Dz. U. z 2010 r. Nr 102, poz. 651, Nr 106, poz. 675, Nr 143, poz. 963, Nr 155, poz. 1043, Nr 197, poz. 1307 i Nr 200, poz. 1323).

**A-2756**

Appendix 2

### Art. 68.

1. Na spółki przechodzą z mocy ustawy uprawnienia i obowiązki Komitetu i PRTV wynikające z decyzji administracyjnych.

2–4. (pominięte).[13]

### Art. 69. (pominięty).[13]

### Art. 70.

1. Traci moc ustawa z dnia 2 grudnia 1960 r. o Komitecie do Spraw Radia i Telewizji „Polskie Radio i Telewizja" (Dz. U. Nr 54, poz. 307 oraz z 1984 r. Nr 54, poz. 275).

2. (pominięty).[13]

### Art. 71.

Ustawa wchodzi w życie po upływie miesiąca od dnia ogłoszenia, z wyjątkiem przepisu art. 52, który wchodzi w życie z dniem 1 lipca 1993 r.

2011-09-09

TVP 021012 402

A-2757

| | | Dz.U. 04.253.2531 | |
|---|---|---|---|
| October 16, 2010 | | | |
| January 1, 2005 | amended by | Dz.U.2004.91.874 | Article 1 |
| May 1, 2005 | amended by | Dz.U.2005.17.141 | Article 35 |
| June 16, 2005 | amended by | Dz.U.2005.85.728 | Article 11 |
| September 30, 2005 | amended by | Dz.U.2004.204.2092 | general |
| December 30, 2005 | amended by | Dz.U.2005.267.2258 | Article 6 |
| January 14, 2006 | amended by | Dz.U.2005.267.2258 | Article 6 |
| March 29, 2006 | amended by | Dz.U.2005.267.2258 | Article 6 |
| May 16, 2006 | amended by | Dz.U.2006.83.574 | Article 1 |
| August 5, 2006 | amended by | Dz.U.2006.133.935 | Article 5 |
| March 15, 2007 | amended by | Dz.U.2006.218.1592 | Article 35(b) |
| April 21, 2007 | amended by | Dz.U.2007.61.411 | Article 1 |
| March 7, 2009 | amended by | Dz.U.2009.18.97 | Article 9 |
| August 5, 2009 | amended by | Dz.U.2009.115.965 | Article 1 |
| January 1, 2010 | amended by | Dz.U.2009.201.1540 | Article 97 |
| March 12, 2010 | amended by | Dz.U.2010.28.146 | Article 4 |
| September 4, 2010 | amended by | Dz.U.2010.152.1023 | Article 1 |
| October 16, 2010 | amended by | Dz.U.2010.127.857 | Article 60 |

# BROADCASTING ACT
## of December 29, 1992.

*(Consolidated unofficial text)*

## CHAPTER I
### General Provisions

### Article 1

1. The tasks of radio and television broadcasting shall be:

  1)  to provide information,
  2)  to ensure access to culture and art,
  3)  [1] to facilitate access to learning, sport and scientific achievements,
  3a) to disseminate civil education,
  4)  to provide entertainment,
  5)  to promote domestic production of audiovisual works,

2. Reception of domestic and foreign programme services, intended by broadcasters for reception by the general public, shall be free, subject to compliance with the requirements set forth by the applicable law.

### Article 1a

1. This Act shall apply to broadcasters established in the territory of the Republic of Poland.

2. A broadcaster shall be deemed established in the territory of the Republic of Poland if it meets at least one of the following criteria:

  1)  it has its seat in the territory of the Republic of Poland, and:

    a)  decisions as regards the structure and content of the programme service are made in the Republic of Poland, or

1

b) a major part of workforce engaged in the broadcaster's activities on the basis of an employment contract or a contract for services operates in the Republic of Poland, and decisions as regards the structure and content of the programme service are made in another member state of the European Union, or

c) a major part of workforce engaged in the broadcaster's activities on the basis of an employment contract or a contract for services operates both in the Republic of Poland and in another member state of the European Union,

2) decisions as regards the structure and content of the programme service are made in the Republic of Poland and a major part of workforce engaged in the broadcaster's activities on the basis of an employment contract or a contract for services operates in the Republic of Poland, while the broadcaster has its seat in another member state of the European Union,

3) the broadcaster began to transmit its programme service in the Republic of Poland or pursuant to the law of the Republic of Poland and maintains stable and effective business relations with the Republic of Poland, unless

a) the broadcaster's seat is located in another member state of the European Union and the decisions as regards the structure and content of the programme service are made in another member state of the European Union, or

b) a major part of workforce engaged in the broadcaster's activities on the basis of an employment contract or a contract for services operates in another member state of the European Union in which the broadcaster has its seat, or if decisions as regards the structure and content of the programme service are made in another member state of the European Union.

3. A broadcaster shall be deemed established in the territory of the Republic of Poland also if a major part of workforce engaged in the broadcaster's activities on the basis of an employment contract or a contract for services operates in the Republic of Poland and if the broadcaster:

1) has its seat in the territory of the Republic of Poland and decisions as regards the structure and content of the programme service are made in a state which is not a member state of the European Union, or

2) has its seat in a state which is not a member state of the European Union and decisions as regards the structure and content of the programme service are made in the Republic of Poland.

4. A broadcaster who:

1) has at its disposal or uses a frequency on the basis of a decision issued by a Polish public administration authority, or

2) although the broadcaster does not have at its disposal or does not use a frequency on the basis of a decision issued by the relevant public administration authority of a member state of the European Union, the broadcaster uses a satellite capacity reserved by a Polish public administration authority, or

3) although the broadcaster does not use a satellite capacity reserved by the relevant public administration authority of a member state of the European Union, the broadcaster uses a satellite up-link situated in the territory of the Republic of Poland,

shall also be deemed established in the territory of the Republic of Poland, notwithstanding that the broadcaster does not meet the conditions specified in paragraphs 1-3 and has not been classified as established in a member state of the European Union under the laws of that state corresponding to regulations set forth in paragraphs 1-3.

2

## Article 2

1. Public broadcasting organisations and holders of broadcasting licences shall be entitled to transmit radio and television programme services.

2. The provisions of the Act shall not apply to:

   1) programme service transmitted or retransmitted solely for reception within a single building,

   2) programme service transmitted or retransmitted in a system, where transmitting and receiving equipment belongs to the same person engaged in business activity or other registered public activity, and where the content of the programme service is limited to matters relating to that activity and is addressed either to employees or another particular group of people connected to the broadcaster,

   3) programme service retransmitted in a cable network, where the number of individual receivers does not exceed 250.

## Article 3

Unless it is otherwise provided for in the Act, the provisions of the press law shall apply to radio and television broadcasting.

## Article 4

For the purpose of the Act:

   1) „broadcaster" shall mean a person who produces or assembles programme services and transmits them or has them transmitted, in a complete and unchanged form, by other persons,

   1a) „social broadcaster" shall mean a broadcaster who:

      a) propagates learning and educational activities, promotes charitable deeds, respects the Christian system of values, being guided by the universal principles of ethics, and strives to preserve national identity in the programme service,

      b) does not transmit programmes or other broadcasts referred to in Article 18 paragraph 5 within the programme service,

      c) does not transmit advertising or teleshopping, sponsored programmes or other sponsored broadcasts,

      d) does not charge any fees for transmission, retransmission or reception of the programme service.

   1b) "foreign person" shall mean a foreign person as defined in Article 5 subparagraph 2 of the Freedom of Business Activity Act of July 2, 2004 (official journal „Dz.U.", No. 173, item 1807),

   1c) "creative team" shall mean a team of persons who create programmes including, in particular: the director, script writer, set designer, operator, performers of lead characters and composer,

   2) „transmission" shall mean:

      a) over-the-air transmission of a programme service for simultaneous reception by the general public (general reception system),

      b) introduction of a programme service into a cable network (collective reception system),

3

**A-2760**

3) „retransmission" shall mean the reception and simultaneous transmission of a complete and unchanged programme service transmitted by a domestic or foreign broadcaster, with an exception of programme services transmitted by way of cable network,

4) „programme service" shall mean a scheduled composition of radio or television programmes, advertising and other broadcasts, transmitted regularly by a single broadcaster,

4a) "thematic programme service" shall mean a programme service where at least 70% of the monthly transmission time during hours from 6 a.m. till 11 p.m. is devoted to programmes and other broadcasts in line with the main theme of the said programme service,

5) „programme" shall mean a separate item of a radio or television programme service which is distinct in terms of its content, form, purpose or authorship,

5a) „programme originally produced in the Polish language" shall mean a programme which meets the criteria of "European audiovisual work" as defined in this Act, which has been produced on the basis of a script written originally in the Polish language and first registered in the Polish language,

6) „advertising" shall mean any broadcast, originating from a person other than the broadcaster, which is intended to promote the sale or any other manner of using products or services, to advance a cause or idea, or to bring about some other effect desired by the advertiser, and which is broadcast in return for remuneration or other form of consideration,

7) „sponsorship" shall mean a direct or indirect financing or co-financing of the production or transmission of a programme or other broadcasts by an entity other than the broadcaster or producer of the programme, with a view to establishing, enhancing or promoting the renown of the name, business name, product or service, trademark or other proprietary identification of the sponsor or its business activities,

8) [2] (repealed),

9) „teletext service" shall mean a set of texts and motionless images transmitted by means of a television signal simultaneously with the programme service,

10) „teleshopping" shall mean any broadcast containing a direct offer of sale of products or supply of services in return for payment,

11) „surreptitious advertising" shall mean the representation, within a programme, of products, services, name, business name, trademark or activities of a business operator which is the manufacturer of goods or the provider of services, if the broadcaster's intention, prompted particularly by a payment of a consideration or deriving other benefit, is to achieve the effect of advertising and if the general public might be misled as to the nature of such a broadcast,

12) "producer" shall mean a natural person, legal person or an organisational unit referred to in Article 33[1] § 1 of the Polish Civil Code, which ventures, actually organises and bears responsibility for the creative, organisational and financial process of producing audiovisual works,

13) "producer independent of a given broadcaster" shall mean a producer who is not bound by employment relation with the given broadcaster, is not a broadcaster itself and holds no stake in the broadcaster's organisation, and in which neither the broadcaster nor any of its subsidiaries nor any companies associated in the same group hold a stake, and if members of its governing bodies are not bound by employment relation with the given broadcaster and are not broadcasters themselves,

14) "business operator" shall mean a business operator as defined in the Freedom of Business Activity Act of July 2, 2004.

4

A-2761

## CHAPTER II
### The National Broadcasting Council

### Article 5

The National Broadcasting Council (hereinafter referred to as „the National Council") shall hereby be established and shall constitute the state authority competent in matters of radio and television broadcasting.

### Article 6

1. The National Council shall safeguard freedom of speech in radio and television broadcasting, protect the independence of broadcasters and the interests of the public, as well as ensure an open and pluralistic nature of radio and television broadcasting.

2. The tasks of the National Council shall be, in particular:

    1) to draw up, in agreement with the Prime Minister, the directions of the State policy in respect of radio and television broadcasting,

    2) to determine, within the limits of powers granted to it under this Act, the terms of conducting activities by broadcasters,

    3) to make, within the scope set forth by the Act, decisions concerning broadcasting licences to transmit and retransmit programme services,

    3a) to grant to a broadcaster the status of a social broadcaster or to revoke such status, on terms laid down in the Act,

    4) to supervise the activity of broadcasters within the limits of powers granted to it under the Act,

    5) to organise research into the content and audience of radio and television programme services,

    6) [3] to determine fees for the award of broadcasting licences and registration,

    6a) [4] to determine licence fees in accordance with the principles set forth in the Licence Fees Act of April 21, 2005 (official journal "Dz.U.", No. 85, item 728),

    7) to act as a consultative body in drafting legislation and international agreements related to radio and television broadcasting,

    7a) [5] (repealed),

    8) to initiate research and technical development and training in the field of radio and television broadcasting,

    9) to organise and initiate international co-operation in the field of radio and television broadcasting,

    10) to co-operate with appropriate organisations and institutions in respect of protecting copyright as well as the rights of performers, producers and broadcasters of radio and television programme services,

    11) [6] to hold public and open competitions to select members of Supervisory Boards of public radio and television broadcasting organizations.

## Article 7

1. [7] The National Council shall consist of 5 members, of which 2 shall be appointed by the Sejm[1], 1 by the Senate and 2 by the President from amongst persons with a distinguished record of knowledge and experience in public media.

2. [8] (repealed).

2a. [9] (repealed).

2b. [10] The Chairman of the National Council shall be elected by the National Council from amongst its members; the Chairman shall also be dismissed by the Council's members.

3. Upon a motion of the Chairman, the National Council shall elect from amongst its members a Vice-Chairman of the National Council.

4. [11] The term of office of the members of the National Council shall be six years from the day of appointment of the last member. Members of the National Council shall perform their functions until the appointment of successors.

5. A member of the National Council may not be appointed for another full term of office.

6. The body which is empowered to appoint a member of the National Council shall dismiss such a member solely in cases when the said person:

   1) has resigned,
   2) has become permanently unable to discharge of duties for reasons of ill health,
   3) has been convicted of a deliberate criminal offence by a valid judgement,
   3a) [12] has submitted an untruthful screening statement, as confirmed by a final and valid decision of the court,
   4) has committed a breach of the provisions of the Act and the said breach has been confirmed by the decision of the Tribunal of State.

7. In case of a dismissal or death of a member prior to the end of the term of office, the appropriate body shall appoint another member of the National Council for the remainder of the term of office.

## Article 8

1. The employer of a member of the National Council shall, at the member's request, grant to such a member a leave of absence, without pay, for the time of holding an office. The time of the leave shall be accounted towards the duration of the member's employment, on the basis of which other benefits resulting from the relation of employment are derived.

2. (repealed).

3. During the term of office of members of the National Council, their membership in:

   1) (null and void),
   2) governing bodies of associations, trade unions, employers' associations, as well as church or religious organisations,

   shall be suspended.

4. It is prohibited to combine the service of a member of the National Council with holding an interest or shares, or with any other involvement, in an entity which is a radio and television broadcaster or producer, as well as with any other gainful employment, save for educational or academic positions of an academic tutor or lecturer or performing creative work.

---

[1] *TRANSLATOR'S NOTE: The „Sejm" is the proper name of the Lower House of the Polish Parliament.*

6

**A-2763**

### Article 9

1. The National Council shall issue regulations and adopt resolutions on the basis of the existing legislation and for the purpose of its implementation.
2. [13] The National Council shall adopt resolutions by a two-thirds majority of votes of the total number of its members specified in the Act.
3. The National Council shall adopt the internal rules of procedure binding upon the Council.

### Article 10

1. The Chairman of the National Council shall direct its work, represent the Council and perform the tasks specified in the Act.
2. The Chairman of the National Council may require a broadcaster to provide materials, documentation and information to the extent necessary for the purpose of supervising the broadcaster's compliance with the provisions of the Act and the terms of the broadcasting licence.
3. The Chairman of the National Council may call upon a broadcaster to cease practices in respect of production or transmission of programme services, if they infringe upon the provisions of the Act, resolution of the National Council or terms of the broadcasting licence.
4. Acting by virtue of the Council's resolution, the Chairman of the National Council may issue a decision ordering the broadcaster to cease the practices referred to in paragraph 3.
5. Paragraphs 2-4 shall apply respectively to the retransmission of radio and television programme services.

### Article 11

1. The National Council shall perform its tasks with the assistance of the Office of the National Council.
2. The organisation and operational procedures of the Office of the National Council shall be laid down in the internal rules of procedure adopted by the National Council.
3. Costs of operations of the National Council and its Office shall be borne by the state budget.
4. Regulations relating to employees of public institutions shall apply to the employees of the Office of the National Council.

### Article 12

1. By the end of March each year, the National Council shall submit to the Sejm, the Senate and the President an annual report on its activities during the preceding year, as well as information concerning key issues in radio and television broadcasting.
2. Each year, the National Council shall present to the Prime Minister an annual account of its activities as well as information on key issues in radio and television broadcasting.
3. By way of resolutions, the Sejm and the Senate shall accept or reject the report referred to in paragraph 1. A resolution concerning acceptance of the report may contain remarks and reservations.
4. In case of rejection of the report by both the Sejm and the Senate, the term of office of all the members of the National Council shall expire within 14 days from the date of the last resolution to this effect, subject to the reservation contained in paragraph 5.

7

**A-2764**

5. The National Council's term of office shall not expire unless so approved by the President of the Republic of Poland.

## CHAPTER III
### Radio and Television Programme Services

### Article 13

1. The broadcaster shall enjoy full independence in determining the content of the programme service with a view to fulfilling the tasks referred to in Article 1 paragraph 1 and shall be responsible for its contents.
2. The provision of paragraph 1 shall not prejudice the provisions on third party liability for the content of particular programmes, advertising or other broadcasts.

### Article 14

1. An obligation to transmit or to desist from transmitting a particular programme or broadcast may be imposed upon a broadcaster only by virtue of the Act.
2. Programmes and broadcasts coming from a source other than the broadcaster shall be clearly distinguishable as such and recognisably separate from the other items of the programme service, leaving no doubt as to their origin from a source other than the broadcaster.

### Article 15

1. Television broadcasters shall reserve at least 33% of their quarterly transmission time to programmes originally produced in the Polish language, excluding news, advertising, teleshopping, sports events, teletext services and games.
2. Radio and television broadcasters shall reserve at least 33% of their quarterly transmission time devoted to vocal-musical compositions for compositions performed in the Polish language.
3. Television broadcasters shall reserve more than 50% of their quarterly transmission time for European works, excluding news, advertising, teleshopping, sports events, teletext services and games.
4. The National Council shall determine, by a regulation, a lower share of programmes referred to in paragraphs 1 and 3 in radio and television programme services for:
   1) broadcasters during the first year of transmission of their programme service,
   2) thematic programme services, for which the number of available programmes referred to in paragraphs 1 and 3, is insufficient,
   3) [14] programme services transmitted solely via satellite or cable which in their entirety are available against payment of a fee, excluding licence fees as defined in the Licence Fees Act of April 21, 2005 and basic fees charged by satellite or cable network operators,
   - with due regard for the need to ensure that a proportion of programmes originally produced in the Polish language and of European works is maintained.

8

A-2765

### Article 15a

1. Television broadcasters shall reserve at least 10% of their quarterly transmission time for European works produced by independent producers, excluding news, advertising, teleshopping, sports events, teletext services, and games. Programmes produced not later than 5 years before their transmission in the programme service shall constitute at least 50 % of the time reserved for European works produced by independent producers.

2. The National Council shall determine, by a regulation, with regard to the programmes and works referred to in Article 15 paragraphs 1 and 3 and paragraph 1 hereof:

   1) the manner in which the broadcaster keeps record of the transmission time,
   2) the duration of storage period of such records, however, not less than 1 year,
   3) the scope of recorded information, including information about the date of transmission of a programme, actual duration of the programme, title and producer of the programme,

   - with due regard for the possibility of keeping the said record in an electronic form, the need to ensure transparency and openness of registered information and refraining from imposing upon broadcasters of excessive burdens and costs related to keeping the records.

### Article 15b

1. A programme shall be deemed to be European work, if it originates from:
   1) a member state of the European Union, or
   2) a state which is a party to the European Convention on Transfrontier Television done in Strasbourg on May 5, 1989 (official journal "Dz.U." of 1995, No. 32, item 160) and which does not apply discriminatory measures against any programmes originating from member states of the European Union, or
   3) other third European state which does not apply discriminatory measures against any programmes originating from member states of the European Union, provided it meets the requirements laid down in paragraph 3.

2. A programme shall originate from the states referred to in paragraph 1 subparagraphs 1 and 2 if the majority of the creative team members have their permanent residence in the territory of one of those states and provided at least one of the following conditions is met:
   1) the programme was produced by a producer whose seat or permanent residence is in the state referred to in paragraph 1 subparagraphs 1 and 2,
   2) the production of the programme is supervised and controlled by a natural person having a permanent residence in the state referred to in paragraph 1 subparagraphs 1 and 2, or by a legal person or entity having no legal personality, while its seat is located in the state referred to in paragraph 1 subparagraphs 1 and 2,
   3) the contribution of co-producers having a seat or permanent residence in the state referred to in paragraph 1 subparagraphs 1 and 2, to the total production costs is preponderant and the co-production is not under control of co-producers that do not have their seat or permanent residence in the state referred to in paragraph 1 subparagraphs 1 and 2.

3. A programme shall also be deemed European work if the majority of creative team members have their permanent residence in the territory of a European state and the programme was produced independently or in co-production with a producer having a seat or permanent residence in one of the member states of the European Union by a producer having a seat or permanent residence in the state referred to in paragraph 1 subparagraph 3, provided that the said state concluded an audiovisual agreement with the European Community.

9

**A-2766**

4. A programme shall also be deemed European work if it was made pursuant to bilateral co-production agreements concluded by member states of the European Union and third parties, and the contribution of co-producers having a seat or permanent residence in the state referred to in paragraph 1 subparagraph 1, to the total production costs is preponderant and the co-production is not under the control of co-producers that do not have their seat or permanent residence in the territory of the state referred to in paragraph 1 subparagraph 1.

5. A programme that does not meet the conditions laid down in paragraphs 1-4 shall also be deemed European work to a degree equivalent to the proportionate contribution of co-producers having their seat or permanent residence in a member state of the European Union to the total production costs, if the majority of creative team members have their permanent residence in a member state of the European Union.

## Article 16

1. Advertising shall be clearly distinguishable as such, and as not originating from the broadcaster, and recognisably separate from the other items of the programme service. The above provision shall apply respectively to teleshopping.

2. Advertising shall not exceed 15%, and advertising broadcast together with teleshopping, subject to provisions of paragraph 3, shall not exceed 20% of the daily transmission time and 12 minutes in any given clock hour.

3. Windows devoted exclusively to teleshopping shall not exceed 3 hours in the daily transmission time. The minimum duration of such a window shall be 15 minutes and the number of such windows may not exceed 8.

4. Pursuant to the provisions of the Act, the National Council shall determine, by a regulation, the manner in which advertising and teleshopping may be conducted in radio and television programme services. In the said regulation, the National Council shall determine:

   1) the manner in which the daily transmission time referred to in paragraphs 2 and 3 shall be determined,

   2) the conditions under which advertising and teleshopping spots may be broadcast in the programme services,

   3) requirements with respect to persons whose voice or image is used in advertising, including restrictions on their ability to host other programmes in radio and television programme services,

   4) the extent to which a broadcaster may allot transmission time for advertising and teleshopping, including the maximum duration per annum for one business operator or business group,

   5) the manner in which the broadcaster shall keep and store a record of duration of broadcast advertising and teleshopping and the scope of data to be recorded.

## Article 16a

1. Broadcasts of advertising and teleshopping spots shall be inserted between programmes, with the reservation of paragraphs 2-7.

2. Advertising or teleshopping spots may be inserted during programmes in such a way that the integrity and value of the programme and the rights of the rights holders are not prejudiced,

A-2767

3. During coverage of sports events containing mandated intervals and of other events containing intervals, and during programmes consisting of autonomous parts, advertising or teleshopping spots shall only be inserted in the intervals or between the parts.

4. Feature and television films, excluding series, serials and documentaries, with duration exceeding 45 minutes, may be interrupted by advertising or teleshopping spots only once for each complete period of 45 minutes. Further interruptions for advertising or teleshopping spots shall be allowed if the duration of the film is at least 20 minutes longer than two or more complete periods of 45 minutes each.

5. [15] Programmes other than those specified in paragraph 3 may be interrupted by advertising or teleshopping spots if a period of at least 20 minutes, in a television programme service, and 10 minutes, in a radio programme service, has elapsed between each successive break in the programme.

6. The following programmes may not be interrupted by advertising or teleshopping spots:

   1) news and current affairs programmes,

   2) programmes with a religious content,

   3) commentaries and documentaries, the duration of which is less than 30 minutes, and if their duration exceeds 30 minutes, the provisions of paragraphs 2-5 shall apply,

   4) programmes intended for children.

7. Programmes in a public radio and television programme service, with the exception of programmes referred to in paragraph 3, shall not be interrupted by advertising or teleshopping spots.

Article 16b

1. It shall be prohibited to broadcast advertising of the following goods and services:

   1) tobacco products, tobacco accessories, products imitating tobacco products or accessories and symbols related to the use of tobacco, to the extent regulated in the Act of November 9, 1995, on Protection of Health Against the Effects of Use of Tobacco and Tobacco Products (official journal „Dz.U." of 1996, No. 10, item 55, as further amended[1]),

   2) alcoholic beverages, to the extent regulated in the Act of October 26, 1982, on Upbringing in Sobriety and Counteracting Alcoholism (official journal „Dz.U." of 2002, No. 147, item 1231, as further amended[2]).

   3) medical services as defined in the Act of August 30, 1991, on Health Care Institutions (official journal „Dz.U.", No. 91, item 408, as further amended[3]), available only on prescription,

   4) medicinal products, to the extent regulated in the Act of September 6, 2001, - Pharmaceutical Law (official journal „Dz.U." of 2004, No. 53, item 533 as further amended[4]),

   5) [16] cylindrical games, card games, dice, mutual bets, slot machines, to the extent regulated in the Gambling Act of November 19, 2009 (official journal „Dz.U." No. 201, item 1540).

2. It shall be prohibited to broadcast advertising which:

   1) directly exhort minors to purchase products or services,

   2) encourage minors to exert pressure upon their parents or other persons to persuade them to purchase the products or services being advertised,

   3) exploit the trust minors place in parents, teachers or other persons,

   4) unreasonably show minors in dangerous situations,

   5) is of a subliminal nature.

11

3. Advertising shall not:
   1) prejudice respect for human dignity,
   2) include any discrimination on grounds of race, sex or nationality,
   3) be offensive to religious or political beliefs,
   4) prejudice the physical, mental or moral development of minors,
   5) encourage behaviour prejudicial to health, safety or environmental protection.
4. The provisions of paragraph 1-3 shall apply respectively to teleshopping.

Article 16c

Broadcasting of surreptitious advertising shall be prohibited.

Article 17

1. Sponsored programmes or other broadcasts shall be identified as such by sponsor credits at their beginning or end. Such credits may specify only the sponsor's name, business name, trademark or contain some other identification of the business operator or its business activities, the image of a single product or service.

2. Identification of the sponsor may not contain the name, business name, trademark or other individual identification of the business operator or its business activities, the image of a single product or service, the advertising of which is prohibited by virtue of Article 16b paragraph 1.

3. The sponsor may not influence the content of the programme or any other broadcast and their scheduling in a manner which would prejudice the independence of the broadcaster. Sponsorship shall not release the broadcaster from liability for the content of the programme.

4. Sponsored programmes or other broadcasts may not encourage the purchase or other use of the products or services of the sponsor or a third party.

5. Subject to the reservations contained in paragraph 6, programmes or other broadcasts may not be sponsored by:
   1) political parties,
   2) trade unions,
   3) employers' organisations,
   4) natural or legal persons whose principal activity consists in the production or sale of products or the provision of services referred to in Article 16b paragraph 1.

6. Sports events coverage may not be sponsored by entities referred to in paragraph 5 subparagraphs 1-3 and by business operators whose principal activity consists in the production, sale or other form of supply of products or services, the advertising of which is prohibited by Article 16b paragraph 1, subparagraphs 1 and 2, subject to the stipulations of Article 13[1] paragraphs 5 and 6, of the Act on Upbringing in Sobriety and Counteracting Alcoholism.

6a. [17] Sponsorship of programmes or other broadcasts by entities that pursue business in the area of cylindrical games, card games, dice, mutual betting and slot machines shall be prohibited.

7. Sponsorship of the following programmes shall be prohibited:
   1) news, with the exception of sports and weather forecasts,
   2) commentaries on social and political topics,
   3) consumer and practical advice programmes,
   4) electoral programmes or programmes directly related to electoral campaigns.

12



8. The National Council shall determine, by a regulation, the manner in which programmes or other broadcasts may be sponsored, having regard to the provisions of paragraphs 1-7, in particular the time of the broadcast, sponsor credits and manner of transmission of information about the sponsor in the opening announcement or trailer of the programme or following the end of the programme or other broadcast, as well as during the programme or other broadcast. In the said regulation, the National Council shall determine the manner in which the broadcaster shall keep and store a record of sponsored programmes or other broadcasts and the scope of information to be recorded.

Article 18

1. Programmes or other broadcasts may not encourage actions contrary to law and Poland's *raison d'Etat* or propagate attitudes and beliefs contrary to the moral values and social interest. In particular, they may not include any discrimination on grounds of race, sex or nationality.

2. Programmes or other broadcasts shall respect the religious beliefs of the public and especially the Christian system of values.

3. Programmes or other broadcasts may not encourage conduct prejudicial to health, safety or the natural environment.

4. Transmission of programmes or other broadcasts threatening the physical, mental or moral development of minors, in particular those containing pornography or exhibiting gratuitous violence, shall be prohibited.

5. Programmes or other broadcasts containing scenes or contents which may have an adverse impact upon a healthy physical, mental or moral development of minors, other than those referred to in paragraph 4, may be transmitted only between 11 p.m. and 6 a.m.

5a. Broadcasters shall be obligated to identify programmes or other broadcasts referred to in paragraph 5 by way of displaying an appropriate graphic symbol throughout their duration in the television programme service or by way of an oral announcement informing of the hazards arising out of their transmission in the radio.

5b. Broadcasters shall be obligated to identify programmes or other broadcasts other than those referred to in paragraph 5 and excluding news, advertising, teleshopping, sports events, teletext services by way of displaying an appropriate graphic symbol throughout their duration in the television programme service, with due regard for the degree of harmful effect of the given programme or broadcast upon minors in a particular age group.

6. The National Council shall determine, by a regulation:
   1) features of programmes and detailed criteria for their classification, transmission and the manner of announcing programmes or other broadcasts referred to in paragraph 5,
   2) classification of minors into age groups and detailed criteria for classification and transmission of programmes and other broadcasts referred to in paragraph 5b, with due regard for the hours of transmission of programmes or other broadcasts intended for a given age group,
   3) specimens of graphic symbols and forms of announcements, referred to paragraphs 5a and 5b, and the manner of their presentation,
   - with due regard for the degree of harmful effect of the given programme or broadcast upon minors in a particular age group.

7. Broadcasters shall ensure the proper quality of the Polish language in their programme services and shall counteract its vulgarisation.

13

A-2770

## Article 19

1. Broadcasters' activity consisting in producing or assembling programme services shall be carried out in the form of editorial activity as defined in the press law.
2. The provisions concerning the production and transmission of radio and television programme services shall apply respectively to teletext service.

## Article 20

1. The broadcaster shall record programmes, advertising or other broadcasts on suitable carriers and store them for a period of 28 days from the date of their transmission. After the lapse of that period, recordings of programmes, advertising or other broadcasts which are subject to proceedings before public authorities shall be stored until the end of such proceedings.
2. Recordings of a programme, advertising or other broadcasts shall be made available to any person claiming that the content of such programme, advertising or other broadcast infringed that person's rights, at the written request of such person and at the expense of the broadcaster, or shall be delivered to such person at this persons' expense, within 7 days from the date of such written request.
3. Should the request to make available the recording of a programme, advertising or other broadcasts be rejected, the person referred to in paragraph 2 may seek a court injunction ordering the broadcaster to make such a recording available; the court of law having proper jurisdiction over such cases shall be the district court.
4. The National Council shall determine, by a regulation, the manner of recording and storing by broadcasters the programmes, advertising and other broadcasts, including the scope of data to be provided about the stored materials.

## Article 20a

1. At the written request of the President of the Office for Competition and Consumer Protection, the broadcaster shall:
    1) disclose the data allowing to identify the person who ordered a programme or advertising,
    2) deliver, free of charge, the recording of the programme or advertising within 7 days from the date of the request.
2. The provision of Article 20 paragraph 3 shall apply accordingly.

## Article 20b

1. A television broadcaster may broadcast live coverage of an event of major importance for society, hereinafter referred to as a „major event":
    1) [18] only in a national programme service as defined in the Act or in the broadcasting licence, accessible entirely free of charge, excluding licence fees as defined in the Licence Fees Act of April 21, 2005 and basic fees charged by cable network operators, or
    2) if the same event is also being transmitted by the broadcaster of a programme service meeting the conditions laid down in subparagraph 1, pursuant to a contract with the broadcaster who had acquired the rights to provide the live coverage of the given event or with any other authorised party, with the reservation of paragraph 6.
3. In view of a widespread social interest, major events shall include, among others:

14

1) summer and winter Olympic Games,

2) semi-finals and finals of World Cup and European Football Championship, as well as all other matches within those events with the participation of the Polish national team, including qualifying games,

3) other football matches with the participation of the Polish national team in official tournaments and matches with the participation of Polish clubs within the Champions League and UEFA Cup.

3. The National Council may specify, by a regulation, a list of major events other than those listed in paragraph 2, having regard to the degree of social interest in the given event and its significance to social, economic and political life.

4. Should a major event be expected to be organised in parts, every such part shall be deemed a major event.

5. The provision of paragraph 1 shall apply to deferred coverage, if the delay in transmitting the given major event does not exceed 24 hours and is due to important reasons, in particular, if:

1) the time, in which the given event takes place, falls between 12 a.m. and 6 a.m. (24:00-6:00) of the official time in the territory of the Republic of Poland,

2) major events or parts thereof overlap in time.

6. The provision of paragraph 1 shall not apply if the given broadcaster can demonstrate that no broadcaster of a programme service meeting the requirements laid down in paragraph 1 subparagraph 1 was ready to conclude a contract ensuring the coverage in accordance with paragraph 1 subparagraph 2.

7. Within the scope laid down by international agreements binding upon the Republic of Poland, the National Council may determine, by a regulation:

1) the list of events deemed as being of major importance for society by other European states,

2) rules governing the exercise of exclusive rights to television coverage of events referred to in subparagraph 1, so as to ensure that the exercise of those rights by broadcasters subject to the Act shall not deprive the viewers in a given state of the possibility of receiving those events under the rules laid down by the given state in accordance with the provisions of international law.

## CHAPTER IV
### Public Radio and Television

### Article 21

1. Public radio and television shall carry out their public mission by providing, on terms laid down in this Act, the entire society and its individual groups with diversified programme services and other services in the area of information, journalism, culture, entertainment, education and sports which shall be pluralistic, impartial, well balanced, independent and innovative, marked by high quality and integrity of broadcast.

1a. The tasks of public radio and television that arise out of the carrying out of the mission referred to in paragraph 1 shall include in particular:

1) production and transmission of national and regional programme services, programme services for reception abroad in the Polish language and in other languages as well as other programme services meeting the democratic, social and cultural needs of local societies,

2) production and transmission of thematic programme services, if a broadcasting licence has been awarded for transmission of the said programme service,



3) construction and operation of radio and television transmitters and relay stations,

4) transmission of teletext services,

5) work on new technologies of production and transmission of radio and television programme services,

6) production, provision of services and carrying out commercial activities related to audiovisual production, including exports and imports,

7) [19] encouraging artistic, literary, scientific and educational and sport activities,

8) dissemination of knowledge of Polish language,

8a) [20] paying due regard to the needs of national and ethnic minorities and communities speaking regional languages, including broadcasting news programmes in the languages of national and ethnic minorities and in regional languages;

9) production of educational programmes and ensuring access by people of Polish descent and Poles living abroad to such programmes.

2. Programme services of public radio and television should:

1) be guided by the sense of responsibility for the content of the message and by the need to protect the good reputation of public radio and television,

2) provide reliable information about the vast diversity of events and processes taking place in Poland and abroad,

3) encourage an unconstrained development of citizens' views and formation of the public opinion,

4) enable citizens and their organisations to take part in public life by expressing diversified views and approaches as well as exercising the right to social supervision and criticism,

5) assist the development of culture, science and education, with special emphasis on the Polish intellectual and artistic achievements,

6) respect the Christian system of values, being guided by the universal principles of ethics,

7) serve to strengthen the family ties,

7a) advance the propagation of pro-health attitude,

7b) [21] serve to promote and popularize sport,

8) contribute to combating social pathologies,

9) [22] (repealed).

3. [23] Acting in agreement with the National Council, every year public radio and television broadcasting organizations shall prepare financial & programme plans of projects involving performance of tasks referred to in paragraphs 1 and 1a that require to be financed with public funds, having regard to a part of costs of operation and development of these organizations.

4. [24] The National Council shall define, by a regulation, dates for submission and scopes of financial & programme plans so as to ensure pursuance of the public mission by public radio and television broadcasting organizations as well as having regard to the freedom of public broadcasters to determine the contents of programme services.

Article 22

1. State authorities may take decisions concerning the functioning of public radio and television broadcasting organisations only in circumstances specified in the existing legislation.

2. Public radio and television broadcasting organisations shall facilitate direct presentation and explanation of the State policy by supreme State authorities.

3. The National Council shall determine, by a regulation, the procedure of action in respect of matters referred to in paragraph 2.



**A-2773**

## Article 23

1. Public radio and television broadcasting organisations shall enable political parties to present their position with regard to major public issues.
2. The provision of paragraph 1 shall apply correspondingly to national trade unions and employers' organisations.
3. The National Council shall determine, by a regulation, the procedure of action in respect of matters referred to in paragraphs 1 and 2.

## Article 23a

1. Public radio and television broadcasting organisations shall enable public service organisations referred to in the Act of April 24, 2003, on Public and Voluntary Service (official journal "Dz.U.", No. 96, item 873; 2004 No. 64, item 593, No. 116, item 1203, No. 210, item 2135) to provide, without any fee, information about the services provided free of charge by these organisations.
2. Paragraph 1 shall not in any way restrain the broadcaster's right to provide more extensive information about services offered by the public service organisations.
3. [25] Acting in agreement with the minister in charge of social security, the National Council shall determine, by a regulation, the procedure of action in respect of providing, without any fee, information on public services provided free of charge by public service organisations, including the manner of preparation and broadcast of programmes as well as their intended transmission time, having regard to the diversity of public tasks defined in Article 4 of the Act on Public and Voluntary Service, and to their significance for the community.

## Article 24

1. Entities participating in elections to the Sejm, the Senate, the local self-government and the European Parliament shall be entitled to transmit election programmes in the public radio and television programme services on terms determined in separate provisions.
2. The provision of paragraph 1 shall apply respectively to the election of the President of the Republic of Poland.
3. Entities entitled to take part in a referendum campaign launched in the radio and television programme services as defined in Article 48 paragraph 1 of the Act of March 14, 2003 on Nationwide Referendum (official journal "Dz.U.", No. 57, item 507 and No. 85, item 782) shall be enabled to transmit referendum programmes in public radio and television programme service on terms laid down in separate provisions.

## Article 25

1. Public radio and television broadcasting organisations may produce and transmit programme services in the Polish language and other languages for receivers abroad.
2. Public radio and television broadcasting organisations shall produce and transmit educational programmes for schools and other educational institutions.
3. Educational programmes shall comply with the requirements of school curricula.

4. The costs of producing programme services and programmes referred to in paragraphs 1 and 2 shall be borne by the state budget within the limits determined in the Budget Act.

5. The scope and manner of conducting the activity referred to in paragraphs 1 and 2 as well as the principles of covering the costs of such an activity shall be defined in agreements concluded by ministers in charge respectively of foreign affairs and for national education with public radio and television organisations.

Article 26

1. Public radio and television broadcasting organisations shall operate exclusively in the form of the sole-proprietor joint stock company of the State Treasury, hereinafter referred to as „the company".

2. Public television shall be formed by the company „Telewizja Polska - Spółka Akcyjna"[2] established for the purpose of producing and transmitting national programme services I, II, TV Polonia as well as regional television programme services.

2a. [26] Regional branches of the company "Telewizja Polska - Spółka Akcyjna" shall have their corporate seats in: Białystok, Bydgoszcz, Gorzów Wielkopolski, Gdańsk, Katowice, Kielce, Kraków, Lublin, Łódź, Opole, Olsztyn, Poznań, Rzeszów, Szczecin, Warszawa, Wrocław.

3. Public radio shall be formed by:
   1) the company „Polskie Radio - Spółka Akcyjna"[3] established in order to produce and transmit national radio programme services and programme services for receivers abroad,
   2) companies founded to produce and transmit regional radio programme services, hereinafter referred to as „regional radio companies".

4. [27] The provisions of the Code of Commercial Companies, except for Articles 312 and 402, shall apply to companies referred to in paragraphs 2 and 3, subject to Articles 27-30 of the Act.

5. [28] Acting in agreement with the Chairman of the National Council, the President of the Office of Electronic Communications shall reserve, by a decision, the frequencies required for the companies to perform their statutory tasks and shall lay down the conditions of use of these frequencies. Any frequency reservations, modifications or withdrawals thereof shall be governed by the provisions of Articles 114 and 115 of the Act of July 16, 2004 - "Telecommunications Law" (official journal „Dz.U.", No. 171, item 1800 and No. 273, item 2703, and of 2005, No. 163 item 1362).

6. [29] Acting in agreement with the Chairman of the National Council, the President of the Office of Electronic Communications shall allocate to companies producing and transmitting:
   1) national television programme services - the frequencies required to cover the territory of the country by the programme services transmitted by the „Polish Television I" and „Polish Television II" channels,
   2) national radio programme services - the frequencies required to cover the territory of the country by programme services transmitted on the first, second, third and fourth channels and frequencies needed to transmit radio programme services for listeners abroad,
   3) regional television programme services - the frequencies required to transmit regional television programme services,
   4) regional radio programme services - the frequencies required to transmit regional radio programme services.

7. The programme service on the TV Polonia Channel shall be transmitted by satellite.

---

[2] TRANSLATOR'S NOTE: „Polish Television - Joint-Stock Company".
[3] TRANSLATOR'S NOTE: „Polish Radio - Joint-Stock Company".

18

8. The provisions of Article 115 paragraph 3 of the Act of July 16, 2004 - „Telecommunications Law" shall apply to the reservation of frequencies designated for transmission and retransmission of digital programme services by terrestrial diffusion or by satellite.

## Article 27

<sup>(30)</sup> 1. The Board of Management shall consist of one to three members.

2. The Board of Management shall have a term of office of four years.

3. The National Council shall appoint members of the Board of Management, including the President of the Board of Management, by a resolution, on the motion of the Supervisory Board, and shall dismiss members, by a resolution, on the motion of the Supervisory Board or the General Meeting.

4. Members of the Board of Management shall comprise exclusively persons competent in management as well as radio and television broadcasting, appointed from amongst candidates selected in the competition held by the Supervisory Board.

5. The National Council shall define, by a regulation, the rules of competition to select candidates for members of the Board of Management, including the procedure for announcing, organizing and holding the competition as well as for announcing results of the competition, with consideration given to the need to ensure general accessibility of the competition, impartiality and open nature of the proceedings, efficient holding of the competition and assessment of competencies of candidates referred to in paragraph 4.

6. A member of the Board of Management may be dismissed in case:
   1) the member has been convicted of a deliberate criminal offence subject to public prosecution or of a fiscal offence, by virtue of a valid court judgement,
   2) the member has acted to the detriment of the company,
   3) of occurrence of circumstances that permanently prevent the member from serving his/her function.

7. Members of Boards of Management and persons who serve managerial functions in public radio and television organizations shall, in their work and assessment of journalists and other creators subordinate to them, be guided by the principles of professionalism, honesty and reliability as well as the guidelines set forth in Article 21 paragraphs 1a and 2 of the Act.

## Article 28

1. <sup>(31)</sup> The Supervisory Boards of "Telewizja Polska – Spółka Akcyjna" and "Polskie Radio – Spółka Akcyjna" shall consist of seven members: five members selected in the competition held by the National Council from amongst candidates competent in law, finance, culture and media, nominated by collegial bodies of institutions of higher learning authorized to award doctoral degrees, one member appointed by the minister in charge of culture and national heritage and one member appointed by the minister in charge of the State Treasury.

1a. <sup>(32)</sup> The Supervisory Boards of regional radio broadcasting companies shall consist of five members: four members selected in the competition held by the National Council from amongst candidates competent in law, finance, culture and media, nominated by collegial bodies of institutions of higher learning authorized to award doctoral degrees, operating in the region, and one member appointed by the minister in charge of the State Treasury acting in agreement with the minister in charge of culture and national heritage.

1b. <sup>(33)</sup> The National Council shall define, by a regulation, the rules of competition to select members of the Supervisory Board, including the procedure for announcing, organizing and

holding the competition, nominating candidates as well as for announcing results of the competition, with consideration given to the need to ensure impartiality and open nature of the proceedings, efficient conduct of the competition and assessment of competencies of candidates referred to in paragraphs 1 and 1a.

1c. [34] The resolution of the National Council concerning results of the competition, naming the persons selected in the competition, shall constitute the appointment to serve as members of the Supervisory Board.

1d. [35] A member of the Supervisory Board may be dismissed by the authority that has appointed the member in case:

1) the member has been convicted of a deliberate criminal offence subject to public prosecution or of a fiscal offence, by virtue of a final court judgement,

2) the member has acted to the detriment of the company,

3) of occurrence of circumstances that permanently prevent the member from serving his/her function.

2. The Supervisory Board shall adopt resolutions by an absolute majority of votes cast in the presence of at least a half of the Board members.

3. The Supervisory Board shall elect the Chairman from amongst its members.

4. The Supervisory Board shall adopt the internal rules of procedure regulating the functioning of the Board.

5. The Supervisory Board shall have a term of office of three years.

6. The Supervisory Board's approval shall be required in order to:

1) employ or dismiss persons holding executive positions specified in the company's statutes,

2) conclude or accede to a collective employment agreement with representatives of the employees,

3) establish or accede to a company other than the company referred to in Article 26 paragraph 1, and to purchase or transfer shares or interest in such a company,

4) transfer or encumber real estate.

7. (repealed).

## Article 28a

1. Programme councils of public radio and public television shall consist of 15 members appointed by the National Council, of which 10 members shall represent parliamentary groups. The remaining 5 members shall be appointed from amongst persons with a record of experience and achievement in culture and mass media.

2. Programme councils shall have a term of office of 4 years. The councils' members shall represent public interests and expectations related to the programming activities of the company.

3. The programme councils shall adopt resolutions evaluating the level and quality of current programming as well as of the programme schedule. The Supervisory Board shall be obliged to consider and act upon resolutions concerning programme matters which are adopted by a majority of votes cast in the presence of at least half of the members of the programme council.

4. Members of a programme council shall be entitled to receive daily allowance paid out by the company in an amount determined by the National Council.

5. The Board of Management shall provide to the members of the programme council the organisational and financial resources necessary to evaluate the level and quality of transmitted programme service and its reception and to commission independent audience research as well as studies of the social impact of a programme service.

20



A-2777

### Article 29

1. The State Treasury shall be represented at the general meeting of shareholders by the minister in charge of the State Treasury.
2. Directions and prohibitions imposed by the general meeting of shareholders in respect of the contents of a programme service shall not be binding upon the Board of Management.
3. Amendment of the company's statutes shall require a prior consent of the National Council.

### Article 30

1. Production and transmission of regional public television programme services shall be the task of regional branches of the company referred to in Article 26 paragraph 2.
2. The company's statutes shall determine the scope of operations and the tasks of the regional branch of the company.
3. The regional branch shall be managed by a director appointed by the Supervisory Board upon a motion of the Board of Management.
4. The Programme Council of the branch shall serve as an advisory and consultative body of the director of the company's regional branch.
4a. [36] When appointing Programme Councils of branches broadcasting programme services in the languages of national and ethnic minorities and in regional languages, branch directors shall take into account candidates put forward by social organizations of national and ethnic minorities and communities speaking regional languages.
5. Upon a motion of the Board of Management and after having consulted the directors of the company's regional branches, the National Council shall determine the minimum share of programmes produced by the branches in the transmission time of particular national programme services.
6. [37] (repealed),

### Article 30a

1. The provisions concerning programme services for viewers abroad shall apply respectively to the programme service transmitted by the "TV Polonia" channel.
2. The programme council of TV Polonia shall serve as an advisory and consultative body in respect of the production and transmission of the programme service of the "TV Polonia" channel.

### Article 31

1. The revenues of the companies referred to in Article 26 paragraphs 2 and 3 shall be the proceeds from:
    1) [38] licence fees, default interest for delay in their payment and fines for the use of unregistered radio and television sets, as defined in the provisions of the Licence Fees Act of April 21, 2005, subject to the reservation of Article 8 paragraph 1 thereof,
    2) trade in programme rights,
    3) advertising and sponsorship,



4) other sources.

2. The revenues of these companies may also include grants from the State budget.

3. Shareholders of the companies referred to in Article 26 paragraphs 2 and 3 shall not be entitled to a share in the companies' profits.

### Article 31a

1. The companies referred to in Article 26 paragraphs 2 and 3 shall be obligated to specify in the documents, refereed to in Article 10 of the Accounting Act of September 29, 1994 (official journal „Dz.U." of 2002, No. 76, item 694, as further amended[5]), the accounting principles, including a company chart of accounts, in a manner ensuring that books of accounts report revenues and related costs separately for the activities, referred to in Article 21 paragraph 1, and other activities as well as methods of allocation of revenues and costs to particular types of activities pursued.

2. The duty, referred to in paragraph 1, shall be without prejudice to the accounting and reporting requirements laid down in separate regulations.

3. The National Council shall set forth, by a regulation, the manner of keeping documents, referred to in paragraph 1, and the manner of preparing the reports, referred to in Article 31b subparagraphs 1-3, with due regard for the need to observe the principles of openness and transparency in the use of funds allocated for the pursuit of tasks referred to in Article 21 paragraph 1 in a manner that would not distort market competition.

### Article 31b

Boards of Management of the companies, referred to in Article 26 paragraphs 2 and 3, shall file with the National Council:

1) by February 15, an annual report on the use of funds, referred to in Article 31 paragraphs 1 and 2, as regards the previous calendar year,

2) by the 25th day of the month following the end of each quarter of a calendar year, quarterly reports on the use of funds allocated in accordance with Article 31 paragraph 1 subparagraph 1 and paragraph 2,

3) by the 25th day of the month following the end of each quarter of a calendar year, quarterly reports on costs incurred in connection with the activities referred to in Article 21 paragraph 1, including the specification of their financing sources.

4) [39] repealed.

### Article 31c

[40] Boards of Management of the companies referred to in Article 26 paragraphs 2 and 3 shall prepare and make publicly available, by March 15 for the preceding calendar year, reports on the use of proceeds from licence fees as defined in the Licence Fees Act of April 21, 2005, default interest for delay in their payment and fines for the use of unregistered sets, for carrying out the public mission referred to in Article 21 paragraph 1, with an indication of funds allocated for implementation of individual tasks set forth in Article 21 paragraph 1a.

22

A-2779

## Article 32

In order to implement the tasks of public radio and television broadcasting, the companies may, upon consent of the National Council, found new business operators as envisaged by the law.

### CHAPTER V
### Broadcasting Licences

## Article 33

1. Transmission of programme services other than those of public radio and television broadcasters shall require a licence to broadcast.
2. Broadcasting licences shall be awarded by the Chairman of the National Council.
3. The Chairman of the National Council shall take decisions as regards broadcasting licences on the basis of a resolution of the National Council. The decision on this issue shall be final.

## Article 34

1. [41] Acting in agreement with the President of the Office of Electronic Communications, the Chairman of the National Council shall publish in the official journal of the Republic of Poland "Monitor Polski" an announcement concerning availability of broadcasting licences to transmit radio and television programme services and determine the time-limit, which shall not be less than 45 days from the date of the announcement, for filing licence applications.

1a. The announcement referred to in paragraph 1 shall specify:

   1) subject of the procedure;

   2) programming conditions of transmission of the programme service, including in particular the type and nature of the programme service;

   3) technical conditions of transmission of the programme service, in particular the frequency or the channel, as well as the power and location of transmitters intended for transmission of the programme service;

   4) number of broadcasting licences;

   5) period for which the broadcasting licence may be awarded;

   6) time-limit and location for filing applications.

1b. The Chairman of the National Council shall, not later than 14 days of the date of the announcement referred to in paragraph 1, publish information on the announcement in at least two printed national dailies.

1c. Exclusively licence applications in connection with the announcement referred to in paragraph 1 shall be examined.

2. The Chairman of the National Council shall publish a list of applicants participating in the licensing procedure. In case of a large number of applications which exceed the existing capacity for the programme service transmission, the said applications shall be examined within the framework of a single procedure.

## Article 35

1. [42] Broadcasting licences may be awarded to natural persons of Polish nationality who permanently reside in the territory of the Republic of Poland, legal persons or partnerships having their seat in the territory of the Republic of Poland.

2. [43] Companies having foreign shareholders may be awarded a broadcasting licence if :

   1) the equity stake held by foreign persons in the company or the stake held by foreign persons in the share capital of the company does not exceed 49%,

   2) the company's articles of association or statutes contain a clause which provides that:

      a) persons of Polish nationality who permanently reside in Poland constitute a majority of persons empowered to represent the company or manage its affairs, or of members of the Board of Management of the said company,

      b) the share of votes exercised by foreign persons and subsidiaries, as defined by the Code of Commercial Companies and Partnerships, of foreign persons may not exceed 49% of votes in a meeting of a limited company's members or the general meeting of shareholders,

      c) foreign persons may not hold, directly or indirectly, a majority in excess of 49% of votes in a partnership,

      d) persons of Polish nationality who permanently reside in Poland constitute a majority of members of the Supervisory Board of the said company.

3. The licence may also be awarded to:

   1) a foreign person, or

   2) a subsidiary, as defined by the Code of Commercial Companies and Partnerships, of a foreign person,

   - having a seat or permanent residence in a member state of the European Economic Area, with exclusion of restrictions imposed by virtue of paragraph 2.

## Article 35a

[44] 1. [45] A *social* broadcaster may file an application for a broadcasting licence for a successive period not later than 12 months before the expiry of the licence held.

2. [46] In case a *social* broadcaster files the application referred to in paragraph 1, the broadcasting licence for a successive period may be refused exclusively if any of the circumstances indicated in Article 38 paragraphs 1 or 2 occurs in respect of the broadcaster.

3. In case a broadcaster files the application referred to in paragraph 1, provisions of Articles 34 and 36 paragraphs 1 and 2 shall not apply to the licensing procedure.

## Article 36

1. In the licensing procedure, the following criteria shall particularly apply:

   1) the degree of compliance of the proposed programming activities with the tasks of broadcasting laid down in Article 1 paragraph 1 of the Act, taking into account the degree of their implementation by other broadcasters in the area covered by the broadcasting licence,

   2) the applicant's ability to make the necessary investments and ensure financing of the programme service,

A-2781

   3) the planned share of programmes produced or commissioned by the broadcaster or co-produced by the broadcaster jointly with other broadcasters, in the programme service,

   4) the planned share of the programmes referred to in Article 15 paragraphs 1 and 3, in a television programme service, or of works referred to in Article 15 paragraph 2, in a radio or television programme service,

   5) past compliance with regulations governing radio communications and the mass media.

2. The broadcasting licence shall not be awarded if transmission of a programme service by the applicant could result in:

   1) threat to the interests of the national culture, transgression of the standards of public decency conduct and proprieties, danger to national security and defence or violation of state secrets,

   2) achievement, by the applicant, of a dominant position in mass media in the given area.

3. [47] The broadcasting licence shall be awarded for 10 years.

## Article 37

1. The broadcasting licence shall specify in particular:

   1) [48] the broadcaster, its seat or place of residence,

   2) the nature of activity covered by the broadcasting licence,

   3) the method of transmitting the programme service (by terrestrial diffusion, satellite and cable system) and:

     - for terrestrial diffusion:

       a. location of the station,

       b. height on which the antenna is located,

       c. power of the transmitter and the maximum radiated power,

       d. antenna radiation pattern,

       e. frequency,

       f. polarisation,

     - for transmission via satellite:

       g. name of the satellite used,

       h. position of the satellite on the orbit,

       i. frequency,

       j. power of the transponder.

     - for cable system:

       k. location of the system head station,

       l. area covered by the cable system.

   4) the nature of programme service to be transmitted and the time of its transmission,

   5) the date of the initial transmission of the programme service,

   6) the date of expiry of the licence,

   7) the share of programmes produced by domestic producers within the programme service.

2. The licence may specify other aspects of the broadcaster's activity, if so required to implement the provisions of the Act.

3. [49] Within the scope stipulated in paragraph 1 subparagraph 3, the broadcasting licence shall be awarded in agreement with the President of the Office of Electronic Communications.

3a. [50] Where the transmission of radio or television programme services requires a frequency reservation, the President of the Office of Electronic Communications shall forthwith reserve a



**A-2782**

frequency for the broadcaster who has been awarded a licence. Any frequency reservations, modifications and withdrawals thereof shall be governed by Articles 114 and 115 of the Act of July 16, 2004 - "Telecommunications Law", and provisions of Article 116 thereof shall not apply.

4. [51] Following consultation with the President of the Office of Electronic Communications, the National Council shall specify, by a regulation, the essential information to be provided in the application form as well as the detailed procedure for awarding or revoking broadcasting licences.

## Article 37a

A broadcaster shall on an annual basis deliver to the National Council its financial statements prepared in the form specified in the Accounting Act of September 29, 1994.

## Article 38

1. The broadcasting licence shall be revoked if:

    1) a final decision has been issued prohibiting the broadcaster to run business activity covered by the broadcasting licence;

    2) the broadcaster blatantly violates the conditions set forth in the Act or broadcasting licence;

    3) the activity covered by the broadcasting licence is run in breach of the Act or the terms of the broadcasting licence, and the broadcaster, despite having been requested by the Chairman of the National Council, has not within a prescribed time-limit eliminated the state of facts or the legal status incompliant with the conditions set forth in the broadcasting licence or the Act;

    4) despite having been requested by the Chairman of the National Council, the broadcaster has not commenced to transmit the programme service within the time-limit set in the broadcasting licence, or has permanently ceased to transmit it via all or some transmitters – unless the broadcaster proves that the delay in commencing transmission of the programme service or cessation of programme service transmission resulted from circumstances beyond its control. Permanent cessation of programme service transmission shall be deemed to mean non-transmission of the programme service for the period of three consecutive months.

2. The broadcasting licence may be revoked if:

    1) the transmission of the programme service threatens the interests of the national culture, security and defence or if it transgresses the standards of public decency;

    2) the broadcaster is declared bankrupt;

    3) by transmitting the programme service the broadcaster gains a dominant position in mass media on the given relevant market as defined in regulations on protection of competition and consumers;

    4) another person takes over direct or indirect control over the activity of the broadcaster,

3. The Chairman of the National Council shall make public information on opening of the procedure for revoking the broadcasting licence.

4. In case the decision revoking the broadcasting licence becomes final, the Chairman of the National Council shall forthwith announce availability of a licence within the scope covered by the revoked licence.

**A-2783**

### Article 38a

1. The rights under the broadcasting licence shall be inalienable, subject to paragraphs 3-5.
2. The rights referred to in paragraph 1 shall not transfer onto the purchaser of a bankrupt enterprise.
3. In case of a merger, division or other transformations of commercial companies, the rights referred to in paragraph 1 may transfer onto another entity upon consent of the National Council expressed in the form of a resolution. The consent shall be refused if:
   1) the broadcaster gains a dominant position in mass media on the given relevant market as defined in regulations on protection of competition and consumers;
   2) another person takes over direct or indirect control over the activity of the broadcaster.
3a. [52] A natural person may transfer the rights under the licence, subject to the consent of the National Council expressed in a resolution, onto a company of which the person is a shareholder and which meets the conditions referred to in Article 35. Consent may be refused for reasons referred to in Article 36 paragraph 2.
4. [53] The Chairman of the National Council shall issue, on the basis of a resolution of the National Council, a decision granting, or refusing to grant, consent referred to in paragraphs 3 and 3a.
5. Provisions of the Act of July 16, 2004 - „Telecommunications Law" shall apply to the rights arising from frequency reservation.

### Article 39

The broadcasting licence to transmit a television programme service shall also cover the use of the television signal to transmit teletext services.

### Article 39a

1. A broadcasting licence may be awarded for the transmission via cable networks or via satellite of a programme service devoted exclusively to:
   1) teleshopping,
   2) self-promotion of the broadcaster's activity.
2. The provisions of the Act, with the exception of the provisions of Articles 15-15b, shall apply as appropriate to the programme services referred to in paragraph 1.
3. The following shall not apply to the programme services referred to in paragraph 1 subparagraph 1:
   1) limitation of the admissible duration of advertising and teleshopping spots per clock hour as laid down in Article 16 paragraph 2,
   2) the provisions of Article 16 paragraph 3 and Article 16a.

### Article 39b

1. The following may apply to the National Council to be granted the status of a social broadcaster:
   1) an association, within the framework of implementing its statutory objectives,
   2) a foundation, within the framework of implementing its statutory objectives,



A-2784

3) a church or a religious legal person of a given church, or a religious organisation whose status is regulated by an Act of Parliament.

2. Social broadcasters shall be exempt from fees payable for awarding or altering the licence.

3. In case of breach by a social broadcaster of requirements specified in Article 4 paragraph 1a, the licensing authority shall issue a decision revoking its status as a social broadcaster and shall impose in the said decision the obligation to pay the fees referred to in paragraph 2, along with legal interest charged as from the date of awarding or altering the broadcasting licence.

### Article 40

1. A fee shall be charged for awarding a broadcasting licence, irrespective of the fee for the use of radiocommunications equipment or the use of a frequency, provided for in the Act on Communications.

2. Acting in agreement with the minister in charge of public finance sector and taking into account the nature of particular broadcasters and their programme services, the National Council shall determine, by a regulation, the fee referred to in paragraph 1. The National Council may specify entities exempt from such fee.

### Article 40a

1. Purchase or acquisition of shares or interest, or acquisition of rights in shares or interest in a company holding a broadcasting licence to transmit a programme service, by a foreign person, shall require a consent of the Chairman of the National Council; the provisions of Article 33 paragraph 3, Article 35 paragraph 2, Article 36 paragraph 2 and Article 38, shall apply thereto as appropriate.

2. The actions referred to in paragraph 1, performed by an entity controlled by a foreign person shall be deemed performed by the controlling entity, as defined by the Code of Commercial Companies and Partnerships.

3. The Chairman of the National Council shall grant and withdraw the consent referred to in paragraph 1, on the basis of a resolution of the National Council.

4. The actions, referred to in paragraph 1, performed without the consent shall be null and void.

5. The provisions of paragraphs 1 - 3 shall not apply to foreign persons or subsidiaries, as defined by the Code of Commercial Companies and Partnerships, to foreign persons having a seat or permanent residence in a member state of the European Economic Area.

### Article 40b

[54] Provisions of Chapter 5 of the Freedom of Business Activity Act of July 2, 2004 shall apply to the control of business activity of business operators, referred to in Article 33.

### CHAPTER VI
#### Retransmission of Programme Services in Cable Networks

### Article 41

1. Programme services retransmitted in cable networks shall be subject to registration.

28



2. The provision of paragraph 1 shall not apply to national programme services of public radio and television and other programme services of domestic broadcasters receivable within the coverage area by means of receivers for reception by the general public.

3. The register shall be kept by the Chairman of the National Council.

4. The Code of Administrative Procedure shall apply to the registration procedure, unless otherwise provided for in the Act.

5. The register shall be open to the public.

## Article 42

1. A fee shall be charged for registration.

2. Acting in agreement with the minister in charge of the public finance sector, the National Council shall determine, by a regulation, the fee referred to in paragraph 1 and may specify entities exempt from such a fee.

## Article 43

1. The cable network operator shall introduce programme services into the cable network in the following sequence:
   1) national programme services of public radio and television,
   2) regional programme services of public radio and television, receivable in the given area,
   2a) programme services of domestic social broadcasters, receivable in the given area,
   3) programme services of other domestic broadcasters, receivable in the given area,
   4) programme services of other domestic and foreign broadcasters.

2. In justified cases, the Chairman of the National Council may issue a decision permitting a different sequence of introducing programme services into a cable network as compared to that referred to in paragraph 1.

## Article 44

1. The registering authority shall register a programme service on the basis of a notification.

2. The cable network operator shall notify a programme service for the purpose of its registration not later than 2 months prior to the commencement of retransmission.

3. The notification referred to in paragraph 1 shall:
   1) specify the applicant, its seat or place of residence;
   2) specify the programme service intended for retransmission and its broadcaster;
   3) define the area over which the programme service is to be retransmitted;
   4) (repealed);
   5) (repealed).

3a. The cable network operator shall enclose with the notification:
   1) a copy of authorisation to operate broadcasting equipment and telecommunications networks necessary to retransmit the programme service;
   2) documents indicating that the retransmission of the programme service will not infringe upon the rights of the programme service broadcaster;

29

**A-2786**

    3) documents indicating that the programme service is transmitted for reception by the general public, and in case of a programme service provided to the operator by the broadcaster — a contract with the programme service broadcaster;

    4) declaration on the sequence of introducing to the network programme services receivable within the coverage area by means of receivers for reception by the general public, the retransmission of which is not subject to notification.

3b. The entry in the register shall contain the particulars referred to in paragraph 3, with the exception of address of residence, if different from the address of the seat.

4. Retransmission of the programme service may be commenced if the registering authority has not refused the registration within 2 months from the date of filing the application.

5. The cable network operator shall notify the registering authority, within 14 days, of any changes in the state of facts or the legal status which are covered by the obligation to register and which arose after the act of registration. The provisions governing the registration of programme services shall apply accordingly to notification of changes.

6. (repealed).

<div align="center">Article 45</div>

1. The registering authority shall refuse to register a programme service if:

    1) the applicant has no authorisation to use the radio equipment or telecommunication networks,

    2) contents in breach of provisions of Article 18 were transmitted at least twice in the said programme service during the last 12 months,

2. The registering authority shall impose a ban upon the cable network operator to retransmit programme services or a particular programme service, if:

    1) contents inciting hatred on the grounds of race, sex, nationality or religion or contents in breach of provisions of Article 18 paragraphs 4 and 5 were retransmitted at least twice in the said programme service during the last 12 months,

    2) the operator introduces changes to the programme service or does not retransmit it complete or simultaneously,

    3) the operator fails to comply with the sequence regulating the introduction of programme services into the cable network laid down in the Act.

3. The refusal to register a programme service or imposing a ban upon retransmission of a programme service shall be made in the form of an administrative decision; the provisions of Article 33 paragraph 3 shall apply accordingly to such a decision.

4. When a ban is imposed as specified in paragraph 2, the Chairman of the National Council acting ex officio shall nullify the registration of the programme services or a programme service.

5. The registration shall be nullified ex officio in case of loss, by the cable network operator, of the authorisation to operate broadcasting equipment and telecommunications networks used for the purpose of retransmission of programme services.

<div align="center">Article 46</div>

The National Council shall determine, by a regulation, a detailed manner and procedure for keeping the register of programme services in cable networks, including:

1) model form of the register,

2) model form of notification for purposes of registration

<div align="center">30</div>

- with due regard to a possibility to keep the register and file applications in the IT system, necessity to ensure transparency and completeness of information recorded in the register and efficiency of the registering procedure, as well as prevention of impediments affecting cable network operators' activities.

Article 47

[55] The provisions on the award of broadcasting licences to transmit programme services shall apply accordingly to the over-the-air retransmission of programme services that does not require a frequency reservation.

## CHAPTER VII

[56] (repealed)

Article 48

(repealed).

Article 49

(repealed).

Article 50

(repealed).

Article 51

(repealed).

## CHAPTER VIII
### Liability under the Law

Article 52

1. Transmission of a radio or television programme service without a licence shall be:
   - punishable by a fine, restriction of liberty or imprisonment of up to 2 years.
2. Retransmission of a radio or television programme service without registration shall be:
   - punishable by a fine, restriction of liberty or imprisonment of up to 1 year.

Article 53

1. A broadcaster failing to comply with the obligations laid down in Article 15 paragraphs 1-3, Article 15a paragraph 1, Article 16 paragraphs 1-3, Article 16a paragraphs 1-6, Article 16b, Article 16c, Article 17 paragraphs 1-7, Article 18 paragraphs 1-5b, Article 20 paragraph 1, Article 20b paragraphs 1 and 6 or under the provisions issued pursuant to Article 15 paragraph 4, Article 15a paragraph 2, Article 16 paragraph 4, Article 17 paragraph 8 and Article 18 paragraph 6, shall be liable to a fine imposed by decisions of the Chairman of the National Council in the amount of 50% of the annual fee for the use of frequency allocated for broadcasting the programme service, while broadcasters who fail to make the payment of the

31

**A-2788**

frequency fee, shall be liable to a fine of up to 10% of the revenues generated by the broadcaster in the preceding tax year.

2. The Chairman of the National Council may impose the fine referred to in paragraph 1 also by virtue of a decision issued under Article 10 paragraph 4.

3. The fine shall be paid from net income after tax or from another surplus of revenues over expenditure, after tax.

4. The fine may not be imposed if over one year elapsed from the breach of the obligations referred to in paragraph 1.


### Article 54

1. If a person who directs the broadcaster's activity fails to carry out the decisions issued under Article 10 paragraph 4, the Chairman of the National Council may, by a decision, impose a fine upon such a person; however, such fine shall not exceed the person's six-month remuneration.

2. The same fine may be imposed upon a person who directs the broadcaster's activity for failure to provide information or for providing inaccurate information requested by the Chairman of the National Council under Article 10 paragraph 2.

3. A decision imposing a fine may not be issued if two years have elapsed from the date of issuing the decision referred to in paragraph 1.


### Article 55

The fines referred to in Article 53 and 54 shall be payable to the state budget.


### Article 56

1. Decisions of the Chairman of the National Council issued under Article 10 paragraph 4 and Articles 53 and 54 may be appealed against to the *Voivodship Court*[57] in Warsaw – Commercial Court.

2. The provisions of the Code of Civil Procedure relating to counteracting monopolistic practices shall apply as appropriate to the procedure in cases involving appeals against the decisions referred to in paragraph 1.

3. In case a decision of the Chairman of the National Council is appealed against to the court, the appealing person shall not have recourse to remedies for the purpose of appealing against the said decision provided for in the Code of Administrative Procedure, particularly as regards resumption of the procedure, reversal, change or declaration of invalidity of the decision.


## CHAPTER IX
### Amendments to the Applicable Legislation,
### Transitional and Final Provisions


### Article 57

In Article 1 paragraph 1 subparagraph 2 of the Act of December 30, 1950, on the Publication of the Official Journal „Dziennik Ustaw" of the Republic of Poland and the Official Journal „Monitor

P2

**A-2789**

Polski" of the Republic of Poland (official journal „Dz.U.", No. 58, item 524; 1991, No. 94, item 420), the coma after the words „and ministers" shall be deleted and the following phrase shall be added thereafter „and the National Broadcasting Council".

### Article 58

Subparagraph 7 shall be added in Article l paragraph 2 of the Tribunal of State Act of March 26, 1982, (official journal „Dz.U.", No. 11, item 84; of 1993, No. 5, item 22), following replacement of the period at the end of the paragraph with a coma:
„7) members of the National Broadcasting Council".

### Article 59

Article 48 of the Act of May 17, 1989 on Relations between the State and the Roman Catholic Church in the Republic of Poland (official journal „Dz.U.", No. 29, item 154; of 1990, No. 51, item 297, No. 55, item 321, No. 86, item 504; of 1991, No. 95, item 425 and No. 107, item 459) shall be amended as follows: (amendments omitted).

### Article 60

Article 25 paragraph 4 of the Act of May 17, 1989 on Guarantees of Freedom of Conscience and Religion (official journal „Dz.U.", No. 29, item 155; of 1990, No. 51, item 297, No. 55, item 321, No. 86, item 504; of 1991, No. 95, item 425) shall be replaced by the following:
„4. Churches and other religious organisations shall be entitled to broadcast religious, moral, social and cultural programme services on radio and television in accordance with agreements executed between the authorities of the particular Church or religious organisation and the public radio and television broadcasting organisations".

### Article 61

The Act of November 23, 1990, on Communications (official journal „Dz.U.", No. 86, item 504; of 1991 No. 69, item 293, No. 105, item 451) shall be amended as follows: (amendments omitted).

### Article 62

Article 36 paragraph 2 of the Act of July 4, 1991, on Relations between the State and the Polish Autocephalic Orthodox Church (official journal „Dz.U.", No. 66, item 287, No. 95, item 425) shall be replaced by the following:
„2. The manner of exercising entitlements referred to in paragraph 1 shall be regulated by agreements between the Sacred Synod of Bishops and the public radio and television broadcasting organisations".

### Article 63

1. The Committee for Radio and Television „Polish Radio and Television" (hereinafter referred to as the „the Committee") is hereby dissolved. The President of the Committee shall direct the

**A-2790**

activities of the state organisational unit „Polish Radio and Television" until registration of the companies referred to in Article 26 paragraphs 2 and 3.

2. The tasks of the Committee and its President defined in the existing legislation with regard to the production and transmission of radio and television programme services shall be transferred to public radio and television broadcasting organisations, to be implemented in accordance with their tasks defined in their statutes and by the applicable legislation.

3. The tasks of the Committee and its President defined in the existing legislation and relating to state administration shall be transferred to the National Council.

4. The functions of the founding body of state-owned enterprises and supervisory functions over research and development units subordinate to the Committee shall be transferred to the Chairman of the National Council.

5. Permits to use telecommunications equipment for broadcasting radio and television programme services shall expire on the day on which a broadcaster who has been assigned the frequency heretofore used for broadcasting a programme service commences to operate in the same area, however, not later than within a year from the date the Act comes into force.

6. The provision of paragraph 5 shall not apply to permits issued under the act referred to in Article 59.

7. The provision of Article 52 shall not apply to broadcasters holding permits referred to in paragraph 5 and broadcasters holding permits issued under the act referred to in Article 59.

8. Entities which retransmit programme services in cable networks shall adjust their activities in order to comply with the provisions of Chapter VI within 6 months from the date the Act comes into force.

Article 64

1. The minister in charge of the State Treasury shall establish:

   1) the company referred to in Article 26 paragraph 2 having its seat in Warsaw and regional branches in Bydgoszcz, Gdańsk, Katowice, Kraków, Lublin, Łódź, Poznań, Rzeszów, Szczecin, Warsaw and Wrocław,

   2) the company referred to in Article 26 paragraph 3 subparagraph 1 having its seat in Warsaw and the companies referred to in Article 26 paragraph 3 subparagraph 2 having their seats in Białystok, Bydgoszcz, Gdańsk, Katowice, Kielce, Kraków, Koszalin, Lublin, Łódź, Opole, Olsztyn, Poznań, Rzeszów, Szczecin, Warsaw, Wrocław and Zielona Góra.

2. The minister in charge of the State Treasury may establish regional radio companies having their seat in towns other than those referred to in paragraph 1 subparagraph 2.

3. The minister in charge of the State Treasury shall agree the statutes of the companies referred to in paragraphs 1 and 2 with the National Council. The statutes of the company referred to in Article 26 paragraph 2 may provide for regional branches in locations other than those referred to in paragraph 1 subparagraph 1.

4. The first Boards of Management of the companies referred to in paragraphs 1 and 2 shall be appointed by the National Council.

A-2791

## Article 65

1. The minister in charge of the State Treasury shall transfer the property remaining after the liquidation of the state organisational unit „Polskie Radio i Telewizja"[4] hereinafter referred to as PRTV, to the companies referred to in Article 64 paragraph 1.
2. Within 1 month from the date on which this Act comes into force, the Council of Ministers shall determine, by a regulation, the detailed procedure of taking an inventory of the property referred to in paragraph 1, its division and transfer as well as settlement of any disputes in this regard.
3. Actions executed with a view to implement Article 64 paragraphs 1 and 2 shall be exempt from court fees and stamp duties; regulations governing the transformation of state enterprises into companies shall apply accordingly to notary's fees for establishing the said companies.

## Article 66

1. Land owned by the State Treasury and administered by PRTV on the date of entry of this Act into force shall, on the date of registration of the companies, be transferred to them to be held under perpetual usufruct by operation of the law. Provisions of Article 41 paragraph 1 of the Act of April 29, 1985 on Land Management and Exrpropriation of Real Property (official journal „Dz.U." of 1991, No. 30, item 127, No. 103, item 446 and No. 107, item 464)[58] shall not apply in respect of the first fee for perpetual usufruct.
2. Buildings and other facilities as well as premises located on land owned by the State Treasury and administered by PRTV on the date the Act comes into force shall, on the date of registration of the companies, become their property by operation of the law. Acquisition of ownership rights shall be free of all charge.
3. Acquisition of the rights to perpetual usufruct of land referred to in paragraph 1 and the ownership title to the buildings, other facilities and premises referred to in paragraph 2, shall be effected by virtue of a decision of the Voivod. The said decision shall also determine the conditions of perpetual usufruct of land, in accordance with the provisions of Article 236 of the Polish Civil Code.

## Article 67

1. Employees of PRTV shall, by operation of the law, become employees of the respective company, subject to the provision of paragraph 2.
2. Employment relationship of executive officers, determined by the National Council, shall cease, by operation of the law, on the date of registration of the companies in the commercial register. Such cessation of employment relationship shall be equivalent, in terms of its legal consequences, to termination of employment relationship as a result of termination of the employment contract by the employer. These employees may be employed in the company on terms agreed upon by the parties.
3. The companies shall be responsible for liabilities arising out of employment relationship which arose prior to the companies' entry in the commercial register.

---

[4] TRANSLATOR'S NOTE: „Polish Radio & Television".

A-2792

## Article 68

1. The rights and liabilities of the Committee and PRTV arising out of administrative decisions shall, by operation of the law, be transferred to the companies.

2. The Minister of Communications acting in agreement with the Chairman of the National Council shall assign to the companies, referred to in Article 26 paragraphs 2 and 3, the frequencies used by PRTV on the date of entry of the present Act into force for the transmission of radio and television programme services.

3. The right to use the frequencies referred to in paragraph 2 vested in other entities on the basis of former provisions shall expire on the date of assignment of these frequencies to the companies.

4. The frequencies referred to in paragraph 2 shall be assigned free of charge.

## Article 69

1. The bodies empowered to appoint members of the National Council for the first term of office after the entry of the present Act into force shall specify which members have been appointed for a term of two and of four years.

2. The first meeting of the National Council shall be convened by the Speaker of the Senate, who shall chair the meeting.

3. The first Chairman of the National Council shall be appointed from amongst all the members serving the first term of office.

## Article 70

1. The Act of December 2, 1960, on the Committee for Radio and Television „Polskie Radio i Telewizja" (official journal „Dz.U.", No. 54, item 307; of 1984, No. 54, item 275) shall hereby be repealed.

2. Prior to the issue of regulations provided for in this Act, however, not longer than for six months, the former provisions of the Act referred to in paragraph 1 shall remain in force, unless they are contrary to this Act.

## Article 71

The Act shall come into force within a month of its publication, with the exception of Article 52, which shall come into force on July 1, 1993.

---

[1] Amendments to the Act were promulgated in the official journal "Dz. U." of 1997, No. 88, item 554 and No. 121, item 770; of 1999, No. 96, item 1107; and of 2003, No. 229, item 2274.

[2] Amendments to the consolidated text of the Act were promulgated in the official journal "Dz. U." of 2002, No. 167, item 1372; of 2003, No. 80, item 719 and No. 122, item 1143; and of 2004, No. 29, item 257, No. 99, item 1001 and No. 152, item 1597.

[3] Amendments to the Act were promulgated in the official journal "Dz. U." of 1992, No. 63, item 315; of 1994 No. 121, item 591; of 1995, No. 138, item 682; of 1996, No. 24, item 110; of 1997, No. 104, item 661, No. 121, item 769 and No. 158, item 1041; of 1998, No. 106, item 668, No. 117, item 756 and No. 162, item 1115; of 1999, No. 28, item 255 and 256 and No. 84, item 935; of 2000, No. 3, item 28, No. 12, item 136, No. 43, item 489, No. 84, item 948, No. 114, item 1193 and No.

120, item 1268; of 2001, No. 5, item 45, No. 88, item 961, No. 100, item 1083, No. 111, item 1193, No. 113, item 1207, No. 126, item 1382, 1383 and 1384 and No. 128, item 1407; of 2002, No. 113, item 984; of 2003, No. 45, item 391, No. 124, item 1151 and 1152, No. 171, item 1663, No. 213, item 2081 and No. 223, item 2215; and of 2004 No. 210, item 2135.

[4] Amendments to the consolidated text of the Act were promulgated in the official journal "Dz. U." of 2004; No. 69, item 625, No. 91, item 877, No. 92, item 882, No. 93, item 896, No. 173, item 1808 and No. 210, item 2135.

[5] Amendments to the consolidated text of the Act were promulgated in the official journal "Dz. U." of 2003, No. 60, item 535, No. 124, item 1152, No. 139, item 1324 and No. 229, item 2276; and of 2004, No. 96, item 959, No. 145, item 1535, No. 146, item 1546 and No. 213, item 2155.

[1] Article 1 paragraph 1 subparagraph 3 amended by Article 60 subparagraph 1 of the Sports Act of June 25, 2010 (Dz.U.10.127.857) as of October 16, 2010.

[2] Article 4 subparagraph 8 repealed by Article 11 subparagraph 1 of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[3] Article 6 paragraph 2 subparagraph 6 amended by Article 11 subparagraph 2 letter a) of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728)as of June 16, 2005.
As of September 30, 2005 Article 6 paragraph 2 subparagraph 6 in its wording before the amendment implemented by Article 11 subparagraph 2 letter a) of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728) on June 16, 2005 was deemed, to the extent it established the competence of the National Broadcasting Council to determine licence fees, inconsistent with Article 217 of the Constitution of the Republic of Poland, by virtue of the decision of the Constitutional Tribunal of September 9, 2004 (Dz.U.04.204.2092).

[4] Article 6 paragraph 2 subparagraph 6a added by Article 11 subparagraph 2 letter b) of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[5] Article 6 paragraph 2 subparagraph 7a repealed by Article 6 subparagraph 1 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of March 29, 2006 - cf: decision of the Constitutional Tribunal of March 23, 2006 (Dz.U.06.51.377).

[6] Article 6 paragraph 2 subparagraph 11 added by Article 1 subparagraph 1 of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010

[7] Article 7 paragraph 1 amended by Article 6 subparagraph 2 letter a) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of December 30, 2005.

[8] Article 7 paragraph 2 repealed by Article 6 subparagraph 2 letter b) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of March 29 2006 - cf: decision of the Constitutional Tribunal of March 23, 2006 (Dz.U.06.51.377).

[9] Article 7 paragraph 2a repealed by Article 6 subparagraph 2 letter c) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of December 30, 2005.

[10] Article 7 paragraph 2b added by Article 1 of the Act of April 25, 2006 (Dz.U.06.83.574) amending this Act as of May 16, 2006.

[11] Article 7 paragraph 4 amended by Article 6 subparagraph 2 letter d) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of December 30, 2005.

[12] Article 7 paragraph 6 subparagraph 3a added by Article 35b of the Act of October 18, 2006 on Disclosure of Information on Documents of the State Security Services Produced in 1944–1990, and Contents of Such Documents (Dz.U.06.218.1592) as of March 15, 2007.

[13] Article 9 paragraph 2 amended by Article 6 subparagraph 3 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[14] Article 15 paragraph 4 subparagraph 3 amended by Article 11 subparagraph 3 of the Licence

**A-2794**

Fees Act of April 21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[15] Article 16a paragraph 5 amended by Article 5 of the Act of June 23, 2006 Amending Certain Acts in Connection with Membership of the Republic of Poland in the European Union (Dz.U.06.133.935) as of August 5, 2006.

[16] Article 16b paragraph 1 subparagraph 5 amended by Article 97 subparagraph 1 of the Gambling Act of November 19, 2009 (Dz.U.09.201.1540) as of January 1, 2010.

[17] Article 17 paragraph 6a added by Article 97 subparagraph 2 of the Gambling Act of November 19, 2009 (Dz.U.09.201.1540) as of January 1, 2010.

[18] Article 20b paragraph 1 subparagraph 1 amended by Article 11 subparagraph 4 of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[19] Article 21 paragraph 1a subparagraph 7 amended by Article 60 subparagraph 2 letter a) of the Sports Act of June 25, 2010 (Dz.U.10.127.857) as of October 16, 2010.

[20] Article 21 paragraph 1a subparagraph 8a added by Article 35 subparagraph 1 letter a) of the Act of January 6, 2005 on National and Ethnic Minorities and on Regional Language (Dz.U.05.17.141) as of May 1, 2005.

[21] Article 21 paragraph 2 subparagraph 7b added by Article 60 subparagraph 2 letter b) of the Sports Act of June 25, 2010 (Dz.U.10.127.857) as of October 16, 2010.

[22] Article 21 paragraph 2 subparagraph 9 repealed by Article 35 subparagraph 1 letter b) of the Act of January 6, 2005 on National and Ethnic Minorities and on Regional Language (Dz.U.05.17.141) as of May 1, 2005.

[23] Article 21 paragraph 3 added by Article 1 subparagraph 2 of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[24] Article 21 paragraph 4 added by Article 1 subparagraph 2 of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[25] Article 23a paragraph 3 amended by Article 4 of the Act of January 22, 2010 Amending the Act on Public and Voluntary Service and Certain Other Acts (Dz.U.10.28.146) as of March 12, 2010.

[26] Article 26 paragraph 2a added by Article 1 subparagraph 14 of the Act of April 2, 2004 (Dz.U.04.91.874) amending this Act as of January 1, 2005.

[27] Article 26 paragraph 4 amended by Article 1 of the Act of February 26, 2007 (Dz.U.07.61.411) amending this Act as of April 21, 2007.

[28] Article 26 paragraph 5 amended by Article 6 subparagraph 4 letter a) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[29] Article 26 paragraph 6, the introductory sentence amended by Article 6 subparagraph 4 letter b) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[30] Article 27 amended by Article 1 subparagraph 3 of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[31] Article 28 paragraph 1 amended by Article 1 subparagraph 4 letter a) of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[32] Article 28 paragraph 1a added by Article 1 subparagraph 4 letter b) of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[33] Article 28 paragraph 1b added by Article 1 subparagraph 4 letter b) of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[34] Article 28 paragraph 1c added by Article 1 subparagraph 4 letter b) of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[35] Article 28 paragraph 1d added by Article 1 subparagraph 4 letter b) of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[36] Article 30 paragraph 4a added by Article 35 subparagraph 2 of the Act of January 6, 2005 on National and Ethnic Minorities and on Regional Language (Dz.U.05.17.141) as of May 1, 2005.

[37] Article 30 paragraph 6 repealed by Article 11 subparagraph 5 of the Licence Fees Act of April

21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[38] Article 31 paragraph 1 subparagraph 1 amended by Article 11 subparagraph 6 of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[39] Article 31b subparagraph 4 repealed by Article 1 subparagraph 5 of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[40] Article 31c added by Article 11 subparagraph 7 of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[41] Article 34 paragraph 1 amended by Article 6 subparagraph 5 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[42] Article 35 paragraph 1 amended by Article 1 subparagraph 1 of the Act of June 25, 2009 (Dz.U.09.115.965) amending this Act as of August 5, 2009.

[43] Article 35 paragraph 2 amended by Article 1 subparagraph 1 of the Act of June 25, 2009 (Dz.U.09.115.965) amending this Act as of August 5, 2009.

[44] Article 35a added by Article 6 subparagraph 6 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[45] Article 35a paragraph 1 amended by Article 6 subparagraph 6 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of March 29, 2006 - cf: decision of the Constitutional Tribunal of March 26, 2006 (Dz.U.06.51.377).

[46] Article 35a paragraph 2 amended by Article 6 subparagraph 6 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of March 29, 2006 - cf: decision of the Constitutional Tribunal of March 23, 2006 (Dz.U.06.51.377).

[47] Article 36 paragraph 3 amended by Article 6 subparagraph 7 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[48] Article 37 paragraph 1 subparagraph 1 amended by Article 1 subparagraph 2 of the Act of June 25, 2009 (Dz.U.09.115.965) amending this Act as of August 5, 2009.

[49] Article 37 paragraph 3 amended by Article 6 subparagraph 8 letter a) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[50] Article 37 paragraph 3a amended by Article 6 subparagraph 8 letter a) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[51] Article 37 paragraph 4 amended by Article 6 subparagraph 8 letter b) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[52] Article 38a paragraph 3a added by Article 1 subparagraph 3 letter a) of the Act of June 25, 2009 (Dz.U.09.115.965) amending this Act as of August 5, 2009.

[53] Article 38a paragraph 4 amended by Article 1 subparagraph 3 letter b) of the Act of June 25, 2009 (Dz.U.09.115.965) amending this Act as of August 5, 2009.

[54] Article 40b amended by Article 9 of the Act of December 19, 2008 Amending the Freedom of Business Activity Act and Amending Certain Other Acts (Dz.U.09.18.97) as of March 7, 2009.

[55] Article 47 amended by Article 6 subparagraph 9 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[56] Chapter 7 repealed by Article 11 subparagraph 8 of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[57] Presently: of the Regional Court, pursuant to Article 4 of the Act of December 18, 1998

Amending the Act – Law on the System of Common Courts (Dz.U.98.160.1064) that entered into force as of January 1, 1999,

[58] Presently: of the Real Property Management Act, pursuant to Article 240 of the Real Property Management Act of August 21, 1997 (Dz.U.00.46.543) that entered into force as of January 1, 1998.

**A-2797**

Zasady realizowania przez Telewizję Polską S.A. misji publicznej

i bez niej; za koszty przypisane do pozostałej działalności uznaje się koszty, których TVP nie poniosłaby w razie zaniechania pozostałej działalności.

12  Szczegółowe zasady rozdziału przypisywania kosztów pośrednich i ogólnozakładowych do działalności misyjnej i pozostałej określają zasady polityki rachunkowości przyjęte przez TVP.

13  TVP prowadzi działalność poza misją publiczną (pozostałą działalność) jako działalność uboczną, jasno wyodrębnioną od działalności z zakresu misji publicznej. Służy temu w szczególności wydzielenie jednostek prowadzących pozostałą działalność, w szczególności Biura Reklamy, części handlowych innych jednostek organizacyjnych. Podstawowym celem prowadzonej przez TVP pozostałej działalności jest pozyskanie środków potrzebnych na realizację misji publicznej, a prowadzenie przez TVP pozostałej działalności powinno odbywać się bez uszczerbku dla realizacji misji publicznej.

14  Pozostała działalność opiera się na zasadach rynkowych, w szczególności ceny towarów lub usług ustalane są na rozsądnym poziomie rynkowym, i nie mogą być ukształtowane poniżej tego, co jest wymagane dla pokrycia kosztów, które musiałby pokryć w normalnym toku czynności efektywny przedsiębiorca w podobnej sytuacji. Kalkulacja cen oprócz pełnego kosztu obejmuje uzasadniony poziom zysku.

15  Pozostała działalność prowadzona jest na zasadzie samofinansowania. Przychody związane z tą działalnością muszą pokrywać w całości jej koszty. Dyrektor jednostki organizacyjnej realizującej pozostałą działalność jest zobowiązany do bieżącego monitorowania wyniku tej działalności.

16  Nadwyżka przychodów z pozostałej działalności ponad jej koszty przeznaczana jest przez TVP na realizację misji publicznej

Appendix 4

POUFNE NE (35)

PLF   DEF
EXHIBIT NO.   H
TRN   FOR ID
4-17-8

(3)

# TV POLONIA BROADCASTING SYSTEMS INC.

## BUSINESS PLAN

SPANSKI ENTERPRISES INC
5100 Montclair Drive
Mississauga, Ontario L5M 5A6
Phone/Fax: (905) 569-9049

TP 7004549

Appendix 4

# TV POLONIA BROADCASTING SYSTEMS INC.

## Business Plan

1. Spis treści ................................................... 2

2. Główne cele .................................................. 3

3. Spanski Enterprises Inc. ..................................... 5

4. TV Polonia Broadcasting Systems Inc. ......................... 7

5. Network Teleports, Inc. ...................................... 10

6. Charakterystyka przedsięwzięcia ............................. 11

7. Analiza rynku ................................................ 17

8. Strategia marketingowa ...................................... 20

9. Czasowy plan działania ...................................... 24

10. Podsumowanie ................................................ 26

11. Projekcje finansowe ........................................ 27

12. Załączniki ................................................. 31

13. Dane techniczne ............................................ 38

TP 7004550

A-2800

Appendix 4

# GŁÓWNE CELE

Spanski Enterprises Inc. stawia sobie za cel
dostarczenie programu TV Polonia jak najszerszym rzeszom
Polaków i ludności polskiego pochodzenia żyjących w Ameryce
Północnej.

Zainteresowanie firmy Spanski Enterprises Inc. (S.E.I.)
retransmisją programu TV Polonia w Ameryce wynika z
konstatacji następujących faktów:

a. liczebność ludności polskiego pochodzenia zamieszkającej
   Amerykę jest bardzo duża i wynosi około dwunastu
   milionów,

b. nasi rodacy przejawiają szczególne przywiązanie do
   ojczyzny, objawiające się między innymi głodem wszelkiego
   rodzaju informacji na temat Polski i z Polski.

Polacy masowo pojawili się na kontynencie amerykańskim
już pod koniec poprzedniego stulecia i od tego czasu ich
liczebność stale rośnie. Warte podkreślenia są dwie fale
polskiej imigracji ostatniego półwiecza, pierwsza - powojenna
i druga - obejmująca lata osiemdziesiąte. Szczególnie ta
ostatnia przyczyniła się do ogromnego wręcz wzrostu liczby
Polaków zamieszkujących kontynent amerykański.

Dla znakomitej większości Polaków oraz obywateli

3

TP 7004551

**A-2801**

Appendix 4

amerykańskich polskiego pochodzenia, utrzymywanie kontaktu z ojczyzną jest sprawą niesłychanie ważną.

Spośród dostępnych obecnie technologii, najlepszym medium zapewniającym Polonii amerykańskiej kontakt z Polską jest bez wątpienia program telewizyjny zawierający informacje i ciekawe materiały na temat kraju ojczystego.

Biorąc pod uwagę wyniki przeprowadzonych w Kanadzie badań społeczności polskojęzycznej, a także liczebność Polonii w Ameryce oraz techniczne możliwości retransmisji programu TV Polonia, firma Spanski Enterprises Inc. sformułowała następujące cele:

1. Uzyskanie od Telewizji Polskiej S.A. prawa wyłączności na retransmisję programu TV Polonia na terenie kontynentu amerykańskiego i podpisanie umowy o wspólnym przedsięwzięciu.

2. Założenie przez S.E.I. nowej firmy o nazwie TV Polonia Broadcasting Systems w celu realizacji zaplanowanego przedsięwzięcia.

3. Zawarcie umowy z firmą Network Teleports, Inc. z Nowego Orleanu, realizującą wszelkie aspekty techniczne dotyczące retransmisji programu TV Polonia.

4. Stworzenie infrastruktury organizacyjnej umożliwiającej prowadzenie działalności marketingowej i akwizycyjnej na rynku amerykańskim.

5. Osiągnięcie w ciągu pięciu lat liczby dwóch milionów abonentów programu TV Polonia oraz zasięgu terytorialnego od Kanady po Amerykę Środkową.

4

Appendix 4

# Spanski Enterprises Inc.

Spanski Enterprises Inc. jest istniejącą już od dziesięciu lat korporacją zarejestrowaną w Kanadzie. W okresie swego istnienia firma osiągnęła wielomilionowe zyski. S.E.I. specjalizuje się w realizowaniu projektów o dużym stopniu ryzyka przynoszących jednocześnie wysokie dochody. We wszystkich swych przedsięwzięciach, z których każde zakończyło się sukcesem, S.E.I. opierała się zawsze na najwyższej klasy specjalistach z danej dziedziny.

Spośród zrealizowanych przez S.E.I. projektów można tu wymienić opracowanie i wprowadzenie na rynek północno-amerykański edukacyjnego programu analizy rynku papierów wartościowych o nazwie INVESTOR.

Przedsięwzięciem S.E.I. zakończonym olbrzymim sukcesem było założenie i rozwinięcie firmy wydawniczej, specjalizującej się w wydawnictwach licencyjnych. Firma ta stała się największą tego typu w Kanadzie.

Za kolejny cel S.E.I. postawiła sobie opracowania i wdrożenie w Polsce systemu finansowego CLUB S International.
Zadanie to wymagało dotarcia do struktur rynkowych z jednej strony i kształcenia konsumenta z drugiej. O akceptacji nowum, jakim była karta dyskontowa CLUB S świadczy

5

TP 7004553

Appendix 4

fakt dynamicznego wzrostu liczby jej posiadaczy, od 70
tysięcy w końcu 92 roku do ponad 360 tysięcy obecnie.  Znak
CLUB S utrwalił się w świadomości konsumenta w całej Polsce.

Działając w wielu dziedzinach, firma S.E.I. uzyskała
doświadczenie niezbędne do wprowadzania w życie
najróżniejszych projektów przy pomocy najbardziej
niekonwencjonalnych i nowatorskich metod.

Na rozruch opisywanego w tym opracowaniu
przedsięwzięcia, Spanski Enterprises Inc. przeznacza kwotę
trzech milionów dolarów amerykańskich.
Udział TVP S.A. w ponoszeniu kosztów nie jest oczekiwany.
Wartym podkreślenia jest fakt, że przy realizacji niniejszego
projektu S.E.I. nie będzie w żadnym stopniu uzależniona od
instytucji finansowych czy też indywidualnych inwestorów,
oraz że inwestowanie własnych środków wiąże się zawsze z dużo
większym zaangażowaniem w dany projekt.

6

TP 7004554

Appendix 4

# TV Polonia Broadcasting Systems Inc.

Firma TV Polonią Broadcasting Systems będzie w całości posiadana przez Spanski Enterprises Inc.

W skład rady nadzorczej TV Polonia Broadcasting Systems wchodzić będą:

1. Prezes TVP S.A. lub inna desygnowana przez TVP S.A. osoba
2. Barbara Lamont, prezes Network Teleports, Inc.
3. Bogusław M.Spanski, prezes Spanski Enterprises Inc.
4. Bogusław T.Pisarek
5. Wojciech Sniegowski

Rada nadzorcza TV Polonia Broadcasting Systems będzie ustalała kierunki działania firmy i nadzorowała jej funkcjonowanie.

W skład zarządu TV Polonia Broadcasting Systems, odpowiedzialnego za prowadzenie codziennej działalności operacyjnej firmy, wchodzić będą:

1. Bogusław M.Spanski - prezes - odpowiedzialny za prowadzenie firmy i nadzór nad jej działalnością ekonomiczną
2. Bogusław T.Pisarek - wiceprezes - odpowiedzialny za marketing i promocję
3. Wojciech Sniegowski - wiceprezes - odpowiedzialny za administrację i nadzór nad biurami lokalnymi.

7

TP 7004555

Appendix 4

Bogusław M.Spanski jest polskim finansistą na stałe
zamieszkałym w Toronto w Kanadzie. Należy do nielicznej
grupy Polaków żyjących w Ameryce Północnej, którzy odnieśli
sukces liczący się w tamtejszej hierarchii społecznej.
Hasłem przewodnim jego działalności jest przeradzanie
śmiałych pomysłów w rzeczywistość. Z wykształcenia jest
architektem z praktyką w krajach Europy Zachodniej (m.in. w
Szwajcarii i we Włoszech), jak również w Kanadzie. Od
pewnego czasu, Bogusław M.Spanski poświęca swą karierę
zawodową projektowaniu i budowie nie obiektów ze stali i
betonu, lecz żywych organizmów, jakimi są firmy, które sam
stworzył i rozwinął w wielu miejscach na świecie.
Bogusław M.Spanski ma 40 lat.

Bogusław T. Pisarek jest głównym managerem firmy CLUB S
International. Z wykształcenia jest socjologiem z ponad
dziesięcioletnią praktyką i doświadczeniem w dziedzinie
marketingu zdobytym w Ameryca Północnej w najbardziej
agresywnie rozwijającej się dziedzinie marketingu i
sprzedaży, jaką są ubezpieczenia. Jako manager specjalizował
się w zagadnieniach związanych z makrogrupami społecznymi.
Znaczna część jego kariery zawodowej przebiegała w Stanach
Zjednoczonych, gdzie Bogusław T.Pisarek koordynował
działalność dużego przedsięwzięcia przeprowadzonego pod
auspicjami rządu kanadyjskiego.
Bogusław T.Pisarek ma 41 lat.

Wojciech Śniegowski jest absolwentem Wydziału Prawa i
Administracji Uniwersytetu Jagiellońskiego w Krakowie.

8

Appendix 4

Większą część swej kariery zawodowej spędził w Kanadzie,
gdzie był założycielem i właścicielem firmy konsultingowej. W
ramach tej działalności specjalizował się w negocjacjach z
agendami rządowymi. Wojciech Śniegowski prowadzi obecnie
polonijny program telewizyjny w stacji CFMT International w
Toronto. W programie o nazwie "Rozmaitości" jest on
odpowiedzialny za przygotowanie serwisu informacyjnego,
wywiady przed kamerą, produkcję reportaży oraz lokalną
sprzedaż reklam.
Wojciech Śniegowski ma 38 lat.

9

TP 7004557

Appendix 4

# Network Teleports, Inc.

Firma Network Teleports, Inc. jest jednym z liderów na amerykańskim rynku przekazu satelitarnego i przyszłym partnerem TV Polonia Broadcasting Systems we wprowadzaniu programu TV Polonia do Ameryki.

Przez dwadzieścia cztery godziny na dobę Network Teleports, Inc. zapewnia serwis telekomunikacyjny dla ponad dziewięciu milionów widzów i słuchaczy w całych Stanach Zjednoczonych, Kanadzie, Alasce i Ameryce Środkowej.

Bazą działalności firmy jest teleport znajdujący się w Nowym Orleanie w stanie Luizjana. Jedenastometrowe anteny teleportu pokrywają swym zasięgiem obszar od Kanady do Kolumbii i od Hawajów po Bermudy. Network Teleports, Inc. posiada również możliwość bezpośredniego przekazu sygnału znanego jako DBS.

Do szerokiego wachlarza usług oferowanych przez Network Teleports, Inc. należą między innymi: kodowanie i dekodowanie sygnału dla odbiorców telewizji kablowej, produkcja programów telewizyjnych, videokonferencje, pełna obsługa statków na wszystkich czterech oceanach oraz ciągłe monitorowanie odbioru i przekazu sygnału satelitarnego.

Network Teleports, Inc. liczy na owocną i uwieńczoną sukcesem współpracę z TV Polonia Broadcasting Systems we wprowadzaniu TV Polonia do Ameryki.

10

Appendix 4

# Charakterystyka
## przedsięwzięcia

Główne założenia dotyczące emisji programu TV Polonia w Ameryce przedstawiają się następująco:

1. Przewiduje się emisję programu TV Polonia w wymiarze 16-18 godzin dziennie.

2. Materiały z Polski dostarczane będą częściowo na taśmach, częściowo zaś za pośrednictwem retransmisji satelitarnej.

3. Program TV Polonia będzie retransmitowany przy pomocy sygnału Ku-band uzyskiwanego z satelity Eutelsat w jednym z zachodnioeuropejskich teleportów (downlink) i przekazywanego przez firmę Network Teleports, Inc. do Nowego Orleanu w USA (uplink).

4. Wstawianie spotów reklamowych dokonywane będzie w Ameryce.

5. Do programu wprowadzane będą produkowane w Ameryce polonijne bloki programowe.

6. Część programu zaopatrzona będzie w napisy w języku angielskim.

W celu realizacji opisywanego przedsięwzięcia Spanski Enterprises Inc. (S.E.I.) założy nową firmę o nazwie TV Polonia Broadcasting Systems, początkowo z biurami w USA (Nowy Jork, Chicago, Los Angeles) oraz w Kanadzie (Toronto). Biura te będą miały za zadanie pozyskiwanie i obsługę lokalnych abonentów programu TV Polonia. Wspominane biura

11

TP 7004559

Appendix 4

będą również odpowiedzialne za prowadzenie działalności
marketingowej, akwizycję reklam oraz - w przyszłości -
produkcję lokalnych bloków programowych w poszczególnych
regionach.

Przy współpracy z Network Teleports, Inc. z Nowego
Orleanu, TV Polonia Broadcasting Systems zaoferuje swym
abonentom pełną gamę technicznych możliwości odbioru programu
TV Polonia poprzez tradycyjny system odbioru programów
satelitarnych, nowoczesny sysytem DBS oraz za pośrednictwem
firm oferujących połączenia kablowe. Tego typu kompleksowa
oferta daje ogromne możliwości dotarcia do największej liczby
abonentów zainteresowanych odbiorem programu TV Polonia.

Tradycyjna metoda odbioru sygnału satelitarnego wymaga
zakupu drogiego sprzętu oraz posiadania odpowiednio dużej
przestrzeni na zainstalowanie talerza satelitarnego o sporych
rozmiarach. Szacuje się, że na kontynencie amerykańskim
liczba posiadaczy tego typu sprzętu wynosi kilkaset tysięcy.
Konieczność umożliwienia im odbioru programu TV Polonia
wydaje się więc oczywista.

Nowa metoda odbioru sygnału satelitarnego DBS (Direct
Broadcasting System) stwarza możliwość powszechnego
udostępnienia sygnału satelitarnego bardzo wysokiej jakości.
Małe rozmiary mini-talerza pozwalają na zainstalowanie go
nawet w niewielkich mieszkaniach czynszowych. Ze względu na
obecną cenę sprzętu (ok.700 USD) prowadzone są negocjacje z
producentem mini-talerzy i dekoderów (RCA) mające na celu

12

TP 7004560

Appendix 4

uzyskanie ceny hurtowej na bazie stu tysięcy abonentów.
Negocjacje z instytucjami finansowymi odnośnie udostępnienia
przyszłym abonentom programu TV Polonia atrakcyjnych warunków
leasingowania niezbędnego sprzętu są dalece zaawansowane.
Należy jednocześnie przyjąć za rzecz prawie pewną, że w ciągu
następnych 1-2 lat cena wyżej wspomnianego sprzętu znacznie
zmaleje, czyniąc go tym samym dużo bardziej dostępnym i
powszechnym.

W tych okolicznościach, skorzystanie z systemu DBS -
przy ułatwieniu sfinansowania zakupu sprzętu - pozwoli bez
wątpienia na znaczne i dynamiczne poszerzenie bazy abonentów
zachęconych łatwością uzyskania możliwości odbioru programu
TV Polonia, jaki i innych programów.

Z punktu widzenia potencjalnego odbiorcy, niewątpliwie
najtańszą metodą jest udostępnienie sygnału lokalnym firmom
oferującym połączenia kablowe. Obok opłaty za abonament
lokalnego "kabla", jedynym wydatkiem jest zakup dekodera,
który można również wynająć (lease).

S.E.I. przeprowadziła rozmowy z dużymi dystrybutorami
kablowymi , w wyniku których ustalono, że po uzyskaniu przez
TV Polonia Broadcasting Systems bazy abonenckiej na poziomie
30 tysięcy, program TV Polonia zostanie wprowadzony do
krajowych sieci kablowych w skupiskach polonijnych w Ameryce.

Reasumując, propozycja jednoczesnego wykorzystywania
wszystkich powyżej opisanych metod pozwoli w najkrótszym
czasie dotrzeć do największej liczby abonentów

13

Appendix 4

zainteresowanych odbiorem programu TV Polonia.

TV Polonia Broadcasting Systems wspólnie z Network Teleport, Inc. jako jedyne przedstawiają tego typu szeroką ofertę dla potencjalnych abonentów programu TV Polonia zamieszkujących kontynent amerykański.

TV Polonia Broadcasting Systems przejmie na siebie wszelkie zobowiązania finansowe wynikające z retransmisji satelitarnej i dalszej dystrybucji sygnału programu TV Polonia w Ameryce, zobowiązując się jednocześnie do podjęcia kompleksowych działań zapewniających retransmisję programu TV Polonia na najdogodniejszych warunkach. Wszystkie koszty operacyjne związane z realizacją tego przedsięwzięcia (w tym opłaty wynikające z ochrony praw autorskich) będą pokrywane przez TV Polonia Broadcasting Systems.

Tak więc TVP S.A. nie poniesie żadnych kosztów związanych z retransmisją programu TV Polonia na terenie kontynentu amerykańskiego.

Dzięki postępom technologicznym, konkurencja na rynku etnicznych programów telewizyjnych jest już znaczna. W samych Stanach Zjednoczonych mieszka obecnie 22 miliony ludzi urodzonych poza granicami tego kraju oraz dużo liczniejsze rzesze urodzonych w USA obywateli amerykańskich o bardzo mocnych więzach z krajami swego pochodzenia. Na ekranach amerykańskich telewizorów można oglądać programy w dwudziestu czterech językach i liczba ta stale rośnie.

14

TP 7004562

Appendix 4

Niektóre firmy działające na etnicznym rynku
telewizyjnym dążą do stworzenia programów wielokulturowych.
Jak pokazuje doświadczenie tego typu stacji telewizyjnych,
interesy poszczególnych programów są często sprzeczne.
Wątpliwa staje się należyta dbałość o integralność całości i
wyraźne oblicze danej stacji. Taka sytuacja bez wątpienia
negatywnie wpływa na zawartość programu oraz jego jakość.
Ze względu na rozległość i różnorodność rynku potencjalnych
odbiorców, trudne jest wyraźne ukierunkowanie działalności
marketingowej, która tym samym nie przynosi spodziewanych
efektów.

Niemcy, Włosi, Portugalczycy, Irlandczycy, Grecy,
Filipińczycy i inni prezentują w Ameryce swe programy o
ściśle sprecyzowanym, wyraźnym profilu narodowym, traktując
je jako istotną część promocji swych krajów.

Tego typu działanie procentuje pozyskiwaniem stałej,
wiernej i coraz szerszej liczby abonentów. TV Polonia
Broadcasting Systems pragnie zastosować tę wypróbowaną już
formułę przy wprowadzaniu programu TV Polonia na rynek
amerykański.

Zaopatrzenie części programu w napisy w języku
angielskim poszerzy bazę potencjalnych odbiorców programu o
ludzi nie mówiących już biegle po polsku. Chodzi tutaj
szczególnie o młodzież i dzieci polskiego pochodzenia
urodzone w Ameryce.

Dzięki napisom w języku angielskim program dostępny

15

TP 7004563

Appendix 4

będzie również dla Amerykanów i Kanadyjczyków niepolskiego pochodzenia. Może to mieć niebagatelne znaczenie w propagowaniu pozytywnego obrazu Polski na kontynencie amerykańskim.

Zespół fachowców zatrudnionych przez TV Polonia Broadcasting Systems będzie - pod nadzorem specjalistów z TVP S.A. - stale dbał o zachowanie wysokiej jakości i integralności programu TV Polonia nadawanego w Ameryce.

Na terenie Ameryki Północnej mieszka obecnie dwanaście milionów Polaków i ludności polskiego pochodzenia. Jest to olbrzymi rynek z nieograniczonymi wręcz możliwościami. Przy agresywnie przeprowadzonej kampanii marketingowo-akwizycyjnej TV Polonia Broadcasting Systems przewiduje uzyskanie w ciągu pierwszych 12-18 miesięcy od podpisania umowy z TVP S.A. bazy abonanckiej rzędu stu tysięcy, która w ciągu następnych czterech lat powinna wzrosnąć do ostatecznej liczby około dwóch milionów.

Według badań opinii publicznej w Ameryce, przeciętna oglądalność etnicznych programów o dobrej jakości wynosi około 80 procent. Jak z tego wynika, założenie uzyskania dwóch milionów abonentów spośród ponad dwunastu milionów Polaków i ludności polskiego pochodzenia mieszkających w Ameryce wynika z realistycznej oceny sytuacji.

Dostarczając abonentom wysokiej klasy program, którego oczekują oraz stwarzając im możliwość jego odbioru, można z dużą dozą prawdopodobieństwa przypuszczać, że TV Polonia Broadcasting Systems osiągnie w terminie zamierzone cele, gwarantując tym samym szybkie uzyskanie stałego poziomu wysokich dochodów.

16

TP 7004564

Appendix 4

# Analiza rynku

W latach osiemdziesiątych cechą charakterystyczną działalności gospodarczej korporacji amerykańskich było koncentrowanie się na zadaniach krótkoterminowych. Ostatni kryzys gospodarczy jasno udowodnił, że brak perspektywicznego planowania oraz przewidywania trendów długofalowych okazał się dla wielu firm amerykańskich bardzo kosztownym błędem. W latach dziewięćdziesiątych nikogo nie stać na tego typu pomyłki. Szczególnie w planowaniu działalności związanej ze środkami masowego przekazu, badania rynku odgrywają niezmiernie istotną rolę.

W celu przygotowania działalności TV Polonia Broadcasting Systems, w pierwszej połowie 1994 roku przeprowadzono wieloaspektowe badania społeczności polskojęzycznej na terenie Kanady. W badaniach nie uwzględniono przedstawicieli populacji polskiej osiadłych w Kanadzie przed rokiem 1964-ym. Nie należałoby ich jednak pomijać jako potencjalnych odbiorców programu TV Polonia, gdyż stanowią oni około 47 procent spośród ponad pięciusettysięcznej Polonii kanadyjskiej.

Dzięki przeprowadzonym badaniom stwierdzono istnienie olbrzymiego zainteresowania programem telewizyjnym z Polski. Z badań wynika, że największym zainteresowaniem cieszyć się

17

TP 7004565

Appendix 4

będą aktualne wiadomości z Polski (98%), ponadto bardzo
popularne będą programy o polskiej sztuce i kulturze (95%),
jak również programy dla dzieci (91%).

Osiemdziesiąt osiem procent badanych wyraziło
zainteresowanie możliwością oglądania polskich filmów na
ekranach swych telewizorów. Wypożyczalnie kaset video pełne
są kopii polskich filmów, ale są one z reguły w nienajlepszym
stanie technicznym. Poza tym, korzystanie z tego typu usług
wymaga każdorazowo wizyty w wypożyczalni, co nie wytrzyma
konkurencji z dogodnością oglądania polskich filmów w ramach
programu telewizyjnego z Polski.

Okazało się, że pomimo dużej ilości informacji na temat
Polski dostępnych w polonijnych stacjach radiowych i prasie,
Polacy oczekują wiadomości telewizyjnych bezpośrednio z
Polski. Wynika to niewątpliwie z ogromnej popularności
telewizji w dzisiejszym świecie. Potwierdzeniem tego stanu
rzeczy jest fakt, że badani oglądają telewizję przeciętnie
3.7 godzin dziennie, podczas gdy radia słuchają około 1.5
godziny, a na czytanie prasy przeznaczają jedynie nieco ponad
12 minut dziennie. Dla 68 procent respondentów telewizja
jest głównym źródłem informacji o świecie.

Ponadto badani uważają, że program telewizyjny z Polski
umożliwi im zachowanie ściślejszych więzów z krajem ojczystym
i jego kulturą. Ma to, według nich, szczególne znaczenie w
odniesieniu do ich dzieci.

18

TP 7004566

A-2816

Appendix 4

Demograficzna sytuacja w Stanach Zjednoczonych przedstawia się bardzo podobnie jak w Kanadzie. Zasadniczą różnicą jest natomiast liczebność ludności polskiego pochodzenia oceniana w USA na około 12 milionów, podczas gdy, jak już wspomniano, w Kanadzie wynosi ona 530 tysięcy.

Przeprowadzone badania jasno wykazują istnienie ogromnego zapotrzebowania na program TV Polonia w Ameryce.

19

TP 7004567

Appendix 4

# Strategia marketingowa

Cała strategia marketingowa musi być przygotowana w
kontekście odpowiedzi na następujące pytania:
- jakie są specyficzne oczekiwania i potrzeby rynku ?
- jaka jest charakterystyka oferowanego produktu ?
- czy korzyści wynikające z jego posiadania zaspakajają
  oczekiwania i potrzeby konsumenta ?

Strategia marketingowa firmy TV Polonia Broadcasting
Systems przewiduje trzy podstawowe elementy, przy pomocy
których wywierany będzie wpływ na grupy konsumentów, do
których chce się dotrzeć. Są nimi:

1. Produkt

2. Cena

3. Promocja

PRODUKT

Jak w każdym innym przedsięwzięciu należy produkt
dostosować do rynku, na którym chce się go sprzedawać. W
kontekście programu TV Polonia należy zwrócić uwagę na
specyfikę Polonii amerykańskiej, wyrażoną w przeprowadzonych
badaniach. Wykazały one istnienie wspólnego dla całej
przebadanej grupy szczególnego zainteresowania następującymi
segmentami programowymi.

20

TP 7004588

A-2818

Appendix 4

Stanowią je:

a. wiadomości z Polski, na które oczekuje 98 procent
   ankietowanych,

b. programy o kulturze i sztuce, budzące zainteresowanie
   wśród 95 procent przebadanych,

c. programy dla dzieci oczekiwane przez 91 procent
   respondentów,

d. polskie filmy z 88-mio procentowym poziomem
   zainteresowania.

Wymienione powyżej segmenty programu TV Polonia pozwolą
na opracowanie i rozpowszechnianie materiałów promocyjnych
zaadresowanych do jak najszerszego kręgu przyszłych
odbiorców.


CENA

Jednym z kluczowych elementów marketingu jest ustalenie
ściwej ceny za dany produkt, w tym przypadku stawki
miesięcznego kosztu abonamentu za odbiór programu TV Polonia.
st to szczególnie ważne w sytuacji bardzo szerokiej oferty
ogramowej rynku telewizyjnego i ostrej konkurencji cenowej.

W Ameryce istnieje obecnie cały szereg lokalnych
ogramów polonijnych udostępnianych odbiorcom na powszechnie
tępnych kanałach telewizyjnych w ramach opłaty
stawowej. Cena usługi oferowanej przez TV Polonia

21

TP 7004569

Appendix 4

Broadcasting Systems może być nieco wyższa, ponieważ nikt inny nie będzie miał podobnie atrakcyjnej ofety programowej. Szczególnie codzienny, aktualny serwis informacyjny z Polski stawia opisywane przedsięwzięcie w uprzywilejowanej pozycji. Ważnymi elementami strategii ustalania właściwej ceny będą również formy i terminy płatności, dostępne formy kredytowania oraz możliwości uzyskiwania zniżek.

Dzięki współpracy z Network Teleports, Inc., opłaty abonamentowe będą pobierane przez firmy dostarczające sygnał programu TV Polonia bezpośrednio do odbiorcy indywidualnego.

Obecnie ceny programów oferowanych widzom poza powszechnie dostępnym serwisem kablowym kształtują się na poziomie 10-12 dolarów amerykańskich miesięcznie. Założona stawka abonamentowa w wysokości 5 dolarów amerykańskich miesięcznie za sygnał programu TV Polonia wydaje się być konkurencyjnie uzasadniona i potwierdzona analizą rynku.

PROMOCJA

Akcja promocyjna obejmie wszystkie dostępne środki masowego przekazu: telewizję, radio i prasę. Planuje się między innymi również takie działania promocyjne jak:

a. wysyłanie ofert na adresy potencjalnych abonentów,

b. konkursy z nagrodami,

22

TP 7004570

Appendix 4

    c. stały udział lokalnych organizacji polonijnych w
       propagowaniu planowanego przedsięwzięcia.

Zakłada się:

    a. opracowania, druk i dystrybucję dwóch milionów broszur
       informacyjnych,

    b. druk i dystrybucję dwóch milionów formularzy
       zgłoszeniowych,

    c. opracowanie i wykonanie odpowiednich materiałów
       reklamowych dla potrzeb promocji telewizyjnej, radiowej i
       prasowej.

    Wymienione powyżej przykłady działań promocyjnych, jak
również agresywnie i w niekonwencjonalny sposób prowadzona
akcja sprzedaży bezpośredniej, zwiększą ogólne
zainteresowanie odbiorem programu TV Polonia.
Zainteresowanie to stanie się z czasem samonapędzającym się
elementem promocji.

    Przewidywany udział szeregu organizacji skupiających
rozległe środowiska polonijne w Ameryce nada niewątpliwie
odpowiednio wysoką rangę tworzonemu przez TV Polonia
Broadcating Systems zjawisku.

23

TP 7004571