**A-2821**

Appendix 4

# Czasowy plan działania

**LIPIEC / SIERPIEŃ 1994**

Przedstawienie TVP S.A. niniejszego Business Planu oraz

zaprezentowanie technicznych możliwości realizacji projektu.

**WRZESIEŃ / PAŹDZIERNIK 1994**

Ostateczna decyzja Zarządu TVP S.A. Po zaakceptowaniu

propozycji S.E.Y., podpisania umowy.

Założenie firmy TV Polonia Broadcasting Systems.

Otworzenie biur firmy w Stanach Zjednoczonych (Nowy Jork,

Chicago, Los Angeles) i w Kanadzie (Toronto).

Rozpoczęcie akcji promocyjno-marketingowej.

**PIERWSZA POŁOWA 1995**

Uzyskanie minimalnej bazy 30.000 (trzydziestu tysięcy)

przyszłych abonentów.

Rozpoczęcie retransmisji programu TV Polonia.

**GRUDZIEŃ 1995**

Osiągnięcie planowanej liczby 100.000 (stu tysięcy)

abonentów.

**GRUDZIEŃ 1996**

Osiągnięcie planowanej liczby 200.000 (dwustu tysięcy)

abonentów.

24

Appendix 4

GRUDZIEŃ 1997

Osiągnięcie planowanej liczby 500.000 (pięciuset tysięcy)
abonentów.

GRUDZIEŃ 1998

Osiągnięcie planowanej liczby 1.000.000 (jednego miliona)
abonentów.

GRUDZIEŃ 1999

Osiągnięcie planowanej liczby 2.000.000 (dwóch milionów)
abonentów.

TP 7004573

Appendix 4

# Podsumowanie

Jak już powiedziano na wstępie, Spanski Enterprises Inc. stawia sobie za cel dostarczenie programu TV Polonia jak najszerszym rzeszom Polaków i ludności polskiego pochodzenia żyjących w Ameryce Północnej.

Na terenie Ameryki Północnej mieszka obecnie dwanaście milionów Polaków i ludności polskiego pochodzenia. Jest to olbrzymi rynek z nieograniczonymi wręcz możliwościami.

Przeprowadzone badania wykazały istnienie ogromnego zapotrzebowania na program TV Polonia w Ameryce.

Dostarczając abonentom wysokiej klasy program, którego oczekują oraz stwarzając im możliwość jego odbioru, można z dużą dozą prawdopodobieństwa przypuszczać, że TV Polonia Broadcasting Systems osiągnie w terminie zamierzone cele, gwarantując tym samym szybkie uzyskanie stałego poziomu wysokich dochodów.

26

TP 7004574

Appendix 4

# Projekcje finansowe

27

TP 7004575

Appendix 4

## TV POLONIA BROADCASTING SYSTEMS INC.

Projected Statement of Operations, unaudited

| In 1000's | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|
| Number of subscribers | 70 | 200 | 500 | 1000 | 2000 |
| **REVENUES** | | | | | |
| Subscription fees | $2,100 | $12,000 | $30,000 | $60,000 | $120,000 |
| Advertisements | 350 | 2,000 | 5,000 | 10,000 | 20,000 |
| TOTAL Revenues | 2,450 | 14,000 | 35,000 | 70,000 | 140,000 |
| **EXPENSES** | | | | | |
| Advertising | 1,000 | 2,000 | 3,000 | 5,000 | 6,000 |
| Travel & Promotion | 200 | 400 | 600 | 1,000 | 1,200 |
| Salaries | 300 | 600 | 1,200 | 2,000 | 4,000 |
| Employee benefits | 60 | 120 | 240 | 400 | 800 |
| Management wages | 200 | 400 | 600 | 1,000 | 1,200 |
| Sales commissions | 61 | 350 | 875 | 1,750 | 3,500 |
| Rent | 200 | 600 | 1,200 | 2,000 | 4,000 |
| Administrative expenses | 50 | 50 | 80 | 100 | 120 |
| Repairs & Maintenance | 60 | 100 | 120 | 150 | 200 |
| Telephone | 50 | 80 | 120 | 180 | 250 |
| Teleport services | 1,000 | 4,000 | 5,000 | 7,000 | 9,000 |
| Professional services | 250 | 300 | 500 | 500 | 500 |
| Royalties for TVP S.A. | 196 | 1,120 | 2,800 | 5,600 | 11,200 |
| Copyright royalties | 74 | 420 | 1,050 | 2,100 | 4,200 |
| Bank charges | 10 | 20 | 30 | 40 | 50 |
| Depreciation | 40 | 180 | 400 | 740 | 1,200 |
| Bad debt expense | 123 | 700 | 1,750 | 3,500 | 7,000 |
| TOTAL Expenses | 3,873 | 11,440 | 19,565 | 33,060 | 54,420 |
| **INCOME from Operations** | (1,423) | 2,580 | 15,435 | 36,940 | 85,580 |
| Income Tax | 0 | 870 | 5,248 | 12,560 | 29,097 |
| **NET INCOME (LOSS)** | (1,423) | 1,690 | 10,187 | 24,380 | 56,483 |

28

TP 7004576

A-2826

Appendix 4

TV POLONIA BROADCASTING SYSTEMS INC.

Projected Statement of Cash Flow, unaudited

| in 1000's | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|
| Collection from customers | $2,094 | $11,967 | $29,917 | $59,833 | $119,857 |
| Payment for operating expenses | (9,247) | (9,240) | (15,236) | (25,216) | (40,443) |
| Payment for Income tax | 0 | 0 | (670) | (5,248) | (12,560) |
| Acquisition of fixed assets | | | | | |
| - equipment | (100) | (500) | (1,000) | (1,500) | (2,000) |
| - automobiles | (100) | (200) | (100) | (200) | (300) |
| Net Cash Inflow (Outflow) | (1,353) | 2,027 | 12,706 | 27,668 | 64,355 |
| Opening Cash | 3,000 | 1,647 | 3,674 | 16,382 | 44,050 |
| Ending Cash | 1,647 | 3,674 | 16,382 | 44,050 | 108,415 |

- 25 -

TP 7004577

A-2827

Appendix 4

## TV POLONIA BROADCASTING SYSTEMS INC.

Projected Balance Sheet, unaudited

| In 1000's | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|
| Cash & cash equivalents | $1,647 | $3,574 | $16,362 | $44,050 | $106,415 |
| Accounts receivable | 233 | 1,333 | 3,333 | 6,667 | 13,333 |
| Other current assets | 504 | 1,263 | 2,011 | 2,107 | 2,234 |
| CURRENT Assets | 2,385 | 6,270 | 21,726 | 52,824 | 123,982 |
| | | | | | |
| Fixed Assets | 200 | 900 | 2,000 | 3,700 | 6,000 |
| less: Accumulated Depreciation | 40 | 180 | 400 | 740 | 1,200 |
| FIXED Assets, net | 160 | 720 | 1,600 | 2,960 | 4,800 |
| | | | | | |
| TOTAL ASSETS | 2,545 | 6,990 | 23,326 | 55,784 | 128,782 |
| | | | | | |
| Accounts payable | 968 | 1,430 | 4,891 | 8,265 | 13,605 |
| Tax payable | 0 | 870 | 5,248 | 12,560 | 29,097 |
| Accrued Liabilities | | | | 7,579 | 26,597 |
| TOTAL LIABILITIES | 968 | 2,300 | 10,139 | 28,404 | 69,299 |
| | | | | | |
| Common Stock | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Retained Earnings | (1,423) | 1,690 | 10,187 | 24,380 | 56,483 |
| SHAREHOLDER's EQUITY | 1,577 | 4,690 | 13,187 | 27,380 | 59,483 |
| | | | | | |
| TOTAL LIABILITIES & EQUITY | 2,545 | 6,990 | 23,326 | 55,784 | 128,782 |

TP 7004578

A-2828

Appendix 4

Załączniki

31

TP 7004579

A-2829

Appendix 4



# POPULATION BY AGE
## POLISH GROUP VS. ONTARIO
1991 CENSUS

Series 1 — POLISH GROUP
Series 2 — ONTARIO ~ TOTAL

TP 7004508

Appendix 4

72% 26%

2%

S



SOURCE OF NEWS

EDUCATIONAL VALUES

88% 5%

27%

9% 38%

53%

TP 7004681

Appendix 4



TV STATIONS/NETWORKS
POLISH GROUP PREFERENCES

Series 1

TP 7004582

Appendix 4



# HOW MANY HOURS PER DAY
## DO YOU SPEND ON

TP 7004583

A-2833

Appendix 4



# POLISH-LANGUAGE TV
## SUBJECT PREFERENCES

SCALE FROM 0 TO 10

TP 7004594

Appendix 4

# WOULD YOU LIKE
## POLISH MOVIES ON TV?



YES
88%

I DON'T KNOW
10 %

NO
2%

TP 7004595

Appendix 4

# Dane techniczne

38

TP 7004586

Appendix 4

39

Submitted to: Mr. Bob Spanski, Spanski Enterprises
Submitted by: Network Teleports

# TV POLONIA TRANS-ATLANTIC PROPOSAL

## Current Polish TV Satellite Distribution

Polish TV programming is currently distributed 18 hours daily
throughout Europe via Eutelsat II C3 transponder 21S located at
16.9 degrees east longitude. The transmission consists of one
analog PAL video carrier in the clear.

## Objective: North American Distribution

To provide Spanski Enterprises with a cost-effective full-time
trans-Atlantic satellite feed of Polish TV, and to distribute TV
Polonia programming throughout North America.

TP 7004587

Appendix 4

40

Submitted to: Mr. Hub Spanski, Spanski Enterprises
Submitted by: Network Teleports

# TV POLONIA SERVICE

++ Network Teleports proposes to "turnaround" Polish TV's
   Eutelsat programming and transmit live to their Teleport, 24
   hours per day, seven days per week.

++ Network Teleports proposes to lease 9 Mhz of Ku-Band satellite
   capacity on the PanAmSat PAS-1 satellite for compressed
   digital video (CDV) delivery of Polish TV programming from
   Poland to the Teleport in New Orleans, Louisiana.

++ The PAS-1 satellite, currently operational at 45 degrees west
   longitude, covers the North American continent with Ku-Band
   coverage via the Conus Beam.

++ Network Teleports considers Compressed Digital Video to be the
   most economical means of reaching major markets. 30 CDV
   channels are presently broadcast on the PAS-1 satellite,
   including such broadcasters as the BBC, CBS International,
   ESPN, Fox, HTV, TV5 and NBC.

++ The attached engineering link budget is based on the use of
   General Instruments Single Channel Per Carrier (SCPC)
   technology.

++ Network Teleports proposes to convert the signal to NTSC video
   standards for North American transmission, and re-broadcast
   (initially at full bandwidth analog video), using a C-Band
   domestic satellite whose footprint covers 35 nations.

++ Some of the programs on TV Polonia will be carried "live"
   directly from Eutelsat, others will be tape delayed, with the
   goal of producing a "seamless" video network complete with
   logos, graphics, commercials and eventually local programming
   inserts.

++ TV Polonia will be an encrypted subscriber service designed
   for Direct-to-Home reception as well as cable and wireless
   carriage.

Appendix 4

41

Submitted to: Mr. Bob Spanski, Spanski Enterprises
Submitted by: Network Teleports

---

## NETWORK TELEPORTS PRICING

Network Teleports proposes to Spanski Enterprises the
following rate for 9 Mhz of Ku-band Conus Beam satellite
capacity on PanAmSat's PAS-1 satellite, Eutelsat turnaround,
conversion to NTSC, downlink in New Orleans, transmission on
C-Band North American satellite and encryption.

US$ 245,000 Per month

Space segment, both transatlantic and domestic, is offered at
either a 5 year term or an End-Of-Life (EOL) service term,
estimated to be 6.5 years. Payments are monthly, payable in
advance, plus one month's deposit in advance of commencement
of service.

## SATELLITE AVAILABILITY

All satellite space segment is subject to availability,
engineering approval and execution of a definitive contract.
The information contained herein is proprietary and
confidential.

July 30, 1994

TP 7004589

Appendix 4

42



## NETWORK TELEPORTS, INC.

### COUNTRIES REACHED ON GALAXY VII

Canada
United States Incl. Alaska & Hawaii)
Mexico
Guatemala
Belize
El Salvador
Honduras
Nicaragua
Costa Rica
Panama
Colombia
Venezuela
Guyana
Surinam
French Guiana
Cuba
Haiti
Dominican Republic
Puerto Rico
St. Kitts and Nevis
Antigua and Barbuda
Dominica
St. Lucia
Grenada
Trinidad and Tobago
Aruba (Neth. Ant.)
Curacao (Neth Ant.)
St. Vincent & Grens.
Barbados
Jamaica
Bahamas
British Virgin Islands
Bermuda
Grand Turk Island
Martinique
Guadeloupe
Anguilla
Monserrat

3200 Chartres Street • New Orleans, LA 70117 • (504) 942-9200 • (504) 942-9204 Fax

47.

TP 7004590

Appendix 4.

43

SATELLITE DETAILS

## GALAXY VII

### Degrees East: -269.0    Degrees West: -91

OWNER/OPERATOR: HUGHES COMMUNICATIONS, INC.

PRESENT STATUS: ............................................................................... UNDER CONSTRUCT
TYPE OF SERVICE : ................................................................................................
TYPICAL USES: .................................................................... VIDEO, AUDIO, SCPC & V
GEOGRAPHIC COVERAGE: ............................................ CONUS, ALASKA, HAWAII, PUERTO F
LAUNCH DATE: ...................................................................................................... LATE
LAUNCH VEHICLE: ......................................................................................... ARIAN
MASS IN ORBIT: ..................................................................................... 637 kg (E
TYPE OF SATELLITE: ........................................................................................... HS-
PRIME CONTRACTORS: ............................................................ HUGHES AIRCRAFT
DESIGN LIFETIME: ..................................................................................... 12 YE,
POLARIZATION: .................................................................................................. LINI
STABILIZATION : ............................................................................................... BC
DIMENSIONS: ......................................................... 6.57 M LONG; 2.16 M DIAGO
BANDWIDTH: ........................................... 36 MHz / 16@27MHz, 8@54
NO. OF - C BAND: .................................................................................................
NO. OF - K BAND: .................................................................................................
FREQUENCY BAND: .......................................................................................... C
TWTA POWER: .................................................... C-BAND16 WATT,  K-BAND 50 W,

## GALS (2 AT 44° E)

### Degrees East: -044.0    Degrees West: -316

OWNER/OPERATOR: INTERSPUTNIK
2 SMOLENSKY, 1/4
MOSCOW,  121099
RUSSIA

CONTACT PERSON: S. P. KURILOV

TEL: 224-03-33
TELEX: 411 288 DISK-SU

PRESENT STATUS: ............................................................................... UNDER CONSTRUCTI
TYPE OF SERVICE : ................................................................................................ F
TYPICAL USES: ................................................................................. TELECOMMUNICATIO
LAUNCH DATE: ................................................................................................. JUNE 1
LAUNCH VEHICLE: ......................................................................................... PROT
MASS IN ORBIT: ................................................................................................. 2500
PRIME CONTRACTORS: ................................... NPO - SCIENTIFIC PRODUCTION ASSOCIATI
DESIGN LIFETIME: ................................................................................... 5 TO 7 YEA
NO. OF - K BAND: .................................................................................................
FREQUENCY BAND: ..............................................................................................

9 - 94

TP 7004591

Appendix 4

44



**GALAXY VII**
Degrees East: -269.0    Degrees West: -91

C Band Vertical Transmit

C Band Horizontal Transmit

TP 7004592

Appendix 4

45

## PALAPA B4

OWNER/OPERATOR: PERUMTEL

| | |
|---|---|
| PRESENT STATUS: | AWAITING LAUNCH |
| TYPE OF SERVICE : | FSS |
| TYPICAL USES: | COMMUNICATIONS |
| GEOGRAPHIC COVERAGE: | ASIAN AREAS |
| LAUNCH DATE: | 1992 |
| LAUNCH VEHICLE: | DELTA |
| LAUNCH WEIGHT: | 647 KG |
| MASS IN ORBIT: | 520 KG |
| TYPE OF SATELLITE: | HS 376 |
| PRIME CONTRACTORS: | HUGHES AIRCRAFT COMPANY |
| DESIGN LIFETIME: | 10 YEARS |
| POLARIZATION: | DUAL POLARIZATION |
| STABILIZATION : | SPINNER |
| DIMENSIONS: | 85" DIAMETER/269" HEIGHT |
| BANDWIDTH: | 36 MHz |
| NO. OF - C BAND: | 24 |
| FREQUENCY BAND: | 0 |
| ERP - MAIN BEAM: | 32 dBW ASIAN COVERAGE |
| ERP SPOT BEAMS: | 34 dBW INDONESIAN COVERAGE |
| TWTA POWER: | 9.6 WATT |
| ELECTRIC POWER: | 917.2 WATT (EOL) / 29, 6 BOLT |
| TELEMETRY BEACONS: | 4200 |
| COMMAND BEACON: | C BAND |

## PANAMSAT (PAS-1)

### Degrees East: -315.0   Degrees West: -45

OWNER/OPERATOR: ALPHA LYRACOM/PAN AMERICAN SATELLITE
THE PICKWICK PLAZA
GREENWICH, CT 06830
USA

CONTACT PERSON: ELIZABETH DICKENS

TEL: (203) 622-6654
FAX: (203) 622-9163

| | |
|---|---|
| PRESENT STATUS: | OPERATIONAL |
| TYPE OF SERVICE : | FSS |
| TYPICAL USES: | TV BROADCAST & DATA |
| GEOGRAPHIC COVERAGE: | N. AMERICA, S. AMERICA, WESTERN EUROPE & CARIBBEAN |
| LAUNCH DATE: | JUNE 15, 1988 |
| LAUNCH VEHICLE: | ARIANE 401 |
| LAUNCH WEIGHT: | 2950 lbs |
| MASS IN ORBIT: | 1560 lbs |
| TYPE OF SATELLITE: | GE ASTRO SERIES 3000 |
| PRIME CONTRACTORS: | GE ASTRO SPACE |
| DESIGN LIFETIME: | 13.3 YEARS |
| POLARIZATION: | LINEAR |
| STABILIZATION : | 3-AXIS |
| BANDWIDTH: | 36 AND 72 MHz |
| NO. OF - C BAND: | 12 @ 36MHz/ 6 @ 72MHz |

TP 7004593

Appendix 4

# PanAmSat
## Link Budget Results

Customer: Network Teleport

The following are the data link budget results you requested for the 6.73Mbps, QPSK, R3/4 carrier on PAS-1/3.

| Satellite | Uplink Site | Uplink Antenna Size | Downlink Site / Receive EIRP | Approx. Antenna Size - Minimum G/T | % of Trans - Bandwidth | % of Trans Power | Difference Factor |
|-----------|-------------|---------------------|------------------------------|-----------------------------------|------------------------|------------------|-------------------|
| PAS-1 | Warsaw/Pads | 2.4m | New Orleans / 42.3dBW | 5.0m - 30.0dB/K | -v= 11.11 | 12.718 | 1.14 |
| | | | | 5.0m - 31.0dB/K* | - 11.111 | 10.786 | 0.97 |
| PAS-3 | | | New Orleans / 45.5dBW | 3.7m - 28.6dB/K | 14.815 | 5.754 | 0.39 |

Notes:
1) Carrier specifications: 6.73Mbps, QPSK, R3/4 - C/N of 7.0 dB degraded          * 45 degree LNBH
2) Transponder Operating Conditions:
    -This is a 72MHz Transponder on the Conus Beam of PAS-1, ISO = 5.0 dB, OBO = 4.4 dB, attenuator setting is 6 dB
    -This is a 34MHz Transponder on the Conus Beam of PAS-3, ISO = 9.3 dB, OBO = 3.5 dB, attenuator setting is 3.1 dB
3) A minimum of 1.5/1.5 dB rain, a 1.0 dB system and a .5 dB downlink pointing error margin are included in all calculations
4) Receive earth station G/T is controlling factor

9/2154
NET/WFBUC.XLS
Engineering and Operations Department
Marketing Support

TP 7004594

Appendix 4

47

PAS-1 6.73MBPS QPSK R3/4 TO NEW ORLEANS 5.0M

--- TRANSMIT EARTH STATION DATA -----
Location          : WARSAW, POLAND
Latitude   (deg N): 52.22.
Longitude (dog N): -21.00
Diameter       (m): 2.4
Tx Gain       (dB): 49.0
Manufacturer/Model: STANDARD/

---- RECEIVE EARTH STATION DATA ------
Location          : NEW ORLEANS, LA
Latitude  (deg N): 30.00
Longitude (deg W): 90.08
Diameter       (m): 5.0
Rx Gain       (dB): 53.5
Feed Loss     (dB): 0.25
Ant. Temp.(deg K): 45
LNA. Temp.(deg K): 110
Nominal G/T (dB/K): *
Manufacturer/Model: STANDARD/

SATELLITE NAME       : PAS-1 ,
SATELLITE LONGITUDE.: 45
TRANSPONDER BW (MHZ): 72.0
TRANSPONDER TYPE     : TWTA
CARRIERS/TRANSPONDER: *

----------- Uplink -----------
Beam: CONUS+EUR,_V
Chan: 23
Uplink Frequency    (GHz): 14.360
G/T, Beam Center  (dB/K): -.9
G/T Toward Tx ES  (dB/K): -3.0
SFD Toward Tx ES (dBW/m2): -80.1

----------- Downlink -----------
Beam: CONUS,_H
Chan: 23
Downlink Frequency (GHz): 11.820
EIRP, Beam Center  (dBW): 44.3
EIRP Toward Rx ES  (dBW): 42.3

---- DIGITAL CARRIER PARAMETERS ----
Information Rate   (KBps): 6730
Modulation Type         : QPSK
Code Rate               : R3/4
Overhead\Other Info.    : GI-SCPC
Occupied Bandwidth (kHz): 6000
Allocated Bandwidth (kHz): 8000
C/N      (clear sky, dB): 7.0
C/N (rain conditions, dB): 7.0

------- OPERATING CONDITIONS -------
Trans. Attenuator Setting (dB): 5
Input Backoff             (dB): 8
Output Backoff            (dB): *
(C/Im) - Nominal          (dB): *
Required System Margin    (dB): 1.0
Uplink   Co-Chan (C/I)    (dB): 60.0
Downlink Co-Chan (C/I)    (dB): 60.0
Downlink Pointing Error   (dB): 0.5
Min. Uplink Rain Margin   (dB): 2.5
Min. Downlink Rain Margin (dB): 3.5

------- ADJACENT SATELLITE INTERFERENCE ASSUMPTIONS -------
Satellite Name                        : PAS3        ISVIIA
Satellite Longitude                   : 43.0        40.5
Uplink Power Density or C/I (dBW/Hz): -46          -43
Uplink Polarization Advantage  (dB): 0            0
Downlink EIRP Density or C/I  (dBW/Hz): -23.5      -32.4
Downlink Polarization Advantage  (dB): 90.0       0
------- CALCULATED TRANSMIT EARTH STATION PARAMETERS -------
Satellite Azimuth (deg)  : 250.6   Satellite Elevation (deg):  5.8
Gain at Specified Uplink Freq.        (dB):  49.1
Path Loss at Specified Uplink Freq.   (dB): 207.9
------- CALCULATED RECEIVE EARTH STATION PARAMETERS -------
Satellite Azimuth (deg)  :_ 116.5   Satellite Elevation (deg): 30.2
Gain at Specified Downlink Freq.      (dB):  53.4
Path Loss at Specified Downlink Freq. (dB): 205.6
G/T at Specified Downlink Freq.       (dB/K): 30.9

PASS (Version 2.1). 07-12-1994   10:01:45 ### Pinhead Engineering  ## ##

Appendix 4

48

### PAS-1 6.73MBPS QPSK R3/4 TO NEW ORLEANS 5.0M

Satellite : PAS-1
Uplink Beam: CONUS+EUR._V
Dlink Beam: CONUS._H

Tx Es: 2.4m , WARSAW, POLAND
Rx En: 5.0m , NEW_ORLEANS, LA

| LINK PERFORMANCE (6730 KBPS QPSK R3/4) | | CLEAR SKY | UP FADE | DN FADE |
|---|---|---|---|---|
| UPLINK | | | | |
| EARTH STATION EIRP | (DBW) | 66.2 | 66.2 | 66.2 |
| P'H LOSS (CLEAR SKY) | (DB) | 207.9 | 207.9 | 207.9 |
| ULINK RAIN ATTENUATION | (DB) | 0.0 | 2.5 | 0.0 |
| SATURATION FLUX DENSITY | (DBW/M2) | -80.1 | -80.1 | -80.1 |
| INPUT BACKOFF (TOTAL) | (DB) | 8.0 | 8.2 | 8.0 |
| INPUT BACKOFF (PER CARRIER) | (DB) | 17.0 | 19.5 | 17.0 |
| SATELLITE G/T | (DB/K) | -3.0 | -3.0 | -3.0 |
| C/N - THERMAL NOISE | (DB) | 16.1 | 13.6 | 16.1 |
| C/I - CO-CHANNEL INTERFERENCE | (DB) | 60.6 | 58.1 | 60.6 |
| C/I - ADJ SAT INTF (PAS) | (DB) | 24.2 | 21.7 | 24.2 |
| C/I - ADJ SAT INTF (ISV11A | ) (DB) | 30.4 | 27.9 | 30.4 |
| C/(N+I) UPLINK | (DB) | 15.4 | 12.9 | 15.4 |
| C/I - INTERMODULATION | (DB) | 16.0 | 13.9 | 16.0 |
| DOWNLINK | (DB) | | | |
| SATELLITE EIRP (TOTAL) | (DBW) | 42.3 | 42.3 | 42.3 |
| OUT BACKOFF (TOTAL) | (DB) | 4.6 | 4.8 | 4.6 |
| OUTPUT BACKOFF (PER CARRIER) | (DB) | 13.6 | 16.0 | 13.6 |
| SATELLITE EIRP (PER CARRIER) | (DBW) | 28.7 | 26.3 | 28.7 |
| PATH LOSS (CLEAR SKY) | (DB) | 205.6 | 205.6 | 205.6 |
| DOWNLINK RAIN DEGRADATION | (DB) | 0.0 | 0.0 | 4.4 |
| EARTH STATION POINTING ERROR | (DB) | 0.5 | 0.5 | 0.5 |
| EARTH STATION G/T (CLEAR-SKY) | (DB/K) | 30.9 | 30.9 | 30.9 |
| C/N-THERMAL NOISE | (DB) | 14.3 | 11.9 | 9.8 |
| C/I - CO-CHANNEL INTERFERENCE | (DB) | 60.6 | 58.2 | 60.6 |
| C/I - ADJ SAT INTF (ISV11A | ) (DB) | 34.3 | 31.9 | 34.3 |
| C/(N+I) DOWNLINK | (DB) | 14.2 | 11.8 | 9.8 |
| C/(N+I) TOTAL | (DB) | 10.4 | 8.0 | 8.0 |
| REQUIRED SYSTEM MARGIN | (DB) | 1.0 | 1.0 | 1.0 |
| T. C/(N+I) | (DB) | 9.4 | 7.0 | 7.0 |

ALLOCATED BW. (KHZ/CARRIER)= 8000.00: OCCUPIED BW (KHZ/CARRIER)= 6000.00
RF POWER (WATTS/CARRIER)= 51.24: Uplink Power Density (dBW/Hz)= -49.93
NUMBER OF CARRIERS PER TRANS.= 7.86: Dnlink EIRP Density (dBW/Hz)= -38.27
LINK BW. (PER CARRIER)= 11.111: Maximum EIRP Density (dBW/Hz)= -36.27
TRANS.POWER (PER CARRIER)= 12.718: Dnlink Flux Den.(dBW/M2/4KHZ)=-164.95

TP 7004596

Appendix 4

49

## PAS-1 6.73MBPS QPSK R3/4 TO NEW ORLEANS 5.0M (BETTER LNB)

Satellite : PAS-1
Uplink Beam: CONUS+EUR._V     Tx Es: 3.4m , WARSAW, POLAND
Dnlink Beam: CONUS,_H     Rx Es: 5.0m , NEW_ORLEANS,_LA

| LINK PERFORMANCE (6730 KBPS QPSK R3/4) | | CLEAR SKY | UP FADE | DN FADE |
|---|---|---|---|---|
| **UPLINK** | | | | |
| EARTH STATION EIRP | (DBW) | 65.4 | 65.4 | 65.4 |
| PATH LOSS (CLEAR SKY) | (DB) | 207.9 | 207.9 | 207.9 |
| UPLINK RAIN ATTENUATION | (DB) | 0.0 | 2.5 | 0.0 |
| SATURATION FLUX DENSITY | (DBW/M2) | -80.1 | -80.1 | -80.1 |
| INPUT BACKOFF (TOTAL) | (DB) | 8.0 | 8.2 | 8.0 |
| INPUT BACKOFF (PER CARRIER) | (DB) | 17.7 | 20.2 | 17.7 |
| SATELLITE G/T | (DB/K) | -3.0 | -3.0 | -3.0 |
| C/N - THERMAL NOISE | (DB) | 15.4 | 12.9 | 15.4 |
| C/I - CO-CHANNEL INTERFERENCE | (DB) | 59.9 | 57.4 | 59.9 |
| C/I - ADJ SAT INTF (PAS3 ) | (DB) | 23.5 | 21.0 | 23.5 |
| C/I - ADJ SAT INTF (ISVIIA ) | (DB) | 29.6 | 27.1 | 29.6 |
| C/(N+I) UPLINK | (DB) | 14.6 | 12.1 | 14.6 |
| C/I - INTERMODULATION | (DB) | 15.3 | 13.1 | 15.3 |
| **DOWNLINK** | | | | |
| SATELLITE EIRP (TOTAL) | (DBW) | 42.3 | 42.3 | 42.3 |
| OUTPUT BACKOFF (TOTAL) | (DB) | 4.6 | 4.8 | 4.6 |
| OUTPUT BACKOFF (PER CARRIER) | (DB) | 14.3 | 16.7 | 14.3 |
| SATELLITE EIRP (PER CARRIER) | (DBW) | 28.0 | 25.6 | 28.0 |
| PATH LOSS (CLEAR SKY) | (DB) | 205.6 | 205.6 | 205.6 |
| DOWNLINK RAIN DEGRADATION | (DB) | 0.0 | 0.0 | 5.4 |
| EARTH STATION POINTING ERROR | (DB) | 0.5 | 0.5 | 0.5 |
| EARTH STATION G/T (CLEAR-SKY) | (DB/K) | 33.0 | 33.0 | 33.0 |
| C/N THERMAL NOISE | (DB) | 15.7 | 13.3 | 10.3 |
| C/I - CO-CHANNEL INTERFERENCE | (DB) | 59.9 | 57.4 | 59.9 |
| C/I - ADJ SAT INTF (ISVIIA ) | (DB) | 33.6 | 31.2 | 33.6 |
| C/(N+I) DOWNLINK | (DB) | 15.6 | 13.2 | 10.3 |
| C/(N+I) TOTAL | (DB) | 10.4 | 8.0 | 8.0 |
| REQUIRED SYSTEM MARGIN | (DB) | 1.0 | 1.0 | 1.0 |
| NET C/(N+I) | (DB) | 9.4 | 7.0 | 7.0 |

LOCATED BW   (KHZ/CARRIER)= 8000.00: OCCUPIED BW   (KHZ/CARRIER)= 6000.00
  RF POWER (WATTS/CARRIER)=   43.17: Uplink Power Density (dBW/Hz)= -50.65
  NBR OF CARRIERS PER TRANS.=   -9.00: Dnlink EIRP Density (dBW/Hz)= -18.99
  RANS BW   (PER CARRIER)= 11.111: Maximum EIRP Density (dBW/Hz)= -36.99
  RANS POWER (PER CARRIER)= 10.766: Dnlink Flux Den.(dBW/m2/4KHz)= -165.68
  1321 (Version 2.2) 02-12-1994 : 19:08:03 PANAMSAT Engineering

TP 7004597

Appendix 4

50

PAS-1 6.73MBPS QPSK R3/4 TO NEW ORLEANS 5.0M (BETTER LNB)

```
----- TRANSMIT EARTH STATION DATA -----        ----- RECEIVE EARTH STATION DATA -----
Location         : WARSAW, POLAND              Location         : NEW ORLEANS, LA
Latitude  (deg N): 52.22                       Latitude  (deg N): 30.00
Longitude (deg W): -21.00                      Longitude (deg W): 90.08
Diameter     (m): 2.4                          Diameter     (m): 5.0
Tx Gain     (dB): 49.0                         Rx Gain     (dB): 53.5
Manufacturer/Model: STANDARD/                  Feed Loss   (dB): 0.25
                                               Ant. Temp.(deg K): 45
                                               LNA Temp.(deg K): 45
                                               Nominal G/T (dB/K): *
                                               Manufacturer/Model: STANDARD/
```

```
                    SATELLITE NAME    : PAS-1
                    SATELLITE LONGITUDE : 45
                    TRANSPONDER BW (MHZ): 72.0
                    TRANSPONDER TYPE  : TWTA
                    CARRIERS/TRANSPONDER: *
```

```
---------- Uplink ----------                   ---------- Downlink ----------
Beam: CONUS+EUR, V                             Beam: CONUS, H
Chan: 23                                       Chan: 23
Uplink Frequency    (GHz): 14.360              Downlink Frequency (GHz): 11.820
G/T, Beam Center   (dB/K): -.9                 EIRP, Beam Center  (dBW): 44.3
G/T Toward Tx ES   (dB/K): -3.0                EIRP Toward Rx ES  (dBW): 42.3
SFD Toward Tx ES (dBW/m2): -80.1
```

```
----- DIGITAL CARRIER PARAMETERS -----         ------- OPERATING CONDITIONS -------
Information Rate  (kBps): 6730                  Trans. Attenuator Setting (dB): 6
Modulation Type   : QPSK                       Input Backoff          (dB): 8
Code Rate         : R3/4                        Output Backoff         (dB): *
Overhead\Other Info.  : GX-SCPC                (C/Im) - Nominal       (dB): *
Occupied Bandwidth  (kHz): 6000                Required System Margin (dB): 1.0
Allocated Bandwidth (kHz): 8000                Uplink  Co-Chan (C/I)  (dB): 60.0
   (clear sky, dB): 7.0                        Downlink Co-Chan (C/I) (dB): 60.0
C/N (rain conditions, dB): 7.0                 Downlink Pointing Error (dB): 0.5
                                               Min. Uplink Rain Margin (dB): 2.5
                                               Min. Dnlink Rain Margin (dB): 3.5
```

```
--------- ADJACENT SATELLITE INTERFERENCE ASSUMPTIONS ---------
Satellite Name :                       : PAS3          ISVIIA
Satellite Longitude                    : 43.0          40.5
Uplink Power Density or C/I (dBW/Hz): -46             -43
Uplink Polarization Advantage    (dB): 0               0
Dnlink EIRP Density or C/I  (dBW/Hz): -23.5           -32.4
Dnlink Polarization Advantage   (dB): 90.0            0.
--------- CALCULATED TRANSMIT EARTH STATION PARAMETERS ---------
Satellite Azimuth (deg) : 250.6  Satellite Elevation (deg):   5.8
Gain at Specified Uplink Freq.      (dB):  49.1
Path Loss at Specified Uplink Freq. (dB): 207.9
--------- CALCULATED RECEIVE EARTH STATION PARAMETERS ---------
Satellite Azimuth (deg)  : 116.5  Satellite Elevation (deg): 30.2
Gain at Specified Downlink Freq.     (dB):  57.4
Path Loss at Specified Downlink Freq. (dB): 205.6
G/T at Specified Downlink Freq.    (dB/K): 33.0
```

DSAT322 (Version 2.1), 07-12-1994  10:08:00 *** PanAmSat Engineering, CT **

Appendix 4

Hand-written: <u>CONFIDENTIAL</u>

# TV POLONIA BROADCASTING SYSTEMS INC.

## BUSINESS PLAN

SPANSKI ENTERPRISES INC
5100 Montclair Drive
Mississauga, Ontario L5M 5A6
Phone/Fax: (905) 569-9049

TP8000639

A-2849

Appendix 4

# TV POLONIA BROADCASTING SYSTEMS INC.

Business Plan

1. Contents .................................................................................................. 2

2. Main Aims ............................................................................................... 3

3. Spanski Enterprises Inc. ........................................................................ 5

4. TV Polonia Broadcasting Systems Inc. ................................................. 7

5. Network Teleports, Inc. ......................................................................... 10

6. Characteristic of Enterprise .................................................................. 11

7. Market Analysis ..................................................................................... 17

8. Marketing Strategy ................................................................................ 20

9. Work Schedule ....................................................................................... 24

10. Summary ................................................................................................ 26

11. Financial Projections ............................................................................ 27

12. Appendices ............................................................................................. 31

13. Technical Data ....................................................................................... 38

TP8000640

Appendix 4

# MAIN AIMS

The aim of Spanski Enterprises Inc. is providing TV Polonia channel to as many Poles and populations with Polish roots, who live in North America.

The interest of the company Spanski Enterprises Inc. (S.E.I.) in retransmission of TV Polonia channel in North America results from ascertainment of the following facts:

a The size of population with Polish roots, which inhabits America, is very big and amounts to ca. twelve million,

b. Our compatriots show special devotion to the homeland, which manifests among other things with the want of any information about Poland and from Poland.

Poles appeared on the American continent in masses at the end of the previous century and since that time their population still increases. Two waves of Polish emigration in the last half-century are worth emphasizing; the first – post-war and the other – in the eighties. Especially the second wave contributed to the significant increase of the number of Poles inhabiting the American continent.

For the majority of Poles and American citizens with Polish roots, keeping in touch with the homeland is a very important matter.

Among the currently available technologies, the best medium that provides Polish Association with the contact with Poland is undoubtedly a TV channel, which offers information and interesting materials regarding the homeland.

TP8000641

Appendix 4

Considering the results of research on the Polish-speaking society, conducted in Canada and the size of Polish population in America, as well as technical potential of retransmission of TV Polonia, the company Spanski Enterprises Inc. established the following aims:

1. Obtaining the exclusive right for retransmission of TV Polonia channel on the area of the American continent from Telewizja Polska S.A., and concluding a joint venture contract

2. Founding a new company by the name TV Polonia Broadcasting Systems by S.E.I. for the purpose of execution of the scheduled enterprise.

3. Concluding a contract with the company Network Teleports, Inc. from New Orleans, which takes deals with all technical aspects regarding the retransmission of the TV Polonia channel.

4. Creating an organizational infrastructure, which enables running marketing and acquisition activity on the American market.

5. Reaching the level of two million of TV Polonia subscribers within five years and the territorial range from Canada to the Central America.

TP8000642

Appendix 4

# Spanski Enterprises Inc.

Spanski Enterprises Inc. is a corporation registered in Canada and it has been running for ten years. During this period the company reached multi-million gains. S.E.I. specializes in execution of projects with large degree of risks and simultaneously providing large incomes. In all its enterprises, all of them successful, S.E.I. has always based itself on specialists of the highest class in their field.

Among the projects executed by S.E.I., there is for example elaboration and introduction to the Northern American market of an educational program for market analysis of securities by the name INVESTOR.

The successful enterprise of S.E.I. was establishment and development of a publishing company, which specializes in licensing publishing. This company became the largest in its trade in Canada.

The next aim of S.E.I. is to elaborate and implement the financial system CLUB S International in Poland.
This task required both reaching the market structures and training the consumer. Acceptance of the innovation, which was the CLUB S discount card, is proven by dynamic growth of the number of its holders, from 70 thousand at the end of the year 1992, to over 360 thousand presently. The consumers in the whole Poland remembered the mark CLUB S.

Acting on many fields, the company S.E.I. has gained the necessary experience to implement different kinds of projects with the help of the most unconventional and innovatory methods.

Appendix 4

For start-up of the herein described enterprise, Spanski Enterprise Inc. assigns the amount of three million American dollars.

Participation of TVP S.A. in bearing costs is not expected. Worth emphasising is the fact that during execution of the present project S.E.I. shall not be dependent from financial institutions or individual investors, and that investment of own resources is always connected with much greater commitment in the particular project.

TP8000644

A-2854

Appendix 4

# TV Polonia Broadcasting Systems Inc.

The company TV Polonia Broadcasting Systems shall be owned in whole by Spanski Enterprises Inc.

The supervisory board of TV Polonia Broadcasting Systems shall be composed of:

1. President TVP S.A. or other person designated by TVP S.A.
2. _____,President of Network Teleports, Inc.    *BARBARA LAMONT*
3. _____, President of Spanski Enterprises Inc.    *BOGUSŁAW M. SPANSKI*
5. *WOJCIECH ŚNIEGOWSKI*    4. *BOGUSŁAW T. PISAREK*

The supervisory board of TV Polonia Broadcasting Systems shall define the directions of the company's activities and supervise its functioning.

The board of directors of TV Polonia Broadcasting Systems, responsible for conducting everyday operational activity of the company, shall be composed of:

1. Bogusław Spanski – President – responsible for running the company and supervision over its economic activity
2. Bogusław T. Pisarek – Vice-president – responsible for marketing and promotion
3. Wojciech Śniegowski – Vice-president – responsible for administration and control of local offices.

Appendix 4

Bogusław Spanski is a Polish financier residing in Toronto, Canada. He belongs to the small group of Poles living in North America, who are successful in the local social ranking. The leading motto of his activity is converting daring concepts into reality. He is architect by profession, with experience in the Western European countries (e.g. Switzerland and Italy), and in Canada. For some period time, Bogusław M. Spanski, is also involved in design and construction – not steel and concrete constructions, but live organisms, which are companies established and developed by himself in many parts of the world.

Bogusław Spanski is 50 years old.

Bogusław T. Pisarek is the chief manager of the company CLUB S International. He is a sociologist by profession, with over ten years' long practice and experience in scope of marketing, acquired in North America, in the most aggressively developing branch of marketing and sales, which is insurances. Being the manager, he specialized himself in matters related with social macro-groups. Considerable part of his career took a course in the USA, where Bogusław T. Pisarek conducted the activity of a large enterprise conducted under the auspices of the Canadian government.

Bogusław T. Pisarek is 41 years old.

Wojciech Śniegocki is a graduate of the Faculty of Law and Administration of the Jagiellonian University in Kraków. Most of his career he spent in Canada, where he founded and is the owner of a consulting company. Within the frameworks of this activity he specialized in negotiations with governmental agendas. Wojciech Śniegowski is currently running the Polish TV channel for CF.MT International in Toronto. In the program by the name "Rozmaitości" [Sundries] he is responsible for preparation of an informational service, interviews in front of a camera, production of reportages and local sales of advertisement.

Wojciech Śniegocki is 38 years old.

Appendix 4

# Network Teleports, Inc.

The company Network Teleports, Inc. is one of the leaders in the American market of satellite transmission and a future partner of TV Polonia Broadcasting Systems in introduction of the TV Polonia channel to America.

Network Teleports, Inc. provides a 24-hour-a-day telecommunication service for over nine million audience and listeners in the whole USA, Canada, Alaska and Central America.

The basis of activity of the company is a teleport located in New Orleans, Louisiana. The eleven-meter long antennas of the teleport cover with its range the area from Canada to Columbia and from Hawaii to Bermudas. Network Teleports, Inc. also has the possibility of a direct signal transmission as DBS.

The wide range of services offered by Network Teleports, Inc. includes among other: coding and decoding of signal for recipients of cable TV, production of TV programmes, video-conferences, complex service of boats on all the four oceans and constant monitoring of reception and satellite transmission.

Network Teleports, Inc. counts on fruitful and successful cooperation with TV Polonia Broadcasting Systems in implementation of TV Polonia to America.

Appendix 4

# Characteristics of the Enterprise

The main assumptions regarding emission of TV Polonia channel in America are as follows:

1.  The emission of TV Polonia channel is foreseen for 16-18 hours a day.
2.  The materials from Poland shall be delivered partially on tapes and partially by means of satellite retransmission.
3.  TV Polonia channel shall be retransmitted by means of a Ku-band signal, obtained from the Eutelsat satellite in one of the western European teleports (downlink) and transmitted by the company Network Teleports, Inc. to New Orleans in the USA (uplink).
4.  Insertion of advertising spots shall be made in America.
5.  Polish program blocks made in America shall be added to the program.
6.  Part of the program shall be subtitled in English.

In order to carry out the described enterprise, Spanski Enterprises Inc. (S.E.I.) shall establish a new company by the name TV Polonia Broadcasting Systems, at the beginning with offices in the USA (New York, Chicago, Los Angeles) and in Canada (Toronto). The task of these offices shall be to obtain and render services for the benefit of the local subscribers of TV Polonia. The above-mentioned offices also shall be responsible for running a marketing activity, sales of advertisements and – in future – for production of local program blocks in particular regions.

In cooperation with Network Teleports, Inc. from New Orleans, TV Polonia Broadcasting Systems shall offer its subscribers a wide range of technical possibilities to receipt TV Polonia channel by means of a traditional satellite transmission receipt system, modern DBS system and by means of cable TV companies. Such a complex offer gives huge possibilities to reach the biggest number of subscribers, who are interested in receipt of TV Polonia channel.

Appendix 4

The traditional method of receipt of satellite signal requires purchase of expensive equipment and having suitable and large space for mounting of a big dish antenna. It is estimated that several thousand of users have such equipment on the American continent. The necessity to facilitate receipt of TV Polonia channel to them is thus obvious.

The new method of receipt of DBS (Direct Broadcasting System) satellite signal gives the possibility of common sharing of a high-quality satellite signal. Small sizes of a mini-dish provide for its installation, even in small rental flats. Due to the current price of equipment (ca. 700 USD), negotiations with the manufacturer of mini-dishes and decoders (RCA) are presently being conducted, in order to obtain a wholesales price on the basis of one hundred users.

Negotiations with financial institutions regarding sharing attractive leasing conditions on the necessary equipment to the future subscribers are far advanced. Simultaneously, it is necessary to admit as almost certain, the fact that within the next 1-2 years the price of the above-mentioned equipment shall be diminished, and thus the product shall be more available and common.

In such circumstances, usage of the DBS system – together with making the purchase of equipment easier, shall considerably and dynamically broaden the base of subscribers of the TV Polonia channel, as well as other channels.

From the point of view of a potential recipient, undoubtedly the cheapest method is sharing of signal with the local cable TV companies. Next to the payment for subscription for the local "cable", the only expense is the purchase of a decoder, which may also be leased.

S.E.I. conducted talks with big cable distributions, and as a result they settled that after obtaining a subscriber base by TV Polonia on the level of 30 thousand, the

Appendix 4

TV Polonia channel shall be introduced to the domestic cable network in Polish agglomerations in America.

To sum up, the proposition of simultaneous usage of all the above methods shall enable reaching the biggest number of subscribers, who are interested in receipt of TV Polonia channel, in short period of time.

TV Polonia Broadcasting Systems together with Network Teleports Inc., exclusively present such a complex offer for potential subscribers of TV Polonia channel, inhabiting the American continent.

TV Polonia Broadcasting Systems shall take over all the financial commitments, resulting from satellite retransmission and further distribution of signal of TV Polonia channel in America, and obliges itself to undertake complex actions in order to provide retransmission of TV Polonia channel on the most convenient conditions. All such operational costs connected with execution of this enterprise (including the fees resulting from copyright protection) shall be covered by TV Polonia Broadcasting Systems.

In such a way TVP S.A. shall not cover any costs connected with retransmission of TV Polonia channel on the American continent.

Due to technological progress, competition on the market of ethnic TV channels is now substantial. Only the USA is currently inhabited by 22 million people, who are born abroad, and masses of American citizens, born in the USA, with very strong roots of their origin. American TV currently offers channels in twenty-four languages and this number is still increasing.

Appendix 4

It turned out that despite large number of information regarding Poland, available in Polish radio stations and in press, the Poles expect TV news directly from Poland. Undoubtedly, it results from huge popularity of TV nowadays. The confirmation of such state of affairs is the fact that the surveyed watch TV approximately 3.7 hours a day, whilst they listen to radio ca. 1.5 hour a day, and they read press only for a little more than 12 minutes a day. For 68 percent of respondents TV is the main source of information about the world.

Moreover, the surveyed believe that a TV channel from Poland shall enable them keeping in touch with their homeland and its culture. Despite this fact, it has special significance regarding their children.

The demographic situation in the USA presents very similarly to that in Canada. The basic difference is the number of people with Polish origins, which is estimated in the USA for 12 million, whilst in Canada it is 530 thousand.

The conducted surveys clearly indicate the existence of the huge need for TV Polonia channel in America.

A-2861

Appendix 4

# Marketing Strategy

The whole marketing strategy must be prepared in context of answers to the following questions:

- What are the specific expectations and needs of the market?
- What are the characteristics of the offered product?
- Do the advantages resulting from using it fulfil the expectations and needs of a consumer?

The marketing strategy of the company TV Polonia Broadcasting Systems foresees three basic elements, with which a group of consumers, to which it is wanted to reach, shall be influenced:

1. Product
2. Price
3. Promotion

## PRODUCT

As in the case of other enterprises, it is necessary to adjust the product to the market on which it is to be sold. In the context of TV Polonia channel, it is necessary to pay attention to the specifics of the Polish society in America, which has been expressed in the survey. It indicated the common interest with the following segments of program.

The segments are:

a. News from Poland, awaited by 98% of surveyed,

b. Programs about culture and art, which are of the interest of 95% of the surveyed,

TP8000655

Appendix 4

   c.  Programs for children, awaited by 91 % of responders,

   d.  Polish films with 88% level of interest.

The above-mentioned segments of TV Polonia channel shall enable elaboration and distribution of promotional materials, addressed to the biggest possible range of the future recipients.

PRICE

One of the key elements of marketing is settlement of a suitable price for the particular product, in this case – the rate for the monthly cost of subscription for receipt of TV Polonia channel. It is especially important in the situation of a wide range of price offers on TV market and strong price competition.

In America, there currently is a wide range of local Polish programs, available on channels within the frameworks of the basic fee. The price of the service offered by TV Polonia Broadcasting Systems may be a little higher, as no-one else shall have a similarly attractive offer on channels, especially on daily, current news from Poland favour it. Important elements of the strategy for settlement price shall also be the forms and terms of payment, available crediting and the possibility to obtain discounts.

Due to cooperation with Network Teleports, Inc., the subscription fees shall be collected by the companies, which provide the TV Polonia signal directly to the individual recipient.

Appendix 4

Currently the prices of programs offered to the viewers apart from the commonly available cable service are between 10 and 12 American dollars per month. The assumed subscription fee in the amount of 5 American dollars per month for the signal of TV Polonia seems to be justified according to competition and confirmed by the market analysis.

PROMOTION

The promotional action includes all the available mass media: television, radio and press. Also the following actions are planned:

a.  Sending offers to the addresses of potential recipients,

b.  Contests with prizes,

c.  Constant participation of local Polish societies in propagation of the planned enterprise.

The following matters are assumed:

a.  Elaboration, printing and distribution of two million informational brochures,

b.  Printing and distribution of two million application forms,

c.  Preparation and execution of suitable advertising materials for the purposes of TV, radio and press promotion.

The above-mentioned examples of promotional activities, as well as aggressive and unconventional matter of direct sales action, strengthen the general interests in receipt of TV Polonia channel. This interest shall turn out to be a self-driving element of promotion in the future.

TP8000657

Appendix 4

The anticipated participation in the series of organizations, which associate Polish societies in America, shall undoubtedly provide high rank to the effect created by TV Polonia Broadcasting Systems.

TP8000658

Appendix 4

# Work Schedule

JULY / AUGUST 1994

Presentation of the present Business Plan to TVP S.A. and presentation of technical
possibilities regarding execution of the project

SEPTEMBER / OCTOBER 1994

Final decision of the Board of Directors of TVP S.A. A contract signed subject to acceptance
of the S.E.I's offer

The company TV Polonia Broadcasting Systems established

Offices of the company in the USA (New York, Chicago, Los Angeles) and in Canada
(Toronto) opened

Promotional and marketing action started

FIRST HALF OF THE YEAR 1995

A minimum base of future subscribers obtained – 30,000 (thirty thousand)

Retransmission of TV Polonia channel started

DECEMBER  1995

The projected number of subscribers obtained – 100,000 (one hundred thousand)

DECEMBER  1996

The projected number of subscribers obtained – 200,000 (two hundred thousand)

Appendix 4

DECEMBER 1997

The projected number of subscribers obtained – 500,000 (five hundred thousand)

DECEMBER 1998

The projected number of subscribers obtained – 1,000,000 (one million)

DECEMBER 1999

The projected number of subscribers obtained – 2,000,000 (two million)

TP8000660

Appendix 4

# Summary

As mentioned in the introduction, Spanski Enterprises Inc., sets the goal to provide the TV Polonia channel to as many Poles and population of Polish origin inhabiting North America, as possible.

Twelve million of Poles and population of Polish origin currently inhabit the area of North America. It is a huge market, with almost unlimited possibilities.

The conducted research indicated the existence of huge need for TV Polonia channel in America.

Whist providing the subscribers with a high-quality channel, which they expect and enabling their receipt, it is possible to expect that TV Polonia Broadcasting Systems shall reach the established goals on time, and simultaneously it shall guarantee obtaining a constant level of incomes in a short period of time.

TP8000661

Appendix 4

Financial Projections

TP8000662

Appendix 4

Technical Data

TP8000663

Appendix 5

REMARKS Concerning the Proposal of Introduction of the TV POLONIA Broadcast to North and South Americas Presented to Telewizja Polska S.A.

AIM OF THIS PROJECT

From the point of view of TVP S.A. the aim of the venture discussed is the delivery of TV POLONIA broadcast to the broad mass of Polish-speaking inhabitants of America.

ASSUMPTION DATA

General assumptions of TVP regarding the realization of this project are as follows:

1. TVP S.A. does not commit any capital expenditure and does not bear – except for current – any other, additional operating costs connected with this project;
2. TVP S.A. has constant control over the contents of the TV POLONIA broadcast in its version transmitted in America and all the same over the maintenance of its integrity and high substantial quality.

THE FUTURE PARTNER QUALITIES:

With such assumptions, the realization of the stated aim is dependent on the partner possessing:

1. Appropriate financial resources;
2. Ability to obtain a large mass of the broadcast subscribers quickly and effectively.

THE RISK

Not investing, TVP S.A. will not meet any financial risk concerning the venture discussed.

Regarding item 3.
SEI, President .... BOGUSLAW SPANSKI          & BOGUSLAW SPANSKI

A. According to the information obtained by the agency of Dun & Bradstreet Company from The Royal Bank of Canada, "net value of ...Y..... as a business executive is placed in the upper range of seven-digit numbers", which means that it comes to 8-9 million Canadian dollars.
B. According to the project of agreement currently negotiated, "SEI undertakes to bear all costs connected with the access to TV POLONIA signal, promotion and marketing of the television program (created on the grounds of agreement) and with its production and broadcasting on the territory of North and South America, including costs of payments on the grounds of copyright of literary and musical works named small rights as well as any additional costs of the use of informative materials".
C. The provisions of the agreement draft state that this program "will consist of TV POLONIA broadcast and – within bounds of possibility – of the broadcasts produced on the territory of America and of advertisements".

Appendix 5

According to the Business Plan, it will be transmitted for 16-18 hours a day. SEI declares to consult and co-operate with TVP S.A. in the production of the local programs.

D. After having signed the agreement with TVP S.A., SEI can see its main advantage and market benefit in the exclusivity in "possessing" a television program "straight out from Poland" on the territory of America.

In the event of broadcasting 16-18 hours a day, the aforementioned exclusivity in relation to very high costs of self-production (and even in relation to costs of re-fitting of the programs), will result in the fact that – in practice – the contents of the program broadcast in America will not be very different from the broadcast schedule of TV POLONIA, and all the same TVP S.A. will maintain constant control over the contents of the program broadcast in America, its integrity and substantial quality.

It must be also mentioned that SEI accepts to obligation to maintain the whole integrity of each programme of TV POLONIA broadcast.

E. .................... is planning the integration of some of the Polish-language programs currently working in North America around its project.

F. The Business Plan included quite a broad outline of the marketing strategy of the venture discussed and the results of market research carried out among Polish-speaking population inhabiting the Ontario state in Canada.

G. In its activity within the framework of CLUB S, S.E.I. has demonstrated – on the new market for itself and with the new product on this market – large efficiency in promotion-marketing activities.

H. It seems that the provisions of paragraph 9 of the agreement draft secure the interest of TVP S.A. in the case of ceasing the broadcasting of TV POLONIA program, significant reduction of the time of its broadcasting or vital changes of the circumstances which determine the performance of the agreement.

Since in the event of any of the above situations, the provisions of paragraph 9 impose on TVP only the obligation to re-negotiate already signed agreement.

CONCLUSIONS:

After having analyzed the above we think that only the proposal presented by Spanski Enterprises Incorporated promises the realization of the project of introduction of TV POLONIA broadcast to North and South America.

ROBERT TERENTIEW

DIRECTOR OF BIURO HANDLU I WSPÓLPRACY Z ZAGRANICĄ

VICE-DIRECTOR OF PROGRAM SATELITARNY TV POLONIA

Warsaw, 29 November 1994

BOGUSLAW SPANSKI

TP8000823

SPANSKI ENTERPRISES, INC. v. TELEWIZJA POLSKA S.A.

Case No.: 10-4933

Expert Report of Professor Marek Wierzbowski

Submitted on Behalf of Telewizja Polska S.A.

April 16, 2012

PROF. MAREK WIERZBOWSKI I PARTNERZY
ADWOKACI I RADCOWIE PRAWNI
UL. MOKOTOWSKA 15A LOK 17 00-640 WARSZAWA
TEL. 022 312 41 10 FAX: 022 312 41 12
office@wierzbowski.com
KRS: 0000274978; NIP: 7010056371

PROF. MAREK WIERZBOWSKI I PARTNERZY

ADWOKACI I RADCOWIE PRAWNI

Warsaw, 16 April 2012

## LEGAL OPINION OF PROFESSOR MAREK WIERZBOWSKI

### I.    Introduction

My opinion is issued at the request of Telewizja Polska S.A. (hereinafter "TVP"). My opinion concerns certain obligations in the agreement between TVP and Spanski Enterprises Inc. (hereinafter "SEI") dated 14.12.1994 ("1994 Agreement") existing under Polish law. Polish law is relevant to an interpretation of the obligations agreed to by the parties because Polish law governed the 1994 Agreement at the time it was concluded.

I am qualified to issue an opinion on the impact of Polish law on the obligations agreed to by the parties in connection with the 1994 Agreement. I am a lawyer practising under Polish law and with regard to my work I could be held liable only before the Polish courts under Polish law. I am the founder and name partner of the Warsaw law firm "Prof. Marek Wierzbowski i Partnerzy." My firm employs 20 lawyers. Before founding the firm, I was a partner at the international law firms Weil, Gotshal & Manges and subsequently Linklaters. I am vice-chairman of the Supervisory Board of the Warsaw Stock Exchange (from 2000 to 2004, I was the Chairman of this board). I have previously served as vice-president of the Arbitration Court of the Polish Chamber of Commerce. I have also acted as an adviser to various Ministries of the Polish government, and have acted as counsel for Poland in an investment arbitration.[1]

In summary, I conclude that the 1994 Agreement imposed upon SEI an obligation to use its best efforts to maximize the viewership of TVP programming in the territory covered by the 1994 Agreement. As I explain, I base my opinion on, among other things:

- TVP's Polish-law-based public mission to disseminate Polish programming to viewers abroad;
- TVP's state-sourced financing to achieve its mandated goals;
- SEI's awareness of TVP's public mission at the time the 1994 Agreement was concluded;
- The historical context of the 1994 Agreement;
- The royalty percentage SEI pays TVP under the 1994 Agreement;

---

[1]    A further summary of relevant qualifications and a list of my publications during the last ten years in Appendix 1.

PROF. MAREK WIERZBOWSKI I PARTNERZY

ADWOKACI I RADCOWIE PRAWNI

* SEI's representations as part of the negotiations of the 1994 Agreement; and

* The nature of the 1994 Agreement as a long-term exclusive licensing arrangement with royalty payments on a per-subscriber basis.

In preparing this opinion, I have analysed and relied on, among other things, documents and information received from TVP and its representatives. I reserve the right to revisit the conclusions of this opinion in the event I learn of additional relevant facts.

My fees for my work on this matter is divided in two parts. I will be paid a fixed amount of PLN 30,000 net (about USD 9,470) for preparing this opinion (not contingent upon the conclusions I reach). I will also receive payment for time spent preparing for and participating in a deposition in these proceedings (and a trial) accordingly to my hourly rates of PLN 750 (about USD 237).

## II. TVP's Status As A Public Broadcaster

### A. TVP's Public Mission Is To Widely Disseminate Polish Programming, And TVP Largely Relies On Public Resources To Accomplish That Mission

Telewizja Polska S.A. is a public television broadcaster in Poland. TVP was established by the Polish Act of 29 December 1992 on Polish Radio and Television Broadcasting[2] ("Broadcasting Act") with the public mission of producing and transmitting national and international programming services, including the channel "TV Polonia," and certain regional programming services.

TVP's fulfillment of its public mission is subject to specific rules embodied in and deriving from the Broadcasting Act. Those rules have a direct impact on TVP's performance, both in terms of: (a) TVP's production and dissemination of programming, and (b) the State-resources financing received by TVP to accomplish its public mission.

Article 21 of the Broadcasting Act defines TVP's public mission. TVP is to provide the entire Polish society, both domestic and abroad, with diversified programming

---

[2]     Act of 29 December 1992 on Polish Radio and Television Broadcasting, Journal of Laws No 7, item 34, consolidated text Journal of Laws of 2011, No 43, item 226 with amendments – TVP 021012 358-402 (Appendix 2).

PROF. MAREK WIERZBOWSKI I PARTNERZY
ADWOKACI I RADCOWIE PRAWNI

in the areas of news, editorial journalism, culture, entertainment, education and sports.[3] The programming is to be pluralistic, impartial, well-balanced, independent and innovative, and marked by high quality and integrity.[4] Specifically, TVP's tasks include among other things: (a) producing and transmitting programming services for reception abroad in Polish and other languages, (b) disseminating knowledge of the Polish language, and (c) producing educational programming, and ensuring access by people of Polish descent and Poles living abroad to such programming.[5]

A 2005 resolution by TVP's management board called The Principles Guiding the Fulfillment of Telewizja Polska S.A.'s Public Mission (hereinafter "Principles")[6], also confirms that the primary mission of TVP is the widespread distribution of its programming content. The Principles provide that "TVP strives to provide the greatest range of access to its programming and other public services possible, in accordance with its purpose and technical and legal limitations".[7] In the case of TV Polonia specifically, the Principles state that this channel is to be widely disseminated outside Poland through satellite, cable, and whatever other broadcasting means necessary to achieve the widest possible audience.[8] The goal of the TV Polonia channel is to maintain contact between Polish emigrants and their native country, taking into consideration expectations of different generations and the promotion of Poland

---

[3]  Although a formal definition of TVP's public mission was specifically added to the Broadcasting Act in 2004, the tasks representing TVP's mission were included in Articles 1 and 21 of the original version of the Broadcasting Act and the Polish Constitution. In that vein, the Polish Constitutional Tribunal (a Polish judicial body appointed by the Polish Lower Chamber of the Parliament (Sejm) among others to resolve disputes over authority between central constitutional organs of the State and to ensure statutory law and international agreements complies with constitutional requirements) emphasised the importance of the media fulfilling its public mission in a democratic country, as well as its function in shaping social and civil attitudes, facilitating social dialogue, and creating Polish language culture. (Polish Constitutional Tribunal's judgment of 9.9.2004, K 2/03; see also Polish Constitutional Tribunal resolution of 13.12.1995, W 6/95).

[4]  Id.

[5]  Broadcasting Act, Article 21(1a).

[6]  The document entitled "Principles guiding the fulfilment of Telewizja Polska S.A.'s public mission" is an appendix to the TVP Management Board Resolution No. 108/2005 of 29 March 2005, available at www.tvp.pl (Appendix 3).

[7]  Principles, point 7.

[8]  See Principles (point 8).

PROF. MAREK WIERZBOWSKI I PARTNERZY

ADWOKACI I RADCOWIE PRAWNI

and its culture and language abroad.[9] TVP's public mission to reach a maximum number of Polish emigrants, as reflected in the Principles, is grounded in Article 6 of the Polish Constitution which provides that the Polish government shall assist Poles living abroad with maintaining their links with Polish cultural heritage.[10]

TVP's programming intended for foreign audiences, including programming on TV Polonia, is co-financed by government subsidies, which are supplemented by subscription fees and income from commercial broadcasting.[11] In order to receive financing from the public resources, TVP must submit agree upon its programming and financial plans with the National Broadcasting Council (whose members are appointed by the Chambers of the Polish Parliament and President), as well as submit quarterly financial reporting detailing its activities to fulfill its public mission.[12] According to the Polish Constitutional Tribunal, Polish public resource financing of TVP's programming activities is important to allow TVP to fulfill its public mission.[13]

Thus, it is evident from TVP's obligations under Polish law as a public broadcaster, from TVP's internal rules implementing Polish legal requirements, and from TVP's public resource financing including the plans TVP must submit to obtain such financing, that TVP's public mission for the TV Polonia channel is to maximise viewership amongst the Polish Diaspora, and not financial in nature. As explained below, TVP's well-known public mission became part and parcel of the parties' obligations under the 1994 Agreement.

---

[9]     See Principles (point 98).

[10]    The Constitution of the Republic of Poland dated 2 April 1997, available at http://www.sejm.gov.pl/prawo/konst/angielski/kon1.htm.

[11]    Pursuant to Article 25(4) of the Broadcasting Act, the costs of producing programming services to be transmitted abroad are to be borne by the state budget within the limits determined in the Budget Act.

[12]    Under Article 31a(1) of the Broadcasting Act TVP is required to maintain books and records in a manner that separates revenues and related costs for TVP's activities relating to its public mission (as defined in Article 21(1) of the Broadcasting Act] and revenues and costs for other activities. Under Article 31b of the Broadcasting Act TVP's board of management must file annual and quarterly reports with the National Broadcasting Council (which oversees public broadcasting in Poland) relating to the use of funds allocated in connection with fulfilling TVP's public mission.

[13]    Polish Constitutional Tribunal's judgment of 9.9.2004, K 2/03.

UL. MOKOTOWSKA 15A LOK 17 00-640 WARSZAWA
TEL. 022 312 41 10 FAX: 022 312 41 12
office@wierzbowski.com
KRS: 0000274978; NIP: 7010056371

Page 5/14

PROF. MAREK WIERZBOWSKI I PARTNERZY

ADWOKACI I RADCOWIE PRAWNI

**III.    Interpretation of the 1994 Agreement under Polish law**

> **A.    Interpretation Of A Contract Governed By Polish Law Requires Consideration Of The Circumstances Of The Contract Including The Parties' Intent**

The governing law chosen by parties to a contract is critical to interpreting the intent and effects of the contract.   Pursuant to § 11.1 of the 1994 Agreement, Polish law was the governing law of the contract.  Therefore, Polish law relating to contracts, specifically the Civil Code in force at the time of the 1994 Agreement, must as a matter of Polish law be considered when evaluating the parties' intent when executing the 1994 Agreement and the legal effects of this Agreement.[14]  Two key provisions of the Polish Civil Code apply.

> Article 56
>
> A legal act gives rise not only to the effects expressed therein but also to those effects which stem from the law, principles of social life, and established customs.
>
> Article 65
>
> § 1. A declaration of intent should be interpreted in the light of the circumstances in which it is made, as required by the principles of social life and established customs.
>
> § 2. In contracts, the common intention of the parties and the aim of the contract should be examined rather than its literal meaning.

Pursuant to Article 56, the legal effects of a given legal act such as a contract extend beyond the wording of the contract and include the legal effects which stem from law (including the Polish Constitution, statutes and ratified international agreements and regulations),[15] and from principles of social life and established customs.  Thus, to have a complete picture of the legal effects resulting from a contract, a Polish court

---

14    The Act of 23 April 1964 – Civil Code, Journal of Laws No 16, item 93 with amendments.

15    The Supreme Court's judgment of 3.10.2004, III CK 546/03.

UL. MOKOTOWSKA 15A LOK 17 00-640 WARSZAWA
TEL. 022 312 41 10 FAX: 022 312 41 12
office@wierzbowski.com
KRS: 0000274978; NIP: 7010036371

A-2878

PROF. MAREK WIERZBOWSKI I PARTNERZY

ADWOKACI I RADCOWIE PRAWNI

would be obliged to take into account all legal, social, and customary considerations relating to that contract.[16]

Article 65 of the Civil Code relates in turn to the interpretation of the parties' declarations of intent. Under Article 65, in addition to legal, social, and customary considerations forming part of the obligations arising from a contract, extra-contractual factors, including the parties' intentions and the contract's aim, regardless of their form, are important to interpret the parties' declaration of intent.

One of the key criteria for assessing a declaration of intent is the circumstances in which the declaration was given.[17] The circumstances must be assessed to determine the proper effect of a party's declaration of intent on the interpretation of a contract which can sometimes depart from the literal meaning of the contract's wording.[18] The most important circumstantial factors taken into account when interpreting the parties' declarations of intent are: the course of the negotiations between the parties preceding the entry into the contract, previous cooperation, current business practices, the parties' behavior, their experience, professionalism and understanding of the text of the agreement, the circumstances of signing or receipt of the text of the contract, and the customary meaning of terms and expressions in a given industry.[19]

But external circumstances alone are not necessarily determinative of the proper interpretation of the parties' intent, and hence the obligations that form part of a contract. Under Article 65(2), the external circumstances relating to interpreting the parties' intent must also be viewed in the light of the parties' actual subjective intent. The parties' subjective common intent must therefore be analyzed, including by looking

---

[16] See also K. Pietrzykowski, Comments on Article 56 of the Civil Code [in:] The Civil Code. Comments, Volumne 1, 6. edition, Warsaw 2011, Legalis.

[17] The Supreme Court's judgment of 3.2.2011, I CSK 348/10 and the Supreme Court's judgment of 20.1.2011, I CSK 193/10.

[18] The Supreme Court's judgment of 12.1.1960, III CR 436/60.

[19] The Supreme Court's judgment of 20.1.2011, I CSK 173/10, the Supreme Court's judgment of 2.12.2010, II PK 134/10, the Supreme Court's judgment of 3.9.1998, I CKN 815/97, the Supreme Court's judgment of 4.7.1975, III CRN 160/75, the Supreme Court's judgment of 27.10.1971, I PR 221/71, the Supreme Court's judgment of 5.3.2008, V CSK 418/07, the Supreme Court's judgment of 19.1.2006, IV CK 343/05, the Supreme Court's judgment of 22.6.2006, III CSK 30/06 and the Supreme Court's judgment of 10.3.2004, IV CK 125/03.

UL. MOKOTOWSKA 15A LOK 17 00-640 WARSZAWA
TEL. 022 312 41 10 FAX: 022 312 41 12
office@wierzbowski.com
KRS: 0000274978; NIP: 7010056371

Page 7/14

PROF. MAREK WIERZBOWSKI I PARTNERZY

ADWOKACI I RADCOWIE PRAWNI

at the goals of a contract.[20]  In this respect, the parties' intentions must be examined not only in the light of the goals of a contract as agreed directly between both parties but also – by analogy with the Articles 491 §2, 492, and 493 of the Civil Code – by reference to the purposes of a contract as intended by only one of the parties, if the other party was aware of such purposes.[21]

Lastly, the parties' common intention and the goal of a contract should always be determined as at the time the parties declared their intent, and not at the time of interpretation.

### B.    Application Of Polish Law To The 1994 Agreement

In the light of the foregoing considerations, the 1994 Agreement comprises not only the obligations explicitly included therein, but also those deriving from Polish law, the attendant circumstances, the common intention of both parties, and the goals of the 1994 Agreement as at the date of signing, as known to both parties.

Based on the circumstances surrounding the conclusion of the 1994 Agreement, it is apparent that the parties entered into the 1994 Agreement to provide the largest possible audience of Polish speakers living in North and South America with access to the TV Polonia and TVP3 (now called TVP Info) channels.  At least five factors demonstrate that the parties' common intention and goal was to maximize viewership, which must therefore be understood as an obligation upon the parties under the 1994 Agreement:

### 1.    As A Polish Legal Imperative, TVP's Statutory Mission Is Incorporated Into The Contract

First, as explained above, TVP, as a public broadcaster in Poland, established and operating pursuant to the Broadcasting Act, and financed to a large extent from State resources, is entrusted with the public mission of providing the Polish Diaspora with the greatest possible access to Polish programming.  In particular, the TV Polonia channel by its very nature is addressed to viewers abroad.  These are the legal preconditions of any actions undertaken by TVP regarding the transmission of its programming services, including TV Polonia.  TVP's public mission as defined by Polish law could not be contracted around by the parties to the 1994 Agreement.  The laws governing

---

[20]     See A. Kidyba, Comments on article 65 of the Polish Civil Code [in:] The Civil Code. Comments, Volume 1. General part, Lex 2009.

[21]     The Supreme Court's Judgment of 15.9.2005, II CK 69/05.

UL. MOKOTOWSKA 15A LOK 17 00-640 WARSZAWA
TEL. 022 312 41 10 FAX: 022 312 41 12
office@wierzbowski.com
KRS: 0000274978; NIP: 7010056371

PROF. MAREK WIERZBOWSKI I PARTNERZY

ADWOKACI I RADCOWIE PRAWNI

TVP's role, by themselves are able to create certain legal effects of the 1994 Agreement. Thus, TVP's statutory mission to maximize dissemination of its programming to viewers abroad formed part of the 1994 Agreement.

2. TVP's Statutory Mission Is Also The Common Intention Of The Parties To The Contract Because That Mission Was Undoubtedly Known To SEI

In addition to the effect of TVP's statutory mission upon the terms of the 1994 Agreement because TVP's public mission is embodied in Polish law, SEI was undoubtedly aware of TVP's public mission and thus its objective for the 1994 Agreement. As Mr. Bogusław Spanski, the owner of SEI, testified: "There is an understanding which was between TVP and SEI that we will do everything that is possible to expand the distribution of TVP's programs" and that "the main objective of TVP [is] getting the most subscribers."[22] Because SEI was aware that maximizing viewership was a central goal of the 1994 Agreement, the 1994 Agreement imposes upon SEI the obligation to use its best efforts to spread and popularize TVP's programming across North and South America.[23]

3. The Historical Context Of The 1994 Agreement And The 8 Percent Royalty Payment Agreed By The Parties Must Also Be Considered In Interpreting The Obligations Under The 1994 Agreement

The historical context of the 1994 Agreement also demonstrates the parties' common intent in executing the 1994 Agreement. In 1989 and 1990, following the collapse of the communist regime, Poland held its first free and democratic parliamentary and presidential elections since the end of the Second World War. This period was marked by significant political and economic changes in Poland. The new Polish government enacted statutory laws ensuring the freedoms and rights of persons and citizens, such as the freedom to express opinions and to acquire and disseminate information. Polish media became free and independent. Freedom of speech and of the media was codified in statutory law, and censorship of means of social communication was prohibited.

---

[22]     April 18, 2008 Deposition of Boguslaw Spanski, p. 235:21-25; p. 237:21-24.

[23]     Even if SEI claims that it was not aware of TVP's public mission, the knowledge of TVP's mission must be imputed to SEI as a professional business entity contracting with TVP.

PROF. MAREK WIERZBOWSKI I PARTNERZY
ADWOKACI I RADCOWIE PRAWNI

In this historical context, the new Polish government desired, for political reasons, to widely disseminate Polish culture as a source of Polish identity.[24] The government established TVP pursuant to the Broadcasting Act in 1992 to help achieve its goals. As the sole public television broadcaster in Poland, TVP was designated with ensuring access to Polish cultural tradition and independent news and information regarding Poland. TVP's mission was especially important for the Polish diaspora. TVP created TV Polonia to integrate Poles worldwide and to ensure that they have contact with Polish language, culture, news, history and politics.

Considering the historical context of the establishment of TVP and the creation of TV Polonia, it was imperative for TVP that its relationship with SEI to facilitate distribution of TV Polonia in North and South America included the objective of distributing the TV Polonia channel to the widest possible audience of Poles and people of Polish descent living abroad. That objective was reflected in the unusually low 8 percent royalty payment agreed by the parties in the 1994 Agreement and in a 25-year-long contract uncommon in practice at that time.

Given the historical context of the 1994 Agreement, and the unusual payment and time-period terms agreed by the parties, under Polish law, the 1994 Agreement included an obligation upon SEI to use best efforts to help TVP achieve its objective of maximizing viewership.

4.   SEI's Business Plan Submitted As Part Of The Negotiations Acknowledged The Parties' Contractual Goal Of Maximizing Subscribers

In addition to the historical context of the 1994 Agreement and the resultant unusual royalty percentage and time-period for the agreement agreed by the parties, the main

---

[24]   Mr. Krzysztof Skubiszewski, the Minister for Foreign Affairs in the first Polish democratic government, during his expose presented in the Polish Parliament on 26.4.1990, pointed out that one of the priorities of the Polish foreign policy is "to remove barriers and create facilities for the fluctuations of people, in particular with regard to the communication between Poles and the world, and between the Polish diaspora and the country." Internet source: http://www.cvce.eu/content/publication/2006/3/28/6a0b3b70-0545-43ce-be95-59e1c0cd825c/publishable_pl.pdf.

Mr. Jacek Kurczewski, a member of Polish Parliament, speaking during one of the Parliament session on 30.4.1993 similarly noted: "The important issue of the Polish policy is to help the Polish communities living abroad". Internet source:

http://orka2.sejm.gov.pl/Debata1.nsf/9a905bcb5531f478c125745f0037938e/0acd92fee0f262fdc125750f0043bcc1?OpenDocument.

PROF. MAREK WIERZBOWSKI I PARTNERZY
ADWOKACI I RADCOWIE PRAWNI

goal of the 1994 Agreement is demonstrated by the business plan prepared by SEI and submitted to TVP during the negotiations,[25] The business plan repeatedly emphasizes that SEI's main goal is to provide the TV Polonia channel to the widest possible audience of Poles and persons of Polish descent residing in America.[26] SEI emphasized the high number of Poles and persons of Polish descent living in North and South America and their particular affection to their motherland, reflected in an unyielding need for all kinds of information about and from Poland.[27] SEI further underlined that for the vast majority of persons of Poles and persons of Polish descent, contact with the motherland was of great importance. From such statements in SEI's business plans, it is reasonable to conclude that both parties placed strong emphasis on the necessity to obtain the largest possible number of subscribers.

What is more, SEI's business plan contains an action plan which anticipated that by the 1st half of 1995 SEI would obtain a subscribers base of at least 30,000, by December 1995, 100,000 subscribers, by December 1996, 200,000 subscribers, by December 1997, 500,000 subscribers, by December 1998, 1,000,000 subscribers, and finally by December 1999, 2,000,000 subscribers.[28] These subscriber numbers may not be specifically binding on SEI but at the very least they demonstrate the parties' focus on rapidly expanding SEI's subscriber base to reach as early as 1999, 2,000,000

---

25   SEI's business plan - TP 8000639-8000663 (Appendix 4).

26   According to the SEI's business plan (p. 3) "The aim of Spanski Enterprises, Inc. is providing TV Polonia channel to as many Poles and population with Polish roots, who live in North America".

27   According to the SEI's business plan (p. 3) "The interest of the company Spanski Enterprises, Inc. (S.E.I.) in retransmission of TV Polonia channel in North America results from ascertainment of the following facts: a. the size of population with Polish roots, which inhabits America, is very big and amounts to ca. twelve million; b. our compatriotrs show special devotion to the homeland, which manifests among other things with the want of any information about Poland and from Poland".

28   In the SEI's business plan (p. 24-25) schedule of activities was presented as follows: "FIRST HALF OF THE YEAR 1995 A minimum base of future subscribers obtained 30,000 (thirty thousand), Retransmission of TV Polonia channel started; DECEMBER 1995 The projected number of subscribers obtained - 100,000 (one hundred thousand); DECEMBER 1996 The projected number of subscribers obtained - 200,000 (two hundred thousand); DECEMBER 1997 The projected number of subscribers obtained - 500,000 (five hundred thousand); DECEMBER 1998 The projected number of subscribers obtained - 1,000,000 (one million); DECEMBER 1999 The projected number of subscribers obtained - 2,000,000 (two million)".

PROF. MAREK WIERZBOWSKI I PARTNERZY

ADWOKACI I RADCOWIE PRAWNI

subscribers (as opposed to 2.5 percent of that total number of approximately 50,000 subscribers that I understand SEI has now achieved, 13 years after 1999).

TVP's intention of distributing TV Polonia in America to the broad masses of Polish-speaking Americans, was consistent with SEI's aim, and was repeatedly and directly declared to SEI during the negotiations of the 1994 Agreement.[29] One of the factors that TVP took into consideration in choosing its partner for distributing TV Polonia was the "ability to obtain a large mass of the broadcast subscribers quickly and effectively."[30]

SEI's stated goals of reaching a large number of subscribers is also reflected in a key obligation imposed upon SEI in the 1994 Agreement to obtain 25,000 declared subscribers before commencing broadcasting of the programming service (§ 5 of the 1994 Agreement).

> 5.    The Nature Of The Exclusive Licensing Arrangement Further Demonstrates The Parties' Intent At The Time Of Signing The 1994 Agreement That SEI Would Maximize Viewership

Finally, the nature of the 1994 Agreement itself suggests that SEI took on an implied obligation to maximize subscribers. Three points are key.

First, under the 1994 Agreement, which is similar in nature to a license agreement, TVP granted SEI the exclusive right, for 25 years, to the one-off use of TV Polonia shows as part of its Programming Service (§ 2.2). When parties agree to a long-term contract such as a 25-year-long contract, a key emphasis of the parties is stabilizing their relationship on the basis of mutual trust.

Second, SEI's per-subscriber royalty payment from SEI to TVP demonstrates that the parties' aim, as part of their mutual trust, was to incentivize SEI to maximize distribution of the programming and obtain the largest audience possible.

---

[29]    According to the "REMARKS Concerning the Proposal of Introduction of the TV POLONIA Broadcast to North and South Americas Presented to Telewizja Polska S.A." (TP8000822-3) (Appendix 5), "From the point of view of TVP S.A. the aim of the venture discussed is the delivery of TV POLONIA broadcast to the broad mass of Polish-speaking inhabitants of America".

[30]    See "REMARKS Concerning the Proposal of Introduction of the TV POLONIA Broadcast to North and South Americas Presented to Telewizja Polska S.A." (TP8000822-3).

UL. MOKOTOWSKA 15A LOK 17 00-640 WARSZAWA
TEL. 022 312 41 10 FAX: 022 312 41 12
office@wierzbowski.com
KRS: 0000274978; NIP: 7010056371

Page 12/14

PROF. MAREK WIERZBOWSKI I PARTNERZY

ADWOKACI I RADCOWIE PRAWNI

Third, under Polish law, when the payments for a licensor are dependent on the effects of the business activity of the licensee, the licensee generally has an implied obligation to undertake all actions needed to maximize the licensee's economic performance. Pursuant to Article 355 § 1 of Polish Civil Code, a debtor (meant as a party committed to make a payment) is obliged to use what is called "due diligence." The criterion for due diligence are interpreted objectively[31] in the context of the nature of the contract. Here, given the nature of the payment arrangement between the parties (the payment TVP receives is directly dependent on SEI's efforts to distribute TVP's programming), SEI's due diligence obligation could not be fulfilled without SEI maximizing the number of subscribers. In other words, if SEI has not adequately attempted to obtain the maximum number of subscribers, its obligations to provide TVP with adequate payment for the rights SEI has been granted would not be performed properly.

## IV. Conclusion

In the light of the statutory regulations governing TVP's performance and financing, and based on an examination of the 1994 Agreement and its attendant circumstances, it is evident that TVP and SEI entered into the 1994 Agreement intending to contribute to the fulfillment of TVP's public mission of the widespread dissemination of its programming for the benefit of Poles and persons of Polish descent living in North and South America.

SEI was not only fully aware of all the legal and factual circumstances of the 1994 Agreement, including the goal of the contract as intended by TVP (which under the Polish law is itself sufficient to establish the existence of the common intent of the parties), but SEI also made certain representations, including in its business plan regarding anticipated subscribers, to induce TVP to enter into the 1994 Agreement. These representations formed the basis of the parties' common intent for the 1994 Agreement, namely the aim to maximize the number of viewers of TVP's programming in North and South America. Finally, historical context of the 1994 Agreement, the long-term nature of the 1994 Agreement, SEI's obligation to obtain a certain number of subscribers before commencing broadcasting, and the per-subscriber basis of SEI's royalty payments to TVP, all demonstrate SEI's implied obligation to maximize viewership in North and South America.

---

[31]    K. Pietrzykowski, Comments on Article 355 of the Civil Code [in:] The Civil Code. Comments on the Articles 1-449[10], Warsaw 2011, Legalis.

UL. MOKOTOWSKA 15A LOK 17 00-640 WARSZAWA
TEL. 022 312 41 10 FAX: 022 312 41 12
office@wierzbowski.com
KRS: 0000274978; NIP: 7010056371

Page 13/14

A-2885

PROF. MAREK WIERZBOWSKI I PARTNERZY

ADWOKACI I RADCOWIE PRAWNI

SEI's failure to maximize viewership in North and South America should be considered a material breach of the 1994 Agreement as intended by the parties at the time they signed the contract.

*Prof. dr hab. Marek Wierzbowski*

Radca Prawny / Adwokat

UL. MOKOTOWSKA 15A LOK 17 00-640 WARSZAWA
TEL. 022 312 41 10 FAX: 022 312 41 12
office@wierzbowski.com
KRS: 0000274978; NIP: 7010056371

Page 14/14

Appendix 1

### Professor Marek Wierzbowski

For many years was a partner of Weil, Gotshal & Manges and subsequently Linklaters. He currently manages Prof. Marek Wierzbowski & Partners – Advocates and Legal Counsels – a law firm of 4 partners and over 20 lawyers.

Within his professional practice, Professor Wierzbowski has led teams of lawyers on a range of major transactions, including the privatizations of Poland's leading state bank, Pekao S.A., and Poland's largest oil concern, PKN Orlen S.A., as well as the sale of the leading food and drinks producer, Agros S.A., to the French group Pernod Ricard. He was also the lawyer behind most of the GDR and ADR issues of the shares of Polish companies on international stock markets, including listings on the London Stock Exchange. He has been a member of the supervisory boards of several listed and non-listed companies.

From the very inception of the modern-day capital market in Poland, Professor Wierzbowski has provided legal advice on the creation of investment funds and brokerage houses, contributing, for example, to the first license for a foreign-owned brokerage house in Poland and the first license for an asset management institution.

Professor Wierzbowski represents private parties before Poland's governmental authorities and regulatory agencies (mostly in the area of energy, telecommunications, competition, banking and capital markets) as well as before administrative courts and arbitration tribunals. In the much-publicized arbitration case of Eureko v. the Republic of Poland, he was one of the lawyers acting on behalf of the Republic of Poland.

In the academic field, Marek Wierzbowski is full professor of law at Warsaw University's School of Law and Public Administration. At Warsaw University since 1968, he is a former Associate Dean of the Warsaw School of Law (1981-1985) and Vice Chancellor of Warsaw University (1985-1991). Head of the Chair of Administrative Law and Administrative Procedure, and former head of the Chair of Public Business Law, Professor Wierzbowski currently teaches administrative procedure and public business law. He is also a former member of the State Central Commission of Academic Degrees and Titles, and a member of the collegium (appellate board) of the Supreme Chamber of Control of the Republic of Poland.

Professor Wierzbowski has lectured as a visiting professor at five American law schools: McGeorge School of Law, St. Louis University School of Law, San Francisco University School of Law, Indiana University School of Law Bloomington, and Capital University School of Law. He was also a visiting scholar at UC Berkeley School of Law (Boalt Hall).

He is the author and co-author of numerous legal publications, as well as editor and co-author of three major academic handbooks: *Administrative Law* (10 editions, LexisNexis), *Administrative Procedure* (14 editions, CH Beck), *Business Law* (together with Hanna Gronkiewicz-Waltz, 7 editions, Lexis Nexis). Recently (on 16 March 2012) he presented a well-received paper at an international conference organized by the European Ombudsman in Brussels. He is a member of the Steering Committee of the international organization Research Network on EU Administrative Law

(see ReNEUAL)

In addition to his academic career and active legal practice, Professor Marek Wierzbowski currently serves as Vice-Chairman of the Supervisory Board of the Warsaw Stock Exchange (subsequent to his term as the Chairman of the Board in 2000-2004) and the President of the Arbitration Court of the Chamber of Brokerage Houses. He is a former Vice President of the Arbitration Court at the Polish Chamber of Commerce (the major permanent Arbitration Court in Poland), 1999 – 2005.

A-2888

Publications of the Professor Marek Wierzbowski

Press publications:

1.      Konrad Zacharzewski, Prawo Giełdowe, Warszawa 2010, Wydawnictwo C. H. Beck, s. 397 [recenzja] PRZEGLĄD USTAWODAWSTWA GOSPODARCZEGO Tom 7 2011, str. 30-32 (Recenzja) Marek Wierzbowski, Paweł Wajda

2.      Umowa z organem w postępowaniu administracyjnym PAŃSTWO I PRAWO Tom 4 2010, str. 15-27 (Artykuł) Marek Wierzbowski, M. Rypina

3.      Skąpe prawa komisji RZECZPOSPOLITA Tom 90 2005, str. 2-2 (Artykuł) Marek Wierzbowski (Autor oryginału)

Book publications:

1.      Kodeks postępowania administracyjnego. Komentarz, C. H. Beck, 201 (Książka) Marek Wierzbowski (Redaktor), Aleksandra Wiktorowska (Redaktor), Maksymilian Chera, Marcin Dyl, Filip Elżanowski, Krzysztof Glibowski, Janusz Malanowski, Grzegorz Rząsa, Rafał Stankiewicz, Paweł Wajda, Krzysztof Wąsowski, Karolina Wojciechowska, Katarzyna Zalasińska

2.      Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi C. H. Beck, 2011 (Książka)

Marek Wierzbowski (Redaktor), Marek Szubiakowski, Marek Wierzbowski, Aleksandra Wiktorowska

3.      Prawo administracyjne LexisNexis, 2011 (Książka)

Marek Wierzbowski (Redaktor), Marek Wierzbowski, Jacek Jagielski, Jacek Lang, Marek Szubiakowski, Aleksandra Wiktorowska

4.      Prawo gospodarcze. Zagadnienia administracyjnoprawne LexisNexis, 2011 (Książka)

Hanna Gronkiewicz-Waltz (Redaktor), Marek Wierzbowski (Redaktor), Cezary Banasiński, Krzysztof Glibowski, Hanna Gronkiewicz-Waltz, Krzysztof Jaroszyński, Remigiusz Kaszubski, Marek Wierzbowski

5.      Prawo o postępowaniu przed sądami administracyjnymi. Komentarz C. H. Beck, 2011 (Książka)

Roman Hauser (Redaktor), Marek Wierzbowski (Redaktor), Maksymilian Cherka, Janusz Drachal, Piotr Gołaszewski, Maria Jagielska, Jacek Jagielski, Grzegorz Rząsa, Rafał Stankiewicz, Paweł Wajda, Aleksandra Wiktorowska, Karolina Wojciechowska, Katarzyna Zalasińska

6.      System Prawa Administracyjnego. T. 6, Podmioty administrujące

Wydawnictwo C.H. Beck, Instytut Nauk Prawnych PAN, 2011 (Książka)

Roman Hauser (Redaktor), Zygmunt Niewiadomski (Redaktor), A. Wróbel (Redaktor), Maksymilian Cherka, Zbigniew Czarnik, Marcin Dyl, Krzysztof Jaroszyński, Zygmunt

**A-2889**

Niewiadomski, Aleksandra Paczkowska-Tomaszewska, Jerzy Posłuszny, Małgorzata Stahl, Rafał Stankiewicz, Paweł Wajda, Marek Wierzbowski, Aleksandra Wiktorowska

7.    Postępowanie Administracyjne – ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi CH BECK, 2010 (Książka)

Marek Wierzbowski, Marek Szubiakowski, Aleksandra Wiktorowska

8.    Postępowanie administracyjne – ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi CH BECK, 2010 (Książka) Marek Wierzbowski (Redaktor)

9.    Współczesne problemy prawa energetycznego Lexis-Nexis, 2010 (Książka)

Marek Wierzbowski (Redaktor), Rafał Stankiewicz (Redaktor)

10.    Prawo administracyjne Lexis Nexis, 2009 (Książka)

Marek Wierzbowski (Redaktor)

11.    Prawo administracyjne Lexis Nexis, 2009 (Książka)

Jacek Jagielski, Jacek Lang, Marek Szubiakowski, Marek Wierzbowski, Aleksandra Wiktorowska

12.    Prawo gospodarcze: zagadnienia administracyjnoprawne Lexis Nexis, 2009 (Książka)

Hanna Gronkiewicz-Waltz (Redaktor), Marek Wierzbowski (Redaktor)

13.    Prawo gospodarcze: zagadnienia administracyjnoprawne Lexis Nexis, 2009 (Książka)

Cezary Banasiński, Krzysztof Glibowski, Hanna Gronkiewicz-Waltz, Krzysztof Jaroszyński, Remigiusz Kaszubski, Marek Wierzbowski

14.    Ustawa o ochronie konkurencji i konsumentów C. H. BECK, 2009 (Książka)

Tadeusz Skoczny (Redaktor), Agata Jurkowska (Redaktor), Dawid Miąsik (Redaktor), Mciej Bernatt, A.M. Będkowski-Kozioł, Łukasz Błaszczak, A. Jurkiewicz, S. Koroluk, E. Kosiński, K. Kowalik-Bańczyk, Małgorzata Król-Bogomilska, P. Lissoń, G. Łaszczyca, C. Martysz, A. Matan, G. Materna, D. Miąsik, Molski, S. Piątek, A. Powałowski, Poździk, M. Sachajko, E. Sage, T. Skoczny, Rafał Stankiewicz, M. Stefaniuk, M. Swora, Alicja Szymanowska, Marek Wierzbowski

15.    Współczesne zagadnienia prawa i procedury administracyjnej. Księga jubileuszowa dedykowana Prof. zw. dr. hab. Jackowi M. Langowi Wolters Kluwer, 2009 (Książka)

Ewa Stefańska (Redaktor), Marek Wierzbowski (Redaktor)

16.    Postępowanie administracyjne - ogólne, egzekucyjne i przed sądami administracyjnymi

C.H. Beck, 2008 (Książka)

Marek Szubiakowski, Marek Wierzbowski, Aleksandra Wiktorowska, Marek Wierzbowski (Redaktor)

17.    Prawo administracyjne LexisNexis, 2008 (Książka)

Marek Wierzbowski, Jacek Jagielski, Jacek Lang, Marek Szubiakowski, Aleksandra Wiktorowska, Marek Wierzbowski (Redaktor)

18.    Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi C.H.Beck, 2007 (Skrypt lub podręcznik akademicki)

Marek Wierzbowski (Redaktor), Marek Szubiakowski, Aleksandra Wiktorowska

19.    Prawo administracyjne LexisNexis, 2007 (Skrypt lub podręcznik akademicki)

Marek Wierzbowski (Redaktor), Zbigniew Cieślak, Jacek Jagielski, Jacek Lang, Marek Szubiakowski, Aleksandra Wiktorowska

20.    Prawo gospodarcze. Zagadnienia administracyjnoprawne LexisNexis, 2007 (Skrypt lub podręcznik akademicki)

Hanna Gronkiewicz-Waltz (Redaktor), Marek Wierzbowski (Redaktor), Cezary Banasiński, Krzysztof Glibowski, Hanna Gronkiewicz-Waltz, Remigiusz Kaszubski, Dariusz Szafrański, Marek Wierzbowski

21.    Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi C.H.Beck, 2006 (Skrypt lub podręcznik akademicki)

Marek Wierzbowski (Redaktor), Marek Szubiakowski, Aleksandra Wiktorowska

22.    Prawo administracyjne LexisNexis, 2006 (Skrypt lub podręcznik akademicki)

Marek Wierzbowski (Redaktor), Zbigniew Cieślak, Jacek Jagielski, Jacek Lang, Marek Szubiakowski, Aleksandra Wiktorowska

23.    Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi C.H.beck, 2005 (Książka)

Marek Wierzbowski (Redaktor), Marek Szubiakowski, Aleksandra Wiktorowska

24.    Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi C.H.Beck, 2004 (Książka)

Marek Wierzbowski (Redaktor), Marek Szubiakowski, Aleksandra Wiktorowska

25.    Prawo administracyjne LexisNexis, 2003 (Skrypt lub podręcznik akademicki)

Marek Wierzbowski (Redaktor), Zbigniew Cieślak, Jacek Jagielski, Jacek Lang, Marek Szubiakowski, Aleksandra Wiktorowska

26.    Prawo gospodarcze. Zagadnienia administracyjnoprawne LexisNexis, 2003

(Skrypt lub podręcznik akademicki)

Marek Wierzbowski (Redaktor), Mirosław Wyrzykowski (Redaktor), Krzysztof Pawłowicz, Hanna Gronkiewicz-Waltz, Cezary Banasiński, Dariusz Szafrański

27.   Postępowanie administracyjne - ogólne, podatkowe i egzekucyjne C.H.Beck, 2002 (Skrypt lub podręcznik akademicki)

Marek Szubiakowski, Aleksandra Wiktorowska, Marek Wierzbowski

28.   Prawo administracyjne Wydawnictwo Prawnicze Lexis Nexis Sp. z o.o., 2002 (Skrypt lub podręcznik akademicki)

Jacek Lang (Autor oryginału), Jacek Jagielski, Piotr Przybysz, Ewa Stefańska, Marcin Dyl, Jarosław Maćkowiak, Alicja Szymanowska, Romuald Szewczuk, Rafał Stankiewicz, Anna Halczuk, Andrzej Złoch, Marek Wierzbowski (Redaktor), Marek Szubiakowski

29.   Postępowanie administracyjne - podatkowe i egzekucyjne C.H.Beck, 2001 (Skrypt lub podręcznik akademicki)

Marek Szubiakowski, Aleksandra Wiktorowska, Marek Wierzbowski

30.   Prawo administracyjne Wydawnictwo Prawnicze PWN, 2001 (Skrypt lub podręcznik akademicki)

Jacek Lang, Jarosław Maćkowiak, Marek Wierzbowski (Redaktor)

31.   Postępowanie administracyjne - ogólne, podatkowe i egzekucyjne C.H.Beck, 2000 (Skrypt lub podręcznik akademicki)

Marek Szubiakowski, Marek Wierzbowski (Redaktor), Aleksandra Wiktorowska

32.   Ustawa-Prawo o publicznym obrocie papierami wartościowymi. Komentarz Dom Wydawniczy ABC, 2000 (Książka)

Marek Wierzbowski, Ryszard Czerniawski

33.   Postępowanie administracyjne - ogólne, podatkowe i egzekucyjne Wyd. PWN, 1999 (Skrypt lub podręcznik akademicki)

Marek Szubiakowski, Aleksandra Wiktorowska, Marek Wierzbowski (Redaktor)

34.   Postępowanie administracyjne - ogólne, podatkowe i egzekucyjne C.H.Beck, 1999 (Skrypt lub podręcznik akademicki)

Marek Szubiakowski, Marek Wierzbowski (Redaktor), Aleksandra Wiktorowska

35.   Prawo administracyjne PWN, 1999 (Książka)

Zbigniew Cieślak, Marcin Dyl, Jacek Jagielski, Jacek Lang, Jarosław Maćkowiak, Piotr Przybysz, Ewa Stefańska, Romuald Szewczuk, Marek Szubiakowski, Alicja Szymanowska, Aleksandra Wiktorowska, Marek Wierzbowski (Redaktor)

Publications in books:

1.      Administracja w dziedzinie oświaty, nauki i kultury. 1, Szkolnictwo podstawowe, ogólnokształcące i zawodowe

w: Prawo administracyjne, str. 560-570, LexisNexis, 2011 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

2.      Administracja w dziedzinie oświaty, nauki i kultury. 2, Szkolnictwo wyższe, placówki naukowo-badawcze: B, Polska Akademia Nauk; C, Placówki naukowo-badawcze; D, Stopnie i tytuły naukowe. 3, Organizacja upowszechniania kultury. 4, Kultura fizyczna i sport

w: Prawo administracyjne, str. 580-598, LexisNexis, 2011 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

3.      Administracyjnoprawna sytuacja osób fizycznych. 1, Obywatelstwo

w: Prawo administracyjne, str. 607-609, LexisNexis, 2011 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska, Karolina Wojciechowska

4.      Brak bezstronności i niezależności jako podstawowe przesłanki wyłączenia arbitra (art. 1174 k.p.c.)

w: Aurea Praxis Aurea Theoria. Księga Pamiątkowa ku czci Profesora Tadeusza Erecińskiego. T. 2, str. 299-354, LexisNexis, 2011 (Esej lub rozdział w książce)

Marek Wierzbowski, A. Krysiak

5.      Centralne organy administracji państwowej

w: System Prawa Administracyjnego. T. 6, Podmioty administrujące, str. 227-298, LexisNexis, 2011 (Esej lub rozdział w książce)

Maksymilian Cherka, Marek Wierzbowski

6.      Nadzór państwa nad rynkiem kapitałowym

w: Prawo administracyjne, str. 395-397, LexisNexis, 2011 (Esej lub rozdział w książce)

Marek Wierzbowski, Marcin Dyl

7.      Organy regulacyjne

w: System prawa administracyjnego. T. 6, Podmioty administrujące, str. 299-354, C. H. Beck, Instytut Nauk Prawnych PAN, 2011 (Esej lub rozdział w książce)

Krzysztof Jaroszyński, Marek Wierzbowski

**A-2893**

8.    Podstawowe pojęcia teoretyczne w nauce prawa administracyjnego. 1, Aparat administracyjny. 2, Nadzór, kontrola, koordynacja, kierownictwo. 3, Decentralizacja i centralizacja administracji. 4, Samorząd. 5, Rodzaje jednostek organizacyjnych w systemie administracji publicznej

w: Prawo administracyjne, str. 99-131, LexisNexis, 2011 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

9.    Polish Code of Administrative Procedure and Perspectives for EU Administrative Procedural Act

w: Die Arche der Freundschaft Festschrift fur Professor Dr. Theodor J. Panagopoulos, str. 729-734, Sakkoulas Publications, 2011 (Esej lub rozdział w książce)

Marek Wierzbowski, Stanisław Radowicki

10.    Prawne formy działania administracji

w: Prawo administracyjne, str. 297-332, LexisNexis, 2011 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

11.    Regulacja publicznoprawna rynku finansowego

w: Prawo gospodarcze. Zagadnienia administracyjnoprawne, str. 404-455, LexisNexis, 2011 (Esej lub rozdział w książce)

Hanna Gronkiewicz-Waltz, Marek Wierzbowski, Remigiusz Kaszubski, Krzysztof Glibowski

12.    Samorząd teryorialny

w: Prawo administracyjne, str. 241-270, LexisNexis, 2011 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

13.    Terenowe jednostki organizacyjne administracji specjalnej

w: Prawo administracyjne, str. 234-240, LexisNexis, 2011 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

14.    Zarys systemu podmiotów administrujących w Unii Europejskiej

w: System Prawa Administracyjnego. T. 6, Podmioty administrujące, str. 553-591, Wydawnictwo C.H. Beck, Instytut Nauk Prawnych PAN, 2011 (Esej lub rozdział w książce)

Marcin Dyl, Rafał Stankiewicz, Marek Wierzbowski, Aleksandra Paczkowska-Tomaszewska

15.    Bezstronność i niezależność, jako kluczowe cechy każdego arbitra

w: Księga pamiątkowa 60-lecia Sądu Arbitrażowego przy Krajowej Izbie Gospodarczej w Warszawie, str. 359-375, Sąd Arbitrażowy przy Krajowej Izbie Gospodarczej, 2010 (Esej lub rozdział w książce)

Marek Wierzbowski, A. Krysiak

16.    Zagadnienia prawne ustroju gospodarczego Polski w świetle dorobku 20-lecia RP i perspektyw rozwoju gospodarczego

w: Quo vadis Polonia? W drodze do demokratycznego państwa prawa. Polska 1989-2009, str. 365-380, Biuro Rzecznika Praw Obywatelskich, 2010 (Esej lub rozdział w książce)

Marek Wierzbowski

17.    Conflict of Norms Stemming from Intra EU BITs and EU Legal Obligations : Some Remarks and Possibile Solutions

w: International investment law for the 21st century : essays in honour of Christoph Schreuer, str. 544-568, Oxford University Press, 2009 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksander Gubrynowicz

18.    Granice ochrony danych osobowych

w: Prawne uwarunkowania wymiany informacji – nowe wyzwania, str. 65-81, Stowarzyszenie Absolwentów Wydziału Prawa i Administracji UW, 2009 (Esej lub rozdział w książce)

Marek Wierzbowski, Alicja Szymanowska

19.    Kryzys ekonomiczny a prawo administracyjne

w: Między tradycją a przyszłością w nauce prawa administracyjnego. Księga jubileuszowa dedykowana Profesorowi Janowi Bociowi, str. 776-780, Wydawnictwo Uniwersytetu Wrocławskiego, 2009 (Esej lub rozdział w książce)

Marek Wierzbowski

20.    Organy regulacyjne – wybrane problemy

w: Współczesne zagadnienia prawa i procedury administracyjnej. Księga jubileuszowa dedykowana Prof. zw. dr. hab. Jackowi M. Langowi, str. 351-364, Wolters Kluwer, 2009 (Esej lub rozdział w książce)

Marek Wierzbowski, Jacek Jagielski

21.    Administracja w dziedzinie oświaty, nauki i kultury

w: Prawo administracyjne, str. 486-525, LexisNexis, 2008 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska, Karolina Zielińska, Katarzyna Zalasińska

22.    Administracyjnoprawna sytuacja osób fizycznych

w: Prawo administracyjne, str. 526-561, LexisNexis, 2008 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska, Jacek Jagielski, Karolina Zielińska

23.    Podstawowe pojęcia teoretyczne w nauce prawa administacyjnego

w: Prawo administracyjne, str. 91-142, LexisNexis, 2008 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska, Piotr Przybysz, Marek Szubiakowski

24.    Prawne formy działania administracji

w: Prawo administracyjne, str. 277-309, LexisNexis, 2008 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

25.    Terenowe jednostki organizacyjne administracji specjalnej

w: Prawo administracyjne, str. 216-223, LexisNexis, 2008 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

26.    Wybrane zagadnienia administracyjnoprawnej gegulacji gospodarki

w: Prawo administracyjne, str. 349-452, LexisNexis, 2008 (Esej lub rozdział w książce)

Jacek Lang, Maksymilian Cherka, Rafał Stankiewicz, Krzysztof Glibowski, Marek Wierzbowski, Marcin Dyl, Ewa Stefańska, Jarosław Maćkowiak, Janusz Malanowski, Krzysztof Wąsowski, Filip Elżanowski, Paweł Wajda, Alicja Szymanowska

27.    Administracyjnoprawna sytuacja osób fizycznych

w: Prawo administacyjne, str. 492-521, LexisNexis, 2007 (Esej lub rozdział w książce)

Jacek Jagielski, Marek Wierzbowski, Aleksandra Wiktorowska, Karolina Zielińska

28.    Podstawowe pojęcia teoretyczne w nauce prawa administracyjnego

w: Prawo administracyjne, str. 91-135, LexisNexis, 2007 (Esej lub rozdział w książce)

Piotr Przybysz, Marek Szubiakowski, Marek Wierzbowski, Aleksandra Wiktorowska

29.    Wybrane zagadnienia administacyjnoprawnej regulacji gospodarki

w: Prawo administracyjne, str. 327-425, LexisNexis, 2007 (Esej lub rozdział w książce)

Maksymilian Cherka, Rafał Stankiewicz, Marcin Dyl, Krzysztof Glibowski, Jacek Lang, Alicja Szymanowska, Janusz Malanowski, Jarosław Maćkowiak, Ewa Stefańska, Romuald Szewczuk, Wojciech Wąsowicz, Filip Elżanowski, Marek Wierzbowski

30.    Administracja w dziedzinie oświaty, nauki i kultury

w: Prawo administacyjne, str. 468-501, LexisNexis, 2006 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska, Karolina Zielińska

31.    Administracyjnoprawna sytuacja osób fizycznych

w: Prawo administacyjne, str. 502-532, LexisNexis, 2006 (Esej lub rozdział w książce)

Jacek Jagielski, Marek Wierzbowski, Aleksandra Wiktorowska, Karolina Zielińska

32.    Podstawowe pojęcia teoretyczne w nauce prawa administracyjnego

w: Prawo administacyjne, str. 91-135, LexisNexis, 2006 (Esej lub rozdział w książce)

Piotr Przybysz, Marek Szubiakowski, Marek Wierzbowski, Aleksandra Wiktorowska

33.    Prawne formy działania administracji

w: Prawo administacyjne, str. 263-296, LexisNexis, 2006 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

34.    Przedmowa

w: Prawo administacyjne, str. 11-12, LexisNexis, 2006 (Esej lub rozdział w książce)

Marek Wierzbowski (Autor oryginału)

35.    Terenowe jednostki organizacyjne administracji specjalnej

w: Prawo administacyjne, str. 232-239, LexisNexis, 2006 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

36.    Wybrane zagadnienia administracyjnoprawnej regulacji gospodarki

w: Prawo administacyjne, str. 337-395, LexisNexis, 2006 (Esej lub rozdział w książce)

Jacek Lang, Rafał Stankiewicz, Maksymilian Cherka, Janusz Malanowski, Jarosław Maćkowiak, Ewa Stefańska, Romuald Szewczuk, Alicja Szymanowska, Krzysztof Wąsowski, Filip Elżanowski, Marek Wierzbowski, Marcin Dyl

37.    Istota i rozwój postępowania administracyjnego

w: postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi, str. 1-4, C.H.Beck, 2004 (Esej lub rozdział w książce)

Marek Wierzbowski (Autor oryginału)

38.    Paragraf 10 Doręczenia i Paragraf 11 Wezwania

w: Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi, str. 65-69, C.H.Beck, 2004 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

39. Postępowanie uproszczone

w: Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi, str. 238-243, C.H.Beck, 2004 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

40. Przedmioty orzekające

w: Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi, str. 30-43, C.H.Beck, 2004 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

41. Uprawnienia prokuratora i Rzecznika Praw Obywatelskich w postępowaniu administracyjnym

w: Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi, str. 227-230, C.H.Beck, 2004 (Esej lub rozdział w książce)

Marek Wierzbowski (Autor oryginału)

42. Zagadnienia ogólne

w: Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi, str. 9-14, C.H.Beck, 2004 (Esej lub rozdział w książce)

Marek Wierzbowski (Autor oryginału)

43. Administracja w dziedzinie oświaty, nauki i kultury

w: Prawo administracyjne, str. 517-532, LexisNexis, 2003 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

44. Administracyjnoprawna sytuacja osób fizycznych

w: Prawo administracyjne, str. 533-545, LexisNexis, 2003 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska, Jacek Jagielski

45. Niezależne organy regulacyjne

w: Prawo gospodarcze. Zagadnienia administracyjnoprawne, str. 114-119, LexisNexis, 2003 (Esej lub rozdział w książce)

Marek Wierzbowski (Autor oryginału)

**A-2898**

46.     Podstawowe pojęcia teoretyczne w nauce prawa administracyjnego

w: Prawo administracyjne, str. 91-127, LexisNexis, 2003 (Edycja źródeł)

Marek Wierzbowski, Aleksandra Wiktorowska, Piotr Przybysz

47.     Prawne formy działania administracji

w: Prawo administracyjne, str. 357-361, LexisNexis, 2003 (Esej lub rozdział w książce)

Aleksandra Wiktorowska, Marek Wierzbowski

48.     Publicznoprawna problematyka ubezpieczeń

w: Prawo gospodarcze. Zagadnienia administracyjnoprawne, str. 262-269, LexisNexis, 2003 (Esej lub rozdział w książce)

Marek Wierzbowski (Autor oryginału)

49.     Publicznoprawne aspekty obrotu papierami wartościowymi

w: Prawo gospodarcze. Zagadnienia administracyjnoprawne, str. 290-314, LexisNexis, 2003 (Esej lub rozdział w książce)

Marek Wierzbowski (Autor oryginału)

50.     Terenowe jednostki organizacyjne administracji specjalnej

w: Prawo administracyjne, str. 265-298, LexisNexis, 2003 (Esej lub rozdział w książce)

Marek Wierzbowski, Aleksandra Wiktorowska

51.     Wybrane zagadnienia administracyjnoprawnej regulacji gospodarki

w: Prawo administracyjne, str. 336-516, LexisNexis, 2003 (Esej lub rozdział w książce)

Jacek Lang, Marek Wierzbowski, Jarosław Maćkowiak, Marcin Dyl, Ewa Stefańska, Krzysztof Glibowski, Romuald Szewczuk, Maksymilian Cherka, Rafał Stankiewicz

* * * 2009 (numbers of publications: 5) * * *

WIERZBOWSKI Marek * "Nie" dla odrębnego sądu finansowego. Rzeczposp. 2009 nr 209.

WIERZBOWSKI Marek * Kryzys ekonomiczny a prawo administracyjne. W: Między tradycją ... s. 776-780, { Między tradycją a przyszłością w nauce prawa administracyjnego. Księga jubileuszowa dedykowana Profesorowi Janowi Bociowi. Red. Jerzy Supernat. Wstęp Adam Błaś. Wrocław 2009 UWr. ss. 844, bibliogr.,}

WIERZBOWSKI Marek, JAGIELSKI Jacek * Organy regulacyjne - wybrane problemy. W: Księga jubileuszowa Prof. J.M. Langa ... s. 351-369, { Współczesne zagadnienia prawa i procedury administracyjnej. Księga jubileuszowa dedykowana Prof.zw.dr.hab. Jackowi M. Langowi. Red. Marek Wierzbowski, Jacek Jagielski, Aleksandra Wiktorowska, Ewa Stefańska. Wwa 2009 Wolters Kluwer ss. 393,}

**A-2899**

WIERZBOWSKI Marek * Prawo nie zastąpi kalkulacji ryzyka. [Dot. rynków kapitałowych]. Wywiad. Rzeczposp. 2009 nr 3.

KULGAWCZUK Dariusz, KWAŚNICKI Radosław L., WIERZBOWSKI Marek * Najnowsze zmiany w kodeksie spółek handlowych. Prawo Spółek 2009 nr 1 s. 2-10.

* * * 2008 (numbers of publications: 1) * * *

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi. Red. Marek Wierzbowski. Wyd. 12 zm i uaktual. Wwa 2008 C.H. Beck ss. XX + 462.

* * * 2007 (numbers of publications: 1) * * *

WIERZBOWSKI Marek, SZUBIAKOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi. Red. Marek Wierzbowski. Wyd. 11. Wwa 2007 C.H. Beck ss. XX + 452, bibliogr., indeks rzeczowy.

* * * 2006 (numbers of publications: 1) * * *

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi. Red. Marek Szubiakowski. Wyd. 10 zm. i uaktual. Wwa 2006 C.H. Beck ss. XX + 448, indeks rzeczowy.

* * * 2005 (numbers of publications: 4) * * *

WIERZBOWSKI Marek * Postępowanie wyjaśniające przed Komisją Papierów Wartościowych i Giełd. Prz.Prawa Handl. 2005 nr 4 s. 12-14.

WIERZBOWSKI Marek * Skąpe prawa komisji. [Dot. obrotu papierami wartościowymi]. Rzeczposp. 2005 nr 90.

JAGIELSKI Jacek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Nietypowe podmioty administrujące - kilka refleksji na tle organizacyjnych form wykonywania zadań publicznych. W: Podmioty administracji ... s. 203-222, { Podmioty administracji publicznej i prawne formy ich działania. Studia i materiały z Konferencji Naukowej Poświęconej Jubileuszowi 80-tych urodzin Profesora Eugeniusza Ochendowskiego. Toruń 2005 TNOiK ss. 483,}

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi. Red. Marek Wierzbowski. Wyd. 9 zm. i uaktual. Wwa 2005 C.H. Beck ss. 448, bibliogr.

* * * 2004 (numbers of publications: 1) * * *

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne - ogólne, podatkowe, egzekucyjne i przed sądami administracyjnymi. Red. Marek Szubiakowski. Wyd. 8 zm. i uaktual. Wwa 2004 C.H. Beck ss. XXIII + 440, bibliogr., indeks.

* * * 2003 (numbers of publications: 3) * * *

WIERZBOWSKI Marek * Oferta jak świnka. Wyrok, który może spowodować perturbacje na polskim rynku kapitałowym. Rzeczposp. 2003 nr 237.

SZYMANOWSKA Alicja, WIERZBOWSKI Marek * Zbliża się termin złożenia wniosków. Pomoc publiczna dla przedsiębiorców o szczególnym znaczeniu dla rynku pracy. Rzeczposp. 2003 nr 14.

CZERNIAWSKI Ryszard, WIERZBOWSKI Marek * Ustawa Prawo o publicznym obrocie papierami wartościowymi. Komentarz. Wwa 2002 Dom Wydawn.ABC ss. 618 + CD-ROM, bibliogr.

* * * 2002 (numbers of publications: 4) * * *

WIERZBOWSKI Marek, SZYMANOWSKA Alicja, MACGREGOR Anne * Ochrona przed nadmiernym przywozem towarów do Polski. Prz.Prawa Handl. 2002 nr 12 s. 24-31.

WIERZBOWSKI Marek * Zależności oraz porozumienia akcjonariuszy w prawie o publicznym obrocie papierami wartościowymi. Prz.Prawa Handl. 2002 nr 5 s. 1-6.

WIERZBOWSKI Marek, DYL Marcin * Znaczne pakiety akcji spółek publicznych. Wwa 2002 C.H. Beck ss. 104, indeks rzeczowy.

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne: ogólne, podatkowe i egzekucyjne. Red. Marek Szubiakowski. Wyd. 5 uzup. i 6. Wwa 2002 C.H. Beck ss. XX + 411; + 415, bibliogr., indeks rzeczowy.

* * * 2000 (numbers of publications: 2) * * *

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne: ogólne, podatkowe i egzekucyjne. Wyd. 4 uzup. Wwa 2000 C.H. Beck ss. XX + 409, bibliogr., indeks rzeczowy.

CZERNIAWSKI Ryszard, WIERZBOWSKI Marek * Ustawa Prawo o publicznym obrocie papierami wartościowymi. Komentarz. Wwa 2000 Dom Wydawn.ABC ss. 524.

* * * 1998 (numbers of publications: 3) * * *

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne - ogólne, podatkowe i egzekucyjne. Wyd. 2. Wwa 1998 C.H.Beck ss. 359.

BIELECKA Zofia, WIERZBOWSKI Marek * Przygotowanie emisji przez polską spółkę. Rzeczposp. 1998 nr 65.

BIELECKA Zofia, WIERZBOWSKI Marek * Papiery dłużne. Zagadnienia praktyczne. Wwa 1998 "Parkiet" Sp. z o.o. ss. 160.

* * * 1997 (numbers of publications: 1) * * *

WIERZBOWSKI Marek * Nadzór państwa nad funduszami powierniczymi. W: Prawo, administracja ... s. 389-393, { Prawo, administracja, obywatele. Profesorowi

**A-2901**

Eugeniuszowi Smoktunowiczowi - Księga pamiątkowa. Białystok 1997 Temida 2 ss. 414,}

* * * 1996 (numbers of publications: 2) * * *

CZERNIAWSKI Ryszard, WIERZBOWSKI Marek * Prawo o publicznym obrocie papierami wartościowymi i funduszach powierniczych. Komentarz. Stan prawny na 15.III.1996 Wwa 1996 Wydawn.Prawn. ss. 235.

  Recenzja:

  Grabowski Jan. PiP 1996 nr 12 s. 90-91.

SZUBIAKOWSKI Marek, WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Postępowanie administracyjne - ogólne, podatkowe i egzekucyjne. Wwa 1996 Wydawn.C.H.Beck ss. 388.

* * * 1995 (numbers of publications: 3) * * *

WIERZBOWSKI Marek * Glosa do postanowienia NSA z 29.XII.1993 II SA 1576/93. [Dot. rachunku za nielegalne pobieranie energii lub paliwa ze wspólnej sieci]. Monitor Prawniczy 1995 nr 7 s. 213-214.

WIERZBOWSKI Marek * Kwity depozytowe (ADRy i GDRy) sposobem na pozyskiwanie kapitałów zagranicznych. Monitor Prawniczy 1995 nr 11 s. 321-323.

FRANKOWSKA-BUDZEŃ Anna, WIERZBOWSKI Marek * Przejmowanie spółek giełdowych. Rzeczposp. 1995 nr 185.

* * * 1994 (numbers of publications: 4) * * *

WIERZBOWSKI Marek * Glosa do postanowienia NSA z 3.IX.1992 III SA 1407/92. [Dot. niedopuszczalności skargi na pozostawienie sprawy bez rozpoznania]. OSP 1994 nr 6 poz. 104 aa.

WIERZBOWSKI Marek * Glosa do wyroku SN z 24.VI.1993 III ARN 33/93. [Dot. dopuszczalności decyzji reformacyjnej - art. 139 k.p.a.]. PiP 1994 nr 9 s. 111-115.

WIERZBOWSKI Marek * Nowelizacja prawa o publicznym obrocie papierami wartościowymi. Prz.Sądowy 1994 nr 9 s. 3-17.

WIERZBOWSKI Marek * Problemy obrotu prawami do polskich papierów wartościowych na rynkach obcych. PiP 1994 nr 5 s. 20-28.

* * * 1993 (numbers of publications: 4) * * *

WIERZBOWSKI Marek, WIKTOROWSKA Aleksandra * Podstawowe pojęcia teoretyczne w nauce prawa administracyjnego. W: Samorząd terytorialny ... s. 31-85, { Samorząd terytorialny i rozwój lokalny. Red. i wstęp Andrzej Piekara, Zygmunt Niewiadomski. Wwa 1992 UW ss. 368,}

WIERZBOWSKI Marek * Sposób na zdobycie obcych kapitałów. [Dot. amerykańskich kwitów depozytowych]. Rzeczposp. 1993 nr 245.

ROSENZWEIG Francis, WIERZBOWSKI Marek * Zagadnienia prawne pozyskiwania kapitałów amerykańskich dla inwestowania w polskie papiery wartościowe. PiP 1993 nr 5 s. 70-78.

HICKS William, WIERZBOWSKI Marek * Eksterytorialny zasięg amerykańskiego prawa papierów wartościowych. Prz.Sądowy 1993 nr 7/8 s. 53-67.

* * * 1992 (numbers of publications: 1) * * *

WIERZBOWSKI Marek * Prawo administracyjne w Stanach Zjednoczonych. W: Zarys prawa Stanów ... s. 169-197 { Zarys prawa Stanów Zjednoczonych. Cz. 2. Red. Jan Głuchowski. [Cz.1. zob. XXIV]. Toruń 1991 UMK ss. 233,}

* * * 1990 (numbers of publications: 2) * * *

WIERZBOWSKI Marek * Administracyjnoprawna regulacja ochrony zdrowia. W: Księga z okazji ... s. 323-328, { Księga z okazji 40-lecia pracy naukowej profesora Jana Jendrośki. Wstęp oprac. koledzy i uczniowie. Acta UWr.Prawo 1990 nr 168 s. 3-348, Rés., Zsf., Sum., Soderż.,}

WIERZBOWSKI Marek * Stabilizacja regulacji prawnej w zakresie rad narodowych. Stud.Iur. 1990 nr 18 s. 213-221, { Organizacja i funkcjonowanie administracji państwowej. Księga poświęcona Jerzemu Służewskiemu. Red. Jacek Lang. Stud.Iur. 1990 nr 18 s. 1-244, bibliogr.,}

* * * 1989 (numbers of publications: 1) * * *

WIERZBOWSKI Marek * Nowe prawo o stowarzyszeniach. PiP 1989 nr 7 s. 13-22.

* * * 1987 (numbers of publications: 3) * * *

[WIERZBOWSKI Marek * Jakość wyrobów. Zagadnienia administracyjno-prawne. Wrocław 1984, zob. XXII]

   Recenzja:

Rabska Teresa. PiP 1987 nr 4 s. 108-110.

WIERZBOWSKI Marek * Prawo a kultura organizacji życia społecznego. ND 1986 nr 10 s. 33-41.

WIERZBOWSKI Marek * Wpływ administracji państwowej na działalność jednostek gospodarki nieuspołecznionej. W: Aktualne problemy administracji ... s.192-203 { Aktualne problemy administracji i prawa administracyjnego. W czterdziestolecie pracy zawodowej i naukowej prof. Zygmunta Rybickiego. Red. Adam Jaroszyński. Wwa 1987 PWN ss. 283}

* * * 1985 (numbers of publications: 2) * * *

WIERZBOWSKI Marek * Administracyjnoprawne formy świadczenia usług. Acta UWr.Prawo 1985 nr 143 s. 341-350.

[WIERZBOWSKI Marek * Jakość wyrobów. Zagadnienia administracyjnoprawne. Wrocław 1984]

Recenzja:

Jełowicki Marcin. OMT 1985 nr 8/9 s. 63-64.

* * * 1984 (numbers of publications: 1) * * *

WIERZBOWSKI Marek * Jakość wyrobów. Zagadnienia administracyjnoprawne. Wrocław 1984 Ossolineum, IPiP ss. 244.

* * * 1983 (numbers of publications: 1) * * *

WIERZBOWSKI Marek * Sądowa kontrola administracji w administracji w Stanach Zjednoczonych. W: Prawo, administracja, gospodarka... s. 531-545, { Prawo, administracja, gospodarka. Księga ku czci Profesora Ludwika Bara. Red. Janusz Łętowski, Jan P. Pruszyński. Tłum. częściowo z bułgarskiego, niem., ros. Wwa 1983 Ossolineum IPiP ss. 559}

* * * 1982 (numbers of publications: 2) * * *

WIERZBOWSKI Marek * Nadzór w systemie rad narodowych i terenowych organów administracji. Stud.Iur. t. 11: 1982 s. 51-63.

WIERZBOWSKI Marek * Nadzór w zdecentralizowanym aparacie państwowym. W: Model władzy ... s. 139-149, { Model władzy lokalnej w systemie reformy gospodarczej. Red. Michał Kulesza. Wwa 1982 UW ss. 220, na prawach rkpsu.,}

* * * 1981 (numbers of publications: 3) * * *

WIERZBOWSKI Marek * Glosa do wyroku SN z 7.XII.1979 I CR 371/79. [Dot. charakteru czynności ZBoWiD polegającej na wydaniu lub odmowie wydania zaświadczenia o uprawnieniach kombatanckich; dopuszczalności drogi sądowej w sprawach ze stosunku członkostwa w ZBoWiD]. OSPiKA 1981 poz. 5 c.

WIERZBOWSKI Marek * Zasady i tryb wydawania zaświadczeń według kodeksu postępowania administracyjnego. PiP 1981 nr 1 s. 42-52.

WIERZBOWSKI Marek * Zgodność z prawem decyzji administracyjnych. OMT 1981 nr 2 s. 13-16.

* * * 1980 (numbers of publications: 3) * * *

WIERZBOWSKI Marek * Administracyjno prawne instytucje kształtowania i kontroli jakości wyrobów. Stud.Prawn. 1980 nr 3 s. 3-43, Soderż., Sum.

WIERZBOWSKI Marek * Charakter prawny zaświadczeń (rozważania na tle projektu noweli do k.p.a.). OMT 1980 nr 1 s. 17-20.

WIERZBOWSKI Marek * Nowe przepisy o radach narodowych w ZSRR. OMT 1980 nr 12 s. 34-37.

* * * 1979 (numbers of publications: 2) * * *

[WIERZBOWSKI Marek * Akty normatywne organizacji spółdzielczych. Wwa 1977]

Recenzja:

Piekara Andrzej. PiP 1979 nr 12 s. 121-124.

WIERZBOWSKI Marek * Upoważnienia do załatwiania spraw a przekazywanie kompetencji administracji państwowej. OMT 1979 nr 5 s. 22-24, 32.

* * * 1978 (numbers of publications: 2) * * *

WIERZBOWSKI Marek * Organy administracji terenowej w Stanach Zjednoczonych Ameryki Północnej. OMT 1978 nr 5 s. 23-26.

WIERZBOWSKI Marek * Postępowanie administracyjne w USA. OMT 1978 nr 3 s. 30-34.

* * * 1977 (numbers of publications: 6) * * *

WIERZBOWSKI Marek * Akty normatywne organizacji spółdzielczych. Wwa 1977 UW ss. 208.

[WIERZBOWSKI Marek * Charakter prawny stosunków w organizacjach społecznych. Wwa 1976]

Recenzja:

Ura Edward. Zesz.Nauk.ASW 1977 nr 17 s. 209-212.

WIERZBOWSKI Marek * Nadzór w systemie rad narodowych i terenowych organów administracji. W: Terenowe organy administracji ... s. 265-309, { Terenowe organy administracji i rady narodowe po reformie. Red. Jerzy Służewski. Wwa 1977 Wiedza Powszechna ss. 432,}

WIERZBOWSKI Marek * Postępowanie administracyjne w Anglii. OMT 1977 nr 12 s. 32-34.

WIERZBOWSKI Marek * Pozycja prawna centralnych związków spółdzielczych. PiP 1977 nr 8/9 s. 92-103.

WIERZBOWSKI Marek * Uprawnienia rad narodowych i terenowych organów administracji w stosunku do jednostek im nie podporządkowanych. W: Terenowe organy administracji ... s. 349-388, { Terenowe organy administracji i rady narodowe po reformie. Red. Jerzy Służewski. Wwa 1977 Wiedza Powszechna ss. 432,}

* * * 1976 (numbers of publications: 3) * * *

WIERZBOWSKI Marek * Charakter prawny stosunków w organizacjach społecznych. Wwa 1976 MSW ss. 113, bibliogr., do użytku służb.

WIERZBOWSKI Marek * Problemy prawne wprowadzania EMC [Elektronicznych Maszyn Cyfrowych] do administracji państwowej. OMT 1976 nr 2 s. 9-13.

WIERZBOWSKI Marek * Unifikacja zarządzania zespołami miejskimi (doświadczenia państw socjalistycznych). OMT 1976 nr 1 s. 13-16.

* * * 1975 (numbers of publications: 2) * * *

WIERZBOWSKI Marek * Unifikacja zarządzania zespołami miejskimi (studium porównawcze przygotowane w oparciu o doświadczenia państw zachodnich). OMT 1975 nr 7 s. 14-20.

URA Edward, WIERZBOWSKI Marek * Podstawy prawne dobrowolnych drużyn ludowych w ZSRR. Służba MO 1975 nr 1 s. 5-15.

* * * 1974 (numbers of publications: 1) * * *

STAROŚCIAK Jerzy, WIERZBOWSKI Marek * Ustawodawstwo o postępowaniu administracyjnym europejskich krajów socjalistycznych. Wrocław 1974 Ossolineum, INP ss. 225.

* * * 1973 (numbers of publications: 2) * * *

WIERZBOWSKI Marek * Rozstrzyganie spraw wynikających z członkostwa w stowarzyszeniach. PiP 1973 nr 11 s. 57-69.

WIERZBOWSKI Marek * Zaskarżalność rozstrzygnięć organu administracji państwowej. [Dot. BRL, WRL, CSRS, SFRJ]. RN Gosp.-Admin. 1973 nr 6.

* * * 1972 (numbers of publications: 1) * * *

WIERZBOWSKI Marek * Z zagadnień trwałości decyzji administracyjnej. OMT 1972 nr 6 s. 14-15.

* * * 1971 (numbers of publications: 2) * * *

WIERZBOWSKI Marek * Posiedzenia prezydiów rad narodowych. Gosp.Admin.Teren. 1971 nr 10 s. 34-35.

WIERZBOWSKI Marek * Współdziałanie rad narodowych z organizacjami społecznymi. Gosp.Admin.Teren. 1971 nr 4 s. 35-36.

* * * 1970 (numbers of publications: 2) * * *

WIERZBOWSKI Marek * Charakter prawny stosunków w organizacjach społecznych. PiP 1970 nr 8/9 s. 302-312.

WIERZBOWSKI Marek * Organizacja wewnętrzna wydziałów (wyniki ankiety GiAT [Gospodarki i Administracji Terenowej]). Gosp.Admin.Teren. 1970 nr 10 s. 42-43.

A-2906

Appendix 2

©Kancelaria Sejmu                                                                    s. 1/45

Dz.U. 1993 Nr 7 poz. 34

# USTAWA

## z dnia 29 grudnia 1992 r.

## o radiofonii i telewizji

Opracowane na
podstawie tj. Dz. U.
z 2011 r. Nr 43, poz.
226, Nr 85, poz. 459,
Nr 112, poz. 654, Nr
153, poz. 903, Nr
160, poz. 963.

### Rozdział 1
### Przepisy ogólne

#### Art. 1.

1. Zadaniem radiofonii i telewizji jest:

   1) dostarczanie informacji;

   2) udostępnianie dóbr kultury i sztuki;

   3) ułatwianie korzystania z oświaty, sportu i dorobku nauki;

   3a) upowszechnianie edukacji obywatelskiej;

   4) dostarczanie rozrywki;

   5) popieranie krajowej twórczości audiowizualnej.

1a. Zadania radiofonii i telewizji, o których mowa w ust. 1, są realizowane przez dostarczanie usług medialnych w postaci programów radiowych i telewizyjnych.

2. Odbiór krajowych i zagranicznych programów przeznaczonych przez dostawców usług medialnych do powszechnego odbioru jest wolny, z zachowaniem warunków określonych przepisami prawa.

#### Art. 1a.

1. Ustawę stosuje się do dostawców usług medialnych ustanowionych na terytorium Rzeczypospolitej Polskiej.

2. Dostawcę usługi medialnej uważa się za ustanowionego na terytorium Rzeczypospolitej Polskiej, jeżeli spełnia on co najmniej jeden z warunków:

   1) ma swoją siedzibę w Rzeczypospolitej Polskiej oraz:

      a) decyzje redakcyjne dotyczące usługi medialnej są podejmowane na terytorium Rzeczypospolitej Polskiej lub

      b) istotna część osób zatrudnionych na podstawie stosunku pracy lub umowy cywilnoprawnej przy świadczeniu usługi medialnej działa na terytorium Rzeczypospolitej Polskiej, a decyzje redakcyjne dotyczące usługi medialnej są podejmowane w innym państwie członkowskim Unii Europejskiej, lub

      c) istotna część osób zatrudnionych na podstawie stosunku pracy lub umowy cywilnoprawnej przy świadczeniu usługi medialnej działa za-

2011-09-09

TVP 021012 358

Appendix 2

równo na terytorium Rzeczypospolitej Polskiej, jak i w innym państwie członkowskim Unii Europejskiej;

2) decyzje redakcyjne dotyczące usługi medialnej są podejmowane na terytorium Rzeczypospolitej Polskiej oraz istotna część osób zatrudnionych na podstawie stosunku pracy lub umowy cywilnoprawnej przy świadczeniu usługi medialnej działa na terytorium Rzeczypospolitej Polskiej, a dostawca usługi medialnej ma swoją siedzibę w innym państwie członkowskim Unii Europejskiej;

3) rozpoczął świadczenie usługi medialnej na terytorium Rzeczypospolitej Polskiej lub na podstawie prawa Rzeczypospolitej Polskiej i utrzymuje stabilne i efektywne związki gospodarcze z Rzecząpospolitą Polską, chyba że:

   a) zarówno siedziba dostawcy usługi medialnej znajduje się w innym państwie członkowskim Unii Europejskiej, jak i decyzje redakcyjne dotyczące usługi medialnej są podejmowane w innym państwie członkowskim Unii Europejskiej lub

   b) istotna część osób zatrudnionych na podstawie stosunku pracy lub umowy cywilnoprawnej przy świadczeniu usługi medialnej działa w innym państwie członkowskim Unii Europejskiej, w którym dostawca usługi medialnej ma swoją siedzibę, lub decyzje redakcyjne dotyczące usługi medialnej są podejmowane na terytorium innego państwa członkowskiego Unii Europejskiej.

3. Za ustanowionego na terytorium Rzeczypospolitej Polskiej uważa się także dostawcę usługi medialnej, jeżeli istotna część osób zatrudnionych na podstawie stosunku pracy lub umowy cywilnoprawnej przy świadczeniu usługi medialnej działa na jej terytorium oraz dostawca ten:

   1) ma swoją siedzibę na terytorium Rzeczypospolitej Polskiej, a decyzje redakcyjne dotyczące usługi medialnej są podejmowane w państwie niebędącym państwem członkowskim Unii Europejskiej, albo

   2) ma swoją siedzibę w państwie niebędącym państwem członkowskim Unii Europejskiej, a decyzje redakcyjne dotyczące usługi medialnej są podejmowane na terytorium Rzeczypospolitej Polskiej.

4. Ustawę stosuje się także do dostawcy usługi medialnej, który:

   1) korzysta ze stacji dosyłowej do satelity zlokalizowanej na terytorium Rzeczypospolitej Polskiej albo

   2) nie korzysta z tej stacji, ale korzysta z łącza satelitarnego należącego do Rzeczypospolitej Polskiej

   – mimo że nie odpowiada on warunkom określonym w ust. 2 i 3 i nie został uznany za dostawcę usługi medialnej ustanowionego w państwie członkowskim Unii Europejskiej na podstawie przepisów prawa tego państwa odpowiadających warunkom określonym w ust. 2 i 3.

### Art. 2.

1. Prawo rozpowszechniania programów radiowych i telewizyjnych przysługuje jednostkom publicznej radiofonii i telewizji oraz osobom fizycznym, osobom prawnym i osobowym spółkom handlowym, które uzyskały koncesję na taką działalność, albo – w przypadku programów telewizyjnych rozpowszechnianych wyłącznie w systemach teleinformatycznych – wpis do rejestru takich programów.

2. Ustawy nie stosuje się do:

TVP 021012 359

Appendix 2

1) programu rozpowszechnianego lub rozprowadzanego wyłącznie w obrębie jednego budynku;

2) programu rozpowszechnianego lub rozprowadzanego w systemie, w którym urządzenia nadawcze i odbiorcze należą do tej samej osoby, prowadzącej działalność gospodarczą lub inną zarejestrowaną działalność publiczną, a treść programu ogranicza się do spraw związanych z tą działalnością i jest adresowana do pracowników lub innego określonego kręgu osób związanych z nadawcą;

3) programu rozprowadzanego w sieci kablowej, jeżeli liczba indywidualnych odbiorców nie przekracza 250;

4) programów radiowych rozpowszechnianych wyłącznie w systemach teleinformatycznych oraz audialnych usług na żądanie;

5) korespondencji prowadzonej z wykorzystaniem środków komunikacji elektronicznej;

6) elektronicznych wersji dzienników i czasopism oraz prasy udostępnianej w systemie teleinformatycznym pod warunkiem że nie składają się w przeważającej części z audycji audiowizualnych;

7) gier losowych i zakładów wzajemnych, chyba że są częścią audycji usługi medialnej.

### Art. 3.

Do rozpowszechniania programów radiowych i telewizyjnych stosuje się przepisy prawa prasowego, o ile ustawa nie stanowi inaczej.

### Art. 3a.

Dostawcy usług medialnych, mając na względzie realizację obowiązków określonych w ustawie, w szczególności w art. 14a, art. 16b ust. 3a i art. 18a mogą tworzyć i przystępować do kodeksów dobrych praktyk w rozumieniu ustawy z dnia 23 sierpnia 2007 r. o przeciwdziałaniu nieuczciwym praktykom rynkowym (Dz. U. Nr 171, poz. 1206).

### Art. 4.

W rozumieniu ustawy:

1) usługą medialną jest usługa w postaci programu, za którą odpowiedzialność redakcyjną ponosi jej dostawca i której podstawowym zadaniem jest dostarczenie przez sieci telekomunikacyjne ogółowi odbiorców audycji, w celach informacyjnych, rozrywkowych lub edukacyjnych; usługą medialną jest także przekaz handlowy;

2) audycją jest ciąg ruchomych obrazów z dźwiękiem lub bez niego (audycja audiowizualna) albo ciąg dźwięków (audycja radiowa), stanowiący, ze względu na treść, formę, przeznaczenie lub autorstwo, odrębną całość w stworzonym przez dostawcę usługi medialnej programie lub katalogu audycji udostępnianych publicznie, zwanym dalej „katalogiem";

3) odpowiedzialnością redakcyjną jest sprawowanie faktycznej kontroli nad wyborem audycji i sposobem ich zestawienia w programie lub w katalogu; nie uchybia to zasadom odpowiedzialności prawnej za treść audycji lub świadczenie usługi;

2011-09-09

TVP 021012 360

Appendix 2

4) dostawcą usługi medialnej jest osoba fizyczna, osoba prawna lub osobowa spółka handlowa ponosząca odpowiedzialność redakcyjną za wybór treści usługi medialnej i decydująca o sposobie zestawienia tej treści, będąca nadawcą;

5) nadawcą jest osoba fizyczna, osoba prawna lub osobowa spółka handlowa, która tworzy i zestawia program oraz rozpowszechnia go lub przekazuje innym osobom w celu rozpowszechniania;

6) programem jest usługa medialna stanowiąca uporządkowany zestaw audycji, przekazów handlowych lub innych przekazów, rozpowszechniany w całości, w sposób umożliwiający jednoczesny odbiór przez odbiorców w ustalonym przez nadawcę układzie;

7) rozpowszechnianiem jest emisja programu drogą bezprzewodową lub przewodową do odbioru przez odbiorców;

8) rozprowadzaniem jest przejmowanie rozpowszechnionego programu w całości i bez zmian oraz równoczesne, wtórne jego rozpowszechnianie;

9) dostarczaniem usługi medialnej jest jej rozpowszechnianie;

10) nadawcą społecznym jest nadawca:

a) którego program upowszechnia działalność wychowawczą i edukacyjną, działalność charytatywną, respektuje chrześcijański system wartości, za podstawę przyjmując uniwersalne zasady etyki, oraz zmierza do ugruntowania tożsamości narodowej,

b) w którego programie nie są rozpowszechniane audycje ani inne przekazy, o których mowa w art. 18 ust. 5,

c) który nie nadaje przekazów handlowych,

d) który nie pobiera opłat z tytułu rozpowszechniania, rozprowadzania lub odbierania jego programu;

11) osobą zagraniczną jest osoba zagraniczna w rozumieniu art. 5 pkt 2 ustawy z dnia 2 lipca 2004 r. o swobodzie działalności gospodarczej (Dz. U. z 2010 r. Nr 220, poz. 1447 i Nr 239, poz. 1593);

12) zespołem twórczym jest zespół osób tworzących audycje, do którego zalicza się w szczególności: reżysera, autora scenariusza, scenografa, operatora, odtwórców głównych ról i kompozytora;

13) programem wyspecjalizowanym jest program, w którym nie mniej niż 70 % czasu nadawania programu w ciągu miesiąca, w godzinach 6–23, stanowią audycje i inne przekazy realizujące przyjętą specjalizację programu;

14) audycją wytworzoną pierwotnie w języku polskim jest audycja spełniająca wymogi audycji europejskiej w rozumieniu niniejszej ustawy i powstała na podstawie scenariusza wytworzonego pierwotnie w języku polskim, której pierwotna rejestracja została dokonana w języku polskim;

15) audycją dla dzieci jest audycja, która ze względu na czas nadania i treść jest skierowana głównie do dzieci;

16) przekazem handlowym jest każdy przekaz, w tym obrazy z dźwiękiem lub bez dźwięku albo tylko dźwięki, mający służyć bezpośrednio lub pośrednio promocji towarów, usług lub renomy podmiotu prowadzącego działalność gospodarczą lub zawodową, towarzyszący audycji lub włączony do niej, w zamian za opłatę lub podobne wynagrodzenie, albo w celach autopromocji, w szczególności reklama, sponsorowanie, telesprzedaż i lokowanie produktu;

2011-09-09

TVP 021012 361

Case 14-1115, Document 42-2, 07/15/2014, 1271746, Page90 of 130

A-2910

Appendix 2

17) reklamą jest przekaz handlowy, pochodzący od podmiotu publicznego lub prywatnego, w związku z jego działalnością gospodarczą lub zawodową, zmierzający do promocji sprzedaży lub odpłatnego korzystania z towarów lub usług; reklamą jest także autopromocja;

18) sponsorowaniem jest każdy wkład w finansowanie usługi medialnej lub audycji, przez podmiot, który nie dostarcza usług medialnych i nie produkuje audycji, w celu promocji jego nazwy, firmy, renomy, działalności, towaru lub usługi, znaku towarowego lub innego oznaczenia indywidualizującego;

19) telesprzedażą jest przekaz handlowy zawierający bezpośrednią ofertę sprzedaży towarów lub odpłatnego świadczenia usług;

20) ukrytym przekazem handlowym jest przedstawianie w audycjach towarów, usług, nazwy, firmy, znaku towarowego lub działalności przedsiębiorcy będącego producentem towaru lub świadczącego usługi, jeżeli zamiarem dostawcy usługi medialnej, w szczególności związanym z wynagrodzeniem lub uzyskaniem innej korzyści, jest osiągnięcie skutku reklamowego oraz możliwe jest wprowadzenie publiczności w błąd co do charakteru przekazu;

21) lokowaniem produktu jest przekaz handlowy polegający na przedstawieniu lub nawiązywaniu do towaru, usługi lub ich znaku towarowego w taki sposób, że stanowią one element samej audycji w zamian za opłatę lub podobne wynagrodzenie, a także w postaci nieodpłatnego udostępnienia towaru lub usługi;

22) lokowaniem tematu jest przekaz handlowy polegający na nawiązywaniu do towaru, usługi lub ich znaku towarowego w scenariuszu lub liście dialogowej audycji w zamian za opłatę lub podobne wynagrodzenie;

23) autopromocją jest każdy przekaz pochodzący od dostawcy usługi medialnej mający służyć bezpośrednio lub pośrednio promocji jego audycji, towarów lub usług;

24) przekazem tekstowym jest zbiór tekstów i nieruchomych obrazów, rozpowszechnianych za pomocą sygnału telewizyjnego lub radiowego równocześnie z programem;

25) producentem jest osoba fizyczna lub osoba prawna, lub jednostka organizacyjna, o której mowa w art. $33^1$ § 1 Kodeksu cywilnego, która podejmuje inicjatywę, faktycznie organizuje i ponosi odpowiedzialność za kreatywny, organizacyjny i finansowy proces produkcji utworu audiowizualnego;

26) producentem niezależnym wobec danego nadawcy jest producent niepozostający w stosunku pracy z danym nadawcą, niebędący sam nadawcą i nieposiadający udziałów w organizacji nadawcy oraz w którym nadawca ani żaden podmiot od niego zależny bądź należący do tej samej grupy kapitałowej nie posiada żadnych udziałów, a w zarządach nie zasiadają żadne osoby pozostające w stosunku pracy z danym nadawcą lub będące nadawcami;

27) przedsiębiorcą jest przedsiębiorca w rozumieniu ustawy z dnia 2 lipca 2004 r. o swobodzie działalności gospodarczej;

28) audiodeskrypcją jest werbalny, dźwiękowy opis obrazu i treści wizualnych zawartych w audycji audiowizualnej przeznaczony dla osób niepełnosprawnych z powodu dysfunkcji narządu wzroku, umieszczony w audycji lub rozpowszechniany równocześnie z audycją;

2011-09-09

TVP 021012 362

Appendix 2

29) systemem teleinformatycznym jest system teleinformatyczny w rozumieniu ustawy z dnia 18 lipca 2002 r. o świadczeniu usług drogą elektroniczną (Dz. U. Nr 144, poz. 1204, z późn. zm.[1]);

30) siecią telekomunikacyjną jest sieć telekomunikacyjna w rozumieniu ustawy z dnia 16 lipca 2004 r. – Prawo telekomunikacyjne (Dz. U. Nr 171, poz. 1800, z późn. zm.[2]).

## Rozdział 2
### Krajowa Rada Radiofonii i Telewizji

### Art. 5.

Tworzy się Krajową Radę Radiofonii i Telewizji, zwaną dalej „Krajową Radą", jako organ państwowy właściwy w sprawach radiofonii i telewizji.

### Art. 6.

1. Krajowa Rada stoi na straży wolności słowa w radiu i telewizji, samodzielności dostawców usług medialnych i interesów odbiorców oraz zapewnia otwarty i pluralistyczny charakter radiofonii i telewizji.

2. Do zadań Krajowej Rady należy w szczególności:

    1) projektowanie w porozumieniu z Prezesem Rady Ministrów kierunków polityki państwa w dziedzinie radiofonii i telewizji;

    2) określanie, w granicach upoważnień ustawowych, warunków prowadzenia działalności przez dostawców usług medialnych;

    3) podejmowanie, w zakresie przewidzianym ustawą, rozstrzygnięć w sprawach koncesji na rozpowszechnianie programów, wpisu do rejestru programów, zwanego dalej „rejestrem", oraz prowadzenie tego rejestru;

    3a) uznawanie za nadawcę społecznego lub odbieranie tego przymiotu, na warunkach określonych ustawą;

    4) sprawowanie w granicach określonych ustawą kontroli działalności dostawców usług medialnych;

    5) organizowanie badań treści i odbioru programów radiowych i telewizyjnych;

    6) ustalanie wysokości opłat za udzielenie koncesji oraz wpis do rejestru;

    6a) ustalanie, na zasadach określonych w ustawie z dnia 21 kwietnia 2005 r. o opłatach abonamentowych (Dz. U. Nr 85, poz. 728 i Nr 157, poz. 1314 oraz z 2010 r. Nr 13, poz. 70 i Nr 152, poz. 1023), wysokości opłat abonamentowych;

    7) opiniowanie projektów aktów ustawodawczych oraz umów międzynarodowych dotyczących radiofonii i telewizji;

---

[1] Zmiany wymienionej ustawy zostały ogłoszone w Dz. U. z 2004 r. Nr 96, poz. 959 i Nr 173, poz. 1808, z 2007 r. Nr 50, poz. 331, z 2008 r. Nr 171, poz. 1056 i Nr 216, poz. 1371 oraz z 2009 r. Nr 201, poz. 1540.

[2] Zmiany wymienionej ustawy zostały ogłoszone w Dz. U. z 2004 r. Nr 273, poz. 2703, z 2005 r. Nr 163, poz. 1362 i Nr 267, poz. 2258, z 2006 r. Nr 12, poz. 66, Nr 104, poz. 708 i 711, Nr 170, poz. 1217, Nr 220, poz. 1600, Nr 235, poz. 1700 i Nr 249, poz. 1834, z 2007 r. Nr 23, poz. 137, Nr 50, poz. 331 i Nr 82, poz. 556, z 2008 r. Nr 17, poz. 101 i Nr 227, poz. 1505, z 2009 r. Nr 11, poz. 59, Nr 18, poz. 97 i Nr 85, poz. 716 oraz z 2010 r. Nr 81, poz. 530, Nr 86, poz. 554, Nr 106, poz. 675, Nr 182, poz. 1228, Nr 219, poz. 1443, Nr 229, poz. 1499 i Nr 238, poz. 1578.

2011-09-09

TVP 021012 363

Appendix 2

7a) (utracił moc);[3]

8) inicjowanie postępu naukowo-technicznego i kształcenia kadr w dziedzinie radiofonii i telewizji;

9) organizowanie i inicjowanie współpracy z zagranicą w dziedzinie radiofonii i telewizji, w tym współpracy z organami regulacyjnymi państw członkowskich Unii Europejskiej, właściwymi w sprawach usług medialnych;

10) współpraca z właściwymi organizacjami i instytucjami w zakresie ochrony praw autorskich, praw wykonawców, praw producentów oraz dostawców usług medialnych;

11) przeprowadzanie jawnych i otwartych konkursów na stanowiska członków rad nadzorczych w jednostkach publicznej radiofonii i telewizji;

12) propagowanie samoregulacji lub współregulacji w zakresie świadczenia usług medialnych objętych ustawą, w tym przedstawianie, na wniosek dostawcy usługi medialnej, opinii o kodeksie, o którym mowa w art. 3a;

13) upowszechnianie umiejętności świadomego korzystania z mediów (edukacji medialnej) oraz współpraca z innymi organami państwowymi, organizacjami pozarządowymi i innymi instytucjami w zakresie edukacji medialnej.

### Art. 7.

1. W skład Krajowej Rady wchodzi pięciu członków powoływanych: 2 przez Sejm, 1 przez Senat i 2 przez Prezydenta, spośród osób wyróżniających się wiedzą i doświadczeniem w zakresie środków społecznego przekazu.

2. (utracił moc).[3]

2a. (uchylony).

2b. Przewodniczącego Krajowej Rady wybierają ze swojego grona i odwołują członkowie Krajowej Rady.

3. Krajowa Rada wybiera ze swego grona, na wniosek Przewodniczącego, zastępcę Przewodniczącego Krajowej Rady.

4. Kadencja członków Krajowej Rady trwa 6 lat, licząc od dnia powołania ostatniego członka. Członkowie Krajowej Rady pełnią swe funkcje do czasu powołania następców.

5. Członek Krajowej Rady nie może być powołany na kolejną pełną kadencję.

6. Organ uprawniony do powołania członka Krajowej Rady odwołuje go wyłącznie w przypadku:

   1) zrzeczenia się swej funkcji;

   2) choroby trwale uniemożliwiającej sprawowanie funkcji;

   3) skazania prawomocnym wyrokiem za popełnienie przestępstwa z winy umyślnej;

   3a) złożenia niezgodnego z prawdą oświadczenia lustracyjnego, stwierdzonego prawomocnym orzeczeniem sądu;

   4) naruszenia przepisów ustawy stwierdzonego orzeczeniem Trybunału Stanu.

---

[3] Na podstawie wyroku Trybunału Konstytucyjnego z dnia 23 marca 2006 r. sygn. akt K 4/06 (Dz. U. Nr 51, poz. 377).

2011-09-09

TVP 021012 364

**A-2913**

Appendix 2

7. W przypadku odwołania członka lub jego śmierci przed upływem kadencji, właściwy organ powołuje nowego członka Krajowej Rady na okres do końca tej kadencji.

**Art. 8.**

1. Pracodawca zatrudniający członka Krajowej Rady udzieli mu, na jego wniosek, urlopu bezpłatnego na czas sprawowania funkcji. Okres urlopu wlicza się do stażu pracy, od którego zależą uprawnienia wynikające ze stosunku pracy.

2. (uchylony).

3. W okresie kadencji członków Krajowej Rady ulega zawieszeniu ich członkostwo:

   1) (utracił moc)[4];

   2) we władzach stowarzyszeń, związków zawodowych, związków pracodawców, organizacji kościelnych lub związków wyznaniowych.

*[4. Nie można łączyć funkcji członka Krajowej Rady z posiadaniem udziałów albo akcji spółki bądź w inny sposób uczestniczyć w podmiocie będącym nadawcą lub producentem radiowym lub telewizyjnym oraz wszelką działalnością zarobkową, z wyjątkiem pracy dydaktyczno-naukowej w charakterze nauczyciela akademickiego lub pracy twórczej.]*

<**4. Nie można łączyć funkcji członka Krajowej Rady z posiadaniem udziałów albo akcji spółki bądź w inny sposób uczestniczyć w podmiocie będącym dostawcą usługi medialnej lub producentem radiowym lub telewizyjnym oraz wszelką działalnością zarobkową, z wyjątkiem pracy dydaktyczno-naukowej w charakterze nauczyciela akademickiego lub pracy twórczej.**>

Nowe brzmienie ust. 4 w art. 8 wchodzi w życie od dn. 1.07.2011 r. (Dz. U. z 2011 r. Nr 85, poz. 459).

**Art. 9.**

1. Na podstawie ustaw i w celu ich wykonania Krajowa Rada wydaje rozporządzenia i uchwały.

2. Krajowa Rada podejmuje uchwały większością 2/3 głosów ustawowej liczby członków.

3. Krajowa Rada uchwala regulamin swych obrad.

**Art. 10.**

1. Przewodniczący Krajowej Rady kieruje jej pracami, reprezentuje Krajową Radę oraz wykonuje zadania określone w ustawie.

2. Przewodniczący Krajowej Rady może żądać od dostawcy usługi medialnej przedstawienia materiałów, dokumentów i udzielenia wyjaśnień w zakresie niezbędnym dla kontroli zgodności działania tego dostawcy z przepisami ustawy, warunkami koncesji lub wiążącymi go aktami samoregulacji.

3. Przewodniczący Krajowej Rady może wezwać dostawcę usługi medialnej do zaniechania działań w zakresie dostarczania usług medialnych, jeżeli naruszają one przepisy ustawy, uchwały Krajowej Rady lub warunki koncesji.

---

[4] Na podstawie wyroku Trybunału Konstytucyjnego z dnia 10 kwietnia 2002 r. sygn. akt K. 26/00 (Dz. U. Nr 56, poz. 517).

2011-09-09

TVP 021012 365

Appendix 2

4. Przewodniczący Krajowej Rady na podstawie uchwały Rady może wydać decyzję nakazującą zaniechanie przez dostawcę usługi medialnej działań w zakresie, o którym mowa w ust. 3.

5. Przepisy ust. 2–4 stosuje się odpowiednio do rozprowadzania programów radiowych i telewizyjnych.

### Art. 11.

1. Krajowa Rada wykonuje swoje zadania przy pomocy Biura Krajowej Rady.

2. Organizację i tryb działania Biura Krajowej Rady określa regulamin uchwalany przez Krajową Radę.

3. Koszty działalności Krajowej Rady i Biura Krajowej Rady są pokrywane z budżetu państwa.

4. Do pracowników Biura Krajowej Rady stosuje się przepisy o pracownikach urzędów państwowych.

### Art. 12.

1. Krajowa Rada przedstawia corocznie do końca marca Sejmowi, Senatowi i Prezydentowi sprawozdanie ze swej działalności za rok poprzedzający oraz informację o podstawowych problemach radiofonii i telewizji.

2. Krajowa Rada przedstawia corocznie Prezesowi Rady Ministrów informację o swojej działalności oraz o podstawowych problemach radiofonii i telewizji.

3. Sejm i Senat uchwałami przyjmują lub odrzucają sprawozdanie, o którym mowa w ust. 1. Uchwała o przyjęciu sprawozdania może zawierać uwagi i zastrzeżenia.

4. W wypadku odrzucenia sprawozdania przez Sejm i Senat kadencja wszystkich członków Krajowej Rady wygasa w ciągu 14 dni, liczonych od dnia ostatniej uchwały, z zastrzeżeniem ust. 5.

5. Wygaśnięcie kadencji Krajowej Rady nie następuje, jeżeli nie zostanie potwierdzone przez Prezydenta Rzeczypospolitej Polskiej.

### Rozdział 3

### Programy radiowe i telewizyjne

### Art. 13.

1. Nadawca kształtuje program samodzielnie w zakresie zadań określonych w art. 1 ust. 1 i ponosi odpowiedzialność za jego treść.

2. Przepis ust. 1 nie narusza przepisów dotyczących odpowiedzialności innych osób za treść poszczególnych audycji, reklam lub innych przekazów.

### Art. 14.

1. Nałożenie na nadawcę obowiązku lub zakazu rozpowszechniania określonej audycji lub przekazu może nastąpić wyłącznie na podstawie ustawy.

2. Audycje i przekazy niepochodzące od nadawcy powinny być wyraźnie wyodrębnione w programie i oznaczone w sposób niebudzący wątpliwości, że nie pochodzą od nadawcy.

2011-09-09

TVP 021012 366

Appendix 2

### Art. 14a.

1. Nadawca jest obowiązany do zapewnienia odbiorcom łatwego, bezpośredniego i stałego dostępu do informacji umożliwiających identyfikację programu i jego nadawcy, a w szczególności do informacji o:

    1) nazwie programu;

    2) nazwisku, nazwie lub firmie tego nadawcy;

    3) adresie jego siedziby;

    4) danych kontaktowych, w tym adresu korespondencyjnego, adresu poczty elektronicznej oraz witryny internetowej.

2. Nadawca jest obowiązany do wskazania Krajowej Rady jako organu właściwego w sprawach radiofonii i telewizji.

3. Krajowa Rada może określić, w drodze rozporządzenia, sposób zapewniania przez nadawców dostępu do informacji umożliwiających identyfikację programu i jego nadawcy oraz inne niż wskazane w ust. 1 informacje, uwzględniając potrzeby odbiorców, integralność przekazów, sposób rozpowszechniania programu i oddziaływanie na interesy odbiorców oraz dążąc do nieobciążania dostawców nadmiernymi utrudnieniami i kosztami w związku z zapewnianiem informacji.

### Art. 15.

1. Nadawcy programów telewizyjnych przeznaczają co najmniej 33% kwartalnego czasu nadawania programu na audycje wytworzone pierwotnie w języku polskim, z wyłączeniem serwisów informacyjnych, reklam, telesprzedaży, transmisji sportowych, przekazów tekstowych i teleturniejów.

*[2. Nadawcy programów radiowych i telewizyjnych przeznaczają co najmniej 33% kwartalnego czasu nadawania w programie utworów słowno-muzycznych na utwory, które są wykonywane w języku polskim.]*

<2. Nadawcy programów radiowych, z wyłączeniem programów tworzonych w całości w języku mniejszości narodowej lub w języku regionalnym w rozumieniu art. 19 ustawy z dnia 6 stycznia 2005 r. o mniejszościach narodowych i etnicznych oraz o języku regionalnym (Dz. U. Nr 17, poz. 141, Nr 62, poz. 550 oraz z 2009 r. Nr 31, poz. 206 i Nr 157, poz. 1241), przeznaczają co najmniej 33 % miesięcznego czasu nadawania w programie utworów słowno-muzycznych na utwory, które są wykonywane w języku polskim, z tego co najmniej 60%[5] w godzinach 5-24.>

<2a. Przy ustalaniu czasu nadawania w godzinach 5-24, o którym mowa w ust. 2, czas nadawania utworu słowno-muzycznego w tych godzinach wykonywanego w języku polskim przez debiutanta jest liczony jako 200 % czasu nadawania utworu.

2b. Za utwór wykonywany przez debiutanta uważa się utwór słowno-muzyczny wykonywany w języku polskim, który w danym okresie rozliczeniowym został rozpowszechniony w programie radiowym, a od daty pierwszego rozpowszechnienia nie minęło 18 miesięcy, przy czym za debiutanta uważa się wyłącznie artystę lub zespół muzyczny, który w powyższym okresie 18 mie-

Nowe brzmienie ust. 2, dodane ust. 2a i 2b oraz nowe brzmienie ust. 4 w art. 15 wchodzą w życie od 1.01.2012 r. (Dz. U. z 2011 r. Nr 85, poz. 459).

---

[5] W 2012 r. jest to co najmniej 40%, a w 2013 r. — co najmniej 50% (Dz. U. z 2011 r. Nr 85, poz. 459, art. 9).

2011-09-09

TVP 021012 367

Appendix 2

sięcy po raz pierwszy opublikował album zawierający utwory słowno-muzyczne lub pojedyncze nagranie utworu słowno-muzycznego.>

3. Nadawcy programów telewizyjnych przeznaczają ponad 50% kwartalnego czasu nadawania programu na audycje europejskie, z wyłączeniem serwisów informacyjnych, reklam, telesprzedaży, transmisji sportowych, przekazów tekstowych i teleturniejów.

*[4. Krajowa Rada określi, w drodze rozporządzenia, niższy udział w programie radiowym lub telewizyjnym audycji, o których mowa w ust. 1 i 3, dla:*

*1) nadawców w pierwszym roku rozpowszechniania przez nich programu,*

*2) programów wyspecjalizowanych, dla których brak jest wystarczającej liczby audycji, o których mowa w ust. 1 i 3,*

*3) programów rozpowszechnianych wyłącznie w sposób satelitarny lub kablowy dostępnych w całości za opłatą, z wyłączeniem opłat abonamentowych w rozumieniu ustawy z dnia 21 kwietnia 2005 r. o opłatach abonamentowych i podstawowych opłat pobieranych przez operatorów satelitarnych lub operatorów sieci kablowych*

*– uwzględniając konieczność zachowania proporcji audycji wytworzonych pierwotnie w języku polskim i audycji europejskich.]*

<4. Krajowa Rada określi, w drodze rozporządzenia, niższy udział w programie telewizyjnym audycji, o których mowa w ust. 1 i 3, oraz w programie radiowym utworów, o których mowa w ust. 2, dla:

1) nadawców w pierwszym roku rozpowszechniania przez nich programu,

2) programów wyspecjalizowanych, dla których brak jest wystarczającej liczby audycji, o których mowa w ust. 1 i 3, lub utworów, o których mowa w ust. 2,

3) programów, na których nadawanie przyznano koncesję określającą, że programy te są przeznaczone dla mniejszości narodowych i etnicznych oraz społeczności posługującej się językiem regionalnym,

4) programów rozpowszechnianych wyłącznie w systemach teleinformatycznych

– uwzględniając konieczność zachowania proporcji audycji wytworzonych pierwotnie w języku polskim i audycji europejskich oraz uwzględniając możliwość realizacji tych obowiązków w danych kategoriach programów.>

### Art. 15a.

1. Nadawcy programów telewizyjnych przeznaczają co najmniej 10% kwartalnego czasu nadawania programu na audycje europejskie wytworzone przez producentów niezależnych, z wyłączeniem serwisów informacyjnych, reklam, telesprzedaży, transmisji sportowych, przekazów tekstowych i teleturniejów. W czasie przeznaczonym na audycje europejskie wytworzone przez producentów niezależnych, audycje wytworzone w okresie 5 lat przed rozpowszechnieniem w programie powinny stanowić co najmniej 50%.

2. Krajowa Rada określi, w drodze rozporządzenia, w odniesieniu do audycji, o których mowa w art. 15 ust. 1 i 3 oraz w ust. 1:

1) sposób prowadzenia przez nadawcę ewidencji czasu nadawania,

2) czas przechowywania ewidencji, nie krótszy niż 1 rok,

2011-09-09

Appendix 2

    3) zakres informacji zawartych w ewidencji, w tym dane o terminie rozpo-
wszechniania audycji, rzeczywisty czas trwania audycji, tytuł i producenta
audycji

– uwzględniając możliwość prowadzenia ewidencji w formie elektronicznej, ko-
nieczność zapewnienia przejrzystości oraz jawności informacji znajdujących się
w ewidencji oraz nieobciążania nadawców nadmiernymi utrudnieniami i kosz-
tami w związku z prowadzeniem ewidencji.

3. Krajowa Rada określi, w drodze rozporządzenia, niższy udział audycji europej-
skich wytworzonych przez producentów niezależnych w okresie 5 lat przed roz-
powszechnieniem w programie dla programów telewizyjnych, dla których ze
względu na wyspecjalizowany charakter programu brak jest wystarczającej licz-
by tych audycji, uwzględniając wpływ charakteru programów na możliwość re-
alizacji przez nadawców tych obowiązków.

### Art 15b.

*[1. Audycją europejską jest audycja, która pochodzi z:*

    *1) państwa członkowskiego Unii Europejskiej lub*

    *2) państwa będącego stroną Europejskiej konwencji o telewizji ponadgranicz-
nej, sporządzonej w Strasburgu dnia 5 maja 1989 r. (Dz. U. z 1995 r. Nr 32,
poz. 160 oraz z 2004 r. Nr 28, poz. 250), niestosującego środków dyskrymi-
nacyjnych w stosunku do audycji pochodzących z państw członkowskich
Unii Europejskiej, lub*

    *3) innego europejskiego państwa trzeciego niestosującego środków dyskrymi-
nacyjnych w stosunku do audycji pochodzących z państw członkowskich
Unii Europejskiej, o ile spełnia ona wymagania określone w ust. 3.]*

<1. Audycją europejską jest audycja:

    **1) pochodząca z państwa członkowskiego Unii Europejskiej lub**

    **2) pochodząca z innego państwa będącego stroną Europejskiej konwencji
o telewizji ponadgranicznej, sporządzonej w Strasburgu dnia 5 maja
1989 r. (Dz. U. z 1995 r. Nr 32, poz. 160 oraz z 2004 r. Nr 28, poz. 250),
zwanej dalej „Europejską konwencją o telewizji ponadgranicznej", nie-
stosującego środków dyskryminacyjnych w stosunku do audycji pocho-
dzących z państw członkowskich Unii Europejskiej, lub**

    **3) wytworzona w koprodukcji w ramach umowy dotyczącej sektora au-
diowizualnego zawartej między Unią Europejską a innym państwem
trzecim spełniająca wymagania określone w tej umowie, jeżeli państwo
to nie stosuje środków dyskryminacyjnych w stosunku do audycji po-
chodzących z państw członkowskich Unii Europejskiej.>**

2. Audycja pochodzi z państw, o których mowa w ust. 1 pkt 1 i 2, jeżeli większość
członków zespołu twórczego stale zamieszkuje na terytorium jednego z tych
państw oraz spełniony jest co najmniej jeden z warunków:

    1) audycja jest wyprodukowana przez producenta mającego siedzibę lub stałe
miejsce zamieszkania w państwie, o którym mowa w ust. 1 pkt 1 i 2;

    2) produkcja audycji jest nadzorowana i kontrolowana przez osobę fizyczną
mającą stałe miejsce zamieszkania w państwie, o którym mowa w ust. 1 pkt
1 i 2, lub przez osobę prawną albo podmiot nieposiadający osobowości
prawnej, których siedziba znajduje się w państwie, o którym mowa w ust. 1
pkt 1 i 2;

*Nowe brzmienie ust.
1 oraz uchylony ust.
3 i 5 w art. 15b
wchodzi w życie od
1.07.2011 r. (Dz. U. z
2011 r. Nr 85, poz.
459).*

2011-09-09

TVP 021012 369

Appendix 2

3) udział współproducentów, mających siedzibę lub stałe miejsce zamieszkania w państwie, o którym mowa w ust. 1 pkt 1 i 2, w łącznych kosztach produkcji audycji jest większościowy i współprodukcja nie podlega kontroli współproducentów niemających siedziby lub stałego miejsca zamieszkania w państwie, o którym mowa w ust. 1 pkt 1 i 2.

*[3. Za audycję europejską uważa się również audycję, której większość członków zespołu twórczego stale zamieszkuje na terytorium państwa europejskiego oraz która została wyprodukowana samodzielnie lub w koprodukcji z producentem mającym siedzibę lub stałe miejsce zamieszkania w jednym z państw członkowskich Unii Europejskiej przez producenta mającego siedzibę lub stałe miejsce zamieszkania w państwie, o którym mowa w ust. 1 pkt 3, jeżeli państwo to zawarło ze Wspólnotą Europejską umowę w sprawach audiowizualnych. ]*

4. Audycją europejską jest także audycja, która została wyprodukowana w ramach dwustronnych umów o koprodukcji zawartych między państwami członkowskimi Unii Europejskiej i państwami trzecimi, a udział współproducentów, mających siedzibę lub stałe miejsce zamieszkania na terytorium państwa, o którym mowa w ust. 1 pkt 1, w łącznych kosztach produkcji audycji jest większościowy oraz współprodukcja nie podlega kontroli współproducentów niemających siedziby lub stałego miejsca zamieszkania na terytorium państwa, o którym mowa w ust. 1 pkt 1.

*[5. Audycją europejską, w stosunku odpowiadającym proporcji udziału współproducentów mających siedzibę lub stałe miejsce zamieszkania w państwie członkowskim Unii Europejskiej w łącznych kosztach produkcji, jest również audycja niespełniająca wymagań określonych w ust. 1–4, jeżeli większość członków zespołu twórczego stale zamieszkuje w państwie członkowskim Unii Europejskiej.]*

## Art. 16.

1. Przekazy handlowe powinny być łatwo rozpoznawalne.

2. Reklamy i telesprzedaż powinny być łatwo odróżnialne od materiału redakcyjnego. Reklamy i telesprzedaż odróżnia się w programie za pomocą środków wizualnych, dźwiękowych lub przestrzennych.

3. Reklamy i telesprzedaż nie mogą zajmować więcej niż 12 minut w ciągu godziny zegarowej.

4. Ograniczenia określonego w ust. 3 nie stosuje się do:.

    1) ogłoszeń nadawcy, zawierających jedynie informacje o jego audycjach lub fragmenty tych audycji;

    2) ogłoszeń nadawcy zawierających jedynie informację o dodatkowych produktach uzyskiwanych bezpośrednio z audycji;

    3) wymaganych prawem oznaczeń przekazów handlowych, w tym wskazań sponsorów.

5. Ogłoszenia, o których mowa w ust. 4 pkt 1 i 2, są emitowane pomiędzy audycjami i nie mogą zajmować więcej niż 2 minuty w ciągu godziny zegarowej.

6. Bloki programowe poświęcone wyłącznie telesprzedaży powinny być wyraźnie oznaczone w sposób wizualny i dźwiękowy oraz nadawane w sposób nieprzerwany przez co najmniej 15 minut. Do bloków takich nie stosuje się ograniczenia określonego w ust. 3.

7. Krajowa Rada określi, w drodze rozporządzenia, sposób prowadzenia w programach radiowych i telewizyjnych działalności reklamowej i telesprzedaży, w tym:

2011-09-09

TVP 021012 370

Appendix 2

    1) warunki nadawania, w tym wyodrębniania, oznaczania i umieszczania, reklam i telesprzedaży w programach,

    2) wymagania dotyczące osób, których głos lub wizerunek jest wykorzystywany w reklamach, z uwzględnieniem zakresu ograniczeń w prowadzeniu przez nie innych audycji w programach radiowych i telewizyjnych,

    3) zakres udostępniania przez nadawcę czasu wykorzystywanego na reklamy i telesprzedaż, w tym maksymalny wymiar czasu w okresie rocznym dla jednego przedsiębiorcy lub ugrupowania gospodarczego,

    4) sposób prowadzenia i przechowywania przez nadawcę ewidencji czasu nadawanych reklam i telesprzedaży oraz zakres danych objętych tą ewidencją,

    5) szczegółowe wymagania dla ogłoszeń nadawców, o których mowa w ust. 4 pkt 1 i 2, oraz sposób ich oznaczania i umieszczania w programach

– kierując się ochroną interesu odbiorców i samodzielności nadawców oraz uwzględniając rozwój technik reklamowych.

### Art. 16a.

1. Umieszczanie reklam lub telesprzedaży podczas audycji nie może naruszać integralności audycji, przy uwzględnieniu naturalnych przerw w audycji, jej czasu trwania i charakteru, ani uprawnień podmiotów praw do audycji.

2. W transmisjach zawodów sportowych zawierających przerwy wynikające z przepisów ich rozgrywania oraz w transmisjach innych wydarzeń zawierających przerwy, reklamy lub telesprzedaż mogą być nadawane wyłącznie w tych przerwach.

3. Filmy wyprodukowane dla telewizji, z wyłączeniem serii, seriali i audycji dokumentalnych, oraz filmy kinematograficzne mogą zostać przerwane, w celu nadania reklam lub telesprzedaży, wyłącznie jeden raz podczas każdego okresu pełnych 45 minut przewidzianych w programie.

4. Audycje inne niż określone w ust. 2 mogą być przerywane w celu nadania reklam lub telesprzedaży, jeżeli okres między kolejnymi przerwami w danej audycji wynosi w programie telewizyjnym co najmniej 20 minut, a w programie radiowym co najmniej 10 minut.

5. Za przerwanie audycji uznaje się każde umieszczenie reklamy lub telesprzedaży w trakcie audycji.

6. Nie można przerywać w celu nadania reklam lub telesprzedaży:

    1) serwisów informacyjnych;

    2) audycji o treści religijnej;

    3) audycji publicystycznych i dokumentalnych o czasie krótszym niż 30 minut;

    4) audycji dla dzieci.

7. Nie można przerywać w celu nadania reklam lub telesprzedaży audycji w programach publicznej radiofonii i telewizji, z wyjątkiem audycji, o których mowa w ust. 2.

### Art. 16b.

1. Zakazane jest nadawanie przekazu handlowego:

    1) wyrobów tytoniowych, rekwizytów tytoniowych, produktów imitujących wyroby tytoniowe lub rekwizyty tytoniowe oraz symboli związanych z używaniem tytoniu, w zakresie regulowanym przez ustawę z dnia 9 listopa-

2011-09-09

TVP 021012 371

[Case 14-1115, Document 42-2, 07/15/2014, 1271746, Page100 of 130]

Appendix 2

da 1995 r. o ochronie zdrowia przed następstwami używania tytoniu i wyrobów tytoniowych (Dz. U. z 1996 r. Nr 10, poz. 55, z późn. zm.[6]);

2) napojów alkoholowych, w zakresie regulowanym przez ustawę z dnia 26 października 1982 r. o wychowaniu w trzeźwości i przeciwdziałaniu alkoholizmowi (Dz. U. z 2007 r. Nr 70, poz. 473, z późn. zm.[7]);

3) świadczeń zdrowotnych w rozumieniu przepisów o działalności leczniczej udzielanych wyłącznie na podstawie skierowania lekarza;

4) produktów leczniczych, w zakresie regulowanym przez ustawę z dnia 6 września 2001 r. – Prawo farmaceutyczne (Dz. U. z 2008 r. 45, poz. 271, z późn. zm.[8]);

5) gier cylindrycznych, gier w karty, gier w kości, zakładów wzajemnych, gier na automatach, w zakresie regulowanym ustawą z dnia 19 listopada 2009 r. o grach hazardowych (Dz. U. Nr 201, poz. 1540 oraz z 2010 r. Nr 127, poz. 857);

6) substancji psychotropowych lub środków odurzających oraz środków spożywczych lub innych produktów, w zakresie uregulowanym ustawą z dnia 29 lipca 2005 r. o przeciwdziałaniu narkomanii (Dz. U. Nr 179, poz. 1485, z późn. zm.[9]).

2. Zakazane jest nadawanie przekazów handlowych:

1) nawołujących bezpośrednio małoletnich do nabywania produktów lub usług;

2) zachęcających małoletnich do wywierania presji na rodziców lub inne osoby w celu skłonienia ich do zakupu reklamowanych produktów lub usług;

3) wykorzystujących zaufanie małoletnich, jakie pokładają oni w rodzicach, nauczycielach i innych osobach;

4) w nieuzasadniony sposób ukazujących małoletnich w niebezpiecznych sytuacjach;

5) oddziałujących w sposób ukryty na podświadomość.

3. Przekaz handlowy nie może:

1) naruszać godności ludzkiej;

2) zawierać treści dyskryminujących ze względu na rasę, płeć, narodowość, pochodzenie etniczne, wyznanie lub światopogląd, niepełnosprawność, wiek czy orientację seksualną;

3) ranić przekonań religijnych lub politycznych;

4) zagrażać fizycznemu, psychicznemu lub moralnemu rozwojowi małoletnich;

---

[6] Zmiany wymienionej ustawy zostały ogłoszone w Dz. U. z 1997 r. Nr 88, poz. 554 i Nr 121, poz. 770, z 1999 r. Nr 96, poz. 1107, z 2003 r. Nr 229, poz. 2274 oraz z 2010 r. Nr 81, poz. 529.

[7] Zmiany tekstu jednolitego wymienionej ustawy zostały ogłoszone w Dz. U. z 2007 r. Nr 115, poz. 793 i Nr 176, poz. 1238, z 2008 r. Nr 227, poz. 1505, z 2009 r. Nr 18, poz. 97 i Nr 144, poz. 1175 oraz z 2010 r. Nr 47, poz. 278 i Nr 127, poz. 857.

[8] Zmiany tekstu jednolitego wymienionej ustawy zostały ogłoszone w Dz. U. z 2008 r. Nr 227, poz. 1505 i Nr 234, poz. 1570, z 2009 r. Nr 18, poz. 97, Nr 31, poz. 206, Nr 92, poz. 753, Nr 95, poz. 788 i Nr 98, poz. 817 oraz z 2010 r. Nr 78, poz. 513 i Nr 107, poz. 679.

[9] Zmiany wymienionej ustawy zostały ogłoszone w Dz. U. z 2006 r. Nr 66, poz. 469 i Nr 120, poz. 826, z 2007 r. Nr 7, poz. 48 i Nr 82, poz. 558, z 2009 r. Nr 18, poz. 97, Nr 63, poz. 520, Nr 92, poz. 753 i Nr 98, poz. 817, z 2010 r. Nr 28, poz. 146, Nr 143, poz. 962, Nr 213, poz. 1396 i Nr 228, poz. 1486 oraz z 2011 r. Nr 63, poz. 322.

2011-09-09

Appendix 2

    5) sprzyjać zachowaniom zagrażającym zdrowiu, bezpieczeństwu lub ochronie środowiska.

3a. Audycjom dla dzieci nie powinny towarzyszyć przekazy handlowe dotyczące artykułów spożywczych lub napojów zawierających składniki, których obecność w nadmiernych ilościach w codziennej diecie jest niewskazana.

3b. Krajowa Rada, po zasięgnięciu opinii ministra właściwego do spraw zdrowia, może określić, w drodze rozporządzenia:

    1) rodzaje artykułów spożywczych lub napojów zawierających składniki, których obecność w nadmiernych ilościach w codziennej diecie jest niewskazana,

    2) sposób umieszczania w programach przekazów handlowych dotyczących tych artykułów, tak aby przekazy te nie towarzyszyły audycjom dla dzieci

    – dążąc do zachęcenia nadawców do przeciwdziałania promowaniu niezdrowego odżywiania wśród dzieci oraz uwzględniając charakter programów, ich wpływ na kształtowanie opinii publicznej i oddziaływanie na interesy odbiorców, bez nakładania nieuzasadnionych obowiązków na nadawców.

4. (uchylony).

### Art. 16c.

Zakazane są:

    1) ukryte przekazy handlowe;

    2) lokowanie produktów, z zastrzeżeniem art. 17a;

    3) lokowanie tematów.

### Art. 17.

1. Odbiorcy powinni zostać wyraźnie poinformowani o sponsorowaniu. Sponsorowane audycje lub inne przekazy są oznaczane przez wskazanie sponsora na ich początku, na końcu oraz w momencie wznowienia po przerwie na reklamę lub telesprzedaż. Wskazanie sponsora może zawierać tylko jego nazwę, firmę, znak towarowy lub inne oznaczenie indywidualizujące przedsiębiorcę lub jego działalność, odniesienie do jego towarów, usług lub ich znaku towarowego.

1a. Wskazanie sponsora i żaden element tego wskazania nie może bezpośrednio zachęcać do zakupu lub najmu towarów lub usług, zwłaszcza przez specjalne, promocyjne do nich odniesienie.

2. Wskazanie sponsora nie może zawierać nazwy, firmy, znaku towarowego lub innego oznaczenia indywidualizującego przedsiębiorcę lub jego działalność, widoku towaru albo usługi, których reklama jest zakazana w art. 16b ust. 1.

3. Sponsor nie może wpływać na treść audycji lub innego przekazu oraz ich miejsce w programie w sposób ograniczający samodzielność i niezależność redakcyjną nadawcy. Sponsorowanie nie zwalnia nadawcy od odpowiedzialności za treść audycji.

4. Sponsorowane audycje lub inne przekazy nie mogą zachęcać do kupna lub innego udostępniania towarów lub usług sponsora lub osoby trzeciej.

5. Zabronione jest sponsorowanie audycji lub innych przekazów, z zastrzeżeniem ust. 6, przez:

    1) partie polityczne;

    2) związki zawodowe;

2011-09-09

TVP 021012 373

Appendix 2

3) organizacje pracodawców;

4) osoby fizyczne lub osoby prawne, których zasadniczą działalność stanowi produkcja lub sprzedaż towarów lub świadczenie usług, o których mowa w art. 16b ust. 1.

6. Zabronione jest sponsorowanie transmisji sportowych przez podmioty wymienione w ust. 5 pkt 1–3 oraz przez przedsiębiorców, których główna działalność polega na produkcji, sprzedaży lub innym udostępnianiu towarów lub usług, których reklama jest zakazana zgodnie z art. 16b ust. 1 pkt 1 i 2, z zastrzeżeniem art. 13¹ ust. 5 i 6 ustawy o wychowaniu w trzeźwości i przeciwdziałaniu alkoholizmowi.

6a. Zabronione jest sponsorowanie audycji i innych przekazów przez podmioty prowadzące działalność w zakresie gier cylindrycznych, gier w karty, gier w kości, przyjmowania zakładów wzajemnych i gier na automatach.

7. Zabronione jest sponsorowanie:

1) serwisów informacyjnych, z wyjątkiem sportowych i prognozy pogody;

2) audycji publicystycznych o treści społeczno-politycznej;

3) audycji poradniczych i konsumenckich;

4) audycji wyborczych lub bezpośrednio związanych z kampanią wyborczą.

8. Krajowa Rada określi, w drodze rozporządzenia, sposób sponsorowania audycji lub innych przekazów, z uwzględnieniem zasad określonych w ust. 1–7, w tym w szczególności czas emisji, wskazania sponsora oraz sposób rozpowszechniania informacji o sponsorze w zapowiedzi audycji albo po zakończeniu audycji lub innego przekazu, a także w czasie trwania audycji lub innego przekazu. W rozporządzeniu Krajowa Rada określi sposób prowadzenia i przechowywania przez nadawcę ewidencji sponsorowanych audycji lub innych przekazów oraz zakres informacji objętych tą ewidencją.

## Art. 17a.

1. Lokowanie produktu jest dopuszczalne wyłącznie:

1) w filmach kinematograficznych, filmach lub serialach wytworzonych na użytek audiowizualnych usług medialnych, a także w audycjach sportowych oraz audycjach rozrywkowych, lub

2) w postaci nieodpłatnego udostępniania towaru lub usługi do wykorzystania w audycji, w szczególności w charakterze rekwizytu lub nagrody

– z wyłączeniem audycji dla dzieci.

2. Audycje, w których stosuje się lokowanie produktu, oznacza się w programach telewizyjnych za pomocą znaku graficznego, a w programach radiowych za pomocą sygnału dźwiękowego informujących o fakcie lokowania produktu, na początku, na końcu oraz w momencie wznowienia po przerwie na reklamę lub telesprzedaż.

3. Na końcu audycji, o której mowa w ust. 2, która została wyprodukowana przy udziale nadawcy lub na jego zamówienie, umieszcza się neutralną informację o producencie lub sprzedawcy lokowanego towaru lub podmiocie świadczącym lokowaną usługę oraz o samym towarze lub usłudze.

4. Zastosowanie lokowania produktu nie może naruszać samodzielności i niezależności redakcyjnej nadawcy przez wpływ na treść lub miejsce audycji w programie oraz nie zwalnia nadawcy od odpowiedzialności za treść audycji.

5. Audycje, w których stosuje się lokowanie produktu, nie mogą:

2011-09-09

TVP 021012 374

Case 14-1115, Document 42-2, 07/15/2014, 1271746, Page103 of 130

**A-2923**

Appendix 2

    1) nadmiernie eksponować danego produktu;

    2) zachęcać bezpośrednio do nabycia lub najmu towarów lub usług, zwłaszcza przez promocyjne odniesienia do nich.

6. Zakazane jest lokowanie produktu dotyczące towarów lub usług, o których mowa w art. 16b ust. 1.

7. Nadawca jest obowiązany do prowadzenia i przechowywania ewidencji audycji, w których zastosowano lokowanie produktu.

8. W zakresie niezbędnym dla kontroli zgodności działania nadawcy z przepisami ust. 1–7, Przewodniczący Krajowej Rady może żądać od nadawcy przedstawienia dokumentacji w zakresie lokowania produktu. Przepis art. 10 ust. 2 stosuje się odpowiednio.

9. Krajowa Rada określi, w drodze rozporządzenia:

    1) szczegółowe warunki oznaczania przez nadawcę audycji, w których zastosowano lokowanie produktu, w tym wzór znaku graficznego oraz formę sygnału dźwiękowego, o których mowa w ust. 2,

    2) sposób prowadzenia oraz przechowywania przez nadawcę ewidencji audycji, w których zastosowano lokowanie produktu, oraz zakres danych objętych tą ewidencją

    — uwzględniając interesy odbiorców i możliwość prowadzenia przez nadawcę ewidencji w postaci elektronicznej, bez obciążania nadawców nadmiernymi utrudnieniami i kosztami.

## Art. 18.

1. Audycje lub inne przekazy nie mogą propagować działań sprzecznych z prawem, z polską racją stanu oraz postaw i poglądów sprzecznych z moralnością i dobrem społecznym, w szczególności nie mogą zawierać treści nawołujących do nienawiści lub dyskryminujących ze względu na rasę, niepełnosprawność, płeć, wyznanie lub narodowość.

2. Audycje lub inne przekazy powinny szanować przekonania religijne odbiorców, a zwłaszcza chrześcijański system wartości.

3. Audycje lub inne przekazy nie mogą sprzyjać zachowaniom zagrażającym zdrowiu lub bezpieczeństwu oraz zachowaniom zagrażającym środowisku naturalnemu.

4. Zabronione jest rozpowszechnianie audycji lub innych przekazów zagrażających fizycznemu, psychicznemu lub moralnemu rozwojowi małoletnich, w szczególności zawierających treści pornograficzne lub w sposób nieuzasadniony eksponujących przemoc.

5. Audycje lub inne przekazy, zawierające sceny lub treści mogące mieć negatywny wpływ na prawidłowy fizyczny, psychiczny lub moralny rozwój małoletnich, inne niż te, o których mowa w ust. 4, mogą być rozpowszechniane wyłącznie w godzinach od 23 do 6.

5a. Nadawcy są zobowiązani do oznaczania audycji lub innych przekazów, o których mowa w ust. 5, odpowiednim symbolem graficznym przez cały czas ich emisji telewizyjnej lub zapowiedzią słowną, informującą o zagrożeniach wynikających z treści emisji radiowej.

5b. Nadawcy są zobowiązani do oznaczania audycji i innych przekazów, innych niż te, o których mowa w ust. 5, z wyłączeniem serwisów informacyjnych, reklam, telesprzedaży, transmisji sportowych i przekazów tekstowych, odpowiednim

TVP 021012 375

Appendix 2

symbolem graficznym przez cały czas ich emisji telewizyjnej, uwzględniając stopień szkodliwości danej audycji lub przekazu dla małoletnich w poszczególnych kategoriach wiekowych.

6. Krajowa Rada określi, w drodze rozporządzenia:

  1) cechy oraz szczegółowe warunki kwalifikowania, rozpowszechniania i sposób zapowiadania audycji lub innych przekazów, o których mowa w ust. 5,

  2) podział małoletnich na kategorie wiekowe oraz szczegółowe warunki kwalifikowania i rozpowszechniania audycji lub innych przekazów, o których mowa w ust. 5b, z uwzględnieniem godzin nadawania audycji lub innych przekazów przeznaczonych dla danej kategorii wiekowej,

  3) wzory symboli graficznych i formuł zapowiedzi, o których mowa w ust. 5a i 5b, oraz sposób ich prezentacji

– uwzględniając stopień szkodliwości audycji dla małoletnich w poszczególnych kategoriach wiekowych.

7. Nadawcy dbają o poprawność języka swoich programów i przeciwdziałają jego wulgaryzacji.

### &lt;Art. 18a.

1. **Nadawcy programów telewizyjnych są obowiązani do zapewniania dostępności programów dla osób niepełnosprawnych z powodu dysfunkcji narządu wzroku oraz osób niepełnosprawnych z powodu dysfunkcji narządu słuchu, przez wprowadzanie odpowiednich udogodnień: audiodeskrypcji, napisów dla niesłyszących oraz tłumaczeń na język migowy, tak aby co najmniej 10 % kwartalnego czasu nadawania programu, z wyłączeniem reklam i telesprzedaży, posiadało takie udogodnienia.**

2. **Krajowa Rada może określić, w drodze rozporządzenia, niższy niż określony w ust. 1 udział w programie telewizyjnym audycji z udogodnieniami odbioru dla osób niepełnosprawnych z powodu dysfunkcji narządu wzroku oraz osób niepełnosprawnych z powodu dysfunkcji narządu słuchu, uwzględniając różnorodną ofertę programową w różnym czasie antenowym, możliwości techniczne, potrzeby odbiorców, sposób rozpowszechniania i specjalizację programu, bez nakładania nieuzasadnionych obowiązków na nadawców.&gt;**

Dodany art. 18a wchodzi w życie z dniem 1.07.2011 r. (Dz. U. z 2011 r. Nr 85, poz. 459).

### Art. 19.

1. Działalność nadawcy polegająca na tworzeniu i zestawianiu programu prowadzona jest w formie redakcji w rozumieniu przepisów prawa prasowego.

2. Do przekazów tekstowych stosuje się odpowiednio przepisy o tworzeniu i rozpowszechnianiu programów radiowych i telewizyjnych.

### Art. 20.

1. Nadawca utrwala audycje, reklamy lub inne przekazy na odpowiednich nośnikach i przechowuje je przez okres 28 dni od dnia rozpowszechnienia audycji, reklamy lub innego przekazu. Po upływie tego okresu przechowuje się zapisy audycji, reklamy lub innego przekazu będącego przedmiotem postępowania przed organem państwowym do czasu zakończenia tego postępowania.

2011-09-09

Case 14-1115, Document 42-2, 07/15/2014, 1271746, Page105 of 130

A-2925

Appendix 2

1a. Na wezwanie Przewodniczącego Krajowej Rady operator rozprowadzający program jest obowiązany utrwalić program określony w wezwaniu przez okres w nim wskazany, nie dłuższy niż 14 dni, i niezwłocznie przekazać jego zapis.

2. Osobie, która twierdzi, że treść audycji, reklamy lub innego przekazu narusza jej prawa, należy na jej pisemny wniosek i na koszt nadawcy udostępnić zapis audycji, reklamy lub innego przekazu albo wydać taki zapis na jej koszt, w terminie 7 dni od dnia złożenia wniosku.

3. W przypadku odmowy udostępnienia zapisu audycji, reklamy lub innego przekazu, osobie, o której mowa w ust. 2, służy roszczenie o udostępnienie zapisu na drodze sądowej; sądem właściwym w tych sprawach jest sąd okręgowy.

4. Krajowa Rada określi, w drodze rozporządzenia, sposoby utrwalania i przechowywania audycji, reklam i innych przekazów przez nadawców, z uwzględnieniem zakresu informacji o przechowywanych materiałach.

### Art. 20a.

1. Na pisemny wniosek Prezesa Urzędu Ochrony Konkurencji i Konsumentów nadawca jest obowiązany:

   1) ujawnić dane umożliwiające identyfikację zleceniodawcy audycji lub przekazu handlowego;

   2) wydać nieodpłatnie zapis audycji lub przekazu handlowego, w terminie 7 dni od dnia złożenia wniosku.

2. Przepis art. 20 ust. 3 stosuje się odpowiednio.

### Art. 20b.

1. Nadawca programu telewizyjnego może nadać bezpośrednią transmisję z wydarzenia

   o zasadniczym znaczeniu społecznym, zwanego dalej „ważnym wydarzeniem", tylko:

   1) w programie ogólnokrajowym w rozumieniu ustawy lub koncesji, dostępnym w całości bez opłaty, z wyłączeniem opłat abonamentowych w rozumieniu ustawy z dnia 21 kwietnia 2005 r. o_opłatach abonamentowych i podstawowych opłat pobieranych przez operatorów sieci kablowych, lub

   2) jeżeli to samo wydarzenie jest transmitowane przez nadawcę programu spełniającego wymogi określone w pkt 1, na podstawie umowy z nadawcą, który nabył prawa do transmisji danego wydarzenia, lub z innym uprawnionym, z zastrzeżeniem ust. 6.

2. Ze względu na duże zainteresowanie społeczne za ważne wydarzenia uważa się między innymi:

   1) letnie i zimowe Igrzyska Olimpijskie;

   2) półfinały i finały mistrzostw świata i Europy w piłce nożnej, a także wszelkie inne mecze w ramach tych imprez z udziałem reprezentacji Polski, w tym mecze eliminacyjne;

   3) inne mecze z udziałem reprezentacji Polski w piłce nożnej w ramach oficjalnych rozgrywek oraz mecze z udziałem polskich klubów w ramach Ligi Mistrzów i Pucharu UEFA.

3. Krajowa Rada może, w drodze rozporządzenia, określić listę innych, niż wymienione w ust. 2, ważnych wydarzeń, uwzględniając stopień społecznego zaintere-

TVP 021012 377

Appendix 2

sowania określonym wydarzeniem i znaczenie tego wydarzenia dla życia społecznego, gospodarczego i politycznego.

4. Jeżeli przewiduje się organizację ważnego wydarzenia w częściach, to każdą taką część uważa się za ważne wydarzenie.

5. Przepis ust. 1 stosuje się do nadań z opóźnieniem, jeżeli opóźnienie nadania transmisji z ważnego wydarzenia nie przekracza 24 godzin i wynika z ważnych powodów, w szczególności:

   1) z czasu, w którym odbywa się dane wydarzenie, obejmującego okres między godziną 24 a godziną 6 czasu obowiązującego na obszarze Rzeczypospolitej Polskiej;

   2) z pokrywaniem się w czasie ważnych wydarzeń lub ich części.

6. Przepisu ust. 1 nie stosuje się, jeżeli dany nadawca wykaże, że żaden nadawca programu spełniającego wymogi określone w ust. 1 pkt 1 nie wyraził gotowości zawarcia umowy umożliwiającej nadanie transmisji zgodnie z ust. 1 pkt 2.

7. Krajowa Rada w zakresie wynikającym z wiążących Rzeczpospolitą Polską umów międzynarodowych może, w drodze rozporządzenia, określić:

   1) listy wydarzeń uznanych przez inne państwa europejskie za ważne wydarzenia;

   2) zasady wykonywania wyłącznych praw do telewizyjnych transmisji wydarzeń, o których mowa w pkt 1, w sposób zapewniający, że wykonywanie tych praw przez nadawców podlegających ustawie nie pozbawi odbiorców w danym państwie możliwości odbioru tych wydarzeń na zasadach określonych przez dane państwo zgodnie z przepisami prawa międzynarodowego.

### Art. 20c.

1. Nadawca programu telewizyjnego uprawniony do nadania na zasadzie wyłączności transmisji z wydarzenia budzącego istotne zainteresowanie społeczne, zwanego dalej „wydarzeniem", jest obowiązany umożliwić innym nadawcom telewizyjnym realizację prawa do krótkiego sprawozdania.

2. Prawo do krótkiego sprawozdania przysługuje każdemu nadawcy ustanowionemu w:

   1) Rzeczypospolitej Polskiej;

   2) innym państwie członkowskim Unii Europejskiej lub państwie będącym stroną Europejskiej konwencji o telewizji ponadgranicznej, o ile żaden nadawca lub inny podmiot w państwie, w którym jest ustanowiony nadawca ubiegający się o dostęp, nie jest uprawniony do transmisji danego wydarzenia i nie może zapewnić dostępu do krótkiego sprawozdania z niego.

3. Realizację prawa do krótkiego sprawozdania umożliwia się przez udostępnienie nadawcy ubiegającemu się o dostęp wybranych przez niego krótkich fragmentów transmisji wydarzenia, łącznie nie dłuższych niż 90 sekund, z sygnału nadawcy, o którym mowa w ust. 1, za zapłatą kosztów udostępnienia.

4. Nadawca realizujący prawo do krótkiego sprawozdania może nadać udostępnione mu zgodnie z ust. 3 fragmenty w okresie 24 godzin, w ogólnych audycjach informacyjnych lub umieszczonych przy nich informacyjnych serwisach sportowych, trzykrotnie w danym programie, w wymiarze krótkiej informacji o wydarzeniu, nie dłuższej niż 90 sekund, pod warunkiem wyraźnego podania źródła.

5. Nadawca, o którym mowa w ust. 1, jest zwolniony z obowiązku realizacji prawa do krótkiego sprawozdania w sposób określony w ust. 3, jeżeli nadawca ubiega-

TVP 021012 378

Appendix 2

jący się o realizację tego prawa ma możliwość wstępu na miejsce wydarzenia i sporządzenia własnego sprawozdania. Przepis ust. 4 stosuje się odpowiednio.

6. Postanowienia umowne uniemożliwiające realizację prawa do krótkiego sprawozdania zgodnie z ust. 1–4 są nieważne.

### Rozdział 4
### Publiczna radiofonia i telewizja

### Art. 21.

1. Publiczna radiofonia i telewizja realizuje misję publiczną, oferując, na zasadach określonych w ustawie, całemu społeczeństwu i poszczególnym jego częściom, zróżnicowane programy i inne usługi w zakresie informacji, publicystyki, kultury, rozrywki, edukacji i sportu, cechujące się pluralizmem, bezstronnością, wyważeniem i niezależnością oraz innowacyjnością, wysoką jakością i integralnością przekazu.

1a. Do zadań publicznej radiofonii i telewizji, wynikających z realizacji misji, o której mowa w ust. 1, należy w szczególności:

   1) tworzenie i rozpowszechnianie programów ogólnokrajowych, programów regionalnych, programów dla odbiorców za granicą w języku polskim i innych językach oraz innych programów realizujących demokratyczne, społeczne i kulturalne potrzeby społeczności lokalnych;

   2) tworzenie i rozpowszechnianie programów wyspecjalizowanych, na których rozpowszechnianie uzyskano koncesję;

   3) budowa i eksploatacja nadawczych i przekaźnikowych stacji radiowych i telewizyjnych;

   4) rozpowszechnianie przekazów tekstowych;

   5) prowadzenie prac nad nowymi technikami tworzenia i rozpowszechniania programów radiowych i telewizyjnych;

   6) prowadzenie działalności produkcyjnej, usługowej i handlowej związanej z twórczością audiowizualną, w tym eksportu i importu;

   7) popieranie twórczości artystycznej, literackiej, naukowej oraz działalności oświatowej i działalności w zakresie sportu;

   8) upowszechnianie wiedzy o języku polskim;

   8a) uwzględnianie potrzeb mniejszości narodowych i etnicznych oraz społeczności posługującej się językiem regionalnym, w tym emitowanie programów informacyjnych w językach mniejszości narodowych i etnicznych oraz języku regionalnym;

   9) tworzenie i udostępnianie programów edukacyjnych na użytek środowisk polonijnych oraz Polaków zamieszkałych za granicą;

   10) zapewnianie dostępności programów lub ich części i innych usług dla osób niepełnosprawnych z powodu dysfunkcji narządu wzroku oraz osób niepełnosprawnych z powodu dysfunkcji narządu słuchu;

   11) upowszechnianie edukacji medialnej.

2. Programy i inne usługi publicznej radiofonii i telewizji powinny:

   1) kierować się odpowiedzialnością za słowo i dbać o dobre imię publicznej radiofonii i telewizji;

2011-09-09

Case 14-1115, Document 42-2, 07/15/2014, 1271746, Page108 of 130

A-2928

Appendix 2

2) rzetelnie ukazywać całą różnorodność wydarzeń i zjawisk w kraju i za granicą;

3) sprzyjać swobodnemu kształtowaniu się poglądów obywateli oraz formowaniu się opinii publicznej;

4) umożliwiać obywatelom i ich organizacjom uczestniczenie w życiu publicznym poprzez prezentowanie zróżnicowanych poglądów i stanowisk oraz wykonywanie prawa do kontroli i krytyki społecznej;

5) służyć rozwojowi kultury, nauki i oświaty, ze szczególnym uwzględnieniem polskiego dorobku intelektualnego i artystycznego;

6) respektować chrześcijański system wartości, za podstawę przyjmując uniwersalne zasady etyki;

7) służyć umacnianiu rodziny;

7a) służyć kształtowaniu postaw prozdrowotnych;

7b) służyć propagowaniu i upowszechnianiu sportu;

8) służyć zwalczaniu patologii społecznych;

9) (uchylony);

10) służyć edukacji medialnej.

3. Jednostki publicznej radiofonii i telewizji opracowują corocznie w porozumieniu z Krajową Radą plany finansowo-programowe przedsięwzięć w zakresie realizacji zadań, o których mowa w ust. 1 i 1a, wymagających finansowania ze środków publicznych, z uwzględnieniem części kosztów funkcjonowania i rozwoju tych jednostek.

4. Krajowa Rada określi, w drodze rozporządzenia, terminy przedkładania i zakres planów finansowo-programowych mając na względzie zapewnienie realizacji misji publicznej przez jednostki publicznej radiofonii i telewizji, a także swobodę nadawców publicznych w kształtowaniu programów.

### Art. 22.

1. Organy państwowe mogą podejmować decyzje w sprawach działalności jednostek publicznej radiofonii i telewizji tylko w przypadkach przewidzianych ustawami.

2. Jednostki publicznej radiofonii i telewizji umożliwiają naczelnym organom państwowym bezpośrednią prezentację oraz wyjaśnianie polityki państwa.

3. Krajowa Rada określa, w drodze rozporządzenia, tryb postępowania w sprawach, o których mowa w ust. 2.

### Art. 23.

1. Jednostki publicznej radiofonii i telewizji stwarzają partiom politycznym możliwość przedstawienia stanowiska w węzłowych sprawach publicznych.

2. Uprawnienia przewidziane w ust. 1 stosuje się odpowiednio do ogólnokrajowych organizacji związków zawodowych i związków pracodawców.

3. Tryb postępowania w sprawach, o których mowa w ust. 1 i 2, określa, w drodze rozporządzenia, Krajowa Rada.

2011-09-09

TVP 021012 380

Appendix 2

### Art. 23a.

1. Jednostki publicznej radiofonii i telewizji stwarzają organizacjom pożytku publicznego, o których mowa w ustawie z dnia 24 kwietnia 2003 r. o działalności pożytku publicznego i o wolontariacie (Dz. U. z 2010 r. Nr 234, poz. 1536), możliwość nieodpłatnego informowania o prowadzonej przez te organizacje działalności nieodpłatnej.

2. Przepis ust. 1 nie wyklucza prawa nadawcy do informowania o działalności organizacji pożytku publicznego w szerszym zakresie.

3. Krajowa Rada w porozumieniu z ministrem właściwym do spraw zabezpieczenia społecznego określi, w drodze rozporządzenia, tryb postępowania związanego z nieodpłatnym informowaniem o prowadzonej przez organizacje pożytku publicznego nieodpłatnej działalności pożytku publicznego, w tym sposób przygotowania i emisji audycji oraz czas przeznaczony na ich rozpowszechnianie, uwzględniając różnorodność zadań publicznych określonych w art. 4 ustawy o działalności pożytku publicznego i o wolontariacie oraz ich znaczenie dla społeczności.

### Art. 24.

1. Podmiotom uczestniczącym w wyborach do Sejmu, Senatu, samorządu terytorialnego oraz Parlamentu Europejskiego zapewnia się możliwość rozpowszechniania audycji wyborczych w programach publicznej radiofonii i telewizji na zasadach określonych odrębnymi przepisami.

2. Przepis ust. 1 stosuje się odpowiednio do wyborów na urząd Prezydenta Rzeczypospolitej Polskiej.

3. Podmiotom uprawnionym do udziału w kampanii referendalnej w programach radiowych i telewizyjnych w rozumieniu art. 48 ust. 1 ustawy z dnia 14 marca 2003 r. o referendum ogólnokrajowym (Dz. U. Nr 57, poz. 507, z późn. zm.[10]) zapewnia się możliwość rozpowszechniania audycji referendalnych w programach publicznej radiofonii i telewizji na zasadach określonych odrębnymi przepisami.

### Art. 25.

1. Jednostki publicznej radiofonii i telewizji mogą tworzyć i rozpowszechniać programy dla odbiorców za granicą w języku polskim i w innych językach.

2. Jednostki publicznej radiofonii i telewizji są obowiązane tworzyć i rozpowszechniać audycje oświatowe dla szkół i innych placówek oświatowo-wychowawczych.

3. Audycje oświatowe powinny odpowiadać wymogom zawartym w szkolnych programach nauczania.

4. Koszty tworzenia programów oraz audycji, o których mowa w ust. 1 i 2, są pokrywane z budżetu państwa, w granicach określonych ustawą budżetową.

5. Zakres i sposób prowadzenia działalności przewidzianej w ust. 1 i 2 oraz zasady pokrywania jej kosztów są określane w formie porozumień zawieranych między

---

[10] Zmiany wymienionej ustawy zostały ogłoszone w Dz. U. z 2003 r. Nr 85, poz. 782, z 2007 r. Nr 112, poz. 766, z 2009 r, Nr 68, poz. 573 i Nr 202, poz. 1547 oraz z 2011 r. Nr 21, poz. 113.

TVP 021012 381

Appendix 2

ministrami właściwymi odpowiednio w sprawach zagranicznych i edukacji narodowej oraz jednostkami publicznej radiofonii i telewizji.

### Art. 26.

1. Jednostki publicznej radiofonii i telewizji działają wyłącznie w formie jednoosobowej spółki akcyjnej Skarbu Państwa, zwanej dalej „spółką".

2. Telewizję publiczną tworzy spółka „Telewizja Polska – Spółka Akcyjna", zawiązana w celu tworzenia i rozpowszechniania ogólnokrajowych programów I, II i TV Polonia oraz regionalnych programów telewizyjnych.

2a. Terenowe oddziały spółki „Telewizja Polska – Spółka Akcyjna" mają swoje siedziby w: Białymstoku, Bydgoszczy, Gorzowie Wielkopolskim, Gdańsku, Katowicach, Kielcach, Krakowie, Lublinie, Łodzi, Opolu, Olsztynie, Poznaniu, Rzeszowie, Szczecinie, Warszawie, Wrocławiu.

3. Radiofonię publiczną tworzą:

   1) spółka „Polskie Radio – Spółka Akcyjna", zawiązana w celu tworzenia i rozpowszechniania ogólnokrajowych programów radiowych i programów dla odbiorców za granicą;

   2) spółki zawiązane w celu tworzenia i rozpowszechniania regionalnych programów radiowych, zwane dalej „spółkami radiofonii regionalnej".

4. Do spółek wymienionych w ust. 2 i 3 stosuje się, z zastrzeżeniem art. 27-30 ustawy, przepisy Kodeksu spółek handlowych z wyjątkiem art. 312 i 402.

5. Prezes Urzędu Komunikacji Elektronicznej, w porozumieniu z Przewodniczącym Krajowej Rady, dokonuje, w drodze decyzji, rezerwacji częstotliwości niezbędnych do wykonywania ustawowych zadań przez spółki oraz określa warunki wykorzystania tych częstotliwości. Do dokonywania, wprowadzania zmian lub cofania rezerwacji częstotliwości stosuje się przepisy art. 114 i 115 ustawy z dnia 16 lipca 2004 r. – Prawo telekomunikacyjne (Dz. U. Nr 171, poz. 1800, z późn. zm.[11]).

6. Prezes Urzędu Komunikacji Elektronicznej, w porozumieniu z Przewodniczącym Krajowej Rady, zapewnia dla spółek tworzących i rozpowszechniających:

   1) ogólnokrajowe programy telewizyjne – częstotliwości niezbędne do pokrycia kraju zasięgiem odbioru programu „Telewizja Polska I" i „Telewizja Polska II";

   2) ogólnokrajowe programy radiowe – częstotliwości niezbędne do pokrycia kraju zasięgiem odbioru programu pierwszego, drugiego, trzeciego i czwartego oraz częstotliwości niezbędne do rozpowszechniania programów radiowych dla odbiorców za granicą;

   3) regionalne programy telewizyjne – częstotliwości niezbędne do rozpowszechniania regionalnych programów telewizyjnych;

---

[11] Zmiany wymienionej ustawy zostały ogłoszone w Dz. U. z 2004 r. Nr 273, poz. 2703, z 2005 r. Nr 163, poz. 1362 i Nr 267, poz. 2258, z 2006 r. Nr 12, poz. 66, Nr 104, poz. 708 i 711, Nr 170, poz. 1217, Nr 220, poz. 1600, Nr 235, poz. 1700 i Nr 249, poz. 1834, z 2007 r. Nr 23, poz. 137, Nr 50, poz. 331 i Nr 82, poz. 556, z 2008 r. Nr 17, poz. 101 i Nr 227, poz. 1505, z 2009 r. Nr 11, poz. 59, Nr 18, poz. 97 i Nr 85, poz. 716 oraz z 2010 r. Nr 81, poz. 530, Nr 86, poz. 554, Nr 106, poz. 675, Nr 182, poz. 1228, Nr 219, poz. 1443, Nr 229, poz. 1499 i Nr 238, poz. 1578.

2011-09-09

Appendix 2

    4) regionalne programy radiowe -- częstotliwości niezbędne do rozpowszechniania regionalnych programów radiowych.

7. Program TV Polonia jest rozpowszechniany w sposób rozsiewczy satelitarny.

8. Do rezerwacji częstotliwości przeznaczonych do rozpowszechniania lub rozprowadzania programów w sposób cyfrowy, drogą rozsiewczą naziemną lub rozsiewczą satelitarną, stosuje się art. 115 ust. 3 ustawy z dnia 16 lipca 2004 r. -- Prawo telekomunikacyjne.

### Art. 27.

1. Zarząd spółki liczy od jednego do trzech członków.

2. Kadencja zarządu trwa cztery lata.

3. Członków zarządu, w tym prezesa zarządu, Krajowa Rada powołuje w drodze uchwały na wniosek rady nadzorczej oraz odwołuje w drodze uchwały na wniosek rady nadzorczej lub walnego zgromadzenia.

4. Do zarządu powołuje się wyłącznie osobę posiadającą kompetencje w dziedzinie zarządzania oraz radiofonii i telewizji, spośród kandydatów wyłonionych w konkursie przeprowadzonym przez radę nadzorczą.

5. Krajowa Rada określi, w drodze rozporządzenia, regulamin konkursu na kandydatów na członków zarządu, w tym sposób ogłaszania, organizację i tryb przeprowadzania konkursu oraz sposób ogłaszania wyników konkursu, uwzględniając potrzebę powszechności dostępu do konkursu, zapewnienia obiektywności i jawności postępowania, sprawnego przeprowadzenia konkursu oraz oceny kompetencji kandydatów, o których mowa w ust. 4.

6. Członek zarządu może być odwołany w przypadku:

    1) skazania prawomocnym wyrokiem sądu za przestępstwo umyślne ścigane z oskarżenia publicznego lub przestępstwo skarbowe;

    2) działania na szkodę spółki;

    3) zaistnienia okoliczności trwale uniemożliwiających sprawowanie funkcji.

7. Członkowie zarządów i osoby zajmujące kierownicze stanowiska w jednostkach publicznej radiofonii i telewizji kierują się w swojej pracy oraz w ocenie dziennikarzy i innych twórców im podległych zasadami profesjonalizmu, uczciwości i rzetelności oraz wskazaniami zawartymi w art. 21 ust. 1a i 2 ustawy.

### Art. 28.

1. Rady nadzorcze spółek „Telewizja Polska – Spółka Akcyjna" i „Polskie Radio – Spółka Akcyjna" liczą po siedmiu członków; pięciu wyłonionych w konkursie przeprowadzonym przez Krajową Radę spośród kandydatów posiadających kompetencje w dziedzinie prawa, finansów, kultury oraz mediów, zgłoszonych przez organy kolegialne uczelni akademickich, jednego powołanego przez ministra właściwego do spraw kultury i ochrony dziedzictwa narodowego oraz jednego powołanego przez ministra właściwego do spraw Skarbu Państwa.

1a. Rady nadzorcze spółek radiofonii regionalnej liczą po pięciu członków: czterech wyłonionych w konkursie przeprowadzonym przez Krajową Radę spośród kandydatów posiadających kompetencje w dziedzinie prawa, finansów, kultury oraz mediów, zgłoszonych przez organy kolegialne uczelni akademickich działających w danym regionie oraz jednego powołanego przez ministra właściwego do

2011-09-09

Appendix 2

spraw Skarbu Państwa w porozumieniu z ministrem właściwym do spraw kultu-
ry i ochrony dziedzictwa narodowego.

1b. Krajowa Rada określi, w drodze rozporządzenia, regulamin konkursu na członka
rady nadzorczej, w tym sposób ogłaszania, organizację i tryb przeprowadzania
konkursu, sposób zgłaszania kandydatów oraz sposób ogłaszania wyników kon-
kursu, uwzględniając potrzebę zapewnienia obiektywności i jawności postępo-
wania, sprawnego przeprowadzenia konkursu oraz oceny kompetencji kandyda-
tów, o których mowa w ust. 1 i 1a.

1c. Uchwała Krajowej Rady w sprawie wyników konkursu, wskazująca osoby wy-
łonione w konkursie, stanowi ich powołanie w skład rady nadzorczej.

1d. Członek rady nadzorczej może być odwołany przez organ, który go powołał, w
przypadku:

1) skazania prawomocnym wyrokiem sądu za przestępstwo umyślne ścigane
z oskarżenia publicznego lub przestępstwo skarbowe;

2) działania na szkodę spółki;

3) zaistnienia okoliczności trwale uniemożliwiających sprawowanie funkcji.

2. Rada nadzorcza podejmuje uchwały bezwzględną większością głosów w obecno-
ści co najmniej połowy składu rady.

3. Rada nadzorcza wybiera ze swego grona przewodniczącego.

4. Rada nadzorcza uchwala regulamin określający tryb jej działania.

5. Kadencja rady nadzorczej trwa trzy lata.

6. Zgody rady nadzorczej wymaga:

1) nawiązywanie i rozwiązywanie stosunku pracy z osobami zajmującymi sta-
nowiska kierownicze określone w statucie spółki;

2) zawarcie lub przystąpienie przez spółkę do umowy zbiorowej z przedstawi-
cielami pracowników;

3) zawiązanie bądź przystąpienie do spółki innej niż spółka, o której mowa w
art. 26 ust. 1, a także nabycie lub zbycie udziałów albo akcji w takiej spółce;

4) zbycie lub obciążenie nieruchomości.

7. (uchylony).

### Art. 28a.

1. Rady programowe publicznej radiofonii i telewizji liczą 15 członków, których
powołuje Krajowa Rada; 10 członków rady programowej reprezentuje ugrupo-
wania parlamentarne. Pozostałych 5 powołuje z grona osób legitymujących się
dorobkiem i doświadczeniem w sferze kultury i mediów.

2. Kadencja rady programowej trwa 4 lata, a jej członkowie reprezentują społeczne
interesy i oczekiwania związane z działalnością programową spółki.

3. Rada programowa podejmuje uchwały zawierające oceny poziomu i jakości pro-
gramu bieżącego oraz programów ramowych. Uchwały w sprawach programo-
wych, podejmowane większością głosów w obecności co najmniej połowy skła-
du rady, są przedmiotem obrad i postanowień rady nadzorczej.

4. Członkom rady programowej przysługuje dieta wypłacana przez spółkę w wyso-
kości ustalonej przez Krajową Radę.

TVP 021012 384

**A-2933**

Appendix 2

5. Zarząd spółki zapewnia członkom rady programowej organizacyjne i finansowe warunki dokonywania ocen poziomu i jakości wyemitowanego programu, badania jego odbioru oraz zlecenia niezależnych badań dotyczących percepcji programu i jego społecznych skutków.

**Art. 29.**

1. W walnym zgromadzeniu Skarb Państwa reprezentowany jest przez ministra właściwego do spraw Skarbu Państwa.

2. Zarząd spółki nie jest związany poleceniami i zakazami ustanowionymi przez walne zgromadzenie, jeżeli dotyczą one treści programu.

3. Zmiana statutu spółki wymaga uprzedniej zgody Krajowej Rady.

**Art. 30.**

1. Tworzenie i rozpowszechnianie regionalnych programów telewizji publicznej należy do terenowych oddziałów spółki, o której mowa w art. 26 ust. 2.

2. Statut spółki określa zakres działania i zadania terenowego oddziału spółki.

3. Działalnością terenowego oddziału spółki kieruje dyrektor powoływany przez radę nadzorczą na wniosek zarządu spółki.

4. Organem opiniodawczo-doradczym dyrektora terenowego oddziału spółki jest rada programowa oddziału.

4a. Powołując rady programowe oddziałów emitujących programy w językach mniejszości narodowych i etnicznych oraz języku regionalnym, dyrektorzy oddziałów uwzględnią kandydatów zgłaszanych przez organizacje społeczne mniejszości narodowych i etnicznych oraz społeczności posługującej się językiem regionalnym.

5. Krajowa Rada, na wniosek zarządu spółki, po zasięgnięciu opinii dyrektorów terenowych oddziałów, określi minimalny udział audycji tworzonych przez terenowe oddziały spółki w poszczególnych programach ogólnokrajowych.

6. (uchylony).

**Art. 30a.**

1. Przepisy dotyczące programów dla odbiorców za granicą stosuje się odpowiednio do programu TV Polonia.

2. Organem opiniodawczo-doradczym w sprawach tworzenia i rozpowszechnienia programu TV Polonia jest rada programowa TV Polonia.

**Art. 31.**

1. Przychodami spółek, o których mowa w art. 26 ust. 2 i 3, są wpływy pochodzące:

   1) z opłat abonamentowych, odsetek za zwłokę w ich uiszczaniu oraz kar za używanie niezarejestrowanych odbiorników radiofonicznych i telewizyjnych, w rozumieniu przepisów ustawy z dnia 21 kwietnia 2005 r. o opłatach abonamentowych, z zastrzeżeniem przepisu art. 8 ust. 1 tej ustawy;

   2) z obrotu prawami do audycji;

   3) z reklam i audycji sponsorowanych;

2011-09-09

TVP 021012 385

Appendix 2

4) z innych źródeł.

2. Przychodami spółek mogą być również dotacje z budżetu państwa.

3. Akcjonariuszom spółek, o których mowa w art. 26 ust. 2 i 3, nie przysługuje prawo do udziału w zysku.

### Art. 31a.

1. Spółki, o których mowa w art. 26 ust. 2 i 3, są obowiązane do określenia w dokumentacji, o której mowa w art. 10 ustawy z dnia 29 września 1994 r. o rachunkowości (Dz. U. z 2009 r. Nr 152, poz. 1223, Nr 157, poz. 1241 i Nr 165, poz. 1316 oraz z 2010 r. Nr 47, poz. 278), zasad rachunkowości, w tym zakładowego planu kont, w sposób zapewniający ujęcie w księgach rachunkowych przychodów i związanych z nimi kosztów odrębnie w odniesieniu do działalności, o której mowa w art. 21 ust. 1, oraz pozostałej działalności, a także metod przypisywania kosztów i przychodów do poszczególnych rodzajów prowadzonej działalności.

2. Obowiązek, o którym mowa w ust. 1, nie narusza obowiązków w zakresie rachunkowości i sprawozdawczości wynikających z odrębnych przepisów.

3. Krajowa Rada określi, w drodze rozporządzenia, sposób prowadzenia dokumentacji, o której mowa w ust. 1, oraz sposób sporządzania sprawozdań, o których mowa w art. 31b pkt 1–3, biorąc pod uwagę konieczność zapewnienia przestrzegania zasad jawności i przejrzystości wykorzystania środków przeznaczonych na realizację zadań, o których mowa w art. 21 ust. 1, w sposób niezakłócający konkurencji na rynku.

### Art. 31b.

Zarządy spółek, o których mowa w art. 26 ust. 2 i 3, są obowiązane do składania Krajowej Radzie:

1) rocznego sprawozdania ze sposobu wykorzystania środków, o których mowa w art. 31 ust. 1 i 2, do dnia 15 lutego, za poprzedni rok kalendarzowy;

2) kwartalnych sprawozdań dotyczących sposobu wykorzystania środków przyznawanych zgodnie z art. 31 ust. 1 pkt 1 i ust. 2, do 25. dnia miesiąca następującego po upływie każdego kwartału danego roku kalendarzowego;

3) kwartalnych sprawozdań dotyczących kosztów poniesionych na działalność, o której mowa w art. 21 ust. 1, wraz z określeniem źródeł ich finansowania, do 25. dnia miesiąca następującego po upływie każdego kwartału danego roku kalendarzowego;

4) (uchylony).

### Art. 31c.

Zarządy spółek, o których mowa w art. 26 ust. 2 i 3, przygotowują i publicznie udostępniają, do dnia 15 marca za poprzedni rok kalendarzowy, sprawozdania z wykorzystania wpływów z opłat abonamentowych w rozumieniu ustawy z dnia 21 kwietnia 2005 r. o opłatach abonamentowych, odsetek za zwłokę w ich uiszczaniu oraz kar za używanie niezarejestrowanych odbiorników, na realizację misji publicznej, o której mowa w art. 21 ust. 1, ze wskazaniem środków przeznaczonych na wykonanie poszczególnych zadań wymienionych w art. 21 ust. 1a.

2011-09-09

**A-2935**

Appendix 2

### Art. 32.

W celu realizacji zadań radiofonii i telewizji publicznej spółki mogą tworzyć, za zgodą Krajowej Rady, przedsiębiorców przewidzianych przepisami prawa.

### Rozdział 5

### Koncesje na rozpowszechnianie programów

### Art. 33.

1. Rozpowszechnianie programów radiowych i telewizyjnych, z wyjątkiem programów publicznej radiofonii i telewizji, wymaga uzyskania koncesji.

1a. Nie wymaga uzyskania koncesji rozpowszechnianie programów telewizyjnych wyłącznie w systemach teleinformatycznych, chyba że program taki ma być rozprowadzany naziemnie, satelitarnie lub w sieciach kablowych.

2. Organem właściwym w sprawach koncesji jest Przewodniczący Krajowej Rady.

3. Przewodniczący Krajowej Rady podejmuje decyzję w sprawie koncesji na podstawie uchwały Krajowej Rady. Decyzja w tej sprawie jest ostateczna.

### Art. 34.

1. Przewodniczący Krajowej Rady, po zasięgnięciu opinii Prezesa Urzędu Komunikacji Elektronicznej w zakresie określonym w ust. 1a pkt 3, ogłasza w Dzienniku Urzędowym Rzeczypospolitej Polskiej „Monitor Polski" informacje o możliwościach uzyskania koncesji na rozpowszechnianie w sposób rozsiewczy naziemny programu radiowego lub telewizyjnego oraz ustala termin, nie krótszy niż 45 dni od dnia ogłoszenia, do składania wniosków o udzielenie koncesji.

1a. W ogłoszeniu, o którym mowa w ust. 1, określa się:

    1) przedmiot postępowania;

    2) warunki programowe rozpowszechniania programu, w tym w szczególności rodzaj i charakter programu;

    3) częstotliwości lub kanały oraz maksymalną moc promieniowaną i lokalizację stacji nadawczych przeznaczonych do rozpowszechniania programu lub obszar, na którym mogą być wykorzystywane częstotliwości, chyba że do rozpowszechniania programu nie jest wymagana rezerwacja częstotliwości;

    4) liczbę koncesji;

    5) czas, na jaki może być udzielona koncesja;

    6) termin i miejsce składania wniosków.

1b. Przewodniczący Krajowej Rady, w terminie nie dłuższym niż 14 dni od dnia ogłoszenia, o którym mowa w ust. 1, zamieszcza w co najmniej dwóch drukowanych dziennikach o zasięgu ogólnopolskim informacje o tym ogłoszeniu.

1c. Rozpatrzeniu podlegają wyłącznie wnioski o udzielenie koncesji w związku z ogłoszeniem, o którym mowa w ust. 1.

2. Przewodniczący Krajowej Rady podaje do publicznej wiadomości listę wnioskodawców uczestniczących w postępowaniu o udzielenie koncesji. W przypadku złożenia większej liczby wniosków, przekraczających istniejące możliwości rozpowszechniania programów, są one rozpatrywane w ramach jednego postępowania.

2011-09-09

Case 14-1115, Document 42-2, 07/15/2014, 1271746, Page116 of 130

**A-2936**

Appendix 2

## Art. 35.

1. Koncesja może być udzielona osobie fizycznej, posiadającej obywatelstwo polskie i stałe miejsce zamieszkania na terytorium Rzeczypospolitej Polskiej, osobie prawnej lub osobowej spółce handlowej, które mają siedzibę na terytorium Rzeczypospolitej Polskiej.

2. Koncesja dla spółki z udziałem osób zagranicznych może być udzielona, jeżeli:

   1) udział kapitałowy osób zagranicznych w spółce lub udział osób zagranicznych w kapitale zakładowym spółki nie przekracza 49%,

   2) umowa lub statut spółki przewidują, że:

      a) osobami uprawnionymi do reprezentowania lub prowadzenia spraw spółki albo członkami zarządu spółki będą w większości osoby posiadające obywatelstwo polskie i stałe miejsce zamieszkania w Polsce,

      b) w zgromadzeniu wspólników lub w walnym zgromadzeniu udział głosów osób zagranicznych i spółek zależnych, w rozumieniu Kodeksu spółek handlowych, od osób zagranicznych nie może przekroczyć 49%,

      c) osoby zagraniczne nie mogą dysponować bezpośrednio lub pośrednio większością przekraczającą 49% głosów w osobowej spółce handlowej,

      d) członkami rady nadzorczej spółki będą w większości osoby posiadające obywatelstwo polskie i stałe miejsce zamieszkania w Polsce.

3. Koncesja może być również udzielona:

   1) osobie zagranicznej lub

   2) spółce zależnej, w rozumieniu Kodeksu spółek handlowych, od osoby zagranicznej

– których siedziba lub stałe miejsce zamieszkania znajduje się w państwie członkowskim Europejskiego Obszaru Gospodarczego – bez stosowania ograniczeń zawartych w ust. 2.

## Art. 35a.

1. Nadawca *społeczny*[12] może złożyć wniosek o udzielenie koncesji na kolejny okres, nie później niż 12 miesięcy przed wygaśnięciem posiadanej koncesji.

2. W przypadku złożenia przez nadawcę *społecznego*[12] wniosku, o którym mowa w ust. 1, odmowa udzielenia koncesji na kolejny okres możliwa jest wyłącznie, gdy w stosunku do nadawcy zachodzi którakolwiek z okoliczności wskazanych w art. 38 ust. 1 lub 2.

3. W przypadku złożenia przez nadawcę wniosku, o którym mowa w ust. 1, do postępowania w sprawie udzielenia koncesji nie stosuje się przepisów art. 34 i 36 ust. 1 i 2.

## Art. 36.

1. W postępowaniu o udzielenie koncesji ocenia się w szczególności:

---

[12] Utracił moc w zakresie, w jakim ust. 1 zawiera słowo „społeczny", a ust. 2 zawiera słowo „społecznego", na podstawie wyroku Trybunału Konstytucyjnego, z dnia 23 marca 2006 r. sygn. akt K 4/06 (Dz. U. Nr 51, poz. 377).

2011-09-09

TVP 021012 388

Appendix 2

    1) stopień zgodności zamierzonej działalności programowej z zadaniami okre-
ślonymi w art. 1 ust. 1 ustawy, z uwzględnieniem stopnia realizacji tych za-
dań przez innych nadawców działających na obszarze objętym koncesją;

    2) możliwości dokonania przez wnioskodawcę koniecznych inwestycji i finan-
sowania programu;

    3) przewidywany udział w programie audycji wytworzonych przez nadawcę
lub na jego zamówienie albo we współdziałaniu z innymi nadawcami;

    4) przewidywany udział audycji, o których mowa w art. 15 ust. 1 i 3, w pro-
gramie telewizyjnym albo utworów, o których mowa w art. 15 ust. 2, w
programie radiowym lub telewizyjnym;

    5) dotychczasowe przestrzeganie przepisów dotyczących radiokomunikacji i
środków masowego przekazu.

2. Koncesji nie udziela się, jeżeli rozpowszechnianie programów przez wniosko-
dawcę mogłoby spowodować:

    1) zagrożenie interesów kultury narodowej, dobrych obyczajów i wychowania,
bezpieczeństwa i obronności państwa oraz zagrożenia dla bezpieczeństwa
informacji niejawnych;

    2) osiągnięcie przez wnioskodawcę pozycji dominującej w dziedzinie środków
masowego przekazu na danym terenie.

3. Koncesja jest udzielana na 10 lat.


## Art. 37.

1. Koncesja określa w szczególności:

    1) nadawcę, jego siedzibę albo miejsce zamieszkania;

    2) przedmiot działalności objętej koncesją;

    3) sposób rozpowszechniania programu (analogowy rozsiewczy naziemny, cy-
frowy rozsiewczy naziemny w multipleksie, rozsiewczy satelitarny, w sie-
ciach telekomunikacyjnych innych niż wykorzystywane do rozpowszech-
niania rozsiewczego naziemnego lub rozsiewczego satelitarnego) oraz:

    – dla rozpowszechniania analogowego rozsiewczego naziemnego:

      a) lokalizację stacji,

      b) wysokość zawieszenia anteny,

      c) maksymalną moc promieniowaną,

      d) charakterystykę promieniowania anteny,

      e) częstotliwość,

      f) polaryzację,

    – dla rozpowszechniania cyfrowego rozsiewczego naziemnego w multiplek-
sie:

      g) multipleks,

      h) obszar rozpowszechniania,

      i) parametry sygnalizacyjne – identyfikatory ID,

    – dla rozpowszechniania rozsiewczego satelitarnego:

      j) nazwę wykorzystywanego satelity,

      k) położenie satelity na orbicie,

      l) częstotliwość,

2011-09-09

TVP 021012 389

Appendix 2

m) lokalizację stacji dosyłowej,

– dla rozpowszechniania w sieciach telekomunikacyjnych innych niż wyko-rzystywane do rozpowszechniania rozsiewczego naziemnego lub roz-siewczego satelitarnego:

n) lokalizację stacji głównej,

o) obszar objęty siecią telekomunikacyjną;

4) rodzaj programu i czas jego rozpowszechniania;

5) datę rozpoczęcia rozpowszechniania programu;

6) termin wygaśnięcia koncesji.

2. Koncesja może określać inne warunki prowadzenia działalności, niezbędne dla realizacji przepisów ustawy.

3. Koncesja w zakresie określonym w ust. 1 pkt 3 jest udzielana w porozumieniu z Prezesem Urzędu Komunikacji Elektronicznej, który zajmuje stanowisko, mając na względzie spełnienie warunków określonych w art. 114 ust. 3 ustawy z dnia 16 lipca 2004 r. – Prawo telekomunikacyjne.

3a. Jeżeli do rozpowszechniania programu radiofonicznego lub telewizyjnego jest wymagana rezerwacja częstotliwości, Prezes Urzędu Komunikacji Elektronicz-nej dokonuje jej niezwłocznie na rzecz nadawcy, który uzyskał koncesję, chyba że program ten będzie rozpowszechniany przez operatora multipleksu w sposób cyfrowy drogą rozsiewczą naziemną. Do dokonywania, wprowadzania zmian lub cofania rezerwacji częstotliwości stosuje się przepisy art. 114 i 115 ustawy z dnia 16 lipca 2004 r. – Prawo telekomunikacyjne oraz nie stosuje się przepisów art. 116 tej ustawy.

4. Krajowa Rada, po zasięgnięciu opinii Prezesa Urzędu Komunikacji Elektronicz-nej, określi, w drodze rozporządzenia, dane, które powinien zawierać wniosek, oraz szczegółowy tryb postępowania w sprawach udzielania i cofania koncesji.


### Art. 37a.

Dostawca usługi medialnej jest obowiązany do corocznego składania do Krajowej Rady sprawozdania finansowego, w formie przewidzianej w ustawie z dnia 29 wrze-śnia 1994 r. o rachunkowości.


### Art. 38.

1. Koncesję cofa się, jeżeli:

1) wydano prawomocne orzeczenie zakazujące nadawcy wykonywania dzia-łalności gospodarczej objętej koncesją;

2) nadawca rażąco narusza warunki określone w ustawie lub w koncesji;

3) działalność objęta koncesją jest wykonywana w sposób sprzeczny z ustawą lub z warunkami określonymi w koncesji, a nadawca, pomimo wezwania Przewodniczącego Krajowej Rady, w wyznaczonym terminie nie usunął stanu faktycznego lub prawnego niezgodnego z warunkami określonymi w koncesji lub w ustawie;

4) nadawca, pomimo wezwania Przewodniczącego Krajowej Rady, nie rozpo-czął rozpowszechniania programu w terminie ustalonym w koncesji lub trwale zaprzestał wykonywania rozpowszechniania programu za pomocą wszystkich lub niektórych stacji nadawczych – chyba że nadawca wykaże, że opóźnienie rozpoczęcia rozpowszechniania programu lub zaprzestanie

2011-09-09

TVP 021012 390

Appendix 2

rozpowszechniania programu zostały spowodowane okolicznościami od niego niezależnymi. Za trwałe zaprzestanie rozpowszechniania programu uważa się fakt nierozpowszechniania programu przez okres trzech kolejno następujących po sobie miesięcy.

2. Koncesja może być cofnięta, jeżeli:

  1) rozpowszechnianie programu powoduje zagrożenie interesów kultury narodowej, bezpieczeństwa i obronności państwa lub narusza normy dobrego obyczaju;

  2) nastąpi ogłoszenie upadłości nadawcy;

  3) rozpowszechnianie programu powoduje osiągnięcie przez nadawcę pozycji dominującej w dziedzinie środków masowego przekazu na danym rynku właściwym w rozumieniu przepisów o ochronie konkurencji i konsumentów;

  4) nastąpi przejęcie bezpośredniej lub pośredniej kontroli nad działalnością nadawcy przez inną osobę.

3. Przewodniczący Krajowej Rady podaje do publicznej wiadomości informacje o wszczęciu postępowania w sprawie cofnięcia koncesji.

4. W przypadku uprawomocnienia się decyzji w sprawie cofnięcia koncesji Przewodniczący Krajowej Rady niezwłocznie ogłasza o możliwości uzyskania koncesji w zakresie objętym cofniętą koncesją.

### Art. 38a.

1. Uprawnienia wynikające z koncesji są niezbywalne, z zastrzeżeniem ust. 3–5.

2. Uprawnienia, o których mowa w ust. 1, nie przechodzą na nabywcę przedsiębiorstwa upadłego.

3. W przypadku łączenia, podziału albo innego rodzaju przekształceń spółek handlowych, uprawnienia, o których mowa w ust. 1, mogą przejść na inny podmiot za zgodą Krajowej Rady wyrażoną w formie uchwały. Odmowa wyrażenia zgody następuje, gdy:

  1) nadawca osiągnie pozycję dominującą w dziedzinie środków masowego przekazu na danym rynku właściwym w rozumieniu przepisów o ochronie konkurencji i konsumentów;

  2) nastąpi przejęcie bezpośredniej lub pośredniej kontroli nad działalnością nadawcy przez inną osobę.

3a. Osoba fizyczna może przenieść uprawnienia wynikające z koncesji, za zgodą Krajowej Rady wyrażoną w formie uchwały, na spółkę, której jest wspólnikiem i która spełnia warunki, o których mowa w art. 35. Odmowa wyrażenia zgody następuje z przyczyn, o których mowa w art. 36 ust. 2.

4. Na podstawie uchwały Krajowej Rady, Przewodniczący Krajowej Rady wydaje decyzję w sprawie wyrażenia zgody bądź odmowy, o której mowa w ust. 3 i 3a.

5. Do uprawnień wynikających z rezerwacji częstotliwości stosuje się przepisy ustawy z dnia 16 lipca 2004 r. – Prawo telekomunikacyjne.

### Art. 39.

Koncesja na rozpowszechnianie programu telewizyjnego obejmuje również wykorzystanie sygnału telewizyjnego do rozpowszechniania przekazów tekstowych.

2011-09-09

Appendix 2

©Kancelaria Sejmu s. 35/45

### Art. 39a.

1. Koncesja może być udzielona na rozpowszechnianie w sieciach kablowych lub w sposób rozsiewczy satelitarny programu poświęconego wyłącznie:

   1) telesprzedaży;

   2) autopromocji.

2. Do programów, o których mowa w ust. 1, stosuje się odpowiednio przepisy ustawy, z wyłączeniem przepisów art. 15–15b.

3. Do programów, o których mowa w ust. 1 pkt 1, nie stosuje się:

   1) ograniczenia dopuszczalnego wymiaru czasowego reklam i telesprzedaży w ciągu godziny, określonego w art. 16 ust. 3;

   2) przepisów art. 16 ust. 6 oraz art. 16a.

### Art. 39b.

1. O uznanie za nadawcę społecznego może do Krajowej Rady wystąpić:

   1) stowarzyszenie w ramach realizacji celów statutowych;

   2) fundacja w ramach realizacji celów statutowych;

   3) kościelna lub wyznaniowa osoba prawna kościoła lub związku wyznaniowego o uregulowanej w ustawie sytuacji prawnej.

2. Nadawca społeczny jest zwolniony z opłat za udzielenie lub zmianę koncesji.

3. W przypadku naruszenia przez nadawcę społecznego wymogów określonych w art. 4 pkt 10, organ koncesyjny wydaje decyzję o uchyleniu decyzji o uznaniu za nadawcę społecznego. Stwierdza w niej obowiązek uiszczenia opłat, o których mowa w ust. 2, wraz z ustawowymi odsetkami liczonymi od dnia udzielenia lub zmiany koncesji.

### Art. 40.

1. Za udzielenie koncesji pobiera się opłatę, niezależnie od opłat za używanie urządzeń radiokomunikacyjnych oraz używanie częstotliwości, przewidzianych w ustawie o łączności.

2. Krajowa Rada w porozumieniu z ministrem właściwym do spraw finansów publicznych, uwzględniając charakter poszczególnych nadawców i ich programów, ustala, w drodze rozporządzenia, wysokość opłaty, o której mowa w ust. 1, oraz może określić podmioty zwolnione od opłaty.

Ust. 2 w art. 40 traci moc z dn.4.08.2012 r. na podstawie wyroku TK z dn. 19.07.2011 r., sygn. akt P 9/09 (Dz. U. Nr 160, poz. 963).

### Art. 40a.

1. Nabycie lub objęcie udziałów albo akcji, bądź nabycie prawa z udziałów lub akcji przez osobę zagraniczną w spółce, która posiada koncesję na rozpowszechnianie programu, wymaga zezwolenia Przewodniczącego Krajowej Rady, do którego stosuje się odpowiednio przepisy art. 33 ust. 3, art. 35 ust. 2, art. 36 ust. 2 oraz art. 38.

2. Czynność, o której mowa w ust. 1, dokonaną przez podmiot, w stosunku do którego osoba zagraniczna jest podmiotem dominującym, w rozumieniu Kodeksu spółek handlowych, uważa się za czynność dokonaną przez podmiot dominujący.

2011-09-09

Appendix 2

3. Przewodniczący Krajowej Rady wydaje i cofa zezwolenie, o którym mowa w ust. 1, na podstawie uchwały Krajowej Rady.

4. Czynności, o których mowa w ust. 1, dokonane bez zezwolenia są nieważne.

5. Przepisów ust. 1–3 nie stosuje się do osób zagranicznych lub spółek zależnych, w rozumieniu Kodeksu spółek handlowych, do osób zagranicznych, których siedziby lub miejsce zamieszkania znajdują się w państwach będących członkami Europejskiego Obszaru Gospodarczego.

### Art. 40b.

Do kontroli działalności gospodarczej przedsiębiorcy, o której mowa w art. 33, stosuje się przepisy rozdziału 5 ustawy z dnia 2 lipca 2004 r. o swobodzie działalności gospodarczej.

### Rozdział 6
### Rozpowszechnianie niektórych programów telewizyjnych i rozprowadzanie programów

### Art. 41.

1. Zgłoszenia do rejestru wymaga:

    1) program rozprowadzany;

    2) program telewizyjny rozpowszechniany wyłącznie w systemie teleinformatycznym.

2. Obowiązek określony w ust. 1 pkt 1 nie dotyczy programów, o których mowa w art. 43 ust. 1.

3. Organem prowadzącym rejestr jest Przewodniczący Krajowej Rady.

4. Do postępowania w sprawach wpisu do rejestru stosuje się przepisy Kodeksu postępowania administracyjnego, chyba że ustawa stanowi inaczej.

5. Rejestr jest jawny.

### Art. 42.

1. Za wpis do rejestru pobiera się opłatę.

2. Krajowa Rada w porozumieniu z ministrem właściwym do spraw finansów publicznych ustala, w drodze rozporządzenia, wysokość opłaty, o której mowa w ust. 1, oraz może określać podmioty zwolnione od opłaty.

### Art. 43.

1. Operator rozprowadzający program, z wyłączeniem podmiotu rozprowadzającego program w sposób cyfrowy drogą rozsiewczą naziemną w multipleksie, jest obowiązany do rozprowadzania programów „Telewizja Polska I", „Telewizja Polska II" i jednego regionalnego programu telewizyjnego rozpowszechnianego przez Telewizję Polską S.A. oraz programów rozpowszechnianych w dniu wejścia w życie ustawy z dnia 30 czerwca 2011 r. o wdrożeniu naziemnej telewizji cyfrowej (Dz. U. Nr 153, poz. 903) na podstawie koncesji na rozpowszechnianie tych programów w sposób analogowy drogą rozsiewczą naziemną przez Telewizję Polsat S.A., TVN S.A., Polskie Media S.A., Telewizję Puls Sp. z o.o. W przypadku operatora rozprowadzającego programy w sieciach

2011-09-09

Appendix 2

telekomunikacyjnych innych niż wykorzystywane do rozpowszechniania roz-
siewczego naziemnego lub rozsiewczego satelitarnego obowiązek rozprowadza-
nia regionalnego programu telewizyjnego dotyczy regionalnego programu tele-
wizyjnego właściwego dla danego obszaru.

2. Nadawca, który rozpowszechnia program, wymieniony w ust. 1, nie może od-
mówić operatorowi rozprowadzającemu program w sieci telekomunikacyjnej, o
której mowa w ust. 1, zgody na rozprowadzanie tego programu, ani też nie może
uzależnić udzielenia takiej zgody od uiszczania jakiegokolwiek wynagrodzenia,
w tym w szczególności z tytułu udzielenia licencji za korzystanie z nadania.

3. Przewodniczący Krajowej Rady przeprowadza ocenę realizacji obowiązku, o
którym mowa w ust. 1, nie rzadziej niż raz na dwa lata, kierując się interesem
społecznym w zakresie dostarczania informacji, udostępniania dóbr kultury i
sztuki, ułatwiania korzystania z oświaty, sportu i dorobku nauki
i upowszechniania edukacji obywatelskiej.

4. Wyniki oceny Przewodniczący Krajowej Rady przedstawia ministrowi właści-
wemu do spraw kultury i ochrony dziedzictwa narodowego, który podejmuje
działania konieczne do zapewnienia, aby obowiązki, o których mowa w ust. 1,
były proporcjonalne i przejrzyste oraz nakładane jedynie wtedy, gdy jest to nie-
zbędne do realizacji celów określonych w ust. 3.

### Art. 43a.

1. Nadawca, który rozpowszechnia program, wymieniony w art. 43 ust. 1, jest
obowiązany do nieodpłatnego udostępniania tego programu na wniosek operato-
ra rozprowadzającego program, w terminie 14 dni od dnia złożenia wniosku.

2. Jeżeli nadawca nie wykonał obowiązku polegającego na nieodpłatnym udostęp-
nianiu programu, Przewodniczący Krajowej Rady, na wniosek operatora roz-
prowadzającego program, wzywa nadawcę do udostępnienia tego programu te-
mu operatorowi, w terminie 14 dni od dnia doręczenia wezwania.

3. Operator rozprowadzający program, jest obowiązany:

   1) rozprowadzać i oferować program, który został mu nieodpłatnie udostępnio-
   ny;

   2) umieszczać w swojej ofercie informację, że program ten jest przeznaczony
   do powszechnego i nieodpłatnego odbioru również w sposób cyfrowy drogą
   rozsiewczą naziemną.

### Art. 44.

1. Organ rejestracyjny dokonuje wpisu do rejestru programu, o którym mowa w art.
41 ust. 1 pkt 1, na podstawie zgłoszenia.

2. Operator rozprowadzający program dokonuje zgłoszenia programu do rejestru
nie później niż na miesiąc przed rozpoczęciem jego rozprowadzania.

3. Zgłoszenie, o którym mowa w ust. 1:

   1) wskazuje wnioskodawcę, jego siedzibę lub miejsce zamieszkania, adres ko-
   respondencyjny, w tym poczty elektronicznej, zapewniający skuteczny i
   szybki kontakt;

   2) wskazuje program przewidziany do rozprowadzania i jego nadawcę;

   3) określa obszar, na którym program ma być rozprowadzany.

4. Operator rozprowadzający program dołącza do zgłoszenia:

2011-09-09

TVP 021012 394

Appendix 2

    1) dokumenty wskazujące, że rozprowadzanie programu nie będzie naruszało praw nadawcy programu;

    2) dokumenty wskazujące, że program jest rozpowszechniany, a w przypadku programu przekazywanego przez nadawcę operatorowi – umowę z nadawcą programu.

5. (uchylony).

6. Wpis do rejestru zawiera w szczególności dane, o których mowa w ust. 3, z wyjątkiem adresu miejsca zamieszkania, jeżeli jest on inny niż adres siedziby.

7. Rozprowadzanie programu można rozpocząć, jeżeli organ rejestracyjny nie odmówił rejestracji w terminie miesiąca od dnia zgłoszenia, pod warunkiem uiszczenia przez operatora opłaty, o której mowa w art. 42 ust. 1.

8. Organ rejestracyjny może wezwać operatora rozprowadzającego program do uzupełnienia zgłoszenia w terminie 14 dni od dnia otrzymania wezwania. W sytuacji gdy organ rejestracyjny wezwał operatora do uzupełnienia zgłoszenia, termin, o którym mowa w ust. 7, biegnie od dnia wpływu uzupełnienia zgłoszenia.

9. Operator rozprowadzający program jest obowiązany zgłaszać organowi rejestracyjnemu, w terminie 14 dni, zmiany stanu faktycznego i prawnego objętego wpisem do rejestru, powstałe po dniu dokonania wpisu. Do zgłaszania zmian stosuje się odpowiednio przepisy o wpisie do rejestru.

### Art. 44a.

1. Organ rejestracyjny dokonuje wpisu do rejestru programu, o którym mowa w art. 41 ust. 1 pkt 2, na podstawie zgłoszenia.

2. Nadawca programu telewizyjnego rozpowszechnianego wyłącznie w systemie teleinformatycznym dokonuje zgłoszenia programu do rejestru nie później niż na miesiąc przed rozpoczęciem jego rozpowszechniania.

3. Zgłoszenie, o którym mowa w ust. 1:

    1) wskazuje nadawcę, jego siedzibę lub miejsce zamieszkania, adres korespondencyjny, w tym poczty elektronicznej, zapewniający skuteczny i szybki kontakt;

    2) zawiera podstawowe informacje o programie przewidzianym do rozpowszechniania;

    3) określa sposób rozpowszechniania programu.

4. Wpis do rejestru zawiera w szczególności dane, o których mowa w ust. 3, z wyjątkiem adresu miejsca zamieszkania, jeżeli jest on inny niż adres siedziby.

5. Rozpowszechnianie programu można rozpocząć, jeżeli organ rejestracyjny nie odmówił rejestracji w terminie miesiąca od dnia zgłoszenia.

6. Organ rejestracyjny może wezwać nadawcę do uzupełnienia zgłoszenia w terminie 14 dni od dnia otrzymania wezwania. W sytuacji gdy organ rejestracyjny wezwał nadawcę do uzupełnienia zgłoszenia, termin, o którym mowa w ust. 5, biegnie od dnia wpływu uzupełnienia zgłoszenia.

7. Nadawca jest obowiązany zgłaszać organowi rejestracyjnemu, w terminie 14 dni, zmiany stanu faktycznego i prawnego objętego wpisem do rejestru, powstałe po dniu dokonania wpisu. Do zgłaszania zmian stosuje się odpowiednio przepisy o wpisie do rejestru.

TVP 021012 395

Appendix 2

### Art. 45.

1. Organ rejestracyjny wykreśla z rejestru program, o którym mowa w art. 41 ust. 1 pkt 2, jeżeli w programie tym, w okresie ostatnich 12 miesięcy, co najmniej dwukrotnie zostały zamieszczone treści poważnie naruszające przepisy art. 18 ust. 1, 4 i 5.

2. Organ rejestracyjny odmawia wpisu do rejestru programu, o którym mowa w art. 41 ust. 1 pkt 1, jeżeli w programie tym, w okresie ostatnich 12 miesięcy, co najmniej dwukrotnie zostały zamieszczone treści poważnie naruszające przepisy art. 18 ust. 1, 4 i 5.

3. Organ rejestracyjny wykreśla z rejestru program rozprowadzany, jeżeli:

    1) w programie tym, w okresie ostatnich 12 miesięcy, co najmniej dwukrotnie zostały zamieszczone treści poważnie naruszające przepisy art. 18 ust. 1, 4 i 5;

    2) operator bez zezwolenia nadawcy wprowadza zmiany do programu, rozpowszechnia go nie w całości lub nierównoczeście.

    3) (uchylony).

4. Odmowa wpisu lub jego wykreślenie, o których mowa w ust. 1–3, następuje w drodze decyzji administracyjnej, do której stosuje się odpowiednio przepis art. 33 ust. 3.

### Art. 46.

Krajowa Rada określi, w drodze rozporządzenia, szczegółowy sposób i tryb prowadzenia rejestru programów rozpowszechnianych wyłącznie w systemie teleinformatycznym i programów rozprowadzanych, w tym:

    1) wzór rejestru,

    2) wzór zgłoszenia o wpis do rejestru

– uwzględniając możliwość prowadzenia rejestru oraz zgłaszania do niego wniosków w systemie teleinformatycznym, konieczność zapewnienia przejrzystości i kompletności zapisu informacji znajdujących się w rejestrze oraz sprawność postępowania rejestracyjnego, a także nieobciążanie dostawców usług medialnych utrudnieniami w zakresie wykonywanej działalności.

### Art. 46a.

1. Jeżeli nadawca programu, o którym mowa w art. 45 ust. 3 pkt 1, jest ustanowiony w innym państwie członkowskim Unii Europejskiej, Krajowa Rada zawiadamia tego nadawcę i Komisję Europejską o stwierdzonych naruszeniach oraz o zamiarze wykreślenia rozprowadzanego programu z rejestru. Program jest wykreślany z rejestru, jeżeli w ciągu dwóch miesięcy od zawiadomienia, w wyniku konsultacji prowadzonych przez Krajową Radę z państwem, w którym jest ustanowiony nadawca, i z Komisją Europejską, nie nastąpi zaniechanie naruszeń.

2. Środki, o których mowa w ust. 1, muszą być obiektywnie niezbędne, stosowane w sposób niedyskryminacyjny i proporcjonalny do zamierzonych celów oraz gdy zostały spełnione następujące warunki:

    1) Krajowa Rada powiadomiła Komisję Europejską i państwo członkowskie, w którym nadawca ma swoją siedzibę, o zamiarze podjęcia takich środków i uzasadniła swoją ocenę oraz

    2) Komisja Europejska stwierdziła, że środki te są zgodne z prawem unijnym.

2011-09-09

Appendix 2

### Art. 46b.

1. Jeżeli program nadawcy ustanowionego w innym państwie członkowskim Unii Europejskiej jest kierowany w całości lub w przeważającej części na terytorium Rzeczypospolitej Polskiej, Przewodniczący Krajowej Rady może wystąpić do państwa, w którym ustanowiony jest nadawca tego programu w celu zastosowania odpowiedniego rozwiązania, w tym zwłaszcza zapewniającego poszanowanie w tym programie zasad ochrony interesu publicznego określonych w ustawie oraz w przepisach odrębnych.

2. Jeżeli w ciągu dwóch miesięcy od wystąpienia, o którym mowa w ust. 1, nie dojdzie do zastosowania odpowiedniego rozwiązania, a nadawca danego programu jest ustanowiony w innym państwie członkowskim Unii Europejskiej w celu obejścia przepisów obowiązujących w Rzeczypospolitej Polskiej, Przewodniczący Krajowej Rady może zawiadomić Komisję Europejską oraz państwo, w którym ustanowiony jest nadawca, o zamiarze odmowy wpisu do rejestru lub wykreślenia z rejestru programu, lub zastosowania innego przewidzianego prawem niezbędnego, niedyskryminacyjnego i proporcjonalnego środka. Do zawiadomienia dołącza się uzasadnienie.

3. Oceniając, czy program, o którym mowa w ust. 1, jest w całości lub w przeważającej części kierowany na terytorium Rzeczypospolitej Polskiej, Krajowa Rada może się odwołać do takich kryteriów, jak źródło dochodów z reklam telewizyjnych lub abonamentu, główny język danej usługi lub obecność audycji lub przekazów handlowych skierowanych bezpośrednio do widzów w państwie członkowskim, w którym są one odbierane.

4. Przewodniczący Krajowej Rady może wydać decyzję o odmowie wpisu do rejestru lub wykreśleniu z rejestru programu, o którym mowa w ust. 1 i 2, lub innym środku, wyłącznie jeżeli Komisja Europejska, w drodze decyzji, nie stwierdzi, w terminie trzech miesięcy od zawiadomienia, o którym mowa w ust. 2, że byłoby to sprzeczne z prawem Unii Europejskiej.

5. Przewodniczący Krajowej Rady dokonuje wystąpienia, o którym mowa w ust. 1, oraz zawiadomienia, o którym mowa w ust. 2, na podstawie uchwały Krajowej Rady.

### Art. 47. (uchylony).

### Rozdział 7
(uchylony)

### Rozdział 8
Odpowiedzialność prawna

### Art. 52.

1. Kto rozpowszechnia program radiowy lub telewizyjny bez koncesji

     – podlega grzywnie, karze ograniczenia wolności albo pozbawienia wolności do lat 2.

2. Kto rozprowadza program radiowy lub telewizyjny bez wpisu do rejestru

TVP 021012 397

Appendix 2

– podlega grzywnie, karze ograniczenia wolności albo pozbawienia wolności do roku.

### Art. 53.

1. Jeżeli nadawca narusza obowiązek wynikający z przepisów art. 14a ust. 1 i 2, art. 15 ust. 1, 2 i 3, art. 15a ust. 1, art. 16 ust. 1–6, art. 16a, art. 16b ust. 1–3, art. 16c, art. 17 ust. 1–7, art. 17a ust. 1–7, art. 18 ust. 1–5b, art. 18a ust. 1, art. 20 ust. 1, art. 20b ust. 1 i 6, art. 20c ust. 1–5, art. 43 ust. 2, art. 43a ust. 1 lub z przepisów wydanych na podstawie art. 14a ust. 3, art. 15 ust. 4, art. 15a ust. 2 i 3, art. 16 ust. 7, art. 16b ust. 3b, art. 17 ust. 8, art. 17a ust. 9, art. 18 ust. 6 i art. 18a ust. 2 lub nie zastosował się do wezwania, o którym mowa w art. 43a ust. 2, Przewodniczący Krajowej Rady wyda decyzję nakładającą na nadawcę karę pieniężną w wysokości do 50% rocznej opłaty za używanie częstotliwości przeznaczonej do nadawania programu, a w przypadku gdy nadawca nie uiszcza opłaty za częstotliwość, karę pieniężną w wysokości do 10% przychodu nadawcy, osiągniętego w poprzednim roku podatkowym, uwzględniając zakres i stopień szkodliwości naruszenia, dotychczasową działalność nadawcy oraz jego możliwości finansowe.

2. Przewodniczący Krajowej Rady może nałożyć karę, o której mowa w ust. 1, także w decyzji wydanej na podstawie art. 10 ust. 4.

3. Kara pieniężna jest płatna z dochodu po opodatkowaniu lub z innej formy nadwyżki przychodów nad wydatkami, zmniejszonej o podatki.

4. Kary pieniężnej nie można nałożyć, jeżeli od naruszenia obowiązku, o którym mowa w ust. 1, upłynął jeden rok.

### Art. 53a.

1. Jeżeli dostawca usługi medialnej rozpowszechnia program telewizyjny w systemie teleinformatycznym bez wpisu do rejestru, Przewodniczący Krajowej Rady wyda decyzję nakładającą na dostawcę karę pieniężną w wysokości do 10 % przychodu dostawcy, osiągniętego w poprzednim roku podatkowym. Przepisy art. 53 ust. 3 i 4 stosuje się odpowiednio.

2. W pierwszym roku prowadzonej działalności kara, o której mowa w ust. 1, nie może przekraczać wysokości dziesięciokrotności przeciętnego miesięcznego wynagrodzenia w sektorze przedsiębiorstw w kwartale poprzedzającym wydanie decyzji nakładającej karę, włącznie z wypłatami z zysku, ogłaszanego przez Prezesa Głównego Urzędu Statystycznego w Dzienniku Urzędowym Rzeczypospolitej Polskiej „Monitor Polski".

### Art. 53b.

1. Jeżeli operator rozprowadzający program narusza obowiązek, o którym mowa w art. 43 ust. 1 lub art. 43a ust. 3, Przewodniczący Krajowej Rady wyda decyzję nakładającą karę pieniężną w wysokości do 10% przychodu tego operatora, osiągniętego w poprzednim roku podatkowym, uwzględniając zakres i stopień szkodliwości naruszenia, dotychczasową działalność operatora oraz jego możliwości finansowe.

2. W przypadku gdy okres działania operatora, o którym mowa w ust. 1, jest krótszy niż rok kalendarzowy, za podstawę wymiaru kary przyjmuje się kwotę 500 tys. zł.

2011-09-09

Case 14-1115, Document 42-2, 07/15/2014, 1271746, Page127 of 130

A-2947

Appendix 2

3. Przewodniczący Krajowej Rady może żądać od operatora, o którym mowa w ust. 1, udzielenia wyjaśnień, przedstawienia dokumentów, w szczególności rocznego sprawozdania finansowego za poprzedni rok podatkowy, w zakresie wykonania obowiązku, o którym mowa w art. 43 ust. 1 lub art. 43a ust. 3.

### Art. 54.

1. Jeżeli osoba kierująca działalnością dostawcy usługi medialnej nie wykonuje decyzji wydanych na podstawie art. 10 ust. 4, Przewodniczący Krajowej Rady może wydać decyzję nakładającą na nią karę pieniężną, nieprzekraczającą jednak jej sześciomiesięcznego wynagrodzenia.

2. Tej samej karze może podlegać osoba kierująca działalnością dostawcy usługi medialnej za nieudzielenie lub udzielenie nierzetelnych informacji na żądanie Przewodniczącego Krajowej Rady, przewidziane przepisem art. 10 ust. 2.

3. Decyzja nakładająca karę nie może być wydana, jeżeli od daty wydania decyzji, o której mowa w ust. 1, upłynęły dwa lata.

### Art. 55.

Kary, o których mowa w art. 53–54, podlegają wpłacie do budżetu państwa.

### Art. 56.

1. Od decyzji Przewodniczącego Krajowej Rady wydanych na podstawie art. 10 ust. 4 oraz art. 53–54 służy odwołanie do Sądu Okręgowego w Warszawie – sądu gospodarczego.

2. W postępowaniu w sprawach odwołań od decyzji, o których mowa w ust. 1, stosuje się odpowiednio przepisy Kodeksu postępowania cywilnego dotyczące spraw z zakresu przeciwdziałania praktykom monopolistycznym.

3. W razie złożenia odwołania od decyzji Przewodniczącego Krajowej Rady do sądu, stronie nie przysługują środki prawne wzruszenia decyzji przewidziane w Kodeksie postępowania administracyjnego, w szczególności dotyczące wznowienia postępowania, uchylenia, zmiany oraz stwierdzenia nieważności decyzji.

### Rozdział 9

### Zmiany w przepisach obowiązujących, przepisy przejściowe i końcowe

### Art. 57–62. (pominięte).[13]

### Art. 63.

1. Znosi się Komitet do Spraw Radia i Telewizji „Polskie Radio i Telewizja", zwany dalej „Komitetem". Przewodniczący Komitetu kieruje działalnością państwowej jednostki organizacyjnej „Polskie Radio i Telewizja" do czasu zarejestrowania spółek, o których mowa w art. 26 ust. 2 i 3.

---

[13] Zamieszczone w obwieszczeniu Marszałka Sejmu Rzeczypospolitej Polskiej z dnia 18 lutego 2011 r. w sprawie ogłoszenia jednolitego tekstu ustawy o radiofonii i telewizji (Dz. U. Nr 43, poz. 226).

2011-09-09

TVP 021012 399

Appendix 2

2. Przewidziane w ustawach szczególnych zadania Komitetu oraz Przewodniczące-go Komitetu w zakresie tworzenia i rozpowszechniania programów radiowych i telewizyjnych przechodzą na jednostki publicznej radiofonii i telewizji, odpowiednio do zakresu ich zadań ustawowych i statutowych.

3. Przewidziane w ustawach szczególnych zadania Komitetu oraz Przewodniczące-go Komitetu w zakresie administracji państwowej przechodzą do właściwości Krajowej Rady.

4. Funkcje organu założycielskiego w stosunku do przedsiębiorstw państwowych oraz uprawnienia nadzorcze w stosunku do jednostek badawczo-rozwojowych podległych Komitetowi przejmuje Przewodniczący Krajowej Rady.

5. Zezwolenia na używanie urządzeń telekomunikacyjnych przeznaczonych do nadawania programów radiowych i telewizyjnych wygasają z dniem rozpoczęcia działalności na tym samym terenie przez nadawcę, któremu przyznano w koncesji częstotliwość wykorzystywaną dotychczas do nadawania programu, lecz nie później niż po upływie roku od dnia wejścia ustawy w życie.

6. Przepis ust. 5 nie dotyczy uprawnień wydanych na podstawie ustawy, o której mowa w art. 59.

7. Do nadawców posiadających zezwolenie, o którym mowa w ust. 5, i do nadawców posiadających zezwolenia wydane w związku z ustawą, o której mowa w art. 59, przepisu art. 52 nie stosuje się.

8. Podmioty rozprowadzające programy w sieciach kablowych dostosują swoją działalność do wymogów określonych w rozdziale 6 w terminie 6 miesięcy od dnia wejścia ustawy w życie.

### Art. 64.

1. Minister właściwy do spraw Skarbu Państwa zawiąże:

   1) spółkę, o której mowa w art. 26 ust. 2, z siedzibą w Warszawie i oddziałami terenowymi w Bydgoszczy, Gdańsku, Katowicach, Krakowie, Lublinie, Łodzi, Poznaniu, Rzeszowie, Szczecinie, Warszawie i we Wrocławiu;

   2) spółkę, o której mowa w art. 26 ust. 3 pkt 1, z siedzibą w Warszawie oraz spółki, o których mowa w art. 26 ust. 3 pkt 2, z siedzibami w Białymstoku, Bydgoszczy, Gdańsku, Katowicach, Kielcach, Krakowie, Koszalinie, Lublinie, Łodzi, Opolu, Olsztynie, Poznaniu, Rzeszowie, Szczecinie, Warszawie, we Wrocławiu i w Zielonej Górze.

2. Minister właściwy do spraw Skarbu Państwa może zawiązać spółki radiofonii regionalnej z siedzibami w innych miejscowościach niż wymienione w ust. 1 pkt 2.

3. Minister właściwy do spraw Skarbu Państwa uzgodni treść statutów spółek, o których mowa w ust. 1 i 2, z Krajową Radą. Statut spółki, o której mowa w art. 26 ust. 2, może przewidywać oddziały terenowe w innych miejscowościach niż wymienione w ust. 1 pkt 1.

4. Pierwsze zarządy spółek, o których mowa w ust. 1 i 2, powoła Krajowa Rada.

2011-09-09

TVP 021012 400

Appendix 2

### Art. 65.

1. Minister właściwy do spraw Skarbu Państwa wniesie do spółek, o których mowa w art. 64 ust. 1, mienie pozostałe po likwidacji państwowej jednostki organizacyjnej „Polskie Radio i Telewizja", zwanej dalej „PRTV".

2. Rada Ministrów określi, w drodze rozporządzenia, w terminie 1 miesiąca od dnia wejścia ustawy w życie, szczegółowy tryb inwentaryzacji mienia wymienionego w ust. 1, zasadę podziału i przekazywania tego mienia oraz tryb rozpoznawania spraw spornych.

3. Czynności podejmowane w wykonaniu art. 64 ust. 1 i 2 są wolne od opłat sądowych i skarbowych; do opłat za czynności notarialne związane z zawiązaniem tych spółek stosuje się odpowiednio przepisy o przekształcaniu przedsiębiorstwa państwowego w spółkę.

### Art. 66.

1. Grunty stanowiące własność Skarbu Państwa, będące w dniu wejścia w życie ustawy w zarządzie PRTV, z dniem zarejestrowania spółek stają się z mocy prawa przedmiotem użytkowania wieczystego tych spółek. Do użytkowania wieczystego nie stosuje się przepisów *art. 41 ust. 1 ustawy z dnia 29 kwietnia 1985 r. o gospodarce gruntami i wywłaszczaniu nieruchomości (Dz. U. z 1991 r. Nr 30, poz. 127, Nr 103, poz. 446 i Nr 107, poz. 464)*[14] w części dotyczącej pierwszej opłaty.

2. Budynki i inne urządzenia oraz lokale znajdujące się na gruntach stanowiących własność Skarbu Państwa, będących w dniu wejścia w życie ustawy w zarządzie PRTV, z dniem zarejestrowania spółek stają się z mocy prawa własnością tych spółek. Nabycie własności następuje nieodpłatnie.

3. Nabycie prawa użytkowania wieczystego gruntów, o których mowa w ust. 1, oraz własności budynków, innych urządzeń i lokali, o których mowa w ust. 2, stwierdza się decyzją wojewody. W decyzji tej określa się również warunki użytkowania wieczystego, z zachowaniem zasad określonych w art. 236 Kodeksu cywilnego.

### Art. 67.

1. Pracownicy PRTV stają się z mocy prawa pracownikami właściwej spółki, z zastrzeżeniem ust. 2.

2. Stosunek pracy pracowników zatrudnionych na stanowiskach kierowniczych, określonych przez Krajową Radę, ustaje z mocy prawa z dniem wpisania spółki do rejestru handlowego. Ustanie stosunku pracy jest równoznaczne w skutkach prawnych z rozwiązaniem stosunku pracy wskutek wypowiedzenia umowy o pracę przez zakład pracy. Zatrudnienie tych pracowników w spółce może nastąpić na warunkach uzgodnionych przez strony.

3. Za zobowiązania wynikające ze stosunku pracy, powstałe przed wpisaniem spółki do rejestru handlowego, odpowiada spółka.

---

[14] Obecnie: ustawy z dnia 21 sierpnia 1997 r. o gospodarce nieruchomościami (Dz. U. z 2010 r. Nr 102, poz. 651, Nr 106, poz. 675, Nr 143, poz. 963, Nr 155, poz. 1043, Nr 197, poz. 1307 i Nr 200, poz. 1323).

2011-09-09

TVP 021012 401

**A-2950**

Appendix 2

### Art. 68.

1. Na spółki przechodzą z mocy ustawy uprawnienia i obowiązki Komitetu i PRTV wynikające z decyzji administracyjnych.
2–4. (pominięte).[13]

### Art. 69. (pominięty).[13]

### Art. 70.

1. Traci moc ustawa z dnia 2 grudnia 1960 r. o Komitecie do Spraw Radia i Telewizji „Polskie Radio i Telewizja" (Dz. U. Nr 54, poz. 307 oraz z 1984 r. Nr 54, poz. 275).
2. (pominięty).[13]

### Art. 71.

Ustawa wchodzi w życie po upływie miesiąca od dnia ogłoszenia, z wyjątkiem przepisu art. 52, który wchodzi w życie z dniem 1 lipca 1993 r.

2011-09-09

TVP 021012 402