# 14-967(L),

## 14-1115(XAP)

# United States Court of Appeals
## for the
## Second Circuit

———◆❙◆———

SPANSKI ENTERPRISES, INC.,

*Plaintiff-Appellant-Cross-Appellee,*

– v. –

TELEWIZJA POLSKA S.A.,

*Defendant-Appellee-Cross-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume XI of XI (Pages A-2951 to A-3194)

DLA PIPER US LLP (NY)
*Attorneys for Defendant-Appellee-*
  *Cross-Appellant*
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500

LOEB & LOEB LLP
*Attorneys for Plaintiff-Appellant-*
  *Cross-Appellee*
345 Park Avenue
New York, New York 10154
(212) 407-4000

i

# Table of Contents

**Page**

District Court Docket Entries ................................................... A-1

Complaint, Dated June 24, 2010 ............................................ A-14

Amended Complaint, Dated October 1, 2010 .......................... A-20

Plaintiff's First Request for the Production of Documents,
    Dated March 3, 2011 ............................................................ A-30

Defendant's First Request for the Production of Documents,
    Dated March 30, 2011 .......................................................... A-37

Plaintiff's Second Request for the Production of Documents,
    Dated December 28, 2011 ................................................... A-44

Joint Pre-Trial Order, Dated February 7, 2013 ...................... A-49

    Exhibit 1 to Joint Pre-Trial Order -
    Stipulated Facts and Law ................................................... A-59

    Exhibit 2 to Joint Pre-Trial Order -
    Plaintiff's Designations of Deposition Testimony .............. A-62

    Exhibit 3 to Joint Pre-Trial Order -
    Defendant's Designations of Deposition Testimony .......... A-66

    Exhibit 4 to Joint Pre-Trial Order -
    List of Plaintiff's Proposed Exhibits .................................. A-68

    Exhibit 5 to Joint Pre-Trial Order -
    List of Defendant's Proposed Exhibits................................ A-74

Trial Declaration of Maria Nadolna,
    Dated February 27, 2013 ................................................... A-76

Trial Declaration of Piotr Lenarczyk,
    Executed on March 1, 2013................................................ A-93

Trial Declaration of Boguslaw Spanski on Behalf of
    Plaintiff, SEI, Dated March 16, 2013 ................................ A-98

Proposed Findings of Fact and Conclusions of Law
    of Plaintiff Spanski Enterprises, Inc. ("SEI"),
    Dated July 1, 2013 ............................................................. A-125

Proposed Findings of Fact and Conclusions of Law
    of Defendant Telewizja Polska, S.A. ("TVP"),
    Dated July 1, 2013 ............................................................. A-142

ii

**Page**

Deposition Transcript of Boguslaw Spanski,
    Dated November 8, 2011 .................................................... A-194

Deposition Transcript of Maria E. Nadolna,
    Dated November 9, 2011 .................................................... A-255

Deposition Transcript of Stephen Shulman,
    Dated June 7, 2012 ............................................................ A-383

Deposition Transcript of Larry Gerbrandt,
    Dated June 19, 2012 .......................................................... A-483

Transcript of Trial, Dated July 22, 2013 ................................. A-536

Witnesses:

    Stephen Walter Shulman     Cross (by Mr. Wenger)........... A-539
                                         Redirect (by Mr. Piskora)...... A-600

    Tomasz Gladowski         Cross (by Mr. Wenger)........... A-602
                                         Redirect (by Mr. Barnett)...... A-614
                                         Recross (by Mr. Wenger)...... A-619

Transcript of Trial, Dated July 23, 2014 ................................. A-622

Witness:

    Maria Nadolna            Cross (by Mr. Zavin)............. A-623
                                         Redirect (by Mr. Wenger)..... A-710

Transcript of Trial, Dated July 24, 2014 ................................. A-719

Witnesses:

    Marek Wierzbowski       Cross (by Mr. Piskora) .......... A-720

    Ivan Reyes                Cross (by Mr. Barnett) .......... A-729
                                         Redirect (by Mr. Wenger)..... A-780
                                         Recross (by Mr. Barnett)....... A-784

    Gary Arlen                Cross (by Mr. Zavin)............. A-785
                                         Redirect (by Mr. Wenger)..... A-866
                                       Recross (by Mr. Zavin) ......... A-872

Transcript of Trial, Dated July 25, 2014 ................................. A-876

Witnesses:

    Timothy Hart            Cross (by Mr. Piskora) .......... A-877
                                       Redirect (by Mr. Wenger)..... A-923

iii

**Page**

Boguslaw Spanski     Direct (by Mr. Zavin) ............ A-934
                     Cross (by Mr. Wenger).......... A-946
                     Redirect (by Mr. Zavin) ........ A-951

Plaintiff SEI's Trial Exhibits:

2    Certified English Translation of December 14, 1994
     Agreement between TVP and SEI (P0008-15) ............ A-956

4    Certified English Translation of November 4, 1999
     First Addendum between TVP and SEI ...................... A-964

6    Certified English Translation of November 4, 1999
     Second Addendum Addendum between TVP and SEI
     (P00026-29)................................................................ A-968

7    Settlement Agreement between TVP and SEI,
     Dated August 11, 2009 (P00030-33)........................... A-972

9    Letter from Wieslaw Walendziak and Adam Brodziak
     to "To Whom it May Concern," Dated March 10,
     1995 (in English) (SEI 000005) .................................. A-976

11   Letter from Wieslaw Walendziak and Adam Brodziak
     to "To Whom it May Concern," Dated March 10,
     1995 (in English) (TP 7000087).................................. A-977

13   Certified English Translation of March 15, 1995
     Letter from Wieslaw Walendziak to Edward Moskal
     (TP 7004249)................................................................ A-978

15   Certified English Translation of May 24, 1995
     Legal Opinion by Ryszard Swiderski (TP 7006700) ... A-981

17   Certified English Translation of June 8, 1995 Fax
     from Marta Suchodolska to Andrej Sikora and
     Waclaw Tylawski (TP 7007459).................................. A-983

19   Certified English Translation of June 12, 1995 Fax
     from Marta Suchodolska to Boguslaw M. Spanski
     (TP 7003598)................................................................ A-985

21   Certified English Translation of June 9, 1997 Letter
     from Robert Telennea to Jack Piotr Latallo
     (TP 7003479)................................................................ A-987

iv

**Page**

23  Certified English Translation of March 17, 2008
    Barter Agreement between TVP and Polvision/
    Polstudios (POL00038-45)........................................... A-990

24  License Agreement between TVP and Polvision,
    Dated June 27, 2008 (POL00054-57) ......................... A-999

26  Certified English Translation of August 31, 2009
    License Agreement between TVP and Polvision
    (POL00058-62) ............................................................ A-1003

28  Certified English Translation of September 3, 2009
    Email String between TVP and Polvision (TVP
    101111 0338-39) ......................................................... A-1009

30  Certified English Translation of November 28, 2009
    Email from TVP to Polvision (TVP 101111 0355)...... A-1012

32  Certified English Translation of December 21, 2009
    Email from TVP to Polvision (TVP 101111 0351)...... A-1014

33  December 23, 2009 Email String from TVP
    to Polvision (P00172) (Polish and Certified
    English Translation) .................................................... A-1016

35  Certified English Translation of January 6, 2010
    Email from TVP to Polvision (TVP 10111 0352)........ A-1018

37  Certified English Translation of January 25, 2010
    Letter from TVP to Polvision (TVP 051611 00044).... A-1020

39  Certified English Translation of January 26, 2010
    Letter from Polvision to TVP (TVP 00045-47) ........... A-1022

41  Certified English Translation of February 18, 2010
    Internal TVP Letter (TVP 101111 0353) ..................... A-1027

43  Certified English Translation of March 30, 2010
    Internal TVP Letter (TVP 072011 0298-99)................ A-1029

45  Certified English Translation of April 1, 2010
    Meeting Notes (TVP 101111 0356-57)......................... A-1031

47  Certified English Translation of April 8, 2010 Internal
    TVP Letter (TVP 051611 00062)................................. A-1034

49  Certified English Translation of May 5, 2010 Letter
    from TVP to Polvision (TVP 051611 00070) .............. A-1036

v

**Page**

51  Certified English Translation of May 5, 2010 Letter
from TVP to SEI (TVP 051611 00290) ...................... A-1038

53  Certified English Translation of May 13, 2010
Internal TVP Letter (TVP 051611 0071) .................... A-1040

55  Certified English Translation of May 18, 2010
Internal TVP Letter (TVP 051611 00076-77)............. A-1042

57  Certified English Translation of May 18, 2010 Letter
from TVP to Polvision (TVP 051611 00079-80)......... A-1045

59  Certified English Translation of June 8, 2010 Letter
from TVP to Polvision (TVP 051611 00085) ............. A-1048

61  Certified English Translation of June 26, 2010 Letter
from TVP to Polvision (TVP 051611 00088) ............. A-1050

63  Certified English Translation of July 1, 2010 Letter
from TVP to Polvision (TVP 051611 00089-92)......... A-1052

65  Certified English Translation of July 1, 2010 Internal
TVP Letter (TVP 051611 00093)................................ A-1059

67  Certified English Translation of July 2, 2010 Letter
from Polvision to TVP (TVP 051611 00094-95)......... A-1062

69  Certified English Translation of July 12, 2010
Internal TVP Letter (TVP 051611 00096) .................. A-1064

71  Certified English Translation of July 16, 2010 Annex
to August 31, 2009 Agreement between TVP and
Polvision (POL00063-65) ........................................... A-1067

73  Certified English Translation of April 7, 2011 Letter
from TVP to Polvision (P00328; P002010) ................ A-1071

79  Certified English Translation of October 5, 2010
Email from IMB+ Records to TVP (TVP 051611
00122-132) ................................................................. A-1072

81  Certified English Translation of October 15, 2010
Notes of Meeting (TVP 051611 00133-34) ................ A-1084

82  Email from IMB+ Records to TVP, Dated October 18,
2010 (in Original Polish and English) (TVP 051611
00138-39) ................................................................... A-1087

**Page**

84    Certified English Translation of October 27, 2010 Email from IMB+ Records to TVP (TVP 051611 00140-142) ................................................................ A-1092

86    Certified English Translation of March 22, 2011 Letter from IMB+ Records to TVP (TVP 051611 00276-278) ................................................................ A-1096

87    Webpages Concerning Polvision (P001100, 1105, 1655-59, 2073, 2104, 2115; 2148, 2186-87) .............. A-1102

88    Directories of TVP Polonia Programming (TVP 021012 458-493; and www.tvp.pl.prosa/ TVPPolonia) ............................................................... A-1109

89    Polvision Mediakit (2010) and Advertising Rate Card .................................................................. A-1145

91    Quarterly Subscriber Numbers, as referenced in Shulman Report, Exh. II (SEI 000103-140; TVP 051611 00154-191) ........................................... A-1157

92    Polvision Programming Schedules (P000 329-34, 2031-72) ........................................... A-1233

93    Spreadsheets of Terminated Internet Subscribers (P001827-2009, 2246-2279) ...................................... A-1281

94    Spreadsheets of Lost Globecast Subscribers (P001785-1826, 2239-2245) ...................................... A-1498

99    Email string between Counsel for SEI and Counsel for Polvision, Dated January 2010 (P00225-227) ........ A-1547

100    Email from Counsel for SEI to Counsel for Polvision, Dated January 19, 2010 (P00242) ............................... A-1550

101    Letter from Counsel for SEI to Polvision, Dated January 6, 2010 (P00249-250) ......................... A-1551

104    Letter from TVP to Counsel for SEI, Dated July 26, 2010 (P00327) ..................................... A-1554

105    Letter from Counsel for SEI to TVP, Dated August 2, 2010 (P00179-83) .............................. A-1555

106    Letter from TVP to Counsel for SEI, Dated May 21, 2010 (P00201-02) ................................ A-1560

vii

**Page**

107  May 2007 EchoStar Presentation for TVP
     (TP9000140, 159-163; 172) ......................................... A-1562

109  Certified English Translation of February 18, 2009
     Letter from Polvision to TVP (TVP051611 0008-9) ... A-1569

111  Certified English Translation of TVP Form Email
     Regarding "Klan" (TVP 072011 0305)........................ A-1571

113  Certified English Translation of January 28, 1994
     Meeting Notes (TP 7004886-87)................................. A-1572

115  Certified English Translation of February 1994
     Proposal (TP 7006364-70) ........................................... A-1575

117  Certified English Translation of February 9, 1994
     TVP Memorandum (TP7006378-79) .......................... A-1583

119  Certified English Translation of March 15, 1995
     Letter from TVP to Moskal (TP 7004249-50) ............. A-1586

121  Certified English Translation of January 7, 1999
     Letter with Legal Opinion (TP 7006672-74) .............. A-1589

122  Letter from TVP, Dated March 24, 1998
     (SEI 000166) ............................................................... A-1593

123  Fax from TVP to EchoStar, Dated March 25, 1998
     (SEI 000721) ............................................................... A-1594

125  Certified English Translation of April 1999 TVP
     Board of Directors Report on Company Activities
     (TP9000632, 653,669, 682, 542, 628)........................ A-1595

127  Certified English Translation of June 1, 1998 TVP
     Press Release (TP 7005054-55) .................................. A-1603

129  Certified English Translation of February 8, 2007
     Screenshot of TVP Webpage (SEI 000246-49) ........... A-1607

131  Certified English Translation of October 5, 1999
     Internal TVP Letter (TP 7006692) .............................. A-1612

133  Certified English Translation of TVP Board Position
     (SEI 000055-57)........................................................... A-1614

134  Email String between TVP and EchoStar,
     Dated April 3, 2002 (TP 7003157-58) ........................ A-1618

**Page**

135   Email from TVP to EchoStar, Dated April 6, 2002
(SEI 001140) ............................................................ A-1620

136   Letter from EchoStar to TVP, Dated June 14, 2002
(TP 7005252)............................................................. A-1621

137   Email from TVP to EchoStar, Dated June 8, 2002
(TP 7003182)............................................................. A-1622

139   Certified English Translation of July 1, 1999 Letter
from TVP to NIK (TP 7001215-18)............................ A-1623

141   Certified English Translation of March 3, 2005 TVP
Internal Memo (TP 7007953-55) ................................ A-1628

142   Shulman Expert Report and Rebuttal Report
(including attachments); Shulman Supplemental
Report (including attachments), Dated
March 18, 2013 .......................................................... A-1633

143   Gerbrandt Rebuttal Report (including attachments),
Dated May 16, 2012 ................................................... A-1958

144   Operating System and Browser Report
(www.tvpolonia.com).................................................. A-1987

145   *Computerworld* Article, Dated January 4, 2013,
Entitled "IE shocker: Microsoft's browser gains
share in 2012"............................................................ A-1988

146   www.netmarketshare.com Report, Dated February
2013, Entitled "Desktop Browser Market Share" ........ A-1991

148   Certified English Translation of September 18, 1995
Fax from TVP's Jerzy Romanski to SEI's Boguslaw
Spanski (TP7003566).................................................. A-1992

150   Certified English Translation of February 19, 1996
Letter from TVP (TP4000183-184) ............................ A-1995

152   Article, Dated June 3, 2013, Entitled "'Klan' is the
time slot leader. 2,700,000 viewers and 43,300,000
zlotys from advertising" (in Original Polish with
Certified English Translation)..................................... A-1997

154   Certified English Translation of Letter from
Boguslaw Spanski to TVP, Dated April 3, 2003
(TP7000323-325) ....................................................... A-2001

ix

**Page**

Defendant TVP's Trial Exhibits:

1    TVP/SEI Agreement, Dated December 14, 1994......... A-2005

2    TVP/SEI Addendum, Dated November 4, 1999 .......... A-2015

3    TVP/SEI Addendum, Dated April 29, 2002 ............... A-2020

4    SEI Quarterly Revenue and Subscriber Reporting
     (2005–2012) ............................................................... A-2025

5    TVP/Polvision Barter Agreement, with Annex,
     Dated March 17, 2008................................................. A-2087

6    TVP/Polvision License Agreement,
     Dated June 27, 2008.................................................... A-2120

7    Email from Agnieszka Pokropek to Urszula
     Zaniewska, Dated March 9, 2009................................ A-2124

8    Email from Agnieszka Pokropek to Urszula
     Zaniewska, Dated April 20, 2009................................ A-2127

9    Email from Urszula Zaniewska to Agnieszka
     Pokropek, Dated June 4, 2009.................................... A-2130

10   Emails from Agnieszka Pokropek to Urszula
     Zaniewska, Dated June 4–5, 2009............................... A-2133

11   Polvision Agreement Certificate,
     Dated June 30, 2009.................................................... A-2136

12   Letter from Urszula Zaniewska to Agnieszka
     Pokropek, Dated July 2, 2009 ..................................... A-2141

13   Email from Agnieszka Pokropek to Urszula
     Zaniewska, Dated July 24, 2009 ................................. A-2144

14   Emails between Urszula Zaniewska and Agnieszka
     Pokropek, Dated August 4–5, 2009 ............................ A-2147

15   Letter from Urszula Zaniewska to Agnieszka
     Pokropek, Dated August 6, 2009 ................................ A-2151

16   TVP/SEI Settlement Agreement,
     Dated August 11, 2009................................................ A-2154

17   TVP/Polvision Licensing Agreement,
     Dated August 31, 2009................................................ A-2158

x

**Page**

18     Emails between Urszula Zaniewska and Agnieszka
Pokropek, Dated September 1–3, 2009 ....................... A-2170

19     Email from Urszula Zaniewska to Agnieszka
Pokropek, Dated October 23, 2009 ............................. A-2176

20     Email from Elżbieta Herezińska to Agnieszka
Pokropek, Dated November 28, 2009 ......................... A-2179

21     Fax from TVP to Waldemar Kotaba, Dated
November 30, 2009 (in Original Polish with
English Translation) ...................................................... A-2182

22     Emails from Piotr Lenarczyk and Urszula Zaniewska
to Agnieszka Pokropek, Dated December 9–21, 2009
(in Original Polish with English Translation) .............. A-2185

23     Email from Urszula Zaniewska to Elżbieta
Herezińska, Dated December 23, 2009 ........................ A-2189

24     Email from Elżbieta Herezińska to Agnieszka
Pokropek, Dated December 23, 2009 (in Original
Polish with English Translation) .................................. A-2192

25     Email from Urszula Zaniewska to Agnieszka
Pokropek, Dated January 6, 2010 (in Original
Polish with English Translation) .................................. A-2195

26     Letter from Waldemar Kotaba to Romulad Orzel,
Dated February 23, 2010 (in Original Polish
with English Translation) .............................................. A-2198

27     TVP/Polvision Meeting Minutes, Dated April 1, 2010
(in Original Polish with English Translation) .............. A-2203

28     Letter from Maria Nadolna to Waldemar Kotaba,
Dated May 5, 2010 (in Original Polish with
English Translation) ...................................................... A-2208

29     Letter from Maria Nadolna to Boguslaw Spanski,
Dated May 5, 2010 ....................................................... A-2211

30     Letter from Maria Nadolna to Waldemar Kotaba,
Dated May 13, 2010 (in Original Polish with
English Translation) ...................................................... A-2214

xi

**Page**

| | | |
|---|---|---|
| 31 | Letter from Romulad Orzel to Waldemar Kotaba, Dated May 13, 2010 (in Original Polish with English Translation) ..................................................... | A-2217 |
| 32 | Letter from Waldemar Kotaba to Romulad Orzel, Dated May 17, 2010 (in Original Polish with English Translation) ..................................................... | A-2220 |
| 33 | Letter from Maria Nadolna to Waldemar Kotaba, Dated May 18, 2010 (in Original Polish with English Translation) ..................................................... | A-2223 |
| 34 | Letter from Waldemar Kotaba to Romulad Orzel, Dated May 19, 2010 ..................................................... | A-2227 |
| 35 | Letter from Maria Nadolna to Waldemar Kotaba, Dated June 8, 2010 (in Original Polish with English Translation) ..................................................... | A-2232 |
| 36 | Letter from Maria Nadolna to Waldemar Kotaba, Dated June 14, 2010 (in Original Polish with English Translation) ..................................................... | A-2235 |
| 37 | Letter from Maria Nadolna to Waldemar Kotaba, Dated June 25, 2010 (in Original Polish with English Translation) ..................................................... | A-2238 |
| 38 | Letter from Maria Nadolna to Waldemar Kotaba, Dated July 1, 2010 (in Original Polish with English Translation) ..................................................... | A-2241 |
| 39 | Letter from Maria Nadolna to Waldemar Kotaba, Dated July 8, 2010 (in Original Polish with English Translation) ..................................................... | A-2251 |
| 40 | Annex to August 31, 2009 Polvision License Agreement, Dated July 16, 2010 (in Original Polish with English Translation) .................................. | A-2260 |
| 41 | Letter from Lukasz Boberek to Boguslaw Spanski, Dated April 9, 2010 ..................................................... | A-2269 |
| 42 | Letter from Tomasz Sieniutyck to IMB, Dated September 3, 2010 ........................................... | A-2274 |
| 43 | Excerpts from Deposition of Boguslaw Spanski, Dated November 8, 2011 ........................................... | A-2275 |

xii

**Page**

44     Amended Statement of Claim in *Spanski Enterprises v. IMB+ Records*, Dated November 19, 2010 .................. A-2277

45     Statement of Defence in *Spanski Enterprises v. IMB+ Records*, Dated March 4, 2011 ........................ A-2303

46     Order of Master Barbara McAfee in *Spanski Enterprises v. IMB+ Records*, Dated November 30, 2011 ..................... A-2310

47     TV Polonia Webpage — About Us .............................. A-2318

48     Chart of Comparison of TVP Polonia Viewership Statistics (in Original Polish with English Translation) ................. A-2320

49     Complaint in *Spanski Enterprises v. Telewizja Polska* (S.D.N.Y., 07-CV-930), Dated February 8, 2007 ........ A-2323

50     Original Complaint, Dated June 24, 2010 ................... A-2337

51     Amended Complaint, Dated October 1, 2010 .............. A-2343

55     Transcript of Oral Argument in *Spanski Enterprises v. Telewizja Polska* (S.D.N.Y., 07-CV-930), Dated March 16, 2009 ................... A-2353

59     Expert Report of Gary Arlen, Dated April 16, 2012, with Appendices ........................... A-2367

60     Expert Report of Tim Hart, Dated April 16, 2012, with Appendices ........................... A-2584

61     Expert Report of Ivan Reyes, Dated April 16, 2012, with Appendices ........................... A-2660

62     Expert Report of Marek Wierzbowski, Dated April 16, 2012, with Appendices ..................... A-2872

63     Supplemental Expert Report of Tim Hart, Dated May 16, 2012, with Appendices ...................... A-3066

64     Supplemental Expert Report of Gary Arlen, Dated May 16, 2012 .................................. A-3106

66     TV Polonia Webpage — Terms and Conditions .......... A-3114

Plaintiff SEI's Post-Trial Memorandum, Dated August 16, 2013 ...................................... A-3117

**xiii**

**Page**

Defendant TVP's Post-Trial Memorandum,
  Dated August 16, 2013........................................................  A-3156

Notice of Appeal, Dated April 1, 2014 ....................................  A-3193

Notice of Cross-Appeal, Dated April 9, 2014 ..........................  A-3194

A-2951

| October 16, 2010 | | Dz.U. 04.253.2531 | Article 1 |
| January 1, 2005 | amended by | Dz.U.2004.91.874 | Article 1 |
| May 1, 2005 | amended by | Dz.U.2005.17.141 | Article 35 |
| June 16, 2005 | amended by | Dz.U.2005.85.728 | Article 11 |
| September 30, 2005 | amended by | Dz.U.2004.204.2092 | general |
| December 30, 2005 | amended by | Dz.U.2005.267.2258 | Article 6 |
| January 14, 2006 | amended by | Dz.U.2005.267.2258 | Article 6 |
| March 29, 2006 | amended by | Dz.U.2005.267.2258 | Article 6 |
| May 16, 2006 | amended by | Dz.U.2006.83.574 | Article 1 |
| August 5, 2006 | amended by | Dz.U.2006.133.935 | Article 5 |
| March 15, 2007 | amended by | Dz.U.2006.218.1592 | Article 35(b) |
| April 21, 2007 | amended by | Dz.U.2007.61.411 | Article 1 |
| March 7, 2009 | amended by | Dz.U.2009.18.97 | Article 9 |
| August 5, 2009 | amended by | Dz.U.2009.115.965 | Article 1 |
| January 1, 2010 | amended by | Dz.U.2009.201.1540 | Article 97 |
| March 12, 2010 | amended by | Dz.U.2010.28.146 | Article 4 |
| September 4, 2010 | amended by | Dz.U.2010.152.1023 | Article 1 |
| October 16, 2010 | amended by | Dz.U.2010.127.857 | Article 60 |

# BROADCASTING ACT

### of December 29, 1992.

*(Consolidated unofficial text)*

## CHAPTER I

### General Provisions

### Article 1

1. The tasks of radio and television broadcasting shall be:

    1) to provide information,
    2) to ensure access to culture and art,
    3) [1] to facilitate access to learning, sport and scientific achievements,
    3a) to disseminate civil education,
    4) to provide entertainment,
    5) to promote domestic production of audiovisual works,

2. Reception of domestic and foreign programme services, intended by broadcasters for reception by the general public, shall be free, subject to compliance with the requirements set forth by the applicable law.

### Article 1a

1. This Act shall apply to broadcasters established in the territory of the Republic of Poland.

2. A broadcaster shall be deemed established in the territory of the Republic of Poland if it meets at least one of the following criteria:

    1) it has its seat in the territory of the Republic of Poland, and:

        a) decisions as regards the structure and content of the programme service are made in the Republic of Poland, or

    b)  a major part of workforce engaged in the broadcaster's activities on the basis of an employment contract or a contract for services operates in the Republic of Poland, and decisions as regards the structure and content of the programme service are made in another member state of the European Union, or

    c)  a major part of workforce engaged in the broadcaster's activities on the basis of an employment contract or a contract for services operates both in the Republic of Poland and in another member state of the European Union,

2)  decisions as regards the structure and content of the programme service are made in the Republic of Poland and a major part of workforce engaged in the broadcaster's activities on the basis of an employment contract or a contract for services operates in the Republic of Poland, while the broadcaster has its seat in another member state of the European Union,

3)  the broadcaster began to transmit its programme service in the Republic of Poland or pursuant to the law of the Republic of Poland and maintains stable and effective business relations with the Republic of Poland, unless

    a)  the broadcaster's seat is located in another member state of the European Union and the decisions as regards the structure and content of the programme service are made in another member state of the European Union, or

    b)  a major part of workforce engaged in the broadcaster's activities on the basis of an employment contract or a contract for services operates in another member state of the European Union in which the broadcaster has its seat, or if decisions as regards the structure and content of the programme service are made in another member state of the European Union.

3. A broadcaster shall be deemed established in the territory of the Republic of Poland also if a major part of workforce engaged in the broadcaster's activities on the basis of an employment contract or a contract for services operates in the Republic of Poland and if the broadcaster:

1)  has its seat in the territory of the Republic of Poland and decisions as regards the structure and content of the programme service are made in a state which is not a member state of the European Union, or

2)  has its seat in a state which is not a member state of the European Union and decisions as regards the structure and content of the programme service are made in the Republic of Poland.

4. A broadcaster who:

1)  has at its disposal or uses a frequency on the basis of a decision issued by a Polish public administration authority, or

2)  although the broadcaster does not have at its disposal or does not use a frequency on the basis of a decision issued by the relevant public administration authority of a member state of the European Union, the broadcaster uses a satellite capacity reserved by a Polish public administration authority, or

3)  although the broadcaster does not use a satellite capacity reserved by the relevant public administration authority of a member state of the European Union, the broadcaster uses a satellite up-link situated in the territory of the Republic of Poland,

shall also be deemed established in the territory of the Republic of Poland, notwithstanding that the broadcaster does not meet the conditions specified in paragraphs 1-3 and has not been classified as established in a member state of the European Union under the laws of that state corresponding to regulations set forth in paragraphs 1-3.

## Article 2

1. Public broadcasting organisations and holders of broadcasting licences shall be entitled to transmit radio and television programme services.

2. The provisions of the Act shall not apply to:

   1) programme service transmitted or retransmitted solely for reception within a single building,

   2) programme service transmitted or retransmitted in a system, where transmitting and receiving equipment belongs to the same person engaged in business activity or other registered public activity, and where the content of the programme service is limited to matters relating to that activity and is addressed either to employees or another particular group of people connected to the broadcaster,

   3) programme service retransmitted in a cable network, where the number of individual receivers does not exceed 250.

## Article 3

Unless it is otherwise provided for in the Act, the provisions of the press law shall apply to radio and television broadcasting.

## Article 4

For the purpose of the Act:

   1) „broadcaster" shall mean a person who produces or assembles programme services and transmits them or has them transmitted, in a complete and unchanged form, by other persons,

   1a) „social broadcaster" shall mean a broadcaster who:

   a) propagates learning and educational activities, promotes charitable deeds, respects the Christian system of values, being guided by the universal principles of ethics, and strives to preserve national identity in the programme service,

   b) does not transmit programmes or other broadcasts referred to in Article 18 paragraph 5 within the programme service,

   c) does not transmit advertising or teleshopping, sponsored programmes or other sponsored broadcasts,

   d) does not charge any fees for transmission, retransmission or reception of the programme service.

   1b) "foreign person" shall mean a foreign person as defined in Article 5 subparagraph 2 of the Freedom of Business Activity Act of July 2, 2004 (official journal „Dz.U.", No. 173, item 1807),

   1c) "creative team" shall mean a team of persons who create programmes including, in particular: the director, script writer, set designer, operator, performers of lead characters and composer,

   2) „transmission" shall mean:

   a) over-the-air transmission of a programme service for simultaneous reception by the general public (general reception system),

   b) introduction of a programme service into a cable network (collective reception system),

3) „retransmission" shall mean the reception and simultaneous transmission of a complete and unchanged programme service transmitted by a domestic or foreign broadcaster, with an exception of programme services transmitted by way of cable network,

4) „programme service" shall mean a scheduled composition of radio or television programmes, advertising and other broadcasts, transmitted regularly by a single broadcaster,

4a) "thematic programme service" shall mean a programme service where at least 70% of the monthly transmission time during hours from 6 a.m. till 11 p.m. is devoted to programmes and other broadcasts in line with the main theme of the said programme service,

5) „programme" shall mean a separate item of a radio or television programme service which is distinct in terms of its content, form, purpose or authorship,

5a) „programme originally produced in the Polish language" shall mean a programme which meets the criteria of "European audiovisual work" as defined in this Act, which has been produced on the basis of a script written originally in the Polish language and first registered in the Polish language,

6) „advertising" shall mean any broadcast, originating from a person other than the broadcaster, which is intended to promote the sale or any other manner of using products or services, to advance a cause or idea, or to bring about some other effect desired by the advertiser, and which is broadcast in return for remuneration or other form of consideration,

7) „sponsorship" shall mean a direct or indirect financing or co-financing of the production or transmission of a programme or other broadcasts by an entity other than the broadcaster or producer of the programme, with a view to establishing, enhancing or promoting the renown of the name, business name, product or service, trademark or other proprietary identification of the sponsor or its business activities,

8) [2] (repealed),

9) „teletext service" shall mean a set of texts and motionless images transmitted by means of a television signal simultaneously with the programme service,

10) „teleshopping" shall mean any broadcast containing a direct offer of sale of products or supply of services in return for payment,

11) „surreptitious advertising" shall mean the representation, within a programme, of products, services, name, business name, trademark or activities of a business operator which is the manufacturer of goods or the provider of services, if the broadcaster's intention, prompted particularly by a payment of a consideration or deriving other benefit, is to achieve the effect of advertising and if the general public might be misled as to the nature of such a broadcast,

12) "producer" shall mean a natural person, legal person or an organisational unit referred to in Article $33^1$ § 1 of the Polish Civil Code, which ventures, actually organises and bears responsibility for the creative, organisational and financial process of producing audiovisual works,

13) "producer independent of a given broadcaster" shall mean a producer who is not bound by employment relation with the given broadcaster, is not a broadcaster itself and holds no stake in the broadcaster's organisation, and in which neither the broadcaster nor any of its subsidiaries nor any companies associated in the same group hold a stake, and if members of its governing bodies are not bound by employment relation with the given broadcaster and are not broadcasters themselves,

14) "business operator" shall mean a business operator as defined in the Freedom of Business Activity Act of July 2, 2004.

4

**A-2955**

## CHAPTER II
### The National Broadcasting Council

#### Article 5

The National Broadcasting Council (hereinafter referred to as „the National Council") shall hereby be established and shall constitute the state authority competent in matters of radio and television broadcasting.

#### Article 6

1. The National Council shall safeguard freedom of speech in radio and television broadcasting, protect the independence of broadcasters and the interests of the public, as well as ensure an open and pluralistic nature of radio and television broadcasting.

2. The tasks of the National Council shall be, in particular:

    1) to draw up, in agreement with the Prime Minister, the directions of the State policy in respect of radio and television broadcasting,

    2) to determine, within the limits of powers granted to it under this Act, the terms of conducting activities by broadcasters,

    3) to make, within the scope set forth by the Act, decisions concerning broadcasting licences to transmit and retransmit programme services,

    3a) to grant to a broadcaster the status of a social broadcaster or to revoke such status, on terms laid down in the Act,

    4) to supervise the activity of broadcasters within the limits of powers granted to it under the Act,

    5) to organise research into the content and audience of radio and television programme services,

    6) [3] to determine fees for the award of broadcasting licences and registration,

    6a) [4] to determine licence fees in accordance with the principles set forth in the Licence Fees Act of April 21, 2005 (official journal "Dz.U.", No. 85, item 728),

    7) to act as a consultative body in drafting legislation and international agreements related to radio and television broadcasting,

    7a) [5] (repealed),

    8) to initiate research and technical development and training in the field of radio and television broadcasting,

    9) to organise and initiate international co-operation in the field of radio and television broadcasting,

    10) to co-operate with appropriate organisations and institutions in respect of protecting copyright as well as the rights of performers, producers and broadcasters of radio and television programme services,

    11) [6] to hold public and open competitions to select members of Supervisory Boards of public radio and television broadcasting organizations.

5

65

A-2956

## Article 7

1. [7] The National Council shall consist of 5 members, of which 2 shall be appointed by the Sejm[1], 1 by the Senate and 2 by the President from amongst persons with a distinguished record of knowledge and experience in public media.

2. [8] (repealed).

2a. [9] (repealed).

2b. [10] The Chairman of the National Council shall be elected by the National Council from amongst its members; the Chairman shall also be dismissed by the Council's members.

3. Upon a motion of the Chairman, the National Council shall elect from amongst its members a Vice-Chairman of the National Council.

4. [11] The term of office of the members of the National Council shall be six years from the day of appointment of the last member. Members of the National Council shall perform their functions until the appointment of successors.

5. A member of the National Council may not be appointed for another full term of office.

6. The body which is empowered to appoint a member of the National Council shall dismiss such a member solely in cases when the said person:

   1)   has resigned,

   2)   has become permanently unable to discharge of duties for reasons of ill health,

   3)   has been convicted of a deliberate criminal offence by a valid judgement,

   3a)  [12] has submitted an untruthful screening statement, as confirmed by a final and valid decision of the court,

   4)   has committed a breach of the provisions of the Act and the said breach has been confirmed by the decision of the Tribunal of State.

7. In case of a dismissal or death of a member prior to the end of the term of office, the appropriate body shall appoint another member of the National Council for the remainder of the term of office.

## Article 8

1. The employer of a member of the National Council shall, at the member's request, grant to such a member a leave of absence, without pay, for the time of holding an office. The time of the leave shall be accounted towards the duration of the member's employment, on the basis of which other benefits resulting from the relation of employment are derived.

2. (repealed).

3. During the term of office of members of the National Council, their membership in:

   1) (null and void),

   2) governing bodies of associations, trade unions, employers' associations, as well as church or religious organisations,

shall be suspended.

4. It is prohibited to combine the service of a member of the National Council with holding an interest or shares, or with any other involvement, in an entity which is a radio and television broadcaster or producer, as well as with any other gainful employment, save for educational or academic positions of an academic tutor or lecturer or performing creative work.

---

[1] TRANSLATOR'S NOTE: The „Sejm" is the proper name of the Lower House of the Polish Parliament.

**A-2957**

## Article 9

1. The National Council shall issue regulations and adopt resolutions on the basis of the existing legislation and for the purpose of its implementation.
2. [13] The National Council shall adopt resolutions by a two-thirds majority of votes of the total number of its members specified in the Act.
3. The National Council shall adopt the internal rules of procedure binding upon the Council.

## Article 10

1. The Chairman of the National Council shall direct its work, represent the Council and perform the tasks specified in the Act.
2. The Chairman of the National Council may require a broadcaster to provide materials, documentation and information to the extent necessary for the purpose of supervising the broadcaster's compliance with the provisions of the Act and the terms of the broadcasting licence.
3. The Chairman of the National Council may call upon a broadcaster to cease practices in respect of production or transmission of programme services, if they infringe upon the provisions of the Act, resolution of the National Council or terms of the broadcasting licence.
4. Acting by virtue of the Council's resolution, the Chairman of the National Council may issue a decision ordering the broadcaster to cease the practices referred to in paragraph 3.
5. Paragraphs 2-4 shall apply respectively to the retransmission of radio and television programme services.

## Article 11

1. The National Council shall perform its tasks with the assistance of the Office of the National Council.
2. The organisation and operational procedures of the Office of the National Council shall be laid down in the internal rules of procedure adopted by the National Council.
3. Costs of operations of the National Council and its Office shall be borne by the state budget.
4. Regulations relating to employees of public institutions shall apply to the employees of the Office of the National Council.

## Article 12

1. By the end of March each year, the National Council shall submit to the Sejm, the Senate and the President an annual report on its activities during the preceding year, as well as information concerning key issues in radio and television broadcasting.
2. Each year, the National Council shall present to the Prime Minister an annual account of its activities as well as information on key issues in radio and television broadcasting.
3. By way of resolutions, the Sejm and the Senate shall accept or reject the report referred to in paragraph 1. A resolution concerning acceptance of the report may contain remarks and reservations.
4. In case of rejection of the report by both the Sejm and the Senate, the term of office of all the members of the National Council shall expire within 14 days from the date of the last resolution to this effect, subject to the reservation contained in paragraph 5.

7

**A-2958**

5. The National Council's term of office shall not expire unless so approved by the President of the Republic of Poland.

## CHAPTER III
### Radio and Television Programme Services

### Article 13

1. The broadcaster shall enjoy full independence in determining the content of the programme service with a view to fulfilling the tasks referred to in Article 1 paragraph 1 and shall be responsible for its contents.

2. The provision of paragraph 1 shall not prejudice the provisions on third party liability for the content of particular programmes, advertising or other broadcasts.

### Article 14

1. An obligation to transmit or to desist from transmitting a particular programme or broadcast may be imposed upon a broadcaster only by virtue of the Act.

2. Programmes and broadcasts coming from a source other than the broadcaster shall be clearly distinguishable as such and recognisably separate from the other items of the programme service, leaving no doubt as to their origin from a source other than the broadcaster.

### Article 15

1. Television broadcasters shall reserve at least 33% of their quarterly transmission time to programmes originally produced in the Polish language, excluding news, advertising, teleshopping, sports events, teletext services and games.

2. Radio and television broadcasters shall reserve at least 33% of their quarterly transmission time devoted to vocal-musical compositions for compositions performed in the Polish language.

3. Television broadcasters shall reserve more than 50% of their quarterly transmission time for European works, excluding news, advertising, teleshopping, sports events, teletext services and games.

4. The National Council shall determine, by a regulation, a lower share of programmes referred to in paragraphs 1 and 3 in radio and television programme services for:

   1) broadcasters during the first year of transmission of their programme service,

   2) thematic programme services, for which the number of available programmes referred to in paragraphs 1 and 3, is insufficient,

   3) [14] programme services transmitted solely via satellite or cable which in their entirety are available against payment of a fee, excluding licence fees as defined in the Licence Fees Act of April 21, 2005 and basic fees charged by satellite or cable network operators,

   – with due regard for the need to ensure that a proportion of programmes originally produced in the Polish language and of European works is maintained.

8

68

## Article 15a

1. Television broadcasters shall reserve at least 10% of their quarterly transmission time for European works produced by independent producers, excluding news, advertising, teleshopping, sports events, teletext services, and games. Programmes produced not later than 5 years before their transmission in the programme service shall constitute at least 50 % of the time reserved for European works produced by independent producers.

2. The National Council shall determine, by a regulation, with regard to the programmes and works referred to in Article 15 paragraphs 1 and 3 and paragraph 1 hereof:

   1) the manner in which the broadcaster keeps record of the transmission time,

   2) the duration of storage period of such records, however, not less than 1 year,

   3) the scope of recorded information, including information about the date of transmission of a programme, actual duration of the programme, title and producer of the programme,

   - with due regard for the possibility of keeping the said record in an electronic form, the need to ensure transparency and openness of registered information and refraining from imposing upon broadcasters of excessive burdens and costs related to keeping the records.

## Article 15b

1. A programme shall be deemed to be European work, if it originates from:

   1) a member state of the European Union, or

   2) a state which is a party to the European Convention on Transfrontier Television done in Strasbourg on May 5, 1989 (official journal "Dz.U." of 1995, No. 32, item 160) and which does not apply discriminatory measures against any programmes originating from member states of the European Union, or

   3) other third European state which does not apply discriminatory measures against any programmes originating from member states of the European Union, provided it meets the requirements laid down in paragraph 3.

2. A programme shall originate from the states referred to in paragraph 1 subparagraphs 1 and 2 if the majority of the creative team members have their permanent residence in the territory of one of those states and provided at least one of the following conditions is met:

   1) the programme was produced by a producer whose seat or permanent residence is in the state referred to in paragraph 1 subparagraphs 1 and 2,

   2) the production of the programme is supervised and controlled by a natural person having a permanent residence in the state referred to in paragraph 1 subparagraphs 1 and 2, or by a legal person or entity having no legal personality, while its seat is located in the state referred to in paragraph 1 subparagraphs 1 and 2,

   3) the contribution of co-producers having a seat or permanent residence in the state referred to in paragraph 1 subparagraphs 1 and 2, to the total production costs is preponderant and the co-production is not under control of co-producers that do not have their seat or permanent residence in the state referred to in paragraph 1 subparagraphs 1 and 2.

3. A programme shall also be deemed European work if the majority of creative team members have their permanent residence in the territory of a European state and the programme was produced independently or in co-production with a producer having a seat or permanent residence in one of the member states of the European Union by a producer having a seat or permanent residence in the state referred to in paragraph 1 subparagraph 3, provided that the said state concluded an audiovisual agreement with the European Community.

9

69

4. A programme shall also be deemed European work if it was made pursuant to bilateral co-production agreements concluded by member states of the European Union and third parties, and the contribution of co-producers having a seat or permanent residence in the state referred to in paragraph 1 subparagraph 1, to the total production costs is preponderant and the co-production is not under the control of co-producers that do not have their seat or permanent residence in the territory of the state referred to in paragraph 1 subparagraph 1.

5. A programme that does not meet the conditions laid down in paragraphs 1-4 shall also be deemed European work to a degree equivalent to the proportionate contribution of co-producers having their seat or permanent residence in a member state of the European Union to the total production costs, if the majority of creative team members have their permanent residence in a member state of the European Union.

## Article 16

1. Advertising shall be clearly distinguishable as such, and as not originating from the broadcaster, and recognisably separate from the other items of the programme service. The above provision shall apply respectively to teleshopping.

2. Advertising shall not exceed 15%, and advertising broadcast together with teleshopping, subject to provisions of paragraph 3, shall not exceed 20% of the daily transmission time and 12 minutes in any given clock hour.

3. Windows devoted exclusively to teleshopping shall not exceed 3 hours in the daily transmission time. The minimum duration of such a window shall be 15 minutes and the number of such windows may not exceed 8.

4. Pursuant to the provisions of the Act, the National Council shall determine, by a regulation, the manner in which advertising and teleshopping may be conducted in radio and television programme services. In the said regulation, the National Council shall determine:

   1) the manner in which the daily transmission time referred to in paragraphs 2 and 3 shall be determined,

   2) the conditions under which advertising and teleshopping spots may be broadcast in the programme services,

   3) requirements with respect to persons whose voice or image is used in advertising, including restrictions on their ability to host other programmes in radio and television programme services,

   4) the extent to which a broadcaster may allot transmission time for advertising and teleshopping, including the maximum duration per annum for one business operator or business group,

   5) the manner in which the broadcaster shall keep and store a record of duration of broadcast advertising and teleshopping and the scope of data to be recorded.

## Article 16a

1. Broadcasts of advertising and teleshopping spots shall be inserted between programmes, with the reservation of paragraphs 2-7.

2. Advertising or teleshopping spots may be inserted during programmes in such a way that the integrity and value of the programme and the rights of the rights holders are not prejudiced,

3. During coverage of sports events containing mandated intervals and of other events containing intervals, and during programmes consisting of autonomous parts, advertising or teleshopping spots shall only be inserted in the intervals or between the parts.

4. Feature and television films, excluding series, serials and documentaries, with duration exceeding 45 minutes, may be interrupted by advertising or teleshopping spots only once for each complete period of 45 minutes. Further interruptions for advertising or teleshopping spots shall be allowed if the duration of the film is at least 20 minutes longer than two or more complete periods of 45 minutes each.

5. [15] Programmes other than those specified in paragraph 3 may be interrupted by advertising or teleshopping spots if a period of at least 20 minutes, in a television programme service, and 10 minutes, in a radio programme service, has elapsed between each successive break in the programme.

6. The following programmes may not be interrupted by advertising or teleshopping spots:
   1) news and current affairs programmes,
   2) programmes with a religious content,
   3) commentaries and documentaries, the duration of which is less than 30 minutes, and if their duration exceeds 30 minutes, the provisions of paragraphs 2-5 shall apply,
   4) programmes intended for children.

7. Programmes in a public radio and television programme service, with the exception of programmes referred to in paragraph 3, shall not be interrupted by advertising or teleshopping spots.

Article 16b

1. It shall be prohibited to broadcast advertising of the following goods and services:
   1) tobacco products, tobacco accessories, products imitating tobacco products or accessories and symbols related to the use of tobacco, to the extent regulated in the Act of November 9, 1995, on Protection of Health Against the Effects of Use of Tobacco and Tobacco Products (official journal „Dz.U." of 1996, No. 10, item 55, as further amended[1]),
   2) alcoholic beverages, to the extent regulated in the Act of October 26, 1982, on Upbringing in Sobriety and Counteracting Alcoholism (official journal „Dz.U." of 2002, No. 147, item 1231, as further amended[2]).
   3) medical services as defined in the Act of August 30, 1991, on Health Care Institutions (official journal „Dz.U.", No. 91, item 408, as further amended[3]), available only on prescription,
   4) medicinal products, to the extent regulated in the Act of September 6, 2001, - Pharmaceutical Law (official journal „Dz.U." of 2004, No. 53, item 533 as further amended[4]),
   5) [16] cylindrical games, card games, dice, mutual bets, slot machines, to the extent regulated in the Gambling Act of November 19, 2009 (official journal „Dz.U." No. 201, item 1540).

2. It shall be prohibited to broadcast advertising which:
   1) directly exhort minors to purchase products or services,
   2) encourage minors to exert pressure upon their parents or other persons to persuade them to purchase the products or services being advertised,
   3) exploit the trust minors place in parents, teachers or other persons,
   4) unreasonably show minors in dangerous situations,
   5) is of a subliminal nature.

11

3. Advertising shall not:
   1) prejudice respect for human dignity,
   2) include any discrimination on grounds of race, sex or nationality,
   3) be offensive to religious or political beliefs,
   4) prejudice the physical, mental or moral development of minors,
   5) encourage behaviour prejudicial to health, safety or environmental protection.
4. The provisions of paragraph 1-3 shall apply respectively to teleshopping.


### Article 16c

Broadcasting of surreptitious advertising shall be prohibited.


### Article 17

1. Sponsored programmes or other broadcasts shall be identified as such by sponsor credits at their beginning or end. Such credits may specify only the sponsor's name, business name, trademark or contain some other identification of the business operator or its business activities, the image of a single product or service.

2. Identification of the sponsor may not contain the name, business name, trademark or other individual identification of the business operator or its business activities, the image of a single product or service, the advertising of which is prohibited by virtue of Article 16b paragraph 1.

3. The sponsor may not influence the content of the programme or any other broadcast and their scheduling in a manner which would prejudice the independence of the broadcaster. Sponsorship shall not release the broadcaster from liability for the content of the programme.

4. Sponsored programmes or other broadcasts may not encourage the purchase or other use of the products or services of the sponsor or a third party.

5. Subject to the reservations contained in paragraph 6, programmes or other broadcasts may not be sponsored by:
   1) political parties,
   2) trade unions,
   3) employers' organisations,
   4) natural or legal persons whose principal activity consists in the production or sale of products or the provision of services referred to in Article 16b paragraph 1.

6. Sports events coverage may not be sponsored by entities referred to in paragraph 5 subparagraphs 1-3 and by business operators whose principal activity consists in the production, sale or other form of supply of products or services, the advertising of which is prohibited by Article 16b paragraph 1, subparagraphs 1 and 2, subject to the stipulations of Article 13[1] paragraphs 5 and 6, of the Act on Upbringing in Sobriety and Counteracting Alcoholism.

6a. [17] Sponsorship of programmes or other broadcasts by entities that pursue business in the area of cylindrical games, card games, dice, mutual betting and slot machines shall be prohibited.

7. Sponsorship of the following programmes shall be prohibited:
   1) news, with the exception of sports and weather forecasts,
   2) commentaries on social and political topics,
   3) consumer and practical advice programmes,
   4) electoral programmes or programmes directly related to electoral campaigns.

8. The National Council shall determine, by a regulation, the manner in which programmes or other broadcasts may be sponsored, having regard to the provisions of paragraphs 1-7, in particular the time of the broadcast, sponsor credits and manner of transmission of information about the sponsor in the opening announcement or trailer of the programme or following the end of the programme or other broadcast, as well as during the programme or other broadcast. In the said regulation, the National Council shall determine the manner in which the broadcaster shall keep and store a record of sponsored programmes or other broadcasts and the scope of information to be recorded.

## Article 18

1. Programmes or other broadcasts may not encourage actions contrary to law and Poland's *raison d'Etat* or propagate attitudes and beliefs contrary to the moral values and social interest. In particular, they may not include any discrimination on grounds of race, sex or nationality.

2. Programmes or other broadcasts shall respect the religious beliefs of the public and especially the Christian system of values.

3. Programmes or other broadcasts may not encourage conduct prejudicial to health, safety or the natural environment.

4. Transmission of programmes or other broadcasts threatening the physical, mental or moral development of minors, in particular those containing pornography or exhibiting gratuitous violence, shall be prohibited.

5. Programmes or other broadcasts containing scenes or contents which may have an adverse impact upon a healthy physical, mental or moral development of minors, other than those referred to in paragraph 4, may be transmitted only between 11 p.m. and 6 a.m.

5a. Broadcasters shall be obligated to identify programmes or other broadcasts referred to in paragraph 5 by way of displaying an appropriate graphic symbol throughout their duration in the television programme service or by way of an oral announcement informing of the hazards arising out of their transmission in the radio.

5b. Broadcasters shall be obligated to identify programmes or other broadcasts other than those referred to in paragraph 5 and excluding news, advertising, teleshopping, sports events, teletext services by way of displaying an appropriate graphic symbol throughout their duration in the television programme service, with due regard for the degree of harmful effect of the given programme or broadcast upon minors in a particular age group.

6. The National Council shall determine, by a regulation:

   1) features of programmes and detailed criteria for their classification, transmission and the manner of announcing programmes or other broadcasts referred to in paragraph 5,

   2) classification of minors into age groups and detailed criteria for classification and transmission of programmes and other broadcasts referred to in paragraph 5b, with due regard for the hours of transmission of programmes or other broadcasts intended for a given age group,

   3) specimens of graphic symbols and forms of announcements, referred to paragraphs 5a and 5b, and the manner of their presentation,

   - with due regard for the degree of harmful effect of the given programme or broadcast upon minors in a particular age group.

7. Broadcasters shall ensure the proper quality of the Polish language in their programme services and shall counteract its vulgarisation.

## Article 19

1. Broadcasters' activity consisting in producing or assembling programme services shall be carried out in the form of editorial activity as defined in the press law.
2. The provisions concerning the production and transmission of radio and television programme services shall apply respectively to teletext service.

## Article 20

1. The broadcaster shall record programmes, advertising or other broadcasts on suitable carriers and store them for a period of 28 days from the date of their transmission. After the lapse of that period, recordings of programmes, advertising or other broadcasts which are subject to proceedings before public authorities shall be stored until the end of such proceedings.
2. Recordings of a programme, advertising or other broadcasts shall be made available to any person claiming that the content of such programme, advertising or other broadcast infringed that person's rights, at the written request of such person and at the expense of the broadcaster, or shall be delivered to such person at this persons' expense, within 7 days from the date of such written request.
3. Should the request to make available the recording of a programme, advertising or other broadcasts be rejected, the person referred to in paragraph 2 may seek a court injunction ordering the broadcaster to make such a recording available; the court of law having proper jurisdiction over such cases shall be the district court.
4. The National Council shall determine, by a regulation, the manner of recording and storing by broadcasters the programmes, advertising and other broadcasts, including the scope of data to be provided about the stored materials.

## Article 20a

1. At the written request of the President of the Office for Competition and Consumer Protection, the broadcaster shall:
   1) disclose the data allowing to identify the person who ordered a programme or advertising;
   2) deliver, free of charge, the recording of the programme or advertising within 7 days from the date of the request.
2. The provision of Article 20 paragraph 3 shall apply accordingly.

## Article 20b

1. A television broadcaster may broadcast live coverage of an event of major importance for society, hereinafter referred to as a „major event":
   1) [18] only in a national programme service as defined in the Act or in the broadcasting licence, accessible entirely free of charge, excluding licence fees as defined in the Licence Fees Act of April 21, 2005 and basic fees charged by cable network operators, or
   2) if the same event is also being transmitted by the broadcaster of a programme service meeting the conditions laid down in subparagraph 1, pursuant to a contract with the broadcaster who had acquired the rights to provide the live coverage of the given event or with any other authorised party, with the reservation of paragraph 6.
3. In view of a widespread social interest, major events shall include, among others:

14

A-2965

1) summer and winter Olympic Games,

2) semi-finals and finals of World Cup and European Football Championship, as well as all other matches within those events with the participation of the Polish national team, including qualifying games,

3) other football matches with the participation of the Polish national team in official tournaments and matches with the participation of Polish clubs within the Champions League and UEFA Cup.

3. The National Council may specify, by a regulation, a list of major events other than those listed in paragraph 2, having regard to the degree of social interest in the given event and its significance to social, economic and political life.

4. Should a major event be expected to be organised in parts, every such part shall be deemed a major event.

5. The provision of paragraph 1 shall apply to deferred coverage, if the delay in transmitting the given major event does not exceed 24 hours and is due to important reasons, in particular, if:

1) the time, in which the given event takes place, falls between 12 a.m. and 6 a.m. (24:00-6:00) of the official time in the territory of the Republic of Poland,

2) major events or parts thereof overlap in time.

6. The provision of paragraph 1 shall not apply if the given broadcaster can demonstrate that no broadcaster of a programme service meeting the requirements laid down in paragraph 1 subparagraph 1 was ready to conclude a contract ensuring the coverage in accordance with paragraph 1 subparagraph 2.

7. Within the scope laid down by international agreements binding upon the Republic of Poland, the National Council may determine, by a regulation:

1) the list of events deemed as being of major importance for society by other European states,

2) rules governing the exercise of exclusive rights to television coverage of events referred to in subparagraph 1, so as to ensure that the exercise of those rights by broadcasters subject to the Act shall not deprive the viewers in a given state of the possibility of receiving those events under the rules laid down by the given state in accordance with the provisions of international law.

## CHAPTER IV
### Public Radio and Television

### Article 21

1. Public radio and television shall carry out their public mission by providing, on terms laid down in this Act, the entire society and its individual groups with diversified programme services and other services in the area of information, journalism, culture, entertainment, education and sports which shall be pluralistic, impartial, well balanced, independent and innovative, marked by high quality and integrity of broadcast.

1a. The tasks of public radio and television that arise out of the carrying out of the mission referred to in paragraph 1 shall include in particular:

1) production and transmission of national and regional programme services, programme services for reception abroad in the Polish language and in other languages as well as other programme services meeting the democratic, social and cultural needs of local societies,

2) production and transmission of thematic programme services, if a broadcasting licence has been awarded for transmission of the said programme service,



A-2966

   3) construction and operation of radio and television transmitters and relay stations,

   4) transmission of teletext services,

   5) work on new technologies of production and transmission of radio and television programme services,

   6) production, provision of services and carrying out commercial activities related to audiovisual production, including exports and imports,

   7) [19] encouraging artistic, literary, scientific and educational and sport activities,

   8) dissemination of knowledge of Polish language,

   8a) [20] paying due regard to the needs of national and ethnic minorities and communities speaking regional languages, including broadcasting news programmes in the languages of national and ethnic minorities and in regional languages;

   9) production of educational programmes and ensuring access by people of Polish descent and Poles living abroad to such programmes.

2. Programme services of public radio and television should:

   1) be guided by the sense of responsibility for the content of the message and by the need to protect the good reputation of public radio and television,

   2) provide reliable information about the vast diversity of events and processes taking place in Poland and abroad,

   3) encourage an unconstrained development of citizens' views and formation of the public opinion,

   4) enable citizens and their organisations to take part in public life by expressing diversified views and approaches as well as exercising the right to social supervision and criticism,

   5) assist the development of culture, science and education, with special emphasis on the Polish intellectual and artistic achievements,

   6) respect the Christian system of values, being guided by the universal principles of ethics,

   7) serve to strengthen the family ties,

   7a) advance the propagation of pro-health attitude,

   7b) [21] serve to promote and popularize sport,

   8) contribute to combating social pathologies,

   9) [22] (repealed).

3. [23] Acting in agreement with the National Council, every year public radio and television broadcasting organizations shall prepare financial & programme plans of projects involving performance of tasks referred to in paragraphs 1 and 1a that require to be financed with public funds, having regard to a part of costs of operation and development of these organizations.

4. [24] The National Council shall define, by a regulation, dates for submission and scopes of financial & programme plans so as to ensure pursuance of the public mission by public radio and television broadcasting organizations as well as having regard to the freedom of public broadcasters to determine the contents of programme services.

Article 22

1. State authorities may take decisions concerning the functioning of public radio and television broadcasting organisations only in circumstances specified in the existing legislation.

2. Public radio and television broadcasting organisations shall facilitate direct presentation and explanation of the State policy by supreme State authorities.

3. The National Council shall determine, by a regulation, the procedure of action in respect of matters referred to in paragraph 2.



A-2967

## Article 23

1. Public radio and television broadcasting organisations shall enable political parties to present their position with regard to major public issues.

2. The provision of paragraph 1 shall apply correspondingly to national trade unions and employers' organisations.

3. The National Council shall determine, by a regulation, the procedure of action in respect of matters referred to in paragraphs 1 and 2.

## Article 23a

1. Public radio and television broadcasting organisations shall enable public service organisations referred to in the Act of April 24, 2003, on Public and Voluntary Service (official journal "Dz.U.", No. 96, item 873; 2004 No. 64, item 593, No. 116, item 1203, No. 210, item 2135) to provide, without any fee, information about the services provided free of charge by these organisations.

2. Paragraph 1 shall not in any way restrain the broadcaster's right to provide more extensive information about services offered by the public service organisations.

3. (25) Acting in agreement with the minister in charge of social security, the National Council shall determine, by a regulation, the procedure of action in respect of providing, without any fee, information on public services provided free of charge by public service organisations, including the manner of preparation and broadcast of programmes as well as their intended transmission time, having regard to the diversity of public tasks defined in Article 4 of the Act on Public and Voluntary Service, and to their significance for the community.

## Article 24

1. Entities participating in elections to the Sejm, the Senate, the local self-government and the European Parliament shall be entitled to transmit election programmes in the public radio and television programme services on terms determined in separate provisions.

2. The provision of paragraph 1 shall apply respectively to the election of the President of the Republic of Poland.

3. Entities entitled to take part in a referendum campaign launched in the radio and television programme services as defined in Article 48 paragraph 1 of the Act of March 14, 2003 on Nationwide Referendum (official journal "Dz.U.", No. 57, item 507 and No. 85, item 782) shall be enabled to transmit referendum programmes in public radio and television programme service on terms laid down in separate provisions.

## Article 25

1. Public radio and television broadcasting organisations may produce and transmit programme services in the Polish language and other languages for receivers abroad.

2. Public radio and television broadcasting organisations shall produce and transmit educational programmes for schools and other educational institutions.

3. Educational programmes shall comply with the requirements of school curricula.



4. The costs of producing programme services and programmes referred to in paragraphs 1 and 2 shall be borne by the state budget within the limits determined in the Budget Act.

5. The scope and manner of conducting the activity referred to in paragraphs 1 and 2 as well as the principles of covering the costs of such an activity shall be defined in agreements concluded by ministers in charge respectively of foreign affairs and for national education with public radio and television organisations.

Article 26

1. Public radio and television broadcasting organisations shall operate exclusively in the form of the sole-proprietor joint stock company of the State Treasury, hereinafter referred to as „the company".

2. Public television shall be formed by the company „Telewizja Polska - Spółka Akcyjna"[2] established for the purpose of producing and transmitting national programme services I, II, TV Polonia as well as regional television programme services.

2a. [26] Regional branches of the company "Telewizja Polska - Spółka Akcyjna" shall have their corporate seats in: Białystok, Bydgoszcz, Gorzów Wielkopolski, Gdańsk, Katowice, Kielce, Kraków, Lublin, Łódź, Opole, Olsztyn, Poznań, Rzeszów, Szczecin, Warszawa, Wrocław.

3. Public radio shall be formed by:
   1) the company „Polskie Radio - Spółka Akcyjna"[3] established in order to produce and transmit national radio programme services and programme services for receivers abroad,
   2) companies founded to produce and transmit regional radio programme services, hereinafter referred to as „regional radio companies".

4. [27] The provisions of the Code of Commercial Companies, except for Articles 312 and 402, shall apply to companies referred to in paragraphs 2 and 3, subject to Articles 27-30 of the Act.

5. [28] Acting in agreement with the Chairman of the National Council, the President of the Office of Electronic Communications shall reserve, by a decision, the frequencies required for the companies to perform their statutory tasks and shall lay down the conditions of use of these frequencies. Any frequency reservations, modifications or withdrawals thereof shall be governed by the provisions of Articles 114 and 115 of the Act of July 16, 2004 - "Telecommunications Law" (official journal „Dz.U.", No. 171, item 1800 and No. 273, item 2703, and of 2005, No. 163 item 1362).

6. [29] Acting in agreement with the Chairman of the National Council, the President of the Office of Electronic Communications shall allocate to companies producing and transmitting:
   1) national television programme services - the frequencies required to cover the territory of the country by the programme services transmitted by the „Polish Television I" and „Polish Television II" channels,
   2) national radio programme services - the frequencies required to cover the territory of the country by programme services transmitted on the first, second, third and fourth channels and frequencies needed to transmit radio programme services for listeners abroad,
   3) regional television programme services - the frequencies required to transmit regional television programme services,
   4) regional radio programme services - the frequencies required to transmit regional radio programme services.

7. The programme service on the TV Polonia Channel shall be transmitted by satellite.

---

[2] *TRANSLATOR'S NOTE: „Polish Television - Joint-Stock Company".*
[3] *TRANSLATOR'S NOTE: „Polish Radio - Joint-Stock Company".*

**A-2969**

8. The provisions of Article 115 paragraph 3 of the Act of July 16, 2004 - „Telecommunications Law" shall apply to the reservation of frequencies designated for transmission and retransmission of digital programme services by terrestrial diffusion or by satellite.

## Article 27

[30] 1. The Board of Management shall consist of one to three members.

2. The Board of Management shall have a term of office of four years.

3. The National Council shall appoint members of the Board of Management, including the President of the Board of Management, by a resolution, on the motion of the Supervisory Board, and shall dismiss members, by a resolution, on the motion of the Supervisory Board or the General Meeting.

4. Members of the Board of Management shall comprise exclusively persons competent in management as well as radio and television broadcasting, appointed from amongst candidates selected in the competition held by the Supervisory Board.

5. The National Council shall define, by a regulation, the rules of competition to select candidates for members of the Board of Management, including the procedure for announcing, organizing and holding the competition as well as for announcing results of the competition, with consideration given to the need to ensure general accessibility of the competition, impartiality and open nature of the proceedings, efficient holding of the competition and assessment of competencies of candidates referred to in paragraph 4.

6. A member of the Board of Management may be dismissed in case:

   1) the member has been convicted of a deliberate criminal offence subject to public prosecution or of a fiscal offence, by virtue of a valid court judgement,

   2) the member has acted to the detriment of the company,

   3) of occurrence of circumstances that permanently prevent the member from serving his/her function.

7. Members of Boards of Management and persons who serve managerial functions in public radio and television organizations shall, in their work and assessment of journalists and other creators subordinate to them, be guided by the principles of professionalism, honesty and reliability as well as the guidelines set forth in Article 21 paragraphs 1a and 2 of the Act.

## Article 28

1. [31] The Supervisory Boards of "Telewizja Polska – Spółka Akcyjna" and "Polskie Radio – Spółka Akcyjna" shall consist of seven members: five members selected in the competition held by the National Council from amongst candidates competent in law, finance, culture and media, nominated by collegial bodies of institutions of higher learning authorized to award doctoral degrees, one member appointed by the minister in charge of culture and national heritage and one member appointed by the minister in charge of the State Treasury.

1a. [32] The Supervisory Boards of regional radio broadcasting companies shall consist of five members: four members selected in the competition held by the National Council from amongst candidates competent in law, finance, culture and media, nominated by collegial bodies of institutions of higher learning authorized to award doctoral degrees, operating in the region, and one member appointed by the minister in charge of the State Treasury acting in agreement with the minister in charge of culture and national heritage.

1b. [33] The National Council shall define, by a regulation, the rules of competition to select members of the Supervisory Board, including the procedure for announcing, organizing and

holding the competition, nominating candidates as well as for announcing results of the competition, with consideration given to the need to ensure impartiality and open nature of the proceedings, efficient conduct of the competition and assessment of competencies of candidates referred to in paragraphs 1 and 1a.

1c. [34] The resolution of the National Council concerning results of the competition, naming the persons selected in the competition, shall constitute the appointment to serve as members of the Supervisory Board.

1d. [35] A member of the Supervisory Board may be dismissed by the authority that has appointed the member in case:

1) the member has been convicted of a deliberate criminal offence subject to public prosecution or of a fiscal offence, by virtue of a final court judgement,

2) the member has acted to the detriment of the company,

3) of occurrence of circumstances that permanently prevent the member from serving his/her function.

2. The Supervisory Board shall adopt resolutions by an absolute majority of votes cast in the presence of at least a half of the Board members.

3. The Supervisory Board shall elect the Chairman from amongst its members.

4. The Supervisory Board shall adopt the internal rules of procedure regulating the functioning of the Board.

5. The Supervisory Board shall have a term of office of three years.

6. The Supervisory Board's approval shall be required in order to:

1) employ or dismiss persons holding executive positions specified in the company's statutes,

2) conclude or accede to a collective employment agreement with representatives of the employees,

3) establish or accede to a company other than the company referred to in Article 26 paragraph 1, and to purchase or transfer shares or interest in such a company,

4) transfer or encumber real estate.

7. (repealed).

Article 28a

1. Programme councils of public radio and public television shall consist of 15 members appointed by the National Council, of which 10 members shall represent parliamentary groups. The remaining 5 members shall be appointed from amongst persons with a record of experience and achievement in culture and mass media.

2. Programme councils shall have a term of office of 4 years. The councils' members shall represent public interests and expectations related to the programming activities of the company.

3. The programme councils shall adopt resolutions evaluating the level and quality of current programming as well as of the programme schedule. The Supervisory Board shall be obliged to consider and act upon resolutions concerning programme matters which are adopted by a majority of votes cast in the presence of at least half of the members of the programme council.

4. Members of a programme council shall be entitled to receive daily allowance paid out by the company in an amount determined by the National Council.

5. The Board of Management shall provide to the members of the programme council the organisational and financial resources necessary to evaluate the level and quality of transmitted programme service and its reception and to commission independent audience research as well as studies of the social impact of a programme service.

20



A-2971

Article 29

1. The State Treasury shall be represented at the general meeting of shareholders by the minister in charge of the State Treasury.
2. Directions and prohibitions imposed by the general meeting of shareholders in respect of the contents of a programme service shall not be binding upon the Board of Management.
3. Amendment of the company's statutes shall require a prior consent of the National Council.

Article 30

1. Production and transmission of regional public television programme services shall be the task of regional branches of the company referred to in Article 26 paragraph 2.
2. The company's statutes shall determine the scope of operations and the tasks of the regional branch of the company.
3. The regional branch shall be managed by a director appointed by the Supervisory Board upon a motion of the Board of Management.
4. The Programme Council of the branch shall serve as an advisory and consultative body of the director of the company's regional branch.
4a. [36] When appointing Programme Councils of branches broadcasting programme services in the languages of national and ethnic minorities and in regional languages, branch directors shall take into account candidates put forward by social organizations of national and ethnic minorities and communities speaking regional languages.
5. Upon a motion of the Board of Management and after having consulted the directors of the company's regional branches, the National Council shall determine the minimum share of programmes produced by the branches in the transmission time of particular national programme services.
6. [37] (repealed),

Article 30a

1. The provisions concerning programme services for viewers abroad shall apply respectively to the programme service transmitted by the "TV Polonia" channel.
2. The programme council of TV Polonia shall serve as an advisory and consultative body in respect of the production and transmission of the programme service of the "TV Polonia" channel.

Article 31

1. The revenues of the companies referred to in Article 26 paragraphs 2 and 3 shall be the proceeds from:
   1) [38] licence fees, default interest for delay in their payment and fines for the use of unregistered radio and television sets, as defined in the provisions of the Licence Fees Act of April 21, 2005, subject to the reservation of Article 8 paragraph 1 thereof,
   2) trade in programme rights,
   3) advertising and sponsorship,



4) other sources.

2. The revenues of these companies may also include grants from the State budget.

3. Shareholders of the companies referred to in Article 26 paragraphs 2 and 3 shall not be entitled to a share in the companies' profits.

### Article 31a

1. The companies referred to in Article 26 paragraphs 2 and 3 shall be obligated to specify in the documents, refereed to in Article 10 of the Accounting Act of September 29, 1994 (official journal „Dz.U." of 2002, No. 76, item 694, as further amended[5]), the accounting principles, including a company chart of accounts, in a manner ensuring that books of accounts report revenues and related costs separately for the activities, referred to in Article 21 paragraph 1, and other activities as well as methods of allocation of revenues and costs to particular types of activities pursued.

2. The duty, referred to in paragraph 1, shall be without prejudice to the accounting and reporting requirements laid down in separate regulations.

3. The National Council shall set forth, by a regulation, the manner of keeping documents, referred to in paragraph 1, and the manner of preparing the reports, referred to in Article 31b subparagraphs 1-3, with due regard for the need to observe the principles of openness and transparency in the use of funds allocated for the pursuit of tasks referred to in Article 21 paragraph 1 in a manner that would not distort market competition.

### Article 31b

Boards of Management of the companies, referred to in Article 26 paragraphs 2 and 3, shall file with the National Council:

1) by February 15, an annual report on the use of funds, referred to in Article 31 paragraphs 1 and 2, as regards the previous calendar year,

2) by the 25th day of the month following the end of each quarter of a calendar year, quarterly reports on the use of funds allocated in accordance with Article 31 paragraph 1 subparagraph 1 and paragraph 2,

3) by the 25th day of the month following the end of each quarter of a calendar year, quarterly reports on costs incurred in connection with the activities referred to in Article 21 paragraph 1, including the specification of their financing sources.

4) [39] repealed.

### Article 31c

[40] Boards of Management of the companies referred to in Article 26 paragraphs 2 and 3 shall prepare and make publicly available, by March 15 for the preceding calendar year, reports on the use of proceeds from licence fees as defined in the Licence Fees Act of April 21, 2005, default interest for delay in their payment and fines for the use of unregistered sets, for carrying out the public mission referred to in Article 21 paragraph 1, with an indication of funds allocated for implementation of individual tasks set forth in Article 21 paragraph 1a.

A-2973

### Article 32

In order to implement the tasks of public radio and television broadcasting, the companies may, upon consent of the National Council, found new business operators as envisaged by the law.

## CHAPTER V
### Broadcasting Licences

### Article 33

1. Transmission of programme services other than those of public radio and television broadcasters shall require a licence to broadcast.
2. Broadcasting licences shall be awarded by the Chairman of the National Council.
3. The Chairman of the National Council shall take decisions as regards broadcasting licences on the basis of a resolution of the National Council. The decision on this issue shall be final.

### Article 34

1. [41] Acting in agreement with the President of the Office of Electronic Communications, the Chairman of the National Council shall publish in the official journal of the Republic of Poland "Monitor Polski" an announcement concerning availability of broadcasting licences to transmit radio and television programme services and determine the time-limit, which shall not be less than 45 days from the date of the announcement, for filing licence applications.
1a. The announcement referred to in paragraph 1 shall specify:
   1) subject of the procedure;
   2) programming conditions of transmission of the programme service, including in particular the type and nature of the programme service;
   3) technical conditions of transmission of the programme service, in particular the frequency or the channel, as well as the power and location of transmitters intended for transmission of the programme service;
   4) number of broadcasting licences;
   5) period for which the broadcasting licence may be awarded;
   6) time-limit and location for filing applications.
1b. The Chairman of the National Council shall, not later than 14 days of the date of the announcement referred to in paragraph 1, publish information on the announcement in at least two printed national dailies.
1c. Exclusively licence applications in connection with the announcement referred to in paragraph 1 shall be examined.
2. The Chairman of the National Council shall publish a list of applicants participating in the licensing procedure. In case of a large number of applications which exceed the existing capacity for the programme service transmission, the said applications shall be examined within the framework of a single procedure.

## Article 35

1. [42] Broadcasting licences may be awarded to natural persons of Polish nationality who permanently reside in the territory of the Republic of Poland, legal persons or partnerships having their seat in the territory of the Republic of Poland.

2. [43] Companies having foreign shareholders may be awarded a broadcasting licence if :

   1) the equity stake held by foreign persons in the company or the stake held by foreign persons in the share capital of the company does not exceed 49%,

   2) the company's articles of association or statutes contain a clause which provides that:

      a) persons of Polish nationality who permanently reside in Poland constitute a majority of persons empowered to represent the company or manage its affairs, or of members of the Board of Management of the said company,

      b) the share of votes exercised by foreign persons and subsidiaries, as defined by the Code of Commercial Companies and Partnerships, of foreign persons may not exceed 49% of votes in a meeting of a limited company's members or the general meeting of shareholders,

      c) foreign persons may not hold, directly or indirectly, a majority in excess of 49% of votes in a partnership,

      d) persons of Polish nationality who permanently reside in Poland constitute a majority of members of the Supervisory Board of the said company.

3. The licence may also be awarded to:

   1) a foreign person, or

   2) a subsidiary, as defined by the Code of Commercial Companies and Partnerships, of a foreign person,

   - having a seat or permanent residence in a member state of the European Economic Area, with exclusion of restrictions imposed by virtue of paragraph 2.

## Article 35a

[44] 1. [45] A *social* broadcaster may file an application for a broadcasting licence for a successive period not later than 12 months before the expiry of the licence held.

2. [46] In case a *social* broadcaster files the application referred to in paragraph 1, the broadcasting licence for a successive period may be refused exclusively if any of the circumstances indicated in Article 38 paragraphs 1 or 2 occurs in respect of the broadcaster.

3. In case a broadcaster files the application referred to in paragraph 1, provisions of Articles 34 and 36 paragraphs 1 and 2 shall not apply to the licensing procedure.

## Article 36

1. In the licensing procedure, the following criteria shall particularly apply:

   1) the degree of compliance of the proposed programming activities with the tasks of broadcasting laid down in Article 1 paragraph 1 of the Act, taking into account the degree of their implementation by other broadcasters in the area covered by the broadcasting licence,

   2) the applicant's ability to make the necessary investments and ensure financing of the programme service,

3) the planned share of programmes produced or commissioned by the broadcaster or co-produced by the broadcaster jointly with other broadcasters, in the programme service,

4) the planned share of the programmes referred to in Article 15 paragraphs 1 and 3, in a television programme service, or of works referred to in Article 15 paragraph 2, in a radio or television programme service,

5) past compliance with regulations governing radio communications and the mass media.

2. The broadcasting licence shall not be awarded if transmission of a programme service by the applicant could result in:

1) threat to the interests of the national culture, transgression of the standards of public decency conduct and proprieties, danger to national security and defence or violation of state secrets,

2) achievement, by the applicant, of a dominant position in mass media in the given area.

3. [47] The broadcasting licence shall be awarded for 10 years.

Article 37

1. The broadcasting licence shall specify in particular:

1) [48] the broadcaster, its seat or place of residence,

2) the nature of activity covered by the broadcasting licence,

3) the method of transmitting the programme service (by terrestrial diffusion, satellite and cable system) and:

- for terrestrial diffusion:

  a. location of the station,

  b. height on which the antenna is located,

  c. power of the transmitter and the maximum radiated power,

  d. antenna radiation pattern,

  e. frequency,

  f. polarisation,

- for transmission via satellite:

  g. name of the satellite used,

  h. position of the satellite on the orbit,

  i. frequency,

  j. power of the transponder.

- for cable system:

  k. location of the system head station,

  l. area covered by the cable system.

4) the nature of programme service to be transmitted and the time of its transmission,

5) the date of the initial transmission of the programme service,

6) the date of expiry of the licence,

7) the share of programmes produced by domestic producers within the programme service.

2. The licence may specify other aspects of the broadcaster's activity, if so required to implement the provisions of the Act.

3. [49] Within the scope stipulated in paragraph 1 subparagraph 3, the broadcasting licence shall be awarded in agreement with the President of the Office of Electronic Communications.

3a. [50] Where the transmission of radio or television programme services requires a frequency reservation, the President of the Office of Electronic Communications shall forthwith reserve a



A-2976

frequency for the broadcaster who has been awarded a licence. Any frequency reservations, modifications and withdrawals thereof shall be governed by Articles 114 and 115 of the Act of July 16, 2004 - "Telecommunications Law", and provisions of Article 116 thereof shall not apply.

4. [51] Following consultation with the President of the Office of Electronic Communications, the National Council shall specify, by a regulation, the essential information to be provided in the application form as well as the detailed procedure for awarding or revoking broadcasting licences.

### Article 37a

A broadcaster shall on an annual basis deliver to the National Council its financial statements prepared in the form specified in the Accounting Act of September 29, 1994.

### Article 38

1. The broadcasting licence shall be revoked if:

   1) a final decision has been issued prohibiting the broadcaster to run business activity covered by the broadcasting licence;

   2) the broadcaster blatantly violates the conditions set forth in the Act or broadcasting licence;

   3) the activity covered by the broadcasting licence is run in breach of the Act or the terms of the broadcasting licence, and the broadcaster, despite having been requested by the Chairman of the National Council, has not within a prescribed time-limit eliminated the state of facts or the legal status incompliant with the conditions set forth in the broadcasting licence or the Act;

   4) despite having been requested by the Chairman of the National Council, the broadcaster has not commenced to transmit the programme service within the time-limit set in the broadcasting licence, or has permanently ceased to transmit it via all or some transmitters – unless the broadcaster proves that the delay in commencing transmission of the programme service or cessation of programme service transmission resulted from circumstances beyond its control. Permanent cessation of programme service transmission shall be deemed to mean non-transmission of the programme service for the period of three consecutive months.

2. The broadcasting licence may be revoked if:

   1) the transmission of the programme service threatens the interests of the national culture, security and defence or if it transgresses the standards of public decency;

   2) the broadcaster is declared bankrupt;

   3) by transmitting the programme service the broadcaster gains a dominant position in mass media on the given relevant market as defined in regulations on protection of competition and consumers;

   4) another person takes over direct or indirect control over the activity of the broadcaster,

3. The Chairman of the National Council shall make public information on opening of the procedure for revoking the broadcasting licence.

4. In case the decision revoking the broadcasting licence becomes final, the Chairman of the National Council shall forthwith announce availability of a licence within the scope covered by the revoked licence.



## Article 38a

1. The rights under the broadcasting licence shall be inalienable, subject to paragraphs 3-5.
2. The rights referred to in paragraph 1 shall not transfer onto the purchaser of a bankrupt enterprise.
3. In case of a merger, division or other transformations of commercial companies, the rights referred to in paragraph 1 may transfer onto another entity upon consent of the National Council expressed in the form of a resolution. The consent shall be refused if:
   1) the broadcaster gains a dominant position in mass media on the given relevant market as defined in regulations on protection of competition and consumers;
   2) another person takes over direct or indirect control over the activity of the broadcaster.
3a. [52] A natural person may transfer the rights under the licence, subject to the consent of the National Council expressed in a resolution, onto a company of which the person is a shareholder and which meets the conditions referred to in Article 35. Consent may be refused for reasons referred to in Article 36 paragraph 2.
4. [53] The Chairman of the National Council shall issue, on the basis of a resolution of the National Council, a decision granting, or refusing to grant, consent referred to in paragraphs 3 and 3a.
5. Provisions of the Act of July 16, 2004 - „Telecommunications Law" shall apply to the rights arising from frequency reservation.

## Article 39

The broadcasting licence to transmit a television programme service shall also cover the use of the television signal to transmit teletext services.

## Article 39a

1. A broadcasting licence may be awarded for the transmission via cable networks or via satellite of a programme service devoted exclusively to:
   1) teleshopping,
   2) self-promotion of the broadcaster's activity.
2. The provisions of the Act, with the exception of the provisions of Articles 15-15b, shall apply as appropriate to the programme services referred to in paragraph 1.
3. The following shall not apply to the programme services referred to in paragraph 1 subparagraph 1:
   1) limitation of the admissible duration of advertising and teleshopping spots per clock hour as laid down in Article 16 paragraph 2,
   2) the provisions of Article 16 paragraph 3 and Article 16a.

## Article 39b

1. The following may apply to the National Council to be granted the status of a social broadcaster:
   1) an association, within the framework of implementing its statutory objectives,
   2) a foundation, within the framework of implementing its statutory objectives,

27

**A-2978**

3) a church or a religious legal person of a given church, or a religious organisation whose status is regulated by an Act of Parliament.

2. Social broadcasters shall be exempt from fees payable for awarding or altering the licence.

3. In case of breach by a social broadcaster of requirements specified in Article 4 paragraph 1a, the licensing authority shall issue a decision revoking its status as a social broadcaster and shall impose in the said decision the obligation to pay the fees referred to in paragraph 2, along with legal interest charged as from the date of awarding or altering the broadcasting licence.

Article 40

1. A fee shall be charged for awarding a broadcasting licence, irrespective of the fee for the use of radiocommunications equipment or the use of a frequency, provided for in the Act on Communications.

2. Acting in agreement with the minister in charge of public finance sector and taking into account the nature of particular broadcasters and their programme services, the National Council shall determine, by a regulation, the fee referred to in paragraph 1. The National Council may specify entities exempt from such fee.

Article 40a

1. Purchase or acquisition of shares or interest, or acquisition of rights in shares or interest in a company holding a broadcasting licence to transmit a programme service, by a foreign person, shall require a consent of the Chairman of the National Council; the provisions of Article 33 paragraph 3, Article 35 paragraph 2, Article 36 paragraph 2 and Article 38, shall apply thereto as appropriate.

2. The actions referred to in paragraph 1, performed by an entity controlled by a foreign person shall be deemed performed by the controlling entity, as defined by the Code of Commercial Companies and Partnerships.

3. The Chairman of the National Council shall grant and withdraw the consent referred to in paragraph 1, on the basis of a resolution of the National Council.

4. The actions, referred to in paragraph 1, performed without the consent shall be null and void.

5. The provisions of paragraphs 1 - 3 shall not apply to foreign persons or subsidiaries, as defined by the Code of Commercial Companies and Partnerships, to foreign persons having a seat or permanent residence in a member state of the European Economic Area.

Article 40b

[54] Provisions of Chapter 5 of the Freedom of Business Activity Act of July 2, 2004 shall apply to the control of business activity of business operators, referred to in Article 33.

### CHAPTER VI
### Retransmission of Programme Services in Cable Networks

Article 41

1. Programme services retransmitted in cable networks shall be subject to registration.



2. The provision of paragraph 1 shall not apply to national programme services of public radio and television and other programme services of domestic broadcasters receivable within the coverage area by means of receivers for reception by the general public.

3. The register shall be kept by the Chairman of the National Council.

4. The Code of Administrative Procedure shall apply to the registration procedure, unless otherwise provided for in the Act.

5. The register shall be open to the public.

### Article 42

1. A fee shall be charged for registration.

2. Acting in agreement with the minister in charge of the public finance sector, the National Council shall determine, by a regulation, the fee referred to in paragraph 1 and may specify entities exempt from such a fee.

### Article 43

1. The cable network operator shall introduce programme services into the cable network in the following sequence:
   1) national programme services of public radio and television,
   2) regional programme services of public radio and television, receivable in the given area,
   2a) programme services of domestic social broadcasters, receivable in the given area,
   3) programme services of other domestic broadcasters, receivable in the given area,
   4) programme services of other domestic and foreign broadcasters.

2. In justified cases, the Chairman of the National Council may issue a decision permitting a different sequence of introducing programme services into a cable network as compared to that referred to in paragraph 1.

### Article 44

1. The registering authority shall register a programme service on the basis of a notification.

2. The cable network operator shall notify a programme service for the purpose of its registration not later than 2 months prior to the commencement of retransmission.

3. The notification referred to in paragraph 1 shall:
   1) specify the applicant, its seat or place of residence;
   2) specify the programme service intended for retransmission and its broadcaster;
   3) define the area over which the programme service is to be retransmitted;
   4) (repealed);
   5) (repealed).

3a. The cable network operator shall enclose with the notification:
   1) a copy of authorisation to operate broadcasting equipment and telecommunications networks necessary to retransmit the programme service;
   2) documents indicating that the retransmission of the programme service will not infringe upon the rights of the programme service broadcaster;

29

3) documents indicating that the programme service is transmitted for reception by the general public, and in case of a programme service provided to the operator by the broadcaster – a contract with the programme service broadcaster;

4) declaration on the sequence of introducing to the network programme services receivable within the coverage area by means of receivers for reception by the general public, the retransmission of which is not subject to notification.

3b. The entry in the register shall contain the particulars referred to in paragraph 3, with the exception of address of residence, if different from the address of the seat.

4. Retransmission of the programme service may be commenced if the registering authority has not refused the registration within 2 months from the date of filing the application.

5. The cable network operator shall notify the registering authority, within 14 days, of any changes in the state of facts or the legal status which are covered by the obligation to register and which arose after the act of registration. The provisions governing the registration of programme services shall apply accordingly to notification of changes.

6. (repealed).

### Article 45

1. The registering authority shall refuse to register a programme service if:
   1) the applicant has no authorisation to use the radio equipment or telecommunication networks,
   2) contents in breach of provisions of Article 18 were transmitted at least twice in the said programme service during the last 12 months,

2. The registering authority shall impose a ban upon the cable network operator to retransmit programme services or a particular programme service, if:
   1) contents inciting hatred on the grounds of race, sex, nationality or religion or contents in breach of provisions of Article 18 paragraphs 4 and 5 were retransmitted at least twice in the said programme service during the last 12 months,
   2) the operator introduces changes to the programme service or does not retransmit it complete or simultaneously,
   3) the operator fails to comply with the sequence regulating the introduction of programme services into the cable network laid down in the Act.

3. The refusal to register a programme service or imposing a ban upon retransmission of a programme service shall be made in the form of an administrative decision; the provisions of Article 33 paragraph 3 shall apply accordingly to such a decision.

4. When a ban is imposed as specified in paragraph 2, the Chairman of the National Council acting ex officio shall nullify the registration of the programme services or a programme service.

5. The registration shall be nullified ex officio in case of loss, by the cable network operator, of the authorisation to operate broadcasting equipment and telecommunications networks used for the purpose of retransmission of programme services.

### Article 46

The National Council shall determine, by a regulation, a detailed manner and procedure for keeping the register of programme services in cable networks, including:

1) model form of the register,
2) model form of notification for purposes of registration

**A-2981**

- with due regard to a possibility to keep the register and file applications in the IT system, necessity to ensure transparency and completeness of information recorded in the register and efficiency of the registering procedure, as well as prevention of impediments affecting cable network operators' activities.

Article 47

[55] The provisions on the award of broadcasting licences to transmit programme services shall apply accordingly to the over-the-air retransmission of programme services that does not require a frequency reservation.

## CHAPTER VII

[56] (repealed)

Article 48

(repealed).

Article 49

(repealed).

Article 50

(repealed).

Article 51

(repealed).

## CHAPTER VIII
### Liability under the Law

Article 52

1. Transmission of a radio or television programme service without a licence shall be:
   - punishable by a fine, restriction of liberty or imprisonment of up to 2 years.
2. Retransmission of a radio or television programme service without registration shall be:
   - punishable by a fine, restriction of liberty or imprisonment of up to 1 year.

Article 53

1. A broadcaster failing to comply with the obligations laid down in Article 15 paragraphs 1-3, Article 15a paragraph 1, Article 16 paragraphs 1-3, Article 16a paragraphs 1-6, Article 16b, Article 16c, Article 17 paragraphs 1-7, Article 18 paragraphs 1-5b, Article 20 paragraph 1, Article 20b paragraphs 1 and 6 or under the provisions issued pursuant to Article 15 paragraph 4, Article 15a paragraph 2, Article 16 paragraph 4, Article 17 paragraph 8 and Article 18 paragraph 6, shall be liable to a fine imposed by decisions of the Chairman of the National Council in the amount of 50% of the annual fee for the use of frequency allocated for broadcasting the programme service, while broadcasters who fail to make the payment of the

31

**A-2982**

frequency fee, shall be liable to a fine of up to 10% of the revenues generated by the broadcaster in the preceding tax year.

2. The Chairman of the National Council may impose the fine referred to in paragraph 1 also by virtue of a decision issued under Article 10 paragraph 4.

3. The fine shall be paid from net income after tax or from another surplus of revenues over expenditure, after tax.

4. The fine may not be imposed if over one year elapsed from the breach of the obligations referred to in paragraph 1.


### Article 54

1. If a person who directs the broadcaster's activity fails to carry out the decisions issued under Article 10 paragraph 4, the Chairman of the National Council may, by a decision, impose a fine upon such a person; however, such fine shall not exceed the person's six-month remuneration.

2. The same fine may be imposed upon a person who directs the broadcaster's activity for failure to provide information or for providing inaccurate information requested by the Chairman of the National Council under Article 10 paragraph 2.

3. A decision imposing a fine may not be issued if two years have elapsed from the date of issuing the decision referred to in paragraph 1.


### Article 55

The fines referred to in Article 53 and 54 shall be payable to the state budget.


### Article 56

1. Decisions of the Chairman of the National Council issued under Article 10 paragraph 4 and Articles 53 and 54 may be appealed against to the *Voivodship Court*[57] in Warsaw – Commercial Court.

2. The provisions of the Code of Civil Procedure relating to counteracting monopolistic practices shall apply as appropriate to the procedure in cases involving appeals against the decisions referred to in paragraph 1.

3. In case a decision of the Chairman of the National Council is appealed against to the court, the appealing person shall not have recourse to remedies for the purpose of appealing against the said decision provided for in the Code of Administrative Procedure, particularly as regards resumption of the procedure, reversal, change or declaration of invalidity of the decision.


### CHAPTER IX
### Amendments to the Applicable Legislation,
### Transitional and Final Provisions


### Article 57

In Article 1 paragraph 1 subparagraph 2 of the Act of December 30, 1950, on the Publication of the Official Journal „Dziennik Ustaw" of the Republic of Poland and the Official Journal „Monitor

Polski" of the Republic of Poland (official journal „Dz.U.", No. 58, item 524; 1991, No. 94, item 420), the coma after the words „and ministers" shall be deleted and the following phrase shall be added thereafter „and the National Broadcasting Council".

## Article 58

Subparagraph 7 shall be added in Article 1 paragraph 2 of the Tribunal of State Act of March 26, 1982, (official journal „Dz.U.", No. 11, item 84; of 1993, No. 5, item 22), following replacement of the period at the end of the paragraph with a coma:
„7) members of the National Broadcasting Council".

## Article 59

Article 48 of the Act of May 17, 1989 on Relations between the State and the Roman Catholic Church in the Republic of Poland (official journal „Dz.U.", No. 29, item 154; of 1990, No. 51, item 297, No. 55, item 321, No. 86, item 504; of 1991, No. 95, item 425 and No. 107, item 459) shall be amended as follows: (amendments omitted).

## Article 60

Article 25 paragraph 4 of the Act of May 17, 1989 on Guarantees of Freedom of Conscience and Religion (official journal „Dz.U.", No. 29, item 155; of 1990, No. 51, item 297, No. 55, item 321, No. 86, item 504; of 1991, No. 95, item 425) shall be replaced by the following:
„4. Churches and other religious organisations shall be entitled to broadcast religious, moral, social and cultural programme services on radio and television in accordance with agreements executed between the authorities of the particular Church or religious organisation and the public radio and television broadcasting organisations".

## Article 61

The Act of November 23, 1990, on Communications (official journal „Dz.U.", No. 86, item 504; of 1991 No. 69, item 293, No. 105, item 451) shall be amended as follows: (amendments omitted).

## Article 62

Article 36 paragraph 2 of the Act of July 4, 1991, on Relations between the State and the Polish Autocephalic Orthodox Church (official journal „Dz.U.", No. 66, item 287, No. 95, item 425) shall be replaced by the following:
„2. The manner of exercising entitlements referred to in paragraph 1 shall be regulated by agreements between the Sacred Synod of Bishops and the public radio and television broadcasting organisations".

## Article 63

1. The Committee for Radio and Television „Polish Radio and Television" (hereinafter referred to as the „the Committee") is hereby dissolved. The President of the Committee shall direct the

**A-2984**

activities of the state organisational unit „Polish Radio and Television" until registration of the companies referred to in Article 26 paragraphs 2 and 3.

2. The tasks of the Committee and its President defined in the existing legislation with regard to the production and transmission of radio and television programme services shall be transferred to public radio and television broadcasting organisations, to be implemented in accordance with their tasks defined in their statutes and by the applicable legislation.

3. The tasks of the Committee and its President defined in the existing legislation and relating to state administration shall be transferred to the National Council.

4. The functions of the founding body of state-owned enterprises and supervisory functions over research and development units subordinate to the Committee shall be transferred to the Chairman of the National Council.

5. Permits to use telecommunications equipment for broadcasting radio and television programme services shall expire on the day on which a broadcaster who has been assigned the frequency heretofore used for broadcasting a programme service commences to operate in the same area, however, not later than within a year from the date the Act comes into force.

6. The provision of paragraph 5 shall not apply to permits issued under the act referred to in Article 59.

7. The provision of Article 52 shall not apply to broadcasters holding permits referred to in paragraph 5 and broadcasters holding permits issued under the act referred to in Article 59.

8. Entities which retransmit programme services in cable networks shall adjust their activities in order to comply with the provisions of Chapter VI within 6 months from the date the Act comes into force.

## Article 64

1. The minister in charge of the State Treasury shall establish:

   1) the company referred to in Article 26 paragraph 2 having its seat in Warsaw and regional branches in Bydgoszcz, Gdańsk, Katowice, Kraków, Lublin, Łódź, Poznań, Rzeszów, Szczecin, Warsaw and Wrocław,

   2) the company referred to in Article 26 paragraph 3 subparagraph 1 having its seat in Warsaw and the companies referred to in Article 26 paragraph 3 subparagraph 2 having their seats in Białystok, Bydgoszcz, Gdańsk, Katowice, Kielce, Kraków, Koszalin, Lublin, Łódź, Opole, Olsztyn, Poznań, Rzeszów, Szczecin, Warsaw, Wrocław and Zielona Góra.

2. The minister in charge of the State Treasury may establish regional radio companies having their seat in towns other than those referred to in paragraph 1 subparagraph 2.

3. The minister in charge of the State Treasury shall agree the statutes of the companies referred to in paragraphs 1 and 2 with the National Council. The statutes of the company referred to in Article 26 paragraph 2 may provide for regional branches in locations other than those referred to in paragraph 1 subparagraph 1.

4. The first Boards of Management of the companies referred to in paragraphs 1 and 2 shall be appointed by the National Council.

## Article 65

1. The minister in charge of the State Treasury shall transfer the property remaining after the liquidation of the state organisational unit „Polskie Radio i Telewizja"[4] hereinafter referred to as PRTV, to the companies referred to in Article 64 paragraph 1.
2. Within 1 month from the date on which this Act comes into force, the Council of Ministers shall determine, by a regulation, the detailed procedure of taking an inventory of the property referred to in paragraph 1, its division and transfer as well as settlement of any disputes in this regard.
3. Actions executed with a view to implement Article 64 paragraphs 1 and 2 shall be exempt from court fees and stamp duties; regulations governing the transformation of state enterprises into companies shall apply accordingly to notary's fees for establishing the said companies.

## Article 66

1. Land owned by the State Treasury and administered by PRTV on the date of entry of this Act into force shall, on the date of registration of the companies, be transferred to them to be held under perpetual usufruct by operation of the law. Provisions of Article 41 paragraph 1 of the Act of April 29, 1985 on Land Management and Expropriation of Real Property (official journal „Dz.U." of 1991, No. 30, item 127, No. 103, item 446 and No. 107, item 464)[58] shall not apply in respect of the first fee for perpetual usufruct.
2. Buildings and other facilities as well as premises located on land owned by the State Treasury and administered by PRTV on the date the Act comes into force shall, on the date of registration of the companies, become their property by operation of the law. Acquisition of ownership rights shall be free of all charge.
3. Acquisition of the rights to perpetual usufruct of land referred to in paragraph 1 and the ownership title to the buildings, other facilities and premises referred to in paragraph 2, shall be effected by virtue of a decision of the Voivod. The said decision shall also determine the conditions of perpetual usufruct of land, in accordance with the provisions of Article 236 of the Polish Civil Code.

## Article 67

1. Employees of PRTV shall, by operation of the law, become employees of the respective company, subject to the provision of paragraph 2.
2. Employment relationship of executive officers, determined by the National Council, shall cease, by operation of the law, on the date of registration of the companies in the commercial register. Such cessation of employment relationship shall be equivalent, in terms of its legal consequences, to termination of employment relationship as a result of termination of the employment contract by the employer. These employees may be employed in the company on terms agreed upon by the parties.
3. The companies shall be responsible for liabilities arising out of employment relationship which arose prior to the companies' entry in the commercial register.

---

[4] TRANSLATOR'S NOTE: „Polish Radio & Television".

A-2986

## Article 68

1. The rights and liabilities of the Committee and PRTV arising out of administrative decisions shall, by operation of the law, be transferred to the companies.
2. The Minister of Communications acting in agreement with the Chairman of the National Council shall assign to the companies, referred to in Article 26 paragraphs 2 and 3, the frequencies used by PRTV on the date of entry of the present Act into force for the transmission of radio and television programme services.
3. The right to use the frequencies referred to in paragraph 2 vested in other entities on the basis of former provisions shall expire on the date of assignment of these frequencies to the companies.
4. The frequencies referred to in paragraph 2 shall be assigned free of charge.

## Article 69

1. The bodies empowered to appoint members of the National Council for the first term of office after the entry of the present Act into force shall specify which members have been appointed for a term of two and of four years.
2. The first meeting of the National Council shall be convened by the Speaker of the Senate, who shall chair the meeting.
3. The first Chairman of the National Council shall be appointed from amongst all the members serving the first term of office.

## Article 70

1. The Act of December 2, 1960, on the Committee for Radio and Television „Polskie Radio i Telewizja" (official journal „Dz.U.", No. 54, item 307; of 1984, No. 54, item 275) shall hereby be repealed.
2. Prior to the issue of regulations provided for in this Act, however, not longer than for six months, the former provisions of the Act referred to in paragraph 1 shall remain in force, unless they are contrary to this Act.

## Article 71

The Act shall come into force within a month of its publication, with the exception of Article 52, which shall come into force on July 1, 1993.

---

[1] Amendments to the Act were promulgated in the official journal "Dz. U." of 1997, No. 88, item 554 and No. 121, item 770; of 1999, No. 96, item 1107; and of 2003, No. 229, item 2274.
[2] Amendments to the consolidated text of the Act were promulgated in the official journal "Dz. U." of 2002, No. 167, item 1372; of 2003, No. 80, item 719 and No. 122, item 1143; and of 2004, No. 29, item 257, No. 99, item 1001 and No. 152, item 1597.
[3] Amendments to the Act were promulgated in the official journal "Dz. U." of 1992, No. 63, item 315; of 1994 No. 121, item 591; of 1995, No. 138, item 682; of 1996, No. 24, item 110; of 1997, No. 104, item 661, No. 121, item 769 and No. 158, item 1041; of 1998, No. 106, item 668, No. 117, item 756 and No. 162, item 1115; of 1999, No. 28, item 255 and 256 and No. 84, item 935; of 2000, No. 3, item 28, No. 12, item 136, No. 43, item 489, No. 84, item 948, No. 114, item 1193 and No.

120, item 1268; of 2001, No. 5, item 45, No. 88, item 961, No. 100, item 1083, No. 111, item 1193, No. 113, item 1207, No. 126, item 1382, 1383 and 1384 and No. 128, item 1407; of 2002, No. 113, item 984; of 2003, No. 45, item 391, No. 124, item 1151 and 1152, No. 171, item 1663, No. 213, item 2081 and No. 223, item 2215; and of 2004 No. 210, item 2135.

[4)] Amendments to the consolidated text of the Act were promulgated in the official journal "Dz. U." of 2004; No. 69, item 625, No. 91, item 877, No. 92, item 882, No. 93, item 896, No. 173, item 1808 and No. 210, item 2135.

[5)] Amendments to the consolidated text of the Act were promulgated in the official journal "Dz. U." of 2003, No. 60, item 535, No. 124, item 1152, No. 139, item 1324 and No. 229, item 2276; and of 2004, No. 96, item 959, No. 145, item 1535, No. 146, item 1546 and No. 213, item 2155.

[1)] Article 1 paragraph 1 subparagraph 3 amended by Article 60 subparagraph 1 of the Sports Act of June 25, 2010 (Dz.U.10.127.857) as of October 16, 2010.

[2)] Article 4 subparagraph 8 repealed by Article 11 subparagraph 1 of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[3)] Article 6 paragraph 2 subparagraph 6 amended by Article 11 subparagraph 2 letter a) of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728)as of June 16, 2005.
As of September 30, 2005 Article 6 paragraph 2 subparagraph 6 in its wording before the amendment implemented by Article 11 subparagraph 2 letter a) of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728) on June 16, 2005 was deemed, to the extent it established the competence of the National Broadcasting Council to determine licence fees, inconsistent with Article 217 of the Constitution of the Republic of Poland, by virtue of the decision of the Constitutional Tribunal of September 9, 2004 (Dz.U.04.204.2092).

[4)] Article 6 paragraph 2 subparagraph 6a added by Article 11 subparagraph 2 letter b) of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[5)] Article 6 paragraph 2 subparagraph 7a repealed by Article 6 subparagraph 1 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of March 29, 2006 - cf: decision of the Constitutional Tribunal of March 23, 2006 (Dz.U.06.51.377).

[6)] Article 6 paragraph 2 subparagraph 11 added by Article 1 subparagraph 1 of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010

[7)] Article 7 paragraph 1 amended by Article 6 subparagraph 2 letter a) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of December 30, 2005.

[8)] Article 7 paragraph 2 repealed by Article 6 subparagraph 2 letter b) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of March 29 2006 - cf: decision of the Constitutional Tribunal of March 23, 2006 (Dz.U.06.51.377).

[9)] Article 7 paragraph 2a repealed by Article 6 subparagraph 2 letter c) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of December 30, 2005.

[10)] Article 7 paragraph 2b added by Article 1 of the Act of April 25, 2006 (Dz.U.06.83.574) amending this Act as of May 16, 2006.

[11)] Article 7 paragraph 4 amended by Article 6 subparagraph 2 letter d) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of December 30, 2005.

[12)] Article 7 paragraph 6 subparagraph 3a added by Article 35b of the Act of October 18, 2006 on Disclosure of Information on Documents of the State Security Services Produced in 1944–1990, and Contents of Such Documents (Dz.U.06.218.1592) as of March 15, 2007.

[13)] Article 9 paragraph 2 amended by Article 6 subparagraph 3 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[14)] Article 15 paragraph 4 subparagraph 3 amended by Article 11 subparagraph 3 of the Licence

Fees Act of April 21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[15] Article 16a paragraph 5 amended by Article 5 of the Act of June 23, 2006 Amending Certain Acts in Connection with Membership of the Republic of Poland in the European Union (Dz.U.06.133.935) as of August 5, 2006.

[16] Article 16b paragraph 1 subparagraph 5 amended by Article 97 subparagraph 1 of the Gambling Act of November 19, 2009 (Dz.U.09.201.1540) as of January 1, 2010.

[17] Article 17 paragraph 6a added by Article 97 subparagraph 2 of the Gambling Act of November 19, 2009 (Dz.U.09.201.1540) as of January 1, 2010.

[18] Article 20b paragraph 1 subparagraph 1 amended by Article 11 subparagraph 4 of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[19] Article 21 paragraph 1a subparagraph 7 amended by Article 60 subparagraph 2 letter a) of the Sports Act of June 25, 2010 (Dz.U.10.127.857) as of October 16, 2010.

[20] Article 21 paragraph 1a subparagraph 8a added by Article 35 subparagraph 1 letter a) of the Act of January 6, 2005 on National and Ethnic Minorities and on Regional Language (Dz.U.05.17.141) as of May 1, 2005.

[21] Article 21 paragraph 2 subparagraph 7b added by Article 60 subparagraph 2 letter b) of the Sports Act of June 25, 2010 (Dz.U.10.127.857) as of October 16, 2010.

[22] Article 21 paragraph 2 subparagraph 9 repealed by Article 35 subparagraph 1 letter b) of the Act of January 6, 2005 on National and Ethnic Minorities and on Regional Language (Dz.U.05.17.141) as of May 1, 2005.

[23] Article 21 paragraph 3 added by Article 1 subparagraph 2 of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[24] Article 21 paragraph 4 added by Article 1 subparagraph 2 of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[25] Article 23a paragraph 3 amended by Article 4 of the Act of January 22, 2010 Amending the Act on Public and Voluntary Service and Certain Other Acts (Dz.U.10.28.146) as of March 12, 2010.

[26] Article 26 paragraph 2a added by Article 1 subparagraph 14 of the Act of April 2, 2004 (Dz.U.04.91.874) amending this Act as of January 1, 2005.

[27] Article 26 paragraph 4 amended by Article 1 of the Act of February 26, 2007 (Dz.U.07.61.411) amending this Act as of April 21, 2007.

[28] Article 26 paragraph 5 amended by Article 6 subparagraph 4 letter a) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[29] Article 26 paragraph 6, the introductory sentence amended by Article 6 subparagraph 4 letter b) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[30] Article 27 amended by Article 1 subparagraph 3 of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[31] Article 28 paragraph 1 amended by Article 1 subparagraph 4 letter a) of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[32] Article 28 paragraph 1a added by Article 1 subparagraph 4 letter b) of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[33] Article 28 paragraph 1b added by Article 1 subparagraph 4 letter b) of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[34] Article 28 paragraph 1c added by Article 1 subparagraph 4 letter b) of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[35] Article 28 paragraph 1d added by Article 1 subparagraph 4 letter b) of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[36] Article 30 paragraph 4a added by Article 35 subparagraph 2 of the Act of January 6, 2005 on National and Ethnic Minorities and on Regional Language (Dz.U.05.17.141) as of May 1, 2005.

[37] Article 30 paragraph 6 repealed by Article 11 subparagraph 5 of the Licence Fees Act of April

21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[38)] Article 31 paragraph 1 subparagraph 1 amended by Article 11 subparagraph 6 of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[39)] Article 31b subparagraph 4 repealed by Article 1 subparagraph 5 of the Act of August 5, 2010 (Dz.U.10.152.1023) amending this Act as of September 4, 2010.

[40)] Article 31c added by Article 11 subparagraph 7 of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[41)] Article 34 paragraph 1 amended by Article 6 subparagraph 5 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[42)] Article 35 paragraph 1 amended by Article 1 subparagraph 1 of the Act of June 25, 2009 (Dz.U.09.115.965) amending this Act as of August 5, 2009.

[43)] Article 35 paragraph 2 amended by Article 1 subparagraph 1 of the Act of June 25, 2009 (Dz.U.09.115.965) amending this Act as of August 5, 2009.

[44)] Article 35a added by Article 6 subparagraph 6 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[45)] Article 35a paragraph 1 amended by Article 6 subparagraph 6 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of March 29, 2006 - cf: decision of the Constitutional Tribunal of March 26, 2006 (Dz.U.06.51.377).

[46)] Article 35a paragraph 2 amended by Article 6 subparagraph 6 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of March 29, 2006 - cf: decision of the Constitutional Tribunal of March 23, 2006 (Dz.U.06.51.377).

[47)] Article 36 paragraph 3 amended by Article 6 subparagraph 7 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[48)] Article 37 paragraph 1 subparagraph 1 amended by Article 1 subparagraph 2 of the Act of June 25, 2009 (Dz.U.09.115.965) amending this Act as of August 5, 2009.

[49)] Article 37 paragraph 3 amended by Article 6 subparagraph 8 letter a) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[50)] Article 37 paragraph 3a amended by Article 6 subparagraph 8 letter a) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[51)] Article 37 paragraph 4 amended by Article 6 subparagraph 8 letter b) of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[52)] Article 38a paragraph 3a added by Article 1 subparagraph 3 letter a) of the Act of June 25, 2009 (Dz.U.09.115.965) amending this Act as of August 5, 2009.

[53)] Article 38a paragraph 4 amended by Article 1 subparagraph 3 letter b) of the Act of June 25, 2009 (Dz.U.09.115.965) amending this Act as of August 5, 2009.

[54)] Article 40b amended by Article 9 of the Act of December 19, 2008 Amending the Freedom of Business Activity Act and Amending Certain Other Acts (Dz.U.09.18.97) as of March 7, 2009.

[55)] Article 47 amended by Article 6 subparagraph 9 of the Act of December 29, 2005 on Transformations and Modifications to the Division of Tasks and Powers of State Bodies Competent for Communications and Broadcasting (Dz.U.05.267.2258) as of January 14, 2006.

[56)] Chapter 7 repealed by Article 11 subparagraph 8 of the Licence Fees Act of April 21, 2005 (Dz.U.05.85.728) as of June 16, 2005.

[57)] Presently: of the Regional Court, pursuant to Article 4 of the Act of December 18, 1998

Amending the Act – Law on the System of Common Courts (Dz.U.98.160.1064) that entered into force as of January 1, 1999,
[58] Presently: of the Real Property Management Act, pursuant to Article 240 of the Real Property Management Act of August 21, 1997 (Dz.U.00.46.543) that entered into force as of January 1, 1998.

Zasady realizowania przez Telewizję Polską S.A. misji publicznej

i bez niej; za koszty przypisane do pozostałej działalności uznaje się koszty, których TVP nie poniosłaby w razie zaniechania pozostałej działalności.

12  Szczegółowe zasady rozdziału przypisywania kosztów pośrednich i ogólnozakładowych do działalności misyjnej i pozostałej określają zasady polityki rachunkowości przyjęte przez TVP.

13  TVP prowadzi działalność poza misją publiczną (pozostałą działalność) jako działalność uboczną, jasno wyodrębnioną od działalności z zakresu misji publicznej. Służy temu w szczególności wydzielenie jednostek prowadzących pozostałą działalność, w szczególności Biura Reklamy, części handlowych innych jednostek organizacyjnych. Podstawowym celem prowadzonej przez TVP pozostałej działalności jest pozyskanie środków potrzebnych na realizację misji publicznej, a prowadzenie przez TVP pozostałej działalności powinno odbywać się bez uszczerbku dla realizacji misji publicznej.

14  Pozostała działalność opiera się na zasadach rynkowych, w szczególności ceny towarów lub usług ustalane są na rozsądnym poziomie rynkowym, i nie mogą być ukształtowane poniżej tego, co jest wymagane dla pokrycia kosztów, które musiałby pokryć w normalnym toku czynności efektywny przedsiębiorca w podobnej sytuacji. Kalkulacja cen oprócz pełnego kosztu obejmuje uzasadniony poziom zysku.

15  Pozostała działalność prowadzona jest na zasadzie samofinansowania. Przychody związane z tą działalnością muszą pokrywać w całości jej koszty. Dyrektor jednostki organizacyjnej realizującej pozostałą działalność jest zobowiązany do bieżącego monitorowania wyniku tej działalności.

16  Nadwyżka przychodów z pozostałej działalności ponad jej koszty przeznaczana jest przez TVP na realizację misji publicznej

Appendix 4

POUFNE Nº (35)

PLF
EXHIBIT NO. (DEF)  H
TRN  FOR ID  4-17-08

(3)

# TV POLONIA BROADCASTING SYSTEMS INC.

## BUSINESS PLAN

SPANSKI ENTERPRISES INC
5100 Montclair Drive
Mississauga, Ontario L5M 5A6
Phone/Fax: (905) 569-9049

TP 7004549

Appendix 4

## TV POLONIA BROADCASTING SYSTEMS INC.

### Business Plan

1. Spis treści ............................................ 2

2. Główne cele ........................................... 3

3. Spanski Enterprises Inc. ............................. 5

4. TV Polonia Broadcasting Systems Inc. ................. 7

5. Network Teleports, Inc. ............................. 10

6. Charakterystyka przedsięwzięcia ..................... 11

7. Analiza rynku ....................................... 17

8. Strategia marketingowa .............................. 20

9. Czasowy plan działania .............................. 24

10. Podsumowanie ....................................... 26

11. Projekcje finansowe ................................ 27

12. Załączniki ......................................... 31

13. Dane techniczne .................................... 38

TP 7004550

Appendix 4

# GŁÓWNE CELE

Spanski Enterprises Inc. stawia sobie za cel
dostarczenie programu TV Polonia jak najszerszym rzeszom
Polaków i ludności polskiego pochodzenia żyjących w Ameryce
Północnej.

Zainteresowanie firmy Spanski Enterprises Inc. (S.E.I.)
retransmisją programu TV Polonia w Ameryce wynika z
konstatacji następujących faktów:

a. liczebność ludności polskiego pochodzenia zamieszkającej
   Amerykę jest bardzo duża i wynosi około dwunastu
   milionów,

b. nasi rodacy przejawiają szczególne przywiązanie do
   ojczyzny, objawiające się między innymi głodem wszelkiego
   rodzaju informacji na temat Polski i z Polski.

Polacy masowo pojawili się na kontynencie amerykańskim
już pod koniec poprzedniego stulecia i od tego czasu ich
liczebność stale rośnie. Warte podkreślenia są dwie fale
polskiej imigracji ostatniego półwiecza, pierwsza - powojenna
i druga - obejmująca lata osiemdziesiąte. Szczególnie ta
ostatnia przyczyniła się do ogromnego wręcz wzrostu liczby
Polaków zamieszkujących kontynent amerykański.

Dla znakomitej większości Polaków oraz obywateli

3

TP 7004551

Appendix 4

amerykańskich polskiego pochodzenia, utrzymywanie kontaktu z
ojczyzną jest sprawą niesłychanie ważną.

Spośród dostępnych obecnie technologii, najlepszym
medium zapewniającym Polonii amerykańskiej kontakt z Polską
jest bez wątpienia program telewizyjny zawierający informacje
i ciekawe materiały na temat kraju ojczystego.

Biorąc pod uwagę wyniki przeprowadzonych w Kanadzie
badań społeczności polskojęzycznej, a także liczebność
Polonii w Ameryce oraz techniczne możliwości retransmisji
programu TV Polonia, firma Spanski Enterprises Inc.
sformułowała następujące cele:

1. Uzyskanie od Telewizji Polskiej S.A. prawa wyłączności na
   retransmisję programu TV Polonia na terenie kontynentu
   amerykańskiego i podpisanie umowy o wspólnym
   przedsięwzięciu.

2. Założenie przez S.E.I. nowej firmy o nazwie TV Polonia
   Broadcasting Systems w celu realizacji zaplanowanego
   przedsięwzięcia.

3. Zawarcie umowy z firmą Network Teleports, Inc. z Nowego
   Orleanu, realizującą wszelkie aspekty techniczne
   dotyczące retransmisji programu TV Polonia.

4. Stworzenie infrastruktury organizacyjnej umożliwiającej
   prowadzenie działalności marketingowej i akwizycyjnej na
   rynku amerykańskim.

5. Osiągnięcie w ciągu pięciu lat liczby dwóch milionów
   abonentów programu TV Polonia oraz zasięgu terytorialnego
   od Kanady po Amerykę Środkową.

4

Appendix 4

# Spanski Enterprises Inc.

Spanski Enterprises Inc. jest istniejącą już od dziesięciu lat korporacją zarejestrowaną w Kanadzie. W okresie swego istnienia firma osiągnęła wielomilionowe zyski. S.E.I. specjalizuje się w realizowaniu projektów o dużym stopniu ryzyka przynoszących jednocześnie wysokie dochody. We wszystkich swych przedsięwzięciach, z których każde zakończyło się sukcesem, S.E.I. opierała się zawsze na najwyższej klasy specjalistach z danej dziedziny.

Spośród zrealizowanych przez S.E.I. projektów można tu wymienić opracowanie i wprowadzenie na rynek północno-amerykański edukacyjnego programu analizy rynku papierów wartościowych o nazwie INVESTOR.

Przedsięwzięciem S.E.I. zakończonym olbrzymim sukcesem było założenie i rozwinięcie firmy wydawniczej, specjalizującej się w wydawnictwach licencyjnych. Firma ta stała się największą tego typu w Kanadzie.

Za kolejny cel S.E.I. postawiła sobie opracowanie i wdrożenie w Polsce systemu finansowego CLUB S International. Zadanie to wymagało dotarcia do struktur rynkowych z jednej strony i kształcenia konsumenta z drugiej. O akceptacji nowum, jakim była karta dyskontowa CLUB S świadczy

5

TP 7004553

**A-2997**

Appendix 4

fakt dynamicznego wzrostu liczby jej posiadaczy, od 70
tysięcy w końcu 92 roku do ponad 360 tysięcy obecnie.   Znak
CLUB S utrwalił się w świadomości konsumenta w całej Polsce.

Działając w wielu dziedzinach, firma S.E.I. uzyskała
doświadczenie niezbędne do wprowadzania w życie
najróżniajszych projektów przy pomocy najbardziej
niekonwencjonalnych i nowatorskich metod.

Na rozruch opisywanego w tym opracowaniu
przedsięwzięcia, Spanski Enterprises Inc. przeznacza kwotę
trzech milionów dolarów amerykańskich.
Udział TVP S.A. w ponoszeniu kosztów nie jest oczekiwany.
Wartym podkreślenia jest fakt, że przy realizacji niniejszego
projektu S.E.I. nie będzie w żadnym stopniu uzależniona od
instytucji finansowych czy też indywidualnych inwestorów,
oraz że inwestowanie własnych środków wiąże się zawsze z dużo
większym zaangażowaniem w dany projekt.

6

TP 7004554

Appendix 4

# TV Polonia Broadcasting
# Systems Inc.

Firma TV Polonią Broadcasting Systems będzie w całości posiadana przez Spanski Enterprises Inc.

W skład rady nadzorczej TV Polonia Broadcasting Systems wchodzić będą:

1. Prezes TVP S.A. lub inna desygnowana przez TVP S.A. osoba
2. Barbara Lamont, prezes Network Teleports, Inc.
3. Bogusław M.Spanski, prezes Spanski Enterprises Inc.
4. Bogusław T.Pisarek
5. Wojciech Sniegowski

Rada nadzorcza TV Polonia Broadcasting Systems będzie ustalała kierunki działania firmy i nadzorowała jej funkcjonowanie.

W skład zarządu TV Polonia Broadcasting Systems, odpowiedzialnego za prowadzenie codziennej działalności operacyjnej firmy, wchodzić będą:

1. Bogusław M.Spanski - prezes - odpowiedzialny za prowadzenie firmy i nadzór nad jej działalnością ekonomiczną

2. Bogusław T.Pisarek - wiceprezes - odpowiedzialny za marketing i promocję

3. Wojciech Sniegowski - wiceprezes - odpowiedzialny za administrację i nadzór nad biurami lokalnymi.

7

TP 7004555

Appendix 4

Bogusław M.Spanski jest polskim finansistą na stałe
zamieszkałym w Toronto w Kanadzie. Należy do nielicznej
grupy Polaków żyjących w Ameryce Północnej, którzy odnieśli
sukces liczący się w tamtejszej hierarchii społecznej. .
Hasłem przewodnim jego działalności jest przeradzanie
śmiałych pomysłów w rzeczywistość. Z wykształcenia jest
architektem z praktyką w krajach Europy Zachodniej (m.in. w
Szwajcarii i we Włoszech), jak również w Kanadzie. Od
pewnego czasu, Bogusław M.Spanski poświęca swą karierę
zawodową projektowaniu i budowie nie obiektów ze stali i
betonu, lecz żywych organizmów, jakimi są firmy, które sam
stworzył i rozwinął w wielu miejscach na świecie.
Bogusław M.Spanski ma 40 lat.

Bogusław T. Pisarek jest głównym managerem firmy CLUB S
International. Z wykształcenia jest socjologiem z ponad
dziesięcioletnią praktyką i doświadczeniem w dziedzinie
marketingu zdobytym w Ameryce Północnej w najbardziej
agresywnie rozwijającej się dziedzinie marketingu i
sprzedaży, jaką są ubezpieczenia. Jako manager specjalizował
się w zagadnieniach związanych z makrogrupami społecznymi.
Znaczna część jego kariery zawodowej przebiegała w Stanach
Zjednoczonych, gdzie Bogusław T.Pisarek koordynował
działalność dużego przedsięwzięcia przeprowadzonego pod
auspicjami rządu kanadyjskiego.
Bogusław T.Pisarek ma 41 lat.

Wojciech Śniegowski jest absolwentem Wydziału Prawa i
Administracji Uniwersytetu Jagiellońskiego w Krakowie.

8

TP 7004556

Appendix 4

Większą część swej kariery zawodowej spędził w Kanadzie,
gdzie był założycielem i właścicielem firmy konsultingowej. W
ramach tej działalności specjalizował się w negocjacjach z
agendami rządowymi. Wojciech Śniegowski prowadzi obecnie
polonijny program telewizyjny w stacji CFMT International w
Toronto. W programie o nazwie "Rozmaitości" jest on
odpowiedzialny za przygotowanie serwisu informacyjnego,
wywiady przed kamerą, produkcję reportaży oraz lokalną
sprzedaż reklam.

Wojciech Śniegowski ma 38 lat.

9

TP 7004557

Appendix 4

# Network Teleports, Inc.

Firma Network Teleports, Inc. jest jednym z liderów na amerykańskim rynku przekazu satelitarnego i przyszłym partnerem TV Polonia Broadcasting Systems we wprowadzaniu programu TV Polonia do Ameryki.

Przez dwadzieścia cztery godziny na dobę Network Teleports, Inc. zapewnia serwis telekomunikacyjny dla ponad dziewięciu milionów widzów i słuchaczy w całych Stanach Zjednoczonych, Kanadzie, Alasce i Ameryce Środkowej.

Bazą działalności firmy jest teleport znajdujący się w Nowym Orleanie w stanie Luizjana. Jedenastometrowe anteny teleportu pokrywają swym zasięgiem obszar od Kanady do Kolumbii i od Hawajów po Bermudy. Network Teleports, Inc. posiada również możliwość bezpośredniego przekazu sygnału znanego jako DBS.

Do szerokiego wachlarza usług oferowanych przez Network Teleports, Inc. należą między innymi: kodowanie i dekodowanie sygnału dla odbiorców telewizji kablowej, produkcja programów telewizyjnych, videokonferencje, pełna obsługa statków na wszystkich czterech oceanach oraz ciągłe monitorowanie odbioru i przekazu sygnału satelitarnego.

Network Teleports, Inc. liczy na owocną i uwieńczoną sukcesem współpracę z TV Polonia Broadcasting Systems we wprowadzaniu TV Polonia do Ameryki.

10

TP 7004558

Appendix 4

# Charakterystyka
## przedsięwzięcia

Główne założenia dotyczące emisji programu TV Polonia w Ameryce przedstawiają się następująco:

1. Przewiduje się emisję programu TV Polonia w wymiarze 16-18 godzin dziennie.

2. Materiały z Polski dostarczane będą częściowo na taśmach, częściowo zaś za pośrednictwem retransmisji satelitarnej.

3. Program TV Polonia będzie retransmitowany przy pomocy sygnału Ku-band uzyskiwanego z satelity Eutelsat w jednym z zachodnioeuropejskich teleportów (downlink) i przekazywanego przez firmę Network Teleports, Inc. do Nowego Orleanu w USA (uplink).

4. Wstawianie spotów reklamowych dokonywane będzie w Ameryce.

5. Do programu wprowadzane będą produkowane w Ameryce polonijne bloki programowe.

6. Część programu zaopatrzona będzie w napisy w języku angielskim.

W celu realizacji opisywanego przedsięwzięcia Spanski Enterprises Inc. (S.E.I.) założy nową firmę o nazwie TV Polonia Broadcasting Systems, początkowo z biurami w USA (Nowy Jork, Chicago, Los Angeles) oraz w Kanadzie (Toronto). Biura te będą miały za zadanie pozyskiwanie i obsługę lokalnych abonentów programu TV Polonia. Wspominane biura

11

Appendix 4

będą również odpowiedzialne za prowadzenie działalności
marketingowej, akwizycję reklam oraz - w przyszłości -
produkcję lokalnych bloków programowych w poszczególnych
regionach.

Przy współpracy z Network Teleports, Inc. z Nowego
Orleanu, TV Polonia Broadcasting Systems zaoferuje swym
abonentom pełną gamę technicznych możliwości odbioru programu
TV Polonia poprzez tradycyjny system odbioru programów
satelitarnych, nowoczesny sysytem DBS oraz za pośrednictwem
firm oferujących połączenia kablowe. Tego typu kompleksowa
oferta daje ogromne możliwości dotarcia do największej liczby
abonentów zainteresownych odbiorem programu TV Polonia.

Tradycyjna metoda odbioru sygnału satelitarnego wymaga
zakupu drogiego sprzętu oraz posiadania odpowiednio dużej
przestrzeni na zainstalowanie talerza satelitarnego o sporych
rozmiarach. Szacuje się, że na kontynencie amerykańskim
liczba posiadaczy tego typu sprzętu wynosi kilkaset tysięcy.
Konieczność umożliwienia im odbioru programu TV Polonia
wydaje się więc oczywista.

Nowa metoda odbioru sygnału satelitarnego DBS (Direct
Broadcasting System) stwarza możliwość powszechnego
udostępnienia sygnału satelitarnego bardzo wysokiej jakości.
Małe rozmiary mini-talerza pozwalają na zainstalowanie go
nawet w niewielkich mieszkaniach czynszowych. Ze względu na
obecną cenę sprzętu (ok.700 USD) prowadzone są negocjacje z
producentem mini-talerzy i dekoderów (RCA) mające na celu

12

Appendix 4

uzyskanie ceny hurtowej na bazie stu tysięcy abonentów.
Negocjacje z instytucjami finansowymi odnośnie udostępnienia
przyszłym abonentom programu TV Polonia atrakcyjnych warunków
leasingowania niezbędnego sprzętu są dalece zaawansowane.
Należy jednocześnie przyjąć za rzecz prawie pewną, że w ciągu
następnych 1-2 lat cena wyżej wspomnianego sprzętu znacznie
zmaleje, czyniąc go tym samym dużo bardziej dostępnym i
powszechnym.

W tych okolicznościach, skorzystanie z systemu DBS -
przy ułatwieniu sfinansowania zakupu sprzętu - pozwoli bez
wątpienia na znaczna i dynamiczne poszerzenie bazy abonentów
zachęconych łatwością uzyskania możliwości odbioru programu
TV Polonia, jaki i innych programów.

Z punktu widzenia potencjalnego odbiorcy, niewątpliwie
najtańszą metodą jest udostępnienie sygnału lokalnym firmom
oferującym połączenia kablowe. Obok opłaty za abonament
lokalnego "kabla", jedynym wydatkiem jest zakup dekodera,
który można również wynająć (lease).

S.E.I. przeprowadziła rozmowy z dużymi dystrybutorami
kablowymi , w wyniku których ustalono, że po uzyskaniu przez
TV Polonia Broadcasting Systems bazy abonenckiej na poziomie
30 tysięcy, program TV Polonia zostanie wprowadzony do
krajowych sieci kablowych w skupiskach polonijnych w Ameryce.

Reasumując, propozycja jednoczesnego wykorzystywania
wszystkich powyżej opisanych metod pozwoli w najkrótszym
czasie dotrzeć do największej liczby abonentów

13

TP 7004561

Appendix 4

zainteresowanych odbiorem programu TV Polonia.

TV Polonia Broadcasting Systems wspólnie z Network Teleport, Inc. jako jedyne przedstawiają tego typu szeroką ofertę dla potencjalnych abonentów programu TV Polonia zamieszkujących kontynent amerykański.

TV Polonia Broadcasting Systems przejmie na siebie wszelkie zobowiązania finansowe wynikające z retransmisji satelitarnej i dalszej dystrybucji sygnału programu TV Polonia w Ameryce, zobowiązując się jednocześnie do podjęcia kompleksowych działań zapewniających retransmisję programu TV Polonia na najdogodniejszych warunkach. Wszystkie koszty operacyjne związane z realizacją tego przedsięwzięcia (w tym opłaty wynikające z ochrony praw autorskich) będą pokrywane przez TV Polonia Broadcasting Systems.

Tak więc TVP S.A. nie poniesie żadnych kosztów związanych z retransmisją programu TV Polonia na terenie kontynentu amerykańskiego.

Dzięki postępom technologicznym, konkurencja na rynku etnicznych programów telewizyjnych jest już znaczna. W samych Stanach Zjednoczonych mieszka obecnie 22 miliony ludzi urodzonych poza granicami tego kraju oraz dużo liczniejsze rzesze urodzonych w USA obywateli amerykańskich o bardzo mocnych więzach z krajami swego pochodzenia. Na ekranach amerykańskich telewizorów można oglądać programy w dwudziestu czterech językach i liczba ta stale rośnie.

14

TP 7004562

A-3006

Appendix 4

Niektóre firmy działające na etnicznym rynku telewizyjnym dążą do stworzenia programów wielokulturowych. Jak pokazuje doświadczenie tego typu stacji telewizyjnych, interesy poszczególnych programów są często sprzeczne. Wątpliwa staje się należyta dbałość o integralność całości i wyraźne oblicze danej stacji. Taka sytuacja bez wątpienia negatywnie wpływa na zawartość programu oraz jego jakość. Ze względu na rozległość i różnorodność rynku potencjalnych odbiorców, trudne jest wyraźne ukierunkowanie działalności marketingowej, która tym samym nie przynosi spodziewanych efektów.

Niemcy, Włosi, Portugalczycy, Irlandczycy, Grecy, Filipińczycy i inni prezentują w Ameryce swe programy o ściśle sprecyzowanym, wyraźnym profilu narodowym, traktując je jako istotną część promocji swych krajów.

Tego typu działania procentuje pozyskiwaniem stałej, wiernej i coraz szerszej liczby abonentów. TV Polonia Broadcasting Systems pragnie zastosować tę wypróbowaną już formułę przy wprowadzaniu programu TV Polonia na rynek amerykański.

Zaopatrzenie części programu w napisy w języku angielskim poszerzy bazę potencjalnych odbiorców programu o ludzi nie mówiących już biegle po polsku. Chodzi tutaj szczególnie o młodzież i dzieci polskiego pochodzenia urodzone w Ameryce.

Dzięki napisom w języku angielskim program dostępny

15

TP 7004563

Appendix 4

będzie również dla Amerykanów i Kanadyjczyków niepolskiego
pochodzenia. Może to mieć niebagatelne znaczenie w
propagowaniu pozytywnego obrazu Polski na kontynencie
amerykańskim.

Zespół fachowców zatrudnionych przez TV Polonia
Broadcasting Systems będzie - pod nadzorem specjalistów z TVP
S.A. - stale dbał o zachowanie wysokiej jakości i
integralności programu TV Polonia nadawanego w Ameryce.

Na terenie Ameryki Północnej mieszka obecnie dwanaście
milionów Polaków i ludności polskiego pochodzenia. Jest to
olbrzymi rynek z nieograniczonymi wręcz możliwościami. Przy
agresywnie przeprowadzonej kampanii marketingowo-akwizycyjnej
TV Polonia Broadcasting Systems przewiduje uzyskanie w ciągu
pierwszych 12-18 miesięcy od podpisania umowy z TVP S.A. bazy
abonenckiej rzędu stu tysięcy, która w ciągu następnych
czterech lat powinna wzrosnąć do ostatecznej liczby około
dwóch milionów.

Według badań opinii publicznej w Ameryce, przeciętna
oglądalność etnicznych programów o dobrej jakości wynosi
około 80 procent. Jak z tego wynika, założenie uzyskania
dwóch milionów abonentów spośród ponad dwunastu milionów
Polaków i ludności polskiego pochodzenia mieszkających w
Ameryce wynika z realistycznej oceny sytuacji.

Dostarczając abonentom wysokiej klasy program, którego
oczekują oraz stwarzając im możliwość jego odbioru, można z
dużą dozą prawdopodobieństwa przypuszczać, że TV Polonia
Broadcasting Systems osiągnie w terminie zamierzone cele,
gwarantując tym samym szybkie uzyskanie stałego poziomu
wysokich dochodów.

16

Appendix 4

# Analiza rynku

W latach osiemdziesiątych cechą charakterystyczną
działalności gospodarczej korporacji amerykańskich było
koncentrowanie się na zadaniach krótkoterminowych. Ostatni
kryzys gospodarczy jasno udowodnił, że brak perspektywicznego
planowania oraz przewidywania trendów długofalowych okazał
się dla wielu firm amerykańskich bardzo kosztownym błędem.
W latach dziewięćdziesiątych nikogo nie stać na tego typu
pomyłki. Szczególnie w planowaniu działalności związanej ze
środkami masowego przekazu, badania rynku odgrywają
niezmiernie istotną rolę.

W celu przygotowania działalności TV Polonia
Broadcasting Systems, w pierwszej połowie 1994 roku
przeprowadzono wieloaspektowe badania społeczności
polskojęzycznej na terenie Kanady. W badaniach nie
uwzględniono przedstawicieli populacji polskiej osiadłych w
Kanadzie przed rokiem 1964-ym. Nie należałoby ich jednak
pomijać jako potencjalnych odbiorców programu TV Polonia,
gdyż stanowią oni około 47 procent spośród ponad
pięciusettysięcznej Polonii kanadyjskiej.

Dzięki przeprowadzonym badaniom stwierdzono istnienie
olbrzymiego zainteresowania programem telewizyjnym z Polski.
Z badań wynika, że największym zainteresowaniem cieszyć się

17

Appendix 4

będą aktualne wiadomości z Polski (98%), ponadto bardzo
popularne będą programy o polskiej sztuce i kulturze (95%),
jak również programy dla dzieci (91%).

Osiemdziesiąt osiem procent badanych wyraziło
zainteresowanie możliwością oglądania polskich filmów na
ekranach swych telewizorów. Wypożyczalnie kaset video pełne
są kopii polskich filmów, ale są one z reguły w nienajlepszym
stanie technicznym. Poza tym, korzystanie z tego typu usług
wymaga każdorazowo wizyty w wypożyczalni, co nie wytrzyma
konkurencji z dogodnością oglądania polskich filmów w ramach
programu telewizyjnego z Polski.

Okazało się, że pomimo dużej ilości informacji na temat
Polski dostępnych w polonijnych stacjach radiowych i prasie,
Polacy oczekują wiadomości telewizyjnych bezpośrednio z
Polski. Wynika to niewątpliwie z ogromnej popularności
telewizji w dzisiejszym świecie. Potwierdzeniem tego stanu
rzeczy jest fakt, że badani oglądają telewizję przeciętnie
3.7 godzin dziennie, podczas gdy radia słuchają około 1.5
godziny, a na czytanie prasy przeznaczają jedynie nieco ponad
12 minut dziennie. Dla 68 procent respondentów telewizja
jest głównym źródłem informacji o świecie.

Ponadto badani uważają, że program telewizyjny z Polski
umożliwi im zachowanie ściślejszych więzów z krajem ojczystym
i jego kulturą. Ma to, według nich, szczególne znaczenie w
odniesieniu do ich dzieci.

18

TP 7004566

Appendix 4

Demograficzna sytuacja w Stanach Zjednoczonych
przedstawia się bardzo podobnie jak w Kanadzie. Zasadniczą
różnicą jest natomiast liczebność ludności polskiego
pochodzenia oceniana w USA na około 12 milionów, podczas gdy,
jak już wspomniano, w Kanadzie wynosi ona 530 tysięcy.

Przeprowadzone badania jasno wykazują istnienie
ogromnego zapotrzebowania na program TV Polonia w Ameryce.

19

TP 7004567

**A-3011**

Appendix 4

# Strategia marketingowa

Cała strategia marketingowa musi być przygotowana w kontekście odpowiedzi na następujące pytania:

- jakie są specyficzne oczekiwania i potrzeby rynku ?
- jaka jest charakterystyka oferowanego produktu ?
- czy korzyści wynikające z jego posiadania zaspakajają oczekiwania i potrzeby konsumenta ?

Strategia marketingowa firmy TV Polonia Broadcasting Systems przewiduje trzy podstawowe elementy, przy pomocy których wywierany będzie wpływ na grupy konsumentów, do których chce się dotrzeć. Są nimi:

1. Produkt
2. Cena
3. Promocja

PRODUKT

Jak w każdym innym przedsięwzięciu należy produkt dostosować do rynku, na którym chce się go sprzedawać. W kontekście programu TV Polonia należy zwrócić uwagę na specyfikę Polonii amerykańskiej, wyrażoną w przeprowadzonych badaniach. Wykazały one istnienie wspólnego dla całej przebadanej grupy szczególnego zainteresowania następującymi segmentami programowymi.

20

TP 7004568

Appendix 4

Stanowią je:

a. wiadomości z Polski, na które oczekuje 98 procent
   ankietowanych,

b. programy o kulturze i sztuce, budzące zainteresowanie
   wśród 95 procent przebadanych,

c. programy dla dzieci oczekiwane przez 91 procent
   respondentów,

d. polskie filmy z 88-mio procentowym poziomem
   zainteresowania.

Wymienione powyżej segmenty programu TV Polonia pozwolą
na opracowanie i rozpowszechnianie materiałów promocyjnych
zaadresowanych do jak najszerszego kręgu przyszłych
odbiorców.

CENA

Jednym z kluczowych elementów marketingu jest ustalenie
właściwej ceny za dany produkt, w tym przypadku stawki
miesięcznego kosztu abonamentu za odbiór programu TV.Polonia.
Jest to szczególnie ważne w sytuacji bardzo szerokiej oferty
programowej rynku telewizyjnego i ostrej konkurencji cenowej.

W Ameryce istnieje obecnie cały szereg lokalnych
programów polonijnych udostępnianych odbiorcom na powszechnie
dostępnych kanałach telewizyjnych w ramach opłaty
stawowej. Cena usługi oferowanej przez TV Polonia

21

TP 7004569

Appendix 4

Broadcasting Systems może być nieco wyższa, ponieważ nikt
inny nie będzie miał podobnie atrakcyjnej oferty programowej.
Szczególnie codzienny, aktualny serwis informacyjny z Polski
stawia opisywane przedsięwzięcie w uprzywilejowanej pozycji.
Ważnymi elementami strategii ustalania właściwej ceny będą
również formy i terminy płatności, dostępne formy
kredytowania oraz możliwości uzyskiwania zniżek.

Dzięki współpracy z Network Teleports, Inc., opłaty
abonamentowe będą pobierane przez firmy dostarczające sygnał
programu TV Polonia bezpośrednio do odbiorcy indywidualnego.

Obecnie ceny programów oferowanych widzom poza
powszechnie dostępnym serwisem kablowym kształtują się na
poziomie 10-12 dolarów amerykańskich miesięcznie.
Założona stawka abonamentowa w wysokości 5 dolarów
amerykańskich miesięcznie za sygnał programu TV Polonia
wydaje się być konkurencyjnie uzasadniona i potwierdzona
analizą rynku.

PROMOCJA

Akcja promocyjna obejmie wszystkie dostępne środki
masowego przekazu: telewizję, radio i prasę. Planuje się
między innymi również takie działania promocyjne jak:
a. wysyłanie ofert na adresy potencjalnych abonentów,
b. konkursy z nagrodami,

22

Appendix 4

c. stały udział lokalnych organizacji polonijnych w
propagowaniu planowanego przedsięwzięcia.

Zakłada się:

a. opracowanie, druk i dystrybucję dwóch milionów broszur
informacyjnych,

b. druk i dystrybucję dwóch milionów formularzy
zgłoszeniowych,

c. opracowanie i wykonanie odpowiednich materiałów
reklamowych dla potrzeb promocji telewizyjnej, radiowej i
prasowej.

Wymieniona powyżej przykłady działań promocyjnych, jak
również agresywnie i w niekonwencjonalny sposób prowadzona
akcja sprzedaży bezpośredniej, zwiększą ogólne
zainteresowanie odbiorem programu TV Polonia.
Zainteresowanie to stanie się z czasem samonapędzającym się
elementem promocji.

Przewidywany udział szeregu organizacji skupiających
rozległe środowiska polonijna w Ameryce nada niewątpliwie
odpowiednio wysoką rangę tworzonemu przez TV Polonia
Broadcating Systems zjawisku.

23

Appendix 4

# Czasowy plan działania

LIPIEC / SIERPIEŃ 1994

Przedstawienie TVP S.A. niniejszego Business Planu oraz
zaprezentowanie technicznych możliwości realizacji projektu.

WRZESIEŃ / PAŹDZIERNIK 1994

Ostateczna decyzja Zarządu TVP S.A.  Po zaakceptowaniu
propozycji S.E.I., podpisania umowy.
Założenie firmy TV Polonia Broadcasting Systems.
Otworzenie biur firmy w Stanach Zjednoczonych (Nowy Jork,
Chicago, Los Angeles) i w Kanadzie (Toronto).
Rozpoczęcie akcji promocyjno-marketingowej.

PIERWSZA POŁOWA 1995

Uzyskanie minimalnej bazy 30.000 (trzydziestu tysięcy)
przyszłych abonentów.
Rozpoczęcie retransmisji programu TV Polonia.

GRUDZIEŃ 1995

Osiągnięcie planowanej liczby 100.000 (stu tysięcy)
abonentów.

GRUDZIEŃ 1996

Osiągnięcie planowanej liczby 200.000 (dwustu tysięcy)
abonentów.

24

A-3016

Appendix 4

GRUDZIEŃ 1997

Osiągnięcie planowanej liczby 500.000 (pięciuset tysięcy) abonentów.

GRUDZIEŃ 1998

Osiągnięcie planowanej liczby 1.000.000 (jednego miliona) abonentów.

GRUDZIEŃ 1999

Osiągnięcie planowanej liczby 2.000.000 (dwóch milionów) abonentów.

TP 7004573

Appendix 4

# Podsumowanie

Jak już powiedziano na wstępie, Spanski Enterprises Inc. stawia sobie za cel dostarczenie programu TV Polonia jak najszerszym rzeszom Polaków i ludności polskiego pochodzenia żyjących w Ameryce Północnej.

Na terenie Ameryki Północnej mieszka obecnie dwanaście milionów Polaków i ludności polskiego pochodzenia. Jest to olbrzymi rynek z nieograniczonymi wręcz możliwościami.

Przeprowadzone badania wykazały istnienie ogromnego zapotrzebowania na program TV Polonia w Ameryce.

Dostarczając abonentom wysokiej klasy program, którego oczekują oraz stwarzając im możliwość jego odbioru, można z dużą dozą prawdopodobieństwa przypuszczać, że TV Polonia Broadcasting Systems osiągnie w terminie zamierzone cele, gwarantując tym samym szybkie uzyskanie stałego poziomu wysokich dochodów.

26

TP 7004574

Appendix 4

# Projekcje finansowe

27

TP 7004575

Appendix 4

TV POLONIA BROADCASTING SYSTEMS INC.

Projected Statement of Operations, unaudited

| in 1000's | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|
| Number of subscribers | 70 | 200 | 500 | 1000 | 2000 |
| REVENUES | | | | | |
| Subscription fees | $2,100 | $12,000 | $30,000 | $60,000 | $120,000 |
| Advertisements | 350 | 2,000 | 5,000 | 10,000 | 20,000 |
| TOTAL Revenues | 2,450 | 14,000 | 35,000 | 70,000 | 140,000 |
| EXPENSES | | | | | |
| Advertising | 1,000 | 2,000 | 3,000 | 5,000 | 6,000 |
| Travel & Promotion | 200 | 400 | 600 | 1,200 | 1,200 |
| Salaries | 300 | 600 | 1,200 | 2,000 | 4,000 |
| Employee benefits | 60 | 120 | 240 | 400 | 800 |
| Management wages | 200 | 400 | 600 | 1,000 | 1,200 |
| Sales commissions | 61 | 350 | 875 | 1,750 | 3,500 |
| Rent | 200 | 600 | 1,200 | 2,000 | 4,000 |
| Administrative expenses | 50 | 50 | 80 | 100 | 120 |
| Repairs & Maintenance | 60 | 100 | 120 | 150 | 200 |
| Telephone | 50 | 80 | 120 | 180 | 250 |
| Teleport services | 1,000 | 4,000 | 5,000 | 7,000 | 9,000 |
| Professional services | 250 | 300 | 500 | 500 | 500 |
| Royalties for TVP S.A. | 195 | 1,120 | 2,800 | 5,600 | 11,200 |
| Copyright royalties | 74 | 420 | 1,050 | 2,100 | 4,200 |
| Bank charges | 10 | 20 | 30 | 40 | 50 |
| Depreciation | 40 | 180 | 400 | 740 | 1,200 |
| Bad debt expense | 123 | 700 | 1,750 | 3,500 | 7,000 |
| TOTAL Expenses | 3,873 | 11,440 | 19,565 | 33,060 | 54,420 |
| INCOME from Operations | (1,423) | 2,560 | 15,435 | 36,940 | 85,580 |
| Income Tax | 0 | 870 | 5,248 | 12,560 | 29,097 |
| NET INCOME (LOSS) | (1,423) | 1,690 | 10,187 | 24,380 | 56,483 |

28

TP 7004576

Appendix 4

TV POLONIA BROADCASTING SYSTEMS INC.

Projected Statement of Cash Flow, unaudited

| In 1000's | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|
| Collection from customers | $2,094 | $11,967 | $29,917 | $59,833 | $119,887 |
| Payment for operating expenses | (3,247) | (9,240) | (15,238) | (25,218) | (40,448) |
| Payment for income tax | 0 | 0 | (870) | (5,248) | (12,560) |
| Acquisition of fixed assets | | | | | |
| - equipment | (100) | (500) | (1,000) | (1,500) | (2,000) |
| - automobiles | (100) | (200) | (100) | (200) | (300) |
| Net Cash Inflow (Outflow) | (1,353) | 2,027 | 12,708 | 27,668 | 64,365 |
| Opening Cash | 3,000 | 1,647 | 3,674 | 16,382 | 44,050 |
| Ending Cash | 1,647 | 3,674 | 16,382 | 44,050 | 108,415 |

· 23

TP 7004577

Appendix 4

## TV POLONIA BROADCASTING SYSTEMS INC.

Projected Balance Sheet, unaudited

| In 1000's | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|
| Cash & cash equivalents | $1,647 | $3,674 | $16,862 | $44,050 | $106,415 |
| Accounts receivable | 233 | 1,333 | 3,333 | 6,667 | 13,333 |
| Other current assets | 504 | 1,263 | 2,011 | 2,107 | 2,234 |
| CURRENT Assets | 2,385 | 6,270 | 21,725 | 52,824 | 123,982 |
| | | | | | |
| Fixed Assets | 200 | 900 | 2,000 | 3,700 | 6,000 |
| less: Accumulated Depreciation | 40 | 180 | 400 | 740 | 1,200 |
| FIXED Assets, net | 160 | 720 | 1,600 | 2,960 | 4,800 |
| | | | | | |
| TOTAL ASSETS | 2,545 | 6,990 | 23,326 | 55,784 | 128,782 |
| | | | | | |
| Accounts payable | 968 | 1,430 | 4,891 | 8,265 | 13,605 |
| Tax payable | 0 | 870 | 5,248 | 12,560 | 29,097 |
| Accrued Liabilities | | | | 7,579 | 26,597 |
| TOTAL LIABILITIES | 968 | 2,300 | 10,139 | 28,404 | 69,299 |
| | | | | | |
| Common Stock | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Retained Earnings | (1,423) | 1,690 | 10,187 | 24,380 | 56,483 |
| SHAREHOLDER's EQUITY | 1,577 | 4,690 | 13,187 | 27,380 | 59,483 |
| | | | | | |
| TOTAL LIABILITIES & EQUITY | 2,545 | 6,990 | 23,326 | 55,784 | 128,782 |

TP 7004578

Appendix 4

Załączniki

31

TP 7004579

Appendix 4



# POPULATION BY AGE
## POLISH GROUP VS. ONTARIO
### 1991 CENSUS

TP 7004580

Appendix 4



72%　　26%

S　　2%

SOURCE OF NEWS

EDUCATIONAL VALUES

88%　　5%

27%

9%　　38%

53%

TP 7004581

A-3025

Appendix 4



TV STATIONS/NETWORKS
POLISH GROUP PREFERENCES

TP 7004582

Appendix 4



# HOW MANY HOURS PER DAY
## DO YOU SPEND ON

TV

RADIO

PRESS

Series 1

TP 7004583

A-3027

Appendix 4



POLISH-LANGUAGE TV
SUBJECT PREFERENCES

SCALE FROM 0 TO 10

TP 7004584

A-3028

Appendix 4

# WOULD YOU LIKE
## POLISH MOVIES ON TV?



YES
88%

I DON'T KNOW
10 %

NO
2%

TP 7004585

Appendix 4

# Dane techniczne

38

TP 7004586

Appendix 4

39

Submitted to: Mr. Bob Spanski, Spanski Enterprises
Submitted by: Network Teleports

# TV POLONIA TRANS-ATLANTIC PROPOSAL

## Current Polish TV Satellite Distribution

Polish TV programming is currently distributed 18 hours daily
throughout Europe via Eutelsat II C3 transponder 21S located at
16.9 degrees east longitude. The transmission consists of one
analog PAL video carrier in the clear.

## Objective: North American Distribution

To provide Spanski Enterprises with a cost-effective full-time
trans-Atlantic satellite feed of Polish TV, and to distribute TV
Polonia programming throughout North America.

A-3031

Appendix 4

40

Submitted to Mr. Bob Spanski, Spanski Enterprises
Submitted by Network Teleports

# TV POLONIA SERVICE

++ Network Teleports proposes to "turnaround" Polish TV's Eutelsat programming and transmit live to their Teleport, 24 hours per day, seven days per week.

++ Network Teleports proposes to lease 9 Mhz of Ku-Band satellite capacity on the PanAmSat PAS-1 satellite for compressed digital video (CDV) delivery of Polish TV programming from Poland to the Teleport in New Orleans, Louisiana.

++ The PAS-1 satellite, currently operational at 45 degrees West longitude, covers the North American continent with Ku-Band coverage via the Conus Beam.

++ Network Teleports considers Compressed Digital Video to be the most economical means of reaching major markets. 30 CDV channels are presently broadcast on the PAS-1 satellite, including such broadcasters as the BBC, CBS International, ESPN, Fox, HTV, TV5 and NBC.

++ The attached engineering link budget is based on the use of General Instruments Single Channel Per Carrier (SCPC) technology.

++ Network Teleports proposes to convert the signal to NTSC video standards for North American transmission, and re-broadcast (initially at full bandwidth analog video), using a C-Band domestic satellite whose footprint covers 35 nations.

++ Some of the programs on TV Polonia will be carried "live" directly from Eutelsat, others will be tape delayed, with the goal of producing a "seamless" video network complete with logos, graphics, commercials and eventually local programming inserts.

++ TV Polonia will be an encrypted subscriber service designed for Direct-to-Home reception as well as cable and wireless carriage.

Appendix 4

41

Submitted to: Mr. Bob Spanski, Spanski Enterprises
Submitted by: Network Teleports

---

## NETWORK TELEPORTS PRICING

Network Teleports proposes to Spanski Enterprises the following rate for 9 Mhz of Ku-band Conus Beam satellite capacity on PanAmSat's PAS-1 satellite, Eutelsat turnaround, conversion to NTSC, downlink in New Orleans, transmission on C-Band North American satellite and encryption.

U.S. 145,000 Per month

Space segment, both transatlantic and domestic, is offered at either a 5 year term or an End-Of-Life (EOL) service term, estimated to be 6.5 years. Payments are monthly, payable in advance, plus one month's deposit in advance of commencement of service.

## SATELLITE AVAILABILITY

All satellite space segment is subject to availability, engineering approval and execution of a definitive contract. The information contained herein is proprietary and confidential.

July 30, 1994

TP 7004589

Appendix 4

42

# NETWORK TELEPORTS, INC.

## COUNTRIES REACHED ON GALAXY VII

Canada
United States Incl. Alaska & Hawaii)
Mexico
Guatemala
Belize
El Salvador
Honduras
Nicaragua
Costa Rica
Panama
Colombia
Venezuela
Guyana
Surinam
French Guiana
Cuba
Haiti
Dominican Republic
Puerto Rico
St. Kitts and Nevis
Antigua and Barbuda
Dominica
St. Lucia
Granada
Trinidad and Tobago
Aruba (Neth. Ant.)
Curacao (Neth Ant.)
St. Vincent & Grens.
Barbados
Jamaica
Bahamas
British Virgin Islands
Bermuda
Grand Turk Island
Martinique
Guadeloupe
Anguilla
Monserrat

3200 Chartres Street • New Orleans, LA 70117 • (504) 942-9200 • (504) 942-9204 Fax

47.

TP 7004590

Appendix 4

43

SATELLITE DETAILS

## GALAXY VII

### Degrees East: -269.0    Degrees West: -91

OWNER/OPERATOR: HUGHES COMMUNICATIONS, INC.

PRESENT STATUS: ............................................................................................ UNDER CONSTRUCT
TYPE OF SERVICE: ................................................................................................................... F
TYPICAL USES: ............................................................................ VIDEO, AUDIO, SCPC & V
GEOGRAPHIC COVERAGE: .................................................. CONUS, ALASKA, HAWAII, PUERTO F
LAUNCH DATE: ................................................................................................................... LATE 1
LAUNCH VEHICLE: ............................................................................................................... ARIAI
MASS IN ORBIT: ........................................................................................................... 637 kg (E
TYPE OF SATELLITE: ................................................................................................................ HS-
PRIME CONTRACTORS: ................................................................................. HUGHES AIRCRAFT
DESIGN LIFETIME: .................................................................................................................. 12 YE
POLARIZATION: ..................................................................................................................... LINE
STABILIZATION: ......................................................................................................................... BC
DIMENSIONS: .................................................................................. 6.57 M LONG; 2.16 M DIAGOI
BANDWIDTH: ................................................................................. 36 MHz / 16@27MHz, 8@54I
NO. OF - C BAND: ...........................................................................................................................
NO. OF - K BAND: ...........................................................................................................................
FREQUENCY BAND: ...................................................................................................................... C
TWTA POWER: ...................................................................... C-BAND16 WATT, K-BAND 50 W/

## GALS (2 AT 44° E)

### Degrees East: -044.0    Degrees West: -316

OWNER/OPERATOR: INTERSPUTNIK
2 SMOLENSKY, 1/4
MOSCOW. 121099
RUSSIA

CONTACT PERSON: S. P. KURILOV

TEL: 224-03-33
TELEX: 411 288 DISK-SU

PRESENT STATUS: ............................................................................................ UNDER CONSTRUCTI
TYPE OF SERVICE: ................................................................................................................... F
TYPICAL USES: ............................................................................................... TELECOMMUNICATIO
LAUNCH DATE: ................................................................................................................... JUNE 1
LAUNCH VEHICLE: ............................................................................................................... PROT
MASS IN ORBIT: ....................................................................................................................... 2500
PRIME CONTRACTORS: ............................................... NPO - SCIENTIFIC PRODUCTION ASSOCIATI
DESIGN LIFETIME: .......................................................................................................... 5 TO 7 YEA
NO. OF - K BAND: ...........................................................................................................................
FREQUENCY BAND: ...........................................................................................................................

9 - 94

Appendix 4

44



TP 7004592

Appendix 4

45

SATELLITE DETAILS

## PALAPA B4

OWNER/OPERATOR: PERUMTEL

| | |
|---|---|
| PRESENT STATUS:- | AWAITING LAUNCH |
| TYPE OF SERVICE :- | FSS |
| TYPICAL USES:- | COMMUNICATIONS |
| GEOGRAPHIC COVERAGE:- | ASIAN AREAS |
| LAUNCH DATE:- | 1992 |
| LAUNCH VEHICLE:- | DELTA |
| LAUNCH WEIGHT:- | 647 KG |
| MASS IN ORBIT:- | 520 KG |
| TYPE OF SATELLITE:- | HS 376 |
| PRIME CONTRACTORS:- | HUGHES AIRCRAFT COMPANY |
| DESIGN LIFETIME:- | 10 YEARS |
| POLARIZATION:- | DUAL POLARIZATION |
| STABILIZATION :- | SPINNER |
| DIMENSIONS:- | 85" DIAMETER/269" HEIGHT |
| BANDWIDTH:- | 36 MHz |
| NO. OF - C BAND:- | 24 |
| FREQUENCY BAND:- | C |
| ERP - MAIN BEAM:- | 32 dBW ASIAN COVERAGE |
| ERP SPOT BEAMS:- | 34 dBW INDONESIAN COVERAGE |
| TWTA POWER:- | 9.6 WATT |
| ELECTRIC POWER:- | 917.2 WATT (EOL) / 29. 6 BOLT |
| TELEMETRY BEACONS:- | 4200 |
| COMMAND BEACON:- | C BAND |

## PANAMSAT (PAS-1)

### Degrees East: -315.0      Degrees West: -45

OWNER/OPERATOR: ALPHA LYRACOM/PAN AMERICAN SATELLITE
ONE PICKWICK PLAZA
GREENWICH, CT  06830
USA

CONTACT PERSON: ELIZABETH DICKENS

TEL: (203) 622-6664
FAX: (203) 622-9163

| | |
|---|---|
| PRESENT STATUS:- | OPERATIONAL |
| TYPE OF SERVICE :- | FSS |
| TYPICAL USES:- | TV BROADCAST & DATA |
| GEOGRAPHIC COVERAGE:- | N. AMERICA, S. AMERICA, WESTERN EUROPE & CARIBBEAN |
| LAUNCH DATE:- | JUNE 15, 1988 |
| LAUNCH VEHICLE:- | ARIANE 401 |
| LAUNCH WEIGHT:- | 2960 lbs |
| MASS IN ORBIT:- | 1560 lbs |
| TYPE OF SATELLITE:- | GE ASTRO SERIES 3000 |
| PRIME CONTRACTORS:- | GE ASTRO SPACE |
| DESIGN LIFETIME:- | 13.3 YEARS |
| POLARIZATION:- | LINEAR |
| STABILIZATION :- | 3-AXIS |
| BANDWIDTH:- | 36 AND 72 MHz |
| NO. OF - C BAND:- | 12 @ 36MHz; 6 @ 72MHz |

INTERNATIONAL SATELLITE DIRECTORY                                  9 - 203

TP 7004593

Appendix 4

TP 7004594

# PanAmSat
## Link Budget Results

**Customer: Network Teleport**

The following are the data link budget results you requested for the 6.73Mbps, QPSK, R3/4 carrier on PAS-1/3

| Satellite | Uplink Site | Uplink Antenna (Size) | Downlink Site / Receive EIRP | Approx. Antenna Size-Minimum G/T | % of Trans Bandwidth | % of Trans Power | Difference Factor |
|---|---|---|---|---|---|---|---|
| PAS-1 | Warsaw/Paris | 2.4m | New Orleans / 42.3dBW | 5.0m - 30.9dB/K | 11.71 | 12.716 | 1.14 |
| | | | | 5.0m - 23.0dB/K* | 11.111 | 10.786 | 0.97 |
| PAS-3 | | | New Orleans / 45.5dBW | 2.7m - 26.6dB/K | 14.815 | 8.734 | 0.59 |

Notes:

1) Carrier specifications: 6.73Mbps, QPSK, R3/4 – C/N of 7.0 dB degraded       * 45 degree LNB!!

2) Transponder Operating Conditions:-

    -This is a 72MHz Transponder on the Conus Beam of PAS-1, IBO = 5.0 dB, OBO = 4.4 dB, attenuator setting is 6 dB

    -This is a 54MHz Transponder on the Conus Beam of PAS-3, IBO = 5.2 dB, OBO = 3.5 dB, attenuator setting is 11 dB

3) A minimum of 2.5/3.5 dB rain, a 1.0 dB system and a .5 dB downlink pointing error margin are included in all calculations

4) Receive earth station G/T is controlling factor

7/2/54
NETWORK.XLS
Engineering and Operations Department
Modelis/Seyoud

Appendix 4

47

PAS-1 6.73MBPS QPSK R3/4 TO NEW ORLEANS 5.0M

```
--- TRANSMIT EARTH STATION DATA ---        --- RECEIVE EARTH STATION DATA ---
Location           : WARSAW, POLAND        Location          : NEW ORLEANS, LA
Latitude  (deg N): 52.22.                  Latitude  (deg N): 30.00
Longitude (deg W): -21.00                  Longitude (deg W): 90.08
Diameter      (m): 2.4                     Diameter      (m): 5.0
Tx Gain      (dB): 49.0                    Rx Gain      (dB): 53.5
Manufacturer/Model: STANDARD/              Feed Loss    (dB): 0.25
                                           Ant. Temp.(deg K): 45
                                           LNA. Temp.(deg K): 110
                                           Nominal G/T (dB/K): *
                                           Manufacturer/Model: STANDARD/

                    SATELLITE NAME       : PAS-1,
                    SATELLITE LONGITUDE  : 45
                    TRANSPONDER BW (MHz) : 72.0
                    TRANSPONDER TYPE     : TWTA
                    CARRIERS/TRANSPONDER : *

--- Uplink ---                             --- Downlink ---
Beam: CONUS+EUR, V                         Beam: CONUS, H
Chan: 23                                   Chan: 23
Uplink Frequency     (GHz): 14.360         Downlink Frequency (GHz): 11.820
G/T, Beam Center    (dB/K): -.9            EIRP, Beam Center  (dBW): 44.3
G/T Toward Tx ES    (dB/K): -3.0           EIRP Toward Rx ES  (dBW): 42.3
SFD Toward Tx ES [dBW/m2]: -80.1

--- DIGITAL CARRIER PARAMETERS ---         --- OPERATING CONDITIONS ---
Information Rate   (kBps): 6730            Trans. Attenuator Setting (dB): 6
Modulation Type         : QPSK            Input Backoff          (dB): 8
Code Rate               : R3/4            Output Backoff         (dB): *
Overhead\Other Info.    : GI-SCPC         (C/Im) - Nominal       (dB): *
Occupied Bandwidth (kHz): 6000            Required System Margin (dB): 1.0
Allocated Bandwidth (kHz): 8000           Uplink  Co-Chan (C/I)  (dB): 60.0
C/N      (clear sky, dB): 7.0             Downlink Co-Chan (C/I) (dB): 60.0
C/N (rain conditions, dB): 7.0            Downlink Pointing Error (dB): 0.5
                                          Min. Uplink Rain Margin (dB): 2.5
                                          Min. Dnlink Rain Margin (dB): 3.5

--- ADJACENT SATELLITE INTERFERENCE ASSUMPTIONS ---
Satellite Name                    : PAS3      ISVIIA
Satellite Longitude               : 43.0      40.5
Uplink Power Density or C/I (dBW/Hz): -46     -43
Uplink Polarization Advantage  (dB): 0        0
Downlink EIRP Density or C/I (dBW/Hz): -23.5  -32.4
Downlink Polarization Advantage (dB): 90.0    0
--- CALCULATED TRANSMIT EARTH STATION PARAMETERS ---
Satellite Azimuth (deg) : 250.6   Satellite Elevation (deg):  5.8
Gain at Specified Uplink Freq.       (dB): 49.1
Path Loss at Specified Uplink Freq.  (dB): 207.9
--- CALCULATED RECEIVE EARTH STATION PARAMETERS ---
Satellite Azimuth (deg) : 116.5   Satellite Elevation (deg): 30.2
Gain at Specified Downlink Freq.     (dB): 53.4
Path Loss at Specified Downlink Freq. (dB): 205.6
G/T at Specified Downlink Freq.      (dB/K): 30.9

PASS (Version 2.1) 07-12-1994  10:01:45 *** PARAMETER Engineering ***
```

Appendix 4

48

## PAS-1 6.73MBPS QPSK R3/4 TO NEW ORLEANS 5.0M

Satellite : PAS-1
Uplink Beam: CONUS+EUR, V          TX Es: 2.4m , WARSAW, POLAND
Dlink Beam: CONUS, H               Rx En: 5.0m , NEW_ORLEANS, LA

| LINK PERFORMANCE (6730 KBPS QPSK R3/4) | | CLEAR SKY | UP FADE | DN FADE |
|---|---|---|---|---|
| **UPLINK** | | | | |
| EARTH STATION EIRP | (DBW) | 66.2 | 66.2 | 66.2 |
| PTH LOSS (CLEAR SKY) | (DB) | 207.9 | 207.9 | 207.9 |
| UPLINK RAIN ATTENUATION | (DB) | 0.0 | 2.5 | 0.0 |
| SATURATION FLUX DENSITY | (DBW/M2) | -80.1 | -80.1 | -80.1 |
| INPUT BACKOFF (TOTAL) | (DB) | 8.0 | 8.2 | 8.0 |
| INPUT BACKOFF (PER CARRIER) | (DB) | 17.0 | 19.5 | 17.0 |
| SATELLITE G/T | (DB/K) | -3.0 | -3.0 | -3.0 |
| C/N - THERMAL NOISE | (DB) | 16.1 | 13.6 | 16.1 |
| C/I - CO-CHANNEL INTERFERENCE | (DB) | 60.6 | 58.1 | 60.6 |
| C/I - ADJ SAT INTF (PAS3 ) | (DB) | 24.2 | 21.7 | 24.2 |
| C/I - ADJ SAT INTF (ISV11A ) | (DB) | 30.4 | 27.9 | 30.4 |
| C/(N+I) UPLINK | (DB) | 15.4 | 12.9 | 15.4 |
| C/I - INTERMODULATION | (DB) | 16.0 | 13.9 | 16.0 |
| **DOWNLINK** | (DB) | | | |
| SATELLITE EIRP (TOTAL) | (DBW) | 42.3 | 42.3 | 42.3 |
| OUT BACKOFF (TOTAL) | (DB) | 4.6 | 4.8 | 4.6 |
| OUTPUT BACKOFF (PER CARRIER) | (DB) | 13.6 | 16.0 | 13.6 |
| SATELLITE EIRP (PER CARRIER) | (DBW) | 28.7 | 26.3 | 28.7 |
| PTH LOSS (CLEAR SKY) | (DB) | 205.6 | 205.6 | 205.6 |
| DWNLINK RAIN DEGRADATION | (DB) | 0.0 | 0.0 | 4.4 |
| EARTH STATION POINTING ERROR | (DB) | 0.5 | 0.5 | 0.5 |
| EARTH STATION G/T (CLEAR-SKY) | (DB/K) | 30.9 | 30.9 | 30.9 |
| C/N-THERMAL NOISE | (DB) | 14.1 | 11.9 | 9.8 |
| C/I - CO-CHANNEL INTERFERENCE | (DB) | 60.6 | 58.2 | 60.6 |
| C/I - ADJ SAT INTF (ISV11A ) | (DB) | 34.3 | 31.9 | 34.3 |
| C/(N+I) DOWNLINK | (DB) | 14.2 | 11.8 | 9.8 |
| C/(N+I) TOTAL | (DB) | 10.4 | 8.0 | 8.0 |
| REQUIRED SYSTEM MARGIN | (DB) | 1.0 | 1.0 | 1.0 |
| NET C/(N+I) | (DB) | 9.4 | 7.0 | 7.0 |

ALLOTED BW. (KHZ/CARRIER)= 8000.00  OCCUPIED BW (KHZ/CARRIER)= 6000.00
MAX RF POWER (WATTS/CARRIER)=  51.24  Uplink Power Density (dBW/Hz)= -49.83
NR OF CARRIERS PER TRANS.=  7.86  Dnlink EIRP Density (dBW/Hz)= -38.27
NOIS BW. (PER CARRIER)=  11.111  Maximum EIRP Density (dBW/Hz)= -36.27
NOIS POWER (PER CARRIER)= -12.738  Dnlink Flux Den.(dBW/m2/4KHz)= -164.95

TP 7004596

Appendix 4

49

PAS-2 6.73MBPS QPSK R3/4 TO NEW ORLEANS 5.0M (BETTER LNB)

Satellite : PAS-1
Uplink Beam: CONUS+EUR,_V          Tx Es: 1.4m , WARSAW, POLAND
Dnlink Beam: CONUS,_H              Rx Es: 5.0m , NEW ORLEANS, LA

| LINK PERFORMANCE (6730 KBPS QPSK R3/4) | | CLEAR SKY | UP FADE | DN FADE |
|---|---|---|---|---|
| **UPLINK** | | | | |
| EARTH STATION EIRP | (DBW) | 65.4 | 65.4 | 65.4 |
| PATH LOSS (CLEAR SKY) | (DB) | 207.9 | 207.9 | 207.9 |
| UPLINK RAIN ATTENUATION | (DB) | 0.0 | 2.5 | 0.0 |
| SATURATION FLUX DENSITY | (DBW/M2) | -80.1 | -80.1 | -80.1 |
| INPUT BACKOFF (TOTAL) | (DB) | 8.0 | 8.2 | 8.0 |
| INPUT BACKOFF (PER CARRIER) | (DB) | 17.7 | 20.2 | 17.7 |
| SATELLITE G/T | (DB/K) | -3.0 | -3.0 | -3.0 |
| C/N - THERMAL NOISE | (DB) | 15.4 | 12.9 | 15.4 |
| C/I - CO-CHANNEL INTERFERENCE | (DB) | 59.9 | 57.4 | 59.9 |
| C/I - ADJ SAT INTF (PAS3 | ) (DB) | 23.5 | 21.0 | 23.5 |
| C/I - ADJ SAT INTF (ISVIIA | ) (DB) | 29.6 | 27.1 | 29.6 |
| C/(N+I) UPLINK | (DB) | 14.6 | 12.1 | 14.6 |
| C/I - INTERMODULATION | (DB) | 15.3 | 13.1 | 15.3 |
| | (DB) | | | |
| **DOWNLINK** | | | | |
| SATELLITE EIRP (TOTAL) | (DBW) | 42.3 | 42.3 | 42.3 |
| OUTPUT BACKOFF (TOTAL) | (DB) | 4.6 | 4.8 | 4.6 |
| OUTPUT BACKOFF (PER CARRIER) | (DB) | 14.3 | 16.7 | 14.3 |
| SATELLITE EIRP (PER CARRIER) | (DBW) | 28.0 | 25.6 | 28.0 |
| PATH LOSS (CLEAR SKY) | (DB) | 205.6 | 205.6 | 205.6 |
| DOWNLINK RAIN DEGRADATION | (DB) | 0.0 | 0.0 | 5.4 |
| EARTH STATION POINTING ERROR | (DB) | 0.5 | 0.5 | 0.5 |
| EARTH STATION G/T (CLEAR-SKY) | (DB/K) | 33.0 | 33.0 | 33.0 |
| C/N THERMAL NOISE | (DB) | 15.7 | 13.3 | 10.3 |
| C/I - CO-CHANNEL INTERFERENCE | (DB) | 59.9 | 57.4 | 59.9 |
| C/I - ADJ SAT INTF (ISVIIA | ) (DB) | 33.6 | 31.2 | 33.6 |
| C/(N+I) DOWNLINK | (DB) | 15.6 | 13.2 | 10.3 |
| C/(N+I) TOTAL | (DB) | 10.4 | 8.0 | 8.0 |
| REQUIRED SYSTEM MARGIN | (DB) | 1.0 | 1.0 | 1.0 |
| NET C/(N+I) | (DB) | 9.4 | 7.0 | 7.0 |

ALLOCATED BW    (KHZ/CARRIER) = 8000.00: OCCUPIED BW     (KHZ/CARRIER) = 6000.00
   RF POWER (WATTS/CARRIER) =   43.37: Uplink Power Density (dBW/Hz) =  -50.65
NUMBER OF CARRIERS PER TRANS. =    9.00: Dnlink EIRP Density (dBW/Hz) =  -38.99
   TRANS BW    (PER CARRIER) =   11.111: Maximum EIRP Density (dBW/Hz) =  -36.99
TRANS POWER   (PER CARRIER) =   10.766: Dnlink Flux Den.(dBW/m2/4KHz) = -165.68

ITIS21(version 2.2)  07-12-1994 : 10:08:03    PANAMSAT Engineering Inc.

TP 7004597

Appendix 4

50

PAS-1 6.73MBPS QPSK R3/4 TO NEW ORLEANS 5.0M (BETTER LNB)

```
--- TRANSMIT EARTH STATION DATA ---      --- RECEIVE EARTH STATION DATA ---
Location        : WARSAW, POLAND          Location        : NEW ORLEANS, LA
Latitude  (deg N): 52.22                  Latitude  (deg N): 30.00
Longitude (deg W): -21.00                 Longitude (deg W): 90.08
Diameter      (m): 2.4                    Diameter      (m): 5.0
Tx Gain     (dB): 49.0                    Rx Gain     (dB): 53.5
Manufacturer/Model: STANDARD/             Feed Loss   (dB): 0.25
                                          Ant. Temp.(deg K): 45
                                          LNA  Temp.(deg K): 45
                                          Nominal G/T (dB/K): *
                                          Manufacturer/Model: STANDARD/

                   SATELLITE NAME    : PAS-1
                   SATELLITE LONGITUDE  : 45
                   TRANSPONDER BW (MHz): 72.0
                   TRANSPONDER TYPE  : TWTA
                   CARRIERS/TRANSPONDER: *

------ Uplink ------                      ------ Downlink ------
Beam: CONUS+EUR_V                         Beam: CONUS_H
Chan: 23                                  Chan: 23
Uplink Frequency   (GHz): 14.340          Downlink Frequency (GHz): 11.820
G/T, Beam Center  (dB/K): -.9             EIRP, Beam Center  (dBW): 44.3
G/T Toward Tx ES  (dB/K): -3.0            EIRP Toward Rx ES  (dBW): 42.3
SFD Toward Tx ES (dBW/m2): -80.1

--- DIGITAL CARRIER PARAMETERS ---        --- OPERATING CONDITIONS ---
Information Rate  (kBps): 6730            Trans. Attenuator Setting (dB): 6
Modulation Type   : QPSK                  Input Backoff       (dB): 8
Code Rate         : R3/4                  Output Backoff      (dB): *
Overhead\Other Info.  : GI-SCPC           (C/Im) - Nominal    (dB): *
Occupied Bandwidth (kHz): 6000            Required System Margin (dB): 1.0
Allocated Bandwidth (kHz): 8000           Uplink  Co-Chan (C/I) (dB): 60.0
(clear sky, dB): 7.0                      Downlink Co-Chan (C/I) (dB): 60.0
C/N (rain conditions, dB): 7.0            Downlink Pointing Error (dB): 0.5
                                          Min. Uplink Rain Margin (dB): 2.5
                                          Min. Dnlink Rain Margin (dB): 3.5

------ ADJACENT SATELLITE INTERFERENCE ASSUMPTIONS ------
Satellite Name                  : PAS3        ISVIIA
Satellite Longitude             : 43.0        40.5
Uplink Power Density or C/I (dBW/Hz): -46      -43
Uplink Polarization Advantage   (dB): 0        0
Dnlink EIRP Density or C/I  (dBW/Hz): -23.5    -32.4
Dnlink Polarization Advantage   (dB): 90.0     0
------ CALCULATED TRANSMIT EARTH STATION PARAMETERS ------
Satellite Azimuth (deg) : 250.6   Satellite Elevation (deg): 5.8
Gain at Specified Uplink Freq.     (dB): 49.1
Path Loss at Specified Uplink Freq.  (dB): 207.9
------ CALCULATED RECEIVE EARTH STATION PARAMETERS ------
Satellite Azimuth (deg)  : 116.5   Satellite Elevation (deg): 30.2
Gain at Specified Downlink Freq.     (dB): 51.4
Path Loss at Specified Downlink Freq. (dB): 205.6
G/T at Specified Downlink Freq.   (dB/K): 33.0

DSATIZ2 (Version 2.1), 07-12-1994  10:08:00 *** PanAmSat Engineering, CT **
```

TP 7004598

Appendix 4

Hand-written: <u>CONFIDENTIAL</u>

# TV POLONIA BROADCASTING SYSTEMS INC.

## BUSINESS PLAN

SPANSKI ENTERPRISES INC
5100 Montclair Drive
Mississauga, Ontario L5M 5A6
Phone/Fax: (905) 569-9049

TP8000639

Appendix 4

## TV POLONIA BROADCASTING SYSTEMS INC.

### Business Plan

1.  Contents ................................................................................................................ 2

2.  Main Aims ............................................................................................................ 3

3.  Spanski Enterprises Inc............................................................................................ 5

4.  TV Polonia Broadcasting Systems Inc..................................................................... 7

5.  Network Teleports, Inc............................................................................................ 10

6.  Characteristic of Enterprise ................................................................................... 11

7.  Market Analysis ................................................................................................... 17

8.  Marketing Strategy .............................................................................................. 20

9.  Work Schedule...................................................................................................... 24

10.  Summary ............................................................................................................ 26

11.  Financial Projections............................................................................................ 27

12.  Appendices .......................................................................................................... 31

13.  Technical Data..................................................................................................... 38

TP8000640

Appendix 4

# MAIN AIMS

The aim of Spanski Enterprises Inc. is providing TV Polonia channel to as many Poles and populations with Polish roots, who live in North America.

The interest of the company Spanski Enterprises Inc. (S.E.I.) in retransmission of TV Polonia channel in North America results from ascertainment of the following facts:

a   The size of population with Polish roots, which inhabits America, is very big and amounts to ca. twelve million,

b.   Our compatriots show special devotion to the homeland, which manifests among other things with the want of any information about Poland and from Poland.

Poles appeared on the American continent in masses at the end of the previous century and since that time their population still increases. Two waves of Polish emigration in the last half-century are worth emphasizing; the first – post-war and the other – in the eighties. Especially the second wave contributed to the significant increase of the number of Poles inhabiting the American continent.

For the majority of Poles and American citizens with Polish roots, keeping in touch with the homeland is a very important matter.

Among the currently available technologies, the best medium that provides Polish Association with the contact with Poland is undoubtedly a TV channel, which offers information and interesting materials regarding the homeland.

Appendix 4

Considering the results of research on the Polish-speaking society, conducted in Canada and the size of Polish population in America, as well as technical potential of retransmission of TV Polonia, the company Spanski Enterprises Inc. established the following aims:

1. Obtaining the exclusive right for retransmission of TV Polonia channel on the area of the American continent from Telewizja Polska S.A., and concluding a joint venture contract

2. Founding a new company by the name TV Polonia Broadcasting Systems by S.E.I. for the purpose of execution of the scheduled enterprise.

3. Concluding a contract with the company Network Teleports, Inc. from New Orleans, which takes deals with all technical aspects regarding the retransmission of the TV Polonia channel.

4. Creating an organizational infrastructure, which enables running marketing and acquisition activity on the American market.

5. Reaching the level of two million of TV Polonia subscribers within five years and the territorial range from Canada to the Central America.

TP8000642

Appendix 4

# Spanski   Enterprises   Inc.

Spanski Enterprises Inc. is a corporation registered in Canada and it has been running for ten years. During this period the company reached multi-million gains. S.E.I. specializes in execution of projects with large degree of risks and simultaneously providing large incomes. In all its enterprises, all of them successful, S.E.I. has always based itself on specialists of the highest class in their field.

Among the projects executed by S.E.I., there is for example elaboration and introduction to the Northern American market of an educational program for market analysis of securities by the name INVESTOR.

The successful enterprise of S.E.I. was establishment and development of a publishing company, which specializes in licensing publishing. This company became the largest in its trade in Canada.

The next aim of S.E.I. is to elaborate and implement the financial system CLUB S International in Poland.
This task required both reaching the market structures and training the consumer. Acceptance of the innovation, which was the CLUB S discount card, is proven by dynamic growth of the number of its holders, from 70 thousand at the end of the year 1992, to over 360 thousand presently. The consumers in the whole Poland remembered the mark CLUB S.

Acting on many fields, the company S.E.I. has gained the necessary experience to implement different kinds of projects with the help of the most unconventional and innovatory methods.

TP8000643

A-3047

Appendix 4

For start-up of the herein described enterprise, Spanski Enterprise Inc. assigns the amount of three million American dollars.

Participation of TVP S.A. in bearing costs is not expected. Worth emphasising is the fact that during execution of the present project S.E.I. shall not be dependent from financial institutions or individual investors, and that investment of own resources is always connected with much greater commitment in the particular project.

A-3048

Appendix 4

# TV Polonia Broadcasting Systems Inc.

The company TV Polonia Broadcasting Systems shall be owned in whole by Spanski Enterprises Inc.

The supervisory board of TV Polonia Broadcasting Systems shall be composed of:

1. President TVP S.A. or other person designated by TVP S.A.
2. _____ President of Network Teleports, Inc.   BARBARA LAMONT
3. _____ President of Spanski Enterprises Inc.   BOGUSŁAW M. SPANSKI
5. WOJCIECH ŚNIEGOWSKI   4. BOGUSŁAW T. PISAREK

The supervisory board of TV Polonia Broadcasting Systems shall define the directions of the company's activities and supervise its functioning.

The board of directors of TV Polonia Broadcasting Systems, responsible for conducting everyday operational activity of the company, shall be composed of:

1. Bogusław Spanski – President – responsible for running the company and supervision over its economic activity
2. Bogusław T. Pisarek – Vice-president – responsible for marketing and promotion
3. Wojciech Śniegowski – Vice-president – responsible for administration and control of local offices.

TP8000645

Appendix 4

Bogusław Spanski is a Polish financier residing in Toronto, Canada. He belongs to the small group of Poles living in North America, who are successful in the local social ranking. The leading motto of his activity is converting daring concepts into reality. He is architect by profession, with experience in the Western European countries (e.g. Switzerland and Italy), and in Canada. For some period time, Bogusław M. Spanski, is also involved in design and construction – not steel and concrete constructions, but live organisms, which are companies established and developed by himself in many parts of the world.

Bogusław Spanski is 50 years old.

Bogusław T. Pisarek is the chief manager of the company CLUB S International. He is a sociologist by profession, with over ten years' long practice and experience in scope of marketing, acquired in North America, in the most aggressively developing branch of marketing and sales, which is insurances. Being the manager, he specialized himself in matters related with social macro-groups. Considerable part of his career took a course in the USA, where Bogusław T. Pisarek conducted the activity of a large enterprise conducted under the auspices of the Canadian government.

Bogusław T. Pisarek is 41 years old.

Wojciech Śniegocki is a graduate of the Faculty of Law and Administration of the Jagiellonian University in Kraków. Most of his career he spent in Canada, where he founded and is the owner of a consulting company. Within the frameworks of this activity he specialized in negotiations with governmental agendas. Wojciech Śniegowski is currently running the Polish TV channel for CF.MT International in Toronto. In the program by the name "Rozmaitości" [Sundries] he is responsible for preparation of an informational service, interviews in front of a camera, production of reportages and local sales of advertisement.

Wojciech Śniegocki is 38 years old.

TP8000646

Appendix 4

# Network Teleports, Inc.

The company Network Teleports, Inc. is one of the leaders in the American market of satellite transmission and a future partner of TV Polonia Broadcasting Systems in introduction of the TV Polonia channel to America.

Network Teleports, Inc. provides a 24-hour-a-day telecommunication service for over nine million audience and listeners in the whole USA, Canada, Alaska and Central America.

The basis of activity of the company is a teleport located in New Orleans, Louisiana. The eleven-meter long antennas of the teleport cover with its range the area from Canada to Columbia and from Hawaii to Bermudas. Network Teleports, Inc. also has the possibility of a direct signal transmission as DBS.

The wide range of services offered by Network Teleports, Inc. includes among other: coding and decoding of signal for recipients of cable TV, production of TV programmes, video-conferences, complex service of boats on all the four oceans and constant monitoring of reception and satellite transmission.

Network Teleports, Inc. counts on fruitful and successful cooperation with TV Polonia Broadcasting Systems in implementation of TV Polonia to America.

TP8000647

Appendix 4

# Characteristics of the Enterprise

The main assumptions regarding emission of TV Polonia channel in America are as follows:

1. The emission of TV Polonia channel is foreseen for 16-18 hours a day.

2. The materials from Poland shall be delivered partially on tapes and partially by means of satellite retransmission.

3. TV Polonia channel shall be retransmitted by means of a Ku-band signal, obtained from the Eutelsat satellite in one of the western European teleports (downlink) and transmitted by the company Network Teleports, Inc. to New Orleans in the USA (uplink).

4. Insertion of advertising spots shall be made in America.

5. Polish program blocks made in America shall be added to the program.

6. Part of the program shall be subtitled in English.

In order to carry out the described enterprise, Spanski Enterprises Inc. (S.E.I.) shall establish a new company by the name TV Polonia Broadcasting Systems, at the beginning with offices in the USA (New York, Chicago, Los Angeles) and in Canada (Toronto). The task of these offices shall be to obtain and render services for the benefit of the local subscribers of TV Polonia. The above-mentioned offices also shall be responsible for running a marketing activity, sales of advertisements and – in future – for production of local program blocks in particular regions.

In cooperation with Network Teleports, Inc. from New Orleans, TV Polonia Broadcasting Systems shall offer its subscribers a wide range of technical possibilities to receipt TV Polonia channel by means of a traditional satellite transmission receipt system, modern DBS system and by means of cable TV companies. Such a complex offer gives huge possibilities to reach the biggest number of subscribers, who are interested in receipt of TV Polonia channel.

TP8000648

Appendix 4

The traditional method of receipt of satellite signal requires purchase of expensive equipment and having suitable and large space for mounting of a big dish antenna. It is estimated that several thousand of users have such equipment on the American continent. The necessity to facilitate receipt of TV Polonia channel to them is thus obvious.

The new method of receipt of DBS (Direct Broadcasting System) satellite signal gives the possibility of common sharing of a high-quality satellite signal. Small sizes of a mini-dish provide for its installation, even in small rental flats. Due to the current price of equipment (ca. 700 USD), negotiations with the manufacturer of mini-dishes and decoders (RCA) are presently being conducted, in order to obtain a wholesales price on the basis of one hundred users.

Negotiations with financial institutions regarding sharing attractive leasing conditions on the necessary equipment to the future subscribers are far advanced. Simultaneously, it is necessary to admit as almost certain, the fact that within the next 1-2 years the price of the above-mentioned equipment shall be diminished, and thus the product shall be more available and common.

In such circumstances, usage of the DBS system – together with making the purchase of equipment easier, shall considerably and dynamically broaden the base of subscribers of the TV Polonia channel, as well as other channels.

From the point of view of a potential recipient, undoubtedly the cheapest method is sharing of signal with the local cable TV companies. Next to the payment for subscription for the local "cable", the only expense is the purchase of a decoder, which may also be leased.

S.E.I. conducted talks with big cable distributions, and as a result they settled that after obtaining a subscriber base by TV Polonia on the level of 30 thousand, the

Appendix 4

TV Polonia channel shall be introduced to the domestic cable network in Polish agglomerations in America.

To sum up, the proposition of simultaneous usage of all the above methods shall enable reaching the biggest number of subscribers, who are interested in receipt of TV Polonia channel, in short period of time.

TV Polonia Broadcasting Systems together with Network Teleports Inc., exclusively present such a complex offer for potential subscribers of TV Polonia channel, inhabiting the American continent.

TV Polonia Broadcasting Systems shall take over all the financial commitments, resulting from satellite retransmission and further distribution of signal of TV Polonia channel in America, and obliges itself to undertake complex actions in order to provide retransmission of TV Polonia channel on the most convenient conditions. All such operational costs connected with execution of this enterprise (including the fees resulting from copyright protection) shall be covered by TV Polonia Broadcasting Systems.

In such a way TVP S.A. shall not cover any costs connected with retransmission of TV Polonia channel on the American continent.

Due to technological progress, competition on the market of ethnic TV channels is now substantial. Only the USA is currently inhabited by 22 million people, who are born abroad, and masses of American citizens, born in the USA, with very strong roots of their origin. American TV currently offers channels in twenty-four languages and this number is still increasing.

TP8000650

Appendix 4

It turned out that despite large number of information regarding Poland, available in Polish radio stations and in press, the Poles expect TV news directly from Poland. Undoubtedly, it results from huge popularity of TV nowadays. The confirmation of such state of affairs is the fact that the surveyed watch TV approximately 3.7 hours a day, whilst they listen to radio ca. 1.5 hour a day, and they read press only for a little more than 12 minutes a day. For 68 percent of respondents TV is the main source of information about the world.

Moreover, the surveyed believe that a TV channel from Poland shall enable them keeping in touch with their homeland and its culture. Despite this fact, it has special significance regarding their children.

The demographic situation in the USA presents very similarly to that in Canada. The basic difference is the number of people with Polish origins, which is estimated in the USA for 12 million, whilst in Canada it is 530 thousand.

The conducted surveys clearly indicate the existence of the huge need for TV Polonia channel in America.

A-3055

Appendix 4

# Marketing Strategy

The whole marketing strategy must be prepared in context of answers to the following questions:

- What are the specific expectations and needs of the market?
- What are the characteristics of the offered product?
- Do the advantages resulting from using it fulfil the expectations and needs of a consumer?

The marketing strategy of the company TV Polonia Broadcasting Systems foresees three basic elements, with which a group of consumers, to which it is wanted to reach, shall be influenced:

1. Product
2. Price
3. Promotion

## PRODUCT

As in the case of other enterprises, it is necessary to adjust the product to the market on which it is to be sold. In the context of TV Polonia channel, it is necessary to pay attention to the specifics of the Polish society in America, which has been expressed in the survey. It indicated the common interest with the following segments of program.

The segments are:

a. News from Poland, awaited by 98% of surveyed,
b. Programs about culture and art, which are of the interest of 95% of the surveyed,

Appendix 4

    c.   Programs for children, awaited by 91 % of responders,

    d.   Polish films with 88% level of interest.

The above-mentioned segments of TV Polonia channel shall enable elaboration and distribution of promotional materials, addressed to the biggest possible range of the future recipients.

## PRICE

One of the key elements of marketing is settlement of a suitable price for the particular product, in this case – the rate for the monthly cost of subscription for receipt of TV Polonia channel. It is especially important in the situation of a wide range of price offers on TV market and strong price competition.

In America, there currently is a wide range of local Polish programs, available on channels within the frameworks of the basic fee. The price of the service offered by TV Polonia Broadcasting Systems may be a little higher, as no-one else shall have a similarly attractive offer on channels, especially on daily, current news from Poland favour it. Important elements of the strategy for settlement price shall also be the forms and terms of payment, available crediting and the possibility to obtain discounts.

Due to cooperation with Network Teleports, Inc., the subscription fees shall be collected by the companies, which provide the TV Polonia signal directly to the individual recipient.

TP8000656

Appendix 4

Currently the prices of programs offered to the viewers apart from the commonly available cable service are between 10 and 12 American dollars per month. The assumed subscription fee in the amount of 5 American dollars per month for the signal of TV Polonia seems to be justified according to competition and confirmed by the market analysis.

PROMOTION

The promotional action includes all the available mass media: television, radio and press. Also the following actions are planned:

a. Sending offers to the addresses of potential recipients,

b. Contests with prizes,

c. Constant participation of local Polish societies in propagation of the planned enterprise.

The following matters are assumed:

a. Elaboration, printing and distribution of two million informational brochures,

b. Printing and distribution of two million application forms,

c. Preparation and execution of suitable advertising materials for the purposes of TV, radio and press promotion.

The above-mentioned examples of promotional activities, as well as aggressive and unconventional matter of direct sales action, strengthen the general interests in receipt of TV Polonia channel. This interest shall turn out to be a self-driving element of promotion in the future.

Appendix 4

The anticipated participation in the series of organizations, which associate Polish societies in America, shall undoubtedly provide high rank to the effect created by TV Polonia Broadcasting Systems.

TP8000658

Appendix 4

# Work Schedule

JULY / AUGUST 1994

Presentation of the present Business Plan to TVP S.A. and presentation of technical
possibilities regarding execution of the project

SEPTEMBER / OCTOBER 1994

Final decision of the Board of Directors of TVP S.A. A contract signed subject to acceptance
of the S.E.I's offer

The company TV Polonia Broadcasting Systems established

Offices of the company in the USA (New York, Chicago, Los Angeles) and in Canada

(Toronto) opened

Promotional and marketing action started

FIRST HALF OF THE YEAR 1995

A minimum base of future subscribers obtained – 3 0 , 0 0 0  (thirty thousand)

Retransmission of TV Polonia channel started

DECEMBER  1995

The projected number of subscribers obtained – 1 0 0 , 0 0 0  (one hundred thousand)

DECEMBER  1996

The projected number of subscribers obtained – 2 0 0 , 0 0 0  (two hundred thousand)

TP8000659

Appendix 4

DECEMBER 1997

The projected number of subscribers obtained — 500,000 (five hundred thousand)

DECEMBER 1998

The projected number of subscribers obtained — 1,000,000 (one million)

DECEMBER 1999

The projected number of subscribers obtained — 2,000,000 (two million)

TP8000660

Appendix 4

# Summary

As mentioned in the introduction, Spanski Enterprises Inc., sets the goal to provide the TV Polonia channel to as many Poles and population of Polish origin inhabiting North America, as possible.

Twelve million of Poles and population of Polish origin currently inhabit the area of North America. It is a huge market, with almost unlimited possibilities.

The conducted research indicated the existence of huge need for TV Polonia channel in America.

Whist providing the subscribers with a high-quality channel, which they expect and enabling their receipt, it is possible to expect that TV Polonia Broadcasting Systems shall reach the established goals on time, and simultaneously it shall guarantee obtaining a constant level of incomes in a short period of time.

TP8000661

A-3062

Appendix 4

Financial Projections

TP8000662

A-3063

Appendix 4

Technical Data

TP8000663

Appendix 5

REMARKS Concerning the Proposal of Introduction of the TV POLONIA Broadcast to
North and South Americas Presented to Telewizja Polska S.A.


AIM OF THIS PROJECT

From the point of view of TVP S.A. the aim of the venture discussed is the delivery of TV
POLONIA broadcast to the broad mass of Polish-speaking inhabitants of America.


ASSUMPTION DATA

General assumptions of TVP regarding the realization of this project are as follows:

1. TVP S.A. does not commit any capital expenditure and does not bear – except for
   current – any other, additional operating costs connected with this project;
2. TVP S.A. has constant control over the contents of the TV POLONIA broadcast in its
   version transmitted in America and all the same over the maintenance of its integrity
   and high substantial quality.


THE FUTURE PARTNER QUALITIES:

With such assumptions, the realization of the stated aim is dependent on the partner
possessing:

1. Appropriate financial resources;
2. Ability to obtain a large mass of the broadcast subscribers quickly and effectively.

THE RISK

Not investing, TVP S.A. will not meet any financial risk concerning the venture discussed.


Regarding item 3.
SEI, President .... BOGUSŁAW SPAŃSKI              & BOGUSŁAW SPAŃSKI

   A. According to the information obtained by the agency of Dun & Bradstreet Company
      from The Royal Bank of Canada, "net value of …Y…… as a business executive is
      placed in the upper range of seven-digit numbers", which means that it comes to 8-9
      million Canadian dollars.
   B. According to the project of agreement currently negotiated, "SEI undertakes to bear all
      costs connected with the access to TV POLONIA signal, promotion and marketing of
      the television program (created on the grounds of agreement) and with its production
      and broadcasting on the territory of North and South America, including costs of
      payments on the grounds of copyright of literary and musical works named small
      rights as well as any additional costs of the use of informative materials".
   C. The provisions of the agreement draft state that this program "will consist of TV
      POLONIA broadcast and – within bounds of possibility – of the broadcasts produced
      on the territory of America and of advertisements".

TP8000822

Appendix 5

According to the Business Plan, it will be transmitted for 16-18 hours a day. SEI declares to consult and co-operate with TVP S.A. in the production of the local programs.

D. After having signed the agreement with TVP S.A., SEI can see its main advantage and market benefit in the exclusivity in "possessing" a television program "straight out from Poland" on the territory of America.

In the event of broadcasting 16-18 hours a day, the aforementioned exclusivity in relation to very high costs of self-production (and even in relation to costs of re-fitting of the programs), will result in the fact that – in practice – the contents of the program broadcast in America will not be very different from the broadcast schedule of TV POLONIA, and all the same TVP S.A. will maintain constant control over the contents of the program broadcast in America, its integrity and substantial quality.

It must be also mentioned that SEI accepts to obligation to maintain the whole integrity of each programme of TV POLONIA broadcast.

E. .................... is planning the integration of some of the Polish-language programs currently working in North America around its project.

F. The Business Plan included quite a broad outline of the marketing strategy of the venture discussed and the results of market research carried out among Polish-speaking population inhabiting the Ontario state in Canada.

G. In its activity within the framework of CLUB S, S.E.I. has demonstrated – on the new market for itself and with the new product on this market – large efficiency in promotion-marketing activities.

H. It seems that the provisions of paragraph 9 of the agreement draft secure the interest of TVP S.A. in the case of ceasing the broadcasting of TV POLONIA program, significant reduction of the time of its broadcasting or vital changes of the circumstances which determine the performance of the agreement.

Since in the event of any of the above situations, the provisions of paragraph 9 impose on TVP only the obligation to re-negotiate already signed agreement.

*BOGUSŁAW SPANSKI*

CONCLUSIONS:

After having analyzed the above we think that only the proposal presented by Spanski Enterprises Incorporated promises the realization of the project of introduction of TV POLONIA broadcast to North and South America.

*ROBERT TERENTIEW*

DIRECTOR OF BIURO HANDLU I WSPÓLPRACY Z ZAGRANICA

VICE-DIRECTOR OF PROGRAM SATELITARNY TV POLONIA

Warsaw, 29 November 1994

**SPANSKI ENTERPRISES, INC.,**

Plaintiff

v.

**TELEWIZJA POLSKA S.A.,**

Defendant

SUPPLEMENTAL EXPERT REPORT OF TIMOTHY H. HART, CPA, CFE

US District Court, Southern District of New York, 10 CV 4933

## Table of Contents

I.     EXECUTIVE SUMMARY OF FINDINGS AND OPINIONS ................................................... 3

II.    INTRODUCTION ................................................................................................. 5

III.   DOCUMENTS CONSIDERED ............................................................................... 5

IV.    DAMAGES CLAIMED BY SEI ............................................................................... 6

    A.   Mr. Shulman's Total Damages Opinion Represents Less than 9 Percent of the Original Total Damages Claimed by SEI .......................................................................... 6

        i.    Claim 1: The Polvision Claim ........................................................................ 6

        ii.   Claim 2: Canadian Legal Action .................................................................... 7

        iii.  Claim 3: The *Klan* Claim .............................................................................. 8

V.     CRITIQUE OF MR. SHULMAN'S OPINION ............................................................. 9

    A.   Claim 1: The Polvision Claim ........................................................................... 9

        i.    Mr. Shulman's Damages Theory is Flawed ..................................................... 9

            a.    Lost Profits are the Proper Measure of Damages ...................................... 9

            b.    SEI Did Not Have the Ability to "License" to Polvision as Mr. Shulman Suggests .. 10

            c.    SEI Never in the History of the Relationship "Licensed" to Anyone ...................... 11

        ii.   Mr. Shulman's Damages Calculation has Numerous Flawed Assumptions ................... 11

            a.    Number of Episodes SEI would be able to "License" under Mr. Shulman's Theory 11

            b.    Damages Scenario #1: Assumptions and Correction .............................................. 13

            c.    Damages Scenario #2: Assumptions and Correction .............................................. 16

            d.    Damages Scenario #3: Assumptions and Correction .............................................. 19

        iii.  Polvision Claim Conclusion ........................................................................... 20

    B.   Claim 3: The *Klan* Claim ............................................................................... 21

        i.    Mr. Shulman Failed to Consider Causation When Determining His Opinion on Damages for the *Klan* Claim ........................................................................................ 21

        ii.   Methodological Flaws in Mr. Shulman's Calculation of Alleged Lost Subscribers ......... 23

        iii.  Corrections of Sourcing and Calculation Errors ............................................... 26

        iv.   *Klan* Claim Conclusion .............................................................................. 28

VI.    CONCLUSION ................................................................................................ 28

VII.   SIGNATURE .................................................................................................. 30

A-3068

## I. EXECUTIVE SUMMARY OF FINDINGS AND OPINIONS

1. On April 16, 2012, Mr. Shulman issued the Expert Report of Stephen W. Shulman ("Shulman Report"). In his report, Mr. Shulman's opinion of the total damages SEI has allegedly sustained for its three claims falls within a range of $1,506,201 (using Claim 1, Damage Scenario #3) to $2,009,808 (using Claim 1, Damage Scenario #1). Mr. Shulman's total damages opinion represents only 6.7 percent to 8.9 percent of SEI's original total claimed damages of $22.5 million.

2. While Mr. Shulman's report supports less than 9 percent of the damages originally claimed by SEI, Mr. Shulman's calculations of damages for the Polvision Claim and the *Klan* Claim rely upon improper damage theory and make inappropriate assumptions and calculation errors.[1] In fact, Mr. Shulman's report and assessment of SEI's damages under the Polvision Claim and the *Klan* Claim have done nothing to substantiate that SEI actually suffered any damages as a result of the alleged wrongful actions of TVP. My opinion now after reviewing Mr. Shulman's report has not changed since my first expert report analyzing SEI's original damages theories: SEI has suffered **no damages** under either the Polvision Claim or the *Klan* Claim.

3. For the Polvision Claim, Mr. Shulman's opinion on damages is flawed because he uses an improper damages theory. In a breach of contract, such as claimed by SEI under the Polvision Claim, the proper measure of damages is lost profits. Mr. Shulman's opinion that SEI has suffered damages as measured by the value of licenses that SEI could or would have entered into with Polvision, incorrectly assumes that SEI had the right to

---

[1] As explained in my initial report, at this time I will not address Claim 2 as all SEI and Mr. Shulman appear to do is add up legal invoices and allocate 100 percent of those costs to TVP. There has been no analysis as to why TVP is responsible for 100 percent of the legal invoices and there is no detail provided with the invoices to even illustrate what services were performed. It is my opinion that there is insufficient support to assess the reasonableness of this damage claim.

license individual TVP programming. SEI did not have this right and further, SEI has never during the history of the agreement licensed any individual TVP programming to anyone. Mr. Shulman's Polvision damages calculation has failed to show that SEI has suffered any loss of profits or any damages at all under the Polvision Claim. Additionally, Mr. Shulman's damages calculations contain many inappropriate assumptions, which serve to inflate his damages calculations.

4. For the *Klan* Claim, Mr. Shulman's opinion on damages suffers from a lack of any causal link to the alleged wrongful action by TVP. Mr. Shulman simply made the absurd assumption that every subscriber lost or not gained by SEI was as a result of TVP dropping an old television series, *Klan*, from its programming lineup on *TV Polonia*. Given the fact that Mr. Shulman has completely failed to link causation to damages, his damages do not reasonably represent the alleged harm suffered by SEI, assuming TVP is liable. It is the job of the damages expert to make this causal link. In my opinion, Mr. Shulman failed in this fundamental step in calculating damages. Aside from the fundamental error which makes the rest of the *Klan* Claim calculations irrelevant, Mr. Shulman's damages calculations under the *Klan* Claim are fraught with methodological flaws and have both sourcing and calculation errors. Mr. Shulman's *Klan* Claim damages calculations are not reliable and do not properly measure the financial impact to SEI of the alleged wrongful act by TVP.

5. In summary, Mr. Shulman has failed to provide theoretically sound and reliable calculations of SEI's alleged damages under the Polvision Claim and the *Klan* Claim. His calculations of damages under both claims are fraught with improper damages theories and utilize inappropriate methods and assumptions. Therefore, Mr. Shulman's damages calculations do not measure the alleged harm suffered by SEI as a result of the claimed actions of TVP and should not be considered as reasonable assessments of damages.

## II.    INTRODUCTION

6.  DLA Piper LLP ("DLA" or "Counsel") has engaged me on behalf of its client, TVP, to provide my objective and independent assessment of the damages allegedly sustained by SEI and the counterclaim damages allegedly sustained by TVP, to assess the calculation of damages put forth by SEI's expert, Stephen W. Shulman ("Mr. Shulman"), and to testify at trial.

7.  On April 16, 2012, I issued my initial expert report in this matter ("initial report" or "Hart Report"). This is my supplemental report. This report is intended solely for use in these proceedings between the parties.   I confirm that I have upheld the principles of independence and impartiality in preparing this report.   My initial report and this supplemental report are supported by the work I have performed and supervised to date.   The opinions and conclusions presented in these reports are based on the information reviewed to date.   Should additional information, data, or documents be produced after the date of this report, my opinions and conclusions may be adjusted or supplemented to reflect my consideration of such information.   In addition, I may develop graphs, charts, and other visual aids in connection with my presentation of the data and the results of my analyses during the trial of this matter.

8.  To formulate my opinion on the alleged damages in this matter, I have been asked to assume liability; however, I render no opinion on liability.   My opinions in this matter are those of a forensic accountant.   I am not offering opinions on matters of law.

## III.    DOCUMENTS CONSIDERED

9.  This report presents the conclusions of analyses that I and/or staff working under my direction have performed in connection with this matter.   While conducting my analysis and forming my opinions, I have considered information obtained from several sources, including SEI and TVP documents, and information from public sources and databases.   A complete list of the new materials that I have relied upon since my initial report is attached hereto as Supplemental Appendix A.

## IV. DAMAGES CLAIMED BY SEI

### A. Mr. Shulman's Total Damages Opinion Represents Less than 9 Percent of the Original Total Damages Claimed by SEI

10. On April 16, 2012, Mr. Shulman issued his expert report, the Shulman Report. The Shulman Report calculates damages on SEI's three claims against TVP. As I explain in this section of my report, Mr. Shulman's total damages calculation is less than 9 percent of SEI's original total claimed damages. The next section of my report contains more detailed critiques of Mr. Shulman's assumptions and calculations for the Polvision Claim and the *Klan* Claim.

### i. *Claim 1: The Polvision Claim*

11. Mr. Shulman describes the Polvision Claim as SEI seeking "[d]amages arising from TVP licensing of certain polish-language [SIC] television programming content to non-party Polvision Chicago..."[2] Mr. Shulman has calculated three different alternative damage scenarios under this claim as detailed in TABLE 1.

TABLE 1:[3]

| Damage Scenario | Damage Total |
|---|---|
| Damage #1: Value of the Licenses from TVP to Polvision (utilizing an industry standard market model), less the royalty SEI would pay TVP had SEI entered into such Licenses | $ 603,685 |
| Damage #2: Value of the Licenses from TVP to Polvision (utilizing the market value of episodes as stated in the Barter Agreement), less the royalty SEI would pay TVP had SEI entered into such Licenses | $ 474,720 |
| Damage #3: Value of the Licenses from TVP to Polvision (pursuant to their terms), less the royalty SEI would pay TVP had SEI entered into such Licenses | $ 100,078 |

---

[2] Shulman Report, ¶ 14.
[3] Shulman Report, ¶ 14.

12. As can be seen from TABLE 1, both the theory of damages and the amount of claimed damages have changed significantly from SEI's position in its Amended Responses to Defendant's First Set of Interrogatories on February 15, 2012. In its February 2012 Interrogatory Responses, SEI answered that with regard to its $5 million Polvision Claim,[4] it sought damages in the form of "lost profits related to SEI's loss of subscribers in the specific regions where Polvision (and/or any other non-party may be distributing programming exclusively licensed to SEI) during the period of TVP's breach."[5] SEI's damage theory as now articulated by Mr. Shulman is not a lost profits claim at all, is inherently flawed (as discussed in more detail later) and results in reducing SEI's damages claim down from its former $5 million claim to at most just 12 percent of the original claim under Mr. Shulman's Scenario #1, and to as little as 2 percent of the original claim under Mr. Shulman's Scenario #3.[6]

### ii.   Claim 2: Canadian Legal Action

13. For Claim 2, Mr. Shulman states that SEI is seeking "[d]amages arising from TVP's alleged failure to properly support SEI in connection with a pending Canadian legal action against alleged internet infringer/pirates of SEI's exclusive distribution rights..."[7] He has calculated damages for this claim totaling $143,245, which is less than 2 percent of the $7.5 million originally claimed by SEI.[8]

---

[4] Amended Complaint, 10/1/2010, ¶ 38; Plaintiff's Objections and Amended Responses to Defendant's First Set of Interrogatories, 2/15/2012, p. 3.

[5] Plaintiff's Objections and Amended Responses to Defendant's First Set of Interrogatories, 2/15/2012, p. 5.

[6] Mr. Shulman's Damage Scenario #1 of $603,685 is 12 percent of the original $5 million claimed in the Polvision Claim, while Damage Scenario #3 of $100,078 is 2 percent.

[7] Shulman Report, ¶ 14.

[8] Amended Complaint, ¶ 43.

### iii.    *Claim 3: The Klan Claim*

14. Mr. Shulman describes the *Klan* Claim, as SEI seeking "[d]amages arising from TVP's alleged wrongful removal of the certain program content from the *TVP Polonia* channel (specifically, the program *Klan*)..."[9]    He calculates SEI's damages for this claim by quantifying "lost profit resulting from the loss of revenue" attributable to TVP's alleged wrongful actions.[10]  His damages are summarized below in TABLE 2.

TABLE 2:[11]

| Damage Period for *Klan* Claim | Damage Total |
|---|---|
| *Klan* Claim Damages: Historical Period | $ 255,353 |
| *Klan* Claim Damages: Beyond Historical Period | $ 1,007,525 |
| **Total *Klan* Claim Damages** | **$ 1,262,878** |

15. As seen in TABLE 2, Mr. Shulman has opined on damages for this claim totaling $1,262,878, which is less than 13 percent of the $10 million originally claimed by SEI.[12]

16. In sum, Mr. Shulman's opinion of the total damages SEI has allegedly sustained for its three claims falls within a range of $1,506,201 (using Claim 1, Damage Scenario #3) to $2,009,808 (using Claim 1, Damage Scenario #1).  Mr. Shulman's total damages opinion represents only 6.7 percent to 8.9 percent of SEI's original total claimed damages of $22.5 million.

---

[9] Shulman Report, ¶ 14.
[10] Shulman Report, ¶ 70.
[11] Shulman Report, ¶ 14.
[12] Amended Complaint, ¶ 47.

## V.   CRITIQUE OF MR. SHULMAN'S OPINION

### A.   Claim 1: The Polvision Claim

####   *i.   Mr. Shulman's Damages Theory is Flawed*

#####   *a.   Lost Profits are the Proper Measure of Damages*

17. Mr. Shulman has reduced SEI's claimed damages for the Polvision Claim by at least 88 percent and at most 98 percent depending on which of his damage scenarios is utilized, but under all three damage scenarios his theory is improper. Rather than performing a lost profits analysis in accordance with SEI's Interrogatory Responses, Mr. Shulman has attempted to assign values to hypothetical licenses that SEI would have entered into with Polvision for the individual TVP programming content that TVP actually licensed to Polvision. Mr. Shulman's damages theory is incorrect because under the alleged breach of contract as claimed by SEI,[13] lost profits are the appropriate form of damages.

> *There are three basic fact situations (sometimes appearing in combination) in which the distributor, franchisee, or exclusive agent may be awarded damages for loss of profits arising from a breach of the contract.*
>
> *First, the agent or franchisee can be awarded damages for lost profits if the manufacturer or franchisor wrongfully terminates the exclusive agency-franchise agreement...*
>
> *Second, the agent can be awarded damages for lost profits if the <u>manufacturer makes sales into the agent's territory</u> (either directly or through an appointed competing agent) in violation of the exclusive agency-franchise agreement...*
>
> *Third, the agent can be awarded damages for lost profits if the manufacturer refuses to fill the agent's reasonable orders.[14]*

---

[13] Amended Complaint, ¶¶ 31-38.

[14] Dunn, Robert L., *Recovery of Damages for Lost Profits: Volume 1*, 6th Edition, Lawpress Corporation 2005, pp. 160-163. (emphasis added).

As is clear from the text above, assuming that TVP is liable for breach of contract relating to the Polvision Claim, the proper measure of SEI's damages would be any lost profits suffered by SEI as a result of TVP's breach.

18. Mr. Shulman's theory of damages is not a lost profits analysis because, as explained below, SEI did not have the legal right to license individual TVP programming to Polvision (or any entity) and had never done so in the past. Mr. Shulman cannot properly claim that but-for TVP's licensing to Polvision, SEI would have made these licensing "profits," because SEI had no ability to make such profits.

### b. SEI Did Not Have the Ability to "License" to Polvision as Mr. Shulman Suggests

19. Mr. Shulman's damages scenarios assume that SEI had the ability under its agreements with TVP to license, or syndicate, individual programs to third parties, in this case Polvision. As explained in Mr. Arlen's report, SEI only had rights to distribute the *TV Polonia* and *TVP Info* signals as whole channels for re-broadcast and did not have the right to syndicate TVP's individual programs.[15]

20. Additionally, as Mr. Arlen notes, Mr. Shulman should have recognized that the agreements between the parties provide for SEI to pay TVP royalties based only on subscriber and advertising revenue earned by SEI.[16] The agreements do not provide for calculation or payment of royalties to TVP from syndication revenues that SEI would earn. While Mr. Shulman calculates TVP's 8 percent royalty on SEI's hypothetical syndication revenue, he ignores the fact that the agreements do not provide for any such revenues to be earned by SEI.

---

[15] Rebuttal Expert Report of Gary Arlen ("Arlen Rebuttal Report"), pp. 2-3.
[16] Arlen Rebuttal Report, p. 3.

### c. SEI Never in the History of the Relationship "Licensed" to Anyone

21. Lastly, even assuming that SEI had a right to license individual programming to third parties, SEI has never done so during the entire history of its 17-year relationship with TVP. This fact is mentioned in Mr. Shulman's report.[17] Since SEI has never utilized its supposed right to "license," it is improper for Mr. Shulman to now claim such hypothetical license values as damages during that same period.

### ii. Mr. Shulman's Damages Calculation has Numerous Flawed Assumptions

22. Assuming that one accepts the theory of damages that Mr. Shulman has presented under the Polvision Claim, which I do not for reasons explained above, Mr. Shulman has made numerous flawed assumptions under each of his damage scenarios, which must be corrected.

### a. Number of Episodes SEI would be able to "License" under Mr. Shulman's Theory

23. A first flawed assumption made by Mr. Shulman is the assumption that SEI would be able to "license" 860 episodes of various different programs to Polvision during his damage period. This is the one common assumption between all three of Mr. Shulman's Claim 1 damage scenarios. This total number of 860 episodes includes episodes from three different TVP/Polvision licenses: (1) June 27, 2008 License Agreement; (2) August 31, 2009 License Agreement; and (3) July 16, 2010 Annex to the August 31, 2009 License Agreement.[18]

24. Mr. Shulman has included many episodes which SEI would have been unable to license to Polvision because: (1) Polvision would not have bought the episodes from SEI; or (2) SEI did not have rights to license those episodes to Polvision (even assuming Mr. Shulman's

---

[17] Shulman Report, ¶¶ 34 and 38.

[18] See Supplemental Appendix B.1 for detailed breakdown of the episodes assumed by Mr. Shulman.

damages premise that SEI had the right to license individual TVP programming from *TV Polonia* and *TVP Info*).

25. To my first point that Polvision would not have bought these episodes from SEI, Mr. Shulman assumes that since the term of the June 27, 2008 License was a little over half way complete at the start of his damage period (August 12, 2009), he could pro-rate half of the episodes licensed under that agreement. However, a review of June 27, 2008 License shows that Polvision was limited to one run and one re-run within 24 hours of the first transmission of each episode of each program (*Na dobre I na zle* and *Plebania*). It was evident that by the start of Mr. Shulman's damage period Polvision had or would have broadcast all of the licensed episodes (per the June 27, 2008 License) of *Na dobre I na zle* and *Plebania* considering (1) the two-run per episode within 24 hours restriction on the June 27, 2008 license, (2) the fact that the August 31, 2009 License Agreement licensed Polvision the next episodes of these two programs (along with episodes of *Klan* and *Zlotopolscy*), and (3) an August 2009 email communication detailing that Polvision was done with the licensed *Na dobre I na zle* episodes and needed more episodes and that it had more than the licensed number of episodes of *Plebania* (up to #104).[19] Therefore, there would be no need for Polvision to purchase in August 2009 the rights to any pro-rated portion of the June 27 2008 License episodes from SEI.

26. As to my second point that SEI would not have the right to license certain episodes to Polvision, Mr. Shulman incorrectly assumes that SEI had the right to license the episodes included in the July 16, 2010 Annex. None of the episodes included in the July 16, 2010 Annex had ever aired on *TV Polonia* or *TVP Info*.[20] So, this assumption is also faulty.

---

[19] Email Chain between Zaniewska and Pokropek re: Polvision, 8/5/2009.

[20] It is my understanding that the July 16, 2010 Annex between TVP and Polvision was entered into in part to resolve any perceived issues related to claims of exclusivity by SEI to licensed content that had previously been aired on *TV Polonia* or *TVP Info*. Therefore, the episodes licensed in the July 2010 Annex had not been aired on *TV Polonia* or *TVP Info*. With regard to *Klan* and *Plebania*, I reviewed documents to check this for my first report. See Hart Report, 4/16/2012, ¶ 28.

However, to be conservative in my approach, I have assumed two alternatives with regard to these July 16, 2010 Annex episodes: (1) exclusion of all episodes that were never aired on *TV Polonia* or *TVP Info*; and (2) inclusion of the episodes of *Klan* and *Plebania*, which are programs that once aired on *TV Polonia* even though these specific episodes in this license did not.[21] I provide the second alternative, because I understand Mr. Spanski has testified that he believes SEI has a right to all episodes of *Klan* and *Plebania,* even to episodes that never aired on *TV Polonia*.[22]

27. After making the adjustments discussed above, the number of possible episodes that SEI would have been able to license to Polvision assuming Mr. Shulman's theory on damages (that SEI had the right to license individual episodes) is either 215 episodes (25 percent of Mr. Shulman's assumed 860 episodes) or 623 episodes (72 percent of Mr. Shulman's assumed 860 episodes). The detailed breakdown of this calculation by program can be seen on Supplemental Appendix B.1.

### b. Damages Scenario #1: Assumptions and Correction

28. Under his Damages Scenario #1, Mr. Shulman assumes that SEI could have realized the value of the licenses TVP entered into with Polvision based upon a rate per episode derived from what he describes as an industry standard market model. This damage scenario assumes that SEI's license rate per episode would be calculated based upon a percentage of Polvision's advertising revenue earned during the broadcast of that episode. Mr. Shulman deducts from this license value the 8 percent royalty that SEI would have to pay TVP. Assuming his theory of damages, Mr. Shulman made four flawed assumptions with this damages calculation: (1) the average advertising sellout level cannot reasonably be 100 percent; (2) Polvision spot rates were not $159-per-30-second-spot; (3) the assumption of a 40 percent program spending to gross advertising billings

---

[21] Hart Report, 4/16/2012, ¶ 28.

[22] Deposition of Boguslaw Spanski, pp. 83-84.