ratio is unsupported and unreasonable; and (4) as discussed above, the assumed number of episodes that SEI would be able to license to Polvision is incorrect.

29. As explained in Mr. Arlen's Rebuttal report, Mr. Shulman's assumption of a 100 percent sellout rate for the advertising spots is unreasonable — a total sellout happens only in very rare circumstances and therefore should not be assumed for the entire damage period.[23] Mr. Shulman has provided nothing to support a 100 percent sellout rate in the case of Polvision. Therefore, I have adjusted the average sellout rate to 90 percent based upon Mr. Arlen's opinion of a more appropriate (and maximum possible) sellout rate for Polvision.[24]

30. Additionally, Mr. Shulman's reliance on the $159-per-30-second-spot rate based on a Polvision rate card is inappropriate. The use of this $159 rate is in direct contrast to the testimony of Mr. Kotaba, Polvision's President. In his deposition, Mr. Kotaba testified that Polvision was actually receiving $40 to $90 per spot for spots ranging from 15 seconds up to 1 minute.[25] Mr. Shulman is aware of Mr. Kotaba's testimony as he relies on it in part and sources from the testimony in his report, but he has apparently chosen to ignore the rates Mr. Kotaba testified that Polvision actually charged.[26] To be conservative, I have adjusted the per-spot rate to $90-per-30-second-spot based on the top end of the range from Mr. Kotaba's testimony.[27]

31. With regard to Mr. Shulman's assumed ratio of program spending as a percentage of gross advertising billings, Mr. Shulman provides no support or evidence that both sides of

---

[23] Arlen Rebuttal Report, p. 4.

[24] Arlen Rebuttal Report, p. 4.

[25] Deposition of Walter Kotaba, pp. 39-40.

[26] For example, see Shulman Report, ¶ 44 and FN 30.

[27] I have been conservative by using the upper end of the range listed by Mr. Kotaba for spots ranging from 15 seconds to 1 minute. Since Mr. Shulman's calculation is pricing a 30 second spot, the average of the range could have reasonably been used, but I chose to be conservative with my selection. Mr. Arlen has addressed the issue of the spot rate in his rebuttal report as well. See Arlen Rebuttal Report, pp. 4-6.

the hypothetical license would be willing to agree to his unsupported premium over what he has suggested is an "industry standard" percentage (as shown in his Exhibit VII). In fact, he mentions only that SEI would consider Polvision as a competitor, but does not appear to consider that the episodes at issue were very old in comparison to those being shown on *TV Polonia* at the time (4 to 10 years old).[28] He also does not appear to consider the financial condition of Polvision as described by Mr. Kotaba in his deposition. Mr. Kotaba testified that Polvision was barely breaking even or was losing money, while paying the lower licensing rates provided by its agreements with TVP.[29] Mr. Shulman's Damage Scenario #1 fails to account for the fact that for SEI to realize Mr. Shulman's assumed ratio of program spending to gross advertising billings, Polvision must be willing and able to pay that assumed ratio. To be conservative, I have adjusted the assumed ratio of program spending to gross advertising billing to the average of Mr. Shulman's source benchmark data (or 33 percent).[30] As discussed by Mr. Arlen, in his view, a significant discount to this benchmark data would be appropriate given the age and therefore the value of the content being licensed.[31]

32. After correcting for the appropriate sellout percentage, advertising spot rate, percentage of programming spend to gross advertising billings, and using both the Low and High number of episodes discussed above,[32] the adjusted damages for Damage Scenario #1 are calculated as detailed in TABLE 3 below.

---

[28] Arlen Rebuttal Report, p. 6.

[29] Deposition of Walter Kotaba, pp. 108-110.

[30] See Shulman Report, Exhibit VII. 33 percent is the average of 2008, 2009, 2010 and 2011 Program Percent Ads. or (30% + 38% + 32% + 32%) ÷ 4 = 33%.

[31] Again, I have been conservative in my selection when correcting Mr. Shulman's calculation. While it is Mr. Arlen's opinion that a discount would be applied to the percentage of program spending to gross advertising billings Polvision would be willing to pay for the content at issue, he could not estimate the exact discount amount with available documentation. Therefore, I have merely taken the average of Mr. Shulman's benchmark data. Arlen Rebuttal Report, p. 6.

[32] See Supplemental Appendix B.1 for episode adjustments.

TABLE 3:[33]

| Damages Scenario #1 | | |
|---|---|---|
| Adjusted Damages | Damages Amount | % Reduction from Shulman |
| Low | $ 64,681 | -89.3% |
| High | $ 187,423 | -69.0% |

### c. *Damages Scenario #2: Assumptions and Correction*

33. Under his Damages Scenario #2, Mr. Shulman assumes that SEI could have realized the value of the licenses that TVP entered into with Polvision based upon what he defines as the "market value" ($600 per episode) for all of the 860 episodes that would be hypothetically licensed by SEI to Polvision. He deducts from this license value the 8 percent royalty that SEI would have to pay TVP. Assuming his theory of damages, Mr. Shulman made two flawed assumptions with this damages calculation: (1) the "market value" assumed for the episodes; and (2) as discussed above, the appropriate number of episodes that SEI would be able to license.

34. In determining the appropriate "market value" for the episodes in this second scenario, Mr. Shulman appears to have decided that the March 17, 2008 Barter Agreement between TVP and Polvision and its December 2, 2008 Annex represent the only data points for "market value" of the programs simply because those agreements contain a stated "market value" for two of the programs he includes within his 860 episodes (*Klan* and *Zlotopolscy*). Mr. Shulman takes this stated "market value" of $600 per episode and applies it to every program in all three licenses.[34]

35. However, Mr. Shulman fails to account for two crucial points: (1) regardless of what is stated as the "market value," in the December 2, 2008 Annex to the Barter Agreement

---

[33] See Supplemental Appendix B.2.
[34] Shulman Report, ¶ 54.

when Polvision licensed from TVP for the first time the *Klan* and *Zlotopolscy* programs, the rate per episode was actually $300, a 50 percent discount from what is stated as the "market value" rate of $600 per episode;[35] and (2) the June 27, 2008 License shows that the "market value" to Polvision for *Na dobre I na zle* was $270 per episode and for *Plebania* was $130 per episode, not $600 per episode.[36]

36. As to the first point that Mr. Shulman failed to account for the actual value of *Klan* and *Zlotopolsky*, as mentioned the December 2, 2008 Annex to the Barter Agreement shows that the true market value for the *Klan and Zlotopolscy* programs at the start of SEI's damage period was at most $300 per episode. This "market value" was the amount that TVP and Polvision agreed was the market rate in an arms-length transaction. In fact, Polvision bartered other services (reportage materials) to pay for this programming.[37] As this agreement was on a barter basis, it is unlikely that the stated barter value equals the actual cash value. Indeed, a short time later, when Polvision and TVP entered into a license (August 31, 2009 License), which actually provided for cash payments for episodes of these programs, the "value" of the episodes was only $110 per episode, or 63 percent less than the stated barter value of $300.[38] The fact that Polvision first bartered for the initial programming and then negotiated a lower cash rate per episode is not surprising given its financial condition. As mentioned, Mr. Kotaba testified that Polvision was struggling financially, even while paying the lowered licensing rates provided by the August 31, 2009 License.[39] Mr. Shulman's Damage Scenario #2 fails to

---

[35] See Barter Agreement between Telewizja Polska S.A. and Polvision dated 3/17/2008, § 2.4 and § 2.5 and Annex 1 to the Barter Agreement of March 17, 2008 dated 12/2/2008, § 2 and Attachment no. 1.

[36] License Agreement No. U/59/TRD/2008 between Telewizja Polsk S.A. and Polvision dated June 27, 2008, § 15. (POL00055).

[37] Annex 1 to the Barter Agreement of March 17, 2008 dated 12/2/2008, § 3 and § 6. It can be seen from the calculation of the value of the license granted (p. 4) of USD 75,540.00 that $300.00 is used by the parties. Oto Polska for 52 episodes (1 additional year) × $270.00 + 205 episodes (Annex Attachment 1) × $300.00 = $75,540.00.

[38] Licensing Agreement between Telewizja Polska S.A. and Polvision, 8/31/2009, Schedule No. 1.

[39] Deposition of Walter Kotaba, pp. 108-110.

account for the fact that Polvision has to be willing and able to pay the assumed rates for SEI to realize Mr. Shulman's assumed market value. This is clearly not the case with Mr. Shulman's assumed "market value" rate of $600 per episode.

37. There is nothing suggesting that the so-called "market value" rate of $600 per episode included in the March 17, 2008 Barter Agreement was anything more than an arbitrary number perhaps inserted to suggest that Polvision was getting a good deal. Mr. Shulman has provided no assessment or analysis supporting the notion that this supposed "market value" rate of $600 per episode would be accepted for this same programming at this same time by Polvision, as mentioned above, or by another similar hypothetical licensee. Therefore, I have adjusted Mr. Shulman's market value rate for *Klan* and *Zlotopolscy* to $300 per episode as of December 2008 and have assumed that since a new license for these programs was not entered into until right at the start of Mr. Shulman's damage period (August 2009),[40] the $300 per episode is the maximum market value that could be utilized for the period under Damage Scenario #2 for these programs.

38. As to the second point Mr. Shulman failed to account for, the actual value of *Na dobre I na zle* and *Plebania,* the June 27, 2008 License is instructive of the actual market value for those programs. Under the June 27, 2008 License, TVP and Polvision agreed to the licensing rates of $270 per episode for *Na dobre I na zle* and $130 per episode for *Plebania* in an arms-length agreement.[41] Mr. Shulman has provided no assessment or analysis that suggests that any rates higher than these would have been accepted by Polvision or another similar hypothetical licensee(s). Therefore, I have adjusted Mr. Shulman's market value rate for *Na dobre I na zle* to $270 and *Plebania* to $130 as of

---

[40] Since the August 31, 2009 License between TVP and Polvision was actually signed by TVP and sent to Polvision in July 2009 and Mr. Kotaba testified that he viewed the license as binding even without his counter-signature (Deposition of Walter Kotaba, pp. 114-119), I could have utilized the lower rates agreed to between the parties to license the programs (*Klan* and *Zlotopolscy* at $110) in the August 31, 2009 License, but to be conservative for this scenario I did not.

[41] License Agreement No. U/59/TRD/2008 between Telewizja Polsk S.A. and Polvision dated June 27, 2008, § 15. (POL00055)

June 2008. I have also assumed that these rates are the proper market values to be utilized for the period under Damage Scenario #2 for these programs since no new license for these programs was entered into until right at the start of Mr. Shulman's damage period (August 2009).[42]

39. After correcting for these price-per-episode problems and using both the Low and High number of episodes discussed above,[43] the adjusted damages for Damage Scenario #2 are calculated as detailed in TABLE 4 below.

TABLE 4:[44]

| Damages Scenario #2 | | |
|---|---|---|
| Adjusted Damages | Damages Amount | % Reduction from Shulman |
| Low | $ 43,948 | -90.7% |
| High | $ 127,466 | -73.1% |

### d. Damages Scenario #3: Assumptions and Correction

40. Mr. Shulman's Damage Scenario #3 for the Polvision Claim assumes the value of the licenses that TVP entered into with Polvision based upon the actual financial terms in the license agreements, less the 8 percent royalty that SEI would pay to TVP assuming SEI and Polvision had entered into such licenses instead. Under Damages Scenario #3, the only correction that needs to be made is to the number of episodes that SEI would be able to license to TVP, as discussed above. After correcting for an appropriate number of

---

[42] Since the August 31, 2009 License between TVP and Polvision was actually signed by TVP and sent to Polvision in July 2009 and Mr. Kotaba testified that he viewed the license as binding even without his counter-signature (Deposition of Walter Kotaba, pp. 114-119), I could have utilized the lower rates agreed to between the parties to license the programs (*Na dobre I na zle* at $180 and *Plebania* at $110) in the August 31, 2009 License, but to be conservative for this scenario I did not.

[43] See Supplemental Appendix B.1 for episode adjustments.

[44] See Supplemental Appendix B.3.

episodes using both the Low and High numbers,[45] the adjusted damages for Damage Scenario #3 are calculated as detailed in TABLE 5 below.

TABLE 5:[46]

| Damages Scenario #3 | | |
|---|---|---|
| Adjusted Damages | Damages Amount | % Reduction from Shulman |
| Low | $ 24,463 | -75.6% |
| High | $ 65,752 | -34.3% |

### iii.    Polvision Claim Conclusion

41. It remains my opinion that SEI has suffered <u>no damages</u> under the Polvision Claim.  While Mr. Shulman's opinion on the Polvision Claim damages is different than the damage originally claimed by SEI, Mr. Shulman's opinion does nothing to substantiate that SEI has suffered any damages as a result of TVP's alleged wrongful act.  In fact, Mr. Shulman's opinion is flawed because he uses an improper damages theory.  In a breach of contract, such as claimed by SEI under the Polvision Claim, the proper measure of damages is lost profits.  Mr. Shulman's opinion that SEI has suffered damages as measured by the value of licenses that SEI could or would have entered into with Polvision, incorrectly assumes that SEI had the right to license individual TVP programming.  SEI did not have that right.  This is evidenced by the fact that SEI has never during the history of the agreement licensed any individual TVP programming to a third party.  Mr. Shulman's damages calculation has failed to show that SEI has suffered any loss of profits or any damages under the Polvision Claim.

42. Also, Mr. Shulman's opinion under each scenario for the Polvision Claim is fraught with inappropriate assumptions.  I have corrected Mr. Shulman's damage scenarios using

---

[45] See Supplemental Appendix B.1 for episode adjustments.
[46] See Supplemental Appendix B.4.

conservative adjustments for purposes of illustrating what the "value" of the hypothetical licenses would be if the Judge were to accept Mr. Shulman's theory and assuming TVP would be found liable for breach of contract. Should the Judge decide that the theory proposed by Mr. Shulman is proper, it is my opinion that Damage Scenario #3 is the only appropriate scenario given the facts of this case, including (but not limited to) the value of the content licensed to Polvision and Polvision's financial ability to pay for the content.

## B.    Claim 3: The *Klan* Claim

### i.    *Mr. Shulman Failed to Consider Causation When Determining His Opinion on Damages for the Klan Claim*

43. As expressed in my initial report, SEI has failed to provide any evidence of a causal link to its claimed damages for the *Klan* Claim and TVP's alleged wrongful actions.[47]   Mr. Shulman's opinion on damages also suffers from this fatal flaw, because he has just assumed causation.[48]   When calculating damages, making a groundless causation assumption can result in a meaningless assessment of numbers and not a true assessment of the damages suffered by the allegedly harmed party.  Proximate cause is a fundamental principle that governs all compensatory damages:

> *Recovery of damages* for lost profits is subject to the general principle that damages *must be proximately caused* by the wrongful conduct of the defendant.[49]

44. SEI and now Mr. Shulman have provided no evidence to show that SEI's claimed damages, based upon alleged subscriber cancellations, were proximately caused by TVP's actions.  Mr. Shulman's *Klan* Claim damages opinion assumes that all lost SEI subscribers

---

[47] See Hart Report, 4/16/2012, ¶¶ 73 and 79.

[48] Shulman Report, ¶ 11.

[49] Dunn, Robert L., *Recovery of Damages for Lost Profits: Volume 1*, 6th Edition, Lawpress Corporation 2005, p. 2. (emphasis added).

A-3087

resulted from TVP's removal of the *Klan* program from *TV Polonia*. This is a baseless assumption. SEI has failed to produce any documents showing any actual subscriber cancellations citing the removal of *Klan* as the reason for cancellation. Mr. Arlen's initial report explains that people cancel their subscriptions for a multitude of reasons.[50] Mr. Shulman fails to consider any other reasons that subscribers cancel their subscriptions. Mr. Shulman has skipped one of the first questions that must be asked related to causation and damages:

> Has the plaintiff excluded or explained other possible causes of the claimed loss? The cases generally hold that failure to do so is <u>fatal to the claim</u>.[51]

45. Additionally, from a purely logical point of view, Mr. Shulman's assumption must fail as *Klan* was just one of more than 20 television series and over 50 other programs shown on *TV Polonia* around the time of its removal from the channel (Summer/Fall 2010).[52] *TVP Info,* packaged with *TV Polonia,* offered numerous types of news related programming. Accordingly, if Mr. Shulman assumes that one hundred percent of the alleged cancellations (or the failure to grow at an assumed rate) are attributable to *Klan*, he is assuming that all of the value of the two channels is derived from one single series (*Klan*). This underlying assumption is absurd on its face and has no place in a proper damages analysis.

46. Mr. Shulman's groundless assumption that all cancellations or failure to grow at an assumed pace is due solely to TVP's decision to remove the *Klan* program from *TV Polonia* defies common sense. Given the fact that Mr. Shulman has completely failed to link causation to damages, his damages do not reasonably represent the alleged harm suffered by SEI, assuming TVP is liable. Mr. Shulman's statement that evidence at trial will prove causation is not helpful in understanding any link between the alleged

---

[50] Arlen Report, 4/16/2012, pp. 12-14.

[51] Dunn, Robert L., *Recovery of Damages for Lost Profits: Volume 1*, 6th Edition, Supplement, Lawpress Corporation 2011, p. 4. (emphasis added).

[52] TVP 021012 458-493.

wrongful act, TVP's removal of *Klan*, and his calculation of damages. It is the job of the damages expert to make this causal link. In my opinion, Mr. Shulman failed in this fundamental step in calculating damages. Therefore, his damages calculations are not a proper measure of damages.

### ii. Methodological Flaws in Mr. Shulman's Calculation of Alleged Lost Subscribers

47. In addition to ignoring causation issues, Mr. Shulman's calculation of SEI's alleged lost subscribers as a result of TVP's removal of the *Klan* program has three methodological flaws: (1) the use of quarter-by-quarter net change in subscribers, rather than evaluating actual subscriber cancellations; (2) the consolidation of subscriber data across regions and distributors; and (3) the improper assumption that cable and Internet subscribers behave in the same manner. Below, I will discuss each methodological flaw and explain why the methodology that Mr. Shulman used is inappropriate, especially in light of the fact that his client has or should have access to more detailed data.

48. The first methodological problem with Mr. Shulman's calculation is his use of quarter-by-quarter net change in subscribers, which is often referred to as "net adds." In this context, "net adds" are defined as new subscribers added during the quarter *less* the subscribers that cancelled during that quarter. Since this number is a combination of both additions (new subscribers) and cancellations, it does not accurately represent cancellations alone. In fact, Mr. Shulman's use of this data in his calculation is a deviation from SEI's pleaded case in its February 15, 2012 Interrogatories. In these Interrogatories, SEI sources only to lists of cancellations by Globecast (cable) and Internet subscribers to support its $10.0 million damage claim.[53]

---

[53] Plaintiff's Objections and Amended Responses to Defendant's First Set of Interrogatories, 2/15/2012, pp. 10 & 12.

49. Given that Mr. Shulman chose to use "net adds" data, it should be noted that during Mr. Shulman's historic damage period (July 26, 2010 to December 31, 2011), SEI did not actually suffer any "lost subscribers" on a net adds basis (it gained a net of 2,647 subscribers). Therefore, Mr. Shulman makes his "lost subscriber" calculation by assuming that TVP's removal of *Klan* caused SEI's subscriber growth to be lower than it would have been but-for TVP's actions. He has provided no analysis to link this change in any way to TVP's alleged action in order to support his calculation. He also purports to normalize the subscriber data, but his method for normalizing is unsupported by any documents. Also as described above, he has assumed that all of SEI's supposed loss of growth in subscribers (as represented by subscribers grown by his normalized growth rate less actual subscribers) is related to the removal of the *Klan* program, which cannot be the case.[54]

50. The second methodological problem with Mr. Shulman's analysis to estimate SEI's alleged lost subscribers is that the data he uses is improperly pooled into one set. His data combines cable subscribers from both the US and Canada (EuroVu and TVP Canada) and combines cable subscribers with Internet subscribers. EuroVu data contains SEI's subscriber numbers for both its cable subscribers in the US through various distributors and SEI's Internet subscribers for all regions. TVP Canada data contains SEI's Canadian cable subscribers through various distributors. By calculating SEI's alleged lost subscribers using data which consolidates not only the US and Canada, cable and the Internet, but also multiple cable distributors, Mr. Shulman incorrectly assessed the data. The clearest way in which to illustrate this point is to look at the actual period of alleged harm. TABLE 6 below illustrates the number of subscribers and the net adds/(losses) at EuroVu and TVP Canada separately for each quarter from the beginning of 2010 through the end of 2011 (grey shading notes quarters outside damage period).

---

[54] Shulman Report, Exhibits III and IV.

TABLE 6:

| Analysis of Net Adds/(Losses) During *Klan* Claim Damage Period | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Subscribers | | | Net Adds/(Losses) | | | |
| Quarter | EuroVu | TVP Canada | Total | EuroVu | TVP Canada | Total | Notes |
| 1Q2010 | 34,391 | 9,417 | 43,808 | | | | |
| 2Q2010 | 33,883 | 10,446 | 44,329 | (508) | 1,029 | 521 | TVP Canada: Added Shaw |
| 3Q2010 | 33,197 | 10,508 | 43,705 | (686) | 62 | (624) | EuroVu: DirectTV Drops |
| 4Q2010 | 33,562 | 11,110 | 44,672 | 365 | 602 | 967 | TVP Canada: Added MTS |
| 1Q2011 | 34,033 | 11,784 | 45,817 | 471 | 674 | 1,145 | |
| 2Q2011 | 33,839 | 11,685 | 45,524 | (194) | (99) | (293) | Both: Added Intercom |
| 3Q2011 | 33,666 | 11,555 | 45,221 | (173) | (130) | (303) | |
| 4Q2011 | 35,058 | 11,918 | 46,976 | 1,392 | 363 | 1,755 | |
| Total Net Adds/(Losses) 3Q10 - 4Q11 | | | | 1,175 | 1,472 | 2,647 | |

As shown in the notes on the table above, based upon the detail provided with SEI's revenue reporting to TVP, in some cases drops or gains in the "net adds" in a region (EuroVu or TVP Canada) may be explained by a corresponding drop or addition of a cable/satellite distributor. For example, in the 3rd Quarter of 2010, DirectTV was no longer distributing TVP's channels for EuroVu (first Quarter of no DirectTV revenue) and EuroVu has a corresponding drop in subscribers that quarter. While we have not been provided with the level of detail to confirm the relative impact of the drop of content distribution by DirectTV, Mr. Shulman has not performed any such analysis to determine how it would affect his conclusions, which are based only on the consolidated data. Mr. Shulman's client, SEI, has access to unconsolidated, distributor-by-distributor data because SEI uses such data to produce its revenue reportings to TVP. If for some unknown reason Mr. Shulman wanted to perform his calculation using net adds data, he should have at least drilled down to the unconsolidated distributor data during his damage period as well as the period during which Mr. Shulman determined the growth rate used in his damage calculation. The unconsolidated data (as even the simple breakout above in TABLE 6 shows) would provide a more detailed (rather than cursory) insight into growth and decline in total subscribers.

51. Lastly, by using the consolidated data, Mr. Shulman assumes that cable subscribers and Internet subscribers behave in the same manner. For SEI's subscribers, the unconsolidated data that is available shows that these groups of subscribers behave

differently. Cable subscribers have a much higher churn rate (as represented by compound annual growth rate (decline) or CAGR) than Internet subscribers. Based on the available unconsolidated data prior to August 2009 (the date of TVP's alleged wrongful acts), I have assessed the CAGRs of subscribers (or churn) for Globecast (cable distributor) and SEI's Internet service, which are detailed below in TABLE 7.[55]

TABLE 7:[56]

|  | Number of Subscribers | | | CAGR | |
|  | Jan-07 | Jan-08 | Jul-09 | Jan-07 - Jul-09 | Jan-08 - Jul-09 |
|---|---|---|---|---|---|
| Globecast (Cable) | 7,705 | 5,953 | 4,431 | -19.3% | -17.0% |
| Internet | N/A | 15,851 | 14,152 | N/A | -6.9% |

52. As shown in TABLE 7 above, the churn of cable subscribers (as represented by Globecast) is more than double the churn of Internet subscribers. Therefore, by consolidating the cable and Internet subscribers, Mr. Shulman has rendered his analysis unusable and unrealistic.

### iii. Corrections of Sourcing and Calculation Errors

53. In addition to the causation and methodological problems discussed above, Mr. Shulman's calculation has basic sourcing and calculation errors, including: (1) incorrectly sourced SEI US revenue; (2) failure to pro-rate damages in 3rd Quarter 2010 to start on July 26, 2010 (start of his historic damage period); and (3) improper assumption to calculate the subscriber attrition rate. While I was unable to correct for the problems discussed in previous sections as they are inherent with Mr. Shulman's entire method of calculation, I have corrected for the three errors to be discussed within this section.

---

[55] I attempted to perform this same analysis for other cable/satellite distributors, but was unable to locate data for the period above for any of the distributors.
[56] P001319-1320 and P001341-1343; P002007-2009.

54. Mr. Shulman does not utilize the correct SEI US revenue, because he fails to use the detailed breakdown sheets provided by SEI to TVP with SEI's revenue reportings. Instead he attempts to calculate these revenue numbers, by using the revenue allocated to TVP (from the lead pages of the reporting) and grossing this revenue up by 66 percent. However, while SEI originally did not allocate Internet revenue at 66 percent, Mr. Shulman still grossed that revenue up by 66 percent. Thus, Mr. Shulman has overstated SEI's revenue and therefore his Quarterly Revenue per Subscriber, which impacts the remainder of his lost profits calculation. My correction for this error can be seen on Supplemental Appendix C.1.

55. Second, Mr. Shulman fails to account for the fact that the 3rd Quarter of 2010 is not a full quarter and therefore the damages in this quarter need to be pro-rated. Mr. Shulman's historic damage period begins on July 26, 2010. My adjustment for the pro-rating of the 3rd Quarter 2010's damages can be seen on Supplemental Appendix C.2.

56. Lastly, the source Mr. Shulman uses for his estimation of the attrition rate has projections of the Polish language speaking population in 2010, 2015 and 2020 under 3 different models: (1) linear; (2) constant; and (3) logistic. To calculate his estimated annual attrition rates, he averages the three models' projections and then uses those averages in his own linear model to calculate year-over-year rates of decline (his attrition rates). By averaging the three models, he has only served to artificially lower the projections of the source and thereby lowered his estimated attrition rates. Since Mr. Shulman determined a linear model was appropriate to estimate his annual attrition rates, then he should have used only the linear model projections from his data source. I have adjusted the attrition rate calculation utilizing Mr. Shulman's linear model and the projections from the source's linear model. These adjustments can be seen in Supplemental Appendix C.3.

57. After correcting for only the errors discussed in this section, the damages for the *Klan* Claim under Mr. Shulman's theory of damages is corrected as detailed below in TABLE 8.

TABLE 8:[57]

| Klan Claim Damages | | |
|---|---|---|
| **Adjusted Damages** | **Damages** | **% Reduction** |
| Historic Period | $  235,820 | -7.6% |
| Future Period | $  879,762 | -12.7% |
| Total | $1,115,581 | -11.7% |

### iv.     Klan Claim Conclusion

58. It remains my opinion that SEI has suffered <u>no damages</u> under the *Klan* Claim.  While Mr. Shulman's opinion on the *Klan* Claim damages is calculated differently than the damages originally claimed by SEI, Mr. Shulman's opinion does nothing to substantiate that SEI has suffered any damages as a result of TVP's alleged wrongful act.  As can be seen from the sections above, Mr. Shulman's opinion on damages under the *Klan* Claim suffers from a lack of any causal link to the alleged wrongful action, has methodological flaws, and has both sourcing and calculation errors.  As such, Mr. Shulman's *Klan* Claim damages calculations are not reliable and do not properly measure the financial impact to SEI as a result of TVP's removal of the *Klan* program.

## VI.    CONCLUSION

59. Even though Mr. Shulman's report supports less than 9 percent of the damages originally claimed by SEI, Mr. Shulman's calculations of damages for the Polvision Claim and the *Klan* Claim utilize improper damage theory and make inappropriate assumptions and calculation errors.  In fact, Mr. Shulman's report and assessment of SEI's damages under the Polvision Claim and the *Klan* Claim have done nothing to substantiate that SEI actually suffered any damages as a result of the alleged wrongful actions of TVP.  It remains my opinion that SEI has suffered **no damages** under either the Polvision Claim or the *Klan* Claim.

---

[57] See Supplemental Appendix C.

Page 28 of 30

60. For the Polvision Claim, Mr. Shulman's opinion on damages is flawed because he uses an improper damages theory. In a breach of contract, such as claimed by SEI under the Polvision Claim, the proper measure of damages is lost profits. Mr. Shulman's opinion that SEI has suffered damages as measured by the value of licenses that SEI could or would have entered into with Polvision, incorrectly assumes that SEI had the right to license individual TVP programming. SEI did not have this right and SEI has never during the history of the agreement licensed any individual TVP programming to anyone. Mr. Shulman's damages calculation has failed to show that SEI has suffered any loss of profits or any damages under the Polvision Claim. Additionally, Mr. Shulman's damages calculations contain many inappropriate assumptions, which serve to inflate his damages calculations.

61. For the *Klan* Claim, Mr. Shulman's opinion on damages suffers from a lack of any causal link to the alleged wrongful action. Given the fact that Mr. Shulman has completely failed to link causation to damages, his damages do not reasonably represent the alleged harm suffered by SEI, assuming TVP is liable. It is the job of the damages expert to make this causal link. In my opinion, Mr. Shulman failed in this fundamental step in calculating damages. Additionally, Mr. Shulman's damages calculations under the *Klan* Claim are fraught with methodological flaws and have both sourcing and calculation errors. As such, Mr. Shulman's *Klan* Claim damages calculations are not reliable and do not properly measure the financial impact to SEI as a result of TVP's removal of the *Klan* program.

62. In summary, Mr. Shulman has failed to provide reliable calculations of SEI's alleged damages under the Polvision Claim and the *Klan* Claim. His calculations of damages under both claims are fraught with problems with theory, and utilize inappropriate methods and assumptions. Therefore, Mr. Shulman's damages calculations do not measure the alleged harm suffered by SEI as a result of TVP's actions and should not be considered as reliable assessments of SEI's damages.

## VII.  SIGNATURE

Timothy H. Hart
May 16, 2012

A-3096

SEI v. TVP                                                Supplemental Appendix A

**Additional Documents Relied Upon**

| Number | Document Title | Document Date | Bates Number |
|--------|----------------|---------------|--------------|
| 1 | Barter Agreement between Telewizja Polska S.A. and Polvision | 3/17/2008 | N/A |
| 2 | License Agreement No. U/59/TRD/2008 between Telewizja Polsk S.A. and Polvision | 6/27/2008 | POL00054-057 |
| 3 | Annex 1 to the Barter Agreement of March 17, 2008 between Telewizja Polska S.A. and Polvision | 12/2/2008 | N/A |
| 4 | Email Chain between Zaniewska and Pokropek RE Polvision, *Translation* | 8/5/2009 | N/A |
| 5 | Expert Report of Stephen W. Shulman | 4/16/2012 | N/A |
| 6 | Rebuttal Expert Report of Gary Arlen | 5/16/2012 | N/A |
| 7 | Programming Schedule of TV Polonia (Fall 2010) | 2010 | TVP 021012 458-49 |
| 8 | Dunn, Robert L., *Recovery of Damages for Lost Profits: Volume 1*, 6th Edition, Lawpress Corporation | 2005 | N/A |
| 9 | Dunn, Robert L., *Recovery of Damages for Lost Profits: Volume 1*, 6th Edition, Supplement, Lawpress Corporation | 2011 | N/A |

**Critique of Mr. Shulman's Analysis of Claim 1**
**Summary of Adjustments to Damage Scenarios**

| | Shulman's Opinion[4] | Adjusted Numbers | | % Reduction from Shulman's Opinion | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **Claim 1: The Polvision Claim** | | | | | |
| Damage Scenario #1[1] | $ 603,685 | $ 64,681 | $ 187,423 | -89.3% | -69.0% |
| Damage Scenario #2[2] | $ 474,720 | $ 43,948 | $ 127,466 | -90.7% | -73.1% |
| Damage Scenario #3[3] | $ 100,078 | $ 24,463 | $ 65,752 | -75.6% | -34.3% |

Notes:
[1] Supplemental Appendix B.2.
[2] Supplemental Appendix B.3.
[3] Supplemental Appendix B.4.
[4] Shulman Report, ¶ 14.

Case 14-1115, Document 43-2, 07/15/2014, 1271749, Page19 of 116

A-3097

SEI v. TVP

Supplemental Appendix B.1

Critique of Mr. Shulman's Analysis of Claim 1
Number of Episodes to "License"

| | Total # of Episodes Under License | Episodes Claimed by Shulman[5] | Appropriate # of Episodes | |
|---|---|---|---|---|
| | | | Low[6] | High[6] |
| **June 27, 2008 License[1]** | | | | |
| Na dobre I na zle | 100 | 50 | - | - |
| Plebania | 100 | 50 | - | - |
| | 200 | 100 | - | - |
| **August 31, 2009 License[2,3]** | | | | |
| Na dobre I na zle | 99 | 42 | 42 | 42 |
| Plebania | 99 | 91 | 91 | 91 |
| Klan | 98 | 40 | 40 | 40 |
| Zlotopolscy | 98 | 42 | 42 | 42 |
| | 394 | 215 | 215 | 215 |
| **Annex to August 31, 2009 License (July 2010)[3,4]** | | | | |
| Apetyt na zycie | 26 | 26 | - | - |
| Dom niespokojnej | 7 | 7 | - | - |
| Piotrek zgubil dziadka | 7 | 7 | - | - |
| Polonia Restituta | 7 | 7 | - | - |
| Samo niebo | 3 | 3 | - | - |
| Sprawa na dzis | 36 | 35 | - | - |
| Licencja na wychowani | 26 | 25 | - | - |
| Mała moskwa | 4 | 4 | - | - |
| Duch w dom | 8 | 8 | - | - |
| Plebania | 186 | 187 | - | 186 |
| Boza podszewka | 13 | 13 | - | - |
| Klan | 222 | 223 | - | 222 |
| | 545 | 545 | - | 408 |
| **GRAND TOTAL** | 1,139 | 860 | 215 | 623 |

Notes:

[1] License Agreement No. U/59/TRD/2008 between Telewizja Polsk S.A. and Polvision dated June 27, 2008 (POL00054-57).

[2] License Agreement between Telewizja Polska S.A. and Polvision dated August 31, 2009.

[3] Annex to Agreement Dated 31 August 2009 between Telewizja Polska S.A. date July 16, 2010.

[4] In Mr. Shulman's Report, he has mistakenly accounted for the number of episodes on individual programs within the July 16, 2010 Annex, but has accounted for the total number of episodes (545) for the Annex correctly. I have utilized, where appropriate, the correct number of episodes per the July 16, 2010 Annex.

[5] Expert Report of Stephen W. Shulman, ¶¶ 52, 54, 58-62.

[6] The Low assumes no episodes from the July 10, 2010 Annex to the August 31, 2009 Agreement as none of these episodes ever played on *TV Polonia* or *TVP Info*; however, the High assumes that the Plebania and Klan episodes are included, since following Plaintiff's theory these shows (although not these episodes) once aired on *TV Polonia*.

SEI v. TVP                                          Supplemental Appendix B.2
Critique of Mr. Shulman's Analysis of Claim 1
Damage Scenario #1

|  | Industry Value (Low) | | Industry Value (High) | |
|---|---|---|---|---|
| Non-Program Minutes Per Hour[1] | | 12.0 | | 12.0 |
| 30-sec. Units per Hour | | 24.0 | | 24.0 |
| Average Sellout Level[2] | | 90% | | 90% |
| Average 30-sec. Units Sold per Hour | | 22.0 | | 22.0 |
| Spot Rate Assumed[3] | $ | 90.00 | $ | 90.00 |
| Average Volume Discount[4] | | N/A | | N/A |
| Average Spot Cost | $ | 90.00 | $ | 90.00 |
| | | | | |
| Average Ad Billings Per Hour | $ | 1,980.00 | $ | 1,980.00 |
| Program Spending % Gross Billings[5] | | 33% | | 33% |
| Value of Program License Per Hour | $ | 653.40 | $ | 653.40 |
| Value of Program License Per Half Hour | $ | 326.70 | $ | 326.70 |
| | | | | |
| | | | | |
| Value of Program License Per Half Hour (Rounded) | $ | 327.00 | $ | 327.00 |
| # of Episodes Licensed[6] | | 215 | | 623 |
| **License Fees Payable to SEI** | **$** | **70,305.00** | **$** | **203,721.00** |
| *Less* : Royalties owed to TVP | $ | (5,624.40) | $ | (16,297.68) |
| **Total Damages Under Claim 1 Damages #1** | **$** | **64,680.60** | **$** | **187,423.32** |

Notes:

[1] A review of the available minutes per hour for TVP's four programs at issue (*Na Dobre, Plebania, Klan,* and *Zlotopolscy* ) show that 12 minutes per hour is a reasonable average to assume.

[2] Arlen Rebuttal Report, p. 4.

[3] Deposition of Walter Kotaba, pp. 39-41. I have assumed the high end of his stated range in an effort to be as conservative as possible in my corrections to Mr. Shulman's damages calculation. Therefore, this calculation is likely overstated.

[4] Since I am utilizing a spot rate actually realized by Polvision, no Volume Discount assumption is needed.

[5] Program Spending % of Gross Billings is conservatively assumed at the average of Mr. Shulman's benchmark source found in Exhibit VII of his report. See also Arlen Rebuttal Report, p. 6.

[6] Supplemental Appendix B.1

| | Market Value Per Episode | # of Episodes (Low)[3] | Market Value (Low) | # of Episodes (High)[3] | Market Value (High) |
|---|---|---|---|---|---|
| Cost of Na dobre I na zle[1] | $ 270.00 | 42 | $ 11,340.00 | 42 | $ 11,340.00 |
| Cost of Plebania[1] | $ 130.00 | 91 | $ 11,830.00 | 277 | $ 36,010.00 |
| Cost of Klan and Zlotopolscy[2] | $ 300.00 | 82 | $ 24,600.00 | 304 | $ 91,200.00 |
| | | 215 | $ 47,770.00 | 623 | $ 138,550.00 |
| | | *Less:* Royalties owed to TVP | $ (3,821.60) | *Less:* Royalties owed to TVP | $ (11,084.00) |
| | | **Total Adjusted Damages #2 (Low)** | **$ 43,948.40** | **Total Adjusted Damages #2 (High)** | **$ 127,466.00** |

Notes:

[1] Pre- damage period license rate (from June 27, 2008 License).

[2] Pre-damage period license/barter rate (from December 2, 2008 Annex to Barter Agreement).

[3] See Supplemental Appendix B.1.

Case 14-1115, Document 43-2, 07/15/2014, 1271749, Page22 of 116

A-3100

Case 14-1115, Document 43-2, 07/15/2014, 1271749, Page23 of 116

A-3101

## Damages #3 (Low)

### June 27, 2008 License[1]

| Series Title | # of Episodes (Low)[4] | Price per Episode (per License) | Total License Value (Low) |
|---|---|---|---|
| Na dobre i na zle | - | $ 270.00 | $ - |
| Plebania | - | $ 130.00 | $ - |
| Total | - | | $ - |

### August 31, 2009 License as Amended[2,3]

| Series Title | # of Episodes (Low)[4] | Price per Episode (per License) | Total License Value (Low) |
|---|---|---|---|
| Na dobre i na zle | 42 | $ 180.00 | $ 7,560.00 |
| Plebania | 91 | $ 110.00 | $ 10,010.00 |
| Klan | 40 | $ 110.00 | $ 4,400.00 |
| Zlotopolscy | 42 | $ 110.00 | $ 4,620.00 |
| | 215 | | $ 26,590.00 |

### July 16, 2010 Annex to August 31, 2009 License[3]

| Series Title | # of Episodes (Low)[4] | Price per Episode (per License) | Total License Value (Low) |
|---|---|---|---|
| Apetyt na zycie | - | $ 110.00 | $ - |
| Dom niespokojnej | - | $ 110.00 | $ - |
| Piotrek zgubil dziadka | - | $ 110.00 | $ - |
| Polonia Restituta | - | $ 180.00 | $ - |
| Samo niebo | - | $ 110.00 | $ - |
| Sprawa na dzis | - | $ 110.00 | $ - |
| Licencja na wychowani | - | $ 110.00 | $ - |
| Mala moskwa | - | $ 180.00 | $ - |
| Duch w dom | - | $ 180.00 | $ - |
| Plebania | - | $ 110.00 | $ - |
| Boza podszewka | - | $ 180.00 | $ - |
| Klan | - | $ 110.00 | $ - |
| | - | | $ - |

| Total License Value (Low) | 215 | | $ 26,590.00 |
|---|---|---|---|

Less: Royalties owed to TVP $ (2,127.2)

Total Adjusted Damages #3 (Low) $ 24,462.80

## Damages #3 (High)

### June 27, 2008 License[2]

| Series Title | # of Episodes (High)[4] | Price per Episode (per License) | Total License Value (High) |
|---|---|---|---|
| Na dobre i na zle | - | $ 270.00 | $ - |
| Plebania | - | $ 130.00 | $ - |
| Total | - | | $ - |

### August 31, 2009 License as Amended[2,3]

| Series Title | # of Episodes (High)[4] | Price per Episode (per License) | Total License Value (High) |
|---|---|---|---|
| Na dobre i na zle | 42 | $ 180.00 | $ 7,560.00 |
| Plebania | 91 | $ 110.00 | $ 10,010.00 |
| Klan | 40 | $ 110.00 | $ 4,400.00 |
| Zlotopolscy | 42 | $ 110.00 | $ 4,620.00 |
| | 215 | | $ 26,590.00 |

### July 16, 2010 Annex to August 31, 2009 License[3]

| Series Title | # of Episodes (High)[4] | Price per Episode (per License) | Total License Value (High) |
|---|---|---|---|
| Apetyt na zycie | - | $ 110.00 | $ - |
| Dom niespokojnej | - | $ 110.00 | $ - |
| Piotrek zgubil dziadka | - | $ 110.00 | $ - |
| Polonia Restituta | - | $ 180.00 | $ - |
| Samo niebo | - | $ 110.00 | $ - |
| Sprawa na dzis | - | $ 110.00 | $ - |
| Licencja na wychowani | - | $ 110.00 | $ - |
| Mala moskwa | - | $ 180.00 | $ - |
| Duch w dom | - | $ 180.00 | $ - |
| Plebania | 186 | $ 110.00 | $ 20,460.00 |
| Boza podszewka | - | $ 180.00 | $ - |
| Klan | 222 | $ 110.00 | $ 24,420.00 |
| | 408 | | $ 44,880.00 |

| Total License Value (High) | 623 | | $ 71,470.00 |
|---|---|---|---|

Less: Royalties owed to TVP $ (5,717.6)

Total Adjusted Damages #3 (High) $ 65,752.40

Notes:

[1] License Agreement No. U/59/TRD/2008 between Telewizja Polsk S.A. and Polvision dated June 27, 2008 (PCL00054-57)

[2] License Agreement between Telewizja Polska S.A. and Polvision dated August 31, 2009

[3] Annex to Agreement Dated 31 August 2009 between Telewizja Polska S.A. date July 16, 2010

[4] See Supplemental Appendix B.1.

**Critique of Mr. Shulman's Analysis of Claim 3**
**Summary of Adjustments to Damages Claimed**

| | Shulman's Opinion[3] | | Adjusted Numbers | | % Reduction from Shulman's Opinion |
|---|---|---|---|---|---|
| **Claim 3: The *Klan* Claim** | | | | | |
| Historic Damage Period[1] | $ | 255,353 | $ | 235,820 | -7.6% |
| Future Damage Period[2] | $ | 1,007,525 | $ | 879,762 | -12.7% |
| **Total Damages Under Claim** | $ | **1,262,878** | $ | **1,115,581** | **-11.7%** |

Notes:
[1] Supplemental Appendix C.2.
[2] Supplemental Appendix C.3.
[3] Shulman Report, Exhibits V & VI.

A-3102

A-3103

SEI v. TVP                    Supplemental Appendix C.1
Critique of Mr. Shulman's Analysis of Claim 3
Corrected EXHIBIT IV: Estimated Quarterly Lost Revenue

| Calendar Quarter | Estimated # of Subscribers | Actual Subscribers | Estimated Lost Subscribers | Quarterly Revenue/ Subscriber [a] | Estimated Quarterly Lost Revenue |
|---|---|---|---|---|---|
| 3Q2010 | 45,083 | 43,705 | 1,378 | $ 25.04 | $ 34,505 |
| 4Q2010 | 45,849 | 44,672 | (201) | $ 24.99 | $ (5,023) |
| 1Q2011 | 46,628 | 45,817 | (366) | $ 24.95 | $ (9,132) |
| 2Q2011 | 47,421 | 45,524 | 1,086 | $ 24.55 | $ 26,661 |
| 3Q2011 | 48,227 | 45,221 | 1,109 | $ 26.25 | $ 29,111 |
| 4Q2011 | 49,047 | 46,976 | (935) | $ 27.00 | $ (25,245) |
| | | | 2,071 | | |

| Calendar Quarter | US Revenue[1] | Canada Revenue in US$s | Total | Actual Subscribers | Quarterly Revenue/ Subscriber |
|---|---|---|---|---|---|
| 3Q2010 | $ 818,733 | $ 275,583 | $ 1,094,316 | 43,705 | $ 25.04 |
| 4Q2010 | $ 827,222 | $ 289,112 | $ 1,116,334 | 44,672 | $ 24.99 |
| 1Q2011 | $ 826,391 | $ 316,729 | $ 1,143,120 | 45,817 | $ 24.95 |
| 2Q2011 | $ 837,663 | $ 280,016 | $ 1,117,679 | 45,524 | $ 24.55 |
| 3Q2011 | $ 835,643 | $ 351,592 | $ 1,187,235 | 45,221 | $ 26.25 |
| 4Q2011 | $ 954,952 | $ 313,526 | $ 1,268,478 | 46,976 | $ 27.00 |
| | | | | Average | $ 25.46 |

| Calendar Quarter | Canadian Revenue[2] | Exchange Rate | Canada Revenue in US$s |
|---|---|---|---|
| 3Q2010 | 283,680 | 0.97146 | $ 275,583 |
| 4Q2010 | 289,179 | 0.99977 | $ 289,112 |
| 1Q2011 | 308,015 | 1.02829 | $ 316,729 |
| 2Q2011 | 273,510 | 1.02379 | $ 280,016 |
| 3Q2011 | 363,147 | 0.96818 | $ 351,592 |
| 4Q2011 | 319,781 | 0.98044 | $ 313,526 |

Notes:
[1] Updated utilizing detailed sheets provided with EuroVu Revenue Reports.
[2] Updated for rounding utilizing detailed sheets provided with TVP Canada Revenue Reports.

**Critique of Mr. Shulman's Analysis of Claim 3**
**Corrected EXHIBIT V: Estimated Lost Revenue During Historic Damage Period**

| Calendar Quarter | Estimated Quarterly Lost Revenue[1] | 3Q2010[2] | 4Q2010 | 1Q2011 | 2Q2011 | 3Q2011 | 4Q2011 | |
|---|---|---|---|---|---|---|---|---|
| 3Q2010 | $ 34,505 | $ 25,120 | $ 34,505 | $ 34,505 | $ 34,505 | $ 34,505 | $ 34,505 | |
| 4Q2010 | $ (5,023) | | $ (5,023) | $ (5,023) | $ (5,023) | $ (5,023) | $ (5,023) | |
| 1Q2011 | $ (9,132) | | | $ (9,132) | $ (9,132) | $ (9,132) | $ (9,132) | |
| 2Q2011 | $ 26,661 | | | | $ 26,661 | $ 26,661 | $ 26,661 | |
| 3Q2011 | $ 29,111 | | | | | $ 29,111 | $ 29,111 | |
| 4Q2011 | $ (25,245) | | | | | | $ (25,245) | |
| | | $ 25,120 | $ 29,482 | $ 20,350 | $ 47,012 | $ 76,123 | $ 50,878 | $ 248,965 |

Lee payments due to TVP - 8% of 66% of revenue (TVP portion of revenue) $ (13,145)

**Damages related to Claim 3 during the Historical Damage Period 2 $ 235,820**

Notes:
[1] Supplemental Appendix C.1.
[2] Pro-rating 3Q2010 Damages (for Damage Period):

| | Days In Full Qtr | Days in Damage Period Qtr | |
|---|---|---|---|
| July | 31 | 6 | |
| August | 31 | 31 | |
| September | 30 | 30 | |
| | 92 | 67 | 72.8% |

Case 14-1115, Document 43-2, 07/15/2014, 1271749, Page26 of 116

A-3104

SEI v. TVP
Critique of Mr. Shulman's Analysis of Claim 3
Corrected EXHIBIT VI: Damages Beyond the Historic Period

Supplemental Appendix C.3

**Exhibit VI Damages Beyond the Historical Damage Period 2**

| | | Damage Year | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | |
| Estimated lost subscribers [a] | | 2,005 | 1,906 | 1,839 | 1,772 | 1,699 | 1,621 | 1,543 | 1,465 | |
| Annual revenue per subscriber | | $ 101.85 | $ 101.85 | $ 101.85 | $ 101.85 | $ 101.85 | $ 101.85 | $ 101.85 | $ 101.85 | |
| Estimated annual revenue | | $ 204,216 | $ 194,132 | $ 187,308 | $ 180,484 | $ 173,049 | $ 165,104 | $ 157,160 | $ 149,215 | |
| *Less* payments due to TVP | | $ (10,783) | $ (10,250) | $ (9,890) | $ (9,530) | $ (9,137) | $ (8,718) | $ (8,298) | $ (7,879) | |
| Revenue net of TVP payment | | $ 193,433 | $ 183,882 | $ 177,418 | $ 170,955 | $ 163,912 | $ 156,387 | $ 148,862 | $ 141,337 | |
| Discount rate | 11% | 0.9009 | 0.8116 | 0.7312 | 0.6587 | 0.5935 | 0.5346 | 0.4817 | 0.4339 | |
| Estimated lost subscribers revenue | | $ 174,264 | $ 149,243 | $ 129,727 | $ 112,613 | $ 97,274 | $ 83,611 | $ 71,700 | $ 61,330 | $ 879,762 |

**Shulman's Notes:**

| [a] Estimated lost subscribers | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|
| Beginning of the period [d] | 2,071 | 1,939 | 1,872 | 1,805 | 1,738 | 1,660 | 1,582 | 1,504 |
| Estimated attrition of subscribers [e][1] | -6.4% | -3.5% | -3.6% | -3.7% | -4.5% | -4.7% | -5.0% | -5.2% |
| End of the period | 1939 | 1872 | 1805 | 1738 | 1660 | 1582 | 1504 | 1425 |
| Average for the period | 2,005 | 1,906 | 1,839 | 1,772 | 1,699 | 1,621 | 1,543 | 1,465 |

[b] Annual revenue per subscriber

| | | |
|---|---|---|
| Average quarterly revenue per subscriber [2] | $ | 25.46 |
| Quarters per year | | 4 |
| Annual revenue per subscriber | $ | 101.85 |

[c] Morningstar Cost of Capital based on the average of the weighted average cost of capital (WACC) plus size premium (CAPM+Size Premium) for SIC 48 and 484

[d] End of the period for 2011 from Exhibit IV

[e] Estimated attrition rate of subscribers is based on language projections 2010 to 2020 (Shin, et al) that estimates the number of Polish speaking individuals in the US from 2010 through 2020, based on US Census data and the 2009 American Community Survey. The authors used three methods to estimate future Polish speaking US population. We used the average of the three methods as follows:

| | | Population Estimates | | |
|---|---|---|---|---|
| | | Under 3 Models | | |
| Year | Linear Model | Constant Model | Logistic Model | Average |
| 2010 | 539,000 | 555,000 | 544,000 | 546,000 |
| 2015 | 452,000 | 578,000 | 480,000 | 503,333 |
| 2020 | 350,000 | 597,000 | 426,000 | 457,667 |

We assumed that the decline in Polish speaking population was linear. Therefore, we estimated the amount of attrition in subscribers per year as follows:

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|
| Polish speaking people in US [1] | 504,200 | 486,800 | 469,400 | 452,000 | 431,600 | 411,200 | 390,800 | 370,400 |
| Change per year | (33,267) | (17,400) | (17,400) | (17,400) | (20,400) | (20,400) | (20,400) | (20,400) |
| Percent change per year | -6.4% | -3.5% | -3.6% | -3.7% | -4.5% | -4.7% | -5.0% | -5.2% |

[f] Payments due to TVP are 8% of 66% of revenue (TVP portion of revenue)

Notes:
[1] Attrition rate calculation was updated to use Mr. Shulman's assumed linear model (Note [e]) and the Polish speaking population projections from the Linear Model only (Note [e]).
[2] Supplemental Appendix C.1

**SPANSKI ENTERPRISES, INC. v. TELEWIZJA POLSKA, S.A.**

**Case No.: 10-4933 (ALC-GWG)**

**Rebuttal Expert Report of Gary Arlen**

**Submitted on Behalf of Telewizja Polska, S.A.**

**May 16, 2012**

**ARLEN COMMUNICATIONS LLC**
**7315 Wisconsin Avenue, Suite 805E**
**Bethesda, MD 20814**
**301.656.7940**
**www.ArlenCom.com**

## I.   INTRODUCTION

I submit this Rebuttal Expert Report on behalf of Telewizja Polska, S.A. ("TVP"). This report responds to the Expert Report of Stephen W. Shulman submitted by Spanski Enterprises Inc. ("SEI"). I address certain points in Shulman's opinion on SEI's Polvision claim. That I do not address other points in Shulman's report does not mean that I agree with any of those points.

In summary, this report discusses my views that Shulman's damages theory relating to SEI's Polvision claim is incorrect because:

(1)   SEI never had the right to syndicate individual programming content owned by TVP;

(2)   Shulman improperly assumed that Polvision would sell 100 percent of its available advertising time at $159 per spot; and

(3)   Polvision would not have spent 40 percent of its gross hourly advertising revenues to purchase the programming content licensed by TVP to Polvision.

## II.   SEI NEVER HAD THE RIGHT TO SYNDICATE INDIVIDUAL PROGRAMMING CONTENT OWNED BY TVP

Shulman's general damages theory regarding SEI's Polvision claim is fundamentally flawed. SEI never had the right to syndicate programming content owned by TVP to a third party. Shulman acknowledges that in the 17 years SEI has been distributing TVP programming for re-broadcast in the Territory, SEI has in fact never syndicated programming content to a third party. Despite SEI's lack of syndication rights and that SEI has never syndicated TVP's programming, Shulman incorrectly grounds his damages theory on the hypothetical syndication value of the programming TVP licensed to Polvision.

Shulman's damages theory concerning the Polvision claim not only lacks any basis in the parties' agreements or SEI's past performance, Shulman has apparently not been willing to support the damages theory previously articulated by SEI which was based on alleged lost subscribers. In its February 15, 2012 Interrogatory Responses, SEI claimed damages attributable to thousands of cancelled television and internet subscriptions as a result of Polvision's broadcast of content licensed by TVP. My April 16, 2012 Expert Report discussed my views concerning that theory. Shulman has apparently abandoned SEI's "lost subscribers" damages theory, and instead has put forth a damages theory based upon a hypothetical syndication value of the programming TVP licensed to Polvision.

Shulman's damages theory has no basis in the parties' agreements. Under the December 14, 1994 Agreement, as amended, and the August 11, 2009 Settlement Agreement, SEI has the right to distribute, as SEI presently does, TVP's *TV Polonia* channel (and until April 29, 2012, TVP's *TVP Info* channel) through third-party cable and satellite distributors. However, SEI has no right to syndicate individual programming content to television networks or channels such as Polvision. My view that SEI has no syndication rights is based upon several provisions in the agreements:

- The *TV Polonia* and *TVP Info* "Signal" - For the purposes of implementing SEI's right to the one-off use of *TV POLONIA* Shows, TVP granted SEI the exclusive right to "receive and use the Signal (defined as the signal of *TV Polonia* and *TVP Info* programming service broadcast by TVP via Satellite) in the Territory." (1994 Agreement, as amended, Section 2.) This wording demonstrates that SEI is granted rights to the full *TV Polonia* and *TVP Info* signals, not syndication of individual programming available as part of those signals.

- "Broadcasting" – The Agreements refer throughout to SEI's "broadcasting" of the *TV Polonia* and *TVP Info* programming services in the Territory, not syndication of individual programming that constitutes the programming services. (1994 Agreement, as amended, Sections 4, 5, and 8; 2009 Settlement Agreement, Clause II.D.)

- Royalty Payments to TVP – The Agreements specify that SEI is to pay TVP 8 percent of royalties SEI earns from subscriber revenue and advertisements. There is no mention of royalties to be paid by SEI from revenues SEI would earn from syndicating TVP programming. (1994 Agreement, Section 6; 2009 Settlement Agreement, Clause II.G.)

- SEI's Distribution Rights: Satellite and Cable Distributors – The August 2009 Settlement Agreement refers to SEI's rights to distribute *TV Polonia* and *TVP Info* through SEI affiliates or third-party satellite or cable distributors. (2009 Settlement Agreement, Clause II.C.) There is no mention of SEI syndicating content (i.e., individual programs) from *TV Polonia* or *TVP Info* to television networks or channels such as Polvision.

- SEI's Distribution Rights: *TV Polonia* and *TVP Info* as Whole Channels – The Settlement Agreement refers to SEI's right to distribute *TV Polonia* and *TVP Info* as whole channels, not to the syndication of individual programming. (2009 Settlement Agreement, Clauses II.A,B,C,D,F, and I.)

The above-listed clauses demonstrate that TVP granted SEI the right to distribute the programming service on TVP's *TV Polonia* and *TVP Info* signals as

2

whole channels for re-broadcast by satellite and cable distributors, in exchange for SEI paying TVP 8 percent royalties on subscriber and advertising revenues derived from broadcasting those channels. Nowhere in the agreements does TVP grant SEI the right to syndicate TVP's individual programming, and there is no provision in the agreements defining how SEI would pay TVP royalties from syndicating TVP programming. SEI's lack of rights to syndicate individual programming is consistent with Clause II.E of the August 2009 Settlement Agreement as not restricting TVP from licensing individual programming on *TV Polonia* or *TVP Info* to other networks or channels, but only restricting TVP from licensing re-runs of the full content of *TV Polonia* or *TVP Info*, or distributing alternative similar channels. (*See* G. Arlen April 16 Expert Report, at 7-8.) In other words, TVP retained the right to syndicate its individual programming on *TV Polonia* and *TVP Info* because TVP never granted SEI syndication rights to individual programming on those channels.

In my experience with practices for syndicating television programming, syndication arrangements are established through carefully-defined syndication agreements. A syndicator (i.e., a program producer/studio or rights-owner – in this case, TVP) enters a contractual arrangement with a local broadcast station, cable network, or other similar entity to allow that entity to telecast specific programs under specific terms. Those terms may include the number of times a show may be aired, the time(s) of day a show must or may be aired, and the number and types of commercials that must or may accompany a show. That there are no such typical syndication-related terms in the parties' agreements here further demonstrates that the parties never entered into a syndication arrangement.

Based on my understanding of the U.S. copyright law, SEI would be statutorily prohibited from syndicating individual TVP programming to which TVP owns intellectual property rights. 17 U.S.C. § 111(b), entitled, "Secondary Transmission of Primary Transmission to Controlled Group," provides:

"[T]he secondary transmission to the public of a performance or display of a work embodied in a primary transmission is actionable as an act of infringement under section 501, and is fully subject to the remedies provided by sections 502 through 506, if the primary transmission is not made for reception by the public at large but is controlled and limited to reception by particular members of the public..."

Here, TVP has granted SEI the exclusive right to distribute for broadcasting the entire content of the *TV Polonia* and *TVP Info* channels. SEI has no right to facilitate the secondary transmission of any individual programming on *TV Polonia* or *TVP Info* via syndication. If SEI would syndicate individual content on *TV Polonia* or *TVP Info* for secondary transmission (which SEI has not done since the beginning the parties' relationship in 1994), SEI would be violating U.S. copyright law.

3

In summary, I believe that SEI never had any right to distribute TVP programming content in any manner beyond what is specified in the parties' agreements. Specifically, SEI had no right to syndicate TVP programming to other networks or channels. If TVP had given SEI any rights to syndicate its shows, such authority would be clearly delineated in the parties' agreements, and no such authority is mentioned in the parties' agreements. Shulman's damages theory based upon a theoretical syndication value to SEI is incorrect because his theory has no basis in the reality of the parties' relationship.

### III. POLVISION WOULD NOT HAVE SOLD 100 PERCENT OF ITS AVAILABLE ADVERTISING TIME AND WOULD NOT SELL THAT TIME AT $159 PER SPOT

In calculating the theoretical syndication value of the programs TVP licensed to Polvision, Shulman improperly assumes that Polvision would sell: (a) 100 percent of its available advertising time, (b) at $159 per thirty-second commercial. Both of these assumptions relating to Polvision's advertising revenues are not only out of line with typical conditions of television commercial sales (which I understand is beyond Shulman's expertise), these assumptions are directly contrary to the testimony of Mr. Walter Kotaba (Polvision's president) which Shulman references only selectively.

Television stations do not sell out their complete commercial inventory except in very rare circumstances, such as during the Super Bowl telecast, during peak advertising seasons, such as holidays or election campaigns, or when the most popular shows are aired, such as the finale of a hit series. Hence, the assumption that Polvision sold 100 percent of its complete inventory is not credible. Although stations do not disclose their amount of unsold inventory, the amount of unsold inventory may be estimated by examining, for example, the number of public service announcements, tune-in promotional messages, or other content that is not revenue-producing, and the amount of "per-inquiry" commercials where the station may receive a commission from sales but which typically run in unsold commercial inventory.

Based on my research and experience, I expect that on average no more than 90 percent of available advertising inventory was sold by Polvision.

Shulman's second improper assumption relating to Polvision's advertising revenues concerns the per-spot rate charged by Polvision. Shulman cites a Polvision rate card purportedly listing Polvision's advertising rates at $159 per 30-second spot (¶ 44). Shulman neither attaches the rate card as an exhibit to his report nor provides a source for the rate card. In any event, Shulman ignores Kotaba's repeated testimony that Polvision actually charged $40 to $90 per spot, and that a spot could be as long as one minute (not just thirty seconds in length). (Kotaba Dep., at 39-41.) Further, Shulman

ignores Kotaba's testimony that in some cases Polvision may have charged less than $40 per spot, and in some cases, Polvision broadcasted commercials for free. (*Id.*, at 28, 40-41.)

The per-spot range of $40 to $90 (and sometimes less) mentioned by Kotaba is consistent with industry expectations. The flat rate of $159/spot purportedly listed on a Polvision rate card which Shulman relies upon for his damages calculations has no basis in reality:

- First, any rate-card price is always a starting point, an established benchmark for stations and ad-buyers (ad agencies, TV buyers, local merchants) to begin negotiations. I have never known a savvy commercial buyer to pay the "rate card listing" price any more than an automobile customer would pay the sticker price for a new car.

- Second, there are always discounts for advertisers who buy multiple commercial placements. The discounts can vary widely, based on the frequency of the ad buy and the term length of the agreement.

- Third, the broadcast industry widely recognizes significant price variations for commercials depending on seasonality and time-of-day. For example, in the Chicago area, according to data from the industry trade organization TV Bureau of Advertising (TvB), the price of a 30-second evening primetime commercial is nearly four times the price of a 30-second "early morning" commercial.[1] The TvB report identifies eight different pricing categories: Early Morning, Daytime, Early Fringe, Early News, Prime Access, Primetime, Late News, Late Fringe.

- Fourth, in the case of the particular four shows licensed by TVP to Polvision, it is further unlikely that an advertiser would pay Polvision's standard rates because the shows do not contain commercial interruptions during the programming. The only availability for commercials is at the end of a program.

Based on Kotaba's testimony and these common industry-accepted practices, I believe that the advertising pricing relied upon by Shulman—$159 per 30-second spot for 100 percent of Polvision's available commercial minutes, ignoring negotiated prices, volume discounts, time-of-day-based pricing, and

---

[1] Television Bureau of Advertising report of VSQAD DATAVue Product Version 3.0.0.1 (Copyright 2004 - 2012), April 2012. Although the pricing data is at current levels, the indicated range of price differentials for different parts of the day would be consistent for the period in question.

out-of-programming placement—is not reasonable. More likely, Polvision may have received between $40 to $90 per 15-second-to-one-minute spot, with large fluctuations and in some cases, as explained above, significant discounts.

In summary, the combined factors relied upon by Shulman in ¶¶ 42-47—100 percent total sell-out of all inventory at a full rate-card price of $159 per spot—do not represent reality, and are an improper basis for Shulman's damages theory.

## IV.  POLVISION WOULD NOT SPEND 40 PERCENT OF ADVERTISING REVENUES TO ACQUIRE A PARTICULAR PROGRAM

Shulman's assumption that Polvision would pay 40 percent of its advertising revenues generated during the broadcast of a program to acquire that particular program is also incorrect.

To arrive at his assumption of a 40-percent ratio of spending to advertising revenue, Shulman relies upon certain data from SNL Kagan indicating a range of a 30-to-38-percent ratio. Shulman then marks up that ratio to 40 percent to account for a premium SEI would charge Polvision in this context as a competing network. (¶ 47 and Ex. VII.)

Despite the estimates from SNL Kagan, the 40 percent figure relied upon by Shulman is an arbitrary figure that cannot be applied to this situation with any degree of certainty. The ratio of program acquisition costs to advertising revenue widely fluctuates depending on individual circumstances. In many cases, original, first-run network shows generate less advertising revenue than the cost of production or syndication. A program's value to a network may be based on the show's value for purposes other than advertising, such as a lead-out from or lead-in to a show, such as a local newscast – a program in which the purchaser of the syndicated content may earn significantly higher revenues from commercials than from commercials broadcasted during the syndicated programming content.

While I cannot quantify with certainty Polvision's advertising-revenue-to-program-acquisition-cost ratio, in my view, based on the circumstances, it would be appropriate to significantly discount the SNL Kagan 30-to-38-percent ratio. As I explained in my April 16 Expert Report (pg. 10), the episodes TVP licensed to Polvision under the August 2009 Licensing Agreement were very old episodes (the episodes of *Klan* and *Zlotopolsky* had been broadcast on *TV Polonia* more than 10 years earlier; the episodes of *Na Dobre* and *Plebania* had been broadcast more than six and four years earlier, respectively). These episodes were of limited value to Polvision. In fact, Kotaba confirmed that Polvision's broadcast of these episodes had no impact on his overall viewership (Kotaba Dep., at 128), further indicating that it is highly unlikely Polvision

6

A-3113

would have paid as much as 40 percent of total advertising revenues to acquire the particular episodes of the programs.

*Gary H. Arlen*
**Gary Arlen**
**May 16, 2012**

Polish version

**Polish** .


# TVPolonia

- My Account
- Help
- Contact Us

- **Home**
- **About Us**
- **Radio**
- **Schedule**
- **Satelite/Cable**



Terms and Conditions

## Terms and Conditions

### Condition of use of the service

Ordering subscription of tvpolonia.com, account is allowed to be accesed from one internet access location. If you have a computer network, you may use each computer, provided that all computers are connected and use the same internet access point (same external IP).

If you want to login from different places, e.g., office, you shall contact support@tvpolonia.com in order to advice us about such need, and receive authorization to login from different places. All logins are monitored and automatically controlled by our system. In the event of unauthorized login, in order to protect our database (in case of use by the third parties) the subscription is automatically suspended, until contact is established with the user to resolve such unauthorized login.

If you are using a laptop and want to login from the different places during the trip, please make sure that you have cookies enabled. This way, user is recognized by the cookies and addresses from which login will take place will not be considered. If you require more information, please contact support@tvpolonia.com.

Cookies are the information, which server writes onto the computer's disc, based on which it will be able to recognize you during the new connection. We recognize our users to verify them, what allows them to move freely on our pages without the need to enter "the user name and "password". In addition, it allows us to analyze which information are the most popular among the users, which in turn allows us to tailor our service to our users interest and expectations. Our users alone create our web page and service of tvpolonia.com. Cookies are set when you enter and leave the service. In no way are they harmful to your computer, never the less, there is always an option to turn them off in each and every browser. You should keep in mind, that using profiled service of tvpolonia.com you have an input on how the service looks and what content is offered. Having cookies disabled using some services will not be possible.

### Unwanted content

Our service does not contain content conflicting with Polish or international law. In tvpolonia.com catalogue you will not find content urging racial, religious or ethnic hate or discrimination. There is also no pornography, content morally questionable and commonly known as unethical.

## Users registration and accounts

All personal data provided on application during the registration for tvpolonia.com are encrypted. We use 128 encryption technology on the secure server.

## Fees

Trying to provide the most convenient and the safest way of payment, we are continuously introducing new alternatives.

Paying by credit card via internet you are obtaining the safety guaranteed by Entrust.net and Authorize.net systems, leaders among the electronic payment systems providers on the internet in real time. After connecting with authorization page, user (card owner) enters data (among them card number, date of expiry) necessary for authorization. Providing the data regarding the card's owner utilizes SSL protocol utilizing full 128 bit encryption. Authorization processed by Entrust.net, Authorize.net is based on computer system contacting the bank, which issued the card, in order to receive the reply if particular payment may be processed.

## Undertaking

By ordering the subscription of tvpolonia.com trough Authorize.net autopay system you wave the right to any credit or refund (charge back) for the reason including but not limited to poor transmission quality, temporary lack of service, interruptions of service or other known or unknown occurrences during any chosen billing cycle. If you are dissatisfied with the service for any reason whatsoever, the ONLY remedy shall be to unsubscribe (cancel) the service and discontinue the subscription beginning from the subsequent billing cycle.

## Good advice

Please remember: Sharing one computer with other users, after finishing each session with tvpolonia.com to which login is required -- you need to log out, meaning to exit your setup, so no one may see the login info. Data used at registration is known ONLY to the User and tvpolonia.com. We guarantee that we will not share your data with anybody. We ask you to keep the same "vengeance" in exposing your data to the third parties.



## Sign up now

We offer a great selection of current news and information programs, sitcoms, series, movies, programs for children, entertainment programs, and much much more...

## Sign up

## Launch player

## Links

**Globecast World**:: TVPOLONIA, TVP INFO, TELE5, RADIO 1 i 3 - 1-888-988-5288
**POL.tv**:: Official opening ceremony new IPTV service

**Seusa.info**:: Super Express USA
**Siskelfilmcenter.org**:: 14th European Union Film Festival
**Chicagofilmfestival.com**:: 47th Chicago International Film Festival - 6/10 - 20/10
**kierunek.us**:: Ameryka dla turyst☐w
**Przewodnikhandlowy.com**:: Polski Przewodnik Handlowy - Toronto
**Zycie.ca**:: Tygodnik Polonii Kanadyjskiej
**Polskastacja.pl**:: Polskie radio internetowe
**pffamerica.com**:: Festiwal Filmu Polskiego w Ameryce 7/11-21/11
**Radiosfera.pl**:: Polskie radio internetowe
**ABCradio.ca**:: Polskie radio internetowe
**VOXIM.pl**:: Telefony, Akcesoria GSM
**teatrpolskitoronto.com**:: Teatr Polski w Toronto
**ogloszenia-us.com**:: Darmowy serwis ogloszeniowo-reklamowy.
**MyPolInfo.com**:: Polonijne Centrum Informacji
**tnpolonia.com** - pismo polonii kanadyjskiej

Copyright © 2011 tvpolonia.com, All Rights Reserved.

- Home
- |
- Terms and Conditions
- |
- Privacy Policy
- |
- Contact Us

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
                                                          :
SPANSKI ENTERPRISES, INC.,
                                                          :
                        Plaintiff,
                                                          :   10 Civ. 4933 (ALC)(GWG)
             v.                                           :
                                                          :
TELEWIZJA POLSKA S.A.,
                                                          :
                        Defendant.
                                                          :
--------------------------------------------------------- X


### PLAINTIFF SPANSKI ENTERPRISES INC.'S
### POST-TRIAL MEMORANDUM

Jonathan Zavin (JZ-1846)
John Piskora (JP-1224)
Michael Barnett (MB-7686)
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
Main: (212) 407-4000
Fax: (212) 407-4990

*Attorneys for Plaintiff*
*Spanski Enterprises, Inc.*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ........................................................................... 1

FACTS ESTABLISHED AT TRIAL ................................................................... 3

    The Parties and Their Agreements ............................................................. 3

    The Prior Action and Settlement Thereof ................................................. 4

    SEI's First Claim – Breach of Contract (Exclusivity) by TVP's License to
    Polvision ...................................................................................................... 5

    SEI's Third Claim – Breach of Contract (Removal of *Klan* from *TVP Polonia*) ............. 9

    SEI's Second Claim – Breach of Contract (Failure to Provide Support Against
    Infringers) .................................................................................................... 12

    TVP's Counterclaim – Alleged Breach of the Implied Duty to "Maximize
    Subscribers" ................................................................................................ 15

APPLICABLE LAW ........................................................................................... 19

I.    SEI SHOULD BE AWARDED DAMAGES AS TO EACH OF ITS CLAIMS............ 19

    Claim 1 – TVP Breached the Agreement and Settlement Agreement by Licensing
    *TVP Polonia* Programming Content to Polvision ........................................ 20

    Claim 3 – TVP Breached the Agreement and Settlement Agreement by Removing
    *Klan* from *TVP Polonia* ............................................................................. 27

    Claim 2 – TVP Breached the Agreement and Settlement Agreement by Failing to
    Provide Support to SEI to Combat Infringers .............................................. 29

II.    TVP'S COUNTERCLAIM FOR THE PURPORTED BREACH OF AN
    IMPLIED OBLIGATION TO "MAXIMIZE SUBSCRIBERS" FAILS ON THE
    FACTS AND THE LAW ............................................................................... 31

CONCLUSION .................................................................................................... 35

i

# TABLE OF AUTHORITIES

Page(s)

CASES

Arbitron v. Tralyn Broad., Inc.,
  526 F. Supp. 2d 441 (S.D.N.Y. 2007), *aff'd*, 327 F. App'x 755 (2d Cir. 2009) ............. 19

Bigelow v. RKO Radio Pictures, Inc.,
  327 U.S. 251, 264-66 (1946) ...................................................................................... 29

BLD Prods. LLC v. Viacom, Inc.,
  2011 WL 1327340 (S.D.N.Y. March 31, 2011) ........................................................ 31

Bravia Capital Partners Inc. v. Fike,
  2010 WL 3359470 (S.D.N.Y. Aug. 25, 2010) ....................................................................

Dalton v. Educational Testing Service,
  87 N.Y.2d 384, 663 N.E.2d 289, 639 N.Y.S.2d 977 (1995) ..................................... 20, 28

Jaffe v. Paramount Comm. Inc.,
  222 A.D.2d 17, 644 N.Y.S.2d 43 (1st Dep't 1996) .................................................. 20, 28

Labajo v. Best Buy Stores, L.P.,
  478 F. Supp. 2d 523 (S.D.N.Y. 2007) ............................................................................ 19

Lorterdan Props. at Ramapo I, LLC v. Watchtower Bible and Tract Soc'y of New York,
  Inc., 2012 WL 2873648 (S.D.N.Y. July 10, 2012) ....................................................... 19

Miller v. Almquist,
  241 A.D.2d 181, 671 N.Y.S.2d 746 (1st Dep't 1998) .............................................. 20, 28

Nemaizer v. Baker,
  793 F.2d 58 (2d Cir. 1986) ............................................................................................ 34

PFRMF Inv. Holdings LLC v. Interpublic Grp. of Cos., Inc.,
  2012 WL 2849771 (S.D.N.Y. July 10, 2012) .............................................................. 34

RBS Holdings Inc. v. Wells Fargo Century, Inc.,
  485 F. Supp. 2d 472 (S.D.N.Y. 2007) ........................................................................... 34

Rexnord Holdings, Inc. v. Bidermann,
  21 F.3d 522 (2d Cir. 1994) ............................................................................................ 19

Soroof Trading Dev. Co. v. GE Fuel Sys. LLC,
  842 F. Supp. 2d 502 (S.D.N.Y. 2012) ........................................................................... 32

## TABLE OF AUTHORITIES

Page(s)

Travellers Int'l, A.G. v. Trans World Airlines,
      41 F.3d 1570 (2d Cir. 1994) ........................................................................ 29

Wood v. Lucy, Lady Duff Gordon,
      222 N.Y. 88 (1917) .................................................................................. 31

Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.,
      126 F.3d 15 (2d Cir. 1997) ........................................................................ 24

Plaintiff Spanski Enterprises, Inc. ("SEI") respectfully submits this post-trial memorandum of law in accordance with the Court's directive at the conclusion of the trial (a bench trial conducted on July 22-25, 2013).

## PRELIMINARY STATEMENT

As set forth more fully below, the evidence at trial clearly established that Defendant Telewizja Polska S.A. ("TVP") breached its contractual agreements with SEI, and its obligations thereunder, by: (1) licensing *TVP Polonia* programming content to Polvision, a competing Polish-language channel, for distribution in SEI's exclusive territory; (2) wrongly removing the longest-running and most popular television program (entitled "*Klan*") in the history of TVP from the *TVP Polonia* channel, in an attempt to "cure" the foregoing breach, thus further breaching the Agreement and Settlement Agreement by depriving SEI of its contractual benefits thereunder; and (3) failing to support SEI in its efforts to stop an unauthorized party from infringing SEI's exclusive distribution rights via the Internet (and, instead, conducting direct negotiations with that same infringer concerning a potential programming content distribution deal in exchange for "legal assistance" from the infringer to TVP as part of an attempt to disprove that SEI's distribution rights were exclusive).  As a clear and direct result of TVP's breaches, SEI suffered substantial monetary damages.

The evidenced adduced at trial similarly established that TVP wholly failed to prove any element of its counterclaim for breach of an implied obligation to "maximize subscribers" and, accordingly, the counterclaim should be dismissed.  This Court already dismissed claims accruing before the parties' August 11, 2009 Settlement Agreement (based upon the general releases contained therein), and further held that SEI has no duty to "maximize subscribers" at all, but rather "SEI has an implied obligation, as exclusive licensee, to **use**

**reasonable efforts** to market and distribute TVP's programming in hopes of maximizing subscribers."  See Opinion and Order, dated January 8, 2013 at 14 (emphasis added).  While TVP attempted to manufacture and prove its counterclaim solely with expert testimony (one such expert opined – wrongly and without any reasonable basis or methodology whatsoever – that SEI should have secured 150,000 paying subscribers by 2006), none of TVP's experts undertook any analysis of or provided any evidence or opinion as to SEI's "efforts" at all, or undertook any analysis of the results achieved in light of the quality of the programming being offered, the competition or pricing of the programming, or what level of distribution other similar foreign language channels had achieved, let alone provided any evidence or opinion that SEI somehow breached an implied contractual obligation to use reasonable efforts to distribute the subject programming in any period **after** the execution of the parties' 2009 Settlement Agreement (pursuant to which TVP represented that SEI was in material compliance with its contractual obligations).  For this reason alone TVP's counterclaim should be dismissed.  Independently, TVP's counterclaim should be dismissed for failure to prove any damages (as TVP's expert's damage calculation was not based upon **any** conduct occurring after the parties' Settlement Agreement, but rather was based entirely upon alleged conduct that occurred, if at all, prior to the August 11, 2009 settlement – i.e., the purported failure to secure 150,000 subscribers by 2006).

Accordingly, and for the reasons discussed more fully below, judgment should be entered in SEI's favor, and against TVP, awarding SEI compensatory damages in the total amount of $1,888,573.30 (plus pre-judgment interest thereon), and dismissing TVP's counterclaim.

2

## FACTS ESTABLISHED AT TRIAL[1]

### The Parties and Their Agreements

Plaintiff Spanski Enterprises, Inc. ("SEI") is a Canadian corporation which, together with its subsidiaries and affiliated companies, distributes Polish-language television and radio content in North and South America via satellite and cable television and over the Internet. See JPTO, Exh. 1 (Stipulated Facts and Law) at ¶ 1.  Defendant Telewizja Polska, S.A. ("TVP") is a business corporation organized under the laws of Poland (and is wholly-owned by the Polish government) which owns and operates several Polish-language television channels including the channels *TVP Polonia* and *TVP Info*.  See JPTO, Exh. 1 (Stipulated Facts and Law) at ¶ 2.

Pursuant to a written agreement (the "Agreement"), dated December 14, 1994, TVP granted SEI the exclusive right to broadcast the programming of TVP's television channel *TVP Polonia* in North and South America (the "Territory") for an initial period of 25 years.  In exchange for the foregoing distribution rights, SEI agreed to pay TVP certain royalties.  See Plaintiff's Trial Exhs. 1-2; Spanski Trial Decl. at ¶¶ 15-16.

On November 4, 1999, the parties entered into an addendum to the Agreement (the "First Addendum") whereby TVP granted SEI the further right to distribute *TVP Polonia* programming content over the Internet within the Territory.  See JPTO, Exh. 1 (Stipulated Facts and Law) at ¶¶ 5-6.  The First Addendum also contained a provision by which TVP designated

---

[1] The dispositive facts are summarized here for the Court's convenience.  Pursuant to the Court's Individual Practices, SEI introduced the direct trial testimony of its fact witnesses Boguslaw Spanski, Piotr Lenarczyk, Thomas Gladkowski, and Casey Chisick, Esq. by declaration, and the direct expert testimony of Stephen W. Shulman and Larry Gerbrandt by expert report (later affirmed).  TVP introduced the direct trial testimony of its fact witness Maria Nadolna by declaration, as well as the direct expert testimony of Gary Arlen, Timothy Hart, Prof. Marek Wierzbowski, and Ivan Reyes by expert report (later affirmed).  Certain of the witnesses gave further testimony at trial (references herein to the trial transcript are made as follows: "Tr. (witness) (page):(line)").

SEI as TVP's representative throughout the Territory with authority from TVP to combat illegal piracy and infringement of *TVP Polonia* programming content, and further provided that TVP would provide support to SEI in connection therewith.   See Plaintiff's Trial Exhs. 3-4. Specifically, the First Addendum provides that: "TVP designates SEI as its representative in the Territory, authorized to prevent any violations and to protect TVP rights.   Any legal action on behalf of TVP, in particular incurring costs, may be undertaken only by prior approval by TVP. TVP will provide appropriate support to SEI actions in this regard." Id.

TVP and SEI entered into a second addendum to the Agreement, dated April 29, 2002 (the "Second Addendum"), pursuant to which TVP granted SEI the distribution rights in and to the programming of second TVP channel, *TVP Info*.   See JPTO, Exh. 1 (Stipulated Facts and Law) at ¶¶ 8-9.   The parties' Agreement (as amended) provides that it is to be construed pursuant to the laws of New York. Id. at ¶ 14.

**The Prior Action and Settlement Thereof**

Following the execution of the parties' 1994 Agreement, and only after years of performance whereby SEI paid all of the expenses to develop the distribution of the channel in the Americas and started to earn a return on that investment, TVP decided that the Agreement was too favorable to SEI.   See Spanski Trial Decl. at ¶¶ 31-33.   TVP's senior management actively sought to "break" TVP's contract with SEI – and put that intent in writing. Id.

Eager to escape its contractual commitments, in 2006 TVP improperly initiated an arbitration in Warsaw seeking to have the Agreement declared void. Id.   Because the parties had contractually agreed to litigate their disputes before this Court, SEI initiated an action (entitled *Spanski Enterprises Inc., et al. v. Telewizja Polska S.A., et al.*; S.D.N.Y. Case No. 07 CIV 930) (the "Prior Action") in this Court seeking, *inter alia*, both to enjoin the improper Warsaw

arbitration proceeding (which the Court did) and declaratory relief concerning its contractual rights.  Id.; See JPTO, Exh. 1 (Stipulated Facts and Law) at ¶ 10.  After many years of time-consuming and expensive litigation, the parties settled the Prior Action on August 11, 2009 by a written settlement agreement (the "Settlement Agreement").  See Spanski Trial Decl. at ¶¶ 34-37; see also Plaintiff's Trial Exh. 7 (Settlement Agreement).

   The Settlement Agreement confirmed SEI's exclusive right to distribute *TVP Polonia* programming content, expressly providing that: "SEI is and shall remain the exclusive distributor of *TV Polonia* and *TVP Info* programming content in the territory of North and South America by any and all means of distribution [subject to a "sole exception" not relevant to this action]."  Plaintiff's Trial Exh. 7 (Settlement Agreement) at II.A (emphasis added); JPTO, Exh. 1 (Stipulated Facts and Law) at ¶ 12.  The Settlement Agreement also unambiguously provided that: "TVP shall not distribute ... or permit the distribution of any other channels in North or South America that contain any of the same programming that is contained, has been contained, or will be contained in either *TV Polonia* or *TV Info*."  Plaintiff's Trial Exh. 7 (Settlement Agreement) at II.E.  Finally, TVP represented in the Settlement Agreement that SEI was then "in material compliance with the terms of the 1994 Agreement (as amended).  See JPTO, Exh. 1 (Stipulated Facts and Law) at ¶ 13.

**SEI's First Claim – Breach of Contract (Exclusivity) by TVP's License to Polvision**

   Just weeks after entering into the August 11, 2009 Settlement Agreement with SEI, TVP entered into an August 31, 2009 license agreement with Polvision (a competing Polish-language television distribution company located in Chicago) and provided the Polvision channel with a number of *TVP Polonia*'s most popular and longest-running serial programs (including certain individual programs from the series entitled *Plebania*; *Klan*; *Na Dobre i na*

*Zle*; and *Zlotopolscy*) for distribution in SEI's exclusive Territory.   See JPTO at Exh. 1 (Stipulated Facts and Law) at ¶ 17 ("TVP entered into a License Agreement with Polvision/Polstudios, dated August 31, 2009, whereby TVP licensed to Polvision for broadcast certain *TVP Polonia* programming content); Plaintiff's Trial Exhs. 25-26; Spanski Trial Decl. at ¶ 42; Lenarczyk Trial Decl. at ¶¶ 10-12.[2]

That TVP's actions and license to Polvision were in breach of the exclusivity provisions of the Agreement (as amended) and Settlement Agreement was simply not disputed.[3] See Spanski Trial Decl. at ¶ 51; Plaintiff's Trial Exhs. 27-28 (TVP advised Polvision: "You may obtain information that TVP S.A. recently signed a settlement with Mr. Spanski's company.  The provisions of this settlement unfortunately somewhat complicate our cooperation, because Spanski Enterprises in the USA are granted exclusive rights to material[] which has been and will be broadcast by TVP POLONIA.  In connection with this you will have to contact Mr. Spanski to get his consent to broadcasting [of episodes of *Plebania*; *Klan*; *Na Dobre i na Zle*; and *Zlotopolscy*] ….."; Polvision responded to TVP: "As far as I know, Mr. Spanski has had the exclusiveness to the programs broadcast via TVPolonia's antenna from way back under his agreement and that's why before the cooperation Office sold us series or any other program they

---

[2]  Given that it was stipulated that the license agreement between TVP and Polvision was entered into on August 31, 2009, the trial testimony of TVP's sole fact witness, Maria Nadolna, to the contrary is irrelevant except to the extent that such testimony established that Ms. Nadolna lacked any credibility whatsoever.  In fact, numerous documents executed by Ms. Nadolna (including the July 16, 2010 "Annex to the Agreement dated August 31, 2009") establish beyond any doubt that the license agreement between TVP and Polvision was effective as of August 31, 2009.  See, e.g., Plaintiff's Trial Exhs. 36-39, 44-45, 48-49, 70-71.

[3]  Nor is it disputed that TVP failed to advise SEI of any license or barter agreement TVP may have had with Polvision during the pendency of the Prior Action and before the Settlement Agreement was executed.  See Spanski Trial Decl. at ¶¶ 42-43; Lenarczyk Trial Decl. at ¶ 11; Tr. (Nadolna) 144:17-25, 145:1-8.  When first confronted with this breach, however, TVP falsely wrote to SEI advising that TVP had terminated its license to Polvision.  See Plaintiff's Trial Exhs. 50-51.

always checked whether there was any collision with broadcasts of [*TVP Polonia*]"); 42-43 (internal TVP letter stating that: "In view of the impossibility, in light of the settlement agreement signed by TVP with the firm of Spanski Enterprises, as regards the further implementation of the license agreement entered into between us [TVP] and the Polish-language television station Polvision in Chicago on the subject of showing selected TVP serial programs on the Polvision channel that are being emitted by TV Polonia, I am turning to you with the request that you consider the possibility of deferring the premiere on TVP Polonia of the series that are enumerated in the attachment to this letter."); 46-47 (internal TVP memorandum stating that: "I hereby kindly inform you that, after receiving a final legal opinion, we have made the decision to cease making available to the Polvision station series not yet aired by TVP Polonia."); 54-55 (internal TVP memo discussing negotiations with Polvision to provide alternative programming and stating that: "Due to the fact that the series presently aired by Polvision; *"Klan", "Zlotopolscy", "Plebania",* and *"Na dobre i na zle",* in light of the settlement agreement entered into between TVP and the company Spanski Enterprises [SEI] violates solely the rights of that company, TVP, after having obtained information from SEI about the breach of its rights, has carefully analyzed the possibilities of changing the content to such that has not been, is not, and shall not be relayed on TV Polonia, therefore in accordance with the subject of the accord [*i.e.*, Settlement Agreement]"); 60-61 (June 25, 2010 letter from TVP to Polvision stating that: "Owing to the fact that we cannot make available for you to air the series and other programs constituting the content of TVP Polonia, … [we ask that you reconsider the airing of alternate programming]"); 72-73 (July 4, 2010 letter from TVP to Polvision providing that: "Due to the terms and conditions included in the agreements between Telewizja Polska S.A. [TVP] and Spanski Enterprises Inc. concerning the cooperation in North

7

and South America, we would like to inform you that for the duration of the agreements, namely until [] 2019, no cooperation with your company will be possible.  Therefore, please contact S.E.I. directly with regard to the business cooperation for broadcasting [TVP] programs in North and South America.").  Further, the unchallenged trial testimony of Piotr Lenarczyk (the former TVP employee responsible for the negotiation of the Settlement Agreement and execution of the Polvision license) stated that: "After the execution of the parties' Settlement Agreement, I and others at TVP realized that its license of *TVP Polonia* programming to Polvision was a mistake and in breach of SEI's contractual exclusivity.").  Lenarczyk Trial Decl. at ¶¶ 12-13.

Finally, even TVP's fact witness Maria Nadolna admitted at trial that the parties' Settlement Agreement precluded TVP from licensing *TVP Polonia* programming content for distribution in SEI's exclusive Territory.  See Tr. 132:23-25, 133:1-25, 135:18-25, 136:1-16; see also 111:22-25, 112:1-17.   Further, while Paragraph II.A of the Settlement Agreement (a provision of the Settlement Agreement consistently ignored by TVP and its witnesses), clearly confirmed that SEI had the exclusive right, both before and after the Settlement Agreement, to distribute all *TVP Polonia* programming content by any means of distribution, both Ms. Nadolna and TVP's industry expert, Gary Arlen, testified that Polvision was a "channel" such that TVP's license of *TVP Polonia* programming content (*i.e.*, content that "is contained, has been contained, or will be contained" on  *TVP Polonia*) to Polvision would be in breach of section II.E of the parties' Settlement Agreement.  See Tr. (Nadolna) 162:16-20, 163:1-4; Tr. (Arlen) 338:1-12; see also Plaintiff's Trial Exhs. 42 (Polish) and 43 (certified English translation) (referring to "showing selected TVP serial programs on the Polvision channel").

### SEI's Third Claim – Breach of Contract (Removal of *Klan* from *TVP Polonia*)

TVP first attempted to resolve its contractual breach (based upon its provision of *TVP Polonia* programming to Polvision) by negotiating the termination of its license agreement with Polvision in exchange for either a monetary payment, or TVP's provision of alternate, "non-*TVP Polonia* programming." See, e.g., Plaintiff's Trial Exhs. 50-51, 56-57 (requesting a "financial proposal" from Polvision for the termination of its license); 58-59 (same). When that didn't work, TVP compounded its breach of its agreements with SEI by improperly removing programming from *TVP Polonia* and licensing such *TVP Polonia* programming to Polvision. See Plaintiff's Trial Exhibits 42 (Polish) and 43 (certified English translation of internal TVP letter stating that: "In view of the impossibility, in light of the settlement agreement signed by TVP with the firm of Spanski Enterprises, as regards the further implementation of the license agreement entered into between us [TVP] and the Polish-language television station Polvision in Chicago on the subject of showing selected TVP serial programs on the Polvision channel that are being emitted by TV Polonia, **I am turning to you with the request that you consider the possibility of deferring the premiere on TVP Polonia of the series that are enumerated in the attachment to this letter**.") (emphasis added). In other words, TVP decided to improperly convert *TVP Polonia* programming into supposedly "non-*TVP Polonia* programming" by artificially delaying the airing of such programming on the *TVP Polonia* channel. This had nothing to do with normal programming decisions.

Ultimately, solely to placate Polvision – but to the detriment of SEI (and to the detriment of *TVP Polonia* viewers and subscribers worldwide), TVP removed the most popular and longest-running series *Klan* (in what was then announced to be its climatic final season, following continual, yearly airing since 1993) from the *TVP Polonia* channel (although the series

continued to be produced and broadcast on TVP's channel *TVP 1* within Poland), and licensed the program to SEI's direct competitor. See Spanski Trial Decl. at ¶¶ 55-57; Plaintiff's Trial Exhs. 70-71 (Annex to Polvision licensing agreement); Exh. 152 (evidencing that *Klan* as broadcast on TVP 1 in Poland is the most popular show in its time slot); Tr. (Arlen) 261:25 – 263:4, 264:23-25 (admitting that *Klan* continues to be one of the most popular shows in Poland).

By Annex dated July 16, 2010 (Plaintiff's Trial Exhibits 70 (Polish) and 71 (certified English translation)), TVP entered into an amendment to its August 31, 2009 license agreement with Polvision. In essence, by this Annex (which TVP never produced in this action, and which was only obtained by subpoena from Polvision), TVP agreed to provide *TVP Polonia* programming to Polvision, by pretending that the programming was not *TVP Polonia* content. Such substitute programming included, among other programming, the newest episodes of *Klan* (as well as additional episodes of the *TVP Polonia* series *Plebania*).

TVP would have this Court believe that its removed the *Klan* series from *TVP Polonia* channel solely as part of its regular programming review process. TVP's claim, however, is belied by the indisputable documentary evidence. When subscribers and viewers ultimately complained to TVP concerning the removal of *Klan*, TVP falsely responded to viewers that "we [TVP] lost the rights to the serial *"Klan"* and under the circumstances, I cannot tell you whether and when we will resume offering this series." See Plaintiff's Trial Exhibits 110-111 (TVP's e-mail response to viewer's inquiry as to when TVP will broadcast *Klan* on *TVP Polonia*). TVP, however, always held the rights to distribute *Klan* – and continued to do so in Poland on its channel *TVP 1* (and in the Chicago area via the Polvision channel).

Nor was there "declining interest" in TVP's *Klan* series – and especially the newest episodes thereof – as TVP would have the Court now believe. In fact (and as TVP's

industry expert admitted), *Klan* remains one of TVP's most popular and longest-running programs.  See Tr. (Arlen) 261:25 – 263:4.  As such, it continues to be produced and broadcast for distribution on TVP's premiere channel in Poland (the *TVP 1* channel) (see Tr. (Arlen) 264:23-25), and the latest episodes are routinely made available for viewing by TVP on its Internet website for a fee.  See Plaintiff's Trial Exh. 152 ("[*Klan*] has given TVP1 the position of TV market leader.…  […] TV1's share was 23.11% of all viewers and 15.42% in the commercial group aged 16-49"); see generally http://vod.tvp.pl/seriale/obyczajowe/klan.[4]

TVP's fact witness, Maria Nadolna, similarly lied when confronted with the issue of TVP's removal of *Klan* from *TVP Polonia*.  Even when faced with the documentary evidence establishing that she had asked the director of the *TVP Polonia* channel to delay or defer programming content such that TVP could offer this very same content to Polvision (see Plaintiff's Trial Exhs. 64-65 (July 1, 2010 letter from Nadolna requesting that certain programs not be broadcast on *TVP Polonia* such that they could be offered to Polvision, concluding: "I also thank you for your support and the ability to offer the above serials to Polvision, which clearly will stabalize [sic] the situation with SEI.")), and that Polvision in fact accepted this alternative programming (Plaintiff's Trial Exhs. 70-71 (Annex to license agreement between TVP and Polvision)), Ms. Nadolna nonetheless denied that the substitute programming had in fact been withheld from the *TVP Polonia* channel at her specific request.  Tr. (Nadolna) 150:4 –

---

[4]  Defendant's Trial Exh. 48, which purports to show that *Klan* was not popular, is completely misleading.  It shows the popularity of *TVP Polonia* shows in Poland, not outside of Poland, which is where *TVP Polonia* is primarily broadcast.  Indeed, *TVP Polonia* is TVP's international channel, and consists of the "best of" all other TVP programing shown on TVP's various channels broadcast in Poland.  In Poland, viewers can watch *Klan* on TVP1 (TVP's prime channel), which they were doing in large numbers.  Outside Poland, *Klan* could only be viewed on *TVP Polonia*, and TVP produced no evidence whatsoever that the popularity of *Klan* had diminished on *TVP Polonia* in the relevant area, which is outside of Poland.

151:21.[5]   Ms. Nadolna, who until recently was a high ranking executive at TVP, also unbelievably testified that she didn't even know that Klan, one of TVP's most successful shows, was still being produced and broadcast in Poland.  See Tr. (Nadolna) 158:17 – 159:9.

The removal of the *Klan* series from *TVP Polonia* had a direct and significant negative impact upon subscription revenues for SEI.  See Spanski Trial decl. at ¶ 58; Plaintiff's Trial Exhibits 91, 93 and 94; see also Export Report of Stephen Shulman (damages expert).

## SEI's Second Claim – Breach of Contract (Failure to Provide Support Against Infringers)

In 2010, SEI and its subsidiary Telewizja Polska Canada, Inc. ("TVP Canada") retained the Canadian law firm of Cassels Brock to represent them in regard to potential claims against IMB+ Records Inc. ("IMB+") and others for, among other things, copyright infringement (under Canadian law) arising from IMB+'s unlicensed and unauthorized distribution of, among other TVP channels and content, *TVP Polonia* and *TVP Info* programming content via the website www.imb-plus.com.  See Spanski Trial Decl. at ¶ 60; Chisick Trial Decl. at ¶ 2.

Because IMB+ was distributing both TVP programming content exclusively licensed to SEI (*i.e.* the programming content of *TVP Polonia* and *TVP Info*, some of which is also broadcast on a number of other TVP channels in Poland, including the channels TVP 1 and TVP 2) and other TVP programming not licensed to SEI, SEI wrote to and discussed with Romuald Orzel, TVP's then-President and Chairman of the Board, it's request that TVP join SEI in a civil action against IMB+, and offered to pay all of the costs and attorneys' fees (including

---

[5]   Ms. Nadolna testified that the replacement programming offered to Polvision was not withheld from the *TVP Polonia* channel, but was in fact broadcast on that channel.   Tr. (Nadolna) 150:4 – 152:20. Apparently intent on lying as to the subject of the removal of such programming, Ms. Nadolna apparently did not appreciate that her testimony completely undermined TVP's argument that its Annex Agreement with Polvision was somehow proper because the programming content licensed thereby had not appeared on *TVP Polonia*.

TVP's) associated with such an action.  TVP declined to join SEI's lawsuit as a party.  See Spanski Trial Decl. at ¶ 61; Chisick Trial Decl. at ¶ 3.

Ultimately, SEI and SEI's Canadian affiliate, TVP Canada, commenced an action against IMB+ (and certain affiliated parties) (the action is captioned *Spanski Enterprises Inc., et al. v. IMB+ Records Inc. et al.*, Ontario Court File No. CV-10-00413950-000) before the Superior Court of Justice in Ontario (hereinafter, the "Canadian Action")).  See Spanski Trial Decl. at ¶ 62; Chisick Trial Decl. at ¶ 4; Plaintiff's Trial Exh. 102.

At the time SEI commenced that action, however, SEI was wholly unaware that IMB+ and TVP were in direct communications and meeting face-to-face in Warsaw concerning IMB+'s proposed distribution of TVP's channels via the Internet in North America.  See Spanski Trial Decl. at ¶ 63; Chisick Trial Decl. at ¶ 5; see generally Plaintiff's Trial Exhibits 78-86. More specifically, representatives of IMB+ had a meeting on October 14, 2010 in Warsaw with representatives of TVP (including TVP's legal counsel) where it was discussed (and later documented) that "IMB [was] offering legal assistance [to TVP] for proving the absence of exclusive rights by the present distributor [SEI] for broadcasting TVP channels in the IPTV system in Canada and in the USA ...."  See Plaintiff's Trial Exhibits 80 (Polish) and 81 (certified English translation).  Thus, at the same time that SEI was suing IMB+ to enforce its rights and TVP's rights against an internet pirate, TVP was actively negotiating and meeting with IMB+ to undermine SEI's claim and exclusive distribution rights.  Any such Internet distribution by TVP or IMB+ would have been in clear breach of the Agreement and Settlement Agreement, and SEI's exclusive distribution rights thereunder.  In addition, while TVP asks this Court to believe that it, as a state-owned public enterprise, "has an obligation to meet with all individuals or firms which will express such a wish," including those that seek to provide assistance to TVP to

disprove the breadth of SEI's exclusive distribution rights (Tr. (Nadolna) 168:24 – 169:17).  In fact TVP's obligations (both express and implied) were to provide appropriate support to SEI, not a known internet pirate and infringer of SEI's rights.

 In addition to its refusal to join SEI as a party plaintiff against IMB+, TVP otherwise refused to provide "appropriate support" to SEI, as TVP was contractually obligated to do pursuant to the First Addendum to the parties' Agreement.[6]  Specifically, TVP failed and refused to respond to SEI's Canadian counsel's request for relevant documents and information (including but not limited to TVP's communications with IMB+).  See Chisick Trial Decl. at ¶ 11.  While TVP's fact witness, Ms. Nadolna, testified that that TVP provided support to SEI by sending IMB+ a "cease and desist" letter on or about September 3, 2010 (see Tr. (Nadolna) 166:1-6; Defendant's Trial Exh. 42), TVP's letter was sent only after SEI had already secured a stipulated preliminary injunction and IMB+ had already ceased its distribution of the infringing programming content – facts which TVP was well aware of months earlier.  See Plaintiff's Trial Exh. 103 (IMB+'s Statement of Defence) at ¶¶ 19-20; Exh. 106 (May 21, 2010 letter from TVP acknowledging that TVP programming content was unavailable via the IMB+ website); see also Plaintiff's Trial Exh. 77.

---

 [6]  On March 4, 2011, IMB+ filed its Statement of Defence in the Canadian Action (a true and correct copy of which can be found as Plaintiff's Trial Exhibit 103), wherein IMB+ admitted infringing conduct, but attempted to defend itself by claiming that TVP was not a co-plaintiff in the lawsuit, that TVP was "aware of [IMB+'s] activities in this regard and have chosen neither to pursue nor to promote pursuance of [IMB+] in any jurisdiction for any violations [of copyright]," and that SEI and TVP Canada were purportedly not proper parties to make copyright claims in regard to either the *TVP Polonia* or *TVP Info* channels and programming.  See Plaintiff's Trial Exhibit 103 at ¶¶ 10, 16(d), 25.  Just days later (on March 22, 2011), and after TVP again declined to assist SEI in its efforts against IMB+, TVP and IMB+ were again in direct communications concerning IMB+'s proposed distribution of TVP's channels via the Internet in North America.  See Plaintiff's Trial Exhibits 85 (Polish) and 86 (certified English translation) (responding to TVP's inquiry and providing an "[i]nitial proposition for cooperating in the distribution of channels in the IPTV system on the territory of Canada and the USA").

If not for TVP's negotiations with IMB+ (pursuant to which IMB+ was to provide "legal assistance" to undermine SEI's contractually granted exclusive distribution rights), and TVP's refusal to provide support and assistance to SEI against IMB+, IMB+ would not have been able to raise the defenses asserted in its Statement of Defence, and SEI would not have had to incur the costs of litigating against IMB+ following the service of the complaint in the Canadian Action.  See Spanski Trial Decl. at ¶ 67; Chisick Trial Decl. at ¶ 12 ("I believe that the lack of support and assistance by TVP has resulted in SEI incurring the significant costs of litigating against IMB+ following the service of the Statement of Claim.").

**TVP's Counterclaim – Alleged Breach of the Implied Duty to "Maximize Subscribers"**

TVP raised a single counterclaim that proceeded to trial.  Specifically, TVP asserted that SEI somehow breached an implied obligation to "maximize subscribers" during the period following the August 11, 2009 Settlement Agreement, which TVP claimed included SEI's purported "failure to address material deficiencies" in SEI's website.  See JPTO at 5.  To put it bluntly, the trial made it clear that this counterclaim doesn't even pass the straight-face test.

There is absolutely no legal or factual basis to support TVP's counterclaim.  The Court has already held that SEI has no duty to "maximize subscribers" at all, but rather "SEI has an implied obligation, as exclusive licensee, to **use reasonable efforts** to market and distribute TVP's programming in hopes of maximizing subscribers."  See Opinion and Order, dated January 8, 2013 at 14 (emphasis added).  The Court further dismissed TVP's counterclaims insofar as they accrued before the parties' August 11, 2009 Settlement Agreement (based upon the general releases contained therein).  Pursuant to the Settlement Agreement, TVP represented that SEI was then in material compliance with its obligations pursuant to the Agreement (as amended) (see Plaintiff's Trial Exh. 7 (Settlement Agreement) at I.A)), and it is undisputed that

SEI has further grown the number of paying subscribers to TVP's programming since the date of the Settlement Agreement.  See Hart Expert Report at Amended App. H.

TVP's sole fact witness, Ms. Nadolna, failed to provide any testimony as to TVP's counterclaim in her trial declaration and admitted upon cross examination at trial that she had no evidence that SEI failed to comply with its contractual obligations.  See Tr. (Nadolna) 174:17-25, 175:1-3.  Ms. Nadolna further admitted that neither she or anyone else at TVP ever complained to SEI that it had purportedly failed to "maximize subscribers."  See Tr. (Nadolna) 172:16-24, 173:5-25, 174:1-3.

Nor did TVP support its counterclaim with "expert" opinion and/or testimony. TVP's industry expert, Gary Arlen, repeatedly admitted upon cross examination at trial that he offered no opinion as to SEI's efforts to distribute TVP's programming at any time (including during the period after the parties' August 11, 2009 Settlement Agreement).  See Tr. (Arlen) 288:2-14 (admitting that his expert report contained no opinion or analysis of SEI's efforts to distribute TVP's programming); 289:4-12 (same); 315:25 – 316:2 ("Q: You don't have an opinion on SEI's efforts to distribute TV Polonia at any time, do you?  A: My paper did not analyze SEI's distribution methodology."); 330:3-10 (Q: Is it fair to say that you made no conclusion or opinion as to SEI's efforts to distribute the TV Polonia program after August 11, 2009?  […] A. It's fair to say that."); see generally Arlen Expert Report.  TVP's other proffered experts – Timothy Hart (accounting/damages), Prof. Marek Wierzbowski (Polish law), and Ivan Reyes (Internet) – similarly offered no opinion or conclusion as to SEI's efforts to distribute TVP's programming.  See Tr. (Hart) 362:18 – 363:4 (admitting that he had no opinion as to whether SEI had an obligation to maximize subscribers, viewers, or revenues), 363:8 – 17 (admitting that he had no opinion as to whether SEI has an obligation to use "best efforts" to

16

distribute TVP's programming), 363:22 – 364:1 (admitting he offered no opinion as to whether SEI had an obligation to use "reasonable efforts" to distribute TVP's programming), 362:2-15 (admitting he offered no opinion as to liability); Hart Expert Report at ¶ 11 (offering no opinion as to liability); Tr. (Wierzbowski) 187:14-17 (admitting that he offered no opinion as to SEI's obligations under New York law), 193:19-25 (admitting that he offered no opinion as to whether SEI adequately attempted to maximize subscribers); 194:2-11 (admitting that he offered no opinion as to whether SEI used "reasonable efforts" or "best efforts" to distribute TVP's programming); Tr. (Reyes) 201:18-23, 202:3-11 (admitting that report does not reach any conclusion about whether any purported deficiency in SEI's caused the loss of any subscribers); Reyes Expert Report (offering no opinion as to SEI's efforts to distribute TVP's programming).

Notwithstanding that none of TVP's experts offered any opinion or conclusion as to SEI distribution efforts, TVP's industry expert, Mr. Arlen, opined that SEI purportedly breached its implied obligation to "maximize subscribers" by failing to secure 150,000 paying subscribers by 2006. See generally Arlen Expert Report. Mr. Arlen admitted at trial, however, that his opinion was "results" oriented based upon his "industry experience" only (Tr. (Arlen) 288:15 – 289:12, 297:3-9), and was not based upon any generally accepted methodology (such as the application of a reasonable penetration rate to the number of Polish-speaking households in light of objective factors such as price, quality of programming, and competition). See Tr. (Arlen) 303:6 – 307:4, 307:16 – 311:5. Indeed, in addition to his failure to analyze SEI's efforts to distribute TVP's programming, Mr. Arlen wrongly calculated potential subscribers based upon the entire population of Polish-speakers in the Territory (as compared to Polish-speaking households), and otherwise failed to even consider or offer any analysis of price considerations (Tr. (Arlen) 307:5-7, 312:8-10, 314:21-25), quality of programming content and/or the

17

"perceived value" of such programming (Tr. (Arlen) 315:3-24), or competition (Tr. (Arlen) 299:22 – 300:25). See also Gerbrandt Rebuttal Expert Report. While Mr. Arlen based his expert opinion based upon his "industry experience," Mr. Arlen admitted that he is not aware of any non-Spanish foreign language television channel that has achieved even 100,000 subscribers (Tr. (Arlen) 328:2-17), and he either was unaware of or ignored a statement by TVP that it sought to achieve, in light of its analysis of similar efforts by German and Japanese distributors, 40,000 subscribers after ten years. See Tr. (Arlen) 320:25 – 322:17). Mr. Arlen simply picked a number out of thin air, without any support whatsoever. Setting aside the numerous defects as to Mr. Arlen's methodology and analysis, fatal to TVP's counterclaim is Mr. Arlen's admission that he offered no opinion or conclusion as to the number of subscribers SEI should have achieved in the period after the parties' August 11, 2009 Settlement Agreement. See Tr. (Arlen) 330:11-14.

Independently, TVP failed to establish any damages related to any purported failure to maximize subscribers during the period following the parties August 11, 2009 Settlement Agreement. With respect to Mr. Arlen's opinion that SEI should have secured 150,000 paying subscribers by 2006, Mr. Hart concluded that TVP had suffered "NO DAMAGES." Tr. (Hart) 366:2-11; Hart Expert Report at Updated App. H. Nor did Mr. Hart calculate any damages arising from any purported "lost" subscribers in the post-settlement period (as Mr. Arlen offered no such opinion or conclusion). See Tr. (Hart) 367:15 – 368:18; 369:1-5. Rather, Mr. Hart merely applied a historic subscriber growth rate for the post-2006 period (Tr. (Hart) 366:11-22, 366:23 – 367:12; 369:6-12), and left it to this Court to determine whether such damages are barred by the parties' Settlement Agreement and releases (which of course they are as such claims and damages relate to a purported failure to secure 150,000 subscribers by 2006). Hart does not advocate that post-settlement agreement damages are valid (Tr. (Hart) 371:2-10),

rather he testified that it is a legal question for the Court to determine whether the post-settlement damages calculation (present value of future damages related to a purported failure to maximize subscribers by 2006) is barred by the parties' Settlement Agreement and releases.

## APPLICABLE LAW

### I.  SEI SHOULD BE AWARDED DAMAGES AS TO EACH OF ITS CLAIMS

It is stipulated and undisputed that the parties' Agreement (as amended) is valid and binding, and to be construed pursuant to the laws of New York.  See JPTO at Exh. 1 (Stipulated Facts and Law) at ¶ 14; Opinion and Order, dated January 8, 2013 at 13 ("The parties do not dispute the existence of a binding contract between them ….").

To establish a claim for breach of contract under New York law, SEI need only prove "the existence of a contract, breach of that contract, and damages resulting from that breach."  Lorterdan Props. at Ramapo I, LLC v. Watchtower Bible and Tract Soc'y of New York, Inc., 2012 WL 2873648, at *7 (S.D.N.Y. July 10, 2012); see also Opinion and Order, dated January 8, 2013 at 11 (citing  Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994); Labajo v. Best Buy Stores, L.P., 478 F. Supp. 2d 523, 529 (S.D.N.Y. 2007); Arbitron v. Tralyn Broad., Inc., 526 F. Supp. 2d 441 (S.D.N.Y. 2007), aff'd, 327 F. App'x 755 (2d Cir. 2009).

There is no dispute (and it is in fact stipulated) that the parties' entered into a binding Agreement, First Addendum, Second Addendum and Settlement Agreement.  See JPTO at Exh. 1 (Stipulated Facts and Law) at ¶¶ 3, 5, 8 and 11; Opinion and Order, dated January 8, 2013 at 13 ("The parties do not dispute the existence of a binding contract between them ….").

In addition to the express terms of the Agreement (as amended) and Settlement Agreement, "every contract contains an implied obligation by each party to deal fairly with the other and to eschew actions which would deprive the other party of the fruits of the agreement."

Miller v. Almquist, 241 A.D.2d 181, 183, 671 N.Y.S.2d 746, 749 (1st Dep't 1998); see also

Dalton v. Educational Testing Service, 87 N.Y.2d 384, 663 N.E.2d 289, 639 N.Y.S.2d 977, 979

(1995) (Implied covenant of good faith "embraces a pledge that 'neither party shall do anything

which will have the effect of destroying or injuring the right of the other party to receive the

fruits of the contract.'") (citations omitted); Jaffe v. Paramount Comm. Inc., 222 A.D.2d 17, 644

N.Y.S.2d 43, 47 (1st Dep't 1996) (implied covenant is "breached when a party to the contract

acts in a manner that, although not expressly forbidden by any contractual provision, would

deprive the other party the right to receive the benefits under the agreement.").

### SEI's Claims for Breach of Contract

**Claim 1:      TVP Breached the Agreement and Settlement Agreement by Licensing *TVP Polonia* Programming Content to Polvision**

The uncontroverted evidence adduced at trial established that SEI has always held

the exclusive distribution rights to *TVP Polonia* as well as its individual programming content.

That it has always been SEI – and not TVP – that has held the exclusive right to distribute or

license individual shows or episodes of *TVP Polonia* programming content, was established by

numerous and repeated contemporaneous writings by TVP management and executives

(including those who negotiated the original Agreement) over many years of the parties'

performance of the Agreement.  See Spanski Trial Decl. at ¶¶ 17- 24; Plaintiff's Trial Exhs. 8-

21, 122-127, 134-137, 147-150.  Indeed, not only did TVP immediately cease all licensing of

*TVP Polonia* programming content to other Polish-language distributors in the Territory

(including Polvision) following the execution of the Agreement (and referred those distributors

to SEI for potential licensing), but TVP's own legal department issued a "legal opinion"

concluding that TVP's licensing of *TVP Polonia*  programming content for distribution in the

Territory would be in breach of the Agreement:

**LEGAL OPINION**

Regarding the interpretation of paragraph 2, section 2 of the agreement of December 14, 1994, between TVP S.A. and Spanski Enterprises Inc.

Upon analysis of the text of paragraph 2, section 2 of the abovementioned agreement, there is no doubt that TVP S.A. granted SEI <u>exclusive rights</u> to the use of the TV Polonia Broadcast in the framework of the Program. These exclusive rights are also unequivocally confirmed by paragraph 2, section 3 of the agreement which states that for the purpose of the realization of section 2, TVP grants SEI <u>exclusive rights</u> to receive and use the signal on the Territory.

Providing access to "Wiadomości" and "Panorama" to local Polonia stations in the USA and Canada would infringe on the exclusive rights granted SEI under paragraph 2, sections 2 and 3 of the agreement and could have the following consequences:

a) a determination that TVP S.A. has seriously breached the agreement ….

Plaintiff's Trial Exhibit 15 at TP7006700 (emphasis in original).

SEI's President, Boguslaw Spanski, further testified at the trial that SEI had in fact licensed individual *TVP Polonia* programming content to third parties during the course of the parties' Agreement, that SEI did so with TVP's full knowledge and approval, and that SEI paid TVP royalties based upon such licensing revenue. <u>See</u> Tr. (Spanski) 399:11 – 408:12, 415:12 – 416:1; Plaintiff's Trial Exh. 154. On the other hand, TVP's representative, Ms. Nadolna, admitted that TVP had <u>not</u> licensed any *TVP Polonia* programming content for distribution in SEI's exclusive Territory from the date of the Agreement until 2008 (which was when TVP was trying to terminate the parties Agreement). <u>See</u> Tr. (Nadolna) 108:24-25, 109:1-3.

TVP's claim that SEI's exclusive distribution rights were somehow limited first arose in the parties' Prior Action. There, TVP sought to terminate and/or rescind the Agreement because TVP (by its new management members) considered it to be "too favorable" to SEI. <u>See</u> Spanski Trial Declaration at ¶¶ 31-32. Indeed, TVP actively sought to "break" the Agreement –

and put that intent in writing.  Id.  And while TVP had never before licensed any *TVP Polonia* programming content to a third-party in SEI's exclusive Territory, during the pendency of the Prior Action TVP did license *TVP Polonia* programming content to Polvision – yet, TVP never produced those licenses in the Prior Action (or, indeed, this action) and failed to otherwise disclose the existence of those licenses to SEI.  Ultimately, the parties' entered into the Settlement Agreement, which resolved the claims in the Prior Action and confirmed SEI's exclusivity to the programming content of *TVP Polonia*.

Specifically, Section II.A of the parties' Settlement Agreement expressly provided that: "SEI is and shall remain the exclusive distributor of TV Polonia and TVP Info programming content in the territory of North and South America by any and all means of distribution [subject to a "sole exception" not relevant to this action]."  See Plaintiff's Trial Exh. 7 at II.A (emphasis added).  The exclusive rights under Section II.A are clear and ambiguous, yet TVP has attempted to ignore this provision in its direct testimony in this action.

Upon cross-examination at trial, TVP attempted to defend against a claim of breach of Section II.A of the Settlement Agreement by claiming that Section II.A somehow referred to the entire *TVP Polonia* channel as a whole (even though Section II.A specifically refers to the "programming content" and does not contain the word "channel" at all).  Given this erroneous construction of Section II.A, TVP further argued that nothing in Section II.A precluded TVP from licensing re-runs or syndicating individual *TVP Polonia* shows (a right which TVP wrongly and repeatedly asserted that SEI had never exercised, notwithstanding that TVP had documents in its possession establishing this very fact).

The evidence at trial totally undermined TVP's attempted defense to SEI's claim that TVP breached Section II.A of the Settlement Agreement.  As an initial matter, TVP's Maria

Nadolna testified that she was unaware what "programming content" even meant as used in Section II.A of the Settlement Agreement. See Tr. (Nadolna) 116:1 -119:18, 131:3-20. In any event, Ms. Nadolna confirmed at trial her prior sworn deposition testimony whereby she stated that the Settlement Agreement precluded TVP from licensing individual *TVP Polonia* shows for distribution in SEI's exclusive Territory. See Tr. (Nadolna) 132:23-25, 133:1-25, 135:18-25, 136:1-16. Thus, even TVP's Ms. Nadolna ultimately advised Polvision that it had to contact SEI directly if Polvision sought to license any addition *TVP Polonia* shows. See Plaintiff's Trial Exhs. 73-74 (April 7, 2011 letter from TVP's Nadolna to Polvision: "Due to the terms and conditions included in the agreements between Telewizja Polska S.A. … and Spanski Enterprises Inc. concerning the cooperation in North and South America, we would like to inform you that for the duration of the agreements, namely until 2019, no cooperation with your company will be possible. Therefore, please contact S.E.I. directly with regard to the business cooperation for broadcasting Telewizja Polska S.A. programs in North and South America.").

          Further, although TVP's industry expert, Gary Arlen, opined that Section II.A of the Settlement Agreement applied solely to the *TVP Polonia* channel as a whole (Tr. (Arlen) 252:17 – 253:3), and thus did not preclude TVP from licensing re-runs or syndicating individual *TVP Polonia* series for distribution (see generally Arlen Expert Report), Mr. Arlen conceded at trial that: (1) the interpretation of Section II.A was a legal issue, he was not offering any legal opinion as to the interpretation of the parties' Settlement Agreement, and he was not qualified to do so (Tr. (Arlen) 251:1-5, 253:15 – 254:17; 255:9 – 256:16); (2) Section II.A does not refer to the *TVP Polonia* "channel," but concerns the "programming content" of *TVP Polonia* (Tr. (Arlen) 252:17 – 253:6); and (3) he was totally unaware (because TVP apparently did not share the relevant documents with him) that SEI had in fact,with the knowledge of TVP, licensed

individual *TVP Polonia* shows for distribution (Tr. (Arlen) 280:5 – 281:16, 282:18 – 286:3; Plaintiff's Trial Exh. 154).

In light of the evidence presented at trial, TVP's licensing of *TVP Polonia* programming content to Polvision for distribution in SEI's exclusive Territory was a clear breach of SEI exclusive rights pursuant to the Agreement (as amended) and Section II.A of the Settlement Agreement.

In addition to a clear breach of Section II A of the Settlement Agreement, Section II.E of the Settlement Agreement further provides that: "TVP shall not distribute ... or permit the distribution of any other channels in North or South America that contain any of the same programming that is contained, has been contained, or will be contained in either *TV Polonia* or *TV Info*." See Plaintiff's Trial Exhibit 7 (Settlement Agreement) at II.E. Both Ms. Nadolna and Mr. Arlen conceded upon cross examination at trial that Polvision was such a "channel." See Tr. (Nadolna) 162:16-20, 163:1-4; Tr. (Arlen) 338:1-12; see also Plaintiff's Trial Exhs. 42 (Polish) and 43 (certified English translation) (referring to "showing selected TVP serial programs on the Polvision channel"). Accordingly, TVP further breached of Section II.E of the Settlement Agreement – as it was stipulated in this action (and not disputed at trial) that TVP entered into a series of agreements with Polvision, including the August 31, 2009 License Agreement, pursuant to which TVP licensed *TVP Polonia* programming to Polvision for distribution in SEI's exclusive Territory. See JPTO at Exh. 1 (Stipulated Facts and Law) at ¶¶ 15-18.

As a result of TVP's breaches, SEI is entitled to compensatory damages, measured as the fair market value of the licensed content (less any royalty that SEI would owe to TVP pursuant to the Agreement). See generally Shulman Expert Report at ¶¶ 31-63; see also Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15, 23-25 (2d Cir.

1997).  Mr. Shulman testified at trial, consistent with his expert report, that his report sets forth a

range of reasonable potential damages related to SEI's first claim.  Consistent with the testimony

at trial, SEI seeks damages related to TVP's breach of contract related to the Polvision licenses

pursuant to Mr. Shulman's "second" damages calculation.  <u>See</u> Shulman Expert Report (at ¶¶ 53-

56).

       As set forth in Mr. Shulman's "second" calculation, SEI's damages for TVP's

breach of contract related to the Polvision licenses is $474,720.00, plus pre-judgment interest.

<u>Id</u>.  Mr. Shulman's calculation is based upon the license of 860 individual episodes of *TVP*

*Polonia* series, multiplied by $600 per episode "market value" (as stated <u>by TVP</u> in its 2008

Barter Agreement with Polvision (Plaintiff's Trial Exhs. 22-23 at ¶ 4(b)), less the 8% royalty SEI

would owe to TVP pursuant to the Agreement.  <u>See</u> Shulman Expert Report at ¶¶ 53-56.

       As Mr. Shulman opined, the calculation of SEI's damages based upon the $600

per episode market value stated by TVP is well within the range of reason: an analysis of the per

episode market value pursuant to the industry standard market model (Mr. Shulamn's "first"

damage calculation, based upon the application of a percentage of potential advertising revenues

for the acquisition of programming content) supports a market value up to a "maximum" of $763

per episode (<u>see id</u>. at ¶¶ 38-52).[7]  The $600 per episode market value stated in the 2008 Barter

Agreement was specifically negotiated and agreed to by TVP prior to the parties' current dispute

(and the pending litigation casts doubt as to whether later per episode licensing fees reflected a

true arms-length negotiation).  <u>See id</u>. at ¶¶ 36-37 (noting that later agreements with Polvision

---

    [7]  Neither TVP or its experts has taken issue with the industry standard market model
presented by SEI's industry expert Larry Gerbrandt and damages expert Stephen Shulman.
Rather, TVP appears to take issue with the propriety of awarding damages based upon the
"maximum" per episode fair market value (and proposes inputs that would result in a lower per
episode market value based upon the very same industry standard model).

"were entered into with the strong possibility that SEI would bring an action against TVP which [could thus] affect the financial realities and motivations of any license fees designated in the agreement between TVP and Polvision."); see also Tr. (Shulman) 41:12-19.

In essence, TVP's challenge to SEI's damage calculation claims: (1) that the $600 per episode fair market value that TVP negotiated and specifically agreed to in its 2008 Barter Agreement with Polvision is now somehow incorrect or unreasonable; and (2) that the applicable number of episodes licensed to Polvision and for which SEI can recover damages is overstated because a number of the episodes purportedly never aired on *TVP Polonia*.  TVP is wrong on both counts.  Not only is the $600 per episode fair market value a reasonable basis upon which to calculate SEI's damages (and TVP offers no legitimate reason why it is not), but the number of applicable episodes properly includes the 545 episode licensed to Polvision by way of the 2010 Annex (Plaintiff's Trial Exhs. 70-71).  As Ms. Nadolna admitted at trial, these episodes actually aired on *TVP Polonia*.  See Tr. (Nadolna) 150:4 – 151:21.  Even if they did not, however, SEI's exclusive rights extend to "any of the same programming that is contained, has been contained, or will be contained" on *TVP Polonia*.  See Plaintiff's Trial Exh. 7 (Settlement Agreement) at § II.E.  The 545 episodes subject to the 2010 Annex Agreement with Polvision, are either long-running *TVP Polonia* series (such as *Klan* and *Plebania*, which have appeared on *TVP Polonia* from its inception until this dispute) and/or were episodes that Ms. Nadolna specifically requested be deferred from broadcast on *TVP Polonia*.  See Plaintiff's Trial Exhs. 42-43 (March 30, 2010 letter from Ms. Nadolna to the Director of *TVP Polonia* requesting: "In view of the impossibility, in light of the settlement agreement signed by TVP with the firm of Spanski Enterprises, as regards the further implementation of the provisions of the licensing agreement entered into between us and … Polvision in Chicago on the subject of showing selected TVP

serial programs on the Polvision channel that are being emitted by TV Polonia, I am turning to you with the request that you consider the possibility of deferring the premiere on TVP Polonia of the series that are enumerated in the attachment to this letter."). Accordingly, the 545 episodes that were licensed to Polvision by the 2010 Annex were properly included in SEI's damage calculation. The $600 per episode value is TVP's own number, it is within the range of reason using a standard industry model, and TVP cannot now "walk away" from its own number.

**Claim 3:** **TVP Breached the Agreement and Settlement Agreement by Removing *Klan* from *TVP Polonia***

TVP also breached the parties' Agreement (as amended), and its implied obligations of good faith and fair dealing thereunder, by removing the *Klan* program from *TVP Polonia* solely to placate Polvision, thus depriving SEI of the fruits of the Agreement and causing SEI a substantial loss in subscribers and revenues. It cannot be disputed that the series *Klan*, one of the most popular and longest running program series on the *TVP Polonia* channel, was *TVP Polonia* programming content exclusively licensed to SEI.

While TVP argues (see generally JPTO at 4; Trial Declaration of Maria Nadolna) that TVP reserved the right in the parties' Agreement (as amended) to make programming changes, and that TVP purportedly removed *Klan* from the *TVP Polonia* broadcast in the ordinary course, the evidence adduced at trial belies TVP's "defense," and established that TVP did not exercise its rights in good faith (see Tr. (Arlen) 277:19 – 278:13 (acknowledging prior deposition testimony wherein he testified that "standard business practices" suggest that TVP had to exercise its programming discretion in good faith), but repeatedly investigated the possibility of removing or deferring the broadcast of programming on the *TVP Polonia* channel solely so that it could offer this programming to Polvision (and with the known result that such action would deprive SEI of such programming). As set forth in the evidence cited in the

27

statement of facts above, TVP's claim that Klan was not popular and removed for that reason was totally fabricated. It was and remains one of TVP's most popular programs, and Ms. Nadolna's unbelievable testimony that she didn't even know whether it was still being broadcast by TVP in Poland displays just how bogus TVP's defense to this claim is. Klan had been on TVP Polonia continuously since the mid-1990s, and merely removing some episodes from TVP Polonia did not miraculously turn Klan into a non-TVP Polonia program. TVP's actions in removing *Klan* from *TVP Polonia,* for the purpose of licensing it to SEI's direct competitor, were in breach of TVP's implied obligations of good faith and fair dealing. See Miller, 241 A.D.2d at 183, 671 N.Y.S.2d at 749 (holding that "every contract contains an implied obligation by each party to deal fairly with the other and to eschew actions which would deprive the other party of the fruits of the agreement"); Dalton, 639 N.Y.S.2d at 979 (Implied covenant of good faith "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'") (citations omitted); Jaffe, 644 N.Y.S.2d at 47 (implied covenant is "breached when a party to the contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party the right to receive the benefits under the agreement.").

As set forth in detail in Mr. Shulman's Export Report, SEI suffered significant damages resulting from TVP's removal of one of the most popular and longest running series from *TVP Polonia* and its license to Polvison. Specifically, Mr. Shulman calculated SEI's lost profits based upon a "before and after" calculation of lost subscribers (in light of historic growth). After adjusting this calculation for "spikes" and other anomalies (that would have doubled SEI's damages if included), and further amending his calculation in light of criticisms received from TVP's accounting expert, Mr. Shulman's final calculation of SEI's damages for

TVP's breach to be $1,206,859.00, plus pre-judgment interest.  See Shulman Expert Report; Plaintiff's Trial Exh. 151 (Mr. Shulman's "Revised Exhibit IV" to his Expert Report and recalculation of damages related to SEI's *Klan* claim); Tr. (Shulman) 66:7-22.  TVP's argument with respect to damages is that Mr. Shulman could not calculate the damages with sufficient precision (because in TVP's view, Internet subscribers act differently that cable and/or satellite subscribers).  However, it is well established that a defendant cannot escape a damage award on the grounds that damages cannot be calculated with complete precision.  See, e.g., Travellers Int'l, A.G. v. Trans World Airlines, 41 F.3d 1570, 1579 (2d Cir. 1994) ("Any calculation of damages based on lost profits always entails a degree of uncertainty caused by the need to rely on assumptions and estimates.  The mere fact that [a party] disagrees with the methodology utilized … or [a particular] assumption … does not render… proof speculative.").  (internal quotations and citation omitted, brackets in original).  Here, Mr. Shulman's damage calculation is reasonable, as was his methodology (which, as a "before and after," accounted for customer churn and eliminated spikes or anomalies resulting from distribution changes).  Where, as here, SEI has unquestionably been harmed by TVP's wrongful breach of contract, it is appropriate for the Court to award damages based upon such a well-accepted and reasonable methodology.  See Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-66 (1946) (trier of fact can "make a just and reasonable estimate of the damage based upon relevant data, and render its verdict accordingly").

### Claim 2:   TVP Breached the Agreement and Settlement Agreement by Failing to Provide Support to SEI to Combat Infringers

The evidence established at trial also established that TVP breached the parties' Agreement, as well as its implied obligation of good faith and fair dealing thereunder, by failing to provide assistance to SEI in its fight against the Internet infringer IMB+.  The parties'

Agreement provides in relevant part that: "TVP designates SEI as its representative in the Territory, authorized to prevent any violations and to protect TVP rights. Any legal action on behalf of TVP, in particular incurring costs, may be undertaken only by prior approval by TVP. **TVP will provide appropriate support to SEI actions in this regard**." JPTO, Exh. 1 (Stipulated Facts and Law) at ¶ 7; Plaintiff's Trial Exhibits 3-4 (First addendum) at § 3 (emphasis added).

Far from providing SEI "appropriate support" in its litigation efforts against IMB+, however, the indisputable documentary evidence established that TVP was in fact in direct negotiations with IMB+ concerning its potential distribution of TVP programming in North America, including programming already exclusively licensed to SEI for distribution in the Territory. See Plaintiff's Trial Exhibits 78-86. In addition, while TVP's implied obligations of good faith and fair dealing require that TVP take no action that would deprive SEI of the benefits of the parties' Agreement, TVP did just that. TVP met with representatives of IMB+ on October 14, 2010 in Warsaw where it was discussed (and later documented) that "IMB [was] offering legal assistance [to TVP] for proving the absence of exclusive rights by the present distributor [SEI] for broadcasting TVP channels in the IPTV system in Canada and in the USA …." See Plaintiff's Trial Exhibits 80 (Polish) and 81 (certified English translation). Thus, at the same time that SEI was suing IMB+ to enforce its rights (and TVP's rights) against an internet pirate, TVP was negotiating with IMB+ to undermine SEI's claim and exclusive distribution rights. But for TVP's actions (IMB's defense in SEI's action against it was that SEI did not have the support of TVP, and that TVP knew of but failed to take any action to prevent IMB+ from distributing TVP programming content), SEI would not have incurred damages in the form of continuing litigation costs as against IMB+. See Chisick Trial Declaration at ¶ 12 ("I believe

30

that the lack of support and assistance by TVP has resulted in SEI incurring the significant costs of litigating against IMB+ following the service of the Statement of Claim.").

Mr. Shulman has calculated SEI's damages related to TVP's breach, based upon legal expenses incurred that should have been avoided, at $206,994.30, plus pre-judgment interest thereon. See Mr. Shulman's Supplemental Expert Report, dated March 18, 2013 at ¶¶ 11-19; Mr. Shulman's Expert Report at ¶¶ 64-68.

## II.   TVP's Counterclaim for the Purported Breach of an Implied Obligation to "Maximize Subscribers" Fails on the Facts and the Law

Although TVP asserted a wholly manufactured claim that SEI breached a purported (and non-existent) obligation to "maximize subscribers," this Court has already held that SEI does not have any such obligation under New York law.   Rather, this Court has correctly held that: "SEI has an implied obligation, as exclusive licensee, to **use reasonable efforts** to market and distribute TVP's programming in hopes of maximizing subscribers." See Opinion and Order, dated January 8, 2013 at 20 (emphasis added) (*citing* Transcript of Proceedings and Ruling in Prior Action, dated March 19, 2009 at 43:8 – 44:9) ("Although there is no express agreement on [SEI's] part to do anything in particular to market the programs, TVP is right that under New York law there is an implied best efforts obligation on the part of an exclusive licensee to use reasonable efforts to market the product or service to which it has exclusive rights.")); see also BLD Prods. LLC v. Viacom, Inc., 2011 WL 1327340, at *7-*8 (S.D.N.Y. March 31, 2011) ("Even where a contract does not reflect an express promise, … courts will sometimes find an 'implicit agreement' that a party will use 'reasonable efforts to bring about profits ….'"); (Wood v. Lucy, Lady Duff Gordon, 222 N.Y. 88, 91 (1917).   Thus, and as now recognized by TVP (see TVP's Proposed Findings of Fact and Conclusions of Law), any such implied duty requires SEI solely to use "reasonable efforts" to generate revenues (via

paying subscribers or otherwise).   While TVP now attempts to change its claim to include a
"reasonable efforts" requirement (see TVP's Proposed Findings of Fact and Conclusions of Law
at ¶ 88), TVP simply cannot salvage its manufactured claims, and has not even offered any
evidence whatsoever as to SEI's efforts, or lack thereof, to market or exploit *TVP Polonia*.

As set forth in the recitation of facts above, none of TVP's witnesses (including
expert witnesses) undertook any analysis of SEI's efforts or offered any opinion that SEI did not
use "reasonable efforts" to distribute TVP's programming.   See Discussion, *supra*, at 15-18.
Although Mr. Arlen did offer the unsupported opinion that SEI should have achieved 150,000
paying subscribers by 2006 as an admitted "results" oriented conclusion based upon his
"industry experience" only (Tr. (Arlen) 288:15 – 289:12, 297:3-9), Mr. Arlen's opinion was
admittedly not based upon any recognized methodology, and his number was merely picked out
of thin air.   Moreover, Mr. Arlen's opinion (1) ignored admittedly relevant factors such as
competition, pricing, and quality of the programming; (2) disregarded the fact that TVP itself
sought to attain 40,000 subscribers after ten years; and (3) was not even based upon his "industry
experience," as Mr. Arlen admitted he is unaware of any non-Spanish foreign language channel
that has secured even 100,000 subscribers.   See Discussion, *supra*, at 17-18.   Even were Mr.
Arlen's opinion at all reasonable or rational (which it is not), it is insufficient to establish any
breach by SEI, as ultimate success in distribution does not inform as to the issue of whether the
distributor used "reasonable efforts."   See Soroof Trading Dev. Co. v. GE Fuel Sys. LLC, 842 F.
Supp. 2d 502, 511 (S.D.N.Y. 2012) (holding that company did not breach "reasonable efforts"
clause of contract because "reasonable efforts to supply a product are not necessarily the same as
actual success in supplying a product").

Nor can TVP rely on the "expert" testimony of Mr. Reyes concerning purported website deficiencies to establish a lack of "reasonable efforts" by SEI.  SEI retained absolute discretion to determine the "distribution technologies" as to its distribution of TVP programming (see Plaintiff's Trial Exhs. 1-2 (Agreement) at § 5, ¶ 1 ("Decisions as to distribution technologies for Program broadcast within the Territory will be at the sole discretion of SEI.")), and there is no evidence that SEI failed to exercise that discretion in good faith (nor could there be any such evidence as TVP represented by the 2009 Settlement Agreement that SEI was in material compliance with its distribution and other obligations pursuant to the Agreement (as amended)). Mr. Reyes' expert opinion and testimony amounted to little more than a subjective esthetic opinion (and concluded that there were "deficiencies" with SEI's website because it did not operate like some sort of Polish-language YouTube).  Not only were Mr. Reyes' subjective criticisms proven incorrect at trial,[8] it is dispositive of TVP's counterclaim that Mr. Reyes offered no opinion as to SEI's efforts (let alone whether SEI's efforts were reasonable), nor whether SEI "lost" or "failed to realize" any subscribers based upon the perceived website deficiencies at all. See Tr. (Reyes) 201:18-23, 202:3-11; Reyes Expert Report.

Having failed to present any evidence or analysis of SEI's "efforts," TVP woefully failed to meet its burden of proof to establish any breach by SEI and, accordingly, TVP's counterclaim should be dismissed on this basis alone.

---

[8]  See generally Gladkowski Trial Decl.  For instance, while Mr. Reyes complained that SEI's website was not "optimized" such that persons searching for Polish television could easily find the site using Google, Mr. Reyes admitted that he did not even attempt to such a search in Polish.  Similarly, while Mr. Reyes opined that it was somehow "deficient" that SEI's website was not available in Spanish (but rather in Polish and English), TVP's own website (which is available in Spain and Portugal) is only available in Polish.  Finally, while Mr. Reyes opined that SEI's website was "deficient" because it did not provide instructions to Apple iPhone and iPad users as to necessary plug-ins and installation, in fact it was established on cross-examination that such instructions had been provided on SEI's website, and that most websites which permit the viewing of video materials require plug-ins (including TVP's own website).

Independently, TVP's counterclaim for the alleged failure to "maximize subscribers" – *i.e.* to secure 150,000 paying subscribers by 2006 – must be dismissed because TVP raised similar claims in the Prior Action and, by the parties' Settlement Agreement, stipulated to the dismissal of such claims with prejudice and provided SEI with a general release (as well as a representation that SEI was then in material compliance with the Agreement (as amended).  See Nemaizer v. Baker, 793 F.2d 58, 60-61 (2d Cir. 1986) ("A dismissal with prejudice has the effect of a final adjudication on the merits favorable to the defendant and bars future suits brought by plaintiff upon the same cause of action."); PFRMF Inv. Holdings LLC v. Interpublic Grp. of Cos., Inc., 2012 WL 2849771, at *7-*8 (S.D.N.Y. July 10, 2012) (granting summary judgment dismissing claims barred by parties' prior release); RBS Holdings Inc. v. Wells Fargo Century, Inc., 485 F. Supp. 2d 472, 478 (S.D.N.Y. 2007) (dismissing claims based upon release because "a broad release … bars all claims, irrespective of whether these claims had ripened at the time of the releasor's execution or whether the releasor was even aware of them at the time of execution") (citation omitted).

Finally, TVP's counterclaim should be dismissed because TVP failed to establish at trial any damages related to any purported breach occurring during the period following the parties August 11, 2009 Settlement agreement.  See, e.g., Tr. (Hart) 366:2-11 (testifying that with respect to Mr. Arlen's opinion that SEI should have secured 150,000 paying subscribers by 2006, Mr. Hart concluded that TVP had suffered "NO DAMAGES"); Tr. (Hart) 382:21 – 383:3 (explaining that his entire damages calculation was based upon the purported failure to secure 150,000 subscribers by 2006); Hart Expert Report at Updated App. H.  Further, Mr. Hart admitted that he did not calculate any damages arising from any purported "lost" subscribers in the post-settlement period (as Mr. Arlen offered no such opinion or conclusion, and Mr. Hart did

not offer any opinion or conclusion as to any purported damages related to perceived website deficiencies).   See Tr. (Hart) 367:15 – 368:18; 369:1-5. TVP's counterclaim damages are completely foreclosed by the parties' Settlement Agreement and releases.


## CONCLUSION

Plaintiff SEI respectfully submits that based upon the evidence adduced at trial (and summarized herein): (1) judgment should be entered in SEI's favor, and against TVP, on each of SEI's claims for breach of contract; (2) SEI should be awarded compensatory damages in the total amount of $1,888,573.30 (plus pre-judgment interest thereon); and (3) judgment should be entered dismissing TVP's counterclaim.

Dated: New York, New York
      August 16, 2013

LOEB & LOEB LLP


By: /s/ Jonathan Zavin
    Jonathan Zavin (JZ-1846)
    John Piskora (JP-1224)
    Michael Barnett (MB-7686)
    345 Park Avenue
    New York, NY 10154
    Ph: (212) 407-4082
    Fax: (212) 407-4990

    *Attorneys for Plaintiff*
    *Spanski Enterprises Inc.*

A-3156

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                              :
SPANSKI ENTERPRISES, INC.,                    :
                                              :
                             Plaintiff,       :   Case No.: 10-4933 (ALC-GWG)
                                              :
                v.                            :
                                              :
                                              :
TELEWIZJA POLSKA, S.A.,                        :
                             Defendant.        :
------------------------------------------------------------x

## POST-TRIAL MEMORANDUM

By Defendant Telewizja Polska, S.A.

DLA PIPER LLP (US)

Andrew L. Deutsch
David S. Wenger
1251 Avenue of the Americas
New York, New York 10020-1104
(212) 335-4702
andrew.deutsch@dlapiper.com
david.wenger@dlapiper.com

*Counsel for Telewizja Polska, S.A.*

## TABLE OF CONTENTS

Page

I.    Preliminary Statement .................................................................................... 1

II.   TVP Did Not Breach Its Agreements With SEI Through Its Contracts With
      Polvision And SEI's Damages Theories Are Incorrect And Exaggerated ....................... 2

      A.    TVP Did Not Breach Through The Polvision Agreements Because TVP
            Never Granted SEI Distribution Exclusivity To Individual *TVP Polonia*
            Programming ................................................................................................ 2

      B.    SEI Has No Claim For The June 2008 Agreement Because SEI's Rights
            Were Limited To One-Off Use Rights, And All Of The Licensed Episodes
            Were Broadcast Prior To The Settlement Agreement ............................................ 6

      C.    SEI Has No Claim For The August 31, 2009 Licensing Agreement
            Because When TVP Signed That Agreement SEI's Rights Were Limited
            To One-Off Use Rights, And In Any Event TVP Immediately Sought In
            Good Faith To Address Any Potential Conflicts With The Settlement
            Agreement ................................................................................................... 7

      D.    SEI Has No Claim Relating To The July 2010 Annex Because None Of
            The Episodes Included In The Annex Were Broadcast On *TVP Polonia* ............. 8

      E.    SEI's Damages Theory For Its Polvision Claim Is Incorrect Because SEI
            Has No Right To Distribute TVP Programming On An Individual Basis
            And Has Not Done So In The 18 Years It Has Been Distributing *TVP
            Polonia* ...................................................................................................... 9

      F.    SEI's Expert Uses An Incorrect Number of Episodes For Each Of His
            Three Alternative Damages Schemes ............................................................. 13

      G.    For His First Damages Scheme, SEI's Expert Relies Upon Incorrect,
            High-End-Only Values For His Inputs ............................................................ 15

      H.    For His Second and Third Damages Schemes, SEI's Expert Also Uses
            Improper Inputs........................................................................................... 20

III.  SEI Has No Claim Relating To The Canadian Litigation Because TVP Never
      Agreed To Join A Litigation Against A Third Party, Especially Where SEI Is
      Claiming Distribution Rights That TVP Disputes ........................................................ 22

      A.    SEI Has Failed To Show A Causal Link Between TVP's Refusal To Join
            The Canadian Litigation and SEI's Legal Fees ................................................. 24

IV.   SEI Has No Claim Relating To *Klan* Because TVP Has Exclusive Control Over
      Its Programming Decisions................................................................................. 25

      A.    SEI Has Failed to Show A Causal Link Between TVP's Removal of *Klan*
            And Any Lost Subscribers ............................................................................. 26

**TABLE OF CONTENTS**
(continued)

Page

B.   SEI's Damages Theory Also Suffers From Methodological Flaws And
Sourcing Errors, And Is Partially Duplicative Of SEI's Polvision-Related
Damages Claim ................................................................................................ 29

V.   SEI Breached The 1994 Agreement By Failing To Comply With Its Obligation To
Maximize Subscribers, And Is Liable For The Lost Profits TVP Has Suffered As
A Result ............................................................................................................ 31

## I.    Preliminary Statement

1.    Defendant Telewizja Polska S.A. ("TVP") respectfully submits this post-trial memorandum following the trial between TVP and Spanski Enterprises Inc. ("SEI") on July 22 through July 25, 2013.  TVP refers to its Proposed Findings of Fact and Conclusions of Law filed July 1, 2013 ("Proposed Findings").

2.    SEI's three claims—the Polvision claim, the Canadian litigation claim, and the *Klan* claim—each rely upon SEI inventing rights and obligations not found in the parties' agreements.

3.    The Polvision claim is meritless because while TVP has granted SEI the right to distribute the collection of programming broadcast as the *TVP Polonia* channel, nowhere in the parties' agreements has TVP ever granted SEI distribution exclusivity to individual programming on *TVP Polonia*.

4.    Even if TVP did grant SEI distribution exclusivity individual programming on *TVP Polonia*, before August 11, 2009 SEI had rights only to first runs of *TVP Polonia* programming, but not to reruns.  The only kind of programming TVP licensed to Polvision in June 2008, and in July 2009 when TVP signed the 2009 licensing agreement with Polvision, was repeat programming.

5.    When SEI claimed the August 11, 2009 SEI/TVP Settlement Agreement expanded its rights to all individual programming on *TVP Polonia* including reruns, TVP acted diligently in good faith to agree with Polvision in the July 2010 Annex upon replacement programming that had never appeared on *TVP Polonia*.  SEI had no arguable rights to that programming, and thus no claim relating to the July 2010 Annex either.

6.    For its Canadian litigation claim, SEI has also invented an obligation not found in the parties' agreements.  TVP never agreed to join a foreign litigation against a third party.  Further, SEI's position in the Canadian litigation, that it has the right to prevent IMB+ from distributing other TVP channels because they contain some *TVP Polonia* programming, is opposite of TVP's view that it never granted SEI distribution exclusivity to individual *TVP Polonia* programming.

7.    SEI's *Klan* claim is defeated by the plain wording in the 1994 Agreement that specifies TVP's exclusive control over the content on its *TVP Polonia* channel.  Besides, TVP removed the *Klan* program due to declining viewer interest and programming requirements; for reasons unrelated to TVP's relationship with SEI.

8.    SEI's damages claim—reduced by more than 90 percent from $22.5 million to its current maximum claim of $2,073,557 (603,685 for its *high-end* Polvision claim; 206,994 for the Canadian litigation claim; and 1,262,878 for the *Klan* claim)—is fatally flawed.  SEI has sustained no provable damages.

9.    For its Polvision claim, SEI relies upon a right to syndicate individual *TVP Polonia* programming which is not found in the parties' agreements.  SEI has presented no credible evidence that it has ever syndicated individual *TVP Polonia* programming content to

other channels.  SEI's damages expert Stephen Shulman advances a lost profits theory grounded in lost syndication opportunities, even though he says in the more than 18 years SEI has been distributing *TVP Polonia* he has seen no evidence of SEI syndicating to a competing channel.  Further, as Shulman acknowledged at the trial, his three damages schemes rely upon theoretical assumptions detached from real-life business practices, resulting in a grossly-inflated claim.

10.     SEI's damages claims for its Canadian-litigation and *Klan* claims are incorrect because SEI has failed to show its alleged damages are causally linked to TVP's alleged breaches.  SEI has not demonstrated that had TVP joined the Canadian litigation SEI's legal fees would have been reduced, much less eliminated.  As to the *Klan* claim, SEI has failed to show that its alleged diminished subscriber growth rate could be attributed to TVP's removal of the *Klan* program from *TVP Polonia*.  Shulman acknowledged at the trial that he relied upon a pile of improper assumptions without considering any alternative causes for his alleged diminution of SEI's subscriber growth rate.

11.     TVP has asserted a counterclaim against SEI for failing to comply with its contractual obligation which the Court has recognized to use reasonable efforts to maximize subscribers to its distribution of the *TVP Polonia* channel.  TVP's industry expert has concluded that the approximately 30,000 television and 15,000 Internet subscribers SEI has achieved in the United States and Canada after more than 18 years of distributing *TVP Polonia* means that SEI has fallen far short of a reasonable minimum market penetration level considering the available market of 2.5 to 3 million Polish-speaking people within this geographic region.  TVP's digital media expert discusses major deficiencies in SEI's website, for example its incompatibility with web browsers used by a majority of Internet users, its incompatibility with Apple products, the lack of a mobile-optimized version, and no translated version for South American subscribers.  At trial, SEI's web developer confirmed that SEI has not made a single change to its website to address these deficiencies.  TVP seeks damages for lost royalties after August 2009 due to SEI's failure to maximize subscribers in the amount of $6,603,285.

**II.     TVP Did Not Breach Its Agreements With SEI Through Its Contracts With Polvision And SEI's Damages Theories Are Incorrect And Exaggerated**

12.     In order to sustain a breach of contract claim, a plaintiff must prove by a preponderance of the evidence: (1) the existence of a contract; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by the defendant; and (4) resulting damages.  *Diesel Props Srl v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).  As to each its claims, SEI has not shown that it has any contractual right that TVP has breached.

**A.     TVP Did Not Breach Through The Polvision Agreements Because TVP Never Granted SEI Distribution Exclusivity To Individual *TVP Polonia* Programming**

13.     SEI claims that TVP breached its agreement with SEI through the June 2008 and the August 31, 2009 agreements, and the July 2010 Annex, that TVP entered into with Polvision.

**A-3161**

14.     As explained in the Proposed Findings, TVP did not breach its agreements with SEI by entering into any of these contracts with Polvision because SEI does not have distribution exclusivity under the parties' agreements to individual *TVP Polonia* programming.[1]

15.     In the 1994 Agreement, TVP granted SEI the "right to one-off use of TV Polonia Shows as part of the Programming Service" to be distributed by SEI.[2]  In order to implement the agreement, TVP granted to SEI the right to "receive and use the Signal [defined as the signal of TV Polonia programming service broadcast by TVP via satellite] in the Territory."[3]  Thus, the 1994 Agreement gives SEI the exclusive right to distribute in the Territory the *TVP Polonia* channel signal, or programming service, as it is broadcast by TVP in Poland.

16.     The *TVP Polonia* channel contains a mixture of programming from TVP's other channels, including *TVP 1*, *TVP 2*, *TVP Historia*, and *TVP Kultura*.  As TVP's Maria Nadolna testified at the trial, nothing in the 1994 Agreement limits TVP from distributing in the Territory individual programming from its other channels that has also appeared or will appear on the *TVP Polonia* channel.[4]  At the trial, in response to questions from SEI's counsel regarding correspondence concerning SEI's distribution rights, Nadolna repeatedly confirmed that TVP granted to SEI the right to distribute the *TVP Polonia* channel but TVP never granted SEI distribution exclusivity to individual *TVP Polonia* programming.  Nadolna testified that:

- SEI "received the exclusive right to receive and distribute [the] satellite signal of *TVP Polonia*";[5]

- "the contract with Spanski was about one-time emission via *TVP Polonia*. It means that TVP had a full ability to do with the programs, I mean separate programs of TVP, whatever it wanted";[6]

- "Contract between TVP and SEI [] granted the right to SEI [] for one-time emission of the program via *TVP Polonia* as a package";[7]

- "Spanski Enterprise[s] had exclusive right to distribute TV signal of *TVP Polonia* within the United States";[8]

---

[1]  Proposed Findings, ¶¶ 5-15.

[2]  TVP Trial Ex. 1, § 2.2-3.

[3]  *Id.*

[4]  July 23, 2013 Trial Tr. 98:17-22.

[5]  *Id.* 97:11-13.

[6]  *Id.* 102:16-19.

[7]  *Id.* 103:2-4.

[8]  *Id.* 111:12-13.

- "this letter confirms, that TVP USA, [cooperating], being in partnership with Spanski Enterprise, has exclusive right to broadcast channel of *TVP Polonia* as a selective package of programs";[9]

- "the entirety of the programming of the TV Polonia cannot be made accessible during that period of time to other stations. But it doesn't mean that single separate programs cannot be made accessible in accordance with the licensing agreement";[10]

- "the agreement with Spanski Enterprises encompassed broadcasting and the receiving of the program of TV Polonia understood as entirety, unit, as a certain and complete lineup of the chosen, best programs of Polish Television";[11]

- "Polish Television granted SEI exclusive rights to receive and to broadcast signal of the TV Polonia within a given territory";[12]

- "Polish Television never granted Spanski Enterprise any rights to individual programs";[13] and

- "this agreement gives exclusive right to the signal carrying programming of *TVP Polonia*."[14]

17.     The parties' August 11, 2009 Settlement Agreement confirmed the rights TVP granted SEI in the 1994 Agreement to the *TVP Polonia* channel, and also expanded those rights.[15]

18.     Clause II.A of the Settlement Agreement confirmed that TVP has granted SEI the exclusive right to distribute in the Territory the content of TVP's broadcast of the *TVP Polonia* channel: "SEI is and shall remain the exclusive distributor of TV Polonia and TVP Info programming content in the territory of North and South America."[16]

19.     Clause II.E expanded SEI'S rights to repeats of the *TVP Polonia* channel: "TVP shall not distribute or offer to distribute, or permit the distribution of any other channels in North

---

[9]  *Id.* 115:22-25.

[10]  *Id.* 124:12-16.

[11]  *Id.* 176:1-4; 176:8-11 (same).

[12]  *Id.* 176:17-19.

[13]  *Id.* 177:1-2.

[14]  *Id.* 178:13-23.

[15]  TVP Trial Ex. 16

[16]  *Id.*, pg. 2. As Arlen explained at the trial, his interpretation of Clause II.A, based on standard industry practices, is that the clause refers to the entire programming content of *TV Polonia* as a whole.  July 24, 2013 Trial Tr. 252:23-253:14.

and South America that contain any of the same programming that is contained, has been contained, or will be contained in either *TV Polonia* or *TV Info*."[17]

20.     Clause II.E adds to SEI's distribution rights the exclusive right to repeat broadcasts of the *TVP Polonia* channel (beyond SEI's previous one-off use rights) – it prevents TVP from distributing "other channels" containing the *TVP Polonia* broadcast, even after the first broadcast of the *TVP Polonia* channel in the Territory by SEI.  However, TVP never agreed that it would not allow others to broadcast individual programs that had originally been broadcast or that would be broadcast on *TVP Polonia*.  Nowhere does the Settlement Agreement refer to individual programming.  If the parties intended to refer to individual programming, they would have done so.

21.     SEI's owner Boguslaw Spanski testified that one of SEI's concerns and claims in the parties' 2007 litigation was that TVP intended to create another channel named something other than *TVP Polonia*, that would contain the full *TVP Polonia* programming,  in order to circumvent SEI's rights to *TVP Polonia*.[18]  The purpose of Clause II.E, Spanski said, was to address that issue – to prevent TVP from distributing another channel containing the same content as *TVP Polonia*.[19]  That is why Clause II.E refers to the distribution of "any other channels," rather than to the distribution of individual programming.

22.     Nadolna similarly explains that Clause II.E confirmed SEI's rights to prevent TVP from distributing other channels containing the *TVP Polonia* programming content as a unit of programming, but did not prohibit TVP from distributing individual *TVP Polonia* programming.[20]

23.     Gary Arlen, based on his more than 40 years of experience in the cable television industry, reads Clause II.E in the same way.  According to Arlen:

> A plain reading of Clause E demonstrates that it is meant to restrict TVP from distributing re-runs of TV Polonia or TVP Info, or other 'channels' in full—as wholly-contained broadcasting packages of TVP programming and advertising—that contain the same programming as TV Polonia or TVP Info.  However, Clause E does not prevent TVP from distributing individual programming content that has appeared on TV Polonia.[21]

---

[17]  TVP Trial Ex. 16, pg. 2.

[18]  November 8-9, 2011 Deposition of Boguslaw Spanski ("Spanski Dep. Tr.") 85:17-88:16; *see also* TVP Trial Ex. 49, ¶¶ 23, 42, and Prayer for Relief "c."

[19]  Spanski Dep. Tr. 88:8-16.

[20]  February 27, 2013 Declaration of Maria Nadolna ("Nadolna Decl.") ¶ 10.

[21]  TVP Trial Ex. 59, Expert Report of Gary Arlen, dated April 16, 2012 ("Arlen Report"), pg. 7.

24.     Notably, at the trial, SEI did not ask Nadolna or Spanski about Clause II.E and its reference to "channels" rather than what Clause II.E could have said, but *does not say*: TVP cannot license repeats of individual *TVP Polonia* programs.

25.     Spanski's trial declaration further confirms that TVP granted SEI the exclusive right to distribute the *TVP Polonia* channel as a unit of programming, but TVP never gave up its right to distribute its individual *TVP Polonia* programming.  Spanski refers to TVP granting SEI the right to: "an exclusive license for re-broadcast of the whole and integral TV POLONIA program" (¶ 11), "exclusive rights be granted to broadcast [the] TV POLONIA program" (¶ 13), "the exclusive right to receive and use the Signal" (¶ 15), "receive and rebroadcast . . . the satellite programme produced by [TVP] known as TV Polonia" (¶ 17), "receive and distribute the satellite programs of [TVP] in North America under the name TV POLONIA" (¶ 18),  and "exclusive distributor of TV Polonia in North America" (¶ 24).

26.     In each of the three agreements at issue between TVP and Polvision, TVP licensed only individual programs to Polvision.  Because SEI has no distribution exclusivity rights to individual programs on *TVP Polonia*, TVP did not breach its agreement with SEI by licensing to Polvision those individual programs.  SEI's first claim for breach of contract should therefore be dismissed.

**B.     SEI Has No Claim For The June 2008 Agreement Because SEI's Rights Were Limited To One-Off Use Rights, And All Of The Licensed Episodes Were Broadcast Prior To The Settlement Agreement**

27.     Even if TVP had granted SEI distribution exclusivity rights to all individual programming on *TVP Polonia* such that TVP cannot distribute its individual *TVP Polonia* programming in the Territory, SEI would have no valid claim based on the agreements TVP entered with Polvision.

28.     The first TVP/Polvision agreement for which SEI has asserted a claim is TVP's June 2008 agreement with Polvision.  Prior to the 2009 Settlement Agreement, the 1994 Agreement indisputably gave SEI only first-run rights to the *TVP Polonia* programming content.[22]  All of the episodes TVP licensed to Polvision as part of the June 2008 agreement had already been shown on *TVP Polonia* years earlier.[23]  To the extent SEI had any rights to individual programming on *TVP Polonia*, at the time of the June 2008 agreement SEI did not even arguably have any rights to such programming after it had already been broadcast on *TVP Polonia*.  Thus, SEI has no claim relating to TVP's June 2008 agreement with Polvision.

29.     In addition, the Court has held that the general mutual release in the parties' Settlement Agreement bars any claims for damages prior to the date of the Settlement Agreement.[24]  All of the episodes that were part of this agreement were broadcast prior to the

---

[22]  TVP Trial Ex. 1, § 2.2 ("the exclusive right to one-off use"); TVP Trial Ex. 2, § 1.2 (same).

[23]  Nadolna Decl. ¶ 7.

[24]  *Spanski Enterprises v. Telewizja Polska*, 2013 WL 81263, at * 4-5.

6

parties' entry into the SEI/TVP Settlement Agreement.[25]  Thus, SEI cannot claim damages relating to the broadcast of episodes under this agreement.

> **C.    SEI Has No Claim For The August 31, 2009 Licensing Agreement Because When TVP Signed That Agreement SEI's Rights Were Limited To One-Off Use Rights, And In Any Event TVP Immediately Sought In Good Faith To Address Any Potential Conflicts With The Settlement Agreement**

30.    SEI's second Polvision-related claim relates to the August 31, 2009 Licensing Agreement TVP entered with Polvision under which TVP licensed the subsequent episodes of the programs TVP had previously licensed to Polvision in the March and June 2008 agreements. Nadolna's declaration relates the history of the negotiations and signature of the August 31, 2009 TVP/Polvision Licensing Agreement.[26]

31.    As Nadolna explains, TVP signed and sent what would become the August 31, 2009 TVP/Polvision Licensing Agreement to Polvision on July 2, 2009, nearly two months before the Settlement Agreement was eventually signed.[27]  Under the terms of the TVP/SEI 1994 Agreement then in effect, as with the June 2008 agreement nothing prevented TVP from licensing reruns of *TVP Polonia* programming content to Polvision because SEI only had "one-off use" rights.  Since all of the episodes included in the new licensing agreement with Polvision had already appeared on *TVP Polonia*, TVP did not breach the 1994 Agreement by entering into the new agreement with Polvision that TVP sent to Polvision on July 2, 2009.

32.    As Nadolna explains, though TVP sent the agreement to Polvision for signature on July 2, 2009, Polvision's owner Walter Kotaba was on vacation and did not countersign the agreement until his return at the end of August.[28]  As Nadolna testified at the trial, TVP viewed the agreement, governed by Polish law, as already binding upon TVP on July 2 and TVP began to perform its obligations by recording the licensed episodes and sending them to Polvision.[29]  In Polvision's view too, the agreement was binding upon TVP when TVP sent it to Polvision on July 2, before Kotaba countersigned.[30]  Kotaba testified Polvision understood that the reason TVP began sending Polvision episodes of series licensed in the agreement before Polvision

---

[25]  *See* TVP Trial Ex. 63 – Supplemental Expert Report of Tim Hart, dated May 16, 2012 ("Hart Supp. Report"), ¶ 25.

[26]  *See* Proposed Findings, ¶¶ 28-45.

[27]  Nadolna Decl. ¶¶ 40-42.

[28]  *Id.* ¶¶ 44-45.

[29]  *See* July 23, 2013 Trial Tr. 138:7-23 ("The agreement was signed on July 2, 2009 . . . . Our point of view, that agreement was already binding to us and was in the process of being adhered to."); *id.* 141:24-25 ("So in my opinion, practically, that agreement is valid since July 2, 2009."); *see also* Nadolna Decl. ¶ 43.

[30]  November 14, 2011 Deposition of Walter Kotaba ("Kotaba Dep. Tr.") 116:22-118:3.

7

countersigned the licensing agreement was because TVP was already bound by the agreement and thus obligated to perform.[31]

33.     On August 31, 2009 Polvision returned the countersigned agreement.[32]  In the meantime, TVP had entered into the August 11, 2009 Settlement Agreement with SEI.  Although the Settlement Agreement expanded SEI's rights to repeats of the *TVP Polonia* channel and as explained prevented TVP from distributing the *TVP Polonia* broadcast as another renamed channel, TVP did not believe that the Settlement Agreement precluded TVP from licensing individual *TVP Polonia* programming to Polvision.[33]

34.     Nevertheless, after having sent many episodes to Polvision, TVP acted diligently in good faith to deal with SEI's concerns (although they were not justified).  Nadolna explains how TVP sought to terminate the Polvision agreement, tried to reach a financial resolution with Polvision, and spent extensive time and effort to try to find replacement programming to license to Polvision that had never been shown on *TVP Polonia*.[34]  Kotaba testified that throughout TVP's efforts to terminate and modify the new Polvision agreement, Polvision would not agree because Polvision viewed the agreement with TVP to be binding and Polvision had the right to broadcast the licensed episodes.[35]  Eventually, Polvision agreed to accept TVP's offer of replacement programming.

35.     The efforts TVP undertook in good faith to attempt to comply with SEI's interpretation of the Settlement Agreements are all that TVP was required to do in the circumstances.  When TVP signed the Polvision agreement in July 2009, SEI had first-run rights only.  The timing of Polvision's return of the countersigned agreement was beyond TVP's control, and once TVP had sent the episodes to Polvision TVP could not prevent Polvision from broadcasting them.

36.     Thus, even if SEI is correct that the Settlement Agreement—signed between when TVP signed and when Polvision signed the August 31, 2009 TVP/Polvision Licensing Agreement—prevented TVP from licensing reruns of individual episodes to Polvision, TVP did not breach the parties' contract due to the episodes that Polvision broadcast under the agreement.

### D.     SEI Has No Claim Relating To The July 2010 Annex Because None Of The Episodes Included In The Annex Were Broadcast On *TVP Polonia*

37.     SEI's last claim relating to TVP's agreements with Polvision concerns the episodes that TVP licensed to Polvision in the July 2010 Annex to replace the episodes TVP had licensed to Polvision in the August 31, 2009 TVP/Polvision Licensing Agreement.

---

[31]  Kotaba Dep. Tr. 139:2-141:7.

[32]  Nadolna Decl. ¶ 49.

[33]  *Id.* ¶¶ 51-52.

[34]  *Id.* ¶¶ 52-67.

[35]  Kotaba Dep. Tr. 84:6-16, 96:3-8.

38.     SEI does not dispute that these episodes had never appeared on *TVP Polonia*.[36] The only basis for SEI's claim relating to these episodes is that of the 545 licensed episodes, some of the episodes (of *Klan* and *Plebania*) that TVP licensed to Polvision were episodes of a series of which other episodes had previously appeared on *TVP Polonia*.  Nothing in the parties' agreements gives SEI rights to all episodes of a series that had appeared on *TVP Polonia* when the individual episodes at issue have never appeared on *TVP Polonia*.  Further, SEI cannot even articulate a basis for a claim relating to 137 of these episodes which were part of series of which no episode had ever been broadcast on *TVP Polonia*.[37]  SEI's claim relating to the July 2010 Annex is meritless.

> **E.     SEI's Damages Theory For Its Polvision Claim Is Incorrect Because SEI Has No Right To Distribute TVP Programming On An Individual Basis And Has Not Done So In The 18 Years It Has Been Distributing *TVP Polonia***

39.     SEI's Polvision-related damages theory is fatally flawed.  As explained in the Proposed Findings, SEI's initial theory of damages for its Polvision claim was a lost profits theory based upon television and Internet subscribers SEI had allegedly lost as a result of TVP's agreements with Polvision.[38]  SEI attempted to show a causal link between the Polvision agreements and alleged subscriber losses.

40.     SEI realized that it could not make a connection between TVP's licensing of programming to Polvision and any subscriber losses.  Its damages theory then changed.[39] Instead of damages based on alleged lost subscribers, SEI now seeks lost profits damages based upon the purported value of the programming TVP licensed to Polvision, under a theory that SEI could have realized that value as profits.

41.     As explained in the Proposed Findings, the premise for SEI's revised Polvision damages theory is incorrect.[40]  Like its claims for breach of contract, SEI's new theory relies upon SEI having rights it has never received under the parties' agreements.  SEI's theory is based upon the notion that not only does SEI have distribution exclusivity to individual *TVP Polonia* programming (such that it can prevent TVP from distributing its individual programming content), but SEI also the exclusive right to syndicate such individual programming to other networks for broadcast.

42.     SEI has no right to syndicate TVP's individual programming to other networks or channels.  Nadolna testified that TVP has never granted SEI syndication rights.[41]  Nadolna

---

[36]  *See* Nadolna Decl. ¶ 67.

[37]  *See* TVP Trial Exs. 38 ("never before broadcast on the antenna of TV Polonia") and 40, Schedule No. 1 (listing replacement series).

[38]  *See* Proposed Findings, ¶¶ 62-65.

[39]  *Id.*

[40]  *Id.* ¶¶ 41-48.

[41]  July 23, 2013 Trial Tr. 98:17-25; 112:18-21 ("it cannot be concluded from the contract" that SEI had the right to license news programs to Polish television stations).

repeatedly confirmed at the trial that SEI has the right only to distribute the *TVP Polonia* channel as a unit of broadcasting as that channel is broadcast by TVP.[42]  SEI attempts to read syndication rights into a contract that certainly could have but simply does not provide for them.  Where the language of an agreement is clear it should "be given effect in spite of one party's claim that something else was intended."  *Spanski Enterprises. v. Telewizja Polska*,  2013 WL 81263, at *5.  The parties' agreements say nothing that gives SEI syndication rights.

43.     As discussed in the Proposed Findings, TVP's industry expert Arlen describes in detail the various clauses in the parties' agreements he relies upon for his conclusion that "TVP has granted SEI the exclusive right to distribute for broadcasting the entire content of the TV Polonia and TVP Info channels," and that "SEI has no right to facilitate the secondary transmission of any individual programming on TV Polonia or TVP Info via syndication."[43]

- The *TVP Polonia* and *TVP Info* "Signal" - For the purposes of implementing SEI's right to the one-off use of *TVP Polonia* shows, TVP granted SEI the exclusive right to "receive and use the Signal (defined as the signal of *TVP Polonia* and *TVP Info* programming service broadcast by TVP via Satellite) in the Territory."[44]  This wording demonstrates that SEI is granted rights to the full *TVP Polonia* and *TVP Info* signals, not syndication of individual programming available as part of those signals.

- "Broadcasting" – The Agreements refer throughout to SEI's "broadcasting" of the *TVP Polonia* and *TVP Info* programming services in the Territory, not syndication of individual programming that constitutes the programming services.[45]

- Royalty Payments to TVP – The Agreements specify that SEI is to pay TVP 8 percent of royalties SEI earns from subscriber revenue and advertisements.  There is no mention of royalties to be paid by SEI from revenues SEI would earn from syndicating TVP programming.[46]

- SEI's Distribution Rights: Satellite and Cable Distributors –  The Settlement Agreement refers to SEI's rights to distribute *TVP Polonia* and *TVP Info* through SEI affiliates or third-party satellite or cable distributors.[47]  There is no mention of SEI syndicating content (i.e., individual programs) from *TVP Polonia* or *TVP Info* to television networks or channels such as Polvision.

---

[42]  *See supra*, ¶ 16.

[43]  TVP Trial Ex. 64 – Supplemental Expert Report of Gary Arlen, dated May 16, 2012 ("Arlen Supp. Report"), pgs. 1-4; Proposed Findings, ¶¶ 43-44.

[44]  TVP Trial Ex. 1, Section 2.

[45]  *Id.*, as amended by TVP Trial Exs. 2-3, Sections 4, 5, and 8; TVP Trial Ex. 16, Clause II.D.

[46]  *Id.*, Section 6; TVP Trial Ex. 16, Clause II.G.

[47]  TVP Trial Ex. 16, Clause II.C.

- **SEI's Distribution Rights: _TVP Polonia_ and _TVP Info_ as Whole Channels** – The Settlement Agreement refers throughout to SEI's right to distribute _TVP Polonia_ and _TVP Info_ as whole channels, not to the syndication of individual programming.[48]

44.    As Arlen explains, his evaluation of business practices for programming distribution in North America led him to conclude that companies contract for distribution rights on a number of levels including whether they can syndicate individual programs or only have the right to distribute channels as a unit.[49]  The arrangement between SEI and TVP, he says, is a "channel agreement," not an arrangement whereby SEI can distribute individual programming.[50]  Notably, SEI's industry expert Larry Gerbrandt has not offered any opinion on whether SEI had the right under the parties' agreements to syndicate individual programming.[51]

45.    As SEI did not have the right under the parties' agreements to syndicate individual _TVP Polonia_ programming, SEI cannot claim 'lost profits' resulting from TVP licensing individual programming to Polvision.  Such profits were necessarily not within the contemplation of SEI and TVP when they made their contracts.

46.    A plaintiff seeking lost profits damages must prove that such damages "were within the contemplation of the parties when the contract was made."  _Schonfeld v. Hilliard_, 218 F.3d 164, 172 (2d Cir. 2002).  SEI did not lose an opportunity for profits to TVP, because SEI had no such opportunity.  SEI's damages expert Shulman acknowledged that the underlying theory to his damage calculation is that SEI had the ability to syndicate individual _TVP Polonia_ programming,[52] but if SEI did not have the right to syndicate individual content his damages theory would not work.[53]

47.    Consistent with the understanding that SEI has only channel (not individual program) distribution rights under the parties' agreements, as Shulman points out, SEI has never syndicated individual programming content to another competing channel during the more than eighteen years that SEI has been distributing TVP programming.[54]  At the trial, Shulman said he has never seen an SEI business plan stating that SEI planned to syndicate individual content to another competing channel; he has not seen any evidence at all that SEI ever planned to syndicate.[55]  Shulman's theory is fatally flawed – he says he is offering a lost profits theory, but

---

[48]  _Id_. Clauses II.A, B, C, D, F, and I.

[49]  TVP Trial Ex. 64, pg. 3; Arlen Dep. Tr. 233:12-234:3.

[50]  TVP Trial Ex. 64, pg. 3.

[51]  June 19, 2012 Deposition of Larry Gerbrandt ("Gerbrandt Dep. Tr.") 116:6-117-3.

[52]  June 22, 2013 Trial Tr. 9:21-10:1.

[53]  Shulman Dep. Tr. 50:13-51:16.

[54]  Shulman Expert Report, ¶ 38.

[55]  June 22, 2013 Trial Tr. 10:21-11:3.

yet he says his theory is "unrelated to cash flow . . . whether or not SEI would have explored those same revenue streams."[56]

48.    In short, SEI cannot claim lost profits from syndication where it could have not and would have not ever earned profits from syndication.  Shulman agreed that if he was performing a financial projection for SEI, he would not include syndication as a source of potential revenue if it was clear that SEI was not syndicating programming.[57]

49.    Shulman has never testified as an expert in a case involving media-related litigation.[58]  This is the first case in which Shulman has offered this kind of lost profits theory,[59] but it is not surprising that in his practical experience he has never heard of this kind of lost profits theory being offered.[60]  As TVP's damages expert Tim Hart explains: "Shulman cannot properly claim that but-for TVP's licensing to Polvision, SEI would have made these licensing 'profits,' because SEI had no ability to make such profits."[61]

50.    At the end of the trial, for the first time in this case SEI attempted to demonstrate that it had in fact syndicated individual *TVP Polonia* content to other channels,[62] despite Shulman's statement in his expert report that SEI had never syndicated content during the 18 years it has been distributing *TVP Polonia*.[63]  During his rebuttal testimony, Spanski referred to a April 3, 2003 letter he wrote to TVP responding to TVP's concerns in an April 1, 2003 letter about an agreement between an SEI affiliate and International Channels Partnership.  In that letter, Spanski described certain *TVP Polonia* news programming apparently broadcast between 1995 and 1998 by International Channels Partnership.[64]  Notably, throughout the letter, what Spanski refers to is "effective promotion of the TV Polonia program," "introducing the TV Polonia program into cable systems in the United States," "inform[ing] a wide audience of viewers as to the possibility of receiving TV Polonia in its entirety," "expanding the TV Polonia distribution in the United States," and "promoting TV Polonia."  In all of these statements, Spanski recognizes SEI's limited rights to distribute the TV Polonia channel in its entirety but not to syndicate individual programs.  Further, in the letter, Spanski never refers to syndication. The letter refers only to the "Wiadomosci" news program, valuable to viewers only on the date it is broadcast, but does not mention syndicating *TVP Polonia* series which are valuable to TVP as content to be licensed by TVP for a much longer period.  There is no evidence that TVP ever

---

[56]  *Id.* 17:10-14.

[57]  Shulman Dep. Tr. 73:15-76:10.

[58]  July 22, 2013 Trial Tr. 7:14-16.

[59]  Shulman Dep. Tr. 65:24-66:4.

[60]  *Id*. 67:7-13.

[61]  TVP Trial Ex. 63 – Hart Supp. Report, ¶¶ 18-21.

[62]  July 25, 2013 Trial Tr. 413:6-10.

[63]  *See* Shulman Expert Report, ¶ 38.

[64]  SEI Trial Ex. 154.

acknowledged that SEI had the right to syndicate TVP's individual content.  SEI has not produced a single document confirming that TVP recognized that SEI had syndication rights.[65]

51.    Moreover, Spanski acknowledged that the 1994 Agreement's royalty-payment provisions provide for SEI to pay TVP a percentage of revenues earned from subscriber fees and advertising only,[66] and that there is no mention anywhere in the parties' agreement of revenues earned from syndication.[67]  Spanski further acknowledged that in all of the years of SEI's revenue reporting to TVP, SEI has never reported to TVP revenue earned from syndication.[68]  Spanski also confirmed that for at least the past nine years, in keeping with the parties' agreement, SEI has not sold any TVP content – news content or otherwise – to any other channel.[69]

52.    In summary, SEI's new damages theory for Polvision grounded in lost profits based upon the syndication value of the programming TVP licensed to Polvision is without merit because SEI had no right to syndicate individual *TVP Polonia* programming and there is no credible evidence it has ever done so.  There is no evidence that TVP has ever recognized SEI had a right to syndicate.  SEI has realized that its original Polvision damages theory grounded in lost subscribers was baseless.  The new theory Shulman advances is no better.

53.    However, even if the Court concludes that, despite SEI's legal inability under the parties' agreement to syndicate individual content and the fact that SEI has no credible evidence of having ever syndicating *TVP Polonia* programming since 1994 (as confirmed by SEI's damages expert), SEI can seek damages based upon lost syndication profits, the Court should reject SEI's Polvision damages calculations as exaggerated and improper.

**F.    SEI's Expert Uses An Incorrect Number of Episodes For Each Of His Three Alternative Damages Schemes**

54.    SEI's damages theory for its Polvision claim, offered by Shulman, is grounded in assigning a value (based upon either an industry standard market value, a value stated in the agreement, or the amount actually paid under the agreement) to each of the episodes that TVP licensed to Polvision.  SEI claims it is entitled to the value of those episodes as lost profits.

55.    For each of these three damages schemes, Shulman applies a per-episode value to 860 episodes which he says should form the basis for SEI's damages claim.  These 860 episodes consist of episodes from the three TVP/Polvision agreements:  (1) June 27, 2008 TVP/Polvision

---

[65]  July 25, 2013 Trial Tr. 415:12-19.

[66]  *See* TVP Trial Ex. 1, § 6.

[67]  July 25, 2013 Trial Tr. 411:15-412:16.

[68]  *Id.* 413:23-414:19.

[69]  *Id.* 415:8-11.

Licensing Agreement; (2) August 31, 2009 TVP/Polvision Licensing Agreement; and (3) July 16, 2010 Annex to the August 31, 2009 Licensing Agreement.[70]

56.      As discussed in the Proposed Findings, TVP's damages expert Hart explains why the 860 episodes used by Shulman is an incorrect number of episodes to be used as the basis for Shulman's three alternative schemes.[71]

57.      First, Shulman uses 100 of the 200 episodes included in the June 27, 2008 TVP/Polvision agreement.  TVP cannot, under any theory, be liable for damages for 100 episodes from the June 2008 TVP/Polvision agreement.[72]  SEI has not put forward any evidence that even one of the 200 licensed episodes, much less 100 episodes, had been broadcast by Polvision after the August 2009 Settlement Agreement.  At the trial, Shulman acknowledged that he has seen no evidence of any post-August 2009 broadcast under this agreement; he said his opinion did not take into account when the episodes were actually broadcast even though the broadcasting of the episodes is the purported violation of the TVP/SEI agreements.[73]

58.      Schulman also improperly includes in his 860 episodes the 545 episodes from the July 2010 Annex to the August 31, 2009 TVP/Polvision Agreement.  As Nadolna explains, the whole purpose of the July 2010 Annex was to substitute content TVP had licensed to Polvision with content that had never appeared on *TVP Polonia*.[74]  None of these 545 episodes had ever been shown on *TVP Polonia*.[75]  SEI had no arguable rights to these episodes.  Shulman acknowledged at his deposition and at the trial that if SEI had no rights to the 545 episodes that are part of the July 2010 Annex, then those episodes should not be included in the damages claim.[76]

59.      At his deposition, Spanski said he believes SEI had the right to all episodes of a particular series so long as any episode of that series had been included on *TVP Polonia*.[77]  Spanski made this claim even though the series at issue consist of thousands of episodes (in the case of *Plebania* and *Klan*).  Notably, SEI's expert Gerbrandt had no opinion on whether the 545 episodes included in the July 2010 Annex should be included in SEI's damages scenarios.[78]  However, even under Spanski's view, only 408 of the 545 episodes of the July 2010 Annex

---

[70]  Expert Report of Stephen Shulman, dated April 16, 2012 ("Shulman Report"), ¶¶ 52, 54, 58.

[71]  TVP Trial Ex. 63, ¶¶ 23-27; Proposed Findings, ¶¶ 52-57.

[72]  TVP Trial Ex. 63, ¶ 25.

[73]  June 22, 2013 Trial Tr. 20:11-13; 20-24.

[74]  Nadolna Decl. ¶¶ 54, 67.

[75]  *Id.* ¶ 67; July 22, 2013 Trial Tr. 20:20-23.

[76]  Shulman Dep. Tr. 110:17-22; July 22, 2013 Trial Tr. 24:24-25:2.

[77]  Spanski Dep. Tr. 83:84.

[78]  Gerbrandt Dep. Tr. 174:5-175:7.

(*Klan* and *Plebania*) could be included because the other 137 episodes were part of series of which no episode had been broadcast on *TVP Polonia*.[79]

60.    As detailed in Supplemental Appendix B.1 to Hart's Supplemental Expert Report, the only number of episodes that could be used for SEI expert Shulman's damages calculations for each of his damages schemes (assuming that SEI is correct on liability and its lost profits theory is viable) is the 215 out of the 400 episodes that were included in the August 31, 2009 TVP/Polvision Licensing Agreement which Polvision had broadcast before agreeing with TVP on the replacement content included in the July 2010 Annex.  Alternatively, if Spanski's unsupported claim of having rights to the entire series of any episode ever broadcast on *TVP Polonia* is correct, 623 episodes should be used (215 episodes from the August 31, 2009 Agreement and 408 episodes from the July 2010 Annex).[80]

61.    However, under no scenario could the 100 episodes from the June 2008 Agreement broadcast before August 2009, or 137 episodes of series from the July 2010 Annex never broadcast on *TVP Polonia*, be used as a basis for calculating damages.  Shulman's inclusion of these 237 episodes in his total of 860 episodes is incorrect even under SEI's view of its rights.

### G.    For His First Damages Scheme, SEI's Expert Relies Upon Incorrect, High-End-Only Values For His Inputs

62.    As explained in the Proposed Findings, in addition to improperly using 860 episodes as the basis for SEI's damages claim, Shulman also relies upon improper inputs to arrive at his purported per-episode value under his three damages schemes.[81]  Shulman's inputs are based on unsupported assumptions of facts not based upon commercial realities.  An expert's opinions must be based on assumptions grounded in real-world facts.  *See Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc.*, No. 07-CV-7483 (RJH), 2010 WL 4892646, *5, 7-8 (S.D.N.Y. 2010) (the "trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted").  Shulman's opinion fails this test, so his Polvision damages schemes should be disregarded.

63.    Shulman does not have an opinion on whether any of the three Polvision damages schemes is more appropriate than the others,[82] but each of his damages schemes rely on improper inputs.

64.    Shulman's first damages scheme relies upon assigning a per-episode value to the episodes TVP licensed to Polvision using a purported industry standard market value.  Shulman acknowledges that he has not offered an opinion on the *appropriate* industry standard market

---

[79]   *See* TVP Trial Exs. 38 and 40, Schedule No. 1 – the 408 episodes of series of which other episodes had been broadcast on *TVP Polonia* consist of 222 episodes of *Klan* and 186 episodes of *Plebania*.

[80]   *See* TVP Trial Ex. 63, ¶ 27.

[81]   Proposed Findings, ¶¶ 62-67.

[82]   Shulman Dep. Tr. 106:15-23.

value for each episode.  Rather, he says, he has offered only the highest theoretical value for each of the episodes based on the highest possible values of the inputs he uses so the Court could consider the upper limit of the potential value for the episodes.[83]  At the trial, he said that he was providing the "uppermost maximum that the value of these licenses could be."[84]  He has not provided low-end ranges, or even appropriate real-life numbers, for any of the inputs he uses to arrive at his maximum industry standard per-episode value.[85]

65.     Shulman uses several inputs to arrive at his highest-level, industry-standard market value for the episodes.  In essence, under this methodology he calculates the value of advertising revenue during Polvision's broadcast of the episodes, then reduces that amount to account for what a company like Polvision would pay SEI to acquire such episodes during which it could charge the calculated advertising revenue.

66.     Shulman assumes: (1) a 100-percent sellout rate for all available advertising during broadcasting of the episodes; (2) a $159-per-thirty-second-spot rate for advertising during broadcasting of the episodes; and (3) a 40-percent ratio of spending by a network to acquire a program compared to gross advertising billings for that program.  As shown at the trial, each of these three inputs are inappropriate.

67.     As to Shulman's assumption of a 100-percent sellout rate for all available advertising during the broadcasting of the licensed episodes, TVP expert Arlen's view is that "television stations do not sell out their complete commercial inventory except in very rare circumstances" such as the Super Bowl, and "the assumption that Polvision sold 100 percent of its complete [advertising] inventory is not credible."[86]  At the trial, Shulman acknowledged that he has offered no evidence suggesting that a 100-percent sellout rate is ever a proper measure,[87] and that a 100-percent sellout rate does not reflect the reality of the amount of advertising a television channel would actually sell.[88]  SEI's expert Gerbrandt acknowledged at his deposition that to determine what sellout rate should be used he would need a lot more information.[89]

68.     Shulman's second assumption is $159-per-thirty-second advertising spot.  He bases this upon a purported unpublished Polvision advertising rate card.  However, Shulman has acknowledged several times, including at the trial, that he has no knowledge whether Polvision ever actually realized those rates for advertising.[90]  Polvision's owner Kotaba testified that: (a) between 2009 and 2011 Polvision charged between $40 and $90 per advertising spot; (b) an advertising  spot could be one minute long (rather than the 30 seconds used by Shulman); and (c)

---

[83]  *Id.* 109:3-22, 122:22-124:16.

[84]  July 22, 2013 Trial Tr. 27:16-18.

[85]  *Id.* 151:25-152:8.

[86]  TVP Trial Ex. 64, pg. 4.

[87]  July 22, 2013 Trial Tr. 28:23-25.

[88]  *Id.* 30:16-21.

[89]  Gerbrandt Dep. Tr. 142:8-143:15.

[90]  July 22, 2013 Trial Tr. 31:10-13; Shulman Dep. Tr. 145:19-25.

some customers may have been charged less than $40 to $90 per advertising spot.[91]  Polvision may have even broadcast some commercials for free.[92]  Shulman completely ignored the reality of what Polvision actually charged its advertisers.[93]

69.     Further, Kotaba said only 20 to 30 percent of Polvision viewers tune in to watch series, such as the episodes licensed by TVP to Polvision; most Polvision viewers are interested in news.[94]  Thus, advertisers are most interested in paying for advertisements during Polvision's news broadcasting, rather than during series-type programming such as the episodes TVP licensed to Polvision.[95]  At the trial, Shulman confirmed that he ignored the advertisers' explicit preferences as explained by Kotaba.[96]  Shulman also said he ignored whether advertisers might pay different amounts for broadcasts at different times of the day.[97]

70.     Shulman also fails to account for volume discounts that advertisers routinely receive for repeat advertising.  He ignored such volume discounts even though Polvision's purported rate card explicitly mentions volume discounts.[98]  Arlen explains that advertisers always negotiate rates, are given volume discounts, pay different amounts based upon broadcast times, and will pay less for end-of-episode advertising as is the case with Polvision's broadcast (where advertisements are inserted after programming) rather than advertising during an episode.[99]  SEI expert Gerbrandt would not agree that failing to apply a volume discount rate could form the basis of an appropriate damages calculation.[100]  In his view, there are a lot of different factors that would affect volume discounts and he would want to consider all of them to arrive at appropriate volume discount rate.  However he did not identify those factors, nor did Shulman include them in his calculations.[101]

71.     Shulman's third assumption is that a network such as Polvision would spend 40 percent of its gross advertising revenue during particular programming to acquire that programming.  Using his supposed $159-per-thirty-second-spot advertising rate, a 100-percent sellout rate, and assuming 12 minutes per hour of advertising, Shulman estimates that gross advertising revenue during a one-hour broadcast of the episodes TVP licensed to Polvision

---

[91]  Kotaba Dep. Tr. 39:12-41:6.

[92]  *Id*. 28:2-4.

[93]  July 22, 2013 Trial Tr. 33:21-34:2.

[94]  Kotaba Dep. Tr. 132:4-13.

[95]  *Id.* 136:3-9.

[96]  July 22, 2013 Trial Tr. 34:16-24.

[97]  *Id.* 34:12-15.

[98]  *Id.* 31:5-9.

[99]  *See* TVP Trial Ex. 64 - Arlen Supp. Report, pgs. 5-6.

[100]  Gerbrandt Dep. Tr. 150:14-151:5.

[101]  *Id*. 154:13-16.

would be $3,816.[102]  Shulman then applies the 40-percent ratio of program acquisition costs to gross advertising revenue, leading to his conclusion that the per-hour value of the programming is $1,526.40, or $763.20 per half-hour episode licensed by TVP to Polvision.  Shulman then multiples $763.20 by the 860 episodes (from the June 2008 and August 2009 agreements, and from the July 2010 Annex), to arrive at a damages claim under his first damages scheme of $603,685.60.

72.     Like the spot advertising rate and the 100-percent sellout rate Shulman uses, there is no basis for his 40-percent ratio of program acquisition costs to gross advertising revenue.  Shulman relied upon data from SNL Kagan indicating a range of a 30-to-38 percent ratio between 2008 and 2011.  He used the 38-percent ratio, then marked up that ratio to 40 percent to account for a premium he says SEI would have charged Polvision to syndicate this content as a competing network.[103]  Shulman acknowledged that he applied the high-end 38 percent ratio in the Kagan data (for 2009) to all of the episodes, even though that ratio in 2009 is significantly higher than the ratio for the other years (2008 – 30 percent; 2010 and 2011 - 32 percent; for an average ratio of 33 percent).[104]  In TVP expert Arlen's view, Shulman's 40-percent ratio is "an arbitrary figure that cannot be applied to this situation with any degree of certainty."[105]

73.     Arlen explains that the ratio of program acquisition costs to advertising revenue fluctuates widely depending on individual circumstances.  For example, networks may value certain programs purely as a lead-in to other programming such as a local newscast during which networks will earn maximum advertising revenues.[106]  Further, as Arlen explains, the majority of the episodes TVP licensed to Polvision were many years old (*Klan* and *Zlotopolsky* – more than ten years old; *Na Dobre* and *Plebania* – more than six and four years old, respectively), and would be of limited value to Polvision to attract advertisers.  As further evidence that the 40-percent ratio is inappropriate, Kotaba confirmed that Polvision viewership did not materially increase after the August 2009 agreement, and it is possible that viewership actually decreased.[107]  Further, Shulman did not consider whether Polvision's restricted territory (Chicago-area only) and restricted use (first run and one rerun) rights should also be applied to further reduce the 40-percent ratio.[108]  Gerbrandt agreed that Shulman's ratio was a maximum-possible high-end number but he would not an offer an appropriate program-acquisition-cost-to-advertising revenue ratio for these circumstances.[109]

74.     Finally, while Shulman's opinion under his first damages methodology is that the market value of a half hour of the licensed programming was $763, at the trial Shulman

---

[102]  Shulman Report, ¶ 47.

[103]  *Id.* ¶ 47 and Ex. VII.

[104]  Shulman Dep. Tr. 159:7-15.

[105]  TVP Trial Ex. 64, pg. 6.

[106]  *Id.*

[107]  Kotaba Dep. Tr. 128:11-21.

[108]  July 22, 2013 Trial Tr. 36:23-37:2; Shulman Dep. Tr. 161:18-162:6.

[109]  Gerbrandt Dep. Tr. 165:16-167:12.

acknowledged that he has seen no evidence that any company has ever paid anywhere close to that amount to TVP for a half hour of its programming.[110]   The only evidence he has seen of any company paying TVP for its programming is what Polvision actually paid; $270 per half-hour *Na Dobre* episode and $130 per half-hour *Plebania* episode under the June 2008 agreement; $180 per half-hour episode for five series in the August 2009 agreement and July 2010 annex; and the rest of the licensed series at $110 per half-hour episode.[111]

75.   In TVP damages expert Hart's view, each of Shulman's damages schemes is incorrect because the appropriate form of damages for SEI's breach of contract claim is lost profits, and as explained, SEI cannot claim lost profits for the syndication value of the episodes TVP licensed to Polvision where SEI had no rights to make profits from syndicating individual programming,  had never syndicated individual TVP programming, and had no plans to syndicate (as Shulman acknowledged).[112]

76.   Nevertheless, assuming Shulman's theory of damages is not incorrect, as explained in the Proposed Findings Hart has corrected for each of Shulman's inputs to arrive at appropriate damages for Shulman's first damages scenario based upon an industry standard per-episode value.[113]

77.   Hart has made conservative corrections.  First, instead of the 100-percent advertising sellout rate used by Shulman, Hart applies a 90-percent sellout rate based on Arlen's opinion of an appropriate maximum sellout rate.  Second, instead of the $159-per-thirty-second spot rate used by Shulman, Hart applies a $90-per-thirty-second spot rate (even though Kotaba said Polvision would sometimes charge less than $40 for a 1-minute spot rate, and might have broadcast some commercials for free).  Third, instead of the 40-percent ratio of program acquisition costs to gross advertising billings used by Shulman, Hart applies the average 33-percent ratio from the Kagan data (even though Arlen says a significant discount should be applied given the age of the programming).

78.   Using these corrected high-end inputs, Hart calculates SEI's damages under Shulman's theory using the high and low numbers of episodes to be included (either the 215 episodes broadcast by Polvision under the August 2009 Agreement, or 623 episodes which also includes the 408 episodes in the July 2010 Annex of series of which other episodes were broadcasted on *TVP Polonia*).[114]  Using 215 episodes, SEI's damages would be $64,681; using 623 episodes, SEI's damages would be $187,423.[115]  Hart's opinion does not however correct for Shulman's failure to provide appropriate low-end inputs for his damages calculation.

---

[110]   July 22, 2013 Trial Tr. 37:3-10.

[111]   *Id.* 37:24-38:8.

[112]   TVP Trial Ex. 63, ¶¶ 17-21.

[113]   Proposed Findings, ¶¶ 71-72.

[114]   TVP Trial Ex. 63, ¶¶ 23-27 and Supp. Appendix B.1.

[115]   *See id.* ¶ 32 and Table 3, and Supp. Appendix B.2.

H.     **For His Second and Third Damages Schemes, SEI's Expert Also Uses Improper Inputs**

79.     Shulman's second damages scenario is based on a per-episode value purportedly assigned by TVP and Polvision in the March 17, 2008 Barter Agreement. That agreement states a "market value" of $600 for the episodes bartered as part of that agreement.[116] Shulman applies that $600 per-episode value across the board to all of the episodes licensed by TVP to Polvision, to arrive at his damages amount of $474,720 under his second damages scheme.[117]

80.     As explained in the Proposed Findings, Shulman's second Polvision damages scenario also relies upon assumptions which are not based on real-world facts.[118] That is fatal to an expert's opinion. *See Ho Myung Moolsan*, 2010 WL 4892646, at *5 (to be admissible, expert testimony must be properly grounded, well-reasoned, and not speculative). This damages scheme is defective from the outset because Shulman uses a $600 stated "market value" from the March 2008 Barter Agreement but, as he acknowledged at the trial, he ignores the $300-per-episode "market value" in the next clause of the agreement which is the value the parties actually used to determine the value of the bartered episodes.[119]

81.     In addition, while Shulman states that he has "not been asked to opine as to the quality of the licensed programming as compared to the programming purportedly licensed by way of the Barter Agreement and its amendment," he assigns a $600 market value to all episodes licensed in the June 2008, August 2009, and July 2010 Agreements. Shulman acknowledged that he used a $600 per-episode value even though in all the agreements there is no other number that equates to $600 per episode other than in the March 2008 Barter Agreement (which included episodes of *Klan* and *Zlotopolsky* in the December 2008 Annex):[120]

(A) In the June 2008 Licensing Agreement, TVP actually charged Polvision much lower rates for the other two licensed episode series - $270 for each of the 100 *Na Dobre* episodes and $130 for each of the 100 *Plebania* episodes.[121]

(B) When Polvision was to actually pay for later episodes of the same series (*Klan* and *Zlotopolsky*) which TVP licensed as part of the August 2009 TVP/Polvision Licensing Agreement, the "value" paid by Polvision was $110 per episode, little more than a third of the assigned $300 value in the March 2008 Barter Agreement.[122]

---

[116]   Shulman Report, ¶ 53.

[117]   *Id*. ¶¶ 54-56.

[118]   Proposed Findings, ¶¶ 74-78.

[119]   *See* TVP Trial Ex. 5, § 2.5(b); July 22, 2013 Trial Tr. 39:13-23.

[120]   June 22, 2013 Trial Tr. 41:21-23; Shulman Dep. Tr. 176:25-177:10.

[121]   *See* TVP Trial Ex. 6, Schedule, No. 15.

[122]   TVP Trial Ex. 18, Schedule No. 1, *Klan* and *Zlotopolsky*. At trial, Shulman again confirmed that he ignored the values per episode assigned by the parties when money actually changed hands for the licensed episodes. June 22, 2013 Trial Tr. 41:6-15.

(C) The stated per-episode value for every episode in the July 2010 Annex was $180 or $110, far less than the $600 amount Shulman uses.[123]

82.    Not only has Shulman disregarded the actual $300-per-episode market value used by the parties for the episodes in the March 2008 Barter Agreement, as Hart explains even though the parties assigned a $300 value, since "this agreement was on a barter basis, it is unlikely that the stated barter value equals the actual cash value."[124]  As Hart explains, "there is nothing suggesting that the so-called 'market value' rate of $600 per episode included in the March 17, 2008 Barter Agreement was anything more than an arbitrary number perhaps inserted to suggest that Polvision was getting a good deal."[125]  Polvision, which Kotaba said was struggling financially at the time of the August 2009 Agreement,[126] would not have paid $300 per episode, let alone $600 per episode.[127]  Gerbrandt had no opinion on the correctness of this damages scheme.[128]

83.    As with Shulman's first damages scheme for SEI's Polvision claim, assuming the theory is not fatally flawed because SEI has not lost any realizable profits (because it had no right to and has never syndicated TVP series), Hart has conservatively corrected for the flaws in Shulman's second damages to account for the per-episode market values actually assigned by the parties.  Hart uses the $300 per-episode market value assigned by the parties in the March 2008 Barter Agreement for the *Klan* and *Zlotopolsky* episodes, and the $270 per *Na Dobre* episode and the $130 per *Plebania* episode used by the parties in the June 2008 Agreement (conservatively, rather than the $180 per *Na Dobre* episode and the $110 per *Plebania* episode that Polvision actually paid under the August 2009 Agreement).[129]

84.    Hart calculates an adjusted damages amount for Shulman's second damages scheme of $43,948 using the low-end number of 215 episodes (broadcast under the August 2009 TVP/Polvision Licensing Agreement), and $127,466 using the high number of 623 episodes (to also include 408 episodes of series of which other episodes had been broadcast on *TVP Polonia* included in the July 2010 Annex).[130]

85.    Shulman's third damages scenario uses, as the quantum of SEI's "lost profits," the amounts Polvision actually paid TVP under the June 2008 and August 2009 agreements and the July 2010 Annex.  Shulman calculates the value of all the episodes at $100,078.[131]  Although

---

[123]  *See* TVP Trial Ex. 40, Schedule No. 1.

[124]  TVP Trial Ex. 63, ¶ 36.

[125]  *Id.* ¶ 37.

[126]  Kotaba Dep. Tr. 109:12-110:4.

[127]  *See* TVP Trial Ex. 63, ¶ 36.

[128]  Gerbrandt Dep. Tr. 172:20-174:4.

[129]  TVP Trial Ex. 63, ¶¶ 36-38.

[130]  *Id.* ¶ 39 and Table 4, and Supp. Appendix B.3.

[131]  Shulman Report, ¶¶ 57-63.

Shulman has not provided the Court with alternative calculations for any of his scenarios using a correct number of episodes,[132] as with Shulman's other scenarios Hart adjusts this damages scenario to correct for the proper number of episodes to be included assuming Shulman's theory is correct.  Using the 215 episodes Polvision broadcasted under the August 2009 TVP/Polvision Licensing Agreement, the proper damages amount should be $24,463; using the 623 episodes which also includes episodes of series of which other episodes have been broadcast on *TVP Polonia* from the July 2010 Annex, the proper damages amount should be $65,752.[133]

86.     In Hart's summary conclusion of his opinion on SEI's Polvision claim, he restates his opinion that SEI has suffered no damages for its Polvision claim.  As he explains, it is incorrect for SEI to put forth a damages claim based on lost profits grounded in SEI's alleged lost syndication opportunities because SEI has no right to syndicate individual TVP content and there is no credible evidence it had never done so in more than eighteen years it has been distributing TVP's *TVP Polonia* channel.[134]

87.     While Hart has corrected each of Shulman's damages schemes to account for improper inputs, his expert opinion is that even if the Court were to conclude that Shulman's damages calculation theory is legally sound, then the only appropriate basis for damages would be the money actually paid to TVP by Polvision after the appropriate adjustments.  Only this basis, while legally incorrect as a lost profits measure, takes into account the limited value of the content TVP licensed to Polvision and Polvision's limited ability to pay for such content.[135]

## III.     SEI Has No Claim Relating To The Canadian Litigation Because TVP Never Agreed To Join A Litigation Against A Third Party, Especially Where SEI Is Claiming Distribution Rights That TVP Disputes

88.     SEI's second breach of contract claim is that TVP failed to join a litigation SEI has been pursuing in Canada against an alleged unauthorized distributor of other TVP channels (*TVP 1*, *TVP 2*, etc.).  SEI claims its legal fees could have been avoided if TVP had joined the litigation, and it seeks reimbursement from TVP for all of its legal fees.

89.     This claim suffers from the same fundamental problem as SEI's Polvision claim.  SEI is claiming a contractual right that it does not have.  A party bringing a breach of contract claim must prove the contractual right it has that the other party has breached.  *Diesel Props*, 631 F.3d  at 52 (listing elements of breach of contract claim).  SEI had no right to require TVP to join its litigation.  TVP has never agreed to join SEI in litigation against third parties; nor did TVP ever agree to fund SEI's legal fees for such a litigation.

90.     As explained in the Proposed Findings, nowhere in TVP's agreements with SEI is there is any obligation for TVP to join a litigation by SEI against a third party.[136]  The parties

---

[132]   June 22, 2013 Trial Tr. 43:5-10,

[133]   TVP Trial Ex. 63, ¶ 40 and Table 5, and Supp. Appendix B.4.

[134]   *Id.* ¶ 41.

[135]   *Id.* ¶ 42; either $24,463, using 215 episodes, or $65,752 using 623 episodes.

[136]   Proposed Findings, ¶¶ 27-33.

could have specified such an obligation but did not do so.  Spanski acknowledged the absence of any contractual obligation for TVP to join such a litigation.[137]  To the contrary, in the 1999 Addendum to the 1994 Agreement, TVP specifically designated SEI as its representative in the Territory to protect against unauthorized distribution of TVP programming.[138]  While TVP agreed to provide "appropriate support" to SEI, TVP never agreed to join SEI in a litigation, much less to fund SEI's legal fees.

91.  As Nadolna explains, not only did TVP never agree to join SEI in a litigation against a third party or to pay SEI's attorney's fees for such an action, TVP had good reason not to join the Canadian litigation against IMB.[139]  As she explains, at the center of the Canadian litigation is the very issue in dispute between TVP and SEI – whether SEI's exclusive distribution rights are limited to the *TVP Polonia* channel as a unit of programming, and whether SEI has rights to all individual programming on *TVP Polonia* such that another distributor may not distribute other *TVP Polonia* channels that contain programming that also appears on *TVP Polonia*.[140]  TVP would not join SEI's litigation against IMB when TVP disagrees with the distribution rights SEI is claiming in that lawsuit.

92.  SEI has the exclusive right to distribute the *TVP Polonia* channel in the Territory.  To the extent that the Canadian litigation concerns SEI's rights to distribute the *TVP Polonia* channel, SEI can protect its rights against IMB without TVP's participation in the lawsuit.  Short of participating in the lawsuit, TVP has offered to support SEI in any reasonable way;[141] Spanski could not identify any information or evidence that SEI asked TVP for that TVP did not provide.[142]

93.  SEI's claim fails because again SEI seeks to impose upon TVP an obligation to which TVP has never agreed.  TVP has provided the "appropriate support" called for under the TVP/SEI agreement, but this term does not reasonably include assuming the substantial expense of SEI's lawsuit, nor adopting SEI's incorrect view of the rights it holds under the TVP/SEI agreement.  TVP has no contractual obligation to pay any of SEI's legal fees.

---

[137]  Spanski Dep. Tr. 218:2-7.

[138]  TVP Trial Ex. 2, amendment No. 5 adding a new Section 7.

[139]  Nadolna Decl. ¶¶ 71-86.

[140]  *Id.* ¶¶ 75-78.

[141]  *Id.* ¶ 74; *see also* July 23, 2013 Trial Tr. 166:3-6 (Nadolna describing TVP Trial Ex. 43, which is TVP's September 3, 2010 letter to IMB demanding that IMB stop broadcast TVP channels without authorization).

[142]  Spanski Dep. Tr. 224:10-14.  At trial, SEI attempted to make something of a meeting between TVP and IMB during this time period.  As Nadolna explained, the meeting was a routine meeting in accordance with TVP's obligation as a public broadcaster to meet with any potential business partners.  July 23, 2013 Trial Tr. 168:24-169:17.  Any proposals from IMB following the meeting which were never in any event accepted by TVP are irrelevant.

A.    **SEI Has Failed To Show A Causal Link Between TVP's Refusal To Join The Canadian Litigation and SEI's Legal Fees**

94.    SEI seeks $206,994.30 in damages for its second claim, purportedly representing all of its legal fees for its Canadian litigation.

95.    As mentioned, there is no basis in the parties' agreement requiring TVP to join the Canadian litigation.  But ever assuming the contrary, SEI has completely failed to show any causal link between TVP's refusal to join the litigation and SEI's legal fees.  "Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages." *Diesel Props*, 631 F.3d at 52-3; *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 731 (2d Cir. 1992) ("A plaintiff seeking damages for breach of contract . . . must demonstrate that the damages were caused by and are directly traceable to the . . . breach."); *Petitt v. Celebrity Cruises, Inc.*, 153 F.Supp.2d 240, 264 (S.D.N.Y. 2001) (plaintiffs' inability to establish that damages resulted from defendant's breach of contract "dooms plaintiffs' contract claim").

96.    SEI has never explained why TVP should be responsible for any of SEI's legal fees.  SEI has not shown that but for TVP's failure to join the Canadian litigation, SEI would not have incurred legal fees.  There is no evidence of what, if anything, IMB, the alleged unauthorized distributor, would have done differently had TVP joined the litigation.

97.    In SEI expert Shulman's March 18, 2013 supplement to his expert report, Shulman modifies the total amount of legal fees SEI is claiming (removing fees incurred prior to the filing of the Canadian complaint and adding fees incurred subsequent to his original report).[143]  But all Shulman states, still, is that he has reviewed SEI's legal invoices to determine they pertain to the Canadian matter.  He has offered no opinion on whether there is a causal link between TVP's failure to join SEI's litigation and SEI's legal fees.[144]

98.    SEI's Canadian lawyer Casey Chisick's trial declaration also fails to make any causation link.  He baldly asserts his belief that the lack of support and assistance by TVP has resulted in SEI incurring significant costs of litigating against IMB.[145]  Like Shulman, Chisick does not explain by what amount if any SEI's legal fees would have been reduced has TVP joined the litigation, or even why SEI's legal fees would have been reduced.  SEI has completely failed to demonstrate why TVP should be responsible for any, much less, all of SEI's legal fees.

99.    In addition, SEI's claim against IMB also concerns non-TVP (Polsat) programming distributed by SEI.[146]  There is no evidence that SEI would not have incurred the same fees even if the TVP content were not at issue in the Canadian litigation.  SEI has not shown that but-for TVP's failure to join the litigation, SEI would have incurred no legal fees.

---

[143]  March 18, 2013 Supplement to the Shulman Report, "Schulman Supp. Report."

[144]  *Id.* ¶¶ 13-15; *see* also Shulman Dep. Tr. 192:17-193:13.

[145]  March 18, 2013 Declaration of Casey Chisick, ¶ 12.

[146]  TVP Trial Ex. 44, ¶ 1(d), 1(e)(ii), 1(g)(i), 1(g)(iv), (1)(g)(v), etc.

24

SEI thus failed to meet its burden to demonstrate the critical causation element of a breach of contract claim: that its damages were caused by an alleged breach of contract by TVP.

100.    As SEI has failed to show any causally connected damages from TVP's non-participation in the Canadian litigation, TVP is not liable on this claim.

**IV.    SEI Has No Claim Relating To *Klan* Because TVP Has Exclusive Control Over Its Programming Decisions**

101.    SEI third claim is that TVP breached its agreements with SEI by removing the long-running *Klan* program from the *TVP Polonia* channel.  SEI claims that TVP did so in response to SEI's June 24, 2010 filing of its original Complaint in this action in order to include subsequent *Klan* episodes in the replacement programming TVP licensed to Polvision as part of the July 2010 Annex.

102.    This claim suffers from the same problem as SEI's first two claims: SEI cannot point to any contractual right it has that TVP has breached.  SEI has no right to control TVP's editorial decisions.  The 1994 Agreement specifies that TVP has unequivocal control over its programming decisions.[147]  SEI acknowledges TVP's exclusive editorial control over *TVP Polonia* programming on its website.[148]  Absent a clear contractual right, SEI has no claim for breach.

103.    As explained in detail in the Proposed Findings, the reasons for TVP's removal of the *Klan* program, though not relevant to TVP's liability for removing *Klan* because TVP has exclusive control over its editorial decisions, disprove SEI's claim that TVP did so in response to SEI's original filing in this case.[149]  As Nadolna recounts, following other significant programming revisions in the Fall of 2009, in the Spring of 2010 TVP decided to remove *Klan* from its programming lineup as part of its regular quarterly programming review due to increasingly declining audience levels for *Klan* (which had fallen below average *TVP Polonia* audience levels) and to free up time for *Poland 24*, new programming required by Poland's Ministry of Foreign Affairs.[150]  As part of that Spring 2010 review, TVP also decided to stop producing its *Zlotopolsky* soap opera series which had been broadcast on *TVP Polonia* since 1997.[151]  This occurred two months before SEI sued TVP.[152]

---

[147]  July 23, 2013 Trial Tr. 180:9-19 ("Section 9.4 says TVP reserves the right to introduce changes to the TV Polonia program").

[148]  *See* Proposed Findings, ¶¶ 77-78; *see also* July 23, 2009 Trial Tr. 156:5-8, 15-16, 158:11-16 (*Klan* was not one of the ten most popular TVP shows in 2010, the show had a below-average audience, and TVP needed to make room for a government-mandated program).

[149]  Proposed Findings, ¶¶ 79-87.

[150]  Nadolna Decl. ¶¶ 93-102.

[151]  *Id.* ¶ 99.

[152]  *Id.* ¶ 101.

104.    TVP did not breach its agreements with SEI by exercising its sole prerogative to edit the content of a television channel it produces.  SEI's claim for breach of contract should be dismissed because SEI has failed to show any contractual right that TVP has breached.

### A.    SEI Has Failed to Show A Causal Link Between TVP's Removal of *Klan* And Any Lost Subscribers

105.    SEI's damages theory for its *Klan* claim is that it has lost existing and potential subscribers to its television and Internet distribution of *TVP Polonia* because TVP removed *Klan* from the programming lineup on *TVP Polonia*.  This damages theory suffers from the same fatal causation problem as SEI's second claim relating to the Canadian litigation.  SEI cannot show a causal link between TVP's removal of *Klan* and any lost subscribers.

106.    SEI's damages theory for its *Klan* claim is based on an alleged diminished subscriber growth rate to SEI's distribution of *TVP Polonia* after TVP removed the *Klan* program.  In Shulman's view, based upon SEI's historical subscriber levels, SEI achieved a growth rate of 1.7 percent per quarter from the end of 2003 through the end of the second quarter of 2010 when TVP removed the *Klan* program.[153]  Shulman compares the estimated number of subscribers SEI should have purportedly achieved based upon this 1.7 percent quarterly growth rate against the number of subscribers SEI actually achieved as of December 31, 2011, a year-and-a-half after *Klan* was removed from *TVP Polonia*.  Shulman uses a purported shortfall of 2,071 subscribers to calculate SEI's lost revenues for his historical-period damages claim, which he calculates at $255,353.[154]  He then applies that estimated shortfall in subscribers as of December 31, 2011 for the duration of the 1994 Agreement's term until 2019 for his forward-looking damages claim of $1,007,525, for a total damages claim of $1,262,878.[155]

107.    SEI's damages theory as advanced by Shulman is incorrect because SEI cannot demonstrate any causal link between TVP's removal of *Klan* from *TVP Polonia* and SEI's purported diminished subscriber growth rate.  As Hart explains, proximate cause is a fundamental principle that governs all compensatory damages.  In other words, "Recovery of damages for lost profits is subject to the general principle that damages must be proximately caused by the wrongful conduct of the defendant."[156]  Hart explains that Shulman has skipped one of the first questions that must be asked related to causation and damages, and that is fatal to his damages theory.  A factfinder must determine: "Has the plaintiff excluded or explained other possible causes of the claimed loss?  The cases generally hold that failure to do so is <u>fatal to the claim</u>."[157]  *See Nat'l Market Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 526, 528 (2d Cir. 2004) (affirming denial of damages for failure to show proximate cause, and holding that

---

[153]   Shulman Report, ¶¶ 72-77.

[154]   *Id*. ¶¶ 78-81 and Exhibit V.

[155]   *Id*. ¶¶ 84-89 and Exhibit VI.

[156]   *See* TVP Trial Ex. 63, ¶ 43,  quoting Dunn, Robert L., Recovery of Damages for Lost Profits, Vol. 1, 6th ed., Supplement, Lawpress Corporation 2011, pg. 2.

[157]   *See id*., quoting Dunn, Robert L., Recovery of Damages for Lost Profits, pg. 4 (emphasis added in Hart's report).

damages are unavailable where they are the result of intervening causes other than contract breach) (emphasis added).

108.    As explained above, SEI has abandoned its lost subscribers damages theory for its Polvision claim because SEI realized it could not show any causal link between TVP's contracts with Polvision and *TVP Polonia* subscriber behavior.[158]  Shulman said "I think in the end, that's the bottom line, we didn't feel comfortable that we could attribute the cancellations to Polvision."[159]  The same causation problem is fatal to SEI's damages theory for its *Klan* claim, for four reasons, as explained in the Proposed Findings.[160]

109.    First, SEI ignores all of the other reasons subscribers cancel or do not subscribe, such as normal customer attrition.  As Arlen explains, the U.S. cable television industry has a "churn rate" (service cancellation rate) of 2.6 percent per month, or 31 percent on an annualized basis, mostly due to customers moving, inability to pay monthly fees, and service adoption issues.[161]  In SEI's case particularly, according to Arlen, cannibalization between SEI's television and Internet offerings may have also accounted for cancellations.[162]  While Shulman acknowledged that it is difficult to attribute subscriber cancellations to any one reason, and there are many reasons why subscribers cancel,[163] in arriving at his purported diminished growth rate for SEI's subscribers, Shulman has completely ignored normal customer attrition.

110.    At the trial, Shulman admitted that he also failed to take into account many other potential reasons for cancellations,[164] such as economic conditions,[165] price changes,[166] changes

---

[158]  *See supra*, ¶¶ 39-40.

[159]  Shulman Dep. Tr. 26:19-27:12.  At the trial, Shulman advanced the dubious explanation that what he meant at his deposition that he "didn't feel comfortable that we could attribute the cancellations to Polvision" was a documentation problem.  June 22, 2013 Trial Tr. 46:12-47:18.  That cannot be true.  All Shulman had to do was ask SEI for whatever subscriber information he wanted.  Every month SEI receives detailed subscriber reports from each cable company which form the basis of SEI's calculation of its royalty payments to TVP.  *See, e.g.*, TVP Trial Ex. 56 (International Media Distribution (IMD)'s detailed reporting to SEI of subscriber information for all the cable companies IMD services, such as Verizon, RCN, Comcast, Cox, AT&T, etc.).  Shulman meant what he said: there was a causation problem with attributing subscriber cancellations to Polvision's distribution.  Yet, as explained, Shulman advances the very same theory he withdrew for the Polvision claim to attempt to attribute lost subscribers to TVP's removal of one show, *Klan*, from *TVP Polonia*.

[160]  Proposed Findings, ¶¶ 95-98.

[161]  TVP Trial Ex. 59, pg. 18.

[162]  *Id.*

[163]  Shulman Dep. Tr. 33:13-23.

[164]  *See id.* 228:17-229:8

[165]  June 22, 2013 Trial Tr. 50:12-51:5 (Shulman did not take into account economic conditions in 2009-2010, or the effect on SEI's subscribers, many of which are lower-income earners).

[166]  *Id.* 51:6-13 (Shulman did not take into account price changes).

in the distribution network,[167] or competition in the marketplace.[168]  While Spanski said that he believes SEI received emails where former subscribers specifically mentioned the removal of *Klan* as the reason for cancelling a subscription,[169] SEI has produced no such email.  Spanski acknowledged that he cannot know all the reasons why subscribers cancelled after *Klan* was removed, he just assumes that removal of the program was the primary reason for cancellation.[170]

111.    Second, subscribers do not cancel subscriptions or choose not to subscribe to a cable channel because one show is discontinued, particularly on a specialty channel such as a foreign language programming channel like *TVP Polonia*.  At the trial, Shulman could not point to any evidence that subscribers react to the cancellation of one show.[171]  Arlen cites the example of HBO, where, after the cancellation of *Sex and the City* and *The Sopranos*, there were no significant subscriber cancellations.  In fact, HBO saw increased viewership when new episodes of The Sopranos were no longer being broadcast.[172]  In Arlen's view, "[t]here is no historical evidence that any significant number of viewers abandon a subscription – especially to a unique and favored service, such as a native-language channel – because of the loss of a single program, or even several favorite shows."[173]  He says "it is inconceivable that a substantial number of viewers would have cancelled a subscription because TVP removed a single show from TV Polonia."[174]

112.    Third, Shulman attempts to attribute all customer cancellations through December 31, 2011 (the end of his "historical damages period"), nearly a year-and-a-half after the removal of *Klan*, to the removal of that program from *TVP Polonia*, even though at the trial he seemed to back away from that view.[175]  As mentioned, Arlen's view is that subscribers, especially to a native-language channel such as *TVP Polonia*, would not cancel subscriptions because of the removal of one program.  However, even if some customers did cancel because of the removal of *Klan*, in Arlen's view, they would have cancelled within 60 days of the program's removal from *TVP Polonia*, and likely earlier, but not for the extended, year-and-a-half cancellation period used by Shulman.[176]

---

[167]  *Id.* 53:1-7 (Shulman did not take into account changes to SEI's cable company distribution network).

[168]  *Id.* 57:2-7 (Shulman did not take into account new alternatives to *TVP Polonia* in the marketplace).

[169]  Spanski Dep. Tr. 132:23-133:5,136:2-6, 266:22-267:5.

[170]  *Id.* 274:14-275:12.

[171]  June 22, 2013 Trial Tr. 53:12-54:7.

[172]  TVP Trial Ex. 59, pg. 17.

[173]  *Id.*

[174]  *Id.* at 18.

[175]  June 22, 2013 Trial Tr. 54:19-22. ("Well, we're not saying exactly that.")

[176]  TVP Trial Ex. 59, pg. 18.

113.    Fourth, the "Terms and Conditions" page of SEI's website states that the website installs cookies on subscribers' computers which allows SEI to track subscriber viewing habits.[177]  Spanski acknowledged at his deposition that SEI's website installs these tracing cookies.[178]  Yet, not surprisingly, SEI has not even attempted to demonstrate based upon these cookies that the *Klan* program was so popular amongst its now cancelled subscribers so as to cause them to cancel their subscriptions.  At the trial, Shulman said he did not even ask to see these cookies.[179]

114.    As mentioned in the Proposed Findings, in all of Hart's 23 years of experience as an expert witness on damages issues, he has never seen a damages expert such as Shulman completely fail to consider causation issues, much less fail to create any provable causal link between the alleged wrongful action and alleged damages.[180]  Tellingly, SEI's industry expert Gerbrandt offers no opinion in connection with Shulman's damages theory for *Klan*; he claims to have not even discussed Shulman's opinion with him.[181]

**B.    SEI's Damages Theory Also Suffers From Methodological Flaws And Sourcing Errors, And Is Partially Duplicative Of SEI's Polvision-Related Damages Claim**

115.    In addition to SEI's failure to show any causal link between TVP's removal of the *Klan* program from *TVP Polonia* and any purported diminished subscriber growth rate, Shulman's theory also contains methodological flaws and sourcing errors which exaggerate SEI's damages claim.

116.    First, Shulman has relied upon an incorrect, simplistic calculation of net additional subscribers to SEI's television and Internet distribution during the period for which he calculated SEI's baseline subscriber growth rate.  For each quarter Shulman used as a baseline reference point, he used new subscribers less cancelled subscriptions.  As Hart explains, because this number is a combination of new subscribers and cancellations, it does not accurately reflect the number of cancellations.[182]  For example, a quarter with few cancellations but also few new subscriptions would result in a low "net additional subscribers" rate when in reality during that given quarter SEI would have sustained only few cancellations.

117.    At the trial, Shulman acknowledged that he did not consider how many subscribers cancelled or subscribed during any given time period; he just focused on net subscribers.[183]  In fact, during Shulman's overall historical damages period (July 2010 to

---

[177]  TVP Trial Ex. 66.

[178]  Spanski Dep. Tr. 331:4-323:2.

[179]  June 22, 2013 Trial Tr. 55:21-24.

[180]  June 21, 2012 Deposition of Timothy Hart, 102:8-12.

[181]  Gerbrandt Dep. Tr. 175:20-176:9.

[182]  TVP Trial Ex. 63, ¶ 48.

[183]  Shulman Dep. Tr. 236:11-17; June 22, 2013 Trial Tr. 56:12-57:1.

December 2011), SEI actually gained 2,647 net additional subscribers, rather than losing subscribers.[184]  Thus, Shulman's theory is essentially that SEI would have gained more subscribers during this period but for TVP's removal of *Klan* from *TVP Polonia*.  But, as mentioned, Shulman has utterly failed to provide any causal link between the removal of *Klan* and cancelled subscriptions, much less any causal link between the removal of *Klan* and lost potential new subscriptions.

118.    In addition, Shulman improperly pooled all of SEI's U.S. and Canada cable television subscribers and Internet subscribers to arrive at SEI's purported historical growth rate.[185]  Shulman's pooling of television and Internet subscribers fails to account for materially different typical churn rates between the two groups of subscribers (17.0 percent between January 2008 and July 2009 for a sample group of SEI's television subscribers, compared to 7 percent during that same period for SEI's Internet subscribers).[186]  According to Hart, this failure to account for different typical churn rates renders Shulman's analysis based on SEI's purported diminished growth rate for all subscribers effectively unusable and unrealistic.[187]

119.    Further, significant changes to SEI's distribution network accounted for large changes to television and Internet subscriber numbers.  Shulman acknowledged that if major distributors had stopped distributing TVP programming for SEI during Shulman's calculated growth period, or if new distributors joined SEI's distribution network, that would skew his calculation of SEI's diminished subscriber growth rate.[188]  Yet, even with access to SEI's detailed records reflecting such material changes to SEI's distribution network, Shulman failed to account for such changes in arriving at SEI's purported diminished subscriber growth rate.  At the trial, Shulman acknowledged that he ignored that DirecTV had stopped distributing the *TVP Polonia* channel during the 3rd Quarter of 2010, resulting in the loss of 624 subscribers, *almost a third of the 2,071 subscribers* Shulman claims SEI lost because of the removal of the *Klan* program.[189]

120.    Shulman's report claims that he removed unusual quarterly spikes in subscriber numbers as anomalies so as not to provide an incorrect subscriber growth rate,[190] but at his deposition he acknowledged that his quarterly subscriber change rate is compared to each

---

[184]  TVP Trial Ex. 63, ¶ 49.

[185]  *Id.* ¶ 50 and Table 6 on pg. 25.

[186]  *See id.* ¶ 51 and Table 7 on pg. 26; June 22, 2013 Trial Tr. 57:11-21.  Neither does Shulman's report account for changes in viewer's viewing habits during this time period when the Internet has become increasingly more popular for video content.  *Id.* 57:21-58:9.

[187]  *Id.* ¶ 52; *see also* July 25, 2013 Trial Tr. 361:8-11.

[188]  Shulman Dep. Tr. 249:6-250:7.

[189]  July 22, 2013 Trial Tr. 58:10-59:4; *see also* TVP Trial Ex. 63, Table 6 on pg. 25.

[190]  SEI Trial Ex. 142, Shulman Report ¶ 73.

previous quarter, so he did in fact use the unusual spike quarters as reference points for subsequent quarters.[191]

121.    Hart has corrected Shulman's opinion for certain sourcing and calculation errors.[192]  However, Hart could not correct for the basic causation problem in Shulman's analysis – his failure to attribute any supposed diminished subscriber growth rate to TVP's removal of *Klan*.  Hart's view is that, as with SEI's Polvision claim, SEI has sustained no damages as a result of TVP's removal of the *Klan* program from *TVP Polonia*.[193]

122.    Finally, even assuming that Shulman's lost subscribers theory is correct despite the lack of any causal link between TVP's removal of the *Klan* program and SEI's claimed damages, any damages from removal of *Klan* claim is to a large extent duplicative of SEI's Polvision claim.  When calculating SEI's alleged damages from TVP's contracts with Polvision, Shulman used 860 episodes TVP licensed to Polvision as a basis for calculating the Polvision-related damages.  However, of the 860 episodes that form the basis for the Polvision claim, 223 episodes are *Klan* episodes.  SEI cannot claim damages for TVP's licensing to Polvision based upon the alleged value of these episodes (under its three alternative schemes), and again seek damages from TVP for allegedly removing the same 223 *Klan* episodes from *TVP Polonia* in order to license them to Polvision.

123.    Shulman admitted that there is double-counting of damages between the Polvision and *Klan* claims, but he provides no alternative damages amount for either claim assuming either of them succeed.[194]  Under any view of the facts, SEI is not entitled to a double recovery.

## V.    SEI Breached The 1994 Agreement By Failing To Comply With Its Obligation To Maximize Subscribers, And Is Liable For The Lost Profits TVP Has Suffered As A Result

124.    In the January 8, 2013 Opinion and Order on SEI's motion for summary judgment, the Court has held, as did Judge Lynch in the parties' previous litigation, that the 1994 Agreement imposes upon SEI, as an exclusive licensee, an obligation to use reasonable efforts to maximize subscribers to its distribution of *TVP Polonia*.[195]  TVP's statutory requirements under Polish law, and its mission to reach as much of the Polish Diaspora as possible with its *TVP Polonia* channel, was central to the parties' expectations under their agreement and incorporated as part of the contract obligations.

125.    In order to prove a prima facie case for breach of contract under New York law, the claimant must establish: (1) a contract existed; (2) performance by one party; (3) breach by the other party; and (4) damages resulting from the breach. *Spanski Enterprises, Inc. v. Telewizja*

---

[191]   Shulman Dep. Tr. 244:6-245:2.

[192]   TVP Trial 63, Table 8 on pg. 28.

[193]   *Id.* ¶ 58.

[194]   *See* Shulman Dep. Tr. 217:24-219:7.

[195]   *Spanski Enterprises v. Telewizja Polska*, 2013 WL 81263, at *8.

*Polska, S.A.*, 2013 WL 81263, at * 6. SEI has fallen far short of complying with its obligation to maximize *TVP Polonia* subscribership, resulting in damages to TVP from lost royalties.

126. Out of an estimated 2.5 to 3 million people in the Territory who speak Polish, SEI has reached only approximately 30,000 television subscribers and 15,000 Internet subscribers. Nadolna testified that members of TVP's Management Board held direct talks with Spanski about TVP's concerns regarding SEI's subscriber numbers.[196] As described in the Proposed Findings, Arlen has concluded that as of 2006, 10 years after SEI began distributing *TVP Polonia*, SEI should have achieved a minimum of 150,000 total subscribers.[197] Arlen says SEI has failed to reach and maintain agreements with major satellite and cable distributors to include *TVP Polonia* in their channel lineup.[198] Arlen testified at the trial that he found SEI's marketing inadequate – he described "very 1970s-in-style efforts to market," "naive and simplistic in an increasingly sophisticated media landscape."[199] Arlen's conclusion of the number of subscribers SEI should have achieved ten years after it began distributing *TVP Polonia* is far less than the 2 million subscribers SEI told TVP it would reach by December 1999, five years after SEI began distributing *TVP Polonia*.[200] SEI's 45,000 total subscribers today is less than 3 percent of the amount SEI projected for December 1999.

127. Reyes has identified major deficiencies in SEI's website, including: (1) incompatibility with major web browsers constituting a large percent of the web browser market, (2) incompatibility with non-Windows based and mobile devices without installing plug-ins, and no version of the website optimized for mobile devices, (3) video quality issues, (4) lack of search engine optimization, (5) a poor user interface, and (6) no Spanish/Portuguese versions.[201] The deficiencies, according to Arlen, have resulted in significant lost website subscribers and lost potential subscribers.[202] He says "SEI has completely failed to exploit opportunities" to distribute TVP's programming via the Internet.[203]

128. SEI's witness Tomasz Gladkowski, who designed SEI's website at the beginning of his web development career 14 years ago,[204] confirmed that SEI has still, as of the trial in July 2013, not addressed a single deficiency Reyes pointed out nearly a year-and-a-half earlier.[205] To view video content on SEI's website on an Internet browser other than Internet Explorer, a user

---

[196] July 23, 2013 Trial. Tr. 173:10:21.

[197] Proposed Findings, ¶¶ 91-93.

[198] TVP Trial Ex. 59, pg. 23; *see also* July 24, 2013 Trial Tr. 296:18-23.

[199] July 24, 2013 Trial Tr. 287:12-22.

[200] *See* TVP Trial Ex. 59, p. 27 and Appendix 10 at pgs. TP 8000624 ("two million of TV Polonia subscribers within five years") and TP8000660.

[201] TVP Trial Ex. 61.

[202] TVP Trial Ex. 59, at 25.

[203] *Id.*

[204] July 22, 2013 Trial Tr. 68:17-69:6.

[205] *Id.* 71:10-18.

must still install a plug-in (in some cases not allowed by workplace policies).[206] As Reyes explained at trial, a typical user reacts to a "plug-in needed" message with frustration – it is a deterrent to using a website.[207] To view video content on SEI's website on an Apple computer, IPad, or IPhone, a user must still install a special application, hardly an attractive option.[208] There is still no version of SEI's website optimized for mobile devices,[209] which users are increasingly using to view video content on the Internet.[210] SEI has also taken no action to optimize its website so it can be found with search terms that would be used to search for the website.[211] Additionally, SEI took no action to improve the user interface of the website,[212] which Reyes explained at the trial is of utmost importance because it is the contact between a user and a website.[213] Finally, SEI has not implemented a Spanish or Portuguese translation of its website to increase accessibility to South American users.[214] Reyes testified that is common for websites aimed at countries speaking different languages to be translated into the native languages.[215]

129.   The Court has correctly dismissed SEI's motion for summary judgment seeking dismissal of TVP's counterclaim relating to SEI's failure to maximize subscribers.[216] As the Court reasoned, that TVP released certain claims against SEI in August 2009 does not mean that in the four years since then SEI has complied with its obligation to maximize subscribers. The Court noted that the claims TVP is now asserting focus on different actions by SEI resulting in the breach of its obligations.[217] As the Court also pointed out, Arlen's analysis of SEI's failure to reach the vast potential market for *TVP Polonia*, and Reyes' identification of major deficiencies in SEI's website, apply particularly to the period since August 2009.[218] That is especially the case considering Gladkowski's testimony that SEI has taken no action to address the website deficiencies.[219] At the trial, Reyes explained that between August 2009 and today, Internet users have become more savvy, and expectations of how a web site should work have evolved – users expect a higher quality of video and the ability to find things on a web site more

---

[206] *Id.* 72:4-7, 73:12-16.

[207] July 24, 2013 Trial Tr. 247:3-9.

[208] July 22, 2013 Trial Tr. 73:17-22.

[209] *Id.* 75:6-14.

[210] TVP Trial Ex. 61, pg. 2 (under heading IV.B).

[211] July 22, 2013 Trial Tr. 76:19-77:6.

[212] *Id.* 78:3-7.

[213] July 24, 2013 Trial Tr. 248:2-10.

[214] July 22, 2013 Trial Tr. 78:12-14.

[215] July 24, 2013 Trial Tr. 248:11-21.

[216] *Spanski Enterprises v. Telewizja Polska*, 2013 WL 81263, at *11.

[217] *Id.* at *4, fn. 2.

[218] *Id.* at *11.

[219] July 22, 2013 Trial Tr. 71:10-18.

easily.[220]  SEI should not be allowed to escape its contractual obligations today because TVP released certain claims of breach against SEI in 2009 resulting from different actions by SEI.

130.    Based on Arlen's opinion of SEI's failure to maximize subscribers, Hart has calculated that TVP has lost $6,603,285 in lost royalties a result of SEI's failure to maximize subscribers.[221]  TVP seeks judgment in that amount for its counterclaim.


Dated: New York, New York
        August 16, 2013

                                DLA PIPER LLP (US)

                                By:    /s/David S. Wenger
                                       Andrew L. Deutsch
                                       David S. Wenger
                                1251 Avenue of the Americas
                                New York, New York  10020-1104
                                (212) 335-4500
                                andrew.deutsch@dlapiper.com
                                david.wenger@dlapiper.com

                                *Counsel for TVP*

---

[220]  July 24, 2013 Trial Tr. 246:5-17; *see also* Tim Hart's testimony on the changes in the market for Internet-based video subscription services. July 25, 2013 Trial Tr. 391:391:5-14.

[221]  *See* TVP Trial Ex. 60, Hart's February 18, 2013 update letter which includes updated Table 9 and Appendixes H and H.1 from Hart's April 16, 2012 report.

A-3193

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                         :
SPANSKI ENTERPRISES, INC.,                               :
                                                         :
                    Plaintiff,                           :        10 CV 4933 (ALC)(GWG)
                                                         :
            v.                                           :
                                                         :
TELEWIZJA POLSKA S.A.,                                   :        **NOTICE OF APPEAL**
                                                         :
                    Defendant.                           :
                                                         :
-------------------------------------------------------- X

      NOTICE IS GIVEN that Plaintiff Spanski Enterprises, Inc. ("SEI") hereby appeals to the

United States Court of Appeals for the Second Circuit from that part of the March 6, 2014

Opinion and Order of the Hon. Andrew L. Carter Jr., as well as the March 14, 2014 Judgment

resulting therefrom, which denied SEI's third claim for relief, which was: that Defendant

Telewizja Polska, S.A. breached its contract with SEI when it removed the *Klan* series from the

*TVP Polonia* channel.

Dated: New York, New York          Respectfully submitted,
      April 1, 2014

                        LOEB & LOEB LLP

                        By: /s/ Jonathan Zavin
                            Jonathan Zavin (JZ-1846)
                            John Piskora (JP-1224)
                            Michael Barnett (MB-7686)
                            345 Park Avenue
                            New York, NY 10154
                            Ph: (212) 407-4082
                            Fax: (212) 407-4990

                            *Attorneys for Plaintiff*
                            *Spanski Enterprises Inc.*

A-3194

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
Spanski Enterprises, Inc.,                                              :
                                                                        :
                          Plaintiff,                                    :
                                                                        :   No. 10-cv-4933 (ALC)(GWG)
                  v.                                                    :
                                                                        :   **NOTICE OF CROSS-APPEAL**
Telewizja Polska S.A.,                                                  :
                                                                        :
                          Defendant.                                    :
                                                                        :
------------------------------------------------------------------------ x

NOTICE IS HEREBY GIVEN that Defendant Telewizja Polska S.A. ("TVP") hereby

cross-appeals to the United States Court of Appeals for the Second Circuit from the parts of the

March 6, 2014 Final Order of Judge Andrew L. Carter, Jr. and the ensuing March 14, 2014

Judgment, which: (a) found for Plaintiff Spanski Enterprises, Inc. ("SEI") on its first claim for

relief relating to TVP licensing programming to Polvision, and (b) denied TVP's counterclaim

that SEI failed to use reasonable efforts to maximize subscribers to TVP's programming.


Dated: April 9, 2014
          New York, New York

                                             *David Wenger*

                                             Stanley McDermott III
                                             David S. Wenger
                                             DLA Piper LLP (US)
                                             1251 Avenue of the Americas
                                             New York, NY 10020-1104
                                             Ph. (212) 335-4500
                                             F. (212) 884-8602
                                             stanley.mcdermott@dlapiper.com
                                             david.wenger@dlapiper.com


                                             *Counsel for Telewizja Polska S.A.*